**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | | |
|---|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. _____ |
| v. | ) ) | |
| NCR CORPORATION and INTERNATIONAL PAPER CO., | ) ) ) ) | |
| Defendants. | ) | |

# COMPLAINT

Plaintiffs Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC (f/k/a Georgia-Pacific Corporation) (collectively "Georgia-Pacific"), by their undersigned counsel, hereby allege as follows:

## INTRODUCTION

1.      This civil action is brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq*. ("CERCLA"), also known as Superfund.

2.      This case is about allocating responsibility for contamination of the Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site ("Kalamazoo River Superfund Site" or "the Site") in southwestern Michigan.  The Site is contaminated with "polychlorinated biphenyls,"

1

better known as PCBs, a hazardous substance and possible human carcinogen.  The primary PCB

contaminant at issue at the Kalamazoo River Superfund Site is known as Aroclor 1242.

3.      Beginning no later than 1954, and lasting at least through 1971, PCBs were

released into the Kalamazoo River (and connected Portage Creek, which flows directly into the

Kalamazoo River) in part through the past discharge, release, and disposal of PCB-contaminated

solids and paper residuals by paper de-inking and recycling companies.  The fact that the waste

paper contained PCBs was unknown to the paper de-inking and recycling companies during this

period of time.

4.      PCBs were released into the Kalamazoo River because waste paper that was de-

inked and/or recycled by companies near the Kalamazoo River included PCB-laden "broke" and

"trim."  Broke and trim were wastes that resulted from the manufacture of proprietary, PCB-

coated "carbonless copy paper" ("CCP") pioneered by Defendant NCR Corporation.

5.      Contamination from the PCB-laden broke and trim has made large segments of

the Kalamazoo River an "NCR river," with NCR CCP being the source of the PCB-contaminated

sediments that require remediation at the Kalamazoo River Superfund Site.

6.      If it were not for NCR's use of PCBs in its CCP, and if not for the contamination

of the Kalamazoo River by PCB Aroclor 1242 attributable to NCR broke and trim, the

Kalamazoo River would not have been listed as a Federal Superfund site.

7.      Georgia-Pacific brings this lawsuit to (1) establish the liability of Defendants

under CERCLA for the PCB contamination of the Kalamazoo River Superfund Site,

(2) determine Defendants' equitable shares of the costs of cleaning up the Kalamazoo River

Superfund Site, and (3) require Defendants to pay their fair portion of past and future cleanup

costs associated with the Kalamazoo River Superfund Site.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this Complaint pursuant to

42 U.S.C. § 9601 *et seq*. and 28 U.S.C. § 1331.

9.      Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b), because:

(a) the events giving rise to the claims asserted in this Complaint are based on the paper-

processing activities that took place in this District; (b) each of the Defendants does business in

the District; (c) claims in this action arise from many of the same activities by the Defendants

which are at issue in the case of *Appleton Papers, Inc. and NCR Corporation v. George A.*

*Whiting Paper Company*, No. 08-CV-00016-WCG, brought by NCR and others, in this

jurisdiction, for costs associated with the investigation and remediation of the PCB

contamination in Fox River; and (d) the Defendants made arrangements in this District with

brokers that ultimately resulted in the release of PCBs into the Kalamazoo River.

10.      Venue also is proper pursuant to 28 U.S.C. § 1391(c), because each Defendant is

subject to personal jurisdiction in this District.

## PARTIES

11.      Georgia-Pacific is the corporate successor to Kalamazoo-area facilities that de-

inked and recycled PCB-containing NCR broke and trim.  Georgia-Pacific, to date, has paid in

excess of $79 million to investigate and remediate the Kalamazoo River Superfund Site.

12.      Defendant NCR Corporation ("NCR") invented the PCB-containing CCP that has

caused the PCB contamination of the Kalamazoo River Superfund Site.  NCR arranged for the

disposal of PCB-laden waste from its own CCP converting operations.  NCR also arranged for

the disposal of PCB-laden broke and trim from its "contract coaters," companies that coated

NCR's paper according to NCR's specifications, using an emulsion consigned to them by NCR.

NCR is also the corporate successor to at least two coaters — the Wisconsin-based Appleton Coated Paper Company ("ACPC"), and Combined Paper Mills, Inc. (also known as the "Combined Locks Mill") — that arranged for the disposal of PCB-laden broke and trim resulting from the coating of NCR CCP.  Waste paper from all these activities was recycled at facilities near the Kalamazoo River, with resulting releases of PCBs into the Kalamazoo River.  NCR has paid nothing toward the cleanup of the Kalamazoo River Superfund Site.  On or about November 24, 2010, the United States Environmental Protection Agency ("EPA") issued a General Notice letter to NCR informing the company that it may be liable for PCB contamination of the Kalamazoo River because NCR arranged for the disposal, treatment, or transportation of hazardous substances at the Site.

13.    Defendant International Paper Co. ("IP") is the corporate successor to St. Regis Paper Company ("St. Regis") -- an entity that itself disposed of large volumes of PCBs into the Kalamazoo River, and that later leased its polluting plant and equipment to a company that continued disposal practices that resulted in the release of PCBs into the Kalamazoo River Superfund Site.  IP has paid nothing toward the cleanup of the Kalamazoo River Superfund Site. On or about November 24, 2010, the EPA issued a General Notice Letter to IP informing the company that it may be liable for PCB contamination of the Kalamazoo River by virtue of its status as a past owner and/or operator of a facility from which PCBs were released at the Site.

**FACTS**

**I.    The Kalamazoo River Superfund Site**

14.    Based upon studies conducted between 1972 and 1989, the Michigan Department of Natural Resources ("MDNR") determined that certain areas in and around the Kalamazoo River below Morrow Dam were contaminated with PCBs.

15.    The Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site was declared a Federal Superfund site by the United States Environmental Protection Agency in August 1990.  The Site was placed on the National Priority List ("NPL") as a Superfund Site pursuant to CERCLA § 105, 42 U.S.C. § 9605.  In 1990, the Site also was listed by the MDNR as an environmental contamination site under the Michigan Environmental Response Act ("Act 307"), M.C.L. §§ 299.601 *et seq.*

16.    EPA has identified Georgia-Pacific as a "potentially responsible party" ("PRP") at the Kalamazoo River Superfund Site.  Georgia-Pacific is now the only remaining PRP left at the Site to provide ongoing funding to investigate and remediate the PCB contamination of the Kalamazoo River, due to the bankruptcies of other PRPs at the Kalamazoo River Superfund Site. (Only one other company, Weyerhaeuser Company, is currently involved in remedial activity, and it is only funding measures to remediate a landfill it owned, and to investigate and remediate a former paper mill it owned.)

17.    PCBs were introduced to Portage Creek and the Kalamazoo River largely through past discharges, releases, and disposal of PCB-contaminated solids and paper residuals by paper-manufacturing operations on Portage Creek and the Kalamazoo River.

18.    The Kalamazoo River Superfund Site currently includes five disposal areas, four paper mill properties, an approximately 80-mile stretch of the Kalamazoo River from Morrow Dam to Lake Michigan, and a three-mile stretch of Portage Creek.

19.    EPA has divided the site into various cleanup projects known as "Operable Units."

20.    One of the areas requiring remediation is the Allied Paper/Bryant Mill Pond Operable Unit.  This area has been classified as Operable Unit 1.  At this Operable Unit, a

Remedial Investigation Report was developed by the State of Michigan and approved by EPA in March 2008. A groundwater investigation was undertaken in the summer of 2009. EPA will be selecting a proposed cleanup plan for this Operable Unit.

21.     Another area requiring remediation is the Willow Boulevard/A-Site Landfill. This area has been classified as Operable Unit 2. The Remedial Investigation/Feasibility Study ("RI/FS") for this site was overseen by the State of Michigan. In a Record of Decision issued in 2006, EPA selected a remedy for this Operable Unit. In September 2009, a consent decree between EPA and Georgia-Pacific for design and cleanup at the Willow Boulevard/A-Site Landfill was approved by a Federal District Court. This settlement, among other things, obligates Georgia-Pacific to consolidate waste materials, construct a permanent landfill cap, and install a groundwater monitoring system.

22.     Operable Unit 3 is the King Highway Landfill. The remedy for this Operable Unit involves the construction of a landfill cap, the seeding of the cap with vegetative growth, and the construction of a gas collection trench. The King Highway Landfill remains under the control of the State of Michigan and construction work is ongoing.

23.     Operable Unit 4 is the Twelfth Street Landfill. In September 2001, EPA signed a Record of Decision for the Twelfth Street Landfill. The remedy includes excavation of PCB residuals that have migrated from the landfill and placement of those residuals back in the landfill. This work is ongoing and is being conducted by Weyerhaeuser with oversight by EPA and MDNR.

24.     Operable Unit 5 concerns the Portage Creek and Kalamazoo River sediments. In February 2007, EPA reached two settlement agreements ("AOCs") with Millennium Holdings LLC (which has since gone bankrupt) and with Georgia-Pacific. These AOCs were the result of

6

two years of mediated negotiations between the PRPs and various government regulators and entities, including the EPA and the State of Michigan.

25.     Under an AOC for a "Removal Action," No. VW-07-C-863, Georgia-Pacific and Millennium agreed to perform sediment excavation in the Kalamazoo River near Plainwell, Michigan.  Under an AOC for a "Remedial Investigation/Feasibility Study," No. VW-07-C-864, Georgia-Pacific and Millennium agreed to conduct a Supplemental RI/FS on the 80-mile stretch of the Kalamazoo River from Morrow Dam to Lake Michigan and Portage Creek from Cork Street to the confluence with the Kalamazoo River.

## II.     Georgia-Pacific's Expenditures to Clean Up the Kalamazoo River Superfund Site

26.     As of the date of this Complaint, Georgia-Pacific has incurred significant costs to investigate and remediate the Kalamazoo River Superfund Site, and to investigate the liability of other potentially responsible parties, such as NCR and IP.  The response costs total at least $79 million as of the date of this Complaint.

27.     The cleanup of the Kalamazoo River Superfund Site is not complete, and substantial work remains to be done.  Georgia-Pacific will be required to spend a significant amount of money in the future to investigate and remediate the Site.

## III.     The Contaminated Kalamazoo is an "NCR River"

### A.     The Development of PCB-Contaminated Paper by NCR

28.     Monsanto Chemical Company ("Monsanto") developed and manufactured a PCB called Aroclor 1242.  (The first two digits refer to the number of carbon atoms, 12, and the second two numbers indicate the percentage of chlorine by mass in the mixture, 42 percent.)  PCB Aroclor 1242 is a stable compound that does not easily degrade.  It is now considered a hazardous substance and a possible human carcinogen.

29.     No later than 1947, the National Cash Register Corporation (predecessor to NCR) began experimenting with and testing a variety of PCBs, including Aroclor 1242, to be used in CCP.

30.     NCR ultimately decided to use Aroclor 1242 as a component of the emulsion that gave CCP its unique characteristics.

31.     To make its CCP, NCR placed this emulsion between two sheets of paper.  The emulsion contained microscopic dye capsules that burst when pressed (by a pen or typewriter, for instance), creating a copy on the second sheet of paper of the markings on the top sheet of paper, without using carbon paper between the two sheets of paper.  These microcapsules were dissolved in PCB Aroclor 1242.

32.     PCB Aroclor 1242 was not incidental to NCR's CCP — it was a crucial element for the manufacture of this product

33.     NCR commenced commercial production and sale of its CCP no later than March 1952.  NCR's CCP proved to be a convenient and popular product in the business world, where forms and other documents were routinely made in duplicate.  NCR's CCP became a profitable product line for the company.

**B.      The Manufacture of NCR CCP:  Coating**

34.     The PCB-containing CCP emulsion was manufactured by NCR at plants located in Dayton, Ohio, from 1953 through 1971, and Portage, Wisconsin, from 1968 through 1971.

35.     NCR then had third parties coat the paper with the PCB-containing emulsion to make bulk CCP.

36.     These third parties were known variously as "toll coaters," "production subcontractors," or "contract coaters" (hereinafter "contract coaters").

37.     NCR's contract coaters coated NCR CCP with NCR's proprietary emulsion according to NCR's confidential specifications.  At all times, NCR retained ownership of the PCB-containing emulsion, with the emulsion being given to the contract coaters on consignment.

38.     ACPC and the Combined Locks Mill (both in Wisconsin) acted as contract coaters for NCR, as did Mead Corporation (in Chillicothe, Ohio).  Between at least 1954 and 1971, substantial quantities of NCR's CCP was coated by one or more of these entities, using NCR's PCB-laden emulsion.

39.     ACPC and Mead coated NCR's CCP from at least 1954 to 1971.  The Combined Locks Mill coated CCP for NCR at various times between 1964 and 1971.

**C.      The Manufacture of NCR CCP:  Converting**

40.     After the CCP had been coated with NCR's proprietary PCB-containing emulsion, the coated bulk rolls or sheets of CCP could then be "converted," *i.e.*, turned into the finished product — business forms.

41.     Some bulk CCP was used by NCR in its own paper-converting operations.  Those operations included at least 13 different paper-converting facilities around the country from 1954 to 1971.  These facilities were part of NCR's "Supply Manufacturing" or "Business Forms and Supply Division," later known as "Systemedia."  Through these operations, NCR sold business forms for its own account.

42.     Other bulk CCP was sold by NCR to NCR customers.  These customers — independent converters — then used the bulk CCP to manufacture their own business forms.

**D.      The Generation of PCB-Laden CCP Waste**

43.     NCR's coating specifications required the paper coater to test samples of the NCR Paper and to scrap any CCP that failed to meet a set of minimum quality requirements. Off-

specification CCP needed to be disposed of and could not be shipped to NCR Paper customers. The coating process would also generate CCP scrap from roll ends, broken rolls, and folded rolls during paper machine breaks.

44.     Similarly, when customers used the rolls of NCR CCP to make business forms, there would be cutting and trimming that would result in unusable scrap paper.

45.     Collectively, the scrap generated from the CCP coating and converting processes was called "broke" and/or "trim."

46.     At all times, NCR knew and understood that the CCP coating and conversion processes created significant amounts of waste paper that was coated with NCR's PCB-containing emulsion.  NCR tracked its coaters' generation of CCP broke and sought to minimize their broke generation.

47.     For example, internal memoranda and external communications by NCR and the Appleton facility referred to NCR Paper broke as a "waste" material and the Appleton facility employees were directed to dispose of broke through the most economical means.

48.     Similarly, in 1952, NCR and Mead concluded that broke and trim from Mead's coating operations would be "about 10%."

49.     With respect to converting, NCR representatives expected that approximately 20 to 25 percent of the PCB-containing sheets and rolls sent to converting plants ended up as unusable wastepaper.

50.     NCR knew that its contract coaters and converter customers would need to dispose of the CCP scrap generated from these processes.

### E. The Recycling of PCB-Laden CCP Waste

51.     The PCB-laden broke and trim created by NCR's converting activities, and by NCR's contract coaters (including by its subsidiaries ACPC and Combined Locks, as well as by Mead), was waste.  This waste was sold either directly, or through third-party waste paper brokers, to paper companies for recycling.

52.     The practice of selling CCP broke and trim for recycling was well known to NCR, was well known within the industry generally, and was widespread.  Approximately 80 to 98 percent of waste paper resulting from coating and converting CCP was recycled within the paper industry.

53.     NCR placed the CCP product into the stream of commerce while knowing and intending that, as a result of the coating and converting process conducted by its converters and contract coaters, broke and trim scraps would be created and would then be sold as waste to recyclers.

54.     Recyclers acquired NCR CCP broke and trim in order to recover the wood fibers from the product and reuse them in other paper products.  NCR knew that CCP broke and trim were being recycled for the fiber within the NCR paper — not for the CCP itself, the coating, or the PCBs in the coating. The PCBs contained in the NCR Paper broke were of no use to those paper mills.

55.     Based in part on their own experiments and experience, NCR knew that re-pulping processes would rupture the capsules coated on CCP broke, releasing the PCBs and the dye. NCR also knew that the dye would discolor the pulp and that the discoloration typically would need to be reduced by deinking or washing processes. NCR knew that mills that recycled NCR CCP broke actually employed such processes to remove unwanted coatings from the broke.

56. The vast majority of the releases of Aroclor 1242 into the Kalamazoo River Superfund Site occurred between at least 1954 (possibly earlier) and 1971, while NCR CCP containing these PCBs was in mass-market production, and thus while PCB-contaminated broke and trim were being generated.

57. When they sold CCP broke and trim, NCR, its predecessors, and its affiliated companies (including subsidiary and third-party contract coaters) intended to dispose of waste containing hazardous substances within the meaning of CERCLA.

**F. NCR Concealed Risks Associated with PCB-Contaminated Paper, and Had Contemporaneous Knowledge of the Dangers of PCB Pollution in the Kalamazoo and Other Rivers**

58. At least as early as 1965, scientists at NCR were aware of the toxicity of PCB Aroclor 1242. NCR records indicate that at least as early as that year, NCR was searching for a replacement to PCB Aroclor 1242.

59. In or about 1969, Monsanto representatives informed NCR employees about continued environmental problems from the use of PCB Aroclor 1242, and about Monsanto's impending decision to end sales of PCB Aroclor 1242 for NCR paper applications.

60. NCR decided to move forward and accelerate production of PCB-containing NCR CCP in 1969 and 1970, despite having frequent meetings about PCBs and despite having increasing knowledge of the environmental risks of PCBs.

61. In June 1970, Monsanto informed its customers, including NCR, that it was ceasing the sale of PCB Aroclor 1242 effective August 30, 1970, because of the continuing environmental concerns posed by Aroclor 1242.

62. After Monsanto wrote its customers in early 1970, explaining why it was discontinuing production of PCB Aroclor 1242, NCR *continued* producing carbonless paper for

another year at a rapid pace using Aroclor 1242.  At the same time, NCR continued to dispose of its PCB-containing broke and trim (whether directly or through its various subsidiaries and contract coaters) by shipping this waste to paper recycling companies, including those located near the Kalamazoo River Superfund Site, for de-inking and recycling.

63.     Before 1971, NCR never warned paper companies that its CCP contained PCBs, much less that the release of PCBs into the environment could cause harm.

64.     By April 1971, NCR phased out its use of PCBs in the production of NCR paper.

65.     Georgia-Pacific was not aware that NCR CCP wastepaper contained PCBs during the production period of 1954 to 1971, or that PCBs could cause environmental damage.

66.     A large percentage of the releases of PCBs to the Kalamazoo River and the Site occurred when NCR (and its subsidiaries) knew that there was a significant risk of environmental damage resulting from the recycling and deinking of waste NCR broke and trim.

67.     NCR elected to follow a risk-management strategy that accepted the concealed risk of potential environmental harm in exchange for the financial benefits of continued (and indeed increasing) sales of carbonless paper containing PCB Aroclor 1242.

68.     Between parties that produced the product, like NCR, and those that, like Georgia-Pacific, merely processed it and recycled it, the producers bear principal responsibility for any resulting environmental damage.

**G.     PCB-Contaminated Paper from NCR's CCP Is the Principal Source of the Present-Day Contamination in the Kalamazoo River**

69.     EPA has determined that the PCB contamination at the Kalamazoo River Superfund Site primarily was caused by discharges of PCBs from the recycling and/or de-inking paper-manufacturing process of paper mills on Portage Creek, the Kalamazoo River, and other areas within the Kalamazoo River Superfund Site.  Specifically, the PCB-contamination of the

13

Kalamazoo River Superfund Site is a direct result of paper companies, including Georgia-Pacific and others, de-inking and/or recycling PCB-containing broke and trim waste from at least 1954 through and including 1971 that was shipped and/or arranged to be shipped by NCR, its subsidiaries and its various contract coaters.

70.     EPA's cleanup requirements at the Kalamazoo River Superfund Site are being driven by the presence of PCB Aroclor 1242, which has been found in sediment, soil, fish, and water samples in Portage Creek, in the Kalamazoo River, and in landfills and other locations that are part of the Kalamazoo River Superfund Site.  PCB Aroclor 1242 is the type of PCB used by NCR in the manufacture of NCR paper from at least 1954 to 1971.

## IV.     NCR's Liability

### A.     NCR is a Corporate Successor to the Arranger Liability of ACPC and Combined Locks

71.     ACPC and the Combined Locks Mill sold substantial quantities of PCB-containing waste to brokers and dealers which, in turn, delivered this waste to various recycling and/or de-inking locations — including Allied Paper Company's Bryant Mill and other paper mills on the Kalamazoo River.

72.     When they sold their PCB-laden broke and trim to brokers, ACPC and the Combined Locks Mill knew, or reasonably should have known, that the waste would be sold to recyclers and/or de-inkers such as the paper mills on the Kalamazoo River.

73.     ACPC and the Combined Locks Mill knew, or should have known, that the reprocessing of waste from the coating process would result in the discharge of wastewater and the disposal of other waste containing PCBs.

74.     Effective July 29, 1969, NCR acquired 100 percent of the outstanding common stock of Combined Paper Mills, Inc.  On September 30, 1970, NCR acquired 100 percent of the

outstanding common stock of ACPC.  Shortly thereafter, NCR consolidated ACPC and

Combined Paper Mills, Inc. into Appleton Papers, Inc. a wholly owned subsidiary of NCR.

Ultimately, Appleton Papers, Inc. was merged into NCR.

75.     NCR is the corporate successor to the resulting liability of ACPC and Combined

Locks.

**B.     NCR Also is Liable as an Arranger in Connection with Mead's Activities**

76.     As set forth above, Mead acted as NCR's contract coater for the purpose of

coating CCP.  NCR consigned the PCB-laden emulsion to Mead; NCR set and enforced

specifications for the bulk coated product created by Mead; and the bulk coated product created

by Mead was either returned to NCR for NCR's own use, or was shipped to NCR's customers

for NCR's account.

77.     NCR also set minimum quality standards for Mead's operations.  Upon

information and belief, NCR would not accept bulk coated product that did not meet the

minimum quality standards set by NCR, and required disposal of such material instead.

78.     Substantial quantities of PCB-laden CCP waste from Mead's Ohio facility were

sold to brokers and dealers which, in turn, delivered this waste to various recycling and/or de-

inking locations -- including Allied Paper Company's Bryant Mill and other paper mills on the

Kalamazoo River.

79.     NCR consigned its emulsion to Mead, directed Mead to engage in the coating of

CCP using that emulsion, and directed and controlled the manner in which Mead engaged in that

coating.

80.     In this relationship with Mead, NCR at all times had the understanding, intention,

and expectation that Mead would (a) engage in a coating process that created waste, (b) dispose

of that waste on behalf of NCR, and (c) send NCR a finished product containing NCR's

emulsion -- an emulsion that NCR owned at all times during the manufacturing process.

81.     NCR knew and intended that the waste from Mead's coating operations would be

sold to recyclers and/or de-inkers such as the mills on the Kalamazoo River.

82.     NCR knew and intended that the reprocessing of waste from the coating process

performed by Mead would result in the discharge of wastewater and disposal of other waste

containing PCBs.

83.     NCR itself was an arranger, within the meaning of CERCLA, for the waste,

containing PCBs, that was disposed of by Mead.

> **C.    NCR's Own Converting Operations Generated, and Made Arrangements for the Disposal of, PCB-Containing Wastes Destined for the Kalamazoo River**

84.     NCR did not own any paper-making facilities during the relevant time period, so

it could not have reused or processed the broke and trim resulting from its own converting

operations.

85.     All of the PCB-containing broke and trim generated by NCR's Business Forms

and Supply Division was delivered to brokers and dealers that delivered this waste paper to third-

party recyclers.

86.     NCR knew and intended that its CCP converting waste would be recycled at

paper mills situated on rivers such as the Kalamazoo River.

87.     NCR also knew, or should have known, that the reprocessing of this waste would

result in the discharge of wastewater and other waste containing PCBs.

88.     On information and belief, substantial amounts of PCB-containing waste paper

from NCR's Business Forms and Supply Division were sold to recycling facilities on the

Kalamazoo River, with the result that PCBs from that waste paper were released into the

Kalamazoo River and the Kalamazoo River Superfund Site.

> **D.**  **EPA Issues a General Notice of Potential Liability to NCR in Connection with PCB Contamination of the Kalamazoo River**

89.     On November 24, 2010, EPA gave notice to NCR that "NCR may be liable under

Section 107 of CERCLA with respect to the Allied Paper, Inc./Portage Creek/Kalamazoo River

Superfund Site as an arranger . . . ."  The EPA also gave notice that "EPA has reason to believe

that NCR arranged for the transportation and disposal of paper material containing PCBs to the

Site."  A copy of this notice is attached as Exhibit A.

**V.**     **IP's Liability**

> **A.**     **The Bryant Mill**

90.     IP is liable under CERCLA for PCB contamination caused by the "Bryant Mill,"

and by other paper mills, at or near the Kalamazoo River Superfund Site.

91.     The Bryant Mill consisted of approximately 70 acres, and was located along

Portage Creek, three miles upstream from Portage Creek's confluence with the Kalamazoo

River.

92.     The Bryant Mill was purchased by Time, Inc. during World War II.

93.     St. Regis Paper Company initially operated the Bryant Mill for Time, Inc., then

purchased the facility outright in 1946.

94.     St. Regis continued to operate the facility until 1956.

95.     During the time period between 1954 and 1956, St. Regis de-inked and re-pulped

PCB-laden NCR broke and trim at the Bryant Mill, releasing PCBs into Portage Creek and the

Kalamazoo River in the process.

96.     In 1956, St. Regis leased the land and equipment of the Bryant Mill to the Allied Paper Division of the Thor Corporation ("Allied").

97.     Allied, as St. Regis's lessee at the Bryant Mill from 1956 through and including 1966, continued to discharge PCBs to Portage Creek and the Kalamazoo River as a direct result of its de-inking and recycling of NCR broke and trim.

98.     Allied's releases of paper waste to Portage Creek and the Kalamazoo River during the lease period frequently were conducted by exceeding permit limits and regulatory requirements.  For example, in one inspection during the lease period, the Michigan Water Resources Commission noted that the waste treatment systems at the Bryant Mill and King Mill were inoperational or were being bypassed.

99.     According to the MDEQ's May 30, 2000, "Preassessment Screen (Kalamazoo River Environment Site)," Allied claims to have released 70,760 kilograms (156,000 pounds) of paper waste per day to Portage Creek and the Kalamazoo River in 1961.  The MDEQ concluded that because dewatered residuals produced during this same time period typically contained elevated concentrations of PCBs, this raw paper waste discharged from the Bryant Mill also contained elevated PCB concentrations.

100.    Allied purchased the Bryant Mill from St. Regis in 1966.

101.    In 1984, St. Regis was acquired by Champion International Corporation.  St. Regis was merged into Champion in 1985.  Champion became the legal successor to St. Regis's liabilities.

102.    In June 2000, IP acquired Champion.  On December 31, 2000, Champion was merged into IP, and IP assumed Champion liabilities including liability for St. Regis.

103.    IP is, therefore, a corporate successor to the owner and operator of the Bryant Mill during the period from 1954 to 1956. IP also is a corporate successor to the owner and lessor of the Bryant Mill during the period from 1956 to 1966.

104.    IP's successor liability for the activities of St. Regis as a result of these acquisitions already has been established at numerous Superfund sites throughout the United States.

105.    Since 2000, EPA and state environmental protection agencies have determined that IP is a responsible party at other Federal and State Superfund sites as a result of the historic operations of both St. Regis and Champion. These sites include the San Jacinto River Waste Pits Superfund Site in Harris County, Texas; the Libby, Montana, Groundwater Superfund Site; the Cass Lake, Minnesota, Superfund Site, also known as the "St. Regis" Superfund Site; the Klickitat Valley Sawmill Superfund Site in Washington State; and the West Site/Hows Corner Superfund Site in Plymouth, Maine.

106.    In addition, on October 28, 2009, in litigation related to the "Friction Division Products Site" in New Jersey, IP admitted that it had previously assumed, and currently bears, "potential liability arising from the former operations of St. Regis."

**B.      EPA Issues a General Notice of Potential Liability to IP in Connection with PCB Contamination of the Kalamazoo River**

107.    On November 24, 2010, EPA gave notice to IP that IP "may be liable under Section 107 of CERCLA with respect to the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site as a past owner and/or operator of a portion of the Site at the time PCBs were released into the environment." The EPA also gave notice that "EPA has reason to believe that International Paper is a corporate successor to St. Regis Paper Company and Bryant Paper

Company, which were owners and operators of paper mills that disposed of PCBs and PCB-containing material at the Site." A copy of this notice is attached as Exhibit B.

## FIRST CAUSE OF ACTION

### Claim for Contribution Against NCR Pursuant to CERCLA Section 113

108.    Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

109.    CERCLA section 113(f), 42 U.S.C. § 9613(f), authorizes any person to seek contribution from any other person who is liable or potentially liable under the standards set forth in CERCLA section 107(a), 42 U.S.C. § 9607(a).

110.    The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

111.    Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

112.    NCR itself, and in its capacity as a corporate successor, is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

113.    There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

114.    NCR is a person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, in the form of PCB-containing NCR paper broke and trim, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

115.    In connection with the releases of PCBs from the facilities located near the Kalamazoo River, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C. § 9601(25).  These "response costs" were, and will be, necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

116.    Georgia-Pacific has made direct payments, and has reimbursed payments made by the United States and the State of Michigan, in amounts greater than Georgia-Pacific's equitable share of Kalamazoo River Superfund Site response costs.  Georgia-Pacific also has made other payments and/or incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River that are greater than Georgia-Pacific's equitable share of those costs.

117.    This Court can and should allocate response costs among liable parties using such equitable factors as the Court deems appropriate pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1).  Among the equitable factors that the court should consider in allocating response costs are the following:

    a.    Georgia-Pacific has cooperated with State and Federal authorities to investigate and remediate the Kalamazoo River Superfund Site;

    b.    Georgia-Pacific has paid in excess of $79 million as of the date of this Complaint, and is required to spend a significant amount of money in the future to investigate and remediate the site;

    c.    NCR developed the PCB-contaminated paper that is the source of the Kalamazoo River Superfund Site conditions that require remediation;

21

       d.      NCR, through its subsidiaries and/or its contract coaters, including ACPC, the Combined Locks Mill, and Mead, and through the operations of its Business Forms and Supply Division, made arrangements to deliver its PCB-laden paper waste to paper recyclers, knowing that the PCBs in the paper likely would be released by paper recycling operations into river systems like the Kalamazoo River;

       e.      NCR also is liable as the successor to ACPC and the Combined Locks processing operations;

       f.      NCR concealed the risks of PCB-laden paper waste from Georgia-Pacific and other mill operators on the Kalamazoo River;

       g.      Relative to NCR, Georgia-Pacific was an innocent discharger of wastes later found to contain PCBs; and

       h.      NCR has not paid its equitable share of response costs at the Kalamazoo River Superfund Site.

118.     NCR is liable to Georgia-Pacific for response costs paid by Georgia-Pacific that are in excess of Georgia-Pacific's equitable share and that are, as a matter of equity, attributable to NCR.

119.     Pursuant to the standards of section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and in accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund Site response costs it has paid and will pay in the future in excess of its equitable share.

## SECOND CAUSE OF ACTION

### Claim for Response Costs Against NCR Pursuant to CERCLA Section 107

120.    Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

121.    CERCLA section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), authorizes the recovery of "necessary costs of response consistent with the national contingency plan."

122.    The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

123.    Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

124.    NCR itself, and in its capacity as a corporate successor, is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

125.    There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

126.    NCR is a person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, in the form of PCB-containing NCR paper broke and trim, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

127.    In connection with the releases of PCBs from the facilities located near the Kalamazoo River, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C. § 9601(25).  These "response costs" were, and

will be, necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

128. Georgia-Pacific has made direct payments, and has reimbursed payments made by the United States and the State of Michigan, in amounts greater than Georgia-Pacific's equitable share of Kalamazoo River Superfund Site response costs. Georgia-Pacific also has made other payments and incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River that are greater than Georgia-Pacific's equitable share of those costs.

129. Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides a cause of action for private parties that may be used either as an alternative, or an additional, legal ground for reimbursement of some or all of the types of costs that have been, and will be, incurred by Georgia-Pacific.

130. Insofar as any costs sought by Georgia-Pacific are not recoverable pursuant to a contribution claim under section 113(f)(1) of CERCLA, 42, U.S.C. 9613(f)(1), those costs are recoverable under section 107(a)(4)(B).

131. Insofar as equitable factors are applicable to resolving a claim under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), when considering the amount and share of costs that should be recovered from NCR, the Court should consider the following:

a. Georgia-Pacific has cooperated with State and Federal authorities to investigate and remediate the Kalamazoo River Superfund Site;

b. Georgia-Pacific has paid in excess of $79 million as of the date of this Complaint, and is required to spend a significant amount of money in the future to investigate and remediate the site;

        c.      NCR developed the PCB-contaminated paper that is the source of the Kalamazoo River Superfund Site conditions that require remediation;

        d.      NCR, through its subsidiaries and/or its contract coaters, including ACPC, the Combined Locks Mill, and Mead, and through the operations of its Business Forms and Supply Division, made arrangements to deliver its PCB-laden paper waste to paper recyclers, knowing that the PCBs in the paper likely would be released by paper recycling operations into river systems like the Kalamazoo River;

        e.      NCR also is liable as the successor to ACPC and the Combined Locks processing operations;

        f.      NCR concealed the risks of PCB-laden paper waste from Georgia-Pacific and other mill operators on the Kalamazoo River;

        g.      Relative to NCR, Georgia-Pacific was an innocent discharger of wastes later found to contain PCBs; and

        h.      NCR has not paid its equitable share of response costs at the Kalamazoo River Superfund Site.

132.    NCR is liable, pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), to Georgia-Pacific for past and future Kalamazoo River Superfund Site response costs that are in excess of Georgia-Pacific's equitable share of those costs.

133.    In accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund site response costs it has paid and will pay in the future in excess of its equitable share of those costs.

## THIRD CAUSE OF ACTION

### Claim for Contribution Against IP Pursuant to CERCLA Section 113

134.    Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

135.    CERCLA section 113(f), 42 U.S.C. § 9613(f), authorizes any person to seek contribution from any other person who is liable or potentially liable under CERCLA section 107(a), 42 U.S.C. § 9607(a).

136.    The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

137.    Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

138.    IP is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

139.    There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

140.    IP is a person that owned and operated facilities at the time of the disposal of hazardous substances within the meaning of CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2).

141.    In connection with the releases of PCBs from the facilities located near the Kalamazoo River and into the Kalamazoo River Superfund Site, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C. § 9601(25), and such "response costs" were and will be necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

142.    Georgia-Pacific has reimbursed the United States and the State of Michigan for amounts greater than its equitable share of Kalamazoo River Superfund Site response costs. Georgia-Pacific has also made other payments and/or incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River Superfund Site that are greater than Georgia-Pacific's equitable share of those costs.

143.    This Court can and should allocate response costs among liable parties using such equitable factors as the Court deems appropriate pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1). Among the equitable factors that the Court should consider in allocating response costs are the following:

a.    Georgia-Pacific has cooperated with State and Federal authorities to investigate and remediate the Kalamazoo River;

b.    IP, as a matter of law, as successor to St. Regis, and under the equitable standards of section 113(f)(1) of CERCLA, bears responsibility for discharges of PCBs into the Kalamazoo River by the Bryant Mill;

c.    The Bryant Mill was a significant contributor of PCBs to the Kalamazoo River;

d.    The Bryant Mill violated applicable permits and regulatory requirements;

e.    Some of the pollution by the Bryant Mill occurred while St. Regis was able and obliged, as a knowledgeable owner and lessor, to monitor and prevent those environmentally damaging activities;

f.    The contribution of IP to the contamination, and to the conditions requiring remediation, of the Kalamazoo River is greater than that of Georgia-Pacific; and

g.     IP has not paid its equitable share of the response costs that have been incurred at the Kalamazoo River Superfund Site.

144.    IP is liable to Georgia-Pacific for costs paid by Georgia-Pacific that are in excess of Georgia-Pacific's equitable share and that are, as a matter of equity, attributable to IP.

145.    Pursuant to the standards of section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and in accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund Site costs it has paid and will pay in the future in excess of its equitable share.

## FOURTH CAUSE OF ACTION

### Claim for Response Costs Against IP Pursuant to CERCLA Section 107

146.    Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

147.    CERCLA section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), authorizes the recovery of "necessary costs of response consistent with the national contingency plan."

148.    The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

149.    Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

150.    IP itself, and in its capacity as a corporate successor, is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

151.    There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

152. IP is a person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, in the form of PCB-containing NCR paper broke and trim, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

153. In connection with the releases of PCBs from the facilities located near the Kalamazoo River, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C. § 9601(25). These "response costs" were, and will be, necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

154. Georgia-Pacific has made direct payments, and has reimbursed payments made by the United States and the State of Michigan, in amounts greater than Georgia-Pacific's equitable share of Kalamazoo River Superfund Site response costs. Georgia-Pacific also has made other payments and incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River that are greater than Georgia-Pacific's equitable share of those costs.

155. Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides a cause of action for private parties that may be used either as an alternative, or an additional, legal ground for reimbursement of some or all of the types of costs that have been, and will be, incurred by Georgia-Pacific.

156. Insofar as any costs sought by Georgia-Pacific are not recoverable pursuant to a contribution claim under section 113(f)(1) of CERCLA, 42, U.S.C. 9613(f)(1), those costs are recoverable under section 107(a)(4)(B).

157.    Insofar as equitable factors are applicable to resolving a claim under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), when considering the amount and share of costs that should be recovered from IP, the Court should consider the following:

a.    Georgia-Pacific has cooperated with State and Federal authorities to investigate and remediate the Kalamazoo River Superfund Site;

b.    Georgia-Pacific has paid in excess of $79 million as of the date of this Complaint, and is required to spend a significant amount of money in the future to investigate and remediate the site;

c.    IP, as a matter of law, as successor to St. Regis, and under the equitable standards of section 113(f)(1) of CERCLA, bears responsibility for discharges of PCBs into the Kalamazoo River by the Bryant Mill;

d.    The Bryant Mill was a significant contributor of PCBs to the Kalamazoo River;

e.    The Bryant Mill violated applicable permits and regulatory requirements;

f.    Some of the pollution by the Bryant Mill occurred while St. Regis was able and obliged, as a knowledgeable owner and lessor, to monitor and prevent those environmentally damaging activities;

g.    The contribution of IP to the contamination, and to the conditions requiring remediation, of the Kalamazoo River is greater than that of Georgia-Pacific; and

h.    IP has not paid its equitable share of response costs at the Kalamazoo River Superfund Site.

158.    IP is liable, pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), to Georgia-Pacific for past and future Kalamazoo River Superfund Site response costs that are in excess of Georgia-Pacific's equitable share of those costs.

159.    In accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund site response costs it has paid and will pay in the future in excess of its equitable share of those costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Georgia-Pacific prays for:

a.    A judgment in favor of Georgia-Pacific and against NCR;

b.    A judgment in favor of Georgia-Pacific and against IP;

c.    An order directing NCR and IP to pay their equitable percentage of the past response costs in the total amount of not less than $79 million, plus interest, that have been incurred by Georgia-Pacific at the Kalamazoo River Superfund Site pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), and section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1);

d.    A declaratory judgment, and other appropriate prospective relief, directing NCR and IP to pay their equitable percentage of all future response costs associated with the cleanup of the Kalamazoo River Superfund Site pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and/or section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2); and

e.    Such other and further relief as the Court deems just and appropriate.

December 3, 2010

Respectfully submitted,

Georgia-Pacific LLC

/s/ Dean P. Laing

_____

Dean P. Laing
O'Neil, Cannon, Hollman,
DeJong & Laing, S.C.
111 East Wisconsin Avenue
Suite 1400
Milwaukee, Wisconsin 53202-4870
Telephone:  (414) 276-5000
Facsimile:  (414) 276-6581

Jan M. Conlin, Minn. Bar No. 0192697
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
(612) 349-8500

*Admission to be requested:*

Tara D. Falsani,
     Minn. Bar No. 0335903 &
     Wisc. Bar. No. 1041767
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
(612) 349-8500

Jeffrey N. Martin, D.C. Bar No. 254201
Hillary Brickey Brennan, D.C. Bar No. 498305
Ryan A. Shores, Va. Bar No. 65934
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 955-1500

Douglas M. Garrou, Va. Bar No. 42069
Robert W. Loftin, Va. Bar No. 68377
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street

Richmond, Virginia 23219-4074
(804) 788-8200

Kathy Robb, N.Y. Bar No. 2311710
Hunton & Williams LLP
200 Park Avenue, 52nd Floor
New York, New York 10166-0005
(212) 309-1000