# EXHIBIT

# B

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
APPLETON PAPERS INC. and NCR Corp.,
Plaintiffs,
v.
GEORGE A. WHITING PAPER CO., et al., De-
fendants.

No. 08–C–16.
March 1, 2011.

**Background:** Successors to entities involved in producing and manufacturing paper containing polychlorinated biphenyl (PCB) brought action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), against paper mills and other entities that treated and/or released wastewater containing PCBs into the river, seeking contribution for costs incurred in cleaning up river contaminated with PCBs. Defendants filed counterclaims for contribution for funds they had already contributed and moved for summary judgment.

**Holdings:** The District Court, William C. Griesbach, J., held that:
(1) fact issue existed as to whether predecessor entities "arranged" for disposal of their waste product;
(2) equitable principles did not require successors to contribute cleanup costs to a distinct body of water into which predecessors did not dispose any PCBs;
(3) equitable principles entitled defendants to contribution for cleanup of river in areas of river in which predecessor entities polluted;
(4) CERCLA's three-year statute of limitations did not apply to contribution claims against successors; and
(5) Army Corps' of Engineers was not required to contribute to successors' cleanup costs.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A €═⊃2498.3**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2498.3 k. Environmental Law,
Cases Involving. Most Cited Cases

Genuine issue of material fact existed as to whether entities involved in producing and manufacturing paper containing polychlorinated biphenyl (PCB) "arranged" for the disposal of their waste product under CERCLA, precluding summary judgment on contribution claims against the entities for cleanup of PCB-contaminated river. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.; Resource Conservation and Recovery Act of 1976, § 1004(3), 42 U.S.C.A. § 6903(3).

**[2] Environmental Law 149E €═⊃445(1)**

149E Environmental Law
  149EIX Hazardous Waste or Materials
    149Ek436 Response and Cleanup; Liability
      149Ek445 Persons Responsible
        149Ek445(1) k. In General. Most Cited Cases

There does not need to be a specific intent that a substance end up in a landfill or in water to establish arranger liability under Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); what matters is that the party had an intent to dispose of or discard the material. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.; Resource Conservation and Recovery Act of 1976, § 1004(3), 42 U.S.C.A. § 6903(3).

**[3] Environmental Law 149E €═⊃445(1)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)

**(Cite as: 2011 WL 806411 (E.D.Wis.))**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek445 Persons Responsible
            149Ek445(1) k. In General. Most Cited Cases

If a possessor of hazardous substances hires a company to discard the substance, he can not avoid arranger liability under Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) by burying his head in the sand and claiming indifference or ignorance of how that substance is ultimately disposed. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.; Resource Conservation and Recovery Act of 1976, § 1004(3), 42 U.S.C.A. § 6903(3).

**[4] Environmental Law 149E ⬚447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases

Divisibility is not a defense to a contribution action under CERCLA. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

**[5] Environmental Law 149E ⬚447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases

Equitable principles did not require entities involved in producing and manufacturing paper containing polychlorinated biphenyl (PCB) to contribute clean-up costs to a distinct body of water into which they did not dispose any PCBs, despite argument that their mobilization of PCBs caused the release of PCBs into the water; holding the entities liable for contribution would have conflicted with, or at least circumvented, CERCLA's bases for impos-

ing liability. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[6] Environmental Law 149E ⬚447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases

Equitable principles entitled paper mills and other entities that treated and/or released wastewater containing polychlorinated biphenyl (PCB) into polluted river, and incurred substantial costs in cleaning up the river, to contribution under CERCLA from entities involved in producing and manufacturing paper containing polychlorinated biphenyl (PCB) for areas of the river into which the producing and manufacturing entities polluted; although the paper mills and other entities seeking contribution may have discharged roughly half of the PCBs into the river, and although some of them may have polluted the river in other ways, they did not share any of the culpability for the PCB pollution giving rise to the CERCLA action, as the producing and manufacturing entities created, mobilized, and profited from the PCBs at issue. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

**[7] Environmental Law 149E ⬚447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases

In any given case, a court may consider several factors, a few factors, or only one determining factor, depending on the totality of circumstances presented to the court in determining liability under CERCLA contribution provision. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)

**(Cite as: 2011 WL 806411 (E.D.Wis.))**

**[8] Environmental Law 149E ⟜670**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek668 Time for Proceedings
            149Ek670 k. Periods Applicable. Most Cited Cases

    CERCLA's three-year statute of limitations period did not apply to contribution claims against successors to entities involved in producing and manufacturing paper containing polychlorinated biphenyl (PCB) for clean-up costs of PCB-contaminated river, where none of the events that could have triggered that period, a judgment, administrative order, or a judicially approved settlement, had occurred. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 113(g)(3), 42 U.S.C.A. § 9613(g)(3).

**[9] Environmental Law 149E ⟜447**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases

    Contribution under CERCLA is an exercise in allotting responsibility for actual expenses sustained by potentially responsible parties (PRPs), not expenses that have already been covered by insurance. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 113(f)(1), 42 U.S.C.A. § 9613(f)(1).

**[10] Environmental Law 149E ⟜447**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases

    Army Corps of Engineers was not required under CERCLA to contribute to costs of entities involved in producing and manufacturing paper containing polychlorinated biphenyl (PCB) in cleaning up PCB-contaminated river, even though there was

evidence suggesting that there was some leakage of PCBs back into the river as a result of the Corps' dredging activities, and some of this could have occurred during a time when the dangers of PCB contamination were widely known, given the vast disparities in the parties' knowledge. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

**[11] Environmental Law 149E ⟜463**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek462 Evidence
            149Ek463 k. In General. Most Cited Cases

    Evidence of response cost under CERCLA will frequently consist of nothing more than a check and a cover letter or invoice. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

Anthony J. Steffek, Brandon J. Evans, Heidi D. Melzer, Michael L. Hermes, Hermes Law Ltd., Green Bay, WI, Dennis P. Birke, Megan A. Senatori, Ronald R. Ragatz, Dewitt Ross & Stevens SC, Madison, WI, Evan B. Westerfield, J. Andrew Schlickman, Charles K. Schafer, Eric W. Ha, Kathleen L. Roach, Margaret R. Sobota, William F. Conlon, Sidley Austin LLP, Chicago, IL, J. Ric Gass, Gass Weber Mullins LLC, David J. Turek, Milwaukee, WI, Joan Radovich, Eimer Stahl Klevorn & Solberg LLP, Chicago, IL, for Plaintiffs.

Christopher P. Riordan, Von Briesen & Roper SC, Milwaukee, WI, Philip A. Munroe, Direnzo & Bomier LLC, Neenah, WI, Scott B. Fleming, Weiss Berzowski Brady LLP, Milwaukee, WI, David G. Mandelbaum, Marc E. Davies, Monique M. Mooney, Sabrina Mizrachi, Caleb J. Holmes, Greenberg Traurig LLP, Philadelphia, PA, Patrick H. Zaepfel, Kegel Klein Almy & Grimm LLP, Lancaster, PA, Allison E. McAdam, David A. Rabbino, Brian L. Zagon, Hunsucker Goodstein & Nelson PC, Lafayette, CA, Erik S. Mroz, Hunsucker Good-

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

stein & Nelson PC, Woodland Hills, CA, John F. Cermak, Jr., Sonja A. Inglin, Baker Hostetler LLP, Los Angeles, CA, Thomas R. O'Donnell, William E. Coughlin, Calfee Halter & Griswold LLP, Cleveland, OH, Timothy B. Anderson, Remley & Sensenbrenner SC, Neenah, WI, Joseph C. Basta, Michelle A. Gale, Dykema Gossett PLLC, Ann Arbor, MI, Linda E. Benfield, Paul Bargren, Foley & Lardner LLP, Milwaukee, WI, Sarah A. Slack, Foley & Lardner LLP, Madison, WI, James P. Walsh, Appleton City Attorney, Appleton, WI, Paul G. Kent, Richard C. Yde, Ted Waskowski, Meg E. Vergeront, Stafford Rosenbaum LLP, Madison, WI, M. Andrew Skwierawski, S. Todd Farris, Ted A. Warpinski, Friebert Finerty & St. John SC, Milwaukee, WI, Allison C. Swanson, City of Green Bay, Green Bay, WI, Thomas R. Schrimpf, Hinshaw & Culbertson LLP, Milwaukee, WI, for Defendants.

### DECISION AND ORDER
WILLIAM C. GRIESBACH, District Judge.

*1 Numerous Defendants have filed motions for summary judgment on their counterclaims for contribution from Plaintiffs NCR and Appleton Papers. Consideration and scheduling of these motions has been somewhat expedited, over Plaintiffs' objection, in response to Defendants' assertion that the remaining issues are limited and are susceptible to resolution through motion practice. The Defendants' position is largely based on this Court's determination, in its December 16, 2009 Decision and Order, that Plaintiffs are not entitled to contribution because they knowingly took the risk that the product they mobilized would have long-lasting environmental consequences. From that decision, the Defendants argue, it follows that the funds *they* have already contributed to the Lower Fox River cleanup effort should be shifted to the Plaintiffs. That is, they believe the same equitable factors that barred Plaintiffs from receiving contribution would support the awarding of full contribution to the Defendants. In addition to their motions seeking recovery of their cleanup costs, the Defendants have also moved for a declaratory judgment based on the

December 16 ruling. Specifically, they ask that I declare not only that Plaintiffs are barred from seeking contribution from Defendants for past costs, but that they are barred from seeking such costs in the future as well. Several of the Defendants have also filed motions touching on more individualized issues.

Plaintiffs contest both the big picture and the details. They argue that other equitable factors, which this Court did not consider in its earlier ruling, would justify denial of contribution with respect to many of the Defendants. They also argue that because their own discharges of PCBs were downstream of Little Lake Butte Morts (known as OU1), they cannot be held accountable for the substantial cleanup costs Defendants incurred there. In addition, they argue that because they were not "arrangers" of the disposal of the toxic waste material, there is no basis for holding them liable for amounts contributed by Defendants. Finally, they spend significant efforts contesting the particular costs many Defendants seek to recover.

For the reasons given below, I conclude that Plaintiffs are not liable in contribution for Defendants' OU1 cleanup costs unless they are found to be arrangers, a question that cannot be answered at this stage of the proceedings. The Defendants are entitled to full contribution, however, for all of their appropriate costs incurred in cleaning up OU2–OU5, as well as any future costs they may be deemed liable for in those sections of the river. I further conclude that Plaintiffs are not entitled to contribution from the United States Army Corps of Engineers.

### I. Analysis

### A. Defendants' Claims for Contribution of OU1 Expenses

Plaintiffs discharged PCBs into OU2 (the portion of the River between Little Lake Butte des Morts and the City of De Pere), and these PCBs flowed throughout OU2 and downriver into OU3,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

OU4 and OU5 (Green Bay). As such, Plaintiffs argue that they cannot be held liable for contribution for PCBs found in OU1 because it is undisputed that their own discharges did not flow *upriver* into Little Lake Butte des Morts, or OU1. The OU1 Defendants (WTM I Company and P.H. Glatfelter Company) offer a number of arguments supporting their claims for contribution of more than $110 million in expenses they incurred in cleaning up OU1. They also seek prospective relief in the form of a judgment declaring that Plaintiffs are jointly and severally liable for all costs either WTM I or Glatfelter might be required to pay in the future. They argue that Plaintiffs were arrangers of the disposal of the PCBs, which makes them liable under § 107. They further argue that even if they were not arrangers, they mobilized the PCBs into the entire Fox River Site and should be held liable for the entire cleanup expenditure on equitable grounds. I address these arguments below.

**1. Arranger Liability**

**\*2** [1] The Defendants concede that the Plaintiffs' own discharges did not pollute OU1, but they argue that Plaintiffs are liable not only as successors to dischargers of pollutants (in OU2–5) but as successors to *arrangers* of the disposal of those pollutants in OU1. The history of PCB discharges into the Lower Fox River is addressed more fully in this Court's previous decisions. To summarize, NCR produced carbonless copy paper ("CCP") by creating a PCB-laden emulsion it sent to the Appleton Coated Paper Company ("ACPC"), which coated it on paper according to NCR's specifications. This process produced a waste product known as "broke"—paper scrap and trimmings—and ACPC sold the broke, through brokers, to paper recycling companies who used it in their own papermaking facilities. The recycling process resulted in the discharge of PCBs into the Fox River Site, including Little Lake Butte des Morts ("OU1"). The Defendants argue that in selling its broke to recycling mills, ACPC "arranged" to dispose of the broke, which was a hazardous substance containing PCBs, and thus Plaintiffs are liable for

any environmental damage to OU1 even though their own discharges did not wind up in OU1.

Section 9607(a)(3) applies to an entity that "arrange[s] for disposal ... of hazardous substances." Much of the present argument on arranger liability involves the interpretation and application of the Supreme Court's 2009 decision in *Burlington Northern and Santa Fe Ry. Co. v. United States,* ——U.S. ——, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009). There, the Court noted that the term "arrange" is subject to a multitude of shadings and interpretations:

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes-cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear. In such cases, courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a "disposal" or a "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions.

129 S.Ct. at 1878–1879 (citations omitted).

The Court concluded that under the plain meaning of the term, "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* at 1879. This means that a party's state of mind comes

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

into play: in order to qualify as an arranger, the entity must not only have the intention to get rid of something, but the "intention that at least a portion of the product be disposed of ... by one or more of the methods described in § 6903(3)." *Id.* at 1880. As set forth in § 6903(3), the term "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters ." In *Burlington Northern,* the Supreme Court addressed the potential liability of Shell Oil Company for its sales of a pesticide called "D–D" to a distributor known as Brown & Bryant ("B & B").

**\*3** When B & B purchased D–D [from Shell], Shell would arrange for delivery by common carrier, f.o.b. destination. When the product arrived, it was transferred from tanker trucks to a bulk storage tank located on B & B's primary parcel. From there, the chemical was transferred to bobtail trucks, nurse tanks, and pull rigs. During each of these transfers leaks and spills could-and often did-occur. Although the common carrier and B & B used buckets to catch spills from hoses and gaskets connecting the tanker trucks to its bulk storage tank, the buckets sometimes overflowed or were knocked over, causing D–D to spill onto the ground during the transfer process.

Aware that spills of D–D were commonplace among its distributors, in the late 1970's Shell took several steps to encourage the safe handling of its products. Shell provided distributors with detailed safety manuals and instituted a voluntary discount program for distributors that made improvements in their bulk handling and safety facilities. Later, Shell revised its program to require distributors to obtain an inspection by a qualified engineer and provide self-certification of compliance with applicable laws and regulations. B & B's Arvin facility was inspected twice, and in

1981, B & B certified to Shell that it had made a number of recommended improvements to its facilities.

129 S.Ct. at 1875.

The Court concluded that while Shell had known that its product would inevitably be subject to some accidental spilling by B & B, that was not Shell's *intent*—in fact, it encouraged its distributors to *prevent* such spills. *Id.* In so holding, the Court rejected the government's position that Shell's knowledge that spills would occur was enough to establish its intent to dispose of hazardous substances. Even so, the Court noted that "in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes." *Id.* But it cautioned that "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Id.*

Here the debate turns on ACPC's intent in selling the broke to brokers. Everyone agrees that ACPC had no use for the broke and, as far as ACPC was concerned, the broke was a waste product that happened to have some commercial value to other companies. Thus, ACPC clearly had the intent to "dispose" of the broke in a general sense—that is, it simply wanted to get rid of it—but it is much less clear that it intended to dispose of the product in the § 6903(3) sense, which is what matters. To repeat, the statute defines disposal as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

**\*4** [2][3] This is where matters become foggy. Plaintiffs argue that although they may have inten-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

ded to get rid of the broke, they never intended that it end up in the river. ACPC—like most entities that want to dispose of waste—simply wanted someone else to deal with the broke (and make a profit in the process), and in some sense it didn't care what happened to the broke once it was out of ACPC's hands. As such, it would be impossible to conclude that it "intended" that the broke be discharged into the river. But the Supreme Court's conclusion that a party must have the intent to dispose of the hazardous material in a § 6903(3) sense should not be read too narrowly. After all, it will be the rare case where an entity arranging to dispose of hazardous material has the specific intent that the material be deposited, leaked, etc. into land or water such that it enters the environment, which is technically what § 6903(3) requires. For example, if someone wheels his waste bin out to the curb for pickup, he may suspect that it will end up in a landfill, but he does not actually have the specific intent that my trash be deposited on land so that it may enter the environment or ground waters. Read too narrowly, *Burlington Northern* would eliminate most forms of arranger liability for the simple reason that most would-be arrangers lack the specific intent that their waste end up in the environment. In fact, the Court itself recognized that "[i]t is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." *Id* . at 1878. Thus, there does not need to be a specific intent that the substance end up in a landfill or in water; what matters is that the party had an intent to dispose of or discard the material. Put another way, if a possessor of hazardous substances hires a company to discard the substance, *Burlington Northern* does not allow him to avoid arranger liability by burying his head in the sand and claiming indifference or ignorance of how that substance is ultimately disposed.

On the other hand, *Burlington Northern* makes clear that "knowledge alone" of leaks or discharges is not enough. But of course the facts in that case were more clear-cut. Shell Oil was selling a new product to a distributor and was thus not "disposing" of the product in any traditional sense at all. The only possible basis for arranger liability was that Shell knew there would be some accidental leaks, but the Court concluded that was not sufficient to demonstrate intent, particularly when Shell took steps to *prevent* those leaks. Shell's intent, in a nutshell, was to *avoid* disposing of the product and to sell the product in the normal course of business. Here, no one argues that Plaintiffs are arrangers based on their sales of the carbonless copy paper in the normal course of business, and so any analogy to the facts of *Burlington Northern* is strained. Instead, Defendants are arguing not just that ACPC knew there would be some accidental leaks or discharges; it also understood the paper recycling process and knew that selling its broke would result in large quantities of the waste material ending up in the Fox River Site; ACPC knew that the recyclers only used the paper fibers and discarded the rest, including the PCB-containing emulsion. Thus, this is not a case of "knowledge alone" like *Burlington Northern,* where Shell merely knew that some accidental spills of its *new* and useful product occurred, spills that were incidental to the product's use. Instead, it is a case of knowledge of *significant* and inevitable discharges combined with the intent to dispose of the hazardous materials, which were waste materials rather than new products. Disposal into the environment was a necessary, significant and known byproduct of the process. Based on this knowledge and ACPC's intent to dispose of the broke, Defendants argue that ACPC qualifies as an arranger under CERCLA.

**\*5** Plaintiffs respond by noting that they *sold* the broke rather than paying a disposal company to haul it away. The broke was a valuable product (albeit not valuable to Plaintiffs) rather than merely waste. Allowing arranger liability based on sales of useful products would transform arranger liability into manufacturer liability, something courts have warned against. "[O]therwise the sale of an automobile would be the disposal of a hazardous sub-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

stance, since an automobile contains a battery, and a battery contains lead, which is a hazardous substance." *G.J. Leasing v. Union Elec. Co.,* 54 F.3d 379, 384 (7th Cir.1995). "The sale of a product which contains a hazardous substance cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal." *Id.* In addition, Plaintiffs argue that their predecessors did not appreciate the danger of PCBs and thus could not have had the requisite intent to dispose of a "hazardous substance" under Section 9607(a)(3). Plaintiffs further argue that they are a step removed from the disposal process because they sold broke to brokers, not to disposal companies or even the recyclers themselves.

I am satisfied that this is a close question and, more importantly, a fact-intensive one. In short, it appears to be a "mixed motives" case, that is, a case where the putative arranger wanted to dispose of his waste materials and also make a few dollars for doing so. *G.J. Leasing v. Union Elec. Co.,* 54 F.3d at 384. Certainly the fact that one's hazardous waste product happens to have some scrap value would not be sufficient grounds to relieve the alleged arranger of liability. But neither is it irrelevant, and if the facts here were viewed in the light most favorable to the Plaintiffs it would be possible to conclude that they did not arrange for the disposal of their waste product. Even so, although "knowledge alone" is not enough (as in *Burlington* ), it is probable that Plaintiffs would have arranger liability if Defendants can show their intent to dispose of broke (even valuable broke) combined with a particular knowledge that nontrivial amounts of the broke waste product would inevitably end up in the river. But these are fact questions, and numerous cases have noted the fact-intensive nature of the arranger liability inquiry. Accordingly, the Defendants' motion for summary judgment on the basis of arranger liability will be denied.

## 2. The "Single Site" Theory: Divisibility is Not a "Defense"

Even if Plaintiffs are not arrangers, however,

Defendants argue Plaintiffs are liable for OU1 costs based on the same equitable factors this Court already considered in denying contribution to Plaintiffs. This Court has held that Plaintiffs mobilized large quantities of PCBs during a period when they knew there was a risk that their product could cause long-lasting environmental damage, and such a conclusion would apply with equal force to support the Defendants' own counterclaims for contribution. Plaintiffs argue that because their own discharges did not flow upriver into OU1, the damage caused there is divisible and would not be chargeable to them under CERCLA contribution.

**\*6** [4] As this Court already observed, however, the question of divisibility *per se* is not properly a part of a contribution action under Section 113. (*See, e.g.,* Dkt. # 751.) "While the 'divisibility' defense to joint and several liability is frequently invoked in cost recovery actions brought under § 107(a), it is not a defense to a contribution action under § 113(f)." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1513 (11th Cir.1996). That court explained that in a Section 107 action, "courts will not hold a defendant jointly and severally liable to a *governmental* or *non-liable* private plaintiff where the defendant can demonstrate the harm at a given site is 'divisible,' i.e., there are distinct harms or a reasonable basis for determining the contribution of each cause to a single harm." *Id.* But in a Section 113 contribution action among PRPs, "the divisibility defense has no relevance as a 'defense' in these cases ." Instead, as discussed below, the fact that Plaintiffs did not physically release toxins into OU1 may be considered as an equitable factor within the framework of a § 113 analysis, but divisibility itself does not provide a "defense" to the Defendants' contribution counterclaims.FN1

Plaintiffs' divisibility argument could be construed as an argument that they are simply not liable under CERCLA for the environmental harm to OU1. As such, there is no basis for contribution. A § 113 claim is premised on liability under § 107:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

[Plaintiff] must establish that [Defendant] is "within one of four classes of persons subject to CERCLA's liability provisions." *California Dept. of Toxic Substances Control v. Payless Cleaners,* 368 F. Supp .2d 1069, 1076 (E.D.Cal.2005). Although section 9607 creates the right of contribution, the "machinery" of section 9613 "governs and regulates such actions, providing the details and explicit recognition that were missing" from section 9607. *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1302 (9th Cir.1997), cert. denied, 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998). As such, if an entity is not a covered person under section 9607, that entity is not subject to section 9613 contribution liability because 9607 creates the section 9613 contribution right.

*Team Enterprises, LLC v. Western Inv. Real Estate Trust,* 721 F.Supp.2d 898, 2010 WL 2403436, *4 (E.D.Cal., June 10, 2010).

Section 107 creates liability for four classes of persons:

(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ...

**\*7** 42 U.S.C. 9607(a).

Thus, if Plaintiffs are not arrangers and if they lack any other kind of liability for OU1 damages under § 107, there would seem to be no basis upon which the Defendants could obtain contribution. Of course the Defendants argue that this § 113 proceeding is not the proper forum to address the Plaintiffs' liability, and that appeared to be true with respect to the *Plaintiffs'* own contribution action against the Defendants. But now that the Defendants are seeking contribution from the Plaintiffs, they have not provided any authority upon which I could base a contribution award when none of the § 107 types of liability apply (assuming they cannot show arranger liability). In some sense, it is purely happenstance that OU1 was grouped together with the other parts of the river and that all of them were deemed a given "site" by the EPA. Apart from that somewhat arbitrary designation, there seems little to differentiate OU1 from a river in New York or California in which paper recyclers discharged NCR broke waste product. No one would argue that Plaintiffs could be liable for contribution at far-distant sites for which they had no § 107 liability, and thus it is difficult to see how they could be liable merely because OU1 happens to be attached to the rest of the Lower Fox River Site. In sum, if Plaintiffs are not owners, operators, arrangers, disposers, etc., *see* 42 U.S.C. 9607(a), I am satisfied that they cannot be deemed liable for contribution, and Defendants have not provided any authority to the contrary.

### 3. The Equitable Factors (Including "Divisibility")

[5] I have concluded above that Plaintiffs are not liable for contribution of OU1 expenses as a matter of law (unless they are arrangers), and my conclusion would be the same under principles of equity. As noted earlier, the Plaintiffs' principal defense to contribution for OU1 costs is the divisibility argument addressed above. Although I have concluded that divisibility is not a "defense," *per se,* in a § 113 action, it is certainly an important factor in the equitable analysis. If a party can demonstrate that it did not release *any* of the pollu-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

tion in a discrete location, requiring that party to re-imburse those who actually did release the pollutants could expand § 113 beyond its intended use.

Defendants note that the entire river is a discrete site, and has been designated as such by the environmental authorities. But that in itself is at least partly a product of administrative and geographic happenstance: although Little Lake Butte des Morts is in fact connected to the other sites, for present purposes it is a distinct body of water into which all parties concede Plaintiffs did not dispose any PCBs. The mere fact that it is deemed part of a "site" called the Lower Fox River Site is not enough to justify requiring Plaintiffs to pay the significant expenses they seek.

Defendants concede that release of PCBs along one part of a river does not in itself make that party liable for the entire river. (Dkt. # 878 at 14.) They argue, however, that this case is unique in that Plaintiffs mobilized the pollution with knowledge of its dangerousness. Even if they did not actually release PCBs into OU1, their mobilization of PCBs (selling broke to the Defendants) is what caused the OU1 Defendants to release them into OU1. I am not satisfied, however, that this theory sufficiently justifies imposition of the OU1 cleanup expenses on Plaintiffs. A key problem with holding Plaintiffs liable for contribution in OU1 is that doing so would conflict with, or at least circumvent, § 107's bases for imposing liability. As set forth above, that Section creates liability on the part of facility owners and operators, hazardous substance transporters and disposers, and arrangers of hazardous substance disposal. I have concluded that Defendants cannot show (at this stage) that Plaintiffs are arrangers, and there is no other basis for imposition of liability under § 107. That section does not talk about "mobilizers" of toxins but only owners, operators and arrangers. Awarding contribution costs under equity when there is no basis for liability under § 107 would not seem a prudent use of this Court's equitable powers.

**\*8** In short, it is one thing to require a polluting party to bear the entirety of costs of cleaning up a site even if that party was not responsible for all of the actual PCB discharges. With respect to OU2–5, Plaintiffs' own pollution caused a significant part of the environmental damage, and requiring them to foot the entire bill is an equitable result under the circumstances of this case. But to apply those same equitable factors when the party did not contribute *at all* to a given site is something else altogether. Defendants have not provided any precedent for such a result, and I am not satisfied that the mere fact that OU1 is considered part of an overall cleanup site is sufficient reason to hold Plaintiffs liable for its cleanup.

**B. Defendants' Claims for Contribution of OU2–OU5 Expenses**

Plaintiff NCR is the successor to ACPC and Combined Paper Mills, Inc., the past owners of the Appleton and Combined Locks plants, which are located in OU2, the span of the river between Little Lake Butte des Morts and the lower section of the De Pere portion of the river. These facilities discharged PCBs into OU2 as a result of the production of carbonless copy paper, and these PCBs flowed down river from OU2 into the rest of the Lower Fox River Site (apart from OU1, which is upstream). As such, Plaintiffs' liability under § 107 for the OU2–5 portions of the river is not contested.

[6] Plaintiffs, along with several other Defendants, have incurred substantial costs in cleaning up the Lower Fox River. In my December 16, 2009 Decision and Order, I determined that equitable principles would preclude the Plaintiffs from receiving contribution from any of the Defendants. The Defendants now argue that these same equitable principles compel the conclusion that they are entitled to contribution from the Plaintiffs for the costs they have expended in cleaning up OU2–OU5. These costs include expenses incurred pursuant to agreements with and orders issued by the EPA and the Wisconsin Department of Natural Resources, as well as monies paid pursuant to settlements with the government. Defendants also seek

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

costs incurred for monitoring and investigating the environmental damage, as well as prejudgment interest.

Plaintiffs raise a number of arguments in opposition to the Defendants' motions. First, they argue that this Court has not yet had the opportunity to consider all of the equitable factors that could potentially play a role in the equitable analysis. For this principle Plaintiffs rely on *Environmental Transportation Systems, Inc. v. ENSCO, Inc.,* in which the Seventh Circuit observed that a district court should consider "the totality of the circumstances presented to the court." 969 F.2d 503, 509 (7th Cir.1992). My decision denying contribution to the Plaintiffs was based largely on a single factor—fault—and so I have already at least implicitly rejected the argument that courts must always consider a "multitude" of factors. And in fact that is not what *ENSCO* requires. *ENSCO* recognized that:

*9 the language of section 9613(f) clearly indicates Congress's intent to allow courts to determine what factors should be considered in their own discretion without requiring a court to consider any particular list of factors. Second, the allocation of cleanup costs is a type of decision particularly suited to case-by-case determination-just as the decision to hold defendants jointly and severally liable to the government in CERCLA actions has been and continues to be made on a case-by-case basis.

*Id.*

[7] The court further acknowledged that district courts may consider a number of factors, or only a single one: "we are in no way requiring or even suggesting that courts must make specific findings as to each factor we have mentioned. Therefore, in any given case, a court may consider several factors, a few factors, or only one determining factor, as the district court did in this case, depending on the totality of circumstances presented to the court." *Id.* The district court in *ENSCO* decided the case solely on the basis of fault, and the Seventh

Circuit affirmed. In fact, the *ENSCO* court found that "courts should equitably allocate costs of cleanup according to the relative culpability of the parties," and culpability (i.e., fault) is the overriding factor in my equitable analysis in this case. *Id.* at 508. There is thus no reason to conclude that this Court would err if it concluded that the other factors cited by Plaintiffs (such as the amounts of PCBs discharged and existence of other forms of pollution) were not relevant to its equitable analysis. It is not as though these factors have not been "considered," after all. I have repeatedly considered Plaintiffs' arguments from the beginning of this case and their protests that other equitable factors should come into play. I have, however, found that such factors should be afforded no weight in balancing the equities. *ENSCO* and numerous others cases reject the idea that a district court has to follow some sort of mechanical laundry-list approach to assessing contribution liability, and I am satisfied that basing contribution on fault, under the totality of the circumstances of this case, is a sound approach to resolving the liability for the river cleanup.

Indeed, it is not as though this Court's focus on fault is a novel approach to CERCLA contribution. In a recent case the Plaintiffs themselves cite, the district court noted that "the overarching goal of CERCLA ... [is] to place the financial cost of the cleanup upon those parties responsible for creating the hazardous condition." *New York v. Solvent Chemical Co., Inc.,* 685 F.Supp.2d 357, 442–443 (W.D.N.Y.2010) (quoting *Amland Props. Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 789 (D.N.J.1989)). And in fact that same court also observed that " 'basic principles of equity' would suggest that the party that profited ... from the creation and operation of a waste-producing enterprise 'should bear primary responsibility for the hazardous byproducts of its activity.' " *Id.* at 442 (quoting *Waste Mgmt. of Alameda County, Inc. v. East Bay Regional Park Dist.,* 135 F.Supp.2d 1071, 1090 (N.D.Cal.2001)). These factors comprised the essence of my conclusion that Plaintiffs were not en-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)

**(Cite as: 2011 WL 806411 (E.D.Wis.))**

titled to contribution: they were responsible for creating the hazardous condition; they knew there was a risk of environmental damage; and they profited from the very condition (PCBs) that made their product hazardous, in contrast to the Defendants, whose discharges of PCBs were almost entirely unknowing and whose profits in no way turned on the presence of PCBs in the broke they processed. These same factors apply with equal force now. Accordingly, I do not consider the other factors Plaintiffs cite to be relevant to my equitable analysis. Although the Defendants may have discharged roughly half of the PCBs into OU2–OU5, and although some of them may have polluted the river in other ways, they do not share any of the culpability for the PCB pollution that gave rise to this CERCLA action.

*10 Plaintiffs also argue that some of the Defendants did not act swiftly to reduce the volume of PCB-laden discharges even after they learned, in or around 1972, that they were polluting the River. But as I noted in my December 16, 2009 Decision and Order, the overwhelming majority of environmental damage was already done by that time. Plaintiffs again protest that this conclusion rests on acceptance of the Wisconsin DNR's "98 percent" figure (i.e., the conclusion that 98 percent of PCBs had been released into the river by 1971), and that figure has not been tested through litigation. But once again that is not true. What is true is that there is no reasonable basis to conclude anything other than that most or almost all of the environmental damage had already been done by the time Plaintiffs stopped using PCBs. And, as noted in the December decision, the recycling of post-consumer waste paper was sanctioned by the government in part because it was not practicable to sort out PCB-containing paper from non-PCB paper. Given the level of fault on the part of the Plaintiffs, and the fact that the pollution occurred nearly a half-century ago, I conclude that it would be neither equitable nor practical to undertake the nickel-and-dime approach Plaintiffs suggest.

I reach the same conclusion with respect to the Plaintiffs' other arguments. They suggest that there are genuine issues of material fact regarding the parties' cooperation with government cleanup efforts, which is one of the so-called "Gore factors" sometimes looked to in contribution cases. Because Plaintiffs are complying with a 2007 unilateral administrative order and have spent $182 million cleaning up portions of the River, and because the Defendants have not been as cooperative, they assert that they should be able to present these facts to the Court. Even if I considered such arguments, however, they would not overcome or undermine my conclusion that this case turns on the Plaintiffs' culpability and acceptance of a business risk.

Plaintiffs also argued, particularly during oral argument, that some of the Defendants' non-PCB pollution should be considered in the analysis because it exacerbated the PCB problem. In my previous decision denying contribution to the Plaintiffs, I rejected this idea because the cause of this cleanup action is PCBs, not other kinds of pollution. But Plaintiffs protest that the Defendants' pollution is intertwined with the PCB problem because the PCBs accumulated in the suspended solids the Defendants released. Even if the suspended solids released by these Defendants did not contain PCBs, they made the PCB problem worse, and Plaintiffs believe that fact justifies consideration in my equitable analysis and further factual development.

The Defendants contest the premise of Plaintiffs' argument. But even if it were true that the Defendants could have averted some of the PCB problem by releasing fewer solids into the river, I would not consider that material to my equitable analysis. The principal reason I do not consider it relevant is that the equities here are driven by the fact that Plaintiffs created, mobilized and profited from the PCBs at issue in this case. Even if some of the Defendants could have mitigated the problem (albeit unknowingly) by reducing their solids discharges, to allow the overwhelmingly culpable parties to receive a "credit" for the Defendants' un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)

**(Cite as: 2011 WL 806411 (E.D.Wis.))**

knowing activities would not be equitable. This is particularly true given my conclusion that the records establish that Plaintiffs were aware that there was an appreciable risk of serious, persistent environmental damage during the very period they were increasing CCP production to its highest levels.

**\*11** For the reasons given above and in the December order, given the totality of the circumstances I do not find that the additional factors cited by Plaintiffs would play a role in my equitable contribution analysis. Accordingly, summary judgment will be granted to the Defendants for any appropriate cleanup costs they incurred in OU2–5.

**1. Claimed Costs and Expenses**

Having concluded that Defendants are entitled to full contribution from the Plaintiffs for OU2–OU5 cleanup costs, the next question is whether all of their claimed costs qualify for reimbursement.

Georgia–Pacific has claimed more than $83 million in recoverable costs. CBC Coating, the successor to Riverside Paper, seeks recovery of the amounts it paid to the Fox River Group Custodial Account in the amount of $665,224, plus interest in the amount of $450,834.[FN2]

Plaintiffs challenge a substantial amount of the Defendants' expenses on the basis of the statute of limitations. Contribution actions under CERCLA are subject to either a three-or six-year limitations period, and Plaintiffs argue that much of the money the Defendants now seek predates the expiration of those limitations periods. The Defendants argue that their ability to obtain contribution is not affected by the statute of limitations because various agreements entered into among the parties provided for tolling of the limitations period. They further assert that even if the agreements did not toll the applicable limitations periods, the statutes of limitations under CERCLA have not yet expired.

In 1997, Defendants CBC (then known as Riverside Paper Corporation), P.H. Glatfelter Com-

pany, Georgia–Pacific LLC (then known as Fort Howard Corporation), WTM I Company ("WTM") (then known as Wisconsin Tissue Mills, Inc.) and U.S. Paper Mills Corp., and Plaintiffs NCR and Appleton Papers entered into an agreement with the State of Wisconsin under which they paid some $10 million to fund certain remediation projects. That agreement contained a tolling provision stating that "The Parties agree that the time from January 31, 1997, through the date of termination of this Agreement will not be included in computing the time limited by any statute of limitations" for any claims under CERCLA the parties might have against each other. This agreement with the state terminated on August 15, 2001. In November 2004, the same parties entered into another tolling agreement, which contained a clause stating that "[n]othing in this Agreement shall be construed as reviving or altering any statutes of limitations that expired prior to the date of this Agreement." Plaintiffs argue that the CERCLA three-year limitation period expired in August 2004, three years after the agreement with Wisconsin (which gave rise to the $10 million in expenses) was terminated. Plaintiffs also assert that significant other expenses may not be recovered. For example, they argue that of the $12 million Georgia–Pacific paid into the Fox River Group ("FRG," a joint defense group comprising many of the parties in this case), $11.6 million is time-barred because it was paid before November 23, 2001—three years before the parties entered into their second tolling agreement.

**\*12** The Defendants, not surprisingly, reject the Plaintiffs interpretation of the parties' various tolling agreements. Although the 1997 agreement might have expired in August 2001, the FRG parties were subject to a 1999 allocation agreement. That agreement reflected the FRG parties' intent to postpone their allocation or contribution disputes and to continuously toll the statute of limitations until a final allocation of liability was entered: "The amounts paid under this agreement and previous funding agreements among the Companies will be subject to reallocation upon completion of the final

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

allocation." (Foley Decl., Dkt. 912, Ex. 106 at ¶ 4.) The intent of the parties to continue tolling was so obvious, the Defendants argue, that in this lawsuit the Plaintiffs themselves sought to recover their FRG costs despite their present argument that such costs are time-barred.

But if the intent to toll was so clear from the agreement's recognition that the amounts paid would be subject to some final allocation, why did the 1997 agreement (and then the November 2004) agreement have distinct tolling provisions? Moreover, simply agreeing that something may be reallocated in the future does not imply that it may be reallocated at *any* time in the future. That is, there is nothing in the various agreements that suggests the statute of limitations would be extended indefinitely, and in fact the specific tolling provisions contained in the 2004 agreement undercut that notion. Accordingly, I cannot conclude at this stage that the statute of limitations was suspended throughout this entire period.

The Defendants also argue that even if their agreements did not toll the limitations period, that is irrelevant because CERCLA's limitations period has not yet expired. They argue that CERCLA's statute of limitations for remedial actions is appropriate, and the appropriate limitations period allows an action to be brought "within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). The FRG remedial actions at issue here were the dredging of an area of the River known as 56/57, and that began in September 1999. Commencement of that project would begin the six-year statute of limitations, and that six-year period had not yet run out by the time the parties entered into their second tolling agreement in November 2004.

The primary question in any statute of limitations dispute is what event or circumstance (if any) triggered the running of the limitations period in the first place. Section 113(g)(3) ("Contribution") states:

No action for contribution for any response costs or damages may be commenced more than 3 years after—

(A) the date of judgment in any action under this chapter for recovery of such costs or damages, or

(B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

**\*13** 42 U.S.C. § 9613(g)(3).

[8] The statute thus lists three "triggers" for the 3–year period: a judgment, administrative order under § 622(g) or (h), or a judicially approved settlement. Here, however, the amounts sought through the Defendants' contribution action are not the product of a judgment, administrative order under § 9622(g) or (h), nor a judicially approved settlement. In other words, there is no event that would have triggered the limitations period for a contribution action. In such circumstances, several circuits treat the contribution action itself as an "initial action for recovery of the costs" and apply the six-year limitations period found in § 113(g)(2)(B) if the action is a "remedial action". 42 U.S.C. § 9613(g)(2)(B). *See, e.g., GenCorp, Inc. v. Olin Corp.,* 390 F.3d 433, 443 (6th Cir.2004) (" § 113(g)(2)—not § 113(g)(3) (entitled "Contribution")—applies to this case because Olin incurred clean-up costs at Big D not as the result of a court judgment or settlement with the government but as the result of a unilateral administrative order issued by the EPA under § 9606.") Although Plaintiffs cite district court cases to the contrary FN3, I am not persuaded that I should apply a three-year statute of limitations period when none of the events that could trigger that period have even occurred. In fact, the Seventh Circuit has suggested, albeit in dicta, that there would be *no* statute of limitations until one of the triggering events occurred. *Rumpke of Indiana, Inc. v. Cummins Engine Co., Inc.,* 107 F.3d 1235, 1241

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)

**(Cite as: 2011 WL 806411 (E.D.Wis.))**

(7th Cir.1997) ("The contribution claim would not accrue until one of the events specified in § 9613(g)(2) occurred, at which time three years would be available in which to file an appropriate suit .") Accordingly, I find no basis in CERCLA to hold that the Defendants' contribution claims for FRG costs are time-barred.

GP also claims more than $8 million for contribution of expenses incurred under a 2000 Administrative Order of Consent ("AOC"). Plaintiffs argue that a three-year limitations period began running from the date of that order (i.e., 2000), but they cite no statute or case supporting this conclusion. (Dkt. # 998 at 26.) Instead, it appears that the work GP did under the AOC was simply a continuation of the dredging project undertaken in area 56/57, which was a "remedial action" under § 9613(g)(2) (B). (*See* Dkt # 1044 at page 12 and footnote 8.) As such, the same statute of limitations would apply.

Plaintiffs also challenge any expenses GP and U.S. Paper Mills seek for which they have received insurance payments. Plaintiffs argue that CERCLA does not allow double recoveries because in order to be eligible for contribution, a plaintiff must have paid more than its fair share of expenses. When a Plaintiff has not incurred such expenses (due to insurance), it should not be allowed to resort to contribution.

GP and U.S. Paper Mills protest that in some sense, it is none of the Plaintiffs' business whether and how any of the Defendants might have insured themselves. If they self-insured, then they are now being made whole through contribution, and if they did purchase insurance then any money they receive in contribution is not a windfall but the fulfillment of a contractual right they purchased. Insurance is simply a bet, and if it paid off for one or more of the Defendants it is certainly not Plaintiffs' position to object or to profit from that bet. After all, why should a Plaintiff found responsible for the entire PCB problem benefit from one Defendant's decision to buy insurance?

**\*14** [9] Although I have some sympathy for the Defendants' position, I am not persuaded that its argument is a winner in the context of CERCLA. As Plaintiffs note, contribution is an exercise in allotting responsibility for actual expenses sustained by PRPs, not expenses that have already been covered. The Tenth Circuit has recently confronted the issue and denied contribution under similar circumstances:

[P]ermitting a CERCLA contribution-action plaintiff to recoup more than the response costs he paid out of pocket flies in the face of CERCLA's mandate to apportion those costs equitably among liable parties. See CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."). Every federal court that has addressed the issue has reached the same conclusion, either with or without reference to the collateral source rule. *See, e.g., K.C.1986 Ltd. P'ship v. Reade Mfg., 472 F.3d 1009, 1018 (8th Cir.2007)* ("Because the settlement credits [from other PRPs to the plaintiff] present a significant allocation factor [under § 9613(f)(1) ] ... the district court should have exercised its discretion to consider them when calculating the amount of the judgment."); *Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1189 (9th Cir.2000)* ("[O]ne equitable factor is preventing someone from recovering for the same harm twice."); *Basic Mgmt. Inc.,* 569 F.Supp.2d at 1125 (refusing to apply the collateral source rule because "[e]quity and common sense ... dictate that Plaintiffs cannot recover the remediation costs paid for by their insurance policies."); *Vine St., LLC v. Keeling, 460 F.Supp.2d 728, 765 (E.D.Tex.2006)* (refusing to apply the collateral source rule, reasoning that because "the Court has a broad duty to consider facts bearing on the proper equitable allocation of response costs, the monies [the plaintiff] has already recovered are relevant."); *United States v. Davis, 31 F.Supp.2d 45, 64 (D.R.I.1998)* ("There is nothing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

'equitable' about [the] kind of an allocation" that permits the plaintiff "to recover a portion of the costs for which it already has been or will be compensated.")

*Friedland v. TIC–The Indus. Co.,* 566 F.3d 1203, 1207 (10th Cir .2009).

Thus, whether the issue is one of equity or of application of the collateral source rule, courts are loathe to shift expenses to a liable party when those expenses have already been borne by an insurer. It is not as though the insured Defendants' insurance was for naught: courts and things like equitable allocations are notoriously unpredictable, and by purchasing insurance they received the peace of mind knowing that their expenses were covered regardless of how any litigation turned out. Accordingly, GP's and U.S. Paper Mills' motions for summary judgment will be denied to the extent any of the funds it seeks have been covered by insurance. Further discovery on relevant insurance proceeds may be permitted if necessary.

**\*15** Plaintiffs also challenge roughly $2.7 million in expenses GP seeks on the grounds that the expenses were not necessary or consistent with the National Contingency Plan. For instance, they cite GP's payments to a public relations consultant as being outside the bounds of properly recoverable costs under CERCLA. Although GP has responded to Plaintiffs' arguments, it appears that there are still issues of material fact outstanding that would preclude the Court from concluding, as a matter of law, that all of the expenses GP seeks are properly recoverable. Although GP chides Plaintiffs for not being diligent in taking discovery on these issues, I am satisfied that the expedited approach we have taken here would excuse any oversights, especially given the mountain of issues presented in the instant motions.

U.S. Paper Mills also claims a right to contribution for some $12 .5 million in expenses it incurred pursuant to a consent decree entered in 2006. Plaintiffs protest that they need more discovery, but

I have concluded above that the additional factors they cite (volume of pollution and the like) are not relevant given the circumstances of this case. For the reasons given above, however, the fact that U.S. Paper Mills has apparently received substantial insurance payments precludes entry of judgment for its expenses.

**C. Motions for Summary Judgment on Prospective Relief**

Menasha Corporation and several of the other Defendants also seek a declaratory judgment applying the rationale of the December 16, 2009 Decision and Order to any *future* expenses they may be asked to incur. In other words, they seek a declaration that they will be entitled to contribution from Plaintiffs for any appropriate response costs they incur in cleaning up the Fox River Site. Such a declaration would promote efficiency and certainty by resolving the issue now rather than requiring the numerous parties to engage in litigation in the future.

Plaintiffs renew their global objections that they have been denied adequate discovery and precluded from arguing divisibility of the harm. As noted above, however, I have concluded that the discovery they seek would not change the equities of the case, even if it proved what the Plaintiffs hope it proves. In addition, I have agreed with Plaintiffs' position that CERCLA does not require them to pay for cleanup expenses in OU1 unless they could be found arrangers. Thus, Plaintiffs' divisibility "defense" argument, at least as it pertains to OU1, is not necessary because I will not require them to contribute to OU1 costs in the future unless they are shown to be arrangers.

Plaintiffs also argue their divisibility "defense" with respect to the volume of discharges and the different types of Aroclors released into the river. That is, they argue for divisibility not just on the basis of geography but on the basis of pollutants and volume. In a nutshell, they assert that these factors may also compel a finding that the environmental harm in the Site is divisible, and thus that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

Plaintiffs are not liable for certain portions of the cleanup. But again, divisibility is not a "defense" in a § 113 contribution action. *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1513 (11th Cir.1996) (finding that "the district court improperly imported the 'divisibility' defense to joint and several liability under § 107(a) into the analysis for equitable allocation under § 113(f)"). Thus, the divisibility arguments Plaintiffs make are properly construed as arguments for a lower share of allocation under principles of equity. I have concluded above that Plaintiffs' divisibility argument relieves them of the need to contribute for OU1 costs (unless they are arrangers), but I have already rejected their arguments that contribution must turn on the various different kinds of Aroclors found in the river or the relative volumes of discharge. The Plaintiffs mobilized the PCBs, and the Defendants are merely innocent and passive dischargers of the pollution Plaintiffs created.[FN4]

**\*16** Plaintiffs also raise a specific objection in arguing that the Defendants are not entitled to obtain natural resource assessment costs and damages because they lack standing. The Defendants have not responded to this argument, and in fact they made a similar argument in seeking dismissal of Plaintiffs' own claims. Because private parties lack standing to seek natural resource damages, the motion will be denied to the extent it seeks such damages. Otherwise, the motion will be granted in part, such that the moving Defendants (those joining Menasha's brief, as well as the City of Appleton, which joined Menasha's brief and filed its own motion) will be entitled to full contribution from Plaintiffs for any future expenses they are required to incur for cleanup of the OU2–OU5 sections of the river, provided that such expenses are properly recoverable in contribution.

**D. City of Green Bay and Brown County's Motions for Summary Judgment**

These Defendants have moved for summary judgment not to recover any expenses they incurred but to ask the Court to rule that Plaintiffs are not

entitled to contribution from them. In other words, although they did not move for summary judgment in the initial phase of motion practice, they assert that this Court's December 16, 2009 Decision and Order should apply with equal force to them and bar Plaintiffs from seeking contribution from them.

On December 1, 2010, the United States filed a notice of settlement and proposed consent decree with Brown County and the City of Green Bay. If approved, the consent decree would resolve these Defendants' liability for contribution: "The Parties agree, and by entering this Consent Decree this Court finds, that this Consent Decree constitutes a judicially-approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that each Settling Defendant and each Settling Federal Agency is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for "matters addressed" in this Consent Decree." (Case No. 10–C–910, Dkt. # 31, Ex. 1, ¶ 26.) Given the pendency of the proposed consent decree, I will refrain from ruling on these Defendants' motion at this time.

**E. United States' Motion for Summary Judgment**

[10] The United States has also moved for summary judgment on Plaintiffs' claim for contribution arising out of the dredging activities of the Army Corps of Engineers. Plaintiffs argue that because Phase I specifically excluded discovery on their dredging claims against the United States, granting summary judgment to the United States would be unfair and would deprive Plaintiffs of meaningful discovery. Plaintiffs assert that there is evidence that the Corps' dredging operations disturbed PCBs buried in the riverbed and led to contamination of other areas where PCBs had not traveled. Some of this activity occurred after the dangers of PCBs were well-known, and thus the United States should bear some of the responsibility for cleanup costs.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)

**(Cite as: 2011 WL 806411 (E.D.Wis.))**

*17 Although discovery on the dredging claim has not been taken, Plaintiffs have marshaled evidence and expert testimony supporting the conclusion that the Corps' dredging activities could have exacerbated the PCB problem during a period when that problem was well-known (*i.e.,* in the early to mid-1970's). Plaintiffs argue that several million cubic yards of sediment was dredged from the river bottom and then "sidecasted"—dumped not into a landfill or land site but into other areas of the river. This practice released PCBs buried deep in the riverbed into the open water and could have caused additional contamination. In addition, the Corps used barges to dump some of the sediment, and often the sediment would overflow the barge container back into the river. The Corps also used "hopper" dredges, which sucked sediment from the river bottom into hoppers onboard a boat, and these hoppers also leaked back into the river. Plaintiffs' expert, Donald Hayes, Ph.D., concludes as follows:

The use of sidecast disposal of dredged sediments, wood fence coaming on deck barges, barge overflow, and hopper overflow do not and did not represent best management practices for contaminated sediment dredging operations. More environmentally sound practices were available during the times in which those practices were in use by or on behalf of the COE on the LFR Site. Inappropriate dredging practices by and on behalf of the COE almost certainly increased the scope and cost of remedial actions at the LFR Site.

(Roach Decl., Dkt. # 980, Ex. 3 at ¶¶ 11–12.)

The government argues that Plaintiffs' evidence has merely established that the Corps is liable under CERCLA—not that it should be forced to contribute to Plaintiffs' cleanup efforts. Given the vast disparity in the parties' knowledge and the other reasons cited in this Court's December 16, 2009 Decision and Order, there is simply no basis on which to hold the Corps of Engineers responsible for the PCB problem. In addition, the United States notes that all of its open-water dumping of dredged material after 1968 was material that came from the outer harbor of Green Bay, not from the more contaminated portions of the river. Thus, it was not as though the Corps was dredging in a heavily contaminated area and then simply dispersing that sludge into another part of the river. In addition, even if some PCBs escaped back into the river as a result of the dredging process, the government argues that its actions had a net positive effect because the Corps dredged some 14 million cubic yards of sediment between 1967 and 2007 and the vast majority of this was deposited on land (such as Bayport) where only minimal leakage occurred. In other words, even if it released some PCBs that were dormant on the river bottom, on the whole the Corps' actions mitigated, rather than exacerbated, the PCB problem.

Under other circumstances, I might agree with Plaintiffs that genuine issues of material fact need exploring before summary judgment could be entered. The evidence they have cited suggests that there was *some* leakage of PCBs back into the river as a result of the Corps' dredging activities, and some of this could have occurred during a time when the dangers of PCB contamination were widely known. But I am satisfied that the considerations I have explained elsewhere and repeated above would overwhelm any facts produced through additional discovery or trial. In other words, even if discovery produced evidence that a given amount of PCBs found its way back into the river site because of the Corps' dredging activities, that would not materially change the equities that preclude Plaintiffs from receiving contribution from these Defendants. Even if Plaintiffs could take more discovery and even if that discovery proved what they believe they can show, it would not change my conclusion that they are not entitled to contribution.

**F. Neenah–Menasha's Motion for Summary Judgment**

*18 The Neenah–Menasha Sewerage Commission ("NMSC") has also moved for summary judg-

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

ment on its counterclaim. As the operator of a wastewater treatment facility that discharges into OU1, NMSC released PCBs into the river. In 1994 it entered into the Fox River Coalition with the Wisconsin DNR and other defendants to finance the remediation of the river. As a part of the Coalition, NMSC contributed some $37,000 to fund remediation projects.

Plaintiffs raise several objections. First, they renew their argument that other principles of equity, apart from fault, must come into play. I have addressed and rejected this argument above. They also argue that there is evidence that NMSC has already received insurance payments for the damages they now seek, and thus it has already been made whole. NMSC notes, however, that it has not received any insurance payments covering its outlays to the Fox River Coalition or for any other remediation projects. Its insurers have contributed to its defense of this action, but nothing more. Accordingly, there is no issue regarding double recovery.

Plaintiffs also argue that the statute of limitations bars NMSC's claims. Its contributions occurred in the mid-nineties, and Plaintiffs argue that CERCLA's three-year statute of limitations would have expired in 2000. As noted above, however, there has not been a "triggering event" under § 113(f). As such, the three-year limitations period was not triggered and the claims are timely.

[11] Plaintiffs further argue that genuine issues of material fact exist as to whether the response costs sought by NMSC are appropriately recoverable costs under CERCLA. First, NMSC paid $19,457 to the WDNR in 1994 for sediment investigation. This payment was made pursuant to a "Cooperative Agreement for: Lower Fox River Remedial Investigations Funding," an agreement among a number of municipalities and the DNR to fund a "contract for the remedial investigation ("RI") of the contaminated sites in the Lower Fox River ... and a feasibility study." (Dkt. # 887, Ex. 1 at 1.) That agreement specified $19,427 as NMSC's

share, and NMSC paid the amount by check to the DNR. (*Id.,* Ex 2.) Plaintiffs' objection that there is not a "signed" cooperative agreement is not enough to create a genuine issue of fact as to whether NMSC's payment to the DNR was a recoverable response cost, as there is no serious dispute that NMSC paid the DNR the exact amount called for in that agreement. Plaintiff also objects that a "naked check" of $11,974, paid to the DNR in July 1995, does not suffice to establish that the funds are properly recoverable under CERCLA. The check, however, is not "naked." It was accompanied by a cover letter explaining that the funds were being paid to fund projects "related to cleanup of contaminated sediments in the Lower Fox River," one of which involved "the extent and concentrations of polychlorinated biphenyls in the lower seven miles of the river." (*Id.,* Ex 4. at 4.) Finally, NMSC paid $1,915 to the Lower Fox River Dischargers Association, which constituted payment for "WDNR Water Quality Funding," annual dues, and a "USGS flow gauging station." (*Id.,* Ex. 3 at 3.) Plaintiffs object that we do not have enough information to conclude that these costs are recoverable under CERCLA, but it is difficult to see how dues to the Lower Fox River Dischargers Association, and other fees related to water quality and flow under the aegis of the "dischargers association" would be anything but recoverable response costs. Plaintiffs' insistence on more detail ignores the fact that evidence of response costs—particularly perhaps when municipalities are involved—will frequently consist of nothing more than a check and a cover letter or invoice. In sum, I conclude that Plaintiffs' objections have not created a genuine issue of material fact as to NMSC's contribution counterclaim.

## II. Conclusion

*19 The Defendants' summary judgment motions [857], [861], [891], [893], [902], and [914] are **GRANTED** in part and **DENIED** in part, as set forth above. These Defendants are entitled to contribution from Plaintiffs for expenses incurred in cleaning up OU2–OU5, but resolution of expenses relating to OU1 will require a determination of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)
**(Cite as: 2011 WL 806411 (E.D.Wis.))**

"arranger" liability. GP's and U.S. Paper Mills' motions for summary judgment will be denied to the extent any of the funds it seeks have been covered by insurance. Issues of fact preclude a ruling on some aspects of damages, as set forth above.

The motion of the United States [867] is **GRANTED.**

The motions of Wisconsin Public Service Corporation and Kimberly–Clark [849] and [852] are **GRANTED.**

CBC Coating's motion to amend [1050] is **GRANTED.**

Neenah–Menasha's motion for summary judgment [880] is **GRANTED.**

Consideration of the motions of Green Bay [865] and Brown County [946] is **STAYED** pending resolution of the consent decree.

The motion to file a sur-reply [1057] is **GRANTED.**

The clerk will place the case on the calendar for a status conference.

**SO ORDERED.**

FN1. Plaintiffs' divisibility argument might have some merit if we were talking about completely unrelated sites and discharges. Suppose the Defendants sought contribution for expenses they incurred in cleaning up a river in California at a site unconnected with the Fox River. In that case, Plaintiffs might have an argument that they are not liable at all under § 107 because that pollution is wholly divisible from any pollution they might be responsible for. But here the Plaintiffs and Defendants share a common liability for cleanup of OU1–OU5, and that is enough to support Defendants' claims for contribution. As noted elsewhere, the "divisibility" analysis

usually surfaces in the equitable analysis, and presumably it is normally a key consideration that will provide an ample defense to contribution. This case is the exception, however, because of my conclusion that Plaintiffs' knowingly took the risk that the material they mobilized would end up throughout the entire Fox River area.

FN2. CBC has filed a motion to amend its answer to add a counterclaim seeking contribution from Plaintiffs. There does not seem to be any prejudice to such an amendment, and the motion to amend will therefore be granted.

FN3. *See, e.g., BASF Catalysts LLC v. United States,* 479 F.Supp.2d 214, 220–24 (D.Mass.2007).

FN4. Although divisibility is not a defense in a contribution action, it seems doubtful that Plaintiffs would win a divisibility argument on the basis of anything other than geography.

E.D.Wis.,2011.
Appleton Papers Inc. v. George A. Whiting Paper Co.
--- F.Supp.2d ----, 2011 WL 806411 (E.D.Wis.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.