# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| GEORGIA-PACIFIC CONSUMER | ) | |
| PRODUCTS LP, | ) | |
| FORT JAMES CORPORATION, and | ) | |
| GEORGIA-PACIFIC LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No: 1:11-cv-00483 |
| v. | ) | |
| | ) | Judge Robert J. Jonker |
| NCR CORPORATION, | ) | |
| INTERNATIONAL PAPER CO., | ) | Magistrate Judge |
| and WEYERHAEUSER CO., | ) | Hugh W. Brenneman, Jr. |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY TO NCR'S OPPOSITION TO MOTION TO COMPEL
PRODUCTION OF DOCUMENTS USED TO PREPARE CORPORATE DESIGNEE
AND RESUMPTION OF DEPOSITION OF DEFENDANT NCR CORPORATION**

NCR's opposition memorandum does not justify NCR's failure to prepare its 30(b)(6) designee, or its refusal to produce the documents that were the exclusive basis for his testimony. NCR cites no cases involving the preparation of a 30(b)(6) designee adequately explaining why NCR need not produce documents used to refresh the corporation's recollection, nor does it explain why any attorney work-product protection was not waived when NCR used the documents to prepare Mr. Gallagher. Tellingly, NCR cannot defend Mr. Gallagher's failure to speak to a single person, outside of litigation counsel, about the topics of NCR's 30(b)(6) deposition, when the information relevant to those topics resided almost exclusively in the memories of former employees available to NCR. Finally, although NCR argues that the noticed deposition topics were overly broad, it chose not to take the obvious recourse of seeking a protective order prior to appearing at the deposition, thereby waiving its right to complain now.

I.  **NCR Must Produce The 30(b)(6) Deposition Preparation Materials, For Which Any Attorney Work-Product Claim Has Been Waived.**

Mr. Gallagher's lack of personal knowledge, and his complete reliance on documents to refresh NCR's recollection, require production of the materials he reviewed prior to NCR's 30(b)(6) deposition. Mr. Gallagher flatly admitted he was not "a percipient witness" regarding *any* of the topics set forth in GP's Rule 30(b)(6) deposition notice for NCR. Ex. A (NCR 30(b)(6) Tr.) at 9:21-10:3. Because Mr. Gallagher could not testify from "firsthand knowledge" during NCR's deposition (*id.*), he was "an 'empty vessel' and documents reviewed on these topics in preparation for the deposition *necessarily* informed his testimony," *Coryn Group II, LLC v. O.C. Seacrets*, 265 F.R.D. 235, 243 (D. Md. 2010) (emphasis added).

Mr. Gallagher testimony (or lack thereof) only compounded the problem of identifying the basis for his statements. He could not adequately respond to inquiries regarding specific documents used in his preparation, as he frequently could not recall what documents he

reviewed. *See* Ex. A at 52:14-20 (stating that he did not remember any "identifying details" of documents he reviewed in preparation for NCR's testimony). He testified about the contents of documents that he also testified he did not recall reviewing. (*Compare id.* at 18:12-15 (stating that he wasn't sure he reviewed Gene Edgerton's deposition) *with* 134:4-8 (recalling Mr. Edgerton's deposition testimony)). Accordingly, and as explained in GP's opening memorandum and in the leading case (*Nutramax Labs., Inc. v. Twin Labs. Inc.*, 183 F.R.D. 458 (D. Md. 1988)), the only way GP can adequately cross-examine NCR is to see what documents Mr. Gallagher reviewed during his preparation. (Dkt. 130 at 4-7.)

NCR's arguments concerning Rule 612 ignore the fact that the deposition was of NCR, not the "empty vessel" of Mr. Gallagher. Cases such as *Nutramax* and *Coryn Group II* are informative in that they deal with the complexities of attorney work-product claims over the *collection* of unprivileged documents used to prepare a Rule 30(b)(6) designee.[1] NCR, by contrast, relies on the inapposite *Parry v. Highlight Indus., Inc.*, which addresses the discoverability of an individual witness-preparation document that may itself contain privileged materials. 125 F.R.D. 449, 452 (W.D. Mich. 1989).[2] Similarly, one concern of *Parry* – the existence of improper "witness coaching" sufficient to justify disclosure of preparation materials – is present here, but in a completely different context. A party responding to a 30(b)(6) notice is *expected* to fill a witness's head with information as needed. But this lawful "coaching" raises the same evidentiary concern as the improper coaching addressed in *Parry*, i.e., the process generates a need for the opposing party to have access to the preparation materials themselves.

---

[1] Mr. Gallagher testified that he reviewed no privileged or work-product protected documents during his deposition preparation. (Ex. A at 22:16-18.)

[2] Thus, *Parry* demands, for example, that the party claiming privilege must submit contested materials for *in camera* review – a process that is unnecessary here. *See Parry*, 125 F.R.D. at 452.

*See id.* (Court was concerned that witness had "been coached, through these documents, to avoid the use of certain terminology.").

Moreover, to the extent NCR's document-selection process could ever be protected by attorney work-product, that protection has been waived. Again, *Nutramax* is on point. *See* 183 F.R.D. at 467 ("If otherwise discoverable documents, which do not contain pure expressions of legal theories, mental impressions, conclusions or opinions of counsel, are assembled by counsel, and are put to a testimonial use in the litigation, then an implied limited waiver of the work-product doctrine takes place, and the documents themselves, not their broad subject matter, are discoverable."). For Rule 30(b)(6) depositions, "[t]here is a greater need to know what materials were reviewed by expert designee witnesses in preparation for deposition since the substance of their testimony may be based on sources beyond personal knowledge." *Id.* at 489.

## II. NCR Failed To Adequately Prepare Its 30(b)(6) Designee, Particularly Because Mr. Gallagher Did Not Speak To Any Current Or Former NCR Employees About the Noticed Topics.

When preparing for its 30(b)(6) deposition, a corporation can conduct an "exhaustive investigation" for all information known or reasonably available to it, or it can bury its head in the sand.[3] *See In re Indep. Serv. Org. Antitrust Litig.*, 168 F.R.D. 651, 654 (D. Kan. 1996). NCR chose the latter. Outside of litigation counsel, Mr. Gallagher spoke to ***no one*** prior to NCR's deposition. (Ex. A at 13:16-20.)

Mr. Gallagher did not find any documents, or speak to anyone about CCP-containing trim produced at NCR's "Systemedia" plant at Washington Court House, Ohio. (*Id.* at 71:3-14.) As

---

[3] GP omitted a citation supporting its unremarkable assertion that NCR, like any entity responding to a 30(b)(6) notice, must "exhaustively" investigate all relevant information known or reasonably available to NCR. (*See* Dkt. No. 147 at 2 n.2.) NCR's claim that it was "not aware of any" legal support for this statement is curious, given that NCR cites to the same page of the case from which GP obtained that standard. (*Id.* at 4 (citing *In re Indep. Serv. Org. Antitrust Litig.*, 168 F.R.D. at 654).)

just one example, he did not speak to Donald Clason, the former Senior Vice President of Systemedia, who claimed three weeks later in response to a GP subpoena that he recalled generation of trim in small volumes, all of which was incinerated on site.  (Ex. B (Donald Clason Tr.) at 16:18-17:5, 40:14-16.)  There is no doubt that Mr. Clason was readily available to NCR, since NCR's lawyers already represented him.  Indeed, GP had previously located and reached out to Mr. Clason for information about Systemedia, only to be told that he was represented by NCR's counsel and was thus off-limits for informal discussion.

Similarly, Mr. Gallagher admitted reviewing a memorandum identifying former NCR employee Daniel McIntosh as someone knowledgeable about the generation and disposition of CCP waste paper, yet Mr. Gallagher did not speak with Mr. McIntosh prior to NCR's deposition. (Ex. A at 13:16-20.)  Again, Mr. McIntosh was plainly available to NCR, and for the same reason – he was already represented by NCR's counsel.  In fact, because of Mr. Gallagher's failure to prepare, *no one but NCR's counsel* has thus far been able to obtain Mr. McIntosh's information. GP had scheduled a deposition of Mr. McIntosh, but NCR's counsel canceled that deposition and thus far has refused to reschedule it.

Rule 30(b)(6) requires Mr. Gallagher, as NCR's representative, to reach out to people like Mr. Clason and Mr. McIntosh.  GP should not be required to identify, locate, and depose every current and former NCR employee to determine who has knowledge of relevant topics.[4]  In short, NCR "cannot meet its discovery obligations by sticking its head in the sand and refusing to look for the answers and then saying it does not know the answer."  *In re Indep. Serv. Orgs. Antitrust Litig.*, 168 F.R.D. at 653.

---

[4] This is particularly true with respect to Mr. Clason and Mr. McIntosh, as neither were listed in NCR's Initial Disclosures as individuals likely to have discoverable information.

### III.    NCR Waived The Right To Protest The Topics Of Its 30(b)(6) Deposition.

NCR's complaints about the propriety of GP's 30(b)(6) deposition notice come far too late.  It is true that NCR sent written objections in response to GP's 30(b)(6) deposition notice, and that GP and NCR had subsequent discussions regarding NCR's concerns. Yet despite these alleged concerns, NCR decided not to seek a protective order, instead agreeing that it would "designate a witness who will provide testimony" on all the noticed topics.  *See generally* Dkt. 130 Ex. C (NCR Corp.'s Responses and Objections to Pls.' Am. Notice of 30(b)(6) Dep).  That decision spoke volumes about GP's noticed topics, which were in fact appropriately limited and plainly proper.

In any event, when NCR produced its witness, NCR's right to complain about the scope and content of the 30(b)(6) notice ended.  Unlike objections to written discovery, objections to the scope or content of a 30(b)(6) deposition must be made *and resolved* in advance of the responsive testimony. *Compare* Fed. R. Civ. P. 33(b)(4), 34(b)(2)(C), 36(a)(5) *with* Fed. R. Civ. P. 30; *see also New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 242 F.R.D. 164, 165-66 (D. Mass. 2007) ("If counsel for [defendant] was of the view that the plaintiff's 30(b)(6) deposition notice was defective or improper in some way…it was [defendant's] burden to seek protection pursuant to Rule 26(c), seeking an order that '…the…discovery may be had only on specified terms and conditions….'") (internal citations omitted); *see also In re Air Crash Disaster at Detroit Metro. Airport on August 16, 1987*, 130 F.R.D. 627 (E.D. Mich. 1989) ("Failure to seek judicial relief prior to [the date of the deposition] will preclude a later objection.").  NCR's protestations of overbreadth **after the deposition was taken** are much like the plaintiff's complaints of a vague deposition notice in *Arctic Cat, Inc. v. Injection Research Specialists, Inc.*: "If, as Arctic Cat portends, the Deposition Notice caused it uncertainty as to the substance of the intended inquiry, Arctic Cat was prepared to ride that

uncertainty to a predictable conclusion -- the inability of its designated deponent to reasonably respond to relevant questioning." 210 F.R.D. 680, 683 (D. Minn. 2002). NCR's failure to seek a protective order before its deposition has waived any grounds for seeking judicial protection at this point.

## IV.     Conclusion:  NCR Must Comply Or Live With Its Choices.

NCR claims it had concerns regarding the topics which GP noticed for its 30(b)(6) deposition, yet NCR decided to let the deposition continue as scheduled, apparently banking on its ability to complain after the fact.  NCR's designee, Mr. Gallagher, was admittedly an empty vessel whose testimony was based solely on business records he could only vaguely identify – yet NCR refuses to produce those records.  Mr. Gallagher spoke to no one but litigation counsel prior to the deposition, even though those same attorneys represented former NCR employees with knowledge of various topics.  Yet now NCR claims that its obligation to conduct an exhaustive investigation and provide testimony on behalf of the corporation has been satisfied.

NCR's gamesmanship should not be rewarded.  Either NCR must try again, or NCR must be bound by its choices.  In addition to an award of its fees incurred in bringing this motion, GP respectfully requests that the Court (a) order NCR to produce, within 10 days, all documents used to prepare Mr. Gallagher for NCR's 30(b)(6) deposition, and (b) order NCR to provide, within 20 days, a properly prepared witness for a resumption of the 30(b)(6) deposition at the offices of Hunton & Williams LLP in Washington, D.C.  As set forth in GP's opening memorandum, in the event NCR claims in an affidavit that it cannot provide further testimony on any of the noticed 30(b)(6) topics, GP requests that the Court take steps to ensure that NCR is held to its inability to present evidence, avoiding any ambush at trial.

Dated: March 2, 2012

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

BY: _____/s/ Douglas M. Garrou_____

Peter A. Smit, Bar No. P 27886
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501
(616) 336-6000

Joseph C. Kearfott
Douglas M. Garrou
George P. Sibley, III
Hunton & Williams LLP
951 East Byrd St.
Richmond, VA 23219
(804) 788-8200

Jeffrey N. Martin
Djordje Petkoski
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Kathy Robb
Hunton & Williams LLP
200 Park Avenue, 52nd Floor
New York, New York  10166-0005
(212) 309-1000

Jan M. Conlin
Tara D. Falsani
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
(612) 349-8500

# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

------------------------------------*
GEORGIA PACIFIC CONSUMER PRODUCTS,
FORT JAMES CORPORATION, and
GEORGE-PACIFIC LLC,                    Civil Action No.

                    Plaintiffs,      1:11-cv-00483-RJJ

          vs.

NCR CORPORATION, INTERNATIONAL
PAPER CO., and WEYERHAEUSER
COMPANY,

                    Defendants.
------------------------------*



          VIDEOTAPED 30(B)(6) DEPOSITION OF

          NCR, by and through its designee,

               EDWARD R. GALLAGHER

          Wednesday, January 25, 2012

               New York, New York

                    10:21 a.m.




Reported by:

Josephine H. Fassett, RPR, CCR

**2**

1    Wednesday, January 25, 2012
2    New York, New York
3    10:21 a.m.
4
5    T R A N S C R I P T  of the Videotaped
6    30(b)(6) Deposition of NCR, by and through its
7    designee, EDWARD R. GALLAGHER, taken by the
8    Plaintiffs, held at the offices of Cravath, Swaine
9    & Moore LLP, 825 Eighth Avenue, New York, New York,
10   on Wednesday, January 25, 2012, commencing at 10:21
11   a.m., before Josephine H. Fassett, a Registered
12   Professional Reporter, Certified Court Reporter,
13   Certified Livenote Reporter and Notary Public of the
14   State of New York.
15
16
17
18
19
20
21
22

**4**

1    A P P E A R A N C E S (cont'd) :
2
3    BAKER HOSTETLER LLP
4    Attorneys for Defendant International Paper Co.
5      PNC Center
6      1900 East 9th Street
7      Suite 3200
8      Cleveland, Ohio  44114-3482
9    BY:  JOHN D. PARKER, ESQ.
10     jparker@bakerlaw.com
11
12
13   PERKINS COIE LLP
14   Attorneys for Defendant Weyerhaeuser Company
15     1201 Third Avenue
16     Suite 4800
17     Seattle, Washington  98101-3099
18   BY:  J. CHRISTOPHER BAIRD, ESQ.
19     jcbaird@perkinscoie.com
20
21   ALSO PRESENT:
22   MARCELO RIVERA, Videographer

**3**

1    A P P E A R A N C E S :
2
3    HUNTON & WILLIAMS LLP
4    Attorneys for Plaintiffs
5      Riverfront Plaza
6      East Tower
7      951 East Byrd Street
8      Richmond, Virginia  23219
9    BY:  DOUGLAS M. GARROU, ESQ.
10     dgarrou@hunton.com
11     JOSEPH C. KEARFOTT, ESQ.
12     jkearfott@hunton.com
13
14
15   CRAVATH, SWAINE & MOORE LLP
16   Attorneys for Defendant NCR Corporation
17     825 Eighth Avenue
18     New York, New York10019-7475
19   BY:  DARIN P. McATEE, ESQ.
20     dmcatee@cravath.com
21
22

**5**

1              I N D E X
2    WITNESS                          PAGE
3    EDWARD R. GALLAGHER
4      By Mr. Garrou              8,191
5      By Mr. Parker              186
6
7         AFTERNOON SESSION - 99
8
9           E X H I B I T S
10   EXHIBIT    DESCRIPTION            PAGE
11   Exhibit 49  Plaintiffs' Amended Notice of
12     30(b)(6) Deposition of NCR
13     Corporation and Request for
14     Production of Documents        7
15   Exhibit 50  Impact Paper Report dated
16     August 31, 1953              28
17   Exhibit 51  The NCR News Article dated
18     May 1954                     33
19   Exhibit 52  NCR Factory News Article dated
20     December 1958                36
21   Exhibit 53  NCR Factory News Article dated
22     March 1967                   39

6

```
1          E X H I B I T S
2   EXHIBIT   DESCRIPTION              PAGE
3   Exhibit 54  NCR Factory News Article dated
4          February 1966              41
5   Exhibit 55  NCR Factory News Article dated
6          June 1964                  48
7   Exhibit 56  Memorandum dated January 23, 1970  52
8   Exhibit 57  NCR World Article dated
9          November-December 1970      63
10  Exhibit 58  NCR World Article dated
11         January-February 1971       97
12  Exhibit 59  Compilation of Attachments to
13         30(b)(6) Deposition Notice     101
14  Exhibit 60  International Paper's Notice of
15         Rule 30(b)(6) Deposition of
16         Defendant NCR Corporation    186
17
18
19
20
21
22
```

8

```
1   525, Washington, D.C.
2       Will present counsel please introduce
3   themselves for the record.
4       MR. GARROU:  Doug Garrou representing
5   Plaintiffs.
6       MR. KEARFOTT:  Joseph Kearfott with
7   Hunton & Williams representing the
8   Plaintiffs.
9       MR. PARKER:  John Parker with Baker &
10  Hostetler representing International Paper.
11      MR. BAIRD:  Chris Baird from Perkins
12  Coie for Weyerhaeuser.
13      MR. McATEE:  Darin McAtee from Cravath
14  for NCR.
15      THE VIDEOGRAPHER:  Will the court
16  reporter please swear in the witness.
17  E D W A R D  R.  G A L L A G H E R, the witness,
18      having been duly sworn, was examined and
19      testified under oath as follows:
20  EXAMINATION BY
21  MR. GARROU:
22      Q   Good morning, Mr. Gallagher.
```

7

```
1       (Plaintiffs' Amended Notice of 30(b)(6)
2   Deposition of NCR Corporation and Request for
3   Production of Documents premarked as Exhibit
4   49, as of this date.)
5       (Whereupon, on the video record.)
6       THE VIDEOGRAPHER:  This is DVD No. 1 of
7   the video deposition of Mr. Ed Gallagher in
8   the matter Georgia-Pacific Consumer Products,
9   et al. versus NCR Corporation, International
10  Paper Company, et al., in the United States
11  District Court for the Western District of
12  Michigan, Southern Division.
13      This deposition is being held at the law
14  offices of Cravath, Swaine & Moore, located
15  at 825 Eighth Avenue, New York, New York, on
16  January 25th, 2012, at approximately 10:21
17  a.m.
18      My name is Marcelo Rivera from the firm
19  of Henderson Legal Services.
20      The court reporter is Josephine Fassett
21  in association with Henderson Legal Services,
22  located at 1015 15th Street, Northwest, Suite
```

9

```
1       A   Good morning.
2       Q   Could you please state your full name
3   and employment position?
4       A   Edward Ray Gallagher.  I'm a law vice
5   president at NCR Corporation.
6       Q   And when you're not testifying as a
7   30(b)(6) witness, what do your job duties consist
8   of?
9       A   I manage our litigation and employment
10  law group.
11      Q   Okay.  Have you brought any documents
12  with you in connection with your testimony today?
13      A   I have not.
14      Q   All right.  I'd like to have you take a
15  look at what I've marked as Exhibit 49.
16      Do you recognize that as the Notice of
17  30(b)(6) Deposition that you're testifying in
18  response to today?
19      A   (Reviews.)
20      Yes, I do.
21      Q   Okay.  When you first reviewed that
22  notice, did you have firsthand knowledge of any of
```

30(b)(6) NCR (Gallagher, Edward R.)                    January 25, 2012

4 (Pages 10 to 13)

10

1    the topics that are set forth in that notice?
2        A   Well, certainly not in the sense of
3    being a percipient witness, no.
4        Q   All right.
5        A   I did -- no, I guess not.
6        Q   I'm sorry, I didn't hear that last part.
7        A   No, I did not.
8        Q   Okay.  And, are you designated to
9    testify on all of the specifications listed in
10   that Exhibit 49?
11       A   I am.
12       Q   So it's fair to say that your testimony
13   on those topics will be based on documents that
14   you've reviewed and/or people you've talked to,
15   correct?
16       A   Yes, that's correct.
17       Q   All right.  And so you didn't review any
18   documents that ever refreshed your firsthand
19   recollection of any matters that are set forth in
20   the, in the notice; did you?
21       A   Would you repeat that, please?
22           MR. GARROU:  Can I have that read back,

11

1    please.
2           (Whereupon, the requested portion was
3    read back by the Reporter:
4           "Question:  And so you didn't review any
5    documents that ever refreshed your firsthand
6    recollection of any matters that are set
7    forth in the notice; did you?")
8        A   No, I did not.
9        Q   All right.  How did you prepare for your
10   deposition today?
11       A   I had some conversations, initially with
12   counsel and with colleagues at NCR.
13           I reviewed several documents, met with
14   counsel, and inquired of counsel as to the topics
15   on at least a couple of occasions.  Probably spent
16   about 50 hours on it.
17       Q   All right.  And when did you start that
18   process?
19       A   I believe in December, but most was in
20   January.
21       Q   All right.  Which of your colleagues at
22   NCR did you speak with in connection with

12

1    preparing for your deposition today?
2        A   John Hartje and Jennifer Daniels.
3        Q   Could you spell Mr. Hartje's last name?
4        A   H-a-r-t-j-e.
5        Q   And Daniels is D-a-n-i-e-l-s?
6        A   Correct.
7        Q   And what topics did you discuss with
8    Mr. Hartje?
9        A   Only who would be an appropriate witness
10   to respond to the notice.
11       Q   All right.  What topics did you discuss
12   with Ms. Daniels in connection with your
13   testimony?
14       A   The same.
15       Q   And the conclusion was that you would be
16   the appropriate witness, I take it?
17       A   I'm certainly the ultimate conclusion.
18       Q   All right.  Did you --
19           THE WITNESS:  Can we take a short -- I
20   want to get some water.
21           MR. GARROU:  Sure.
22           THE WITNESS:  If I could take a quick

13

1    break.
2           MR. GARROU:  Sure.
3           MR. McATEE:  I'll get you some.
4           THE WITNESS:  Thanks.
5    BY MR. GARROU:
6        Q   In preparation for your testimony today,
7    did you have any discussions with former NCR
8    employees?
9        A   I did not.
10       Q   Same question with respect to the former
11   employees of Appleton Papers, Incorporated.  Did
12   you have any contact with them in connection with
13   preparing for your deposition?
14       A   No.
15       Q   Maybe the easiest way to do this is:
16           Other than the two people that you
17   mentioned, Mr. Hartje and Ms. Daniels, did you
18   have any conversations with anyone other than
19   counsel in preparation for your deposition today?
20       A   I don't recall that I did.
21       Q   All right.
22       A   It's possible that our environmental

30(b)(6) NCR (Gallagher, Edward R.)                    January 25, 2012

18

1  depositions -- well, strike that.
2       Is the Martin deposition that you
3  referred to the deposition of Leon Martin taken in
4  this case?
5       A   Sounds correct.
6       Q   All right.  A former employee at the
7  Kalamazoo mill?
8       A   I believe that's right.
9       Q   Did you review a deposition of
10  Mr. Lacey, L-a-c-e-y?
11       A   I think that I did.
12       Q   How about a Mr. Edgerton?  Did you
13  review a deposition in this case by Gene Edgerton?
14       A   I know the name, I'm not sure that I
15  reviewed the testimony.
16       Q   The same question with respect to George
17  Hunter.  Did you read a deposition by Mr. George
18  Hunter taken in this case?
19       A   I don't recall that name.
20       Q   All right.  You mentioned that you
21  reviewed newsletters.  What newsletters did you
22  review?

19

1       A   They were internal Appleton or NCR
2  newsletters.  They, I believe, were in the 104(e)
3  production.
4       Q   Did those include, or, among those
5  materials, were there any NCR Factory News
6  publications?
7       A   I don't recall seeing that title.
8       Q   All right.  What titles do you recall
9  seeing, if any?
10       A   There might have been something called
11  Appleton Scene, I'm not certain.
12       Q   I think you got that right.
13       Anything else you recall?
14       A   I think I did see other newsletters, but
15  I don't recall titles.
16       Q   All right.  What financial records did
17  you review?
18       A   I remember some Appleton financial
19  reports for, I think 1969.
20       Q   Did you review any documents in
21  preparation for your testimony today, other than
22  depositions, that were not part of the 104(e)

20

1  submissions from NCR at some point in time?
2       A   The documents I understand were produced
3  either in the 104(e) or in this litigation.
4  Possibly in the Fox River litigation.
5       Q   All right.  You mentioned progress
6  reports.  What progress reports did you review?
7       A   I think it was the title given to these
8  reports that came from the Portage, Wisconsin
9  plant.
10       Q   That's NCR's Portage, Wisconsin plant?
11       A   It was, yes.
12       Q   And what internal memoranda do you
13  recall reviewing?
14       A   There were several.  There were reports
15  of research activity.  And others.  I don't really
16  have specific recollections of them.
17       Q   All right.  Did you review any resources
18  from the Internet?
19       A   I did not.
20       Q   Did you review any governmental or
21  regulator reports?
22       A   No, no, I didn't.

21

1       Q   Did you review any documents in the form
2  of electronic images as opposed to paper
3  documents?
4       A   I did not.
5       Q   Did you review any summaries or other
6  accounts of witness interviews?
7       A   I think the only thing was a summary
8  attached to one of the expert witness reports, or
9  at least that came from an expert witness and was
10  produced.
11       Q   And what expert witness report was that?
12       A   Again, I'm not certain it was the
13  report, but it -- I think Mr. Moore, but I'm not
14  certain.
15       Q   And do you know whether the report that
16  you read was something that was produced in the
17  Fox litigation?
18       A   I believe that it was.
19       Q   And by "produced," to be more clear, I
20  mean disclosed to the other side.
21       A   That's what I meant.
22       Q   Okay.  Did you review any investigators'

30(b)(6) NCR (Gallagher, Edward R.)                 January 25, 2012

7 (Pages 22 to 25)

---

**22**

1    reports?
2        **A  No.**
3        Q    Did you review any newspaper articles?
4        **A  I don't think so.  I don't know if any**
5    **happened to be included in the old materials, I**
6    **don't remember any specifically.**
7        Q    All right.  I take it, it would not be
8    possible for you to tell me precisely which
9    documents you looked at in preparation for this
10   deposition as you sit here, correct?
11       **A  I could tell you some, but I certainly**
12   **couldn't tell you all of them.**
13       Q    All right.  Did you review any summaries
14   of documents provided to you by counsel?
15       **A  No.**
16       Q    Did you review any documents that were
17   marked privileged or work product?
18       **A  I did not.**
19       Q    Have you completed your review in
20   preparation for your deposition today?
21       **A  Yes, I have.**
22       Q    And do you feel that you were given

---

**23**

1    adequate time to do so?
2        **A  I do.**
3        Q    All right.  I'd like to move to the --
4    some of the specifications in the notice.
5            And I'd like to start first with
6    Specification No. 6.
7            What did you review to prepare yourself
8    to testify on Specification No. 6?
9        MR. McATEE:  Let him read 6.
10       MR. GARROU:  Sure.
11       MR. McATEE:  Since you threw me for a
12       loop, because I thought you'd start with 1.
13       MR. GARROU:  Tricky Richmond lawyer.
14       **A  (Reads.)**
15       **With respect to Specification 6, there**
16   **were relatively few documents in the record that**
17   **related to this.  There was, Mr. Stutz had made**
18   **some remarks in his deposition.  Although this,**
19   **that was in connection with his research work.**
20   **And I don't believe, while we're still looking at**
21   **the matter, I don't think we found anything as to**
22   **general recycling at the Dayton headquarters or**

---

**24**

1    facilities.
2        Q    All right.  So the reference to
3    Mr. Stutz's testimony you think referred to a
4    research rather, which would be, I guess, Topic 7,
5    not Topic 6; is that correct?
6        **A  It would probably fit 7 better than 6.**
7        Q    All right.  I'll save it for 7 then.
8            What business activities did NCR engage
9    in in Dayton, Ohio, that made use of
10   PCB-containing CCP?
11       MR. McATEE:  Could I have that back?
12       (Whereupon, the requested portion was
13       read back by the Reporter:
14       "Question:  What business activities did
15       NCR engage in in Dayton, Ohio, that made use
16       of PCB-containing CCP?")
17       (Whereupon, discussion off the audio
18       record.)
19       MR. McATEE:  So, Doug, I don't think
20       that's one of the topics he's being put up
21       for today.
22   BY MR. GARROU:

---

**25**

1        Q    You can go ahead.
2        **A  I took this to refer to use in offices**
3    **and recycling of that material.  And the extent to**
4    **which it was used in offices we haven't found to**
5    **this point any indications.  That's, that's how I**
6    **understood the question.**
7        Q    All right.  I take it you're not able to
8    answer any of the subparts of Topic 6, in light of
9    what you've just said; is that correct?
10       **A  That's correct.**
11       Q    Are you familiar with NCR's printing
12   division?
13       **A  Well, there isn't one today.  And I**
14   **don't recall there was something, an entity or a**
15   **division by that name in the past.**
16       Q    All right.  So you've never undertaken
17   any investigation regarding the activities and
18   paper handling practices of NCR's printing
19   division in Dayton?
20       **A  I'm familiar with other businesses that**
21   **worked with paper, but, you know, don't recall the**
22   **name printer division.**

---

50

1      Q    All right.  Where have you looked for
2   those materials?
3      A    In the documents that have been
4   generated.  I did review this document before the
5   deposition.  And -- and -- not personally but
6   through interviews of former employees.
7      Q    All right.  Is NCR aware of any former
8   employees who were involved in coating operations
9   in Dayton, Ohio?
10      MR. McATEE:  Who were involved in that?
11      MR. GARROU:  Yes, sir.
12      A    There's certainly memoranda that talk
13   about some of the tests and that's -- and the
14   research work.  I don't recall their names.  But
15   that may be what's referred to here.
16      Q    Have you completed your answer?
17      A    Oh, yes, I have.
18      Q    Sorry.
19         What was the disposition of the
20   documents associated with the Research Division
21   Pilot Plant in Dayton?
22      A    I'm not aware of that disposition.

51

1      Q    All right.  Do you know whether the
2   Research Division Pilot Plant still exists in
3   Dayton?
4      A    It does not.
5      Q    Do you know when it would have been
6   deactivated?
7      A    No, I don't.
8      Q    All right.
9         All right.  Moving to Specification No.
10   8 in Exhibit 49.
11      A    (Complies.)
12      Q    With respect to any operation that
13   produced carbonless copy paper for NCR in Dayton
14   or otherwise, are you aware of the manufacture of
15   any finished CCP that was not ultimately sold to a
16   customer?
17      A    I've seen references in some of the
18   documents about customer complaints.  And to
19   subsequent testing.
20      Q    Do you recall which documents those are?
21      A    Several of the research reports or
22   activity reports reference customer complaints.

52

1   And there are references to materials being sent
2   to Appleton, Dayton, Mead, or being held at a
3   customer location.  But there's a reference to a
4   small warehouse of an indeterminate location in
5   one memo.
6      Q    Do you know anything about that
7   warehouse?
8      A    I don't.
9      Q    What investigation did you undertake in
10   preparation for testifying on Specification 8?
11      A    It's primarily a review of documents in
12   the record that indicated the sorts of things I
13   was just mentioning.
14      Q    All right.  Are you able to identify
15   those documents with any more specificity than you
16   just did?
17      A    There was a memo from a Mr. McClenahan
18   that referenced some of that.  Others appear in
19   several different documents, and I can't recall
20   their identifying details now.
21      (Memorandum dated January 23, 1970
22   marked as Exhibit 56, as of this date.)

53

1   BY MR. GARROU:
2      Q    I'm going to hand you what I think may
3   be that document marked as Exhibit 56.  Could you
4   take a look at that for me?
5      A    (Reviews.)
6      Q    Is this the memo from Mr. McClenahan you
7   were referring to earlier?
8      A    Yes, it is.
9      Q    All right.  The -- the person being
10   described here, Daniel McIntosh, Section Manager
11   NCR Technical Services, do you know who that is?
12      A    Only by name.
13      Q    All right.  Do you know whether that
14   was, in fact, his title as of January 1970?
15      A    I don't have a reason to doubt it.
16      Q    Do you know whether NCR's lawyers
17   represent Mr. McIntosh?
18      A    I don't know.
19      Q    Did you ever ask to be put in touch with
20   Mr. McIntosh in preparation, as a part of
21   preparation for your deposition today?
22      A    I understand he's very ill and so I did

30(b)(6) NCR (Gallagher, Edward R.)                    January 25, 2012

70

1   **generated there.**
2       Q   All right.  When was that?  And by
3   "broke" do you mean PCB-containing CCP broke?
4       **A   I do.**
5       Q   All right.  When was that PCB-containing
6   CCP broke generated at the Washington Court House
7   facility?
8       **A   I believe in this 1960s, perhaps other**
9   **times.**
10      Q   All right.  What's that belief based on?
11      **A   From the inquiries I made prior to the**
12  **dep or in preparation for the deposition.**
13      Q   All right.  And did you -- did those
14  inquiries include speaking with any people?
15      **A   Not outside of counsel.**
16      Q   All right.  Aside from counsel, did you
17  obtain any information from any person that led
18  you to believe that there was some CCP broke and
19  trim containing PCBs generated at Washington Court
20  House in the 1960s?
21      THE WITNESS:  I'm sorry, I lost that.
22      MR. GARROU:  Let me ask that one over.

71

1       That was terrible.
2   BY MR. GARROU:
3       Q   Aside from speaking with counsel, did
4   anyone else provide you with facts leading you to
5   believe that in the 1960s, and perhaps other
6   times, the Washington Court House operation
7   generated PCB-containing CCP broke?
8       **A   I can't recall any other communications.**
9       Q   All right.  How about documents?  Did
10  you review any documents leading you to believe
11  that that broke was generated in the 1960s and
12  perhaps other times?
13      **A   I don't think we've located any**
14  **documents to that effect.**
15      Q   All right.  Do you know what facts
16  formed the basis for your counsel's discussion
17  with you regarding the creation of PCB-containing
18  CCP broke at Washington Court House?
19      MR. McATEE:  Object to form.
20      Can you just ask that without counsel in
21  the question?  He's here to talk as a
22  representative of the company in answering

72

1   your questions.
2   BY MR. GARROU:
3       Q   Well, am I correct that your only
4   information regarding the generation of
5   PCB-containing broke at Washington Court House
6   came to you in connection with discussion with
7   counsel?
8       MR. McATEE:  Object to form.
9       **A   I don't recall any others.**
10      Q   All right.  What did you learn from
11  counsel regarding the creation of PCB-containing
12  broke and trim at Washington Court House?
13      **A   I wanted to know if there had been some,**
14  **and I understood that there was, and I don't --**
15  **well, that's -- that was my main purpose.**
16      Q   All right.  So aside from being told
17  that by counsel, are you aware of any facts
18  supporting your belief that PCB-containing CCP
19  broke and trim was generated at Washington Court
20  House?
21      **A   No, I don't recall any specific facts.**
22      Q   What led you to believe that it was

73

1   generated in the 1960s and possibly other times?
2       **A   I don't think -- it wouldn't have come**
3   **after 1970, '71 when we stopped doing CCP broke,**
4   **or stopped using Aroclor 1242.  And the reason for**
5   **other times, I don't recall how long the facility**
6   **had been in use.**
7       **From the reference in Exhibit 57, it's**
8   **highly likely it was in place in 1970 and**
9   **therefore I'm presuming it was doing work in the**
10  **sixties.**
11      Q   You said that you wouldn't expect it to
12  have been generated after 1970 or 1971 due to the
13  fact that NCR stopped using Aroclor 1242.  Is that
14  an accurate summary of what you said?
15      **A   That's correct.**
16      Q   All right.  When, in fact, did NCR stop
17  using Aroclor 1242?
18      **A   I don't recall the exact date, it was in**
19  **'70 or '71.**
20      Q   Okay.  You can't narrow it down any
21  further than that?
22      **A   I could, but not as I sit here today.**

30(b)(6) NCR (Gallagher, Edward R.)                    January 25, 2012

35 (Pages 134 to 137)

134

1      Q    Are you familiar with the term
2    backhauling?
3      A    I am.
4      Q    Are you familiar with any evidence
5    suggesting that carbonless broke was backhauled by
6    truck from the Appleton plant?
7      A    I think Mr. Edgerton may have suggested
8    that.
9      Q    Do you have any reason to think he's
10   incorrect about that?
11     A    It's not consistent with the testimony
12   of the people that actually handled the broke
13   sales.
14     Q    All right.  So NCR doesn't believe that
15   any carbonless broke was backhauled from the
16   Appleton plant between 1953 and 1971?
17     A    That's right.
18     Q    The brokers that you've identified as
19   being the ones that NCR believes purchased
20   carbonless broke from Appleton, those brokers
21   being National Fiber, Continental and Golper, is
22   that the same collection of brokers that NCR

135

1    believes obtained PCB-containing carbonless broke
2    from Combined Locks?
3      A    We believe so.
4      Q    All right.  So would your answers with
5    respect to carbonless broke leaving the Appleton
6    plant and what brokers it went to and how it was
7    transported, would those answers all be the same
8    for the Combined Locks plant?
9      A    Yes.
10     Q    All right.  So you believe that the
11   Combined Locks plant -- strike that.
12         You believe that any PCB-containing
13   carbonless broke from the Combined Locks plant
14   would have been transported away from that
15   facility by rail?
16     A    Yes.
17     Q    And you don't believe any would have
18   been transported by truck?
19     A    We've seen nothing to suggest that.
20     Q    All right.  And you don't believe any
21   would have been transported by truck to
22   Mr. Golper's facility in particular?

136

1      A    I have seen nothing to that effect.
2      Q    All right.
3      A    Nor heard of it.
4      Q    During what time period did the Combined
5    Locks Mill create PCB-containing carbonless broke?
6      A    It did some trial runs in the
7    mid-sixties, as I recall, and then resumed in the
8    late-sixties.  In -- not resumed, it commenced
9    some regular production in the late-sixties.
10     Q    All right.  Have you been able to
11   estimate for any year the amount of PCB-containing
12   carbonless broke that would have been generated by
13   the Combined Locks Mill?
14     A    No.  The -- you'd have to do some of the
15   same inferences based on shipment of emulsion from
16   Portage, much as we had discussed several minutes
17   ago with respect to Appleton, both for volume and
18   PCB quantities.
19     Q    All right.  And -- and have you
20   conducted those estimates?
21     A    No.  I have not tried to create the
22   experiment for that or the -- identify the

137

1    assumptions you'd have to make.
2      Q    Does NCR have any idea of the volume,
3    annual or otherwise, of PCB-containing CCP broke
4    that was generated at the Combined Locks Mill?
5      A    At this point, not beyond what I just
6    mentioned.  We may engage an expert to do that.
7      Q    All right.  With respect to
8    PCB-containing carbonless broke from either the
9    Appleton plant or from the Combined Locks Mill,
10   does NCR have any knowledge with respect to where
11   that broke ended up?
12     A    Again, based on the testimony of the
13   individuals from the Purchasing Department, they
14   indicated they were aware or had become aware that
15   it was going to the mills in the Fox River.
16   Although that was not true for any particular
17   shipment because the brokers tended to guard their
18   business and their customer identities carefully.
19     Q    All right.  What portion does NCR
20   believe -- strike that.
21         With respect to carbonless -- strike
22   that.

# EXHIBIT B

Clason, Donald                                   February 17, 2012

1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGIA-PACIFIC CONSUMER
PRODUCTS LP, FORT JAMES
CORPORATION, and
GEORGIA-PACIFIC, LLC,
          Plaintiffs,          Case No.: 1:11-cv-00483
vs.                            Judge Robert J. Jonker
NCR CORPORATION,
INTERNATIONAL PAPER CO.,
and WEYERHAEUSER CO.,

          Defendants.

VIDEOTAPED DEPOSITION OF DONALD CLASON


          TAKEN BY:     Plaintiffs Herein

          DATE:         Friday, February 17, 2012

          TIME:         8:34 a.m. - 10:54 a.m.

          PLACE:        Sarasota Meeting Center

                        2042 Bee Ridge Road

                        Sarasota, Florida

          REPORTED BY:  Linda C. Mead, CCR, CSR

                        Notary Public, State of Florida

Clason, Donald

February 17, 2012

2 (Pages 2 to 5)

---

**2**

1  APPEARANCES:
   GEORGE P. SIBLEY, III, ESQUIRE
2    Hunton & Williams, LLP
     951 East Byrd Street
3    Richmond, Virginia 23219
4      Appearing on behalf of Plaintiffs
5
6  DAVID R. MARRIOT, ESQUIRE
7  OWEN J.M. ROTH, ESQUIRE
8    Cravath, Swaine & Moore, LLP
9    Worldwide Plaza
10   825 Eighth Avenue
11   New York, New York 10019
12     Appearing on behalf of Defendant
13     NCR Corporation
14
15  J. CHRISTOPHER BAIRD, ESQUIRE
16   Perkins Coie, LLP
17   1201 Third Avenue
18   Suite 4800
19   Seattle, Washington 98101
20     Appearing on behalf of Defendant
21     Weyerhaeuser Company
22

---

**4**

1  DEPOSITION OF:  Donald Clason
2
3  Examination
4                        Page
5  By Mr. Sibley...............................    6
6  By Mr. Marriot............................    80
7  By Mr. Sibley..............................    82
8
9                   EXHIBITS
10 Description                        Page
11 Exhibit 63  1966 Telephone Directory..........    18
12 Exhibit 64  1971 Telephone Directory..........    27
13 Exhibit 65  1971 Organization Charts..........    32
14 Exhibit 66  Consolidated Statements Ending
15    5/31/72...........................    43
16 Exhibit 67  Open House Announcement.............  50
17 Exhibit 68  Letter/Financial Statements 12/18/72..61
18 Exhibit 69  Letter to Anderson 11/21/72..........  65
19 Exhibit 70  Letter to Katz 7/14/00..............  68
20 Exhibit 71  Letter to Katz 8/21/00..............  72
21
22

---

**3**

1  APPEARANCES:
2
3  MICHAEL D. MEUTI, ESQUIRE
4    Baker Hostetler
5    PNC Center
6    1900 East 9th Street
7    Suite 3200
8    Cleveland, Ohio 441114
9      Appearing on behalf of Defendant
10     International Paper Company
11
12
13
14
15
16
17
18
19
20
21
22

---

**5**

1                  PROCEEDINGS
2                    * * * * *
3
4        THE VIDEOGRAPHER:  Good morning.  My name
5  is Rick Spector, Videographer for Henderson
6  Legal Services.  This matter is before the
7  United States District Court for the Western
8  District of Michigan, Southern Division.
9        This is the matter of Georgia Pacific
10 Consumer Products, LP, Fort James Corporation
11 and Georgia-Pacific, LLC as Plaintiffs versus
12 NCR Corporation, International Paper Company
13 and Weyerhaeuser Company as Defendants.  The
14 Case Number is 1:11-cv-000483 before Judge
15 Robert J. Jonker.
16       Today is Friday, February 17th, 2012.
17 It's 8:33 in the morning.  This is the
18 deposition of Donald Clason.
19       At this time I'll ask the attorneys to
20 please introduce themselves.
21       MR. SIBLEY:  Trey Sibley from Hunton &
22 Williams for Georgia-Pacific and the

---

Clason, Donald

February 17, 2012

5 (Pages 14 to 17)

---

14

1    Q   Okay. With respect to carbonless paper,
2  where -- where did NCR get its carbonless paper?
3    A   Where did --
4    Q   Who was the supplier?
5    A   At what point in time are you talking
6  about?
7    Q   I'm talking about when you were in Los
8  Angeles.
9    A   When I was in Los Angeles it was Business
10 Systems, Incorporated first and we bought some of
11 it -- most of it actually came from Mead.
12       MR. MARRIOT: Just to be clear, are we
13    talking about the period from '60 to '64 before
14    NCR or '64 --
15 BY MR. SIBLEY:
16    Q   If it's the -- Was it the same operation
17 all six years just a change in ownership in 1964?
18    A   It was -- Yeah. It was the same people,
19 the same structure. Nothing changed really except
20 the ownership as far as NCR from about '60 to '66.
21    Q   And how did that paper come to the --
22 those facilities in Los Angeles? Did it come in big

---

15

1  rolls?
2    A   Yeah. It came in rolls or in some cases
3  in sheets. We had both sheet-fed and roll-fed
4  presses.
5    Q   And at your facility the forms would be
6  cut down to size and printed?
7    A   Yes.
8    Q   And in the course of that process there
9  would be scrap paper generated, correct?
10    A   Yes.
11    Q   And during the -- that time period, what
12 would you have referred -- how would you have
13 described that paper? What term would you have
14 used?
15    A   What paper?
16    Q   The scrap paper.
17    A   The scrap.
18       MR. MARRIOT: I'm sorry. I just want to
19    make sure we're clear about whether we're now
20    talking about the carbonless copy paper or any
21    other paper that was there.
22 BY MR. SIBLEY:

---

16

1    Q   I'm talking about all paper.
2    A   All paper.
3    Q   In the course of making business forms.
4    A   Well, scrap -- Ask the question again now.
5    Q   The scrap paper that would be generated in
6  the process of making business forms, what did you
7  call that?
8    A   Well, it called in two categories. One
9  was -- One was scrap or waste and the other was
10 trim.
11    Q   What was the difference between the two?
12    A   Waste basically -- mostly involved
13 wrappers or just the beginning of a roll or the end
14 of a roll.
15    Q   And trim was everything else?
16    A   Yes. Trim was the smaller portion because
17 we tried to buy it to size.
18    Q   Okay. And during this period when you
19 were a controller, what was -- what did Business
20 Systems or later NCR do with that trim as it was
21 generated?
22    A   There were two sides to it because you're

---

17

1  talking about carbonless. Carbonless we did nothing
2  with basically. The other trim and waste was sold
3  as scrap, but carbonless couldn't be sold as scrap
4  so we typically burned it. There was very little of
5  it back in those days.
6    Q   Back in those days.
7       The carbonless paper that was used during
8  this period, that would have been what's known as
9  NCR paper, correct?
10    A   Yes.
11    Q   And you're aware now that that paper
12 contained as part of the emulsion that coated it a
13 chemical -- a set of chemicals known as
14 polychlorinated biphenyl or PCBs?
15    A   I've heard that term, but I'm not in the
16 paper business so I don't know much about it to tell
17 you the truth.
18    Q   Okay. The -- Was there a point in time
19 when you came to learn that NCR paper of this
20 vintage used PCBs as part of the technology that
21 made it work?
22    A   Not particularly. I didn't get into the

---

Clason, Donald

February 17, 2012

11 (Pages 38 to 41)

---

38

1   **certainly less than one percent.**
2     Q  Less than one percent?
3     **A  Yes.**
4     Q  Okay.  And did -- during that time period,
5   did NCR keep track of how much it was losing as
6   trim, converter trim?
7     **A  Not between -- not separating between**
8   **them. We kept track of waste and trim, yes, but not**
9   **separating out carbonless and bond and carbon and**
10   **carbon paper and all that. It was not separated.**
11     Q  With respect to other types of paper, you
12   mentioned bonded and carbon. Let's deal with all
13   paper used to create forms at Washington Court House
14   during this time period.  As a percentage how much
15   trim would have been generated?
16     **A  I would be guessing to be really precise**
17   **40 years ago, but certainly less than one percent.**
18     Q  Combined for all paper?
19     **A  Yes.**
20     Q  Less than one percent?
21     **A  Sure.**
22     Q  How many tons -- Let me try it this way:

---

39

1   Did you keep track of how many -- how much -- how
2   many tons per week of paper came into that -- or to
3   any printing facility?
4     **A  Sure.**
5     Q  Do you recall with respect to Washington
6   Court House how many tons per week paper came into
7   the facility?
8     **A  No.**
9     Q  And let's talk about -- continue to talk
10   about converter trim.  During this time period would
11   NCR have sold converter trim to waste paper brokers?
12     **A  If you're talking about carbonless paper,**
13   **no.**
14     Q  Okay.  NCR did not?
15     **A  We couldn't sell carbonless paper, the**
16   **trim. Brokers wouldn't buy it.**
17     Q  But they would buy other trim?
18     **A  Yes.**
19     Q  Did -- Did NCR segregate the paper?
20     **A  Yes.**
21     Q  Okay.  And is this at all of -- all of
22   NCR's facilities?

---

40

1     **A  Yes.**
2     Q  What sort of brokers -- Which brokers did
3   NCR use, if you know, to buy other types of paper
4   other than carbonless?
5     **A  I don't know names.  It was a very, very**
6   **small activity.  Very small.**
7     Q  Are you familiar with a company called the
8   Montgomery Paper Company?
9     **A  No.**
10     Q  What about National Fiber Supply?
11     **A  No.**
12     Q  What about Continental Paper Grading?
13     **A  No.**
14     Q  So what did NCR do with the trim, the
15   carbonless trim?
16     **A  For the most part they burned it.**
17     Q  And where did they burn it?
18     **A  Well, they had boilers at the time.**
19     Q  So there would have been some sort of
20   incinerator on site?
21     **A  Yeah, back in those days.  Again, we're**
22   **talking about '64.  It was very, very small.  I**

---

41

1   mean, it really wasn't very much at all.  Most of
2   **the forms we made were bond and carbon, they were**
3   **not carbonless.**
4     Q  This -- Most of the forms you made were
5   bonded carbon you said?
6     **A  Bond and carbon.**
7     Q  Bond and carbon.
8     **A  Again, we're talking back in the '60s.**
9     Q  Did -- But NCR did use carbonless copy --
10   did create carbonless forms, correct?
11     **A  Sure.**
12     Q  During this time period, right?
13     **A  Yes.**
14     Q  And as a percentage -- Do you know sitting
15   here today as a percentage how much carbonless was
16   used in comparison to the other types of paper at
17   Washington Court House?
18     **A  No. I wouldn't know that.**
19     Q  Now, when NCR sold business forms to
20   customers, were there times when customers rejected
21   the delivery because -- for one reason or another?
22     **A  I can't think of any frankly.**

---