**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GEORGIA-PACIFIC CONSUMER PRODUCTS LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **No: 1:11-cv-00483** |
| **v.** | ) ) | **Judge Robert J. Jonker** |
| **NCR CORPORATION, INTERNATIONAL PAPER CO., and WEYERHAEUSER CO.,** | ) ) ) ) | |
| **Defendants.** | ) | |

**SUPPLEMENTAL JOINT STATUS REPORT**

A status conference is scheduled for March 20, 2012 at 1:00 p.m. before the Hon. Robert

J. Jonker pursuant to the Court's Notice dated March 5, 2012.  Appearing for the parties as

counsel will be:

| | |
|---|---|
| Counsel for Georgia-Pacific Consumer Products LP, Fort James Corporation, and Georgia-Pacific LLC (collectively "Georgia-Pacific") | Peter A. Smit<br>Varnum LLP<br>Grand Rapids, MI<br><br>Joseph C. Kearfott<br>Douglas M. Garrou<br>George P. Sibley, III<br>Hunton & Williams LLP<br>Richmond, VA |
| Counsel for NCR Corporation ("NCR") | Geoffrey A. Fields<br>Dickinson Wright PLLC<br>Grand Rapids, MI<br><br>Evan R. Chesler<br>Omid H. Nasab<br>Cravath, Swaine & Moore LLP<br>New York, NY |

|  | Evan B. Westerfield<br>Sidley Austin LLP<br>Chicago, IL |
|---|---|
| Counsel for International Paper Co. ("International Paper" or "IP") | John D. Parker<br>Baker & Hostetler LLP<br>Cleveland, OH |
| Counsel for Weyerhaeuser Company ("Weyerhaeuser") | Douglas A. Dozeman<br>Scott M. Watson<br>Warner Norcross & Judd, LLP<br>Grand Rapids, MI<br><br>Mark W. Schneider<br>Perkins Coie, LLP<br>Seattle, WA |

Preliminary Note:  The parties filed on June 22, 2011 a Joint Status Report ("JSR"), a copy of which is attached as Attachment A.  Weyerhaeuser had not been added as a defendant at the time and did not participate in submission of the JSR.  Georgia-Pacific, NCR and IP each incorporates its Statement of the Case as set forth in the JSR.  Each will add here only supplemental information that it believes may assist the Court.  Weyerhaeuser sets forth its Statement of the Case in full.

1.  Jurisdiction.    The basis for the Court's subject matter jurisdiction is 42 U.S.C. § 9601 *et seq.* and 28 U.S.C. § 1331.  No party objects to the Court's personal or subject-matter jurisdiction.  There are no pendent state law claims.

2.  Jury or Non-Jury.  This case is to be tried before the Court as trier of law and fact.

3.  Judicial Availability.  The parties do not agree to have a United States Magistrate Judge conduct any or all further proceedings in the case, including trial, or to order entry of final judgment.

4.  Geographic Transfer.  The parties are advised of the possibility, pursuant to W.D.

Mich. L. Civ. R. 3.3(h), of a transfer of the action to a judge located in a different city on the basis of the convenience of counsel, the parties or witnesses.  Reassignment of the action shall be at the discretion of the Court and shall require the consent of all parties and of both the transferor and transferee judge.  The parties do not believe that a transfer for geographic convenience is warranted in this case.

5.      Statement of the Case.  This case involves claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*.  The parties' respective statements of the case are set forth below:

(A)      **Georgia-Pacific's Supplemental Statement**:

With respect to its claims against NCR, Georgia-Pacific stated previously that it expects the evidence to establish that NCR was an arranger within the meaning of CERCLA on account of  pre-consumer "broke and trim" resulting from the coating and the conversion of  PCB-containing carbonless copy paper ("CCP").  Such broke and trim was generated as wastes at plants owned and operated by NCR or its predecessors in interest, and at other plants for which NCR had responsibility under CERCLA, and was shipped to paper mills on the Kalamazoo River.  Georgia-Pacific now expects the evidence to show also that NCR generated wastes consisting of pre-consumer CCP rejects or returns from its customers and post-consumer forms made from CCP used at NCR's own offices, that such wastes also were shipped to paper mills on the Kalamazoo River, and that NCR also is an arranger under CERCLA with respect to such wastes.

With respect to its claims against IP, Georgia-Pacific notes that IP has contended in discovery responses that it was not the owner of the Bryant Mill after July 1, 1956.  Instead, it contends that the lease of the Bryant Mill that its predecessor, St. Regis Paper Company, entered

into effective as of July 1, 1956 was in reality a sale, that the lease was a security interest, not a lease, and that it therefore was not an owner within the meaning of Sections 101(2) and 107(a) of CERCLA. Georgia-Pacific disputes this contention. Georgia-Pacific expects the evidence to establish that IP has liability under CERCLA as an owner and operator of the Bryant Mill on account of releases of PCBs prior to July 1, 1956 and as an owner of the Bryant Mill on account of releases after July 1, 1956.

Georgia-Pacific alleged in the First Amended Complaint that IP's predecessor, St. Regis Paper Co., de-inked and repulped PCB-laden broke and trim at the Bryant Mill between 1954 and 1956. It now believes that the evidence will show that St. Regis released PCBs from the Bryant Mill before 1954. Such releases, from prior to 1954 through the period of St. Regis's ownership of the Bryant Mill and beyond, resulted from recycling NCR's CCP, both pre-consumer broke and trim and post-consumer waste paper, and from PCBs that were part of the general wastepaper waste stream that had been contaminated with PCBs from NCR's CCP.

With respect to its claims against Weyerhaeuser (and Weyerhaeuser's claims against it), Georgia-Pacific expects that it and Weyerhaeuser will file shortly a stipulation with the Court by which each admits that, as an owner and operator of one or more facilities on the Kalamazoo River, it is liable to the other under the standards of CERCLA. They believe that this stipulation will resolve all matters to be litigated during the Phase I trial except for any limitations defenses that Weyerhaeuser may assert. They anticipate that all other issues between them will be resolved in later stages of the case.

     (B)    **NCR's Supplemental Statement**:

As was the case when the parties filed their initial Joint Status Report on June 22, 2011, NCR remains unaware of any credible evidence supporting Georgia-Pacific's allegation that,

prior to April of 1971,[1] NCR or its predecessors-in-interest sold PCB-containing CCP broke, directly or indirectly, to any recycling mill located along the Kalamazoo River.

Georgia-Pacific's new (and unpleaded) allegation with respect to alleged NCR sales of "rejects or returns from its customers and post-consumer forms made from CCP used at NCR's own offices" is equally baseless.

Further, NCR is unaware of any credible evidence to show that it is liable as an arranger within the meaning of CERCLA § 107(a)(3) with respect to CCP broke generated and sold by Mead Corporation ("Mead"), a separate corporation that owned, possessed and controlled all of the CCP broke generated by its manufacturing process.

Finally, NCR disagrees with any contention that CCP broke was a "waste."  NCR expects that the evidence at trial will show that CCP broke was a valuable product, sold into a well-established market, for the primary purpose of making new paper.

(C)    **IP's Supplemental Statement**:

International Paper has valid Phase I defenses against Georgia-Pacific's claims in at least two regards.

First, International Paper is not liable for any discharges at the Bryant Mill that may have taken place after June 30, 1956 because after that date, St. Regis Paper Company ("St. Regis," International Paper's predecessor in interest) was not an "owner" or "operator" of the Bryant Mill as those terms are defined in CERCLA.  CERCLA specifically provides that "a person that . . . holds indicia of ownership primarily to protect [a] security interest" is not an "owner or operator."  42 U.S.C. § 9601(20)(E)(i).  Further, CERCLA defines "security interest" to include "a right under a . . . lease . . . to secure the payment of money."  *Id.* § 9601(G)(vi).  The

---

[1] No PCBs were used in the production of CCP after April 1971.

transaction between St. Regis and Thor Corporation ("Thor," which later became Allied Paper Company ("Allied")) that took place on June 30, 1956, although denominated a lease, was in reality a lease-purchase transaction.  As part of the 1956 transaction, St. Regis sold to Thor/Allied all of the equipment, supplies and contracts associated with operating the Bryant Mill.  St. Regis "leased" the real property to Thor/Allied with an option to purchase, which Thor/Allied exercised in 1966.

Second, International Paper is unaware of any evidence that NCR broke or other waste containing PCBs was recycled at the Bryant Mill before June 30, 1956.  Likewise, International Paper is unaware of any other discharge of PCBs from the Bryant Mill prior to June 30, 1956.  Accordingly, Georgia-Pacific will not be able to meet its burden of proof of demonstrating that any PCBs were released at the Bryant Mill during the period for which International Paper (as successor to St. Regis) is alleged to be responsible as an "operator" under CERCLA with respect to the  Bryant Mill.

 (D) **Weyerhaeuser's Statement:**

From 1961 until 1970, Weyerhaeuser owned and operated a paper mill and landfill in Plainwell, approximately 15 miles downstream of the Georgia-Pacific and International Paper facilities in and around Kalamazoo.  Weyerhaeuser's operations included the use of recycled paper at the Plainwell mill.  Decades later, it now appears that some of that paper contained small amounts of PCBs.  Weyerhaeuser was unaware at the time of its operations that some of the paper that was recycled at the Plainwell mill contained small amounts of PCBs.  Although the Plainwell mill released a mere fraction of the PCBs released by other mills, Weyerhaeuser has been diligently working with federal, state and local agencies to respond to that contamination by, among other things, conducting environmental investigations and cleanups

and providing funding to the U.S. Environmental Protection Agency for additional investigation and cleanup. This work has been performed in response to contamination that may have been released from its former facility and from facilities upstream of the Plainwell mill, including those owned or operated by Georgia-Pacific and International Paper, and from facilities downstream of the Plainwell mill, including the former mill in Otsego operated by a predecessor to MW Custom Papers LLC.

Weyerhaeuser expects that it and Georgia-Pacific will shortly file a stipulation with the Court by which each admits that, as an owner and operator of one or more facilities on the Kalamazoo River, it is liable to the other under the standards of CERCLA. They believe that this stipulation will resolve all matters to be litigated between them during the Phase I trial except for any limitations defenses that Weyerhaeuser may assert. They anticipate that all other issues between them will be resolved in later stages of the case.

6. <u>Joinder of Parties and Amendment of Pleadings</u>. Weyerhaeuser has moved the Court for leave to file a third-party complaint naming MW Custom Papers, LLC, successor to Mead Corporation, based on its ownership and operation of a paper mill located on the Kalamazoo River in Otsego, Michigan that discharged PCBs to the river. Pursuant to the Court's Notice, the parties will be prepared to discuss at the status conference whether MW Custom Papers should be allowed to be brought in at this stage and the effect that its inclusion would have on the existing Case Management Order.

As to other amendments, the parties disagree regarding the timing of any further amendments to the pleadings for purposes of Phase I.

(A)     Joint Statement of Georgia-Pacific and Weyerhaeuser

Georgia-Pacific and Weyerhaeuser note that evidence has been and is being developed

through discovery and investigation that may justify amendments to the First Amended Complaint and to the Answers, both to add allegations and to delete them. Georgia-Pacific and Weyerhaeuser suggest that the Court set a deadline after the close of all discovery for Georgia-Pacific to file an amended complaint and for Defendants to file amended answers. They suggest this so that the claims and defenses will be clearly set out in the pleadings well in advance of the trial date. Based on the current schedule, they propose that Georgia-Pacific's deadline for filing an amended complaint would be July 2, 2012, with amended answers due on July 30, 2012.

As to IP's stated concern about potential claims against it for mills on the Kalamazoo River other than the Bryant Mill, this issue relates only to the Otsego, Michigan mill that is the subject of Weyerhaeuser's proposed third-party complaint.

(B)    NCR's Statement

NCR takes no position on Weyerhaeuser's motion to add Mead and to assert new cross-claims and counter-claims, including new cross-claims against NCR. Should the Court grant Weyerhaeuser's motion, however, less than two weeks would remain under the current schedule for NCR to conduct discovery relative to the new claims and defenses. This time would be insufficient for NCR to conduct the additional discovery precipitated by Weyerhaeuser's motion and would be another basis for NCR's motion to extend the current fact discovery deadline. Specifically, if Weyerhaeuser's motion is granted, NCR will need a sufficient opportunity to conduct discovery concerning whether NCR has a statute of limitations defense against Weyerhaeuser's claims. NCR will also likely need to conduct additional discovery with respect to Mead.

NCR opposes the unusual proposal of Georgia-Pacific and Weyerhaeuser to have the Court set a new deadline for amending the pleadings after the close of discovery. Georgia-

Pacific and Weyerhaeuser's proposal is fundamentally unfair and inconsistent with the Federal Rules. Defendants cannot be expected to conduct discovery against the allegations currently brought against them, only to have Weyerhaeuser and Georgia-Pacific change those allegations after discovery has closed. Any future motion by Georgia-Pacific or Weyerhaeuser to amend their pleadings should be governed by Rule 15 of the Federal Rules of Civil Procedure.

(C) IP's Statement

International Paper opposes Georgia-Pacific's proposal to amend its pleadings after discovery closes. Insofar as Georgia-Pacific intends to add claims concerning mills other than the Bryant Mill after discovery closes, Georgia-Pacific's proposal puts the cart before the horse: Defendants cannot defend themselves without discovery on Georgia-Pacific's claims, and they cannot conduct appropriate discovery until they know what Georgia-Pacific's allegations are. It is not fair to ask defendants to aim at a moving target—all the more so because under Georgia-Pacific's proposal, that target will not stop moving until after discovery has closed.

7. <u>Disclosures and Exchanges</u>. All parties timely filed initial disclosures in accordance with the Case Management Order. Georgia-Pacific and NCR each supplemented its disclosures on March 2, 2012. IP and Weyerhaeuser have not served supplemental initial disclosures.

(A) IP's Statement

The parties' initial Joint Status Report, filed June 22, 2011, indicated that Georgia-Pacific would provide the documents produced in *Kalamazoo River Study Group v. Rockwell Int'l* (Case No. 1:95-CV-838, W.D. Mich.) (the "KRSG Litigation") by July 22, 2011. [ECF No. 78, at 16.] The Case Management Order set that date as August 5, 2011. [ECF No. 83.] NCR has detailed below the delays that occurred in making these historical documents available in a form that

would allow for meaningful review of them.[1]  The rolling production of those documents, however, did not begin until September 2011, when an initial set of documents was provided to NCR.  Weyerhaeuser and IP did not receive any documents from that production until November.  Additional productions were made on:

- December 16, 2011;

- December 20, 2011;

- January 17, 2012;

- January 25, 2012;

- February 9, 2012;

- February 23, 2012;

- February 29, 2012; and

- March 1, 2012.

International Paper understands that Georgia-Pacific is prepared to produce the remaining documents from the KRSG Litigation shortly.  Many of those documents relate to the additional mill as to which Georgia-Pacific has indicated it may provide a basis for its claims against International Paper and as to which Georgia-Pacific first sought written discovery from International Paper on March 1, 2012.

Delays in the production of these documents resulted from the age, volume, and format of the documents, and work required to get the documents into an easily producible format. Regardless, discovery of the KRSG Litigation documents has not occurred at the pace that the parties initially contemplated last summer, when they drafted the initial Joint Status Report and

---

[1]  Georgia-Pacific suggests that International Paper had earlier access to the 80 or more boxes of paper records from this litigation.  International Paper had no reason to embark on a review of the paper records, given Georgia-Pacific's plans to make them available electronically.

adopted the current discovery deadlines, and International Paper could not have engaged in a substantive review of documents that it did not have.

Moreover, Georgia-Pacific has decades of involvement at the Site; it was involved in the KRSG Litigation (which lasted eight years) as well as other litigation involving the Site. International Paper is a newcomer to the Site and was not involved in any of the prior litigation, and absorbing and understanding background testimony and evidence regarding the Bryant Mill that is contained in the KSRG Litigation documents—including scores of deposition transcripts of Allied employees, experts and others—simply requires more time, especially given when the documents became available in a usable form.

(B)     Georgia-Pacific's Statement

Georgia-Pacific addresses here only IP's statements concerning the production of documents from the KRSG Litigation.  It addresses in section 8(A)(i) the state of discovery generally in this case.

Georgia-Pacific stated in the Joint Status Report status report that it would make available documents produced in the KRSG Litigation by July 22, 2011.  (The date for initial disclosures was pushed back to August 5 in the Case Management Order.)  At the time of the original Joint Status Report, counsel for Georgia-Pacific believed that the entire KRSG Litigation document production was available electronically and could be easily produced in that format.  On further investigation, only documents produced by the KRSG's environmental remediation consultant (Blasland, Bouck & Lee) and portions of the documents produced by KRSG defendants in that case were available electronically.  On August 5, 2011, counsel for Georgia-Pacific advised all parties of that fact and made available 80 boxes of KRSG litigation documents for inspection and copying subject to a clawback agreement.

On August 15, counsel for NCR contacted Georgia-Pacific regarding this collection of KRSG litigation documents, and on August 18, Georgia-Pacific agreed to have the documents scanned at NCR's expense.  On September 8, 2011, Georgia-Pacific produced the first set of these materials and has continued to supplement productions thereafter.  The electronic documents that it had at the time also were produced to NCR on September 8.

Counsel for Georgia-Pacific can find no record that counsel for IP responded to its August 5 letter offering the 80 boxes of KRSG for review.  Counsel for Georgia-Pacific later focused on the fact that IP had not received the documents scanned at NCR's expense. On November 1, 2011, Georgia-Pacific produced to IP all documents produced to NCR up to that point.

IP's statement that "the production of [the KRSG Litigation] documents is not yet complete" is inaccurate.  All such documents have been made available for inspection and copying.  On February 24, 2012, Georgia-Pacific identified the last remaining set of KRSG Litigation production documents and arranged for NCR's document scanning vendor (IKON) to process the documents in the same manner as previous productions.  On February 27, 2012, Georgia-Pacific advised counsel for NCR, IP and Weyerhaeuser that IKON was waiting on direction from NCR to proceed with scanning the documents.  Counsel for Georgia-Pacific advised counsel for IP of that fact again on March 12, 2012.  To date, IP has made no alternative arrangement to have these documents processed.

8.  Discovery.

(A) Depositions.  The parties provide the following information on the status of depositions as requested by the Court in its Notice:

(i)  Georgia-Pacific's Statement

Depositions taken to date:

| Witness | Date of Deposition |
|---|---|
| Marilyn Wren | April 11, 2011 |
| Edwin Bush (regarding third-party subpoena) | May 4, 2011 |
| Leon Martin | August 30, 2011 |
| Donald D. Lacey | August 31, 2011 |
| George Hunter | November 16, 2011 |
| Gene Edgerton | December 2, 2011 |
| William Slater | January 11, 2012 |
| Richard M. Bennett | January 12, 2012 |
| 30(b)(6) of NCR (Edward R. Gallagher) | January 25, 2012 |
| Mack Rupard | February 3, 2012 |
| Donald Clason | February 17, 2012 |
| Daniel McIntosh | March 15, 2012 |
| Robert Self | March 16, 2012 |
| Clinton Gilmore | March 16, 2012 |

Depositions to be taken:

The deposition of James E. Grabow is scheduled for March 23, 2012.

NCR in its initial disclosures identified five former employees of the Systemedia Division of NCR and further stated that those persons could be contacted only through counsel for NCR.  Counsel for Georgia-Pacific by letter dated January 20, 2012 requested deposition dates for these five employees.  One has been deposed, but counsel for NCR has not yet provided deposition dates for the others.  Georgia-Pacific intends to notice the depositions of the remaining four former Systemedia employees:

| Witness |
|---|
| Donald Burke |
| Richard Cimaglia |
| James Sherer |
| William Sullivan |

In addition, Magistrate Judge Brenneman ruled on March 9, among other things, that the Rule 30(b)(6) deposition of NCR should be reconvened as to certain topics.  As to the scheduling of that deposition and those of the four Systemedia employees, see paragraph 8(B).

- 13 -

Georgia-Pacific continues to investigate the facts relating to NCR's operations and may locate additional former employees of NCR or others who have knowledge of those operations and who have not previously been identified in discovery.  It is therefore possible that there may be additional witnesses with relevant knowledge whose testimony is needed at trial.  If so, Georgia-Pacific anticipates that the previous agreement of the parties reflected in paragraph 8 of the JSR would apply.  It states that "[t]he parties agree that depositions of third-party witnesses solely to perpetuate testimony to be used at trial may continue after the completion of fact discovery by agreement or for good cause shown."

Georgia-Pacific will be prepared to address in detail at the conference the allegations made by NCR and IP concerning the status of discovery generally.  The central reality, ignored by both, is that NCR and IP have sat back until the last possible moment to conduct discovery that they could have undertaken months ago.  Examples abound.  NCR has taken no depositions.[2] It first served interrogatories and requests for admission on February 29, 2012.  It has noticed the depositions of Fred Harrison,  Ronald Hanson and Robert Fetters on March 26 and 27, the last week of discovery.  All three were identified in the initial disclosures served by Georgia-Pacific on August 5, 2011.

Each of the three areas of additional discovery that NCR describes in its statement is work that it could and should have been engaged in for months.  This is a self-inflicted wound. Georgia-Pacific has done nothing to impede NCR's progress.  It is particularly ironic, moreover, that NCR claims it needs time to pursue discovery related to Mead based on depositions that it will not take until the last week of discovery.  The issue of NCR's responsibility for Mead's

---

[2]  It states that it "has taken deposition testimony" of four former Georgia-Pacific employees and of a former Allied Paper employee, Marilyn Wren.  All five of these depositions were noticed and taken by Georgia-Pacific.  NCR participated in cross-examination.

broke and trim has been in the case from the beginning.

IP's performance has been no better.  The only deposition it has taken, a 30(b)(6) deposition of NCR, was noticed and taken of the same NCR 30(b)(6) witness whom Georgia-Pacific had noticed months before.  It has had in its possession since at least the middle of December the deposition transcripts of over 70 former Allied Paper employees taken in connection with insurance litigation involving, among other things, the Bryant Mill.  In response to written discovery served in December, Georgia-Pacific provided on January 31 the names and addresses of 9 retired Allied Paper employees who worked in Kalamazoo in the 1950s and 1960s and who Georgia-Pacific had confirmed were still alive.  Georgia-Pacific previously had deposed three of these employees.  IP has failed to notice depositions of any employees whose depositions it had or who were identified by Georgia-Pacific.

Both IP and NCR now try to make up lost ground by serving, on March 13 and March 14 respectively, extensive 30(b)(6) deposition notices of Georgia-Pacific for the last week of discovery.  These notices both come too late and, in certain important respects, are improper in scope.

(ii)  NCR's Statement

Deposition testimony taken and Depositions currently scheduled by NCR:

Despite the breadth of Georgia-Pacific's allegations against NCR, Georgia-Pacific has disclosed only five of its former employees who may have information that may support Georgia-Pacific's claims against NCR.  NCR has taken deposition testimony from four of these five former employees—Leon Martin, Donald Lacey, George Hunter and Gene Edgerton.  NCR has noticed the deposition of the fifth former employee disclosed by Georgia-Pacific (Ronald Hanson) for March 27, 2012.

NCR has also noticed a 30(b)(6) deposition of Georgia Pacific for March 30, 2012.  The 30(b)(6) notice served by NCR is modeled after, and is parallel to, the 30(b)(6) notice that Georgia-Pacific has already served on NCR.  The notice was appropriately noticed under the Federal Rules of Civil Procedure within the current discovery period, and NCR expects full compliance, just as Georgia-Pacific expects full compliance from NCR.

Georgia-Pacific has disclosed only two former employees of other recycling facilities along the Kalamazoo River who may have information that may support Georgia-Pacific's claims against NCR, both of whom are former employees of Allied Paper.  NCR has already taken deposition testimony from Marilyn Wren.  NCR has noticed the deposition of the other former Allied employee (Fred Harrison) for March 26, 2012.

Georgia-Pacific has disclosed only one person who may have information that may support Georgia-Pacific's allegation that NCR may be liable for Mead's CCP broke—Robert Fetters.  NCR has noticed the deposition of Mr. Fetters (a former Mead employee) for March 27.  NCR has also noticed the deposition of another former Mead employee, Joseph Montgomery, for March 26.

Georgia-Pacific has disclosed only one recovered fiber broker who may have information that may support Georgia-Pacific's claims against NCR—Leo Golper of Appleton, Wisconsin.  Mr. Golper previously submitted a signed letter to the United States that states that he did not sell CCP broke to recycling facilities along the Kalamazoo River.  NCR does not intend to depose Mr. Golper, who is in ill health.

Additional depositions that NCR intends to take if an extension is granted:

If the Court grants NCR's motion to extend the discovery deadline, NCR intends to pursue at least three avenues of evidence to further rebut Georgia-Pacific's allegations in this

case.

First, NCR intends to review the record in the KRSG litigation to learn the identities of Kalamazoo-area mill employees, shippers and brokers who may have knowledge regarding the sources of the CCP broke recycled at Kalamazoo-area mills.  NCR believes that Georgia Pacific, prior to filing suit against NCR, reviewed key parts of the KRSG record and identified in this litigation any individuals that may have information that would support its claims against NCR. For example, Ronald Hanson was deposed in the KRSG litigation.  Georgia-Pacific visited with Mr. Hanson prior to filing suit against NCR and had him execute an affidavit on Georgia-Pacific's behalf.  Georgia-Pacific then disclosed Mr. Hanson to NCR.  But Georgia-Pacific did not produce, despite NCR's long-pending document requests, the most relevant parts of the KRSG record (as explained in NCR's motion to modify the current Case Management Order) until late January, on the eve of trial in the Whiting litigation in Wisconsin.

While Georgia-Pacific implies that it made the KRSG litigation materials to NCR in paper form at the outset of the discovery period, that is belied by Georgia-Pacific's own recent submission to the Court.  Georgia-Pacific made available a piece of the KRSG record in September of 2011, but it did not make the most critical parts of the record available (including most depositions in the record).  According to Georgia Pacific's own brief opposing NCR's request to extend the discovery period, Georgia-Pacific's delay was caused by a "laborious", "six month" process of collecting the KRSG files (Dkt. No. 144 at 5), not by any delay from NCR. Thus, Georgia-Pacific's new position, that the delay in discovery is a wound that NCR inflicted on itself, is simply not true.

NCR is now actively reviewing the KRSG record, with the help of a team of contract attorneys.  As potential witnesses are identified, NCR is attempting to determine whether such

witnesses are reachable and what level of knowledge they in fact have concerning Georgia-Pacific's allegations. As NCR identifies potential witnesses with relevant knowledge, it will notice them for deposition.

Second, based on the limited evidence it has seen, NCR believes that Georgia-Pacific and its agents have contacted dozens of individuals in an attempt to find witnesses who may have information that supports Georgia-Pacific's allegations against NCR. While Georgia-Pacific has disclosed its communications with a handful of these potential witnesses (those witnesses that Georgia-Pacific has noticed for depositions), it has thus far kept secret from NCR its communications with other third-party witnesses, including witnesses that NCR believes have information that directly refutes Georgia-Pacific's allegations in this case. NCR is moving to compel these third-party communications. Based on these communications, NCR may depose additional witnesses who may help refute Georgia-Pacific's allegations.

Third, based on the upcoming depositions of Robert Fetters and Joseph Montgomery (both former Mead employees), and the continued investigation of NCR into its relationship with Mead during the period from 1954 to April of 1971 (which has been slowed by the passing of many of the former employees at NCR with knowledge of the relationship with Mead during the relevant period), NCR may identify and depose additional individuals with knowledge of the relationship between NCR and Mead.

    (iii) IP's Statement

    Depositions taken to date:

| Witness | Date Noticed |
|---|---|
| 30(b)(6) of NCR (Edward R. Gallagher) | January 25, 2012 |
| 30(b)(6) of MeadWestvaco Corp. | December 8, 2011[3] |

---

[3] International Paper noticed the third-party 30(b)(6) deposition of MeadWestvaco Corp. After MeadWestvaco produced documents, but before the deposition date, International Paper

Depositions to be taken:

| Witness | Date Noticed |
|---|---|
| Corporate representative of Weyerhaeuser | March 28, 2012 |
| Corporate representative of Georgia-Pacific | March 29, 2012 |

International Paper may need to take additional depositions, but it is unable to identify the potential deponents because of the pace at which document discovery has proceeded and the sheer volume of the documents produced. International Paper has received over 2.4 million pages of documents from the other parties in this case. Over 2 million of them have arrived since the beginning of 2012, including a 1.7-million-page production by Georgia-Pacific on January 31. That production consisted of documents from the *Fox River* litigation in Wisconsin, but many of the other documents produced recently have been from the KRSG Litigation, to which International Paper was not a party. As noted above, the Case Management Order provided that those documents would be complete by August 5, 2011. Yet production of the KRSG Litigation documents is still not complete, and production of non-KRSG-Litigation documents is also continuing, with Georgia-Pacific's latest production on March 13.

The documents from the KRSG Litigation are essential to determining underlying facts regarding the Bryant Mill—a mill with which International Paper had no direct involvement and as to which its alleged liability arises out of its 2000 merger with Champion International Corporation ("Champion"), which had in turn acquired St. Regis in 1985, nearly 30 years after St. Regis's operation of the Bryant Mill ended. International Paper understands that St. Regis did not maintain operational records of the Bryant Mill after St. Regis sold the mill's business operations to Thor/Allied in 1956. Accordingly, Champion would not have obtained those

---

agreed to continue the deposition pending the parties' discussions regarding adding MeadWestvaco or another Mead-related entity as a defendant.

records when it acquired St. Regis, and International Paper did not acquire any such operational records when it acquired Champion.

Allied (Thor's successor) operated the Bryant Mill from July 1956 until the mill closed in the 1980s (after the period relevant to this litigation). Allied was also a participant in the Kalamazoo River Study Group and a party to the KRSG Litigation. As the effort to locate those operational documents took place, it was ultimately disclosed by Georgia-Pacific in November 2011 that it believed that all such records had ultimately been produced by Allied's counsel and were in the control of Georgia-Pacific and would be included in its productions.

As noted above, most of the 300,000-plus pages of KRSG Litigation documents were produced in the last several months—long after the July 22, 2011 date originally agreed upon. Among those documents are approximately 200 deposition transcripts from the KRSG Litigation, including transcripts of former Allied employees. Also among those documents are documents that Allied produced in the KRSG Litigation, including deposition transcripts from insurance-coverage litigation involving Allied. The KRSG Litigation documents are thus the only known source of information about the Bryant Mill's operations during the period that Allied operated the mill.

Until the production of documents from the KRSG Litigation is complete and until International Paper has sufficient time to review those documents, including the deposition transcripts, it cannot be in a position to determine which additional witnesses it needs to attempt to locate and depose. That is why International Paper supports NCR's request for a 90-day extension of discovery. This extension is all the more necessary based on information that has come to light since NCR filed its motion on February 10, 2012.

(iv)  Weyerhaeuser

Weyerhaeuser is awaiting responses from Georgia-Pacific to Weyerhaeuser's First Set of Interrogatories and Requests for Production, which concerned Georgia-Pacific's claim to recover past environmental investigation and cleanup costs.  Depending on Georgia-Pacific's responses, Weyerhaeuser may take a Rule 30 (b)(6) deposition of Georgia-Pacific, with possible follow-up  depositions, regarding Georgia-Pacific's claimed costs to determine whether Georgia-Pacific's claims for any of those costs may be barred by applicable statutes of limitations  If MW Custom Papers LLC is added to the litigation, Weyerhaeuser may conduct a Rule 30 (b)(6) deposition of MW Custom Papers LLC, with possible follow-up depositions, concerning MW Custom Papers LLC's paper recycling processes, discharges of wastewater, wastewater treatment, bypasses of treatment, and related subjects.

(B)  Other Discovery Matters

(i)  Proposed Discovery Extension

The Court wishes to take up at the conference on March 20 NCR's Motion to Modify the June 28, 2011 Case Management Order (docket no. 136) to provide for an additional 90 days of fact discovery on Phase I issues.  The Motion has been fully briefed, with the positions of the parties set forth in those briefs.

If the Court grants NCR's motion, the parties wish to discuss at the status conference a new schedule to be incorporated into an Amended Case Management Order.  If the Court denies NCR's Motion, Georgia-Pacific and NCR will ask the Court to permit the additional depositions that Georgia-Pacific requested, including the completion of NCR's 30(b)(6) witness, to be taken during the three-week period ending on April 20, 2012, with a corresponding extension of the deadlines for Georgia-Pacific's expert reports and Defendants' expert reports, and with no other

modification of any deadlines.  This is requested without prejudice to NCR's Motion or to Georgia-Pacific's opposition to that Motion in order to avoid double tracking of depositions.

International Paper's Statement

International Paper joined in NCR's motion, but due to recent developments in the case, the proposed 90-day extension may not be sufficient.  As noted above, the documents from the KRSG Litigation are still being produced.  Many of those documents—including nearly 200 deposition transcripts from that litigation—were produced in the last several months. International Paper needs additional time to digest this information.  Only after it has been able to do so can it determine whether it needs to take additional depositions and to pursue additional written discovery.  Additionally, Georgia-Pacific may seek to premise International Paper's liability upon a mill other than the Bryant Mill, and has recently sought discovery from International Paper that it directed to mills other than the Bryant Mill.  Adding a new source of potential liability necessitates additional discovery; doing so this late in the game necessitates an extension to accommodate that discovery.

Georgia-Pacific's Response to International Paper's Statement

International Paper's description of the pace and content of Georgia-Pacific's production of materials from the KRSG Litigation is inaccurate and exaggerates the volume of material pertinent to the claims against International Paper that have been produced since January. Georgia-Pacific produced on December 16 and 20, 2011 an electronic copy of a complete set of documents produced in the KRSG Litigation by Allied Paper Company (Allied first leased, then purchased the Bryant Mill from St. Regis Paper Company, which was merged into Champion International Corp., which was merged into International Paper).  This production included the deposition transcripts of over 70 former Allied Paper employees from earlier, insurance

litigation.  Only 12 of the 200 transcripts produced in January are of witnesses affiliated with Allied.  International Paper has had ample time to digest this material.

The document discovery described by IP that Georgia-Pacific recently served relates to IP's ownership interest in the same paper mill in Otsego, Michigan that is the subject of Weyerhaeuser's proposed third-party complaint.  That discovery was filed solely because of the possibility that Weyerhaeuser's motion might be granted and this mill become part of the case.  If Weyerhaeuser's motion is denied, Georgia-Pacific will withdraw these document requests.

(ii)     Expert Discovery

Remaining discovery relates to experts.  The current Case Management Order provides as follows:  (a) Plaintiffs will disclose expert reports by April 18, 2012;  (b) Defendants will disclose expert reports by no later than May 18, 2012;  (c) Expert discovery shall close on June 29, 2012.

If NCR's Motion is denied but the Court grants the joint request of Georgia-Pacific and NCR described in the previous paragraph, Georgia-Pacific and NCR request that the revised expert schedule will be as follows:  (a) The parties will serve expert reports and disclosures as to issues on which they bear the burden of proof no later than May 9, 2012;  (b) responsive expert reports and disclosures shall be filed by no later than June 8, 2012;  (c) expert discovery shall close on June 29, 2012.

International Paper disagrees with this proposal.  The Case Management Order presently in effect provides that the Plaintiffs shall serve expert reports first, and the Defendants will serve rebuttal expert reports later.

Georgia-Pacific's position on this issue is described in Section 14(A).

9.     Motions.  Under the current Case Management Order, all dispositive motions with

- 23 -

respect to liability in Phase I will be filed by July 27, 2012.

The parties acknowledge that it is the policy of this Court to prohibit the consideration of non-dispositive discovery motions unless accompanied by a certification that the moving party has made a reasonable and good faith effort to reach agreement with opposing counsel on the matters set forth in the motion.

10.    Alternative Dispute Resolution.  The parties do not believe that a submission of this matter to alternative dispute resolution would be productive at this time.

11.    Length of Trial.  Georgia-Pacific's estimate of the time to try Phase I is approximately 3 to 4 weeks, with it being premature to determine at this point how the trial days will be allocated among the parties.  NCR estimates that the trial will take approximately 2 weeks.  This estimate could change.

12.    Prospects of Settlement.  The parties have thus far conducted no substantive settlement negotiations.

13.    Electronic Document Filing System.  Counsel for the parties acknowledge their receipt and understanding of the instructions for the Electronic Document Filing System set forth in the Court's Order of May 20, 2011.

14.    Other Special Characteristics.  The trial in the Fox River Litigation before Judge Griesbach that was described in the JSR was completed on February 29, 2012.  No decision has been issued.

The parties disagree on whether the Court should consider other modifications to the existing Case Management Order.  Georgia-Pacific and Weyerhaeuser believe that it should, in the manner and for the reasons described below.  NCR and International Paper do not believe that the Court's March 5 Notice countenances additional modifications to the Case Management

Order and, for the reasons discussed below, believe that it would be premature and inappropriate to consider the modifications proposed by Georgia-Pacific and Weyerhaeuser at this time.

 (A)  Joint Statement of Georgia-Pacific and Weyerhaeuser

 Georgia-Pacific and Weyerhaeuser ask that the Court incorporate certain additions to the Court's Case Management Order in order to provide certainty on the exact issues that will and will not be litigated in the Phase I trial.  A number of these items were discussed and resolved at the June 27, 2011 Scheduling Conference but are not addressed in the Case Management Order.

 In addition, Georgia-Pacific and Weyerhaeuser request that the Case Management Order be modified to reflect what the parties agreed to in the original Joint Status Report submitted to the Court as to expert reports.  Specifically, Georgia-Pacific, NCR and IP requested that the date for disclosing expert reports be tied to the party with the burden of proof, not whether the party was "Plaintiff" or "Defendant."  There was no disagreement among the parties at the time the Joint Status Report was submitted to the Court.  Georgia-Pacific strongly suspects that IP is trying to change what the parties had agreed and tendered to the Court in order to avoid having to disclose first its expert report on a defense that it has raised recently on which it clearly has the burden of proof, the security interest exception to CERCLA.

 Accordingly, Georgia-Pacific and Weyerhaeuser propose that the Case Management Order be amended to add the following language:

 1.  Trial scheduled on February 19, 2013 will be of Phase I.  All dates set forth in the Case Management Order relate to trial of Phase I.

 2.  The issues included in Phase I and that will be tried are:

  a.  Whether defendant IP is liable under the standards of section 107(a) of CERCLA as alleged in the First Amended Complaint and cross-claims

filed by other parties.  This includes:  (i) whether IP (via corporate succession) was an owner or operator of one or more facilities at the Kalamazoo River Superfund Site at a time when there was a disposal of a hazardous substance, including whether IP can establish, for the period July 1, 1956 to August 5, 1966, a right to rely on the exclusion of § 101(20)(A) of CERCLA applicable to a person "that is a lender that, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility"; and (ii) whether there has been a release or threatened release and disposal of polychlorinated biphenyls (PCBs) from one or more of these facilities to the Kalamazoo River Superfund site.

b.      Whether defendant NCR is liable under the standards of section 107(a) of CERCLA as alleged in the First Amended Complaint and cross-claims filed by other parties.  This includes: (i) whether NCR (via corporate succession or otherwise) is a person that by contract, agreement or otherwise arranged for disposal or treatment or arranged with a transporter for transport for disposal or treatment of CCP containing PCBs, either pre-consumer broke or trim or rejects or post-consumer CCP owned by it, to a facility owned or operated by another party or entity; and (ii) whether there has been a release or threatened release of PCBs from any such facility to the Kalamazoo River Superfund Site.

c.      Any affirmative defenses to liability alleged by Defendants.  Except as to the statute of limitations, all defenses related to the amount and

recoverability of claimed costs will be resolved in a later phase.

Limitations defenses relating to certain categories or types of costs the
Defendants may claim are barred by an applicable statute of limitations
will be included in Phase I.

3.     Issues that will not be litigated in Phase I include:

a.     Whether plaintiffs Georgia-Pacific, et al. are liable under the standards of
section 107(a) of CERCLA, they having previously admitted to these
Phase I issues for purposes of this litigation.  (Joint Status Report,
¶ 8(B)(iv)).

b.     Whether defendant Weyerhaeuser is liable under the standards of section
107(a) of CERCLA as a current or former owner or operator of the
Plainwell Mill and the 12th Street Landfill, as it expects to file a stipulation
to this Phase I issue for purposes of this litigation.

c.     The extent to which liability for injuries, damages and costs in connection
with the Site is divisible.

d.     Apportionment and equitable allocation of response costs or other relief
sought in this case.

e.     Whether a release or threatened release of PCBs caused the incurrence of
response costs.

f.     The amount, if any, of any necessary costs of response that are consistent
with the national contingency plan.

4.     Pursuant to paragraph 8(g)(i) of the Joint Status Report, the term "Plaintiff" as
used in the provisions of the Case Management Order relating to expert witnesses and expert

reports shall refer to the party bearing the burden of proof on the issue for which the expert is tendered.  The term "Defendant" shall refer to the party not bearing the burden of proof.

 (B)    NCR's and IP's Statement

NCR and International Paper object to Georgia-Pacific's attempt to modify the Case Management Order by including this discussion of "Phase I" issues.  The Court's March 5 Notice did not ask the parties to address the scope of trial in the Joint Status Report; the Notice instead asked the parties to focus on the pending motions to add MW Custom Papers, LLC as a party and to extend the fact discovery cutoff.  Moreover, the parties have not met and conferred on the subject of these proposed modifications to the Case Management Order, nor have they had an opportunity to do so in the three days since Georgia-Pacific circulated the first draft of this Supplemental Joint Status Report.  Should the Court wish to receive a statement of the issues to be tried in Phase I, NCR and International Paper are prepared to confer with Georgia-Pacific and Weyerhaeuser and, with the benefit of a full discussion, propose a joint statement to the Court.

**GEORGIA-PACIFIC CONSUMER PRODUCTS,
LP., FORT JAMES CORPORATION, and
GEORGIA-PACIFIC LLC**

By:  ___/s/ Joseph C. Kearfott_____

Peter A. Smit, Bar No. P 27886
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501
(616) 336-6000

Joseph C. Kearfott
Douglas M. Garrou
George P. Sibley, III
Hunton & Williams LLP
951 East Byrd St.
Richmond, VA 23219
(804) 788-8200

Jeffrey N. Martin
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 955-1500

Kathy Robb
Hunton & Williams LLP
200 Park Avenue, 52nd Floor
New York, New York  10166-0005
(212) 309-1000

Jan M. Conlin
Tara D. Falsani
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
(612) 349-8500

**NCR CORPORATION**

By:    /s/ Geoffrey A. Fields

Geoffrey A. Fields
Dickinson Wright
200 Ottawa Avenue, N.W., Suite 1000
Grand Rapids, MI 49503-2427
Phone: (616) 336-1017
Fax: (616) 458-6753
gfields@dickinsonwright.com

Evan R. Chesler
Sandra C. Goldstein
Darin P. McAtee
Cravath, Swaine & Moore LLP
Worldwide Plaza, 825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700

Evan B. Westerfield
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

Linda R. Larson
Bradley M. Marten
Marten Law PLLC
1191 Second Avenue, Suite 2200
Seattle, Washington 98101
Phone: (206) 292-2600
Fax: (206) 292-2601

**INTERNATIONAL PAPER COMPANY**

By:    /s/ John D. Parker
John F. Cermak, Jr.
Sonja A. Inglin
Baker & Hostetler, LLP
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025
Phone: (310) 820-8800
Fax: (310) 820-8859

John D. Parker
Baker & Hostetler LLP
1900 East 9th Street, Suite 3200
Cleveland, OH 44114-3482
Phone: (216) 861-7610
Fax: (216) 696- 0740

**WEYERHAEUSER COMPANY**

By:    /s/  Mark W. Schneider
Mark W. Schneider
J. Christopher Baird
Michael Dunning
Karen M. McGaffey
Perkins Coie
1201 Third Avenue
Suite 4800
Seattle, Washington  98101-3099

Douglas A. Dozeman
Scott M. Watson
Warner Norcross and Judd LLP
900 Fifth Third Center
111 Lyon St NW
Grand Rapids, Michigan  49503-2487

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2012 I electronically filed a true and correct copy of the foregoing using the Court's ECF System, which will send notification of such filing by operation of the Court's electronic systems to all parties. I further certify that I caused a courtesy copy of the foregoing to be sent to defense counsel via e-mail.


By:   /s/ Joseph C. Kearfott