# Exhibit 1

Defendant NCR Corporation's Notice of 30(b)(6) Deposition of Georgia-Pacific Consumer Productions LP, Fort James Corporation and Georgia-Pacific LLC and Request for Production of Documents
(March 14, 2012)

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER ) <br> PRODUCTS LP, ) <br> FORT JAMES CORPORATION, and ) <br> GEORGIA-PACIFIC LLC ) <br> ) <br>       Plaintiffs, ) <br> ) <br>   v. ) <br> ) <br> NCR CORPORATION, ) <br> INTERNATIONAL PAPER CO., ) <br> and WEYERHAEUSER CO., ) <br> ) <br>       Defendants. ) | No: 1:11·cv·00483 <br><br> Judge Robert J. Jonker |

**DEFENDANT NCR CORPORATION'S NOTICE OF 30(b)(6) DEPOSITION OF GEORGIA-PACIFIC CONSUMER PRODUCTS LP, FORT JAMES CORPORATION AND GEORGIA-PACIFIC LLC AND REQUEST FOR PRODUCTION OF DOCUMENTS**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant NCR Corporation ("NCR") will take the oral deposition of Plaintiffs Georgia-Pacific Consumer Products LP, Fort James Corporation and Georgia-Pacific LLC (collectively "GP"). The deposition will commence on March 30, 2012 at 9:00am, and will continue from day to day until completed. The deposition will be held at the offices of Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, VA 23219, or at such place as may be agreed upon by counsel for the parties. The deposition shall be taken before a duly authorized officer certified to administer oaths and take depositions, and shall be recorded by stenographic and audiovisual means. The deposition will be taken for the purpose of discovery, for use as evidence at any hearing or trial and for any other purposes authorized by law.

GP is requested to designate, pursuant to Rule 30(b)(6), person(s) to testify about information known or reasonably available to GP regarding the subject matters listed in the Schedule A attached hereto.

GP is requested to provide NCR's counsel, as soon as reasonably possible, a written designation of the name(s) and position(s) of the person(s) who will testify on behalf of GP and, for each person so designated, the matters set forth in the attached Schedule A as to which he or she will testify.

Date: March 14, 2012

Respectfully Submitted,

Omid H. Nasab
*Counsel for NCR Corporation*

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Darin P. McAtee
Omid H. Nasab
Worldwide Plaza 825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000 Fax: (212) 474-3700
onasab@cravath.com

SIDLEY AUSTIN LLP
Evan B. Westerfield
One South Dearborn Street
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 853-7036
evanwesterfield@sidley.com

MARTEN LAW PLLC
Linda R. Larson
Bradley M. Marten
1191 Second Avenue, Suite 2200
Seattle, Washington 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
llarson@martenlaw.com

# SCHEDULE A

**I.  DEFINITIONS**

NCR adopts the definitions of terms as provided in its First Set of Requests for Admission, First Set of Interrogatories and Second Requests for the Production of Documents to Plaintiffs GP, dated February 29, 2012. In addition, the following terms are defined as follows:

1. "CCP Broke" shall mean PCB-containing carbonless copy paper trim, scrap and broke.

**II.  INSTRUCTIONS**

1. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, you are directed to designate one or more of your officers, directors, managing agents or other persons who consent to testify on your behalf and who have knowledge of and are adequately prepared to testify concerning the topics enumerated below.

2. All terms and phrases used herein shall be construed in an ordinary, commonsense manner, and not in a technical, strained, overly-literal or otherwise restrictive manner.

**III.  DEPOSITION TOPICS**

1. GP's knowledge and the bases of it for the following as to ACPC's CCP Broke for each calendar year of the Relevant Period:

   a. The volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility;

   b. The amount of PCBs contained in such CCP Broke;

  c. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

  d. The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (c);

  e. The terms of the purchases or acquisitions of such CCP Broke, including but not limited to the amounts paid;

  f. The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

  g. The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

2. GP's knowledge and the bases of it for the following as to CPM's CCP Broke for each calendar year of the Relevant Period:

  a. The volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility;

  b. The amount of PCBs contained in such CCP Broke;

  c. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

  d. The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (c);

e.   The terms of the purchases or acquisitions of such CCP Broke, including but not limited to the amounts paid;

f.   The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

g.   The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

3. GP's knowledge and the bases of it for the following as to Mead's CCP Broke for each calendar year of the Relevant Period:

a.   The volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility;

b.   The amount of PCBs contained in such CCP Broke;

c.   The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

d.   The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (c);

e.   The terms of the purchases or acquisitions of such CCP Broke, including but not limited to the amounts paid;

f.   The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

g.   The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

4. GP's knowledge and the bases of it for the following as to any CCP Broke generated by any facility owned or operated by NCR during the Relevant Period in or near Dayton, Ohio, for each calendar year of the Relevant Period:

   a. The identity and location of each such facility that generated or stored such CCP Broke that was ultimately acquired by any GP Site Facility or Other Site Facility;

   b. The volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility that originated with each facility listed in subsection (a);

   c. The amount of PCBs contained in such CCP Broke;

   d. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

   e. The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (d);

   f. The terms of such purchases or acquisitions, including but not limited to the amounts paid;

   g. The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

   h. The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

5. GP's knowledge and the bases of it for the following as to any CCP Broke generated by any facility owned or operated by NCR during the Relevant Period in or near Washington Court House, Ohio, for each calendar year of the Relevant Period:

    a. The identity and location of each such facility that generated or stored such CCP Broke that was ultimately acquired by any GP Site Facility or Other Site Facility;

    b. The volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility that originated with each facility listed in subsection (a);

    c. The amount of PCBs contained in such CCP Broke;

    d. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

    e. The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (d);

    f. The terms of such purchases or acquisitions, including but not limited to the amounts paid;

    g. The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

    h. The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

6. GP's knowledge and the bases of it for the following as to any CCP Broke generated by any facility owned or operated by NCR during the Relevant Period in or near Viroqua, Wisconsin, for each calendar year of the Relevant Period:

   a. The identity and location of each such facility that generated or stored such CCP Broke that was ultimately acquired by any GP Site Facility or Other Site Facility;

   b. The volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility that originated with each facility listed in subsection (a);

   c. The amount of PCBs contained in such CCP Broke;

   d. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

   e. The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (d);

   f. The terms of such purchases or acquisitions, including but not limited to the amounts paid;

   g. The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

   h. The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

7. GP's knowledge and the bases of it as to any CCP Broke from any facility not identified in Topics 1-6 of this Schedule A, from which GP contends (a) that NCR arranged for the disposal of and (b) that any GP Site Facility or Other Site Facility recycled, for each calendar year of the Relevant Period

   a. The identities of any facilities that generated or stored such CCP Broke that was ultimately acquired by any GP Site Facility or Other Site Facility;

   b. For each facility identified in subsection (a), the volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility that originated with it;

   c. The amount of PCBs contained in such CCP Broke;

   d. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

   e. The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (d);

   f. The terms of such purchases or acquisitions, including but not limited to the amounts paid;

   g. The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

   h. The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

8. GP's knowledge and the bases of it as to any customers of NCR that purchased CCP and generated CCP Broke (such as Moore Business Forms, Uarco Inc., and Standard Register), for each calendar year of the Relevant Period:

    a. The identity and location of each customer that generated such CCP Broke that was ultimately acquired by any GP Site Facility or Other Site Facility;

    b. The volume of such CCP Broke acquired by any GP Site Facility or any Other Site Facility that originated with each customer identified in subsection (a);

    c. The amount of PCBs contained in such CCP Broke;

    d. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such CCP Broke to any GP Site Facility or Other Site Facility;

    e. The amounts of such CCP Broke purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (d);

    f. The terms of such purchases or acquisitions, including but not limited to the amounts paid;

    g. The dates of acquisitions of such CCP Broke by any GP Site Facility or Other Site Facility;

    h. The Shippers who delivered such CCP Broke to any GP Site Facility or Other Site Facility.

9. GP's knowledge and the bases of it as to NCR's own use of CCP in its business operations, for each calendar year of the Relevant Period:

    a. The identity of each NCR location that used CCP that was ultimately acquired by any GP Site Facility or Other Site Facility;

    b. The volume of such used CCP acquired by any GP Site Facility or any Other Site Facility that originated with each location identified in subsection (a);

    c. The amount of PCBs contained in such used CCP;

    d. The identity of any and all entities, including Recovered Fiber Brokers, who sold or otherwise conveyed such used CCP to any GP Site Facility or Other Site Facility;

    e. The amounts of such used CCP purchased or otherwise acquired by any GP Site Facility and any Other Site Facility from each entity identified in subsection (d);

    f. The terms of such purchases or acquisitions, including but not limited to the amounts paid;

    g. The dates of acquisitions of such used CCP by any GP Site Facility or Other Site Facility;

    h. The Shippers who delivered such used CCP to any GP Site Facility or Other Site Facility.

10. The name, address and telephone number of any Persons who have provided information to GP in connection with the following, with respect to the Relevant Period:

    a. The destination and transport of any CCP Broke from any entity identified in Topics 1-9 of this Schedule A;

    b. The handling of such CCP Broke by any GP Site Facility or Other Site Facility;

    c. The sale or conveyance of such CCP Broke by any entity, including any Recovered Fiber Brokers, to any GP Site Facility or Other Site Facility.

11. The factual bases (including the specific identity of documents and the source, nature and extent of testimony and/or communications, whether oral or written) for the following allegations in the Amended Complaint ("Am. Compl."):[1]

    a. "At all times, NCR retained ownership of the PCB-containing emulsion, with the emulsion being given to the contract coaters on consignment." Am. Compl. ¶ 40.

    b. "NCR tracked its' coaters generation of CCP broke and sought to minimize their broke generation." Am. Compl. ¶ 49.

    c. "For example, internal memoranda and external communications by NCR and the Appleton facility referred to NCR paper broke as a 'waste' material, and the Appleton facility employees were

---

[1] NCR here identifies only those allegations in the Amended Complaint that are relevant to Phase I of this litigation. NCR reserves the right to have GP identify the factual bases for allegations concerning issues that may arise in later phases, if any, of this litigation.

directed to dispose of broke through the most economical means." Am. Compl. ¶ 50.

d. "Similarly, in 1952, NCR and Mead concluded that broke and trim from Mead's coating operations would be 'about 10%.'" Am. Compl. ¶ 51.

e. "With respect to converting, NCR representatives expected that approximately 20 to 25 percent of the PCB-containing sheets and rolls sent to converting plants ended up as unusable wastepaper." Am. Compl. ¶ 52.

f. "NCR placed the CCP product into the stream of commerce while knowing and intending that, as a result of the coating and converting process conducted by its converters and contract coaters, broke and trim scraps would be created and would then be sold as waste to recyclers." Am. Compl. ¶ 56.

g. "ACPC and [CPM] sold substantial quantities of PCB-containing waste to brokers and dealers which, in turn, delivered this waste to various recycling and/or de-inking locations — including Allied Paper Company's Bryant Mill and other paper mills on the Kalamazoo River." Am. Compl. ¶ 76.

h. "When they sold their PCB-laden broke and trim to brokers, ACPC and [CPM] knew, or reasonably should have known, that the waste would be sold to recyclers and/or de-inkers such as the paper mills on the Kalamazoo River." Am. Compl. ¶ 77.

i. "ACPC and [CPM] knew, or should have known, that the reprocessing of waste from the coating process would result in the discharge of wastewater and the disposal of other waste containing PCBs." Am. Compl. ¶ 78.

j. "NCR consigned the PCB-laden emulsion to Mead." Am. Compl. ¶ 81.

k. "NCR consigned its emulsion to Mead, directed Mead to engage in the coating of CCP using that emulsion, and directed and controlled the manner in which Mead engaged in that coating." Am. Compl. ¶ 84.

l. "In this relationship with Mead, NCR at all times had the understanding, intention, and expectation that Mead would (a) engage in a coating process that created waste, (b) dispose of that waste on behalf of NCR, and (c) send NCR a finished product containing NCR's emulsion — an emulsion that NCR owned at all times during the manufacturing process." Am. Compl. ¶ 85.

m. "NCR knew and intended that the waste from Mead's coating operations would be sold to recyclers and/or de-inkers such as the mills on the Kalamazoo River." Am. Compl. ¶ 86.

n. "NCR knew and intended that the reprocessing of waste from the coating process performed by Mead would result in the discharge of wastewater and disposal of other waste containing PCBs." Am. Compl. ¶ 87.

o. "All of the PCB-containing broke and trim generated by NCR's Business Forms and Supply Division was delivered to brokers and dealers that delivered this waste paper to third-party recyclers." Am. Compl. ¶ 90.

p. "NCR knew and intended that its CCP converting waste would be recycled at paper mills situated on rivers such as the Kalamazoo River." Am. Compl. ¶ 91.

q. "NCR also knew, or should have known, that the reprocessing of this waste would result in the discharge of wastewater and other waste containing PCBs." Am. Compl. ¶ 92.

r. "On information and belief, substantial amounts of PCB-containing waste paper from NCR's Business Forms and Supply Division were sold to recycling facilities on the Kalamazoo River, with the result that PCBs from that waste paper were released into the Kalamazoo River and the Kalamazoo River Superfund Site." Am. Compl. ¶ 93.

12. The factual bases (including the specific identity of documents and the source, nature and extent of testimony and/or communications, whether oral or written) for the following statements in GP's May 23, 2003 letter to Eileen L. Furey, United States Environmental Protection Agency:

a. "Only limited trimmings would be expected to be produced because the coating plant shipped coated paper to NCR in bulk rolls."

b. "The documents indicate that only a limited amount of broke was generated and it all went to Appleton, Wisconsin."

c. "We could find no evidence that any NCR paper broke containing PCBs was ever shipped from the Nekoosa coating plant, directly or indirectly to mills located within the Kalamazoo River area of Michigan. Instead, available evidence shows that a limited amount of broke was sent to a broker in Appleton, Wisconsin."

d. "It should be noted that Kalamazoo, Michigan is approximately 400 miles by road away from the Nekoosa/Port Edwards area. Many of those miles were on two-lane roads at the time and the trip would have had to go through Chicago and Gary, Indiana."

e. "We are aware of deposition testimony from prior litigation regarding the Kalamazoo River that some waste paper was potentially sent to Kalamazoo from the Nekoosa area, however the time frame and type of wastepaper was unclear, and the amount was not quantified."

f. "Based on the contemporaneous documents identified above and enclosed, there is no reason to believe that anything containing PCBs was ever shipped there from the Nekoosa coating operation."

g. "We were not able to locate records showing the names of any brokers, or quantities and dates of shipments, but based on information from the former employees we interviewed and available records, the coating plant shipped a small amount of

broke containing coated capsules to a broker in Appleton, Wisconsin. It is believed that this is the same broker who purchased NCR broke from a plant in Combined Locks, Wisconsin. Rolls of paper coated with pressure sensitive emulsion were shipped from the coating plant in Nekoosa to Combined Locks, Wisconsin."

IV. **DOCUMENT REQUESTS**

NCR requests that reasonably in advance of the deposition of GP, GP produce:

1. All documents reviewed, considered or used by the deponent to determine the facts related to the deposition topics listed in Section III or otherwise to prepare for this deposition.

2. The deponent's current resume.

3. To the extent not previously produced, all documents related to or reflecting purchases, during the Relevant Period, of CCP Broke generated by any facility identified in Section III above, by any GP Site Facility or by any Other Site Facility.