# Exhibit 7

Georgia Pacific's Responses to Defendant
International Paper's First Set of Interrogatories
(January 31, 2012)

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GEORGIA-PACIFIC CONSUMER** | ) | |
| **PRODUCTS LP,** | ) | |
| **FORT JAMES CORPORATION, and** | ) | |
| **GEORGIA-PACIFIC LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No: 1:11-cv-00483** |
| **v.** | ) | |
| | ) | **Judge Robert J. Jonker** |
| **NCR CORPORATION,** | ) | |
| **INTERNATIONAL PAPER CO.,** | ) | |
| **and WEYERHAEUSER CO.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**GEORGIA-PACIFIC'S ANSWERS AND OBJECTIONS TO DEFENDANT**
**INTERNATIONAL PAPER'S FIRST SET OF INTERROGATORIES**

Plaintiffs Georgia-Pacific Consumer Products LP, Fort James Corporation, and Georgia-Pacific LLC (collectively "Georgia-Pacific"), by counsel, submit these objections and answers to the First Set of Interrogatories from Defendant International Paper Company ("IP").

**General Objections and Limitations**

The following General Objections apply to each of IP's interrogatories and shall have the same force and effect as if set forth in full in response to each.

1.      Georgia-Pacific objects to the Instructions, Definitions and each and every interrogatory to the extent that they improperly attempt to expand, alter, or modify the scope of permissible discovery under the Federal Rules of Civil Procedure and any other applicable rules.

2.      Georgia-Pacific objects to definition of "you", which is apparently a typographical error, as it defines "you" to mean the NCR Corporation.  For the purposes of these responses, "you" will be interpreted to mean Plaintiffs.

3.      Georgia-Pacific objects to the terms "alleged lease period," "alleged operating

period," and "post-alleged affiliation period" in the context of these Interrogatories on the grounds that some evidence of which Georgia-Pacific is aware is not associated with specific dates and other evidence, with specific dates, is representative of recurring events that occurred both earlier and later. Accordingly, Georgia-Pacific's answers as to any one period apply to all, unless specifically noted otherwise.

4. Georgia-Pacific objects generally to the list of terms and definitions, the vast majority of which are not used in these Requests.

5. Georgia-Pacific objects to these interrogatories on the grounds that they are premature at this point in the discovery process, as its investigation is still ongoing and fact discovery has not yet closed. Georgia-Pacific states that the fact discovery deadline in this case extends until the end of March 2012. Discovery continues, and Georgia-Pacific awaits IP's document production. Therefore, Georgia-Pacific continues its investigation of all relevant facts in this case and reserves its right to supplement or change these objections and answers, including after the judicial resolution of disputes between the parties regarding the proper scope of discovery in this action. Georgia-Pacific's Answers and Objections to IP's interrogatories are based on information presently known to Georgia-Pacific.

6. Georgia-Pacific objects to these interrogatories on the grounds that they are premature to the extent that they seek information related to expert discovery. Georgia-Pacific will timely comply with the Case Management Order entered in this case as it relates to expert disclosures and will supplement its response to these interrogatories at that time.

7. Georgia-Pacific objects to IP's interrogatories to the extent they seek the disclosure of information and/or documents protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the mediation privilege, and/or any other available

privilege or immunity.  The inadvertent disclosure of any information or production of any document that is confidential, privileged, was prepared in anticipation of litigation or for trial, or is otherwise irrelevant and/or immune from discovery shall not constitute a waiver of any such privilege or of any ground for objection to discovery with respect to such information or document, the subject matter of the information or document, or of Georgia-Pacific's right to object to the use of any such information or document in the above captioned proceeding or elsewhere.

8.      Georgia-Pacific's decision to provide any response to an interrogatory, notwithstanding the objectionable nature of any of the interrogatories themselves, is not:  (a) an acceptance of, or agreement with, any of the characterizations or purported descriptions of the transactions or events contained in the interrogatory; (b) a concession or admission that the material is relevant to this proceeding; (c) a waiver of the General Objections or the objections asserted in response to specific interrogatories; or (d) an agreement that interrogatories for similar information will be treated in a similar manner.

9.      The term "Allied" as used in these responses refers to the corporate entity that leased, then later purchased, the Bryant Mill from St. Regis.  That entity was known first as Thor Corporation but later changed its name to Allied Paper Company.

## ANSWERS TO FIRST SET OF INTERROGATORIES

All General Objections are incorporated into each of Georgia-Pacific's responses, in addition to objections that are specific to particular paragraphs of the interrogatories.

**INTERROGATORY NO. 1:**  For each Request for Admission propounded upon you by International Paper in this case in which the response is not an unqualified admission, describe in detail the factual basis—including all documents and all persons with knowledge of facts—for your response.

a.      RFA 1: Admit that you are presently unaware of any evidence that NCR broke and/or trim was reprocessed at the Bryant Mill specifically during the alleged operation period.

      **Answer:** Denied.

**ANSWER TO INTERROGATORY NO. 1(a):** As noted in Objections 5 and 6, discovery and investigation are on-going, and expert witness reports are not due for three months. In addition, Georgia-Pacific still awaits IP's document production, which was promised months ago. As a result, Georgia-Pacific's Answer to Interrogatory No. 1 by necessity is preliminary and is subject to revision as more facts and expert opinions are available.

With that caveat, Georgia-Pacific states that several lines of evidence, some direct and some circumstantial, demonstrate that NCR broke and/or trim was reprocessed, as that term is defined, at the Bryant Mill during the entirety of the period 1954-1971 and likely before 1954.[1] These lines of evidence include:

1.      The Bryant Mill for all the years in question used wastepaper as a significant source of fiber for its papermaking business. Categories of wastepaper that it used heavily were book and ledger. It received its wastepaper furnish both from wastepaper brokers and from customers to whom it sold paper.

2.      The Bryant Mill de-inked and re-pulped wastepaper from before 1950 to 1971. Together with the King Mill, it had the largest de-inking operation in the United States.

---

[1] The evidence summarized here and other evidence also show that wastepaper containing PCBs other than NCR broke and/or trim, as defined, was recycled at the Bryant Mill resulting in PCB releases during all applicable periods. Georgia-Pacific relies in this case on all PCB releases during the time of IP's ownership, whether or not associated with NCR broke and/or trim. Its case is not restricted to the matters that are the subject of IP's Requests for Admission and Interrogatories.

3.      During the period up to August 5, 1966, when St. Regis owned the Bryant Mill, and thereafter, most recycled wastepaper came from publishing, printing and industrial sources and from large governmental and commercial establishments.  These represent the sources of the wastepaper used at the Bryant Mill.  Relatively little came from such sources as residences, schools, and smaller government, office and commercial sources.

4.      NCR paper was first commercially produced at least as early as 1954 at Appleton Coated Paper Company in Appleton, Wisconsin ("ACPC").  The process of developing commercial NCR paper began prior to that date in several locations and generated NCR paper broke earlier than 1954.

5.      At relevant times, ACPC was the largest contract coater of NCR paper.  It generated large volumes of NCR broke and/or trim.

6.      NCR broke and/or trim was usually categorized as ledger, a type of  wastepaper that the Bryant Mill used in large quantities.

7.      Companies that utilized over-the-road trucks for product deliveries without exception tried whenever possible to load returning trucks to avoid dead-heading.  Allied Paper Corporation, and almost certainly St. Regis Paper Company, from at least the 1950s used trucks that delivered their product to customers to transport wastepaper back to Kalamazoo.  Sometimes wastepaper was picked up at buyer's facility.  Other times it was picked up from wastepaper brokers in the vicinity.  At relevant times, de-inking mills in the Kalamazoo, including the Bryant Mill, also obtained wastepaper using transportation services provided by third party trucking firms.  Some of those trucks were likely "backhauling" wastepaper after making deliveries of finished products.

8.      ACPC was a customer of both St. Regis Paper Company and Allied.  Indeed, ACPC was a customer of St. Regis Paper Company at least as early as January 1, 1955.  Allied sometimes had contracts with Allied's paper customers to pick up wastepaper when it delivered its paper products.  ACPC sometimes sold wastepaper to mills, such as the Bryant Mill, that recycled it.

9.      Whether obtained directly from ACPC, or via wastepaper brokers, backhauling by St. Regis and Allied likely included ACPCs NCR broke and/or trim.

10.      An employee of ACPC, Fred Heinritz, stated in a letter dated May 19, 1965 that "several different mills have used limited quantities of our CB broke over the years, including . . . Allied Paper Company, Kalamazoo, Michigan."  The time period referred to by Heinritz was when St. Regis owned the Bryant Mill.

11.      ACPC sold large volumes of wastepaper to brokers.  Much of that volume was transported out of ACPC's facility to destinations selected by the brokers.  These brokers did not ordinarily reveal the destination or their buyers to ACPC.  It is likely that large volumes were shipped to Chicago and beyond.

12.      Allied and likely St. Regis Paper Company purchased wastepaper from, among others, the same brokers to whom ACPC sold NCR broke and trim.

13.      During the time periods that the Combined Locks mill was coating CCP using NCR's PCB-containing emulsion, it is likely that broke and/or trim from the Combined Locks mill made its way to Kalamazoo-area de-inking mills, including the Bryant Mill, via the market and transportation system described above with respect to ACPC.

14.      Allied, and likely St. Regis Paper Company, had a large number of customers in the Chicago area.  Backhauls from the Chicago area included large volumes of wastepaper.

15.     Retired employees of Allied recall that NCR paper broke and trim was a desirable wastepaper furnish because it provided good fiber with no ink.  This is consistent with Heinritz's observation that ACPC sold NCR CB broke at $75 per ton, "which is quite high in relation to other wastepapers we sell."  In addition, retired employees have a specific recollection of the peculiar smell of NCR paper being present in the de-inking mill at the Bryant Mill, and, as to Richard Bennett, that NCR paper broke and trim came from Wisconsin.

16.     High concentrations of the type of PCBs used to produce NCR paper, Aroclor 1242, have been found in Portage Creek and Bryant Mill Pond sediments, and in site soils, landfill soils, dewatering lagoon sediments and sub-surface water at the Bryant Mill.  The extremely high concentrations of and total mass of these types of PCBs can only be explained by recycling of wastepaper containing PCBs.  They are consistent with the recycling of NCR paper broke and/or trim.

17.     The primary clarifier and the dewatering lagoon servicing the primary clarifier were constructed at the Bryant Mill in 1954.  Suspended solids were released from the clarifier into this dewatering lagoon once it went into operation in 1954.  PCBs were detected in all dewatering lagoon core segments that contain paper mill residue.

18.     Sampling cores that penetrated the berm surrounding the dewatering lagoon indicate that paper mill residues containing PCBs were present at least as early as 1954.

19.     PCBs from NCR paper were present in certain wastepaper from at least 1953 and possibly earlier.  Their presence in wastepaper expanded dramatically over the years after 1953. The de-inking process in Mill A was the largest source of PCB releases at the Bryant Mill.  It operated continuously from before 1953 to 1971.  Of this 18 year period, St. Regis owned and operated or owned the Bryant Mill for 13 years, over 70 percent of the total time.  It defies logic

and reason to conclude that all PCBs were released only in the 5 year period after St. Regis sold the Bryant Mill and not in the 13 year period leading up to the sale.

20.    The historical records of the Bryant Mill indicate that very high volumes of suspended solids were discharged in the waste water effluent, particularly from the de-inking operation in Mill A.  The volume of suspended solids decreased over the 1950s and 1960s as first St. Regis and then Allied made improvements and changes to the system.  PCBs found in wastepaper adsorb to suspended solids in waste water effluent.  Of the total suspended solids released by the Bryant Mill in the 18 year period from 1953 to 1971, vastly more were released during the 13 year period of St. Regis's ownership than during the 5 year period after it sold the mill.  Given the widespread presence of PCBs generally in wastepaper by the late 1950s and early 1960s, it is a certainty that PCBs were contained in the suspended solids discharged by the Bryant Mill for many years prior to 1966.  NCR paper broke and/or trim constituted a material portion of the PCB-containing wastepaper processed by the Bryant Mill.

        b.    RFA 2:  Admit that you are presently unaware of any evidence that NCR broke and/or trim was reprocessed at the Bryant Mill specifically during the alleged lease period.

            **Answer:**  Denied.

**ANSWER TO INTERROGATORY NO. 1(b):**  See Answer to Interrogatory No. 1(a).

        c.    RFA 3:  Admit that you are presently unaware of any shipments of NCR broke and/or trim that the Bryant Mill received during the alleged operation period.

            **Answer:**  Georgia-Pacific objects to the phrase "unaware of any shipments" as being vague and ambiguous.  To the extent that this Request asks Georgia-Pacific to admit that there were no shipments of NCR broke and/or trim to the Bryant Mill during the relevant time period, denied.  To the extent that it asks Georgia-Pacific to admit that it does not have documentation of specific shipments on specific dates, admitted.

**ANSWER TO INTERROGATORY NO. 1(c):**  See Answer to Interrogatory No. 1(a).

d.  RFA 4:  Admit that you are presently unaware of any shipments of NCR broke and/or trim to the Bryant Mill received during the alleged lease period

**Answer:**  Georgia-Pacific objects to the phrase "unaware of any shipments" as being vague and ambiguous.  To the extent that this Request asks Georgia-Pacific to admit that there were no shipments of NCR broke and/or trim to the Bryant Mill during the relevant time period, denied.  To the extent that it asks Georgia-Pacific to admit that it does not have documentation of specific shipments on specific dates, admitted.

**ANSWER TO INTERROGATORY NO. 1(d):**  See Answer to Interrogatory No. 1(a).

**INTERROGATORY NO. 2:**  Please identify—by name and title and/or department— all persons of whom you are aware who worked at the Bryant Mill during the alleged operation period.

**ANSWER TO INTERROGATORY NO. 2:**  Georgia-Pacific has never owned the Bryant Mill.  Information that it has as to the identity of persons who worked at the Bryant Mill comes from documents produced in litigation.  These documents have been produced to counsel for IP and bear production numbers KZ-KRSG-0083913 to 208371.  Georgia-Pacific specifically calls IP's attention to multiple deposition transcripts of various former employees of Allied, many of whom worked at the Bryant Mill.  See KZ-KRSG-00179418 to 207890.  Additional employees not deposed are identified in these depositions.

While these documents are not Georgia-Pacific's business records, the information requested in this Interrogatory is available in these documents and the burden of deriving or ascertaining the answer is substantially the same for IP as it is for Georgia-Pacific.

Many of the people identified in these documents are deceased.  As part of its investigation, Georgia-Pacific has identified and obtained addresses of some former Allied employees who were employed in the 1950s and 1960s and who are still living.  Some of these people may have worked at the Bryant Mill.  Their contact information is:

Richard Bennett
1037 Flora Vista Street
Trinity, Florida  34655
*Assistant to Superintendent*

Per Oskar Hagard
607 Oak Street
Paw Paw, MI  49079

Fred A. Harrison
9914 Gull Lake Drive
Richland, MI  49083

Guy F. Mahoney
847 Knollwood Village
Southern Pines, NC  28387
*National Sales Manager, Kalamazoo Mills*

Mary Prouty
7840 Lovers Lane
Portage, MI  49081

William Slater
1201 Eighth Avenue West
Lot E 45
Palmetto, Florida  34221
*City driver*

Ken Sweet
Kalamazoo, MI
exact address unknown
*General Superintendent, Bryant Mill*

Robert J. Thiessen
219 South Gull Lake Drive
Richland, MI  49083
*Coating Development Lab Manager*

Marilyn Wren
3014 Lowell Street
Kalamazoo, MI  49001

**INTERROGATORY NO. 3:**  Please identify all persons of whom you are aware (including but not limited to persons identified in response to Interrogatory No. 2) who may have knowledge of the Bryant Mill's purchase for use of NCR broke and/or trim during the alleged operation period.

**ANSWER TO INTERROGATORY NO. 3:**  See Answer to Interrogatory No. 2.  As to the former employees identified in Answer to Interrogatory No. 2, the employees whom Georgia-Pacific knows to have some information concerning the Bryant Mill's purchase of NCR broke and/or trim are Ms. Wren and Messrs. Slater and Bennett.  In addition, former ACPC employee Fred Heinritz also may have such knowledge.

**INTERROGATORY NO. 4:**  Please identify all persons of whom you are aware (including but not limited to persons identified in response to Interrogatory No. 2) who may have knowledge of the Bryant Mill's receipt or use of NCR broke and/or trim during the alleged operation period.

**ANSWER TO INTERROGATORY NO. 4:**  See Answer to Interrogatory No. 3.  In addition, multiple investigations in connection with the Kalamazoo River Superfund Site have

concluded that the substantial contamination of the Bryant Mill, Portage Creek, and the Bryant Mill Pond resulted from the receipt and use of NCR paper as wastepaper furnish at the Bryant Mill.

     **INTERROGATORY NO. 5**:  Identify all documents that you contend show the Bryant Mill's purchase for use of NCR broke and/or trim during the alleged operation period.

     **ANSWER TO INTERROGATORY NO. 5:**  Georgia-Pacific specifically objects to Interrogatory No. 5 on the grounds that it is premature.  Documentary and other evidence is still being gathered from a variety of sources and is being evaluated.  Some of this evidence will be the basis for expert testimony and described in expert reports which will be exchanged on April 30.  Georgia-Pacific is not required by the Case Management Order entered in this case to disclose at this time the exhibits on which it will rely in support of its case against IP.

     Subject to this objection, Georgia-Pacific says that it may rely on some or all of the following in support of its case against IP:

     1.      All depositions taken in this case and, specifically, the depositions of Marilyn Wren, William Slater and Richard Bennett and the exhibits identified in those depositions.

     2.      Responses by various entities to requests for information from regulatory authorities relating to both the Fox River and the Kalamazoo River.  This includes responses by NCR, Appleton Papers Inc., Continental Paper Grading Company, National Fiber Supply Company, Golper Supply Company and others.

     3.      Depositions taken in *Appleton Papers, Inc. v. George A. Whiting Paper Company* of ACPC employees and employees of brokers, including Donald Christensen, Floyd Strelow, Fred T. Heinritz, and Leo Golper.

4.      Letter from Heinritz to Burroughs dated May 19, 1965.  (Deposition Ex. ___ from Bennett deposition)

5.      Assignment of Contracts, Etc. dated as of June 29, 1956 between St. Regis and Thor Corporation.  (IPC-001- 0000817-829).

6.      Letter from Sherman and Sterling to Federal Trade Commission dated June 2, 1978, with attachments listing "Ten Largest Suppliers to the Appleton Division."  (NCR-FOX-0562625 - 27 and NCR-FOX-00551756 - 63).

7.      Various reports prepared by or for US EPA and Michigan Department of Environmental Quality (a/k/a Michigan Department of Natural Resources) evaluating the presence of PCBs at the Bryant Mill, Portage Creek and the Bryant Mill Pond and the sources of the PCBs.  There are many reports and technical memoranda addressing these issues, all of which are publicly available and most of which have been produced by Georgia-Pacific in this litigation.  See, e.g., Report entitled "Allied Paper, Inc. Operable Unit Remedial Investigation Report" dated March 2008 and Report entitled Stage I Assessment Report, Volume 1 -- Injury Assessment:  Kalamazoo River Environment" dated March 15, 2005 and other documents referenced therein.

8.      Multiple documents contained within the Allied document production from the KRSG litigation that relate to, describe or discuss the history of wastepaper usage and wastewater effluent and treatment at the Bryant Mill.  (KZ-KRSG-0083913 - 208371).

9.      Judicial decisions from the KRSG litigation.  See, e.g., *Kalamazoo River Study Group v. Rockwell International,* 107 F. Supp. 2d 817 (W.D. Mich. 2000).

**INTERROGATORY NO. 6**: Identify all documents which you contend show the Bryant Mill's receipt or use of NCR broke and/or trim during the alleged operating period.

**ANSWER TO INTERROGATORY NO. 6**: See Answer to Interrogatory No. 5.

**INTERROGATORY NO. 7**: Please identify—by name and title and/or department—all persons of whom you are aware who worked at the Bryant Mill during the alleged lease period.

**ANSWER TO INTERROGATORY NO. 7**: See Answer to Interrogatory No. 2.

**INTERROGATORY NO. 8**: Please identify all persons of whom you are aware (including but not limited to persons identified in response to Interrogatory No. 2) who may have knowledge of the Bryant Mill's purchase for use of NCR broke and/or trim during the alleged lease period.

**ANSWER TO INTERROGATORY NO. 8**: See Answer to Interrogatory No. 3.

**INTERROGATORY NO. 9**: Please identify all persons of whom you are aware (including but not limited to persons identified in response to Interrogatory No. 2) who may have knowledge of the Bryant Mill's receipt or use of NCR broke and/or trim during the alleged lease period.

**ANSWER TO INTERROGATORY NO. 9**: See Answer to Interrogatory No. 4.

**INTERROGATORY NO. 10**: Identify all documents that you contend show the Bryant Mill's purchase for use of NCR broke and/or trim during the alleged lease period.

**ANSWER TO INTERROGATORY NO. 10:**  See Answer to Interrogatory No. 5.

**INTERROGATORY NO. 11:**  Identify all documents which you contend show the Bryant Mill's receipt or use of NCR broke and/or trim during the alleged lease period.

**ANSWER TO INTERROGATORY NO. 11:**  See Answer to Interrogatory No. 5.

**INTERROGATORY NO. 12:**  Please identify—by name and title and/or department—all persons of whom you are aware who worked at the Bryant Mill during the post-alleged affiliation period.

**ANSWER TO INTERROGATORY NO. 12:**  See Answer to Interrogatory No. 2.

**INTERROGATORY NO. 13:**  Please identify all persons of whom you are aware (including but not limited to persons identified in response to Interrogatory No. 2) who may have knowledge of the Bryant Mill's purchase for use of NCR broke and/or trim during the post-alleged affiliation period.

**ANSWER TO INTERROGATORY NO. 13:**  See Answer to Interrogatory No. 3.

**INTERROGATORY NO. 14:**  Please identify all persons of whom you are aware (including but not limited to persons identified in response to Interrogatory No. 2) who may have knowledge of the Bryant Mill's receipt or use of NCR broke and/or trim during the post-alleged affiliation period.

**ANSWER TO INTERROGATORY NO. 14:**  See Answer to Interrogatory No. 4.

**INTERROGATORY NO. 15:**  Identify all documents that you contend show the Bryant Mill's purchase for use of NCR broke and/or trim during the post-alleged affiliation period.

**ANSWER TO INTERROGATORY NO. 15:**   See Answer to Interrogatory No. 5.


**INTERROGATORY NO. 16:**  Identify all documents which you contend show the Bryant Mill's receipt or use of NCR broke and/or trim during the post-alleged affiliation period.

**ANSWER TO INTERROGATORY NO. 16:**  See Answer to Interrogatory No. 5.

## VERIFICATION

STATE OF OHIO         )

                              )     To-Wit:

CITY/COUNTY OF _Lucas_   )

     Garry T. Griffith, being duly sworn, deposes and says that he is a Director, Field

Environmental Service, of Georgia-Pacific LLC, one of the named Plaintiffs in this lawsuit, and

that he signs the foregoing Georgia-Pacific's Answers and Objections to Defendant International

Paper's First Set of Interrogatories and is duly authorized to do so; that the matters stated in the

foregoing document are not all within his personal knowledge and that he is informed that there

is no other officer of Plaintiffs who has personal knowledge of all such matters; and that the facts

stated in the foregoing document have been assembled by authorized employees and counsel of

Plaintiffs and deponent is informed by those authorized employees that the facts stated in the

foregoing document are true.

_[signature]_

Sworn to and subscribed before me this _31st_ day of January 2012.

My commission expires: _May 5th 2012_

DENNY PARSSON
Notary Public, State of Ohio
My Commission Expires
May 5, 2016

_[signature]_
NOTARY PUBLIC

Dated:  January 31, 2012

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**


By:  ___/s/ Joseph C. Kearfott_____

Peter A. Smit, Bar No. P 27886
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501
(616) 336-6000

Joseph C. Kearfott
Douglas M. Garrou
George P. Sibley, III
Hunton & Williams LLP
951 East Byrd St.
Richmond, VA 23219
(804) 788-8200

Jeffrey N. Martin
Djordje Petkoski
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037-1701
(202) 955-1500

Kathy Robb
Hunton & Williams LLP
200 Park Avenue, 52nd Floor
New York, New York  10166-0005
(212) 309-1000

Jan M. Conlin
Tara D. Falsani
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
(612) 349-8500

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2012, I caused to be served by electronic mail a copy of Georgia-Pacific's Answers and Objections to Defendant International Paper's First Set of Interrogatories upon counsel for each Defendant, at the following e-mail addresses:

**Counsel for NCR Corporation:**

| | |
|---|---|
| Evan R. Chesler | echesler@cravath.com |
| Geoffrey A. Fields | gfields@dickinsonwright.com |
| Sandra C. Goldstein | sgoldstein@cravath.com |
| Eric W. Ha | eha@sidley.com |
| Linda R Larson | llarson@martenlaw.com |
| Vanessa A. Lavely | vlavely@cravath.com |
| Meline Grace MacCurdy | mmaccurdy@martenlaw.com |
| Bradley M Marten | bmarten@martenlaw.com |
| Darin P. McAtee | dmcatee@cravath.com |
| Omid H. Nasab | onasab@cravath.com |
| Margaret R. Sobota | msobota@sidley.com |
| Evan B. Westerfield | evanwesterfield@sidley.com |

**Counsel for International Paper Co.:**

| | |
|---|---|
| John F. Cermak, Jr. | jcermak@bakerlaw.com |
| Sonja A. Inglin | singlin@bakerlaw.com |
| Michael Dominic Meuti | mmeuti@bakerlaw.com |
| John D. Parker | jparker@bakerlaw.com |

**Counsel for Weyerhaeuser Co.:**

| | |
|---|---|
| J. Christopher Baird | jcbaird@perkinscoie.com |
| Douglas A. Dozeman | ddozeman@wnj.com |
| Michael Dunning | mdunning@perkinscoie.com |
| Karen M. McGaffey | kmcgaffey@perkinscoie.com |
| Mark W. Schneider | mwschneider@perkinscoie.com |
| Scott M. Watson | swatson@wnj.com |

By:     /s/ Joseph C. Kearfott

29073.000396 EMF_US 38278439v3

**Barden, Sheila**

| | |
|---|---|
| **From:** | Alexander, Gayle |
| **Sent:** | Tuesday, January 31, 2012 1:13 PM |
| **To:** | Chesler, Evan; Fields, Geoffrey; Goldstein, Sandra; Ha, Eric; Larson, Linda; Lavely, Vanessa; MacCurdy, Meline; Marten, Bradley; McAtee, Darin; Nasab, Omid; Sobota, Maggie; Westerfield, Evan; Cermak, John; Inglin, Sonja; Meuti, Michael; Parker, John; Baird, Chris; Dozeman, Douglas; Dunning, Michael; McGaffey, Karen; Schneider, Mark; Watson, Scott Michael |
| **Subject:** | GP et al. v. NCR Corporation et al.:  GP Responses to IP's discovery requests |
| **Attachments:** | img-201020755.pdf; img-201020811.pdf |



img-2010207
5.pdf (703 KB

img-2010208
1.pdf (117 KB