Exhibit C

Lacey, Don  8/31/2011  1:16:00 PM

1       UNITED STATES DISTRICT COURT

2     FOR THE WESTERN DISTRICT OF MICHIGAN

3   _____

4   GEORGIA-PACIFIC CONSUMER

5   PRODUCTS, LP, et al.,

6      Plaintiffs,   Case No. 1:11-cv-00483

7    v.

8   NCR CORPORATION, et al.,

9      Defendants.

10  _____

11

12

13     VIDEOTAPED DEPOSITION OF:  DONALD D. LACEY

14

15

16  DATE:    August 31, 2011

17  TIME:    9:00 a.m.

18  LOCATION:  Varnum, LLP

19      333 Bridge Street, N.W., 17th Floor

20      Grand Rapids, Michigan

21  REPORTER:  Kelly M. Kane, RPR, CSR-1470

22

23

24

25

Lacey, Don  8/31/2011  1:16:00 PM

1   1960s?

2       MR. NASAB:  Objection to form.

3   A.  Yes.

4   BY MS. CONLIN:

5   Q.  Okay.  Do you know when this particular notebook was

6       prepared?

7       MR. NASAB:  Objection.

8   A.  I would say right around '69, '68, probably somewhere in

9       there.

10  BY MS. CONLIN:

11  Q.  Okay.  Now, finally, Mr. --

12  A.  I don't really know.

13  Q.  -- Mr. Lacey, on --

14      MR. NASAB:  I'm sorry, what was the last part you

15      said?

16      THE WITNESS:  I'm not really sure when it was

17      given to me, when it -- or when it was wrote up, but it had

18      to have been the same stuff.

19      COURT REPORTER:  Same what?  I'm sorry.

20      MS. CONLIN:  Stuff.

21  BY MS. CONLIN:

22  Q.  Now, finally, Mr. Lacey, were you asked to do some work in

23      this case locating potential people who might know things?

24  A.  Yes, ma'am.

25  Q.  Okay.  And did you work with Mr. Leon Martin --

Lacey, Don  8/31/2011  1:16:00 PM

1   A.   Yes, ma'am.

2   Q.   -- on that?

3         And did you work to uncover names of individuals

4     who might have either documents or other information that

5     might be relevant to this case?

6         MR. NASAB:  Objection to form.

7   A.   I sure did.

8   BY MS. CONLIN:

9   Q.   Okay.  And were you reimbursed for your time in connection

10    with that?

11  A.   Yes, ma'am.

12        MS. CONLIN:  Okay.  I have no further questions.

13               E X A M I N A T I O N

14  BY MR. NASAB:

15  Q.   Mr. Lacey, like I said, my name is Omid Nasab.  And it's

16    nice to meet you.

17  A.   Nice to meet you.

18  Q.   So you said that you began working at GP in 1953, correct?

19  A.   Correct.

20  Q.   And you stopped working at GP in November of 1995, right?

21  A.   Yes.

22  Q.   And you stopped working at GP because GP terminated you,

23    according to Mr. Martin; is that true?

24  A.   There was downsizing, yes.

25  Q.   Okay.  And you are a paid consultant for GP, correct?

1  A.  Pardon?

2  Q.  You're a paid consultant for GP?

3  A.  Yes.

4  Q.  And GP pays you by the hour for the consulting work that you

5      do for GP, correct?

6  A.  For what I did here, yes.

7  Q.  And GP pays for all the expenses that you incur during the

8      course of your consulting work?

9  A.  Yes.

10  Q.  And the first paid work that GP asked you to do was to look

11      through documents that you had taken with you from GP at the

12      time of your termination, correct?

13  A.  Repeat that, please.

14  Q.  Sure. And any time you -- you don't get the question, just

15      ask me, and I'm --

16  A.  I will.

17  Q.  -- very happy to repeat it.

18        The first paid work that GP asked you to do was to

19      look through the documents that you'd taken with you from

20      GP, when you left your job at GP --

21  A.  Correct.

22  Q.  -- true?

23  A.  Yes.

24  Q.  And it was Mr. Leon Martin that asked you to look through

25      those documents, but you kept putting him off for months

Lacey, Don 8/31/2011 1:16:00 PM

1       until Mr. Martin offered to pay you $50 per hour to look

2       through those boxes; isn't that true?

3              MS. CONLIN: Objection, compound.

4    A. No, I didn't put him off until -- on account of that reason.

5       I was asked to do it, and I did it.

6    BY MR. NASAB:

7    Q. Did you do it the first time Mr. Martin asked you to do it?

8    A. When we got together, yes. It was probably maybe three

9       months, or something like that, aft -- before I actually got

10      with him to do this, yes.

11   Q. And what was it that caused you to become willing to do it?

12   A. Well, I worked for Georgia-Pacific for 43 years, so I felt I

13      was obligated to do it. I had no hard feelings against

14      them.

15   Q. So did you do it the first time Mr. Martin asked?

16             MS. CONLIN: Asked and answered.

17   A. We talked about it, yeah. I didn't refuse, no.

18             MR. NASAB: Can I mark that, please? Is that

19      Martin 19? I mean Lacey 19?

20             COURT REPORTER: 20.

21             MS. CONLIN: Are you going to provide copies for

22      the rest of us?

23             MR. MEUTI: Is that 19 or 20?

24             MR. NASAB: It's been marked 20 on my copy.

25

1    (Deposition Exhibit Number 20 was marked for

2    identification.)

3    MR. NASAB: For the record, I'm referring to Lacey

4    Exhibit 20, which is Bates number KZWIT719.

5  A.  So what do you want to know?

6  BY MR. NASAB:

7  Q.  Sure. My question is, do you see that, in the first email

8    of this chain, the one at the bottom --

9  A.  Yes.

10  Q.  -- that Mr. Martin writes an email to John Childs, who works

11    at the GP law department, saying that Lacey said that he had

12    three or four boxes to go through yet but said he didn't

13    have time. He's been saying that for a couple of months, so

14    I asked if he would have time for $50 per hour. I could see

15    from what he was saying that he wanted something for doing

16    that. Well, shit, it turns out that he had ten boxes, and

17    it took him ten hours to go through them. How should I

18    handle that, as an expense or what.

19    Did I read that correctly, sir?

20    MS. CONLIN: The document speaks for itself.

21  A.  Pretty much.

22    COURT REPORTER: I'm sorry?

23    MS. CONLIN: The document speaks for itself.

24  A.  It was close.

25

Lacey, Don 8/31/2011 1:16:00 PM

1    BY MR. NASAB:

2    Q.  And it's true, sir, that Mr. Martin at least thought that

3        you wanted something for going through those ten boxes;

4        true?

5           MS. CONLIN:  Well, objection --

6    A.  Well, he might have thought --

7           MS. CONLIN:  -- lack --

8    A.  He might have thought --

9           MS. CONLIN:  Hold on a second.  Hold on a second,

10       Mr. Lacey.

11           THE WITNESS:  Sure.

12           MS. CONLIN:  Objection, lack of foundation.

13           You may answer.  Go ahead.

14    A.  He may have thought that, but I never said anything.  And we

15       had already met, and I hadn't went through the boxes.  And

16       we discussed a few things, and I believe I met with Jan.

17       And that's where we come up with it, and that's how it was.

18    BY MR. NASAB:

19    Q.  Okay.  Well, what Mr. Martin wrote to Mr. Child was, I could

20       see, from what he was saying -- referring to you -- that he

21       wanted something for doing that; true?

22    A.  He might have thought that.  I -- I can't tell you what he

23       thought.

24    Q.  And that's what he wrote, right?

25           MS. CONLIN:  Well --

1   A.   That's what he wrote.

2         MS. CONLIN: -- the document speaks for itself.

3         MR. NASAB: Jan, that's enough interruptions. I

4   was following the rules during your examination; you can

5   follow the rules during mine.

6         MS. CONLIN: Well, I just made an objection that

7   the document speaks for itself.

8   BY MR. NASAB:

9   Q.   So around December of 2010, sir, you met with Ms. Conlin,

10      who is a GP lawyer, to, among other things, work on your

11      affidavit, right?

12  A.   Yes.

13  Q.   And around that time you entered a consulting agreement

14      whereby GP would pay you $50 per hour directly, correct?

15  A.   Correct.

16  Q.   As part of your consulting work your job is to help GP build

17      evidence against NCR in this litigation, correct?

18  A.   Correct.

19  Q.   And you're being paid to help contact potential witnesses to

20      help GP in this matter, correct?

21  A.   For my time that I put in, yes.

22  Q.   One of the things that you've been paid for is when you take

23      potential witnesses out to dinner; is that true?

24         MS. CONLIN: Objection as to form.

25  A.   No.

Lacey, Don  8/31/2011  1:16:00 PM

1  BY MR. NASAB:

2  Q.  Okay.  Well --

3  A.  Rephrase it.

4       MS. CONLIN:  What are we on?  20?  21.

5       (Deposition Exhibit Number 21 was marked for

6   identification.)

7  BY MR. NASAB:

8  Q.  Sir, this is a page from Mr. Martin's notes with Bates

9       number KZWIT00556, and it has been marked as Lacey

10      Exhibit 21.  Sir, did you at any point in time go to dinner

11      with Jackie at the Red Brick during your consulting work for

12      GP?

13 A.  No.

14 Q.  Did you have any plans at any point in time to go with a

15      Jackie to the Red Brick?

16 A.  I was asked, yes.

17 Q.  Who is Jackie?

18 A.  She used to work for GP.

19 Q.  Do you know her last name, sir?

20 A.  Sweet.

21 Q.  And what position did she hold at GP?

22 A.  She ordered supplies.

23 Q.  And why was it that you ended up not going to dinner with

24      her?

25 A.  She wouldn't go.

Lacey, Don  8/31/2011  1:16:00 PM

| | | |
|---|---|---|
| 1 | Q. | You can put that aside. |
| 2 | | Have you ever gone to dinner with any potential |
| 3 | | witnesses during your consulting work for GP? |
| 4 | A. | A couple times, yes. |
| 5 | Q. | Who have you gone to dinner with? |
| 6 | A. | Chamberlain, Chamberlain and his wife.  I don't remember his |
| 7 | | first name. |
| 8 | Q. | And did you pick up the tab at that dinner, sir? |
| 9 | A. | No, I never picked up the tab. |
| 10 | Q. | Okay.  Were you -- did you bill the time that you spent at |
| 11 | | that dinner to GP as part of your consulting work? |
| 12 | A. | Yes. |
| 13 | Q. | Okay.  So during the time that you spend at dinner with |
| 14 | | potential witnesses, you've been compensated for that by GP, |
| 15 | | correct? |
| 16 | A. | Yes. |
| 17 | Q. | Okay.  Another thing you've been asked to do as part of your |
| 18 | | consulting work is to reach out to witnesses who have been |
| 19 | | unwilling to talk to Mr. Martin or GP's lawyers; true? |
| 20 | A. | True. |
| 21 | Q. | Now, how did -- how did you and GP decide on $50 per hour as |
| 22 | | your initial consulting rate? |
| 23 | A. | They just offered it. |
| 24 | Q. | GP offered you $50 per hour? |
| 25 | A. | Through Leon. |

1  Q. Okay. And then when you entered the formal consulting

2     agreement through Ms. Conlin, how did you decide on $50?

3  A. I asked her if -- I thought I was a little bit -- worth a

4     little bit more.

5  Q. Okay. And what was her response?

6  A. They gave me a raise.

7  Q. I'm just talking about initially, during your initial --

8  A. That's what I --

9  Q. -- consulting work.

10 A. That's what happened.

11 Q. And wasn't your initial work at $50 per hour?

12 A. Pardon?

13 Q. Wasn't your initial consulting work at $50 per hour?

14 A. When I first started, yes.

15 Q. And it was like -- it was at that rate for at least a few

16    months, correct?

17 A. Correct.

18 Q. And what I'm asking is, that first period, how did you guys

19    settle on $50 for that first period of time?

20        MS. CONLIN: Asked and answered.

21 A. All the time I spent in checking for names, running people

22    down, calling them and this and that.

23 BY MR. NASAB:

24 Q. And what I'm -- what I'm trying to get at is how you arrived

25    at the number $50. Was it -- did you ask for that amount?

Lacey, Don 8/31/2011 1:16:00 PM

1  Did GP offer that amount?

2  A. Offered that amount.

3  Q. Okay. Were you happy with that rate?

4  A. At the time, yes.

5  Q. At the time you thought it was adequate, $50 per hour?

6  A. Yeah.

7  Q. The meeting you had in around December 10 with Ms. Conlin to

8  work on your affidavit, you were paid for the time you spent

9  at that meeting, correct?

10 A. Correct.

11 Q. In fact, any time that you spent working on your affidavit,

12 you've been paid for that, correct?

13 A. Correct.

14 Q. After the meeting Ms. Conlin sent you a draft affidavit. Do

15 you recall that?

16 A. No.

17    (Deposition Exhibit Number 22 was marked for

18 identification.)

19 BY MR. NASAB:

20 Q. Mr. Lacey, the court reporter has handed you what's been

21 marked as Lacey Exhibit 23, which starts with the Bates

22 number KZWIT1 and goes to KZWIT 3.

23    MR. MEUTI: Is that 22 or 23?

24    MR. NASAB: I heard 23.

25    COURT REPORTER: It's 22.