IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC )))))) | |
| Plaintiffs, ) | |
| ) | No: 1:11-cv-00483 |
| v. ) | |
| ) | Judge Robert J. Jonker |
| NCR CORPORATION, INTERNATIONAL PAPER CO., and WEYERHAEUSER CO., )))) | |
| Defendants. ) | |

**PLAINTIFFS' SUBMISSION OF SUPPLEMENTAL AUTHORITY**

Georgia-Pacific Consumer Products LP, Fort James Corporation, and Georgia-Pacific LLC (collectively "Georgia-Pacific"), submit the attached case, *U.S. v. Dico, Inc.*, ___ F. Supp. 2d ___, No: 4:10-cv-00503, 2012 WL 4361414 (S.D. Iowa Sept. 24, 2012), as supplemental authority in opposition to Defendant NCR Corporation's Motion for Summary Judgment (July 27, 2007) ("NCR's Motion") (Dkt. #247). *Dico* was decided on September 24, 2012, after the filing of Georgia-Pacific's most recent brief addressing summary judgment issues. The case addresses several matters directly relevant to NCR's Motion.

***Dico* Generally.** In *Dico*, the United States moved for summary judgment on its claim that defendants (collectively "Dico") were liable under CERCLA for PCB contamination of the Southern Iowa Mechanical ("SIM") site in Ottumwa, Iowa. 2012 WL 4361414 at *1. The PCBs had been released when Dico sold certain buildings to SIM for demolition or disassembly. *Id.* at *1-2. Specifically, SIM obtained the buildings from Dico, dismantled them, and then disposed of

all of the buildings' components other than their steel beams, which SIM stored at its site. *Id.* at *3.  Unfortunately, Dico failed to inform SIM that the buildings contained PCBs (Aroclor 1254) that had been left over after an earlier remedial action directed toward insulation materials. *Id.* at *1-3 and n.4.  The EPA later discovered PCBs in the piles of steel beams and in surrounding soils at the SIM site. *Id.* at *3.  The United States sued Dico for costs incurred in cleaning up the site, alleging that Dico was a CERCLA "arranger." *Id.* at *4-6.

Dico maintained that it had not "arranged for disposal" under CERCLA, arguing in relevant part that (1) it did not intend to dispose of any PCBs by selling the buildings to SIM, and (2) the buildings it sold SIM were "commercially useful products." *Id.* at *8.

**Arranger Intent.**  The *Dico* Court investigated whether Dico had the arranger "intent" required by *Burlington N. & Santa Fe Ry. Co. v. United States,* 556 U.S. 599 (2009), noting that under the circumstances of the Dico-SIM transaction, this was a "fact-intensive inquiry" that looked "beyond the parties' characterization of the transaction…." *Id.* at *8-9 (citation omitted). The Court concluded as a matter of law that Dico had, by "selling the buildings to SIM, … intended to dispose of the PCBs therein." *Id.* at *9.

The *Dico* Court found that Dico's intent was analogous to the intent of CERCLA arrangers that sell used batteries or wire to reprocessors – with the reprocessors then extracting the materials' valuable metal components, and discarding the other components.[1]

> Just as the scrap metal companies … had to crack open the batteries to get to their lead plates, so too did SIM have to demolish the buildings to extract the valuable steel beams. SIM's extraction of the beams is also similar to the extraction of the lead plates and the copper wire as it required the removal and disposal of PCB-containing insulation covering some of the steel beams.

---

[1] *Id.* at *11; *see also* Georgia-Pacific's Response to Defendant NCR Corporation's Motion for Summary Judgment ("GP Opp. Memo") at 28 n.16 (August 27, 2012) (Dkt. 299) (collecting cases).

*Dico*, 2012 WL 4361414 at *11 (citations omitted). As NCR has acknowledged, this process is precisely what happened to NCR's PCB-contaminated broke: it was sold to recyclers such as Georgia-Pacific, where it was then "broken down" (NCR's phrase) into (1) the useful fiber, which was used to make new paper, and (2) its other components (including PCBs), which were discharged in recycling mill effluent.[2] Thus, just as Dico was a CERCLA arranger because it "knew that virtually all building components other than the beams would end up being discarded," 2012 WL 4361414 at *11, NCR is a CERCLA arranger because it knew (and indeed hoped) that recyclers would re-use the fiber in broke and "wash away" everything else. *See* GP Opp. Memo at 7-9.

**Useful Product.** Like NCR here, Dico argued that its personnel believed the buildings were a "useful product," and that this fact demonstrated that Dico was not a CERCLA arranger.[3] The United States countered that the buildings were "waste" for the purposes of CERCLA because "all of their components, except for the steel beams, had to be discarded." *Id.* at *13.

The *Dico* Court agreed with the United States as a matter of law, noting that the useful product doctrine was "inapplicable when a product's only remaining purpose is to reclaim a material … or when the material could not be used without processing." *Id.* (citation omitted). The Court pointed out that Dico's buildings could not be "disassembled in a way that preserve[d] their structural components for later use," and that "[e]ven the steel beams themselves could not be reused before removing any PCB residue off their surface." *Id.* at *14.

---

[2] Memorandum of Law in Support of NCR Corporation's Motion for Summary Judgment ("NCR SJ Memo") at 8 (July 27, 2012) (Dkt. #265).

[3] 2012 WL 4361414 at *12-13. The *Dicon* Court viewed the "useful product" analysis as another window on the intent element required under *Burlington Northern*. *See id.* at *12-14 ("useful product" inquiry is "a convenient proxy for the intent element" of a CERCLA arranger case; goal of analysis is "to determine the intent underlying the transaction"; presence of a useful product could "invoke a presumption of" an intent other than disposal) (citations omitted).

Again, the analysis in *Dico* is applicable wholesale to this case. Like the buildings in *Dico*, the bales of broke at issue here were not *themselves* commercially useful products; instead, the bales' only remaining purpose was to reclaim paper fiber through reprocessing by recyclers like Georgia-Pacific. NCR SJ Memo at 8. And like the steel beams in *Dico*, even the paper fibers themselves could not be reused without removing the PCB coating on their surface. Of course, NCR not only was aware of that fact, it actually offered advice to recyclers on how to accomplish that cleaning. *See* GP Opp. Memo at 7-9.

Dated: October 12, 2012.

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

By:      /s/ Douglas M. Garrou

Peter A. Smit, Bar No. P 27886
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501
(616) 336-6000

Joseph C. Kearfott
Douglas M. Garrou
George P. Sibley, III
Hunton & Williams LLP
951 East Byrd St.
Richmond, VA 23219
(804) 788-8200

Jeffrey N. Martin
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Kathy Robb
Hunton & Williams LLP
200 Park Avenue, 52nd Floor
New York, New York  10166-0005
(212) 309-1000

Jan M. Conlin
Tara D. Falsani
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
(612) 349-8500

6

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 12, 2012, I electronically filed the foregoing using the ECF system, which will send notification of such filing by operation of the Court's electronic systems. Parties may access this filing via the Court's electronic system.

      **GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

      By     /s/ Douglas M. Garrou