Westlaw

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Iowa,
Central Division.
UNITED STATES of America, Plaintiff,
v.
DICO, INC. and Titan Tire Corporation, Defendants.

No. 4:10–cv–00503.
Sept. 24, 2012.

Bryan S. Hatch, Bryan S. Hatch, Stinson Morrison Hecker LLP, Omaha, NE, Mark E. Johnson, Brian D. Williams, Mark E. Johnson, Brian D. Williams, Stinson Morrison Hecker LLP, Kansas City, MO, for Plaintiff.

Eric C. Albert, Sara C. Colangelo, Loren A. Remsberg, Sarah D. Himmelhoch, U.S. Dept of Justice, Washington, DC, for Defendants.

ORDER

ROBERT W. PRATT, District Judge.

**\*1** Before the Court is the United States of America's ("Plaintiff") Motion for Partial Summary Judgment on **Arranger** Liability ("Plaintiff's Motion"), filed June 8, 2012. Clerk's No. 61. On July 9, 2012, Dico, Inc. ("Dico") and Titan Tire Corporation ("Titan") (collectively "Defendants") filed their Memorandum in Opposition to Plaintiff's Motion. Clerk's No. 68. On July 25, 2012, Plaintiff filed a Reply Memorandum. Clerk's No. 78. On August 22, 2012, the Court held a hearing on Plaintiff's Motion.[FN1] *See* Clerk's No. 86. The matter is fully submitted.

> FN1. At the hearing, the Court also heard argument on two additional pending summary judgment motions in this case. *See* Clerk's Nos. 62–63. The present order, however, only addresses Plaintiff's Motion.

I. PROCEDURAL BACKGROUND

Dico is a Delaware corporation "doing business in this district." Pl.'s Statement of Undisputed Facts ("Pl.'s Facts") ¶ 1. Titan is an Illinois corporation also "doing business in this district." *Id.* ¶ 7. This lawsuit arose out of Plaintiff's claims under "Sections 106, 107 and 113(g) of the Comprehensive Environmental Response, Compensation, and Liability Act ["**CERCLA**"] of 1980." Compl. ¶ 2. Plaintiff seeks to recover unreimbursed response costs, civil penalties, and punitive damages in connection with the release and threatened release of PCB [FN2] at Southern Iowa Mechanical's ("SIM") site in Ottumwa, Iowa. *See id.* Plaintiff also prays that this Court enter a declaratory judgment holding Defendants liable for all future response costs that Plaintiff will incur as a result of this release and threatened release of PCB at SIM's Ottumwa location. *See id.*

> FN2. PCB is an abbreviation for polychlorinated biphenyl. *See* Pl.'s Mot. at 1. "PCBs are a group of man-made chemicals containing as many as 209 individual compounds." Pl.'s App. at 131 ¶ 22. PCB is a hazardous substance. *See* 40 C.F.R. § 302.4.

II. FACTUAL BACKGROUND

The discovery of PCB in some of Dico's buildings' insulation [FN3] led to an investigation by the Environmental Protection Agency (the "EPA" or the "Agency"). This investigation culminated with the issuance of an unilateral administrative order on March 4, 1994 (the "1994 Order") requiring Dico to implement a series of measures designed to prevent the release of PCB into the environment. *See* Pl.'s Facts ¶¶ 23–26, 34. Consistent with the terms of the 1994 Order, Dico and the EPA agreed on a Removal Action Work Plan to address the PCB contamination. *See id.* ¶¶ 36, 41. Dico performed the Work Plan according to its terms and submitted a final report to the EPA on April 11, 1997 (the "1997 Report") indicating that it had completed the required removal. *See id.* ¶ 43. Less than a month later, on May 8, 1997, the EPA issued a notice of completion approving the 1997 Report and noting that "the continuing obligations" of the 1994 Order remained in effect.[FN4] *See id.* ¶ 76; *see also* App. to United States' Statement of Undisputed Facts ("Pl.'s App.") at 218.

> FN3. Specifically, Eckenfelder, Inc., a company retained by Dico, concluded that there

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

were five PCB-contaminated buildings—buildings 2, 3, 4, 5, and the maintenance building. *See* Pl.'s Facts ¶¶ 18, 23–25. Eckenfelder, Inc.'s investigation was, however, limited to testing only buildings 1–5 and the maintenance building. *See id.* ¶ 20. None of Dico's other buildings has ever been tested for the presence of PCB.

FN4. Although this notice approves the 1997 Report, it does not state that Dico removed all of the PCB-contaminated insulation in the buildings. *See* Pl.'s App. at 218. In arguing to the contrary, Defendants rely mainly on the following language of the 1997 Report:

> In the buildings where previous investigations indicated PCBs were present in the insulation, this material was removed for disposal as work progressed through the buildings. As the waste insulation was removed, it was placed in the 55–gallon fiber drums, which were sealed and labeled. The drums were placed in the hazardous waste storage area to await offsite removal. The insulation was disposed of by incineration at the Aptus facility in Lakeville, Minnesota.

Hr'g Tr. at 58:11–18. Defendants construe this language as providing support for the proposition that there was no PCB left in the buildings following the removal action under the 1994 Order. *See id.* at 59:23–60:3.

Plaintiff disagrees with this interpretation. In support, Plaintiff notes that even the author of the 1997 Report—James Fechter ("Fechter")—testified that he believed that there was some PCB left in the buildings following the removal action. *See* Pl.'s App. at 581, pp. 86:7–87:2. Furthermore, Plaintiff argues that the doctrines of judicial estoppel, admission by acquiescence, and admission by conduct establish that Defendants knew of the remaining PCB. *See* Hr'g Tr. at 18:4–19:12. Defendants, however, insist that none of these doctrines can be properly applied in this case. *See id.* at 55:12–57:2; *see also* Defs.' Supp. Br. in Opp'n to Pl.'s Summ. J. Mots. ("Defs.' Supp. Br.") (Clerk's No. 94) ¶¶ 3–5.

After 2001, Dico did not use or occupy "on a routine basis" some of the PCB-contaminated buildings subject to the 1994 Order.[FN5] *See* Pl.'s App. at 531 ¶ 22. Because of this, "at some point prior to 2004," Dico decided to sell these buildings and authorized Titan's President, William Campbell ("Campbell"), to act as its agent in negotiating the sales. *See* Pl.'s Facts ¶ 98. To that end, in 2007, Titan, on behalf of Dico, entered into three transactions with SIM: two "demo and remove" contracts concerning the maintenance building and the western portion of building 3, and one purchase agreement for buildings 4 and 5. *See id.* ¶ 109. SIM paid Dico $1.00 per square foot to acquire these four buildings.[FN6] *See* Pl.'s App. at 414–15; 417.

FN5. The parties dispute whether Dico discontinued all manufacturing activities and vacated the PCB-contaminated buildings or simply ceased business operations in some of those buildings. *Compare* Pl.'s App. at 268 ¶ 11 *with* Pl.'s App. at 531 ¶ 22. Accordingly, the Court only considers as an undisputed fact Dico's admission that, after 2001, it did not use or occupy "on a routine basis" buildings 4, 5, and the maintenance building. *See id.* at 531 ¶ 22; *see also* Fed.R.Civ.P. 36(b).

FN6. It appears that, in addition to paying Dico $1.00 per square foot, SIM may have also agreed to perform work for Dico at no charge. *See* Pl.'s App. at 947, p. 237:12–19. The record in this case contains no information regarding the amount of such work or its value; accordingly, it is impossible to calculate the true value of SIM's bid. *See id.* at 948, p. 238:11–18. Despite this lack of information, Dico maintains that SIM's bid was the highest. *See id.* at 949, p. 256:15–19. Yet, Campbell testified that Dico "could have sold [the buildings] to a demolition company [for scrap,] made a lot more money." *Id.* at 947, p. 236:13–14.

**\*2** These three transactions, however, were not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

the only transactions between Defendants and SIM. *See* Pl.'s Facts ¶ 102; *see also* Defs.' App. at 138–39. SIM purchased Dico's weld shop building in 2004 and the northern part of its production building in 2007. *See* Pl.'s Facts ¶ 102; Defs.' App. at 138–39; Hr'g Tr. at 64:9–13. Neither of these two buildings fell under the scope of the 1994 Order as they had never been tested for PCB, nor had they been otherwise confirmed to contain PCB. *See* Pl.'s Facts ¶ 34; *see also* Defs.' Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. on "**Arranger** Liability" ("Defs.' Br.") at 7.

SIM's motives for entering the three 2007 transactions are far from clear. *Compare* Pl.'s App. at 517 ¶¶ 10, 12 (stating that "SIM wanted to buy only the [buildings'] steel beams") *with* Pl.'s App. at 516 ¶ 4 (stating that SIM had reconstructed the weld shop building purchased in 2004 at its facility in Ottumwa and is still using it in its business operations) *and* Defs.' App. at 821 ¶ 4, 824–25 ¶ 5 (stating that SIM intended to reassemble the buildings and use them in its business operations). Having carefully examined the record on summary judgment, the Court notes that the evidence concerning SIM's motives is self-contradictory, inconsistent, and confusing. For instance, SIM states that the buildings it purchased from Defendants were "movable steel buildings" which SIM intended to "disassemble[ ] and remove[ ] ... to its [Ottumwa] property for later use." Pl.'s App. at 118 ¶ 2; 121 ¶ 16. For this reason, SIM did not consider its activities on Dico's property to be demolition, but rather disassembly.[FN7] *See id.* at 118 ¶ 2. On the other hand, SIM also describes its motives for purchasing the buildings by stating that it "wanted to buy only the steel beams" and planned on discarding the remaining building components or selling them for scrap. *See id.* at 517 ¶ 10. SIM further states that it never intended to reuse every component of these buildings and that its transactions with Defendants were not conditioned on reusing all of the building components. *See id.* at 517 ¶¶ 12–13.

> [FN7.] Defendants consistently take issue with Plaintiff's repeated references to demolishing the buildings. *See, e.g.,* Defs.' Resp. to Pl.'s Facts ("Defs.' Facts") ¶¶ 135–37. Defendants maintain that these buildings were not demolished, but rather were dismantled. *See id.* To the extent that this Court uses both terms, it does so not because it considers them interchangeable, but to accurately present each party's arguments.

In addition to disputing SIM's motives, the parties also disagree as to Defendants' motives for selling the buildings to SIM. Defendants maintain that they "did not sell any of these buildings for the purpose of disposing, treating, or transporting any hazardous substances." Defs.' App. at 811 ¶ 12; 825–26 ¶ 8. Defendants further claim that these buildings were commercially useful products.[FN8] *See* Pl.'s App. at 666, pp. 241:1–3 & 241:23–25. Plaintiff, on the other hand, insists that the evidence permits but one reasonable inference—Defendants entered the three 2007 contracts "for the purpose of discarding a used and no longer useful product containing [PCB]." Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Br.") at 12. In support, Plaintiff urges this Court to consider that Dico "had no use for the [PCB-contaminated] [b]uildings," that "Dico had no employees after the mid–1990s," that two of the three contracts at issue were labeled "demo[lish] and remove," that Defendants did not pay sales tax [FN9] on these transactions, that Defendants did not disclose the environmental history of the buildings, and that by selling them to SIM, Dico "eliminated a $2.87 million liability [FN10] in favor of a $150,000 profit." [FN11] *Id.* at 13–14, 18. Furthermore, Plaintiff argues that Defendants deliberately chose to contract with SIM because SIM was a "patsy ... who wouldn't ask the tough questions because [it] was not a demolition contractor." Hr'g Tr. at 36:11–13.

> [FN8.] Campbell testified in his deposition as follows:
>
> Q. Did you believe that all parts of the buildings were commercially useful? A. Yes.
>
> ...
>
> Q. Did you believe that the insulation in the buildings was commercially useful?
>
> A. Yes.
>
> Pl.'s App. at 948, pp. 241:1–3 & 241:23–25. In his affidavit, Campbell states:
>
> At the time of the sale of the buildings to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

SIM, and at all times since then, I believed that Titan Tire, on behalf of Dico, was selling a commercially useful product or material for a reasonable value inasmuch as it was my understanding that SIM intended to reassemble the buildings on its property in Ottumwa, Iowa, for use in its business operations.

Defs.' App. at 810–11 ¶ 10. Plaintiff, however, argues that to the extent that these references to commercial usefulness are "intended to invoke the 'useful product doctrine,' " the Court should disregard them because "any such subjective belief [on the part of Campbell] was unreasonable." Pl.'s Resp. to Defs.' Statement of Add'l Material Facts ¶ 75.

FN9. Defendants dispute the assertion that Dico did not pay sales tax in connection with the three 2007 transactions with SIM. *See* Defs.' Facts ¶ 112. In his deposition testimony, Campbell only states that he "ha[d] no idea" whether sales taxes had been paid. *See* Pl.'s App. at 665, p. 230:11–14. During the hearing on the pending summary judgment motions, Plaintiff acknowledged that the record does not support the statement that Dico did not pay sales tax on the sale of the buildings. *See* Hr'g Tr. at 41:11–14.

FN10. Although Defendants do not dispute that the proper removal of the PCB in the buildings at issue would have necessitated a sizeable expense, they contend that this figure is inflated, for it includes the cost of removing the concrete floors of the buildings purchased by SIM. *See* Hr'g Tr. at 70:6–10. Since these concrete pads were not removed, however, Defendants assert that the estimated cost of removal is overstated. *See id.* Plaintiff disagrees and claims that the record contains no support for such an assertion. *See id* . at 85:23–86:1.

FN11. Plaintiff also argues that the economic benefit that inured to Defendants as a result of the three 2007 contracts far exceeds the sum of the avoided PCB removal cost and the buildings' sale price. *See* Pl.'s Supp. Br. (Clerk's No. 95) at 5. Demolishing the "contaminated buildings," Plaintiff claims, led to a "substantial increase in [the] property value" of Dico's parcel on which the buildings used to be located. *Id.*

**\*3** Despite the parties' disagreement on almost all aspects of this case, they agree on at least one issue—at the time of entering the three 2007 contracts, SIM did not know that, in 1992, Eckenfelder, Inc. confirmed the presence of PCB in some of the buildings purchased by SIM. *See* Pl.'s Facts ¶ 118; Pl.'s App. at 517 ¶¶ 14–15; Defs.' App. at 821 ¶ 6. Defendants admit that they did not share this information with SIM, but point out that they warned SIM "not to breach the asphalt cap under or surrounding the structures." Pl.'s Facts ¶ 119. This asphalt cap, however, had nothing to do with the PCB contamination; rather, it had been installed in an effort to contain an existing groundwater contamination at the Dico site. *See* Hr'g Tr. at 36:6–10. Following its purchase of the Dico buildings, SIM dismantled them and disposed of all materials, except for the steel beams, which it took to its Ottumwa site. *See* Pl.'s Facts ¶¶ 129–30; Hr'g Tr. at 13:8–12.

When, on September 9, 2007, the EPA learned of the buildings' sale, the Agency undertook efforts to locate the building components. *See* Pl.'s Facts ¶¶ 136–37, 139–40. It discovered that SIM had stored the steel beams at its Ottumwa site "in piles in a large open area, many in direct contact with the ground ... and not protected from the elements." FN12 *Id.* ¶ 149. Pieces of insulation were visible among these piles. *See id.; see also* Pl.'s App. at 673. In May of 2008, the EPA tested FN13 samples taken from the steel beam piles and the soil in the vicinity of the piles and confirmed that PCB was present on at least some of the beams, in the soil, and in some of the remaining insulation attached to the beams. *See* Pl.'s Facts ¶¶ 150–51; *see also* Pl.'s App. at 225–28; 234. The EPA, however, had no way of tracing the origin of this PCB. *See* Defs.' App. at 138–39. The Agency knew that the beams came from Dico buildings, but could not confirm whether they came from buildings subject to the 1994 Order or from other Dico buildings.FN14 *See id.* at 136–39; *see also* Defs.' Br. at 7.

FN12. There were hundreds of steel beams at the SIM site covering approximately three quarters of an acre. *See* Pl.'s App. at 234,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

238.

FN13. The EPA tested random steel beams. *See* Pl.'s App. at 224 (stating that the EPA conducted biased sampling, i.e. tested steel beams that had chunks of insulation still attached to them). Of the thirteen collected wipe samples, eleven tested positive for PCB. *See id.* at 234. PCB in the remaining two samples "was not detected above the reporting limit." *Id.* The EPA recommended that the steel beams be decontaminated through scarification, a process designed to remove any PCB residue off the beams' surface. *See id.* at 237. Following the scarification, the beams would be suitable for reuse. *See id.*

FN14. Specifically, Defendants argue that all of the steel beams that tested positive for PCB "very well could have come from the production building." Hr'g Tr. at 66:16–19. In response, Plaintiff maintains that, once it is established that "[Defendants] contributed any [PCB] to SIM's facility[,]" the Court may find Defendants liable as **arrangers** even if the response costs were prompted by the release of PCB that did not originate with any of the Dico buildings subject to the 1994 Order. *See* Hr'g Tr. at 6:5–11. Plaintiff insists that, on this record, no reasonable fact-finder would conclude that Defendants did not contribute to the PCB contamination at SIM's facility. *See* Hr'g Tr. at 34:12–23; 37:14–17; 37:24–38:7; 38:8–13; 38:19–24. For instance, Daniel Hoffman ("Hoffman"), an expert witness for Defendants, testified that since the insulation covering the steel beams had been bolted onto them, it had to be stripped off "to get to the beams." *See* Pl.'s App. at 694, pp. 71:9–14 & 72:13–18.

Defendants insist that the steel beams taken from the buildings at issue were free from PCB. *See* Defs.' App. at 879 ¶¶ 1.2–1.5; Hr'g Tr. at 53:16–18. In support, they assert that the wall and ceiling insulation was the only confirmed source of PCB. *See* Defs.' App. at 879 ¶ 1.5. Notably, Defendants state, the 1994 Order makes no mention of the buildings' steel beams. *See id.* ¶ 1.4. Furthermore, Mary Peterson FN15 believed that the PCB testing of the steel beams at SIM's facility was "a precautionary measure," and she "very much expected to find clean beams." Defs.' App. at 143:11–17. Plaintiff, on the other hand, claims that there is not "really a dispute [that] there was [PCB-contaminated] insulation covering at least some of [the] beams ... in the Dico buildings." Hr'g Tr. at 38:4–7; *see also id.* at 37:14–17. Plaintiff further argues that it is undisputed that Defendants knew that PCB was present in the buildings at the time they were sold to SIM. *See* Hr'g Tr. at 72:16–17 ("[I]t is bedrock corporations law that [corporations] do not forget what they learn."); 73:6–8 (James Fechter ("Fechter"), the author of the 1997 Report, admitting that some PCB remained in the buildings even after the removal action was completed).

FN15. As a project manager for the Iowa/Nebraska branch of the Superfund Division, Mary Peterson oversaw the removal action undertaken at the Dico site pursuant to the 1994 Order. *See* Pl.'s Facts ¶ 134; Pl.'s App. at 221–22, 257, 290.

*4 In support of their claim that no PCB remained in the buildings at issue, Defendants argue that the entire structures, not only the steel beams, were free from PCB. *See* Defs.' Br. at 5–6; Hr'g Tr. at 48:19–21; 59:23–60:8. In support, Defendants contend that, pursuant to the 1994 Order, they removed all building insulation that had been confirmed as containing PCB. *See* Defs.' App. at 11 ¶ 3.2.3. Defendants also assert that the steel beams that tested positive for PCB had likely been exposed to PCB contamination from an external source during the six months during which they had been stored in SIM's yard. FN16 *See* Defs.' App. at 178 ¶ 3; 136–37. Defendants claim that this assertion is consistent with the "notably different [PCB] fingerprints" reported by the EPA following the testing of the steel beams at SIM's facility in 2008 as compared to the PCB patterns reported by Eckenfelder, Inc. in 1992. *Id.* at 177–78 ¶ 2.

FN16. With respect to SIM's location in Ottumwa, Dr. Remy Hennet ("Hennet"), an expert witness for Defendants, observed that:

The SIM facility yard is a junk yard where recycled materials are stored and processed. During my visit to the site, I wit-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

nessed and photographed numerous piles of cut off and twisted materials that included high pressure pipes and hoses, old electric motors, electrical equipment, leaky hydraulic equipment, and a lot of insulation materials from diverse recycled parts and piping.

Defs.' App. at 179 ¶ 1.

Plaintiff disputes Hennet's conclusions. *See* Hr'g Tr. at 14:24–15:3. Specifically, in his affidavit, James Hughes ("Hughes"), the President of SIM, disputes that SIM's facility yard contained any other sources of PCB. *See id.*; *see also* Pl.'s App. at 520–25 ¶¶ 36–39. Furthermore, Plaintiff calls Hennet's conclusions "speculation" because he did not test for PCB at SIM's yard and "didn't see any equipment that was labeled with a PCB label." Hr'g Tr. at 15:4–14.

Plaintiff rejects this possibility of external PCB contamination. In support, Plaintiff notes that Aroclor 1254—"the predominant aroclor [Eckenfelder, Inc.] found in [the] buildings [sold to SIM]"—was also present at the SIM site. *See* Hr'g Tr. at 10:8–12. Moreover, Plaintiff points out that even Fechter, the author of the 1997 Report, testified that he believed that there was some PCB left in the buildings after the removal action. *See* Pl.'s App. at 581, pp. 86:7–87:2.

Following unsuccessful negotiations to reach an administrative settlement between the EPA and Defendants regarding the clean-up of the SIM facility, the Agency sent Defendants an action memo, a settlement agreement, and an administrative order. *See* Pl.'s Facts ¶ 155. Since Defendants did not sign the settlement agreement, the administrative order took effect on January 23, 2009. *See id.* Under the compulsion of this order and under EPA supervision, Defendants removed the PCB-contaminated materials from the SIM site. *See id.* ¶ 157. Plaintiff "incurred and continues to incur response costs" associated with this removal action. *Id.* ¶ 158. To date, Defendants have not reimbursed Plaintiff for these response costs.[FN17] *See* Pl.'s Mot. for Partial Summ. J. on Resp. Costs (Clerk's No. 63).

[FN17.] Plaintiff incurred costs "relating to locating the Dico building debris, conducting sampling at the SIM Site, overseeing the SIM cleanup, and enforcing this action for cost recovery and penalties at the SIM Site." *See* Pl.'s Mot. for Partial Summ. J. on Resp. Costs at 2.

### III. STANDARD FOR SUMMARY JUDGMENT

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[FN18] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[FN19] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

[FN18.] Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

[FN19.] Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 336 (1979) and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

judgment court involvement. *See id.* at 283–88.

**\*5** Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 209 (8th Cir.1976) (citing Windsor v. Bethesda Gen. Hosp., 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467 (1962) (quoting Sartor v. Ark. Natural Gas Corp., 321 U . S. 620, 627 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." Anderson v. Viking Pump Div., Houdaille Indus., Inc., 545 F.2d 1127, 1129 (8th Cir.1976) (citing Lyons v. Bd. of Educ., 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); Harlston v. McDonnell Douglas Corp ., 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Wilson v. Myers, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing Weightwatchers of Quebec, Ltd. v. Weightwatchers Int'l, Inc., 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See* Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 248. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.;* Celotex, 477 U.S. at 322–23; Anderson, 477 U.S. at 257. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247–48. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See* id. at 248. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

**\*6** Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing Anderson, 477 U.S. at 249 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

### IV. LAW AND ANALYSIS
**CERCLA** liability attaches when: (1) there has been a release or threatened release of a hazardous substance; (2) at a facility; (3) resulting in response costs for the government; and (4) the defendant fits

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

into one of the four categories of responsible persons under 42 U.S.C. § 9607(a).[FN20] *See* United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1378–79 (8th Cir.1989) (internal citations omitted). "**CERCLA** imposes strict liability for environmental contamination upon four broad classes of" potentially responsible parties ("PRPs"). Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 608 (2009). "Once an entity is identified as a PRP, it may be compelled to clean up a contaminated area or reimburse the Government for its past and future response costs." *Id.* (citing Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 161 (2004)).

> FN20. Defendants do not dispute that a release, or at least a threat of release, occurred at the SIM site resulting in response costs for the government. *See* Defs.' Facts ¶¶ 151 ("Defendants admit only for purposes of responding to these motions that Plaintiff has accurately summarized language from EPA's report [stating that the EPA testing at the SIM site confirmed PCB on the surface of the steel beams and in the chunks of insulation still attached to some of the beams.]"); 163, 185 (conceding the accuracy of the response costs incurred by Plaintiff).

The class of PRPs at issue in this case is the one sometimes referred to as "**arrangers**." **CERCLA** defines this class to include:

[A]ny person who by contract, agreement, or otherwise **arranged** for disposal or treatment, or **arranged** with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances....

*Id.* (quoting 42 U.S.C. § 9607(a)(3)). Thus, to prove that Defendants are "**arrangers**" under **CERCLA**, Plaintiff must show that: (1) Defendants are "persons" within the meaning of **CERCLA**; (2) Defendants "**arranged** for disposal" of PCB; (3) Defendants "owned or possessed" the PCBs at the time such **arrangement** was made; and (4) the disposal was done "at any facility or incineration vessel owned or operated by another party or entity." *See id.* Defendants do not dispute that they are persons and that they owned or possessed the PCB at the time of the sale of the buildings to SIM. *See generally* Defs.' Br. at 10–20. Therefore, the Court will only address the remaining two elements—whether Defendants **arranged** for disposal of PCB and whether SIM's location qualifies as a facility under **CERCLA**.[FN21] For reasons that follow, the Court finds that Defendants have failed to demonstrate the existence of a genuine issue of material fact precluding summary judgment for Plaintiff on the issue of Defendants' **arranger** liability. In doing so, the Court recognizes the admonition that "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *See* Turner v. Ferguson, 149 F.3d 821, 824 (8th Cir.1998).

> FN21. Defendants also seem to incorporate by reference the argument that they should not be ordered to reimburse Plaintiff for its response costs because the costs were inconsistent with the National Contingency Plan (the "NCP"). *See* Defs.' Br. at 10 ("Additional elements of Plaintiff's claim are addressed in Defendants' brief in opposition to Plaintiff's summary judgment motion on response costs."). Since this argument is a defense to the recoverability of response costs, but not a defense to liability for such costs, the Court will not presently address it. *See* EPA v. TMG Enters., Inc., et al., 979 F.Supp. 1110, 1121 (W.D. Ky 1997) (collecting cases).

### A. *Facility*

**\*7** Defendants do not specifically address this element of **arranger** liability. *See generally* Defs.' Br. Rather, they incorporate by reference the discussion of the facility element as outlined in their "brief in opposition to Plaintiff's summary judgment motion on response costs." *Id.* at 10. In that brief, Defendants argue that the following two statutory limitations on the definition of "facility" prevent the SIM site from qualifying as a facility within the meaning of **CERCLA**: (1) the consumer product in consumer use exception, *see* 42 U.S.C. § 9601(9); and (2) the exception for "products which are part of the structure of ... residential buildings or business or community structures," *see* 42 U.S.C. § 9604(a)(3)(B). *See* Defs.' Br. on Resp. Costs at 7–8. Defendants assert that both of these exceptions "are applicable and bar Plaintiff's [recovery]." *Id.* at 9.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

The Court disagrees. Facility is defined as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located ... but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9). Under the plain meaning of this statutory definition, SIM's yard where the steel beams were stored qualifies as a facility. *See id.* In claiming the contrary, Defendants rely almost exclusively on two cases— *G.J. Leasing Co. & S.I. Enters., L.P. v. Union Elec. Co.,* 854 F.Supp. 539 (S.D.Ill.1994) and *Kane v. United States, et al.,* 15 F.3d 87 (8th Cir.1994). After a close reading of these cases, the Court finds them inapposite.

In *G.J. Leasing,* the plaintiffs purchased a commercial building. *See G.J. Leasing Co.,* 854 F.Supp. at 558. During a remodeling, they voluntarily removed asbestos, a hazardous substance, contained in some of the building materials and sued the former owner of the building under 42 U.S.C. § 9607(a)(2) to recover the cost of the removal. *See id.* In denying relief, the court held that "**CERCLA** does not provide a private right of action to recover the cost of removing from a building [a hazardous substance] which is part of the structure." *Id.* This case, however, does not present similar issues. The Court here need not decide whether **CERCLA** provides a private right of action because Plaintiff is not a private party. Additionally, Plaintiff is not suing Defendants to recover the cost of PCB removal from Dico's buildings. Rather, the sole issue before the Court is whether Defendants can be held liable as **arrangers** and be ordered to reimburse Plaintiff for its response costs incurred in connection with the PCB release at the SIM site. Therefore, at best, *G.J. Leasing* has only limited applicability to this case. Accordingly, the Court declines to consider its analysis.

*Kane* is similarly inapplicable. The plaintiffs in Kane purchased a residence from the Veteran's Administration ("VA"). *See Kane,* 15 F.3d at 88. After discovering that the house contained asbestos, they sued the VA under 42 U.S.C. §§ 9607(a)(2) and (a)(3). *See id.* at 88, 89. In affirming the district court's dismissal of the Kanes' claim, the Eighth Circuit held that since the asbestos was contained in some of the building materials used in constructing the house, the house was not a facility because it "was a consumer product in consumer use and thus exempt under **CERCLA**." *See id.* at 89 (citing *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.,* 906 F.2d 1059 (5th Cir.1990)).

**\*8** Here, unlike in *Kane,* the PCB released at SIM's location was not a part of a building structure. Instead, it was found on the surface of the steel beams, which were stored in SIM's yard, and in the chunks of insulation still attached to some of them. Although the beams and the insulation containing PCB were consumer products, they were neither in consumer use nor incorporated into a building structure while stored at SIM's site.[FN22] *See Dayton Indep. Sch. Dist.,* 906 F.2d at 1066 (stating that **CERCLA's** legislative history confirms that Congress did not intend for **CERCLA** to provide relief for "releases from useful consumer products in the structure of buildings"). The very purpose of the consumer product exception is "to protect from liability those who engage in production activities with a useful purpose, as opposed to those engaged in the disposal of hazardous substances." *Id.* at 1065. Thus, the consumer product exception was meant to protect "legitimate manufacturers or sellers of useful products ... [and not as a haven for those] who ... attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal." *Id.*

> FN22. The consumer product exclusion applies to *"all* consumers," including entities engaged in commercial activities. *See Emergency Servs. Billing Corp. v. Allstate Ins. Co.,* 668 F.3d 459, 470 (7th Cir.2012) (emphasis in original). Therefore, insulation containing PCB can never be a facility if it is a part of a building. *See id.* Similarly, an entire building containing hazardous materials as a part of its structure is not a facility as long as the building remains intact. *See id.*

> Notably, Plaintiff is not claiming that the PCB-contaminated insulation inside the Dico buildings was a facility. Neither is Plaintiff claiming that the Dico buildings at issue were a facility. Rather, Plaintiff argues that SIM's yard was the facility where the release occurred. *See* Hr'g Tr. at 9:2–5.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

Based on this analysis, the Court concludes that neither of these two exceptions applies in this case. Therefore, the Court finds that no reasonable jury could conclude that the SIM site was not a facility within the meaning of **CERCLA**. Accordingly, the Court concludes that Plaintiff is entitled to judgment as a matter of law that SIM's yard was a facility.

### B. *Arranged for Disposal*

Defendants place the focus of their entire resistance on the "**arranged** for disposal" element of **arranger** liability. *See* Defs.' Br. at 10. Specifically, they advance the following arguments: (1) Defendants did not "intend[ ] to dispose of any PCBs by selling the Dico [b]uildings to SIM"; (2) Defendants sold commercially useful products to SIM; and (3) Defendants did not know that the buildings at issue contained PCB. *See id.* at 13, 15, 16.

1. *Intent.*

The main purpose behind **arranger** liability is to prevent owners of hazardous substances from avoiding liability by transferring ownership over these substances to another party for the purpose of disposal. *See Team Enters., LLC v. W. Inv. Real Estate Trust,* 647 F.3d 901, 907 (9th Cir.2011) (citing *Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610). To be liable as **arrangers**, Defendants must have **arranged** for the disposal of PCB. *See* 42 U.S.C. § 9607(a)(3). Defendants have **arranged** for such disposal only if they entered at least one of the three 2007 transactions with SIM "for the sole purpose of discarding a used and no longer useful hazardous substance." *See Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610. Where, as here, the nature of the transactions is "less than clear [FN23][,] ... courts have concluded that the determination whether an entity is an **arranger** requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction ... to discern whether the **arrangement** was one Congress intended to fall within the scope of **CERCLA's** strict-liability provisions." *Id.* (internal citations omitted).

FN23. If Plaintiff had direct evidence that Defendants contracted with SIM with the intent to dispose of the PCB contained in the buildings at issue, this would have been an easy case as it would fall squarely at the one extreme on the spectrum of possible "**arrangements**." *See Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610. At the other extreme—and also easy to decide—are cases where an entity sells a new and useful product that the purchaser later discards in a way that leads to contamination. *See id.* Any "permutations of ' **arrangements**' that fall between these two extremes," such as this case, require a fact-intensive inquiry to determine whether the defendants **arranged** for the disposal of a hazardous material. *See id.*

*9 Since **CERCLA** does not define "**arrange**[ ] for disposal," courts have interpreted the phrase by giving it "its ordinary meaning." *See Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610–11. ' "[ **A**]**rrange**' implies action directed to a specific purpose." *Id.* at 611 (citing MerriamWebster's Collegiate Dictionary's definition of "**arrange**"). Thus, *Burlington Northern* held that, to be liable as an **arranger**, an entity must take "intentional steps to dispose of a hazardous substance." *Id.* (internal citation omitted). *Burlington Northern* did not, however, limit the scope of **arranger** liability so that an entity is liable as an **arranger** only when "the stated or facially-evident purpose of an **arrangement** is to dispose of hazardous substances." *United States v. Gen. Elec. Co.,* 670 F.3d 377, 384 (1st Cir.2012) (interpreting *Burlington N. & Santa Fe Ry. Co.*'s holding). To further clarify the scope of **arranger** liability, *Burlington Northern* held that an entity's knowledge that its hazardous product will somehow be discarded, although relevant to the entity's intent to dispose of it, is not by itself sufficient to establish the requisite **arranger** liability intent. *See Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 612. Consequently, under *Burlington Northern,* Defendants will be liable as **arrangers** only if, based on the circumstances surrounding the three 2007 transactions with SIM, the fact-finder concludes that, by selling at least one of the buildings to SIM, Defendants intended to dispose of the PCB therein.[FN24]

FN24. Defendants urge the Court to adopt a different standard with respect to the requisite **arranger** liability intent. *See* Hr'g Tr. at 101:13–16; Defs.' Supp. Br. at 1. Relying on *In re Medtronic Inc., Sec. Litig.,* 618 F.Supp.2d 1016, 1035 (D.Minn.2009), they argue that "[w]hen intent or state of mind is an element of a cause of action against a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

corporation, the required state of mind must actually exist in the individual corporate officer acting on behalf of the corporation." *Id.* As Plaintiff correctly notes, however, the *Medtronic* case is inapposite as it deals with "shareholder claims alleging securities fraud under the Private Securities Litigation Reform Act [ ("PSLRA") ] ... [which] creates a pleading standard for securities fraud more exacting even than the heightened pleading standard for fraud under Fed.R.Civ.P. 9(b)." Pl.'s Supp. Br. at 2. Plaintiff maintains that "[t]here is no basis for applying [this] heightened standard for showing corporate scienter under the PSLRA to the standard for **arranger** liability under **CERCLA**." *Id.* The Court agrees. Absent authority to the contrary, the Court sees no justification to depart from *Burlington Northern's* mandate that a fact-intensive inquiry into the nature of the three 2007 transactions between Dico and SIM is necessary to determine if Defendants sold the buildings at issue with the intent to dispose of the PCB therein. *See Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610.

Because the nature of the transactions at issue is "less than clear," a fact-intensive inquiry is necessary to determine whether Defendants **arranged** for the disposal of PCB. *See Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610 ("[T]here is no bright line between a sale and a disposal under **CERCLA**."). Having completed this inquiry, the Court concludes that there is no genuine issue of material fact precluding judgment as a matter of law that Defendants intended to dispose of PCB. Indeed, Plaintiff convincingly argues that a review of the relevant facts in this case compels the conclusion that, by selling the buildings to SIM, Defendants intended to dispose of the PCB therein.

Although confident in its conclusion, the Court notes that this case exemplifies the practical difficulties in deciding whether an **arrangement** is a sale or a disposal. These difficulties are largely due to the lack of case law presenting similar to this case's facts. Absent such precedent, the Court must analyze the facts of this case against the backdrop of relevant, yet not directly on point, case law and decide whether Defendants intended to dispose of PCB.

In urging that Defendants **arranged** for the disposal of PCB, Plaintiff insists that this case is akin to *United States v. Atlas Lederer Co.,* 282 F.Supp.2d 687 (S.D.Ohio 2001) and *Catellus Dev. Corp. v. United States,* 34 F.3d 748 (9th Cir.1994). *See* Pl.'s Br. at 15–17. In *Atlas Lederer,* the court concluded, as a matter of law, that Beckner Iron & Metal Company ("Beckner") [FN25] **arranged** for the disposal of hazardous substances by selling spent lead batteries to United Lead Scrap Company ("ULSC"). *See id.* at 716. In so concluding, the court took into account "that USLC never re-sold the whole batteries that it purchased, never sent them out for processing, and never shipped them to other sites." *Id.* at 717. Instead, ULSC cracked open the batteries and "extract[ed] scrap lead from the worthless acid and casings." *Id*. Then, it simply discarded the acid and the "lead-contaminated casings" on its property. *Id.* In granting summary judgment for the plaintiff, the court noted that viewing the record in the light most favorable to Beckner leads to only one reasonable inference—Beckner **arranged** for the disposal of the hazardous materials contained in the batteries sold to ULSC.[FN26] *Id.*

> FN25. Beckner was one of the twenty-seven defendants in that case. *See Atlas Lederer Co.,* 282 F.Supp.2d at 692 n. 2.

> FN26. The *Atlas Lederer* court utilized virtually identical reasoning in finding, as a matter of law, that another sixteen defendants **arranged** for the disposal of the hazardous substances in the spent batteries that they sold to ULSC. *See id.* at 713–55.

**\*10** *Catellus*—the other battery-cracking case Plaintiff relies on—is almost identical to *Atlas Lederer* in both its reasoning and conclusion. Similar to Atlas Lederer, battery casings were the source of the contamination necessitating the response costs. *See Catellus Dev. Corp.,* 34 F.3d at 752. In concluding that the seller of the spent batteries is liable as an **arranger**, the *Catellus* court notes that the battery casings "were not a subject of recycling [and that] [t]hey retained their character as waste throughout [the process of extracting the lead from the spent batteries] and would have to be [discarded eventually]." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

Plaintiff also likens this case to *TMG Entersprises. See* Pl.'s Br. at 17. In that case, the court held that by selling scrap copper wire to a scrap metal company, K & R Corporation—also a scrap metal company—— **arranged** for the disposal of the hazardous substances contained in the wire insulation. *See TMG Enters., Inc.,* 979 F.Supp. at 1123–24. In so concluding, the court noted that the sole remaining useful purpose of this copper wire was to reclaim the copper, which required "removal and disposal of the insulation material covering the copper wire." *Id.* at 1124.

Naturally, Defendants deny that any of the cases cited by Plaintiff are applicable and contend that the Court should instead look to other cases for guidance. *See generally* Defs.' Br. at 10–20. One such case is *Schiavone v. Northeast Utilities Service Co.,* No. 3:08CV429, 2011 U.S. Dist. LEXIS 29090 (D.Conn. Mar. 22, 2011). *See id.* at 17–18. In *Schiavone,* the court held that there was a genuine issue of material fact precluding judgment as a matter of law that the defendants **arranged** for the disposal of PCB by selling used transformers that may have contained PCB. *See Schiavone,* 2011 U.S. Dist. LEXIS, at *14–16. In denying summary judgment, the court noted that the defendants "have produced evidence that would support a conclusion that their specific purpose [in selling the used transformers] ... did not extend beyond [disposing of those transformers]." *Id.* at * 15. Furthermore, the court's decision was influenced in no small part by the fact that there was no conclusive evidence that any of the transformers sold by the defendants contained PCB. *See id.* at *6, 16.

Another case Defendants rely on is *United States v. B & D Electric, Inc., et al.,* No. 1:05CV63, 2007 U.S. Dist. LEXIS 34086 (E.D.Mo. May 9, 2007). *See* Defs.' Br. at 18. In that case, the plaintiff moved for summary judgment that two of the defendants **arranged** for the disposal of PCB by selling used but operable transformers containing PCB. *See B & D Elec., Inc.,* 2007 U.S. Dist. LEXIS 34086, at *4–5, 12. In denying summary judgment, the court relied primarily on the following two factors: (1) although used, the transformers were operable; and (2) there was a well-developed market for used transformers. *See id.* at 14–16. The court reasoned that selling used but operable transformers on the well-developed secondary market does not amount to an **arrangement** for disposal of the PCB inside the transformers. *See id.* at 19–20 ("Consumer demand demonstrates the usefulness and value of the transformers.").

**\*11** After conducting *Burlington Northern's* fact-intensive inquiry and evaluating the facts of the present case against this backdrop of relevant case law, the Court concludes that this case bears more similarities to *Atlas Lederer, Catellus,* and *TMG Enters.* than it does to *Schiavone* and *B & D Elec.* Defendants have presented no evidence that SIM was interested in any of the building components except for the steel beams.[FN27] *See* Pl.'s App. at 517 ¶¶ 10, 12–13. Just as the scrap metal companies in *Atlas Lederer* and *Catellus* had to crack open the batteries to get to their lead plates, so too did SIM have to demolish the buildings to extract the valuable steel beams. SIM's extraction of the beams is also similar to the extraction of the lead plates and the copper wire as it required the removal and disposal of PCB-containing insulation covering some of the steel beams. Compare *Catellus Dev. Corp.,* 34 F.3d at 752 (stating that the lead-contaminated battery casings could not be recycled and had to be discarded following the extraction of the scrap lead) *and TMG Enters., Inc.,* 979 F.Supp. at 1124 (finding that reclaiming the copper required the removal and disposal of the insulation material containing hazardous substances and covering the copper wire) *with* Pl.'s App. at 699, p. 135:18–23 (stating that it makes no sense to reuse insulation from a demolished building). Indeed, the three 2007 transactions between Defendants and SIM contemplate demolishing the buildings, removing any valuable structural components, and disposing of the rest, including the PCB-contaminated insulation. *See* Pl.'s App. at 414–15; 417 (showing that the contracts at issue contemplated the demolition and removal of the buildings); 694, p. 72:13–18 (stating that the insulation covering some of the steel beams would not be reusable "because you have to get it off to get to the beams"); 699, p. 135:18–23 (stating that it makes no sense to reuse insulation from a demolished building).

> [FN27.] Similarly, Defendants have introduced no evidence that any of the other companies that allegedly submitted bids to purchase the buildings were interested in anything other than the steel beams.

Furthermore, despite Defendants' argument to the contrary, this case is distinguishable from both

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

*Schiavone* and *B & D Electric, Inc.* Unlike *B & D Electric, Inc.,* Defendants here have not presented any evidence that there exists any demand for used buildings of the type they sold to SIM. Notably, the sheer size and structure of these buildings suggest that the only viable way to remove them from Dico's property was to demolish them and remove the building components. Thus, it is logical that, unlike with used but operable transformers, there would be no secondary market for used buildings of this type. Further, even if the buildings at issue were usable while erected on Dico's property, once sold, they lost their usefulness because they had to be demolished and removed and could not be disassembled in a way that preserved the integrity of their components for later use.

Moreover, unlike the *Schiavone* defendants, Defendants here have failed to present evidence that their specific purpose in entering the three 2007 transactions with SIM "did not extend beyond [disposing of no longer needed buildings]." *See Schiavone,* 2011 U.S. Dist. LEXIS 29090, at * 15. Indeed, Defendants have hardly put on any evidence to try and establish that. Instead, rather than proffering any substantive evidence regarding this intent, Defendants rely almost exclusively on their self-serving declaration that they did not engage in these transactions for the purpose of disposing of PCB. [FN28] *See* Defs .' Br. at 13, 14; Defs.' App. at 811 ¶ 12; 825–26 ¶ 8. Defendants' mere declaration, however, is insufficient to contradict the intent apparent from the fact that Defendants knew that virtually all building components other than the beams would end up being discarded.

> FN28. Defendants also argue that it would be improper for a fact-finder to infer an intent to dispose of PCB "from the [mere] fact that Dico no longer needed the buildings." *See* Defs.' Br. at 14. In granting summary judgment for Plaintiff, however, the Court did not need to make such an inference.

**\*12** Defendants offer one more argument in support of their claim that they did not intend to dispose of PCB by selling the buildings to SIM. They argue that they could not have possibly intended to dispose of PCB because there was no PCB in the buildings at issue, and even if PCB existed, they had no knowledge of it. *See* Defs.' Br. at 13, 14; Hr'g Tr. at 48:19–21. In support, Defendants state that they believed that all the PCB had been removed when Dico completed the removal action pursuant to the 1994 Order. *See* Defs.' Br. at 14. Defendants find a basis for such belief in the following language of the 1997 Report: "In the buildings where previous investigations indicated PCBs were present in the insulation, this material was removed for disposal as work progressed through the buildings." *See* Hr'g Tr. at 58:11–13. Although Defendants place much emphasis on the fact that the 1997 Report was approved by the EPA, *see id.* at 58:8–10, they overlook the fact that the EPA approval letter does not state—or even imply—that Dico had removed all the PCB from the buildings. *See generally* Pl.'s App. at 218. In fact, this letter specifically states that it does not alter any of the "continuing obligations" under the 1994 Order, such as record retention, annual inspections, and "post removal site control activities under paragraph 31" of the 1994 Order. *Id.* Furthermore, even Fechter, the author of the 1997 Report, testified that he believed that PCB remained in the buildings even after the removal action imposed by the 1994 Order. *See* Hr'g Tr. at 73:6–8; Pl.'s App. at 581, p. 86:7–87:2.

Having considered all of these facts, the Court finds that no reasonable fact-finder could conclude that: (1) the buildings sold to SIM were free of PCB; (2) Defendants did not know that these buildings still contained PCB; or (3) Defendants did not intend to dispose of the remaining PCB when they sold the buildings to SIM. In so concluding, the Court notes that, although these three issues are undoubtedly material with respect to Defendants' **arranger** liability intent, Defendants have failed to present sufficient evidence to generate a *genuine* dispute precluding summary judgment. *See Anderson,* 477 U.S. at 248 (emphasis added). Indeed, Defendants have offered little more than self-serving statements that they did not possess the requisite **arranger** liability intent and the unwarranted conclusion that the buildings were free from PCB or that Defendants had no knowledge of any PCB. Such evidence is insufficient to generate a genuine issue of material fact. Thus, after viewing the record in the light most favorable to Defendants, the Court must conclude that Plaintiff is entitled to judgment as a matter of law that Defendants intended to dispose of PCB.

2. *Commercial usefulness.*
**CERCLA** was not intended to impose liability

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

on legitimate manufacturers or sellers of useful products containing hazardous substances. *See Dayton Indep. Sch. Dist.,* 906 F.2d at 1065; *City of Merced v. Fields,* 997 F.Supp. 1326, 1332 (E.D.Cal.1998) ("[A] manufacturer who does nothing more than sell a useful, albeit hazardous product to an end user has [not] ... **arranged** for the disposal of hazardous waste."); *Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610 (endorsing the useful product doctrine). Rather, **CERCLA** "reflects Congress' [s] desire to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal." *Dayton Indep. Sch. Dist.,* 906 F.2d at 1065–66; *see also Team Enters., LLC,* 647 F.3d at 908 (limiting the scope of **arranger** liability to those cases where the hazardous substance in question constitutes waste). Thus, legitimate manufacturers or sellers of useful but hazardous products can successfully escape **arranger** liability by showing that the products in question serve a useful purpose. *See id.; see also California v. Summer del Caribe,* 821 F.Supp. 574, 581 (N.D.Cal.1993) (labeling this defense to **arranger** liability "the sale of a useful product" defense). At the core of this useful product defense is the presumption that selling a useful product is done for a legitimate business purpose, rather than to dispose of the hazardous materials contained in the product. *See Team Enters., LLC,* 647 F.3d at 908. Due to this correlation between **arranger** liability intent and the useful product defense, the latter "serves as a convenient proxy for the intent element [of a **CERCLA arranger** liability claim]." *Id.*

**\*13** Invoking the useful product defense and avoiding **arranger** liability is precisely what Defendants seek to accomplish by arguing that the buildings they sold to SIM were commercially useful products. *See* Pl.'s App. at 666, p. 241:1–3 (Campbell testifying at his deposition that he believed that all parts of the buildings at issue were commercially useful); Defs.' App. at 810–11 ¶ 10 (Campbell stating in his affidavit that he believed that Dico "was selling a commercially useful product" to SIM); 821 ¶¶ 4–5 (Hughes stating in an affidavit that SIM purchased the buildings for the useful purpose of reassembling them in Ottumwa). If Defendants establish that those buildings were commercially useful, they would invoke "the general presumption that persons selling useful products do so for legitimate business purposes." *See Team Enters., LLC,* 647 F.3d at 908. Naturally, if Defendants had a "legitimate business purpose[ ]" for

selling the buildings to SIM, they did not sell them *"for the purpose* of disposing of hazardous waste." *See id.* (emphasis in original).

In an attempt to overcome Defendants' useful product defense, Plaintiff maintains that Dico's old and "dilapidated buildings" were not and, indeed, cannot constitute commercially useful products. *See* Pl.'s Br. at 12; *Team Enters., LLC,* 647 F.3d at 908 ("A plaintiff can overcome the [useful product] defense by showing that the substance involved in the transaction 'has the characteristic of waste at the time it is delivered to another party .' ") (internal citation omitted). Rather, Plaintiff contends that the buildings were waste because all of their components, except for the steel beams, had to be discarded. *See id.* at 15–16 (arguing that this case is identical to *"Atlas Lederer* and the other battery-cracking cases"). Therefore, Plaintiff reasons, Defendants' sole purpose for selling the buildings was to dispose of the PCB contained therein. *See id.* at 12.

Although intuitive and easy-to-understand, the theoretical distinction between useful products and waste does not conveniently translate into practice. *See Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.,* 508 F.3d 930, 935 (9th Cir.2007) (noting that "the [useful product] doctrine has developed piecemeal through case law [and that] its contours are not entirely clear"). While Eighth Circuit case law does not offer much guidance in distinguishing useful products from waste, the Ninth Circuit has set forth the following non-exhaustive list of factors to consider in drawing this distinction: "(1) the commercial reality and value of the product in question; (2) a factual inquiry into the actions of the seller in order to determine the intent underlying the transaction; and (3) whether the material in question was a principal product or by-product of the seller." *Id.* at 938 (internal quotation marks and citation omitted). Additionally, the useful product doctrine has been held inapplicable when "a product's only remaining purpose is to reclaim a material ... or when the material could not be used without processing." *Tex Tin Settling Defs. Steering Comm. v. Great Lakes Carbon Corp. et al.,* No. G96–0247, 2008 U.S. Dist. LEXIS 71520, at \*29 (S.D.Tex. Sept. 22, 2008) (internal citations omitted).

**\*14** A review of the relevant facts in this case convinces the Court that no reasonable fact-finder

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

could conclude that the buildings at issue were commercially useful. Although these structures, while erected on Dico's property, were capable of being put to some use, the Court finds that they lost their usefulness once Defendants sold them to SIM. As noted above, distinguishing between commercially useful products and waste is often harder than expected. *See* [Cal. Dep't of Toxic Substances Control, 508 F.3d 930](). This case confirms it.

On the one hand, there is ample evidence supporting an inference that the buildings were not commercially useful and that SIM purchased them only to extract the valuable steel beams. These beams were the only building component SIM actually wanted, and it planned to discard or sell as scrap the remaining building materials. *See* Pl.'s App. at 517 ¶ 10. Furthermore, SIM never intended to reuse every building component, and the three 2007 contracts contained no such condition. *See id.* ¶¶ 12–13; *see also* Pl.'s App. at 414–15; 417.

On the other hand, the record contains some evidence suggesting that the entire structures were commercially useful. Specifically, SIM considered these buildings movable steel structures that it was planning to re-erect at its Ottumwa facility just as it did in 2004 with Dico's weld shop building. *See* Pl.'s App. at 118 ¶ 2; 121 ¶ 16; Pl.'s App. at 516 ¶ 4; Defs.' App. at 821 ¶ 4; 824–25 ¶ 5. Because of these plans, SIM considered its activities in taking down the Dico buildings disassembly, rather than demolition. *See* Pl.'s App. at 118 ¶ 2.

Despite this competing evidence, following its fact-intensive inquiry into the facts of this case, the Court finds that no reasonable fact-finder could conclude that the buildings at issue were commercially useful. SIM's characterization of these buildings as movable steel structures notwithstanding, the commercial reality was that they could not be relocated without being dismantled first. *See* Pl.'s App. at 414–15, 417 (showing that, pursuant to the three 2007 contracts, Dico sold four buildings with a combined total square footage of 160,200). Defendants, however, have not presented any evidence showing that the buildings could be disassembled in a way that preserves their structural components for later use. For example, the insulation could not be reused and had to be discarded. *See* Pl.'s App. at 699, p. 135:18–23 (stating that it makes no sense to reuse insulation from a demolished building). The concrete floors of the buildings were permanently affixed and could not be moved. *See id.* at 666, pp. 239:16–240:12. Although the wiring and plumbing were purportedly in a good condition, there is no evidence that SIM made any use of them. *See id.* at 666, p. 239:9–15; 517 ¶¶ 10, 12; 519 ¶ 29. Even the steel beams themselves could not be reused before removing any PCB residue off their surface. *See id.* at 237. Therefore, once sold, the Dico buildings were only useful insofar as SIM could "reclaim" and, following scarification, reuse the steel beams.

**\*15** Where, as here, reclaiming a material is the sole remaining useful purpose of a product and where the reclaimed material could not be reused without further processing, the useful product doctrine is inapplicable. *See Tex Tin Settling Defs. Steering Comm .,* 2008 U.S. Dist. LEXIS 71520, at \*29. Therefore, Defendants have failed to present sufficient evidence to invoke any presumption that they had a legitimate business purpose for selling the buildings. Accordingly, the Court concludes that Plaintiff is entitled to judgment as a matter of law that the buildings were not commercially useful products when Dico sold them to SIM.

3. *Causal nexus between Defendants and the PCB found at the SIM site.*

To establish Defendants' **arranger** liability, Plaintiff must show that Defendants' PCB was actually deposited at the SIM site. *See* [TMG Enters., Inc., 979 F.Supp. at 1125](). Defendants contend that Plaintiff has failed to do so. Specifically, they argue that the PCB found in the steel beam piles stored at SIM's site could have come "from the [p]roduction [b]uilding, or from one of the other buildings [not covered by the 1994 Order], or from some other source ." Defs.' Br. at 16; *see also id.* at 7. Defendants maintain that this is a plausible argument for the following reasons. First, they claim that, pursuant to the 1994 Order, Dico removed all building insulation that had been confirmed as containing PCB. *See* Defs.' App. at 11 ¶ 3.2.3. Second, certain Dico buildings purchased by SIM—namely the weld shop and the northern portion of the production building—had never been tested for PCB. *See* Defs .' Br. at 7, 16; Defs.' App. at 136–39. Defendants contend that they had no reason at all, in the absence of test results to the contrary, to suspect that PCB was present in the production building or any other untested building.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

*See* Defs.' Br. at 7. Third, although there is no dispute that the steel beams at SIM's site came from Dico buildings, there is no way of tracing which beam came from what building. *See* Defs.' App. at 138:16–23. Fourth, the only areas of the buildings covered by the 1994 Order that had been confirmed to contain PCB were the wall and ceiling insulation.[FN29] *See id.* at 879 ¶ 1.5. Fifth, Plaintiff has been unable to rule out the possibility that the steel beams had been contaminated with PCB from an external source while being stored on SIM's premises.[FN30] *See id.* at 136–37.

> [FN29.] Notably, the 1994 Order does not mention "steel beams" or any equivalent terms. *See* Defs.' App. at 879 ¶ 1.4.
>
> [FN30.] Defendants point to the "notably different [PCB] fingerprints" reported by the EPA following the testing of the steel beams at SIM's facility in 2008 as compared to the PCB patterns reported by Eckenfelder, Inc. in 1992. *See* Defs.' App. at 177–78 ¶ 2. Plaintiff, however, notes that Aroclor 1254, which was the predominant aroclor identified by Eckenfelder, Inc. in 1992, was also present at the SIM site. *See* Hr'g Tr. at 10:8–12.

Taking all these facts into account, Defendants reach a two-fold conclusion. First, they deduce that Plaintiff has failed to show that PCB was present on the steel beams of any of the buildings purchased by SIM, including those subject to the 1994 Order. *See* Defs.' Br. at 16. Second, Defendants surmise that, even if there was PCB on the beams of these buildings, they had no reason to suspect its presence. *See id.* Without PCB or reason to suspect PCB, Defendants argue that they could not have possibly intended to dispose of PCB when they sold the buildings to SIM. *See id.* at 11–16.

**\*16** Plaintiff advances two arguments in response. First, Plaintiff states that Defendants' arguments are nothing but conjecture, noting that "[i]rrelevant facts and pure speculation do not create genuine or material disputes." Reply Mem. in Supp. of Pl.'s Mot. ("Pl.'s Reply") at 5. Second, Plaintiff argues that even if the Court were to find Defendants' arguments plausible, it should nevertheless grant summary judgment to Plaintiff because, to establish **arranger** liability, Plaintiff need not "fingerprint" Defendants' waste. *See id.* (citing *United States v. Hercules,* 247 F.3d 706, 716 (8th Cir.2001) and a two-site **CERCLA** case— *United States v. Wash. State Dep't of Transp.,* No. 08–5722, 2010 WL 4723718 (W.D.Wash. Nov. 17, 2010)).

For reasons that follow, the Court finds neither of the two cases cited by Plaintiff controlling. Plaintiff correctly cites *Hercules* for the proposition that the government need not "fingerprint" a defendant's waste to recover on a **CERCLA** claim. *See Hercules,* 247 F.3d at 716. Plaintiff, however, takes this statement out of context and, for that reason, unduly extends its meaning. *Hercules* concerns "the role of causation in ... [ **CERCLA's**] statutory scheme." *Id.* It holds that the government need not prove, as part of its prima facie case, that the defendant caused harm to the environment. *See id.* Rather, once it is determined that the defendant is a responsible party under **CERCLA**, it is sufficient that a release or threatened release resulted in response costs. *See id.* ("[O]nce the requisite connection between the defendant and a hazardous waste site has been established ..., it is enough that response costs resulted from 'a' release or threatened release—not necessarily the defendant's release or threatened release.") (internal citation omitted)). Thus, to recover its response costs, the government need not prove that it was the defendant's release that necessitated the response costs. *See id.*

Plaintiff mistakenly relies on *Hercules* to support its argument that Defendants may face **arranger** liability even absent a connection between them and the PCB found at SIM's facility.[FN31] *See* Pl.'s Reply at 5–6. The Court disagrees. *Hercules* becomes relevant to this case only if the government proves that Defendants "fit[ ] into one of the four categories of responsible parties" under **CERCLA**. *See Hercules,* 247 F.3d at 716. Whether Defendants fit into one of those categories—namely **arrangers**—is precisely the issue before the Court. *See* Clerk's No. 61. Therefore, the cited portions of *Hercules* are irrelevant to Defendants' potential status as **arrangers**.

> [FN31.] During the August 22, 2012 hearing on the pending summary judgment motions, Plaintiff acknowledged its burden to establish such a connection. *See* Hr'g Tr. at 9:10–21. Still, Plaintiff advocates that the Court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

impermissibly extend the *Hercules* holding, thus effectively extinguishing Plaintiff's burden to prove the connection. *See id.* at 9:22–10:17.

Similar to *Hercules, Washington State Department of Transportation* discusses causation between a **CERCLA** defendant's hazardous substance and the government's response costs. *See Wash. State Dep't of Transp.,* 2010 WL 4723718, at *3. In that case, the Washington State Department of Transportation (the "WSDOT") did not dispute that it owned the Tacoma Spur Property containing PAH, a hazardous substance found in coal tar. *See id.* at *4. The WSDOT also admitted that it had constructed a drainage system collecting coal tar contaminated water from the Tacoma Spur Property and conveying it into the Thea Foss Waterway. *See id.* at * 1, 2. It was also undisputed that the government incurred response costs in connection with a PAH contamination of the Thea Foss Waterway. *See id.* at * 1, 4. The WSDOT's defense was that it could not be held liable as an **arranger** because the government had not established that it was the WSDOT's PAH that caused the response costs incurred at the Thea Foss Waterway. *See id.* at *3. In rejecting this argument, the court held that, in a two-site **CERCLA** case, the plaintiff meets its burden on summary judgment if it "(a) identifies [a] contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site." *Id.* at *3 (citing *Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053, 1066 (C.D.Cal.2003)). On the authority of *Washington State Department of Transportation,* Plaintiff claims to have met its burden on summary judgment in this case because it has established these three elements. *See* Hr's Tr. at 10:6–17.

**\*17** A closer reading of *Washington State Department of Transportation,* however, shows that it is inapposite. A key distinction between *Washington State Department of Transportation* and this case is that the WSDOT admitted that some of its PAH found at the Tacoma Spur Property indeed migrated to the Thea Foss Waterway. *See id.* at *2 ("It is also undisputed that coal tar contamination migrated from the Tacoma Spur Property into ... the drainage system and was disposed of into the Thea Foss Waterway.").

Thus, establishing the requisite **arranger** liability causal nexus between a **CERCLA** defendant and the hazardous substance that necessitated the response costs was not at all the issue in *Washington State Department of Transportation.* What the WSDOT argued was that the government had not established that it was the WSDOT's PAH, and not somebody else's PAH, that necessitated the response costs. *See id.* at *3, 4. In contrast, the issue on summary judgment in this case is precisely the alleged connection between Defendants and the PCB at the SIM site. [FN32] Therefore, Plaintiff's reliance on *Washington State Department of Transportation* to establish this connection is erroneous. Indeed, similar to *Hercules, Washington State Department of Transportation* becomes relevant only if the government proves a connection between Defendants and the PCB found at the SIM site. Accordingly, Plaintiff cannot rely on *Washington State Department of Transportation* to establish that Defendants are **arrangers** within the meaning of 42 U.S.C. § 9607(a)(3).

> FN32. Here, Defendants dispute that any of the PCB that Eckenfelder, Inc. confirmed was present in the buildings purchased by SIM actually made it to the SIM site. Specifically, Defendants advance two related arguments: (1) the buildings at issue, including the steel beams, were completely free from PCB at the time of their sale to SIM, *see* Hr'g Tr. at 57:7–58:24; and (2) even if the buildings were not free from PCB, Plaintiff has failed to establish that the steel beams that tested positive for PCB came from the buildings that had been previously confirmed as containing PCB, *see id.* at 66:13–19.

Having rejected *Hercules* and *Washington State Department of Transportation* as inapplicable, the Court must now determine whether a reasonable fact-finder could conclude that the PCB found in the steel beam piles at SIM's facility did not come from any of the Dico buildings covered by the 1994 Order. If the Court answers this question in the affirmative, there exists a genuine issue of material fact precluding summary judgment as to whether Defendants **arranged** for the disposal of PCB. If, for instance, a reasonable fact-finder could conclude that all of the steel beams that tested positive for PCB actually came from Dico's production building, then Plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

has failed to establish the absence of a genuine issue of material fact as to Defendants' intent to dispose of the PCB.[FN33] Without such intent, there can be no **arranger** liability under 42 U.S .C. § 9607(a)(3).

> FN33. Since the production building has never been confirmed to contain PCB, the Court can hold Defendants liable as **arrangers** only if Plaintiff proves that Defendants somehow knew that the building contained PCB. Plaintiff has presented no such evidence, however. Without knowledge of PCB, Defendants could not have sold the northern portion of the production building with the intent to dispose of any PCB therein. Furthermore, even if Plaintiff had independent evidence that the production building did indeed contain PCB, Plaintiff must still show that Defendants knew about the PCB. Absent such a showing, Plaintiff has failed to shoulder its burden to prove that Defendants had the requisite **arranger** liability intent to dispose of a hazardous substance. *See Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 610.

After its fact-intensive inquiry, the Court finds that the record lacks sufficient evidence for a reasonable fact-finder to infer that the PCB detected in the steel beam piles at the SIM site came from the production building.[FN34] Neither party to this case has offered any direct evidence on this issue. The absence of direct evidence, however, does not mean that the only permissible inferences to be drawn by the Court are those favorable to Defendants. *See Atlas Lederer Co.,* 282 F.Supp.2d at 718. "Rather, in the context of summary judgment, the drawing of an inference against [Defendants] is improper only when the facts support two or more reasonable inferences, at least one of which is favorable to [them]." *See id.* For the reasons below, the Court concludes that the record, when viewed in the light most favorable to Defendants, supports only one reasonable inference—at least some of the beams that tested positive for PCB came from buildings covered by the 1994 Order.

> FN34. The northern portion of the production building was the only building Dico sold to SIM in 2007 that was not covered by the 1994 Order.

**\*18** The SIM site contained hundreds of steel beams from the Dico buildings sold in 2007. *See supra* n. 12. These beams were stacked in piles covering approximately three quarters of an acre. *See id.* The EPA took thirteen random samples from the steel beams; eleven tested positive for PCB. *See supra* n. 13. Defendants argue that all of these eleven samples could have been taken from steel beams that came from the production building. *See* Hr'g Tr. at 66:16–19. The Court cannot agree that such a possibility generates a genuine issue of material fact. To the contrary, the Court finds that it is far beyond the realm of reasonable inferences for a fact-finder to conclude that all eleven PCB-positive samples were taken from steel beams that came from Dico's production building.

Concluding so leaves only one possibility for Defendants to survive summary judgment—by showing that a reasonable fact-finder could conclude that, although at least some of these eleven PCB-positive samples were taken from beams that came from Dico buildings subject to the 1994 Order, those beams were completely free from PCB and were contaminated while stored at SIM's location. For the reasons below, such a conclusion is too beyond the realm of reasonable inferences, even when viewing the record in the light most favorable to Defendants.

On the record, no reasonable fact-finder could conclude that all of the beams taken from the buildings that Dico sold to SIM in 2007 were free from PCB. *See* Pl.'s App. at 581, p. 86:7–87:2 (Fechter testifying that even after the 1997 Report was approved, some PCB remained in the buildings); 694, p. 71:9–14 & 72:13–18 (Hoffman testifying that insulation was bolted to some of the beams); Hr'g Tr. at 18:4–19:12 (summarizing Defendants' admissions that PCB remained in the buildings). Moreover, even if a reasonable fact-finder could so conclude, Defendants have offered nothing but pure speculation to suggest that SIM's location contained other sources of PCB that could have contaminated the otherwise clean steel beams. *See* Hr'g Tr. at 15:4–14 (emphasizing that Hennet "didn't do any testing ... or see any equipment that was labeled with a PCB label"); *see also* Pl.'s App. at 520–25 ¶¶ 36–39 (challenging Hennet's conclusion that the steel beams were contaminated with PCB while stored in SIM's yard). Absent some evidence proving that the SIM site housed any items containing PCB, Defendants are not entitled to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)
**(Cite as: 2012 WL 4361414 (S.D.Iowa))**

a favorable inference on this issue. *See Atlas Lederer Co.,* 282 F.Supp.2d at 718.

Therefore, after viewing the evidence in the light most favorable to Defendants, the Court concludes that Plaintiff is entitled to judgment as a matter of law that: (1) at least some of the eleven beams that tested positive for PCB came from Dico buildings covered by the 1994 Order; (2) the buildings at issue were not free from PCB at the time of their sale to SIM; and (3) SIM's yard contained no other sources of PCB that could have contaminated the otherwise clean beams.

### V. CONCLUSION

**\*19** For the reasons discussed above, Plaintiff's Motion (Clerk's No. 61) is GRANTED. In light of this ruling, the Court cancels the October 15, 2012 trial start date pending its ruling on the remaining two summary judgment motions (Clerk's Nos. 62–63). If necessary, the Court will schedule a new trial date to decide any remaining issues in this case.

IT IS SO ORDERED.

S.D.Iowa,2012.
U.S. v. Dico, Inc.
--- F.Supp.2d ----, 2012 WL 4361414 (S.D.Iowa)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.