UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGIA-PACIFIC CONSUMER
PRODUCTS LP, FORT JAMES CORP.,
and GEORGIA-PACIFIC LLC,

        Plaintiffs,

                                       CASE NO. 1:11-CV-483

v.

                                       HON. ROBERT J. JONKER

NCR CORPORATION,
INTERNATIONAL PAPER CO., and
WEYERHAEUSER CO.,

        Defendants.
_____/

## OPINION AND ORDER
## DENYING MOTIONS FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

In 2010, Georgia-Pacific ("GP") sued International Paper ("IP") and two other defendants for the costs of cleaning up the Kalamazoo River Superfund Site ("the Site"). GP and IP both moved for summary judgment as to IP's liability for polluting the Site. (Pl.'s Mot. for Summ. J., doc. # 237; Def.'s Mot. for Summ. J., or Alternatively, for Partial Summ. J., doc. # 242.) The Court denies both Motions.

## II.    BACKGROUND

### A.    Overview of the Superfund Site

The Kalamazoo River and its tributary, Portage Creek, run through Southwestern Michigan. They are contaminated with polychlorinated biphenyls ("PCBs"), a hazardous substance and possible carcinogen. The PCBs in Portage Creek and the Kalamazoo River were

allegedly discharged by paper mills located in the Kalamazoo River Valley. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), doc. # 238, at 11.) The paper mills recycled wastepaper as a source of pulp. (*Id.*) Some of the wastepaper recycled by the mills was NCR Corporation's ("NCR's") carbonless copy paper ("CCP"). (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), doc. # 259, at 7.) CCP was made using Aroclor 1242, a source of PCBs. (*Id.*) In the course of the recycling process, some of the PCBs from the recycled CCP found their way into wastewater effluent, which the mills discharged into Portage Creek and the Kalamazoo River. (Pl.'s Mem., doc. # 238, at 11.) Because of the PCB contamination, the area is now listed on the National Priorities List. It has been labeled as the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.

### B.     The Bryant Mill and Bryant Mill Pond

The Bryant Mill ("the Mill") was built in 1895 along Portage Creek. As part of the Mill's construction, Portage Creek was dammed. Damming Portage Creek provided water and a power source for the Mill. It also created the Bryant Mill Pond ("the Pond"), which became an important part of the Mill's operations. (Ex. 1, doc. # 239-1, at 11-15.)

The Mill coated, manufactured, and disposed of paper. (*Id.*) It was not, however, equipped to produce pulp, the base component of paper. Because the Mill could not produce its own pulp, it relied on purchased wastepaper and externally-sourced pulp in its paper manufacturing. By 1953, recycled wastepaper accounted for over two-thirds of the fiber used at the Mill. (Ex. 3, doc. # 239-1, at 46.)

Workers at the Mill usually had to de-ink wastepaper before they used it for paper manufacturing. During the de-inking process, ink, clay, and other residuals were removed from the desirable paper fibers through a combination of chemical washing, heat, and mechanical

agitation. ((Ex. 1, doc. # 239-1, at 28-31.) Until the 1950's, this mixture of ink, clay, and other residuals was then discharged, untreated, directly into Portage Creek. (*Id.* at 16.) During the 1950's, St. Regis constructed a clarifier at the Mill to help settle out solid material from the effluent that was discharged into Portage Creek. (*Id.*) Even with these protective measures in place, however, roughly 70% of the suspended solids in the Mill effluent made it into Portage Creek. (Pl.'s Mem., doc. # 238, at 18.)

IP is the successor-in-interest to a company called St. Regis, which acquired the Mill in 1946. (Ex. A, doc. # 243-1, at 5.) Three years later, Panelyte--one of St. Regis' subsidiaries--acquired a property ("the Panelyte property") abutting the Pond and adjacent to the Mill, for use in producing injection-molded plastics. (Def.'s Mem., doc. # 259, at 3-4.) Part of the Panelyte Property, which IP has referred to as the "Alleged Panelyte Pond Area," was inundated upon creation of the Pond. (*Id.*) Panelyte's activities on the Panelyte property involved neither paper manufacture nor the purchasing or use of recycled wastepaper.

From 1946 until July 1, 1956, St. Regis manufactured paper at the Mill using a combination of virgin pulp and wastepaper. (Ex. 1, doc. # 239-1, at 17.) The parties dispute whether, and to what extent, the wastepaper used at the Mill contained PCBs. IP claims the wastepaper St. Regis used at the Mill was primarily purchased from Detroit and did not contain PCBs. (Def.'s Mem., doc. # 259, at 7-8.) Georgia Pacific ("GP") says that the wastepaper recycled by St. Regis contained PCBs that contributed to contamination of the Site. (Pl.'s Mem., doc. # 238, at 19-20.)

St. Regis produced paper at the Mill until July 1, 1956, when, by virtue of an agreement ("the Agreement") with Allied Paper Corporation ("Allied"), St. Regis conveyed its paper business at the Mill to Allied, including executory customer and supply contracts, equipment,

raw materials, works in process, and inventory. (Ex. F, doc. # 245.) In a series of ancillary agreements, St. Regis and Allied also agreed that the Mill would continue to provide steam to the Panelyte facility as needed, and that Allied would have use of the effluent system constructed by St. Regis, which transported de-inking waste through the Panelyte property to the Mill's clarifier. (Ex. J, doc. # 240-4, at 57-59.) Allied was allowed to terminate the Agreement if St. Regis sold the Panelyte facility before 1966. (Ex. 9FF, doc. # 240-4, at 11.)

The Agreement also included a provision--which both Allied and St. Regis denominated a "lease" ("the Lease")--whereby St. Regis conveyed to Allied for a period of 13 years the right to possess and use the real property and equipment associated with the Mill. (Ex. J, doc. # 274-1, at 29 ("[Allied] does hereby take and hire the premises, including side-track rights . . . and the property described in Schedule B hereto annexed (hereinafter sometimes referred to as the 'equipment').").) In return, Allied agreed to pay St. Regis $1.2 million during the first year of the lease and $400,000 per year thereafter until the Lease expired. (*Id.* at 30-31.) The Lease gave Allied an option to purchase the Bryant Mill for $675,000 after its ten years, and again after its thirteenth year. (*Id.* at 72.) Unless and until Allied exercised its purchase option, it was obligated under the Lease to continue its monthly payments to St. Regis, regardless of whether the property was damaged or destroyed. (*Id.* at 46.) The Lease also made Allied responsible for reimbursing St. Regis for payment of real estate taxes, insurance, maintenance, and other costs associated with the Mill property. (S*ee, e.g.*, *id.* at 31-32 (requiring Allied to reimburse St. Regis for payment of taxes).) St. Regis also retained the right to inspect and make repairs to the Mill. (*Id.* at 43-44.)

The Agreement went into effect on July 1, 1956. (Ex. 9FF, doc. # 240-4, at 11.) From that date forward, Allied operated the Mill, but St. Regis continued to hold title to the Mill.

4

St. Regis also continued to own and operate the neighboring Panelyte property until early 1965. Ten years into the Lease, Allied exercised its purchase option for the Mill and St. Regis conveyed to Allied legal title to the Mill and to the equipment covered by the lease. (Ex. AA, doc. # 289-1, at 2.)

C.     The Current Litigation and the Motions Before the Court

Between 1972 and 1989, the Michigan Department of Natural Resources ("MDNR") conducted a number of studies that showed the Site was contaminated with PCBs. (Ex. 1, doc. # 239-1, at 12.) In 1990, the United States Environmental Protection Agency placed the Site on the National Priority List pursuant to 42 U.S.C. § 9605, and the MDNR listed the Site as an environmental contamination site under the Michigan Environmental Response Act, M.C.L. §§ 299.601 *et seq.*

GP is the corporate successor to Kalamazoo-area facilities that recycled PCB-laden CCP. It has acknowledged liability for a portion of the pollution at the Site and has incurred costs in the course of investigating and remediating contamination of the Site. (Pl.'s Mem., doc. # 238, at 21.) On December 3, 2010, GP sued IP, NCR, and Weyerhaeuser for contribution in cleaning up the Site, alleging that each was a potentially responsible party under the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"). (Compl., doc. # 1.) Following a Rule 16 conference, the Court structured a segmented trial, where individual Defendants' liability would be determined at the first stage, and damages would be apportioned among liable Defendants at the second stage.

GP argues that IP is liable for contamination of the Site as St. Regis' corporate successor. (Pl.'s Mem., doc. # 238, at 9-11.) IP disputes that St. Regis was liable for any PCB

5

contamination at the Site. (Def.'s Mem., doc. #259, at 2-3.) Both parties have moved for summary judgment on the question of IP's liability. (Pl.'s Mot. for Summ. J., doc. # 237; Def.'s Mot. for Summ. J., or Alternatively, for Partial Summ. J., doc. # 242.)

## III.    LEGAL STANDARD

To establish a prima facie case for cost recovery under CERCLA, a plaintiff must prove four elements: (1) a release of hazardous substances occurred; (2) the release occurred at a facility; (3) the release caused the plaintiff to incur response costs; and (4) the defendant falls within one of the four categories of potentially responsible parties ("PRPs") set out in 42 U.S.C. § 9607(a). 42 U.S.C. § 9607(a); *see also Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000). A "facility" is "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9)(B). A defendant is a PRP under 42 U.S.C. § 9607(a) if it is:

> (1) the owner and operator of a vessel or a facility, (2) [a] person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) [a] person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, [or] (4) [a] person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

*Id.* at § 9607(a).

Holding legal title to a facility generally suffices to make an entity liable as an owner under CERCLA. *See id.* at § 9601(20)(A)(ii) (defining "owner or operator" to include "any person owning or operating such facility"). An exception to that general rule of owner liability--

6

called the "secured creditor exemption"--provides that "[t]he term 'owner or operator' does not include a person that is a lender that, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility." 42 U.S.C. § 9601(20)(E)(i).[1] The term "lender" covers not just financial institutions and other commercial lenders, but also "any person (including a successor or assignee of any such person) that makes a bona fide extension of credit to or takes or acquires a security interest from a nonaffiliated person . . . ." *Id.* at § 9601(20)(G)(iv)(V). "The term 'extension of credit' includes a lease finance transaction in which the lessor does not initially select the leased vessel or facility and does not during the lease term control the daily operations or maintenance of the vessel or facility . . . ." *Id.* at § 9601(20)(G)(i)(I). And "[t]he term 'security interest' includes a right under a . . . lease and any other right accruing to the person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person." *Id.* at § 9601(G)(vi).

Liability under CERCLA is strict. *See United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996) ("After all, if the tortured history of CERCLA litigation has taught us one lesson, it is that CERCLA is a strict liability statute."). Where a plaintiff makes its prima facie case, the defendant will be liable, regardless of actual fault or knowledge, unless it can prove one of the very limited defenses recognized under 42 U.S.C. § 9607(b).[2] *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1508 (6th Cir. 1989) ("We agree . . . that CERCLA

---

[1] The language in § 9601(20)(E)(i) largely mirrors that of § 9601(20)(a)(iii), though the provisions are not identical. *See* 42 U.S.C. § 9601(20)(a)(iii) ("[The term 'owner or operator'] does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.").

[2] Neither party suggests that any of the § 9607(b) defenses applies to this case.

contemplates strict liability for landowners, who, absent a defense recognized under section 9607(b), are deemed responsible for some of the harm."); *see also United States v. Monsanto*, 858 F.2d 160, 168 (4th Cir. 1988) ("The plain language of [§ 9607(a)(2)] extends liability to owners of waste facilities regardless of their degree of participation in the subsequent disposal of hazardous waste.").

## IV.    ANALYSIS

GP and IP have moved for summary judgment on the same issue: whether IP is liable to GP under 42 U.S.C. § 9607(a). Of the four categories of PRPs listed in 42 U.S.C. § 9607(a), IP-- as St. Regis' corporate successor-in-interest--is potentially liable as a "person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). GP asks the Court to grant summary judgment that IP is liable because St. Regis owned both the Mill and the Panelyte facility while Allied was disposing of PCBs. (Pl.'s Mot. for Summ. J., doc. # 237, at 2.) IP asks the Court for summary judgment that it is *not* liable either as the owner of the Mill or as the owner of the Panelyte facility, and further that it is not liable for disposing of PCBs at the Site before July 1, 1956, when St. Regis was still operating the Mill. (Def.'s Mot. for Summ. J., or Alternatively, for Partial Summ. J., doc. # 242, at 2.)

The cross-motions raise three issues: (1) whether St. Regis qualifies for the secured lender exemption from the definition of "owner or operator" for Allied's disposal of PCBs from July 1, 1956 through 1965; (2) whether St. Regis, itself, disposed of PCBs at the Mill before July 1, 1956; and (3) whether St. Regis' ownership and operation of the Panelyte facility triggers potential liability for Allied's disposal activity. Issues of material fact exist with respect to each of these questions. Therefore, the Court denies both Motions. *See* Fed. R. Civ. P. 56(a)

8

(summary judgment is proper only when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law").

      A.      **St. Regis' ownership of the Mill After July 1, 1956**

It is undisputed that St. Regis held title to the Mill from 1946 to 1965. This includes the more than nine years, from July 1, 1956 to 1965, when Allied operated the Mill and disposed of PCBs in the Pond. GP claims that St. Regis' legal ownership of the Mill makes IP liable as an owner under 42 U.S.C. § 9607(a)(2). IP demurs, arguing that St. Regis retained title after July 1, 1956 primarily to protect a security interest in the Mill and, thus, that St. Regis falls within CERCLA's secured creditor exemption for any ownership during Allied's operation. *See* 42 U.S.C. § 9601(20)(E)(i) ("The term 'owner or operator' does not include a person that is a lender that, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect the security interest of the person in the . . . facility.").[3] The secured creditor exemption, by its original terms, implicates a fact-intensive inquiry of a party's primary intentions. *See id.* at § 9601(20)(A)(iii). Later amendments meant to clarify the exemption actually added layers of potentially overlapping definitions that, in the end, do not necessarily deliver the desired clarity. *See id.* at §§ 9601(20)(E)-(G). In fact, after tracking through all the definitional pathways, it is not clear that §§ 9601(20)(E)-(G) do much beyond providing a more elaborate route to the original § 9601(20)(A)(iii) exclusion. In any event, for the secured creditor exemption to apply, IP will ultimately have to establish, among other things, that St. Regis held title to the Mill "primarily to protect [its] security interest" in that facility. *Id.* at

---

      [3] 42 U.S.C. § 9601(20)(A)(iii) contains a highly similar, though not formally identical, provision.

§§ 9601(20)(A)(iii), 9601(20)(E)(i). Disputed issues of material fact currently preclude summary judgment for either IP or GP on this issue.

GP and IP disagree about the true nature of the transaction that ultimately resulted in Allied's acquisition of the Mill. GP argues that St. Regis' Lease of the Mill to Allied was exactly what both sides called it: a lease of real property, not an extension of credit or the grant of a security interest. (Pl.'s Mem., doc. # 238, at 30-33.) Moreover, according to GP, the only transaction that could qualify IP for the secured creditor exemption in this case is the one expressly described in 42 U.S.C. § 9601(20)(G)(i)(I). And, according to GP, IP cannot qualify under § 9601(20)(G)(i)(I) because St. Regis not only selected, but actually owned, the Mill for a decade before the Lease. Accordingly, GP argues that the secured creditor exemption is, as a matter of law, unavailable to IP, regardless of its primary intention in holding title to the property. (Pl.'s Mem., doc. # 238, at 30-33.)

GP may ultimately prevail on its claim that the secured creditor exemption does not apply, but the Court is not prepared to reach this conclusion as a matter of law under § 9601(20)(G)(i)(I) because the statutory definition of "security interest" is so broad that it may permit application of the secured creditor exemption to at least some owners that do not satisfy the strictures of Sections 9601(20)(G)(i)(I) or (II).[4] Indeed, the statute's definition of "security interest" is so broad that it may well encompass anything that could reasonably be defined as an "extension of credit," and more. *See* 42 U.S.C. § 9601(20)(G)(vi) ("The term 'security interest

---

[4] This is true regardless of whether the potential exemption is applied directly from the language of § 9601(20)(A)(iii), which is still in force in its original form, or from the later addition of § 9601(20)(E)-(G). This is because the added term "lender" in § 9601(20)(E)(i) covers not only "extensions of credit," but also any other acquisition of a security interest. *See* 42 U.S.C. § 9601(20)(G)(iv). In other words, not all pathways to the § 9601(20)(E)(i) version of the exemption pass through the § 9601(20)(G)(i).

includes a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person."). If so, the special definitions in § 9601(20)(G)(i), applicable to lease finance transactions, may not add much clarity. But at a minimum, an inability to satisfy the strictures of § 9601(20)(G)(i) would not automatically preclude a party's reliance on the broader and more generic category of a security interest, including a right under a lease that secures "the repayment of money, the performance of a duty, or any other obligation by a non-affiliated person." 42 U.S.C. § 9601(20)(G)(vi). The sweep of this statutory definition is so broad as to cover--by its literal terms--virtually every lease of real estate. That, of course, cannot mean that every lease actually qualifies for the exemption because this would generate an unacceptable potential end run of CERCLA's owner liability provision. But the best way to draw a reasonable line between a lease that qualifies for the exemption and one that does not will benefit from full factual development at trial.

The necessary line-drawing will likely focus on the question of whether St. Regis held indicia of ownership "primarily to protect [its] security interest." 42 U.S.C. §§ 9601(20)(A)(iii); 9601(20)(E)(i). Determining a party's purpose in holding indicia of ownership is an inherently fact-laden process. In this case, facts on the record support inferences both for and against each moving party. Accordingly, summary judgment is inappropriate.

Certain facts in evidence suggest that St. Regis held indicia of ownership primarily for the purpose of protecting its security interest. For instance, the Lease required Allied to reimburse St. Regis for real estate taxes, insurance costs, and maintenance expenses incurred by Allied. (S*ee, e.g.*, *id.* at 31-32 (requiring Allied to reimburse St. Regis for payment of property

11

taxes).) Thus, under the Lease, St. Regis was not financially responsible for many of the obligations that traditionally come with ownership. This is, of course, a common feature of triple net commercial leases, and so not determinative of the issue. But here, the overall financial structure of the lease--including the triple net feature--is consistent with a seller-financed sale of the Mill, rather than a traditional lease. In particular, the pricing and purchase options of the lease appear calculated to induce an eventual sale as the only economically sensible construction of the transaction. And, if so, a reasonable fact-finder might conclude the Lease was primarily designed to secure the sale terms.

Other facts in evidence, however, suggest that St. Regis might have held indicia of ownership, not primarily to protect its security interest, but to ensure that the property was managed in ways acceptable to St. Regis. The Lease gave Allied only an *option* to purchase the Mill, for example, meaning that St. Regis retained some potential interest in the property upon expiration of the Lease. And the commercial relationship--including agreements for the provision of steam and the use of piping--between the Mill and St. Regis' operations at the adjacent Panelyte facility offers a plausible basis for concluding that St. Regis retained title to the Mill to protect the Panelyte facility, rather than to secure payment under the agreement. (*See* Ex. J, doc. # 240-4, at 57-59 (affirming continuation of steam-sharing agreements and permitting Allied to use piping--constructed by St. Regis, used by Panelyte, and running under the Panelyte property--to discharge effluent from the Mill).) Finally, the parties did use the form and accounting of a true lease, and not a sale, whether on a land contract or subject to mortgage. The parties must have had some reason for eschewing the most obvious methods of securing seller financing, and using the form of a lease transaction instead.

Under either version of the exemption, another pivotal issue will be whether St. Regis participated in management of the Mill. *See* 42 U.S.C. §§ 9601(20)(A)(iii), 9601(20)(E)(i). This is an inherently fact-based inquiry. "Participate in management" means "actually participating in the management or operational affairs of a . . . facility," as distinguished from "merely having the capacity to influence, or the unexercised right to control, . . . facility operations." *Id.* at § 9601(20)(F)(i). This focus must be on a person's "day-to-day decisionmaking" on both environmental and non-environmental matters. *Id.* at § 9601(20)(F)(ii). Simply holding a security interest or monitoring or enforcing the terms and conditions of a security interest is insufficient to constitute "participation in management." *Id. at* § 9601(20)(F)(iv)(I), (III).

The record contains some evidence suggesting that St. Regis participated in management of the Mill. St. Regis continued to own and operate the neighboring Panelyte property for the duration of the Lease, and this might lead a reasonable fact-finder to conclude that it was at least a co-manager of the Pond, which, in turn, may have been part of the "facility." *See infra* Part IV.C. This is particularly true because, under a series of agreements reaffirmed in the Lease, St. Regis retained an interest in the use of steam from the Mill and use of the effluent system used by the Mill to dispose of de-inking water in Portage Creek. (Ex. J, doc. # 240-4, at 57-59.) Indeed, the PCB-laden effluent passed through the Panelyte property, on its way to Portage Creek, under an easement granted by St. Regis. (Pl.'s Mem., doc. # 238, at 31.) The interconnectedness of the operations at the Mill and at Panelyte property might also convince a reasonable fact-finder that St. Regis participated in management of the Mill. Because a reasonable fact-finder could find that St. Regis participated in management of the Mill, IP is not entitled to summary judgment. *See* Fed. R. Civ. P. 56(a) (movant only entitled to summary

judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

Nor is GP entitled to summary judgment on the issue. All of GP's evidence that St. Regis participated in management of the Mill after July 1, 1956 is circumstantial. The only way for a fact-finder to conclude that St. Regis participated in management of the Mill after July 1, 1956 would be to draw that inference from the circumstantial evidence. While a fact-finder might draw such an inference at trial, the record certainly does not require it. Moreover, the Court is not permitted to draw such an inference on summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (at summary judgment, all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party). Because a reasonable fact-finder could conclude that St. Regis did not participate in management of the facility, GP is not entitled to summary judgment on that issue. Deciding whether St. Regis qualifies for the secured creditor exemption requires the sort of fact-intensive inquiry best handled at trial. Accordingly, the Court denies both parties' Motions for Summary Judgment on this issue.

### B.     St. Regis' Ownership and Operation of the Mill Before July 1, 1956

IP separately argues that it is entitled to summary judgment on the question of St. Regis' liability for operating the Mill prior to July 1, 1956. To avoid summary judgment on that question, GP must show that it can establish each element of its prima facie case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To make a prima facie case for St. Regis' liability as the owner and operator of the Mill prior to July 1, 1956, GP must show that, prior to July 1, 1956: (1) St. Regis purchased and then processed wastepaper that contained CCP; and (2) there was a "release" from the Mill involving the "disposal" of PCBs. 42 U.S.C. § 9607(a)(2). IP

14

claims that summary judgment is appropriate as to it's pre-Lease liability because GP has not produced any direct evidence to support either prong of its prima facie case. (Def.'s Mem., doc. # 259, at 14-16 ("[T]he absence of any specific evidence to which Plaintiffs can point showing that St. Regis in fact purchased or processed wastepaper containing CCP is fatal to their claims for the period prior to July 1, 1956.").)

IP's argument overstates the need for direct evidence at the summary judgment stage. To support a claim against IP for St. Regis' pre-transfer ownership and operation of the Mill, GP need only establish that St. Regis discharged even a tiny amount of PCB-laden effluent in its operation of the Bryant Mill before July 1, 1956. *See Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 660 (6th Cir. 2000) (noting that a single discharge of contaminants is sufficient to support liability under CERCLA); *see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) ("[E]ven a minimal amount of hazardous waste brings a party under the purview of [CERCLA] as a PRP."). It can do so even without "direct" documentary evidence. *See Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000) ("CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence."). As the Sixth Circuit has observed, "there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain." *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001). Indeed, given that more than half a century has passed since the alleged disposals occurred in this case, it would be at least mildly surprising if a wealth of direct documentary evidence existed to substantiate GP's claims. *See Niagara Mohawk*, 596 F.3d at 131 ("[T]he type of evidence, be it direct or circumstantial, and its quality, is to some degree impeded by the passage of time . . . .

15

The available evidence of who did what at the relevant site is often dependent on inference."). Thus, the lack of direct documentary or testimonial evidence showing that St. Regis discharged pollutants at the Site prior to July 1, 1956 is not fatal to GP's case. Rather, GP may survive summary judgment simply by producing enough indirect or circumstantial evidence to so that a reasonable fact-finder could decide that St. Regis discharged PCBs at the Site.

GP has produced enough evidence to meet this burden. The evidence indicates that, before July 1, 1956, the Bryant Mill discharged substantial amounts of suspended solids at the Site. (*See* Ex. 2, doc. # 239-1, at 34-36; Ex. 14, doc. # 240-5.) To the extent there was CCP in the wastepaper furnished that generated those suspended solids, PCBs from that paper would have adsorbed to suspended solids in the Mill's effluent, meaning that St. Regis would have discharged PCBs at the Site in its operations of the Mill. (Ex. 17, doc. # 241-1, at 14.) Although there is no direct evidence that St. Regis used CCP in its operations of the Mill, there is circumstantial evidence that, on the whole, might convince a reasonable fact-finder that St. Regis more likely than not discharged PCBs at the Site. For one thing, NCR's coaters were producing CCP as early as 1953, and shipping hundreds of thousands of pounds of "NCR Broke" to the Kalamazoo Valley by 1955. (Ex. XX, doc. # 291-1.) GP's expert, James Farrand, has opined that paper recycling mills in the Kalamazoo Valley, like the Bryant Mill, would likely have processed CCP during the 1950s because it was an attractive source of high-quality paper fibers. (Ex. 2, doc. # 239-1, at 26.) St. Regis' business relationship with ACPC, one of the coaters charged with manufacturing CCP, may well have made St. Regis and its facilities (including the Mill) a logical destination for the delivery of CCP broke. (*See* Ex. 9E, doc. # 240-3, at 56; Ex. 40, doc. # 298-3, at 11.) Finally, core samples from the site where solid waste from the

16

Mill's clarifier was deposited show PCBs at levels where paper residues were already deposited by July 1, 1956. (Ex. 42, doc. # 298-3.)

Based on the totality of the circumstances, a reasonable fact-finder could infer that St. Regis used CCP in its operations at the Mill prior to July 1, 1956, and that it discharged PCBs at the Mill during that time, which would make IP liable under 42 U.S.C. § 9607(a)(2). This is not to say that a reasonable fact-finder would necessarily conclude that IP is liable; the nature of circumstantial evidence is such that it seldom requires a particular conclusion. The evidence provided by GP thus far is certainly not enough to conclusively establish that St. Regis *did* discharge PCBs at the Site prior to July 1, 1956. Summary judgment for GP on that ground would, therefore, be inappropriate. But GP's circumstantial evidence is sufficient to establish a genuine issue of material fact as to whether St. Regis discharged PCBs at the Site prior to July 1, 1956. As such, summary judgment for IP on this issue is inappropriate.

### C.    St. Regis' Ownership of the Panelyte Property

The final subject of dispute between the parties is whether St. Regis' ownership of the Panelyte property from 1956 to 1965--during which period, it is conceded, Allied was discharging PCBs into the Pond--is sufficient to make IP liable under 42 U.S.C. § 9607(a)(2). GP argues that St. Regis' ownership of the Panelyte property makes it a co-owner of the Pond, because a portion of the Panelyte property was submerged beneath the Pond and because the Panelyte property otherwise abutted the Pond. (Pl.'s Mem., doc. # 238, at 28-30.) GP further argues that the entire Pond is a "facility" for CERCLA purposes, so that St. Regis' part-ownership of the Pond makes it a part-owner of a "facility" that Allied used to dispose of PCBs from 1956 to 1965. (*Id.*) On this basis, GP concludes, St. Regis' ownership of the Panelyte property makes it liable as an "owner or operator" under 42 U.S.C. § 9607(a)(2).

17

IP responds that St. Regis only owned that portion of the Pond to which it took legal title through its purchase of the Panelyte property (a portion of the Pond that IP refers to as the "Panelyte Pond Area."). According to IP, the only PCB contamination of the Panelyte Pond Area occurred as the result of passive migration from the part of the Pond abutting the Mill. (Def.'s Opp. to Pl.'s Mot. for Summ. J., doc. # 302, at 13.) Because passive migration generally cannot form the basis for owner or operator liability under CERCLA, *see Bob's Beverage, Inc. v. Acme*, 264 F.3d 692, 697-98 (6th Cir. 2001), IP argues that it is not liable as the owner or operator of a facility at which hazardous substances were disposed of based on its ownership and operation of the Panelyte facility. (Def.'s Opp. to Pl.'s Mot. for Summ. J., doc. # 302, at 13-15.)

In light of the Court's rulings on the earlier issues, the Panelyte issue may have more significance for allocation purposes then in the liability phase of the case. But since it is possible IP will prevail at trial on the other liability issues, it is worth addressing the Panelyte issue on summary judgment. On the present record, neither party is entitled to summary judgment on this issue. In the first place, CERCLA defines "facility" broadly, to include "any . . . pond . . . ." 42 U.S.C. § 9601(9)(A). Sixth Circuit precedent establishes that "an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility' [for purposes of CERCLA], even if it contains parts that are non-contaminated." *United States v. Twp. of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998); *see also United States v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000). "The mere formal division [of a property] in the land records is not a 'reasonable or natural' division under *Brighton*." *150 Acres of Land*, 204 F.3d at 709. Whether the Pond admits of "reasonabl[e] or natura[l]" divisions is a question more

18

appropriately decided after trial, where the parties can expound on the aspects of the Pond that do or do not lend themselves to such division.[5]

Second, there are fact questions that prevent a simple invocation of "passive migration" from serving as an automatic bar to liability of IP in this case. It is one thing to say that mere "passive migration" is not enough to trigger CERCLA liability as an owner or operator at the time of disposal. But drawing the line between simple "passive migration," on the one hand, and "disposal," on the other, is not always so easy and naturally requires careful factual parsing. Engaging in activities that stir or move contaminants previously deposited by others may amount to "disposal." *See, e.g., Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992) ("disposal" includes "not only active conduct, but also the reposing of hazardous waste and its subsequent movement through the environment"); *Kaiser Aluminum v. Catellus Dev.*, 976 F.2d 1338, 1342 (9th Cir. 1992) (dispersion of pre-existing contamination constituted new "disposal"); *Tanglewood E. Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568 (5th Cir. 1988) (same); *Ganton Technologies v. Quadion Corp.*, 834 F. Supp. 1018 (N.D. Ill. 1993) (same)*. Here, IP's predecessor granted Allied an easement for the discharge pipe carrying PCB-laden waste. Moreover, activities in operation of the Panelyte facility may have otherwise disturbed or affected previously deposited PCB-contamination in a way that went beyond "passive migration." Trial proofs will allow resolution of these fact issues.

---

[5] Another complication regarding ownership of the Pond may turn out to be the operation of riparian ownership rights. Neither party has addressed the issue, and the Court need not resolve it at this time. But the Court notes that riparian owners in Michigan can be deemed owners of bottomlands beyond the metes and bounds of a deed. *See, e.g., United States v. Chandler-Dunbar Water Power Co.*, 209 U.S. 447, 451-52 (1908) (noting that, under Michigan common law, a riparian owner also owns the bed of the adjacent river or lake to its center point along with islands rising from the bottomlands); *Wheeler v. United States*, 770 F. Supp. 1205, 1211 (W.D. Mich. 1991) (same).

19

**THEREFORE, IT IS ORDERED** that Georgia-Pacific's Motion for Summary Judgment as to International Paper's Liability (doc. # 237) is **DENIED**.

**IT IS FURTHER ORDERED** that International Paper's Motion for Summary Judgment, or Alternatively, for Partial Summary Judgment (doc. # 242) is **DENIED**.

Dated:   January 24, 2013                        /s/ Robert J. Jonker
                                                 ROBERT J. JONKER
                                                 UNITED STATES DISTRICT JUDGE