UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GEORGIA-PACIFIC CONSUMER
PRODUCTS LP, FORT JAMES CORP.,
and GEORGIA-PACIFIC LLC,

           Plaintiffs,

                                        CASE NO. 1:11-CV-483

v.
                                        HON. ROBERT J. JONKER

NCR CORPORATION,
INTERNATIONAL PAPER CO., and
WEYERHAEUSER CO.,

           Defendants.
_____/

## OPINION AND ORDER
## DENYING NCR's MOTION FOR SUMMARY JUDGMENT

Georgia Pacific ("GP") has sued NCR Corporation ("NCR") and other defendants under the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").

(First Am. Compl., doc. # 80.) GP alleges that NCR is liable as a CERCLA arranger for at least part

of the cost of cleaning up the polychlorinated biphenyl ("PCB") contamination at the Kalamazoo

River Superfund Site ("the Site"). (*Id.*) GP claims that NCR and its corporate affiliates arranged for

paper recycling companies in the Kalamazoo River Valley to dispose of broke, the PCB-laden

byproduct of NCR's carbonless copy paper ("CCP"). (*Id.*) NCR moves for summary judgment,

declaring that it cannot be liable as an arranger because: (1) GP is collaterally estopped by a

prospective judgment in the *Whiting* litigation from arguing that NCR is liable as an arranger; and

(2) GP cannot establish a sufficient connection between the contamination at the Site and NCR's

conduct. (Def.'s Mot. for Summ. J., doc. # 247; Def.'s Mem. in Supp. of Summ. J. ("Def.'s Mem."),

doc. # 265, at 6-9.) The Court denies NCR's Motion because a reasonable fact-finder could find NCR liable, considering the record in the light most favorable to GP. This is true even assuming that GP and the Court are required to accept particular fact findings from the *Whiting* action.

## I. BACKGROUND

### A. Manufacturing CCP

NCR developed CCP in the mid-1950s. (Ex. 3, doc. # 253-3, at 3.) CCP consisted of two overlain sheets, each with a special coating developed and sold by NCR. (*Id.*) The top sheet, called "Coated Back" or "CB," was coated on its backside with a thin layer of emulsion containing microscopic capsules. (*Id.*) The capsules contained colorless ink, oils, and a transfer solvent. (*Id.*) The bottom sheet, called "Coated Front" or "CF," was coated on its front side with a special clay-resin coating and contained no solvent. (*Id.* at 4.) When pressure was applied to the top of the CB sheet, the microcapsules in the coating would rupture and the colorless ink would release and react with the coating on the front of the CF sheet to create an identical image. (*Id.*) From 1954 through April 1971 ("the production period"), NCR used Aroclor 1242, a type of PCB, as a solvent in the microcapsules.

There were two steps in the production of CCP: (1) "coating" large base paper rolls with PCB emulsion and other substances to make raw materials for the different sheet types in CCP forms; and then (2) "converting" the base paper rolls by cutting, printing, and collating the components into final CCP form, such as receipts or airline tickets. NCR outsourced the coating process to several independent companies ("the coaters"), including Appleton Coated Paper Company ("ACPC"), Combined Paper Mills ("CPM"), and Mead Corporation ("Mead"). (Ex. 4, doc. # 253-4, at 9-11.) At the end of the coating process, the coaters would sell the coated paper to NCR. NCR then filled

orders for CCP for its own customers, who converted the bulk CCP into smaller, end-use CCP products, which they then sold. In addition to filling orders for customers, NCR also supplied CCP to conversion facilities that it owned ("the NCR converters"). (Ex. 10, doc. # 256-6, at 3.) The NCR converters were collectively organized under the name "Systemedia." Systemedia operated conversion facilities all over the country, including one in Viroqua, Wisconsin, one in Washington Court House, Ohio, and one in Dayton, Ohio. (*Id.* at 4.)

**B.** **CCP Broke**

Both the manufacturing and converting of CCP generated "broke." Broke consists of the paper that is not used in the finished paper product, either because it does not meet finished product specifications, is damaged in the manufacturing process, or is trim and cuttings produced during manufacture and conversion. (Ex. 3, doc. # 253-3, at 5.) Although CCP broke from manufacture and conversion was unsuitable for the production of finished business forms, paper recyclers used it as a raw material in the manufacture of new paper. (*Id.*) Thus, there was a well-established market for broke and each of the coaters and converters spent at least some effort preparing broke for sale, either to brokers or directly to paper recycling plants.

Paper recycling mills competed to obtain broke and viewed it as "a valuable and even indispensable product, given that recycling it was the basis of their business." *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920, at *3 (E.D.Wis. July 3, 2012). But broke had to be processed before it was suitable as pulp for new paper. Mills recycling broke would break it down into fiber (useful) and an effluent (waste) containing the remaining components (e.g., ink). (Def.'s Mem., doc. # 265, at 13.) The recycling mills recovered fiber and made it into new paper for commercial sale. (*Id.*) They typically treated and discharged the effluent.

3

In most respects, the process of recycling CCP broke was identical to the process for recycling ordinary paper broke, and it was nothing new in the paper industry. (Ex. 3, doc. # 253-3, at 5.) One unique problem with recycling CCP broke, however, was that, during the recycling process, the dyes in the coating emulsion would oxidize or react with clays in the paper and become visible (a process known as "blueing"). (Ex. 64, doc. # 300-1, at 140.) This hampered recyclers' efforts to create usable, white paper fibers. (*Id.*) NCR allegedly spent considerable time and money researching a way to solve the blueing problem, so that recyclers would be willing to purchase CCP broke. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), doc. # 299, at 17.) Ultimately, GP claims, NCR developed and recommended to recyclers a de-inking process whereby the microcapsules in the CCP broke were chemically broken up and the dyes they contained were adsorbed onto clay suspended in water. (*Id.* at 17-19.) Once the PCB-laden dyes had attached to the clay molecules in the water, the recyclers discharged the effluent into nearby bodies of water. (*Id.* at 18.) Even when recyclers treated the effluent before discharging it, at least 20% of the PCBs remained. GP claims it was this disposal process--allegedly orchestrated by NCR--that led to PCB contamination at the Site. (*Id.* at 44.)

### C. The *Whiting* Case

This is not the first lawsuit in which GP has alleged that NCR is liable for arranging the disposal of PCBs. In *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920 (E.D.Wis. July 3, 2012), GP argued that NCR was liable, not just for arranging to have other entities dispose of the PCBs in its CCP, but also as the successor in interest to another alleged arranger, ACPC. After years of litigation and denial of summary judgment motions, Judge William Griesbach of the United States District Court for the Eastern District of Wisconsin conducted a

4

bench trial on claims by GP that NCR had arranged for the disposal of PCBs in Wisconsin's Fox River. The rulings in *Whiting* are key to NCR's Motion.

In *Whiting*, as in the case now before the Court, NCR moved for summary judgment on the issue of its liability as an arranger. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 776 F. Supp. 2d 857, 859 (E.D. Wis. 2011). NCR argued that it had outsourced the coating process to coaters and facilitated the sale of CCP broke to recyclers, not for the purpose of arranging for the disposal of NCR's hazardous PCBs, but to sell commercially useful products and lessen production costs. *Id.* at 863-64. Judge Griesbach denied NCR's Motion. *Id.* at 864. He reasoned that the question of whether NCR (or ACPC, its predecessor in interest) contrived to dispose of PCBs through the coating and sale of CCP and CCP broke was a highly fact-intensive question that could not be resolved at summary judgment. *Id.* As Judge Griesbach wrote,

> I am satisfied that [whether NCR is liable for arranging the disposal of hazardous materials] is a close question and, more importantly, a fact-intensive one. In short, it appears to be a "mixed motives" case, that is, a case where the putative arranger wanted to dispose of his waste materials and also make a few dollars for doing so. . . . [I]t is probable that [NCR and ACPC] would have arranger liability if [GP] can show their intent to dispose of broke (even valuable broke) combined with a particular knowledge that nontrivial amounts of broke waste product would inevitably end up in the river. But these are fact questions, and numerous cases have noted the fact-intensive nature of the arranger liability inquiry. Accordingly, [NCR and ACPC's] motion for summary judgment will be denied.

*Id.*

The matter went to trial where Judge Griesbach concluded that NCR and ACPC were not liable as arrangers. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920, at *12 (E.D.Wis. July 3, 2012). As to ACPC's liability for arranging disposal of PCBs in

the Fox River, Judge Griesbach explicitly made both fact-findings and conclusions of law. Judge

Griesbach summarized his factual conclusions regarding ACPC, finding that ACPC:

> (1) lacked serious knowledge that broke, a byproduct of its manufacturing product, could be hazardous; (2) invested money and labor in treating, sorting and selling its broke; (3) always sold the broke, rather than sometimes sending it to a landfill or otherwise disposing of it; (4) sold the broke through brokers in a well-established secondary market; and (5) treated the broke, for accounting and other purposes, as an asset that was integral to its business model. For these reasons, the broke had far more characteristics of a useful product than of a waste product, and ACPC was thus indifferent, at best, about what might happen to the broke waste products after the broke was recycled. Although ACPC obtained some benefit by removing the broke from its facility, that was outweighed by the financial benefit it obtained by consistently treating the broke as a valuable product with a known and predictable market.

*Id.* Based on his factual findings, including without limitation these summary findings, Judge

Griesbach reached the legal conclusion that ACPC was not a CERCLA arranger. *Id.*

Judge Griesbach also concluded that NCR was not liable as an arranger apart from ACPC.

In contrast to the explicit fact-findings he made regarding ACPC, Judge Griesbach made no explicit

factual findings regarding NCR. Instead, he included only three paragraphs in the "Conclusions of

Law on Arranger Liability" section of his opinion explaining why he concluded NCR was not liable

as an arranger. *Id.* at *12-13. The absence of any specific fact findings regarding NCR, itself,

complicates the potential application of any issue preclusion in this case. Similarly, Judge Griesbach

did not make any fact findings or conclusions of law regarding any coaters or NCR converters, other

than ACPC.

There is not yet final judgment on the record in the *Whiting* litigation. The parties have

indicated they expect final judgment "soon," but it has not yet issued.

**D.      GP's Claims Against NCR in This Case**

In the instant litigation, GP alleges that NCR is liable for arranging the disposal of PCBs at the Site. (First Am. Compl., doc. # 80, at ¶¶ 146-59.) GP asserts that NCR is liable as an arranger, both as a formulator and as a converter.

First, GP alleges that NCR is liable for contamination at the Site because NCR intentionally outsourced the coating process so that the coaters in this case (ACPC, CPM, and Mead) would be forced to dispose of the PCBs for NCR. (Pl.'s Resp., doc. # 299, at 23-24). Under this theory, which the parties have labeled "formulator liability," NCR is liable as an arranger, not just because it developed the hazardous materials that ultimately contaminated the Site, but because it formulated the means and method by which paper recyclers ultimately disposed of the PCBs in the CCP broke. A variation of this theory of liability--commonly known as *Aceto* liability--is that NCR so totally controlled the coating process--right down to facilitating the sale of CCP broke and prescribing means for recycling the broke--that it was effectively responsible for the movement of the broke at all stages of the process, all the way through the sale of PCB-laden broke to recyclers in the Kalamazoo River Valley. (*Id.* at 24.)

GP's second theory of NCR liability in this case is based on the activities of various parties that helped produce final-form CCP. According to GP, NCR is liable as the successor in interest to ACPC and CPM, both of which NCR acquired after the production period and both of which allegedly arranged for disposal of PCBs at the Site through their coating activities. (*Id.* at 24-25.) In addition, GP alleges that NCR is liable as the owner and operator of the converters in Viroqua, Dayton, and Washington Court House, all of which, according to GP, arranged with recycling plants along the Kalamazoo River to dispose of CCP broke. (*Id.* at 26-33.) Under this theory, GP argues

7

that the NCR converters knew of the toxic nature of the CCP broke and deliberately transferred it to the recyclers so that the recyclers would ultimately be responsible for disposing of the PCBs in the broke. (*Id.*)

### E.    NCR's Motion for Summary Judgment in This Case

NCR moves for summary judgment on GP's formulator theory on the ground that GP is collaterally estopped, by virtue of Judge Griesbach's *Whiting* opinion, from arguing that NCR arranged to dispose of a hazardous substance. (Def.'s Mem., doc. # 265, at 18-30.) According to NCR, *Whiting* established that NCR and ACPC lacked the requisite intent to dispose of the PCBs when outsourcing responsibility for coating or selling CCP broke. Thus, NCR argues, it cannot be liable, either for formulating a plan to dispose of the PCBs, or as a successor in interest to ACPC (since ACPC also lacked intent to dispose). NCR further argues that, because NCR's business relationships with CPM and Mead were effectively the same as its relationships with ACPC, Judge Griesbach's conclusions about NCR and ACPC in *Whiting* should apply with equal force to CPM and Mead. Therefore, NCR argues, *Whiting* bars relitigation of NCR's liability concerning all the coaters, not just ACPC.

With regard to the converters in this case, NCR raises two arguments in support of summary judgment. First, it claims that Judge Griesbach's *Whiting* opinion bars GP from arguing that CCP broke from the converters was a "hazardous substance." (*Id.* at 22.) At the core of this argument is the assumption that Judge Griesbach determined that all CCP broke--not just some of it, some of the time--was a useful product, rather than a hazardous substance. (*Id.*) On that assumption, NCR argues that the converters were not deliberately disposing of a hazardous substance when they sold broke to the recyclers, but were actually engaging in a reasonable commercial transaction involving a

useful product of the sort that is not proscribed by CERCLA. (*Id.* at 22-26.) Second, NCR claims that, even if CCP broke is deemed a hazardous substance, GP cannot establish that any CCP broke from the NCR converters (in Viroqua, Dayton, or Washington Court House) actually made its way to the Site. (*Id.* at 30-34.) Accordingly, NCR argues, it is also entitled to summary judgment that the converters were not liable as arrangers.

## II.     LEGAL FRAMEWORK

### A.     Summary Judgment Standard

Summary judgment is proper only when the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of a nonmoving party. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The moving party has the burden of showing the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party must come forward with evidence by which a reasonable fact-finder could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The non-moving party may rely upon circumstantial evidence, as well as direct evidence, to defeat a motion for summary judgment. *Doe v. Claiborne County Bd. Of Educ.*, 103 F.3d 495, 505 (6th Cir. 1996).

### B.     Arranger Liability Under CERCLA

CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). To that end, CERCLA identifies four categories of potentially responsible parties ("PRPs") subject to strict liability: (1) the current owner or operator of a waste facility; (2) any previous owner or operator during any time

9

when hazardous substances were disposed of at the waste facility; (3) any person who arranged for disposal or treatment of hazardous substances at the waste facility; and (4) any person who transported hazardous substances to a waste facility. 42 U.S.C. § 9607(a)(1)-(4). PRPs are liable for the costs of cleanup incurred by private parties, state governments, or the federal government. *See id.* at §§ 9607(a)(4)(A)-(B); § 9613(f).

> An entity is liable as an arranger if:
>
> [B]y contract, agreement, or otherwise [it] arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). The mere sale of a product--even one that ultimately proves hazardous--does not constitute "arranging for disposal" under CERCLA. *AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir. 1993). In other words, "no arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a useful, albeit dangerous product to serve a particular intended purpose." *Id.* A party is liable as an arranger only if it has "taken an affirmative act to dispose of a hazardous substance . . . as opposed to convey[ing] a useful substance for a useful purpose." *Id.* Absent a contract or agreement, a court must look to the totality of the circumstances, including any "affirmative acts to dispose," in order to determine liability. *United States v. Cello-Foil Prod., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996).

> Liability under § 9607(a)(3) exists on a spectrum, since the term "arrange" is subject to many interpretations.

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that

10

an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes-- cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the sale of a hazardous substance are less than clear. In such cases, courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a "disposal" or "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions.

*Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 609-10 (2009); *see also Pneumo Abex Corp. v. High Point, Thomasville & Denton R. Co.*, 142 F.3d 769, 775 (4th Cir. 1998) ("[T]here is no bright line between a sale and a disposal under CERCLA. A party's responsibility . . . must necessarily turn on a fact-specific inquiry into the nature of the transaction.").

"[A]n entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington N. & Santa Fe Ry.*, 556 U.S. at 611. Specific intent to dispose of a hazardous substance is an element of arranger liability because, "in common parlance, the word 'arrange' implies action directed to a specific purpose." *Id.*; *see also Cello-Foil Prods.*, 100 F.3d at 1231 ("[I]t would be error for us not to recognize the indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal . . . of hazardous substances.'"). Thus,

While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product.

*Id.* at 612.

Moreover, simply divesting itself of a hazardous substance--however intentionally--does not make a party liable as an arranger, because arranger liability requires that the party have "the intention that at least a portion of the product be disposed of . . . by one or more of the methods described in § 6903(3)." *Id.* at 612. 42 U.S.C. § 6903(3) defines "disposal" as:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

Ultimately, then, the question of arranger liability turns largely on whether there is evidence to support a reasonable conclusion that the alleged arranger "planned for the disposal" of a hazardous substance, a highly fact-intensive question. *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 612.

Like other PRPs, arrangers are strictly liable under CERCLA. *Id.* at 610. Thus, common law rules of causation, such as proximate cause, do not apply in the CERCLA context. *See, e.g.*, *AlliedSignal, Inc. v. Amcast Intern. Corp.*, 177 F. Supp. 2d 713, 749 (S.D. Ohio 2001) (citing *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177 (9th Cir. 2000), and *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886 (10th Cir. 2000)). Assuming the requisite intent to dispose is established, the plaintiff in an arranger liability action need only show that the alleged arranger's waste actually reached the site in question. This "causal nexus" requirement is satisfied if the plaintiff shows that the waste for which the defendant arranged disposal was deposited at the site. *See, e.g.*, *United States v. Distler*, 803 F. Supp. 46, 51 (W.D. Ky. 1992).

### C.     Collateral Estoppel/Issue Preclusion

When a question of ultimate fact--such as a party's intent to dispose of hazardous materials-- was actually litigated and decided in a valid and final judgment, that question cannot again be

litigated between the same parties in any future lawsuit. *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). This principle is commonly known as "collateral estoppel" or "issue preclusion." The Sixth Circuit employs a four-part test for deciding whether and when collateral estoppel bars relitigation of an issue:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Aircraft Braking Sys. Corp. v. Local 856, UAW*, 97 F.3d 155, 161 (6th Cir. 1996). "The 'identity of the issues' element requires that the key issue in both cases is the same." *Georgia Pacific Consumer Products LP v. Four-U-Packaging*, 701 F.3d 1093, 1098 (6th Cir. 2012). The requirement that there be a final judgment means, as a practical matter, that there must be a decision by a court that is sufficiently final as to be deserving of preclusive effect. *Am. Postal Workers Union Columbus Area Local AFL-CIO v. U.S. Postal Serv.*, 736 F.2d 317, 319 (6th Cir. 1984); *see also Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (Friendly, J.) ("'Finality' . . . may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.") Whether final judgment has actually entered is obviously a factor in this determination, but not necessarily controlling. *See Am. Postal Workers Union*, 736 F.2d at 319. The pendency of an appeal does not destroy the claim-preclusive effect of a district court's decision otherwise entitled to preclusive effect. *Smith v. S.E.C.*, 129 F.3d 356, 362 (6th Cir. 1997); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).

### III.    ANALYSIS

NCR's Motion for Summary Judgment can be separated into two sets of arguments: (1) those involving the preclusive effect of the *Whiting* decision; and (2) those concerning GP's ability to prove that CCP broke from the converters contributed to contamination of the Site. Neither set of arguments merits summary judgment.

#### A.        Preclusive Effect of the *Whiting* Decision

*Whiting* addressed only NCR's and ACPC's liability as arrangers. More importantly, *Whiting* makes explicit fact findings only with respect to ACPC. Nevertheless, NCR argues that Judge Griesbach's decision in that case conclusively establishes that NCR cannot be liable here because *Whiting* necessarily means NCR did not intend to dispose of PCBs, either when it outsourced coating of CCP to ACPC, CPM, and Mead, or when its converters in Viroqua, Dayton, and Washington Court House sold CCP broke to recyclers. According to NCR, the "determination [in *Whiting*] that the sales of CCP broke by ACPC and CPM constitute sales of a useful product also applies to the identical sales of identical CCP broke by Mead and the NCR converters," because GP's expert has conceded that "the process of disposal of broke and where it went whether it was from Mead or ACPC was pretty much the same." (Def.'s Mem., doc. # 265, at 7-8.) NCR, in other words, reads Judge Griesbach's *Whiting* decision as collaterally estopping all of GP's claims against NCR, including those that were not actually in litigation in *Whiting*.

The Court does not believe Judge Griesbach's decision is entitled to such broad preclusive effect. Contrary to NCR's assertions, for example, the *Whiting* decision did not expressly address CPM's liability as an arranger, much less make specific fact findings regarding CPM. The opinion speaks only to the liability of NCR and ACPC, and includes explicit fact findings only regarding

ACPC. Indeed, the bulk of the opinion's arranger liability analysis does not even apply to NCR. Rather, it focuses almost exclusively on whether ACPC had the requisite intent to dispose. There is nothing in Judge Griesbach's opinion that expressly applies to CPM. And there are no explicit fact findings regarding CPM, NCR, or any party other than ACPC. Without explicit fact findings, it is virtually impossible to apply claim preclusion because the doctrine applies only to specific issues of fact necessarily and finally adjudicated.[1] *See Aircraft Braking Sys. Corp. v. Local 856, UAW*, 97 F.3d 155, 161 (6th Cir. 1996).

NCR argues, however, that even if *Whiting* did not expressly address NCR's liability regarding the activity of CPM, Mead, or the NCR converters, the allegations and facts at issue in that case were effectively the same as those now before the Court, so that the holding in *Whiting* should extend to NCR's relationships with CPM, Mead, and the NCR converters, as well. (Def.'s Mem., doc. # 265, at 24-25.) It is well-established that, "[w]here a litigant brings repeated actions based upon the same operative facts, issue preclusion may still properly apply despite a change in legal theory or the 'cast of characters-defendants.'" *Georgia-Pacific Consumer Products LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012). The question in such actions is not whether the parties or players are the same, but whether "the key issue in both cases is the same." *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 908-09 (6th Cir. 2001).

---

[1] Equally important for purposes of addressing NCR's argument, issue preclusion pertains only to specific findings of fact, *not* to legal conclusions or labels. A finding of fact may have issue-preclusive effect. A legal conclusion, however, is not a finding of fact and, thus, is not entitled to issue-preclusive effect. With respect to NCR, for example, Judge Griesbach's opinion in *Whiting* included only "Conclusions of Law on Arranger Liability." *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920, at *7 (E.D. Wis. July 3, 2012). Such conclusions are not entitled to preclusive effect.

That statement of general legal principle is true enough, but it does not carry the day for NCR. As Judge Griesbach repeatedly explained in his *Whiting* order, the key issue in that case was whether NCR or ACPC engaged in business relationships for the purpose of disposing of PCBs. There is no necessary relationship between that issue and the majority of the issues in this case, namely whether NCR possessed the requisite intent to dispose of hazardous materials through its relationships with the other coaters and NCR converters. NCR argues that the parallels between its relationships with ACPC and its relationships with the other coaters and NCR converters are enough to justify the assumption that its intent (or lack thereof) with respect to ACPC was also its intent with respect to the other coaters and NCR converters. It does not, however, explain why this is necessarily so. Just because NCR may not have outsourced coating work to ACPC with the intent that ACPC then dispose of the hazardous materials in the coating emulsion, it does not necessarily follow that NCR had similar intentions with respect to its agreements with CPM, Mead, or the NCR converters. *See, e.g.*, *Bernstein v. Bankert*, --- F.3d ----, 2012 WL 6601218, at *25 (7th Cir. Dec. 19, 2012) (declining to apply issue preclusion in a CERCLA case where the issue in the matter before the court was similar, but not identical, to the issue resolved in a previous decision). The one finding does not necessitate the other. Indeed, as Judge Griesbach observed in *Whiting*, the inquiry is extremely fact-intensive and, thus, any findings are not likely to be generalizable. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 776 F. Supp. 2d 857, 864 (E.D. Wis. 2011). As such, issue preclusion does not apply here.

NCR also argues that the order in *Whiting* requires the Court to treat the sale of CCP broke as the sale of a useful product. The "useful product" classification is important because the sale of a useful product cannot, by definition, be an arrangement for the disposal of a hazardous substance.

16

*See AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir. 1993) ("[N]o arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a useful, albeit dangerous product, to serve a particular intended purpose."). But principles of issue preclusion do not require the Court in this case to treat all sales of CCP broke as the sale of a useful product. This is because Judge Griesbach did not conclude that the sale of CCP broke was always tantamount to the sale of a useful product and *never* constituted a disposal of waste; he merely found that the sale of broke by ACPC to recyclers in the Fox River area more closely resembled the sale of a useful product than the disposal of a hazardous material. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920, at *12 (E.D.Wis. July 3, 2012) ("[T]he broke [i.e., the broke here at issue] had far more characteristics of a useful product than of a waste product . . . ."). In reaching that decision, he was heavily influenced by specific fact findings regarding ACPC's intent to dispose of its broke in *Appelton. Id.* Those same fact findings are not generalizable to the other coaters, or to the NCR converters. In short, Judge Griesbach's opinion does not require this Court to find that all sales of CCP broke constitute sales of a useful product. That determination depends on facts that the parties currently dispute, meaning it is not an appropriate basis for summary judgment.

Judge Griesbach's explicit findings of fact regarding ACPC may well be entitled to preclusive effect at trial of this action, at least if the decision goes to final judgment by that time.[2]

_____

[2] As noted above, courts apply a functional approach in deciding the issue of finality, rather than relying on formal, bright line rules. Applying that functional approach, the Court is not satisfied that *Whiting* is sufficiently "final" at this point. It has been months since Judge Griesbach's order deciding liability in that case, but final judgment has still not entered. Furthermore, even once final judgment enters in that case, further litigation on appeal is inevitable. Although appeal does not automatically strip the preclusive effect from an otherwise preclusive judgment, it does militate against a finding of finality under the practical, functional calculus used in cases like this. In

But these facts alone--even if they earn preclusive effect--are not automatically enough for NCR to prevail as a matter of law on all liability issues in this case. The *Whiting* opinion makes no express findings regarding NCR's relationships with Mead, CPM, or the NCR converters. Nor does it make explicit fact findings regarding NCR itself. Whatever preclusive effect certain findings from the *Whiting* decision might have in this case, it is not so great as to eliminate the introduction of arguments and evidence that might cause a reasonable fact-finder to decide the case in favor of GP. Accordingly, it cannot be the basis for summary judgment.

### B.    Dayton, Washington Court House, and Viroqua as Converters

NCR separately argues that GP cannot show that any CCP broke from the NCR converters actually reached the Site. (Def.'s Mem., doc. # 265, at 30-34.) The basis for this argument is NCR's claim that GP lacks direct evidence that CCP from the NCR converters reached any Kalamazoo paper recycling mill.

In *Franklin County Convention Facilities Authority v. American Premier Underwriters, Inc.*, 240 F.3d 534 (6th Cir. 2001), the Sixth Circuit rejected an argument very similar to the one NCR makes here. The *Franklin County* Court held that "there is nothing objectionable in basis findings solely on circumstantial evidence, especially where the passage of time has made direct evidence

---

particular, the near certainty of ongoing litigation in both *Whiting* and this case creates practical finality problems. If the Court gave *Whiting* the broad preclusive effect NCR requests and the *Whiting* findings were subsequently undone on appeal in that case, the Court would well have to unwind its liability findings and, potentially, allocation findings in this case. After all, if a party is found liable and later allocated a share of responsibility in this case, that share of responsibility would likely change if the claims against NCR were later reinstated. Problems like that could have been averted had this matter stayed in Wisconsin, where it began. It was NCR itself, however, that filed the motion resulting in transfer of the Kalamazoo River claims to this Court. The potential practical problems thus created make it premature to assign finality to the *Whiting* order, and the NCR-initiated transfer mitigates any perceived unfairness in moving the cases forward on parallel tracks without broad preclusive effect from the as-yet non-final decision in *Whiting*.

difficult or impossible to obtain." *Id.* at 547; *see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 1010) (quoting *Franklin County*); *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000) ("CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence.") In this case, GP has presented considerable circumstantial evidence, and has even produced some direct evidence in support of its claims. For example, Gene Edgerton's deposition testimony that he backhauled CCP broke to GP's Kalamazoo Mill from NCR's Washington Court House facility is direct evidence that CCP broke from that facility reached the Site. It may or may not ultimately be accepted by the fact-finder, but a reasonable fact-finder could choose to accept it.

Of course, the bulk of GP's case consists of circumstantial evidence. But there is nothing inherently wrong with that, especially as it has been roughly half a century since the alleged disposals occurred. *See Franklin County Facilities Auth.*, 240 F.3d at 547. After so many years, it is hardly surprising that GP would have difficulty obtaining overlapping eyewitness accounts or individual documents to serve as the smoking gun in its case against NCR. That is precisely why the Sixth Circuit, in *Franklin County*, allowed a party to make its case for arranger liability by means of circumstantial evidence.

In this instance, GP has produced enough circumstantial evidence so that a reasonable fact-finder could decide in its favor. For instance, George Hunter has stated that, as of June 1971--just a month or two after the production period ended, and thus a time period in which office waste, customer returns, and even printing waste may well have contained PCB-coated CCP wastepaper--GP trucks were backhauling wastepaper to the Kalamazoo River Valley from NCR's Dayton facility. (Ex. 112, doc. # 300-5, at 47-48.) Hunter does not say for certain that there was CCP broke in the

19

Case 1:11-cv-00483-RJJ  Doc #346 Filed 01/24/13  Page 20 of 20  Page ID#7964

truckloads of paper at that time, but his testimony could support an inference along those lines. Similarly, Leo Golper has testified that he purchased NCR broke for NCR's Viroqua converting operation during the production period, and that he also shipped wastepaper to Michigan during that time. (Ex. 118, doc. # 300-5, at 68.) Again, while Golper's testimony does not directly confirm that CCP broke traveled from the Viroqua facility to the Site, it makes that possibility more likely. Moreover, NCR's own experts, in addition to GP's experts, have acknowledged that facilities like the NCR converter facilities were likely sources of broke for Kalamazoo River recycling mills. (*See, e.g.*, Ex. 106, doc. # 300-5, at 13-14.) None of this evidence incontrovertibly establishes that CCP broke from the NCR converters actually reached the Kalamazoo River recycling facilities. Collectively however, it could convince a reasonable fact-finder that broke from the NCR converters contributed to pollution at the Site. Summary judgment is, therefore, unwarranted, despite the relative lack of direct evidence presented by GP.

**THEREFORE, IT IS ORDERED** that NCR's Motion for Summary Judgment (doc. # 247) is **DENIED**.


Dated:   January 24, 2013              /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       UNITED STATES DISTRICT JUDGE

20