**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, ) | |
| FORT JAMES CORPORATION, and ) | |
| GEORGIA-PACIFIC LLC, ) | |
|   ) | |
|            Plaintiffs, ) | |
|   ) | No. 1:11-CV-00483 |
|   v.  ) | |
|   ) | Judge Robert J. Jonker |
| NCR CORPORATION, ) | |
| INTERNATIONAL PAPER CO., and ) | |
| WEYERHAEUSER CO., ) | |
|   ) | |
|            Defendants. ) | |

___

**DEFENDANT NCR CORPORATION'S CORRECTED MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM PRESENTING TESTIMONY FROM JOHN GOUGH AND DONALD D. LACEY**

___

Defendant NCR Corporation ("NCR") respectfully submits this memorandum in support of its motion *in limine* to preclude Plaintiffs ("GP") from presenting testimony at trial from its improperly paid fact witnesses, John Gough and Donald D. Lacey.

## PRELIMINARY STATEMENT

When compensating fact witnesses, the common law and ethical rules regulating the legal profession require that such compensation be reasonable and severely circumscribed. In its attempt to develop evidence against NCR, GP has retained fact witnesses with relevant knowledge as "litigation consultants" who not only met with GP's lawyers and reviewed documents relevant to their own knowledge, but who have undertaken far more expansive tasks that could have been handled by individuals who will not be called by GP to testify against NCR in this case. In doing so, GP has also compensated these witnesses excessively, paying them up to $70,000 each.

Two such witnesses / litigation consultants—John Gough and Donald D. Lacey—are the subject of this motion. For these witnesses, GP failed to conduct any analysis of what would constitute reasonable compensation for each witness (as required by the relevant ethical rules) and paid each witness clearly excessive amounts. While the amount of compensation alone raises the specter of GP having improperly aroused these witnesses' sympathies, the evidence here establishes that Mr. Gough and Mr. Lacey have been *demonstrably* influenced by GP's payments. For example, as further described below, GP helped persuade a reluctant Mr. Lacey to execute an affidavit drafted by GP by volunteering to triple the prior consulting rate the parties had agreed to, even though Mr. Lacey, at the time, was "happy" with the prior rate and felt it was "adequate". In Mr. Gough's case, the compensation caused him, despite having no prior affiliation with GP, to "root" for GP in this litigation and to refuse to cooperate with other

parties to avoid a "conflict of interest". Accordingly, NCR respectfully requests that this Court preclude GP from presenting testimony from Mr. Gough and Mr. Lacey at trial.

## BACKGROUND

GP has enlisted three fact witnesses as "litigation consultants" for purposes of developing evidence against NCR: John Gough, Donald Lacey and Leon Martin.[1] NCR seeks the exclusion of testimony from two of these witnesses, Mr. Lacey and Mr. Gough. Although the sum paid by GP to fact-witness Mr. Martin is excessive,[2] GP's payments to Mr. Lacey and Mr. Gough are not only excessive, but also have demonstrably tainted their testimony in such a way that exclusion is the appropriate remedy.

The first witness, Mr. Lacey, worked for GP in various positions, including mill foreman, between 1953 and 1995. (McAtee Decl., Ex. 3 (Lacey Dep. 26:18-24).) Mr. Lacey has been identified by GP as a fact witness for trial, but is also "a paid consultant for GP". (*Id*. at 27:2-3.) He has freely admitted to being paid by GP to "help GP build evidence against NCR in this litigation". (*Id*. at 31:16-18.) Such "consulting" work includes "contact[ing] potential witnesses to help GP in this matter". (*Id*. at 31:16-21). For example, GP paid Mr. Lacey for the

---

[1] At least a fourth fact witness, David Hatton, was compensated by GP for his time. But in Mr. Hatton's case, GP paid him for a more common set of tasks: reviewing documents relevant to Mr. Hatton's personal knowledge and meeting with GP's attorneys to discuss that knowledge. (McAtee Decl., Ex. 1 (Hatton Dep. 65:4-25).)

[2] GP paid Mr. Martin approximately $60,000 by September 6, 2011, the date of his deposition, for consulting work (McAtee Decl., Ex. 2 (Martin Dep. at 73:12-17; 75:15-20)), which included "talk[ing] to dozens of potential fact witnesses" (*id*. at 79:9-14), asking "whether they had any leads or recollections that might be helpful to Georgia-Pacific in connection with this case" (*id*. at 79:22-25), taking "multiple witness, all paid for by Georgia Pacific" to dinner (*id*. at 80:18-20), and buying witnesses wine—including a case of wine to get one witness to "start talking" (*id*. at 80:21-81:2).

time he spent going out to dinner with potential witnesses in an effort to convince witnesses to cooperate with GP. (*Id*. at 33:2-16.)

GP intends to call Mr. Lacey to testify about the types of furnish used by GP's Kalamazoo mill. Mr. Lacey was recruited by Mr. Martin. (McAtee Decl., Ex. 2 (Martin Dep. 81:14-16).) According to Mr. Martin, Mr. Lacey informed Mr. Martin during an initial meeting that he had boxes of documents related to his work at GP. (*See* McAtee Decl., Ex. 4 (Lacey Dep. Ex. 20).) When Mr. Martin requested that Mr. Lacey look through the boxes for information that could help GP's case, Mr. Lacey repeatedly said that he did not have time, maintaining this position "for a couple of months", despite Mr. Martin's repeated requests. (*Id*.) In an email to GP's legal department, Mr. Martin relayed that he "could see from what [Lacey] was saying that he wanted something for doing that". (*Id*.) Later at his deposition, Mr. Martin confirmed that "the only way [he] could get [Lacey] to go through" the paperwork Mr. Lacey had "to find what [GP] needed" was to pay Mr. Lacey $50 an hour. (McAtee Decl., Ex. 2 (Martin Dep. 81:19-82:5).) Once Mr. Martin offered Mr. Lacey $50 per hour, Mr. Lacey promptly looked through the ten boxes of documents in his possession. (*See* McAtee Decl., Ex. 4 (Lacey Dep. Ex. 20).)

As this episode demonstrated to GP, $50 an hour was quite sufficient to compensate Mr. Lacey for his time. And when Mr. Lacey started "consulting" for GP directly, that is exactly the rate to which GP and Mr. Lacey agreed. As Mr. Lacey would later testify, $50 an hour was "adequate" to compensate him for his time and he was "happy" with that rate. (McAtee Decl., Ex. 3 (Lacey Dep. 34:24-35:6).)

At the end of January 2011, GP's attorneys sent Mr. Lacey an affidavit that they had drafted for him to sign. (McAtee Decl., Exs. 3 (Lacey Dep. 35:20-36:12) & 5 (Lacey Dep. Ex. 22).) But even after it was revised and finalized shortly thereafter, Mr. Lacey declined to

3

sign the affidavit. (McAtee Decl., Ex. 3 (Lacey Dep. 38:3-5).) After several months of trying to coax Mr. Lacey to sign the affidavit, GP "volunteered" to increase Mr. Lacey's consulting rate to $150 per hour in May 2011, thus tripling Mr. Lacey's already-adequate rate. (McAtee Decl., Exs. 3 (Lacey Dep. 40:25-41:2) & 6 (Lacey Dep. Ex. 23 at KZWIT00026).) This incident—GP's counsel tripling Mr. Lacey's hourly rate—coincides approximately with the date that Mr. Lacey finally agreed to sign the affidavit GP's counsel had drafted for him months prior. (McAtee Decl., Ex. 3 (Lacey Dep. 40:15-20).) In total, prior to his deposition, GP paid Mr. Lacey more than $17,500. (*Id*. at 40:2-41:8)

The second witness, John Gough, is a retired researcher who worked at Wiggins Teape, a paper company that manufactured carbonless copy paper for sale in the United Kingdom, from 1958 through 1987. (McAtee Decl., Ex. 7 (Gough Dep. 8:14-9:2).) GP intends to offer Mr. Gough's testimony on various experiments that Wiggins Teape ran to increase the sales price of the paper scrap (or "broke") it produced from the manufacture of carbonless copy paper.[3] Prior to being retained as a litigation consultant, Mr. Gough had no prior employment relationship (or any kind of relationship) with GP. (*Id*. at 70:11-13; 145:8-146:14.) From 2009 to the date of his deposition (October 20, 2011), GP paid Mr. Gough approximately $70,000. (*Id*. at 144:13-145:7.)

Mr. Gough's $70,000 in cash compensation accumulated at a rate of £1,500 per day. (*Id*. at 148:25-149:10.) Mr. Gough was retired at the time GP offered to pay him £1,500 per day. (*Id*. at 152:3-15.) Prior to his retirement in 2003, Mr. Gough was working as a "pulp paper expert" and was compensated at "£600 or £700 per day"—less than half of the rate of pay

---

[3] While GP seeks to introduce at trial testimony from Mr. Gough's deposition taken during the *Whiting* litigation, as Mr. Gough testified, his testimony was perpetuated specifically for this litigation. (McAtee Decl., Ex. 7 (Gough Dep. 127:22-128:24; 141:8-21).)

offered by GP. (*Id*. at 147:22-148:9.) GP offered this rate unilaterally; Mr. Gough freely admits that he did not need to negotiate and had "no idea [of] the going rate" for litigation consulting work. (*Id*. at 147:14-20.) Apparently, GP did not investigate whether this rate was reasonable to properly compensate Mr. Gough for his time, as GP never even asked Mr. Gough the amount that he was paid in his last consulting position. (*Id*. at 149:7-19.)

Mr. Gough, having never previously worked for GP, has no reason, independent of the funds paid to him, to be loyal or sympathetic to GP. Even so, Mr. Gough admitted that at the time of his deposition—after having been paid $70,000—that he has "hope in [his] heart that Georgia-Pacific wins this litigation". (*Id*. at 157:16-19.) Mr. Gough further testified that he is "rooting" for GP and celebrates when he convinces other witnesses to join GP's effort against NCR. (*Id*. at 155:23-156:20.) Despite numerous meetings with GP's counsel, Mr. Gough refused to meet with counsel for NCR or Appleton Papers for even ten minutes, stating that having been "retained" and "paid" by GP, it would be "a conflict of interest". (*Id*. at 158:4-25.)

## ARGUMENT

This Court has the inherent authority to sanction GP for its conduct in this litigation. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1992). The practice of paying fact witnesses for their testimony in the manner that GP has done here is prohibited by applicable rules of professional conduct and common law. GP has paid fact witnesses inappropriate sums, far more than was needed to compensate the witnesses for the time needed to elicit the factual knowledge they each held. While it was arguably permissible for GP to pay these witnesses reasonable sums for time devoted to meetings and reviewing documents relevant to the witnesses' personal knowledge, paying additional tens of thousands of dollars prior to their testimony under litigation consulting agreements was improper and has raised at least the

5

impression of tainted testimony, as these witnesses now view themselves as advocates for GP, advocates who would suffer a "conflict of interest" by providing equal cooperation to NCR.

Rule 3.4 of the American Bar Association's Model Rules of Professional Conduct provides that a lawyer shall not "offer an inducement to a witness that is prohibited by law".[4] Model Rules of Prof'l Conduct R. 3.4(b) (2012). The warning from the State Bar of Michigan is equally clear: "Compensating a witness for the purpose of influencing testimony or making the witness 'sympathetic' is clearly prohibited." Mich. Comm. on Prof'l & Judicial Ethics, Op. No. RI-117, at *2 (1992). Payment can be made to a fact witness "solely for the purpose of compensating the witness for the time the witness has lost in order to give testimony", however, "the amount of such compensation must be reasonable, so as to avoid affecting, *even unintentionally*, the content of a witness's testimony." ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 96-402 (1996) (emphasis added).

The onus is on the lawyer to determine what constitutes a "reasonable amount", and where the fact witness is retired or unemployed, "the lawyer must determine the reasonable value of the witness's time based on all relevant circumstances". *Id.* The Court of Appeals for the Seventh Circuit has cautioned that reimbursements to fact witnesses must be "severely circumscribed" to the "reasonable cost of travel and sustenance incurred and the reasonable value of time lost in attendance". *Hamilton v. Gen. Motors Corp.*, 490 F.2d 223, 229 (7th Cir. 1973) (finding that agreements to compensate fact witnesses lack consideration and are unenforceable as against public policy); *see also* 18 U.S.C. §§ 201(c)(2),(d) (2012).

---

[4] Rule 3.4(b) of the Michigan Rules of Professional Conduct (M.R.P.C.) mirrors this language.

### A. GP's Compensation of Mr. Gough and Mr. Lacey Was Not "Severely Circumscribed".

The absolute amounts that GP has paid Mr. Gough and Mr. Lacey are too high. The compensation agreements and litigation assignments GP has executed with these fact witnesses are in no sense "severely circumscribed". *Hamilton*, 490 F.2d at 229. Nor can GP claim entitlement to the "reasonableness" safe harbor of the ethical rules; GP has never disclosed any assessment it performed of the reasonableness of amounts it paid fact witnesses for their time in this case. Nor could it, as GP apparently failed to conduct such an analysis, which is clearly required by the ethical rules. (*See* Mich. Comm. on Prof'l & Judicial Ethics, Op. No. RI-117, at *2 (1992); ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 96-402 (1996).) For example, Mr. Gough testified as follows about the process that led to GP agreeing to pay him £1,500 a day for his services:

> " Q. Did you – did anybody talk about how Georgia-Pacific's agent got to a rate of £1,500 per day?
>
> " A. No.
>
> " Q. Was there any type of push back from Georgia-Pacific?
>
> " A. No.
>
> " Q. Did Georgia-Pacific ask you what you were paid as a consultant in the paper industry?
>
> " A. No.
>
> " Q. No discussion of that at all?
>
> " A. No.
>
> " Q. Now, was there any discussion with Georgia-Pacific about what rate of income you would otherwise be earning
>
> " A. No.
>
> " Q. if you were [not] consulting with Georgia Pacific?

7

"A. No."

(McAtee Decl., Ex. 7 (Gough Dep. 149:7-150:2).) Any analysis of the sums paid by GP to its fact witnesses prior to their depositions in this case—approximately $70,000 to Mr. Gough, $60,000 to Mr. Martin and $17,500 to Mr. Lacey—would have revealed their unreasonable nature.

Furthermore, the deposition testimony from Mr. Lacey and Mr. Gough demonstrates that these witnesses have been improperly influenced by GP's payments. For example, with Mr. Lacey, once GP "volunteered" to triple his consulting rate, he finally signed an affidavit drafted by GP's lawyers that he had refused to sign for months. *See Rentclub, Inc. v. Transam. Rental Fin. Corp.*, 811 F. Supp. 651, 655 (M.D. Fla. 1992), *aff'd*, 43 F.3d 1439 (11th Cir. 1995) (affirming a finding of reasonable probability of impropriety because the witness executed affidavit only five days after being retained as trial consultant). The $150 per hour fee paid to Mr. Lacey is, quite plainly, "beyond the reasonable value of time lost", when compared to the original rate of $50 per hour accepted by GP and Mr. Lacey—a rate that he himself thought was "adequate" and that had motivated him to meet with GP and review boxes of documents. *See United States v. Cinergy Corp.*, No. 1:99-cv-1693, 2008 WL 7679914, at *12 (S.D. Ind. Dec. 18, 2008) (holding that raising rate paid to fact witness from $88 to $200 per hour for the same consulting services is "beyond the reasonable value of time lost" for a person who purports to be "retired") (internal quotations omitted).

As to Mr. Gough, GP has paid him double the amount he was paid during his prior consulting position. After $70,000, Mr. Gough was "rooting" for GP and even admitted that, as he testified, he desired that GP would win this litigation. (McAtee Decl., Ex. 7 (Gough Dep. 156:17-20; 157:16-19).) Further, despite having never worked for GP during his career,

8

Mr. Gough refused to meet with counsel for another party besides GP to avoid, in his own words, "a conflict of interest". (*Id*. at 158:16-25.)

### B. In Light of GP's Unreasonable Compensation, the Testimony of Mr. Gough and Mr. Lacey Should Be Precluded.

Courts have remedied a party's improper conduct by precluding the testimony of the paid fact witness from trial. *See*, *e.g.*, *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1525-26 (S.D. Fla. 1994), *aff'd in relevant part*, 117 F.3d 1328, 1335 n.2 (11th Cir. 1997) (affirming district court's exclusion of paid fact witness's testimony as a sanction for party's violation of Florida's rule against unreasonable compensation); *Rocheux Int'l. of New Jersey v. U.S. Merchants Fin. Grp., Inc.*, No. 06-6147, 2009 WL 3246837, at *4 (D.N.J. Oct. 5, 2009) (excluding paid fact witness from trial was "necessary to protect the integrity of these proceedings"). Recently, a federal court in Michigan precluded a party from presenting the testimony of a paid fact witness for conduct similar to GP's actions here. *See Nissan N. Am., Inc. v. Johnson Elec. N. Am., Inc.*, No. 09-11783, 2011 WL 1812505 (E.D. Mich. May 12, 2011). In *Nissan*, the Defendant's law firm entered into a litigation consulting agreement to pay a former employee $350 per hour to refrain from assisting the Plaintiff and to obligate him not to discuss the case with anyone outside Defendant's law firm. *Id*. at *2. After plaintiff learned of this consulting arrangement, it objected on various grounds, including M.R.P.C. Rule 3.4(b). *Id*. at *3. Defendant responded by reducing the hourly rate it paid the former employee from $350 to $150 per hour and allowing the former employee to speak with the Plaintiff. *Id*. The court found that Defendant's counsel violated M.R.P.C. Rule 3.4(b): "It is the Court's opinion that there is no viable explanation for the dramatic decrease in [the former employee's] hourly rate of compensation other than that Defendant's counsel was paying for testimony under the original agreement." *Id*. According to the court, the

9

"[consulting] arrangement between Defendant's counsel and [the former employee] raised the specter as to whether [the former employee] is being paid by defense counsel for his factual testimony or his work as a litigation consultant". *Id*. The remedy fashioned by the court was to preclude the Defendant from using any testimony or information it obtained from the former employee. *Id*. at *4.

Just like the defendant's counsel in *Nissan*, GP's attorneys have not adhered to M.R.P.C. 3.4(b). GP, through its counsel, improperly paid these fact witnesses extensive sums for their testimony, failed to properly analyze whether such rates were reasonable compensation for time lost, and even raised these rates at the same time it was attempting to persuade a fact witness to sign a favorable affidavit. GP's payments to Mr. Gough and Mr. Lacey "ha[ve] cast a cloud over the legitimacy of [their] testimony". *Rocheux*, 2009 WL 3246837, at *4. In order to remedy GP's improper fact witness compensation and to deter such conduct in the future, this Court should preclude GP from presenting the testimony of Mr. Gough and Mr. Lacey at trial.

## CONCLUSION

For the foregoing reasons, NCR respectfully requests that this Court preclude GP from presenting the testimony of John Gough and Donald D. Lacey at trial.

Dated:  January 28, 2013  Respectfully submitted,

      NCR CORPORATION

      /s/ Darin P. McAtee
      *Counsel for NCR Corporation*

      DICKINSON WRIGHT PLLC
      Geoffrey A. Fields
      200 Ottawa Avenue, N.W., Suite 1000
      Grand Rapids, Michigan 49503-2427
      Phone:  (616) 336-1017
      Fax:  (616) 458-6753

      CRAVATH, SWAINE & MOORE LLP
      Evan R. Chesler
      David R. Marriott
      Darin P. McAtee
      Worldwide Plaza, 825 Eighth Avenue
      New York, New York 10019
      Phone:  (212) 474-1000
      Fax:  (212) 474-3700
      dmcatee@cravath.com

      SIDLEY AUSTIN LLP
      Evan B. Westerfield
      One South Dearborn Street
      Chicago, Illinois 60603
      Phone:  (312) 853-7000
      Fax:  (312) 853-7036

      MARTEN LAW PLLC
      Linda R. Larson
      Bradley M. Marten
      1191 Second Avenue, Suite 2200
      Seattle, Washington 98101
      Phone:  (206) 292-2600
      Fax:  (206) 292-2601

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2013, I electronically filed Defendant NCR Corporation's Memorandum in Support of Its Motion *in Limine* To Preclude Plaintiffs from Presenting Testimony from John Gough and Donald D. Lacey using the ECF system, which will send notification of such filing by operation of the Court's electronic systems. Parties may access this filing via the Court's electronic system.

FURTHERMORE, I hereby certify that on January 28, 2013, I served by electronic mail a copy of the aforementioned document upon counsel listed below:

>Dean P. Laing
>O'Neil Cannon Hollman DeJong & Laing SC
>111 E Wisconsin Ave., Suite 1400
>Milwaukee, WI 53202
>Dean.Laing@wilaw.com

>/s/ Darin P. McAtee
>*Counsel for NCR Corporation*