# Exhibit 2

Page Intentionally Left Blank
for Double-Sided Printing

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF MICHIGAN

 3   _____

 4   GEORGIA-PACIFIC CONSUMER

 5   PRODUCTS, LP, et al.,

 6           Plaintiffs,        Case No. 1:11-cv-00483

 7      v.

 8   NCR CORPORATION, et al.,

 9           Defendants.

10   _____

11

12

13              VIDEOTAPED DEPOSITION OF:  LEON MARTIN

14

15

16

17

18   DATE:      August 30, 2011

19   TIME:      9:00 a.m.

20   LOCATION:  Varnum, LLP

21              333 Bridge Street, N.W., 17th Floor

22              Grand Rapids, Michigan

23   REPORTER:  Kelly M. Kane, RPR, CSR-1470

24

25
```

Page Intentionally Left Blank
for Double-Sided Printing

```
 1        fact they upped the price to $150 at the end of the year,

 2        right?

 3   A.   Yes, sir.

 4   Q.   And is that something you also asked for?

 5   A.   Yes, sir.

 6   Q.   So for the past -- for more than a year you've been

 7        operating as a -- as a paid witness for Georgia-Pacific;

 8        true?

 9   A.   Consultant.

10             MS. CONLIN:  Objection as to form.

11   BY MR. McATEE:

12   Q.   You're -- you're a paid witness for Georgia-Pacific --

13             MS. CONLIN:  No.

14   BY MR. McATEE:

15   Q.   -- aren't you?

16             MS. CONLIN:  Objection as to form.

17   A.   I'm a consultant.

18   BY MR. McATEE:

19   Q.   When you -- when you got the checks from Georgia-Pacific

20        that were -- that made all the payments, didn't they say

21        witness?

22   A.   I believe they did.

23   Q.   Okay.  Are you denying that you're a paid witness for

24        Georgia-Pacific?

25   A.   No, I guess not.
```

1  **Q.**  Okay.

2          MS. CONLIN:  I'm going to object as to form.

3  BY MR. McATEE:

4  **Q.**  All right.  And you knew from the very first meeting in June

5       of 2010 that you would be providing testimony for them with

6       respect to your own personal knowledge; true?

7  **A.**  Yes, sir.

8  **Q.**  And one of the things that Georgia-Pacific asked you to do,

9       as part of your role, was to gather litigation evidence for

10      them, right?

11 **A.**  I don't know -- I guess, probably.  I was looking just for

12      information.

13 **Q.**  You were looking for information to help them in their --

14 **A.**  I didn't --

15 **Q.**  -- lawsuit against NCR?

16         MS. CONLIN:  Objection as to form.

17 A.   I didn't know where this was going.  So, you know, all -- I

18      just thought we were going to see about cleaning up the

19      Kalamazoo River.  That's what I'd hoped to do.

20 BY MR. McATEE:

21 **Q.**  Well, didn't they tell you very early on, sir, that what

22      they are interested in was NCR broke/trim wastepaper sales

23      from Appleton to the Kalamazoo River Valley in the '50s,

24      '60s, and early '70s?

25 **A.**  Yes, sir.

1  **Q.**   And you understood that as part of your paid role in this

2         case you were -- you were to go out and try to help them

3         collect information about that subject, right?

4  **A.**   Yes, sir.

5              MS. CONLIN:  Objection as to form.

6  BY MR. McATEE:

7  **Q.**   And you knew that they were keenly interested in any -- any

8         broke or trim that originated at Appleton Coated Paper

9         Company in Appleton, Wisconsin, and made its way to the

10        Kalamazoo mills, right?

11 **A.**   Yes, sir.

12 **Q.**   And that's what you were looking for when you were out on

13        the road going to the various places talking to people?

14 **A.**   Yes, sir.

15 **Q.**   What's the total amount that Georgia-Pacific has paid you to

16        date?

17 **A.**   I have no idea.

18 **Q.**   Is it in the ballpark of fifty or sixty thousand dollars,

19        sir?

20 **A.**   I would imagine.

21 **Q.**   And with respect to your investigative work for

22        Georgia-Pacific, which you conducted beginning in June of

23        2010, you were paid for all your time by Georgia-Pacific?

24 **A.**   Yes, sir.

25 **Q.**   And you were paid for all of your expenses?

1  **A.**   Yes, sir.

2  **Q.**   And you were paid for the work that you did on the affidavit

3         that we -- that we've seen today?

4  **A.**   I guess I don't understand the question.

5  **Q.**   When you were -- when they sent you drafts of the affidavit

6         and you talked to the lawyers and you edited it and you

7         signed it and sent it back, was that time that you got paid

8         for by Georgia-Pacific?

9  **A.**   Yes, sir.

10 **Q.**   All right.

11 **A.**   I billed them for it.

12 **Q.**   Okay.  And when Georgia-Pacific attorneys wanted debriefings

13        and things like that from your investigation of -- into the

14        case, you billed them for that and you were paid for that,

15        right?

16 **A.**   Yes, sir.

17 **Q.**   And you spent substantial preparation sessions to get ready

18        for today, didn't you?

19 **A.**   Yes, sir.

20 **Q.**   Including multiple trips to Grand Rapids to work with these

21        lawyers, right?

22 **A.**   Yes, sir.

23 **Q.**   And you were paid for that preparation time --

24 **A.**   Yes, sir.

25 **Q.**   -- true?  Yes?

1  **A.**  Yes, sir.

2  **Q.**  So the only thing that you're not being paid for is the time

3     you're spending in this room today?

4  **A.**  Yes, sir.

5  **Q.**  How many hours did you spend to get ready for today?

6  **A.**  I have no idea.

7  **Q.**  Did you spend four long days in August in Grand Rapids

8     working with these lawyers on testimony?

9        MS. CONLIN:  Objection as to form, assumes facts

10    not in evidence.

11 BY MR. McATEE:

12 **Q.**  You can answer, sir, if you remember.

13 **A.**  I don't really recall.

14 **Q.**  Do you remember spending eight hours on August 2nd, three

15    hours on August 10th --

16 **A.**  That was --

17 **Q.**  I'm sorry, ten hours on August -- let me start over.

18        Do you recall spending eight hours on August 2nd,

19    ten hours on August 3rd, eight hours on August 9th, 12 hours

20    on August 10th, in Grand Rapids?

21 **A.**  That was --

22        MS. CONLIN:  If you're --

23 A.  -- travel time, I think you're referring to.

24        MS. CONLIN:  If you've got something, why don't

25    you show it to the witness so that he's got something in

1       front of him?  You're clearly reading from a document.

2               MR. McATEE:  I've done this before, so I'll --

3       I'll do it the way I want to.

4  BY MR. McATEE:

5  Q.   In ballpark, how many -- how many hours did you spend

6       getting ready to give this deposition today?

7  A.   We might have spent a couple hours yesterday, a couple hours

8       the other time I was up here.

9               Some of the time that I was up here in this area I

10      called on brokers, too.  One in Kalamazoo in particular,

11      Walt Redmond, who I think I was told to look into, see what

12      he could recall.

13 Q.   In your opinion how many hours did you spend to get ready

14      for today?

15 A.   You're talking the preparation with the attorneys, face to

16      face?

17 Q.   Yes, whether it was with attorneys or --

18 A.   Well, you know --

19 Q.   -- just yourself getting ready.  How much time did you

20      spend, sir?

21 A.   You know, if you're talking from June of last year, it's a

22      hell of a lot of time.  You'd have to add up the hours.

23      That's all in preparation to what I'm testifying today.

24 Q.   Did -- when you were getting ready for this testimony did

25      you go over the examination that just -- that just occurred?

1  **A.**  I don't recall.

2  **Q.**  Did you go over questions and answers that were asked today?

3  **A.**  Some of them.

4  **Q.**  Did you practice for my cross-examination?

5  **A.**  No.

6  **Q.**  Did you spend approximately 400 to 500 hours working for
7        Georgia-Pacific in connection with this case?

8  **A.**  Probably.

9  **Q.**  Did you talk to dozens of potential fact witnesses that may
10       have known something about things that Georgia-Pacific was
11       interested in?

12 **A.**  Many, many.

13 **Q.**  Is dozens a pretty good --

14 **A.**  Yes, sir.

15 **Q.**  -- estimate?  Yes?

16 **A.**  Yes.

17 **Q.**  Did you ask them about whether they had any documents or
18       files that might have relevant evidence?

19 **A.**  Yes, sir.

20 **Q.**  And in fact some of them gave you some documents, right?

21 **A.**  Yeah.

22 **Q.**  And did you ask all of the witnesses you talked to whether
23       they had any leads or recollections that might be helpful to
24       Georgia-Pacific in connection with this case?

25 **A.**  Yes, sir.

1  Q.  In your view were you being paid to conduct this work

2      because Georgia-Pacific viewed you to be in a great position

3      to help them find evidence?

4  A.  Probably the only position that the -- most of the people I

5      talked to didn't want to talk to lawyers, and they -- I

6      wanted to bring a lawyer along to meet with some of them,

7      and they said no.

8  Q.  They thought that you -- Georgia-Pacific thought the best

9      way to get at this evidence was through you, right?

10 A.  I thought it was the best way too.

11 Q.  And you were authorized to treat any witness to dinner?

12 A.  In purchasing I was taken out to dinner when I come to

13     somebody's place, so I felt -- that's the way we done it.

14     That's the way I'd do it, and that's the way I did it.

15 Q.  And Georgia-Pacific agreed to reimburse you for any dinners?

16 A.  I didn't ask -- I didn't ask them, but they did reimburse

17     me, yes, sir.

18 Q.  And you had multiple dinners with multiple witnesses, all

19     paid for by Georgia-Pacific, right?

20 A.  Yes, sir.

21 Q.  And you bought some of the witnesses wine; true?

22 A.  Yes, sir.

23 Q.  Including one witness that you spent a case of wine because

24     you thought it would be helpful to -- to relax that witness

25     to start talking, right?

```
 1   A.   That was about the only way we could get to meet him.
 2        Because he had been terminated too.
 3   Q.   Your view was that part of your role as being -- as being a
 4        paid consultant for Georgia-Pacific was to, for lack of a
 5        better word, schmooze potential witnesses and to see if you
 6        could get them willing to help Georgia-Pacific with this
 7        litigation, right?
 8             MS. CONLIN:  Objection as to form.
 9   A.   Yes.
10   BY MR. McATEE:
11   Q.   You were trying to talk them into helping GP, right?
12   A.   I was trying to get the information to see if they were
13        capable of helping them.
14   Q.   The witness who is going to be here tomorrow, Mr. Lacey, you
15        helped kind of grease the skids with that witness, right?
16   A.   Yes, sir.
17             MS. CONLIN:  Objection as to form.
18   BY MR. McATEE:
19   Q.   In fact, you paid him -- you paid him money that
20        Georgia-Pacific then reimbursed?
21             MS. CONLIN:  Objection as to form, misstates the
22        record.
23   BY MR. McATEE:
24   Q.   You can answer, sir.
25   A.   I paid him to research -- he wasn't -- he had -- he had some
```

| | | |
|---|---|---|
| 1 | | paperwork, and he -- the only way I could get him to go |
| 2 | | through it, to find what we needed, was -- or if there was |
| 3 | | anything that we could use, was to -- I offered -- |
| 4 | | finally told -- told him we'd give him -- I'd give him |
| 5 | | $50 an hour to look for it. |
| 6 | **Q.** | Okay. And so you -- he agreed to do that, and you paid him, |
| 7 | | and Georgia-Pacific reimbursed you for that, right? |
| 8 | **A.** | Yes, sir. |
| 9 | **Q.** | I want to talk to you a little bit about the specific |
| 10 | | subject of whether, during the course of your more than a |
| 11 | | year of paid investigative work for Georgia-Pacific, whether |
| 12 | | or not you found any evidence, whether any witness told you |
| 13 | | that broke or trim from the Appleton Coated Paper Company in |
| 14 | | Appleton, Wisconsin, made its way to the Kalamazoo mills for |
| 15 | | recycling. |
| 16 | **A.** | No. |
| 17 | **Q.** | Not one witness told you that in the whole investigation, |
| 18 | | right? |
| 19 | **A.** | Right. |
| 20 | **Q.** | And when you asked witnesses to find particular documents or |
| 21 | | to go through their files, such as Mr. Lacey, you didn't |
| 22 | | find one document that said that either, did you? |
| 23 | **A.** | I think I passed most of that information on to the |
| 24 | | attorneys. I don't recall reading them all, so I don't -- |
| 25 | | I'm not sure what he -- what it was. |

1   **Q.**   For the documents that you looked at, did you -- did any of them say that Appleton Coated Paper Company broke and trim --

4   **A.**   No.

5   **Q.**   -- went to Kalamazoo?

6   **A.**   No.

7   **Q.**   Did Georgia-Pacific lawyers ever say that any documents you found showed that --

9   **A.**   No.

10  **Q.**   In fact, as was brought out on your direct examination, several witnesses said that the Appleton Coated broke and trim went to mills on the Fox River and not Kalamazoo, right?

14  **A.**   Yes.  And Ohio, too, I think.  I don't know if I had that in there.

16  **Q.**   But in any event, not to Kalamazoo, right?

17  **A.**   That's what they said.

18  **Q.**   Including Fran Brown and Jane and Del Carter?  All those witnesses told you that the Appleton Coated Paper Company broke and trim went to non-Kalamazoo mills, right?

21             MS. CONLIN:  Objection as to form, misstates the record.

23  A.   I believe that's what they said.

24  BY MR. McATEE:

25  **Q.**   With -- let me talk to you a little bit about your

```
 1              declaration briefly.  That's -- that's something that

 2              lawyers wrote and gave to you?

 3       A.     Yes.

 4       Q.     They did the first draft?

 5       A.     Yes, sir.

 6       Q.     And then you edited it and gave it back?

 7       A.     Yes, sir.

 8       Q.     And that's one thing that's not in your declaration, is it,

 9              that any -- that you recall any broke and trim from Appleton

10              Coated Paper Company making its way to Kalamazoo?

11       A.     That's right.

12       Q.     That's because you don't remember that happening, right?

13       A.     That's right.

14       Q.     And in fact do you recall that two times, in two different

15              places in your draft affidavit from your -- your lawyers you

16              were asked to add something about that issue and you

17              declined?

18       A.     Because I didn't remember, yes, sir.

19                     MR. McATEE:  I'm going to mark your draft

20              affidavit with -- which I believe contains your handwritten

21              edits, and it's got Bates numbers KZWIT00494 dash -- I'm

22              sorry, let me start over because I think that it's in

23              reverse Bates order.  But the first page is KZWIT00494, the

24              second page is 0493, and the third page is 0492.  We'll mark

25              that as whatever the next number is.
```