# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGIA-PACIFIC CONSUMER
PRODUCTS LP,
FORT JAMES CORPORATION and
GEORGIA-PACIFIC L.L.C.

                  Plaintiffs,

v.                                    No. 1:11-cv-00483
                                    Judge Robert J. Jonker

NCR CORPORATION,
INTERNATIONAL PAPER CO., and
WEYERHAEUSER COMPANY,

                  Defendants.

_____/

Report Under FRCP 26(a)(2)(B)
By: Stephen A. Bromberg, Esq.
<u>Expert Witness for Plaintiffs</u>

My name is Stephen A. Bromberg. I am a senior attorney with Butzel Long, Stoneridge West, 41000 Woodward Avenue, Bloomfield Hills, Michigan 48304. I have practiced law in Michigan since 1954, basically as a real estate practitioner. My qualifications are set forth in paragraph III below.

I have been asked by the Plaintiffs to examine whether the document of June 29, 1956 entitled "Lease" between St. Regis Paper Company as "Lessor" and Thor Corporation (later known as Allied Paper Corporation) as "Lessee" (IPC-001-0000834-897) in the opinion of an experienced Michigan real estate lawyer, who practiced in the l950s, was a true "lease" (and not a lease intended as a security or financing device in connection with a sale of the real estate to the Lessee). Set forth below are my opinions and the analysis and reasons therefor. I do not intend to state legal opinions in this report, although my opinions are informed by my knowledge of the law. Instead, I offer these opinions based on my experience and familiarity with lease transactions dating back to the mid-1950s and with how parties structured and described such transactions.

I have very carefully reviewed the document of June 29, 1956, and the documents executed in conjunction therewith, and the law in relation thereto, and in my opinion, as an experienced Michigan real estate attorney who practiced in 1956, this document is a true "lease" (and not a lease intended as a security device in connection with a sale of the real estate to the Lessee).

I.    The following are the bases and reasons for this opinion:

    **(A)** The Lease and related transaction documents, other contemporaneous documents, and later documents of both St Regis and Allied indicate that the two parties intended the transaction to be a true lease at the time of the transaction in 1956.

        1.   This Lease has the five (5) necessary requisites for creation of a lease as stated by the Michigan Supreme Court in Bushman v. Faltis, 184 Mich 172, 179 (1915): (1) a lessor (St. Regis Paper Company); (2) a lessee (Thor Corporation, later known as Allied Paper Corporation), (3) a sufficient description in Schedule A thereto of the leased premises; (4) the designation of a term (i.e. thirteen (13) year term from July 1, 1956 to June 30, 1969); and (5) a specification of the exact amount of rent to be paid as defined in Article II thereof (which was paid, after the initial payments, over the term of the Lease at the rate of $33,333.33 per month).

        2.   The intent of the parties to a written lease is found by an examination of the lease, Patterson v. Butterfield, 244 Mich 330, 336 (1928). Where it is not ambiguous or misleading its meaning must be determined from the instrument itself, Thomas v. Texas Co., 297 Mich 275, 281 (1941).

        3.   "A lease is construed like any other agreement, in accordance with the intention of the parties.  Their intention is controlling and must be gathered from the language of the lease in light of the circumstances surrounding the parties at the execution of the instrument, where no law or rule of public policy is thereby offended. . . ."  Friedman on Leases, 5th Ed. 26.2

        4.   This Lease itself states in Article I, Sec. 1, that it is a lease and it repeatedly refers to itself as "this Lease" throughout and contains provisions typically found in true leases: e.g. (a) Article II, Sec. 3 regarding rent; (b) Article IV, Sec. 1 regarding payment of taxes; (c) Article V requiring that Lessee shall not permit any liens on the premises; (d) Article VI requiring no assignment or subletting by Lessee without the consent of Lessor; (e) Article VII, Sec. 11 requiring Lessee to pay insurance premiums; (f) Article VIII permitting Lessor to perform Lessee's covenants upon Lessee's failure to do so;  (g) Article

IX, Sec. 1 requiring Lessee to maintain the demised premises in good order and condition; (h) Article X, Sec. 1 requiring Lessee to comply with all laws and ordinances; and (i) those provisions described in subparagraph I(A)8 below, etc.

5. The Agreement of June 22, 1956 (IPC-001-0000962-1202) outlining the transaction between the parties refers in paragraphs 2(i), 4(i) and 5(ii)(a) to this document as a "lease", and at no place does it refer to this document as a security device.

6. At no place does the Lease itself state that it is intended as a security or financing device for payment of a purchase price. (A lease is typically used as a security device when a property owner sells the property to a lender or other creditor for the amount of the loan and then leases the property back at a rental rate sufficient to pay back the debt plus interest over the term of the lease; under this structure, once the term of the lease ends - and the debt has thus been repaid - the lessee is typically able to re-acquire title to the property for a nominal consideration or for no additional consideration).

7. The Lease does not automatically transfer ownership to Lessee at the end of the Lease term or contain a bargain price option to purchase. Article XXIX on pages 44 through 46 of the Lease provides an option to purchase the real estate and improvements for $675,000 (Section 7, page 44 at the end of the tenth year or at the end of the thirteenth year), and is thus a true option to purchase for substantial consideration.

In terms of 2012 dollars, as compared to 1956 dollars, the $675,000 would be Five Million Six Hundred Ninety Two Thousand Six Hundred Thirty Two and 35/100 ($5,692,632.35) Dollars. http://data.bis.gov/cgi-bin/cpecalc.pl). The Lease also provides for a further option to purchase "at any time during the term of this Lease" at a purchase price which, in addition to the $675,000.00, would "equal the then present value, discounted at three percent (3%) per annum of the fixed or net rent received under this Lease, to the end of the tenth year of the term of this Lease if the option is exercised before the end of the tenth year, and to the end of the thirteenth year if exercised after the tenth year (Section 3, pages 44 and 45). Thus, the Lessor would be assured of payment of the full rental of at least the initial ten (10) years in any event (or of at least for the 10th to the 13th years if exercised during that period) in addition to the $675,000.00 option payment. Accordingly, these provisions give the Lessee the incentive to exercise the option by the end of the 10th year of the lease term, in order to avoid paying rent from the 10th through 13th years. Finally, in 1966, when the deed (IPC-001-0000830-833) was given upon the exercise of

the option, the $675,000.00 was paid by a Thirty Five Thousand ($35,000.00) Dollars cash payment and a note for $640,000.00. In terms of 2012 dollars, as compared to 1966 dollars, the $675,000 would be Four Million Seven Hundred Seventy Nine Thousand (4,779,000.00) Dollars (http://data.bis.gov/cgi-bin/cpecalc.pl)

8. The provisions of the Lease cited in paragraph I(A)(4) above and in this subparagraph are all consistent with normal lease provisions in Michigan leases. For example, in addition to those referred to in paragraph I(A)4 above, other provisions in the Lease typically found in Michigan leases are: the covenants against mechanics' liens (Article XI), against waste (Article XII), the Lessee indemnity of Lessor (Article XV), the fire provisions (Article XVI), the condemnation provisions (Article XVII), the alterations provisions (Article XVIII), and particularly the provisions relative to surrender to Lessor of the premises (and all alterations and equipment), in good condition and repair on termination of the Lease (Article XXIII), etc.

9. In addition, separate agreements between the parties executed at the time the Lease was signed provide that they terminate when the Lease terminates, thus demonstrating the intent that this was in fact a true lease. Thus, the separate agreement of June 29, 1956 known as the Facilities Agreement (IPC-001-0000425-444) (relating to the fire protection system, water, fuel oil, sewage, electricity and other lines passing through and servicing both the leased premises and the premises retained by the Lessor) provides (Article VIII) that this common use ends upon termination of the Lease. In addition, the Railroad Spurs and Siding Agreement of June 29, 1956 (IPC-001-0000693-697) provides that it ends upon termination of the Lease (paragraph 5).

10. The option to purchase for the substantial consideration of $675,000 (and/or present value of remaining rent, depending on the time of exercise of that option) in Article XXIX, rather than an option to purchase for nominal or no consideration, make it clear that this is a true lease and not a security device. In addition, no credit was given toward the purchase price for the monthly rent of $33,333.33 paid during the Lease term (which might be the case in a situation where the lease is simply part of a financing transaction). The fact that Allied Paper required a $640,000 note to be used to pay the balance of the option price indicates clearly that Allied Paper felt that the $675,000 was "substantial" and not nominal or a bargain price. This is further demonstrated by reference to the current 2012 value of this amount (see paragraph 7 above).

11. The extensive communications between the attorneys for the "Lessor" (LeBouef, Lamb and Leiby) and the "Lessee" (Simpson, Thatcher and Bartlett) in 1956 are consistent with a lease negotiation. Thus, the initial "Memorandum of Instructions for Preparation of Papers" (IPC-002-0000343), attached to a letter of April 20, 1956 from an attorney for the Lessor to an attorney for the Lessee (IPC-002 0000342) is headed:

> "To carry out Agreement between Mr. R. K. Ferguson, President, St. Regis Paper Company and Mr. Arnold H. Maremont, Chairman, Thor Corporation for Lease to Thor Corporation of St. Regis Paper Mill and Fixtures at Kalamazoo, Michigan."

It then details the rent, term, option to purchase and other details ultimately utilized or modified in the Lease and states:

> "The Lease shall be a net Lease and as additional rent Thor shall reimburse St Regis for all taxes and insurance."

In a further example, in IPC-002-000343, there is "the Lease shall be for a term of 13 years, with an option to Thor to purchase the property at the end of the tenth year ....". Further, in IPC 002-0000335, IPC 002-0000520, IPC 002-0000509, IPC 002-0000507, IPC 002-0000501, IPC 002-0000500, etc. are references to "the draft of the lease", the "draft lease", "the lease," the "Lease", the "Proposed Lease", etc. Also, after July 1, 1956, there are further letters referring to the "Lease of Kalamazoo Paper Mill to Thor Corporation" (IPC 002-0000457, IPC 002-0000451 and IPC 002-0000439). None of these letters at any point refer to this transaction as a security or financing transaction. On the contrary, they all refer to it as a lease or lease transaction and are all consistent therewith. Also, a Memorandum of Lease (and not a mortgage or other security device) was recorded (IPC 001-0000678-692, IPC 002-0000465), which is further evidence of a pure lease transaction.

Similarly, the communications in 1966 between the attorneys at that time for the "Lessor" (LeBouef, Lamb and Leiby) and "Lessee" (Sonnenshein, Levinson, Carlin, Nath and Rosenthal), and between the parties themselves, were consistent therewith. (e.g. IPC-001-0001246; IPC-001-0001247; IPC-001-0001248; IPC-001-0001229; IPC-001-0001228; IPC-001-0001225; IPC-001-0001250; IPC-001-0001219; IPC-001-0001220; and IPC-001-0001207).

In these 1956 communications, there were no references to any security or financing arrangements, only to regular lease negotiations. Similarly, in these 1966 communications, there were no references to any security or financing transactions, only to the Lease and to the option exercise and resulting sale.

Also, the resolution of the directors of St. Regis Paper Company adopted at a meeting held May 16, 1956, which authorized the lease and initial terms thereof (IPC-001-0001210; IPC-001-001211), and the minutes of that meeting (IPC-001-0009513; IPC-001-0009514; IPC-001-000915), and the additional minutes of the directors meeting of June 20, 1956 providing for $75,000 sale of part of the real property and reduction of the original option price of $750,000 to $675,000 (IPC-001-0009529; IPC-001-0009530), made no reference to a security or financing transaction, only to the Lease.

12. The accounting records of <u>St. Regis</u> confirm that the payments under the Lease were treated as "Lease Property" payments (IPC-001-0008183), and not payments, of indebtedness or interest as would have been the case for a financing transaction. Also, it is noteworthy that The 1956 Annual Report of St. Regis Paper Company provided (IPC-001-0001622, page 11) "Allied Paper Corporation leased the Kalamazoo Mill on June 30th under an agreement that includes an option to buy." The accounting records also confirm that St. Regis retained ownership of the assets covered in the Lease, and did not sell them to Allied Paper, since St. Regis took depreciation on them in December 1956 (IPC-001-0007898; IPC-001-0007901; IPC-001-007902), December 31, 1959 (IPC-001-0007933; IPC-001-0007925; IPC-001-0007915) and December 31, 1961 (IPC-001-0007939; IPC-0001-7941; IPC-001-0007947). Indeed the 1959 records included a schedule of the assets entitled "Rental Properties" (IPC-001-0007916) and the 1961 records included a schedule of these assets entitled "Kalamazoo Mill Rental Property Depreciation Year 1961" (IPC-001-007950).

The accounting records of <u>Allied Paper</u> confirm the treatment on its records as a true lease, as it was on the records of St. Regis. For example, Note H of the Allied Paper annual report of December 31, 1956 entitled "Long-Term Lease Commitment" (page 7; KZ00022697) states:

> "Under the provisions of its lease for the use of the facilities of the Bryant mill, effective July 1, 1956, the Corporation agreed to pay rentals which are being charged to income at the rate of $480,000 annually to June 30, 1966 (the date on which its option to purchase the facilities may be exercised at the most

favorable price) and at the rate of $400,000 annually from July 1, 1966 to June 30, 1969, the end of the lease period."

Note H of the Allied Paper annual report of Allied Paper of December 31, 1957 confirms this is a long term lease with an option to purchase (KZ00097605), while Note F of the Allied Paper annual report of December 31, 1958 in discussing long term leases thereof (page 11; KZ00097619) states:

"In the case of one of the facilities, annual rent of $400,000 will continue from 1966 to 1969 if the purchase option is not exercised.  The Corporation has agreed to pay taxes, insurance, repair costs, etc. on the facilities during the terms of the leases."

Note F of the Allied Paper annual report of December 31, 1959 (page 10; KZ00097634) again states:

"The Corporation's principal long-term lease relating to manufacturing facilities requires annual rentals amounting to $480,000 (including $80,000 annual amortization of rent prepaid in 1956) until 1966, the year in which the Corporation may exercise an option to purchase the facilities. Annual rental of $400,000 will continue from 1966 to 1969 if the purchase price option is not exercised.  The Corporation has agreed to pay taxes, insurance, repair costs, etc., on the facilities during the lease period."

———————

Accordingly, in the years immediately following the Lease of June 29, 1956, both parties to the Lease treated it for their accounting purposes as a true lease (and not a security or financing device).

———————

Moreover, the Allied Paper annual report of December 31, 1960, in Note G, (KZ00022707) entitled "Changes in Accounting Practices, states:

"In 1956, the Bryant Mill was leased to the Corporation until 1969 at an annual rental of $480,000 (including $80,000 amortization of prepaid rent) with an option exercisable in 1966, to purchase the facility for $675,000.  The Corporation made improvements to the Mill at a cost of $1,600,000 prior to

January 1, 1960, which were treated in the accounts as capital additions.

In recognition of circumstances including the probability that the option to purchase the Bryant Mill will be exercised in 1966, management believes that it is more realistic and appropriate for accounting purposes to treat the transaction arising from the 1956 agreement as a purchase."

Thereafter the Allied Paper annual reports of December 31, 1961 (KZ00097647), December 31, 1962 (KZ00097662) and December 31, 1963 (page 7; KZ00097675), under the heading "Long-Term Debt" all in effect state or confirm the following:

"Remaining rentals ($400,000 payable annually to 1966) and purchase option price ($675,000) under lease of Bryant Mill."

These later annual reports of Allied Paper indicate that it was changed circumstances in the years <u>after</u> the lease was executed that prompted a change in their accounting treatment.

13. Lessee exercised the option to purchase by its letter of May 25, 1965 (IPC-001-0001251).  As of July 1, 1966, Lessee and Lessor entered into an agreement (IPC 002-0001589, IPC-002-0001590 and 002-0001591) reciting the Lease of June 29, 1956, the option therein, the exercise of the option, certain closing details and that "subject to the terms and conditions thereof the Lease is hereby surrendered by Allied and the surrender is hereby accepted by St. Regis; and the parties mutually release each other, and their respective successors and assigns, from any and all obligations hereafter arising under said Lease" with certain minor continuing exceptions.  Clearly, the parties thought that up to that time the Lease was in effect and binding upon them, and that it was necessary to formally terminate the Lease in conjunction with the transfer of title by the deed effective as of July 1, 1966 as part of the completion of the exercise of the option.  Lessee and Lessor both treated the Lease as binding upon them, as a lease, until that time or else this termination and release would not have been necessary.

14. The retained ownership and leasing out of the property in the Lease is further confirmed in Registration Statement, Form S-1, filed by St. Regis with the Securities and Exchange Commission.  Thus, the S-1 Form filed October 26, 1956, stated, at page 13 (IPC-001-0012671):

"In addition to the mills mentioned above, the Company also owns a pulp and paper mill at Kalamazoo, Michigan, which is leased for a term of thirteen years expiring in 1969.  The lease includes an additional right of the tenant to purchase the mill at the expiration of the lease or at the end of the tenth year of the lease."

Further, the S-1 Form filed by St. Regis with the Securities and Exchange Commission November 12,1959, stated at page 11 (IPC-001-15209):

"The Company owns a fifth paper mill at Kalamazoo, Michigan, which is leased until 1969.   The tenant has the option to purchase the mill either on June 30, 1966 or 1969."

Further, the S-1 Forms filed by St. Regis on March 27, 1960, on page 13 (IPC-001-0016101) and so filed by St. Regis on July 14, 1960, on page 13 (IPC-001-0016187) also have the exact last quoted language.

These statements, filed under federal law, give important proof that St. Regis "leased" this property, and did not intend or treat the Lease as a security or financing device.

15. Publicity releases in 1956 referring to this transaction recited (KZ00032275) "St. Regis Paper is leasing the facilities of its paper mill at Kalamazoo, Mich., to allied Paper Div. of Thor Corp., Chicago, Ill. The lease which is on a long term basis became effective on June 30 and included a purchase option."  (See also IPC-001-0002750)

16. In the Expert Report of Timothy J. Riddiough, Ph.D. CRE (the "Other Report"), Dr. Riddiough discusses what he terms "Relevant Tax and Accounting Rules during the 1950s and 60s" (page 19, Section 6.1) and relies upon an internet article (pages 20 and 21; footnotes 39 and 41) and IRS Revenue Ruling 55-540 (page 21) to opine that the Lease was entered into so that the parties could take advantage of certain tax law changes relative to "leasing".   Dr. Riddiough inexplicably fails to note, however, that both the article and the Revenue Ruling related exclusively to "equipment leasing" and the tax implications thereof at that time.

Thus, with respect to the article, Dr. Riddiough fails to note that the very first sentence thereof states:  "Leasing is corporate America's biggest external source of equipment finance", and that the article relates only to equipment leasing.  Furthermore, in item 62 of the Other Report (page 21), Dr. Riddiough quotes the portion of the article which

states that "By 1955 . . . The tax code, which had been issued by the IRS the previous year, had not distinguished clearly between a true lease and a conditional sale agreement," without ever noting that the internet article dealt exclusively with equipment leasing and not real estate leasing.

Again, in item 62 of the Other Report (page 21), Dr. Riddiough refers to Revenue Ruling 55-540 and utilizes it as a basis for a substantial continuing purported analysis. However, Dr. Riddiough fails to clarify that Revenue Ruling 55-540 relates only to equipment financing. Thus, section 1 of Revenue Ruling 55-540 states:

> "The purpose of this Revenue Ruling is to state the position
> of the Internal Revenue Service regarding the income tax
> aspects of the purported leasing of <u>equipment</u> for use
> in the trade or business of the lessee."

Accordingly, the Lease clearly does not fall within the purview of either the article or the Revenue Ruling cited by Dr. Riddiough, since it was a lease of real estate.

Even assuming, *arguendo*, that the Lease can be analyzed in the same manner as an equipment lease, it is still clear that the Lease was a true lease and not a financing mechanism. As previously noted (paragraphs 5 and 6, above), neither the Lease nor any other document executed in connection therewith refers to the Lease as a security or financing device. Had the parties intended the Lease to serve as security for a loan, they could have inserted such language into the Lease or any of the ancillary documents. It is not uncommon, for instance, for an equipment lease to include a provision explicitly noting the nature of the lease as a "Finance Lease" (see, e.g., <u>Amerus Leasing, Inc.</u> v. <u>Sterling Warren Pharmacy, Inc., et al.</u>, 1998 Mich. App. LEXIS 2092). In addition, unlike equipment lease financing, St. Regis was not a third party vendor, lender, broker or independent leasing company; rather, St. Regis was the owner of the land and improvements.

17. In the final three pages of the Other Report (pages 26 through 28), Dr. Riddiough discusses how accountants analyzing the Lease today, under current accounting standards, would have classified the Lease, which he then uses to support his conclusion that the Lease was essentially a financing mechanism and not a true lease. The accounting standards referenced in this section of the Other Report, Financial Accounting Standards No. 13, were adopted by the Financial Standards Accounting Board in 1976, which was <u>20 years after the Lease was executed</u> and 10 years after the Lessee exercised its option

to buy the real estate. Although acknowledging that these accounting standards were not in effect at the time of the Lease, Dr. Riddiough nonetheless considered his analysis under this section to be relevant since, as stated in item 78 of the Other Report (page 27), "FASB 13 was created to distinguish between the legal form of a lease and its economic substance." This statement and the general discussion on this topic, however, is misguided at best.

First, as stated in the beginning of FASB 13 (paragraph 1 thereof), FASB 13 "establishes standards of financial accounting and reporting for leases by lessees and lessors." In other words, and as more particularly discussed in Appendix A of the standards (paragraphs 52 through 58 thereof), FASB 13 was simply created in order to address the various inconsistencies in lease accounting practices among lessors and lessees and to establish a uniform set of accounting guidelines. Only in paragraph 29 of FASB 13, in the section dealing with leases between related parties, do the standards note that "In such cases [i.e., related party leases] the classification and/or accounting shall be modified as necessary to recognize economic substance rather than legal form." Second, FASB 13 obviously did not exist in 1956. Analyzing how the parties' accountants would have viewed the Lease had FASB 13 been in existence at the time the Lease was executed is simply irrelevant and offers no real guidance as to how the Lease was actually viewed in 1956.

Better guidance can be found in the annual accounting reports of St. Regis and Allied Paper after 1956 which, as previously noted (paragraph 12, above), clearly referred to the Lease as a lease with an option to buy.

Finally, and perhaps most importantly, the manner in which a lease is classified for accounting purposes has no bearing on how such lease is viewed under Michigan law. Even if FASB 13 had been in effect in 1956, the fact remains that under applicable Michigan law the Lease was a true lease and not a financing mechanism.

18. Finally, Dr. Riddiough makes several allusions in the Other Report to the fact that a capital lease is "the equivalent of a sale with seller debt financing" (page 4, item 7.F; page 26, item 77; and page 27, item 79), thus making the assumption that if, under FASB 13, the Lease is considered a "capital lease" then it is by definition actually a sale with seller debt financing. However, Dr. Riddiough once again confuses the point of classifying a lease as a capital lease under FASB 13. As stated in paragraph 17 of this report, the stated purpose of FASB 13 was to create a uniform system of accounting standards and not to determine the actual, legal nature of a lease. Simply because the

parties may classify a lease as a capital lease for accounting purposes does not mean that such a lease is necessarily a seller debt financing lease: in other words, although all seller debt financing leases are capital leases, all capital leases are not seller debt financing leases. This point can be further clarified by an examination of the discussions in Appendix B of FASB 13, wherein the FASB Board noted, among other things, (i) that limiting capital leases to only "those leases that are 'in substance installment purchases.' . . . is too limiting as a basis for lease capitalization" (paragraph 69 of FASB 13), (ii) that the legal distinctions of "whether a lease obligation represents debt in the strict legal sense" were "not relevant or practical in application to the accounting issue of lease capitalization" (paragraph 71 of FASB 13), and (iii) that although a lease that "transfers substantially all of the benefits and risks incident to the ownership of property should be accounted for as the acquisition of an asset and the incurrence of an obligation by the lessee and as a sale or financing by the lessor," such transactions are not "necessarily 'in substance purchases' as that term is used in previous authoritative literature." (paragraph 60 of FASB 13).

19. In items 28 and 30 of the Other Report (page 13), Dr. Riddiough references that typical loan agreements on commercial real estate do not provide "control rights" to lenders, which is then used to support his argument that the Lease (which, according to Dr. Riddiough in item 26 of the Other Report, shifts "full control rights" to the Lessee) is substantially the same as a loan (i.e., the borrower/Lessee, and not the lender/Lessor, in either scenario has operational control). However, typical loan documentation does provide lenders with certain elements of control over a borrower's operations, such as requiring lenders' consent to managerial changes, to incurring of secondary or additional loans, to making of loans to officers or to third parties, to maintenance of certain accounting ratios, to changes in operations of the borrower, etc. and, as stated in paragraphs 4 and 8 of this report, the Lease also contains various control rights of Lessor, but these lessor control rights are typical in Michigan lease agreements and are not the same as those lender control rights found in typical loan documents.

20. Accordingly, the conclusions in the Other Report based upon these incorrect tax, accounting and control references are without proper foundation, particularly in the total absence of citations of any supporting law.

**(B)** The provisions of the Lease, as partially enumerated in paragraphs I(A)4 and I(A)8 above, and as set forth in the remaining provisions of the Lease,

were typical of industrial and commercial leases of real property in the 1950s, as far as can be recalled at this time.

    1. See Friedman on Leases, 5th Ed. for extensive enumeration.

  **(C)** It was not common in the 1950s to use leases as security devices. An infrequent use of leases as security devices at that time was in sales and lease back transactions utilized in transactions involving syndications with the intent of generating tax deductions (Real Estate Transactions – Structure and Analysis with Forms, August 2011, 13.2).

    1. As noted above, the Lease was not part of a sales and lease back transaction inasmuch as Lessee never had title to the premises prior to, at the time of, or after June 29, 1956 and not until after its exercise of the option to purchase approximately ten (10) years later.

    2. The security devices normally used in the 1950s were, to the best available recollection, simply mortgages of real estate and chattel mortgages.

II.    Exhibits to Support Opinions and Other Documents Reviewed:

  (A) Agreement of June 22, 1956 (IPC-001-0000962-1202)
  (B) Lease of June 29, 1956 (IPC-001-0000834-897)
  (C) Facilities Agreement of June 29, 1956 (IPC-001-0000425-444)
  (D) Railroad Spurs and Siding Agreement of June 29, 1956 (IPC-001-0000693-697)
  (E) Exercise of Option of May 25, 1965 (IPC-001-0001251)
  (F) Agreement of July 1, 1966 (IPC-002-0001589)
  (G) Deed of July 1, 1966 (IPC-002-0001595)
  (H) See Attachment 1 for other documents reviewed

III.    Qualifications:

    I graduated from University of Michigan in 1952 (AB with distinction with Phi Beta Kappa honors). I graduated from the University of Michigan Law School in 1954 (J.D.). I have practiced law in Michigan from 1954 to date. I was managing partner in a firm which became Bromberg, Robinson, Shapero, Cohn and Burgoyne. That firm merged into Butzel Long in 1985, where I practice today as a senior attorney. I was for many years a Director and for a number of years President of Butzel Long.

During my years of practice, I have specialized in real estate, financing and related matters.  These matters included representing:

    a.  A multi-building, multi-use, Detroit Riverfront project involving apartment and office leases;

    b.  Other major Detroit law firms in their office lease transactions;

    c.  National office and commercial leasing companies in establishing multiple Michigan leases;

    d.  Local landlords in office and commercial leases;

    e.  Shopping center owners and tenants and dealing with their leases;

    f.  A synthetic lease transaction participant for a major Detroit project involving a foreign bank;

    g.  A drug store chain on its leases and then sales of its 20+ stores;

    h.  Apartment owners relative to their leases; and

    i.  First American Title Insurance Company, subdivision developers, home builders, mobile home park owners, a large building supply company, a national underground sewer contractor, multiple hotel owners, Detroit Housing Commission on housing redevelopment projects, a general construction contractor, and many others.

I am admitted to practice before the United States Supreme Court, the Sixth Circuit Court of Appeals, the U.S. District Court for the Eastern District of Michigan and Michigan courts.  I have successfully tried cases related to real estate issues in the Sixth Circuit, Michigan Supreme Court and Michigan Court of Appeals.  I was active in the American College of Mortgage Attorneys, became President thereof in 2002 – 2003 and continue to be a member today.  I was a charter member of the American College of Real Estate Lawyers and continue to be a member today.  I served as Chairman of the Real Property Law Section of the Michigan Bar in 1984-1985, after many years as a Director of the Section and as a frequent lecturer at its seminars.

I have been named in Best Lawyers of America for 20 years.  I have been named in Chambers USA since its inception in 2007 and in Who's Who Legal Real Estate Lawyers for many years, as well as Super Lawyers, Top Lawyers in Michigan and other honorary designations and associations.

I have not authored published articles since the 1980s.

IV.    I have not testified as an expert at trial or by deposition during the previous 4 years.

V.    I am being compensated for study and testimony at an hourly rate of $375.00
      (with assistance from Thomas Kabel, Esq. at an hourly rate of $325.00).

Respectfully submitted,

Stephen A. Bromberg (P11235)
Butzel Long
Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, MI 48304
(248) 258-1401

Dated: June 4, 2012

Attachment 1

**Documents Reviewed**

| Beg Bates Number | End Bates Number |
|---|---|
| IPC-001-0000425 | IPC-001-0000444 |
| IPC-001-0000678 | IPC-001-0000692 |
| IPC-001-0000693 | IPC-001-0000697 |
| IPC-001-0000703 | IPC-001-0000707 |
| IPC-001-0000708 | IPC-001-0000713 |
| IPC-001-0000720 | IPC-001-0000799 |
| IPC-001-0000817 | IPC-001-0000829 |
| IPC-001-0000830 | IPC-001-0000833 |
| IPC-001-0000834 | IPC-001-0000897 |
| IPC-001-0000962 | IPC-001-0001202 |
| IPC-001-0001203 | IPC-001-0001203 |
| IPC-001-0001204 | IPC-001-0001204 |
| IPC-001-0001205 | IPC-001-0001205 |
| IPC-001-0001206 | IPC-001-0001207 |
| IPC-001-0001210 | IPC-001-0001211 |
| IPC-001-0001210 | IPC-001-0001211 |
| IPC-001-0001212 | IPC-001-0001213 |
| IPC-001-0001214 | IPC-001-0001215 |
| IPC-001-0001216 | IPC-001-0001216 |
| IPC-001-0001217 | IPC-001-0001218 |
| IPC-001-0001219 | IPC-001-0001219 |

| Beg Bates Number | End Bates Number |
|---|---|
| IPC-001-0001220 | IPC-001-0001221 |
| IPC-001-0001220 | IPC-001-0001221 |
| IPC-001-0001225 | IPC-001-0001225 |
| IPC-001-0001226 | IPC-001-0001226 |
| IPC-001-0001226 | IPC-001-0001226 |
| IPC-001-0001227 | IPC-001-0001227 |
| IPC-001-0001228 | IPC-001-0001228 |
| IPC-001-0001229 | IPC-001-0001231 |
| IPC-001-0001232 | IPC-001-0001234 |
| IPC-001-0001232 | IPC-001-0001234 |
| IPC-001-0001235 | IPC-001-0001245 |
| IPC-001-0001235 | IPC-001-0001245 |
| IPC-001-0001246 | IPC-001-0001246 |
| IPC-001-0001247 | IPC-001-0001247 |
| IPC-001-0001248 | IPC-001-0001249 |
| IPC-001-0001250 | IPC-001-0001250 |
| IPC-001-0001250 | IPC-001-0001250 |
| IPC-001-0001251 | IPC-001-0001251 |
| IPC-001-0001251 | IPC-001-0001251 |
| IPC-001-0001252 | IPC-001-0001252 |
| IPC-001-0001612 | IPC-001-0001653 |
| IPC-001-0002026 | IPC-001-0002070 |
| IPC-001-0002750 | IPC-001-0002750 |
| IPC-001-0002750 | IPC-001-0002750 |

| Beg Bates Number | End Bates Number |
|---|---|
| IPC-001-0007897 | IPC-001-0007914 |
| IPC-001-0007915; IPC-001-0007924 | IPC-001-0007918; IPC-001-0007933 |
| IPC-001-0007938; IPC-001-0007959 | IPC-001-0007950; IPC-001-0007959 |
| IPC-001-0008181 | IPC-001-0008183 |
| IPC-001-0009502 | IPC-001-0009524 |
| IPC-001-0009525 | IPC-001-0009531 |
| IPC-002-0000185 | IPC-002-0000199 |
| IPC-002-0000229 | IPC-002-0000234 |
| IPC-002-0000236 | IPC-002-0000243 |
| IPC-002-0000281 | IPC-002-0000285 |
| IPC-002-0000290 | IPC-002-0000294 |
| IPC-002-0000335 | IPC-002-0000336 |
| IPC-002-0000342 | IPC-002-0000344 |
| IPC-002-0000426 | IPC-002-0000426 |
| IPC-002-0000427 | IPC-002-0000427 |
| IPC-002-0000428 | IPC-002-0000429 |
| IPC-002-0000430 | IPC-002-0000430 |
| IPC-002-0000431 | IPC-002-0000431 |
| IPC-002-0000432 | IPC-002-0000435 |
| IPC-002-0000438 | IPC-002-0000438 |
| IPC-002-0000439 | IPC-002-0000439 |
| IPC-002-0000443 | IPC-002-0000443 |
| IPC-002-0000445 | IPC-002-0000445 |

| Beg Bates Number | End Bates Number |
| --- | --- |
| IPC-002-0000446 | IPC-002-0000446 |
| IPC-002-0000450 | IPC-002-0000450 |
| IPC-002-0000451 | IPC-002-0000451 |
| IPC-002-0000452 | IPC-002-0000453 |
| IPC-002-0000457 | IPC-002-0000462 |
| IPC-002-0000463 | IPC-002-0000463 |
| IPC-002-0000464 | IPC-002-0000464 |
| IPC-002-0000465 | IPC-002-0000465 |
| IPC-002-0000468 | IPC-002-0000468 |
| IPC-002-0000491 | IPC-002-0000491 |
| IPC-002-0000495 | IPC-002-0000495 |
| IPC-002-0000500 | IPC-002-0000500 |
| IPC-002-0000501 | IPC-002-0000501 |
| IPC-002-0000503 | IPC-002-0000503 |
| IPC-002-0000507 | IPC-002-0000507 |
| IPC-002-0000509 | IPC-002-0000512 |
| IPC-002-0000520 | IPC-002-0000520 |
| IPC-002-0000756 | IPC-002-0000757 |
| IPC-002-0000768 | IPC-002-0000770 |
| IPC-002-0001198 | IPC-002-0001199 |
| IPC-002-0001200 | IPC-002-0001202 |
| IPC-002-0001587 | IPC-002-0001655 |
| KZ00022690 | KZ00022697 |
| KZ00022698 | KZ00022708 |

| Beg Bates Number | End Bates Number |
| --- | --- |
| KZ00032243 | KZ00032243 |
| KZ00033066 | KZ00033066 |
| KZ00033069 | KZ00033069 |
| KZ00033070 | KZ00033070 |
| KZ00033075 | KZ00033075 |
| KZ00097596 | KZ00097607 |
| KZ00097608 | KZ00097621 |
| KZ00097622 | KZ00097637 |
| KZ00097638 | KZ00097650 |
| KZ00097651 | KZ00097664 |
| KZ00097665 | KZ00097678 |
| KZ00097679 | KZ00097690 |
| KZ00097691 | KZ00097709 |
| KZ00097710 | KZ00097727 |
| KZ00097728 | KZ00097728 |

| Documents Without Bates Numbers | |
| --- | --- |
| Date | Description |
| 2/13/2012 | Objections and Responses of IP to GP's First Set of Interrogatories |
| 6/24/2011 | First Amended Complaint |
| 5/9/2012 | Defendant IP's Expert Report of Timothy J. Riddiough |

5