**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GEORGIA-PACIFIC CONSUMER** | ) | |
| **PRODUCTS LP,** | ) | |
| **FORT JAMES CORPORATION, and** | ) | |
| **GEORGIA-PACIFIC LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No**: **1:11-cv-00483** |
| **v.** | ) | |
| | ) | **Judge Robert J. Jonker** |
| **NCR CORPORATION,** | ) | |
| **INTERNATIONAL PAPER CO.,** | ) | **\*ORAL ARGUMENT REQUESTED\*** |
| **and WEYERHAEUSER CO.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>GEORGIA-PACIFIC'S TRIAL BRIEF</u>**

## Table of Contents

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ ii

Preliminary Statement ......................................................................................................1

Discussion .........................................................................................................................2

    I.      Relevant Legal Standards ...............................................................................2

           A.      CERCLA Generally .................................................................................2

           B.      Liability for Arrangers ............................................................................3

           C.      Liability for Owners at the Time of Disposal .........................................5

                    1.      "Facility" ....................................................................................5

                    2.      "Owner" ......................................................................................5

                    3.      "Disposal" ...................................................................................7

    II.      Issues to Be Resolved at Trial ........................................................................7

           A.      Georgia-Pacific's Claims Against NCR ..................................................7

           B.      Georgia-Pacific's Claims Against IP .......................................................8

    III.    Issues Relating to the Presentation of Evidence ............................................10

           A.      The Type and Volume of Georgia-Pacific's Expected Evidence .......................10

                    1.      Testimony .................................................................................10

                    2.      Documents ................................................................................12

            B.      Evidentiary Objections ..........................................................................13

                    1.      Authenticity and Ancient Documents ......................................13

                    2.      The Use of Prior Testimony .....................................................15

Conclusion ......................................................................................................................17

## Table of Authorities

### FEDERAL CASES

*AlliedSignal, Inc. v. Amcast Intern. Corp.*, 177 F. Supp. 2d 713 (S.D. Ohio 2001)........................3

*AM International, Inc. v. International Forging Equipment Corp.*, 982 F.2d 989
    (6th Cir. 1993)...................................................................................................4, 5

*Anspec Co. v. Johnson Controls*, 922 F.2d 1240 (6th Cir. 1991) .....................................3

*Appleton Papers, Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL
    506049 (E.D. Wisc. Dec. 16, 2009)..................................................................12, 13

*Appleton Papers, Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL
    2704920 (E.D. Wisc. July 3, 2012)...................................................................12, 14

*Bob's Beverage, Inc. v. Acme*, 264 F.3d 692 (6th Cir. 2001) ..........................................7

*Burlington N. & Santa Fe Railway Co. v. United States*, 556 U.S. 599 (2009) .........................2, 4

*Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5th Cir. 1985)  ............................................17

*Dykes v. Raymark Indus., Inc.*, 801 F.2d 810 (6th Cir. 1986)  .......................................16

*ForeWord Magazine, Inc. v. OverDrive, Inc.*, 2011 U.S. Dist. LEXIS 125373
    (W.D. Mich. Oct. 31, 2011)  ...........................................................................14

*Gencorp, Inc. v. Olin Corp.*, 390 F.3d 433 (6th Cir. 2004) ........................................4, 7

*Idaho v. Hanna Mining Co.*, 882 F.2d 392 (9th Cir. 1989) ..........................................3

*Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648 (6th Cir. 2000)..........................3

*Kelley v. Thomas Solvent Co.*, 727 F. Supp. 1532 (W.D. Mich. 1989) .................................3

*Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179 (3d Cir. 1978) ....................................16

*Louisiana-Pacific Corp. v. Beazer Mat'ls & Services, Inc.*, 811 F. Supp. 1421
    (E.D. Cal. 1993)..........................................................................................5

*Moore v. Cycon Enterprises*, 2006 U.S. Dist. LEXIS 57452 (W.D. Mich.
    Aug. 16, 2006) .............................................................................................7

*Murphy v. Owens-Illinois, Inc.*, 779 F.2d 340 (6th Cir. 1985)  .....................................16

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112

(2d Cir. 2010) ............................................................................................3

*Organic Chemical Site PRP Group v. Total Petro Inc.*, 58 F. Supp. 2d 755
    (W.D. Mich. 1999) ..................................................................................6

*S. Pac. Transport Co. v. Voluntary Purchasing Groups Inc.*, No. 3:94-cv-2477,
    1997 WL 457510 (N.D. Tex. Aug. 7, 1997) ...........................................6

*Thanongsinh v. Board of Education*, 462 F.3d 762 (7th Cir. 2006) ....................14

*United States v. 150 Acres of Land*, 204 F.3d 698 (6th Cir. 2000)..................5, 7

*United States v. CDMG Realty Co.*, 96 F.3d 706 (3d Cir. 1996).........................7

*United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227 (6th Cir. 1996) .......3, 4

*United States v. R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir. 1989) ......................3

*United States v. R.W. Meyer, Inc.*, 932 F.2d 568 (6th Cir. 1991) .......................6

*United States v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998) .................5

*United States v. Rohm & Haas Co.*, 2 F.3d 1265 (3d Cir. 1993), *overruled on
    other grounds by U.S. v. E.I. DuPont De Nemours & Co.*, 432 F.3d 161
    (3d Cir. 2005) ..........................................................................................6

## FEDERAL STATUTES

42 U.S.C. § 6903(3) .............................................................................................7

42 U.S.C. § 9601(20)(A)(ii) ................................................................................6

42 U.S.C. § 9601(20)(E)-(G) ...........................................................................6, 7

42 U.S.C. § 9601(29) ...........................................................................................7

42 U.S.C. § 9601(9)(A) ........................................................................................5

42 U.S.C. § 9607(a)(1)-(4) ...................................................................................3

42 U.S.C. § 9607(a)(2) .........................................................................................5

42 U.S.C. § 9607(a)(3) .........................................................................................4

42 U.S.C. § 9607(b) ..............................................................................................3

Fed. R. Evid. 803(16).........................................................................................15

Fed. R. Evid. 804(b)(1) ................................................................................................15

Fed. R. Evid. 807 .........................................................................................................17

Fed. R. Evid. 901(a) .....................................................................................................14

Fed. R. Evid. 901(b)(8) ................................................................................................15

**MISCELLANEOUS**

*Webster's II New College Dictionary* 62 (2001) ........................................................4

**Preliminary Statement**

The Kalamazoo River and its tributaries (the Site) are heavily contaminated with poly-chlorinated biphenyls (PCBs).  Those PCBs were discharged into the river and its tributaries by paper mills that recycled carbonless copy paper (CCP) from the early 1950s until the early 1970s.  Defendant NCR Corporation pioneered CCP, and until the early 1970s, NCR and its toll manufacturers made CCP using an emulsion that contained Aroclor 1242, a toxic PCB.  When paper mills recycled CCP scrap paper generated by NCR and others, the PCBs in the emulsion were liberated from the paper fibers and discharged into the environment along with other recycling waste.

The U.S. Environmental Protection Agency (EPA) and the State of Michigan have ordered Plaintiffs and other former owners of Kalamazoo-area paper mills to pay for the on-going clean-up of the Site.  Plaintiffs Georgia-Pacific Consumer Products, LP, Fort James Corporation, and Georgia Pacific LLC (collectively, Georgia-Pacific), have paid substantial sums for clean-up work undertaken to date.  Millions more will be spent to complete response actions at the Site.

Plaintiffs have brought this CERCLA cost recovery action to recover some of their costs from other companies that are liable under CERCLA for the PCB contamination of the Site—NCR, Defendant International Paper Company (IP), and Defendant Weyerhaeuser Company (Weyerhaeuser).  At the trial starting on February 19, 2013, Georgia Pacific will prove that NCR and IP are liable under CERCLA.[1]  NCR is liable under CERCLA § 107(a)(3), because it arranged for the disposal of CCP scrap paper, including NCR's PCB-based emulsion, at Kalamazoo-area mills.  This CCP wastepaper came from two categories of sources for which NCR bears responsibility:  (1) coating "broke" generated by its contract coaters, Appleton Coated Paper

---

[1] This trial only will address liability.  Later phases of the case will address other issues, such as fault allocation and the precise amount of Georgia-Pacific's recoverable costs.  Weyerhaeuser has stipulated to liability so the claims against it will not be addressed at this trial.

Company (ACPC) in Appleton, Wisconsin; Mead Corporation (Mead) in Chillicothe, Ohio; and Combined Paper Mills (CPM) in Combined Locks, Wisconsin; and (2) converter "trim" generated by NCR's own converting operations in Dayton, Ohio, Washington Court House, Ohio, and Viroqua, Wisconsin.  IP is liable because its corporate predecessor, St. Regis Paper Company, owned the Bryant Mill—one of the largest contributors of PCB-laden waste at the Site—during a time when the Bryant Mill recycled CCP and discharged PCBs along with the rest of its recycling effluent into Portage Creek.

In this trial brief, Georgia-Pacific will (1) summarize briefly the relevant CERCLA principles, most of which the Court already has addressed in its thorough summary judgment opinions; (2) identify the legal and factual issues the Court will need to resolve at trial; and (3) discuss the manner in which Georgia-Pacific intends to present its case and two categories of evidentiary issues the Court may wish to address before trial.  Georgia-Pacific will not go through all of facts it plans to introduce at trial.  The parties already have provided the Court with lengthy previews of what they believe the evidence will show.  The Court's extensive summary judgment opinions tell Georgia-Pacific that the Court does not need to read that material again.

<u>Discussion</u>

I.     **Relevant Legal Standards**

A.     **CERCLA Generally**

CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009).  To that end, CERCLA identifies four categories of potentially responsible parties (PRPs) subject to strict liability: (1) the current owner or operator of a waste facility; (2) previous owners and operators who owned or operated the facility at the time of disposal of hazardous substances; (3) any per-

son who arranged for disposal or treatment of hazardous substances at the facility; and (4) any person who transported hazardous substances to the facility. 42 U.S.C. §9607(a)(1)-(4).

Liability under CERCLA is strict. *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996). Where a plaintiff makes its prima facie case, the defendant will be liable, regardless of actual fault or knowledge, unless it can prove one of the very limited defenses recognized under 42 U.S.C. § 9607(b). *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1508 (6th Cir. 1989). A CERCLA plaintiff need not satisfy common law rules of causation, such as proximate cause, to meet its burden. *See, e.g., AlliedSignal, Inc. v. Amcast Intern. Corp.*, 177 F. Supp. 2d 713, 749 (S.D. Ohio 2001). And there is no minimum amount of pollution that CERCLA will tolerate. *See Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 660 & n.7 (6th Cir. 2000). "[E]ven a minimal amount of hazardous waste brings a party under the purview of the statute as a PRP." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010).

Exceptions to CERCLA's broad sweep must be narrowly construed so as not to frustrate CERCLA's remedial purpose. *See Idaho v. Hanna Mining Co.*, 882 F.2d 392, 396 (9th Cir. 1989). "[T]he remedial nature of CERCLA's scheme requires the court to interpret its provisions broadly to avoid frustrating the legislative purposes." *Anspec Co. v. Johnson Controls*, 922 F.2d 1240, 1247 (6th Cir. 1991). Courts therefore "construe CERCLA's limited defenses narrowly to effectuate the Act's broad policies." *Kelley v. Thomas Solvent Co.*, 727 F. Supp. 1532, 1540 n.2 (W.D. Mich. 1989).

## B. Liability for Arrangers

Under CERCLA, an entity is liable as an arranger if:

> by contract, agreement, or otherwise [it] arranged for disposal or
> treatment, or arranged with a transporter for transport for disposal
> or treatment, of hazardous substances owned or possessed by such

> person, by any other party or entity, at any facility or incineration
> vessel owned or operated by another party or entity and containing
> such hazardous substances.

42 U.S.C. § 9607(a)(3).

Under Sixth Circuit law, a party qualifies as an arranger under CERCLA when it under-takes a transaction with a plan for the disposal of hazardous substances. *Gencorp, Inc. v. Olin Corp.*, 390 F.3d 433, 446 (6th Cir. 2004). "To 'arrange' for something means to 'plan or pre-pare' for it, though not necessarily to implement the plan." *Id.* (citing *Webster's II New College Dictionary* 62 (2001)). And the text of the statute makes clear that "[m]aking such preparations … does not require a formal disposal agreement, as the statute provides that a person may ar-range for hazardous waste disposal 'by contract, agreement or *otherwise*.'" *Id.* (quoting 42 U.S.C. § 9607(a)(3)) (emphasis in original). Arrangements for disposal therefore can stem from a broader "transaction" as opposed to a discrete event. *Cello-Foil*, 100 F.3d at 1231.

Accordingly, the central inquiry in determining whether a party qualifies as an arranger is whether it has taken "affirmative act[s] to dispose of a hazardous substance." *AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir. 1993); *Burlington N.*, 556 U.S. at 611 ("[A]n entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."). Once that showing is made, the party's lack of knowledge about or control over the specific mechanism for disposal is no defense. "[A] party can be re-sponsible for 'arranging for' disposal, *even when it has no control over the process leading to the release of substances*." *Cello-Foil*, 100 F.3d at 1232 (emphasis added). Nor must the arranger, to be liable, possess an "intent to have waste disposed in a particular manner or at a particular place." *Id.*; *see also Gencorp*, 390 F.3d at 446 ("The party must have some intent to make prepa-rations for the disposal of hazardous waste, *though that intent goes to the matter of disposing waste generally, not to disposing of it in a particular manner or at a particular location*.") (em-

phasis added). Indeed, the arranger need not even be absolutely certain that a release will occur. *See AM Int'l*, 982 F.2d at 998.

### C. Liability for Owners at the Time of Disposal

A previous owner of a "facility" from which a release has occurred is liable if it "owned" the facility within the meaning of CERCLA "at the time of disposal." 42 U.S.C. § 9607(a)(2). Three aspects of this basis for CERCLA liability are at issue in Georgia-Pacific's case against IP: (1) the definition of "facility"; (2) what constitutes "ownership"; and (3) what constitutes "disposal."

#### 1. "Facility"

Under CERCLA, "facility" is defined broadly to include:

> (A) any building, structure, installation, equipment, pipe or pipe-line ..., well, pit, ***pond***, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or
>
> (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

42 U.S.C. § 9601(9)(A) (emphasis added). The statute thus defines facilities based either on their functional boundaries or on the bounds of the area contaminated. *See United States v. Twp. of Brighton*, 153 F.3d 307, 313-14 (6th Cir. 1998); *id.* at 322-23 (Moore, J., concurring). Facilities are not defined based on ownership lines in land records. *United States v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000); *see also Louisiana-Pacific Corp. v. Beazer Mat'ls & Servs., Inc.*, 811 F. Supp. 1421, 1431 (E.D. Cal. 1993). Nor can facilities that operate as a single functional unit be subdivided to shield an owner from liability. *See Brighton*, 153 F.3d at 313-14, 322-23.

#### 2. "Owner"

As a general matter, holding legal title to the facility suffices to make an entity an "own-

er" under CERCLA.  *See* 42 U.S.C. § 9601(20)(A)(ii).  Part ownership is enough to make an en-

tity liable.  *See United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1279-80 (3d Cir. 1993), *over-*

*ruled on other grounds by United States v. E.I. DuPont De Nemours & Co.*, 432 F.3d 161 (3d

Cir. 2005) (owner of 10% of facility treated as "owner" because § 107 imposes liability without

regard to whether a party is the sole owner or a partial owner)*; S. Pac. Transp. Co. v. Voluntary*

*Purchasing Groups Inc.*, No. 3:94-cv-2477, 1997 WL 457510, *5 (N.D. Tex. Aug. 7, 1997)

(owner of portion of property found liable under section 107 for activities at entire facility).  And

lessors of a facility are liable, even if the lessee was actually responsible for the disposal or re-

lease of hazardous substances.  *See United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 571 (6th

Cir. 1991) (affirming district court order finding lessor and lessee jointly and severally liable for

site contamination under CERCLA despite finding that "the lessee was the primary actor in al-

lowing this site to become contaminated" because the lessor bore significant responsibility

"simply by virtue of being the landowner").

CERCLA exempts from its definition of "owner" lenders who hold title to property only

to secure the repayment of a loan or other obligation, but otherwise have no role in the manage-

ment or operation of the facility.  *See* 42 U.S.C. § 9601(20)(E)-(G).  Georgia-Pacific and IP al-

ready have addressed the contours of this exemption at length, but three aspects of the exemption

bear emphasis with respect to trial.  First, the exemption is an affirmative defense to CERCLA

liability, so the party claiming the benefit of it bears the burden of proof.  *Organic Chem. Site*

*PRP Group v. Total Petro Inc.*, 58 F. Supp. 2d 755, 761 (W.D. Mich. 1999) ("The party who in-

vokes this provision to protect itself from CERCLA liability carries the burden of showing that it

is entitled to the exemption.").  Second, the "controlling factor" in determining whether an own-

ership interest in a facility is, in fact, a mere security interest, is the intent of the parties engaged

in the transaction that allegedly created the security interest. *Moore v. Cycon Enters.*, 2006 U.S.

Dist. LEXIS 57452, at * 28-30 (W.D. Mich. Aug. 16, 2006). Third, a party seeking the exemp-

tion also must show no participation in the management of the facility, even if the parties intend-

ed to create a security interest. 42 U.S.C. § 9601(20)(E)(i).

### 3.    "Disposal"

CERCLA adopts RCRA's definition of disposal. 42 U.S.C. § 9601(29). Under that defi-

nition, "disposal" means:

> the discharge, deposit, injection, dumping, spilling, leaking, or
> placing of any solid waste or hazardous waste into or on any land
> or water so that such solid waste or hazardous waste or any con-
> stituent thereof may enter the environment or be emitted into the
> air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). The common thread among all of the actions that qualify as disposal under

this definition is human action. So disposal occurs when contaminants are introduced to the en-

vironment through active human conduct. *150 Acres*, 204 F.3d at 705-06; *see also United States*

*v. CDMG Realty Co.*, 96 F.3d 706, 714 (3d Cir. 1996). But disposal does not include the mere

"passive migration" of hazardous substances underground through no human action. *See Bob's*

*Beverage, Inc. v. Acme*, 264 F.3d 692, 697-98 (6th Cir. 2001).

## II.    Issues to Be Resolved at Trial

### A.    Georgia-Pacific's Claims Against NCR

Georgia-Pacific alleges that NCR arranged for the disposal of hazardous substances with-

in the meaning of CERCLA § 107(a)(3). Georgia-Pacific contends that NCR qualifies as an ar-

ranger because it engaged in a series of transactions with an overarching plan for the disposal of

hazardous substances. *See Gencorp*, 390 F.3d at 446.

First, NCR itself sold CCP wastepaper from its facilities in Dayton, Ohio; Washington

Court House, Ohio; and Viroqua, Wisconsin with the intent that the hazardous PCB emulsion

used to coat that paper would be discharged into rivers by paper recyclers.

Second, ACPC and CPM, both of which ultimately merged into NCR, sold coating broke from their coating operations in Appleton and Combined Locks, Wisconsin with the intent that the PCB coating would be washed away from paper fibers and discharged into rivers.  NCR is liable for these arrangements because (a) it is a corporate successor to ACPC and CPM; and (b) even absent corporate successorship, NCR's relationship with ACPC and CPM, which included a plan for the disposal of the PCB-containing emulsion in NCR broke, is itself sufficient to make NCR directly liable under CERCLA for those transactions.

Finally, NCR is responsible for Mead's sales of broke.  NCR is not a corporate successor to Mead, but as with ACPC and CPM, NCR's relationship with Mead included a plan for the disposal of the PCB-containing emulsion in NCR broke and thus is sufficient to make NCR directly liable under CERCLA for those transactions.

As to each of these avenues of CERCLA liability, the Court must answer two questions:

1. With respect to any of the transactions above, did NCR take intentional steps to dispose of hazardous substances—namely, PCBs in its emulsion and on coated broke and trim generated by ACPC, CPM, Mead, or NCR's own printing operations?

2. Is it is more likely than not that at least one bale of CCP broke or trim, during the time when CCP broke and trim contained PCBs, was sent from ACPC, CPM, Mead, or NCR and recycled at paper mills located on the Kalamazoo River and Portage Creek in Michigan?

### B.    Georgia-Pacific's Claims Against IP

Georgia-Pacific alleges that IP, through its predecessor St. Regis Paper Company, owned all or part of the Bryant Mill "facility" in Kalamazoo during the period of time when Allied Paper Corporation indisputably was recycling CCP and discharging PCB-laden waste into the Bryant Mill Pond and Portage Creek.  IP is liable under CERCLA for each of three separate reasons.

First, Allied operated the Bryant Mill starting on July 1, 1956, and it recycled CCP during the relevant time period, resulting in the disposal of PCBs into the Bryant Mill Pond and Portage Creek and the downstream movement into the Kalamazoo River. St. Regis owned most of the property that comprised the Bryant Mill during the period July 1, 1956 to August 5, 1966. None of these facts is in material dispute. Together, they make IP liable under CERCLA § 107(a)(2).

With respect to this part of Georgia-Pacific's case against it, IP contests only the allegation that it was the "owner" within the meaning of CERCLA § 101(20) of most of the Bryant Mill from July 1, 1956 to August 5, 1966. It contends instead that it held only a security interest in the property during that period. Georgia-Pacific disputes that contention. To qualify for the exemption, IP must show that St. Regis and Allied intended that the 1956 transaction would be a lease of the portion of the Bryant Mill described in the Lease dated June 29, 1956, as opposed to a sale with a security interest. If IP can show the parties intended to create a security interest, IP then must prove that St. Regis did not during the lease term participate in management or otherwise control the daily operations or maintenance of the facility.

Second, St. Regis owned and operated the Panelyte Facility, which included a portion of the Bryant Mill Pond, until March 3, 1965. PCBs from Allied's de-inking operation at the Bryant Mill were disposed of in the Bryant Mill Pond, including the portion owned by St. Regis, during the relevant time period. IP therefore is liable as an owner of the Bryant Mill Pond. As to this contention, IP admits that it was an owner of the Panelyte portion of the Bryant Mill Pond but denies that it is liable on account of this ownership. It contends that there is no evidence that the Panelyte operation resulted in the disposal of PCBs or that Allied disposed of PCBs in the Panelyte portion of the Pond. It contends that PCBs came to be located in the Panelyte portion of the Pond because of passive migration. Georgia-Pacific agrees that there is no evidence that

St. Regis itself disposed of PCBs during its operation of Panelyte.

To resolve this issue, the Court first must determine whether the evidence establishes that, during the period July 1, 1956 to March 3, 1965, the portion of the Bryant Mill Pond that was owned and operated by St. Regis as part of Panelyte was a part of the same "facility" under CERCLA into which Allied was discharging PCB-laden wastewater effluent. If the answer to that question is yes, then IP is liable. If the answer is no, the Court then must determine whether the evidence establishes that, during the period July 1, 1956 to March 3, 1965, the discharge and deposition of PCB-laden water and sediments in the Panelyte portion of the Bryant Mill Pond as a result of Allied's operations constitutes "disposal" under CERCLA.

Third, St. Regis both owned and operated the Bryant Mill, which it called the Kalamazoo Paper Mill, from 1946 to June 30, 1956. Georgia-Pacific contends that St. Regis's wastepaper furnish at the Bryant Mill included NCR CCP, resulting in the disposal of PCBs into the Bryant Mill Pond and Portage Creek and the downstream movement into the Kalamazoo River. IP therefore is liable as an owner and an operator of the Bryant Mill during the pre-June 30, 1956 time period. IP admits that St. Regis owned and operated the Bryant Mill during this time period, but it denies that CCP was recycled or that PCBs were disposed of then. To resolve this issue, the Court must determine whether the evidence establishes that St. Regis recycled CCP as part of its wastepaper furnish during the months and years it operated the Bryant Mill up to June 30, 1956, thus releasing PCBs into the Bryant Mill Pond, Portage Creek and the Kalamazoo River.

III.   **Issues Relating to the Presentation of Evidence**

    A.   **The Type and Volume of Georgia-Pacific's Expected Evidence**

        1.   **Testimony**

This case presents unique exigencies that will impact the manner in which Georgia-

Pacific will present its testimonial evidence.  First, the case involves events that occurred be-

tween 40 and 60 years ago.  Few witnesses to those events are still alive.  Of those that are, most

are unavailable to testify live, either due to advanced age or because they live more than 100

miles from the courthouse.  Second, many individuals with knowledge pertinent to the issues to

be resolved in this case have testified previously, either at deposition or at trial, in one or more

actions relating to either NCR paper generally, the clean-up of the Kalamazoo River, or insur-

ance coverage of relevant parties.  As a result, there is a relatively large reservoir of relevant tes-

timony of unavailable witnesses from which to draw.

Georgia-Pacific intends to present as much of its case as possible through live testimo-

ny—likely eight experts (six for Georgia-Pacific's case in chief and two for rebuttal of IP's case)

and three fact witnesses, one a current Georgia-Pacific employee and two who are within 100

miles of the courthouse.  The remaining testimonial evidence that Georgia-Pacific intends to pre-

sent will be submitted through the deposition testimony of 44 witnesses.  Each of those witnesses

is unavailable.  Six are deceased, two are elderly, and the remainder live more than 100 miles

from the courthouse.  None is a current Georgia-Pacific employee, and none is otherwise under

Georgia-Pacific's control.

Of the depositions on which Georgia-Pacific intends to rely, many were videotaped.  But

not all of that video-recorded testimony is of sufficient importance to the case to justify the use

of scarce trial time for presentation in open court.  Accordingly, Georgia-Pacific intends to offer

the testimony of only three of these witnesses through video.  Georgia-Pacific will submit tran-

scripts of the remaining testimony—highlighted to indicate designated testimony—to the court

for review in camera.

##### 2.     Documents

The vast bulk of Georgia-Pacific's evidence comes from a large number of historical documents.  The volume of these documents is significant, and is driven paradoxically by the gaps in the documentary record.  As Judge Griesbach observed in the Whiting case, relevant business records of NCR and ACPC evidently were destroyed long ago.  *See Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 506049, *4 n.14 (Dec. 16, 2009) (*Whiting* 2009).  In the absence of such records that would conclusively establish key fact issues, such as NCR's plan from the earliest stages to deal with their CCP broke problem by washing away the PCB emulsion in the recycling process, Georgia-Pacific has had to re-construct the documentary record with evidence from a variety of other sources.  For example, Georgia-Pacific located key documents establishing NCR's knowledge about the dangers to human health and the environment dating back to 1964 in the files of NCR's exclusive licensee for CCP production in Europe.  *Id.* at *4.  And Georgia-Pacific obtained other documents from, oddly enough, the "Legacy Tobacco Documents Library" maintained by the University of California, San Francisco.  *See Appleton Papers, Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920, *17 (E.D. Wis. July 3, 2012) ("*Whiting 2012*").  So rather than one document from NCR's own files that shows NCR's knowledge and intent, Georgia-Pacific has assembled an array of documents from overlapping sources.

Georgia-Pacific's expert and fact witnesses will discuss the significance of some of the documents Georgia-Pacific will present, but many will be introduced independently.  In light of the large volume of such documents, Georgia-Pacific respectfully submits that the Court would benefit from a mechanism for presenting such evidence during the course of trial that would allow the parties to explain the significance of certain documents as the come in.  For example, given that this is a bench trial, there is no need to publish exhibits to the jury periodically in open

court.  Instead, a party offering a collection of documentary evidence might present to the Court at the start of each trial day a binder of exhibits that will be independently introduced along with a short (no more than 2 pages) annotation of the documents in the binder.  Georgia-Pacific looks forward to discussing this issue further at the Final Pretrial Conference.

**B.      Evidentiary Objections**

Georgia-Pacific looks forward to discussing at the Final Pretrial Conference how the Court wishes to handle evidentiary objections.  While Georgia-Pacific and IP have lodged relatively limited evidentiary objections, NCR has taken a much different approach, especially as it relates to historical documents, the authenticity and admissibility of which already has been litigated.  Georgia-Pacific therefore discusses below two categories evidentiary issues that the Court might wish to address at the Final Pretrial Conference: (1) NCR's authenticity and hearsay objections to ancient documents; and (2) the introduction of prior testimony against an entity that was not a party to the proceeding where that testimony was taken.

**1.      Authenticity and Ancient Documents**

NCR has lodged objections more than 300 objections to exhibits on Georgia-Pacific's exhibit list on some combination of lack of authenticity and/or hearsay.  The vast bulk of these documents are "ancient" records that were produced by NCR or its affiliates in the related Fox River litigation.  Among these documents are some of the most significant pieces of evidence in the case.  They form the backbone for Judge Griesbach's 2009 conclusion in deciding motions for summary judgment that—at a minimum—"by the late 1960s [NCR] had access to the vanguard of data suggesting an appreciable risk of serious and long-lasting environmental damages result from the production and recycling of NCR paper."  *Whiting 2009*, 2009 WL 5064049, at

*14.[2]  They include the 1965 Heinritz letter (Exs. 1239 & 1240), which is the subject of a sepa-
rate motion in limine, that shows both that ACPC was telling Wiggins Teape how best to deal
with CCP broke and that ACPC's broke was being recycled by Kalamazoo-area mills.  They also
include the report of the 1965 meeting between Wiggins Teape and NCR in Dayton, where NCR
explained that the best way to deal with broke is to send it to recyclers, who would wash out the
PCBs with other recycling effluent.  *See* Ex. 1233.  In sum, these exhibits, viewed in the aggre-
gate, provide compelling evidence that establishes and corroborates NCR's overarching plan for
the disposal of PCB-laden waste through the sale of broke and trim to wastepaper recyclers.

The objections that NCR has lodged against these documents are largely the same objec-
tions NCR raised as to these documents in *Whiting*.  Judge Griesbach overruled them all.  *See
Whiting 2012*, 2012 WL 2704920, at *16-*18.  Georgia-Pacific will address NCR's objections to
specific exhibits at the appropriate time, but several of the bedrock evidentiary principles identi-
fied by Judge Griesbach deserve emphasis.

First, to establish authenticity, the proponent need only adduce evidence showing "that
the item is what the proponent claims it is."  Fed. R. Evid. 901(a); *see also ForeWord Magazine,
Inc. v. OverDrive, Inc.*, 2011 U.S. Dist. LEXIS 125373, at *7-*8 (W.D. Mich. Oct. 31, 2011)
(document authentication requires only "a *prima facia* showing that it is what the proponent
claims it to be.").  "Rule 901 does not erect a particularly high hurdle."  *Whiting 2012*, 2012 WL
2704920, at *16 (quoting *Thanongsinh v. Board of Educ.*, 462 F.3d 762, 779 (7th Cir. 2006)).

Second, courts may admit into evidence "[s]tatements in a document in existence twenty

---

[2] To the extent Judge Griesbach's factual findings in his 2012 order are entitled to preclu-
sive effect, his findings in 2009 should enjoy similar effect.  As the Court held in its recent sum-
mary judgment opinion, there are myriad reasons why consideration of the preclusive effect of
*Whiting* should be tabled for now, but should the Court conclude that the *Whiting* decision is suf-
ficiently final, Judge Griesbach's 2009 factual findings are preclusive.

years or more the authenticity of which is established." Fed. R. Evid. 803(16). In the case of

such "ancient" documents, authenticity is established where the document "(A) is in such condi-

tion as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic,

would likely be, and (C) has been in existence 20 years or more at the time it is offered." Fed. R.

Evid. 901(b)(8).

Third, Judge Griesbach observed that these documents were found in places where they

would be expected to be found and addressed relatively prosaic topics, both factors that support-

ed their authenticity. *Whiting 2012*, 2012 WL 2704920, at *17-*18.

Finally, Judge Griesbach overruled objections that some of the documents contained

"hearsay within hearsay." He correctly observed that the bulk of such assertions were offered

not to establish the truth of the matter asserted, but to show NCR's knowledge and intent. *Id.* at

*18.

Georgia-Pacific looks forward to discussing at the Final Pretrial Conference how to effi-

ciently address NCR's objections.

## 2.      The Use of Prior Testimony

NCR objects to Georgia-Pacific's use of deposition testimony from three prior cases in

which it was not a party: *H.M. Holdings, Inc., et al. v. Lumbermens Mutual Casualty Co., et al.*,

No. L 8573-89 (Superior Ct. of New Jersey, Union County); *Kalamazoo River Study Group v.*

*Rockwell Intl.*, No. 1:95-CV-838 (W.D. Mich.); and *Columbia Casualty Co. v. Arjo Wiggins Ap-*

*pleton, PLC, et al.*, No. 05-CV-36 (Circuit Court of Brown County, Wisconsin).

The Federal Rule of Evidence 804(b)(1) excludes from the definition of hearsay

"[t]estimony that (A) was given as a witness at a trial, hearing, or lawful deposition, whether

given during the current proceeding or a different one; and (B) is now offered against a party

who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar mo-

tive to develop it by direct, cross-, or redirect examination."  "[T]he fact of being a predecessor in interest is not limited to a legal relationship, but is also to be determined by the second aspect of the test under the rule: whether the defendant had an opportunity and similar motive to develop the testimony by cross-examination."  *Dykes v. Raymark Indus., Inc.*, 801 F.2d 810, 816 (6th Cir. 1986).  Accordingly, "a previous party having like motive to develop the testimony about the same material facts is, in the final analysis, a predecessor in interest to the present party."  *Murphy v. Owens-Illinois, Inc.*, 779 F.2d 340, 343 (6th Cir. 1985) (quoting *Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1187 (3d Cir. 1978)).  Where testimony does not meet the requirements of Rule 804(b)(1), it is hearsay and can be admitted only if an exception to the hearsay rule applies.

The testimony from *Columbia Casualty* that Georgia-Pacific intends to offer against NCR meets the requirements of Rule 804(b)(1), so the testimony is not hearsay.  NCR was not a party to that case, but its lawyers were present for each of those depositions and entered appearances at the depositions on behalf of NCR.  Moreover, NCR's close affiliate, Appleton Papers, Inc. (API), was a party to those cases, and it had the same motive with respect to those depositions as does NCR here. The fundamental issue was the same—i.e., what ACPC and NCR knew about its own responsibility for the PCB contamination of rivers due to the recycling of CCP broke and trim.  NCR and API also were parties to a cost-sharing agreement with respect to the Fox River cleanup, so NCR's financial interests were perfectly aligned with those of API.

The testimony from *H.M. Holdings* and *KRSG* may not meet the requirements of Rule 804(b)(1) to the extent it is used against NCR, because NCR was not a party to those cases.  But transcripts of that testimony nonetheless are admissible under one or both of the ancient records exception (Fed. R. Evid. 803(16)) or the residual exception (Fed. R. Evid. 807) to the hearsay

-16-

rule.  The transcripts of all depositions taken in H.M. Holdings qualify as ancient records—they are more than 20 years old, they were produced from attorney files where they would be expected to be found, and there is no suggestion that any has been altered.  The KRSG transcripts are less than 20 years old, but they have ample guarantees of trustworthiness and admitting the testimony would serve the purposes of the rules and the interests of justice.  *See* Fed. R. Evid. 807; *see also Dartez v. Fibreboard Corp.*, 765 F.2d 456, 462-463 (5th Cir.1985) (admitting deposition transcript under residual hearsay exception).

As with the authenticity and hearsay issues addressed above, Georgia-Pacific looks forward to addressing these issues with the Court at the Final Pretrial Conference.

## <u>Conclusion</u>

Georgia-Pacific appreciates the time and attention the Court already has devoted to this matter and looks forward to a smooth trial.

Dated:  January 30, 2013

**GEORGIA-PACIFIC CONSUMER PRODUCTS,
LP., FORT JAMES CORPORATION, and
GEORGIA-PACIFIC LLC**

By:_____/s/ Joseph C. Kearfott_____

Peter A. Smit, Bar No. P 27886
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI  49501
(616) 336-6000

Joseph C. Kearfott
Douglas M. Garrou
George P. Sibley, III
Paul T. Nyffeler
Hunton & Williams LLP
951 East Byrd St.
Richmond, VA  23219
(804) 788-8200

Jeffrey N. Martin
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Kathy Robb
Hunton & Williams LLP
200 Park Avenue, 52nd Floor
New York, NY  10166-0005
(212) 309-1000

Jan M. Conlin
Tara D. Falsani
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
(612) 349-8500

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 30, 2013, I electronically filed the foregoing using the

ECF system, which will send notification of such filing by operation of the Court's electronic

systems. Parties may access this filing via the Court's electronic system.

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

By:＿＿＿/s/ Joseph C. Kearfott＿＿＿＿＿＿＿＿＿＿

29073.000396 EMF_US 43791473v1