UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGIA-PACIFIC CONSUMER
PRODUCTS LP, FORT JAMES CORP.,
and GEORGIA-PACIFIC LLC,

        Plaintiffs,

                                       CASE NO. 1:11-CV-483

v.

                                       HON. ROBERT J. JONKER

NCR CORPORATION,
INTERNATIONAL PAPER CO., and
WEYERHAEUSER CO.,

        Defendants.

_____/

## OPINION AND ORDER

       Georgia Pacific ("GP") claims that NCR Corporation ("NCR"), International Paper Company

("IP"), and Weyerhaeuser Company ("Weyerhaeuser") are liable under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601

*et seq.*, for the costs of investigating and cleaning up polychlorinated biphenyl ("PCB")

contamination at the Kalamazoo River Superfund Site ("the Site"). Weyerhaeuser has admitted

liability but reserves the right to contest all remedial issues, including divisibility of harm and

allocation; NCR and IP have denied liability. The question presently before the Court is whether

NCR and IP are, in fact, liable under CERCLA for any of the response costs at the Site.

       GP says NCR is liable for arranging—either directly or through affiliates—the disposal of

PCBs at the Site. Specifically, GP charges that scraps ("broke" or "broke and trim") from NCR's

carbonless copy paper ("CCP") were a major source of PCBs; that, at the time it was manufacturing

CCP, NCR knew the PCBs in CCP broke were hazardous and would be released in the recycling process; and that NCR arranged to have paper recycling mills, like the ones all along the Site, recycle CCP broke as a means of avoiding the costs of disposing of the PCBs in some other way (such as incineration). NCR denies liability, claiming, first, that GP cannot prove any CCP broke went to the paper mills at the Site, and, second, that CCP broke was not a waste, but a useful product, such that any release of PCBs in the recycling process cannot be the basis for arranger liability under CERCLA.

GP says IP is liable as the corporate successor to St. Regis Corporation ("St. Regis"), which owned or operated the Bryant Mill, and which allegedly recycled CCP broke and discharged PCBs at the Site. At a minimum, GP argues, even if St. Regis did not directly dispose of the PCBs through its own operations at the Bryant Mill, it held title to the Mill while another company operated the Mill in a way that caused the disposal of PCBs at the Site. IP denies liability because, it says, GP cannot prove that CCP broke reached the Bryant Mill before July 1, 1956, the date on which St. Regis stopped operating the Mill itself, and sold or leased Mill assets to a new company. IP further argues that, even if the Bryant Mill did recycle CCP at some point after July 1, 1956, IP cannot be liable for the resulting PCB disposal as an owner because it continued to hold title to the Mill only to secure performance of a lease financing transaction with the new operator.

The Court conducted a two-week bench trial in this matter, featuring 25 expert and lay witnesses, and hundreds of exhibits.  The trial record fills 50 binders and covers thousands of pages. This Opinion and Order constitutes the Court's Rule 52 findings of fact and conclusions of law based on the trial record. The Court concludes that NCR is directly liable as an arranger under CERCLA, 42 U.S.C. § 9607(a)(3). The Court's conclusion is based on its finding, as a matter of fact, that NCR

2

understood, no later than 1969, that CCP broke was a waste, not a useful product, because no rational paper recycler, fully apprised of the facts as NCR was, would use CCP broke in its recycling process. Even after NCR knew hazardous waste disposal necessarily resulted from the process of recycling CCP broke, NCR continued to manufacture CCP and encourage recyclers—like those in the Kalamazoo River Valley—to use CCP broke in their recycling operations to avoid other, higher cost means of disposing of the CCP broke. That makes NCR an arranger under CERCLA. The Court further concludes that IP is liable under CERCLA as an owner at the time of disposal of PCBs from the Bryant Mill.  This conclusion is based on the Court's finding, as a matter of fact, that IP's predecessor in interest, St. Regis, owned the Bryant Mill at a time when the Mill was recycling CCP and thereby disposing of PCBs at the Site. The Court does not find that GP has proven by a preponderance of the evidence that CCP broke reached the Bryant Mill before July 1, 1966, while IP was both an owner and operator of the Mill.  But the Court finds that GP has made the necessary showing that the Mill disposed of PCBs from CCP waste while IP remained an owner of the Mill, and the Court further finds that IP does not qualify for CERCLA's secured lender exception.

## I.    BACKGROUND

### A.    Overview of the Site

The Kalamazoo River and its tributary, Portage Creek, run through Southwestern Michigan. They are contaminated with PCBs, a hazardous substance under CERCLA. The PCBs in the Kalamazoo River and Portage Creek were discharged by paper mills in the Kalamazoo River Valley. The mills recycled wastepaper as a source of pulp. Some of the wastepaper recycled by the mills was NCR's CCP. From 1954 to 1971 ("the production period"), CCP was made using Aroclor 1242, a source of PCBs. In the course of the recycling process, some of the PCBs from the recycled CCP

3

found their way into wastewater effluent, which the mills discharged into the Kalamazoo River and Portage Creek.  Because of the PCB contamination, the area is now listed on the National Priorities List, a list of national priorities of known or threatened releases of hazardous substances. It has been labeled as the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.

**B.**     **The Bryant Mill and Bryant Mill Pond**

One of the paper mills located at the Site is the Bryant Mill ("the Mill"). The Mill was built in 1895 along Portage Creek. As part of the Mill's construction, Portage Creek was dammed. Damming Portage Creek provided water and a power source for the Mill. It also created the Bryant Mill Pond ("the Pond"), which became an important part of the Mill's operations.  The Mill coated, manufactured, and disposed of paper. It was not, however, equipped to produce pulp, the base component of paper. Because the Mill could not produce its own pulp, it relied on purchased wastepaper and externally-sourced pulp in its paper manufacturing. By 1953, recycled wastepaper accounted for over two-thirds of the fiber used at the Mill.

Workers at the Mill usually had to de-ink waste paper before they used it for paper manufacturing. During the de-inking process, ink, clay, and other residuals were removed from the desirable paper fibers through a combination of chemical washing, heat, and mechanical agitation. Until the 1950s, this mixture of ink, clay, and other residuals was discharged, untreated, directly into Portage Creek. Sometime during the early 1950s, IP's predecessor in interest, St. Regis, constructed a clarifier at the Mill to help settle out solid material from the effluent that was discharged into Portage Creek. Even with the clarifier, however, roughly 70% of the suspended solids in the Mill effluent made it into Portage Creek.

St. Regis acquired the Mill in 1946. Three years later, Panelyte—one of St. Regis's subsidiaries—acquired a property ("the Panelyte property") abutting the Pond and adjacent to the Mill, for use in producing injection-molded plastics. Part of the Panelyte property was inundated upon creation of the Pond. Panelyte's activities on the Panelyte property involved neither paper manufacture nor the purchase or use of recycled wastepaper.  Panelyte and the Mill did, however, have some facilities in common, and both made use of the Mill Pond.

From 1946 until July 1, 1956, St. Regis manufactured paper at the Mill using a combination of virgin pulp and wastepaper. On July 1, 1956, by virtue of an agreement ("the Agreement") with Allied Paper Corporation ("Allied"), St. Regis conveyed its paper business at the Mill to Allied, including executory customer and supply contracts, equipment, raw materials, works in process, and inventory. In a series of ancillary agreements, St. Regis and Allied also agreed that the Mill would continue to provide steam to the Panelyte facility as needed, and that Allied would have use of the effluent system constructed by St. Regis, which transported de-inking waste through the Panelyte property to the Mill's clarifier.  St. Regis, continued to own and operate the Panelyte property after July 1, 1956, but did not continue operating the Mill itself.  Allied took over Mill operations.

St. Regis, IP's predecessor, did, however, maintain ownership of the Mill even though Allied took over operations.  This was accomplished with a lease provision in the Agreement.  The Lease gave Allied the right to possess and use the Mill and equipment associated with it for 13 years. In return, Allied agreed to pay St. Regis $1.2 million during the first year of the Lease and $400,000 per year thereafter until the Lease expired. The Lease gave Allied an option to purchase the Mill for $675,000 after ten years, and again after the Lease's thirteenth year. Unless and until Allied exercised its purchase option, legal title to the Mill remained with St. Regis. Not only did St. Regis

5

hold title to the Mill, but it was also responsible for paying property taxes, insurance, and certain other expenses associated with the property. St. Regis also retained the right to inspect and make repairs to the Mill. Under the Lease, Allied was obligated to reimburse St. Regis for all these expenses, but the only way for it to own the property outright was to exercise its purchase option after ten or 13 years. In the meantime, the Lease obligated Allied to continue its monthly payments to St. Regis, regardless of whether the Mill was damaged or destroyed. Allied was allowed to terminate the Agreement—including the Lease—if St. Regis sold its interest in the Panelyte facility before 1966.

The Agreement took effect on July 1, 1956. From that date forward, Allied operated the Mill, while St. Regis continued to hold title to it. St. Regis also continued to own and operate the neighboring Panelyte property until early 1965. Ten years into the Lease, in 1966, Allied exercised its purchase option for the Mill. St. Regis thereupon conveyed to Allied legal title to the Mill and to the equipment covered by the Lease. Both before and after the Lease, the Mill was used exclusively, like many mills in the Kalamazoo River Valley, for recycling and manufacturing paper.

### C.    NCR's Manufacture of Carbonless Copy Paper

NCR started manufacturing CCP in the 1940s. CCP consisted of two overlain sheets, each with a special coating developed and sold by NCR. The top sheet, called "Coated Back" or "CB," was coated on its back side with a thin layer of emulsion containing microscopic capsules. The capsules contained colorless ink, oils, and a transfer solvent. The bottom sheet, called "Coated Front" or "CF," was coated on its front side with a special clay-resin coating. When pressure was applied to the top of the CB sheet, the microcapsules in the coating would rupture, releasing the colorless ink. The colorless ink would then react with the coating on the front of the CF sheet,

6

creating an identical image as on the CB sheet. From 1954 through April 1971 ("the production period"), NCR used Aroclor 1242 as a solvent in the microcapsules. Aroclor 1242 is a source of PCBs.

There were two steps in the production of CCP: (1) "coating" large base paper rolls with PCB emulsion and other substances to make raw materials for use in the different sorts of paper products for which CCP was used; and then (2) "converting" the base paper rolls by cutting, printing, and collating the components into final CCP form, such as receipts or airline tickets. NCR outsourced the coating process to several independent companies (the "coaters"), including Appleton Coated Paper Company ("ACPC"), Combined Paper Mills ("CPM"), and Mead Corporation ("Mead"). At the end of the coating process, the coaters would sell the coated paper back to NCR. NCR would then fill orders for CCP for its own customers, who converted the bulk CCP into smaller, end-use CCP products, which they then sold. In addition to filling orders for customers, NCR also supplied CCP to conversion facilities that it owned (the "NCR converters"). The NCR converters were collectively organized under the name "Systemedia." Systemedia operated conversion facilities all over the country, including in Viroqua, Wisconsin, in Washington Court House, Ohio, and in Dayton, Ohio.

Both the manufacturing and converting of CCP generated "broke." Broke consists of the paper that is not used in the finished paper product, either because it does not meet finished product specifications, is damaged in the manufacturing process, or is trim and cuttings produced during manufacture and conversion. Although CCP broke from manufacture and conversion was unsuitable for the production of finished business forms, paper recyclers used it as a raw material in the manufacture of new paper. The recyclers would take the broke, recover the paper fibers from it,

dispose of waste products (including PCBs in the recycling process) and turn the recovered fiber into new paper. There was a well-established market for broke and other sources of recycled paper.  The coaters and NCR converters spent time and money preparing their broke for sale, either to brokers or directly to paper recycling mills.

By some estimates, more than 110 million pounds of CCP broke were sold and distributed through the wastepaper market during the production period. Paper recycling mills competed to obtain the broke and viewed it as an essential part of their business. Still, broke had to be processed before it was suitable as pulp for new paper. Mills recycling broke would break it down into fiber (useful) and an effluent (waste) containing everything else from the broke (e.g., ink). The recycling mills took the useful fiber and made it into new paper for commercial sale. They discharged the waste as part of their effluent—sometimes after treating it, sometimes without treating it.  The effluent included PCBs when the base wastepaper included CCP.

In most respects, the process of recycling CCP broke was identical to the process for recycling ordinary paper broke, so it was nothing new in the paper industry. One unique problem with recycling CCP broke, however, was that, during the recycling process, the dyes in the coating emulsion would oxidize or react with clays in the paper and become visible (a process known as "blueing"). This hampered recyclers' efforts to create usable, white paper fibers. NCR spent considerable time and money researching a way to solve the blueing problem, so that coaters and converters would be willing to participate in manufacturing CCP products, and so that recyclers would be willing to purchase CCP broke. Ultimately NCR developed a de-inking process whereby the microcapsules in the CCP broke were chemically broken up and the dyes they contained were adsorbed onto clay suspended in water. Once the dyes had attached to the clay molecules in the

water, the recyclers discharged the effluent into the environment. The effluent included PCBs from the CCP wastepaper.

### D.    The Litigation

Between 1972 and 1989, the Michigan Department of Natural Resources ("MDNR") conducted several studies that revealed the Site was contaminated with PCBs.  In 1990, the United States Environmental Protection Agency placed the Site on the National Priority List under 42 U.S.C. § 9605, and the MDNR listed it as an environmental contamination site under the Michigan Environmental Response Act, M.C.L. § 299.601 *et seq.* GP, whose subsidiaries own property at the Site, says it has spent millions of dollars dealing with the PCB contamination there. In 2010, it brought this CERCLA action seeking contribution from IP, NCR, and Weyerhaeuser in footing the bill for the cleanup activities.

## II.    CERCLA LIABILITY

Congress enacted CERCLA "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks omitted). CERCLA accomplishes this, in part, by allowing private parties to sue other parties who may be responsible for polluting a particular site. To establish a prima facie case for contribution under CERCLA, a plaintiff must prove four elements: (1) a release of hazardous substances occurred; (2) the release occurred at a facility; (3) the release caused the plaintiff to incur response costs; and (4) the defendant falls within one of the four categories of potentially responsible parties ("PRPs") set out in 42 U.S.C. § 9607(a). *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000). A "facility" is "any site or area where a hazardous substance has been

deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C.

§ 9601(9)(B). A defendant is a PRP under § 9607(a) if it is:

> (1) the owner and operator of a vessel or a facility,
> (2) [a] person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) [a] person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substance, [or]
> (4) [a] person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

*Id.* at § 9607(a).

Liability for all categories of PRPs under CERCLA is strict. *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996). It attaches to any party responsible for any part—even the tiniest fraction—of the contamination at a given site. *See Kalamazoo River Study Grp.*, 228 F.3d at 660 (a single discharge of contaminants suffices to support liability under CERCLA); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) ("[E]ven a minimal amount of hazardous waste brings a party under the purview of [CERCLA] as a PRP."); *United States v. Monsanto Co.*, 858 F.2d 160, 168 (4th Cir. 1988) ("The plain language of [§ 9607(a)(2)] extends liability to owners of waste facilities regardless of their degree of participation in the subsequent disposal of hazardous waste."). Where a plaintiff makes out a prima facie case for liability, the defendant will be liable for contribution, regardless of actual fault or knowledge, unless it can prove one of the very limited defenses recognized under 42 U.S.C. § 9607(b). *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1508 (6th Cir. 1989) ("We agree

10

. . . that CERCLA contemplates strict liability for landowners, who, absent a defense recognized under section 9607(b), are deemed responsible for some of the harm."). None of the Defendants here assert a § 9607(b) defense.

To prevail in a CERCLA contribution action, a plaintiff must establish by a preponderance of the evidence that it is entitled to reimbursement from the defendant. *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d 574, 589–90 (6th Cir. 2004). The plaintiff may carry its burden with or without "direct" documentary evidence. *See Tosco Corp. v. Koch Indus., Inc.* 216 F.3d 886, 892 (10th Cir. 2000) ("CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence."). Indeed, the timing of CERCLA actions—which frequently occur decades after the underlying contamination took place—oftentimes makes direct evidence difficult or impossible to obtain. *See, e.g., Niagara Mohawk Power Corp.*, 596 F.3d at 131 ("[T]he type of evidence, be it direct or circumstantial, and its quality, is to some degree impeded by the passage of time . . . ."). Thus, "there is nothing objectionable in basing findings [of CERCLA liability] solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain." *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.* 240 F.3d 534, 547 (6th Cir. 2001).

### A.     Owner or Operator Liability Under § 9607(a)(2)

Holding legal title to a facility generally suffices to make an entity liable as an owner under CERCLA for disposal occurring during the ownership. 42 U.S.C. § 9601(20)(A)(ii) (defining "owner or operator" to include "any person owning or operating such facility"). An exception to the general rule of owner liability, known as the "secured creditor exemption," provides that "[t]he term 'owner or operator' does not include a person that is a lender that, without participating in the management

11

of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility." *Id.* at § 9601(20)(E)(i). The term "lender" covers not just financial institutions and other commercial lenders, but also "any person (including a successor or assignee of any such person) that makes a bona fide extension of credit to or takes or acquires a security interest from a nonaffiliated person . . . ." *Id.* at § 9601(20)(G)(iv)(V). "The term 'extension of credit' includes a lease finance transaction in which the lessor does not initially select the leased vessel or facility and does not during the term of the lease control the daily operations or maintenance of the vessel or facility . . . ." *Id.* at § 9601(20)(G)(i)(I). And "[t]he term 'security interest' includes a right under a . . . lease and any other right accruing to the person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person." *Id.* at § 9601(G)(vi).

## B.     Arranger Liability Under § 9607(a)(3)

In addition to owners and operators of facilities, CERCLA also imposes liability on "arrangers." An entity is liable as an arranger if:

> [B]y contract, agreement, or otherwise [it] arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

*Id.* at § 9607(a)(3). The mere sale of a useful product—even one that ultimately proves hazardous—does not constitute "arranging for disposal" under CERCLA. *AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir. 1993). In other words, "no arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a useful, albeit dangerous product, to serve a particular intended purpose." *Id.* (internal quotation marks omitted).

12

A party is liable as an arranger only if it has "taken an affirmative act to dispose of a hazardous substance . . . as opposed to convey[ing] a useful substance for a useful purpose." *Id.* (internal quotation marks omitted).  Absent a contract or agreement, a court must look to the totality of the circumstances, including any "affirmative acts to dispose," to determine liability. *Cello-Foil*, 100 F.3d at 1232.

Arranger liability exists on a spectrum, since the term "arrange" is subject to many interpretations.

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes–cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear. In such cases, courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a "disposal" or "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions.

*Burlington N. & Santa Fe Ry.*, 556 U.S. at 609-10; *see also Penumo Abex Corp. v. High Point, Thomasville & Denton R. Co.*, 142 F.3d 769, 775 (4th Cir. 1998) ("[T]here is no bright line between a sale and a disposal under CERCLA. A party's responsibility . . . must necessarily turn on a fact-specific inquiry into the nature of the transaction.").  This is one of those in-between cases.

"[A]n entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington N. & Santa Fe Ry.*, 556 U.S. at 611. Specific intent to dispose of a hazardous substance is an element of arranger liability because, "in commonplace

parlance, the word 'arrange' implies action directed to a specific purpose." *Id.*; *see also Cello-Foil Prods.*, 100 F.3d at 1231 ("[I]t would be error for us not to recognize the indispensable role that state of mind must place in determining whether a party has 'otherwise arranged for disposal . . . of hazardous substances.'"). Thus,

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product.

*Burlington N. & Santa Fe Ry.*, 556 U.S. at 612. Moreover, simply divesting itself of a hazardous substance—however intentionally—does not automatically make a party liable as an arranger, because arranger liability requires that the party have "the intention that at least a portion of the product be disposed of . . . by one or more of the methods described in § 6903(3). *Id.* 42 U.S.C. § 6903(3) defines "disposal" as,

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

Ultimately, then, the central, fact-intensive question in determining arranger liability is whether there is evidence to support a reasonable conclusion that the alleged arranger "planned for the disposal" of a hazardous substance. *Burlington N. & Santa Fe Ry. Co.* 556 U.S. at 612. In this case, the question is whether and when NCR's sale of CCP broke—a waste in the production of CCP—moved from the sale of a useful product to paper recyclers to an arrangement for disposal of PCB-contaminated waste that no fully informed paper recycler would ever use. For reasons detailed below, the Court concludes this occurred no later than 1969, when NCR understood this but

14

continued to unload the broke and trim to recyclers who did not understand.  In short, not later than 1969, NCR understood the CCP broke and trim was no longer anything but waste and was no longer useful to any paper recycler who understood the true facts as NCR did.

Like owners and operators, arrangers are strictly liable under CERCLA. *Id.* at 610. Thus, common law rules of causation, such as proximate cause, do not apply in the CERCLA context. *See, e.g., AlliedSignal, Inc. v. Amcast Int'l Corp.*, 177 F. Supp. 2d 713, 749 (S.D. Ohio 2001) (citing *Boeing v. Cascade Corp.*, 207 F.3d 1177 (9th Cir. 2000), and *Tosco Corp.*, 216 F.3d 886). Assuming the requisite intent to dispose is established, the plaintiff in an arranger liability action need only show that the alleged arranger's waste actually reached the site in question. This "causal nexus" requirement is satisfied if the plaintiff shows that the waste for which the defendant arranged disposal was deposited at the site. *See, e.g., United States v. Distler*, 803 F. Supp. 46, 51 (W.D. Ky. 1992).

## III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

GP alleges that NCR is liable under CERCLA as an arranger and that IP is liable under CERCLA as an owner or operator. The Court agrees on both counts. NCR is liable because it planned the disposal of CCP broke at a time when it knew broke could no longer be useful to a fully informed recycler and because at least some of that broke reached the Site. IP is liable because it owned the Bryant Mill at a time when the Mill was recycling PCB-laden CCP broke.

### A.    NCR's Liability

NCR agrees that GP has established the first three elements of a prima facie case of CERCLA liability. Specifically, NCR does not dispute that: (1) a release of hazardous substances (i.e., PCBs) occurred; (2) the release occurred at a facility (i.e., the Site); and (3) the release caused GP to incur

response costs. The only dispute between GP and NCR, then, is whether NCR qualifies as an arranger under 42 U.S.C. § 9607(a)(3). The Court finds that GP has carried this burden by proving by a preponderance of the evidence that no later than 1969, NCR knew that recycling CCP broke in the paper mills created a hazardous waste stream; that NCR continued to sell CCP broke to brokers and recyclers even though it understood no rational recycler would want the CCP broke anymore if it understood what NCR did; and that CCP broke reached the Kalamazoo River Valley Site.

### 1.  NCR learned CCP broke was hazardous during the production period

At trial, GP presented considerable evidence that NCR understood, at various points in the production period, that the CCP broke they were selling to brokers and recycling mills generated a hazardous PCB waste as part of the normal recycling process. An internal NCR memo, for example, acknowledges that "[i]n the late 1960's accumulative evidence began to show that PCB's may have adverse effects on certain forms of animal life." (Trial Ex. 1612 at 916.) The deposition testimony of Dan McIntosh, manager of NCR's Technical Services Group, backs that up. McIntosh testified that, in the "late 60's," he had conversations with NCR's Manager of Carbonless Paper Research, J.E. Gordon Taylor, about the need to replace the PCBs in CCP because of the environmental effects of those PCBs. (Trial Ex. 84 at 79:3-80:24.)

Memoranda and follow-ups to NCR internal meetings further support the conclusion that NCR knew, during the production period, of the dangers of recycling CCP. At a March 27, 1969 meeting with Monsanto personnel, several NCR leaders were given an article linking dispersal of PCBs with health problems in San Francisco-area wildlife. (Trial Ex. 1509 at 385.) Because the article "could play into the hands of [NCR's leading competitor in the paper market]," the NCR personnel elected to "take no action unless a second article appeared specifically naming their paper

as a source of pollution." (Trial Ex. 1509 at 385–86.) A memo written one month after that meeting expressed NCR's continued nervousness about the possibility that "the second shoe would drop" with respect to publicizing the PCBs in CCP. (Trial Ex. 1511.) In a December 16, 1969 meeting, Monsanto's scientists told NCR's Manager of Carbonless Paper Research, J.E. Gordon Taylor, that the sorts of PCBs used in CCP "will be toxic to Benthic plankton and bottom feeders." (Trial Ex. 1526, at 928–29.) Based on this and similar evidence from the record—largely produced and maintained by NCR—the Court finds by a preponderance of the evidence that, by at least March of 1969, NCR knew CCP broke generated a toxic, hazardous by-product in normal recycling.

The evidence also shows that, by mid-1970, knowledge of the PCB problem with CCP broke had spread outside NCR, to companies like ACPC and CPM. Indeed, the record shows that these companies understood CCP broke as potentially posing a legal risk for anyone selling it. For example, a memo from September 3, 1970 reports that ACPC's Vice President of Research, Thomas Busch, requested "a 'Hold-Harmless' statement from [NCR for] all liability connected with Aroclor." (Trial Ex. 1791, at 687.) Likewise, a September 15, 1970 letter to NCR from J.F. Whalen, a technical director at CPM's Combined Locks Mill, enclosed an article on PCB contamination in Appleton, Wisconsin, along with a statement that "studies [were] underway on [the] occurrence & prevalence of PCB's and recommends studies of their potential effect [on] aquatic creatures including fishbeds." (Trial Ex. 1791, at 687.) This evidence also supports the Court's finding that NCR was aware of the environmental hazards posed by CCP broke.

None of the evidence, moreover, suggests that NCR genuinely believed that treating the effluent from recycled CCP broke would keep PCBs from flooding into the environment through the recycling process. At trial, Dr. James Kittrell testified persuasively that the technical personnel at

NCR—as well as at ACPC and CPM—would have understood that waste water treatment in paper recycling operations would do little, if anything, to remove PCBs from the effluent that was ultimately deposited into the environment. (Trial Tr., doc. # 399, at 465–66 (Kittrell testimony that PCBs would "go with the sludge from the wastewater treatment system, or . . . go with the water."). Dr. James Farrand, an expert in de-inking procedures, also said that the paper professionals and chemists at NCR throughout the production period would have known that, whatever treatment protocols were in place, a substantial quantity of PCBs would be discharged into the environment. (Trial. Tr., doc. # 397, at 120.) By contrast, not a single witness suggested that anyone at NCR believed that treatment protocols at paper recycling mills effectively removed PCBs from the effluent discharged by those mills. Indeed, by January 26, 1970, the problem of "PCB residue" in the effluent had become so bad that NCR, Monsanto, and NCR's European licensee, Wiggins Teape, had to meet in London to discuss non-treatment options to prevent PCBs from recycled CCP from entering the environment. The meeting adjourned with the members concluding that there was "no effective method for controlling the disposal of used paper." (Trial Ex. 1539, at 881.) For example, NCR proposed incinerating CCP broke, but the cost of doing so, coupled with the fact that the PCBs in CCP paper underwent little decomposition when burnt, derailed that option. (Trial Ex. 1543, at 427.) Instead of ordering the cessation of broke sales, however, NCR's representatives at the meeting asked only that Monsanto not "identify NCR paper as a major outlet for Aroclor at [Monsanto's] forthcoming meeting with the Ministry of Agriculture." (Trial Ex. 1539, at 880. From this, the Court further finds that, during the production period, NCR knew CCP broke was not useful for a fully informed buyer, but a worthless waste product at best, and a serious environmental hazard at worst. Indeed, the Court finds by a preponderance of the evidence that, no later than March of 1969, NCR

18

itself viewed the disposal of broke as a major problem for the company. (See Trial Tr., doc. # 402, at 1022–23 (testimony of NCR's expert, Bradford Cornell, that, after the September 1970 meeting with Monsanto, NCR viewed broke as a waste).)

### 2. NCR continued to sell CCP broke to brokers and recyclers after discovering it to be a legal and environmental liability

NCR continued to manufacture and sell CCP–and CCP broke–after learning of these problems. Not until May 25, 1971–years after discovering that recycling CCP broke led to disposal of toxic PCBs in the environment–did NCR stop shipping its PCB-laden CCP emulsion to ACPC, CPM, and Mead. The result was that, in 1971 alone, more than 3,850,000 reams of CCP were manufactured (Trial Ex. 1174), notwithstanding that NCR knew continued CCP production posed a serious environmental hazard. The Court therefore finds, by a preponderance of the evidence, that, during the production period, NCR arranged for disposal of CCP broke that it knew to be an environmental and economic liability.  Alhough the arrangement was in the form of a sale to paper recyclers, the preponderance of the evidence precludes treatment of the arrangement as the sale of a useful product from 1969 through the end of the production period.

NCR's principal argument at trial was that, throughout the production period, it saw the CCP broke as a useful product, not as a hazardous substance. The record from trial belies that characterization. First, the evidence clearly establishes that, from the late 1960s through the end of the production period, NCR was scrambling to find alternative ways of disposing of the CCP broke, rather than selling it to paper recyclers. (*See, e.g.*, Trial Ex. 1296, at 532–35 (detailing NCR's efforts to pay Monsanto to "dispose of" CCP broke and emulsion in Monsanto's hazardous waste incinerator); *see also* Trial Ex. 85, at 122:17–123:6 (explaining that the discussion with Monsanto

occurred because NCR "wanted the paper with Aroclor capsules on it disposed of").) Moreover, the record demonstrates that NCR actively attempted to conceal the hazards associated with CCP broke—from recyclers, the public, and even governmental entities. When news outlets first began reporting on the problems associated with PCB accumulation in the environment, NCR was careful not to reveal that its CCP emulsion was loaded with PCBs. (*See* Trial Ex. 1509, at 385–86.) Indeed, it expressed hope that the story would not get traction. (Trial Ex. 1511 (NCR Manager of Carbonless Paper Manufacturing, J.E. Gordon Taylor, expressing concern about "the possibility that the second shoe would drop").) And when the British government began investigating  PCB contamination, NCR expressly instructed Monsanto, with whom it had been working to resolve the PCB problem, not to say anything about the presence of PCBs in CCP broke. (Trial Ex. 1539, at 880; Trial Ex. 26, at 36:10–37:13.).

Collectively, the evidence paints a clear and unequivocal picture that, at least by the late 1960s, NCR knew the CCP broke it was facilitating was a hazardous substance, the disposal of which created the possibility of substantial legal liability. Under those circumstances, the Court finds that no one with NCR's knowledge of the situation could have believed that CCP broke was a useful product. For that reason, the Court concludes, NCR's continued attempts to move CCP broke near the end of the production period were not attempts to sell a genuinely useful product, but rather attempts to divest itself of a product that it knew to be hazardous and a legal liability. The fact that brokers and paper recyclers were, at the time, willing to pay for CCP broke is not evidence to the contrary, since NCR had deliberately attempted to conceal from them—and everyone else—the toxic nature of CCP broke. To the recyclers and brokers, CCP broke remained a safe, viable source of pulp. But, as the Court has found, NCR was fully aware of the truth no later than March of 1969.

Because NCR knew by that time that CCP broke was a legal liability, not a useful product, its continued sale of CCP broke for years after that time is not covered by any "useful product" exemption to arranger liability. Rather, the Court concludes as a matter of law that NCR arranged for the disposal of CCP broke as a means of getting rid of a substance it knew to be hazardous.

### 3. CCP broke from ACPC, CPM, Mead, and the Systemedia entities reached the Site

That still leaves the question whether, as a matter of fact, CCP broke actually reached the Kalamazoo River Valley Site. The Court finds, by a preponderance of the evidence, that it did. The Court's finding in this respect is based on both direct and circumstantial evidence. Gene Edgerton, a truck driver for GP, testified to transporting shipments labeled as CCP broke to the Kalamazoo River Valley in the "latter part of '70 into '71," and "later, too." (Trial Ex. 40, at 24:20–25:10.) Edgerton recalled the broke was CCP broke because it was "something new" to him. (*Id.* at 94:18–95:17.) On one haul from NCR's Washington Court House facility, Edgerton described the rolls of paper he was hauling: "[H]e could take these two sheets and run [his] fingernail across it and look, there would be another like an ink line there. It would go through. They would have a copy on it." (*Id.* at 152:7–153:19.) That is a description of CCP.

Transport records from the late 1960s substantiate Edgerton's testimony. Two entries from 1968, for example, record delivery to a Kalamazoo River Valley mill of material specifically identified as "NCR Broke" and "NCR Stock." (Trial Ex. 1833, at 494, 524.) Another 1968 entry in the same set of records details the delivery to the same mill of "colored broke" (CCP broke was sometimes referred to as "colored ledger"). (*Id.* at 470.) What is more, NCR acknowledges that these records come from a source, National Fiber, that brokered CCP broke from ACPC and CPM during

the production period. Also persuasive is a 1965 letter from Bud Heinritz detailing the shipment of "limited quantities" of ACPC's CB broke to "Allied Paper Company, Kalamazoo Michigan." (Trial Ex. 1240, at 20.) Mr. Heinritz worked for ACPC at the time he wrote the letter.

Circumstantial evidence at trial buttressed the direct evidence that CCP broke made its way to the Kalamazoo River Valley Site. For example, several witnesses at trial confirmed that Kalamazoo-area paper recycling mills purchased broke from suppliers known to use CCP broke. One of GP's business experts, Dr. Robert Dolan of Harvard University, persuasively testified that, given the heavy demand for paper fiber in the Kalamazoo River Valley, the relative proximity of NCR's Ohio and Wisconsin facilities to the Kalamazoo River Valley, and the availability of affordable transport, truck, and rail transport would likely have led a considerable amount of CCP broke from NCR sources in Wisconsin and Ohio to end up in the Kalamazoo River Valley. Dr. Dolan's views were confirmed by a study from Franklin Associates entitled "Use of Waste NCR Papers in the East North Central Region and Fox River Mills, 1969." (Trial Ex. 1772, 245.) Taking the record as a whole, the Court finds, by a preponderance of the evidence, that CCP broke reached the Site during the production period.

Having already concluded that NCR arranged for the disposal of the broke after learning it to be a hazardous waste product, the Court finds that NCR is liable as an arranger for contamination at the Site. The Court's finding should not be read to suggest that NCR's sole purpose in making and selling CCP and CCP broke during the entire production period was to dispose of the PCBs in its CCP emulsion, or the PCBs in the CCP itself. This is exactly the sort of mixed-motive case that the *Burlington Northern* court said required "a fact-intensive inquiry . . . to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability

22

provisions." *Burlington N. & Santa Fe*, 556 U.S. at 610. After conducting such an inquiry, the Court has found only that, at some point in the production period, NCR stopped viewing the sale of CCP broke as the sale of a useful product, and necessarily started to recognize it as the disposal of a chemical-laden waste to which considerable legal liability might attach. Under those circumstances, NCR is liable under CERCLA as an arranger.

### 4. The preclusive effect of the *Whiting* decision

Throughout this case, NCR has argued that principles of issue preclusion require a judgment in its favor in this matter. Specifically, NCR claims that the United States District Court for the Eastern District of Wisconsin's decision in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920 (E.D. Wis. July 3, 2012), effectively settled the question of whether NCR or any of its affiliates had the requisite intent to dispose of the PCBs in CCP broke. As the Court explained in one of its summary judgment orders in this case (doc. # 346), the preclusive effect of the *Whiting* decision extended only to the issue of whether *ACPC* had the requisite intent to dispose of PCBs from the Fox River Valley. Importantly, Judge Griesbach's decision in *Whiting* made no specific findings of fact as to NCR. (*See* Op. & Order Denying Mot. for Summ. J., doc. # 346, at 14–18.) The Court's decision in this case, by contrast, rests not on any findings as to ACPC's culpability or mindset during the production period, but entirely on NCR's knowledge and intent to dispose of what it well understood to be a hazardous, toxic substance. Unlike the question of ACPC's mindset, the question of whether NCR intended to dispose of PCBs in manufacturing and marketing CCP and CCP broke was never resolved, as a matter of fact, by the *Whiting* Court. Consequently, this Court's decision in this case does not upset or contradict any of the formal factual findings that Judge Griesbach made in *Whiting*.

### B.    IP's Liability

Like NCR, IP agrees that GP has established the first three elements of a prima facie case of CERCLA liability. In other words, IP does not dispute that: (1) a release of hazardous substances (i.e., PCBs) occurred; (2) the release occurred at a facility (i.e., the Site); and (3) the release caused GP to incur response costs. The only points of contention between GP and IP involve whether IP qualifies as either an owner or operator under 42 U.S.C. § 9607(a)(1)–(2). To establish that IP qualifies as an owner or operator under CERCLA, GP must prove: (1) that IP "owned or operated" a "facility" at the Site; and (2) that "hazardous substances were disposed of" at that "facility" during IP's ownership or operation. *See* 42 U.S.C. § 9607(a)(1)–(2).

### 1.    Disposal of Hazardous Substances at the Bryant Mill Before July 1, 1956

In addressing IP's liability as the owner or operator of the Bryant Mill, the Court must first determine when hazardous materials were disposed of at the Mill. In particular, the parties dispute whether disposal of PCBs from CCP occurred at Bryant Mill before July 1, 1956, the last day IP's predecessor actually operated the Mill. IP's predecessor was the sole owner and operator of the Mill from 1946 to June 30, 1956. Thus, the parties recognize that IP would be liable as an owner or operator of a CERCLA "facility" if the Court finds, by a preponderance of the evidence, that PCBs were disposed of at the Mill between 1946 and June 30, 1956. Potential liability for any disposal on or after July 1, 1956, implicates other issues.

The Court finds that GP has not established by a preponderance of the evidence that PCBs from CCP were disposed of at the Mill between 1946 and June 30, 1956. At the outset, there was no direct evidence presented at trial of specific shipments of CCP wastepaper that made it to the Bryant Mill before July 1, 1956. (Trial Tr., doc. # 401, at 868:25–869:2.) Of course, lack of direct

24

evidence is not dispositive in a CERCLA case, but given the existence of other shipment records in this case, the fact that no records of any CCP shipments to the Mill have been shown to exist at least weighs against a finding of liability for the period in question. That view is supported by the paucity of indirect or circumstantial evidence in the record. In the first place, several witnesses affirmed that, between 1946 and 1956, CCP broke and trim represented less than .001% of the total wastepaper consumed in the United States. (*See, e.g.*, Trial Tr., doc. # 403, at 1199:10–24; Trial Ex. 5254, at 2 (table detailing "Consumption of Waste Fibrous Materials by U.S. Mills").) Given the general consensus among witnesses for both parties that CCP broke was exceedingly rare compared to other types of broke prior to July 1, 1956, it is correspondingly unlikely that any CCP broke would have made its way to the Bryant Mill in particular. Indeed, the only recorded shipment of CCP broke to the Kalamazoo Valley was a 1955 shipment from Mead to Dreyfuss Paper Stock Company, a Kalamazoo wastepaper broker that worked closely GP's Kalamazoo Paper Company, but did not have any relationship with the Bryant Mill. (Trial Ex. 1755 (1955 Mead shipments to Dreyfuss); Trial Tr. at 878:10–879:2 (Dolan testimony about Dreyfuss shipment).) GP's own expert testified that, given the business relationship between Dreyfuss and Kalamazoo Paper Company, the most likely endpoint for the Mead CCP broke was the Kalamazoo Paper Company, not the Bryant Mill. (Trial Tr., doc. # 401, at 879:6–18; 883:5–13.)

GP attempted to address the timing problem with expert testimony from Dr. Kenneth Jenkins, who employed Cesium-137 dating at Lake Allegan (which is downstream from the Bryant Mill and several other mills at the Site) to identify the date when PCBs were first discharged at the Site. Jenkins' studies suggested that PCBs were present at the Site by 1954. But Jenkins' testimony did not suggest which of the several recycling mills at the Site was actually responsible for the PCBs he

identified. (Trial Tr., doc. # 398, at 373:1–17.) Nor did Jenkins's study account for how long it would have taken PCBs from the Mill—which is roughly 37 miles upstream from Lake Allegan—to travel to Lake Allegan and become embedded in the sediment. (*Id.* at 296:3–19; 372:21–25.) Jenkins attempted to tie his findings to photographs of the Bryant Mill and the Mill's historic residual dewatering lagoon ("HRDL"), but he was unable to testify about the rate at which the HRDL filled with effluent and sediment, or the extent to which the sediment in the HRDL was disturbed (or stirred up) by subsequent discharges or human digging in the HRDL. (*Id.* at 324:12–325:18; 326:8–14.) Dr. Jenkins's testimony is interesting but not persuasive to the Court on the timing issue.

On balance, the Court finds that GP has simply not presented enough evidence to carry its burden with respect to proving that PCBs from CCP were discharged at the Mill before July 1, 1956. What limited evidence GP has presented on the subject either does not tie PCBs to the Mill itself, or is insufficiently reliable to establish liability. By contrast, unrebutted circumstantial evidence of the paucity of CCP broke in circulation by July 1, 1956 makes it highly unlikely that any such broke reached the Mill before that date. Consequently, the Court finds GP has not proven, by a preponderance of the evidence, that the Bryant Mill discharged PCBs at the Site before July 1, 1956.

## 2. St. Regis's Status as an Owner or Operator of the Bryant Mill after July 1, 1956

There is no question, by contrast, that GP has met its burden of proving PCBs were discharged at the Mill between July 1, 1956 and 1966. (See Stipulation, doc. # 377, at ¶ 31.) During that period, Allied Paper operated the Mill under the Lease from St. Regis. The only liability question that remains, then, is whether St. Regis remained an "owner or operator" under CERCLA at this time. By its terms, CERCLA imposes liability on "any person owning or operating" a facility

at which hazardous substances are dispersed. *See* 42 U.S.C. § 9601(20)(A)(ii). There is no dispute that St. Regis held legal title to the Bryant Mill between July 1, 1956 and 1966. GP says that should end of the matter. IP argues, however, that St. Regis retained title after July 1, 1956 principally to protect a security interest in the Mill. In other words, according to St. Regis, the Lease was just part of a seller-financed sale of the Mill and the Mill's operations that should fall within CERCLA's secured creditor exemption for the period between July 1, 1956 and 1966, when it finally sold the Mill outright to Allied. *See* 42 U.S.C. § 9601(20)(E)(i) ("owner or operator" liability under CERCLA does not extend to "a person that is a lender that, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect the security interest of the person in the . . . facility.").[1] As the Court noted at summary judgment, St. Regis' motivation in retaining title to the Mill during the Lease period is fundamentally a question of fact. In this case, the Court finds, by a preponderance of the evidence, that St. Regis did not hold title to the Mill primarily to protect a security interest in the Mill and so the secured creditor exemption does not apply.

In the first place, the transactional documents and all related contemporaneous records treat the property transaction as a lease, not a sale. The introduction to the June 22, 1956 Agreement between St. Regis and Thor Corporation, Allied's parent company, describes the transaction as one "to hire the paper mill of St. Regis at Kalamazoo, Michigan, under a lease to contain options to purchase the Mill . . . ." (Trial Ex. 5149, at 963.) The Agreement, itself, expressly contrasts the purpose of the Lease—to hire the paper Mill for the term of the Lease—with the "options to purchase the Mill." (*Id.*) Thus, by its own terms, the Agreement specifies a traditional lease, not a

---

[1] 42 U.S.C. § 9601(20)(A)(iii) contains a highly similar, though not formally identical, provision. A finding that IP did not hold title primarily to protect a security interest is disqualifying under either version of the exemption.

sale—whether seller-financed or otherwise. GP presented dozens of exhibits from the transactional time period, moreover, expressly describing the transaction as a "lease." (*See, e.g.*, Trial Ex. 2029, at 343 (St. Regis memo describing "Lease to Thor Corporation of St. Regis Paper Mill and Fixtures at Kalamazoo, Michigan"); Trial Ex. 2030, at 514–15 (resolution at St. Regis board meeting authorizing St. Regis's officers to prepare and execute an agreement to lease the Bryant Mill to Thor with an option to purchase); Trial Ex. 2045 (communication between counsel for St. Regis and Thor, describing transaction as a lease); Trial Ex. 2092 (St. Regis press release announcing that it was "leasing the facilities of its paper Mill at Kalamazoo, Michigan, to Allied Paper Division of Thor Corporation, of Chicago, Illinois. The lease, which is on a long-term basis, becomes effective on June 30 and includes a purchase option.").)  In contrast, IP produced no contemporaneous record describing the transaction as a sale, or as anything but a genuine lease.  In addition, the parties accounted for the transaction as a lease, too, and paid taxes accordingly.  At trial, Stephen Bromberg testified that, based on his experience practicing real estate law at the time of the Lease, there were, in 1956, two generally-used, widely-understood means of accomplishing a seller-financed sale of real estate, neither of which the parties used. (Trial Tr., doc. # 404, at 1346–48.) Bromberg testified, based on his experience, that there was no credible reason for using a lease to effectuate a sale of the property, rather than the more common methods generally employed in the industry. (*Id.*)

The commercial relationship between the Mill and the Panelyte property offers further support for the conclusion that St. Regis did not retain title to the Mill primarily as a security interest. At trial, GP presented considerable evidence of the continued interaction between the Mill and the Panelyte property, which St. Regis continued to operate after July 1, 1956. For example, on June 29, 1956, St. Regis and Thor entered into an agreement setting the terms by which St. Regis could

appropriate steam generated at the Mill for its use at the Panelyte property. (Trial Ex. 5159, at 196–97.) Also on June 29, 1956, St. Regis and Thor entered into a Facilities Agreement whereby St. Regis agreed to give Thor the use of an effluent line running through the Panelyte property. (Trial Ex. 2122, at 429–30.) Finally, the Filter House at the Mill was completely surrounded by the Panelyte facility, so that the Facilities Agreement expressly provided for joint use of amenities like "the fire protection system, water supply from Portage Creek, fuel oil piping, effluent lines, chlorine supply line, air supply line and energy lines for the Mill and the Panelyte plant . . . ." (Trial Ex. 2122, at 425.) The relationship between operations at the Mill and operations at the Panelyte property made it more likely that St. Regis merely leased the Mill to Thor, rather than selling it outright in 1956, because St. Regis had obvious and ongoing interest in controlling what happened to the property.

Finally, the fact that St. Regis retained a supervisory role in the Mill during the term of the Lease supports the conclusion that the Lease was not really a sale. Among other things, the Lease included a provision requiring St. Regis to acquire, at Thor's expense, various forms of insurance. (Trial Ex. 2116, at 840–43.) It also authorized St. Regis to enter the Mill at all times during regular business hours to inspect the premises and to perform repairs and other necessary work. (*Id.* at 848.) And the Lease required St. Regis to give its approval to any changes or alterations to the Mill exceeding $25,000. (*Id.* at 859–60.) Those sorts of requirements are much more consistent with a standard lessor-lessee relationship than with a buyer-seller relationship.

IP's best evidence that the Lease was actually a seller-financed sale of the Mill comes from Allied's 1960 Annual Report, which for the first time recorded Mill expenses as part of the purchase cost of the Mill. (*See* Trial Ex. 2062, at 702.) This was a change in the way Allied had originally accounted for the transaction. GP's expert, Dr. Timothy Riddiough, suggested at trial that the change

29

in accounting meant that Allied entered into the transaction as a sale, not as a lease. But the language of the Report suggests otherwise. Indeed, it expressly notes that the decision to account for Mill expenditures as part of the purchase cost was made only "[i]n view of the substantial expenditures involved in these improvements, [and] with the approach of the time for exercising the option, among other circumstances . . . ." (*Id.*) As GP's expert in real estate economics, Dr. Richard Voith, persuasively testified, the explanatory language in the Annual Report is most plausibly read to suggest that Allied's decision to account for the Mill as a purchase agreement only came about because of the investments made years *after* it first agreed to the Lease. (Trial Tr., doc. # 404, at 1374-76.) Seen in that light, the change in accounting in the Annual Report actually shows that, when it entered the Lease and for several years thereafter, Allied did not see the Lease as a sales agreement, otherwise it would have accounted for it as a sale from the beginning.

The Court finds the result fully consistent with the overall CERCLA liability provisions for owners of facilities at the time of disposal, and with the narrow carve-out for certain secured lenders who may be "owners" primarily to protect their investments. IP's predecessor was not some stranger to the Bryant Mill with nothing but capital to loan to an unrelated third party. To the contrary, IP's predecessor operated the Bryant Mill itself for a decade. By its own admission, St. Regis was very eager to dissociate itself from operations at the Bryant Mill in 1956. It was willing to facilitate a transaction with Allied in any reasonable business form—even a Lease transaction—because it wanted to separate itself from operational responsibility for the Mill. So even assuming for purposes of argument that the Lease transaction was a creative form of seller financing, the Court would still find by a preponderance of the evidence that IP's primary purpose in the transaction was not to protect a security interest, but rather to facilitate a series of transactions

30

that would ultimately rid it of both operational and ownership responsibility for a Mill it no longer

wanted.  A party, like IP, that both owned and operated a facility, cannot—and should not—easily

wash itself of potential CERCLA liability simply by facilitating a transaction with seller financing.

The secured lender exemption from ownership liability is properly limited to those persons whose

connection to a facility is simply as an arms-length provider of capital otherwise free of

entanglements to the Site.

Because Thor and St. Regis denominated and described the Lease Agreement as a lease,

because the Lease provided that St. Regis would retain both a commercial interest and an oversight

role in the Bryant Mill, because the financing structure underlying the Lease is more consistent with

a true lease than with a seller-financed sale, and because St. Regis was not simply a disinterested

provider of capital free of other entanglements to the site, the Court finds, by a preponderance of the

evidence, that St. Regis did not enter into the Lease primarily to protect a security interest in the Mill.

Accordingly, the Court finds that IP is not eligible for CERCLA's secured creditor exemption in this

case. Because IP was the owner of the Mill, for purposes of CERCLA, at a time when it is

acknowledged that PCBs were disposed of at the Mill, IP is liable under CERLCA as an "owner or

operator" of a facility at which hazardous materials were disposed of.[2] *See* 42 U.S.C. § 9607(a)(2).

**ACCORDINGLY, IT IS ORDERED** that Defendants NCR Corporation and International

Paper Company are found liable parties under CERCLA.  The Court will convene a status

conference to address a schedule for litigation of remaining issues in the case.

---

[2] Having concluded that IP is liable as a § 9607(a)(2) owner, there is no need, at this point
in the proceedings, to address GP's remaining argument that IP is also liable because it owned the
Panelyte property. To the extent that issue matters for purposes of allocation, it can be addressed at
those proceedings.

Dated:      September 26, 2013          /s/ Robert J. Jonker
                                        ROBERT J. JONKER
                                        UNITED STATES DISTRICT JUDGE