UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF MICHIGAN
                            SOUTHERN DIVISION

_____

GEORGIA-PACIFIC CONSUMER
PRODUCTS, LP; FORT JAMES
CORPORATION; and GEORGIA-PACIFIC,
LLC,

                        Plaintiffs,
                                            DOCKET NO. 1:11-cv-483
        vs.


NCR CORPORATION;
INTERNATIONAL PAPER COMPANY; and
WEYERHAEUSER COMPANY,

                        Defendants.

_____/


                TRANSCRIPT OF MOTION TO COMPEL HEARING

     BEFORE UNITED STATES MAGISTRATE JUDGE HUGH W. BRENNEMAN, JR.

                        GRAND RAPIDS, MICHIGAN

                            July 15, 2014




Court Reporter:              Glenda Trexler
                            Official Court Reporter
                            United States District Court
                            685 Federal Building
                            110 Michigan Street, N.W.
                            Grand Rapids, Michigan 49503


Proceedings reported by stenotype, transcript produced by

computer-aided transcription.

```
 1    A P P E A R A N C E S:

 2    FOR THE PLAINTIFF GEORGIA-PACIFIC:

 3         MR. GEORGE P. SIBLEY
           HUNTON & WILLIAMS, LLL
 4         951 East Byrd Street
           Richmond, Virginia 23219
 5         Phone: (804) 788-8262
           Email: gsibley@hunton.com
 6
           MR. ADAM JOHN BRODY
 7         VARNUM, RIDDERING, SCHMIDT & HOWLETT, LLP
           333 Bridge Street, N.W.
 8         P.O. Box 352
           Grand Rapids, Michigan 49501-0352
 9         Phone:  (616) 336-6000
           Email:  Ajbrody@varnumlaw.com
10
           MR. MICHAEL RANDOLPH SHEBELSKIE
11         HUNTON & WILLIAMS, LLP
           Riverfront Plaza, East Tower
12         951 East Byrd Street
           Richmond, Virginia 23219
13         Phone:  (804) 788-8200
           Email: mshebelskie@hunton.com
14

15    FOR THE DEFENDANT NCR CORPORATION:

16         MR. DAVID FRANK LISNER
           CRAVATH, SWAINE & MOORE LLP
17         Worldwide Plaza
           825 Eighth Avenue
18         New York, New York 10019
           Phone:  (212) 474-1000
19         Email: dlisner@cravath.com

20

21

22

23

24

25
```

```
 1    FOR THE DEFENDANT INTERNATIONAL PAPER COMPANY:

 2         MR. JOHN D. PARKER
           BAKER HOSTETLER
 3         PNC Center
           1900 East 9th Street, Suite 3200
 4         Cleveland, Ohio 44114-3482
           Phone: (216) 861-7610
 5         Email: jparker@bakerlaw.com

 6         MR. DAVID W. CENTNER
           CLARK HILL, PLC
 7         200 Ottawa Avenue, N.W., Suite 500
           Grand Rapids, Michigan 49503
 8         Phone:  (616) 608-1100
           Email: dcentner@clarkhill.com

 9
      FOR THE DEFENDANT WEYERHAEUSER COMPANY:
10
           MR. DOUGLAS A. DOZEMAN
11         WARNER, NORCROSS & JUDD, LLP
           111 Lyon Street, N.W., Suite 900
12         Grand Rapids, Michigan 49503-2487
           Phone:  (616) 752-2000
13         Email:  Ddozeman@wnj.com

14                            *   *   *   *   *

15                                   Grand Rapids, Michigan

16                                   July 15, 2014

17                                   9:39 a.m.

18                     P R O C E E D I N G S

19         THE COURT:  Good morning, gentlemen.

20         MR. PARKER:  Good morning.

21         MR. SIBLEY:  Good morning, Your Honor.

22         THE COURT:   You all look familiar.  It seems like

23    you were just here.  The sun is trying to decide if it's coming

24    out or not.  I drove a convertible to work this morning, and

25    it's one of those cases that just when you're getting on the
```

 1   expressway when it's too late to change your mind, you start

 2   seeing these drops of rain on your windshield.  Well, the rule

 3   of thumb is as long as you don't stop, you stay dry.

 4          On the other hand, the car is not designed to

 5   drive on -- it's a sports car -- it's not designed to drive in

 6   the rain either.  The tires aren't designed for that either.

 7   So it's a tossup, you know.  But, fortunately, it also can

 8   outrun the rain.  So I'm here safely.  And having had that

 9   brief thrill this morning, I can relax now and join this case.

10          We're here on the plaintiffs' motion to determine the

11   sufficiency of International Paper's answers and objections to

12   the plaintiffs' phase 2 requests to admit.

13          I've had a chance to read over the briefs.  I managed

14   to get those done before the soccer match was held this

15   weekend.  Not that I'm a soccer fan, but somehow I got caught

16   up in it like everybody else in America.  So perhaps -- who is

17   going to be arguing on behalf of Georgia-Pacific?

18          *MR. SIBLEY:*  I will, Your Honor.  Trey Sibley.

19          *THE COURT:*  All right.  Fine.  Anybody else on behalf

20   of the plaintiff or just yourself?

21          *MR. SIBLEY:*  Just myself, Your Honor.

22          *THE COURT:*  And who is going to be opposing the

23   motion?

24          *MR. PARKER:*  I will, Your Honor.  John Parker on

25   behalf of International Paper.

1              *THE COURT:*  All right.  Thank you.

2              *MR. PARKER:*  The players are the same for you.

3              *THE COURT:*  All right.  Good.  Counsel, please

4     proceed.

5              *MR. SIBLEY:*  Thank you, Your Honor.  Trey Sibley for

6     Georgia-Pacific, and may it please the Court, we're here today

7     as you note, Your Honor, on Georgia-Pacific's motion to

8     determine the sufficiency of International Paper's objections

9     to certain requests to admit and generally to resolve a dispute

10    about the relevancy and discoverability of information with

11    respect to International Paper's historical connection to

12    certain of the mills at the site.

13              Before I get too deep into that, I want to step back

14    for a second and just talk generally about the case.  I know

15    Your Honor is familiar with it from the previous hearing, but I

16    think we are guilty sometimes of assuming a lot of knowledge on

17    behalf of our audience about the case, forgetting that we've

18    lived with it for many years.

19              *THE COURT:*  You are right on point.

20              *MR. SIBLEY:*  The case, of course, is about the PCB

21    contamination of the Kalamazoo River.  And as we note in a

22    footnote in our brief, our argument 1 in phase 2 is that the

23    contamination of the river is solely the responsibility of

24    NCR Corporation.  NCR developed carbonless copy paper in the

25    early 1950s, and the original formulation for that product

1    involved the use of a PCB-containing emulsion.  You would coat

2    the back side of the top sheet of a multi-form -- multi-sheet

3    set of forms.  That emulsion contained ink capsules, and when

4    you press on the top sheet, they would rupture and they would

5    react with clay on the bottom sheet.  It's NCR's product.  It

6    was a very profitable product.

7            NCR, we established in phase 1, knew very early in

8    the process that the PCB-containing emulsion that they used was

9    toxic, that it was resistant to biodegradation, and that it

10   necessarily would be discharged into environment when scraps of

11   that paper -- we sometimes call these scraps broke and trim --

12   would be recycled by deinking and recycling mills around the

13   country.

14           Indeed, the recycling of the scraps which are

15   generated when you coat the rolls of paper, you'd coat a big

16   roll of paper and you have end pieces and end rolls and stuff

17   like that.  There's quite a bit of that.  It can vary between

18   10 and 20 percent of the total amount in paper that's coated

19   with emulsion.  When you coat it you generate this stuff and

20   when you make forms you generate it as well.  They take the

21   forms and they slice them into 9 1/2 -- or 8 1/2 x 11 pages.

22   NCR's plan from the very beginning was that this stuff would be

23   recycled.  In fact, they needed it to be.

24           We established in phase 1 that NCR knew that

25   that product it had on its hands was a waste product, and

1    Judge Jonker, therefore, found that they had arranged for the

2    disposal of a hazardous substance within the meaning of CERCLA

3    when they sold that product to unsuspecting paper mills like

4    those owned by Georgia-Pacific, International Paper, and

5    Weyerhaeuser.

6         We are here today to talk about an argument that

7    comes up in phase 2 only if Judge Jonker disagrees with us that

8    a hundred percent of the liability should be allocated to NCR.

9    Such a holding, we would note, is not without precedent.

10   Judge Griesbach in the Fox River case, a case very similar in

11   its factual predicate to this case, Judge Griesbach held that

12   NCR was a hundred percent responsible there.  We think the same

13   result obtains here.  But I certainly cannot rule out that

14   Mr. Lisner and his colleagues at the Cravath law firm, who are

15   some of the finest lawyers in the country, might have something

16   to say about that, and they very well might persuade

17   Judge Jonker that maybe it's something less than a hundred

18   percent.  So we have to deal with the issue of how to allocate

19   the balance among the paper companies.  And that's where this

20   motion comes in.

21        You've seen in the papers, Your Honor, reference to a

22   number of mills.  I have brought with me today as a

23   demonstrative exhibit a map to help walk you through where

24   those mills are located because I think it helps -- certainly

25   makes it easier for me to understand this, and I suspect it

1    will for Your Honor as well.  If I may.

2              THE COURT:  I assume everybody is familiar with this

3    map?

4              That would be great.  Thank you.

5         MR. SIBLEY:  And this is purely a demonstrative,

6    Your Honor.  This is a map that was used in connection with a

7    deposition last week, but it's just to provide some basic

8    orientation.

9              THE COURT:  We've got a whiteboard for you, but I'm

10   glad that you've used this, because I don't think the

11   whiteboard would have been as efficient.

12        MR. SIBLEY:  I doubt it would, and my handwriting

13   certainly would not have been sufficient.

14             There are as many as 14 mills that may have recycled

15   carbonless copy paper.  I have -- on the first page of the map,

16   Your Honor, you see sort of clusters of facilities in the

17   Kalamazoo area and then up in the Plainwell/Otsego area.

18             If you flip to the second figure, you see the focus

19   around the Kalamazoo area.  And if I could just run very

20   quickly through the pertinent mills there.

21             Down in sort of the bottom left there are two mills,

22   the Monarch Mill and the Bryant Mill.  The Bryant Mill -- the

23   dot for the Bryant Mill is above what's called the Bryant Mill

24   Pond, but the discharge point for most of the Bryant Mill's

25   waste was into a point at the upstream of that pond.

 1          I'm sure Your Honor knows this, but the Portage Creek

 2    runs south to north, it intersects with the Kalamazoo River in

 3    Kalamazoo, and then the Kalamazoo River runs north before

 4    turning to the west and discharging into Lake Michigan.

 5          The Bryant Mill on Portage Creek is the biggest and

 6    we would submit the dirtiest of the mills during this time

 7    period.  You cannot read any of the literature, historical

 8    literature about the PCB contamination of the river without

 9    being struck by the extent to which the Bryant Mill contributed

10    PCBs and solids to Portage Creek and the river itself.  In

11    phase 1 of the case, we established that IP owned that mill for

12    a 10-year stretch from 1956 to 1966.

13          The Monarch Mill was operated by

14    International Paper's lessee Allied Paper Corporation.  The

15    Monarch Mill was -- International Paper did not own the

16    Monarch Mill.

17          If you go up into Kalamazoo and follow the river

18    upriver -- and I'll start with actually the Morrow Lake Dam and

19    we'll move downriver from there.  You have the approximate

20    location of a mill known as the Rex Mill.  That was operated

21    for a short time by Allied.  It's not connected, as best we

22    know, to any of the parties in this case.

23          You see further downriver the Georgia-Pacific Mill.

24    That is a site, Your Honor, of the old Kalamazoo Paper Company.

25                THE COURT:  I'm sorry, where are you?

1          *MR. SIBLEY:*  I'm on Figure 2.

2          *THE COURT:*  Okay.

3          *MR. SIBLEY:*  And I am starting at Morrow Lake and

4    moving downriver.

5          *THE COURT:*  I see.  All right.

6          *MR. SIBLEY:*  And the Rex Mill is north of the river,

7    the Georgia-Pacific Mill is north of the river.

8          Now, adjacent to the Georgia-Pacific Mill are two

9    historic mill sites.  They are among the --

10         *THE COURT:*  Do you mind if I mark up your --

11         *MR. SIBLEY:*  I do not mind at all, Your Honor.

12   Please feel free.

13         *THE COURT:*  So the water flows from Morrow Lake -- on

14   the map would be from right to left, and then -- because the

15   Kalamazoo River is flowing from east to west and then south to

16   north?

17         *MR. SIBLEY:*  That is correct, Your Honor.

18         *THE COURT:*  All right.

19         *MR. SIBLEY:*  Now, next to the Georgia-Pacific Mill --

20   and they are not featured on this map, and I apologize for

21   that -- but there are two of the what are sometimes called the

22   12 or we prefer 14 mills.  There are two mills there.  There's

23   the National Gypsum Company facility and then the old Hawthorne

24   Paper Company mill.  They are not figured there, but they are

25   right there in the vicinity of the Georgia-Pacific mill.

1        As you move up past the confluence of the

2   Kalamazoo River and Portage Creek to the north, you have on the

3   west bank of the river a facility known as the Sutherland Mill.

4   It's known as that because it was the Sutherland Paper Company

5   for many years.  It was later acquired by the Brown Paper

6   Company and then ultimately acquired by my client, Fort James

7   Corporation, or one of its subsidiaries.

8        Further to the north you have the what's known as the

9   KVP Mill in the parlance of this case, the Kalamazoo Vegetable

10  Parchment Mill, made parchment paper.  Also a mill formerly

11  owned by one of my clients, Fort James Corporation.

12       If you flip to Figure 3, Your Honor, you move further

13  downriver and you reach eventually Plainwell and the site of

14  the Weyerhaeuser Mill, the Plainwell mill, owned by

15  Weyerhaeuser until I believe the early seventies and then

16  acquired by the Simpson Plainwell Company.  You'll recall we

17  talked about the Plainwell Company's role in connection with

18  the mediation that was the subject of the previous discovery

19  motion.

20       You move further downriver past the Plainwell -- the

21  old Plainwell Dam and you get to Otsego proper.  And there are

22  two mills in Otsego.  Only one of them is noted on this map.

23  The one that's noted is the old Hoerner-Waldorf MacSimBar Mill

24  owned by Hoerner-Waldorf until 1968.  The mill was sold in an

25  asset deal to Mead Corporation and then went on and was sold to

1   Rock-Tenn, I believe, International Paper, and their papers

2   reference that.

3           There's also adjacent to that another mill that's

4   among the 14.  It doesn't figure in this motion, but just in

5   the interest of completeness, there is what's known as the

6   Otsego Falls Mill historically owned by a number of companies,

7   one of which was known as the Menasha Corporation.  None of the

8   parties in this case are connected to that facility.

9           Now, on the map, Your Honor, if we were to go -- in

10  the interest of having a map that's not -- doesn't have such

11  small print that we can't fit everything -- if you went over to

12  the east a little bit, you would come to Battle Creek.  And in

13  Battle Creek there are two rather large paperboard mills, the

14  Fountain Street Mill and the Angel Street Mill.  These are two

15  mills that make paperboard.  And we believe the evidence shows

16  that these mills would have used potentially carbonless copy

17  paper.  And given the behavior of these PCBs once they enter

18  the river, we believe that some of those PCBs would have found

19  their way all the way into the Superfund site.  So they are

20  part of the equation as well.

21          When we talk about the 14 mills, those are the mills

22  that we are referring to.

23          Now, as I mentioned, some of the owners of these

24  mills have incurred -- are parties in the case -- some of the

25  former owners -- and some of those owners incurred costs to

1  clean up the site.  Georgia-Pacific is one of them.

2  Georgia-Pacific has incurred north of a hundred million dollars

3  in cleanup costs to date.  We expect that number to increase by

4  several multiples before all is said and done, and this case is

5  about figuring out who the CERCLA lia -- how that cost or past

6  costs and the expected future costs should be allocated amongst

7  the CERCLA-liable parties.

8           In phase 1 the Court held that NCR,

9  International Paper, and Weyerhaeuser -- Weyerhaeuser had

10  stipulated to liability -- were liable for -- under CERCLA.

11          With respect to the Bryant Mill, the basis for the

12  liability finding against International Paper, that makes -- by

13  dent of that liability finding, IP is jointly, we would submit,

14  jointly and severally liable for the cleanup of all downstream

15  stretches from that mill.  That takes you from -- all the way

16  on Bryant Mill all the way down to Lake Michigan.  All of those

17  stretches are IP's -- are within the ambit of IP's liability.

18          IP might argue in phase 2 that it should not be

19  liable for portions of the river that are upstream of the

20  confluence of Portage Creek as a result of its ownership of the

21  Bryant Mill, and that's an issue on which they would bear the

22  burden in phase 2.

23          The Court's job --

24          *THE COURT:*  So are you contending that they are

25  liable for any pollution from the confluence up to Morrow Lake?

1          *MR. SIBLEY:*  Certainly not as a result of their

2     ownership of the Bryant Mill, Your Honor.  Equitably whether

3     they should bear some portion of the costs that have been

4     incurred there, that's a question.  And candidly, Your Honor,

5     there are very few costs that have been incurred in those

6     areas.  The way these PCBs behave in the environment, they flow

7     downstream, so the bulk of all the costs have been incurred,

8     and all costs that will be incurred in the future will be

9     incurred in downstream reaches.  So I think theoretically that

10    would be an argument IP could make, that certain areas there

11    are not their responsibility, but that's their burden to prove

12    in phase 2.

13          In phase 2 the Court will allocate equitably

14    responsibility for past and future cleanup costs downriver.

15    And this inquiry, Your Honor, is sweeping.

16          As the Seventh Circuit said in the Environmental

17    Transportation Systems case, 969 F.2d. 503 at 507, "The court

18    is to allocate response costs among liable parties using such

19    equitable factors as the court determines are appropriate."

20    And, Your Honor, the inquiry is just as broad as that statement

21    might suggest.  And the Sixth Circuit in the R.W. Meyer case,

22    932 F.2d. 568 at pages 572 to '73, notes that the factors are

23    not limited to the percentage of a party's improper conduct

24    that causally contributed to the toxicity of the site in a

25    physical sense.

 1          It is sweeping.  The Court has broad discretion to

 2   consider whatever factors it determines are appropriate.

 3          And in the Fox River case, the Appleton Papers cases

 4   which is cited in our papers, Your Honor, Judge Griesbach noted

 5   that the cases overwhelmingly suggest that a court's equitable

 6   powers are broad and the considerations it chooses are not

 7   bound by narrow and legalistic arguments.

 8          Certainly the case, Your Honor, that factors the

 9   Court considers go well beyond the narrow facts that might be

10   necessary to establish a party's liability, other issues --

11   CERCLA being a strict liability statute -- other issues such as

12   fault, knowledge, concealment, those types of factors enter

13   into the equation.

14          Now, it is certainly relevant in phase 2 that -- the

15   operations of these 14 mills I should say is certainly relevant

16   in phase 2.  IP has acknowledged as much.  IP has asked

17   Georgia-Pacific questions about 12 of the 14 mills I

18   identified, including the MacSimBar Mill.

19          Your Honor, we believe the evidence shows that

20   International Paper -- just to put this out there -- it's clear

21   that International Paper acquired Champion Corporation which

22   had acquired Hoerner-Waldorf.  Hoerner-Waldorf owned that mill

23   until 1968.  The facts on this are not in meaningful dispute.

24          *THE COURT:*  Which one is that?

25          *MR. SIBLEY:*  The MacSimBar Mill, Your Honor, is in

 1   Otsego.  It is on my -- on page 1 of the map, if you look, it's

 2   the one that's called the Mead Hoerner Mill.  We have given it

 3   that title because Mead acquired it in 1968.  So these mills

 4   sometimes go by multiple names, and in some cases we've

 5   included both names.

 6           *THE COURT:*  What's the other name you're referring to

 7   it as?

 8           *MR. SIBLEY:*  What's that?

 9           *THE COURT:*  What's the other name you're referring to

10   it as?

11           *MR. SIBLEY:*  I'm sorry.  MacSimBar is

12   M-A-C-S-I-M-B-A-R, and that's how the parties have described

13   this mill in their papers.  And I apologize for not having that

14   label on this exhibit.

15           The operations at that mill and all of these mills is

16   relevant.  How much did that mill discharge in terms of PCBs?

17   How much carbonless copy paper would it have used?

18           It's plainly relevant to the analysis, and

19   International Paper has acknowledged as much.  They have served

20   discovery on Georgia-Pacific asking Georgia-Pacific to

21   acknowledge, to tell what it knows about how much the total

22   mass of PCBs that that mill might have put out into the

23   environment.  Clearly a relevant factor.

24           It's relevant, Your Honor, in the same way that the

25   fault of nonparties can come into the equation in a typical

1   personal injury action under common law.  You would have a

2   liability determination, but then the parties might try and

3   show that there are orphan shares of liability, other parties

4   that contributed to the harm, and their liability should be

5   taken into account.  So it comes into the equation.

6           And again, that's not a controversial proposition.

7   International Paper has agreed to answer questions about the

8   operations at the MacSimBar Mill, among others, recognizing

9   that it's a relevant consideration.

10          International Paper has also asked Georgia-Pacific to

11  answer questions about Georgia-Pacific's connection to some of

12  these mills.  Now, Georgia-Pacific has not been the subject of

13  any liability finding.  We have performed the work voluntarily

14  pursuant to administrative orders on consent.  We have not been

15  sued in the way that IP, NCR, and WeyCo had to be sued to be

16  brought into the case.  So there was no liability discussion

17  about -- for Georgia-Pacific in phase 1.

18          Historically the regulatory authorities have noted

19  Georgia-Pacific's ownership of the Kalamazoo Paper Company mill

20  as the ownership interest that makes it liable potentially

21  under CERCLA, and it's certainly that ownership interest that

22  has compelled Georgia-Pacific under the law to cooperate with

23  the authorities and clean up the river to the tune to date of

24  over a hundred million dollars.

25          *THE COURT:*  Which mill is that one?

1              *MR. SIBLEY:*  That mill, Your Honor, is if you --

2      probably the easiest thing to do is to look at Figure 2.

3              *THE COURT:*  Okay.

4              *MR. SIBLEY:*  And it is the mill that's marked

5      "Georgia-Pacific."

6              *THE COURT:*  It's also known as the Kalamazoo Paper

7      Company?

8              *MR. SIBLEY:*  Yeah.  Until 1967 the company that owned

9      that mill was the Kalamazoo Paper Company, and that's who had

10     owned it for decades.  In 1967 Georgia-Pacific purchased the

11     Kalamazoo Paper Company, and thereafter it was known as the

12     Georgia-Pacific Kalamazoo mill.

13             In phase 2, as I mentioned, Your Honor,

14     International Paper has asked Georgia-Pacific about its

15     ownership of mills other than the Kalamazoo Paper Company Mill,

16     the one that has brought Georgia-Pacific into the case to begin

17     with, into this cleanup to begin with.  It specifically asked

18     about the Hawthorne Mill which was adjacent to the

19     Georgia-Pacific Mill, and they specifically asked whether

20     Georgia-Pacific is the successor in interest to the

21     Hawthorne Paper Company.  And the relevance of that inquiry,

22     Your Honor, is plain.  If Georgia-Pacific owned -- is the

23     successor to the company that owned that mill, assuming NCR is

24     not found a hundred percent responsible, some portion of that

25     mill's discharge, IP would argue, should be the responsibility

1    of Georgia-Pacific.

2            Now, we don't think these kind of volumetric

3    considerations, total mass that's put out, is the primary,

4    secondary, or even tertiary factor that drives the equitable

5    analysis, but it's certainly relevant.  And the fact that one

6    of the parties in this case may have owned one of these mills

7    and that mill -- let's assume that it's established that that

8    mill discharged into the river -- it's certainly a relevant

9    factor.  And they have asked us that question and

10   Georgia-Pacific answered it.

11           Georgia-Pacific propounded the same type of question

12   to International Paper.  The question was:  Did you own --

13   admit that you owned the MacSimBar Mill and those two mills

14   identified in Battle Creek.  IP has refused to answer.

15           The basis for their objection is that the facts on

16   which we seek discovery are facts that if established in

17   phase 1 would have made International Paper independently

18   liable.  They say that because we did not pursue those bases of

19   liability in phase 1, we are precluded from doing so in

20   phase 2.

21           IP does not dispute that what went on at these mills

22   is relevant.  They can't.  They have asked the same discovery

23   about these facilities to us.  They say that -- their objection

24   is more narrow than that.  They will admit -- they will answer

25   questions about the operations of the mills, how much -- they

1    will look into how much carbonless these facilities used, they

2    will state their position, but they take the position that they

3    cannot be made to answer questions about whether they owned the

4    mill.  Because had we chosen to pursue that in phase 1, it

5    would have shown that they are -- we could have established

6    their liability on that basis.

7              Your Honor --

8              *THE COURT:*  You could have or could not have?

9              *MR. SIBLEY:*  We could have.  We could have.  CERCLA

10   is a beautiful statute in this sense, and I have to acknowledge

11   it:  Owner and operator liability is fairly easy to establish.

12   There are some cases where ownership is not sufficient.

13   International Paper thought that this would be one of them with

14   respect to its ownership of the Bryant Mill based on its lease

15   interest, but that was litigated in phase 1.  And it turns out

16   that they were in fact an owner as we had contended.  But

17   that's the rare instance.  Ordinarily owner and operator

18   liability is not litigated because it is a black-and-white

19   determination.  In fact, Your Honor, it's one to which

20   International Paper has admitted previously.  If I could hand

21   up another document.  I do take some satisfaction in being able

22   to hand up International Paper's response to EPA's 2003 104(e)

23   request, which I know Your Honor is familiar with from the

24   proceedings the last time.

25              If I could, Mr. Parker.

1              Now, this is a document that I believe NCR obtained

2      from EPA pursuant to a FOIA request and by the agreement of the

3      parties they produced it.  And you'll see on the first page

4      International Paper is responding to a request and they note

5      that the request identified three facilities:  The

6      Fountain Street Mill, the Angel Street Mill, the MacSimBar

7      facility.

8              The first two, Your Honor, are those Battle Creek

9      paperboard mills that we mentioned, and the MacSimBar is that

10     one in Otsego.  In IP's answers to questions -- now, we don't

11     see the rest of their answer.  Maybe Mr. Parker can illuminate

12     us on this.  But they acknowledge that they owned

13     Fountain Street and Angel Street.  At least as that term was

14     defined in the request.  I, unfortunately, don't have a copy of

15     the requests with me, Your Honor.  But these mills have been

16     known and IP's connection to these mills has been known for

17     quite some time.  IP has known for quite some time that they

18     had -- they had some connection to it.  And it's an easy

19     question to answer.  It's pure corporate successorship.

20             With respect to the Fountain Street and Angel Street

21     mills, those mills ultimately rolled up to -- were owned by the

22     St. Regis Paper Company.  St. Regis is acquired by Champion.

23     International Paper acquires Champion.  It's black and white.

24     And those are the types of questions we've asked them to admit.

25     Just admit that chain of corporate successorship.

1          With respect to the MacSimBar Mill it's a little

2     different.  The Hoerner-Waldorf Corporation is acquired by

3     Champion, then IP acquires Champion.  St. Regis doesn't come

4     into that mix.  But these are the easy questions about these

5     mills.  These are the ones that don't take a whole lot of

6     effort to answer.  And we think they should.

7          Now, IP, again, has objected because there is some

8     overlap between the equitable inquiry, considering all of the

9     factors, and the facts that might be used to establish

10    liability.  And we submit, Your Honor, that there is no legal

11    basis for this objection.  Indeed, throughout IP's brief they

12    don't cite a single case that supports this type of narrow and

13    legalistic rule of exclusion as a discovery matter at all.

14    They don't cite even a case that says that those considerations

15    are taken off the table in phase 2.  In fact, the cases

16    uniformly push in the other direction.

17         I would point most notably to the Appleton Papers

18    decision where one of the parties in that case tried to argue

19    very narrowly that certain factors could not be considered

20    because that wasn't the narrow basis of their liability, but

21    the Court had none of that.  It said, "I'm not limited by those

22    things.  I can consider everything."  The weight the judge

23    applies to those things, that's a different question.  But

24    that's not why we're here.  IP wants to take the issue

25    completely off the table.  To we'll have a dossier, one might

1    imagine, on the Hoerner-Waldorf MacSimBar Mill and the one --

2    with a curious blind spot, a curious redaction over the

3    relevant consideration of who owned that mill before 1968.  And

4    that's just not something that CERCLA case law, the statute or

5    the case law recognizes.

6            *THE COURT:*  Let me interrupt you for just a moment so

7    that I make sure I understand the facts.  Which you are setting

8    out very clearly, if I may say so.

9            As far as Fountain Street Mill and Angel Street Mill,

10   which you referred to as the Battle Creek mills, they are not

11   on this chart?

12           *MR. SIBLEY:*  They are not.

13           *THE COURT:*  They are farther to the east?

14           *MR. SIBLEY:*  Farther to the east.  They are.

15           *THE COURT:*  All right.  And so how much farther would

16   they be on this map if the map were to extend?

17           *MR. SIBLEY:*  Your Honor, I hate to speculate.

18   Perhaps another six inches to the east on the map.

19           *THE COURT:*  All right.

20           *MR. SIBLEY:*  Your Honor, Battle Creek is a good

21   distance from Kalamazoo.  A fact we would readily concede.

22           *THE COURT:*  All right.

23           *MR. SIBLEY:*  And, Your Honor --

24           *THE COURT:*  And so the water -- the river flows from

25   Battle Creek toward this confluence and would pass through

1    Morrow Lake; is that right?

2            MR. SIBLEY:  That's correct.

3            THE COURT:  And that's the Kalamazoo River?

4            MR. SIBLEY:  That is correct, Your Honor.

5            THE COURT:  All right.  And it passes through or over

6    the Morrow Lake Dam?

7            MR. SIBLEY:  That is correct, Your Honor.

8            THE COURT:  And if there were these contaminants

9    released by Fountain Street Mill and Angel Street Mill, they

10   would have to flow down all of this way through Morrow Lake and

11   continue on to get to the area where you're responsible for?

12           MR. SIBLEY:  That's correct, Your Honor.

13           THE COURT:  Were you held responsible for anything

14   upstream from the Georgia-Pacific rotation here?  Between

15   Georgia-Pacific and Morrow Lake?

16           MR. SIBLEY:  Georgia-Pacific has incurred costs in

17   those areas.

18           THE COURT:  How far upstream?

19           MR. SIBLEY:  Up to Morrow Lake.  There has been

20   little, if any, actual cleanup work done upstream of

21   Morrow Lake.

22           Now, Your Honor, I would submit -- and Mr. Parker has

23   correctly acknowledged in his paper -- that very little

24   Aroclor 1242 -- and let me quickly explain -- just take a step

25   to the side really quickly because I'm going to use some of

1    these terms, and it took me a while to understand them, and I'm

2    sensitive to the fact that you haven't spent as much time with

3    this as we have.  That Aroclor is the trade name that the PCB

4    that NCR purchased from Monsanto went by.  The 1242, the

5    numbers refer to the number of chlorine compounds in the

6    mixture.  And I'm not enough of a chemist to competently

7    explain the difference between Aroclor 1242 and 1254 really

8    beyond what I've told you.

9            In Morrow Lake there is some 1242.  There's also a

10   fair amount of 1254.  1254 was used in other applications,

11   industrial applications like capacitors and transformers and

12   that type of thing.  And that's what you see in Morrow Lake.

13           Now, Mr. Parker correctly notes that there's not a

14   whole lot of 1242 there.  And they haven't done a whole lot of

15   cleanup work upstream of Morrow Dam.  And that's a very

16   important point.  And but for, Your Honor, a contention that IP

17   advanced in phase 1, we might not care about those mills.  We

18   may leave them off the table and we wouldn't do any discovery

19   at all.  But IP has staked out the position that carbonless

20   copy paper would have been used predominantly by paperboard

21   mills.

22           If I can go back to my map, Your Honor, and explain

23   kind of what a couple of these mills did.  The three mills

24   we're talking about in this motion are paperboard mills.  The

25   two in Battle Creek and the one up in Otsego.  They made --

1    when I say paperboard, Your Honor, I'm talking about cardboard

2    boxes.  Cereal boxes.  Corrugated boxes that you might store --

3    you know, bankers' boxes you might store paper in, that type of

4    thing.

5            The theory which was articulated in phase 1,

6    Your Honor, by their expert, Dr. Frank Woodard.  And I've

7    brought up some excerpts of his testimony.  Brought with me

8    today, Your Honor, excerpts of his testimony.

9            Oh, I see what I did here.  Your Honor, I'm sorry.

10   If I may have that back.  I gave you -- the testimony is in two

11   places, and I gave you one of the places.

12           *THE COURT:*  No harm done.  I didn't read it yet.

13           *MR. SIBLEY:*  Your Honor, I took Mr. -- Dr. Woodard's

14   deposition, and if you'll look, the first time this theory was

15   articulated was at his deposition which was taken on July 20th,

16   2012, and you'll see we've highlighted the places where this

17   came up.  And we asked him about the documents that show the

18   delivery of NCR Paper to the Dreyfuss Paper Corporation, which

19   was a wastepaper broker based in Kalamazoo, and I was asking

20   questions about the logical destination of that, and he

21   answers, and this is at page 119 of that transcript, "The most

22   logical mill for those bales of broke to go to would have been

23   the Brown Boxboard Company."

24           And when we switch over to page 136 we get a little

25   more elucidation of that as to why it is he believes that.  And

1    I don't need to belabor the point, but the testimony is all

2    included there.

3           His theory is that these boxboard mills would have

4    used this carbonless paper because they were less concerned

5    with the quality of the end product.  Whereas boxes are just

6    brown boxes.  They don't have to meet any color or brightness

7    requirements.

8           Printing paper, specialty papers like, you know,

9    paper you would run through a printer today and the paper that

10   was made by the Bryant Mill in the 1954 to 1956 time period --

11   well, really throughout their operation, which was they made

12   the highest-quality specialty grades.  They made paper for

13   Encyclopedia Britannica and stuff like that.  And their theory

14   was -- his theory was this mill wouldn't have used any of this

15   stuff because of its propensity to turn the stock blue.

16          There is some evidence in phase 1 about how that

17   might happen.  It was a problem that NCR itself identified.  If

18   you read Judge Jonker's opinion, he talks about this.  The

19   problem was fixed very early on and NCR taught the paper

20   companies how to recycle this paper and to deal with the

21   problem.

22          We don't agree with Dr. Woodard's theory, but he's

23   trying to push paper, carbonless paper away from the

24   Bryant Mill onto boxboard mills.  My client, Georgia-Pacific,

25   the Sutherland Mill which is on the map, is a boxboard mill.

1    If that's their theory --

2              *THE COURT:*  Which one is that?  I'm sorry.

3         *MR. SIBLEY:*  If you look just -- it's the first mill

4    on the upstream -- or I'm sorry, downstream of the confluence

5    of Portage Creek and the Kalamazoo River.

6              *THE COURT:*  I see.  That's your mill?

7         *MR. SIBLEY:*  That's owned by Fort James, yes.

8    Historically owned by Fort James.  His theory is it all went

9    there.

10             *THE COURT:*  That's a Georgia-Pacific?

11        *MR. SIBLEY:*  It is.  Fort James Corporation was the

12   product of a merger between James River Paper Company and

13   Fort Howard.  They named themselves Fort James, and then

14   shortly after that the entire company was acquired by

15   Georgia-Pacific.  Fort James Corp. is one of the named

16   plaintiffs in this case.  We've kind of lumped them together as

17   Georgia-Pacific, but that's how that -- how they come into

18   play.

19             Anyway, that's the theory that was articulated.  That

20   it all went to the boxboard mills.  Well, Your Honor, if that's

21   their theory, it's certainly relevant that International Paper

22   owned some of the very facilities where they say this paper

23   would have gone.  And it's relevant in any number of respects.

24   The fact that they owned it is a relevant consideration.  The

25   fact that they operated it would be relevant.  They are

1    contributing to the problem.

2            As we get to these downstream areas up downstream of

3    Otsego such as the former Otsego impoundment, and Judge Jonker

4    is asked to figure out who should pay what share in that area

5    of the river, certainly it's relevant that International Paper

6    owned one of the mills where International Paper's own expert

7    says this paper would have gone.

8            THE COURT:  So their expert says this waste product

9    was sent to the boxboard companies or the -- points out

10   Sutherland Mill.  You come back and say, "Well, if that's the

11   case, IP owns three of these companies -- three of these mills,

12   the MacSimBar and the two Battle Creek mills, Fountain Street

13   and Angel Street"?

14           MR. SIBLEY:  That's correct.  Now, Your Honor, we

15   disagree with his theory.  We don't think it's right.  We don't

16   think Dr. Woodard is really qualified even to offer that

17   opinion.  But it's certainly relevant.  It's an issue they put

18   at issue in phase 1.  And Mr. Parker is --

19           THE COURT:  Still at issue?  Or did Judge Jonker not

20   accept that?  Has that issue been resolved?

21           MR. SIBLEY:  It's very much still at issue.  He

22   didn't resolve -- he held that in phase 1 -- Mr. Parker loves

23   to mention -- that for the 1954 to '56 period the evidence was

24   not sufficient to show that the Bryant Mill recycled carbonless

25   copy paper.  That was the first two years that --

1          *THE COURT:*  Say that again.

2          *MR. SIBLEY:*  That from 1954 to 1956 -- the 1956 date

3     being significant in the case, Your Honor, because that's when

4     International Paper leased the Bryant Mill to Allied Paper

5     Company.  Allied Paper operating it from that point forward.

6     International Paper's theory was that lease was effectively a

7     sale and that they were not the owner within the meaning of

8     CERCLA.  And that's what phase 1, the bulk of phase 1 was

9     about.  But we also -- we had evidence that we believe

10    demonstrated that they would have used the paper before 1956.

11    But Judge Jonker ruled against us on that.

12          The issue, though, is still in play in phase 2.  I

13    mean, the extent to which any of these mills would have had a

14    propensity to use carbonless is relevant.  You know, that

15    theory could be extended to the post-1956 period.

16          Mr. Parker and his colleagues could call on

17    Dr. Woodard again to articulate this theory and try to convince

18    Judge Jonker that the Bryant Mill, notwithstanding the

19    remarkable environmental evidence showing Aroclor 1242 in the

20    disposal areas for the Bryant Mill and then Portage Creek,

21    nonetheless might argue that they use less than say the

22    Georgia-Pacific mill and certainly less than the Brown boxboard

23    mill.  So that's the theory in phase 2.  And if that's the

24    case, it's certainly fair for us to note as an equitable factor

25    that one of these boxboard mills, the MacSimBar Mill, and it

1    was owned by International Paper, by a predecessor to

2    International Paper.  The same with respect to the Battle Creek

3    mills.

4           We'd note also that if the Battle Creek mills were

5    recycling carbonless to the extent that Dr. Woodard says, you

6    would see much more 1242 in Morrow Lake than you do.  So it all

7    comes together.  And it's part of a mix.  It's discovery.

8    We're working out all of these factors and we're discovering

9    these facts.

10          The extent to which Judge Jonker may choose to rely

11   on that fact remains to be seen, but it's certainly fair game

12   for discovery.  In fact, Your Honor, in phase 1 it wasn't just

13   the 1954 to 1956 and the secured creditor exception that was

14   the subject of dispute between Georgia-Pacific and IP.

15   International Paper also owned a chunk of -- owned and operated

16   a chunk of what's broadly known as the Bryant Mill facility

17   from 1956 through 1965.  It's not depicted on this map, but

18   it's known as the Panelyte facility.  If you read

19   Judge Jonker's opinion, he talks about how he didn't need to

20   reach that question about whether IP was responsible as an

21   owner at the time of discharge with respect to its ownership

22   and operation of the Panelyte facility, which included a large

23   chunk of Bryant Mill Pond which is where the Bryant Mill's

24   waste went.  So I didn't need to reach that.  I'll deal with

25   that in phase 2.

1          And he's absolutely right.  All we needed to show was

2     that IP had a seat at the table.  And we established that.  And

3     the question now is, you know, let's throw in all the equities

4     and let's figure out who pays what.  Assuming we even need to

5     get to the question of equities between the mill companies.

6          So Judge Jonker clearly contemplated that issues

7     going beyond the narrow basis on which he found a party liable

8     could be considered in phase 2.

9          IP also objects that this would be burdensome and

10    prejudicial.  Your Honor, again, this is the easy question.

11    It's not as though by sustaining International Paper's

12    objection you would keep out discovery as to these other

13    facilities.  We're still going to have discovery on them.  The

14    only thing is you would have a little blind spot over the

15    question of who owned the facility from -- the MacSimBar

16    facility up until 1968 and the Battle Creek facilities during

17    the relevant years there.

18          I've already handed Your Honor the 104(e) response.

19    IP has already done its work on this.  They know the answer.

20    And I would submit, Your Honor, if they could have denied it

21    truthfully, they would have.  They have objected because the

22    answer is, as we all know, they owned these facilities.

23          And again, it's not a surprise.  It's not a surprise

24    that this has come up.  Mr. Parker correctly notes that there

25    was a time during phase 1 when there was some consideration of

1    bringing Mead into the case.  Weyerhaeuser moved to add Mead

2    and Judge Jonker said, "It's too late.  We're well too far

3    along in this phase 1 to do that."

4         Had Mead been brought in, certainly the Otsego Mill

5    would have been front and center.  But Georgia-Pacific elected

6    to focus on the Bryant Mill.  The Bryant Mill is, Your Honor --

7    and I -- we didn't attach them to our papers, and I suspect

8    that unless we were back in front of you on another discovery

9    motion, you may not have occasion to go read them, but the

10   public documents about this site, one is struck instantly by

11   the role of the Bryant Mill.  It is the big, the big Kahuna.

12   It's the big mill that's doing -- that's responsible for a

13   large chunk of the mess that we're cleaning up.  And IP's

14   connection to that mill over that 10-year period which we've

15   established is more than sufficient to make it jointly and

16   severally liable all throughout the river.  And that's why that

17   was the focus of our case in phase 1.

18        *THE COURT:*  Why didn't you try to add Mead at an

19   earlier stage so that you wouldn't have had the objection from

20   Judge Jonker that it was too late to add Mead?

21        *MR. SIBLEY:*  We did not seek to add Mead.  We have

22   settled with Mead.  We have a settlement agreement with them,

23   and we've resolved their liability for their contribution.  So

24   we did not sue Mead.

25        Now, these other parties could have brought a

1    third-party claim to bring them to the table.  They elected not

2    to do so until it was too late in Judge Jonker's mind to do

3    that.

4           *THE COURT:*  Do you know why they waited so long?

5           *MR. SIBLEY:*  That's a question for Mr. Parker.  I

6    don't know.

7           But adding the -- adding a claim against

8    International Paper as to the Otsego Mill didn't give us

9    anything that we wouldn't already have by the claim against the

10   Bryant Mill.  And, frankly, that's where the -- in terms of

11   equitable allocution, to the extent volume comes into the

12   equation, that's where the cost/benefit analysis tilts in favor

13   of pursuing a claim against IP.  If we're dealing just with the

14   Otsego Mill.  Again, under our theory, we don't think the

15   boxboard mills used very much of this stuff at all.  To the

16   extent they did, it did not result in the discharge of PCBs in

17   the same quantities that you're seeing from the Bryant Mill.

18   But that's our theory.  IP has a different view of that.  And

19   so it certainly comes into the equation in phase 2.

20          *THE COURT:*  It sounds like your argument is that

21   these boxboard mills are not a big player, but we really don't

22   want to talk about them, but if they are going to be -- if they

23   are going to be brought into the argument, then let's bring the

24   other guy's boxboard mills in too and so we need to know about

25   them.

1              *MR. SIBLEY:*  That's exactly right.  And the role

2    generally -- it's not just that they have opened the door.  I

3    think the contribution of all of these facilities is relevant

4    to some extent.  Judge Jonker is going to have to decide how to

5    deal with so-called orphan shares.  These mills that --

6              *THE COURT:*  What are the orphans?  I read that in

7    your brief.  I understand the argument, but what's --

8              *MR. SIBLEY:*  Yeah, it's funny.

9              *THE COURT:*  Can you point those out on the map here?

10             *MR. SIBLEY:*  Yeah, I'm happy to do so.  First of all,

11   let me say, I don't think there are any orphans, because all of

12   these mills recycled NCR's paper.  So as a technical matter I

13   would say that.

14             Now, as between the paper companies, if we take NCR

15   out of the equation, there are some companies that none of

16   Georgia-Pacific, Weyerhaeuser, or International Paper owned.

17   And let me tick through those.  And I'm going to set aside the

18   three that are the subject of this motion that we think IP

19   owned.

20             But the Rex Mill, none of the parties are connected

21   to that as best we know.

22             The King Mill is probably an orphan.  There is some

23   evidence, Your Honor, that the Bryant Mill and the King Mill

24   were coordinated to some extent in their operations.  We're

25   still sort of sorting that out.  I don't want to say

1    definitively that IP has no connection to that, but it's

2    probably an orphan as among the paper companies.

3            The Monarch Mill, same thing.  Probably an orphan.

4    But there is some evidence showing that those three mills --

5    Monarch, King, and Bryant -- were coordinated.  So I don't want

6    to rule that out entirely, but it's probably an orphan.

7            Moving downstream, Sutherland and KVP are owned by a

8    former Fort James/Georgia-Pacific Mill, so they are not

9    orphans.

10           The Weyerhaeuser Mill, of course, that's

11   Weyerhaeuser.  It's not an orphan.

12           And then a mill that is not depicted on this map

13   right adjacent to what's called the Mead Hoerner Mill is the

14   Otsego Falls Mill, and it is almost certainly an orphan.

15           *THE COURT:*  What's the name of it?

16           *MR. SIBLEY:*  The -- it's called -- we've called it in

17   the case the Otsego Falls Mill.

18           *THE COURT:*  Huh.

19           *MR. SIBLEY:*  It's right there at the Otsego Falls

20   Dam.

21           But the first question, of course, is are these

22   really orphans?  Is it the case that none of these mills are

23   connected to any of the parties here?  Should we treat them as

24   orphan shares?

25           So, for example, Your Honor, if the MacSimBar Mill

1    was a true orphan, one way to allocate responsibility for its

2    contribution to the river would be to take the parties'

3    relative shares for the rest of the river, or at least that

4    portion of the river, and just apply that to that orphan and it

5    really comes out as a wash.  It doesn't tilt the analysis at

6    all.

7           But if International Paper owned that mill at the

8    time it was discharging, that would suggest a different way to

9    treat that mill.  That their share should be increased.

10   Certainly it's a relevant consideration that Judge Jonker can

11   consider.

12          Now, Mr. Parker and International Paper may argue

13   that that shouldn't come into play as a matter of equity

14   because we didn't pursue it in phase 1.  I don't think that's

15   right.  That's a fair argument to raise with Judge Jonker,

16   though.  But that's a trial argument.  That's a motion in

17   limine.  That's something you raise in your post-trial brief.

18   It's not off-limits within the meaning of Rule 26 discovery.

19   You know, the sweep of Rule 26 is broad to begin with.  You

20   apply the Rule 26 relevancy standard to a CERCLA allocation

21   proceeding, where the judge can consider literally almost any

22   factor he wants to, and you have a very, very wide discovery

23   standard indeed.  I would submit that what we're talking about

24   here falls comfortably within the heart of the type of inquiry

25   that gets made in a CERCLA case, and we think these are

1   questions that IP should be made to answer.

2            *THE COURT:*  Where is the Rex Mill and the King Mill?

3            *MR. SIBLEY:*  If you -- let's look at Figure 2,

4   Your Honor.  I think that's probably the easiest place to look.

5            The Rex Mill is kind of right in the middle of the

6   document.  It's about two, three inches to the left of

7   Morrow Lake Dam on the north bank of the --

8            *THE COURT:*  I see.  I'm sorry.

9            *MR. SIBLEY:*  -- Kalamazoo River.

10           *THE COURT:*  All right.  And the King Mill?

11           *MR. SIBLEY:*  The King Mill is --

12           *THE COURT:*  That's it.

13           *MR. SIBLEY:*  Yeah.  So the Rex Mill, Your Honor,

14  we're still doing discovery.  I don't want to box myself in on

15  any of this.  But I think the Rex Mill is a fairly minor

16  contributor overall.

17           The King Mill was a deinking mill that was operated

18  by Allied.  Owned and operated by Allied.  As a general matter,

19  as a general proposition, Your Honor, deinking mills -- and

20  there are -- among the deinking mills are Georgia-Pacific's

21  Kalamazoo Paper Company Mill, the King Mill, the Bryant Mill,

22  the Monarch Mill, although only for a couple of years, and then

23  the Weyerhaeuser Mill up until 1962.  The deinking mills were

24  the mills that took paper and they -- it wasn't just paper

25  recycling, it was a deinking process that removed coatings and

inks.  And our view, and we believe that the evidence supports

this, is that the deinking mills were the primary destination

for carbonless.  That doesn't mean it wasn't used at boxboard

mills.  It could have been.  Indeed it likely was.  But not

nearly to the same extent as the deinking mills.

Moreover, the deinking mills, given the nature -- the

quality of the paper that those mills produced, they would have

generated greater quantities of waste that would need to have

been treated to avoid putting contaminants into the river.

Although I would note that there was no treatment system in

place at the time that would have prevented the discharge of

PCBs into the environment.  It was not on anybody's radar

screen at that point.

THE COURT:  The diagram there went further away from

the river than the other mills, but I see that there's the

King Highway Landfill between the King Mill and the river.  Is

that the landfill for the King Mill?

MR. SIBLEY:  Not for the King Mill, Your Honor.  That

actually was a facility that was used by Georgia-Pacific.

We've noted -- this document has been used for other purposes.

We've noted on the map some of the landfills and disposal areas

just in a general sense.

THE COURT:  How did the King Mill get to the river

then?

MR. SIBLEY:  There is a storm -- there's a sewer line

1    that runs out basically almost due north, and that's how it

2    gets -- how it both draws water -- it doesn't draw water

3    through the sewer line, but it pipes it from the river and then

4    it discharged to the river.

5            The same with the Rex Mill.  It's not -- I believe

6    there may have been a canal that connected the Rex Mill to the

7    river itself.

8            THE COURT:  Thank you.

9        MR. SIBLEY:  Your Honor, I've -- you've been very

10   generous with your time.  This is plainly relevant evidence.

11   There is literally no precedent for the objection that IP has

12   lodged to it.  It's a unique position to accept that discovery

13   as to these mills is relevant broadly except for the question

14   of whether you owned it.  And I think the reason why they don't

15   want to acknowledge that is because it's a harmful fact.  And I

16   just don't -- there's no basis for recognizing that type of

17   objection.  We would ask that the motion be granted and that

18   IP's objections be overruled and that they be made to answer

19   discovery.  Thank you, Your Honor.

20           THE COURT:  Thank you.

21           Counsel.

22       MR. PARKER:  Thank you, Your Honor.  Good morning.

23           THE COURT:  Good morning.

24       MR. PARKER:  Judge, we're here to decide if

25   Georgia-Pacific can pin liability on International Paper in

1   phase 2 for three mills which were not the subject of liability

2   in phase 1.  And I think the answer to that question is no.

3   It's a question that ought to be answered now before the

4   parties spend a lot of money and relitigate all of the issues

5   that were decided in phase 1 regarding the Bryant Mill and not

6   something that, as Mr. Sibley has suggested, is appropriate for

7   a motion in limine before trial.

8           In advance of the very first Rule 16 planning

9   conference in this case held on June 27th, 2011, a conference

10  at which Georgia-Pacific advocated dividing this case into two

11  phases, a liability phase and then an allocation phase, the

12  parties filed a Joint Status Report with the Court.  Now, we've

13  attached that Joint Status Report as Exhibit D to our brief.

14  It's actually docket number 78.  And at page 5 Georgia-Pacific

15  has its statement of the case, the portion of that Joint Status

16  Report that it drafted, and it says the following, and I quote:

17  "Georgia-Pacific further contends that International Paper

18  should be wholly responsible relative to Georgia-Pacific for

19  all costs and damages attributable to the facilities and

20  activities for which International Paper has CERCLA liability

21  as an owner or operator.  This includes the Bryant Mill which

22  IP owned and operated and leased at various times."

23          Let me reread a portion of that, Judge.

24  "Georgia-Pacific contends that International Paper should be

25  wholly responsible relative to Georgia-Pacific for all costs

1    and damages attributable to facilities and activities for which

2    International Paper has CERCLA liability."  That's what they

3    said to the Court.  That's what they represented to the Court

4    phase 1 would be about.  And they spent an inordinate amount of

5    time, as Judge Jonker said -- by the way, Judge, those are the

6    only two sentences in that whole Joint Status Report where they

7    talk about International Paper.

8                 And we went through a phase 1 trial for two weeks at

9    which 25 expert and lay witnesses were called, which

10   Judge Jonker noted in his opinion and order had a trial record

11   that covered over 50 binders with thousands of pages.  In that

12   trial they established CERCLA liability against my client not

13   as an operator, they failed to do that, which Mr. Sibley

14   suggested was something easy to do.  They could not do that.

15   They established CERCLA liability against International Paper

16   as to our ownership of one facility, the Bryant Mill, from 1956

17   to 1966.  They did not establish our CERCLA liability for two

18   mills that are 25 miles upstream in Battle Creek.  They did not

19   establish our CERCLA liability for the Otsego MacSimBar Mill

20   which is the furthest downstream of all of these mills.  But

21   now that we're in phase 2 they want to try to use the back door

22   to bring those facilities in and somehow pin liability and,

23   therefore, allocation on International Paper.  But they can't

24   do that.  They've got to go through the front door of phase 1

25   liability and show that we have responsibility for those

 1    facilities before they can do that.  Having decided not to do

 2    it in phase 1 and not to pursue those other three mills, they

 3    can't do it now.

 4            Now, I apologize that you are getting such a factual

 5    background on this case, Judge, but it is helpful, I think, in

 6    trying to understand what's going on here.  And as you now, I

 7    think, understand, we're in phase 2 of a two-phase case about

 8    CERCLA liability resulting from PCBs being in the

 9    Kalamazoo River.

10            At the beginning of the case Judge Jonker ordered

11    that we would try it in two phases.  Phase 1 was liability;

12    phase 2 was allocation.  And as we talked -- as I mentioned, we

13    had this two-week trial, all of these witnesses, all of these

14    exhibits to establish whether or not we, International Paper,

15    had CERCLA liability for a single mill, the Bryant Mill.  No

16    other mill.

17            Now, the Court found that we were liable as an owner

18    only for a 10-year period during which we owned the

19    Bryant Mill.

20            *THE COURT:*  Is CERCLA liability for the mill or for

21    the contamination of the river?

22            *MR. PARKER:*  I believe it's clear, Judge, that it is

23    for the mill.  And in fact, if I can read from Judge Jonker's

24    opinion, he quotes CERCLA and says, "A defendant is a PRP" --

25    and I'm sorry, this is on page 10 of his opinion and order --

1    "A defendant is a PRP under Section 9607(a) if it is, (1) the

2    owner or operator of a vessel or facility or (2)" -- and this

3    is the one that Georgia-Pacific relied on -- "a person who at

4    the time of disposal of any hazardous substance owned or

5    operated any facility at which such hazardous substances were

6    disposed of."

7              I would submit to you we did not own and operate the

8    river.  We owned and operated a mill.  The facility is the

9    mill.  It's not the river.  The river is the site.  But the

10   facility is the mill.  Because we can't own and operate the

11   Kalamazoo River.  We can only own or operate a facility.  Which

12   in this case was the Bryant Mill.  And that was the only

13   subject of phase 1.

14             And establishing our liability as to the mill is a

15   threshold issue, of course, for the allocation that's going to

16   occur in phase 2.  And that's the issue that was properly

17   designed to --

18             *THE COURT:*  CERCLA couldn't have been -- couldn't

19   have cared less, I suppose, about your mill.  CERCLA is

20   concerned about the river.

21             *MR. PARKER:*  But whether or not we're a PR --

22             *THE COURT:*  The facility is just the means by which

23   the river is contaminated.

24             *MR. PARKER:*  True, Judge, but in order to determine

25   our allocation, we first have to be determined to be liable.

1     And the liability arises from our operation or ownership of a

2     facility.  And that is a threshold issue.  And an issue that's

3     actually fairly important for phase 2.

4          I mean, for example, the fact that we were determined

5     not to be an operator of the Bryant Mill during a time it was

6     discharging PCBs from 1954 to 1956.  An issue that Judge Jonker

7     spent several pages of his opinion deciding.  And we had lots

8     of witnesses at the trial regarding that issue.  Certainly will

9     limit our allocation responsibility in the next phase.  Had we

10    operated it during that period and had discharged PCBs during

11    that period, presumably our allocation would have been larger.

12         There were big threshold issues as to whether or not

13    during the period of our ownership and operation of the

14    Bryant Mill in phase 1 PCBs were discharged.  Judge Jonker

15    found that they weren't, and we were not found to be liable on

16    that basis.

17         Had Georgia-Pacific raised the issue in phase 1

18    regarding these other mills, I would have had the opportunity

19    at that point in time to argue that, hey, we didn't own the

20    mill during the period of time these were discharged.  That's a

21    phase 1 issue.

22         Now they are trying to move that around into phase 2

23    after having made a decision for very good reasons, and I'll

24    explain those in a moment.  They didn't raise them in phase 1,

25    and now they want to back door them in phase 2, and they

```
 1   certainly shouldn't be allowed to do that.

 2           Let me just briefly discuss the three mills, if I can

 3   to you, Judge.  And I actually brought a different map, which

 4   if I can approach I'd like to --

 5           THE COURT:  Well, I think we're talking about the

 6   Superfund site; are we not?

 7           MR. PARKER:  Yes, Judge.  And I actually have a map

 8   of the Superfund site.

 9           THE COURT:  All right.

10           MR. PARKER:  From the EPA.  Can I?

11           THE COURT:  I would love to see that.

12           MR. PARKER:  I've handed Your Honor a map of the

13   seven areas of Operable Unit 5.  Operable Unit 5 is the

14   Kalamazoo River and the Portage Creek.  And as you can see from

15   their nice little seal in the upper right-hand corner, this is

16   from the United States Environmental Protection Agency.  And it

17   shows the seven areas of OU-5, the river.  And by the way, the

18   OU-1 through 4 are the various landfills that each of the mills

19   have.  So, for example, the Bryant -- OU-1 is the Bryant Mill

20   landfill.  OU-2 is Georgia-Pacific's landfill.  So those are

21   the OU-1 through 4.  But OU-5 is the river, and it's broken

22   down by the EPA into seven areas.

23           What you won't see in the Superfund site is

24   Battle Creek, because it's not part of the site.  And the two

25   mills, the Angel Street Mill and the Fountain Mill, that are
```

```
 1   located 25 miles away from Kalamazoo up in Battle Creek are not

 2   part of this site.  So whether you want to use the phrase

 3   "facility" or you want to use the phrase "site," they don't

 4   belong here.  And trying to bring them in now, when they

 5   weren't brought in in phase 1, is certainly inappropriate.

 6           The MacSimBar Mill, which as Mr. Sibley showed you is

 7   very far downstream, was owned and operated by

 8   Mead Corporation.  And as I'll explain and as Mr. Sibley

 9   conceded, Georgia-Pacific had settled with Mead, so they didn't

10   bring -- name them as a party in this action.  And in fact, in

11   the settlement agreement which we've filed as an exhibit to our

12   response brief, Georgia-Pacific agreed to indemnify and defend

13   Mead if it were brought into the case.  So they never raised in

14   phase 1 the MacSimBar Mill, the Otsego Mill, because that would

15   necessarily bring them back into the case as Mead's indemnitor.

16           Weyerhaeuser, one of the defendants, tried to add

17   Mead as a third party, and at that time Georgia-Pacific

18   actually served some discovery on International Paper, similar

19   to what we have in front of us now, asking us about ownership

20   of the mill.  And at the same time --

21           THE COURT:  Say that again, please.

22           MR. PARKER:  Sure.  At the time --

23           THE COURT:  When you say at the time?

24           MR. PARKER:  At the time that Weyerhaeuser's motion

25   to add Mead as a defendant -- as a third-party defendant was
```

1    pending in front of Judge Jonker in phase 1, Georgia-Pacific

2    chose to serve some discovery on International Paper asking us

3    about our historic successor ownership related to the Otsego

4    and the MacSimBar Mill.  When the judge denied Weyerhaeuser's

5    motion, wouldn't allow them to add it, Georgia-Pacific withdrew

6    that discovery.  And they did it because they knew that if they

7    continued to pursue in phase 1 that mill, the judge would say,

8    "Wait a second, I ruled that Mead and this mill is not an issue

9    in phase 1, and you have opposed, you Georgia-Pacific have

10   opposed Weyerhaeuser's attempt to bring them in and assign some

11   liability for that mill to Mead," because that will really put

12   Georgia-Pacific in the soup as the indemnitor.  So they

13   withdrew it.  Now they are trying to bring in into phase 2 what

14   they made a strategic decision not to do in phase 1.

15            *THE COURT:*  Was that before or after your expert

16   argued about the brown box mills and the fact that this

17   material was sent to the brown box mills?

18            *MR. PARKER:*  I would argue -- I'd have to think about

19   that a little bit, Judge.  I'm not sure when the expert reports

20   came out in relation to when that was argued.  I suspect our

21   expert argued that after.  But again, I wouldn't want to be

22   quoted on that without having some time to actually look at

23   that.

24            *THE COURT:*  If that was the case, perhaps their

25   strategic interests changed again if the brown box mills became

1   the target or the focus of a litigation and they had to point

2   out that, all right, if the brown box mills are going to become

3   the focus of litigation, now we're back interested in the brown

4   box mills that IP may be responsible for, including the

5   MacSimBar Mill.

6          *MR. PARKER:* Well, I guess, Judge, I would say that

7   if that is -- they obviously deposed our expert. You saw the

8   testimony that Mr. Sibley handed out. If that became their

9   theory, then back in phase 1 they should have alerted the Court

10  that that was one of the facilities and activities for which

11  International Paper has CERCLA liability. They never did that.

12  They never said, "Okay, well, then you've got -- we're going to

13  establish liability for the MacSimBar Mill." They didn't do

14  that. Let alone mills that are 25 miles upstream.

15         *THE COURT:* Well, I think their position was, as I

16  understood it, that's not a particularly persuasive argument,

17  but it's one that you are raising and they were going to have

18  to meet. So if they were going to have to meet it, they were

19  going to point out that you had those mills just like they did.

20  So they would have no interest in raising it at the outset but

21  only in defense. And if it hadn't come along at the time that

22  Weyerhaeuser lost its attempt to bring in the Mead mill and

23  they had no other reason to bring in the Mead mill, I can see

24  why they may drop their interest in it until you caused them to

25  have some interest in Mead mill. But perhaps I'm speculating.

1          *MR. PARKER:*  Well, again, Judge, I don't know the

2    date of the expert report that Mr. -- or Dr. Woodard gave,

3    but --

4          *THE COURT:*  I know.  That's why I'm asking.

5          *MR. PARKER:*  I will say this, though:  The status

6    conference, the initial Rule 16 conference that I quoted their

7    statements from, that wasn't the only time we got in front of

8    Judge Jonker on a status conference.  He had another one on

9    June -- I'm sorry, on March 20th, 2012, and the parties filed a

10   Supplemental Joint Status Report at that time which we've

11   attached as Exhibit B to our brief.  It's docket 173.  And

12   again, the big issue at that status conference was

13   Weyerhaeuser's attempt to add Mead and the Otsego Mill as a

14   party to this matter, which motion GP vehemently opposed.  In

15   that Supplemental Joint Status Report GP expressly incorporated

16   its statement of the case from the first one, from the first

17   Joint Status Report where they said they sought to hold

18   International Paper liable for damages attributable to the

19   facilities and activities for which International Paper has

20   CERCLA liability.

21          And I'd just note, Judge, if they meant facilities

22   was the river, it would be singular, not plural.  Not multiple

23   rivers here.  But they went on -- not only did they expressly

24   incorporate that on page 2 of the Supplemental Joint Status

25   Report, on pages 7 and 8 of the Supplemental Joint Status

1   Report Georgia-Pacific talked about amending the Complaint to

2   add allegations that were being developed in discovery.  And

3   International Paper expressed some concern about that,

4   naturally.  And on page 8 GP responded, and I quote, "As to

5   IP's stated concern about potential claims against it for mills

6   on the Kalamazoo River other than the Bryant Mill, this issue

7   relates only to the Otsego, Michigan, mill that is the subject

8   of Weyerhaeuser's proposed third-party complaint."

9           So at that point in time, March of 2012, they didn't

10  even mention the Battle Creek mills at that point.  They never

11  suggested that we would have any potential liability for that.

12  And instead they said that might only relate to the

13  Otsego Mill.  They had outstanding discovery to us on that.

14  And when the judge denied Weyerhaeuser's motion and would not

15  add Mead to this case, they withdrew that discovery.  So

16  at least twice they said, "The only mill we'll seek to hold you

17  liable is that for which we seek CERCLA liability in phase 1."

18          And in fact, if you look at the Amended Complaint,

19  the only mill they ever mention in the Amended Complaint is the

20  Bryant Mill.  And again, Judge, phase 1 was all about showing

21  that we weren't responsible.  I mean, I like to say we were

22  found to be barely an owner of that mill in that decision.  We

23  were clearly shown not to be an operator of the mill during any

24  period of time when PCBs were discharged.

25          So I also showed that we're an owner but only by

1    virtue of a lease agreement with Allied which operated the

2    mill, and they were the ones who were then in the act of

3    actually discharging them.  All of that will be relevant in

4    phase 2.  If in phase 1 I knew these other three mills were

5    going to be at issue, I would have had an opportunity to show

6    that during whatever period of time our predecessors, be it

7    Champion or be it St. Regis -- because IP never operated any of

8    these mills, we just had the bad judgment to buy the companies

9    that once did -- but during our predecessors' ownership period

10   I could have shown we didn't discharge any PCBs.  I

11   successfully did that for the big bad Bryant Mill.  The mill

12   that supposedly was the dirtiest mill on the street.  I showed

13   the judge, and he agreed, that we did not discharge any PCBs

14   during the period of time that we operated it.  I could have

15   done that in phase 1.  Now they are going to try -- and that's

16   what phase 1 was about.  Now they are going to try to back-door

17   it.

18          *THE COURT:*  Did you seek to obtain discovery from

19   Georgia-Pacific about the PCBs discharged by the

20   MacSimBar Mill?

21          *MR. PARKER:*  Yes, for a reason totally unrelated to

22   their ownership of it or our ownership of it.  Mr. Sibley is

23   right that the experts now in phase 2 are creating these mass

24   balance models where they show all of the PCBs, where they are

25   in the river, which mills they came from.  And you have to

1   include in that every mill.  Even if it's an orphan, you've got

2   to include it, because they are responsible potentially for

3   discharging PCBs, and where they are in the river impacts who's

4   responsible for how much.  So clearly evidence of discharging

5   from every mill, even a mill that everybody concedes is an

6   orphan, is highly relevant in phase 2.  But the ownership of

7   those mills can only go to the issue of liability.  And that's

8   why we answered the discovery as it related to operation but

9   objected to it in connection with GP's attempt to show in

10  phase 2 that we're somehow liable for a mill it didn't show we

11  were liable for in phase 1.  Because they don't need to know

12  who owned the mill in order to show what output from the mill

13  there was.  So that's where we draw the line.

14          *THE COURT:*  If the output is relevant, why wouldn't

15  the ownership be relevant?

16          *MR. PARKER:*  The ownership is not relevant in this

17  phase for anybody who is not a party.  I mean, because in

18  phase 1 they didn't show that we had liability for that mill.

19  Now they are trying to say, "Okay, but you are liable for it

20  because you owned it and because it discharged."  That's what

21  we did in phase 1.  That's how Judge Jonker set this up.

22          *THE COURT:*  Let's assume for the moment that all of

23  these mills on the river were owned by IP.  Wouldn't that be

24  relevant to allocation if they -- you look up and you figure

25  out each discharged such and such and that gives you the

discharge from all of these mills and it turns out that IP

owned every single one of them.  Wouldn't that be relevant as

to allocation?

  *MR. PARKER:*  Only if the mill that IP owned actually

discharged PCBs.  If we owned a mill on the river that didn't

discharge PCBs, it's not relevant to this -- to any phase of

the case, 1 or 2.  And what phase 1 was about was figuring out

which of those mills are we -- did discharge.

  *THE COURT:*  My hypothetical -- perhaps extreme, but

nevertheless -- you figure out which mills discharged what, and

that's what your discovery went to.  And so MacSimBar Mill

discharged a certain percentage, and the rest of them all

discharged different percentages, but it turns out that IP

owned every single mill.  If that was the case, wouldn't that

be relevant to the allocation of equitable allocation of

liability?

  *MR. PARKER:*  If I understand your hypothetical,

Judge, it is that IP owned all the mills and all the mills

discharged.

  *THE COURT:*  Well, some did, some didn't.  If you

owned them all, wouldn't you be a hundred percent responsible?

  *MR. PARKER:*  Well, if we owned them a hundred percent

of the time as well?  In other words --

  *THE COURT:*  Obviously.

  *MR. PARKER:*  Okay.  Yes.  Because by the way, these

```
 1    mills were owned by various people at different times.  This
 2    MacSimBar Mill --
 3              THE COURT:  They can factor a hypothetical that
 4    covers that.
 5              MR. PARKER:  Fair enough.  Okay.  If we owned them
 6    all all of the time, I suspect there wouldn't be any lawsuit
 7    because it would just be us and EPA.  But the fact that there
 8    are multiple parties is what makes the ownership in phase 1 and
 9    the operation and liability relevant.  So I think what your
10    hypothetical, which as you conceded was extreme, it takes that
11    issue right out of it.  But once you have multiple people and
12    multiple mills, then necessarily the way Judge Jonker set this
13    up was to say in phase 1 we'll figure out which facilities have
14    CERCLA liability and then in phase 2 we'll allocate
15    responsibility based upon what we determine in phase 1.
16              THE COURT:  What's the judge going to do with this
17    information that says the MacSimBar Mill discharged let's say
18    20 percent of the PCBs into the river if he doesn't know who
19    owns it?  He's going to say, well, so that means Bryant with
20    80 percent of the responsibility, so we're going to reduce your
21    liability to only 80 percent of the . . .
22              MR. PARKER:  I think he'd decide they are an orphan.
23    And let me answer your question this way, Judge.  Assume for a
24    minute in phase 1 where I opposed ownership and operation, I
25    won on ownership, I lost -- I mean, I lost on ownership, I won
```

1    on operation.  Assume I would have won on ownership, okay?  Now

2    I'm out of the case, right?  Could they have tried to bring me

3    back in in phase 2 based upon three other mills they didn't

4    argue in phase 1?  Of course not.  Because they made a choice

5    in phase 1.  They said, "This is the mill we're going to try to

6    pin your liability on."  And clearly, if I would have succeeded

7    on my ownership issue -- which I think I barely lost -- but if

8    I would have succeeded on that issue, Judge, I would be in

9    Cleveland today.  I wouldn't be here.  By the way, I love

10   coming to Grand Rapids because it's like Cleveland.  But if --

11            *THE COURT:*  You may get to go to Cincinnati instead.

12   Another fine city in the state of Ohio.

13            *MR. PARKER:*  Yes.  And no offense to the

14   Sixth Circuit, but I prefer Grand Rapids and Cleveland to

15   Cincinnati.

16            But that's one way to think about this, Judge.  If I

17   would have won on the Bryant Mill in phase 1, there is no

18   argument today about this, right?  And that's why they had to

19   raise these things in phase 1.  They took a calculated risk for

20   a lot of reasons, and now they can't back away from that.  They

21   can't say, "Well, you know what, Judge Jonker is not going to

22   let Mead in this case, now it's okay for to us try to back-door

23   some liability" --

24            *THE COURT:*  Well, it's not unusual once you establish

25   liability to go beyond the narrow facts of liability when

1    you're looking at damages.

2         *MR. PARKER:*  Well, but it's not just damages.  It's

3    allocation.  And what we set up in phase 1, by their own

4    admission is --

5         *THE COURT:*  Isn't it a broad -- I mean, look at all

6    the cases that your opponent cited that says how broad the

7    discretion of the court is in determining equitable allocation.

8    The court can look at a variety of things that had nothing to

9    do with the actual determination of liability.

10        *MR. PARKER:*  That's clearly true, Your Honor.  But I

11   would challenge Georgia-Pacific to give the Court a case where

12   you were found liable for -- because a lot of these CERCLA

13   cases are done in phases -- but where you're found liable for a

14   facility in phase 1 and somehow in phase 2 you get equitable

15   allocation for other facilities that weren't the subject of

16   phase 1.  None of their cases stand for that proposition.  They

17   say you can look at intent, you can look at how evil the person

18   was, all of these kinds of things, but they don't say "We

19   established liability for one facility in phase 1 and then in

20   phase 2 we're going to go out and show you have a greater share

21   of the overall allocation for facilities we never showed you to

22   be CERCLA-liable for."  None of their cases stand for that

23   proposition, and we couldn't find one that did.

24        *THE COURT:*  But can the Court ignore, can the Court

25   ignore other ownership interests that IP may have that

1    contributed to this Superfund site pollution?

2         *MR. PARKER:*  I would submit yes, and I would submit

3    that's exactly what Judge Jonker did when he said Mead is not

4    coming into the case.  It's too late.

5         You know, at the first status conference one of the

6    things -- NCR wanted to actually subdivide phase 1 into two

7    subphases.  And the judge said, "You know what, we've got

8    really old witnesses in this case.  People" -- it's in the

9    transcript -- he said, "They are literally dying on us because

10   this stuff goes back to the '50s.  I don't want to wait that

11   long.  I want this decided now."

12        Well, wouldn't you think, then, that if there were

13   other mills that International Paper should somehow be liable

14   for, those should have been addressed in phase 1?  I mean, I've

15   got the prejudice now I've got to go out and find all those

16   people, redo phase 1 as to three mills to figure out whether or

17   not there was recycling going on during the periods of

18   ownership.  All of those kinds of things.  When Judge Jonker

19   said, "Man, we need to do this now because these are old

20   people."  And now suddenly I've got to try this in phase 2 when

21   I may not have those witnesses available to me anymore?  I

22   mean, I haven't even had a chance to look.  And that's the

23   other thing.  We've got a discovery schedule.  Discovery is

24   over in two months.  We've got a year to do this discovery in

25   phase 1 -- actually more than a year -- on whether or not there

1    was CERCLA liability for the Bryant Mill.  Now I've got less

2    than two months to determine whether -- to do all the discovery

3    I'm going to need to do to try to show in phase 2 whether or

4    not there's CERCLA liability for those mills?

5           And, Judge, I think I've got a really good shot of

6    showing that.  You remember from the last time we were here

7    there was this KRSG, the Kalamazoo River Study Group, which

8    consisted of Georgia-Pacific, the Allied Corporation which

9    operated the Bryant Mill and bought it from us in 1966.  They

10   owned and operated the King Mill.  They owned and operated the

11   Monarch Mill.  And at various times before companies went

12   bankrupt there were other members of the KRSG.  They brought a

13   lawsuit in this court trying to hold, for example, Eaton liable

14   for PCBs that were discharged upstream of Morrow Lake.  Came

15   down, somehow flowed over the dam and came into the site, the

16   Superfund site.

17          In that case Judge Bell ruled -- and this is at

18   258 F. Supp. 2d 736 is the case, and this page that I'm going

19   to cite from is at 757.  Back in 2002 Judge Bell held that

20   Aroclor 1254 and 1260 made up 90 percent of the PCBs in

21   Morrow Lake.

22          Now, Mr. Sibley's chemistry lesson, which I'm glad he

23   had to give and not me, is that the PCBs that come from

24   carbonless copy paper, those are 1242.  Judge Bell ruled

25   90 percent of the PCBs in Morrow Lake are 1254 and 1260.  Right

1  on page 757 of that case.  So at most 10 percent is Aroclor

2  1242.  That's assuming -- and there's a whole bunch of

3  different Aroclors.  There's more than three.  So if 90 percent

4  are 1254 and 1260, the most that could have come from the

5  carbonless copy paper, the 1242, would have been 10 percent.

6        He held that the total PCBs, 90 percent of which were

7  not my PCBs or any paper company's PCBs, were not a significant

8  contributor to the PCBs in the Superfund site.  That was the

9  holding of his case.  So if 90 percent of the PCBs in the

10  Morrow Lake were not a significant contributor to PCBs in the

11  Superfund site, how could that little 10 percent, some subset

12  of which is the Aroclor 1242 that might have come from the

13  Angel Mill and the Fountain Mill 25 miles up in Battle Creek.

14  Those are all things in phase 1 I could have shown.  Now, with

15  less than two months left in discovery I've got to try to

16  garner all those facts and do a mini phase 1 trial inside the

17  phase 2 trial, or file a motion in limine as Mr. Sibley

18  suggested, to say that was -- that was for last February when

19  we had the trial in phase 1.

20        So there are really good grounds for me to show that

21  these mills didn't contribute anything to this Superfund site.

22        I mean, Mr. Sibley has told you he doubts the theory,

23  yet we're going to get this trial in phase 2.  The prejudice to

24  us would be really, really great from that.  And my experience

25  with Judge Jonker is he doesn't like to move his deadlines, but

1   I'm going to be forced to ask him to if I suddenly have to try

2   three phase 1 trials inside the context of phase 2.

3          Every -- the other thing, Judge, it not only --

4          *THE COURT:*  Didn't your chemical results show a

5   marked change downriver from the MacSimBar Mill?

6          *MR. PARKER:*  Well, it's the farthest downstream,

7   Judge, so presumably all of the mills that were upstream of

8   it -- you know, you can't -- unfortunately nobody can

9   fingerprint the 1242.  You can't tell if the 1242 came from

10  Georgia-Pacific's --

11         *THE COURT:*  No, I understand that.  But you said that

12  the box -- the brown box has a different chemical fingerprint

13  than the copy paper.

14         *MR. PARKER:*  I don't think that's right.  I don't

15  think that's what Mr. Sibley said.  They make different kinds

16  of paper, obviously, and the processes for making a fine white

17  paper obviously are different than for making cardboard.

18         *THE COURT:*  Is the cardboard that's made -- MacSimBar

19  Mill, does that make --

20         *MR. PARKER:*  Cardboard.

21         *THE COURT:*  -- exclusively brown box?

22         *MR. PARKER:*  Cardboard is my understanding.

23         *THE COURT:*  Cardboard?

24         *MR. PARKER:*  That's my understanding.

25         *THE COURT:*  All right.  Does that leave a different

```
 1   fingerprint?

 2           MR. PARKER:  No.  No.  When we're looking at the

 3   PCBs, they are all 1242.

 4           THE COURT:  All right.

 5           MR. PARKER:  Because it's not -- the problem is when

 6   we recycle NCR's paper, it had the 1242 Aroclor in it, the PCB,

 7   and so whether you were making the fine white paper using that

 8   or the box paper or whatever, it got put in.  And unfortunately

 9   we can't -- when we dig in the river and they do these core

10   samples, it's my understanding -- and Mr. Sibley can correct me

11   if I'm wrong -- you can't tell whether it came from a boxboard

12   mill or a fine paper mill by looking at the Aroclor.

13           Now, I'm sure the experts are going to opine, well,

14   where its location in the river vis-a-vis a particular mill

15   might somehow give you some insight.  If it's right outside

16   your discharge pipe, it's probably more likely from that mill

17   than somebody else.  But as to looking at the molecules, it's

18   my understanding you can't tell where they came from.

19           THE COURT:  All right.

20           MR. PARKER:  But I think that's relevant for the

21   mills up in Battle Creek, because, you know, they have got to

22   flow 25 miles, go up over a dam, and as Judge Bell --

23           THE COURT:  So water does go over the dam?

24           MR. PARKER:  Clearly.  Clearly it goes over the dam.

25   But not --
```

1              *THE COURT:*  So these can migrate?

2              *MR. PARKER:*  They can.  But it's not as significant,

3      as Judge Bell held against KRS, Kalamazoo River Study Group, of

4      which Georgia-Pacific was a member -- international Paper was

5      not -- I should point out, you know, one of the reasons -- you

6      had asked why didn't the parties try to bring Mead in sooner.

7      Weyerhaeuser was the party that tried in bring in Mead.  We did

8      not.

9              *THE COURT:*  Right.

10             *MR. PARKER:*  We are the newcomer to this site.

11     Allied Paper Company was the big behemoth on this river because

12     they owned three mills:  The King Mill, the Monarch Mill, and

13     the Bryant Mill.  The only mill which St. Regis, IP's

14     predecessor twice removed, owned for a period of time, up

15     through 1966, was the Bryant Mill.  And so -- and we only

16     operated it -- we owned it for a 10-year period during this

17     lease.  And it is during that period that -- while Allied was

18     operating and the PCBs were discharged.  And Allied was always

19     the party -- was a member of the KRSG, was out dealing with the

20     EPA until its bankruptcy.  After its bankruptcy in 2009, then

21     EPA did some searching, Georgia-Pacific did some searching and

22     said, "Hey, way back then, back in 1956, they owned and

23     operated this mill.  Let's see if we can bring them to the

24     party."  So we're literally scrambling in phase 1 when they

25     bring this suit to figure out all the facts.

1          We're worried -- we don't have any operational

2     records for our own mill because we sold it in 1966 and we

3     turned over operation of it in '56.  Our mill being the

4     Bryant Mill.  Let alone, Judge, try to figure out who everybody

5     else is on the river, owned and operated and all those kinds of

6     things.  So it was everything we could do to get ready for that

7     phase of the trial, let alone bring in other parties.

8          Georgia-Pacific, on the other hand, has been on this

9     river since at least the 1990s.  And active -- as we saw last

10    time -- the mediation summary that you ordered produced was

11    from 2001.  They have known about who was on the river and all

12    those kinds of things.  I mean, they settled with Mead in 2002.

13    So they have known all these things and had reason to bring in

14    people.  We just -- we're just the new kids on the block, and

15    that's why we did not seek to bring in Mead.

16         Obviously, if the Otsego Mill had been the subject of

17    phase 1, we certainly would have tried to bring in Mead which

18    co-owned in the sense -- not at the same time -- but owned --

19    also had common ownership of that mill during part of the

20    period.

21         Judge, just to summarize --

22         THE COURT:  Uh-huh.

23         MR. PARKER:  -- Judge Jonker set up this case so that

24    we would have a phase 1 where we would determine CERCLA

25    liability for facilities.  As Georgia-Pacific represented to

```
 1    the Court, they would only seek allocation as to those
 2    facilities and activities -- activities referring to
 3    arrangement for disposal, NCR -- but to those facilities for
 4    which they could establish CERCLA liability.  They did that for
 5    the Bryant Mill.  They chose not to do that for any other mill.
 6    And, therefore, they shouldn't be able to do in phase 2 what
 7    they specifically agreed they wouldn't do or didn't seek to do
 8    in phase 1.  And that's why, given the great prejudice that
 9    would result to International Paper, by bringing in these three
10    mills this late in this case, we oppose this motion.  Thank
11    you.
12              THE COURT:  Thank you.
13              MR. SIBLEY:  May I briefly, Your Honor?
14              THE COURT:  Yes.
15              MR. SIBLEY:  I want to address a question you posed
16    to Mr. Parker at the outset of his argument.  Specifically
17    whether liability -- what you're apportioning -- what is it
18    that you're apportioning in phase 2?  Actually "apportion" is
19    the wrong word.  What are you allocating in phase 2 on an
20    equitable basis?
21              Mr. Parker answered that it all comes back to
22    liability and the ownership of specific mills.  And I would
23    respectfully submit that that's not the correct inquiry.  What
24    we're allocating in phase 2 is equitable responsibility for
25    costs that have been incurred and that will be incurred.
```

1    You're talking about cleaning up the actual river.  That's what

2    the costs are.  Your liability is only your ticket to the

3    dance.  It's your Charlie with the golden ticket to go see

4    Willy Wonka, right?  That's what we figured out in phase 2:

5    Who has the golden tickets?  And there's three of them who do.

6    And so they are there.  They are out there.  We're at the

7    chocolate factory now and we're trying to figure out who pays

8    for what in the cleanup.

9           The construct that International Paper has erected

10   here is that all liability -- anything having anything to do

11   with liability is resolved, if at all, in phase 1, we put all

12   of that aside and then we look at other stuff in phase 2.  And

13   that's simply not correct.  Judge Jonker's own order

14   acknowledges that that's not right.  He didn't need to reach,

15   for example, the Panelyte facility, because he had already

16   determined that IP was in fact an owner.  They have their

17   ticket, right?  They are coming.  They are going to pay a part

18   of this.  And that's why this notion that we are trying to pin

19   liability on IP in phase 2 is simply incorrect.  They're

20   already liable.

21          The Bryant Mill, all of the stuff that the

22   Bryant Mill discharged into the river that flows down

23   Portage Creek, if you look at the map -- Mr. Parker noted that

24   flows all the way down Portage Creek.  It goes into these

25   downstream areas all the way down into Lake Allegan and indeed

1   all the way down into Lake Michigan.  They are jointly and

2   severally liable for that.  The question is whether as an

3   equitable matter I can -- how big a share I can pin on them.

4   And again, I'm always quick to note that's the share -- the

5   non-NCR share we're talking about.  They can be made to clean

6   up everything.

7           What they are going to argue is that, you know, in

8   these areas downstream of Otsego, they'll say, "Look, that's

9   Otsego Mill stuff.  That's not my stuff."  And what we would

10  want to say to Judge Jonker is, "You know what, Judge, it

11  doesn't matter.  That argument, you shouldn't give that any

12  weight, because they owned that mill until 1968."

13          Moreover, Mr. Parker noted that the issue of

14  ownership can only relate -- can only go to the question of

15  liability.  I think that's what he said.

16          The same can be said for discharge.  They acknowledge

17  that they were an owner of the Bryant Mill, owner and operator

18  from 1954 to 1956.  They won on that question because we didn't

19  have sufficient documentary evidence showing that they received

20  carbonless during those years.  Now, that question which was

21  litigated in phase 1 is the same question that they want to

22  litigate as to these other mills in phase 2.  They already have

23  gone down that road.

24          This mass balance analysis he talks about, they are

25  going to look at what this MacSimBar Mill did, what these

1   Battle Creek mills did and decide whether they contributed to

2   the PCBs in the river.  And if the testimony of Dr. Woodard is

3   any indication, they are going to try and put that on board

4   mills.  In fact, if Mr. Parker and everyone else would be

5   willing to stipulate that board mills were not major

6   contributors of PCBs in rivers right now, perhaps this issue

7   goes away.  I don't think they are going to do that.  We

8   certainly have the right to defend ourselves and note that if

9   that's correct that they bear a responsibility as well.

10          Let me talk a little bit about the timing very

11  quickly.  The discovery -- fact discovery cutoff was in March

12  of 2012.  It is around that time that Judge Jonker ruled that

13  Mead cannot be brought into the case.

14          Dr. Woodard, he did not articulate in his expert

15  report that board mills would have received -- at least my

16  recollection is that he didn't articulate that in his expert

17  report.  The first time that came up -- and I'm going off of

18  recollection, Your Honor.  Mr. Parker I'm sure will correct me

19  if his report does mention that.  But the first time I recall

20  it coming up was when we took his deposition in July of 2012.

21  And so it had been -- we were four months after the discovery

22  cutoff, we were well into expert discovery, and we were months

23  away from trial at that point.  This was a late-arising theory.

24  And one that really could only go to become relevant in

25  phase 2.  It was really a preview of what we expected to have

1   to deal with at that point.  At that point Judge Jonker had

2   already made his decision that Mead would not be brought into

3   the case, and we had made our decision not to pursue liability,

4   a liability finding as to the Otsego Mill.

5           And again, that finding is superfluous to what we

6   got.  We got the bigger, the bigger and better liability

7   finding, the one related to the Bryant Mill, that would make IP

8   responsible for cleaning up all stretches of the river,

9   including stretches well upstream of Otsego.

10          So that's the --

11          THE COURT:  Can you say the last part again?

12          MR. SIBLEY:  The liability of the Bryant Mill

13  makes -- IP's liability for ownership of the Bryant Mill makes

14  it jointly and severally liable for the cleanup at the site.

15          Now, IP might argue it made some sort of divisibility

16  argument based on geography, right?  If they just owned the

17  Otsego Mill, if that was the only thing we pursued, they might

18  say, "You know what, these costs, Georgia-Pacific, that you've

19  incurred upstream to clean up the Plainwell impoundment," to

20  use one example, "we don't have to pay for that because that

21  couldn't be our stuff.  The stuff flows downriver."  Right?  So

22  we picked the furthest upriver IP facility we could and that's

23  what we focused on.  It's also the biggest and dirtiest and the

24  one that we think gives us the most bang for the buck.

25          I'd like to also note, finally, that toward the end

1    of the argument Mr. Parker said that IP is the new kid on the

2    block and they are just coming to this and that's been the tune

3    for a long time.  It's not true.  They were served with these

4    104(e) requests back in 2003.  They have known that they are

5    involved in the sites for that long.  It's simply incorrect to

6    say that this comes out of the blue that they may be

7    responsible for having to clean up -- be made responsible for

8    contributions from these other boxboard mills.

9           Moreover, Mr. Parker also said that we're now

10   two months from the end of fact discovery.  That's true, but we

11   served these requests in April of this year.  That was three

12   months ago.  So they have had plenty of time.

13          And even that, Your Honor, is not -- only goes so

14   far.  Mr. Parker has already acknowledged that they are going

15   to be doing mass balance analyses that look at the contribution

16   and discharges from all of these mills.  So it's simply

17   incorrect to say that this expands discovery in some meaningful

18   way.  The only thing it would do is put a blind spot, put a big

19   redacted stamp over the question of who owned the mill, the

20   MacSimBar Mill, before 1968, and certainly with respect to the

21   Battle Creek mills.

22          Your Honor, I think the discovery is relevant, it's

23   clearly a factor that Judge Jonker can consider, and we'd ask

24   again that the motion be granted.  Thank you.

25          *THE COURT:*  Thank you, Counsel.

1          *MR. PARKER:*  Judge, could I raise one point I forgot?

2          *THE COURT:*  Sure.

3          *MR. PARKER:*  Thank you.  And Mr. Sibley reminded me

4     of it.  The Panelyte mill he mentioned was something

5     Judge Jonker deferred deciding in phase 1.  If I can use the

6     whiteboard at the risk of showing off my lack of artistic

7     talent.

8          The Bryant Mill site which was located along

9     Portage Creek and an A mill right here, which was the

10    Bryant Mill Pond when they damned the mill -- or the creek, it

11    may not have been a pond -- the Panelyte mill was right here.

12    Here, this was Alcott Street.  Up here were the B, C, D, and at

13    one time E mills.  All of this being the Bryant Mill.  Monarch

14    was over here.  And the river flowed this way.  They had the

15    alternative ownership theory.  They said, look, you own -- this

16    was the big bad deinking mill that discharged into the pond

17    that flowed up eventually to the confluence of the Kalamazoo.

18    This Panelyte mill, which admittedly did not process PCBs, had

19    common piping from the A mill and other mills up here because

20    at one time St. Regis owned all this.  When we sold -- well,

21    first we leased it, and we leased everything but Panelyte to

22    them.  And then when we sold it in 1966 we kept Panelyte.  It

23    made plastics.  Refrigerator inserts in the '50s and '60s.

24    That kind of papery-looking plastic I understand that they had

25    that back in those days.

1    Their alternative ownership theory was, "Well, if you

2  could get out of this under your security exemption defense

3  that you were raising, this lease, you still kept the Panelyte,

4  and because you shared piping and everything in common with the

5  pond, we can get you CERCLA liability on that."

6    The judge said, "Well, look, Parker, you lose on

7  that.  You lose the security interest defense.  So there is

8  ownership here.  I don't need to decide, therefore, whether

9  this Panelyte mill that wasn't even discharging PCBs somehow

10  gets you in under an ownership theory."

11    That is quite different, I would submit, than

12  deciding whether 25 miles to the east in Battle Creek, or

13  40 miles whatever it is down to Otsego, those mills are somehow

14  part of this.  For their theory on this deferral, you've only

15  got to get in the door on CERCLA liability and then it's all

16  over, why would the judge spend five pages in his opinion

17  concluding that St. Regis was not an operator if I can walk in

18  the door of CERCLA liability by virtue of this ownership which

19  he did find, I lost on that argument, why did he spend all his

20  time talking about this for in the opinion?  Because it's not

21  just a door you walk in.  The basis of, one, establishing

22  liability and the basis for liability are all going to be

23  relevant to phase 2, and he wanted us to do those issues in

24  phase 1.  And now what they are saying is, "Let's do phase 1 as

25  to these mills."  It's too late.  They made a decision,

1    Georgia-Pacific made a decision not to include those, for

2    whatever reason.  Some of which I've tried to articulate, other

3    ones I'm not really sure other than they -- I think they agree

4    with Judge Bell it's a waste of time to include these mills in

5    Battle Creek.  But they chose not to do it.  And they can't

6    back-door it in phase 2, because that's not what Judge Jonker

7    set up as the way we were going to try this case.  Thank you

8    for indulging me.  And my artwork in particular.

9           THE COURT:  Well, I certainly think I did indulge you

10   with the artwork.

11          MR. PARKER:  Yeah, I think that's pretty apparent,

12   Judge.

13          MR. SIBLEY:  May I just very quickly, Your Honor?

14          THE COURT:  Sure.

15          MR. SIBLEY:  I just want to -- Mr. Parker was

16   reluctant to acknowledge that even using his map the Panelyte

17   property comes into the fold.  It's over the pond.  The pond is

18   where they disposed of the PCBs.  That gets you in the door

19   under CERCLA.  I just wanted to make sure that's clear.

20          Also let me point out one factor.  It's why ownership

21   interest is important.  Mr. Parker has articulated, perhaps

22   better than I could ever hope to, why board mills did not use

23   carbonless paper and why his theory doesn't work.

24          The Fountain Street and Angel Street mills, if they

25   were big dischargers of PCBs, really irrespective of whether

they used carbonless as Dr. Woodard says, you'd see it in
Morrow Lake.  I bet if we actually got some discovery from them
on this, we might see some -- from the mid-'70s, we might see
some documents authored by people at what was historically
known as -- the Michigan Carton Company owned both of these
mills -- rolls up to IP saying, you know, we're not a big
discharger -- given our processes, we would not have discharged
very much, if any, of the PCBs, right?  If IP is the owner,
that's an admission.  That's a party admission that I can use
to impeach any witness that attempts to articulate the theory
that Dr. Woodard articulated.

He notes the distances.  Twenty-five miles to the
east of -- that Battle Creek is 25 miles to the east of
Morrow Dam.  If you look at his map, Your Honor -- and I'll
tell you that a tremendous amount, as much as 50 percent of the
total mass of PCBs in the Superfund site are in Lake Allegan.
Lake Allegan is 40 miles downstream from the Sutherland Mill,
which is my boxboard mill, my brown boxboard mill.  Okay?
What's the one thing -- if my mill was discharging that, right,
why do we see so many PCBs here but not in Morrow Lake?  Well,
the reason is because it's not coming from the board mills,
right?  It's coming from the deinking mills.  Anyway, it's that
type of impeachment evidence, Your Honor, that I would love to
be able to put on and I need to establish and get discovery and
acknowledging their ownership interest in order to do it.  And

1   I think it's squarely within the scope of what's allowed under

2   the cases, and again we'd ask that you grant our motion.  Thank

3   you.

4         *THE COURT:*  Excellent arguments by both attorneys, no

5   question about that.

6         I'm privileged to have a young intern from Notre Dame

7   Law School assisting me this morning who certainly will benefit

8   from hearing very, very fine argument from both counsel.  She's

9   had a chance to study these briefs over the past week as well.

10  But she will not have a chance to help me draft an opinion

11  because I'm going to render it from the bench.

12        Before the Court is the issue of whether or not the

13  defendant should be compelled to respond to requests to admit,

14  and they have raised objections to a number of these requests.

15  The objections are all the same.  We haven't discussed these

16  individual requests as we would normally do since it's the same

17  objection to all of them.  And it's not an issue of the

18  sufficiency of the answer.  The issue before the Court is

19  whether or not the defendant ought to be required to respond to

20  the request or not.  If the objection is well taken, then they

21  don't need to be responded to.  If it is not well taken, then

22  the Court will direct that the defendant file a response to the

23  request to admit and they can go ahead and file their response.

24        I appreciate the maps that have been furnished,

25  because as I read through these briefs, it became more and more

1    evident that one needs to understand the facts to make at least

2    an intelligent run at this issue.  That's why I had the

3    whiteboard brought in.  Because I had thought the parties were

4    assuming the Court understood all of this, and that would be a

5    risky assumption.  But the parties made the correct assumption,

6    that is that they knew a lot more about this than the Court

7    did, and wisely chose to bring in maps that illustrated their

8    respective positions, and that was of great assistance.

9            Counsel for IP began by stating that the issue for

10   the Court is to decide in effect the scope of the liability.

11   That is the -- and I may not be phrasing that exactly as

12   counsel did -- but essentially they put before the Court the

13   issue that is for Judge Jonker in phase 2 of this lawsuit.  I

14   don't take that as the issue before the Court today.  I think

15   the issue before the Court today is more limited and it's one

16   of discovery.  Which may portend which way I'm going to rule on

17   this issue.

18           Here the Court is guided by Rule 26, and I think that

19   the request to admit ought to be answered.  They simply ask

20   ownership questions, and it will tell the parties and the Court

21   who owns these mills that are at issue.  Because everything

22   else won't make much sense if the parties aren't even able to

23   argue to the Court who owns the mills going forward.

24           Now, it's understood that these mills are going to be

25   examined to determine what they produced or how much

1   contamination they produced.  Certainly to do that in a vacuum

2   without knowing which mills were owned by which parties won't

3   be of great assistance to the Court.  And certainly IP can make

4   its arguments that it has so ably made today to Judge Jonker at

5   the appropriate time that the Court should not or need not or

6   cannot consider that mills owned by IP other than Bryant should

7   be taken into consideration in allocating responsibility.

8   Whether or not they prevail on that I'm not sure.  Certainly

9   CERCLA offers wide relief.  It was after all passed by the same

10  body, that is Congress, that tells us in a different arena, in

11  the criminal arena, that if a defendant is convicted of one

12  crime among others that he's charged with by say a plea of

13  guilty, the Court can consider a wide variety of factors for

14  which he has not pled guilty but has only been charged with in

15  sentencing him.  Or where a defendant has been convicted in a

16  conspiracy and has been shown to have participated in a small

17  portion of that conspiracy can nevertheless be held responsible

18  for the entire product of that conspiracy when it comes to

19  sentencing.  Congress had no difficulty with those concepts.

20          And here where we have a remedial situation as far as

21  the Superfund site is concerned and strict liability is imposed

22  on someone who has contaminated a Superfund site, a particular

23  mill which is only the means of the contamination, I don't

24  think Congress really cared about the means of the

25  contamination but rather looked to the end result, the cleanup

1  of the Superfund site.  Once you're held responsible, I suspect

2  there's a strong argument that says if you're in, you're in all

3  the way and everything is in play.  So you have a ticket to the

4  dance, as Georgia-Pacific would argue.  Perhaps that was the

5  allusion to Willy Wonka.  Frankly, I never saw the movie, so I

6  can't say.

7          But coming back, the relevance under Rule 26 is

8  construed broadly to encompass any matter that bears on or

9  reasonably could lead to any matter that bears on any claim or

10  defense, and here what it bears on is very broad under CERCLA.

11  So you have a broad rule of discovery or of matters that could

12  lead to relevant discovery or relevant matters in court on a

13  very broad statute and a very broad remedy.  You put those one

14  on top of the other and I think it fully encompasses what the

15  plaintiff is seeking here.

16          And then we have the orphans, the possible orphans

17  out here, and if we have mills that are orphans, perhaps they

18  ought to be -- their allocation ought to be divided up equally

19  among all parties, but if they are not really orphans, then

20  their responsibility ought to be attributed to one party or the

21  other, that makes a difference.  So that provides some argument

22  that ownership is important.

23          International Paper has, of course, made its own

24  inquiries through discovery and are specific as to both the

25  MacSimBar Mill and Hawthorne having to do with the output of

1    those mills.  I understand why, but again that comes back to

2    the fact that if we're looking at the amount of contamination

3    from these mills, ownership of these mills may be of interest

4    to the Court in allocating responsibility.  I suspect

5    Judge Jonker will prefer not to make these determinations in a

6    vacuum.  Or if he decides in favor of International Paper,

7    at least he'll know what it is he is not going to be

8    considering when he decides not to consider it.

9            The Motion to Compel International Paper to provide

10   the answers to the requests to admit is granted.

11   International Paper will provide responses to the requests to

12   admit within the next 10 days.

13           I assume you can do that within the next 10 days.

14           *MR. PARKER:*  Yes, thank you, Judge, we can.

15           *THE COURT:*  All right.  Anything further?

16           *MR. PARKER:*  No, thank you, Judge.

17           *THE COURT:*  Thank you gentlemen.

18           *MR. SIBLEY:*  Thank you, Your Honor.

19           *THE COURT:*  We'll have a brief recess until our 11:30

20   matter is in place.  Thank you.

21       *(Proceeding concluded at 11:39 a.m.)*

22                       *   *   *   *   *

23                          CERTIFICATE

24           I certify that the foregoing is a transcript from the

25   Liberty Court Recording System digital recording of the

1  proceedings in the above-entitled matter, transcribed to the

2  best of my ability.

3

4  July 21, 2014

5

6                              /s/ Glenda Trexler
                               Glenda Trexler, CSR-1436
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25