```
 1                     UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION


 3    _____

 4    GEORGIA-PACIFIC CONSUMER
      PRODUCTS, LP; FORT JAMES
 5    CORPORATION; and GEORGIA-PACIFIC,
      LLC,
 6
                            Plaintiffs,
 7                                          DOCKET NO. 1:11-cv-483
      vs.
 8

 9    NCR CORPORATION; INTERNATIONAL
      PAPER COMPANY; and WEYERHAEUSER
10    COMPANY,

11                          Defendants.

12    _____/

13

14                  TRANSCRIPT OF MOTION HEARING

15          BEFORE MAGISTRATE JUDGE HUGH W. BRENNEMAN, JR.

16                      GRAND RAPIDS, MICHIGAN

17                       September 22, 2014

18

19

20    Court Reporter:          Glenda Trexler
                                Official Court Reporter
21                              United States District Court
                                685 Federal Building
22                              110 Michigan Street, N.W.
                                Grand Rapids, Michigan 49503
23

24    Proceedings recorded by digital audio, transcript produced by

25    computer-aided transcription.
```

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF GEORGIA-PACIFIC:

 3        MR. GEORGE P. SIBLEY
          HUNTON & WILLIAMS, LLL
 4        951 East Byrd Street
          Richmond, Virginia 23219
 5        Phone: (804) 788-8262
          Email: gsibley@hunton.com
 6
          MR. PETER A. SMIT
 7        VARNUM, RIDDERING, SCHMIDT & HOWLETT, LLP
          Bridgewater Place
 8        333 Bridge Street, N.W.
          P.O. Box 352
 9        Grand Rapids, Michigan 49501-0352
          Phone: (616) 336-6000
10        Email: pasmit@varnumlaw.com

11   FOR THE DEFENDANT NCR CORPORATION:

12        MR. DAVID R. MARRIOTT
          CRAVATH, SWAINE & MOORE, LLP
13        825 Eighth Avenue
          New York, New York 10019
14        Phone:  (212) 474-1430
          Email: dmarriott@cravath.com
15
          MS. KATHERINE LEE DACEY
16        CRAVATH, SWAINE & MOORE, LLP
          825 Eighth Avenue
17        New York, New York 10019
          Phone:  (212) 474-1000
18        Email: kdacey@cravath.com

19        MR. GEOFFREY A. FIELDS
          DICKINSON WRIGHT, PLLC
20        200 Ottawa Avenue, N.W., Suite 900
          Grand Rapids, Michigan 49503
21        Phone:  (616) 458-1300
          Email:  Gfields@dickinsonwright.com

22

23

24

25
```

1    FOR THE DEFENDANT INTERNATIONAL PAPER COMPANY:

2         MR. JOHN D. PARKER
          BAKER HOSTETLER
3         PNC Center
          1900 East 9th Street, Suite 3200
4         Cleveland, Ohio 44114-3482
          Phone: (216) 861-7610
5         Email: jparker@bakerlaw.com

6         MR. DAVID W. CENTNER
          CLARK HILL, PLC
7         200 Ottawa Avenue, N.W., Suite 500
          Grand Rapids, Michigan 49503
8         Phone:  (616) 608-1100
          Email: dcentner@clarkhill.com

9
     FOR THE DEFENDANT WEYERHAEUSER COMPANY:
10
          MR. JAMES C. BAIRD
11        PERKINS COIE, LLP
          1201 Third Avenue, Suite 4800
12        Seattle, Washington 98101
          Phone: (206) 359-6643
13        Email: jcbaird@perkinscoie.com

14        MR. SCOTT MICHAEL WATSON
          WARNER, NORCROSS & JUDD, LLP
15        111 Lyon Street, N.W., Suite 900
          Grand Rapids, Michigan 49503-2487
16        Phone: (616) 752-2465
          Email: swatson@wnj.com

17

18                  P R O C E E D I N G S

19                            Grand Rapids, Michigan

20                            September 22, 2014

21                            2:13 p.m.

22                  P R O C E E D I N G S

23        THE COURT:  Good afternoon, gentlemen.  It's a

24   pleasure to see you.  This is a motion to compel.  I've had an

25   opportunity to read the briefs the parties have submitted.

| | |
|---|---|
| 1 | Which includes, of course, NCR's brief in support of its |
| 2 | motion, International Paper's brief in opposition.  And the |
| 3 | Court, of course, appreciates Georgia-Pacific's brief |
| 4 | adjudicating the matter.  We'll simply adopt that, unless the |
| 5 | parties have an objection, and we can all go home. |
| 6 | So I suppose we ought to make a record, however, just |
| 7 | for purposes of appeal.  And NCR may proceed. |
| 8 | MR. MARRIOTT:  Thank you, Your Honor. |
| 9 | THE COURT:  I will ask beforehand, I understand |
| 10 | there's going to be a Power Point presentation? |
| 11 | MR. MARRIOTT:  Well, Your Honor, I apologize for the |
| 12 | confusion.  We have prepared a set of demonstratives which I |
| 13 | would like to hand out with the Court's permission.  They are |
| 14 | Power Point slides.  The intent is not to display them, and I |
| 15 | think there was some poor communication on our side for which I |
| 16 | apologize.  We did not -- we do not intend to display them on |
| 17 | the screen.  And we recognize that inconvenience to the Court |
| 18 | and the person who spent 30 minutes preparing it, and so for |
| 19 | that I apologize. |
| 20 | THE COURT:  Our IT people did spend some time getting |
| 21 | ready based on the notification they received last Friday, I |
| 22 | believe. |
| 23 | MR. MARRIOTT:  Yes. |
| 24 | THE COURT:  And it would have been nice to have been |
| 25 | told that it wasn't going to be necessary.  We have that |

1   capacity.  Why don't you want to use it?

2       MR. MARRIOTT:  Well, Your Honor, I have a handout

3   which I thought might be easier.  It is exactly what we would

4   display on the screen.

5       THE COURT:  All right.  I will let you present your

6   argument any way you want to.

7       MR. MARRIOTT:  Again, I apologize, Your Honor, for

8   the miscommunication.  It's entirely our fault, and it won't

9   happen again.

10      With your permission I would like to hand out what

11  otherwise might have been displayed on the screen.  I hope this

12  will be a little easier to follow.

13      THE COURT:  If you would like to share a copy with

14  me, I would appreciate it.

15      MR. MARRIOTT:  Your Honor, we seek, as you know, by

16  way of this motion from having reviewed the papers two things.

17  We would like, respectfully, supplemental answers to

18  interrogatories, and we would like a 30(b)(6) witness.

19      The information that's been requested is, we believe,

20  unquestionably relevant, and none of the arguments that have

21  been submitted by Georgia-Pacific are in our judgment

22  sufficient to justify its refusal to respond.

23      And indeed I believe Georgia-Pacific -- excuse me,

24  with respect to IP, IP's opposition is, I think, quite clear in

25  conceding that they have no objection to the 30(b)(6) witness

1    at this point, so the argument is, I believe, today really

2    about the interrogatories, but I'll touch briefly upon both.

3            Let me just explain, Your Honor, what you have before

4    you.  You have before you some demonstratives which I hope will

5    be of some help in explaining the argument.  And if I may ask

6    you to turn to page 2, let me explain what this is.

7            This lawsuit concerns, as I believe you know, a site

8    known as the Kalamazoo Superfund site.  The site consists of

9    approximately 83 miles of the Kalamazoo River and Portage Creek

10   and certain surrounding areas.  The Environmental Protection

11   Agency, the EPA, has divided the site into a number of operable

12   units and work areas.  And insofar as it matters to this

13   motion, Your Honor, there are 15 or 14 different mills,

14   recycling mills to be specific, that are located either at the

15   site or upstream of the site.  Twelve of those mills are within

16   the boundaries of the site, and two of those mills are outside

17   the boundaries of the site, but Judge Jonker has indicated that

18   they will be part -- potentially at least -- part of the next

19   trial in this case.

20           If I can have you turn to the next page, Your Honor.

21   As this chart shows, the recycling mills located at the site

22   discharged waste into the Kalamazoo River directly, and they

23   did that over a not-insignificant period of time, and not

24   shockingly those discharges contaminated both the river and the

25   surrounding areas and are very much at the core and heart of

1    what this case is about.

2              Now, Georgia-Pacific operated, Your Honor, a number

3    of the mills located at the site or it's a successor to those

4    who did, and it was determined relatively early on that

5    Georgia-Pacific was at least a potentially responsible party

6    for cleaning up the site.  And it has in fact been involved in

7    several litigations about that very subject.

8              Georgia-Pacific commenced the present case in an

9    effort effectively to shift at least partially responsibility

10   for the cleanup of the site onto the defendants in the case,

11   and that includes International Paper, it includes NCR, and it

12   includes Weyerhaeuser.

13             Importantly, though, for purposes of why we've served

14   the discovery requests we NCR have served, Your Honor, is that

15   NCR does not own, did not ever own a mill recycling paper on

16   the Kalamazoo River.  NCR did not discharge any waste into the

17   Kalamazoo River.  NCR didn't make the PCBs that are the subject

18   of the request for cleanup.  NCR sold paper, and a coating on

19   portions of that paper included PCBs.

20             We don't believe, Your Honor, for NCR that any of the

21   carbonless copy paper that was recycled at the site derives

22   from transactions for which NCR can be held responsible.  But

23   we had a trial, a phase 1 trial in this case, and Judge Jonker

24   determined that at least some of NCR's sales of carbonless copy

25   paper broke or trim could be the subject of liability, and,

 1   therefore, NCR remains in the case.

 2           If I can refer you to the next page, page 5 of the

 3   deck, there are in this phase of the case a number of issues.

 4   These issues are important as backdrop to the present requests

 5   to compel.  Among other things, the issues to be decided here,

 6   Your Honor, are apportionment of the alleged harm to the river,

 7   equitable allocation of the responsibility among the parties to

 8   clean up the river, and the applicability or not of certain

 9   defenses:  Statute of limitations, estoppel, laches, and

10   unclean hands.

11           And so in order to pursue those defenses, NCR served

12   a set of interrogatories.  Those are excerpted at page 6 of

13   this handout.  And at the same time we served a 30(b)(6)

14   request on the parties.  And essentially the same requests have

15   been served on all the parties.  And what those requests seek,

16   among other things, is the parties' understanding and positions

17   and contentions with respect to whether or not carbonless copy

18   paper was recycled at those 14 mills, and if so in what

19   amounts, and when it was recycled.  We seek their positions as

20   to what, if any, PCBs were recycled at those mills.  We seek

21   their contentions and facts they may possess about the paper

22   products that were produced at the mills, because that gives

23   some indication as to whether or not carbonless copy paper for

24   which NCR could be held responsible was recycled at a given

25   mill.  And we seek information about the recycling processes

1    that were used at the mills and the wastewater that was, if

2    any, discharged at those mills.  All of those questions go to

3    whether or not at a given mill there was carbonless copy paper

4    recycled for which NCR could be held responsible.  So we served

5    those requests.

6              And just to illustrate, Your Honor, why this matters.

7    If I can refer you to page 7.  You have a diagram.  It may be a

8    little crude, but I hope it will illustrate the point.  A key

9    issue here is the extent to which there are PCBs at this site

10   for which NCR can be held responsible.  And we intend to show

11   during the phase 2 trial of the case that the mills -- that the

12   mills recycling at the site were not recycling carbonless copy

13   paper for which NCR can be held responsible and that the PCBs

14   at the site and the cleanup of those PCBs at the site are the

15   responsibility of the other parties to the case.

16             To make that showing, Your Honor, we need information

17   about what exactly went on at these mills.  We need to know

18   what carbonless copy paper, if any, was recycled at the mills

19   and what the parties' contentions are with respect to those

20   recycling operations.  So we need to know, for example, if you

21   look at the top of this chart where you have a little green

22   recycling bin, we need to know what was going into these mills,

23   where that carbonless copy paper, where that wastepaper was

24   coming from.  Was it wastepaper for which NCR can be held

25   responsible or was it not?  And we need to know once it went

 1   into the mills what happened to it, what processes were applied
 2   to it.  Because that affects whether it went to a landfill, it
 3   affects whether the wastewater that was used to recycle the
 4   paper went to a treatment plant, and it affects whether it went
 5   in some instances directly to the river.  Your Honor saw the
 6   pictures earlier in the handout that shows water, wastewater
 7   going directly to the river, and that happened and happened for
 8   some period of time, and the question is did it happen with
 9   respect to the recycling of carbonless copy paper for which NCR
10   can be held responsible.
11           So those are some of the reasons, Your Honor.  We
12   need to know what it is that happened at these mills so we can
13   make a showing that NCR is not, can't be responsible for the
14   PCBs discharged at a given site.
15           International Paper and the other parties have taken
16   the position that despite NCR's absence from the site, despite
17   the fact that it didn't discharge any PCBs into the site, we
18   are entirely responsible for the cleanup of the PCBs in the
19   river simply because NCR manufactured paper that included at
20   one period of time PCBs and because Judge Jonker found that as
21   of a certain period of time NCR had awareness that there were
22   PCBs in the coating on its paper.
23           *THE COURT:*  Has that issue been litigated?
24           *MR. MARRIOTT:*  Well, the issue, Your Honor, as to
25   whether or not NCR is potentially responsible has been

1    litigated.  It was litigated in phase 1.  And we have been

2    identified, as have the other parties, as a potentially

3    responsible party.  So for the issues, a set of issues for the

4    second phase of the case is what is the nature and scope of

5    liability?  What, if any, apportionment and allocation of

6    responsibility can be made as between and among the parties?

7    So, in other words, who is responsible for what cleanup?

8              *THE COURT:*  But nobody has said that you are

9    responsible simply because you manufactured the paper?

10             *MR. MARRIOTT:*  Well, we've been found to -- I think

11   that's right, Your Honor.  I think what Judge -- I don't speak

12   for Judge Jonker, obviously, but I believe what he intended by

13   his opinion is to say that we are potentially responsible and

14   we're potentially responsible because he found that there were

15   at least some transactions, some sales of carbonless copy paper

16   that were made at a time when Judge Jonker believed NCR had

17   knowledge sufficient to convert those sales from being sales of

18   useful product into disposal of hazardous waste.  So there are

19   at least some transactions for which the Court has found that

20   we are potentially responsible.

21             So that led, Your Honor, to the requests that are

22   presently at issue and to the IP responses to those requests.

23   And the response, Your Honor, is effectively four-fold, and

24   we've tried to describe them in a netted-out way on page 8.

25             What essentially International Paper has said is, "We

1    can't give you what you've asked for because we don't know."

2    One.  "We can't -- we can't tell you what you've asked for

3    because what you've asked for is privileged, and telling you

4    would reflect the mental impressions and opinions of our

5    lawyers."  They then said, "We can't tell you now, but we'll

6    tell you later.  You'll know later when you see our expert

7    reports what it is exactly we have to say."  And then they

8    said, "Failing that, take a look at the documents and you can

9    find the answers in the documents."  And what they basically

10   said is reflected in these five bullet points in the bottom

11   right quadrant of the diagram.  They have said, "Look at the

12   documents that either have been produced" -- and this is

13   important, and Georgia-Pacific underscores this in its

14   papers -- "or will be produced."

15           These are documents that were produced not only in

16   the present litigation but also in prior litigations to which

17   NCR and I believe also International Paper were not parties.

18   They have told us that the documents may answer the questions

19   but not necessarily.  They have not specified the productions

20   to which we're pointed with any particularity.  They

21   effectively comprise about 4 million pages of paper.  I don't

22   believe there's been any serious dispute of that.  Those

23   answers are, Your Honor, we submit, not sufficient.

24           And let me take, if I may, just a few more minutes of

25   the Court's time and try to walk through each of those four

1    rationales.

2              Again, as I said at the outset, what we're looking

3    for simply is what we consider to be real answers to our

4    questions.  We need answers to the questions in order to

5    prepare for trial.  We need to know what the allegations are.

6    We need the information for our experts to be able to come up

7    with their opinions.  And the information requested is, as I

8    said, unquestionably relevant.  No one has told you that the

9    information we have sought isn't relevant.  We've simply been

10   presented with these objections.

11             So let's take the first which I've described at

12   page 10 of this handout.  The first explanation, the first

13   defense, if you will, or objection is sort of the so-called "We

14   don't know" defense.  And effectively what they have said is

15   that we, International Paper, have a very limited role at the

16   site, we're relatively new to the site, and we just don't know

17   the answer to the questions and, therefore, we can't provide

18   the answer to the questions.

19             I think the problem with that, Your Honor, is that a

20   party may not, at least as we understand the rules, simply say

21   they don't know without making some reasonable effort to learn

22   the information that's called for by the interrogatory.  And

23   there's no indication on their response to our interrogatories

24   that they have really undertaken that reasonable search.

25             If after undertaking a reasonable search they in fact

1   do not know the answer, then certainly, Your Honor, they are

2   entitled to say that they don't know.  But here is the critical

3   problem with what their approach does:  What they can do is say

4   they don't know.  What they can't do, in our view, is to say

5   they don't know now, undertake to learn later when discovery is

6   closed, and then provide the answer at trial.  And that,

7   unfortunately, is precisely what we expect they intend to do.

8   Not know now, have discovery close, which it does in about

9   seven weeks, tell us the answer later at a point in time when

10  we can do nothing about it by way of further discovery, and

11  when we are only left with their expert reports and can only

12  cross-examine expert reports and can't otherwise pursue related

13  discovery, and at a point where we can't develop factually

14  through other discovery our case.

15          What we asked to know is what their contentions are,

16  Your Honor, and certainly they know what their contentions are.

17          This case was originally filed in 2010.  There was a

18  not-insignificant period of discovery that preceded the

19  first-phase trial.  There was a first-phase trial.  There was a

20  first-phase decision.  And there has been a year that has

21  elapsed since Judge Jonker entered his first-phase decision and

22  set us off on the course of preparing for a phase 2 trial.  So

23  there has been ample time for International Paper to figure out

24  what its contentions are and to be able to tell us what they

25  are.  And the "I don't know" defense perhaps has some

applicability to some aspects of discovery requests, but it certainly can't, we don't believe, properly be applied to what their contentions are.

We asked to know what it is they contend specifically happened at these mills for which we can be held responsible so that we can take further discovery from them, from other parties, and from third parties and prepare our experts to respond to what it is they have to say.

Rule 33 expressly contemplates the prospect and the possibility of asking for contention interrogatories.  And that is essentially what we're asking:  What is it that you contend these mills did?  We know you weren't there with respect to all of the mills, but you take a position and you intend to take a position about what happened at these mills and what went on, and that's what we'd like to know now so that we aren't proceeding -- even if -- so that we aren't proceeding into effectively what becomes a trial in an expert phase by ambush when we learn for the first time, again when it's too late, what it is they contend the case is about.  And on the particular theory on which they contend we can be held responsible.  So that's our response to their first defense of "I don't know."

The second, Your Honor, is the so-called "privilege" defense which we briefly describe at page 11.  And essentially what here they have said is "We don't know because we don't

1    personally have somebody who worked at these mills," because,

2    after all, these events took place, many of them, more than

3    five decades ago.  "We don't know.  And so what we do know is

4    reflected not only in documents but in our lawyer's review and

5    assessment of those documents."

6             But the rules, Your Honor, have been long since

7    revised to permit discovery that calls for opinions and

8    contentions and admissions relating not only to facts but the

9    application of facts to law.  And in answering contention

10   interrogatories, a party is not only giving factual specifics

11   which the party contends supports a claim, they are giving

12   their contentions.  And that is, we believe, an unquestionably

13   permissible area of discovery.  For us to know with specifics

14   what exactly it is they contend the facts are or they will take

15   positions as to at trial so that we can prepare our case.

16            And interestingly, International Paper -- and we

17   included this in Exhibit E to our opening motion -- they have

18   effectively asked -- though not quite as many as we asked --

19   they effectively asked the exact same interrogatories of us

20   that we've asked of them.  It can't be -- it can't be,

21   Your Honor, for that additional reason that this information,

22   telling someone what your contentions are, what you intend

23   shortly to say in an expert report in any case, are privileged

24   and, therefore, immune from discovery.

25            In a case like this, much of what goes on, much of

1   what will be said relates in some way to expert issues, and if

2   it relates to expert issues where a defense -- we would

3   effectively get no discovery and get nowhere, and that's,

4   unfortunately, the concern we have about where we end up in a

5   world in which they can't and won't tell us anything until

6   later in the case.

7          That brings us to the third defense of

8   International Paper which is the "tell you later" defense.  And

9   that defense we think is, for reasons I've already stated, we

10  think simply untenable and unfair, because it puts us in a

11  position of not knowing even what their specific allegations

12  are as to how it is NCR could be responsible at any one of

13  these 14 mills when they won't tell us.  When we will have

14  learned it at a point in time when discovery is closed and

15  we're in no position to take follow-up discovery of third

16  parties, of government agencies, we're in no position to find

17  witnesses -- additional witnesses who may have some information

18  to add, because we didn't get the information in time.

19         At this point in the case where, again, there has

20  been one trial, where the case was filed more than four years

21  ago, they ought to be in a position to tell us what their

22  contentions are.  And that, again, is what these

23  interrogatories fundamentally are asking.  What is it you

24  contend is the wastepaper that went into those mills?  How much

25  and when?  What is it you contend by way of PCBs went from

1   those mills into that river for which you say NCR can be held

2   responsible?

3           Lastly, Your Honor, the defense offered here is sort

4   of a "look-at-the-production" defense, and that's the

5   Rule 33(d) defense which we describe at page 13.  And, of

6   course, Rule 33(d) of the Federal Civil Procedure allows a

7   party in appropriate circumstances to refer to documents by way

8   of answering an interrogatory.

9           Here, however, we think that International Paper's

10  reliance on Rule 33(d) is misguided.  The rule permits

11  reference to business records in lieu of a narrative response,

12  but it only does that where the burden of ascertaining the

13  answer is substantially the same for both parties and where the

14  records to which counsel points specifically identify in detail

15  the information that purportedly provides the response.

16          And in this case International Paper points to a

17  large collection of documents.  It expressly says in its

18  opposing paper that these documents are not its business

19  records, which by itself takes it out of the rule on which it

20  purports to rely.  It points to millions of pages of paper.  No

21  specificity provided.  And it becomes, frankly, quite clear,

22  Your Honor, from reading their papers that the documents they

23  reference are not even documents that they have thoroughly

24  reviewed and carefully reviewed to find the answers.  They say

25  they may provide the answers.  They say the answers may be

1    provided in documents yet produced.  That response puts an

2    undue burden on NCR to understand what their contentions are,

3    even if the documents answered the questions, and it doesn't

4    appear to us that the documents necessarily answer the

5    questions, but candidly we haven't been through the 4 million

6    pages since they referred us to the documents to be able to say

7    that for certain.  But even if that did do it, Your Honor,

8    referring us to documents doesn't tell us what it is they

9    contend happened at each of these mills for which NCR can be

10   held responsible.  And it is fundamentally their contentions

11   here that they are trying to keep from us in a way that we

12   think results in prejudice to NCR.

13           We're now in a position where because of a brief

14   extension in the discovery period discovery closes on

15   November 14th.  Expert reports are due on November 17th.  And

16   what we would ask the Court to do is to require NCR -- to

17   require International Paper to within 14 days answer the

18   interrogatories for which it's now had two months to provide

19   responses since our motion went in, answer the interrogatories,

20   tell us what their contentions are so that we then have what

21   will just be about five weeks to get out additional written

22   discovery if any is appropriate and to pursue as appropriate

23   further discovery before the fact discovery period closes on

24   November 14th.

25           *THE COURT:*  Don't your interrogatories go beyond

1    simply asking for contentions, though?

2         *MR. MARRIOTT:*  The interrogatories are not expressly

3    styled, Your Honor, as contention interrogatories in the sense

4    they do not say "Please tell us what you contend about X."

5    They are certainly intended as contention interrogatories, and

6    I have personally made clear to all of the parties in this case

7    that what we are seeking -- and I can limit myself for now, I

8    suppose, to International Paper -- what we are seeking is their

9    contentions about what happened at the sites.

10        The interrogatories do not use the word "contention."

11   That is unquestionably true.  But that is exactly what they

12   seek.  And they don't do that, Your Honor, because in some

13   cases there's more that they can provide than contentions.

14   They can tell us additional information, they can provide

15   additional facts called for by the interrogatories that are

16   more than contentions.  But at a minimum we believe we ought to

17   be able to learn what it is their contentions are on these

18   critical topics.  Otherwise we go to -- the fact period closes,

19   we get nothing with which we can follow up, and our expert

20   reports go in three days later unsure of even what their

21   contentions are.  Promising not only that we will be in a

22   position where we didn't get full and fair discovery as to

23   whatever the contentions are, unless we happen to guess exactly

24   right, which doesn't always happen unfortunately, and we will

25   be in a position where the experts didn't have the benefit of

1   precisely what it is they contend and we have a risk of expert

2   reports simply passing in the night.

3          So we're in a case -- we're left in a situation where

4   we have the other parties all looking to NCR and saying,

5   "Despite the fact that I had mills on the river and despite the

6   fact that I dumped -- or my mills dumped waste into the river,

7   I'm not responsible.  You, NCR, are because you made the paper

8   that ultimately got recycled.  And you should pay the full

9   bill, but we're not going to tell you exactly what the

10  contentions are about what the mills did until it's too late in

11  time for you to be able to do anything about it.  And that

12  fundamentally is our problem.

13         *THE COURT:*  I understand your position.  And I think

14  you made it very clear.  The interrogatories, however, which

15  the Court has to enforce, speak in more detail.  And while you

16  may have made it clear subsequently to the other side as to

17  what it is you're looking for, I wonder quite how they are

18  expected to respond.

19         And I'm just picking one of these interrogatories out

20  at random.  For example, number 6.  "Please identify all

21  evidence that any transaction identified in response to

22  number 4 was an arrangement by NCR for the disposal of

23  hazardous substances."  Or number 7, "Please identify by year

24  and by source the PCBs released into the site."

25         Does it require rewording of these interrogatories to

1   get what you want?  Otherwise you're looking for some specific

2   amount of particular evidence it would appear.

3       *MR. MARRIOTT:*  That's -- I think you chose the more

4   difficult ones for me in this respect, Your Honor.  But let me

5   try to answer the question in this way, because I think the

6   answer to these is actually, frankly, much simpler than it

7   might at first appear.

8       What I think would be doable here is for the parties

9   simply to say -- as one party at one point suggested that it

10  would, and we were unable unfortunately to get a stipulation to

11  that effect -- I think it would be sufficient for the parties

12  to say "We have no evidence of transactions that were an

13  arrangement by NCR for the disposal of hazardous waste," for

14  example, "except what was already presented in the first phase

15  of the case."

16      What these interrogatories -- those particular

17  interrogatories are trying to drive at is is there some

18  addition to the case that was made by principally

19  Georgia-Pacific in the first phase of the case that you're

20  going to present anew in the second phase of the case?  And if

21  the answer to those particular questions is "We stand on the

22  record such as it was presented in the first phase of the case.

23  The transcript says what it says.  Our experts said what they

24  say."  If that's what they will say, that we present nothing on

25  this score further than what's there, then I would say fine.

1    That's a clear, clean statement.  The transcript says what it

2    says.  That tells us what we need to know.  Unfortunately, we

3    haven't been able to get that clean statement from them.  If

4    there's more than that, then we would like to know exactly what

5    the more than that is.

6              So those two interrogatories, frankly, it seems to

7    me, can be answered by saying "We stand on the record in

8    phase 1 of the case.  The documents we presented, the experts

9    we offered."  Preferably they would tell us exactly who, but we

10   can figure that out, Your Honor.  But what is it, if anything,

11   beyond that?  And no one has told me -- and, frankly, I don't

12   think there is anything beyond that -- but just knowing that,

13   knowing that that seals the universe so I now have a target,

14   the target is what was presented in phase 1 and there will be

15   nothing else, that gives me what I believe we need with respect

16   to 6 and 7.

17             *THE COURT:*  Number 9 says, "Please identify by type

18   and amount the paper products produced in the . . ." -- is it

19   "furnish"?

20             *MR. MARRIOTT:*  It is.

21             *THE COURT:*  ". . . used by each mill during each year

22   of the relevant period."

23             Again you're asking for specifics.

24             *MR. MARRIOTT:*  We are -- I'm sorry, Your Honor.  We

25   are there asking for specifics.  And this is one where -- here

1   is another answer to this question that I think ought to make

2   it relatively straightforward for International Paper.

3   International Paper made a motion to require Georgia-Pacific to

4   produce questionnaires -- your Honor heard the motion at

5   length -- to produce questionnaires that contained information

6   about what mills at the site did.  If the answer to this

7   question from International Paper is "We have nothing to say

8   about this subject that isn't said in the answer to the

9   questionnaire, we don't take any issue with what's in the

10  questionnaire such that you, NCR, can rely upon the contents of

11  that questionnaire in your expert presentations and we're not

12  going to supplement what's in that questionnaire," then here

13  again I think we have perhaps no problem.

14          The concern is they are going to look at the

15  questionnaire -- I know at least from what one party has said

16  that they are going to take issue with what their own

17  questionnaire said, so relying upon the questionnaire doesn't

18  get us quite where we would want to get.  And I don't know in

19  what ways they are going to take issue with the questionnaire

20  or not take issue with the questionnaire.  But the answers to

21  those questionnaires provide quite detailed and specific

22  information.  It isn't complete.  It doesn't necessarily cover

23  every year.  If they are going to take a position, for example,

24  that while the questionnaire covers eight years, they think it

25  was the same for all the other years, that's the position I

 1   would like to know, because then I can say to my experts, "Look

 2   at the table, see what it says in the questionnaire, there's

 3   eight rows of data.  They have told us that they are going to

 4   assume it was the same for the other years.  Their position is

 5   not that it was any different."  Then I've got some actual

 6   numbers I can give to my expert, the expert can put them in his

 7   model, and I can prepare an expert report.  But when all I've

 8   got is a collection of documents and no ability to know whether

 9   they are going to espouse, reject, supplement, or modify those,

10   it makes it difficult to prepare an expert, it makes it

11   difficult to know what contention to respond to.

12          But that's one where there are specific documents,

13   and if they are able to say "We aren't going to take issue with

14   what's in any of those questionnaires," then my only issue

15   becomes:  What are they going to do where the questionnaire

16   doesn't address the question?  And it's for that that I'm

17   asking what their contention is.

18          And if you look at some of the other ones,

19   Your Honor -- so, for example, just take 1 and 2.  Take 1:

20   "Please identify by mill -- by year and mill the amount of

21   carbonless copy paper recycled at the site during the relevant

22   period."

23          Well, here again, there are questionnaires for some

24   but not all of the 14 mills.  We have questionnaires, I think,

25   from seven or eight of the 14 mills.  Those questionnaires ask

1   the responding party to identify in the questionnaire whether

2   or not there was carbonless copy paper recycled at a given

3   mill, and if so in what amounts.

4        If the answer is "The best information we have is in

5   the questionnaire, we endorse, we adopt the questionnaire, the

6   questionnaire is admissible into evidence, you can rely upon

7   it," then I know what their position is and I can proceed with

8   that.

9        Where there are holes in the questionnaire, what we

10  ask is to be told what their position is as to what the holes

11  are.  Are they going to say that if the questionnaire says that

12  there was no carbonless copy paper, are they today going to say

13  in fact they were wrong about that, there is carbonless copy

14  paper?

15       And at least one party has suggested to us that's

16  what they are going to do.  They are going to look at the

17  questionnaire, they are going to say, "Well, it might say that,

18  but that's wrong and that was not fully informed at the time."

19  And that's where the problem arises.  I can't simply look at

20  the documents when they are going to tell me when I can't do

21  anything about it that the questionnaire really isn't right

22  after all, that they have now got better information and it's

23  not true.

24            *THE COURT:*  It sounds like you have reworked these

25  questions somewhat.

1          *MR. MARRIOTT:*  Well, I wouldn't say, I guess, I've

2     reworked them.  What I have done is I've discussed them at

3     length with the parties, and I have some sense of what it is I

4     think they are going to say about them and what it is I

5     think they -- that I believe they can do about them.

6          And, you know, if you want to read into these,

7     "Please identify" -- "Please identify what do you contend was

8     the carbonless copy paper recycled at the mill during the

9     period?" that effectively gets me the same thing.  And to the

10    extent that the concern is these seem too absolute and you're

11    asking someone in some absolute sense what the answer is, I

12    recognize it's been 50 years.  We weren't at the site.  Others

13    of us weren't at the site.  But we're all in a position now

14    where we're proceeding to a trial at which despite the fact

15    that nobody was at the site, people mostly through their

16    experts are going to be taking positions about what happened at

17    the site.

18          *THE COURT:*  Were you able when you were talking to

19    the other parties, the other side, to agree upon what any of

20    these interrogatories now mean and how they can be resolved, or

21    do we still have issues with all of them?  I think there were

22    two of them you said you weren't pursuing anymore.  I can't

23    recall which two those were.

24          *MR. MARRIOTT:*  Well, 13 and 14 we did not move

25    against.

1          THE COURT:  Right, 13 and 14.  How about any others?

2          MR. MARRIOTT:  I think the fairest way to say it,

3    Your Honor, is that we had discussions with

4    International Paper, we talked about potential compromises.  We

5    were unable to bridge the gap.

6          THE COURT:  The Court, of course, encourages the

7    parties to try to resolve these things short of coming into

8    court.  But when you come into the court, I can only look at

9    what the parties actually have submitted, what the actual

10   question is, and does it fly or not, are the answers responsive

11   or not and so forth.  Not so much what was intended but what

12   was submitted by both sides.  So if the question has evolved

13   somehow to something other than what it says on paper, that's

14   nice, but I don't sit here and try to adjudicate those matters,

15   because that's just not practical.  I have to look at what's on

16   the documents the parties have submitted to the Court under the

17   rule.

18          All right.

19          MR. MARRIOTT:  If I may just briefly, what I would

20   say to that, Your Honor, is I don't -- I think the questions --

21   we stand by the questions as we propounded them.  We genuinely

22   believe that we are entitled to know by way of discovery

23   response what it is that each of these mills did during the

24   relevant period of time.

25          My point about contentions is if their answer is that

1    "We can't tell you that" -- they may well -- in fact, I think

2    in some cases they absolutely know the answers to these

3    questions.  They submitted some of these parties questionnaires

4    which effectively under oath to the EPA answer the questions.

5    I think they can in some cases answer these questions as they

6    are written.

7             All I'm saying is if there are instances in which

8    they can't because they say "We don't know," at a minimum what

9    we contend is we ought to be able to know what it is you're

10   going to contend about it at trial.  Because it's one thing to

11   say "We don't know today, no one has personal knowledge,"

12   that's probably true of much of what's at issue in this case,

13   because of when the underlying events took place.  The period

14   of interest here for when PCBs were in carbonless copy paper

15   begins in effectively 1954 and it ends in 1971.  So my point

16   really is that there's going to be a limited universe of people

17   who have personal knowledge in any traditional sense, so to the

18   extent these are framed this way, so to the extent there are,

19   there are such people, we get that.  To the extent there aren't

20   such people, the lesser -- the lesser quality but still very

21   valuable piece of information that we would like is for them to

22   say "We don't have anyone with personal knowledge, but we

23   contend as follows."  And that's why I would say the

24   interrogatories I don't think have evolved, it's just that what

25   they are able to do, what the parties are able to do varies by

```
 1    party, it varies by mill.  And if we can't have a kind of
 2    absolute answer to this is what this mill did because we owned
 3    it or we are responsible for it, what we'd like to know is what
 4    they are going to contend about it so we can properly prepare.
 5              THE COURT:  I think you have a good argument there.
 6    I think you're entitled probably to know what their contention
 7    is.  And that makes sense.  And I think that would be
 8    supportable.
 9              Whether these interrogatories -- well, okay.  Why the
10    parties can't agree on that much, I don't know.
11              MR. MARRIOTT:  Unless you have anything further from
12    me, Your Honor, I'll sit.  Thank you.
13              THE COURT:  No.  Thank you.
14              MR. PARKER:  May I, Your Honor?
15              THE COURT:  I appreciate this book too.  I've often
16    made the point and people say, "Well, any suggestions how we
17    ought to present cases in court?"  I think I've said you can't
18    dumb things down enough for a Court.  I think you've tried
19    here.
20              MR. MARRIOTT:  I'm just sorry I botched the screen,
21    Your Honor.
22              THE COURT:  It's fine as far as I'm concerned.
23              MR. PARKER:  Good afternoon, Judge, John Parker from
24    Baker & Hostetler on behalf of International Paper.  If you're
25    looking for dumb, I'm your man.
```

1       *THE COURT:*  No, I just want the old yellow book, the

2   idiot's guide to motions.  This is great.

3       *MR. PARKER:*  Judge, my cocounsel, David Centner, has

4   a 4:00 hearing in front of Judge Jonker, so I trust we'll be

5   done before then, but if not, he's going to excuse himself a

6   few minutes early.

7       What NCR is really asking for here, Judge, is what do

8   you contend your experts are going to say when they are done

9   with their analysis?  And we don't yet know what they are going

10  to say, and that's the problem with us trying to respond to

11  these interrogatories.  And we've repeatedly told NCR that.

12      *THE COURT:*  Wait a minute.  I know you're going to

13  posture as to what do you contend your experts are going to

14  say, but your experts just speak for the company, for the

15  party.  It's what the company says.  It's what the company

16  contends.  The experts are just the mouthpiece for the company,

17  aren't they?

18      *MR. PARKER:*  If I can, Judge, what I hope to explain

19  to you, and it's going to take me a couple of minutes, is to

20  show you why the company doesn't know this information.  These

21  are really questions that are going to be directed at experts.

22  Because of the long time that has passed, they are going to

23  have to make lots of assumptions.  And let me see if I can try

24  to explain that.

25      *THE COURT:*  But ultimately doesn't it come down to

1    what the company's position is?

2              MR. PARKER:  Sure.

3              THE COURT:  Whether it's informed by the experts or

4    it's informed by somebody else.

5              MR. PARKER:  Fair enough.  Fair enough.  I don't

6    disagree with that.  But until the experts inform the company,

7    I can't answer the questions.  Because they are the ones who

8    are really, as I'll explain in a moment, going to be giving us

9    the answers to these questions.

10             You know, the truth of the matter is, while

11   International Paper and its experts are going through all of

12   the documents that have been produced in this case, we don't

13   have any more familiarity with those documents than does NCR.

14             International Paper never operated a mill on this --

15   on the Kalamazoo River.  We were never a party to any of the

16   prior litigation from which documents that have been produced

17   in this case were generated.  And in fact, unlike NCR, we

18   weren't a big party in the Fox River, the companion case that's

19   going on in Wisconsin to this case.  So in truth we have the

20   least knowledge, the least background on PCBs and what's in the

21   Kalamazoo River of anyone here.

22             And this is now my third time in front of you, Judge.

23   I went through all of phase 1 in this trial without getting to

24   meet you personally.  Now I feel like a regular customer.  For

25   that I guess I apologize.  And so I know you're becoming a

little bit familiar with the facts of the case.  But let me just give you what I think are the important facts for this motion.

In the 1950s, and even beginning before it, NCR developed carbonless copy paper or CCP as we refer to it.  And CCP, unbeknownst by all the mills that would subsequently recycle it, contained PCBs.

Now, all of these 14 mills on the Kalamazoo River, none of them made CCP.  But unfortunately they used scrap CCP called broke and trim from the mills that were making the CCP on behalf of NCR.  And the mills on the river recycled that to make other papers:  Book paper, writing paper, boxboard, cardboard.  And unfortunately when they made those other kinds of paper, that process released a certain amount of PCBs into the river.

Now, as I mentioned, International Paper never owned a paper mill on the Kalamazoo River.  Rather, St. Regis, another company, owned a company or a mill called the Bryant Mill on the river.  It owned the Bryant Mill from 1949 until 1966.  But it only operated that mill up until 1956.

And Judge Jonker found in phase 1 that prior to 1956 the Bryant Mill didn't recycle CCP and, therefore, didn't discharge PCBs.

The mill was leased -- the Bryant Mill was leased to a company called Allied Paper Company in 1956, and Allied

operated the mill until 1966 at which point it bought it from

St. Regis.  So St. Regis is the nexus to this case.  And its

ownership -- not its operation but its ownership -- from 1956

to '66.

And International Paper is a party in this case

because in 1990 St. Regis, which had sold the Bryant Mill

14 years before, was bought by a company called Champion.

Ten years later International Paper buys Champion.  So we're a

third cousin twice removed from any of these mills that are on

the river.  And as a result, International Paper doesn't have

operational records for any of these mills.  We never owned

them; we never operated them.  Everything that

International Paper has in this case is a result of discovery

that was done in earlier cases about the river, whether it was

insurance litigation or other things like that.  So there's no

records of our own we can dig into and say "This is the

information, NCR, that you are looking for."

Now, in its motion NCR breaks down its discovery into

five categories, and those are useful for me in trying to

explain to you why it is we just can't answer these requests

like NCR would like us to.

The first category they indicate in their motion is

the source and amount of CCP that was recycled at the 14

different mills on the river.

The second category they identified was the source

1    and amount of PCBs released from the 14 mills or, by the way,

2    from any other industrial plant on the mill.

3          The third category is NCR's involvement with and

4    responsibility for PCBs released at the site.

5          And the fourth category is the operational

6    characteristics of the 14 mills that would impact potentially

7    their release of PCBs.

8          And then the fifth category, which they are not

9    moving for on their motion, where the remediation activities

10   were taken at the site, whether the past or the present.

11         Now, groups 1, 2, and 4 -- the source and amount of

12   CCP, the source and amount of PCBs, and the operational

13   characteristics of the mills and how that would affect the

14   discharge of PCBs -- can really all be kind of lumped together.

15   And we don't know the answer to those questions, but we're

16   working on it.

17         Determining the amount of PCBs that are released from

18   each of the mills, which is really what this all comes down to,

19   is complicated and time-consuming, and our experts are working

20   on it.  And as a result what they are really asking for in

21   those three categories is "Tell us what are your experts'

22   opinions."  And we can't do that yet.

23         But I want to make clear to the Court, the

24   information they are asking for, Judge, it's not in a business

25   record somewhere.  It's not sitting in some record among the

1   millions that have been produced in this case.  But by the way,

2   if it was, NCR would be in just as good a position as we are to

3   find this.

4        You know, they were critical of us in their motion --

5   and Mr. Marriott mentioned it again on his argument -- that you

6   just can't say to a party, "Well, here is a bunch of business

7   records.  Go find something."  And they cite a few cases for

8   that as well.  But all of those cases are distinguishable from

9   this situation in this regard:  They all involved a party who

10  took their own records, gave them to the other side, and said,

11  "Here, you search through those records and find this

12  information."

13       These aren't our records.  We're in no better

14  position than is NCR to ferret through those records that

15  relate to other parties and other mills than they are.  And

16  because we never owned a mill, they aren't ours.  They can find

17  the information as easily as we can.

18       Second, those cases that are relied upon by --

19       *THE COURT:*  You have no independent knowledge.

20       *MR. PARKER:*  Right.

21       *THE COURT:*  Your whole case is relying upon these

22  records, so that's why these records have any relevance to the

23  answers to the interrogatories that you have to answer, and you

24  don't know anything about what's in the records?

25       *MR. PARKER:*  Well, we know something about what's in

 1    the records.  But my final point on that score is, the other

 2    way those cases are distinguishable, Judge, is that they all

 3    dealt with a record that actually specifically answered the

 4    question.  And one of the cases they cite was "What was the

 5    cost of our steel?"  And the other party said, "Well, that's in

 6    here somewhere."  Well, they could have pointed them to the

 7    records that show the cost of the steel.

 8          But here -- and I'm no expert, just ask my wife --

 9    the experts are looking at the records and making value

10    judgments about them and they are trying to understand.

11          For example, one of the opinions -- one of the things

12    they have asked us for is, you know, What kind of furnish, what

13    went into these mills?  And furnish is the raw material.  It's

14    the feed stock that the mills used.

15          So our experts have to first determine for each of

16    these 14 mills for each of the years that they operated, what

17    was the furnish, the front-end product that went in?  Well, was

18    it CCP?  Was it virgin pulp?  You know, the puffed-up wood that

19    you can make paper from.  Was it some other form of recycled

20    paper?

21          Now, few, if any, of these mills have records that

22    show that.  It's 50 years ago.  They simply don't have them.

23    Now, there are the mediation questionnaires that Mr. Marriott

24    referred to, and he certainly is aware of those as much as we

25    are.  But by the way, as we explained to you when we first came

 1    in on that motion a few months ago, those were prepared for

 2    mediation.  There may be a tad bit of advocacy in those.  But

 3    our experts are going to look at those.  Our experts are going

 4    to also look at other documents outside of what has the

 5    operational records of -- it's unfair to call them mediation

 6    questionnaires.  Operational records.  Lawyers prepared those

 7    from records way back when that have since been lost or

 8    destroyed.  But they will look at those.

 9            They will also look at sources of industry data that

10    shows what were mills generally using during that period.  And

11    in fact we identified two of those reports to NCR, the Lockwood

12    and Post directories that talk about what were mills using back

13    in those days.  There's another report that everybody is aware

14    of, this Franklin report.  So our experts have to -- and this

15    is true for all the parties -- have to divine based upon not

16    just records that exist but also they will have to render an

17    opinion that, okay, this mill was operating in 1957, it was

18    making primarily this kind of paper, therefore, it is our

19    opinion that of the amount of paper that they were -- or the

20    furnish they were using, 30 percent would have been pulp,

21    30 percent would have been this kind of recycled paper,

22    10 percent would have been that kind of recycled paper.  They

23    don't have an answer, but they are going to render an opinion

24    as to what they think it was likely that mill did.  So it's

25    impossible until they finish that analysis for us to answer

1    that question.  Particularly as to all 14 mills for all

2    14 years, none of which we operated.

3            THE COURT:  Why did we follow the normal course of

4    pretrial preparation where we did fact discovery followed --

5    and then closed it followed by expert discovery?  Why didn't we

6    have, after some obvious fact discovery, why didn't we have

7    expert discovery followed by some fact discovery or fact --

8    further factual discovery based on what the experts have said?

9    So -- in other words, so the parties could follow up on the

10   respective contentions of the parties who apparently have no

11   idea what their case is until the experts tell them.

12           MR. PARKER:  I can't answer -- I mean, I don't

13   believe any of the parties specifically asked Judge Jonker to

14   set it up that way.  But I really -- this happened in phase 1

15   as well.  The majority of the folks who testified in phase 1

16   were experts, and we had a fact discovery and then we had

17   expert discovery.  And the parties are going to be going after

18   the opinions of the experts.

19           The facts that they have to rely on are so limited

20   given the long passage of time and the derth of records that

21   exist here, that -- you know, it didn't stop any of the parties

22   from putting on good cases.  I apparently didn't put on a quite

23   good enough one because I'm still here.  But I think -- I don't

24   think that's going to prove problematic, Judge, because there

25   simply aren't enough records out there that my expert is going

1    to, you know, reach into a stack of 4 million, pull out a

2    record and say, "Aha, this is the one that shows that the

3    Bryant Mill recycled less CCP than everybody thought."

4            And it doesn't stop there, by the way.  It doesn't --

5    that's just the input.  You know, trying to figure out then how

6    much CCP or PCBs then came out of the mill, it would be like if

7    I said, Judge, I want you to -- I want to tell 14 different

8    automobiles how much carbon monoxide did they discharge over a

9    20-year period?  Well, it depends on the kind of automobile.

10   It depends on whether it was gas or diesel.  It depends on how

11   it was driven.  What kind of engine does it have?  All sorts of

12   conditions.  And that's exactly the same thing that's going on

13   with these mills.  And our experts have to again go back and --

14   "divine" is perhaps a strong word -- but they are going to

15   render an opinion of what was the amount of CCPs that were

16   discharged based upon a bunch of factors.  The type of mill.

17   Was it boxboard mill?  Was it a fine-paper mill?  Did it have

18   deinking capabilities or did it not?  What was its capacity?

19           *THE COURT:*  You normally have an idea of what the

20   experts rely upon before we hear their reports.  In other

21   words, everybody has an idea of what the universe of facts are

22   and then the experts go to work on those facts.

23           Here we have 4 million pages of documents and nobody

24   knows what's in there, and then the experts go through that and

25   they come out and they tell you what's in there and they give

1    you their opinions.  And presumably, I guess, you would depose

2    the experts and you would look at their reports and you find

3    out what portions of those 4 million pages are particularly

4    relevant to this case that everybody is relying upon and you

5    say, Oh, I see now why you're contending that so and so had X

6    amount of CCPs or PCBs discharged and so forth.  But now that I

7    know that, I've got to meet that.  I've got to go into those

8    records further.  The expert went into those particular records

9    of a particular year, a particular file, particular area, and

10   I've got to go in there and dig out something that refutes that

11   or makes that clear, so I need further discovery.

12          I mean, it seems to me that we've got the cart before

13   the horse because of the rather unusual circumstance that we

14   don't know what the facts are until the experts tell us, based

15   on what you're telling me.

16          MR. *PARKER:*  Well -- and by the way, while I'm sure

17   my experts will be testifying about facts, I think mostly they

18   are going to be opinions.  They are going to say "Based upon

19   what facts we've been able to glean."  Mr. Marriott gave --

20          *THE COURT:*  All the more reason, though, isn't it, to

21   find out where they draw their opinions from?  So the other

22   side is going to want to go in and say, "Well, where did you

23   get" -- whatever little knowledge you have to base your opinion

24   on, where did you go to in this record to get that little bit

25   of knowledge?"  And then they are going to want to go into

those formally in the documents and find something that
contradicts that or explains it more fully.  So we have
followup -- unless somebody wants to memorize and master all
4 million documents so they can at a moment's notice pull up
the key document when they are cross-examining that expert.

       MR. PARKER:  Well, fair enough, Judge.  And let me
see if I can illustrate your point with an example.

       In Mr. Marriott's nice "Why does it matter?" picture,
he shows that one of the things -- the waste comes out of the
mill and it goes to a landfill, it goes to a treatment plant,
it goes to the Kalamazoo River.  The treatment plant is a
little bit glorified here.  They were what they called
clarifiers, big settling tanks that were used.  But many of the
mills -- well, I think most of the mills -- I can't speak
definitively for all 14 -- but many of them hooked into the
city sewer system at some juncture.  That's a very important
fact for the expert, because the amount of discharge before it
hooked into the sewer system would be much higher than after.

       If they want to ask us in an interrogatory "When does
your expert contend each mill hooked into the sewer system?" we
could answer that.  But what the expert has got to divine, to
use that word again, is once it hooked into the sewer system,
what impact did that have on the amount of PCBs?  Yes, it
reduced them, but how much?  How efficient were all of the
other systems within the mill if it had a save-all system?  How

1    well did your clarifier work?  When you discharged it to your

2    landfill, was your landfill next to the river such that it was

3    still leaching into the river?  All of those are factors that

4    he's going to have to weigh in some sort of qualitative manner

5    to come up with how many PCBs were ultimately released.

6            The one fact there that really doesn't totally rely

7    on his expertise, if you will, is "When did you hook into the

8    city sewer system?"  We weren't asked that.  We were asked, you

9    know, "What was the amount of PCBs that were discharged?"

10           Every one of the parties here is going to have an

11   expert who is going to opine on that.  We have to because we've

12   ultimately got to show what we discharged, because it's a big

13   factor on how much Judge Jonker is going to say we're

14   responsible for.  But until they are done doing that, I don't

15   know how I answer interrogatories that say "Tell me what your

16   expert is."

17           And just to be clear, while we'll produce a 30(b)

18   witness, if that's what Mr. Marriott wants, his answers won't

19   be any different.  I can't -- the representative of the

20   company, until those experts are done, as I've explained to

21   Mr. Marriott, won't have answers to give any different than

22   answering these interrogatories.  So my predicament is the

23   same.  I didn't want to suggest that I wouldn't produce

24   somebody, but until I'm done, he doesn't have anything to say.

25           So the experts are trying to take all these factors

1    and opine as to the amount of PCBs that were discharged from

2    every one of these 14 mills.  And some of these mills, because

3    none of the parties in this room have any relationship to them,

4    even as a third cousin twice removed, they are really, really

5    hard to try to figure out what it was they discharged.  And in

6    those cases the experts have to look at them and say "I've got

7    no operational records, I have no mediation survey

8    questionnaire from the early 2000s, but I think it was this

9    kind of a mill that was making this kind of product, so I

10   assume this is how much PCBs they discharged."  It will not be

11   based on a lot of facts.  It's going to be based on their

12   expert opinion and their knowledge of the industry and what the

13   processes of a mill of that sort would have had.  So in that

14   regard, Judge, we're really, really at a loss to answer those

15   questions.

16            Now, the other category of documents -- I'm sorry --

17   of requests that NCR has made is the third category I

18   mentioned, their involvement with and responsibility for PCBs

19   released at the site.  This is really an issue of law, and we

20   answered that interrogatory by saying "We think you're

21   responsible for all of the CCP, because every bit of carbonless

22   copy paper was originally manufactured for NCR.  So you're

23   responsible for it all.  You provided it directly or

24   indirectly, all of it to the site."  We said that in response

25   to their interrogatory number 5.

1           We also said that "You're responsible under CERCLA

2      for all of the CCP and, therefore, all of the PCBs at the

3      site."  And we said "That's because Judge Jonker found NCR to

4      be liable in phase 1 of the case."  And that's what we said in

5      response to interrogatory number 6.

6           Now, what -- interestingly, what NCR is trying to do,

7      Judge, is what I very unsuccessfully tried to do in front of

8      you a couple of months ago -- and by the way, Judge Jonker

9      agreed with you -- I said, "Look, in phase 1 I had one mill,

10     the Bryant Mill, and now Georgia-Pacific wants to bring a

11     couple other mills in that are located way up in Battle Creek."

12     And we said that ought not come in.  And we had a status

13     conference in front of Judge Jonker, and I raised my hand and

14     actually filed a motion in limine in advance of that and said,

15     "Judge, how are these mills in?"  And he said, "Look, when

16     you're in and you're liable in phase 1, you know, we'll

17     determine all this later as to what you're responsible and what

18     you're not responsible for.

19          In our view he has found NCR to be responsible as an

20     arranger for CCP in the site.  So from our perspective they are

21     responsible.  They are in.  There's no parsing up of anything.

22     It's all in.  And so I think that that was something that we've

23     already been determined.  But most importantly, we've given him

24     a response.  We have said, "You're responsible for it all and

25     you arranged for it all."  They may not like that answer, and

1    they want to read Judge Jonker's opinion differently than we

2    want to read it or than we do read it, but from our perspective

3    that's very much a question of law.  So it really comes down to

4    the questions about how much PCBs did each of the mills

5    discharge?

6              *THE COURT:*  Did you say that in your response to 5?

7              *MR. PARKER:*  We answer at the top of page 14 in the

8    second sentence, "Further, NCR is indirectly responsible for

9    all CCP recycled at the site and the resulting discharge of

10   PCBs."  They asked us --

11             *THE COURT:*  That's what you're talking about there?

12             *MR. PARKER:*  Yes.  They asked us in that

13   interrogatory, "Identify any transactions by which NCR provided

14   CCP."  We say -- "directly or indirectly."  And we say, "You

15   are indirectly responsible for it all."  Because it was all

16   made at their request, Judge.  It was all made for them.  So in

17   our view, it was all -- indirectly at least, if not directly,

18   they are responsible for all of it.

19             You know, Judge, Mr. Marriott mentioned that after we

20   got these interrogatories we served a similar admittedly less

21   onerous set of the same discovery on NCR.  I will tell you that

22   was a defensive move on my part.  I looked at these and said,

23   "These can't be answered now and they know that."

24             Now they have taken an extension and haven't yet

25   responded to mine.  But I did that because I was hoping it

 1    would point out that this is premature.  This is the subject of

 2    our experts.  This is what they are going to talk about.  And

 3    your point that perhaps we should have done fact discovery

 4    after expert discovery may resonate a little bit.  But the

 5    truth of the matter is that right now International Paper is

 6    not in a position to answer any of these requests.  If they

 7    want to give me some specific requests that talk about, you

 8    know, "When did you hook into a wastewater treatment plant?" I

 9    could answer that.  But I can't answer, "How many PCBs did you

10    discharge?"  I don't yet know how much CCP did I recycle,

11    because that's going to be an opinion.  There are no facts that

12    show that 50 years later.  My guys are going to have to surmise

13    what that was by looking back at a whole bunch of factors.  The

14    nature of the mill, its capacity, what mills were generally

15    recycling at that time.  And, frankly, even you can look -- you

16    know, one of the things, Judge, there's no doubt that all the

17    mills recycled this stuff.  To the extent we have these dumps

18    that he shows, these landfills, they are filled with PCBs, so

19    we know we recycled the CCP.  But trying to determine how much

20    and when and those sorts of things is going to be something our

21    experts are going to do.  You know, the judge has set a

22    deadline for experts.  I promise you, Judge, our guys are

23    working hard.  They are not done with this.  This is a really,

24    really complicated, difficult analysis.  And when they are

25    done, we will respond and give NCR these answers.  But until

```
 1  then, I'm not sure what I can do other than what I've tried to
 2  do right now.
 3          THE COURT:  What about partial answers?  Obviously
 4  your experts must have some of this information.  They are not
 5  going to get it all in the last hour and try to put it
 6  together.
 7          MR. PARKER:  But here is my problem with that, Judge.
 8  In other words, if I say, "Well, my experts are working on this
 9  and they think maybe this mill produced this much PCBs were
10  discharged, but we're not done and we're still checking on it,"
11  first, I don't know what use that is to NCR, unless they want
12  to try to hold me to it so they have got some aha moment when
13  my experts are finally done with their reports and they have
14  had a chance to review everything and they come out with those
15  reports and they say, "Okay, the Bryant Mill discharged a half
16  a pound of PCBs" -- I wish it were so -- but say a half a pound
17  of PCBs, and Georgia-Pacific's mill, you know, discharged
18  7 million pounds of PCBs.  The numbers are probably wrong.  The
19  scale is close.  But, you know, if I tell them in the interim,
20  "Well, you know, our mill discharged a pound and
21  Georgia-Pacific's discharged 3 million," when they come out
22  with a half million and 7 million at the end, NCR is going to
23  say, "Aha, we asked you in an interrogatory, and we know your
24  experts weren't done, but this is what they told us, so now you
25  can't tell us something different."  That's the problem with
```

1    trying to give them some answer before our experts are done

2    coming up with this.  Because it's not always --

3            THE COURT:  I wouldn't think that would be a problem

4    if you identify it as a partial answer based on what you have

5    to date with the idea that you will continue to supplement it.

6            MR. PARKER:  On Friday I called our experts in

7    anticipation of that possible question and said, "Where are you

8    in this process?"  And they are still studying the various --

9    with most of the mills, frankly, trying to figure out what kind

10   of processes did they have.  Did they have these save-all

11   systems, for example?  How effective were their clarifiers?

12   And these like variables are huge in trying to determine how

13   much was your car driven almost in terms of the carbon monoxide

14   emissions.  And then they have got to break it down by year, by

15   mill.  We are working really, really diligently to get this

16   done.  I mean, it is unconscionable the amount of money that

17   the parties in this room are spending with experts in this

18   case.  And they are talented people, they are working hard, but

19   trying to hold them to something prematurely I think is unfair

20   to them and it's not particularly useful.  Particularly if at

21   the end of the day we get to say, "Well, that's not what --

22   "Upon further reflection here is what they come up with."  It

23   would be almost like asking for preliminary expert reports.

24   Which I've not heard a court do, but I'm not sure it would be a

25   good idea either.  Because, again, I don't think that until

1    they are done it's fair.  Or I don't think they would feel

2    comfortable saying "This is our answer to a reasonable degree

3    of scientific certainty" until they have had a chance to

4    complete their report entirely.

5          As a result, if there are specific factual

6    interrogatories that NCR would like to ask like "When did you

7    hook into the sewer system?  When did you put in your clarifier

8    system?"

9          THE COURT:  I think counsel has made the point, he's

10   looking for contention interrogatories.  He's viewing these as

11   contention interrogatories.

12         MR. PARKER:  Fair.  But how can I answer what PCBs I

13   contend were discharged from Georgia-Pacific's mill let's say

14   until my experts have come up with an answer for that?  I don't

15   know the answer to that.  International Paper doesn't know the

16   answer to that.  My guess is if St. Regis were still in

17   existence they wouldn't know the answer to that because they

18   didn't operate the mill.  So we've got to look at what records

19   we can, what evidence in the industry exists, what other things

20   that these guys divine from output, input, that they can find

21   and go from there, Judge.  So it's really a contention

22   interrogatory that asks "What do you contend your experts are

23   going to say at the end of the day about these facts?"  And

24   it's a sad commentary on a CERCLA case like this, I guess,

25   that's 50 years old that that's what we're left with.  But the

1    witnesses themselves, were they able to assist in this kind of

2    thing, unfortunately have long since passed away.  So we don't

3    have people we can ask.  We don't have records that we can look

4    at beyond what have been produced.  And that's the predicament

5    I find myself in.  I fully understand.  I do not like coming in

6    before a judge like you and saying "I can't answer."  I know

7    that's not a good defense.  But in this case it's actually

8    true.

9            THE COURT:  Well, we agree on that point.

10           MR. PARKER:  It's true or it's a good defense?

11           THE COURT:  We agree on that point it's not a good

12   defense.

13           All right.  So tell me when you could have a

14   preliminary expert report done.

15           MR. PARKER:  I don't know the answer to that question

16   at all.

17           THE COURT:  Well, it's the middle of September.

18           MR. PARKER:  I can tell you when the schedule is for

19   when our expert reports are due.

20           THE COURT:  Yeah, that's November 17th, isn't it?

21           MR. PARKER:  Um --

22           THE COURT:  I'm not sure they are all due the same

23   day.

24           MR. MARRIOTT:  The party bearing the burden on an

25   issue --

1          MR. PARKER:  Thank you.

2          MR. MARRIOTT:  -- submits a report on November 17th.

3          THE COURT:  All right.  So that's two months from

4     now.  It sounds like anything that breaks this cycle of "none

5     of us can do anything until everything is done" would be of

6     some use.  Knowing I'll ask the other side the same thing.

7          MR. PARKER:  It sounds then we're like accelerating

8     the schedule that Judge Jonker set.  And I appreciate --

9          THE COURT:  Well, otherwise we're going to be in a

10    position -- if the Court accepts the argument that nothing can

11    be done until we have the expert reports, then we have no

12    alternative but to have further discovery after you have the

13    expert reports, because that's going to be the first time the

14    other side is exposed to your contentions, and they have an

15    opportunity, it would seem to me, to be able to respond to

16    those contentions.

17         MR. PARKER:  Well, we do have expert discovery after

18    the reports are submitted.  To the extent our experts rely --

19         THE COURT:  How about more factual discovery?

20         MR. PARKER:  Actually I don't think so, Judge,

21    because the facts that they do rely on, to the extent there are

22    any, are going to be very static.  In other words, they will

23    say, "Here were a couple of documents that I looked at."  This

24    is what happened in phase 1.  I'll give you an illustration.

25    Georgia-Pacific put on an expert who said, "I could tell in

1    your landfill when the stuff was deposited, so I could tell

2    when it was you were recycling CCP and discharging PCBs."  And

3    he said, "Here is some data that I looked at."  And he

4    identified in his expert report, you know, this is -- these

5    were reports you could look back.  They were basically core

6    samples that had been taken of the landfill.

7          It's not like anybody is going out and talking to

8    witnesses here.  They are dead.  So you do get to see exactly

9    what documents.  Using those documents that he identified in

10   his report, as an expert has to do, I was able to cross-examine

11   him -- or take his deposition, ask him a bunch of questions,

12   and then cross-examine him at trial.  And I think the same

13   thing will happen here.  Each one of the experts will identify

14   those documents or industry treatises on papermaking or those

15   sorts of things that they rely on in coming up with these.

16         Mr. Marriott will be able to look at those.  It's not

17   as though there's other additional discovery that will have to

18   be done about facts.  If he thinks, "Well, that's a bad

19   treatise, I've got a better one," it's like any other expert,

20   he'll be able to use that.  But there's not more facts to be

21   developed beyond those which the experts identified they relied

22   on.  And I suggest those will be precious few.  They will be

23   the mediation questionnaires.  There may be some documents that

24   say, "Here is when we switch to a sewer -- to the sewer system

25   from direct discharge to the river."  But there's not going to

1   be a lot of documents of that nature that anybody needs to go

2   out and do more discovery on.  And there's nobody to ask.

3   Unfortunately they have all passed away.  So I don't think the

4   predicament would be like you would see in a normal case

5   because our facts are static.  They can't -- there's nobody

6   alive to talk, and the documents have to be identified by the

7   expert as they relied upon.  And that's exactly what happened

8   in phase 1 with exactly the same sequencing we have here of

9   fact discovery and then expert discovery.  So I think from that

10  standpoint we should be okay.

11          *THE COURT:*  All right.  Thank you.

12          *MR. PARKER:*  Thank you, Judge.

13          *THE COURT:*  The Court is somewhat sympathetic to the

14  comments that it's hard to go back and ask people 50 years ago

15  what happened.  In our own world to save the taxpayer dollar,

16  the Administrative Office which is what we all answer to in

17  Washington, has decided that we can save shelf space at the

18  National Archives by simply destroying the court's files and

19  thereby save a little rent space and presumably balance the

20  budget of the United States government.  So to do that they are

21  going to destroy 80 percent of our records from 1970 to 1996, a

22  25-year period.  They figure that's an economical way of

23  balancing.  But they said if -- of course, some of us have

24  protested that there might be some significant cases during

25  that period of time.  And they said, "Well, if there are,

1    that's fine, there may be some historical cases, go back and

2    talk to the judges during that period and get their

3    recollections and so forth."  And we said, "Well, eighty --

4    86 percent of the criminal cases were from judges who are no

5    longer with us."  So, you know, in one memo I wrote about it I

6    said if you can give us some funding for a séance, we actually

7    could do something.  I think that line got stricken before the

8    memo went off to Washington.

9              But anyway, it's an ongoing battle, and so I

10   understand exactly what you're saying.

11             Counsel, go ahead.

12             *MR. SIBLEY:*  If I may, Your Honor, Trey Sibley for

13   Georgia-Pacific.  This is a motion by NCR against IP.  I should

14   probably keep my mouth shut.  But the answer to the motion is

15   going to impact my client --

16             *THE COURT:*  I understand.

17             *MR. SIBLEY:*  -- the same as it will impact

18   International Paper.

19             Your Honor, I think what it would be useful to do is

20   to step back and put into context the factual dispute that has

21   driven the need for this discovery.

22             In phase 1 of the case Judge Jonker found that NCR

23   qualified as an arranger for the disposal of a hazardous waste.

24   The hazardous waste in this case being carbonless copy paper.

25             The judge also found with respect to

International Paper that they were an owner of a facility at
the time of disposal and Weyerhaeuser had stipulated to
liability.

Now, as you ruled on International Paper's motion for
a protective order, or maybe it was our motion to compel, once
you're in the -- once you've been found liable, it's like --
it's very much like criminal sentencing.  There are a host of
factors that come into play, and all of those factors can be
considered.  One thing that makes this slightly different from
criminal sentencing is the idea of apportionment.

Judge Jonker found -- and let me explain why that's
relevant.  Judge Jonker found in phase 1 -- and I think
recurring to his opinion is very important here -- he found in
phase 1 that NCR during the period of time when it
unquestionably was possessed of the state of mind sufficient to
make it an arranger supplied a considerable amount of the
carbonless copy paper, wastepaper that was recycled by mills in
the Kalamazoo River.  I don't think any party disputes that the
mills -- the vast majority of mills that are at issue here, the
vast majority of the 14 mills, recycled at least some
carbonless copy paper.  By force of Judge Jonker's ruling in
phase 1, a considerable amount of that would have come from an
NCR source.

That's critical because it gets to the question of
apportionment of harm.  Can we carve at the joint such that --

1    as we believe NCR will attempt to do in phase 2 -- NCR's

2    liability can be capped such that equitable factors could not

3    come into play to make NCR 100 percent responsible, which is

4    our core contention, and is the conclusion that Judge Griesbach

5    reached with respect to the Fox River in Wisconsin.

6          To carve at the joint, to achieve apportionment, NCR

7    must be able to state with precision how much of its paper went

8    to each mill.  That's why they are pushing this discovery on

9    each of us to get to us answer the question.  The trouble that

10   they have -- and this is -- no amount of discovery will change

11   this fact -- we don't know the answer to that question.

12         We know that there was a considerable amount so

13   Judge Jonker found.  We know that it went to multiple mills.

14   There are documents establishing that that have been well

15   discussed and have been produced in phase 1.  But there's no

16   document out there, there's no piece of evidence, of testimony

17   that will give the level of precision that NCR is seeking in

18   its interrogatories.  And that is the core problem.

19         Mr. Parker is absolutely right when he says that the

20   facts here are static.  The documents out there that are

21   available have been in circulation, they have been produced,

22   everyone has them.  We know which ones are the key ones.  We

23   have identified -- Georgia-Pacific has identified those in our

24   answers to NCR's interrogatories.  And International Paper has

25   identified a fair number of those in answer to interrogatories

1    we've propounded to them.

2         Those documents describe relevant operational

3    characteristics that go to the ultimate question "About how

4    much would this mill have done?"  And I state that with a sort

5    of lack of precision because no one can go -- no one can do

6    much better than that.

7         We know that this mill was operational from -- you

8    know, was in operation during the relevant period.  We know it

9    produced about this much paper.  We have some testimony and

10   other evidence that says their mix of furnish would have been

11   roughly this much wastepaper versus this much virgin fiber.

12   And we have some evidence that they recycled carbonless copy

13   paper.  That evidence being, as Mr. Parker rightly noted,

14   mostly in the environmental record in these landfills.

15        The key question is how much, how much of NCR's

16   paper.  That's the question they want to ask.  And the question

17   has really already been answered.  That is impossible to state

18   with any certainty.  And that's a result, quite frankly, of

19   decisions that NCR made long ago when they disposed of their

20   sales records that would say where all of their wastepaper

21   went.  I'm not casting blame, I'm not suggesting spoliation or

22   anything like that.  It's just the circumstance we find

23   ourselves in.  If we had a complete comprehensive documentary

24   record, perhaps we could achieve that level of certainty.

25        A couple of other points that I think bear emphasis.

1   NCR already knows the parties', the recycling parties' core

2   contentions.  They know that we contend that they arranged for

3   disposal of carbonless.  They know why we contend that.  And

4   they know we've -- at least Georgia-Pacific has taken the

5   position that it is impossible to state with precision exactly

6   how much NCR paper went there versus other paper.  And we don't

7   think it matters.

8         Mr. Parker rightly notes that every molecule of

9   Aroclor 1242.  That's the -- Aroclor is the trade name.  That's

10  the PCB, the type of PCB that was put on this paper.  Every

11  molecule of 1242 that's in that river came from one of two

12  places:  NCR headquarters in Dayton, Ohio, or its facility in

13  Portage, Wisconsin.  That's where it all came from.

14        Judge Jonker found that NCR knew long before anybody

15  else that this Aroclor 1242 was hazardous to the environment.

16  They knew -- it's funny, Your Honor, this document on page 7 of

17  their deck, this cartoon diagram, there's a very similar

18  document like this that was made in 19 I think 68 or 69 where

19  NCR is talking about just this dynamic and how PCBs from its

20  product are necessarily being discharged into rivers in the

21  United States and in the United Kingdom as a result of NCR's

22  actions.  It's a critical fact.

23        I emphasize all of this not to lapse into the merits

24  of the case unnecessarily.  I think it's very relevant to this

25  dispute that the Court appreciate where this comes up and where

1    this fits in the big scheme of things.

2              Another couple of points I think that bear emphasis.

3    I think we do take some issue with sort of the undifferentiated

4    use of Rule 33(d).  We do think there is a modicum of precision

5    that's required identifying at least some specific stuff.  In

6    the supplementation that has occurred, NCR very well may

7    have -- or International Paper may have achieved that.  I

8    suppose that's a question for another time.  But I do think

9    they can't -- we agree with NCR insofar as NCR says you can't

10   just point to the universe of documents and leave it at that.

11             That said, I do think NCR goes too far with its

12   request for a 30(b)(6) deposition.  That's also the topic of

13   its motion, and that's lurking out there for the parties.  No

14   corporate representative from Georgia-Pacific is going to be

15   able to have any information other than what its lawyers have

16   on what was done at one of these other mills.  I'm flipping to

17   the map of the site.  There are 14 of them.

18             To the extent we've formed a position on what

19   happened at say the National Gypsum Mill, that's stuff that we

20   would have spoken to already to one degree or another in

21   written discovery.  We think a 30(b)(6) on that as to what

22   other people did is a waste of everyone's time.

23             *THE COURT:*  But the irony is the other side in this

24   motion hasn't objected.  You're objecting because you're seeing

25   the same thing affecting you down the line, but you're not a

1   party to this particular motion.

2          *MR. SIBLEY:*  No, I think International Paper does

3   object to that.  Mr. Parker can speak for me if not.  You mean

4   on the 30(b)(6).  I'm sorry.  Yeah.

5          On the question of answering as to what happened at

6   other parties' mills, I do think there's a clear distinction

7   there.  I think we can say in general terms we can identify the

8   factors that would make it more or less likely that a given

9   mill would have used carbonless.  But there's nobody at

10  International Paper, there's nobody at Georgia-Pacific who can

11  say with the precision that NCR seeks how much carbonless copy

12  paper the National Gypsum Mill would have used in its period of

13  operation and let alone how much of that came from an NCR

14  source.

15         I think the idea, Your Honor -- you discussed the

16  idea of preliminary expert reports.  I don't think that's --

17  Georgia-Pacific does not think that that would be a worthwhile

18  approach.  The court schedule is set, and November 17th is the

19  date for experts to speak on this.  I don't think it is

20  necessarily the case that NCR needs experts to learn what our

21  contentions are.  They know what our contentions are.  They

22  place a lot of importance on these facts:  How much carbonless,

23  how much NCR carbonless did a given mill recycle.  We've

24  answered that.  We say we don't know.  We know it was a

25  considerable amount.  That's what Judge Jonker ruled in

1    phase 1.  We know if it was a mill of this type, it would have

2    been more likely rather than less to use it.  We know that the

3    environmental record shows that the mill used it because

4    there's lots of PCBs, Aroclor 1242, or PCBs characterized as

5    Aroclor 1242 in landfills.  And that is enough.

6            You were tagged with the -- I know you didn't like my

7    metaphor the last time -- but the golden ticket.  You've got

8    your ticket to the dance.  You've been found guilty and it's

9    time for sentencing.  And the factors that can be considered

10   are considerable, and we don't think it's terribly relevant

11   precisely how much to get down to the precise level.  It can't

12   be done.  We said that.  And I think -- I think it's useful for

13   the Court to consider that substantive context in deciding

14   exactly what International Paper should be required to do.  Of

15   course, that obligation will likely be imposed on

16   Georgia-Pacific as well, so that's why we appreciate you

17   allowing us to speak to this.

18           *THE COURT:*  I appreciate your comments.  I'm not sure

19   where they leave the Court.  It sounds like you're splitting

20   the baby a little bit as far as saying that International Paper

21   ought to do a better job of responding than they did, but they

22   can't live up to what NCR wants them to give.

23           So how much should they be able to produce?

24           *MR. SIBLEY:*  Well, I think there are certain

25   documents that are of particular relevance.  I mean, the answer

that International Paper gave to each one of these questions was, "Look at all the documents.  We don't know.  Our experts are looking at it."

We don't have in front of the Court, but we could, show you what Georgia-Pacific did by way of contrast.  We've pointed to -- you know, to deal with the question how much carbonless came from NCR.  We point to Judge Jonker's opinion.  We point to the evidence that underlies that.  We show that here are the bodies of evidence.  All of that, by the way, is documented quite extensively in our proposed findings of fact from phase 1.  The evidence is out there.

I think Mr. Marriott identified what his real issue is.  He's like, "Am I going to be surprised by another body of evidence?"  If I have some secret set of documents that answer this question or if I have some witness who is going to speak and can tell you exactly how much NCR paper or paper from NCR resources we recycled.  If we have that stuff, it's our obligation to disclose it.  And if we haven't disclosed it and it appears for the first time in an expert report, they have -- they would have a decent motion, I would submit, that that information should not be considered.

That's really what they are going for.  This is an attempt to box us in to a specific position, and I don't -- I think the evidence is all out there.  There's no more documents that are going to be identified.  There's no more witnesses

1    that have something to say.

2         THE COURT:  Well, there's 4 million documents, so I

3    suspect there probably aren't any more documents.  But isn't

4    the whole question which of those 4 million are really

5    pertinent to this lawsuit?

6         MR. SIBLEY:  Well, and I think we've identified those

7    in broad category.  The -- we noted that in Georgia-Pacific's

8    answers to the interrogatories.  And this is where I

9    think we -- this is where we do -- you're right, we do kind of

10   split the baby.  I don't think International Paper --

11   Georgia-Pacific does not think International Paper went far

12   enough.  I think you need to do more.  We think we did.  We

13   think we satisfied that burden.  We think that's enough.  But

14   the precision that NCR seems to seek is something they

15   desperately want, and they desperately want us to be able to

16   say with precision down to the molecule how much, because they

17   have to.  That's a critical part of their defense in this case.

18   And that's just impossible.  And that is a fact.  No amount of

19   discovery is going to change that.  We can identify at a rough

20   high level of generality what the contentions are.  We

21   certainly have done that.  I think International Paper is

22   moving in that direction.  But to achieve the level of

23   precision that Mr. Marriott seems to command is not -- is not

24   -- it's not going to happen.  We'll have experts who offer

25   opinions about what all of this -- the factual material might

1    suggest.

2             THE COURT:  But we don't have any expert so far who

3    has produced an affidavit to support what you're saying?

4             MR. SIBLEY:  No, we don't have that, but we do have

5    the answers that have been provided.  Right?  We do have the

6    environmental record.

7             THE COURT:  We apparently have your answers, not

8    International Paper's.

9             MR. SIBLEY:  A fair point.  A fair point.  And we do

10   think that they should go further than that.  But I don't think

11   the bar is all that high for International Paper to clear here.

12   I think there's -- and I don't think it's any mystery at all to

13   NCR what those categories of evidence are.  They have been well

14   rehearsed.  They have been discussed in phase 1.

15            The environment -- the environmental record tells the

16   tale, right?  These landfills are chock full of PCBs.  And they

17   are PCBs that came from recycling NCR paper.  That is -- that

18   is probably the least controversial fact in this entire case.

19   And I don't think -- I just don't think -- I think there's this

20   notion lurking back there that there is some core position that

21   a party has yet to reveal that would be -- would come up in an

22   answer to one of these interrogatories, and I would submit that

23   that's just not the case.

24            THE COURT:  Okay.

25            MR. SIBLEY:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          MR. BAIRD:  Actually, may I?

3          THE COURT:  Certainly.

4          MR. BAIRD:  Your Honor, Chris Baird for Weyerhaeuser.

5     I just wanted to make a couple points in response to your

6     question about whether preliminary expert reports could be

7     useful here.  And Weyerhaeuser's position is that they

8     wouldn't, and I've got at least three reasons for that.

9          One is a schedule reason.  You know, we've been

10    living with this schedule for quite some time.  There was an

11    extension just a few weeks ago.  But the schedule provides for

12    two expert disclosure dates.  There's a primary -- the party

13    with the burden on an issue has to submit its expert reports by

14    the middle of November.  The party that doesn't have the burden

15    gets to submit responsive expert reports I think it's the

16    middle of January.  So to do preliminary expert reports before

17    the close of fact discovery wouldn't preserve the option for

18    parties without the burden to get -- to have the time that they

19    are going to need to respond to the expert reports because we

20    only have seven weeks left here.  So there's some issues that

21    Georgia-Pacific as the plaintiff it will have the burden on.

22    Weyerhaeuser as the defendant, it will be responding to

23    Georgia-Pacific's experts.

24         Now, as a defendant I'm completely fine with that,

25    which leads to the second issue.  All of the experts will list

1    in their reports the documents that they reviewed and the

2    documents that they relied upon.  I'll be able to depose

3    Georgia-Pacific experts.  I'll be able to say, "Hey, my expert

4    says that this document is important.  Why didn't you find that

5    important?"  That's completely fine.  I have two months to

6    depose GP's experts, and then actually the expert discovery

7    cutoff is another six weeks or so after rebuttable expert

8    reports are due.  That's plenty of time for there to be

9    depositions about why parties did or did not find certain parts

10   of the record to be persuasive.

11        The only other point I'll offer is that until we

12   identify our experts in the course of expert disclosures, all

13   of our experts right now are consulting experts.  The opinions

14   or views of consulting experts are not the subject of discovery

15   until they are offered as an expert.  You know, I don't --

16        *THE COURT:*  Experts have not been identified yet?

17        *MR. BAIRD:*  No, they have not been identified yet.

18   Not to each other.  We presumably each have a stable of experts

19   that we've been working with.  Some of them we might be quite

20   confident will testify; others may not, depending on the views

21   that they come out with.  And no party is entitled to the views

22   of another party's consulting expert.

23        *THE COURT:*  Huh.

24        *MR. BAIRD:*  And unless you have any questions, that's

25   all I have.

1           *THE COURT:*  I appreciate your comments, Counsel.

2    Thank you.

3           *MR. BAIRD:*  Thank you.

4           *THE COURT:*  I didn't realize you had not identified

5    experts yet.

6           Counsel --

7           *MR. MARRIOTT:*  Thank you, Your Honor.

8           *THE COURT:*  -- do you agree with Georgia-Pacific that

9    International Paper ought to provide answers that were as good

10   as theirs?

11          *MR. MARRIOTT:*  That's a difficult question to answer,

12   Your Honor.  They should provide better answers.  The

13   Georgia-Pacific answers weren't remotely close.  So I know they

14   believe their answers are the standard.  I respectfully think

15   they are not the standard.  And I -- so, no, I don't think

16   having answers to do what Georgia-Pacific's answers do would

17   get us where we need to get.

18          What I heard, Your Honor, in counsels' comments are a

19   couple of things that I think are particularly telling.  What I

20   heard is from International Paper and Georgia-Pacific that all

21   the facts that matter are static.  I heard that everybody knows

22   what the contentions are, and I heard there's no mystery here

23   about precisely what those contentions will be.  Well, I

24   suppose in some metaphysical sense, Your Honor, all the facts

25   are static because the fact is what it is.  But that really

1    isn't the relevant point.  The question is which facts matter.

2    And there are, as you recognize now, 4 million pages of paper.

3    There are any number of contentions any one of these parties

4    could make about what goes on at a particular mill.  And so,

5    sure, the facts are what they are.  The issue is:  What are the

6    facts -- what are the contentions they are going to make about

7    them?  So we know which facts to marshal, which facts to try to

8    discover in order to make out our defenses.  And so the mere

9    fact that facts in some sense are static is really beside the

10   point.  The question is:  Which ones matter?  Which ones can

11   we, should we, do we need to go find in order to make out our

12   defense?

13           We do not know what their contentions are, and any

14   suggestion by counsel to the contrary is simply not true.  Yes,

15   Your Honor, we understand they are saying we're completely

16   100 percent responsible.  I get that.  I've heard them say

17   that.  That's not the same thing as knowing on what basis do

18   you contend that that's the case?

19           Contrary to what's been suggested, Judge Jonker

20   didn't say that.  Judge Jonker said that we are a potentially

21   responsible party.  He found that some amount of carbonless

22   copy paper from NCR made it to the site.  He didn't say exactly

23   where it came from.  He didn't say which mills it related to.

24   And what's been suggested by counsel is because we are somehow

25   in for a -- in in the sense that we could potentially be

1    responsible for everything that we somehow lose our defenses.

2            What we have is a matter of statute and common law

3    right and opportunity here to try to convince Judge Jonker that

4    there's an apportionment defense, an allocation defense.  But,

5    yeah, maybe -- yes, perhaps the Court finds that NCR knew

6    before other parties knew that there were PCBs in its

7    carbonless copy paper, but does that translate into a hundred

8    percent responsibility for the cleanup of the site?  We

9    respectfully submit in no way, shape, or form.

10           Obviously my colleagues here take a different view.

11   They are entitled to assert that view, Your Honor, but they are

12   not entitled, we would submit, to deny us any and all discovery

13   to try to -- that matters to try to demonstrate that in fact

14   you can, as counsel says, break this river at the hinges.  And

15   you can say in that particular portion of the river NCR has no

16   responsibility.  In that particular portion it has no

17   responsibility.  In this portion it has a little bit of

18   responsibility.

19           And they have an enormous incentive on their side to

20   not know and to not say until discovery is closed and we can do

21   nothing about it.  Because the precision allows us to be able

22   to say -- knowing their contentions allows us to be able to say

23   that the Court can apportion the harm and it can hold this

24   party responsible for that piece and this party responsible for

25   that piece.  And the more it's all jumbled together and the

1    more we don't know what the allegations are and what each mill

2    did until a point in time when no one can do anything about it,

3    the more difficult it is for us to be able to make out the

4    defense.

5          But the defense unquestionably exists, and the only

6    way we can pursue it is if we know what their allegations are.

7    Otherwise we don't know which part of the 4 million pages of

8    paper to look at.  We don't know which facts to pursue from

9    regulatory agencies.  Maybe all the individuals aren't alive,

10   Your Honor, anymore.  That I'm sure is true.  I know that to be

11   true.  That doesn't mean that agencies and individuals don't

12   have knowledge that might relate.  And knowing what the

13   allegations are makes it possible to know exactly what it is

14   that relates.

15         So it's been suggested that somehow the experts just

16   don't know and we can't know.  What we seek is not their

17   experts' opinions.  We are not trying to get their experts'

18   opinions.  We want the company's position.  And the company is

19   free to determine that position however it wants.  It can look

20   in a crystal ball, it can hire an expert.  The lawyers can sit

21   around the table and make it up.  We don't much care.  We just

22   want to know what their position is and what the basis of it is

23   so that we can defend ourselves at trial and we can put on a

24   case that tries to convince the judge that we don't, contrary

25   to what they are all saying, bear a hundred percent

 1  responsibility for what happened at this river.

 2          *THE COURT:*  What is your answer to their position

 3  that like you they came into this case long after it was over,

 4  long after the facts were whatever they were, and they don't

 5  know any more about them than you do.  In fact, the argument

 6  was may know even less than you do.  But let's assume they

 7  don't know any more than you do.  So the argument has been

 8  persuasively made that they really need their experts to go

 9  back through these documents, try to figure out what happened,

10  what was the course of business back in the day, and so based

11  on whatever they are able to put together and put together with

12  whatever the course of action was back in the day, they can

13  make reasonably sound estimates as experts that probably this

14  much CCP was being used in this plant or that plant and so

15  forth.  So it's a best-estimate sort of thing, I suppose.  But

16  they won't know that until their experts get done doing this.

17  Their experts are overworked as it is.  And so they will have

18  this done by the November -- November 17th, but probably not

19  much before that.  And that's when they will know -- be in some

20  kind of position to answer your question.

21          *MR. MARRIOTT:*  Well, Your Honor --

22          *THE COURT:*  Before that what you get is going to be

23  worthless.

24          *MR. MARRIOTT:*  Sure.  Well, with respect to that

25  question, we are in some sense in a similar position to

1    International Paper.  We didn't have a mill at the site.  We

2    didn't discharge anything into the site.  And so we have to for

3    ourselves answer the very same questions.

4         We didn't ask these questions not expecting that we

5    weren't going to get the same questions back to us.  In fact,

6    we got at least one of them from International Paper.  And

7    though it hasn't been mentioned and though our 30(b)(6) notice

8    has been called overbroad, we got a 30(b)(6) request that was

9    twice as broad from Georgia-Pacific asking us essentially the

10   same question.  So I fully get that I can't stand here and ask

11   you to order them to do it without expecting that I'm going to

12   have to do the same thing.  And I think that's just a sensible

13   way to do it.  So will we get the input of our experts in doing

14   this?  We will.  Will we have the lawyers sit around and think

15   about what makes sense in various -- given all the allegations

16   in the case?  We will.  But at least at some point in time the

17   parties will then exchange positions so we can actually in some

18   sensible way figure out whether there's any fact discovery that

19   matters and should be pursued in relation to it.

20        So is it challenging?  It is challenging.  I don't

21   deny that it's challenging.  But the case wasn't filed

22   yesterday, right?  The case was filed in 2010.  There was an

23   entire first phase.  There was a first-phase trial.  There was

24   a decision by Judge Jonker a year ago.  And over

25   Georgia-Pacific's objection, over their objection Judge Jonker

 1   extended the fact discovery period past September 15th.

 2   Georgia-Pacific objected.  They wanted their expert reports to

 3   go in sooner, not later.  They wanted fact discovery to be

 4   over.  They don't want us to be able to get at the underlying

 5   facts that will demonstrate that this harm can in fact be

 6   apportioned and it can in fact be allocated.

 7            So, yes, we require experts, yes, they are working

 8   hard, but at some point in time, Your Honor, you have to be

 9   able to identify what your position is if we're to meaningfully

10   move forward.  They have known that their expert reports -- all

11   parties have known that expert reports were going to be due

12   this fall.  Until just a couple of weeks ago they were due much

13   sooner than they are now due in November.  People have been

14   working -- should have been working under the expectation that

15   they would have to disclose their positions.  We held these

16   requests until later, expecting that if we did it too soon

17   knowing people would say it's too soon.  Now we're both going

18   to be too soon and too late all at the same time.  So the

19   parties have had enough time to figure it out.

20            As far as producing preliminary reports, Your Honor,

21   I, frankly, don't disagree with all counsel that the production

22   of a preliminary report is probably not the best solution here,

23   but what we're asking for demands and requests far less than a

24   complete report.

25            Just, for example, if you look at the first of our

1   requests, "Please identify by year and mill the amount of

2   carbonless copy paper recycled at the site during the period."

3         Rather than give us a complete report with all of the

4   T's crossed and all of the I's dotted about that, it ought

5   not --

6         *THE COURT:*  Are you looking at interrogatory 1?

7         *MR. MARRIOTT:*  I am, Your Honor.  It ought not be

8   that difficult of a proposition to say, right, Based upon our

9   analysis of the records provided, our position in the case is

10  that "X" mill recycled carbonless copy paper as follows.  In

11  1954 approximately X pounds a year.  And in each of the

12  following years the same amount except in 1967 approximately

13  20 percent more.  I mean, that's a bottom-line position.

14        If their experts are truly going to be in a position

15  to submit expert reports on November 17th, which is an

16  extension of what the deadline was until recently, they

17  certainly know the essence of what it is they are going to say

18  if they are in a position to now be preparing all of the backup

19  that goes with it.  So that's a far-less-burdensome exercise

20  than giving us a full report.  Just tell us what your position

21  is, tell us what your position is as to how much carbonless

22  copy paper was recycled at each of these 14 mills.  And

23  especially for parties like Georgia-Pacific which actually

24  owned or was responsible for some significant number of the

25  mills at the site.  It's a much easier exercise for them,

1   Your Honor.  They have been involved in litigation at this site

2   for decades.  Litigation to which neither IP or NCR had any

3   involvement.  So simply answering the question as to what your

4   position is without all that comes with a complete expert

5   report ought to not be that onerous of an exercise, and it

6   at least puts us all in a position to have some sense of where

7   the allegations are before we go into a phase we never again

8   will be allowed fact discovery absence presumably some

9   extraordinary showing that one may or may not be able to make.

10          The mere fact that the facts in a sense are static

11  doesn't mean we have what we need.  And the facts, as we all

12  know well, flow from what the allegations are.  The ones that

13  really matter.  And so I get that we're generally, they say,

14  responsible for everything.  That doesn't really tell me what

15  they are arguing.  And I'm pretty sure when it comes to trial

16  they are not going to be saying "NCR is responsible for

17  everything, Judge.  That's the end of our presentation."  We're

18  going to have all kinds of detail that I don't know about

19  today.  Thank you, Your Honor.

20          THE COURT:  All right.  Thank you.

21          Well, is your cocounsel the only person that has to

22  argue in front of Judge Jonker, or do other people want to hear

23  his argument and respond?

24          MR. PARKER:  No, it's not related to this case,

25  Judge.

1          *THE COURT:*  Other case.

2          *MR. PARKER:*  Yes.

3          *THE COURT:*  I didn't want the rest of you to miss out

4    on argument that you might have to respond to, so if you all

5    wanted to hurry up and hear his argument, go ahead.

6          *MR. PARKER:*  I wish we could do that.

7          *THE COURT:*  Well, I'll try to get you out of here

8    very quickly so that you can go do that.

9          Well, this case certainly is an unusual case in that

10   you're looking back into history that occurred long before any

11   of you were involved.  In fact, probably before some of you

12   might have been born.  Surprisingly, that doesn't mean there

13   are not witnesses available to some of this, I suspect.  But

14   they are probably getting old.  There are still witnesses to

15   World War II.  But, again, not as many as there used to be.  So

16   there are people with memories, there are people that span that

17   time period.  But admittedly, it's hard to know what took place

18   at these mills that long ago.  And clearly a lot of it has to

19   do or will be determined by what the experts tell you I

20   suspect.

21         Having said all of that, the immediate issue before

22   the Court is the motion to compel the answers to the

23   interrogatories.  There's also a request for a 30(b)(6)

24   deposition which I do not understand to be disputed at this

25   point.

1          Now, at the risk of simplifying this too much, dummy
2    it down even more so than the brief that was handed up, the
3    defense seems to be, "Well, until the experts get done telling
4    us what's there and analyzing it for us, we're really not in a
5    position to know or be able to give answers to the
6    interrogatories, because they are going to go through these
7    records, find what they can, and using their expertise draw out
8    from these records the best answers possible."  And
9    parenthetically, I really did appreciate this exhibit.  I
10   wasn't criticizing it.
11         This motion is really not about the business records
12   or the business records rule.  Interestingly, the comment was
13   made, "Well, if they are not records of International Paper,
14   they shouldn't be citing the business records rule."  But I
15   guess the records do belong to them, and I'm not too concerned
16   with that argument.  But this is really not about the business
17   records.  The question is should they respond -- should
18   International Paper respond to the interrogatories?  It is
19   International Paper that has cited these records as the source
20   of their answer in saying "Here's your answer.  Look there."
21         I don't think it was NCR that was saying where do you
22   find in these records such and such information or produce such
23   and such documents, produce such and such business records.
24   NCR simply wants certain information produced, and
25   International Paper has said, "Well, we don't know it, but it's

1    probably in these records someplace.  We can't find it.  You

2    can find it as well as we can.  And until we talk to our

3    experts, we're not going to know the answers."

4           I think they have a strong point, but I think at the

5    end of the day NCR prevails, because at the end of the day they

6    are entitled to know the contentions of the opposing parties.

7    And they are entitled to know that before the close of

8    discovery.

9           Yes, the facts are fixed.  There is a world of --

10   universe of facts.  It's not changing.  But if it's 4 million

11   pages of facts, it is, as counsel said, the facts that matter

12   that are at issue here.  And not all 4 million pages are at

13   issue and not all 4 million pages matter.  Which of those pages

14   matter is more to the point.  And what are the respective

15   positions of the parties?  What is it that NCR has to defend

16   against?

17          That's why I asked is there some bright-line rule

18   that says NCR is responsible simply because they produced this

19   paper?  And I didn't hear anybody say that Judge Jonker had

20   ruled that simply because they had produced this paper they

21   are, therefore, responsible for everything.  That there was

22   some strict liability.

23          Now, the comment was made that at some point they may

24   have become aware that this paper had PCBs in it and may be

25   some liability attached -- to a greater extent either attached

1    or attached to it at a greater extent after that point.  But I

2    didn't hear anybody tell me there was strict liability even

3    after that point.  So I don't think it's enough to simply say

4    NCR made this paper, they produced PCBs, PCBs were found at the

5    site and, therefore, NCR is responsible for everything.  And if

6    that's not the case, then there's going to have to be some

7    apportionment.  And then we get into the contentions as to

8    which mills produced what amount of paper or what amount of

9    PCBs at what times and when.  And what amounts, pardon me.  And

10   so it seems to me NCR is entitled to know what the other

11   parties are going to be contending so they know what they have

12   to defend against.  And it seems to me they are entitled to

13   know that prior to the close of discovery.

14           And I think the parties are probably correct when

15   they say it wouldn't be particularly advantageous to get a

16   preliminary report from the experts.  I say that because that

17   would just generate more work by the experts.  That's one of

18   those things that you run it up the flagpole and see if anybody

19   salutes it.  But that doesn't mean you can't to talk to your

20   experts and get enough information to answer these

21   interrogatories.  And that's certainly a lot easier than

22   producing a preliminary expert report.

23           The point has been made that the experts are probably

24   fairly well along.  They were supposed to have had their

25   reports done sooner than November 19th.  The time has been

1    extended.  So I have to assume that given another 14 days they

2    ought to be able to be far enough along that they can assist to

3    the extent necessary in providing some answers to these

4    interrogatories so that NCR knows where it stands.  And to the

5    extent the other parties are in the same position, their

6    experts can do the same.

7              There's a continuing duty to supplement any

8    discovery, and so to the extent that the experts can provide

9    further information as their reports are finalized and the

10   parties want to adjust their contentions or their answers to

11   the interrogatories, I suppose they have the right to do that.

12   Nor does this require anybody to reveal who their experts are.

13   I'm glad Weyerhaeuser made that point, that the experts have

14   not been identified, that they are simply consulting experts at

15   this point.  You are not required to identify where these

16   answers come from or what you're drawing upon when you identify

17   the amount of CCPs recycled and so forth.  So that's another

18   reason why it's probably advantageous simply to answer the

19   question and not prepare a preliminary expert's report.

20             So I'm going to grant the motion, require that these

21   responses to interrogatories be supplemented within 14 days of

22   today's date.

23             *MR. PARKER:*  Judge, could I raise an issue?

24             *THE COURT:*  Of course.

25             *MR. PARKER:*  Back when the original discovery cutoff

1   was set in this case it was going to be last Friday, and as a

2   result -- and this is Parker -- I set my vacation for Thursday

3   of this week, and I come back on October 6th.  I'll be out of

4   the country with her.  That's two weeks.

5           Now, I know there's a couple other lawyers on my

6   team, but none of them have sat and listened to what you've had

7   to say about this.  So if I can get another week beyond that --

8           *THE COURT:*  You can share what I've said with the

9   gentleman that's up in Judge Jonker's courtroom right now.

10          *MR. PARKER:*  Yeah, but he's not -- in fairness, he's

11  been working on the case -- or been present, but he's not been

12  working on the case.  So if I can get one more week.  I mean,

13  I'm going to literally be unable to talk to these experts.  I'm

14  going to be in Spain.  So I won't be able to talk to --

15          *THE COURT:*  Where are you going to be in Spain?

16          *MR. PARKER:*  We're going to Sevilla, Toledo, and

17  Madrid.  And I'm really looking forward to it.  I would prefer

18  not to have to work on this while I'm there.

19          But if I could get that extra week, that would -- not

20  only would I be happy; Mrs. Parker would be happy.  In my many,

21  many years of marriage to her, I've come to learn that she's

22  never unhappy alone.  So I would appreciate an extra week, if I

23  could get that.

24          *THE COURT:*  If momma is unhappy, ain't nobody happy.

25          I'm not going to put you on the spot by asking if you

1  want to be nice or not.

2        MR. MARRIOTT:  I'm not going to make Mrs. Parker

3  unhappy, Your Honor.

4        THE COURT:  Thank you very much.

5        MR. PARKER:  Thank you.

6        THE COURT:  I think Ms. Parker is a very reasonable

7  person.  The one thing the Court may consider granting

8  extensions for is preplanned vacations.  I suspect it's

9  preplanned by now?

10        MR. PARKER:  Yes.

11        THE COURT:  All right.  One more week.

12        MR. PARKER:  Thank you.

13        THE COURT:  All right.  I was going to suggest you

14  might want to go to Barcelona before it becomes not a part of

15  Spain.

16        MR. SIBLEY:  He better act quick.

17        THE COURT:  You better act quickly.

18        All right.  Thank you.

19        MR. PARKER:  Thank you, Your Honor.

20        THE CLERK:  All rise.  Court is adjourned.

21      (Proceeding concluded at 4:12 p.m.)

22                    *   *   *   *   *

23

24

25

CERTIFICATE

 1

 2          I certify that the foregoing is a transcript from the

 3  Liberty Court Recording System digital recording of the

 4  proceedings in the above-entitled matter, transcribed to the

 5  best of my ability.

 6

 7  September 25, 2014

 8

 9                              /s/ Glenda Trexler
                                Glenda Trexler, CSR, RPR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25