1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3    _____

4    GEORGIA-PACIFIC CONSUMER
     PRODUCTS, LP; FORT JAMES
5    CORPORATION; and GEORGIA-PACIFIC,
     LLC,
6
                              Plaintiffs,
7                                            DOCKET NO. 1:11-cv-483
     vs.
8

9    NCR CORPORATION; INTERNATIONAL
     PAPER COMPANY; and WEYERHAEUSER
10   COMPANY,

11                            Defendants.

12   _____/

13       TRANSCRIPT OF NCR's MOTION TO COMPEL SUPPLEMENTAL

14      INTERROGATORY RESPONSES FROM PLAINTIFF GEORGIA-PACIFIC

15    BEFORE UNITED STATES MAGISTRATE JUDGE HUGH W. BRENNEMAN, JR.

16                     GRAND RAPIDS, MICHIGAN

17                        October 8, 2014

18

19   Court Reporter:        Glenda Trexler
                            Official Court Reporter
20                          United States District Court
                            685 Federal Building
21                          110 Michigan Street, N.W.
                            Grand Rapids, Michigan 49503
22

23   Proceedings reported by audio recording, transcript produced by

24   computer-aided transcription.

25

```
 1    A P P E A R A N C E S :

 2    FOR THE PLAINTIFF GEORGIA-PACIFIC:

 3         MR. MICHAEL RANDOLPH SHEBELSKIE
           HUNTON & WILLIAMS, LLP
 4         Riverfront Plaza, East Tower
           951 East Byrd Street
 5         Richmond, Virginia 23219
           Phone:  (804) 788-8200
 6         Email: mshebelskie@hunton.com

 7         MR. ADAM JOHN BRODY
           VARNUM, RIDDERING, SCHMIDT & HOWLETT, LLP
 8         333 Bridge Street, N.W.
           P.O. Box 352
 9         Grand Rapids, Michigan 49501-0352
           Phone:  (616) 336-6000
10         Email:  Ajbrody@varnumlaw.com

11    FOR THE DEFENDANT NCR CORPORATION:

12         MR. DAVID R. MARRIOTT
           CRAVATH, SWAINE & MOORE, LLP
13         Worldwide Plaza
           825 Eighth Avenue
14         New York, New York 10019
           Phone:  (212) 474-1430
15         Email: dmarriott@cravath.com

16         MR. GEOFFREY A. FIELDS
           DICKINSON WRIGHT, PLLC
17         200 Ottawa Avenue, N.W., Suite 900
           Grand Rapids, Michigan 49503
18         Phone:  (616) 458-1300
           Email:  Gfields@dickinsonwright.com

19

20

21

22

23

24

25
```

```
 1    FOR THE DEFENDANT INTERNATIONAL PAPER COMPANY:

 2         MR. JOHN D. PARKER
           BAKER HOSTETLER
 3         PNC Center
           1900 East 9th Street, Suite 3200
 4         Cleveland, Ohio 44114-3482
           Phone: (216) 861-7610
 5         Email: jparker@bakerlaw.com

 6         MR. DAVID W. CENTNER
           CLARK HILL, PLC
 7         200 Ottawa Avenue, N.W., Suite 500
           Grand Rapids, Michigan 49503
 8         Phone:  (616) 608-1100
           Email: dcentner@clarkhill.com

 9
      FOR THE DEFENDANT WEYERHAEUSER COMPANY:
10
           MR. JAMES C. BAIRD
11         PERKINS COIE, LLP
           1201 Third Avenue, Suite 4800
12         Seattle, Washington 98101
           Phone: (206) 359-6643
13         Email: jcbaird@perkinscoie.com

14         MR. DOUGLAS A. DOZEMAN
           WARNER, NORCROSS & JUDD, LLP
15         111 Lyon Street, N.W., Suite 900
           Grand Rapids, Michigan 49503-2487
16         Phone:  (616) 752-2000
           Email:  Ddozeman@wnj.com

17

18                                  Grand Rapids, Michigan

19                                  October 8, 2014

20                                  10:09 a.m.

21                  P R O C E E D I N G S

22         THE COURT:  It's getting a little scary when all your

23    faces begin to look so familiar.  I hope you're all enjoying

24    Art Prize.  You're here often enough you ought to be voters.

25    You get to vote, you know, if you register.  And perhaps some
```

1   of you were up this morning first thing looking at the eclipse

2   of the moon.  I was out trying to take pictures of that, but

3   I'm afraid they didn't come out too well.  But more likely you

4   were up getting ready for this motion this morning, reading

5   these briefs over one more time.  So we'll try to get this done

6   with dispatch.

7          Now, this is the latest Motion to Compel, docket

8   number 575 for the record, and this is NCR's motion to compel

9   supplemental interrogatory responses from plaintiff

10  Georgia-Pacific.

11         I've had the opportunity to go through both the

12  motion and the plaintiff's opposition to that motion.  We're

13  trying to keep this on a fast track for obvious reasons.  My

14  experience with discovery motions has generally been to first

15  of all give the parties an opportunity to state their

16  respective positions so we know where we're going, but

17  ultimately we have to look at each issue -- or each discovery

18  request to see what's been sought and then what's been supplied

19  in response to it.

20         This matter arises out of the previous motion we

21  heard last time we were all here regarding interrogatories by

22  NCR to International Paper.  The responses by

23  International Paper were considerably different than the

24  responses by Georgia-Pacific, and so it might call for a bit of

25  a different approach, I think.  And really in that instance the

1   overall positions of the parties were quite helpful because

2   there really were not that many responses by

3   International Paper to really look at.

4           Here that's not the case.  Georgia-Pacific has made a

5   number of specific responses.  So I think that now that I have

6   some feel for the overall positions of the parties, rather than

7   simply rehash those since I've had a chance to read the briefs,

8   it might be more productive to get right into the individual

9   interrogatories and look at what was requested and what was

10  produced in response to what was requested.  Because despite

11  what the parties might want or believe they have produced or

12  believe their responsibilities are, the Court can only look at

13  the request itself to see what's sought and then see what was

14  supplied in response to that.  Anything outside of that is

15  between the parties.  Any other understandings you have and so

16  forth is between the parties.  So the Court sits to enforce

17  what the federal rules require.

18          With that in mind, I would invite NCR to point out

19  the interrogatories that remain at issue, since I think you

20  said that you had tried to discuss each of these with

21  Georgia-Pacific and were unable to come to a resolution.  As is

22  your obligation under our local court rule, to talk about each

23  one of these, as you know.  And tell me which ones are at issue

24  and we'll go through them one by one.  And normally it helps

25  to, I find, have the other side respond on a one-by-one basis

1    so we don't get too confused.

2          Counsel.

3          MR. MARRIOTT:  Thank you, Your Honor.

4    R. David Marriott for NCR.  Mindful of the Court's more

5    specific direction that I, candidly, anticipated as a start to

6    this, I want to be as responsive as I can.  At the same time

7    we've prepared, because it seemed to be helpful last time, a

8    little handout.  If I may hand it out to Your Honor and to

9    counsel.

10          Your Honor, what I -- just so I set the stage -- and

11    I'll come to Your Honor's very specific question -- what I had

12    contemplated doing was making four points.  And the first

13    point -- and you can see those laid out at page 2 of this

14    handout -- and it was first simply that we believed Your Honor

15    did rule on this question.

16          Georgia-Pacific makes two arguments in its opposition

17    papers.  One is that they have fully complied with the

18    interrogatories as they were framed.  And so my second point

19    here was going to be, and still is going to be, that that in

20    fact is not true.  The second point they make and really their

21    final point is that NCR ought not be able to make these

22    interrogatory requests at all because we have not, they say,

23    asserted a divisibility defense in the case.

24          And my final point was going to be about

25    reconsideration being unwarranted.

1              Let me, if I may, mindful of Your Honor's remarks,

2      just skip if I could to the second section.  I'll circle back.

3      I want to be as responsive as I can to your very direct

4      question.  But if you turn, Your Honor, to page 6, I would like

5      to generally characterize their answers, and then I'm happy to

6      go interrogatory by interrogatory and discuss what it is about

7      them we believe to be the deficiency.  As I think Your Honor

8      will see, however, our belief is the deficiency runs

9      continually throughout most of them, so I think several

10     examples ought to be sufficient, but I'm certainly happy to go

11     through every single one of them.

12              The basic problem here, Your Honor, is that in its

13     responses to our interrogatories what Georgia-Pacific has

14     largely done is to assert an objection that it will not provide

15     information protected by the work product privilege or the

16     attorney-client privilege.  That's the same objection that was

17     asserted by International Paper.  Your Honor, dealt with that

18     objection I believe at the last hearing in ordering answers to

19     the interrogatories.  They assert that they ought not have to

20     respond to any of the interrogatories except as they relate to

21     mills owned by Georgia-Pacific.

22              Your Honor may recall that Georgia-Pacific owned or

23     operated four of the 14 mills, and they take the position in

24     their opposition papers and in their responses to objections

25     more particularly that they ought not have to respond to any

1    requests relating to any mill not owned by them.  Irrespective

2    of whether they will make contentions about what happened at

3    that mill during the trial of the case.

4          And then basically what they do in addition to that,

5    Your Honor, is point NCR to collections of documents produced

6    in the case.  They point us to documents produced in the prior

7    litigation, the so-called KRSG litigations of which there were

8    several.  They point us to documents produced during the first

9    phase of this case.  Indeed in response to several of the

10   interrogatories what they have done is to point us to the

11   entirety of the trial transcripts in the first part of the

12   case.

13         The answers of Georgia-Pacific to be absolutely clear

14   as it comes to referring specifically to documents are superior

15   to the answers of International Paper.  As Your Honor knows now

16   better than I, the International Paper responses basically

17   referred us to 4 million pages of paper without much additional

18   description.  The Georgia-Pacific answers are more specific.

19   But fundamentally at the end of the day we're left in precisely

20   the same position.  They have taken more time to write

21   narratives about what's in the documents, but they are at the

22   end of the day really simply referring us to documents that

23   touch the topic of the interrogatory rather than answer the

24   interrogatory.  Indeed many of the documents by their own

25   acknowledgment absolutely do not answer the questions that we

1    have put to them.  They say in their responses and objections

2    that the answers are, in their words, impossible, and then they

3    add to it that they will tell us more -- they will tell us what

4    their contentions are with respect to those topics at the trial

5    of the case.  And that is fundamentally the problem.  And I

6    believe that's what -- and I obviously don't speak for

7    Your Honor, but I believe having sat through the last hearing

8    that what fundamentally was behind the Court's order was a

9    concern that the parties weren't disclosing contentions of one

10   another during discovery at a time when follow-up discovery

11   could be taken.  And so while the Georgia-Pacific answers give

12   us more -- they give us some more particularity in pointing out

13   documents, which is not surprising since they have been in

14   litigation involving this river for about 20 years, we get a

15   little bit more particularity, but we don't get any answers

16   really to the questions.  We don't know what their contentions

17   are any more than we know what the contentions of

18   International Paper are.  So while I agree they are more crafty

19   in their responses to the interrogatories by being specific, by

20   providing text and narrative text, substantively it really

21   makes no difference.  They have been no more forthcoming with

22   respect to their contentions about the key issues than has

23   International Paper.

24           And perhaps we can take an example.  Why don't we

25   start at the beginning and start with interrogatory number 1.

1    And you'll see that this is described in part at page 6 of my

2    handout, Your Honor, but interrogatory number 1 asks that

3    Georgia-Pacific disclose the amount of carbonless copy paper

4    that was recycled at the mills of the site.

5            This is fundamentally a case about who ought to be

6    responsible for cleaning up the PCBs that were put into the

7    river as a result of recycling of carbonless copy paper.  So we

8    have said to them -- since they are 14 mills and responsibility

9    we believe will vary by mill, we have said, All right, so which

10   of the mills contributed carbonless copy paper and in what

11   amounts?  And their answer to that, Your Honor, is -- after a

12   series of objections -- let me just so I don't in any way

13   misstate it, let me just get the precise response.

14           *THE COURT:*  It would be helpful, I think, to point to

15   the interrogatory -- one of the exhibits so we have the actual

16   interrogatory in front of us as well as their answer, if you

17   could do that.

18           *MR. MARRIOTT:*  Sure.  So this is Exhibit B,

19   Your Honor, to NCR's motion.  Exhibit B includes at page 6

20   interrogatory number 1.

21           *THE COURT:*  Uh-huh.

22           *MR. MARRIOTT:*  So at page 6 you see interrogatory

23   number 1, and what we've asked is for them to please identify

24   by year and by mill the carbonless copy paper recycled at the

25   site.  How much did you recycle?  That's the way we figure out

how many, if any, PCBs went from that mill into the river and
what ought to be cleaned up.  And their response is -- if you
take their first paragraph, they say they object because it's
work product and it's privileged and it reveals, you know,
their questions, and they said they won't respond for that
reason.  And they basically make their objection in the second
paragraph that says "We ought not to have to respond to
anything except Georgia-Pacific, because we had four mills and
we don't want to answer as to any of the other mills."  That's
essentially what that says.

        And then you have the third paragraph where they say
that we're as able as they are to look at the documents and
tell them what the documents say.  And then they come to their
answer.  And what they say in their answer in the very first
line is "Due to the absence of comprehensive records
documenting types of wastepaper purchased by each mill, it's
impossible to state precisely how much CCP each mill at the
site recycled during any given year during the relevant
period."  So they begin by saying, "We can't answer the
question, not possible to answer the question," and then they
go on essentially over the course of the next sentence,
"Available evidence, nonetheless, establishes conclusively that
substantial quantities of CCP, considerable amounts are there."
        Their position basically is, Your Honor, that because
in phase 1 Judge Jonker found that there was some carbonless

1    copy paper that originated the judge found from NCR at the

2    site, somehow the inquiry is over.  The Court found there's

3    some considerable amount there, we get no -- we get no

4    opportunity to demonstrate that the carbonless copy paper at

5    any particular mill can't be attributed to us or we ought not

6    be responsible for it.  So they basically say the Court has

7    said there's considerable amounts.  That, of course, doesn't

8    answer the question about how much there was at any particular

9    mill and whether that carbonless copy paper could have resulted

10   in the discharge of PCBs.

11       *THE COURT:*  You said they owned four of the 14 mills.

12   Why would they necessarily know the answers to those questions

13   as to the other 10 mills?

14       *MR. MARRIOTT:*  Well, it's less that they know the

15   answer, Your Honor, and more that they are going to what the

16   trial in the case made contentions with respect to it.

17       *THE COURT:*  But that's not what you're asking in

18   interrogatory number 1.  You don't ask "What do you contend the

19   mills produced?"  You are asking a factual question that's not

20   a contention as such.  You're saying, "Please identify by year

21   and mill the amount of CCP recycled at the site, each of these

22   sites during the relevant period."

23       *MR. MARRIOTT:*  You're absolutely right.  That's the

24   language said.  And this is the subject we discussed to some

25   degree at the last hearing.  And what we -- what I said then

1    and I guess what I will repeat now is that that is exactly what

2    it says.  What we understand is that the parties, because these

3    events took place a long time ago, may not have people who have

4    personal knowledge of them.  What we want is them to tell us

5    what the actual facts are.  To the extent they don't actually

6    know the facts but are going to make arguments and contentions

7    about them at trial, we think the subset included within

8    knowledge is that piece of information.  What is it that you're

9    going to say about it?  So if you don't actually know, to the

10   extent you have somebody who was there, who lived it, where you

11   have records that demonstrate it, then tell us what it is that

12   happened at a particular mill.  Answer that question.

13           And then they prepared indeed extensive

14   questionnaires that to some degree answered these questions, so

15   to some extent they can tell us that.  But what we want to

16   know, Your Honor, about that is what are their contentions

17   about what happened at each mill.  We don't want to have to go

18   to a trial and find out that we're going to go there having

19   been told by them now that there's been considerable amount of

20   carbonless copy paper and that's all we need to know and then

21   go to trial and have them say, "Well, here's what happened at

22   each mill.  Here's the amount that was recycled of carbonless

23   copy paper, here's the amount of PCBs that went into the river.

24   This is where it came from."  And that from these answers is

25   exactly what we believe -- and we'll see that, I think, more as

1    we go on -- that they are going to do.  So, in other words, we

2    believe that the broader request to identify the amount of CCP

3    recycled includes in it the lesser request to at least tell us

4    what your contention is.  And I believe that's what Your Honor

5    ruled that ought to be the case with respect to International

6    Paper's responses last time.  Because International Paper is in

7    the same position.  They had responsibility for some disputed

8    number of mills, but no more than four I think it's fair to

9    say, and they might tell you it's as few as one mill.  So they

10   know what they know about the mill for which they had some

11   ownership and responsibility, and then they,

12   International Paper, like I believe all the parties, are going

13   to make arguments at trial, contentions about what it is

14   happened at the other mills.

15           So in an ordinary case where you lived and you had

16   all the facts it would be easier to provide the answer.  But I

17   would say there's even more need in this case for disclosure as

18   to parties' contentions because we don't have access to the

19   contemporaneous data in a way that you would in an ordinary

20   case.  Knowing the parties' contentions is that much more

21   important, because otherwise we go in almost completely blind.

22           *THE COURT:*  Why didn't you ask what their contentions

23   were?

24           *MR. MARRIOTT:*  Well, I guess, frankly, Your Honor, in

25   retrospect, if I had anticipated this question, we would have.

1  I believed then and I believe now that that includes the lesser

2  request of the contention.  And for what it's worth, in every

3  meet and confer I've had with any party in this case from many

4  months ago, we've made it perfectly clear that that's what at a

5  minimum we are seeking:  Their contentions as to what happened.

6  Because they are in some sense easy answers.  "Well, how could

7  I know?  It was 50 years ago."  And I understand that.  And if

8  they don't know that, they, I think, in fairness can say that.

9  What I think they can't in fairness do is to say they don't

10  know and then discover later in whatever fashion with their

11  experts or just as the lawyers sit around to figure out their

12  arguments or what their position about it is going to be.

13  Because then we truly get to a trial where we don't -- we've

14  had no meaningful opportunities, no opportunity really to take

15  discovery as to what it is their contentions are with respect

16  to what happened.

17          *THE COURT:*  So when does discovery close?

18          *MR. MARRIOTT:*  Discovery closes on the 15th of

19  November, Your Honor.  So this answer --

20          *THE COURT:*  You said November?

21          *MR. MARRIOTT:*  I did.  If I misspoke, someone will

22  correct me.  I think that's right.

23          So this answer in the second paragraph under the

24  answer goes on to point out some documents.  Environmental data

25  contained in numerous technical reports.  It basically says

1   there's data in reports.  That's true there's data in reports,

2   but that doesn't advance the ball in any meaningful respect.

3   Much of what's referred to in these interrogatories are the

4   very questionnaires that Georgia-Pacific stood in court now

5   several months ago and told you they shouldn't have to produce

6   to the parties in the case because they weren't going to help

7   them very much.  We already had the underlying documents.  So I

8   mean, they've given us data, they have pointed to documents,

9   but they don't tell us -- it's as if they just took several of

10  the documents and described several of the paragraphs.  That's

11  basically what this is.  It's a much more sophisticated --

12  "sophisticated" is the wrong word -- it's a more artful form of

13  a response to the same interrogatory that we propounded to

14  International Paper, but in the end it's the same thing.

15  International Paper just didn't take several paragraphs to say

16  what's in the documents.  But as you see when you look at these

17  descriptions of what's in the documents, it doesn't tell us how

18  much carbonless copy paper was they contend recycled at any one

19  of the mills.  It doesn't tell us how much was in fact recycled

20  and it doesn't tell us what they are going to contend was

21  recycled at each mill.  So we will end --

22          THE COURT:  How would they improve on what they have

23  here as far as you're concerned?

24          MR. MARRIOTT:  As far as I'm concerned what they

25  would do is they would prepare a little table that would list

1    the years, 1954 to 1971-ish, that's the period, and they would

2    say for each of the mills here is the amount, the quantity of

3    carbonless copy paper that we contend was recycled at that

4    mill.  And what they say in this --

5            THE COURT:  Well, as to their -- again, 10 of those

6    mills aren't even theirs, so why would they have any more

7    knowledge about those mills than you would have at this point?

8            MR. MARRIOTT:  Well, that's a fair question.  They

9    wouldn't have as to those mills necessarily any more knowledge

10   than I have except as to this critical thing:  Only they know

11   what their contentions are.  So as to what in fact happened, I

12   mean, I'm trying to figure out what in fact happened, and

13   everybody in the room is saying, "I don't know what happened

14   because it wasn't my mill."  So I'm left with no choice but to

15   say, "Okay, tell me what you contend happened or what you're

16   going to contend happened."

17           So I get that they are not in a position today to

18   tell me with absolute certainty what happened at some mill they

19   don't own, they didn't own 50 years ago.  What I believe they

20   are in a position to do -- and if they aren't in a position to

21   do it, I don't know how we can ever have a trial -- is to tell

22   me what it is they are going to say -- whether they have some

23   guy who has personal knowledge of it or not -- what they are

24   going to say actually happened at that mill at trial.  What is

25   your contention about what happened?  I understand someone

1  didn't live it.  I understand it was 50 years ago.  And I

2  understand you don't own it.  But what are you going to say

3  about it?  And if the answer to the question -- Your Honor, if

4  the answer to that question is "I don't know" or "I'm not going

5  to take any position on that," then I have no problem with it.

6  If they are going to say they don't know and they are going to

7  take no position on it, I think this motion -- they can say

8  that on the record and the motion has achieved its purpose and

9  we're done.  The problem is they are not, I don't believe, ever

10 going to say that.  Because their -- and you see that as you

11 continue on in the request.  And what they really say -- and

12 they say this quite clearly in their brief -- their brief

13 declares in unequivocal terms -- let me just refer you to

14 page 8 of our little handout here -- their brief declares in

15 unequivocal terms that they have fully responded to these

16 interrogatories.  I'm quoting:  "Georgia-Pacific fully answered

17 every interrogatory."  Next one:  "Georgia-Pacific's responses

18 exhaustively answer NCR's interrogatories."  Next one:  "There

19 is nothing to compel."  That is their position:  They couldn't

20 possibly have done a better job.

21         The problem with that is if that's true, if that's

22 really their position, then they have -- then I'm perfectly

23 happy to truly take them at their word if that's going to be

24 their word.  If that's true, if they fully and completely have

25 complied, if there's nothing to compel, if there's no way they

1    could have done better, then they are going to have nothing

2    further to say at trial than what they have said in these

3    interrogatories.  If that's the case, then I think we have --

4    they can say that and we can move on.  But I'm confident that's

5    not what they are doing, Your Honor.  What they are saying is

6    "I've told you all that I can tell you, all I'm going to tell

7    you, except my contentions, and I'll tell you those later."

8    And that's why I think they are in no different --

9            *THE COURT:*  It sounds like you've entered into a

10   discussion with them that has evolved from the time you asked

11   the interrogatories and you've said, "Look, I understand that

12   you don't -- can't give me all the facts because you didn't own

13   it or you didn't live it or you don't have people that lived it

14   and so forth, but I want to know what your contentions are."

15   So you've kind of evolved in your mind, and perhaps the minds

16   of everybody here, that these are contention interrogatories.

17   But they are not contention interrogatories.  They are fact

18   interrogatories.  Not to say you couldn't ask contention

19   interrogatories, but that's not what these are.  So they can

20   say with a straight face, I would imagine, "Yes, these -- we

21   have fully complied with these interrogatories because we have

22   told you everything that we can about the answers to these

23   interrogatories by telling you by year and mill the amount of

24   CCP broke recycled at this site.  Factually this is what we

25   know."

1         Now, it doesn't say "what we are going to contend,"

2    "what our arguments are going to be," but that's not what the

3    interrogatory asks.  On its face that's not what it asks.  It

4    may be what you all have evolved this to mean, but that's not

5    what it says.  So their answer when they say "We've answered

6    the interrogatory" may well be correct.

7         *MR. MARRIOTT:*  Well, I think, Your Honor, if you

8    look -- if you compare the question to the answers they

9    provide, I don't think -- I mean, I can't speak for what's in

10   their minds, but what I can do is compare the interrogatory

11   itself which says tell me what carbonless copy paper was

12   recycled in each of the years at the mills, and I can look at

13   their answer and the answer doesn't tell me as to any one of

14   the mills when the carbonless copy paper was recycled if at

15   all.  They simply don't provide that.  I mean, an answer to the

16   question in my mind would say, Here is the year, here is -- and

17   for this mill, mill A, that year we recycled -- that much

18   carbonless copy paper was recycled.  The next year this amount,

19   this amount.  A little table with a number.

20        *THE COURT:*  That brings me to the second question I

21   asked you.  First of all, how could they answer that as to the

22   10 mills they didn't own?  I think you told me that they were

23   probably in no greater position as to those facts than anybody

24   else, including yourself.  But now as to the four mills they

25   did own, perhaps you're on stronger ground here, what do you

 1    think they should have provided that they didn't provide?  And

 2    they are going to tell me, "Look, this is the information we

 3    have and we've supplied it, we've supplied it to NCR."  But --

 4            *MR. MARRIOTT:*  Well, even --

 5            *THE COURT:*  What do you think they should have --

 6    what more, for example?  Can you give me an example?  Because

 7    then I'll ask them to respond to your example.

 8            *MR. MARRIOTT:*  Sure.  May I just approach this,

 9    Your Honor?  I hate to.

10            *THE COURT:*  Sure.

11            *MR. MARRIOTT:*  So, again, if this were a

12    spreadsheet --

13            *THE COURT:*  Uh-huh.  Do you want a blackboard?

14            *MR. MARRIOTT:*  No, this should be fine.  1954, 1955,

15    1956, 1957.  I would list the years.  I would say

16    Georgia-Pacific Mill 1, 2, 3, and 4.  And the question is "How

17    much carbonless copy paper was recycled?"  I think the answer

18    is whatever it was, 500 pounds, 500 tons.  And it's a number

19    for each of those years.  They had four mills.  They owned and

20    operated the mills.  No one is in a better position to know

21    precisely what happened at those mills, one would think, than

22    they are.  And at a minimum they ought to be able to tell us

23    for their mills, the mills they owned and operated, how much

24    carbonless copy paper was recycled every year.  And you don't

25    see that in the interrogatory answer.  Instead what you see in

1   the interrogatory answer is, again, a general reference to

2   documents, and then you see this.  If you look at the bottom of

3   page 7, all right?  And I would urge a contrast between the

4   notion that they fully, completely responded, couldn't respond

5   more with this answer.  They say, "The amount of CCP that any

6   particular mill may have used would vary based on the

7   production processes in place at the mill, types of paper

8   products manufactured by the mill, the production output of the

9   mill, the degree to which the mill relied on ledger grades of

10  wastepaper, the sources of the mill's secondary fiber, the

11  degree to which the mill relied upon post-consumer mixed office

12  waste, the amount of CCP that may have been found in

13  post-consumer mixed office waste, the amount of non-CCP

14  wastepaper in any given bale that may have contained paper

15  manufactured using CCP.  Information potentially relevant to

16  these variables is available in documents produced in this

17  case."

18          So what they have done is basically said there's a

19  bunch of variables from which one could figure it out, good

20  luck.  Go figure it out.  So that not only doesn't tell us what

21  happened at their own mills, but it doesn't begin to even

22  reveal what their contentions are.  I mean, it's as if --

23  Your Honor, as if you had a personal injury case and you had an

24  interrogatory that said to -- the defendant to the plaintiff,

25  "Hey, tell me what your damages are and what it is that you

1    claim, what it is that you suffered," and the answer is, "Well,

2    my injuries are very complicated.  They depend on where on my

3    body the injuries occurred, how much pain I felt, how much I'm

4    out-of-pocket, how much it hurt my family and those I'm

5    associated with," without really telling you what it is we

6    really are arguing about in the case.  They have identified a

7    bunch of variables which are helpful but, frankly,

8    commonsensical and not in any way a surprise to anybody, and

9    they have said from that one can figure it out.

10             THE COURT:  What are the references here that

11   Georgia-Pacific makes to interrogatories 23 and 24 of its

12   answers to Weyerhaeuser and its requests for production of

13   documents?  Weyerhaeuser apparently submitted some

14   interrogatories and requests to produce.  Have you seen those

15   responses?

16             MR. MARRIOTT:  I have, Your Honor.

17             THE COURT:  Now, of course, the Court can order those

18   be incorporated or reproduced here.  If you have the answers to

19   those, that may not be necessary.  Are those of any help?  What

20   do those provide?

21             MR. MARRIOTT:  Well, so the short answer is they are

22   of some help, but they don't -- they likewise simply don't

23   answer the questions.  And there's certainly no need from our

24   perspective for the Court to simply order them to repeat the

25   text of those interrogatories here.  I take that incorporation

1   for reference for what it says.  I don't quibble with that

2   device.  My point is, when you follow the device and you look

3   at the answers, they don't -- there's no table in those answers

4   any more than there is a table here.  So there's some more

5   references to documents, there's some references to mills other

6   than Georgia-Pacific mills, but there's no answer to the

7   question that we have asked.

8        THE COURT:  All right.  Let me ask the other side to

9   respond.  Thank you.  And perhaps this would be a good place to

10  start as soon as you can, Counsel.

11       MR. SHEBELSKIE:  Thank you, Your Honor.  If it please

12  the Court, Mike Shebelskie for the plaintiffs.  These are fact

13  interrogatories, and Georgia-Pacific in response to each has

14  identified all the facts it knows in response to these specific

15  interrogatories.  Let me make that clear.

16       I think it helps set the context, Your Honor, because

17  there's been a lot of discussion about Georgia-Pacific

18  allegedly not disclosing its contentions, not being forthcoming

19  with evidence it needs to put on phase 2 of the case as an

20  element of its claim.

21       I want to make clear that's not the case here,

22  Your Honor.  In phase 1 of this trial Georgia-Pacific presented

23  evidence about substantial quantities of NCR's PCB-contaminated

24  paper that was recycled at the mills and discharged into the

25  river and other locations in the Superfund site here.  Based on

1    that evidence, Judge Jonker found that NCR is a responsible

2    party, and as a consequence of that, because of its arranger

3    liability, is jointly and severally liable for 100 percent of

4    the cleanup costs, case over on their liability.

5            In phase 2 we do not have to put on evidence of the

6    amount of NCR's contaminated paper that was recycled at each

7    mill, much less on a year-by-year basis.  For any purpose.  And

8    we're not going to put on that evidence.  That's not anything

9    we have to prove.

10           Now, NCR apparently is going to try to -- they say

11   they want to use that kind of data to minimize their liability.

12   Well, that's an affirmative defense.  That is something they

13   have to prove.  Now, as a matter of fact, they haven't even

14   pled that as an affirmative defense.

15           *THE COURT:*  Let me stop you right there.  Your

16   position is you do not have to -- do not intend to put on any

17   evidence on a mill-by-mill basis regarding the amount of

18   pollution?

19           *MR. SHEBELSKIE:*  We're not going to put on a

20   mill-by-mill year-by-year quantification of the type of table

21   that NCR's counsel is positing.  As we say in our interrogatory

22   answers, that's impossible.  We can't do it.  They can't do it.

23   No one can do it.  Because the documents and data don't exist.

24           Your Honor, nobody was measuring PCB discharges from

25   these mills during the relevant time period because nobody knew

1    PCBs -- none of the mills knew that PCBs were being discharged

2    because NCR covered up that information.  And the production

3    records that would show how much recycled paper -- how much

4    wastepaper the mills were buying from NCR and from various

5    brokers and other sources don't exist.  Perhaps not surprising

6    because we're talking about purchases that go back into the

7    '50s that those documents don't exist.  And so no party can

8    answer those questions.

9            Now, as we've shown at phase 1, and what continues to

10   be our contention and will be our consistent contention, is

11   that various of these mills recycled substantial quantities of

12   NCR's PCB-contaminated paper during the relevant time period.

13   We know that's true because there is a scattershot of documents

14   and anecdotal testimony from people saying, "Yeah, I remember

15   we bought some and we recycled some."  And, of course, there's

16   the evidence of the PCBs at the site.  Various mills have in

17   their landfills substantial quantities of PCBs.  And there are,

18   of course, substantial quantities of PCBs in the river.  We

19   know those PCBs got in those locations because of recycling of

20   NCR's PCB-contaminated papers.  Nobody can say, though -- we

21   know a lot was done.  We know the general time period it was

22   done.  But no one can provide the type of specification that

23   they want, as they ask in these interrogatories on a

24   mill-by-mill year-by-year basis of you purchased or recycled X

25   tons of NCR's paper, as a result of that you produced X tons of

1   PCBs, and what portion of that went to the river, how many tons

2   went to the landfill on a year-by-year basis?  Impossible to

3   do.  And we're not going to be putting that on at trial in

4   phase 2, and we don't need to put that on trial for phase 2.

5   If anything, it is their burden to prove it.  And having not

6   even pled it, they can't.  And really what we have done --

7       *THE COURT:*  What is going to be your contention if

8   you're not going to do that?  Are you going to sit on -- rest

9   on the merits of phase 1 and say, "Look, they have polluted the

10  river.  They are the arrangers.  They are 100 percent

11  responsible, and looking over the overall damages" --

12      *MR. SHEBELSKIE:*  Our initial position is NCR is

13  100 percent liable for the cleanup costs because basically

14  every molecule of the PCBs that were required to be cleaned up

15  in this river come from their client.  There's no dispute about

16  that.  We don't have to prove anything further.

17          Now, continuing, if there's going to be any

18  allocation amongst the mills, any portion of liability and then

19  any inter-mill allocation, our positions will be what are set

20  forth in these interrogatory answers.  That various of the

21  mills each recycled substantial quantities of this paper and

22  each discharged substantial quantities of PCBs sufficient in

23  and of themselves to justify the cleanup.  There were a couple

24  of mills that didn't recycle NCR paper, and we identified those

25  in our interrogatory answers.  When you look at the complete

```
 1    interrogatory answers that include those ones from
 2    Weyerhaeuser.  Because Your Honor asked about those, and those
 3    interrogatories were directed specifically to the four
 4    Georgia-Pacific mills, and we provided the information on
 5    those.  Incidentally, Weyerhaeuser has not moved to compel
 6    answers on those.  They understand what the facts are and what
 7    our positions are on those facts.  So we had been forthcoming
 8    in setting forth all of our facts.
 9             And, Your Honor, I want to expand further, because
10    not only do our answers incorporate the answers to
11    Weyerhaeuser's interrogatories, we incorporate our proposed
12    findings of fact from phase 1.  And that obviously is already
13    in the docket there, so we didn't reproduce it because it's
14    such a voluminous document.  But we set forth there all the
15    facts and all the evidence that we had about the recycling of
16    CCP, NCR's contaminated paper, at our mills.  There are no
17    further facts that we can disclose.  All of our documents have
18    been produced.  What we know about our mills has been
19    disclosed.  And we say our mills.  I do also want a caveat that
20    Georgia-Pacific didn't operate all of these mills during the
21    relevant time period.  There were some that Georgia-Pacific
22    acquired after the fact.  So we don't have firsthand knowledge
23    of the -- the current Georgia-Pacific doesn't have firsthand
24    knowledge of even some of these four mills.  So our facts have
25    been disclosed.
```

1          Mr. Marriott says he would like to have a table to be

2    sort of the cherry on top of the cake here of a mill-by-mill

3    year-by-year basis.  We can't do it, and we won't do it at

4    trial.

5          THE COURT:  As far as if there's a mill-by-mill

6    allocation, how do you do that at that point?

7          MR. SHEBELSKIE:  We would say -- well, for example,

8    let's say that the mill for which International Paper is

9    responsible on Portage Creek, we know that substantial

10   quantities of NCR's contaminated paper were recycled there.  We

11   know that because, again, we have a scattershot of documents

12   and testimony about people saying recycling took place there

13   and they bought some and recycled some.  All of that has been

14   disclosed.

15         We also know from the variety of studies and analyses

16   that have been done that there are substantial quantities of

17   PCBs in their landfill, so we know they recycled a lot during a

18   couple-decade period.  And just by the nature of the way these

19   things work, a substantial amount would have gotten into the

20   river.  But how much -- can we say it was X versus Y, the kind

21   of quantification that NCR is asking for here?  No.  But what

22   we can say is that it is a substantial volume that in and of

23   itself would justify the cleanup as much as the Georgia-Pacific

24   main mill released and would justify the cleanup.  So the two

25   mills in that respect are comparable, and there's no meaningful

1    way to distinguish between those mills.  So if there's going to

2    be a pro rata allocation, at least in the part of the river

3    where it's conjoined, the two are equal.  That will be our

4    position at trial in phase 2 on those issues.  Consistent with

5    the facts.

6          And really, Your Honor, I think what NCR is really

7    concerned about is whether at trial somehow we come forward

8    with new facts, new information not disclosed in discovery,

9    whether in our initial disclosures or interrogatory answers or

10   whatever.  That's addressed under Rule 37.  That's not going to

11   happen.  But that's really what the rules contemplate.  Which

12   is if a party has not made an initial disclosure that was

13   required to be disclosed or hasn't supplemented its

14   interrogatory answers as discovery takes place, the party who

15   feels that they are prejudiced by that moves to exclude the

16   evidence under Rule 37 and the trial court at that point

17   considers whether there's substantial cause for the

18   late-disclosed fact and whether prejudice has occurred.  That's

19   really -- they are sort of anticipating that sort of thing

20   happening and trying to prejudge that.  But what they are

21   asking for now is not what anybody can provide, Your Honor.

22          THE COURT:  All right.

23          MR. SHEBELSKIE:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MR. PARKER:  Judge, could I be heard?

1          *THE COURT:*  Certainly.

2          *MR. PARKER:*  Thank you.  Judge, I just want to try to

3   make two points and make sure I understand in the context of

4   what has been discussed today --

5          *THE COURT:*  Would you put your appearance on the

6   record so that -- we're keeping an oral record here.

7          *MR. PARKER:*  I apologize.  John Parker from

8   Baker & Hostetler on behalf of International Paper.

9          *THE COURT:*  I know who you are.

10          *MR. PARKER:*  I was going to say, Judge, unfortunately

11   I'm becoming one of your better customers, and I apologize for

12   that.  And I want to make two points today and just try to get

13   a little bit understanding of your prior motion.

14          I will also add that I was under strict instructions

15   from Mrs. Parker to tell you thank you for giving me that week

16   extension for my vacation.

17          The first point I want to make --

18          *THE COURT:*  Tell her she's welcome.

19          *MR. PARKER:*  I will duly report that.

20          Really the only difference between the answers that

21   Georgia-Pacific has given in this case and those that

22   International Paper has given in this case as to the things

23   that Mr. Marriott is interested on behalf of NCR in finding

24   out, his chart for example, is that their answers are longer

25   than ours.  They point to some more documents, admittedly, than

1    we do.  Which you would expect, because as Mr. Shebelskie just

2    pointed out, they actually operated mills -- not all four of

3    their mills but some of their mills -- during the relevant

4    period of time.

5           To be clear, International Paper never operated a

6    mill at any point in time on the Kalamazoo River.  Not for one

7    single day.  Now, we acquired some companies that acquired some

8    companies that at one point owned a mill that they sold, but we

9    never operated a mill.  We have as much knowledge of these

10   mills as NCR does.  So, of course, our answers are shorter,

11   because we don't have as much record -- we don't have any

12   records, and we don't have the knowledge.

13          But in terms of the specific questions that NCR wants

14   with how much PCBs by year or by day, all those sorts of

15   things, our answers are similar.  And I think that is the case

16   because the only way you can get any kind of more definition

17   than pointing to the documents is if you try to take the

18   knowledge that our experts have in this case and somehow give

19   that to NCR.  This is what I understood at the end of the day

20   the last time we were here you're essentially ordering me to

21   do.  And I don't think -- I think that's the only way we can

22   give more information or, frankly, Georgia-Pacific could give

23   more information of the kind that Mr. Marriott wants.

24          Now, if you think that Georgia-Pacific's answer that

25   they have given with the more information than we gave is

1  sufficient, I can incorporate those answers into mine and

2  comply then I think with your order.  In other words, if you

3  rule today that what they have done is sufficient, I can go

4  back and point to all those same documents, incorporate all the

5  things that they have done and comply with your order.  And if

6  that's what you are telling me I need to do, I will do it.

7  Because that is exactly what Georgia-Pacific has done.

8          In fact, if you look at page 4 of their brief, they

9  even point out that when NCR asked to identify by year and mill

10  the amount of CCP recycled at the site, they say they replied

11  since there's a lack of documentary evidence which precludes

12  precise statements about how much CCP each mill at the site

13  recycled for a given year, yet referred NCR to

14  Georgia-Pacific's proposed findings of fact from phase 1 and

15  voluminous records created by its contractors as part of the

16  site cleanup process, referred NCR to documents cited in

17  several of the previous mill owners' mediation questionnaire

18  responses, each of which cited hundreds of references

19  discussing each aspect of a mill's wastepaper usage.  Even

20  provided a spreadsheet translating the Bates number references

21  in the mediation questionnaire responses to the Bates numbers

22  used in this litigation.

23          Additionally, Georgia-Pacific incorporated its

24  responses to Weyerhaeuser's interrogatories on the types and

25  sources of wastepaper furnish used at Georgia-Pacific's mill at

1    the site which identify numerous documents and depositions and

2    provided specific descriptions for each mill.  We can do that,

3    Judge.  If that's what you were ordering me to do the first

4    time around, we can do that.  But what I understood to have

5    happened and what I understand Mr. Marriott to be asking for

6    today is that we somehow confer with our experts, get their

7    preliminary ideas of what each mill might have done in this

8    regard, assuming they can -- and, frankly, we don't even know

9    that they can do that yet because they are still working on

10   this -- and then that knowledge becomes International Paper's

11   knowledge or Georgia-Pacific's knowledge, if that's what you

12   order them to do, and they then disclose that we as parties,

13   because now we've got the knowledge of our experts, disclose

14   that over to NCR.  And with all due respect, we think that

15   would be -- if that is what you were in fact suggesting we do,

16   we would think that would be inappropriate, and I would suggest

17   you should not do that to Georgia-Pacific today either.

18   Requiring us to confer with our experts and -- which would

19   somehow transmogrify their otherwise privileged opinions to

20   facts that we then disclose to NCR would really in my mind

21   violate the rule, if that's what we're being ordered to do,

22   that says that information remains privileged.

23           If my client were sued for making a defective part

24   and I went out and hired a consulting expert and he said -- he

25   looked at the part and he said, "Boy, you've got a problem,

```
 1   Parker, that's a defective product," and he tells me and my
 2   client that, my client, that's privileged.  And even though my
 3   client has received that information, he's under no obligation
 4   to disclose that in discovery or otherwise.  So the notion that
 5   I would have to go try to glean this information from our
 6   experts and then somehow disclose that -- again, if that is
 7   what I was ordered to do, and I'm not sure I was -- I think
 8   would be inappropriate.  And if that's what NCR is asking for
 9   again today, I think that would be inappropriate.
10             Also, if that's what I'm being asked to do, I think
11   it's unfair.  It would be equally unfair to Georgia-Pacific.
12   Because it would change the timing of the scheduling order.  In
13   the scheduling order the judge has not only given a date for
14   when expert opinions will be disclosed, he's also said it's
15   going to be done simultaneously.  If --
16             THE COURT:  What was going to be disclosed?
17             MR. PARKER:  The expert opinions.
18             THE COURT:  Okay.
19             MR. PARKER:  So if I'm required to go glean from my
20   experts what they may say and disclose it now simply because I
21   got served with interrogatories by NCR or by the way they chose
22   to move against me first on a motion that appears to be
23   identical that brings us here again today, I'm going to have to
24   disclose those opinions before anybody else, that's a horrible
25   prejudice to my client and puts me at a big disadvantage in the
```

1   fact that I would have to go out and get those opinions.

2         Now, if where Your Honor is headed with this is that

3   it would be okay if International Paper had done the more

4   tedious discussion of the records that exist in this case -- by

5   the way, none of which are ours, none of which relate to mills

6   we operated -- we can do that.  We can incorporate those by

7   reference.  I just want to be sure, and I think I can glean

8   this from the context of what you ordered today, that I'm not

9   being asked to go talk to my experts, get their opinions, and

10  somehow relate those to NCR.  Because I think that would be --

11  I think that would violate the rule.  I also think it would be

12  grossly unfair because it would require me to do it, disclose

13  expert opinions, tentative as though they may be, before

14  everybody else would have to do it.  Which is obviously not

15  what the scheduling order contemplates.  So I'm just looking

16  for a little direction from the Court in terms of the ultimate

17  ruling that you would give today as to what I have to do.

18        *THE COURT:*  I think what you're looking for, Counsel,

19  and you've already accomplished it, is to reargue the motion we

20  were here before on.

21        *MR. PARKER:*  I would ever do that, Judge?

22        *THE COURT:*  Would you ever?  Not the third time.  I

23  suspect you've already done it twice.  I'm going to give the

24  other side two minutes to respond to this since you have.  Go

25  ahead.

1              *MR. PARKER:*  Thank you, Judge.

2              *MR. MARRIOTT:*  Thank you, Your Honor.  Well, look, I

3    think Your Honor hit the nail right on the head.  What you just

4    heard, at least by counsel for International Paper, is a

5    complete reargument of what occurred last time.  There's

6    nothing said that wasn't said before.

7              Your Honor then ruled last time as follows -- you

8    know what Your Honor ruled.  But what you said quite clearly

9    was this wasn't about just pointing to documents.  It wasn't a

10   Rule 33(d) issue.  We didn't raise Rule 33(d).  They raised

11   Rule 33(d).  And what Your Honor said is that we were entitled

12   to have their contentions.  It seems to me that NCR is entitled

13   to know what the other parties are going to be contending so

14   they know what they have to defend against.  It seems to me

15   they are entitled to know that prior to the close of discovery.

16   And what counsel has just done is after having already appealed

17   Your Honor's decision to Judge Jonker, basically rearguing it

18   now, previewing what he's apparently going to say in front of

19   Judge Jonker again.  We respectfully submit there's no basis

20   for -- especially where there never was even a motion for

21   reconsideration -- reconsideration of that order against which

22   we've all governed ourselves over the last several weeks.  Nor,

23   frankly, Your Honor, I believe is there in principle

24   distinction between what Georgia-Pacific did and what

25   International Paper did.  The difference, however, I think the

1    very important difference, which I think I just heard from

2    counsel for Georgia-Pacific, is that they don't have any

3    contentions of the kinds which we're seeking.  Despite what

4    their papers say.  Your Honor, in their papers, in their brief

5    in opposition to the present motion, after telling us it was

6    impossible to answer the questions, they say at page 6,

7    "Experts will address these topics soon."  That, of course, is

8    our enormous concern.  But what I just heard --

9         THE COURT:  What was that word, please?

10         MR. MARRIOTT:  "Experts will address these topics

11    soon."

12         THE COURT:  And then you said?

13         MR. MARRIOTT:  Well, I guess I'm not entirely sure

14    what I said, Your Honor.

15         THE COURT:  Tell me about your concern.

16         MR. MARRIOTT:  Yeah, our concern is that they are

17    going to do with their expert reports, reveal the contentions

18    that they are otherwise unwilling to reveal.  But it sounds

19    like that's not the case.  What I heard counsel to say is they

20    do not intend during phase 2 of the case to present expert or

21    any other evidence that speaks to the amount of carbonless copy

22    paper recycled at any given mill in any given year.  What they

23    intend, it sounds like, instead to say is that they already won

24    the case in phase 1, it's over, and NCR ought to be held

25    responsible based on the record that was already presented.

1              Now, as you might imagine, I respectfully disagree

2      with that version of the world, but they are entitled, I

3      suppose, to make that argument to Judge Jonker.  What we

4      believe they are not entitled to do is now having given us no

5      real answer to our questions in terms of what their contentions

6      are, having now said they aren't going to submit evidence

7      expert or otherwise to answer those questions at trial, then

8      later do it.  I think I perhaps have my record, Your Honor.

9      Counsel has said what counsel said.  I understand they are not

10     going to submit evidence in this regard.  My concern apparently

11     was misplaced.  I think we have the contentions.  In other

12     words, there won't be any contentions on these points.  And

13     that seems fundamentally to differentiate from

14     International Paper which clearly has such contentions.

15              *THE COURT:*  Thank you.

16              Counsel, do you want to respond to his last comment?

17     Is that in fact your contention or lack of contention?

18              *MR. SHEBELSKIE:*  We will respond to whatever

19     contention that they make.  They haven't disclosed what their

20     divisibility argument is.

21              *THE COURT:*  Well, assuming they don't make any

22     contentions.

23              *MR. SHEBELSKIE:*  If they don't make any contention on

24     this topic, we're not going to put on mill-by-mill year-by-year

25     specification of the amounts of paper recycled at each mill and

1  the amount of PCBs discharged by each mill.  Our position is,

2  as I stated as it was in phase 1 and as I stated here today,

3  that various of the recycling mills recycled during the

4  20-or-so-year period a substantial quantity of PCBs-containing

5  paper and discharged substantial quantities each alone

6  justifying the cleanup.  So they are all equal in that respect.

7  That's our position.

8          *THE COURT:*  Thank you.

9          *MR. MARRIOTT:*  It sounds to me, Your Honor -- let's

10  parse that answer a little bit.  All right.  So counsel says --

11  counsel says that they are not going to present anything.  That

12  gives me great assurance.  But if what he's saying is the

13  moment that an NCR expert or any other party's expert --

14  because the mills are going to be duking it out, so to speak,

15  among themselves -- but the moment Mr. Parker's expert says for

16  a given mill which is the amount of carbonless copy paper we

17  project was recycled at that mill, in order to differentiate

18  IP's mills from GP's mills or other mills from one another,

19  then he is going to open his mouth by way of expert and they

20  are going to have all sorts of things to say about the issue.

21  If I misheard, then I'm sure they will tell me.  But it sounds

22  like they are saying, "We're not taking any position until we

23  take a position."  We're not -- so they do, it seems, have a

24  position.  They are just going to wait and do it.  An even

25  worse stage, right?  So we won't get it with the initial expert

reports when they are due on November 17th.  What it sounds
like he's saying is, "You won't hear from me then, but I'm
going to wait and see what you all say and then I'm going to
come roaring in and then you're going to hear what I have to
say about every one of these mills because I'm going to say
your guys are all dead wrong and the only way I can prove your
guys are dead wrong is by having my guys tell you what the real
answer ought to be."  If he's not saying that, then perhaps we
have no issue.  If he is saying that, then I think we're right
back to where we started.

          *MR. SHEBELSKIE:*  Let me clarify, if I could.  It
seems like one of those arguments I have at home:  Every time I
open my mouth, it gets worse.  But what I meant by that latter
statement, just to set NCR's counsel's mind at ease, is that if
they come forward with an expert who says, "Oh, we know for
mill A that in year 1 they recycled X tons and in year 2 it was
Y tons and year 3 Z tons," certainly we're going to attack
that.  We're going to say that's not a reliable calculation.
You're relying on insufficient data.  You're relying on faulty
assumptions.  Nobody can make that kind of specification.
That's what I meant by we would attack the specifics of their
contentions.

          *THE COURT:*  Because you're going to say no one can
make those estimates?

          *MR. SHEBELSKIE:*  Exactly.

1          *THE COURT:*  Okay.

2          *MR. MARRIOTT:*  And so, Your Honor, if he's not saying

3    "We have an alternative view to offer," then I think I have the

4    on-the-record acknowledgment that they have no position on

5    these things that I need except that one can't possibly know

6    the answer.

7          *THE COURT:*  I think you heard what he said.

8          *MR. MARRIOTT:*  I did.  Thank you.

9          *THE COURT:*  All right.  Back to Mr. Parker.  I

10   appreciate Mr. Parker's attempt to reargue this motion,

11   particularly when it's already on appeal to Judge Jonker.

12   Never lose an opportunity.

13         *MR. PARKER:*  Thank you, Judge.  Judge, could I just

14   add one thing too?

15         *THE COURT:*  No.  You've already gotten the argument a

16   second time.  And I'm sorry, I don't mean to be rude to you.

17         *MR. PARKER:*  No, you're not.  You've been

18   accommodating.  I appreciate that.

19         *THE COURT:*  And I was about to amend my order

20   regarding Rule 30(b)(6) as far as having an attorney -- I was

21   referring to litigation attorneys -- and yet be your 30(b)(6)

22   witness.  But I suppose you're not going to have your

23   litigation attorney be a 30(b)(6) witness just to eliminate an

24   unnecessary problem.

25         *MR. PARKER:*  Correct.

1            *THE COURT:*  Actually, a true 30(b)(6) witness if they
2    have a privilege can raise it, but I don't want to create
3    artificial problems.  That was what I was referring to in that
4    order.  And you're free to appeal that as you did.  But that's
5    what I was referring to.
6            I don't want to reargue that motion.  IP was
7    apparently not a no operator.  And while I came in here loath
8    to be in a position where I might give what would appear to be
9    inconsistent rulings, we have inconsistent positions here
10   because the answers are different, the parties are in somewhat
11   different positions.  The decision regarding
12   International Paper was given within the context of that
13   hearing.  The arguments made at that time.  And the Court was
14   persuaded that contention interrogatories were a subset or a
15   part of or perhaps an adequate substitute for interrogatory
16   answers that were otherwise not forthcoming.  They were a
17   lesser answer.  And I think there was the talk about 4 million
18   pages of documents that had been proffered and that was not an
19   acceptable answer.  But rather than attempt to require a
20   tremendous amount of factual information, what Georgia-Pacific
21   was really after were the contentions of the parties, and so I
22   was persuaded that if International Paper came forward with its
23   contentions so that Georgia-Pacific knew what those were, that
24   would be an adequate way of resolving that and that was the
25   basis of my ruling.

1          I'm not sure I directly said how those contentions

2    were to be arrived at, but nevertheless that ruling stands.

3    Unless, of course, Judge Jonker sees otherwise.  And I don't

4    want to revisit that at this time.  I'm always happy to hear

5    Mr. Parker's arguments.  They are articulate and erudite, and I

6    enjoy Mr. Parker's presence in court.

7          *MR. PARKER:*  Thank you.

8          *THE COURT:*  I'm glad his wife allowed him to come

9    back.  And I think we're all better off for hearing the

10   arguments.  But nevertheless, I'm not going to revisit that

11   ruling.  The ruling stands.

12         And this situation is a little bit different because

13   here we have a number of factual answers given, and I think

14   that during the course of our exchange here a lot of what

15   Georgia-Pacific is concerned about may have been alleviated by

16   the representations of opposing counsel as to what its

17   contention really is.

18         So I don't know at this point, Counsel, do you want

19   to pursue your argument?

20         *MR. MARRIOTT:*  Well, Your Honor, let me just -- I

21   think what I want -- what I believe is the case, Your Honor, is

22   that counsel's position -- we talked really principally about

23   interrogatory number 1, and I guess I infer from the discussion

24   that their position is really the same with respect to the

25   other interrogatories.  And if that's true and what they are

1    saying is we're not going to offer evidence that isn't in those

2    interrogatories at trial, then I have no problem.

3              THE COURT:  Counsel?

4              MR. SHEBELSKIE:  That's the case, Your Honor.

5              MR. MARRIOTT:  Fine.

6              THE COURT:  All right.

7              MR. MARRIOTT:  Apparently I may have missed

8    something, Your Honor.  Give me just one second.

9              THE COURT:  Certainly.

10             MR. MARRIOTT:  But counsel wisely points out we would

11   nevertheless like a ruling so that we have the benefit of

12   judicial estoppel in the event that someone decides on the

13   other side that they want to rethink the positions taken today.

14             THE COURT:  Well, Mr. Fields' counsel is always well

15   taken.  I'm going to deny the motion at this point.  I believe

16   that the -- as I said, the Court sits to rule on the

17   interrogatories as they are written.  And these are factual

18   requests, and I believe factual answers have been given.  They

19   have incorporated other references to other documents, but

20   there's no objection as to those devices.  I think that's very

21   professional by Georgia-Pacific not to object to those because

22   of the nature and the extent of the other documents that are

23   being incorporated.  So the position taken by the responding

24   party is that they can't answer these questions further than

25   what they have provided and they are not going to try to come

1   up with answers that they think are impossible and they are

2   going to point that out if anybody else tries to come up with

3   more specific answers.  Their position is you can't figure this

4   stuff out.  It's just simply impossible at this stage.  So I

5   think these answers are probably pretty good attempts to answer

6   these interrogatories as they are asked.

7           As I pointed out, these are not strictly speaking

8   contention interrogatories.  Not to say those could not be

9   asked.  Contention interrogatories, of course, are perfectly

10  proper.  These simply are not such.  And there's more time for

11  those if the parties really wanted to I suppose ask those.  So

12  I'm going to deny the motion.  I'm not going to get to the

13  issue of whether or not these are relevant.  That's another

14  objection to these.  Because the issue of divisibility and so

15  forth, I don't think I need to rule on that.  And we'll save

16  that for another day, and that's something else Judge Jonker

17  can rule upon at an appropriate time.  So this ruling does not

18  reach that issue.  All right.  I think that's it.

19          *MR. SHEBELSKIE:*  Your Honor, may I raise a

20  housekeeping matter?

21          *THE COURT:*  Certainly.

22          *MR. SHEBELSKIE:*  Thank you.  Georgia-Pacific filed

23  this morning a Motion to Compel against NCR and

24  International Paper.  It's a discrete issue.  It concerns a

25  production of documents that the two parties received from the

```
 1   Missouri -- Missouri -- the Michigan Department of
 2   Environmental Quality.  It is -- I hesitate to say this in a
 3   case with so many lawyers, it really is a five-, 10-minute
 4   argument, and we are asking for expedited consideration of that
 5   because the deposition of the Missouri Department of
 6   Environmental Quality is scheduled for October 29th, and so we
 7   certainly would like -- we've requested, they won't produce the
 8   documents, and that's why we have the Motion to Compel.  We
 9   would like to have the documents obviously in advance of the
10   deposition in order to use them at the deposition so we don't
11   have to postpone it for that reason.  So I was inquiring
12   whether it would be possible to even arrange a telephonic
13   conference on that so all the parties -- after you read the
14   motion if you think it's appropriate to do so by that means,
15   whether we could arrange something if not later this week, next
16   week on that.  I don't know if the Court does that as a matter
17   of practice or not.
18           THE COURT:  As a matter of practice never.
19           MR. SHEBELSKIE:  Oh.
20           THE COURT:  So just to put your mind at rest on that.
21   I detest motions over the telephone for a variety of reasons.
22   One of which is it's very, very hard to accomplish that without
23   people talking over each other or my not being able to
24   interrupt parties because they keep right on talking and they
25   can't hear me.  Apparently our electronics don't allow for
```

1    that.  That's not to say we wouldn't -- I shouldn't say

2    never -- but very rarely.  So number 1.

3            Number 2, I don't -- you said that was just filed

4    today?

5            MR. SHEBELSKIE:  Yes, sir.

6            THE COURT:  It seems like I got something yesterday

7    or the day before.  Another black binder came in.  Is there

8    another motion pending out there besides that?

9            MR. SHEBELSKIE:  Oh, yes, there is.  Georgia-Pacific

10   has filed another Motion to Compel, and that's scheduled for

11   hearing the 29th or 30th of October.

12           THE COURT:  All right.  Maybe that's the one I'm

13   thinking of.  So you've filed another one yet today?

14           MR. SHEBELSKIE:  Yes, sir.

15           THE COURT:  All right.

16           MR. MARRIOTT:  Your Honor, I haven't read what was

17   filed today, but I'm confident it wouldn't yet have been

18   referred to Your Honor, so it may be for that reason.

19           THE COURT:  First of all, it has to be referred to

20   me.  That would be number 1.  Today is my criminal duty week

21   which is already pretty well booked up.  Even if I were to get

22   a response in this week -- and I will be in New York next week

23   at the direction of my wife, so I know I will not be -- that's

24   reason number 2 we're not going to do this next week I'm

25   afraid.

1               When is your hearing -- or your deposition?

2          MR. SHEBELSKIE:  It is noticed for October 29th.  I

3     don't -- that's all I know.  I mean, obviously there's a

4     possibility that gets postponed by -- at the request of the

5     deponent, but that's all I know right now.

6          THE COURT:  Well, that leaves us -- did you say the

7     29th?

8          MR. SHEBELSKIE:  Yes, sir.

9          THE COURT:  That gives us two weeks after next --

10    let's see, no, that gives us one week after next week.  That

11    gives us the week of the 21st.  It seems like we might be able

12    to schedule something that week.

13         MR. SHEBELSKIE:  That would be much appreciated,

14    Your Honor.

15         THE COURT:  Let me look at the motion.  Is it one we

16    have to have an oral argument on?

17         MR. SHEBELSKIE:  I think we could elect to bypass

18    that, yes, Your Honor.

19         THE COURT:  You don't know what it is yet?

20         MR. MARRIOTT:  I haven't read it, but I'm certainly

21    open to that.

22         THE COURT:  All right.  Well, I'll look at it, and

23    the parties can give me their opinion as to whether or not they

24    want to have oral argument.  I won't rule out a possibility of

25    a telephone argument.  But if all these parties want to be

1   involved, that makes it even more difficult.  So -- and the

2   other argument was set for what date?  You said -- we set it

3   yesterday.

4         MR. SHEBELSKIE:  I think it may be the 30th of

5   October, Your Honor.

6         THE COURT:  Well, that would be the day after, so

7   that wouldn't be.

8         All right.  Well, stay in touch with our office, and

9   we'll try to accommodate you.

10         MR. SHEBELSKIE:  Thank you, Your Honor.

11         MR. MARRIOTT:  Thank you, Judge.

12         THE COURT:  Thank you.

13         THE CLERK:  All rise.  Court is adjourned.

14     (Proceeding concluded at 11:13 a.m.)

15                    *   *   *   *   *

16                       CERTIFICATE

17         I certify that the foregoing is a transcript from the

18   Liberty Court Recording System digital recording of the

19   proceedings in the above-entitled matter, transcribed to the

20   best of my ability.

21

22   October 13, 2014

23

24                    /s/ Glenda Trexler
                      Glenda Trexler, CSR-1436
25