1        UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF MICHIGAN
2              SOUTHERN DIVISION

3    _____

4    GEORGIA-PACIFIC CONSUMER
     PRODUCTS, LP; FORT JAMES
5    CORPORATION; and GEORGIA-PACIFIC,
     LLC,
6
                    Plaintiffs,
7                                  DOCKET NO. 1:11-cv-483
     vs.
8

9    NCR CORPORATION;
     INTERNATIONAL PAPER COMPANY; and
10   WEYERHAEUSER COMPANY,

11                  Defendants.

12   _____/

13

14        TRANSCRIPT OF HEARING ON MOTION TO COMPEL

15   BEFORE UNITED STATES MAGISTRATE JUDGE HUGH W. BRENNEMAN, JR.

16              GRAND RAPIDS, MICHIGAN

17               October 30, 2014

18

19   Court Reporter:        Glenda Trexler
                            Official Court Reporter
20                          United States District Court
                            685 Federal Building
21                          110 Michigan Street, N.W.
                            Grand Rapids, Michigan 49503
22

23   Proceedings reported by audio recording, transcript produced by

24   computer-aided transcription.

25

```
 1    A P P E A R A N C E S:

 2    FOR THE PLAINTIFF GEORGIA-PACIFIC:

 3         MR. PAUL THOMAS NYFFELER
           HUNTON & WILLIAMS, LLP
 4         Riverfront Plaza, East Tower
           951 East Byrd Street
 5         Richmond, Virginia 23219
           Phone:  (804) 787-8182
 6         Email: pnyffeler@hunton.com

 7         MR. PETER A. SMIT
           VARNUM, RIDDERING, SCHMIDT & HOWLETT, LLP
 8         Bridgewater Place
           333 Bridge Street, N.W.
 9         P.O. Box 352
           Grand Rapids, Michigan 49501-0352
10         Phone:  (616) 336-6000
           Email:  Pasmit@varnumlaw.com

11

12    FOR THE DEFENDANT NCR CORPORATION:

13         MR. DARIN P. McATEE
           CRAVATH, SWAINE & MOORE, LLP
14         Worldwide Plaza
           825 Eighth Avenue
15         New York, New York 10019
           Phone:  (212) 474-1000
16         Email:  Dmcatee@cravath.com

17    FOR THE DEFENDANT INTERNATIONAL PAPER COMPANY:

18         MR. DAVID W. CENTNER
           CLARK HILL, PLC
19         200 Ottawa Avenue, N.W., Suite 500
           Grand Rapids, Michigan 49503
20         Phone:  (616) 608-1100
           Email: dcentner@clarkhill.com

21

22    FOR THE DEFENDANT WEYERHAEUSER COMPANY:

23         MR. SCOTT MICHAEL WATSON
           WARNER, NORCROSS & JUDD, LLP
24         111 Lyon Street, N.W., Suite 900
           Grand Rapids, Michigan 49503-2487
25         Phone:  (616) 752-2465
           Email:  Swatson@wnj.com
```

```
 1                              Grand Rapids, Michigan

 2                              October 30, 2014

 3                              9:41 a.m.

 4                 P R O C E E D I N G S

 5         THE COURT:  Good to see you gentlemen again.

 6         MR. McATEE:  Good morning, Your Honor.

 7         MR. NYFFELER:  Good morning, Your Honor.

 8         THE COURT:  My wife wonders about this Georgia I keep

 9   talking about in my sleep at night.  I tell her it's the name

10   of a case, not another woman.

11         MR. McATEE:  A fine distinction.

12         THE COURT:  As well as a jealous mistress.  I told

13   her this is the last motion I have on my docket in this case as

14   far as I know.  She suggested that perhaps I am close to

15   atoning for whatever I did in a past life that has required

16   this case to come on my docket.  But then my judicial

17   assistant, my secretary, tells me that we're scheduled for a

18   settlement conference or perhaps two settlement conferences in

19   this case coming up in the spring and the summer, so perhaps

20   I'm not as close to atoning as I thought I might be and I still

21   have some more work to do.

22         Anyway, this is the plaintiff's motion to compel

23   production of documents and interrogatory responses from NCR,

24   and I think we're talking about in particular some insurance

25   settlement agreements pertaining to two specific requests.
```

 1          I had a chance to read the plaintiff's motion and the

 2   supporting brief and NCR's response.  So, counsel, any time

 3   you're prepared.

 4          *MR. NYFFELER:*  Your Honor, Paul Nyffeler with

 5   Hunton & Williams for Georgia-Pacific.

 6          *THE COURT:*  Good morning.

 7          *MR. NYFFELER:*  May it please the Court, as you just

 8   said, Your Honor, we're here today to discuss the motion

 9   requesting the Court to compel NCR to produce insurance

10   settlement agreements and indemnification agreements that NCR

11   has thus far refused to produce on the grounds that the

12   information sought is irrelevant and subject to strict

13   confidentiality requirements.

14          We contend that the information is relevant and that

15   granting Georgia-Pacific's motion in conjunction with the

16   protective order entered in this case that NCR joined resolves

17   all outstanding confidentiality concerns.

18          With regard to the relevance of this information, we

19   cited in our brief the case United States versus Davis written

20   by Judge Torres in the District of Rhode Island, and he was

21   presiding over a CERCLA case and outlined four critical issues

22   or factors that can be used in equitable allocation for CERCLA

23   litigation.  And those four factors were the extent to which

24   cleanup costs are attributable to wastes for which a party is

25   responsible, the party's culpability, the degree to which the

1    party benefited from the disposal of the waste, and the party's

2    ability to pay its share of the costs.

3          Now, with regard to this fourth factor, the ability

4    to pay, this factor is relevant in equitable allocations

5    because assigning an equitable share in excess of a potentially

6    responsible party's ability to pay would only harm the parties

7    seeking contribution.

8          In this case the discovery that Georgia-Pacific seeks

9    is not to increase or decrease NCR's share of liability.  In

10   fact, Georgia-Pacific maintains that NCR's liability for

11   cleaning up the Kalamazoo River should be 100 percent.  The

12   purpose is to ensure that if NCR eventually goes the way of

13   Plainwell or Allied, Georgia-Pacific will not be left holding

14   the check.

15         Now, in the Millennium Holdings bankruptcy --

16         *THE COURT:*  Can you be a little more specific about

17   that when you say goes the way of these other two companies for

18   the uninitiated?

19         *MR. NYFFELER:*  Sure.  Allied and Plainwell were two

20   former mill owners within the site that have subsequently filed

21   for bankruptcy.  In fact, the Allied Corporation ended up

22   passing through the Millennium Holdings Corporation, and that

23   was actually the entity that actually filed bankruptcy.  But

24   initially those two entities were involved in paying to help

25   clean up the site, but after the bankruptcy they were no longer

1    assisting.

2            THE COURT:  So if NCR should suffer the same fate,

3    you want to know there is adequate insurance to take their

4    place?

5            MR. NYFFELER:  What we're really -- yes, but what

6    we're really looking for is not whether there's adequate

7    insurance.  What we need to know is if they are not going to be

8    able to pay 100 percent of the costs, then we're going to have

9    to -- we're going to have to come up with a way to allocate the

10   existing costs amongst the other defendants.  So if, for

11   example, NCR is assigned 100 percent but then eventually is

12   only able to pay 50 percent, Georgia-Pacific, we don't want to

13   be left paying the remaining 50 percent.  We would like to be

14   able to make sure that the other defendants also are involved

15   in helping pay to clean up the site.

16           So actually -- in the Millennium Holdings bankruptcy

17   actually, the United States' proof of claim for the cleanup of

18   the site was $2.6 billion plus interest.  And I checked

19   yesterday, NCR's market capacity, and Bloomberg said it was

20   4.6 billion.  So if the Court were to require NCR to pay

21   100 percent of the cleanup costs at the site, as

22   Georgia-Pacific believes should be entered, NCR's share would

23   be more than half of its current market capacity.  And that's

24   just for the Kalamazoo River site.  NCR is also involved in

25   some other sites as well.  So Georgia-Pacific needs this

1    information to make sure that NCR in fact will be able to pay

2    the allocation that it's assigned.

3                Now I want to walk through a little bit of history

4    because some things have happened since the motion has been

5    filed.  So initially NCR disclosed in their Rule 26 disclosures

6    that they would make available their insurance policies.

7    Georgia-Pacific then served -- on June 26th served one

8    interrogatory amongst a set of other interrogatories and one

9    request for production in a set of other requests for

10   production addressing the insurance and indemnification

11   agreements.  Now, by comparison previously NCR had actually

12   served over 20 interrogatories relating to Georgia-Pacific's

13   insurance.  And in doing so, Georgia-Pacific also had

14   confidentiality concerns with their insurance settlement

15   agreements and we couldn't produce it without a protective

16   order.  So the parties got together and everyone stipulated to

17   a protective order to protect the confidential information in

18   the case.  And that was docket number 447 entered on

19   April 14th.  And after the protective order Georgia-Pacific

20   produced the documents NCR was seeking, including

21   Georgia-Pacific's insurance agreements.  The settlement

22   agreements.

23                *THE COURT:*  Just a moment.

24                *MR. NYFFELER:*  Yes, sir.

25                *THE COURT:*  Go ahead.

1          *MR. NYFFELER:*  All right.  Now, when NCR responded to

2     our Request for Production, of all the requests for production

3     they had a format.  They would have -- underneath the request

4     they would put a little line that said "Objection" and then

5     they would state their objection, and then they would put

6     "Response" and they would put their response.  Now, in all

7     those cases of the requests for production except the last one

8     they actually had an objection and a response.

9          For the request for production for the insurance

10    materials they had an objection but they didn't lodge a

11    response.  They just left it open.  And also in response to our

12    interrogatory on the insurance matters, they referred us to its

13    public filings made with the Securities and Exchange

14    Commission.  NCR did not say what year or which filing to look

15    at.  And as far as I know at least at the time NCR had never

16    produced any SEC filings in the case.  So on August 27 -- and

17    this is actually in the --

18          *THE COURT:*  So there's no response to what was

19    request number 9?

20          *MR. NYFFELER:*  I believe it's request --

21          *THE COURT:*  There was request number 10 and then

22    there was request number 9 to produce.  Which one had no

23    response to it besides the objection?

24          *MR. NYFFELER:*  It was -- one moment.

25          *THE COURT:*  You just told me and I didn't write it

 1   down.

 2          *MR. NYFFELER:*  Yeah, it was request number 9.  Yes.

 3          *THE COURT:*  Request number 9 --

 4          *MR. NYFFELER:*  "Produce all agreements and other

 5   documents or communications, including any insurance policies,

 6   judicial decisions, contracts, arbitration awards, settlement

 7   agreements, and/or other indemnification agreements under which

 8   any party is, would be, or alleged is or would be obliged to

 9   pay, in whole or in part, NCR's court-determined share of any

10   past or future costs associated with the site."

11          *THE COURT:*  All right.  And that's one of your

12   exhibits here, I believe.

13          *MR. NYFFELER:*  Correct.  It's Exhibit E.  Well, E was

14   their response.  Which also includes the request itself.

15          *THE COURT:*  Well, they filed their objection and no

16   further response.

17          *MR. NYFFELER:*  That's correct.  All right.  So --

18          *THE COURT:*  And then as far as interrogatory number

19   10 -- which exhibit is that?

20          *MR. NYFFELER:*  Well, only the answer actually is part

21   of D.  We didn't actually get the question.  I think that's in

22   C.

23          But their response in there was subject to and

24   without waiving these objections or any of its general

25   objections, NCR states that extensive information concerning

1   its insurance policies proceeds and indemnification

2   arrangements related to its environmental matters is discussed

3   in its public filings made with the Securities and Exchange

4   Commission.

5           *THE COURT:* Right.  Okay.  Go ahead.

6           *MR. NYFFELER:*  So on August 27th we sent a letter to

7   NCR laying out the reasons that their response was deficient.

8   At that time we also laid out the reasons why we thought the

9   information was relevant with the U.S. v. Davis case.

10          We had a meet and confer on September 5th and NCR

11  came back and said, you know, "We would really like you to look

12  at the SEC filings and ask us if there's anything else you

13  really need.  We would like you to come back before you file a

14  motion to compel.  We'd like to sort of keep this process

15  open."

16          So at the time NCR really didn't address the U.S.

17  versus Davis case.  They said they were not willing to put

18  NCR's ability to pay at issue in the case.

19          Now, we went out and we reviewed the SEC filings, and

20  they did not in fact provide the information that we were

21  seeking.

22          We sent them a second letter on September 26th laying

23  out the reasons it was deficient.

24          On September 30th NCR stated that it was going to

25  stand on its relevance objections.

1          And then on October 2nd we filed our Motion to

2  Compel.  And at that time NCR had still never responded to our

3  requests for production for insurance and indemnification

4  materials.  And also NCR had still not made its insurance

5  policies available which it said it would do in its initial

6  disclosures.

7          Now to the stuff that is not in the briefs,

8  Your Honor.  On October 13th we held another meet and confer at

9  the request of NCR's attorneys.

10         *THE COURT:*  October 13th?

11         *MR. NYFFELER:*  Yes, sir.  On this call NCR's

12  attorneys offered to produce NCR's insurance policies which

13  they admitted were not in fact confidential.  We asked whether

14  they would produce the settlement agreements.  NCR said they

15  were not allowed to produce them.  We asked them why the

16  protective order would not meet NCR's confidentiality needs,

17  and NCR said that the settlement agreements forbid their

18  disclosure.

19         We asked if we could get around it by having them

20  summarize the terms for the settlement agreements.  NCR said

21  the settlement agreements forbid disclosing the terms.

22         On October 17th NCR contacted us again.  This was

23  three days before their responsive brief was due.  NCR at that

24  time then produced the insurance agreements.  I'm sorry, not

25  the insurance agreements, the insurance polices.  And it said

1    that NCR has produced all of its indemnity agreements except

2    for one.  And NCR said that this last indemnity agreement will

3    be produced shortly.  And they did not suggest that there would

4    be any limitation on its production.

5           Now, at this time NCR offered to disclose the

6    aggregate amount of any insurance settlement for which the

7    Kalamazoo site was arguably covered and the amount of that

8    aggregate which NCR had actually applied to the site and for

9    which costs.  NCR maintained that it would not be producing its

10   insurance settlement agreements.  Now, the problem that we had

11   is without the settlement agreements, Georgia-Pacific has no

12   way to know how the insurance settlements will be applied to

13   the Kalamazoo site, if at all.  It's entirely possible that the

14   settlement agreements include provisions that limit

15   distributions to certain individual sites.  It's possible the

16   settlement agreements require additional arbitrations.  The

17   bottom line is, without these settlement agreements we have no

18   way to know how any insurance payments can and will be applied

19   to cover past and future cleanup costs at the site if NCR is

20   required to pay them.

21          We also asked why NCR was unable to simply send the

22   documents as we requested given that there was a protective

23   order in the case.  And NCR replied, "Because we need consent

24   of all insurers which I have been unable to abstain."  And I

25   don't know, Your Honor, if that means that some of the insurers

1    actually agreed or not.  It's not really clear.

2            THE COURT:  So on October 17th NCR did produce the

3    insurance polices, and I thought I heard you say they also

4    produced some indemnification agreements but not all of them.

5            MR. NYFFELER:  Actually, they pointed out that they

6    had produced some of them but not all of them.

7            And at that time because --

8            THE COURT:  Did you know they had produced some but

9    not all?

10           MR. NYFFELER:  We had seen some of the older ones,

11   yes.

12           THE COURT:  So these are not the same as the

13   settlement agreements?

14           MR. NYFFELER:  No, the things that he was talking

15   about that were produced were the indemnification agreements.

16   And the settlement agreements we're talking about are for

17   insurance.

18           THE COURT:  And how many settlement agreements did

19   you understand there to be?  I think I've seen a number.

20           MR. NYFFELER:  Um, there's -- I think there was

21   litigation involving 25 insurers.  I'm not really sure how many

22   insurance settlement agreements there are.

23           THE COURT:  I thought I saw a number around 19 or

24   something like that.

25           MR. NYFFELER:  That could be.

1              THE COURT:  All right.  So none of those have been

2    produced as far as you know?

3              MR. NYFFELER:  No, sir.

4              THE COURT:  And that's really what is at issue today?

5              MR. NYFFELER:  Correct.

6              THE COURT:  Now, you had settlement agreements as

7    well.

8              MR. NYFFELER:  Yes, Your Honor.

9              THE COURT:  And you have produced yours subject to

10   that protective order?

11             MR. NYFFELER:  That's correct.

12             THE COURT:  And you understood when you entered into

13   that protective order that they were going to produce their

14   settlement agreements as well subject to that protective order?

15             MR. NYFFELER:  At the time we hadn't actually served

16   discovery on that yet I don't believe.  But that was our

17   understanding, yes, that it would apply both ways.

18             THE COURT:  Why did you feel you needed a protective

19   order for your settlement agreements?

20             MR. NYFFELER:  My understanding is that the

21   settlement agreements had confidentiality provisions in them

22   that required us to seek a protective order.

23             THE COURT:  Why did they have confidentiality

24   provisions in them?

25             MR. NYFFELER:  I'm not sure that I'm aware of the

1    exact reasons other than that's what the insurance companies

2    required.

3           THE COURT:  You don't know why the insurance company

4    wanted those confidentiality provisions?

5           MR. NYFFELER:  Not right here, no, Your Honor.

6           THE COURT:  So I assume you don't know why they would

7    want them as far as the NCR settlement agreements.

8           MR. NYFFELER:  No, Your Honor.

9           THE COURT:  Would the insurance companies want to

10   keep the insurance polices themselves confidential if they

11   could?

12          MR. NYFFELER:  I'm not sure I know the answer to

13   that.  I know that a number of insurance polices have been

14   produced in this case by Georgia-Pacific and the other parties

15   as well.

16          THE COURT:  Well, 26(a)(1) pretty much mandates they

17   have to do that.

18          MR. NYFFELER:  Right.

19          THE COURT:  Of course, the insurance companies would

20   be aware of that.  There is some case law that suggests that

21   Rule 26(a)(1) is limited to insurance polices and not

22   settlement agreements.

23          MR. NYFFELER:  That's correct, Your Honor.  It's in

24   the notes actually following Rule 26.  Of the initial

25   disclosures.  That doesn't affect whether they are discoverable

1   or not.

2        THE COURT:  But I have yet to hear your reason why it

3   should be confidential, other than the insurance companies

4   might like to keep it that way.  So I thought that's why I

5   would ask you why you wanted to keep it confidential.  And

6   again we're coming back to the circle that it's some insurer

7   that wants to keep it confidential.

8        MR. NYFFELER:  I think that's correct, Your Honor.

9        THE COURT:  All right.  Go ahead.

10       MR. NYFFELER:  All right.  So on Monday,

11  October 20th, NCR did two things.  First they filed

12  supplemental discovery responses, including for the first time

13  an actual response to Georgia-Pacific's Request for Production

14  of Documents relating to NCR's indemnification and insurance

15  agreements.  However, in that response it still refused to

16  produce the insurance settlements claiming that they are

17  subject to strict confidentiality restrictions.

18       In their interrogatory response which they also

19  supplemented, they went into greater detail.  They listed dates

20  ranges for the arbitration agreements that had been produced.

21  They still pointed to the SEC filings and still included some

22  of the language that we had pointed out was rather vague.  For

23  example --

24       THE COURT:  Do I have copies of those?

25       MR. NYFFELER:  Yes, Your Honor.  They were included

1   as exhibits in NCR's response.  Their interrogatory response is

2   Exhibit 1.  And once you find it, their answer begins on

3   page 20.

4           *THE COURT:*  Page 20?

5           *MR. NYFFELER:*  Page 20, yes.

6           *THE COURT:*  So this supplements interrogatory

7   number 10?

8           *MR. NYFFELER:*  Correct.

9           *THE COURT:*  When I read this I wasn't entirely sure

10  what these cost-sharing agreements were.  Are these the

11  settlement agreements you're talking about, or are these

12  indemnification agreements that you had mentioned earlier?

13          *MR. NYFFELER:*  Well, so on page 21, the cost-sharing

14  agreement, our understanding is that is the outcome of an

15  arbitration or a litigation that occurred between NCR, API, and

16  British American Tobacco, BAT.  So the lists at least in the

17  bullets on page 21 as far as we understand relate to the

18  outcome of arbitrations.

19          *THE COURT:*  All right.

20          *MR. NYFFELER:*  And also --

21          *THE COURT:*  So those are or are not the settlement

22  agreements that you are seeking?

23          *MR. NYFFELER:*  Those are not what we're talking about

24  specifically, because those are for the indemnification

25  arrangements, not the insurance settlement agreements.

1      *THE COURT:*  All right.  So --

2      *MR. NYFFELER:*  And then they also point out at the

3  bottom of 21 that there's the last arbitration -- I'm sorry --

4  indemnification agreement.  This is the -- "A Form 8-K filed by

5  NCR announced on September 30th of 2014 NCR entered into a

6  funding agreement with Appvion, formerly known as

7  Appleton Papers, Windward Prospects, BAT Industries, and BTI

8  2014."

9      This is -- if you follow a little further, it says

10  NCR will produce the funding agreement in redacted form once it

11  is publicly disclosed by Appvion.

12      It doesn't --

13      *THE COURT:*  You will get it once the public gets it?

14      *MR. NYFFELER:*  I guess, Your Honor.  It doesn't

15  explain why it has to be redacted.

16      *THE COURT:*  It's nice to know that you're at least

17  second in line to the public.

18      *MR. NYFFELER:*  Yes.  All right.  So on

19  October 20th --

20      *THE COURT:*  Is that a settlement agreement?

21      *MR. NYFFELER:*  Is this --

22      *THE COURT:*  Is that referring to a settlement

23  agreement?

24      *MR. NYFFELER:*  I believe we would call this an

25  indemnification agreement.  This is what they said --

1          THE COURT:  All right.  So let's talk about

2   settlement agreements.

3          MR. NYFFELER:  Yes, sir.

4          THE COURT:  Is there any settlement agreement talked

5   about?  I'm looking at the very last paragraph.  It says,

6   "Finally NCR has identified 19 settlement agreements," and I

7   guess that's where I got the 19, "that it entered into with 25

8   insurance carriers.  These are strictly confidential.  NCR has

9   contracted with these carriers when it entered into these

10  confidential settlement agreements and informed them of

11  interrogatory number 10.  The insurers have thus far refused to

12  consent to disclose these."

13         So it sounds like those are still off-limits and have

14  not been furnished to you.

15         MR. NYFFELER:  That's correct.

16         THE COURT:  All right.  So the supplemental discovery

17  still has not furnished you what you're asking for today.

18         MR. NYFFELER:  Exactly, Your Honor.

19         THE COURT:  All right.  Go ahead.

20         MR. NYFFELER:  So the second thing they did on

21  October 20th was to file their responsive brief.  They first

22  argued -- NCR argued that Georgia-Pacific's Motion to Compel is

23  moot because NCR offered to provide some information at some

24  later date without actually disclosing that information

25  directly.

 1          NCR maintains that its settlement agreements are

 2   irrelevant.  As we pointed out too, they said that they would

 3   be producing the last indemnification agreement in a redacted

 4   form but didn't explain why it had to be redacted.  And they

 5   actually didn't say a specific date when it would be produced.

 6   Just some time in November they understood.

 7          NCR continues to maintain that the information sought

 8   is subject to strict --

 9          THE COURT:  So the record is going to be produced in

10   November why?

11          MR. NYFFELER:  Our understanding, what it said, is

12   that one of the other parties, Appvion, will be releasing it to

13   the public.

14          THE COURT:  So because we have to allow the public to

15   see it first?

16          MR. NYFFELER:  I guess, Your Honor.

17          Now, as we said, NCR maintains that this material is

18   strictly confidential and that it is contractually unable to

19   produce this information without a court order.  And NCR also

20   disclosed at least some of the terms of the settlement

21   agreements in its brief, namely, the terms that say they are

22   not allowed to disclose it short of a court order.

23          So I guess, Your Honor, the real issue here today

24   that needs to be addressed is whether the material is actually

25   relevant.  And if we assume for a moment that this discovery is

1    relevant, then the only outstanding issue is that the material

2    sought is confidential and that NCR cannot produce this without

3    a court order.

4            Now, this problem again is very similar to when NCR

5    requested the same settlement agreements from Georgia-Pacific

6    and Georgia-Pacific obtained the protective order with the

7    consent of all the parties because its insurance agreements

8    also had strict confidentiality requirements.  And once the

9    order was entered, then the information could be produced.  And

10   I have not heard any suggestion from NCR that the protective

11   order entered into in this case isn't sufficient to protect its

12   confidentiality obligations.

13           And if it is indeed the case that NCR needs an order

14   from this Court to compel production with NCR's receipt, then

15   that's exactly what our motion seeks to do.  So if the

16   discovery is relevant, then this Court's motion and the

17   protective order should resolve all outstanding issues.

18           Now, as we discussed previously, this discovery that

19   we seek is not marginally relevant as NCR suggests, but it's

20   critical to understanding the needs of an allocation of past

21   and future costs at the site.

22           Now, NCR in their brief argues that the discovery

23   sought is irrelevant because NCR is not asserting a claim for

24   costs in contribution.  However, as we said, that's not why

25   we're seeking this information.  Georgia-Pacific intends to

1    prove in this case that NCR should be held 100 percent liable

2    for all past and future costs associated with cleaning up the

3    site.

4              Now, we seek this information under the fourth factor

5    from Judge Torres in the Davis case in order to know ahead of

6    time whether NCR is actually capable of paying for 100 percent

7    of the cleanup costs at the site.  And NCR in their brief cites

8    two court cases which are actually informative to explain why

9    we need this and why NCR's objections are not going to be --

10   are not adequate.

11             They cited the Lockheed Martin versus the

12   United States case, and we believe actually this is very

13   informative as to why Georgia-Pacific needs this information.

14   As NCR wrote in its brief, "The Torres ability-to-pay factor is

15   not an open invitation for courts to increase or decrease a

16   party's equitable share based solely on net worth but is

17   instead meant to recognize that a PRP's share of liability

18   should not be established at a level that exceeds its

19   resources, lest the plaintiff be left to shoulder that PRP's

20   equitable share."

21             As I said, Georgia-Pacific is not seeking this

22   information to increase or decrease NCR's equitable share based

23   solely on net worth.  Georgia-Pacific --

24             *THE COURT:*  Just a moment.

25             *MR. NYFFELER:*  Yes, sir.

1      *THE COURT:*  Go ahead.

2          *MR. NYFFELER:*  Georgia-Pacific needs to know if they

3   are actually capable of shouldering 100 percent of the costs at

4   the site.  Because if they are capable of only paying say

5   50 percent of the costs, NCR if it goes the way of Plainwell or

6   as we said of Allied or Millennium Holdings, Georgia-Pacific

7   should not be left to shoulder the remainder as it was said in

8   Lockheed Martin.

9          Now, the other case that NCR cites in their brief is

10  Ryland Group versus Payne --

11         *THE COURT:*  They are going to say we'll pay the total

12  amount that the insurance will supply under this confidential

13  settlement agreement.  The insurance policies may say that

14  there's X amount of insurance, the settlement agreements will

15  say there's Y, but Y is available, so now you know how much is

16  available.  Plus you know our assets because you looked them

17  up.  So that's what we've got available.  What more do you

18  need?

19         *MR. NYFFELER:*  Well, the problem is, first of all, we

20  don't know what the settlement agreement -- the insurance

21  settlement agreements say about how the costs should be

22  allocated amongst the different sites that NCR is involved in.

23  So although there might be a certain amount of money involved

24  in the pot of insurance funds, it could be that the insurance

25  settlement agreements allocate, you know, the vast majority or

 1    all of it to another site, leaving nothing for Kalamazoo at

 2    all.  We just don't know.

 3         *THE COURT:*  What if they say, "We'll tell you that --

 4    we'll tell you the amount that's allocated for Kalamazoo"?

 5         *MR. NYFFELER:*  So far all they have been willing to

 6    say is that they are going to -- they would tell us the amount

 7    that's been allocated to date in the Kalamazoo site.  And so

 8    far NCR has not been assigned any costs for cleanup yet.  So,

 9    again, we're talking about past and future costs, and what they

10    are proposing doesn't get us all the way there.

11         *THE COURT:*  Are there other sites that NCR may be

12    responsible for?  Is this a real consideration?

13         *MR. NYFFELER:*  There's at least one that I'm aware of

14    right now.  That's the Fox River litigation going on in

15    Wisconsin.  And there may be others as well, Your Honor.  I

16    don't know.

17         *THE COURT:*  Has there been any determination in this

18    case that NCR is in fact going to have to pay any cleanup costs

19    as far as Kalamazoo is concerned?

20         *MR. NYFFELER:*  We had the trial in phase I where NCR

21    was determined to be a liable party.  As I understand, phase II

22    is simply going to be about determining past and future costs

23    for cleanup at the site.  Who has to pay what.  And that's why

24    this information is relevant.

25         *THE COURT:*  So is it fair to say that NCR is going to

```
 1   have to pay some money as far as Kalamazoo is concerned?

 2             MR. NYFFELER:  Counsel, may disagree on that point,

 3   but that's our position, yes.  Our position in fact is that

 4   they should pay for all of it.

 5             THE COURT:  I know your position is they should pay

 6   all of it.  How are they going to be able to argue that they

 7   can't -- shouldn't have to pay any of it?

 8             MR. NYFFELER:  Um . . .

 9             THE COURT:  How would they be able to argue that now?

10             MR. NYFFELER:  Right now all I'm aware of is that the

11   equitable argument they are relating to perhaps the material

12   wasn't all there for all periods of time or something like

13   that.  But --

14             THE COURT:  Wouldn't that affect the amount they

15   would have to pay as opposed to -- as opposed to not paying

16   anything?  Could they make an argument that they don't have to

17   pay anything?

18             MR. NYFFELER:  I don't know if they are going to try

19   to argue that.

20             THE COURT:  Is that a feasible argument?

21             MR. NYFFELER:  Given that the judge was clear that

22   for a certain period of time they clearly were an arranger for

23   the disposal of hazardous waste, at least for some time period

24   for at least one mill I don't think they can really argue that

25   they have nothing to pay.
```

1          *THE COURT:*  So if they were to make an argument this

2     morning that there's no obligation proven so far that they have

3     to pay anything, therefore, they shouldn't have to produce any

4     insurance policy numbers -- or pardon me -- any settlement

5     agreement numbers because they haven't been adjudged to have

6     any obligation, you don't think that argument would fly?

7          *MR. NYFFELER:*  No, Your Honor.  And again, the

8     purpose of the discovery right at this stage is to determine

9     whether they will be able to actually pay or not.  So --

10         *THE COURT:*  But if they were going to say there's no

11    obligation to pay, then it would be premature to find out if

12    they have the money.

13         *MR. NYFFELER:*  Well, again, since they have already

14    been found liable in phase I --

15         *THE COURT:*  Uh-huh.

16         *MR. NYFFELER:*  -- they will have to pay for

17    something.

18         *THE COURT:*  That's what I'm asking.

19         *MR. NYFFELER:*  Yes.  So they have been liable from

20    1969 to 1971 at a minimum for the Georgia-Pacific Mill.  And we

21    contend that it was also for all years, 1954 to 1971 and all

22    locations at the site.

23         And also, Your Honor, if NCR is trying to argue that

24    their liability should somehow be limited, the burden is on

25    them to actually prove that.

1              *THE COURT:*  You appeared to concede a few minutes ago

2     that Rule 26(a)(1) does not require them to produce anything

3     other than the insurance polices.

4              *MR. NYFFELER:*  In their initial disclosures,

5     Your Honor.

6              *THE COURT:*  In their initial disclosures.

7              *MR. NYFFELER:*  That's correct, yes.

8              *THE COURT:*  So I assume you are not relying strictly

9     on 26(a)(1) to obtain these settlement agreements?

10             *MR. NYFFELER:*  No, Your Honor.  The information we

11    seek is relevant under the fourth factor of the Torres factors:

12    Their ability to pay.

13             *THE COURT:*  So you're seeking this as part of routine

14    discovery in addition to whatever might be mandated by

15    Rule 26(a)(1)?

16             *MR. NYFFELER:*  That's correct.  This relates to

17    CERCLA liability and equitable allocation of costs at the site.

18             *THE COURT:*  Just a routine discovery through

19    interrogatories and production of documents?

20             *MR. NYFFELER:*  Correct.

21             *THE COURT:*  All right.  I think I interrupted you.

22    Go ahead.

23             *MR. NYFFELER:*  Oh.  Well, the only -- the last point

24    I wanted to make was the other case that NCR cites in its

25    brief, Ryland Group versus the Payne firm.  In that case Ryland

1   was the plaintiff and it sued the Payne firm and a man named

2   Mr. Thomas.  Now, Mr. Thomas eventually sought some discovery

3   regarding the Payne firm's ability to pay for cleanup costs.

4   The problem for Thomas, however, was that the Court in that

5   case had entered summary judgment capping the Payne firm's

6   liability to Thomas for $50,000.

7           The plaintiff in that case had also agreed that it

8   would not make the Payne firm's ability to pay an issue in the

9   case.  So as that case explains, the only possible relevance of

10  the sought documents would be to prove that Payne is capable of

11  paying an amount greater than it will ever be called upon to

12  pay in this case.

13          Now, the problem for NCR is that those situations and

14  facts do not apply to them in this case.  NCR in fact has no

15  such cap on its liability in this case.  We are seeking a

16  hundred percent of all costs, past and future.

17          The plaintiff in this case, namely, Georgia-Pacific,

18  also has not necessarily decided whether NCR's ability to pay

19  would be an issue in the case, but we need to have discovery to

20  determine whether we need to make that an issue in the case.

21  Therefore, the discovery that Georgia-Pacific seeks is relevant

22  to prove that NCR is capable of paying the maximum amount that

23  anyone could be called upon to pay at the site, which is a

24  hundred percent of all past and future costs.

25          Now, NCR wishes to cut off this discovery by saying

 1  that it has represented to Georgia-Pacific that it does not

 2  contest its ability to pay any adverse judgment.  However,

 3  Georgia-Pacific does not intend to take them at their word on

 4  this.  Especially when the costs could be as much as half or

 5  more of NCR's current market capacity.  So if we were to ask

 6  what the value would be of the same representation if made by

 7  Plainwell or Allied, who are no longer in existence, in

 8  hindsight that representation would not be worth very much,

 9  which is why Georgia-Pacific wants this information.

10        So, Your Honor --

11        *THE COURT:*  So even though they are saying "We're

12  good for it," you're saying, "Well, we don't want to take your

13  word for that"?

14        *MR. NYFFELER:*  We want to see some proof, Your Honor.

15        *THE COURT:*  All right.  Thank you.

16        *MR. NYFFELER:*  Thank you.

17        *MR. McATEE:*  Good morning, Your Honor.

18        *THE COURT:*  Good morning, Counsel.

19        *MR. McATEE:*  Darin McAtee from Cravath for NCR.  I

20  think I would like to start with the indemnity agreements

21  because I think that's a little bit simpler.  There are three.

22  There's a 1998 confidential settlement agreement that's known

23  as the CSA.  Under that agreement the costs are shared with

24  Appleton Papers, Inc., also known as API, and British American

25  Tobacco or BAT.  That agreement was produced years ago in the

```
 1    Fox River case.  By agreement of the parties, anything produced

 2    in that case is deemed produced in this case.  And so they had

 3    it and have had it for years.

 4         It is now also described in our supplemental answer

 5    to interrogatory number 10.  And, frankly, described ad nauseam

 6    in our securities filings.  It's a very well-known agreement,

 7    and they have it.

 8         The second agreement is a 1996 trivestiture agreement

 9    with AT&T.  Under that agreement costs are shared with AT&T and

10    Lucent and NCR.  It goes back to their corporate history where

11    they were once upon a time connected companies.  That agreement

12    was produced in the Fox River case.  Georgia-Pacific has had it

13    for years.  By agreement of the parties it was deemed to have

14    been produced in this case with the initial disclosures.  And

15    it's now also described in our response to interrogatory

16    number 10 and also in our securities filings.

17         The third agreement is very recent.  It almost killed

18    me to get it negotiated.  It was the month of September.  I

19    literally spent 20 hours a day in September getting it done.

20    It came into existence on September 31st and it was widely

21    disclosed in the press.  Georgia-Pacific has the NCR and API

22    press releases.  They do not have the actual funding agreement

23    itself because that piece of paper is a very confidential

24    agreement.  It covers a lot of different topics, not just the

25    Kalamazoo issue.  And it's currently being negotiated among the
```

1   parties to that agreement as to what can be publicly disclosed.

2           I will represent that none of the redactions that are

3   going to happen are going to relate to the Kalamazoo River.

4   It's things like bank accounts, wiring instructions, strategy

5   for pursuit of third parties, including, frankly,

6   Georgia-Pacific.  So it has some things in it that may need to

7   be redacted, but it's not going to relate to this issue, which

8   is how is the money going to be there for Kalamazoo if there's

9   money left over?  That agreement needs to be disclosed by API

10  in redacted form the first week of November.  And so what I

11  told counsel for Georgia-Pacific is I didn't want to get ahead

12  of the kind of negotiations as to what the redactions should

13  be, but I would give it to them as soon as it was made public

14  by API, which is during the discovery period.

15          So those are the indemnity agreements, Your Honor.

16          *THE COURT:*  You have agreed to produce that to

17  Georgia-Pacific by the end of the first week in November?

18          *MR. McATEE:*  Yes, Your Honor.

19          *THE COURT:*  And you have agreed to produce it to them

20  in redacted form.  None of the redactions pertain to the

21  Kalamazoo River and how much money would be available to pay

22  for the cleanup in the Kalamazoo River.  There may be some

23  redactions that pertain, however, to what, obtaining money from

24  Georgia-Pacific?

25          *MR. McATEE:*  From third parties, including

1    Georgia-Pacific.  It's an arrangement whereby these various

2    companies have come together and said we're going to go after

3    these other parties, including Georgia-Pacific, collect what we

4    can, put it all into a big pot and use it to fund first

5    Fox River.  And then if at the end of all of that there's money

6    left over, we'll use the money for Kalamazoo.  That's what this

7    agreement is.

8              THE COURT:  Do the redactions pertain to Fox River?

9              MR. McATEE:  So there may be some redactions, again

10   that's being negotiated, as to the strategy for pursuing

11   parties in Fox River.  But, again, in this case they would not

12   be entitled to that.  That is confidential between these

13   companies.

14             THE COURT:  Not the strategies for pursuing the

15   parties, but as far as the amounts that would be available for

16   Kalamazoo, it sounds like that might be impacted by how much

17   money is available for Fox River.  You said the remainder goes

18   to Kalamazoo.

19             MR. McATEE:  I'm sorry, Your Honor, I didn't

20   understand the question.  No, the redactions would not relate

21   to the amount of money that's available for Fox River.

22             THE COURT:  Okay.

23             MR. McATEE:  That would be publicly disclosed and

24   given to Georgia-Pacific in this case.

25             So I think once they have the redacted agreement,

1    they will have what they need, which is -- what they claim to

2    need -- which is how does this agreement affect NCR's ability

3    to pay for costs on the Fox River if it's adjudicated liable.

4          *THE COURT:*  Just a moment, please.  What did the

5    interrogatory actually request?

6          *MR. McATEE:*  I think it requested a description --

7          *THE COURT:*  I'm sorry to interrupt you in answering

8    that.  I apologize.  You are preferring -- I'm sorry -- you are

9    providing this information in response to which, the request to

10   produce documents or the interrogatory?

11         *MR. McATEE:*  Actually both.  This funding agreement

12   is described in our supplemental interrogatory response, and it

13   also will be made available in response to the requests for

14   production.

15         *THE COURT:*  And do those discovery requests seek

16   specific information to which you are responding or seek the

17   documents themselves?

18         *MR. McATEE:*  I think it sought any documents relating

19   to indemnification for Kalamazoo costs.  And because this

20   funding agreement, which is primarily a Fox River document, but

21   because at the end of it it says if there's any money left over

22   we'll use that for Kalamazoo, it becomes responsive to their

23   request for information about Kalamazoo indemnification, which

24   is why we are willing to provide it as soon as it's made

25   public.

1          *THE COURT:* All right.  Thank you.  Please go on.

2          *MR. McATEE:* So if I could switch to insurance.

3    There are 53 insurance policies.  Those have all now been

4    produced.  Forty-two of them were produced in the Fox River

5    case, and, therefore, were deemed to have been produced in this

6    case.  And the other 11 were produced with our production in

7    October.  What we basically did is took all 53 of those and put

8    them together as one package and then reproduced them in the

9    Kalamazoo case so they would know specifically which 53 were

10   the ones that may provide coverage for Kalamazoo.  So they now

11   have that.

12          Your Honor is correct, there are 19 settlement

13   agreements, which are different from the insurance polices.

14   There is strict confidentiality obligations.  The settlement

15   agreements do not allow us to disclose if there is a protective

16   order.  So if we were to do that, we would risk breach,

17   insurance companies coming to us saying "We want to claw back

18   the money because you violated the terms of the agreement," and

19   that's not a risk that NCR would like to take.

20          The confidentiality issue is broader than the public

21   not being able to see the agreements.  What we hear from the

22   insurance companies when we talk to them about this issue is

23   that they also insure Georgia-Pacific and IP,

24   International Paper, and Weyerhaeuser, and if those companies

25   even in the privacy of this litigation had access to the actual

settlement numbers that NCR was given, that it would be an

advantage to them in their negotiations with the very same

insurance companies.  So that's the issue that they are

concerned about, and that's why they have refused to consent to

allow production of the settlement agreements to these parties

in this case.

What I came up with was an idea that had worked in

some other cases where I've done this exact same thing, and

that is the idea Your Honor asked counsel for Georgia-Pacific

about:  What if they had the aggregate information?  I could

give them a stipulation where I aggregate all 19 settlement

agreements and I say "Here is how much was allocated to

Fox River, here is how much was allocated to the

Kalamazoo River, here is how much was allocated to other

places," and I can separate that between indemnity, you know,

cleanup costs and defense costs, so I can come up with a piece

of paper.  Let's say that we had a total of a hundred million

dollars in proceeds.  10 million of that was allocated to

Kalamazoo.  I would just stipulate to that.  So then they had

their number.  If they wanted to know my ability to pay and

have to argue about that, they will know that $10 million of

that insurance pot is available for Kalamazoo costs.  And I

think that gives them everything they need, Your Honor.  They

don't need to see the specific terms of each agreement or the

specific numbers that a particular insurer agreed to.  So

1    that's the solution that we would urge Your Honor to adopt.

2         THE COURT:  You have tendered that solution to the

3    other side, I take it, and they have not agreed to it?  They

4    don't think it goes far enough; is that right?

5         MR. McATEE:  That's right, Your Honor.

6         THE COURT:  And why do they think that it's not gone

7    far enough?  What is it that they are asking for, as you

8    understand it, that you're not willing to give them?

9         MR. McATEE:  Well, I don't know.  I heard counsel say

10   maybe I wasn't offering the specific allocations to sites.  In

11   fact, I was.  I was intending to make an offer that would allow

12   them to see how much money was there for Kalamazoo.  So

13   hopefully that problem is resolved.  So the only other thing I

14   heard is that they don't trust us, they don't trust me.  And,

15   you know, this would be a stipulation, we would have to do it

16   as officers of the court, we would represent that these were

17   the correct numbers from the agreements.  And as I've said,

18   I've done that in many other cases where this was the solution

19   because of the identical problem that I just raised, which is

20   that insurance companies don't want other parties to see what

21   the settlements were.

22        THE COURT:  Why should this Court be interested in

23   protecting the interests of the insurance companies which are

24   solely a matter of interest to them?  I mean, they may have

25   some business reasons for wanting to protect their business

1    secrets.  Most businesses have reasons they don't want their

2    secrets known.  But be that as it may, why does that trump the

3    litigation in this court?  They are not parties to this

4    lawsuit.  They are not even here.  They haven't filed any kind

5    of brief.  They haven't made an argument here.  In fact, until

6    you've tendered this argument, nobody else seemed to even know

7    why these confidentiality provisions are put in here.  These

8    provisions are put in between the parties to have a voluntary

9    set of handcuffs everybody is putting on themselves and then

10   coming into court and saying, "Look, I can't do this because I

11   have these handcuffs on which, by the way, I put on myself."

12          It's nice that you did that, but these are not

13   restrictions that somebody else has placed on you that you have

14   no control over.  You voluntarily assumed them.  And they are

15   not particularly persuasive as far as the Court is concerned

16   that if there's no real outside reason, as there sometimes is,

17   for the Court to consider that confidentiality.

18          Again I come back to the fact that, all right, the

19   insurance companies want to protect their business secrets

20   because they have become so big they are insuring everybody.

21   Well, isn't that their problem?  Isn't that something they take

22   on as part of doing business?  And with all deference to them

23   and their success, why does that trump what we need to address

24   here and what the parties legitimately need to litigate this

25   lawsuit?

1          **MR. McATEE:**  So, Your Honor, my answer to that is I

2    think there are competing policy interests.  And I'm not

3    suggesting that one trumps the other.  The policy that the

4    insurance companies would point to -- and, frankly, I think we

5    would point to, everybody in this room -- is that we want to

6    encourage insurance companies to settle, to pay.  And if one of

7    the things that they are going to require to have -- you know,

8    to be willing to, you know, not litigate and to come to the

9    table and put the money up is protection against this scenario

10   where other parties see what NCR has done and try to gain some

11   kind of bargaining advantage, if we have to protect that policy

12   in order to encourage them to settle, then we should do that.

13   As long as there's an accommodation that could be made that

14   gets Georgia-Pacific the information they need in a way that

15   doesn't allow them to see each individual settlement.  So I

16   think we can reconcile both of those policies with the solution

17   that we've been talking about, which is the aggregate

18   disclosure of information which doesn't give -- doesn't have

19   the same bargaining advantage problem associated with it but

20   still gives them the ability-to-pay information that they claim

21   they need.

22          **THE COURT:**  Perhaps you could describe what the

23   settlement agreements do.  You are insured by the insurance

24   company for certain damages you might have to pay caused by

25   your products or something your company does for certain

1    judgments that might be entered against you for damages caused
2    by your company, I suppose, in a very broad sense.  What, if
3    you could tell me, do these settlement agreements that the
4    parties keep talking about do?  Because nobody has actually
5    even spoken to what these agreements are that everybody seems
6    to be entering into.  Either the agreement -- I mean, we start
7    out with the premise that the insurance company has an
8    obligation.  Now you've reached some kind of agreement with the
9    insurance company that apparently reconfigures what that
10   obligation is.  Perhaps you could kind of describe what that is
11   in hypothetical or general terms.
12        *MR. McATEE:*  Sure, Your Honor.  So there is usually
13   an underlying policy or set of policies that provide
14   environmental liability coverage.
15        *THE COURT:*  Uh-huh.
16        *MR. McATEE:*  When we had the Fox River or Kalamazoo
17   problem, we would go to the insurance company and say, "We have
18   this policy that you have issued.  We would like for you to pay
19   the costs."  They generally say no.  They have a variety of
20   reasons.  And it depends on the jurisdiction as to how strong
21   those are, but they generally refuse.  There's usually
22   litigation, and then there's negotiation that leads to a
23   settlement where the insurance company puts up a sum of money
24   for defense costs and for indemnity costs.  There's a release
25   given under the insurance polices so NCR loses its right to go

1    after those insurance companies for those policies for those

2    sites.  And then there's the confidentiality provisions that

3    protect disclosure to the public and to parties like

4    Georgia-Pacific.  There may be some other things in there as

5    well, but that's the gist.

6         *THE COURT:*  The last part of that is what again?

7         *MR. McATEE:*  The confidentiality provisions that

8    we've been discussing that protects the individual settlement

9    amounts from getting out to the public or to other parties that

10   the same insurance companies insure for the very same risk.

11        *THE COURT:*  All right.  So the insurance company

12   insures you, you want to collect the insurance, they say,

13   "Well, no, our policy doesn't say what you think it says."  The

14   common problem most people have when they try to collect their

15   insurance.

16        *MR. McATEE:*  Amen.

17        *THE COURT:*  So then you have to fight the insurance

18   company to get them to pay what you think they already promised

19   to pay.  Do they enter into these agreements to forestall that

20   litigation or as a result of that litigation?

21        *MR. McATEE:*  I think both.

22        *THE COURT:*  In your case what happened?

23        *MR. McATEE:*  In this case there was litigation that

24   was settled by these settlement agreements.  There were

25   declaratory judgment actions brought for coverage.

1          *THE COURT:*  All right.  And then was there a final

2     judgment entered that was litigated, or did you as a result of

3     the -- at some point after the declaratory judgment you entered

4     into a settlement to finally resolve the actual dollar amount?

5          *MR. McATEE:*  So I'm not the insurance coverage lawyer

6     for NCR, so with that caveat, my understanding is that almost

7     all of these settle before there was some kind of declaration

8     or judgment of liability.  There may be one or two examples of

9     higher-level carriers that went to judgment that NCR is still

10    fighting with.  But the vast majority of this was settled short

11    of a judgment.

12         *THE COURT:*  All right.  And so now everybody

13    understands that was a party to that litigation what the

14    insurance company actually has to pay in regard to the

15    Kalamazoo River?

16         *MR. McATEE:*  Well --

17         *THE COURT:*  Is that right?

18         *MR. McATEE:*  Maybe I can put a point on the kind of

19    problem I've been talking about.

20         Let's say that NCR settles with carrier X for $10 for

21    the Kalamazoo site and carrier X also insures Georgia-Pacific

22    but they haven't settled.  And I'm required to give that -- in

23    this litigation I'm required to give Georgia-Pacific my

24    agreement with that carrier that says $10 is what they are

25    willing to pay me.  They now have an advantage in their

1   negotiations with that carrier because they know what NCR paid

2   for their settlement, so they can in their negotiations say,

3   "You paid 10 to NCR, you should give us 10," or 20 or whatever.

4   That's the problem we're trying to stop.

5        THE COURT:  Well, wouldn't they have a stronger

6   argument -- first of all, they have already entered into an

7   agreement with Georgia-Pacific, haven't they?  Because

8   Georgia-Pacific already has settlement agreements with them.

9   Which, by the way, they furnished to you under this protective

10  order.

11       MR. McATEE:  So I actually don't know if they have

12  settled with all of their insurers already.  Georgia-Pacific.

13  They did give their agreements to me, that's true.  Their

14  agreements must have had different terms or they may have had

15  consent from their insurance companies.  I don't know.  But

16  they did give their settlement agreements under the protective

17  order to NCR.  That's true.

18       THE COURT:  And we're really concerned about

19  recognizing this confidentiality because we're inducing the

20  insurance companies to come to the table, but we haven't really

21  been successful in doing that because you had to sue them in

22  the first place to get a declaratory judgment to find out how

23  much they are going to pay you to honor the agreement they

24  entered into in the first place which they didn't pay you on.

25       MR. McATEE:  That's true.

1          *THE COURT:*  So I'm not really encouraged this is

2     going to really get them to cooperate.  Now, maybe if they came

3     to the table right away and said, "Yeah, we'll enter into an

4     agreement to honor our first agreement if you keep it quiet."

5     That's one thing.  You had to take them to court, drag them

6     through court to get a declaratory judgment, and now they want

7     to preserve that.  I'm not sure what policy is being served

8     except -- I'm not sure what policy is being served.

9          Doesn't -- when we look at Rule 26(a)(1), it requires

10    the insurance company to -- or the insurance policy being

11    involved -- and I recognize that's as far as it goes -- there's

12    some language in a case Excelsior College versus Frye, a 2006

13    case, and it talks about that rule.  And an interesting line

14    that the judge says -- in order that this is exactly what the

15    rule says -- "Rule 26(a)(1) only mandates the production of

16    agreements," meaning insurance polices, "that may create an

17    obligation, not any agreements that may negate such an

18    obligation."

19          Well, just to read that condemns the whole rule as

20    being inadequate.  It's like all an insurance policy is is a

21    contract, and the rule says give up the contract, but you don't

22    have to give up any subsequent modification of the contract

23    that may negate what the contract says.  What good is that?

24    The whole purpose of discovery is to eliminate surprise.  So

25    you have a rule that says, "Well, we don't want you to be

1    surprised by the insurance policy, so give up the insurance

2    policy."  But you don't have to give up any modification of the

3    insurance policy that negates it.  So that's what the rest of

4    discovery is for.  And so we come along now and we have the

5    rest of discovery which says, okay let's get the modifications.

6    In the same spirit it would seem that the rule contemplates, to

7    eliminate surprise.  Well, the insurance companies can't

8    protect the policy itself.  They can refuse to honor it because

9    they customarily do it seems like.  They can drag you through

10    court and make a court tell you what the policy that they

11    drafted in all likelihood says.  And now they argue that they

12    are going to keep that quiet.  But the rule initially said that

13    policy was not to be kept quiet.  I'm having a hard time

14    understanding why the subsequent declaration as to what that

15    policy really says could be kept any more quiet or confidential

16    than the policy itself.  If the policy is not supposed to be

17    kept quiet, why should the confidentiality -- why should the

18    agreement as to what a court ultimately says about it or what

19    the negotiation that forestalls the court determination says

20    about it be kept quiet?

21          *MR. McATEE:*  The only thing I can think of,

22    Your Honor, is if an insurance company insures four different

23    parties, and it wants to settle with one of them for $10 but

24    doesn't want the other three to find out, they will want to

25    have a confidentiality provision in the agreement that prevents

1    disclosure to those parties so that the other three don't

2    obtain an unfair advantage.  And if the agreements in spite of

3    that get produced routinely in cases like this one --

4         *THE COURT:*  They are the ones with the unfair

5    advantage.  They have the secrets.  They know what they are

6    dealing with with one party versus the other party.  If the

7    other parties know what they are doing, then presumably they

8    would have to treat everybody the same, wouldn't they?

9         *MR. McATEE:*  Well, it gives the other three parties a

10   negotiating advantage to know what the first settler got.

11        *THE COURT:*  Right, so the insurance company would

12   have to treat all three of them the same way.

13        *MR. McATEE:*  Perhaps.  Or what's more likely to

14   happen is the insurance company is going to say "I'm not even

15   going to settle with the first one because the other three are

16   going to find out, so let's just keep litigating."

17        So I think the policy we're talking about here is

18   encouraging -- and I know they are often recalcitrant -- but

19   encouraging to the extent we can insurance companies to settle

20   with their insureds, put money on the table, and if they

21   bargain for protections, confidentiality protections, honor

22   those to the extent possible while still giving relevant

23   information to a party who wants it.  And that's where I come

24   back to the aggregate solution of giving them the aggregate

25   amount so they have the total picture and they can make their

1    arguments but they don't need to know each individual number.

2         THE COURT:  At the risk of going in a circle, how

3    well did that work with you when you had to sue them and go

4    through a declaratory judgment action to get to that

5    confidentiality agreement?

6         MR. McATEE:  Well . . .

7         THE COURT:  If they had come to the table at the

8    outset and said, "Yeah, we'll negotiate with you as long as

9    it's confidential," that's one thing.  You had to go through a

10   declaratory judgment to that get to that agreement.  So I don't

11   think they came to the table very quickly.

12        MR. McATEE:  Well, that may be true in those cases,

13   but, you know, they eventually did come to the table, and, of

14   course, NCR wanted the money, so we agreed to their request to

15   keep it confidential from others.  And to that extent, I think

16   it encouraged the settlements, albeit belated.

17        THE COURT:  Okay.  Thank you, Counsel.

18        MR. McATEE:  Thank you, Your Honor.

19        THE COURT:  A vigorous argument on their behalf

20   should be noted.

21        MR. NYFFELER:  Rebuttal, Your Honor?

22        THE COURT:  Yes.

23        MR. NYFFELER:  So I guess to start out here, you

24   know, Georgia-Pacific wants to point out that it took up this

25   motion to compel before any of these responses and any of the

1    stuff that we're looking at was actually produced by NCR.  So

2    the motion to compel was actually necessary to start this whole

3    process going.

4           I guess the question I'd want to ask is, you know,

5    why does NCR specifically care if you grant this motion?  I'm

6    not sure I follow this.  I understand the insurance companies

7    are the ones that appear to be concerned, but I don't see them

8    here today.  And so I don't understand, you know, if they are

9    really concerned, why aren't they here today?  And as you point

10   out, Judge, it seems like the insurance settlement agreement --

11          *THE COURT:*  Well, if Cravath, Swain & Moore, which is

12   one of the finest law firms in the country is arguing on their

13   behalf, who else are they going to hire that's going to do a

14   better job?

15          *MR. NYFFELER:*  I mean -- as you suggest, Judge, I

16   mean, these insurance settlements in some ways are -- it's a

17   contractual attempt to get around the disclosure rules of

18   Rule 26.

19          Now, the purpose of Rule 26 initial disclosures and

20   to disclose these insurance agreements is in fact, as NCR's

21   counsel pointed out, is to encourage settlement.  But that's

22   another reason why this information be disclosed to us.

23   Because Georgia-Pacific, if we had this information and knew it

24   was going on, then we might be encouraged to settle with them.

25   So why is this information not available for us to review as

```
 1    well?  And it's not a question of whether we trust counsel to,
 2    you know, summarize or whatever.  I mean, first of all, there's
 3    been done a lot of litigations over these very complicated
 4    contracts.  There's at least 19 of them.  I'm sure they are
 5    longer than a page.  So, I mean, it's not just a question of
 6    whether we trust them or not.  This is a very complicated
 7    process.  And, you know, and also too, Your Honor, I will point
 8    out that Georgia-Pacific actually responded to NCR's
 9    interrogatories about our insurance settlement agreements, and
10    all the information that they asked for we provided that, and
11    we're still fighting to get this information from them.  And
12    lastly, Your Honor --
13              THE COURT:  Were yours subject to confidentiality
14    agreements?
15              MR. NYFFELER:  I'm sorry?
16              THE COURT:  Were your settlement agreements, did they
17    contain confidentiality provisions?
18              MR. NYFFELER:  Yes, Your Honor, they were, and that's
19    why the parties stipulated to the protective order.
20              THE COURT:  You thought that was sufficient
21    protection under the -- as far as the confidentiality
22    obligations under the settlement agreements?
23              MR. NYFFELER:  Yes, Your Honor.  The whole purpose
24    was to get this in place so we wouldn't have to have the kind
25    of fight we're having right now.
```

```
 1              THE COURT:  Okay.
 2              MR. NYFFELER:  And lastly with respect to the
 3     redacted Appvion funding agreement that counsel mentioned will
 4     be released the first week in November, we don't necessarily
 5     agree with the way it's being produced.  However, we would ask
 6     that an unredacted copy be given to Your Honor so you can
 7     review it in camera to determine whether the actual redactions
 8     are limited in the way it's been said.
 9              THE COURT:  So that I can determine what?
10              MR. NYFFELER:  Well, so -- I understand that counsel
11     has said that it's going to be limited -- the redactions are
12     going to be limited maybe to strategy, bank accounts, and
13     things like that.  We would ask Your Honor just to take a look
14     at that and make sure --
15              THE COURT:  Just to take a look at that?
16              MR. NYFFELER:  -- and make sure that the redactions
17     don't go to the way that the payments are supposed to be
18     disbursed between the Kalamazoo, Fox, and any other sites.
19              THE COURT:  I appreciate your faith in the Court.
20     And I probably have some spare time between halftime over the
21     weekend.  If the football game gets dull, I can just glance at
22     that.  But I suspect from the amount of time it took counsel to
23     draft that that's not something that can casually be done.  So
24     I'm not sure that that's something I want to take on.  I guess
25     I shouldn't try to be facetious about it, but I would rather
```

1  take counsel's representation as an officer of the court that

2  it contains or doesn't contain what he represents.

3       *MR. NYFFELER:*  Do you have any further questions,

4  Your Honor?

5       *THE COURT:*  Yes, but it's actually directed to

6  opposing counsel.

7       There's a question I really didn't give you an

8  opportunity to answer because I didn't ask it.  And you didn't

9  address it and Georgia-Pacific raised it.  When you, or NCR,

10  originally responded in your disclosures under 26(a) language,

11  and I'm not sure if I have it handy here.  Yes, here it is.  I

12  believe you provided that you said you would make available for

13  inspection and copying any insurance agreement under which an

14  insurance business may be liable to satisfy all or part of a

15  possible judgment in this action or to indemnify or reimburse

16  for payments made to satisfy the judgment.

17       There was no reservation made there that you were

18  limiting that to insurance polices.  Rather it was a blanket

19  statement that any insurance agreement would be produced.  Why

20  didn't you -- why can't the Court read that and why can't more

21  specifically Georgia-Pacific read that as you giving away the

22  store right then and there?

23       *MR. McATEE:*  My answer to that, Your Honor, is that

24  it probably could have been worded better, but the insurance

25  settlement agreements that we're talking about here don't

```
 1   promise to pay a piece of a judgment in any of these cases.  So
 2   that's the qualifying language that I would point to in the
 3   response you just read.
 4        We were agreeing -- any agreement that offered to
 5   cover a judgment or liability like the insurance polices
 6   themselves, we would provide those and did provide those.  But
 7   these settlement agreements are just a sum of cash to be
 8   allocated to certain either cleanup costs or defense costs.
 9   They are not a promise to pay a judgment.
10        THE COURT:  Interesting.  Would you run that by me
11   one more time, please?  The settlement agreement --
12        MR. McATEE:  So the --
13        THE COURT:  The agreement does what again?
14        MR. McATEE:  So the representation we made in our
15   initial disclosure pleading was that we would provide any
16   insurance agreement under which an insurance business may be
17   liable to satisfy all or part of a possible judgment, and then
18   it goes on.
19        The 19 settlement agreements we've been talking about
20   don't make any insurance companies liable to satisfy all or
21   part of a possible judgment.  All they do is settle a claim
22   that the insurance company had to fund response costs or
23   defense costs and then provide a sum of money for NCR to
24   satisfy those past costs.  They don't promise to pay a future
25   judgment.  But I agree with Your Honor we should have worded it
```

1    better.

2         THE COURT:  The original insurance polices do not

3    require payments going forward or these costs?

4         MR. McATEE:  Yeah, the original insurance polices do

5    say if you have a judgment in the future, if you have costs in

6    the future and they are covered under the policy, the insurance

7    company will pay it.  That's what this language in the initial

8    disclosure is meant to pick up.

9         THE COURT:  But the settlement agreements only agree

10   to pay costs -- I'm sorry -- they don't agree to cover -- they

11   don't agree to cover those costs?

12        MR. McATEE:  What they generally do is provide a sum

13   of money that NCR can then allocate either to cleanup costs it

14   has incurred or to defense costs.  What they don't do is say,

15   "And you know what, in the Kalamazoo case if you have a

16   judgment of X million dollars, we'll pay 10 percent of that" or

17   "50 percent of that."  They don't do that.  They are just

18   putting a sum of money on the table for NCR to use to fund its

19   costs in exchange for a release of the policy.

20        THE COURT:  So they put a finite number on the table

21   as opposed to an open-ended amount --

22        MR. McATEE:  That's right.

23        THE COURT:  -- going forward.

24        MR. McATEE:  That's right, Your Honor.

25        THE COURT:  All right.  Thank you.

1          *MR. McATEE:*  Thank you, Your Honor.

2          *THE COURT:*  I don't know if you had anything further

3     since it was your motion.

4          *MR. NYFFELER:*  No, Your Honor.

5          *THE COURT:*  All right.  Thank you gentlemen.

6          The issue before the Court is the request by

7     Georgia-Pacific that the Court order NCR to provide discovery

8     in response to Georgia-Pacific's request number 9 of its first

9     phase II request for production to NCR and interrogatory number

10    10 of its first phase II interrogatories.  And essentially what

11    we're talking about are these settlement agreements that have

12    yet to be produced being some 19 in number.

13         There's also a remaining indemnity agreement that was

14    just negotiated, in fact apparently is still being negotiated

15    to some extent.  As to the latter document, it's agreed that --

16    it's been agreed by NCR that will be produced by the end of the

17    first week in November, which is coming up pretty quickly,

18    today being October 30th.  And while it will be redacted, none

19    of the redacted portions pertain to the amount of money

20    available to clean up -- or pertaining to the cleanup of the

21    Kalamazoo River.  And as I understand it, this document

22    actually is an indemnity document for other purposes but does

23    touch on the Kalamazoo River, and so it comes into play for

24    that reason.  And it's this portion of the document that is not

25    redacted that is really the responsive part to the request.  So

1   to the extent that there are some redactions, they do not

2   appear to be germane to what is being sought by the discovery.

3   And I'm willing to take counsel's representation as an officer

4   of the court that that is the case.  I am going to decline

5   Georgia-Pacific's invitation to review this document in camera,

6   because in light of that representation, I really don't think

7   that's probably necessary.

8          But the real focus of this motion has been on these

9   19 settlement agreements, and the only reason they have not

10  been produced, as I understand it, is that they contain

11  confidentiality agreements insisted upon by the insurance

12  companies to the agreements, who are parties to the agreements.

13  So these are self-imposed confidentiality agreements entered

14  into between the parties to those agreements.  NCR is one party

15  and the insurance companies are the other parties.

16         Of course, one cannot avoid one's discovery

17  obligation simply by entering into a confidentiality agreement

18  with a third party who is not a party to this litigation

19  whereby you promise to keep something secret and then turn

20  around and come to this Court and say, "Well, I promised

21  somebody else I wouldn't talk about that, and, therefore, I

22  can't divulge that information in this litigation, Judge."

23         There does not appear to be any privilege raised or

24  work product raised or anything of that nature raised as a

25  reason for the confidentiality, rather it's a question of

1    policy.  And not even that so much as a desire of the insurance

2    companies to best position themselves when they are negotiating

3    with their insureds.  And to the extent that people want --

4    other parties might want to keep the insurance companies happy,

5    there might be some benefit in allowing them to have their

6    confidentiality agreements.  Because they are the big kids on

7    the block.

8         And NCR's very able counsel has made a vigorous

9    argument on behalf of the insurance companies on their desire

10   to keep these settlement agreements confidential, but the issue

11   remains should the insurance companies' desire to keep their

12   negotiations secret trump the legitimate needs of the parties

13   to this litigation?

14        Now, of course, even the parties to the agreement

15   have implicitly recognized that perhaps that shouldn't be the

16   case because they have built in an escape hatch.  They have

17   said that those confidentiality agreements are subject to an

18   escape clause, which is a court order.  Well, this Court holds

19   the key to those handcuffs that they have voluntarily placed on

20   themselves.

21        I don't know if the availability of these

22   confidentiality agreements makes the insurance companies more

23   amenable to negotiations with their insureds or not.  It sounds

24   like many times you still have to sue them to get them to honor

25   their insurance agreements, which they draft for the most part.

1   You still have to drag them through court.  And then at the end

2   of the day, after a considerable amount of time and expense,

3   you work out some agreement with them as to what their policy

4   really meant.  But only if you at that point agree to keep it

5   confidential.  And maybe that confidentiality provision has

6   helped somehow.  But, of course, they have obtained something

7   for that too.  They have avoided the risk that a judge might

8   rule adversely to them.  They haven't taken that to a final

9   determination in front of a judge.

10          I handle settlement conferences all the time, and

11  both parties usually want to avoid taking that final issue in

12  front of a judge for some reason.  So they may very well agree

13  to settle some of those cases even if there are not settlement

14  agreements -- I'm sorry -- confidentiality agreements in those

15  settlement agreements for fear of how the courts might rule as

16  to whether or not they should honor some of those insurance

17  polices that they write and enter into.  But that's all

18  speculation.

19          We come back to the question of whether the

20  self-imposed confidentiality agreements should trump the

21  interests of the parties here.  And the parties here have

22  entered into a protective order that have allowed for the

23  exchange of these settlement agreements.  And as I understand

24  it all parties entered into that.  Georgia-Pacific has in fact

25  furnished its confidentiality -- I'm sorry -- its settlement

1   agreements pursuant to that order.  So there's an argument that

2   it would seem fair that NCR be held to do the same.

3          I think we've all agreed that Rule 26(a)(1) by itself

4   does not require production of these settlement agreements.  It

5   does require production of insurance agreements, but that is

6   read to me to read insurance polices, which is what the rule

7   was back in the 1990s.  But apparently not any subsequent

8   agreements that may negate what the insurance policy says,

9   which is the point they tried to make during our discussion.

10  So the authors of the Federal Rules of Civil Procedure have

11  said it's important that these insurance polices be produced.

12  Those cannot be kept secret.  We want disclosure.  We don't

13  want surprises.  We want the parties to be able to obtain

14  insurance polices that are germane to this lawsuit so both the

15  parties know what the insurance is that's out there, what

16  obligations are created by the insurance.  But the rule does

17  not go so far as to require subsequent agreements that negate

18  that insurance policy, which renders the whole rule kind of

19  hollow if we were to stop there.  But you're allowed to

20  continue to have discovery and ask for subsequent agreements

21  that would explain if that insurance policy has been rendered

22  hollow or not or somehow modified.  And that's what's been done

23  here.  There have been requests for production of documents and

24  interrogatories, and those subsequent agreements have been

25  requested.  Clearly those policies have been modified.  The

1    effect of it has been modified.  They apparently are somewhat

2    complicated.  There are 19 of them.  Affecting a number of

3    policies in excess of 19.

4            Counsel has tendered the suggestion that they could

5    be briefly summarized in the aggregate, but I think the movant,

6    Georgia-Pacific, is entitled to the policies themselves to make

7    its own determination as to what they say.  I'm going to grant

8    the motion in that regard.

9            I think these documents are relevant to determine the

10   ability of NCR to meet its potential burden, potential burden

11   at the end of the day as to paying for cleanup costs.  NCR has

12   said it won't contest its ability.  It's not going to put that

13   in issue.  But the reality of the situation is that those costs

14   might be at issue.  I'm sorry, its ability might be at issue.

15   It's a 4 1/2-billion-dollar company apparently as of yesterday.

16   Arguably cleanup could be a 2 1/2-billion-dollar project.

17   There could be costs worth 2 1/2 billion dollars according to

18   counsel, plus interest.  And NCR might have other obligations

19   besides this one.  If it truly got stuck for a bill for 2 1/2

20   billion dollars, that would substantially impact it.  And we

21   are certainly finding out that some companies are not too big

22   to fail.

23            When I was younger there were some companies I knew

24   would never go under, but they don't exist today.  My dad

25   always put his money in one particular stock brokerage and it

1    was a giant, but it would have gone under if it hadn't been

2    bought up by another company.

3              There are other companies that had to be failed out

4    by the federal government that were the biggest manufacturers

5    in the country or the world.  There are a couple of companies

6    named by the plaintiff in this case that went bankrupt.  And if

7    we think there are companies that are too big to fail and the

8    government will bail them out, after what happened a few years

9    ago, that might not be possible the next time around.  The

10   public might not allow the next round to bail out companies

11   that are too big to fail.  Who knows.  But the very question

12   mark suggests that where you have damages in numbers that start

13   with a B, Georgia-Pacific is justified in exercising

14   due diligence to determine the assets available to a company

15   that it's seeking to obtain a judgment from.  So I think it's

16   entitled to determine if NCR has the assets to meet a potential

17   judgment in this case.

18             Now, maybe NCR is not going to be held substantially

19   liable.  It does look like there's some liability.  And the

20   question then is really to what extent.  But it could be

21   substantial.  So I think it's entitled to these documents

22   because I think they are relevant as to NCR's ability to meet

23   any judgment.  I think the only reason that they are not being

24   produced is a self-imposed confidentiality provision.  The

25   Court can come to NCR's rescue and free it from the handcuffs

1    NCR put on itself, the Court provides that key.  And whether

2    NCR wants to get out of those handcuffs or not, the Court is

3    going to open those handcuffs for it.  So those documents

4    should be produced in the next 10 days.

5            Georgia-Pacific is entitled to costs in this case,

6    and I assume the parties can work that out.  I'll give them

7    7 days to do that.  In the event you cannot agree on costs

8    within 14 days, GP -- I'm sorry -- Georgia-Pacific should file

9    an affidavit and related documents or supporting documents as

10   to what it believes its costs are, and I'll give NCR seven days

11   thereafter to file responsive documents pertaining to costs.

12   The Court will decide that on papers, reserving the right for

13   further hearing if necessary.

14           Is there anything further we need, gentlemen?

15           MR. NYFFELER:  No, Your Honor.

16           MR. McATEE:  Your Honor, if I may, I had one

17   clarifying question.  In producing the 19 settlement agreements

18   it would be our intent to redact amounts for other sites.  A

19   lot of these agreements cover multiple things.  And since this

20   is an argument about the Kalamazoo site and how much is

21   available for Kalamazoo, I would just ask that we be permitted

22   to redact out other sites.

23           THE COURT:  Would that have any impact on calculating

24   the amounts available for the Kalamazoo site?

25           MR. McATEE:  The answer to that is no, and if it

1    would, we wouldn't redact the information.  Only if we could

2    redact out whatever the specific amounts for other places that

3    are not at issue in this case and are totally irrelevant.

4            *THE COURT:*  Okay.  Any problem with that, Counsel?

5            *MR. NYFFELER:*  Well, Your Honor, they have

6    specifically said that the money was going to go first to

7    another site and whatever is left is for Kalamazoo.  I may have

8    misspoken.

9            *THE COURT:*  Well, that went to the indemnification

10   agreement.

11           *MR. NYFFELER:*  Okay.  I guess I just don't understand

12   why NCR cares.  We have a confidentiality agreement in place.

13   I just don't understand.

14           *MR. McATEE:*  The information is totally irrelevant.

15   It's about other sites.  Some of those other sites these other

16   companies may be involved in.  The protective order doesn't

17   prevent them from giving it to their clients.  They can give it

18   to their coverage counsel.  So it's a sensitive issue, and it's

19   totally irrelevant from this case.

20           *THE COURT:*  I may have cut off Georgia-Pacific's

21   attorney when he was beginning to make an argument just now

22   about whether money would go to other sites first.

23           Were you going to make that argument, Counsel?

24           *MR. NYFFELER:*  Your Honor, I guess my only concern is

25   simply I don't -- I don't pretend to know what these say, and I

1   don't know how they are going to affect how money is flowing to

2   the Kalamazoo or money will not be available to the Kalamazoo.

3   I just don't know.

4        *THE COURT:*  I understood counsel to say that there

5   was a set amount of money that was being paid by the insurance

6   companies to NCR for Kalamazoo or for the Kalamazoo cleanup

7   under these agreements.

8        Is that correct?

9        *MR. McATEE:*  So, Your Honor, I think each agreement

10  is different.  But I think many of them cover more than one

11  site.  So you might have a hundred dollars, you know, $20 to

12  site A, $30 to site B.  All I'm asking is whether it's

13  permitted to just redact out the other sites.  So they see $10

14  to Kalamazoo but not the other provisions with respect to the

15  other sites.  Because, again, it's totally irrelevant and it's

16  a very sensitive issue given that all of us are involved in

17  multiple sites with the same insurance companies.  I would not

18  by way of redaction inhibit in any way their ability to

19  determine how much of the insurance was in fact for Kalamazoo.

20  I understand Your Honor has ordered that disclosed.  I'm just

21  talking about completely irrelevant data.

22       *THE COURT:*  I guess I don't see a problem with that

23  as long as there is no way that the other amounts or the

24  provisions of the settlement agreement could in any way impact

25  the Kalamazoo amount.  So if it's percentages, certain

1  percentages go to one and that somehow their use or nonuse

2  would affect the percentage that went to Kalamazoo, that might

3  make a difference.  I'm just speculating because I have no idea

4  how these things are drafted.

5       If you're simply redacting a set dollar amount that

6  went someplace else besides Kalamazoo, I don't have a problem

7  with it.  But I suspect you should leave in whatever

8  methodology of how these amounts are arrived at and just redact

9  the dollar amount itself so there's no mystery that would cause

10 the other side to wonder "How does this impact Kalamazoo?"

11 Because that will just bring us right back here again, and I

12 would have a problem with that.

13      *MR. McATEE:*  Understood, Your Honor, and I wasn't

14 suggesting that.  I was suggesting doing the way you suggested.

15      *THE COURT:*  Okay.

16      *MR. McATEE:*  Thank you.

17      *THE COURT:*  Counsel, I'll give you one last comment

18 on it.

19      *MR. NYFFELER:*  I guess the only question I have,

20 Your Honor, is that we initially talked about there's

21 indemnification agreements and there's a certain amount of

22 money that's first going to be applied, as counsel said, to the

23 Fox River, and if anything is left to Kalamazoo.  The concern

24 that I don't understand is -- there's essentially -- we're

25 talking about two different pools of money?

1          *THE COURT:*  Are we talking about the indemnification

2     agreement now or the settlement agreements?

3          *MR. NYFFELER:*  I'm talking about both.  Because there

4     could be some money from indemnification that goes to Fox and

5     then to Kalamazoo.  But we don't know that.  And if -- I don't

6     know what order that money is going to be applied, so if -- I

7     mean, is the indemnification money first in line to pay

8     anything in the Fox, or is it after the insurance agreements?

9     If it's after the insurance agreements, then more money will

10    come back to the Kalamazoo.  I guess I just don't understand

11    the interplay between the different pools of money because we

12    have indemnification and insurance, and I just don't understand

13    how this money is going to be available and when.  I'm not

14    necessarily trying to pry, I just -- I don't understand this

15    kind of stuff.  I just don't get it.

16         *THE COURT:*  First of all, you ought to be prying

17    because that's what discovery is all about.

18         *MR. NYFFELER:*  Well, but . . .

19         *THE COURT:*  Putting aside the semantics of it.  The

20    indemnification agreement as I understand it does not redact

21    anything that pertains to the amount of money available for

22    Kalamazoo.  And again, if they redacted anything that pertained

23    to the methodology of the amount of money that's going to end

24    up in Kalamazoo, I think we would have the same problem.  And

25    so we come back to the issue of, well, how much money is

1   available for the Fox River cleanup and then what's left over

2   goes to Kalamazoo, doesn't that become problematic?  How do we

3   handle that, Counsel?  Here I'm addressing NCR, of course.

4          MR. McATEE:  If we're talking about the funding

5   agreement --

6          THE COURT:  Yes.

7          MR. McATEE:  -- that was executed in September of

8   2014 --

9          THE COURT:  Yes.

10          MR. McATEE:  -- it would be our intention for that

11   agreement to show the Fox River amounts and then the provisions

12   that leave it over for Kalamazoo.  So they would have full

13   disclosure of that.

14          THE COURT:  All right.  Then I don't have a problem

15   with that.

16          As far as the settlement agreements are concerned, I

17   think counsel made it clear that he was only going to redact

18   the dollar amounts and how -- there would be no mystery as to

19   how the parties got to those dollar amounts, but as to the

20   actual dollar amounts that went to the other cleanup sites that

21   did not pertain to this lawsuit or this Kalamazoo River, those

22   would be redacted.  And you wouldn't need those.

23          MR. NYFFELER:  That's acceptable, Your Honor.

24          THE COURT:  All right.  Agreeable?

25          MR. McATEE:  Agreed, Your Honor.  Thank you.

1          *THE COURT:*  All right.  Thank you, gentlemen.  Have a

2     good day.

3          *THE CLERK:*  All rise.  Court is adjourned.

4       *(Proceeding concluded at 11:36 a.m.)*

5                        *   *   *   *   *

6                          CERTIFICATE

7          I certify that the foregoing is a transcript from the

8     Liberty Court Recording System digital recording of the

9     proceedings in the above-entitled matter, transcribed to the

10    best of my ability.

11

12    November 1, 2014

13

14                         /s/ Glenda Trexler
                          _____
15                        Glenda Trexler, CSR-1436, RPR, CRR

16

17

18

19

20

21

22

23

24

25