1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF MICHIGAN

3                SOUTHERN DIVISION

4    GEORGIA-PACIFIC CONSUMER PRODUCTS LP, et al,

5         Plaintiff,              No.  1:11cv483

6     vs.

7    NCR, INTERNATIONAL PAPER COMPANY,
     WEYERHAEUSER,
8
          Defendants.
9

10    Before:

11                 THE HONORABLE HUGH BRENNEMAN, JR.,
                        U.S. Magistrate Judge
12                    Grand Rapids, Michigan
                         October 22, 2014
13                      Motion Proceedings

14    APPEARANCES:
                    Varnum Riddering Schmidt & Howlett
15                  MR. ADAM JOHN BRODY
                    333 Bridge Street, NW
16                  PO Box 352
                    Grand Rapids, MI 49501-0352
17                  616-336-6000

18                      On behalf of the Plaintiff;
                    Dickinson Wright PLLC
19                  MR. GEOFFREY A. FIELDS
                    200 Ottawa Avenue NW
20                  Suite 900
                    Grand Rapids, MI 49503
21                  616-458-1300

22                      On behalf of the Defendant NCR,

23                  MR. DAVID W. CENTNER
                    Clark Hill PLC
24                  200 Ottawa Avenue, NW
                    Suite 500
25                  Grand Rapids, MI 49503
                    616-608-1100

```
 1
 2                    MR. JOHN DANIEL PARKER
                      Baker & Hostetler LLP
 3                    PNC Center
                      1900 E. Ninth Street
 4                    Cleveland, OH 44114-3485
                      216-861-7610
 5                         On behalf of the Defendant IP.
 6
 7
          REPORTED BY:  MS. KATHY J. ANDERSON, RPR, FCRR
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          October 22, 2014

2          PROCEEDINGS, 9:12 a.m.

3          THE COURT:  Good morning, gentlemen.

4          MR. BRODY:  Good morning, Your Honor.

5          MR. FIELDS:  Good morning, Your Honor.

6          THE COURT:  I had a dentist appointment yesterday, and

7     one of those routine appointments where they take all the

8     x-rays and everything seemed fine until they found a little

9     shading in an inlay I had; inlay was quite old.  The dentist

10    told me that it looked like there was a little decay there and

11    they would have to drill that inlay out and put a cap in.  But,

12    fortuitously, Tim told me that there was an opening at 8:30 the

13    next morning, which is today, and he could get me in.  It's an

14    hour and a half process, one of two steps.  And I said, "Tim,

15    what makes you even believe that I would want to cancel my

16    schedule for tomorrow morning and rush in here at 8:30, sit in

17    your chair for an hour and a half where you drill in the first

18    of two steps, pay you $1,500 because my insurance doesn't cover

19    crowns, and are you serious?"  And then I looked at my

20    calendar, and I thought perhaps I'm being too rash.  But on the

21    off chance that somebody had flight plans and was actually here

22    this morning because of this motion, I thought in all fairness

23    I probably shouldn't cancel the morning, and so here we are.  I

24    did put off the dentist appointment until a little bit later.

25    So, anyway, it's good to see all of you today.

1           This is Georgia-Pacific's motion to compel.  Only five

2    attorneys this morning.  I'm disappointed.  But we do have

3    enough table space for a change in this small courtroom.  So

4    that's good.  There is always a plus.

5           I read the, I read the briefs of the three that have

6    submitted the briefs, so I think we're ready to go.  Counsel,

7    please proceed.

8           MR. BRODY:  Yeah, I was going to say you've got the B.

9    team here today, but I don't want to insult Mr. Parker, so I

10    appreciate --

11           THE COURT:  I don't think there is a B. team among all

12    the attorneys here.  I think there's just a surplus of an A.

13    team.

14           MR. BRODY:  Your Honor, I don't have a whole lot to

15    add to what is in the brief.  I do want to dispel this notion

16    that we are freeloaders looking to take advantage of other

17    people's work.

18           First of all, we have abided by the party's agreement.

19    We have voluntarily produced at our expense approximately

20    75,000 pages of documents that we have obtained from public

21    sources.  But I think even more importantly, on this specific

22    issue of the MDEQ documents that are at issue, the background

23    is very important because NCR said, hey, we are going to copy

24    this entire site file.  Our response was, we have already

25    produced a lot of that; we don't want to pay to duplicate that

1   effort.  Let's find another way.  Let's streamline this.  That

2   was the last we heard from them.  They copied the entire thing.

3          Now they want to say, well, because we didn't want to

4   share in an unnecessary and excessive cost, we can't get these

5   documents, even though they are relevant, and even though they

6   are responsive to our discovery requests.

7          And really, Your Honor, that last point I think goes

8   to the heart of this issue, because even apart from the party's

9   agreement, these documents are responsive to a request that had

10  been served on both NCR and IP.  And we specifically cited to a

11  number of those in our brief, but there are many others that

12  deal specifically with the MDEQ.  Requests relating to

13  submission by IP or others made in response, the information

14  requests from the MDEQ related to this site, requests for

15  production dealing with any notice of violation from MDEQ,

16  requesting with communications between NCR and MDEQ.

17         So there is no question that the documents that we are

18  asking be produced are responsive to our discovery requests.

19  And they don't really argue otherwise.  NCR halfheartedly said,

20  well, your requests are too broad.  IP didn't challenge it at

21  all in their response.

22         But the point is, these are responsive documents that

23  have to be produced.  And they can do it now at basically no

24  cost.  They are the ones who decided to go through the expense

25  on the front end.  And that was their decision and they are

1     free to do that.  But now all they have to do to comply with

2     their obligation under the discovery rules is copy a disk or

3     send us a flash drive at basically no expense.

4          On the issue of NCR's claim of work product, there was

5     no law cited in their brief for this proposition that the MDEQ

6     documents that weren't created by or for NCR and not in

7     anticipation of this litigation are work product, but even if

8     they were, they waived that protection.  IP has that exact same

9     set of documents, so any claim that there is some work product

10    protection that precludes them or allows them to not produce

11    them, that's baseless.  And, frankly, they have offered to give

12    them to us if we write them a check for 16 grand.  So I think

13    this work product argument is a red herring.

14          THE COURT:  You're saying they waived that because

15    they have produced the same documents to IP.

16          MR. BRODY:  Exactly.  And one final point that we

17    raised and that was addressed I believe by NCR is we did ask

18    that they produce all documents they have received from the

19    MDEQ or other public sources.  And my point there, Your Honor,

20    would be if they're responsive to our discovery requests, they

21    need to be produced.  And that's under the discovery rules, not

22    necessarily under the agreement that the parties had been

23    abiding by for the duration of this case.

24          So we're here today to ask you to grant the motion and

25    order either NCR or IP to produce an electronic copy of the

1    documents at issue.  And as you saw in the papers, we are

2    asking that that be done right away because of the deposition

3    that we have scheduled for October 29th.

4         THE COURT:  First of all, what is the discovery

5    request that you're pointing to specifically where you seek

6    these particular documents.

7         MR. BRODY:  If you look at page 5 and 6 of our brief,

8    Your Honor, we talk about the requests for production that were

9    served on IP.  And those are numbers 54, 63, 67, and 79.  And I

10   have referenced some additional ones here this morning that I'm

11   happy to give you the citations for.

12        THE COURT:  All right.

13        MR. BRODY:  And those would be our requests to IP

14   number 35, number 51, number 52, number 59, and number 77.  And

15   with respect to NCR, those would be request numbers 1 and 2 as

16   well as our general request for any documents relied on in

17   answering our interrogatories and requests for admissions.

18        THE COURT:  I have the ones you have stated what they

19   were as far as the first four going to IP.  The remaining ones

20   to IP and the two to NCR, are those stated here in the brief?

21        MR. BRODY:  They are not set forth specifically in the

22   brief, Your Honor.

23        THE COURT:  Will I find those in the defendant's

24   briefs?

25        MR. BRODY:  I don't believe that they cited those,

1    Your Honor.

2         THE COURT:  Just a moment.  Who is asking for the

3    $16,000, NCR or IP or both?

4         MR. BRODY:  I think that NCR fronted it.  They can

5    speak to that.  And then got a contribution from IP, so I

6    believe it would be NCR.

7         And if I could back up just for one moment, Your

8    Honor.  We have the requests set forth in our brief that I

9    believe would cover all the materials we are talking about.  In

10   response NCR claimed, well, those are just overly broad.  So I

11   wanted to give the Court some examples of some other requests

12   that are specifically targeted to MDEQ documents.  But the

13   overarching point is these are responsive to the ones we have

14   already set forth in our briefing.

15        THE COURT:  Which are the four that you sent to IP.

16        MR. BRODY:  Correct.

17        THE COURT:  But your motion goes to NCR as well.

18        MR. BRODY:  It goes to both.  Yeah.  Frankly, we don't

19   care who sends is us a disk of those documents.  We both have

20   possession, custody and control of it.  And it's easy enough to

21   actually just send us a link to a secure website, as they did

22   last night in producing some other documents.

23        THE COURT:  I guess my point goes to your motion to

24   compel which normally is directed to a specific discovery

25   request, and as far as NCR is concerned, these first four that

1      you lay out in your brief don't go to NCR.  They go to IP.

2              MR. BRODY:  Correct.

3              THE COURT:  So I was wondering what the language was

4      that NCR considers too broad, and that would be either 1 or 2,

5      and I don't have that language in front of me.

6              MR. BRODY:  And they didn't cite to any specific

7      example of what was too broad.  They made the generic blanket

8      statement in their brief, Your Honor.

9              THE COURT:  But I can't see that language to analyze

10     it.  All right.

11             Let's go back to this agreement.  You maintain today

12     and in your brief that you've abided by the agreement.  As I

13     understood their briefs, and they certainly are free to

14     articulate their argument better than I'm sure I could, that

15     there is no agreement in Phase II, the agreement never carried

16     over.  That, in fact, the discovery in the first part was

17     apparently smaller and that this discovery was substantially

18     larger and that's why NCR was asking for contributors before it

19     undertook the discovery, and that you specifically did not want

20     to contribute.  Apparently two parties were willing to

21     contribute and you and I think Weyerhaeuser did not want to

22     contribute.  So out front, you were put on notice that there

23     was no particular agreement to share these documents unless you

24     contributed and you didn't contribute.

25             MR. BRODY:  Well, a dispute did arise in the context

1    of these documents.  If you look at Exhibit 4 to our brief,

2    that appears to be the exchange of correspondence where we say,

3    we have this agreement, and Mr. Lisner disagrees with that.

4    But if you look in our brief, Your Honor, it's not simply we

5    don't want to contribute anything, it's let's find a better way

6    to do this, because we, Georgia-Pacific, have already produced

7    a large number of these documents, so let's streamline it,

8    let's not spend $50,000 to get largely duplicative materials,

9    and then we heard nothing about it after that point in time.

10            THE COURT:  Was that after they asked you to

11    contribute some money to it and you declined?

12            MR. BRODY:  I believe it was, Your Honor, yes.  That

13    would be set forth in our brief.

14            THE COURT:  And you said let's find a better way, and

15    you heard nothing else.

16            MR. BRODY:  Correct.

17            THE COURT:  So how do you go from that point to

18    understanding that there was some agreement?

19            MR. BRODY:  Well, we had an agreement all along, Your

20    Honor.  What we are saying now is, well, they are trying to

21    dispute it in specific context of this motion.  We are saying

22    it's improper for them to dispute it in the context of this

23    motion because up to that point in time that's what everyone

24    had been doing, including us.

25            THE COURT:  You're saying at that point they tried to

1    change what had previously existed by saying as to these MDEQ

2    documents they wanted to change the ground rules by charging

3    money.

4          MR. BRODY:  Yes.

5          THE COURT:  And you did not want to change the ground

6    rules.

7          MR. BRODY:  And it wasn't just changing the ground

8    rules.  Again, it was why are we taking what we already have

9    98 percent of and paying $50,000 to copy all this.  Why would

10   anybody do that?  Let's find a better way, and they apparently

11   had no interest in that because we didn't hear anything back

12   from them on that front.

13         THE COURT:  As far as Phase II of the case is

14   concerned, were there any other sets of documents that were

15   exchanged under the agreement that you had in Phase I of the

16   case?

17         MR. BRODY:  Your Honor --

18         THE COURT:  Where you had this agreement that

19   everybody had an understanding.

20         MR. BRODY:  I believe that some of the 75,000 pages of

21   documents that we have disclosed were in Phase II, but I'm not

22   certain about that.  So I don't want to make that

23   representation to the Court.

24         THE COURT:  Okay.  Now, as far as these MDEQ documents

25   are concerned that you're talking about, they say they are all

1    available to you, they want 16,000 as your share of the cost,

2    you don't want to pay that because you don't need the entire

3    set of documents, you want part of those documents, but there

4    would be a big effort in sorting out which of those documents

5    you want, and the only practical way to do that is to obtain

6    all of the documents and then go through those as you need

7    them.

8         MR. BRODY:  And we're willing to do that.  We'll sort

9    through and see what's duplicative and what's not.  Again, all

10   we want is a disk that has the file on it and we'll take care

11   of the rest at that point, Your Honor.  They won't need to do

12   anything else.

13        THE COURT:  What would be the practicality of doing

14   that and then returning the document or setting out those

15   documents, setting those documents aside, and paying for those

16   documents after the fact?

17        MR. BRODY:  Paying for the non duplicative documents?

18        THE COURT:  Yes, after you sorted them out.

19        MR. BRODY:  I would assume we could do that.  I don't

20   think it's going to be a large number.  And doing that would be

21   contrary to what we have been doing throughout this case, but

22   if that's the Court's decision, I'm sure we would be willing to

23   do that.  It's just we don't want to pay for duplicative

24   documents.

25        THE COURT:  You wouldn't be if you did that.

1      MR. BRODY:  Correct.

2      THE COURT:  I'm just asking.

3      MR. BRODY:  Sure.

4      THE COURT:  All right.

5      MR. BRODY:  Again, I go back to the point of they

6  should be provided in response to our discovery requests, and

7  if that's the case, we are under no obligation to pay them to

8  produce them.  The general rule is the party producing pays.

9  And that's separate from our agreement that we had throughout

10  this case.

11      THE COURT:  Let's go back then to your request.  Does

12  your request seek documents that might already be in your

13  possession however?  Some of these requests look like they

14  might be asking for documents that are in fact duplicative.

15      MR. BRODY:  I'm sure we do have some of those

16  documents, Your Honor.  You're speaking of the discovery

17  requests referenced in our brief?

18      THE COURT:  Well, there are those four.

19      MR. BRODY:  Yes.

20      THE COURT:  And then the other list that you gave me

21  which I don't have in front of me so I don't know.  But I

22  assume that if you looked at all of those documents, a lot of

23  those would be requests for documents that you already have,

24  whether they know which of those documents you already have or

25  not, I don't know.  But a lot of those you might very well have

1     obtained from other sources.

2              MR. BRODY:  I think that's correct, yes.

3              THE COURT:  So you would be seeking duplicative

4     documents there at their cost.

5              MR. BRODY:  Well, what we would typically do in that

6     situation is say we already have these documents, you don't

7     need to send us additional copies, just as a practical matter.

8              THE COURT:  What point in the production would you do

9     that?  Because you've already asked for them.

10             MR. BRODY:  Well, presumably they know the documents

11    that we had produced that we have already obtained from the

12    MDEQ.  So they wouldn't need to reproduce those for us.

13             THE COURT:  All right.  Thank you.  Mr. Fields.

14             MR. FIELDS:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. FIELDS:  I thought I would start out with the

17    rules, kind of old fashion that way, and briefly reference that

18    the motion is brought under Rule 37, which in subparagraph

19    (A)(iii) gives the Court the power to issue an order to compel

20    either a disclosure, a response, or something pertaining to a

21    deposition.  And since we don't have a deposition at stake here

22    or a disclosure, it's a response.  And I make that obvious

23    point because the rule doesn't talk about enforcing an

24    agreement.  It talks about enforcing discovery requests to

25    which an improper response or an incomplete response has been

given.  So we start with that rule.

And the other rule I wanted to bring to the Court's attention, not that I need to probably, is Local Rule 7.1(B) which says when you file a motion to compel, you need to attach or quote verbatim the request and the response.  And that's to allow the Court and all the other parties to focus in on what is the deficiency here, or is there one.  And so your questions already point out an obvious problem with this motion to compel, at least with respect to NCR; is that no motion has been filed that is quoted, or attached a request to NCR, nor has it attached a response, and we're all operating in a vacuum.

And I think that really is about all I need to say about the motion because the MDEQ thing is a fairly focused issue.  But my further problem is that the order that's attached to the motion, the proposed order, requests that the Court order --  well, first of all, "Objections by defendants are deemed waived," so apparently there is going to be some kind of blanket work product waiver for reasons that I don't understand because of course with respect to NCR, we don't even have a properly tendered request that's in the record.  And, "NCR shall immediately produce all relevant documents collected from public sources to Georgia-Pacific," which seems to me to be a little more sweeping than just the MDEQ documents.  And I'm a little leery of sitting down at this point if we're going

1  to find out there is going to be an order that is that

2  sweeping, so sweeping that let's say hypothetically last night

3  an NCR associate at the Cravath firm went on the web and

4  printed out something that all of a sudden that is swept into

5  something that was supposed to be just focused issue with the

6  MDEQ because that was the reason for the expedited hearing.

7       So I want to just make a few more comments to make the

8  record.

9       With respect to the MDEQ, just so that the Court has

10  the full background, NCR requested these documents through a

11  FOIA request to the MDEQ.  The response was there are an

12  enormous number of documents and it's going to cost you.

13  That's when NCR proposed and International Paper agreed to

14  share costs.  And I mention this because I think it shows in

15  spades that there was no agreement in Phase II to produce

16  things that one obtained from public sources.  There was an

17  agreement during Phase I, and in fact if you look at

18  Mr. Garrou's letter which is attached as Exhibit 1 to

19  Georgia-Pacific's motion, it references Phase I discovery.  But

20  during Phase II there was no such agreement.  I don't believe

21  you'll find it in the joint status report that led to the

22  discovery schedule and the case management order in Phase II,

23  and furthermore, the fact that NCR was proposing to share costs

24  and International Paper agreed, tells us by the course of

25  conduct of the parties there was no such agreement.  And the

1    fact that Georgia-Pacific said, we'll only pay if it's more

2    limited, shows that the course of the conduct of the party that

3    there was no such deal.

4         But in any event, I return back to Rule 37 which

5    authorizes and gives the Court authority to compel production

6    of an inadequate response, not an agreement.

7         Now, as far as Georgia-Pacific's contention that they

8    ever asked for this stuff, and this is a point that's made in

9    NCR's brief, the four illustrative requests that are at pages 4

10   and 5 of Georgia-Pacific's brief, don't hit the mark.  None of

11   them ask for the MDEQ documents.  They ask for other things.

12   It's theoretically possible that something within the MDEQ

13   production pertains to that, but it's theoretically possible

14   that any number of other things pertain to it.  And I can tell

15   you this, the complete set of MDEQ documents don't overlap and

16   merge in any way with those requests.

17        As I pointed out, those requests were tendered to

18   International Paper, not NCR.  So with respect to NCR, there is

19   really nothing to enforce here, and I think the Court should

20   deny the request with respect to the MDEQ.

21        But because of my concern about that request for the

22   other public documents, let me say as follows:  Georgia-Pacific

23   has not filed a motion with any request to anybody that

24   pertained to public documents.  They haven't cited or attached

25   any such requests to their motion.  So there is nothing to

1    enforce here.  They didn't raise this in the meet and confer,

2    so I'll say it another Local Rule 7.1(e) because that ought to

3    have been discussed.  Only the MDEQ issue was discussed.  And

4    there wouldn't have been any basis for expedited consideration

5    for that matter because the whole premise for this motion is

6    there is an MDEQ deposition coming, so, Judge, will you please

7    hurry up and let's have briefs.  Well, that can't possibly be

8    the case for all public records.

9         And for all of these things, I'm going to maintain

10   there is a work product privilege at stake.  As the Court

11   knows, there isn't any such thing as a limited waiver.  And

12   I'll note that we are co-defendants with IP, and there is a

13   joint defense aspect to what is on the record.  But with

14   respect to --  we are not even talking about a request to NCR

15   at this point.  There is no request that is on the record for

16   purposes of this motion, not with respect to the DEQ, and not

17   with respect to the other public documents.  And I'll be darned

18   if I stand here in court and waive in any way the work product

19   privilege for something that is not even in the record.  I'm

20   just not going to do that.

21        If you have any other further questions, Judge, that's

22   all I had to say this morning.

23        THE COURT:  Well, I understand this motion to be

24   directed to documents obtained from the MDEQ.

25        MR. FIELDS:  I'm being careful, Judge, just because of

the nature and the language in the proposed order that was
submitted to the Court.

THE COURT:  And I can understand that.  You wouldn't
be doing your job if you weren't concerned.  The focus of the
Court, however, is limited to the MDEQ.  That's why the Court
has expedited this hearing.  And so that the parties are aware,
that's the focus of the hearing this morning.  And that's all
the focus is limited to.  The third parties wanted other
documents, then I think we need to discuss that.  But that's
the focus of these documents or this motion.

Now, I will say, and perhaps parenthetically, that the
Court is also concerned that this case keep moving along.  And
I understand that we have a deposition coming up.  But I don't
want to see us get bogged down.  I want to get this matter
resolved.

The motion before the Court, and I'm not deciding the
motion yet because I have not even heard from International
Paper, but the motion appears to be one to compel, and
normally, as I think Mr. Fields has postured this, a motion to
compel is to compel discovery.  And we normally think of that
as discovery that's been previously requested such as requests
to produce documents.

Here the request appears to also be broader than that;
it's a request to enforce an agreement, kind of piggy backed on
a motion to compel production of documents.  Or shoe horn in to

1      a motion to produce documents.

2              Normally the Court doesn't enforce private agreements

3      made between the parties, but only enforces the Federal Rules

4      of Civil Procedure and discovery pursuant to those rules.

5      Which is why I asked at the outset what document requests were

6      at issue.  Four were pointed out, some more were listed, but I

7      haven't actually seen those.

8              Now, that's a technicality, it's an important one

9      because it's hard to evaluate those since I haven't seen them.

10     Two of those pertain to NCR.  The objection to those two by NCR

11     was, well, they are overly broad.  That is not an

12     insurmountable problem.  But as I understand it, Mr. Fields --

13     I don't understand it, I guess, is what is your position on

14     that?  Are those requests 1 and 2 that were directed to NCR not

15     sufficient to encompass the documents that NCR has obtained

16     from MDEQ or not?

17             MR. FIELDS:  I can't speak to it, Judge, because I

18     don't have those requests in front of me, and candidly will

19     state as local counsel have not flyspecked requests.  I think

20     NCR's brief is referring to the four illustrative requests that

21     were at pages 4 and 5 of Georgia-Pacific's brief.  And I don't

22     understand any other interrogatories to be in play here other

23     than this morning when they were alluded to on the record.

24             But I can't take a position until, I know it's a

25     technicality, but until I see the request and the response, I

1    can't take a position either.  I haven't seen it.  And I will

2    hasten to tell the Court that I don't like to come to court

3    unprepared and gave thought to reviewing the reams of written

4    discovery requests to see if I could deduce one or two

5    pertained, but there have been a lot of them.  And I wasn't

6    even sure I could get a complete set.

7            Mindful, however, of what the Court has said about the

8    need to move things along, there's obviously another side to

9    this story because this motion does have four requests to

10   International Paper, and International Paper does make I think

11   some cogent points about the need to pay to play, and that it

12   may turn out that --  I mean I can't argue for International

13   Paper.  It may be that the resolution to this motion could be

14   found through the completion of the hearing.

15           THE COURT:  All right.  Let me hear from International

16   Paper at this point.

17           MR. PARKER:  Good morning, Your Honor.  John Parker on

18   behalf of International Paper.

19           THE COURT:  Good morning, Mr. Parker.

20           MR. PARKER:  How are you?

21           THE COURT:  I'm fine.  How are you doing?

22           MR. PARKER:  Well, I think I'm okay.  I think now that

23   I have had the pleasure of being before Your Honor five or six

24   times in the last couple of months, and during that time you've

25   probably come to conclude that I may not be the brightest bulb

1    in the pack.

2            THE COURT:  I never even thought along those lines.

3    Quite the contrary.

4            MR. PARKER:  I assure you, Judge, if you grant

5    Georgia-Pacific's motion today it will resolve all doubt that

6    I'm an idiot.  And here's why.  When I was approached by NCR --

7            THE COURT:  Let's not make this so personal.  I would

8    hate to have my conscious would bother me if I --

9            MR. PARKER:  I don't mean to go there.

10           THE COURT:  -- dull bulb because I ruled in favor of

11   Georgia-Pacific.  I would go home at night and anguish over the

12   fact that I had labeled Mr. Parker a dull bulb.

13           MR. PARKER:  You would not be the first.

14           THE COURT:  Then I have to worry about Mrs. Parker.  I

15   would think maybe I granted her request to go on vacation just

16   because I felt sorry for her to be married to a dull bulb.  No,

17   I didn't do that.

18           MR. PARKER:  I need to order this transcript as well,

19   Judge, just for that purpose.

20           THE COURT:  I did it on its own merits.  He's a very

21   sharp bulb, a very bright bulb, as a matter of fact.

22           MR. PARKER:  Well, let me at least explain why there

23   would be further proof that I'm not a very bright bulb.

24           When I was approached by NCR, as was Georgia-Pacific,

25   and Weyerhaeuser, and asked if International Paper wanted to

1    participate in the cost of copying these documents from the

2    MDEQ, I was told by NCR, as was Georgia-Pacific and

3    Weyerhaeuser, that would be extremely expensive to copy these

4    documents.  Probably would cost about $50,000.  So I went back

5    to my client and I said, look, there are these documents from

6    the MDEQ.  There may be some documents in there that are

7    duplicative of other documents.  We don't know how many, if

8    any, until we see them.  But there might be important documents

9    in there.  What would you like to do?  And they said, well,

10   let's share in that cost.  So I went back to NCR, I said, fine,

11   we will share equally in the cost with as many parties as want

12   to participate in the copying of those documents.

13   Georgia-Pacific declined that opportunity, as did Weyerhaeuser.

14   And as a result, it ended up costing International Paper

15   $24,480 for a set of those documents.

16        But the proof of the dull bulb is what I should have

17   done, according to Georgia-Pacific, was simply wait for NCR to

18   copy them totally at their own expense and then say no, no, no,

19   there is some agreement out there that requires you to give me

20   these documents for free, and I should have said that after NCR

21   went ahead and copied the documents even though they asked me

22   if I want to share in the costs beforehand.

23        There's --  I just don't see that, Judge, as the

24   appropriate course of action here.  If Georgia-Pacific wants a

25   set of these documents, we would then divide the cost three

ways which means their share would be $16,000, frankly 8,000 of which would come to me and $8,000 of which would go to NCR to cover that one-third of the 24,000 plus we have each already paid out for the cost of these documents.

Let me make just a few points on why I think the motion to compel should be denied.

First, if Georgia-Pacific truly believed that there was some Phase I agreement to produce all of these public records voluntarily, they should have raised that with NCR before NCR went out and copied the documents, and not after they copied them.  It just, I don't know, defies logic that you would let somebody go ahead and spend what you knew to be $50,000 to copy them and then say after the copying was done, aha, I got you, you need to give me my set for free.

Second point.  Even if there is some general agreement, or was some general agreement between the parties about producing documents from public sources, and whatever that may mean, that agreement was changed under the exceptional circumstances presented here of $50,000 being charged by the MDEQ to copy these documents, and NCR approaching the parties and saying, do you guys want in.  And when you said no, I don't want in because I think there might be duplicative documents, I don't think after the fact you can say now you owe them to me for free, or now I'm going to go through them and figure out what's duplicative and what's not and only want to pay for some

1    small subset of the total cost.

2          Third, if you want to parse that Phase I agreement,

3    Judge, and I would suggest you shouldn't because it is a

4    private agreement between the parties, but even if you want to,

5    and you read the letter that went between the parties back in

6    Phase I, it talked about producing the documents.  It didn't

7    talk about who would pay for them.  It just said the parties

8    agree to exchange these documents when they get them from these

9    public sources.  Again, didn't say who would pay for them.

10          Now, the practice admittedly in Phase I was that each

11   party just sent them to the other side without sending them a

12   bill for them.  That's because, as Your Honor knows, if I have

13   a $500 copy job, it costs me more money to follow up with

14   Mr. Fields and --  to get my portion of that $500 than to just

15   give them to them and say try to return the favor the next

16   time.  But the agreement is absolutely silent as to who pays

17   for the documents.

18          Let me just touch on the four requests that do appear

19   in Georgia-Pacific's motion as my fourth point why the motion

20   ought to be denied.

21          I will tell you, Judge, I am like Mr. Fields, not

22   familiar with the other requests to International Paper that

23   are not cited in the motion.  The number of discovery requests

24   in this case is mind boggling.  The requests for production now

25   number in the thousands.  There are countless requests for

production.  So if I don't have the specific ones in front of me, I really can't comment on them.  But as to those four, they are indeed so overbroad as to never contemplate these MDEQ documents.  For example, the first one listed in their brief, number 54, "All Documents relating to the use or presence of CCP broke, CCP trim, or postconsumer waste containing CCP at each of the Fourteen Mills and Other Mills."

The Michigan Department of Environmental Quality is a governmental agency that is not looking at the use or presence of CCP, carbonless copy paper, in broke or trim.  These, except to the extent that it's ubiquitous in the river and therefore would encompass every document in this case.  And that's true for the other ones, "Documents relating to sludge and wastewater disposal practices," "Documents relating to any investigation of the source of CCP."

Those are such all encompassing documents that they are not, you could say how about documents from the MDEQ if you wanted to be a little specific.  But we don't have that request in front of us.  These are just over arching requests that don't call for this.  And clearly Georgia-Pacific, at least tacitly, concedes that by leading with the argument that, hey, we have got this private agreement in Phase I to produce all these documents.

And, again, the notion that they could somehow end run the agreement that or that NCR made with, look, anybody who

1    wants these come and pay up, by saying after the fact I don't

2    want to pay but there are outstanding requests, requests that

3    predate NCR's offer to copy these documents and share the

4    costs, and they are somehow entitled to them, and by the way,

5    not required to pay for the cost of them, seems to me to be

6    disingenuous.

7            The last point.  Even if somehow these documents were

8    covered by one of these very, very broad requests, Judge, I

9    don't believe under the Federal Rules that obviates the need

10   for Georgia-Pacific to share in the cost of copying them.

11   Nowhere in the rules does it say because I have an obligation

12   to produce the documents do I somehow, do they get them for

13   free necessarily.  And here the parties have already paid;

14   these parties, NCR and International Paper, paid $50,000 for

15   the copying of these documents.  It's just fair and equitable

16   that Georgia-Pacific should have to pay for them too.

17           I'm a little surprised that Georgia-Pacific has

18   brought this motion, Judge, for this reason.  And then I'll sit

19   down.  This case is about hundreds of millions of dollars.

20   Georgia-Pacific claims it's already spent $110 million in

21   cleaning up the Kalamazoo River.  There have been over a

22   hundred million dollars spent cleaning up the river by parties

23   that are now in bankruptcy.  Georgia-Pacific seeks from the

24   defendants in this case that we contribute some portion to that

25   cleanup, and by the way, they also want future costs which

1    could dwarf the amount of past costs in this case.  In this

2    case the cleanup of this river could reach numbers that start

3    with a B. as opposed to an M.  We're here today about $16,000.

4    That's Georgia-Pacific's share for these documents.  And I got

5    to tell you, I did not come from Cleveland just for this

6    motion.  I wouldn't have done that to my client.  I was in a

7    deposition in this case in Seattle on Monday, I've got a

8    deposition here in Grand Rapids tomorrow.  And was actually

9    cheaper for my client to come here so that I could without

10    having to go back home and burden Mrs. Parker with my presence.

11    So I came here directly.  Otherwise, I wouldn't even have come

12    for this motion.

13         But literally, if Georgia-Pacific is concerned about

14    getting --

15         THE COURT:  I have to say I was kind of curious about

16    that.  If I had seen one more attorney in this room when I

17    walked in, I was trying to mentally multiply your hourly rates,

18    which I don't know but I assume is in the atmosphere somewhere

19    far above my pay grade.  Times of flight costs and everything

20    else for what is at issue here.  It is a pure victory for

21    whoever wins this.

22         MR. PARKER:  Your point is well taken, Judge.  If they

23    really need them on an expedited basis for this deposition

24    that's next week, pay the $16,000.  We are talking about a

25    billion dollar case.  And, you know, they filed briefs, we have

1    got this argument, and, again, I mean I'm here because I would

2    be here anyway, and I enjoy being in front of Your Honor.  But

3    it seems to me that if Georgia-Pacific wants these documents

4    they should simply pay for them.  That's the equitable thing to

5    do.  That's what NCR has done, that's what International Paper

6    has done.  Weyerhaeuser doesn't want the documents so they

7    shouldn't have to pay for them.  But for the parties who want

8    them, I think it's pretty clear they should have to pay.

9    Thanks.

10          THE COURT:  Thank you.  I'll give you a chance to

11   speak.  Just give me a moment.

12          MR. BRODY:  Absolutely.

13          THE COURT:  Counsel, go ahead.

14          MR. BRODY:  Your Honor, let's just focus on the

15   discovery requests.

16          THE COURT:  Which one?

17          MR. BRODY:  The four that we have cited in our brief.

18   Let's just go with what we have there.  They said, well, they

19   are overly broad.  That could cover anything and everything.

20   But this is a different circumstance than what you typically

21   see in the context of a discovery dispute.  We have a finite

22   universe of documents that we are talking about here today.

23   They haven't argued they are not responsive to this.  They have

24   just said, well, there are a bunch of other documents that are

25   responsive to that.  They have not taken the position, this is

1   IP, that the MDEQ documents are not responsive to the four that

2   we have cited.  That alone is enough to grant this motion.

3           With respect to who should pay, we have cited for the

4   Court, the typical default rule that a party bears the costs of

5   responding to discovery.  And I think people often use the word

6   ironic incorrectly and maybe I'm doing it here --

7           THE COURT:  All right.  Let's talk about that last

8   point.

9           MR. BRODY:  Yeah.

10          THE COURT:  That the party responding bears the cost.

11  Specifically what rule are you pointing to?

12          MR. BRODY:  I'm pointing to page 6 of our brief, the

13  citation to the Oppenheimer Fund, the United States Supreme

14  Court case, Your Honor.

15          THE COURT:  And what does that say?

16          MR. BRODY:  We have cited it for the proposition that,

17  "The default rule is that each party bears its own costs in

18  responding to reasonable discovery demands."

19          THE COURT:  And what do you understand that to be when

20  you say reasonable discovery demands?  If the costs are

21  $16,000, is that a reasonable discovery demand?

22          MR. BRODY:  We are not asking them to expend $16,000

23  to respond to our discovery, Your Honor.  That's an important

24  distinction here.  They made the decision to go and get this

25  universe of documents which they now have.  We have propounded

1    discovery requests.  Their costs to respond is basically a

2    stamp.  All they have to do is send --

3         THE COURT:  That's not realistic, is it?  You wait for

4    them to get the documents.  If you hadn't waited for them to

5    get the documents, there wouldn't be any documents, or for you

6    to get.  You would have to go to the MDEQ yourself and pay

7    $50,000.  You're really getting a bargain.

8         MR. BRODY:  We wouldn't have paid $50,000; we wouldn't

9    have paid 16 because we didn't need most of those documents

10   because they were duplicative.  That's why we tried to address

11   this on the front end --

12        THE COURT:  If you didn't need them, why are you

13   asking for them now?

14        MR. BRODY:  No.  We don't need the duplicative ones.

15   Which is why we tried to address this on the front end and say

16   let's find a better way than just blanketly copying everything

17   they have got for 50 grand.  Because we, Georgia-Pacific, have

18   already produced a number of responsive documents that are in

19   this file.

20        THE COURT:  Why do you need the non duplicative

21   documents?  You didn't seek to get those yourself from MDEQ.

22        MR. BRODY:  I don't know why they weren't sought by

23   Georgia-Pacific from MDEQ, Your Honor.  I do not --  I wasn't

24   personally involved in that and I don't have an answer for

25   that.

1    THE COURT:  Well, it sounds like you need them or you

2    wouldn't be asking for them.  You wouldn't take this Court's

3    time probably to ask for them if you didn't need them.

4    MR. BRODY:  Certainly.

5    THE COURT:  So if you needed them, you could have

6    incurred the cost of going to MDEQ and asking for them, either

7    in bulk, paid $50,000, or sort them out yourself one by one and

8    pay whatever costs there would have been.  I have no idea what

9    that cost would have been.  I doubt you do either.  So there's

10   obviously a cost involved.  And either you incurred it or the

11   other side incurred it.  But to say there's no cost involved

12   simply isn't the case.

13   The other side incurred the cost, and simply to say,

14   well, they can copy it now on a flash drive for a few pennies,

15   is just to ignore the reality of the situation in that somebody

16   had to incur the cost to bring those records into existence so

17   that that flash drive could be made.

18   MR. BRODY:  And, Your Honor, I don't know if it's

19   happened in this case previously, but that is often the case

20   where you send a discovery request for any documents the other

21   side has obtained via subpoena or otherwise from any third

22   party, and they get produced and you don't pay whatever they

23   spent to subpoena the records or otherwise obtained them.

24   THE COURT:  So sort of a game of chicken, wait to see

25   who is going to get the documents first, and --

1      MR. BRODY:  I don't believe that was on anybody's mind
2  going into it, Your Honor.  I really don't.  I just think --
3      THE COURT:  They could have waited to see if you
4  needed the documents --
5      MR. BRODY:  We did attempt, like I said, to work this
6  out with them on the front end and that was met with silence.
7      THE COURT:  Isn't Mr. Parker's argument rather
8  persuasive that you --  I take that back.  Mr. Parker --
9      MR. BRODY:  I will not admit that he made a persuasive
10  argument.
11      THE COURT:  It was actually Mr. Fields's persuasive
12  argument that you would have been willing to pay for this if
13  the amount had been more limited.  But you declined.  It sounds
14  like Georgia-Pacific acknowledged that this would have been a
15  costly deal, and NCR was told it would be costly, attempted to
16  defer the costs, Georgia-Pacific thought, well, fine, but we
17  want it to be more limited, so we don't want to participate.
18  But you acknowledge that had it been a more favorable deal we
19  would have entered into it.  Doesn't that indicate that in fact
20  there was no agreement as far as these documents were
21  concerned?
22      MR. BRODY:  And, again, Your Honor, I think the whole
23  dispute over whether there was or not an agreement arose at the
24  outset of this based on the correspondence we have attached as
25  Exhibit 4 to our brief.  We said, hey, you're going to provide

1    these anyway, Mr. Sibley did in his response that he received

2    from Mr. Lisner was, we don't think we are going to do that.

3    And then it went down the road from there.

4         But I --  my point is separate from any agreement

5    between the parties.  If they had responsive documents, they

6    are duly bound to produce them, and we're not talking about a

7    burden here other than copying them to a disk and sending them

8    to us.  Exhibit 4 is the September 18th e-mail from Mr. Lisner

9    which they say, Cravath says, "We do not believe the agreement

10   refers to Phase II."  So that's where they are taking issue

11   with that.

12        So I guess, Your Honor, in conclusion, IP doesn't

13   argue that they are not responsive to the requests that we

14   cited in our briefs.  If this agreement had never even been

15   proposed by NCR and they had just gotten the documents for

16   whatever reason, they would have to produce them under the

17   rules and under our discovery requests.  And that's what we are

18   asking for here today.

19        THE COURT:  So then do I understand you are no longer

20   pursuing your request to NCR or your request to IP under the

21   other discovery requests that you have not set forth in your

22   brief, but you're just relying on these four requests to

23   produce?

24        MR. BRODY:  Your Honor, I believe in fairness we are

25   required to do that, that we are required to be limited to

1    what's in our brief under the local rules.

2            THE COURT:  All right.  So let's focus on those four.

3            And since we're sort of refocusing the motion, I'm

4    going to give Mr. Parker a chance to respond to that.

5    Mr. Parker, what about the Georgia-Pacific argument that under

6    the Oppenheimer case since you are not arguing that the MDEQ

7    documents are not responsive, you have an obligation to produce

8    these documents and you have to bear your own costs in doing

9    that, which are negligible, just by transferring them to a

10   flash drive.

11           MR. PARKER:  Judge, let me respond in hopes that

12   perhaps I can one day make a persuasive argument to the Court.

13   I thought I really had one there for a moment.  I'm glad you

14   gave it back to me.

15           THE COURT:  And you can reiterate the ones you already

16   made because probably slipped right by me.

17           MR. PARKER:  No, no, that's all right.  Two points.

18   One, I don't believe these documents are responsive to the four

19   requests listed because only to the extent that those documents

20   --  those requests are so broad they would call for every

21   document in the case that's been produced.  So none of them ask

22   for the MDEQ documents.  None of them are specific enough to

23   address the documents that are at issue here.  And there are a

24   lot of documents here, Judge, too.  We are talking $50,000.

25           THE COURT:  Why don't you step up here --

1          MR. PARKER:  I'm sorry.

2          THE COURT:  There are -- also I need to know when the

3    MDEQ documents were obtained and when these requests were made,

4    if you know.  Were these requests made before the MDEQ

5    documents came into play?

6          MR. PARKER:  You're challenging my memory here, Judge,

7    and I don't want to give you an incorrect answer.  The sequence

8    of that I couldn't exactly tell you.  Perhaps Mr. Fields can.

9    I know that the --  I believe these requests were made before I

10   got the offer from NCR to pay for half of the or my share of

11   the costs because that's a much more recent development.  I

12   don't know when they actually came by these documents.

13         THE COURT:  These requests may have been made back on

14   April 18th, according to the Georgia-Pacific brief.  Is that

15   correct?

16         MR. BRODY:  Yes, Your Honor.

17         THE COURT:  Page 5.

18         MR. BRODY:  Yes.

19         THE COURT:  All right.  These requests to produce were

20   made on April 18th of 2014.

21         MR. FIELDS:  That's right.  And, Your Honor, just for

22   the record, the FOIA request made by NCR to the MDEQ was in

23   February of 2014.  I don't know when the records were copied

24   and produced.

25         MR. PARKER:  And I believe that to be sometime

1    thereafter because of the bill I got from NCR which I passed on
2    to my client.  And that was an event I remember because it was
3    a large, it was a large amount.
4         And, Judge, on the Oppenheimer case, that talks about
5    a default rule.  The Court clearly has the power under Rule 26
6    to apportion the costs reasonably among the parties, and to say
7    that because I have now come in to the possession of the
8    documents after I paid NCR $24,000 that I can then simply copy
9    them on to a flash drive and send them on for no cost or
10   virtually no cost, I think puts form over substance.
11        My client spent $24,500 getting these documents.  And
12   all we're asking Georgia-Pacific is to pay their fair share.
13        This is not the typical motion in front of Your Honor
14   when one party doesn't want to produce documents.  We're saying
15   you can have them.  You can have them tomorrow if you want.
16   Just pay your fair share.  And I think the rules specifically
17   allow Your Honor to dictate that.  Even if you were to say, I'm
18   going to order you to produce them because I somehow find these
19   overbroad requests to ask IP, require IP, who, by the way, if I
20   hadn't agreed to share the costs with NCR, I wouldn't have the
21   documents, GP still wouldn't get the documents because now the
22   way this convoluted motion has come they have got to flow from
23   NCR through me to GP.  It makes no sense for them not to just
24   pay their fair share.
25        And I'm sure the folks at Cravath 24 hours a day could

1  send those documents to them whenever they agree to pay that

2  money.  And I think under Rule 26, you certainly have the power

3  to both order them produced and order GP to pay its fair share

4  if they are going to be produced to them.  And that's what I

5  would suggest the Court do.

6          THE COURT:  You're not worried about violating

7  Mr. Fields's work product privilege.

8          MR. PARKER:  No, I'm not.

9          THE COURT:  Doesn't concern you.

10         MR. PARKER:  That does not.  And I understand what he

11  is saying about work product.  He is saying, well, look,

12  apparently we made some selection about these documents and

13  therefore that's work product.  When they gave, agreed --

14         THE COURT:  If You're not concerned, Mr. Parker, I'm

15  not concerned.

16         MR. PARKER:  Thank you, Judge.  Okay.

17         THE COURT:  All right.  We are going to take just a

18  brief recess.  I pretty much know what I'm going to do.  But I

19  want to take just a moment.  So we still have a few minutes

20  before my 10:30.  And I am sure -- that's a criminal matter,

21  I'm sure he won't mind waiting.  So we'll just take a few

22  moments.

23         THE CLERK:  All rise, please.

24         (Recess taken, 10:14 a.m., Resume Proceedings, 10:27

25  a.m.)

1     THE COURT:  Once in a while a judge has to do his own

2     legal research.  I have a fine, outstanding law clerk who finds

3     himself on jury duty today down in Kalamazoo.  And as an

4     officer of the court he has the same obligations the rest of

5     society has.  I virtually assured Jim that he would not be

6     selected on jury duty for some obvious reasons, and one perhaps

7     less obvious reason and that is that the prosecutor in the case

8     used to be one of my interns who was supervised by Jim when she

9     was in our office.  And if the defense attorneys down there

10    have an ounce of intelligence, they will probably disqualify

11    him because he was her supervisor.  Or perhaps not.  In this

12    day and age I take nothing for granted.  And he's not back in

13    the office yet, so perhaps he has been selected.  I tell people

14    that have the opportunity to serve on juries that they should

15    never pass up that opportunity.  Never.  Particularly lawyers.

16    Because if you ever have the chance, I tell people ten years

17    from now you won't remember what you did yesterday, but you

18    will remember what you did the day you serve on juries, and the

19    insights you gain are fantastic.  Besides, it's fun.

20         But I suspect he will get back here and tell me he did

21    not get selected.

22         In any event, I did want to check out one or two

23    things.  But to the matter at hand, I have some thoughts.

24         First of all, I said before I don't think it's the

25    function of this Court to try to enforce private agreements

1    reached between the parties about how they are going to proceed

2    on discovery matters, but rather focus on issues that are

3    governed by the Federal Rules of Civil Procedure, and to

4    enforce those rules.

5          But regardless, I find there is no agreement here in

6    Phase II that would pertain, so it becomes a moot point.  There

7    was an agreement in Phase I; all the parties acknowledge that.

8    But as to these documents, I don't see a meeting of the minds.

9    And as to the MDEQ documents, they were clearly going to be an

10    expense.  They were produced as the result of a FOIA request.

11    NCR was put on notice by the state of the cost; NCR then asked

12    the other parties if they wanted to contribute, and obtain

13    these documents, some said yes, some said no; Georgia-Pacific

14    said if it didn't cost so much we might be interested, but we

15    don't want to pay that much.  I think everybody was on notice

16    that these were not under the earlier agreement.

17          And the motion today really seeks to enforce that

18    agreement.  That's the thrust or the gravamen of this motion.

19          Now, part of the objection of Georgia-Pacific is that

20    they don't want to pay NCR for what they call its gross

21    inefficiency in copying MDEQ's entire file when only a small

22    fraction of the documents in that file are non duplicative.

23    But ironically it wants the same entire file without pointing

24    out which non duplicative documents it needs stating that to do

25    so would be time consuming and probably they would expedite

1    that.  So despite the fact that NCR was grossly inefficient, it

2    wants the same entire file itself at no cost to it.

3              But without incurring any of the costs NCR incurred.

4              The Court also notes that Georgia-Pacific can

5    certainly go to the MDEQ itself to obtain these documents

6    through FOIA, I suppose.  Georgia-Pacific has cited the

7    Oppenheimer case, and I suppose that's as good a statement of

8    the rule as any.  I will cite it for the record.  It states on

9    page 358, "That the presumption is that the responding party

10   must bear the expense of complying with discovery requests, but

11   they may invoke the district court's discretion under Rule

12   26(c) to grant orders protecting them from "undue burden or

13   expense" in doing so, including orders conditioning discovery

14   on the requesting party's payment of the costs of discovery."

15             But here all parties are on equal footing as far as

16   being able to bear these costs.  There is no party

17   substantially more able to bear these costs than anybody else.

18   While on some larger level, the parties may not be on equal

19   basis for these purposes, I'm sure they are all able to bear

20   these costs.

21             And the parties that have obtained these records have

22   paid their share and have been forthright in saying if anybody

23   else wants to obtain these records they are readily available

24   at an equal distribution of the costs, at an equal sharing of

25   the costs.  Mr. Parker just made that argument.  He said they

1    could have these records immediately upon payment of their

2    share of the cost.  There is no real argument about work

3    product, nor do I think there could be.

4          And he is willing to make them available even though

5    strictly speaking the motion is addressed to NCR, which has now

6    been really removed from the motion.

7          As I said before, I don't think that this matter

8    should be allowed to interfere with the more important

9    proceedings in this case, and that's that the deposition and so

10   forth continue expeditiously.

11         So I think that Georgia-Pacific probably is entitled

12   to these documents from IP, as long as it pays its fair share.

13         So I will treat this as a motion to compel production

14   of the documents pursuant to these four requests to enforce:

15   54, 63, 67, and 79, provided that Georgia-Pacific pay its fair

16   share of the costs as indicated, which I believe is in the

17   neighborhood of $16,000.

18         And I believe that could be considered a ruling on the

19   merits of the motion and not simply so that Mr. Parker can hold

20   his head up when he goes home to see Mrs. Parker, although he

21   certainly can do that.

22         MR. PARKER:  For the record, Judge, I think I lost.

23         THE COURT:  You get your $16,000.

24         MR. FIELDS:  For the record, Your Honor, I would like

25   half of that 16.

1          THE COURT:  And half of it goes to NCR.  You might

2   have to arm wrestle Mr. Parker, however.

3          MR. FIELDS:  He would win.

4          MR. PARKER:  Thank you, Judge.

5          THE COURT:  Thank you, gentlemen.

6          (Proceedings concluded, 10:38 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

 I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.


      /s/ Kathy J. Anderson

      Kathy J. Anderson, RPR, FCRR

      U.S. District Court Reporter

      402 Federal Building

      Grand Rapids, MI  49503