1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4    GEORGIA-PACIFIC CONSUMER PRODUCTS LP, et al,

5          Plaintiff,            No.  1:11cv483

6      vs.

7    NCR, INTERNATIONAL PAPER COMPANY,
     WEYERHAEUSER,
8
          Defendants.
9

10   Before:

11                  THE HONORABLE HUGH BRENNEMAN, JR.,
                       U.S. Magistrate Judge
12                     Grand Rapids, Michigan
                          June 26, 2014
13                   Motion to Compel Proceedings

14   APPEARANCES:
                    MR. ADAM JOHN BRODY
15                  Varnum Riddering Schmidt & Howlett
                    333 Bridge Street, NW
16                  PO Box 352
                    Grand Rapids, MI 49501-0352
17                  616-336-6000

18                  MR. GEORGE P. SIBLEY
                    Hunton & Williams LLP
19                  951 E. Byrd Street
                    Richmond, VA  23219
20                  804-788-8355

21                          On behalf of the Plaintiff;
                    MR. DAVID FRANK LISNER
22                  MR. DAVID R. MARRIOTT
                    Cravath Swaine & Moore LLP
23                  825 Eighth Avenue
                    New York, NY 10019
24                  212-474-1000

25                          On behalf of the Defendant NCR,

1          MR. DAVID W. CENTNER
           Clark Hill PLC
2          200 Ottawa Avenue, NW
           Suite 500
3          Grand Rapids, MI 49503
           616-608-1100
4
           MR. JOHN DANIEL PARKER
5          Baker & Hostetler LLP
           PNC Center
6          1900 E. Ninth Street
           Cleveland, OH 44114-3485
7          216-861-7610

8                    On behalf of the Defendant IP.

9

10

11    TRANSCRIBED BY:  MS. KATHY J. ANDERSON, RPR, FCRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | June 26, 2014 |
| 2 | PROCEEDINGS, 9:31 a.m. |
| 3 | THE COURT:  Good morning, gentlemen. |
| 4 | MR. PARKER:  Good morning, Your Honor. |
| 5 | MR. BRODY:  Good morning, Your Honor. |
| 6 | THE COURT:  We live in a democracy, but this matter is |
| 7 | not going to be decided by a popular vote so you may have |
| 8 | brought a few too many attorneys here.  I'm not sure. |
| 9 | I will also put everybody on notice that we have some |
| 10 | grand jury returns to take sometime this morning.  We were told |
| 11 | they hoped to be done by 9:30 this morning, which is quite |
| 12 | early.  When they do come, I'm going to have to kick all of you |
| 13 | out for a few moments to take that but that won't take very |
| 14 | long. |
| 15 | This is a motion by the defendant, International Paper |
| 16 | Company, to compel the plaintiffs to produce certain documents |
| 17 | responsive to the defendant's request for production of |
| 18 | documents number 25.  I think we have another motion coming up |
| 19 | in a while, but that one is not at issue yet. |
| 20 | I have had a chance to look over the briefs, and so I |
| 21 | think we can go ahead with the motion at this time.  Perhaps |
| 22 | since we have a number of people here -- I don't think I know |
| 23 | everybody, perhaps all of you do -- but I would ask you to put |
| 24 | your appearances on the record at this time.  Who would like to |
| 25 | start? |

1          MR. SIBLEY:  For the plaintiff, Trey Sibley at Hunton

2     & Williams for Georgia-Pacific.

3          THE COURT:  Fine.  Thank you.

4          MR. BRODY:  Good morning, Your Honor, Adam Brody from

5     Varnum for plaintiffs.

6          THE COURT:  Thank you.

7          MR. PARKER:  Good morning, Your Honor.  John Parker

8     with Baker & Hostetler on behalf of the defendant,

9     International Paper.

10          THE COURT:  Thank you.

11          MR. CENTNER:  David Centner also on behalf of

12     International Paper.

13          THE COURT:  Thank you, counsel.

14          MR. MARRIOTT:  Good morning, Your Honor, from Cravath

15     for NCR.

16          THE COURT:  Thank you, counsel.

17          MR. DOZEMAN:  Good morning, Your Honor, Doug Dozeman

18     from Warner, Norcross on behalf of the defendant, Weyerhaeuser.

19          THE COURT:  Thank you.

20          MR LISNER:  Good morning, Your Honor, David Lisner

21     from Cravath Swaine & Moore on behalf of NCR.

22          THE COURT:  Thank you as well.  Just for planning

23     purposes, how many of you have speaking parts today?

24          MR. PARKER:  I do, Your Honor, on behalf of the

25     movant.

1    THE COURT:  All right.

2    MR. SIBLEY:  I will speak on behalf of the plaintiffs,

3 Your Honor.

4    MR. MARRIOTT:  And on behalf of NCR, with Your Honor's

5 permission, I would like to briefly be heard.

6    THE COURT:  Fine.  Go ahead.  Let's begin.

7    MR. PARKER:  Thank you, Your Honor.  Again I'm John

8 Parker on behalf of the defendant International Paper.

9    And we're here on International Paper's motion to

10 compel a document that was created around 2001 that contains

11 highly relevant information about the operation of

12 Georgia-Pacific's mills in the 1950s, the 1960s, and the 1970s.

13    That document was originally created for use in a

14 mediation, but it was subsequently given to the EPA as a

15 "interim response" to EPA's 104(e) request to Georgia-Pacific

16 served in 2003.  As a result, there is no privilege covering

17 that admittedly relevant document, and if there were a

18 privilege, Georgia-Pacific, or GP as I will sometimes refer to

19 them, has waived that privilege.  To the extent there is any

20 confidential information in that now ten-year old plus

21 document, those concerns can certainly be addressed by the

22 protective order that's already in place in this litigation

23 between the parties.

24    If I can, Judge, I want to give you a little bit of

25 background for context about what this litigation entails.  We

1    are in Phase II of a multi-phase trial that's going to allocate

2    liability among the parties for cleanup costs associated with

3    PCBs that are in the Kalamazoo River.  Those PCBs came from

4    carbonless copy paper, sometimes referred to as CCP, that was

5    made and sold by NCR Corporation.

6          Mills along the Kalamazoo River, including my, or

7    including Georgia-Pacific's mills, for example, recycled the

8    CCP which resulted in the PCBs being discharged into the river.

9          Now, assuming NCR doesn't bear 100 percent

10   responsibility for that cleanup, it is anticipated that how

11   much CCP or carbonless copy paper a mill recycled, what the

12   mill's processes were in recycling paper, their production

13   processes, what their wastewater treatment procedures were will

14   all be relevant to Judge Jonker in assessing liability among

15   the mills.  Their contribution percentage, if you will.

16         And as I'll explain in a moment, that's precisely the

17   type of information, the wastewater treatment procedures, the

18   production procedures, how much of all of those things you did

19   and when you did them that are contained in this questionnaire

20   response which is at issue in this motion.

21         Now, the PCB problem in the Kalamazoo has been known

22   for many years.  Georgia-Pacific has been involved in

23   litigation involving the cleanup and who bears responsibility

24   for that cleanup since the 1990s.  International Paper, my

25   client, however, is a newcomer to this site.  We were first

1  sued by Georgia-Pacific in this case in 2010, alleging that one
2  of our corporate predecessors, St. Regis Corporation was the
3  owner and operator of the Bryant mill, which discharged into
4  the Kalamazoo.
5       Judge Jonker ruled in Phase I after that trial, that
6  International Paper through St. Regis was not an operator of
7  that mill during the period that PCBs were discharged but that
8  it was just an owner of that mill during that period of time.
9       During the period of discharge from the Bryant mill,
10 the Bryant mill was owned by Allied Paper Company, which
11 subsequently became Millennium, so sometimes you'll hear it
12 called Millennium, sometimes you'll hear it called Allied.  In
13 addition to owning and operating the Bryant mill, which they
14 purchased in 1966 as Judge Jonker found, Allied owned two other
15 mills along the Kalamazoo River, the King mill and the Monarch
16 Mill, which recycled and discharged wastewater into the
17 Kalamazoo River.
18      In the late 1990s, Georgia-Pacific, Millennium, or
19 Allied and others formed a group called the Kalamazoo River
20 Study Group.  The KRSG.  International Paper and St. Regis,
21 because we were long gone from the river by that point, were
22 never parties to the KRSG.  And the KRSG tried unsuccessfully
23 to sue others for PCB contribution to the river.
24      They also had a mediation among themselves back in
25 early 2000, 2001.  And as part of that mediation each party

1    submitted a mediation questionnaire response.  Now we have a

2    fairly good idea what is in Georgia-Pacific's mediation

3    questionnaire response because we have received from the EPA

4    Millennium's questionnaire response and Plainwell's mediation

5    questionnaire response, other parties to the KRSG litigation.

6    And, in fact, Your Honor, if you don't mind I have with me a

7    copy of Millennium's questionnaire response so you can see the

8    kind of information that each of the parties was providing, and

9    I think that will be helpful.  If you don't mind if I can

10   approach and provide you with a copy of this, I would like to

11   do that.

12            THE COURT:  If there is no objection.

13            MR. SIBLEY:  No objection, Your Honor.

14            THE COURT:  Fine.

15            MR. PARKER:  Now, this is the, this, Judge, is the

16   front narrative portion of the mediation questionnaire.  There

17   are 17 binders of exhibits that go along with that document.

18            Now --  which obviously I have not bothered you with

19   the 17 binders of documents.

20            THE COURT:  Put a thank you on the record.

21            MR. PARKER:  Now, what does that questionnaire

22   response contain?  It contains information about the mill's

23   recycling processes.  It contains actual paper production

24   statistics.  It contains sources of the stock, the waste paper

25   that was used in the recycling process.  It contains wastewater

1    discharge and production information.  It contains the

2    percentage of discharges that went to the public sewers as

3    opposed to the river.  And much, much more.  All highly

4    relevant information in this case, and not otherwise available

5    in that distilled format where the 17 binders get distilled

6    into that narrative.

7            Now, what does the questionnaire not contain?  One

8    thing it does not contain, Judge, is an offer of compromise.

9    Nowhere in that document will you find any information or any

10   statement that, hey, Millennium, we think our percentage is

11   20 percent or 25 percent or any of those kinds of 408 offers of

12   compromise.  Not in that document.  No mention whatsoever.

13   Instead it just contains, as I said, the factual responses to

14   factual questions, factual responses to questions regarding

15   production and output.

16           And of course if the Court had any concern that

17   Georgia-Pacific's questionnaire response contained offers of

18   compromise, you could certainly review it in camera.  But they

19   have not contended that that's the problem with their document.

20           The other thing that that document does not contain is

21   confidential information.  The information in that response,

22   while highly relevant to mill operations in the 1950s and

23   1960s, is no longer proprietary.  These mills are long gone.

24   They are for the most part vacant brown fields.

25           So how they operated long ago is unimportant unless

1    you're trying to establish for Judge Jonker how they operated

2    in the '50s and '60s and what their wastewater discharge was at

3    that point in time.  But in terms of confidential proprietary

4    information, they don't contain that.  And if they did, we

5    already have a protective order in this case that

6    Georgia-Pacific could use to deal with that issue.  Now, the

7    mediation for which the questionnaire was originally intended

8    was unsuccessful.

9              THE COURT:  Say again, please.

10             MR. PARKER:  It was unsuccessful.  That mediation that

11   the questionnaire was originally done for in 2000, 2001, that

12   didn't resolve the dispute between the parties.  And if that

13   were all that the questionnaire was ever used for,

14   Georgia-Pacific might have an argument that some privilege

15   applies.  But much more happened to that response.

16             On March 4, 2003, the EPA sent a 104(e) request to

17   Georgia-Pacific.  Now, 104(e) request is a vehicle provided for

18   by CERCLA that allows the EPA to require persons like

19   Georgia-Pacific to furnish information related to contaminated

20   sites, cleanup of those sites, et cetera.  And the information

21   has to be verified as truthful and honest.

22             The 104(e) request is attached as Exhibit 1 to the

23   affidavit of Michael Davis which GP filed in its response.

24   Now, nowhere in that Exhibit 1, that letter, the March 4, 2003,

25   letter, is the Plainwell mill mentioned.  And I'll explain why

1    that's important in a second.

2         Now, GP responded to the EPA's 104(e) request on

3    May 6, 2003.  And the cover letter that they sent in response

4    is Exhibit 2 to the Davis affidavit.  I don't know if you have

5    it in front of you, Your Honor, but I can if you don't --  here

6    I have another copy.  If I can approach.  And in the May 6,

7    2003, letter from Mr. Davis that GP sent to the EPA he says,

8    and I'll read from the middle paragraph, middle of the first

9    paragraph of the May 6th letter.  "Georgia-Pacific understands

10   and agrees that providing the questionnaire responses is not an

11   official response to the 104(e), and the information is being

12   provided to EPA as an interim response.  As an interim

13   response.  Until such time as the EPA establishes a new

14   deadline for responding to the 104(e) and/or requests

15   additional information beyond that requested in the original

16   104(e) request of March 4, 2003."

17        So we know from the very letter that Mr. Davis

18   attached to his affidavit that in fact the questionnaire

19   response was provided to EPA as an interim response to their

20   104(e) request.  Now also importantly nowhere in that May 6,

21   2003, letter is the Plainwell mill and its bankruptcy

22   mentioned.  Why is that important?  Well, GP has tried to spin

23   a story here, Judge, designed to deflect your attention from

24   the facts maybe hoping you wouldn't read those letters or

25   Mr. Davis's affidavit.  Specifically, Georgia-Pacific claims

1   that the reason GP provided the questionnaire response to the

2   EPA was not as an interim response to the 104(e) request but

3   rather because EPA wanted to assess the fairness of a

4   settlement that Plainwell was entering into as part of its

5   bankruptcy.  That story is not supported by the facts, Judge.

6   Neither the May --  I'm sorry, neither the March 4, 2003 104(e)

7   request nor the May 6th response letter that we just, that I

8   just handed to you mentioned Plainwell or its bankruptcy.  Nor

9   do they say the questionnaire was provided so EPA could assess

10  the Plainwell bankruptcy.  By the way, neither does Mr. Davis's

11  affidavit.  He attaches an affidavit.  He was the author of

12  that letter.  He doesn't say in that affidavit that this was

13  part of the Plainwell bankruptcy.

14          So when GP says on page 3 of its response brief, and I

15  quote, "As reflected in the letter transmitting the Responses,

16  the May 6, 2003, letter, Georgia-Pacific voluntarily shared the

17  document with EPA to help EPA resolve claims against Plainwell

18  Inc."  That's simply not the facts.  It's not in the May 6th

19  letter.

20          I'm assuming that Georgia-Pacific hoped you wouldn't

21  read the letter and by the way, Judge, Exhibit 1 to the Davis

22  affidavit is the March 4, 2003, --

23          THE COURT:  I'm sorry, say that last part again.

24          MR. PARKER:  Sure.  Exhibit 1 to the Davis affidavit

25  is a March 4, 2003, letter from EPA containing its 104(e)

1    request.  And if you look at that document, you'll see that

2    there's no mention of Plainwell in it.  And in fact, it's

3    actually only half of the letter.  I assume it's a double-sided

4    copying problem, but the exhibit which Georgia-Pacific filed

5    with the court as Exhibit 1 to the Davis affidavit only has

6    every other page.  So I have brought with me today a complete

7    copy of that letter for the Court.  And if you look, Judge, at

8    the 104(e) request, you will see, which is attached to the

9    March 4th letter, now you would have every page of it, you'll

10   look through here you'll see they are not asking for

11   information related to the Plainwell mill.  More importantly,

12   on the second page of this letter, which was not attached to

13   Mr. Davis's letter because I'm assuming this was a victim of

14   two sided copying, the EPA says to Georgia-Pacific, "The agency

15   is attempting to determine now through their 104(e) request --"

16        THE COURT:  Where are you pointing to?

17        MR. PARKER:  I'm sorry.  The second sentence of the

18   second paragraph on page 2 of the March 4, 2003, letter.

19        THE COURT:  All right.  The agency also understands --

20        MR. PARKER:  I'm actually down --  actually, "The

21   agency is attempting to determine."

22        THE COURT:  I see it.

23        MR. PARKER:  "...to determine to what extent

24   Georgia-Pacific may have purchased either directly or

25   indirectly through waste paper brokers, NCR paper broke from

1   the National Cash Register Corporation, NCR Corporation of

2   Dayton, Ohio, or from any of the NCR paper coating facilities

3   identified on attachment 2 during the periods indicated.  The

4   agency is also attempting to determine to what extent

5   Georgia-Pacific may have purchased NCR paper converter trim

6   from any source during the period 1954 through 1971.  Finally,

7   the U.S. EPA is attempting to determine the quantity and fate

8   of the PCBs contained in the waste generated at Georgia-Pacific

9   mills between 1954 and 1989."  Nowhere does it say in there,

10  Judge, we are trying to figure out what's going on with

11  Plainwell so we can enter into some bankruptcy settlement with

12  them.  Which, by the way, wasn't entered in until 2005.

13      Further in the next paragraph it indicates, "The

14  agency issues this information request under authority of

15  Section 104(e) of CERCLA.  Georgia-Pacific should respond

16  completely and truthfully to this information request as soon

17  as possible but not later than 60 days from the date of this."

18  And that's important because when a company like

19  Georgia-Pacific responds to a 104(e) request they got to do so

20  truthfully.  So there is not going to be statements of puffery

21  and those kinds of things in any response, whether interim or

22  complete, that Georgia-Pacific gives to the EPA.

23      Now, keep in mind, Judge, all of the parties to the

24  KRSG submitted their questionnaire response to EPA, gave their

25  questionnaire response in response to these 104(e) requests.

1    How do we know that?  Well, one, we have the Millennium one

2    which EPA gave to us pursuant to a FOIA which I provided to

3    you.  And EPA determined that because Millennium and Plainwell

4    had gone into bankruptcy, there was no basis to claim the

5    questionnaire responses contained confidential business

6    information or CBI as EPA refers to it.  So they gave us those

7    responses.

8          Of course, if there is confidential information or CBI

9    in Georgia-Pacific's response they would be protected by the

10   protective order in this case.  So that's not an issue germane

11   to your analysis.

12         But Georgia-Pacific has raised a question about

13   whether we, International Paper, shouldn't continue to try to

14   pursue this through our FOIA request which is how we got the

15   Millennium response and claimed that we are not actively doing

16   that.  Well, in fact, we have been spending a couple years

17   trying to get the questionnaire response from the EPA.  We made

18   our initial FOIA request on August 26, 2011.

19         THE COURT:  Say the date again, please.

20         MR. PARKER:  I'm sorry, August 26th, 2011, is when

21   International Paper made our first FOIA request.  On

22   October 12th of 2011 EPA provided certain documents that said

23   that the request is being "partially initially denied."  They

24   said we could appeal that decision, so we did; on November 10th

25   of 2011 we filed an appeal.  On December 8th of 2011 EPA found

1      the appeal was moot because they said they are still

2      determining whether the questionnaire responses contained CBI

3      or confidential business information.  On July 31st of 2012 EPA

4      gave its they called it a "partial response," that it was

5      releasing the Millennium and the Plainwell questionnaire

6      response, Millennium one I've already given to you, but that it

7      was still determining whether they would give us any other

8      ones.  And because they are still in that process, we can't

9      appeal it yet.  They haven't made a decision.  So with no

10     ability to appeal we're continuing to wait for the EPA to rule.

11          THE COURT:  How long have they been considering this?

12          MR. PARKER:  Well, that would have been since

13     July 31st of 2012.  But more importantly, Judge, your

14     determination of whether the questionnaire response is

15     discoverable is completely different from the question that the

16     EPA is deciding on whether to turn it over or not.  I found a

17     case that I thought was instructive on this.  It's called

18     Friedman versus Bache Halsey Stuart and Shields, 738 F.2d 1336.

19     It is out of the Federal Circuit in 1984, and I'll read briefly

20     from a portion of it at page 1344.  And I'm going to skip the

21     citations.  The Court said, "The relation between discovery

22     procedures and FOIA exemptions is well established.  If

23     information in government documents is exempt from disclosure

24     to the general public under FOIA, it does not automatically

25     follow the information is privileged within the meaning of Rule

26(b)(1), and thus not discoverable in civil litigation.  The
FOIA acts as a floor when discovery of government documents is
sought in the course of civil litigation.  Though information
available under FOIA is likely to be available through
discovery, information unavailable under FOIA is not
necessarily unavailable through discovery.  The FOIA furthers
the public's general right to know and ensures governmental
accountability.  Discovery discourages unfair surprise and
delay at trial.  In the FOIA context, the requesting party's
need for the information is irrelevant.  The most urgent need
will not overcome an applicable FOIA exemption."

So and in fact, Judge, the cases which Georgia-Pacific
has cited to you in their response brief are cases where let's
say I bring my FOIA against the government and they turn down
my request.  I can actually file a lawsuit against the
government as a private individual seeking that information.
Georgia-Pacific has correctly said, well, you've got to go
through the administrative process before you can bring that
separate lawsuit.  But that's totally different from what we're
doing here where we're asking you to rule on a discovery
request in ongoing civil litigation.

I would suggest to you that Judge Jonker will not
delay this trial while I bring that suit to get the FOIA
through that sort of means.  I frankly would be willing to bet
quite a bit of money that he would not do that.

1        Moreover, Judge, the questionnaire response is not
2    privileged.  The questionnaire response had two purposes:
3    First, it had some role in that mediation long ago.  But then
4    it had a second role, and that role is not privileged.  It was
5    given as an interim response to an EPA 104(e) request.  And in
6    that context, it was never privileged.  It was really like
7    answering an interrogatory under Rule 33(d) where you provide
8    documents in your response.  Once you give those documents
9    over, there's no privilege associated with that regardless of
10    what purpose the document had in its prior incarnation.
11        Even if Georgia-Pacific could claim there's a
12    privilege, Judge, they have waived that.  They claim a
13    settlement privilege attached to this under the Goodyear versus
14    Chiles case.  But the Goodyear case is not as broad as
15    Georgia-Pacific claims.  It only covers statements of puffery
16    and the like.  In the Grupo Condumex versus SPX case which was
17    cited in NCR's brief, Judge Carr of the Northern District of
18    Ohio, my home district, said that, "Goodyear is limited to
19    communications and privileges that it was designed to protect.
20    Those that are inherently unreliable because of the likelihood
21    of puffery."  In Graff versus Haverhill North in the Southern
22    District of Ohio, another case cited in NCR's brief, Judge
23    Litkovitz ordered, "Production of documents submitted to the
24    EPA under CERCLA's 114(a) because the document has, "none of
25    the characteristics of communications exchanged in furtherance

of settlement that the Goodyear court intended to protect such
as puffery, and posturing."

Here there was no puffery or posturing.  It was a
truthful response, as it had to be, under 104(e) giving factual
information to the EPA as that interim response.  And you can
see that when you look at the Millennium version of the
questionnaire.  It doesn't contain puffery, it doesn't contain
offer of settlements.  There is no 408 issue here because the
questionnaire doesn't contain an offer of compromise.

Now, GP claims that providing the questionnaire
response to EPA did not waive the settlement privilege.  And
the premise of their position is set forth on page 5 of their
response brief where they say, "International Paper posits that
the responses lost their privileged status at that point
because responses to 104(e) cannot be confidential.  But
Georgia-Pacific did not provide the questionnaire response as a
response to a 104(e) request.  International Paper is simply
mistaken."  This is where they rely on this story that it was
given to the EPA as part of the Plainwell bankruptcy and not in
response to the March 4, 2003 104(e) request.  But their own
letter belies that, Judge.  It says it was given as an interim
response.  And since that's how they gave it to the EPA, they
have waived any privilege.

Now, we cited some cases to you in our brief about the
waiver of privilege in the Sixth Circuit and they said, this is

1    not analogous to the attorney-client privilege which our cases

2    are given because, as you know, in an attorney client

3    situation, a limited waiver can result in a waiver of all

4    statements, and they say that's not the case here, this should

5    be more like the work product document.  But Georgia-Pacific is

6    missing the point.  We're not saying, Judge, because

7    Georgia-Pacific made statement X which was privileged they

8    waived statement, the privilege as to statement Y.  We're not

9    saying that.  We're saying you waived the privilege as to

10   statement X, we want statement X.  That's the mediation

11   questionnaire response.  This isn't like we're trying to say

12   because you made a little limited waiver every privileged

13   comment you made comes in.  We're not saying tell us what was

14   said at the mediation, all of those things.  We're saying as to

15   the specific document that you gave to the EPA as an interim

16   response, we are entitled to it.

17          THE COURT:  Did the EPA specifically ask for the

18   response that Georgia-Pacific provided at the mediation?

19          MR. PARKER:  No.  They asked for --  they have, as you

20   will see attached to this March 4, 2003, letter beginning I

21   believe at page, the fifth page of it, there are information

22   requests.  It's attachment 1.

23          THE COURT:  I have that.

24          MR. PARKER:  Yeah.  There are, these are like

25   interrogatories, Judge.  There are in fact 25 of them.  In lieu

of answering all of those, they did like a Rule 33(d) response.
They said, we won't answer these.  We will give you this
document instead and 17 binders to go along with it.  So they
responded to the specific questions by providing this document.
Now they would like to say, well, because it was in the form of
this document, instead of answering these specific questions,
it somehow didn't lose its privileged status.  That can't be
because that was not the purpose.  This wasn't in furtherance
of a mediation.  This was in furtherance of a response to a
104(e) request.  Even they say it's our interim response until
we know whether you want more.  It's, that's in the May 6,
2003, letter.

Even, Judge, by the way, where they claim the work
product privilege is the more applicable privilege to look at
here, they would have waived that too.  On page 6 of their
response brief, Georgia-Pacific cites to the Columbia HCA
Healthcare case from the Sixth Circuit.  And they quote the
court by saying, "In order to constitute a waiver of the work
product doctrine, disclosure "must be to an 'adversary'."
Well, here they disclosed it to EPA.  The EPA is clearly
Georgia-Pacific's adversary when it comes to a 104(e) request.
The EPA is the one demanding the cleanup of the Kalamazoo
River.  How much more of an adversary could you have?  If EPA
were not all of our adversaries in the cleanup of the river.
We wouldn't be here today talking to you because they are the

1    ones who are making everybody spend the money.

2          Now, Georgia-Pacific tries to weave around that again

3    with their story saying, well, they weren't really our

4    adversary; we were just helping them out and trying to analyze

5    the Plainwell bankruptcy.  Well, first of all, that story

6    doesn't hold up in light of the facts.  This request wants to

7    know what Georgia-Pacific's culpability was in the cleanup of

8    this river.  EPA had taken over control of this site in 2002.

9    So they were clearly Georgia-Pacific's adversary and by --

10         THE COURT:  I'm sorry, who took over the site in 2002?

11         MR. PARKER:  In 2002, EPA took over control of this

12   Super Fund site from Michigan, the State of Michigan's

13   Department of Environmental had it before that, and the EPA

14   took it over in 2002.

15         So you can't, you cannot avoid the fact that they gave

16   it to a --  rely on the work product privilege analogy which

17   they are trying to do because they gave it to an adversary.

18   And that's pretty obvious from the May 6, 2003, letter.

19         Judge --  I'm sorry.

20         THE COURT:  Does Georgia-Pacific have a legal

21   obligation to respond to a section 104(e) request?

22         MR. PARKER:  Yes.

23         THE COURT:  Does that provide them with any kind of

24   shelter as far as having to produce this information to

25   somebody else?  In other words, they have to respond to the

1    government.  Does that fact protect them from this material

2    being turned over to some other private individual?

3          MR. PARKER:  Well, it would depend, Judge, because it

4    would depend on the way they got to turn it over.  Once EPA

5    gets it -- and let me just preface this by saying EPA didn't

6    say give us your mediation questionnaire response.  That's how

7    they chose to respond to the 104(e).

8          THE COURT:  That was my first question.  You answered

9    that.

10         MR. PARKER:  Right.  Secondly then, once EPA has it

11   and we issue a FOIA request, we can't get it from EPA if EPA

12   says it's confidential business information, and there are

13   certain exemptions to FOIA.

14         THE COURT:  That's what they are going through now as

15   far as their analysis.

16         MR. PARKER:  To us.  But as the case I quoted from,

17   that's a very different question than you have which is whether

18   in this civil litigation --

19         THE COURT:  That's what I'm asking, civil litigation.

20   Are they sheltered by some kind of protection?

21         MR. PARKER:  Not because they gave it to EPA.  They

22   are claiming they got the mediation privilege because this was

23   originally used in 2001 for that purpose.

24         THE COURT:  I understand.

25         MR. PARKER:  So I mean I don't think --  the fact they

1    gave it to EPA gives them no independent right to withhold it

2    from us.  That fact, either this has got a mediation privilege

3    established in 2001 or it doesn't for purposes of whether we

4    are entitled to it.  And we argue, whatever that is, is

5    irrelevant.  Because in 2003 once they gave it to EPA for some

6    purpose other than the mediation request we can get it.

7            The parties in this case have served lots of FOIA

8    requests on EPA and gotten lots of documents from them.  This

9    is the one they withheld because they claim, they being

10   Georgia-Pacific has withheld, and they are the ones who said to

11   EPA don't turn it over to them.

12           THE COURT:  Well, you're saying that they waived

13   whatever privilege they have because they disclosed to a third

14   party.  But if they had a legal obligation they had no choice

15   but to disclose it, it wasn't, it wasn't a voluntary

16   disclosure.  So aren't they protected, can't they say, we

17   didn't have any choice but to disclose it.  So we have never

18   really voluntarily disclosed anything to anybody else.  We kept

19   this protected.

20           MR. PARKER:  Let me say this, Judge.  Had they

21   answered the questions to this FOIA request instead of

22   providing the mediation questionnaire instead, there is no

23   question but we would have already gotten that from EPA and

24   they would have to turn that information over to us.  If this

25   were, if they had done interrogatory responses, if you will,

1    instead of the Rule 33(d) response by turning over documents in

2    lieu, they would clearly have to give us that.  They would not

3    be able to argue --

4              THE COURT:  Why would that be?

5              MR. PARKER:  Because it's not -- clearly it's relevant

6    to this litigation.  Just the fact they gave it to EPA doesn't

7    create its own privilege.  The fact that any of us have given

8    documents to EPA doesn't create a separate privilege that would

9    prevent disclosure.  They are arguing because this served a

10   different purpose at one point in its life as something used in

11   connection with the mediation, it has a privilege even though

12   they gave it to EPA.  The act of giving it to EPA does not

13   independently create a reason to prevent them from turning it

14   over to us.

15        So it's merely the fact that in a prior life this

16   document was used in a mediation and they chose to answer EPA's

17   questions that way, that it's somehow shielded from privilege.

18   You can think about that, Judge.  That would create kind of a

19   nifty little thing for parties to do.  If I had to give

20   somebody to EPA, I quickly set up a little mediation, put it

21   all in a mediation summary, then give it to EPA saying I'm not

22   waiving my mediation privilege; now nobody is going to be able

23   to get what otherwise would clearly be discoverable if I would

24   have chosen to answer the questions from EPA, the 104(e)

25   requests like interrogatories.  You just can't -- that would

1     thwart the whole purpose.

2            And I would just submit to you, Judge, in conclusion.

3     The document is really not privileged.  This is not even a

4     waiver issue.  If it had been a mediation summary and they

5     showed it to somebody else for that purpose, that's one thing.

6     But because documents given to the EPA under 104(e) are not

7     privileged, by virtue of doing that, the fact they are

8     compelled doesn't mean they are privileged.  This document has

9     no privilege assigned to it for that purpose.  And because it

10    doesn't contain those statements of puffery or posturing that

11    the Goodyear mediation or settlement privilege would govern, it

12    should be produced in any event.  Thank you.

13           THE COURT:  Thank you, counsel.  Georgia-Pacific.

14           MR. SIBLEY:  I'm happy to speak right now, Your Honor.

15    I know that NCR is siding with IP.

16           THE COURT:  All right.

17           MR. SIBLEY:  Might be more efficient for --

18           THE COURT:  You want to respond to both of them at the

19    same time?

20           MR. SIBLEY:  I would prefer to do it that way, Your

21    Honor, if they want to be heard.

22           THE COURT:  Go ahead.

23           MR. MARRIOTT:  Thank you, Your Honor.  I will be

24    brief.  My name is David Marriott.  I represent NCR.

25           If I may, Your Honor, by way of first responding.  I

1    would like to make three points.  Before I make each of those

2    points, let me just respond in a slightly different way from

3    Georgia-Pacific to the question --  I'm sorry, from IP to the

4    question Your Honor just asked.

5         And the question Your Honor asked was whether or not

6    Georgia-Pacific was compelled, required to make the response it

7    made.  And my response, Your Honor, is from Georgia-Pacific's

8    brief submitted to this court in this matter, and this is at

9    the second paragraph, and here's what Georgia-Pacific says.

10   "Here are the facts:  Georgia-Pacific voluntarily provided the

11   mediation questionnaire responses to the EPA."

12        I said, Your Honor, I had three points.

13        THE COURT:  I understand that they said that.  And

14   that's a question I will be asking them.  Had they not

15   voluntarily provided some sort of response, would they have

16   been legally required to provide a response?  Sounds like they

17   entered into some sort of an agreement with EPA to provide

18   something other than what was requested.  Had they not arrived

19   at some interim solution would they have been provided --  been

20   required to provide a response to a CERCLA request.  It sounds

21   like they would have been.

22        MR. MARRIOTT:  I guess, Your Honor, there is a

23   different between, the law requires what it requires.  I

24   believe that's what counsel for International Paper was

25   addressing.  That does not mean they didn't voluntarily make

the choice, as I believe they did, as I believe the statement says to comply with that.  So there is a sense in which they were both required and a sense in which it was voluntary on their part.  If that's the way they are saying, both are true, Your Honor, in different senses.

Three quick points, Your Honor.  First of all, we would respectfully submit to the Court that the document here in question is simply not protected by this alleged privilege. There is no federal mediation privilege.  It does not exist. What exists, Your Honor, is a limited settlement privilege addressed by the Sixth Circuit Court of Appeals in the Goodyear case.  The cases that have followed the Goodyear decision make, I would submit, perfectly clear that that privilege is a, "quite limited privilege".  The purpose of the privilege, Your Honor, is to protect from disclosure communications that are made for the purpose of and in furtherance of settlement.  And whatever one might say about this initial, initially prepared questionnaire between the parties in the KRSG dispute, what was communicated to the EPA several years later was not a communication, as I believe counsel for International Paper indicated, in furtherance of settlement.  It was the voluntary disclosure by Georgia-Pacific to its regulator, to a regulator, the EPA, it was not a communication with the EPA in settlement. And indeed if you believe what is said in the Georgia-Pacific papers, they were not an adversary of the EPA's at the time.

1    They were effectively cooperating, as Georgia-Pacific would put

2    it.  And we would submit that for that reason alone it was not

3    a communication in furtherance of settlement.

4            Furthermore, Your Honor, with respect to this first

5    point as to whether there is a privilege.  This limited

6    privilege has, as counsel for IP indicated in the quotations he

7    provided the Court, it applies where what is being protected

8    from disclosure is inherently unreliable information because it

9    is some form of puffery associated with it.  That's effectively

10   what I believe the Goodyear case says; it's what the Southern

11   District of Ohio says in Graff; and it's what the Northern

12   District of Ohio says in Grupo.  The communications here at

13   issue are simply not communications that I believe can fairly

14   be described as inherently unreliable puffery.  I have not

15   heard the lawyers from Georgia-Pacific stand, haven't had a

16   chance yet to stand, and I don't believe they will stand and

17   tell the Court that the submission that they made to the EPA by

18   way of this questionnaire was inherently unreliable, that it's

19   puffery, that there is something inaccurate or untruthful about

20   it.  I believe they made what they believed to be at the time

21   to be truthful and accurate statements.  And for that

22   additional reason, what this settlement privilege is about is

23   simply here not applicable.

24           And as counsel for International Paper said, whatever

25   they want to say about being, not being a request, the cover

letter that they submitted to the EPA makes clear it's a
request and the request is required to be submitted if
submitted in a truthful fashion.  So that's the first point.

Second point, Your Honor, concerns waiver.  We would
submit to the Court that the law is clear that where there is a
voluntary disclosure, and, again, GP has said it was voluntary,
there is a waiver.  Selective waiver is not allowed in the
Sixth Circuit.  And to quote the Sixth Circuit from the In Re
Columbia HCA case which I believe is cited by Georgia-Pacific,
this is what the Court says; it says quote, "We reject the
concept of selective waiver in any of its various forms.  We
reject the concept of selective waiver in any of its various
forms."  That's at page 302 of the Columbia HCA case, Sixth
Circuit 2002.

Georgia-Pacific hasn't cited, Your Honor, and we are
not aware of any case saying that the so-called settlement,
limited settlement privilege cannot be waived.  Georgia-Pacific
has analogized as support for this otherwise unsupported
proposition to the work product doctrine.  And they cite in
that regard this Columbia HCA case.  There is, however, an
important passage of that case for which I would like to pause
for a moment.  This is at page 307 of the Columbia HCA case.
This is what the Sixth Circuit said with respect to waiver in
that case.  It said, "The standard for waiving work product
should be no more stringent than the standard for waiving the

1   attorney-client privilege.  Once the privilege is waived,

2   waiver is complete."

3            So the analogy to the work product doctrine doesn't

4   support the proposition here that somehow there is no waiver

5   permissible or possible with respect to this disclosure because

6   it was a disclosure concerning the settlement privilege.

7            And finally, Your Honor, to reiterate what was said by

8   counsel for International Paper, the mere fact that there is a

9   process by which a party might before the EPA try to get

10  documents and process by which the EPA evaluates whether

11  documents are business confidential is simply irrelevant to the

12  question of whether in this litigation the document that here

13  has been withheld is protected from disclosure.  There is a

14  protective order.  The protective order provides all of the

15  protection that ought to be required here of this document.

16  And if for some reason counsel for Georgia-Pacific believes

17  that there is some statement that they made in this submission

18  to the EPA now many years ago that needs to be put into

19  context, that needs to be explained, that maybe was in some

20  sense puffery, that's something they can have a witness do at

21  trial when Judge Jonker considers the document for whatever

22  it's worth.

23            Those are my three points, Your Honor.  Thank you.

24            THE COURT:  The last point you're referring to is the

25  FOIA procedure?

1          MR. MARRIOTT:  It is, Your Honor.

2          THE COURT:  Thank you, counsel.

3          MR. MARRIOTT:  Thank you.

4          MR. PARKER:  You couldn't see it.  We lost some

5     documents.

6          THE COURT:  I hope that's not symbolic of your case

7     falling apart.

8          MR. PARKER:  Let's hope not.

9          MR. SIBLEY:  Good morning, Your Honor.  May it please

10    the Court, Trey Sibley for the plaintiffs in this case.

11         Let me start with an observation.  The mediation

12    questionnaires that we are discussing here today asked a series

13    of questions.  They are admittedly questions seeking factual

14    information about the operations of the underlying mills.  As

15    Mr. Parker accurately explained and with respect to the

16    Millennium response, Millennium and the other parties to the

17    mediation included with their narrative responses to the

18    questionnaires a host of business records.  Those business

19    records, Your Honor, have been produced in this case.  They

20    were produced in 2011.

21         International Paper and NCR have the freedom in this

22    case to serve interrogatories asking the very same questions.

23    We are not claiming that we are precluded or somehow protected

24    from having to respond to those interrogatories because we

25    responded to similar questions in the context of a confidential

1    mediation.

2         The information that they seek from us is available

3    through the very discovery means that are open to any party in

4    any case in federal court.

5         Mr. Parker referenced that what they would be lacking

6    by taking that tack is the, "distillation of all of those facts

7    into a single concise form which is reflected in these

8    mediation questionnaire responses," and that's really the rub

9    of it.

10        What is in that distillation that they don't get from

11   other discovery means that are available to them.  The

12   distillation contains the thoughts of counsel, how they

13   characterize and shade certain facts to suit their negotiating

14   purposes, and the foundation for the positions that the parties

15   would take in negotiating in the context of the confidential

16   mediation.  In this respect, Your Honor, the questionnaires are

17   no different than the recitation of facts that one might find

18   in a confidential mediation submission that parties submit all

19   the time during mediations and that are unquestionably covered

20   by the mediation privilege.

21        I would submit that it's those thoughts, those

22   positions, that posturing that's reflected in the questionnaire

23   responses, that's what IP and NCR are really after.  And that's

24   precisely the type of information and material that's squarely

25   and comfortably protected by the Goodyear mediation privilege

1       doctrine.

2              Now, the argument has been made by Mr. Parker and

3       Mr. Marriott, that, look, this is just factual material.  But

4       let me suggest, Your Honor, that, and one really need do no

5       more than to have listened to Mr. Parker's characterizations of

6       the facts leading up to this case; the recitation of the facts

7       frequently contains some of the most important pieces of

8       advocacy.  How one views those facts is critical.  I suspect

9       Your Honor has participated in quite a few mediations, and

10      anyone who has done so knows that how parties view the facts is

11      often a matter of significant dispute, and how they

12      characterize them, how they deal with them is of course very

13      important.  And in the context of the mediation, and what the

14      Goodyear doctrine says is that parties should have the comfort

15      to do that without having their positions be held against them

16      in subsequent litigation.

17             And that's why we think the document was squarely

18      privileged in the first instance.

19             The second question, Your Honor, is whether we have

20      had any waiver of that privilege.  And here we have a rather

21      substantial dispute over the underlying facts.  We provided

22      some context both in the context of our brief and in the

23      affidavit provided by Mr. Davis.  Mr. Parker suggests that

24      those facts are inaccurate.  We would of course resist that

25      conclusion.

35

           The facts are that EPA did serve a 104(e) request in
March of 2003 that was quite voluminous and, Your Honor, I
apologize for not including the entire request.  And I thank
Mr. Parker for bringing that.  That was an error on our part
and please accept the version that Mr. Parker submitted in lieu
of Exhibit 1 filed with Mr. Davis's affidavit.

           That request was served asking a host of information,
but as frequently happens, especially in a context such as this
where you're dealing with an active Super Fund site, the
lawyers for the KRSG participants, including Georgia-Pacific,
called up EPA and said what are you really looking for and they
quickly learned, look, we are trying to resolve the Plainwell,
the Plainwell's claim here, and we need to compare what they
are saying with the positions taken by these other parties.  It
would really be helpful if we had your questionnaire response.

           After negotiation, all of the parties agreed to
provide them.  Now, I agree with Mr. Marriott, incidentally,
this was not a compelled disclosure.  This is not the
situation, Your Honor, where we were compelled and ordered to
produce the questionnaire response and thus can take comfort
that there was no waiver under the compelled disclosure
doctrine.  That's, it's -- I can see why Your Honor would ask
that question.  But that's really not applicable here.

           But we did reach agreement to provide EPA this on the
condition that they keep it confidential because of course, as

1   both IP and NCR have referenced, we were in active litigation

2   at that point with other parties who, other potential

3   responsible parties or parties that we believed were

4   potentially responsible parties on river, and we did not want

5   that information disclosed to them.  EPA agreed to those

6   conditions and they accepted it, and we never filed a formal

7   104(e) response.

8          Your Honor, I wish that we had brought with us today a

9   copy of some of the 104(e) responses that have been submitted

10  in this, with respect to this site.  The mediation

11  questionnaire contains none of the trappings that one sees with

12  those.  You have a series of questions, we do not --  we make

13  no attempt to meet any of those questions in a 104(e) response

14  you go question by question and provide your answer.  The end

15  of it will contain a verification, a certification that is

16  truthful and accurate.  That does not exist here.  This was not

17  a 104(e) response as Mr. Davis's cover letter says, "This is

18  not an official response."  He does go on to say that it's an

19  interim response, and that's perhaps a poorly, poor choice of

20  words in describing the agreement reached between

21  Georgia-Pacific and EPA with respect to them.

22         So we submit this was not a formal response.  We have

23  never, the obligation to respond was indefinitely tolled;

24  Georgia-Pacific to this day has not submitted anything

25  resembling a formal response to the 104(e) request.

1   The question then becomes does the disclosure --

2   THE COURT:  Where is the agreement that you're

3   pointing to that the EPA says they will keep this confidential?

4   MR. SIBLEY:  We have included that agreement, Your

5   Honor, in the affidavit, the description of that agreement in

6   the affidavit of Michael Davis which was attached as the first

7   attachment to our response brief in paragraph 7.  "After

8   negotiations with Georgia-Pacific --"

9   THE COURT:  Let me find that so we all have it.

10   MR. SIBLEY:  Okay.

11   THE COURT:  Is that Exhibit 2?

12   MR. SIBLEY:  It's not Exhibit 2.  The affidavit is.

13   THE COURT:  I have your affidavit.

14   MR. SIBLEY:  Okay.  Exhibit 2 is his cover letter.

15   Now, in paragraph 7 --

16   THE COURT:  I have that.

17   MR. SIBLEY:  -- he describes it.  And he says here

18   that in the sentence that Mr. Parker quoted, "It's not an

19   official response.  The information is being provided as an

20   interim response until such time as EPA establishes a new

21   deadline for responding to the 104(e) and/or requests

22   additional information.  Georgia-Pacific by submitting the

23   questionnaire responses does not intend to waive the

24   confidentiality of any of the documents, memos, briefs or any

25   other material prepared during the course of the confidential

1    mediation allocation."

2           He is referencing, we would submit, Your Honor, the

3    agreement he has reached with Ms. Furey at EPA Region 5

4    regarding the conditions under which Georgia-Pacific is

5    providing the questionnaire response.  And that's significant.

6    Because --

7           THE COURT:  Just a moment.  Go ahead, please.

8           MR. SIBLEY:  Your Honor, Mr. Parker and Mr. Marriott

9    dispute Georgia-Pacific's version of the facts as to what

10   happened when Georgia-Pacific made the submission.  I would

11   submit, Your Honor, that the place to resolve that factual

12   dispute is not in this court.  It is with EPA.

13          THE COURT:  Which factual dispute are you talking

14   about?

15          MR. SIBLEY:  Is Mr. Parker has insinuated that this

16   had nothing to do with the Plainwell bankruptcy and that our

17   representations to that effect are not accurate.

18          THE COURT:  All right.  Is there something in here

19   that you want to point to that would support your statement

20   that this is all about the Plainwell bankruptcy?

21          MR. SIBLEY:  Your Honor, that is the --  there is

22   nothing --  the letter does not specifically reference the

23   Plainwell bankruptcy, but --  and the, nor does Mr. Davis's

24   affidavit and, Your Honor, that is an oversight on our part.

25   It clearly did.  That is the lore, that is what happened in

1    this case.  That's why they wanted to.  Because they had

2    received Plainwell, we articulate this, actually, there is a

3    place where we reference that, it's in our verified objections

4    to International Paper's interrogatory number 25 where we

5    describe that sequence of events.  EPA had received Plainwell's

6    questionnaire response in connection with those negotiations.

7    Plainwell had requested from the other KRSG mediation

8    participants leave to submit its questionnaire response to, for

9    a, for their consent to disclose to EPA something that was

10   otherwise protected by the confidentiality portions of the KRSG

11   mediation agreement.  Their questionnaire response.  EPA wanted

12   to compare --

13            THE COURT:  Wait.  Slow up a little bit.  Say that

14   again.

15            MR. SIBLEY:  Okay.  Let me refer you, Your Honor, to

16   --

17            THE COURT:  Plainwell wanted to submit something to

18   the EPA.  What was it?

19            MR. SIBLEY:  Plainwell wanted to submit, because EPA

20   had requested it, a copy of their individual mediation

21   questionnaire response.

22            THE COURT:  Which is the same thing you submitted to

23   the EPA.

24            MR. SIBLEY:  That is correct.

25            THE COURT:  And Plainwell wanted the permission of who

1    to submit their response to the EPA?

2         MR. SIBLEY:  Because the document was specifically

3    created for the KRSG mediation and exchanged among the

4    mediation participants, it was governed by the confidentiality

5    provisions in the KRSG mediation agreement.  Plainwell did not

6    feel like they could disclose that response without violating

7    the provisions in that agreement, and so they requested and

8    obtained the consent of the other KRSG mediation participants

9    to share that document with EPA.

10         THE COURT:  That anticipates a question I wanted to

11   ask you.  Did you do the same thing before you submitted your

12   response to the EPA?

13         MR. SIBLEY:  Yes.  All of the KRSG mediation

14   participants conferred after receiving these requests and

15   agreed that they could, each party could disclose the

16   questionnaire responses provided that EPA agreed to treat them

17   as confidential.  Because that's what EPA was really seeking.

18   You see, Your Honor, EPA had Plainwell's response, but it was

19   difficult for EPA to put that in context without seeing what

20   all of the other PRPs were saying in this same negotiation.

21   Ordinarily EPA would not be entitled to that.  But we, we

22   reached this agreement with EPA, we were provided, provided

23   that the agreement would be treated --  the submission would be

24   treated as confidential.  And EPA has continued to treat

25   Georgia-Pacific's submission as confidential.

1           Let me, if I could briefly --  actually let me refer,

2     Your Honor, just quickly to, if you would look at page 6 and 7

3     of International Paper's brief.  They excerpt accurately and at

4     length the objection that we articulated.  Those objections

5     were part of our responses and objections, which are attached

6     as Exhibit B to Mr. Parker's declaration, and those are

7     verified responses.

8           THE COURT:  Just a moment.  Page 6 and 7 of their

9     brief, I have it.

10          MR. SIBLEY:  The timeline is set forth, Your Honor, at

11    length in that objection.

12          THE COURT:  This gives rise to two questions.  First

13    of all, why isn't any of this reflected in the EPA documents or

14    requests to you because that's clearly not what is in their

15    letter to you.  Their letter to you asks for information for

16    other purposes.  Doesn't mention the Plainwell bankruptcy at

17    all.  Secondly, could this not be easily read as a mutual

18    agreement among the parties to protect this information from

19    the public generally by designating it as privileged as far as

20    FOIA is concerned?  FOIA is one level of protection against the

21    public generally.  Does that really speak to this piece of

22    civil litigation.  As opposing counsel has pointed out, we

23    really have two different standards here.  I'm not sure what is

24    privileged as far as FOIA is concerned really governs what's

25    been, what's available as far as civil discovery in this

1     context is concerned.

2         MR. SIBLEY:  Two very good questions.  Let me address

3     them in turn.  First, why doesn't it mention Plainwell.  Your

4     Honor, I would submit that EPA does not have to explain why it

5     wants to ask questions in a 104(e) request.  They can simply

6     ask the question.  It is --

7         THE COURT:  They don't have to.  But the Court is

8     governed by what the facts are and what the documents say, and

9     what the facts are and what the documents say is that they are

10    looking at what you did.  Not what Plainwell did or what its

11    bankruptcy is all about.  They are looking at your liability.

12        MR. SIBLEY:  That's exactly right, Your Honor.

13    Because they wanted to compare what --  in determining what was

14    fair to accept from Plainwell, they needed to make a judgment

15    as to what their relative contribution was and they needed to

16    know this information from, from the other parties.

17        Now, Your Honor, I would submit that that context,

18    there are a lot of internal reasons why EPA may want to serve a

19    104(e) request.  Those do not need to be articulated on the

20    face of the document to make the request valid.  In fact, it

21    frequently is the case that to get that type of context and to

22    figure out precisely what it is that the agency is looking for,

23    the best way to do that is to pick up the phone and talk to the

24    lawyer serving the request and find that information.  In fact,

25    that is a recommended practice because you want to make sure

1    you give the agency exactly what they are looking for.  And in

2    the context of that conversation, that is how we came to learn

3    that they were looking for this information in connection with

4    the Plainwell bankruptcy.  And really what they really wanted,

5    what would be most useful to them, would be to see the

6    analogous submissions to the Plainwell mediation questionnaire

7    response so that they could put that response in the context of

8    other responses like it that were shared amongst the parties in

9    the mediation.

10        Now, with respect to Your Honor's question about

11   shielding information from the public.  EPA certainly had the,

12   had the ability to demand actual responses to the 104(e)

13   requests, and had they done so, and had we responded, which we

14   would have responded, those responses would be public.  There

15   is, as Mr. Parker says, there is no --  the actual content of

16   the questionnaire is not confidential business information.

17   Now, we under the FOIA --

18        THE COURT:  What they are asking for is 104(e)

19   information which is not confidential.

20        MR. SIBLEY:  They are asking for information --  no.

21   They are asking for the mediation questionnaire which certainly

22   is confidential.

23        THE COURT:  Not in their letter.

24        MR. SIBLEY:  The EPA, I'm sorry, Your Honor.  They,

25   the EPA was asking for 104(e) information which was not

1    confidential.  But after talking with them, we realized that's

2    not really what they wanted, what they wanted was the

3    questionnaire responses, and we reached this agreement; we said

4    these need to be treated as confidential and not disclosed and

5    EPA has honored that agreement.

6         In terms of waiver, and you mention the fact, Your

7    Honor, that the standards for judging FOIA exemptions and

8    waiver of privileges in civil litigation are two different

9    standards.  And that's true.  But in this case, they are

10   closely interrelated.

11        IP's argument, as I understand it, is that

12   Georgia-Pacific waived by submitting this questionnaire as a

13   formal response to a 104(e) request.  Formal responses to a

14   104(e) request unless designated confidential and upheld as

15   confidential are open to the public.  By disclosing this

16   document in a way that made it open to the public, the argument

17   goes, we waived.  We put it in a place where anyone can see it.

18   That's, that's their argument.

19        So the question of the circumstances under which it

20   was submitted and whether in fact EPA continues to treat it as

21   confidential under FOIA is very relevant to the waiver

22   question.  Because if EPA is treating it as confidential, then

23   it is not open to the public.  It is not open to parties

24   outside of the negotiations such as International Paper, and

25   NCR.  That is why the two interrelate and are so --  and the

1    relationship is so important in this, in this context.

2         In International Paper's brief, as Mr. Parker noted,

3    they cite cases dealing with waiver of the attorney-client

4    privilege.  We do not think those cases are analogous here.

5    The attorney-client privilege is much easier to waive than is

6    our other evidentiary privileges such as attorney work product.

7    In attorney work product, as the HCA case says, you must

8    disclose it to your adversary.  That is the party from whom the

9    information, that's why the privilege exists is to keep it from

10   the adversary in litigation.  Now, we have analogized those

11   cases, but to --  in a way to fill a gap in the, in the case

12   law.  There is a dearth of case law on the mediation privilege.

13   There is no case going one way or the other on whether the

14   mediation privilege can be waived and under what circumstances

15   it can be waived.

16        We will submit that what the distinction drawn in HCA

17   between the attorney-client privilege on one hand and the

18   attorney work product doctrine on the other hand provides some

19   very useful, provides a useful data point in figuring out how

20   to determine when the mediation privilege is waived.  We would

21   submit that the key, the key question there is have you

22   disclosed it in a context that would make it available to the

23   parties who are outside of the negotiation.  And we would

24   submit that that has not happened here.  EPA was actively

25   involved in trying to resolve liability against Plainwell.  The

1    KRSG mediation participants were trying to resolve Plainwell's

2    allocation.  It was a logical extension of the privilege to

3    bring EPA in, share the documents with them, so that they could

4    make their very similar, the similar type of determination that

5    the parties were making in the KRSG mediation.

6              THE COURT:  Did you ever anticipate that the EPA might

7    be sitting across the table from you as an adversary?

8              MR. SIBLEY:  No more than we anticipated that we may

9    be across the table from the other participants in the KRSG

10   mediation.  We were, we were mediating to resolve a dispute.

11   And.

12             THE COURT:  Weren't you sitting across the table from

13   the other litigants or the other parties as potential

14   litigants?

15             MR. SIBLEY:  In any mediation the parties that are

16   exchanging information that's squarely covered by the Goodyear

17   doctrine are adversaries.  That's why, that's why the analogy

18   --

19             THE COURT:  Wasn't EPA an adversary here?

20             MR. SIBLEY:  They are.  Well, no more than, no more

21   than they are another party that has an interest in the

22   negotiation in resolving who pays the response costs.  But

23   that's where the focus on the adversary and the attorney work

24   product doctrine is, that's where the analogy breaks down.  And

25   I would submit that it doesn't matter that you disclose it to

1    an adversary, if that was the case, every document shared in a

2    mediation would be waived.

3          That's not the question.  The question is whether

4    you're disclosing it in a context, in a way that makes the

5    information broadly available outside of the negotiation, which

6    is what the mediation privilege is intended to protect.

7          Submitting it to EPA alone does not constitute waiver.

8    And the fact that EPA as treated as confidential, so there was

9    no waiver in the first instance.  And we would submit therefore

10   the --

11         THE COURT:  -- settlement negotiations with EPA, are

12   you?

13         MR. SIBLEY:  We were not in settlement negotiations

14   with EPA, that is correct.

15         THE COURT:  And aren't they an adversary or a

16   potential adversary with you on this matter?

17         MR. SIBLEY:  I suppose that EPA itself has incurred

18   its own response costs, and is the regulatory agency overseeing

19   the site.  They have their own interests in pursuing it.  But

20   that makes them no different, Your Honor, than any of the other

21   participants.  Millennium could have sued Georgia-Pacific and

22   --  the way you protect the mediation privilege is to say,

23   look, I'm going to share this document with you, but you have

24   to treat it as confidential.  This is my position and you're

25   not going to go wave it around in court once I do that.  And

1    EPA agreed to abide by those conditions.  Just as all of the

2    KRSG mediation participants did.

3              THE COURT:  You're taking a document that is not being

4    used for settlement purposes, and you're giving it to somebody

5    else.  It may have been used for settlement purposes at one

6    time, but you're giving it to somebody else in a non-settlement

7    situation.  In fact, all of you may be doing that.  But that's

8    your choice.  You're doing that voluntarily.  That's not what

9    they asked for.  You called them up and said, well, instead of

10   answering your questionnaire, we will give you something else.

11   And you voluntarily turned over to them your work product.

12   You're not their client, they're not your client.  In fact,

13   they are on the other side of the table from you.  You're

14   telling them what you're thinking.  If that's what is in there.

15   If that's your work product, you are exposing your innermost

16   thoughts that you're telling me you're trying to protect from

17   one potential adversary to another potential adversary.  Why is

18   it still protected?

19             MR. SIBLEY:  Your Honor, it's protected because we --

20   we disclosed --  first of all, the suggestion that the document

21   was not created for the purpose of settlement, maybe I

22   misheard.  It clearly was created for the purpose of

23   settlement.

24             THE COURT:  In a different dispute.

25             MR. SIBLEY:  In a closely, in a closely related

dispute.  What the parties effectively did is they brought EPA
into the mediation, made them, made EPA abide by the same
conditions to help EPA resolve its own claim.  They shared this
limited category of documents so that EPA could decide whether
its settlement with Plainwell was, was a reasonable one.  It
was clearly, it was clearly a --  the party's intent was that
EPA would be brought into the fold and they would preserve the
confidentiality of the document.  And they have.  They have.

       THE COURT:  It sounds like you're creating a fiction
here to say they are now part of the settlement process that
you started back in, what, 2001?  That's an ongoing settlement
conference that --  did they disclose their settlement position
with you?  Did they give you a settlement document that --

       MR. SIBLEY:  They did not.  They certainly disclosed
it with Plainwell.

       THE COURT:  Well --

       MR. SIBLEY:  Which was the purpose of their
negotiation.

       THE COURT:  Their negotiations with Plainwell, their
negotiations not with you.  They are not disclosing, they are
not on equal footing with you.  They are not part of that
settlement conference.  That settlement conference is over.

       MR. SIBLEY:  That, that's a true statement, Your
Honor.  But they certainly have agreed to abide by the
confidentiality.  We would submit that subjecting by agreeing

1   that the documents were being exchanged with EPA subject to the

2   same conditions indicates that the parties expected and

3   intended that EPA would continue to treat the documents

4   confidential and would not be able to use it as an evidentiary

5   document in a subsequent proceeding.  They have not.  They have

6   never attempted to use that document.  They have kept it

7   confidential.  And none of the --  they have refused to produce

8   it to International Paper as they agreed to do.

9           We think that what the analogy to --

10          THE COURT:  Does the fact that they made that decision

11  carry any weight as far as this Court is concerned?

12          MR. SIBLEY:  It absolutely does, Your Honor.

13          THE COURT:  Why is that?

14          MR. SIBLEY:  The key question is the context of the

15  disclosure.  That's where, what the position we articulate in

16  our brief is that you should not look to attorney-client

17  privilege cases, which say any disclosure is a waiver, any

18  disclosure to a third party is a waiver.  You should look

19  instead to the work product doctrine which says you need to

20  look more closely to whom the information is being disclosed

21  and the circumstances surrounding disclosure.  Thus, it is very

22  relevant that EPA said we agree, we will not, we will treat

23  this as confidential.  And it's relevant that they have.

24          Your Honor, let me emphasize this other point --

25          THE COURT:  I'm just asking if the fact that you

disclose it to an outside party, and they unilaterally say,
fine, we will honor this confidentiality because it might be in
their vested interest to get ahold of the information, the
disclosure has already been made.  They have benefited from it.
If you disclose it to somebody on the street, and they say
yeah, sure, we will keep it secret.  Does that somehow give it
some kind of protection as far as the rule is concerned?  It
seems like the disclosure has already been made.  And the fact
that the person receiving it decides to give it that disclosure
its blessing, that doesn't necessarily give it any legal
significance.

MR. SIBLEY:  Your Honor, let me resist that statement
because I don't think that's accurate.  I think what happened
is the disclosure was made on the condition that it be treated
as confidential.  The disclosure would not have been made --
it's not as if EPA after the fact said okay, yeah, we will
treat this as confidential.  We will say, look, and by the way
-- factually the sequence of events is that EPA specifically
asked, said, look, what we really want is this.

THE COURT:  Does that sequence make any difference?

MR. SIBLEY:  I want to make sure the record is clear
on that.

THE COURT:  I accept that.  I'm just saying if you
went to a half dozen people or agencies out there and say if
you'll keep this secret from IP I'll tell you everything that I

1   was thinking.  And you tell half the world on the promise that
2   they won't tell anybody else.  You divulge your work product to
3   half the world but you don't tell IP.  The fact that they give
4   it their blessing and say, fine, I won't tell anybody else, you
5   know --  does that make, does that make, does that continue to
6   protect the work product?
7           MR. SIBLEY:  If we had disclosed it to half the world,
8   Your Honor, I submit we likely would have waived.  But we
9   didn't.  We disclosed to an agency who was in the context in
10  negotiating with one of the participants in the mediation.
11          THE COURT:  But it wasn't with you.
12          MR. SIBLEY:  This is true.
13          THE COURT:  It was one of your adversaries.
14          MR. SIBLEY:  That is exactly right.  It was one of our
15  adversaries.  And EPA was very much in the same situation as
16  each of the participants, a party that had incurred response
17  costs at the site and likely would continue to incur response
18  costs.  It was attempting to resolve potential liability in the
19  same way that the mediation participants were.  I submit that
20  that is, that is not, that is not the circumstance that would
21  constitute the waiver of the mediation privilege.  And I submit
22  that the, that the interest of efficiency would be ill served
23  by imposing such a doctrine.  And I don't think it's commanded
24  at all by the HCA case, and I think it would be at odds with
25  what the Sixth Circuit held in the Goodyear case.

1          Now, if we're wrong about the import of sharing it

2     with EPA, if -- and to be clear, to be clear --

3          THE COURT:  Why did you tell the IP to go, to go to

4     EPA and get this information?  Why did you tell them to go

5     there in the first place?

6          MR. SIBLEY:  Because if their position, their

7     articulated position is that it's not confidential because it

8     was a 104(e) response, if they are right about that, they can

9     get it from the EPA.  They are wrong about that.  And they know

10    they're wrong about that.  It wasn't a response.  It was

11    something voluntarily shared --

12         THE COURT:  I'm sorry.  I want to get this straight.

13    Initially did you or did you not tell them, you can get this

14    from the EPA.  Go to the EPA?

15         MR. SIBLEY:  We did not tell them that.

16         THE COURT:  Okay.  I thought that that's --

17         MR. SIBLEY:  No.

18         THE COURT:  You told them initially.

19         MR. SIBLEY:  No.  We articulated -- the factual

20    predicate for them specifically asking --  incidentally, the

21    document request to which we object was not the first time that

22    this issue has come up.  We have been in discussion about this

23    for quite sometime.  And we know what their position is.  We

24    have known it for quite sometime.  We know they think we

25    waived, because this was, as Mr. Parker, articulated a 104(e)

1    response; in our objection we say, if you're right, we say you

2    can get this from EPA.  We're saying if you're right that this

3    was a 104(e) response and that we waived, then EPA will have to

4    give it to you.  That's why we, that's why we articulated the

5    response in that way.

6            Let me make -- I want to get back to the point I made

7    initially, Your Honor, because I think it's a critical one.

8    All of the documents that are cited, all of the business

9    records that are cited in these questionnaire responses, they

10   have been produced.  IP is free to serve these same

11   interrogatories.  They have seen the questions.  They can ask

12   those questions.  They can ask those very questions.  Will we

13   give them exactly the same answers?  Of course not because we

14   are not shading, we are not participating in a mediation.  We

15   are not trying to angle for that particular outcome.  Some of

16   this stuff will be the subject of expert analysis in this case

17   down the line.

18           But we will give them the factual information.  We

19   will articulate as we are obliged to do under Rule 33 what we

20   know as a company about these factual matters.  The factual

21   information is available for IP.  What they want is our

22   negotiating positions.  And that is exactly what the Goodyear

23   doctrine is intended to protect.  And that's why we think that

24   IP's motion should be denied.

25           Let me, let me quickly add one point about the

timeline with EPA because I think it's very important.  If
they're right that this was a waiver, that we put this in a
forum where anybody could have it, that EPA is not bound by its
commitment to keep it confidential, they can get the
information from EPA.  Now, Mr. Parker referred to the
timeline, how they originally requested this in 2011, and they
still haven't gotten a response to it.

We've --  unless I am, unless there is something that
I'm not aware of, the first time Georgia-Pacific was asked to
substantiate its claim of confidentiality over the
questionnaire in connection with the FOIA process was recently
in response to a demand for substantiation that was served by
counsel for NCR on EPA.  We have responded to that and EPA is
in the process of resolving that.

THE COURT:  I'm sorry.  I'm sorry.  Somehow I slipped
a gear there.  You're going to have to start that one over
again.

MR. SIBLEY:  Under FOIA, the process as I understand
it works as follows:  When a party makes a, submits something
to the government, they can, they can ask that it be treated as
confidential.  EPA will honor that request until someone
challenges it.  To our understanding, even though IP served a
FOIA request in 2011, they never actually challenged the
confidentiality designation.  The first time to my knowledge
that it has been challenged by a party in this case was by NCR

1    just recently.  Just a couple of months ago.  IP has known

2    about this for quite sometime, as Mr. Parker candidly

3    acknowledges.  They have always had the opportunity to

4    challenge this with EPA.  And EPA will decide if, if the

5    circumstances under which they received the document are

6    sufficient to continue to treat the documents as confidential.

7    This issue could have been resolved long ago, I would submit,

8    Your Honor, had IP diligently pursued its rights with EPA under

9    FOIA.

10            And, again, all of this information is, the underlying

11   information is discoverable.  What's not discoverable is the

12   stuff that fills in the gaps:  The impressions of counsel, the

13   shading, the emphasizing one fact, de emphasizing another, all

14   of the stuff that goes on in, in the context of a mediation.

15            Your Honor, we would ask that IP's motion be denied.

16   Thank you.

17            THE COURT:  Thank you, counsel.  All right.

18            (Discussion off record in court)

19            THE COURT:  I want to give the movant a chance to

20   respond.  It's your motion.  But we're going to take a short

21   break to give the grand jury an opportunity to make some

22   returns, so I will excuse the rest of you.  You can leave all

23   your papers right where they are.  They will be perfectly safe.

24   Please don't wander too far.  We will have you back in here

25   inside of ten minutes.

1          (Recess taken, 10:57 a.m.; Resume Proceedings, 11:08

2     a.m.)

3          THE COURT:  Everybody back?

4          MR. PARKER:  Looks like it, Judge.

5          THE COURT:  I'll resume then with the rebuttal by the

6     movant.

7          MR. PARKER:  Thank you, Your Honor.  And hopefully by

8     that short break I have managed to shorten this down.  So I

9     will try to be very brief.

10          Georgia-Pacific tried to make the point that what

11     we're really after here instead of this factual information

12     which you can see is given in the Millennium response, that

13     we're after the mental impressions of the lawyers.  That's not

14     the case.  And I doubt there are very many mental impressions

15     in this document.  Remember, and this is attachment 4 to the

16     March 4, 2003, letter from the EPA, their 104(e) request to

17     Georgia-Pacific.  They reminded Georgia-Pacific in the

18     instructions on how to answer a 104(e) request that, "Although

19     the U.S. EPA seeks your cooperation in this investigation,

20     CERCLA requires that you respond fully and truthfully to this

21     information request.  False, fictitious, or fraudulent

22     statements or misrepresentations may subject you to civil or

23     criminal penalties under federal law.  Section 104 of CERCLA,

24     42 U.S.C. 96404 authorizes the U.S. EPA to pursue penalties for

25     failure to comply with that section or for failure to respond

1   adequately to requests for submissions of required

2   information."

3           As the Court has noted, EPA didn't ask Georgia-Pacific

4   for the questionnaire.  They asked for specific responses.

5   They got this questionnaire in lieu of that.  And it had to be

6   factually accurate.  The Court will note that in the May 6,

7   2003, cover letter to the EPA providing the questionnaire as

8   the interim response, Mr. Davis even went to pains to correct a

9   factual inaccuracy that was in the statement.  In the final

10  paragraph, he says, I'm sorry, third to the final paragraph he

11  says, "One response in the Georgia-Pacific questionnaire needs

12  updating.  After the questionnaire response was submitted in

13  June 2001, we identified a discrepancy in our information that

14  warranted a change to one of the wastewater responses.  We

15  initially believe the Georgia-Pacific Kalamazoo River had

16  connected to the Kalamazoo wastewater treatment plant in 1964.

17  We later determined that it was more likely, the more likely

18  year we connected was 1967.  This information was developed

19  well after the question was submitted."

20          So not only can we expect that the answers in the

21  questionnaire are truthful, if they weren't, they would have

22  been corrected in this cover letter as Mr. Davis in fact did in

23  that one situation we know about.

24          So, Judge, when, if they would have answered the

25  104(e) request, I submit to you lawyers would have looked at

1    it.  One of the things, and I know this will come as a great

2    shock to you, we lawyers tend to try to spin the answers we

3    give in interrogatories a little bit.  We can't change the

4    facts, but sometimes we word them one way that might help -- I

5    know that's shocking -- might help our clients.  And I'm sure

6    they did a little bit of that in this response.  But that

7    doesn't make it privileged any more than an interrogatory

8    response does where a lawyer has some input.  Now, if there

9    were statements of puffery in there, which we have not heard,

10   that might be different.  And I would suggest to you, Judge, if

11   you think that's the issue here, and after looking at the

12   Millennium response I doubt you will, but if you do, look at it

13   in camera.  Figure out if there are any of those kinds of wild

14   statements that somebody might --

15          THE COURT:  Isn't that the argument that opposing

16   counsel is making that the whole thing is shaded as to their

17   approach to this matter and how they, how they come at it, and

18   if that's the case, how do you divorce that from a straight

19   factual statement.  Obviously I'm sure they postured that brief

20   in the way most agreeable to themselves; it puts their client

21   in the best possible light.  From that I'm sure you can extract

22   how they might approach the case and handle any given issue.

23   Doesn't that give you an insight into their thinking?

24          MR. PARKER:  I don't think it does, Judge, because of

25   the nature of this document.  But again, you can look at it in

1    camera if you thought there was that concern.  But when --

2         THE COURT:  I would tell them to redact those portions

3    and I would probably come back with a document that looked like

4    a small child had gotten ahold of it and there would be very

5    little print for anybody to actually read.

6         MR. PARKER:  I'm sorry, I'm stuck on the small child

7    reference since Mr. Sibley is so much younger than me.  But I

8    doubt, Judge, it would look like that even if you did the

9    redacting.  Because --

10         THE COURT:  I didn't do any redacting.

11         MR. PARKER:  I appreciate that.  If you look at the

12   Millennium response, the questions are not of the nature like

13   are you liable?  Why do you dispute liability?  Where a lawyer

14   might go off on these kinds of things.  These are very factual.

15   For example, page 42 of the Millennium response, the question

16   is, "Please identify and describe any and all paper production

17   operations that occurred on your property, including, A, the

18   nature of the processes, B, physical operations that

19   constituted those processes, including, without limitation,

20   specific types of paper production machines, cylinder, form

21   grinder, et cetera."  And the response goes on for several

22   pages explaining in each of Millennium's mills how that all

23   happened.

24         I mean as talented a lawyer, as lawyers as we may

25   think we are, there is very little we can do with that in terms

1    of trying to add puffery or statements, mental impressions;

2    these are factual responses.

3           Moreover, Judge and I think you hit on this with your

4    questions to Mr. Sibley, that what they are trying to do here

5    is take a document that perhaps had some mediation privilege

6    with it associated in one context, voluntarily submit it to an

7    adversary, and then say, well, but it retains its nature.

8    Admitting that if they had bothered to go through the trouble

9    of specifically answering the questions, they couldn't make

10   that argument no matter what kind of spin the lawyers might

11   have put on those answers to the 104(e) request if they

12   responded as interrogatories.  I mean that just is, as I said,

13   it suggests there is some ploy that I could next time I've got

14   to do a 104(e) response for my client I ought to enter into a

15   mediation with somebody, submit the response in lieu of it, and

16   then later when some other party, an adversary such as

17   International Paper tries to get it, I'm going to say, wait a

18   second, I've got a mediation privilege from another context

19   that doesn't get waived when I submit it to the EPA in response

20   to a 104(e) request; when if I had gone through the trouble of

21   answering the specific questions, I would have clearly waived

22   it and they clearly could have it, as Mr. Sibley has conceded.

23          So I don't think there are clear factual answers here,

24   and the fact that they may have been looked at by a lawyer

25   doesn't change the nature.

1      One thing that I did want to correct.  I think at one

2  point in discussing the waiver of the work product doctrine,

3  Mr. Sibley suggested that the HCA case said you waive it if you

4  give it to your adversary.  Well, that, the actual quote is if

5  you give it to an adversary.  EPA is clearly an adversary here.

6  As the 104(e) request indicates, they are doing an

7  investigation.  I mean for any industrial company that is

8  alleged to have discharged pollutants into a river, there is no

9  greater adversary, I would submit, than the EPA because they

10  will make you pay to clean it up.  Thus, we are all here.

11      And I think they were clearly an adversary.  And if

12  that were not the case, then every 104(e) response would be

13  given, would not be being given to an adversary and wouldn't be

14  subject to production.

15      The last point I want to make, Judge, is that

16  Mr. Sibley has suggested to you that this was given, this

17  questionnaire response was given in lieu of the 104(e) response

18  on the condition that EPA maintain its confidentiality.  I

19  haven't seen EPA say anything that they made that agreement.  I

20  can see Mr. Davis's letter where he says that by submitting the

21  questionnaire response Georgia-Pacific does not intend to waive

22  the confidentiality of any of the documents or memos.  By the

23  way, he doesn't say we don't waive the mediation privilege.  He

24  just says we don't waive confidentiality.  And the truth of the

25  matter is they knew that once it was given to the EPA with the

1    designation of confidential business information, if there were

2    a FOIA request, like International Paper would do ten years

3    later, it would be withheld by the EPA unless they could make a

4    determination that there was no confidential business

5    information.  Now, EPA made that decision for Plainwell; they

6    made that decision for Millennium; and they finally gave us

7    those requests or the questionnaire responses in 2012.  But

8    they're basically saying to Georgia-Pacific, well, if you think

9    it's confidential, we are not going to give it to International

10   Paper, although they haven't made that final decision so that I

11   could appeal it if I want.  But I would again submit to you

12   that is totally separate from the decision you have as to

13   whether or not it's discoverable in this case.  Which is quite

14   different from the FOIA standard.

15          So where all they care about --  whereas the case I

16   read to you said, my need for the information, my client's need

17   for the information is completely irrelevant to their decision.

18   I would -- Mr. Sibley suggested to you, and I don't doubt it,

19   that he has not heard from the EPA until recently about a

20   challenge to the confidential business information.  I can give

21   you a copy of this.  I only brought one, Judge, but this is a

22   July 31st letter, July 31st, 2012, letter, so it's nearly two

23   years old, from the U.S. EPA to my partner, John Cermak, where

24   it says, "This letter serves as the Super Funds division

25   partial response to your Freedom of Information request to the

1    EPA dated August 26th, 2011."  So it's taken them a year almost

2    to get to this point.  "In close, please find the Millennium

3    Holding LLC's June 11, 2003, response to EPA's CERCLA 104(e)

4    information request and Plainwell Inc.'s KRSG mediation

5    questionnaire.  EPA has not yet made a confidentiality

6    determination on the other information that EPA withheld from

7    disclosure in relation to the above-referenced FOIA request."

8              Now, that was July of 2011.  If they have waited, if

9    EPA waited all that time until recently to actually contact

10   Georgia-Pacific about it, that actually illustrates my

11   predicament and why I need to get this document through the

12   auspices of this court for litigation that Judge Jonker has us

13   on a fast track for as opposed to waiting to whenever they may

14   get around to it.

15             I think the EPA is going to just hold it.  They know

16   we can, we can come to this court as we have and seek it this

17   way, and I would suggest that because the document is not

18   privileged by virtue of the fact that it was used as a 104(e)

19   response, Georgia-Pacific should be compelled to produce it.

20   Thank you.

21             THE COURT:  The document that Georgia-Pacific

22   furnished to the EPA is the equivalent of this Millennium

23   Holdings document, is that correct?

24             MR. PARKER:  That's correct, Your Honor.

25             THE COURT:  But not the 17 boxes that accompany it.

1      MR. PARKER:  I believe that there are documents that

2  accompany it.  Maybe Mr. Sibley who has reviewed the document

3  can answer these questions better than I.  But there are, as I

4  understand it, supporting documents in addition to that.  Some

5  of which may have been produced, some of which may not.  I

6  don't know because --

7      THE COURT:  What is it that you are seeking?

8      MR. PARKER:  I would like it all.  If some of the

9  attachments have already been produced, those are the factual

10  documents that in the Millennium case Mr. Sibley said had

11  already been produced even before the EPA gave them to us.  If

12  they have already been given to us, getting them again would

13  not be harmful, but I would like to have the entire document.

14  Because, as I understand it, the supporting documents provide

15  further factual basis for the statements that are made in the

16  response.  So we would appreciate, and believe we are entitled

17  to the entire document.  But --

18      THE COURT:  I just want to make sure I understood what

19  you were asking for.

20      MR. SIBLEY:  Your Honor, if I may.  The document that,

21  that the 17 boxes, the analogous 17 boxes for the

22  Georgia-Pacific response to the extent those are business

23  records, they have been produced.  I don't know as I stand here

24  before you what exactly was in Millennium's 17 boxes.  There

25  may be some stuff in those boxes that were specifically created

1   for the mediation and that might otherwise be subject to the,

2   to the privilege.  We consider ourselves bound by that

3   agreement even though Millennium is, is in bankruptcy.  So we

4   haven't have produced that.  But to the extent they are

5   underlying business records, they have been produced.  And in

6   like fashion, the underlying business records that are cited

7   for the answers to support the answers that are reflected in

8   the Georgia-Pacific response, and, Your Honor, I have a copy of

9   the response for Georgia-Pacific.  I'm happy to submit it in

10  camera, in camera review if you think that would be beneficial.

11  I will say that in broad measure, it is similar to the

12  Millennium response.  I can't say that the Millennium response

13  is any more or less argumentative than the Georgia-Pacific

14  response.  I do think that Millennium, in fact, I know having

15  looked at those responses in the context of the Bryant mill

16  which is addressed in that response and that Mr. Parker, his

17  client is now responsible for, I would take dispute with some

18  of the ways that they, they shaded the facts as to that mill.

19  Things that they emphasized, things that they chose to ignore

20  in answering the questions I would take dispute with.  But I

21  think in terms of form, the Georgia-Pacific response is

22  substantially similar.

23          And, again, to reiterate, we have produced the

24  records, the business records, that are cited.  So I think all

25  we are talking about is the document itself.

1          MR. PARKER:  Two quick points if I could on that,

2     Judge.  One, if there are documents that have not been produced

3     that are part of the backup for that, obviously we are

4     requesting those.  I want to be clear about that.  And I'm not

5     sure.

6          THE COURT:  I understand that.

7          MR. PARKER:  And secondly, Mr. Sibley just made

8     another point.  It's interesting.  He is saying, look, I've got

9     the Millennium response which commits you to a position about

10    your mill back in 2003.  I might try to dispute some of those

11    things, impeach you, whatever, at trial with that document.  I

12    don't have the converse document for his mill.  So he, by not

13    getting this document, it sort of puts me at a litigation

14    disadvantage.  He's got the same thing about my mill but I

15    don't have it for his?

16         MR. SIBLEY:  I have Millennium's statements.  I don't

17    have International Paper statements.  I think it's an important

18    difference.

19         MR. PARKER:  Same mill.

20         THE COURT:  Okay.  Before you sit down, figuratively

21    speaking, you said you don't have anything from the EPA

22    regarding this confidentiality issue.  Is it your position that

23    when they, the representations from Georgia-Pacific is that

24    there was a confidentiality agreement, is it your position that

25    EPA was only talking about confidentiality in the FOIA sense,

1    or you don't know, or that EPA never agreed to confidentiality

2    in the first place?

3        MR. PARKER:  Judge, I don't know.  I mean this is all,

4    as I think Mr. Sibley used the word, lore that has been passed

5    down.  There is no document that shows me that EPA has agreed

6    to protect, one, the mediation privilege; I only see a document

7    where Georgia-Pacific says, it's confidential, and then I have

8    this document from EPA which says, we haven't decided whether

9    confidential business information, which of course can be

10   protected by the protective order in this case, whether that's

11   an issue or not.

12       THE COURT:  So you don't know to the extent that they

13   agreed to protect confidentiality, assuming that they agreed to

14   protect confidentiality in the first place?

15       MR. PARKER:  Yes.  That's correct.  I don't know,

16   Judge, because I don't have the visibility to these supposed

17   discussions that went on.

18       THE COURT:  All right.  Let's assume for the moment

19   that they agreed to protect the mediation brief because it was

20   a mediation brief.  I think I would have to agree there is

21   nothing on here that says that.  I'm not even sure you can

22   imply that or infer that but maybe you could.  What is the

23   significance of that, if EPA did do that as far --

24       MR. PARKER:  I don't think there is any significance

25   would attach to that any more than to borrow your analogy if

1    they were walking out on Ottawa Avenue and they saw somebody

2    and said, here, I'll give this to you but you got to keep it

3    subject to this mediation privilege.  They can ask --  I don't

4    think that vis-à-vis us in the context of this civil litigation

5    means anything.  They have waived the privilege by doing this.

6    No more than if I were to give an attorney-client privilege

7    piece of information to somebody and said, I'm going to tell

8    you this, but I don't intend to waive the privilege.  It

9    doesn't work that way.  You can't create expansions of the

10   privilege by agreement of parties.

11        THE COURT:  Counsel argues it's harder to waive the

12   work product privilege than it is the attorney-client

13   privilege.  They are not analogous.

14        MR. PARKER:  Well, I think Mr. Marriott cited a case

15   from the Sixth Circuit that would suggest that's not true.  But

16   even if it is, I believe they have done it in this context by

17   again providing it to an adversary.  That's what the HCA case

18   said.  Once they turned it over to the EPA, to the extent it

19   had any privilege in that context at all, they have waived it.

20        THE COURT:  All right.  Thank you.

21        MR. PARKER:  Sure.  Thank you, Judge.

22        THE COURT:  Counsel.

23        MR. MARRIOTT:  Thank you, Your Honor.  First, Your

24   Honor, there is no applicable privilege here.  Counsel has not

25   cited a single case saying that there exists some federal

1    common law mediation privilege.  None.  Not a single one.

2         The case cited is the Goodyear case from the Sixth

3    Circuit for the proposition that there is a settlement

4    privilege.  There is indeed a settlement privilege that exists

5    but it is, as courts have repeatedly found following the Sixth

6    Circuit's decision, a narrow privilege, and it applies for the

7    purposes of protecting communications that are in furtherance

8    of settlement.  It is undisputed that what was given to the EPA

9    here in 2003 was not for purposes of settlement.  What came

10   before might have been.  What happened when Georgia-Pacific

11   gave this communication to the EPA was not in furtherance of

12   settlement, and that we submit, Your Honor, is by itself

13   dispositive.

14         Now, they have argued that there is some form of an

15   effort here to get at posturing.  There is no posturing

16   exception that somehow takes a non-existent privilege and turns

17   it into one.  And even if there were, Your Honor, if you were

18   to look at the document that counsel provided, either the

19   Plainwell submission or the Millennium submission, you will see

20   by looking at those questions that there is really nothing

21   about those questions that is susceptible to much posturing.

22   Either you gave a truthful answer or you didn't give a truthful

23   answer.  They call for very factual information.  So there's no

24   evidence that there's any posturing.

25         The evidence the Court has is the evidence and the

1    other submissions and there is nothing much about that that's

2    posturing.

3          Counsel has suggested that we ought to just take a

4    look at the 17 boxes of documents that ought to be good enough,

5    or whatever the number of boxes of documents is.  There is

6    enormous value, Your Honor, in having this, this compilation of

7    however many pages, 300 pages, the answers to the questions

8    that they gave to the EPA with the representation, at least

9    implied, as to accuracy.  They said this morning in this court

10   that the EPA needed it because it wanted to be able to put in

11   context the statements made by Plainwell and others in their

12   statements.  And it is for precisely that reason that it's

13   important to the parties in this litigation to be able to put

14   into context, as Mr. Parker said, the statements that we now

15   have from Millennium and from Plainwell that tell us in a more

16   contemporaneous fashion what the particulars of what those

17   mills were doing.

18         Second, Your Honor, even if there were a privilege

19   here, and respectfully there is not, that privilege was waived.

20   Voluntary disclosure results in waiver even if the law requires

21   a person to do something.  A person makes a voluntary choice

22   whether or not to comply.  Georgia-Pacific here by the first,

23   second paragraph of their submission says they voluntarily did

24   this.  That results in a waiver.

25         And they have suggested somehow things are different

1    because they can make an analogy to the work product doctrine.

2    First of all, the only reason they are making an analogy to the

3    work product doctrine is because there is absolutely no support

4    for the proposition that there exists this kind of selective

5    waiver that they are advocating.  Even so, Your Honor, in the

6    Sixth Circuit's decision in the HCA, Columbia HCA Healthcare,

7    page 307 the Court said this, "Again, like our discussion of

8    the attorney-client privilege above, preserving the traditional

9    confines of the rule affords both an ease of judicial

10   administration as well as a reduction of uncertainty for

11   parties faced with such a decision.  These and other reasons

12   persuade us that the standard for waiving work product doctrine

13   should be no more stringent than the standard for waiving the

14   attorney-client privilege.  Once the privilege is waived,

15   waiver is complete."

16          Now, counsel has said, Your Honor, that the choice of

17   words here were poor.  I think they called them an oversight.

18   But the fact of the matter is in the communications they gave

19   to the EPA back when there wasn't litigation and people didn't

20   have incentives to posture as they presently do in the context

21   of this dispute, they said they were providing an interim

22   response.  That interim response was voluntary.  That interim

23   response results in a waiver.  And it simply doesn't matter

24   that the documents in question might have in some sense been

25   confidential.  Confidentiality and discoverability are two very

1    different creatures, Your Honor.  It is hard to imagine,

2    frankly, that the information they are claiming to be

3    confidential is in fact confidential when you actually look at

4    the answers and consider that they concern mills that are now

5    non-operational.  Very hard to imagine it's confidential.

6    Especially when you view what other people did.  But even if it

7    were confidential, the protective order in this case completely

8    solves the problem.  The parties here are not seeking to

9    publish the information in their responses to, you know, in the

10   New York Times or in any other publication.  We want to use it

11   in this case so that Judge Jonker has the benefit of a complete

12   picture about what went on at these mills.  The protective

13   order provides them all the protection they need with respect

14   to confidentiality.  And the mere fact that they have now sent,

15   they sent the document off to the EPA and it has a process to

16   deal with confidentiality, doesn't subvert the power, the

17   authority, or the obligation of this Court to figure out

18   whether the information is, is discoverable in the context of

19   this litigation.

20        The idea that merely because parties have an agreement

21   that they will keep things confidential somehow, somehow

22   immunizes information from discovery is entirely antithetical

23   to our system of litigation.  The parties in this case have

24   reached an agreement, Your Honor, under which we have agreed

25   that when a party designates a document as confidential we

1    won't produce it.  By extension of the Georgia-Pacific

2    reasoning, now in this case though the parties have produced

3    documents as confidential under a protective order our clients

4    are immunized from ever having an obligation to produce those

5    documents in any other context because there's an agreement

6    that the information will be kept confidential.  That's not,

7    Your Honor, what we would respectfully submit the law of

8    discovery means as it relates to confidentiality.

9           And for those reasons we would ask that the document

10   be required to be produced.  Thank you.

11          THE COURT:  Thank you.

12          MR. SIBLEY:  Your Honor, may I briefly just make one

13   point then I will sit down both literally and metaphorically.

14          THE COURT:  Yes.

15          MR. SIBLEY:  In the Columbia HCA case at page 306 when

16   talking about waiver, in that case, Your Honor, the Court is

17   specifically talking about selective waiver.  Whether, in that

18   case there is a --  the question is whether waiver has occurred

19   in the first instance, and if waiver has occurred in that, does

20   the waiver apply more broadly as to other parties.  That's the

21   real question you're dealing with in that case.  And they make

22   this important point.  Shortly before the language that

23   Mr. Marriott has quoted to you.  It says, "Other than the fact

24   that the initial waiver must be to an adversary, there is no

25   compelling reason for differentiating the waiver of work

1    product from waiver of attorney-client privilege."  And they go

2    on to note that, that the, they cite the numerous cases that

3    say it must be to --  just waiver of work product must involve

4    disclosure to an adversary, and they say that that is not a

5    question they need to reach here because there unquestionably

6    was disclosure to an adversary.

7           So the Sixth Circuit clearly endorses the idea that it

8    is more difficult to disclose, to waive the work product, work

9    product privilege than it is to waive attorney-client.  And

10   very quick point of emphasis.  We are not saying that the, the

11   document itself is, is necessarily work product, and we're not

12   claiming work product is a basis for not producing it here.  We

13   are asserting the privilege that is articulated in the Goodyear

14   case.  Mr. Marriott has said repeatedly there is no case that

15   supports this.  The Goodyear case supports it.  Clearly.

16   Document created specifically for mediation, specifically for

17   settlement, it's exactly comfortably within what Goodyear

18   protects.

19          We're referring to the work product waiver doctrine by

20   way of analogy and the analogy we would draw is that context

21   matters.  And in this sense the mediation privilege is more

22   like the work product where context matters than it is like

23   attorney-client privilege where any disclosure constitutes

24   waiver.

25          One final point, Your Honor, and I really will sit

down.  The questionnaire responses, I would urge Your Honor to
look at them very closely.  There is actual --  some of the
questions that are asked, and let's get right to the nub of it.
The question that's on everyone's mind, on everyone's mind in
this case, it was on everyone's mind in the mediation, how much
of NCR's carbonless copy paper contaminated with PCBs, did you
recycle?  Tell us that.  There is no data that provides the
answer to that question.  That is the million dollar question.
It's the one everybody was trying to figure out.  And they were
trying to fill in gaps about mill operation to provide an
answer to that question.  The problem is even some of the
inputs that might allow one to infer the answer to that
question, to interpolate it, are themselves missing.  So you
have to interpolate those facts.  How you interpolate, how you
fill in those gaps is very much a question of posturing.
That's what posturing is.  Taking an absence of the facts and a
certain area of the factual record and positioning yourself by
emphasizing other facts so that that ambiguity is resolved in
your favor.  That's posturing.  And that's what these documents
are by and large.  Thank you, Your Honor.

          THE COURT:  On that last point, counsel, the request
by the EPA to your client states that the agency is attempting
to determine to what extent Georgia-Pacific may have been
responsible for some of the harm caused.  I think if we
summarize this in very broad terms.  And what I just heard you

1    say was, well, instead of answering these questions one by one,

2    we gave them a brief that we had used earlier where we probably

3    not having specific facts tried to fill in the blanks and

4    postured ourselves, I presume, in the best light possible.

5         So what you're telling me is we sent this posturing

6    position in the best light possible to the EPA.  And I presume

7    you did that because you wanted to convince the EPA that this

8    is the way they ought to treat you because you did the least

9    amount of harm.  Or you put yourself in a position where you

10   said, this is the amount of harm we did, if we did any, was no

11   more than what is put forth in this brief, in this letter we

12   are giving to you.  So you're putting forth a position to the

13   EPA as favorable to you as you possibly could make it.  Isn't

14   that what you're doing when you sent this to the EPA?

15        MR. SIBLEY:  I disagree with that characterization.

16        THE COURT:  Why would you send it to them if it wasn't

17   as favorable to you as possible?

18        MR. SIBLEY:  Because they specifically requested it to

19   compare it to what Plainwell was saying.  EPA has forever

20   tolled our obligation to respond --

21        THE COURT:  I don't have any of that in here, though.

22   You're telling me that but there is no affidavit from the EPA

23   saying, you know, in lieu of the 104(e) requests, you can send

24   us a brief giving us your most favorable position.

25        MR. SIBLEY:  Your Honor, it is.  It's in Mr. Davis's

1    affidavit.  There isn't a reference to Plainwell, regrettably,

2    the Plainwell negotiation, but he clearly says that we agreed

3    that it would toll; EPA would toll the time for EPA to respond

4    to the, to the 104(e) request.  That's paragraph 7.  Paragraph

5    9 says we have never responded.  We have never issued what

6    would to any environmental practitioner would look and quack

7    and walk like a 104(e) response.  What they really wanted, they

8    were trying to get at what Plainwell, some of the particular

9    things Plainwell was saying.  That's what we understood to be

10   the case.  And so we had this agreement that we would provide

11   this instead.

12           Now, what I'm saying is --

13           THE COURT:  What I guess I'm asking, isn't every party

14   here that submitted their respective position papers to the EPA

15   trying to posture themselves in the best light possible to the

16   EPA, and probably trying to minimize their respective

17   responsibilities when they are doing that?  And you're choosing

18   to do that and that's fine, but that's a choice you're making

19   and you're making --  you're choosing to do that by submitting

20   this document to the EPA which you had confidentially kept in a

21   settlement posture previously, but this isn't a settlement

22   conference now with the EPA.  You're giving an adversary, or an

23   organization that certainly you ought to treat as an adversary,

24   because they are in a position to do great harm to you, and

25   you're trying to minimize your position to them because they

1    are inquiring, well, how much harm did you do?

2          MR. SIBLEY:  Well, Your Honor, let me submit this.

3    Had EPA --

4          THE COURT:  That's the context.  You asked me to look

5    at the context.

6          MR. SIBLEY:  It is certainly the context.  But every,

7    every party in a mediation context is an adversary.  Let's, let

8    me posture a hypothetical that I think --  let me posit a

9    hypothetical that I think illustrates the point quite well.  If

10   Mr. Parker, Mr. Marriott, and I and our clients were to sit

11   down and have a negotiation, and exchange mediation positions,

12   I would want some --  some agreement from them that the

13   positions I articulate in those documents are not something

14   that they're going to go wave around and use against me in any

15   further proceeding.  That is a condition of almost every

16   confidential mediation, certainly everyone that I have been a

17   participant in.  I recognize that I am, I'm just a child in

18   Mr. Parker's eyes, but I have done a number of these.  And in

19   every one you're prohibited from taking the statements that

20   parties make and use them against them in future proceedings.

21         We are unquestionably adversaries.  We are, we are

22   very much adversaries.

23         THE COURT:  Well, certainly.  I think we all

24   understand the role of mediation.  The Court conducts

25   mediations daily.  In fact, this is kind of a relief because

1    this is one day I don't have any mediation, if you can consider
2    this a relief.  But not every time you talk to the other side
3    can you consider it a mediation.  And I wouldn't consider this
4    forum today a mediation just because you're talking to the
5    other side.  And I wouldn't necessarily consider the fact the
6    EPA has made a request of you for information, and the fact you
7    furnished it, a mediation.  There are mediations, and there are
8    discovery dispute proceedings.  Why would you necessarily
9    characterize their request for information from you, which they
10   can obtain under the law, and you're furnishing information
11   mediation --
12        MR. SIBLEY:  I guess I disagree with the premise of
13   the question, Your Honor.  The EPA did serve a 104(e) request.
14        THE COURT:  Okay.
15        MR. SIBLEY:  And the truth is and the facts are we
16   have never responded to that request as required by law because
17   EPA has tolled our obligation to do so.  Why?  Because EPA told
18   us, I really don't want to see your response to that.  I really
19   need to compare what you're saying --  what Plainwell is saying
20   in this one context with what you're saying.  Can you give us
21   that?  Answer, no.  It's confidential.  We can't give you that.
22   Negotiation ensues, EPA says, look, let's -- we will agree to
23   treat it as confidential, and we will not --  we will toll your
24   obligation to respond.  I don't really need a response to this.
25   Incidentally, by 2002, the contributions of these various

1    parties to the site were pretty well-known.  The site had been

2    in active cleanup at that point for 12 years, the subject of an

3    extensive, even as of 2002, a voluminous administrative record,

4    several rounds of discovery in the KRSG litigation.  The

5    information was out there.

6         What EPA needed was the analog to the Plainwell

7    response that's what they really needed.  So we reached an

8    agreement that said, yes, we will share this with you, but you

9    have to agree to abide by the same conditions as everyone else.

10   You need to treat it as confidential.  This is a settlement

11   communication.  This is not something that you could in a

12   subsequent proceeding hold up, hold against us in the way that

13   International Paper is trying to hold it against us right now.

14   And that's the, that's why, that's why we think --

15        THE COURT:  Where is there anything that says the EPA

16   could not use your response against you in a subsequent

17   proceeding?

18        MR. SIBLEY:  Your Honor, I think that is reflected, is

19   included in the agreement that's described in paragraph 7.  Is

20   there a document?  Is there a piece of paper?  No.  Have we --

21   the person who could speak to this of course would be EPA

22   itself, and that's why we submit the appropriate forum for

23   potential concerns to resolve this would be in a judicial

24   review proceeding challenging the confidentiality of the

25   document.

1      THE COURT:  Doesn't that carry this whole thing one

2  step further than anything that's been represented so far?

3  Assuming that there is some sort of an agreement, arguably it

4  might go no further than we will give you FOIA confidentiality,

5  or there's confidentiality as to other people beyond that, but

6  now you're saying, not only that, but we will not, never used

7  anything you've told us, should we come after you.  That's a

8  whole other step.  That's the first time I have heard that

9  argument.

10      MR. SIBLEY:  Well, I think that's fairly implied by

11  the idea that it would be treated as confidential.  The idea,

12  Your Honor --

13      THE COURT:  No.  Confidentiality as opposed to these

14  guys on the other side of the aisle is different from not being

15  able to use it against you.

16      MR. SIBLEY:  Your Honor, the agreement that was

17  articulated and, if the --  the agreement that the parties

18  agreed to was that EPA would be bound to treat the documents as

19  confidential just as any other participant to the mediation

20  would.  They were settlement communications, they were not

21  documents that would be disclosed to the public, and I think

22  ipso facto not documents that would be, could be used against a

23  party as some form of admission in a subsequent action.  If EPA

24  wanted that, they could have compelled, Your Honor, a formal

25  response to the 104(e) request.  And let me submit one of the

1   reasons why --

2       THE COURT:  Let me ask you.  I'll give you a chance to

3   continue that thought.  If you enter into a protective order

4   that treats something as confidentiality, confidential.  If you

5   enter into a protective order with the other side and you

6   furnish information to them, but do you understand that

7   information that you're furnishing subject to a protective

8   order to be information they can't use against you in a

9   litigation?

10      MR. SIBLEY:  Of course not, of course not.  It's

11  different.

12      THE COURT:  How do I understand this to be any

13  different than perhaps their understanding this to be a

14  protective order of some sort?

15      MR. SIBLEY:  Your Honor --

16      THE COURT:  You're really going a long ways to say

17  they can never use this information that you're furnishing them

18  against you.

19      MR. SIBLEY:  Your Honor, it would, we would certainly

20  take the position, if we were ever in litigation, which we

21  haven't been because we have been working cooperatively with

22  EPA to clean up the site, one of the only, of the parties in

23  this room, we are the only party to have done so.  I think

24  that's important.  We have been working cooperatively with EPA

25  for the duration of the cleanup at this site.

1       If we were in litigation, I think we would point to

2   these underlying facts and in both the Goodyear doctrine

3   successfully.  They agreed to treat the document as

4   confidential, it was shared in connection with EPA's attempt

5   itself to resolve the settlement of the Plainwell bankruptcy.

6   We think under all those circumstances that they would be

7   precluded from using it against us.

8       Did the parties articulate every potential permutation

9   of confidentiality in the agreement they reached?  Clearly they

10  did not.  That is no different than most other agreements.  And

11  the party who is missing in all of this, incidentally, is EPA.

12  IP has made no effort to track down Ms. Furey who is still with

13  Region 5 and could readily dispute this if we have our facts

14  wrong.  But we think we have them right.  And again, again, the

15  underlying information, it's all available.  They have had it

16  for three years.  We produced, we originally produced these

17  documents starting in 2011.  No later than the end of 2012.  We

18  have produced a few documents here and there as we have

19  discovered potential gaps, but that pales in comparison to what

20  was produced originally.

21      Now, they can serve interrogatories.  It's not as

22  though they can't get the information.  We are not saying that

23  our mill operations is a matter of confidence.  It's not.  It's

24  fair game in discovery.  We will -- we are obliged to produce

25  information about our, the underlying business records.  We are

1    obliged to answer interrogatories as required by the rules.

2    They can get at this.  What don't they get?  They don't get the

3    confidential statements we made in the context of the

4    negotiation.  That is critical.

5    THE COURT:  You did not supply any affidavit from

6    Ms. Furey either.

7    MR. SIBLEY:  We did not, Your Honor.

8    THE COURT:  Thank you.  All right.  Well, both sides

9    have been very articulate in setting forth their positions.

10   And I have no doubt that however this Court rules that one side

11   or the other will appeal, and both sides are very able to

12   articulate their positions on appeal should that happen.

13   So rather than to try to duplicate the fine job you

14   gentlemen have done by taking this under advisement and trying

15   to get out a lengthy opinion, I'm simply going to give you the

16   resolution and let you carry it from there.

17   Whatever settlement privilege there was between the

18   parties to the original mediation that pertained to this

19   document that's being requested, whatever privilege there was

20   as to that document, I don't think it protects that document

21   under all circumstances.  I don't think it protects it in this

22   instance when it was not used for the purpose of that

23   settlement conference.

24   Here the EPA, which was not a party to that settlement

25   conference, they came along later, and made a request for other

1    information under 104(e), which they do under the CERCLA

2    statute, made a request of Georgia-Pacific to determine to what

3    extent Georgia-Pacific may have caused some of the problems, or

4    had been responsible for some of the problems that ended up

5    harming the Kalamazoo River.

6           And Georgia-Pacific then, as I understand it, more

7    from counsel's representations or as much from counsel's

8    representations as from the documents submitted, entered into

9    negotiations with the EPA and instead of a strict response to

10   the request chose to submit this, this settlement paper.  But

11   in doing so, it was, Georgia-Pacific was giving this settlement

12   paper to a party that was not part of the original settlement

13   proceeding, to a party that was outside of the original

14   settlement proceeding, and while it may have had interests

15   related, it was not part of that proceeding.  That proceeding

16   no longer was continuing or was in existence.  That had not

17   been a successful mediation and did not involve the EPA.

18          So even if there was a, that document was privileged,

19   I think that it wasn't privileged or the privilege didn't

20   extend to this instance.  I think it was waived when it was

21   submitted to the EPA under these circumstances.

22          I think the EPA has to be treated as an adverse party.

23   It's an agency of the federal government charged under CERCLA

24   with enforcing federal law and assessing penalties or fines or

25   assessing costs or whatever else it's required to do against

1    people who have polluted, who may be responsible for cleanup

2    costs and wasn't a client of Georgia-Pacific or

3    Georgia-Pacific's attorneys.  It was somebody Georgia-Pacific

4    had to answer to, respond to.  They may have tried to work

5    together, but they had separate interests and had to deal at

6    arm's length.

7         To the extent that the EPA may have said they would

8    treat this document as confidential, and there's no document

9    from the EPA stating to what extent they were going to treat it

10   as confidential, that may well have been nothing more than

11   saying for FOIA purposes it would be treated as confidential.

12   The Court is not in a position at this point to read more into

13   it than that.  I don't believe that they can create a privilege

14   or create confidentiality --  create confidentiality that will

15   preclude this Court from requiring the document to be produced.

16        Georgia-Pacific is required under 104(e) to provide

17   truthful answers and it stated it was providing this as an

18   interim response to 104(e), so I assume that even though it

19   might not have been a formal response, it still had to follow

20   the guidelines or the obligations of 104(e) required of it as

21   far as being truthful and so forth.

22        So I assume this was a factual document, objective

23   document.  And I have looked over the Millennium document that

24   was of a similar nature, according to what the parties have

25   told me, and apparently the Georgia-Pacific document is very

1    similar to that.

2           I agree with counsel for Georgia-Pacific that context

3    does matter.  But I think this in the broad context it was

4    Georgia-Pacific's decision to voluntarily relinquish this

5    document to the federal agency to position itself in the best

6    light possible with this agency, and the other organizations

7    may have done the same thing.  But in doing so I think they

8    waived any privilege that may still attach to these documents

9    when they were kept, that had been previously kept as in-house

10   just between themselves as part of a settlement negotiation.

11   The parties could simply have answered the 104(e) request or

12   they could have done some other alternative.  They could have

13   sent in an abbreviated response to the 104(e) summarizing

14   answers.  It wasn't an either/or situation.

15          As counsel for the EPA said, he candidly admitted this

16   was not a compelled disclosure.  And I think that the election

17   to make this disclosure caused Georgia-Pacific to waive any

18   privilege that did attach to it either as work product or as a

19   privileged settlement document, if there was any settlement

20   privilege that attached to it at this point.

21          And I think the HCA case is instructive as far as

22   that's concerned.

23          I'm going to grant the motion, require that the

24   document be produced to International Paper, along with any

25   supporting documents not heretofore produced.  I assume that

1    can be accomplished in the next ten business days.

2              MR. SIBLEY:  Yes, Your Honor.

3              THE COURT:  All right.  Thank you, gentlemen.

4              MR. MARRIOTT:  Just ask for one clarification.  I

5    assume the production also was to the other parties, not just

6    to International Paper.

7              THE COURT:  Was it requested by the other parties?

8              MR. MARRIOTT:  It's covered by our document requests

9    as well, Your Honor, yes, and we have the motion effectively

10   joining the IP motion.

11             MR. SIBLEY:  We have no objection to producing it to

12   NCR, Your Honor.

13             THE COURT:  So ordered.

14             MR. MARRIOTT:  Thank you, Your Honor.

15             THE CLERK:  All rise, please.  Court is adjourned.

16             (Proceedings concluded, 12:03 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3         I certify that the foregoing is a transcript from the

 4    Liberty Court Recording System digital recording of the

 5    proceedings in the above-entitled matter to the best of my

 6    ability.

 7

 8

 9

10                          /s/ Kathy J. Anderson

11                          Kathy J. Anderson, RPR, FCRR

12                          U.S. District Court Reporter

13                          402 Federal Building

14                          Grand Rapids, MI  49503

15

16

17

18

19

20

21

22

23

24

25
```