1              IN  THE  UNITED  STATES  DISTRICT  COURT

2           FOR THE  WESTERN  DISTRICT  OF  MICHIGAN

3                SOUTHERN  DIVISION

4   GEORGIA-PACIFIC  CONSUMER  PRODUCTS  LP,  et  al,

5        Plaintiff,            No.  1:11cv483

6    vs.

7   NCR,  INTERNATIONAL  PAPER  COMPANY,
    WEYERHAEUSER,

8

        Defendants.

9

10  Before:

11            THE  HONORABLE  HUGH  BRENNEMAN,  JR.,
               U.S.  Magistrate  Judge
12              Grand  Rapids,  Michigan
                December  16,  2014
13        Motion  for  Protective  Order  Proceedings

14  APPEARANCES:

15            MR.  GEORGE  P.  SIBLEY
            Hunton  &  Williams  LLP
16            951  E.  Byrd  Street
            Richmond,  VA  23219
17            804-788-8355

18            MR.  PETER  A.  SMIT
            Varnum  Riddering  Schmidt  &  Howlett
19            333  Bridge  Street,  NW
            PO  Box  352
20            Grand  Rapids,  MI  49501-0352
            616-336-6000

21

             On  behalf  of  the  Plaintiff;

22

            MR.  DAVID  R.  MARRIOTT
23            MS.  REBECCA  RETTING
            Cravath  Swaine  &  Moore  LLP
24            825  Eighth  Avenue
            New  York,  NY  10019
25            212-474-1000

                    MR. GEOFFREY A. FIELDS
1                   Dickinson Wright PLLC
                    200 Ottawa Avenue NW
2                   Suite 900
                    Grand Rapids, MI 49503
3                   616-458-1300

4
                              On behalf of the Defendant NCR,
5
                    MR. DAVID W. CENTNER
6                   Clark Hill PLC
                    200 Ottawa Avenue, NW
7                   Suite 500
                    Grand Rapids, MI 49503
8                   616-608-1100

9                   MR. JOHN DANIEL PARKER
                    Baker & Hostetler LLP
10                  PNC Center
                    1900 E. Ninth Street
11                  Cleveland, OH 44114-3485
                    216-861-7610

12
                              On behalf of the Defendant IP.
13

14

15
        TRANSCRIBED BY:  MS. KATHY J. ANDERSON, RPR, FCRR
16

17

18

19

20

21

22

23

24

25

```
 1                                December 16, 2014
 2                        PROCEEDINGS, 10:17 a.m.
 3          THE COURT:  Seem to have an empty table.  How is that
 4    possible?  Did somebody not make it past the magnatometer
 5    downstairs?
 6          MR. MARRIOTT:  Well, we don't know, Your Honor.
 7    Weyerhaeuser is not present and we don't know why they are not
 8    present.
 9          THE COURT:  Could they have capitulated?  Decided this
10    case was too much?  Dare we hope?  I guess not.  All right.
11          Well, fortunately I had a reserved seat.  I wasn't
12    sure I would get a seat here if I didn't reserve my own.
13          We have several motions here.  The first one I believe
14    would be the one by Georgia-Pacific for a protective order,
15    file number is 646, to be followed by a motion by NCR, 649, to
16    compel a Rule 30(b)(6) deposition.  I think both of these are
17    addressing whether NCR should take Rule 30(b)(6) depositions.
18          Since Georgia-Pacific brought the motion, you may
19    proceed.
20          MR. SIBLEY:  Thank you, Your Honor.  Trey Sibley for
21    the Georgia-Pacific parties.  May it please the Court.
22          We filed this motion, Your Honor, with respect to
23    30(b)(6), notice of 30(b)(6) depositions served at the tail end
24    of the discovery period.  And I think to discuss the motion and
25    to put this notice into context, it's important to recount all
```

1    of the discovery that has taken place in the case by the time

2    we received this notice.

3         As the Court knows, we have been engaged in discovery

4    in Phase II of the case for the better part of a year.  The

5    original cutoff for discovery was September 15th.  At NCR's

6    request, that period was extended to the middle of November,

7    ostensibly to do some cleanup, some additional discovery.  It

8    turned out that the discovery contemplated was rather more

9    substantial than that.

10        Over the course of the entire discovery period,

11   Georgia-Pacific has responded to 87 different interrogatories,

12   many of which go to questions relating to the operations of the

13   mills.  We have responded to 549 requests for admission

14   propounded by the three defendants.  And we have produced

15   400 pages of documents.  That's just the document and written

16   discovery.  The deposition discovery has been substantial as

17   well.

18        Focusing only on witnesses affiliated in respect to

19   Georgia-Pacific, Georgia-Pacific has defended the depositions

20   of six current company employees deposed over seven days,

21   including one employee who was deposed as a corporate designee

22   over two days on issues relating to the costs Georgia-Pacific

23   has incurred at the site.  Those deposition notices on those

24   topics being propounded by Weyerhaeuser, NCR and International

25   Paper.  We sat for deposition for two days for that.

1          THE COURT:  Rule 30(b)(6) depositions?

2          MR. SIBLEY:  30(b)(6) deposition, yes, Your Honor.  We

3   have also, as I mentioned, defended depositions of nine former

4   employees or consultants affiliated with Georgia-Pacific.

5          These are just the Georgia-Pacific parties.  There

6   have been dozens of other depositions of other witnesses

7   related to the case.  And in total, the number of depositions

8   exceeds I believe 40, the vast majority of which I would note

9   took place within the last 30 days of discovery.  By the time

10  October 22nd rolls around, which is a key date with respect to

11  this motion, we were under a schedule largely imposed by NCR,

12  NCR's request to take discovery, where we would take 24

13  depositions in 30 days.  This is -- 17 of those depositions I

14  would note were noticed after the original discovery cutoff.

15         I know Your Honor has already, has already read the

16  papers on the written discovery that was served we think after

17  the close of, after the deadline for serving discovery.  It is,

18  it is no exaggeration to say there was quite a bit of discovery

19  crammed into the very last possible period of time to do it,

20  and the vast majority of which was initiated by NCR.

21         On October 22nd Georgia-Pacific received from NCR a

22  notice of 30(b)(6) deposition.  This is Exhibit A to

23  Georgia-Pacific's motion.  The sweep of that notice is

24  expansive.  It covers every aspect of the case.  The time

25  allotted for Georgia-Pacific to prepare for this deposition was

1    a scant three weeks, three and a half weeks, deposition to take

2    place as noticed on November 13, 2014.

3         Our first reaction was to call counsel for NCR to ask

4    metaphorically, "Are you serious?"  A deposition on all of

5    these topics to prepare a witness properly on this would take,

6    would take months.  That's no exaggeration.

7         When we look at the notice, and I think it probably

8    would be useful to do it, if you look at Exhibit A which is the

9    notice and list topics, it, it's quite staggering.  You have

10   the first, the first four, four notices ask us to put up a

11   witness to talk about our interrogatory, responses to

12   interrogatories served by any party.  They don't specify which

13   interrogatory responses.  Again, there is 80 something of them.

14   So there are not just a few.  There's quite a bit.

15        Issue number 4, "Documents produced by Georgia-Pacific

16   in response to any party's request for production of

17   documents."

18        THE COURT:  Pardon me.  You said there were 80

19   interrogatory responses if we added up those referred to in

20   paragraphs 1 through 3?  Is that correct?

21        MR. SIBLEY:  That is correct, Your Honor.

22        THE COURT:  Okay.

23        MR. SIBLEY:  I believe the, we had these tallied, it's

24   in our paper.  87 different interrogatories by our count.

25        Issue 6 and 7 ask us to, "Produce a witness to talk

1      about the acquisition, construction, maintenance --"

2             THE COURT:  You are on, I'm sorry, when I interrupted

3      you, we were --

4             MR. SIBLEY:  We were on Schedule A to Exhibit A which

5      is the deposition notice served on October 22nd.

6             THE COURT:  Which point were you on when I interrupted

7      you?

8             MR. SIBLEY:  We were working through issues 1 through

9      3.  We were talking about number 4, the documents, that's

10     right, we were talking about documents, they ask for a witness

11     to talk about documents produced by Georgia-Pacific.  No

12     specification of which documents.  There are 400,000 of them.

13     They relate to every issue in the case, as you might imagine.

14            Issue 5, "Denials of request for admission."  Issue 6

15     and 7, relate to the "Acquisition, construction, maintenance

16     and operation of any mill."  That's issue 6.  Issue 7, same

17     request, focused on sludge, lagoons, landfills and

18     impoundments.

19            So any facility, acquisition, construction,

20     maintenance and operation; I'm not sure there is any aspect of

21     those facilities that would fall outside of those notice --  of

22     the nouns used in those, in those two issues.

23            Issue 8, "The questionnaire responses."  Your Honor

24     will recall our discussion of the questionnaire responses from

25     several months ago.  These are the responses prepared by the

1    participants in the mediation convened in the early 2000s among

2    the members of the Kalamazoo River Study Group.

3           Each of these questionnaires is a comprehensive

4    operational history of each of the mills involved in the case.

5    They are hundreds of pages of, hundreds of pages long, and

6    that's just the narrative responses themselves.  Once you

7    include the appendices, some of which are quite technical,

8    there are several hundred pages longer than that even, and that

9    doesn't even get into the supporting documentation which are

10   the historical business, business records which in the case of

11   some mills are quite voluminous.

12          Issue 9, the "Section 104(e) responses."  This is a

13   defined term and you have to dig a little bit to find it.  I

14   think the easiest way to refer the Court to what this term

15   refers to is to look at, it's docket entry number 647-1, which

16   I believe is Exhibit A to the brief we filed, and it's on page,

17   page 26 of the document as filed.  And it's, it's a defined

18   term section of a set of discovery that NCR served previously.

19   And the Section 104(e) responses refers to responses by a

20   number of parties to requests for information propounded by EPA

21   under CERCLA; 104(e) is the section of CERCLA that allows EPA

22   to request information from parties who might be, who might

23   have a connection to a CERCLA site.  The parties listed here

24   are parties that are not parties to the lawsuit and were not

25   participants in the KRSG mediation.  So you have 3M, a

1    manufacturer of a competing brand of carbonless copy paper,

2    Gould, Graphic Packaging, International Paper, who is a party,

3    Menasha Packaging, Michigan Paperboard, Millennium Holdings,

4    National Gypsum, Rock-Tenn and Weyerhaeuser.  So a couple of

5    the parties who are here also submitted the 104(e) responses.

6    So those 104(e) responses are akin to the questionnaire

7    responses.  It's EPA's request for information relevant to

8    issues relating to CERCLA liability.  Mediation questionnaires

9    went to that very issue, in fact, as Your Honor knows, the

10   participants in that mediation submitted the questionnaires as

11   their 104(e) response, and that's, for that reason the Court

12   ruled that any mediation privilege over those had been lost.

13        The sweep of the notice, Your Honor, cannot be

14   exaggerated.  It is, it is expansive.  Given, given the breadth

15   of the notice, we called counsel for NCR --

16        THE COURT:  I'm going to interrupt you for a moment.

17   You in regard to number 9 referred to Exhibit 647-1 which falls

18   right behind this document request.

19        MR. SIBLEY:  That is correct, Your Honor.  And it's

20   page 26.

21        THE COURT:  Page 26.

22        MR. SIBLEY:  I'm sorry.  Page 26.  And it's paragraph

23   number 27 --

24        THE COURT:  I'm apparently missing page 26.

25        MR. SIBLEY:  I'm sorry.  If you look at the header at

1      the top of the page --

2              THE COURT:  Oh.

3              MR. SIBLEY:  -- those are the page numbers I'm using,

4      yeah.

5              THE COURT:  All right.  Each page can have up to three

6      numbers on it.  All right.

7              MR. SIBLEY:  So it's paragraph 27 that defines --

8      again, the notice just says the 104(e) responses.  There is no

9      direction as to what about these responses that NCR

10     specifically wants a Georgia-Pacific witness to speak to.  It's

11     just the 104(e) responses generally.

12             In response to the notice, we called counsel for NCR

13     and asked the obvious question, "Are you serious?"  Do you

14     really intend to proceed with a deposition of this breadth?  Is

15     there --  do you really intend to cover these topics?  The

16     answer came back 11 days later, 11 days later NCR got back to

17     us and said, yes, we do intend to proceed on the deposition as

18     noticed.

19             This is the state of play as it exists on

20     November 4th.  This is ten days before the close of discovery.

21     It's important to note at this point, Your Honor, that the

22     deposition noticed on October 22nd was Exhibit A.  There was no

23     other deposition notice, there was no amended notice of a

24     previous deposition notice that had been served but abandoned,

25     just the October 22nd notice.  This was, this was what NCR was

1  prepared to depose a Georgia-Pacific witness on as of

2  October 22nd, and as of November 4th when they confirmed that

3  they intended to proceed.

4      Counsel for Georgia-Pacific, yours truly, notified

5  counsel for NCR that we intended to move for a protective

6  order, made clear that they should make arrangements for a

7  deposition on the 13th, and at that point for the first time

8  counsel for NCR responded back and said, we also want to take

9  on the 13th a deposition on topics that were part of a notice

10  served some months ago.  This is the notice, Your Honor, that

11  is attached as Exhibit C.

12      Note that the date on this amended notice is served on

13  November 6th.  The topics in the notice, though, are from a

14  deposition notice that was served back in June.  And if you

15  look at these topics, Your Honor, they will, they will be

16  familiar to you, I think.  For example, and again, this is

17  Exhibit C to the motion, and if you look at Schedule A which on

18  the, using the header pagination starts at page 5, topic 1,

19  "The identification, by year and Mill, of the amount of CCP

20  that underwent recycling processes at the Site during the

21  Relevant Period."  This is the -- these issues are the same

22  issues that were packaged as interrogatories that were the

23  subject of two motions that Your Honor ruled on, the first

24  filed by NCR with respect to International Paper's responses to

25  those interrogatories, the second with respect to

1    Georgia-Pacific's answers.  Your Honor will recall that in

2    argument it was clear that Georgia-Pacific had answered the

3    questions, had concluded quite importantly that it's impossible

4    to say mill by mill, year by year what the answer was.  The

5    Court looked at, examined Georgia-Pacific's answers and

6    concluded that they were sufficient.

7            NCR propounded this deposition notice right at the

8    same time that they propounded the interrogatories.  The two

9    were bound up with one another.  And whether this was NCR's

10   intent or not, I don't know, but our response to it was that we

11   could pick our poison, either answer the interrogatories, or

12   sit for a deposition.  It was very quickly apparent that we

13   were at an impasse over whether the answers that

14   Georgia-Pacific provided were adequate.  NCR took the position

15   that they were not, we took the position that they were.

16           Once it became clear that that, that the answer to

17   that question would need to be resolved through some form of

18   motion practice, any mention of a 30(b)(6) deposition was off

19   the table.  The last time before November 6th, when this

20   deposition notice was served, the last time that anybody from

21   NCR had talked with anybody from Georgia-Pacific about a

22   deposition on these topics was in early August when I spoke on

23   the phone with Mr. Marriott about the broader issue of what

24   Georgia-Pacific needed to do in response to the

25   interrogatories.

1    So this issue lay dormant; it was not part of what

2    they served on October 22nd.  It did not come up until after we

3    made clear we would move for a protective order.  I submit,

4    Your Honor, that this was resurrected given the patent

5    deficiencies in the notice that was served on October 22nd.

6    Let me talk about those deficiencies.  We think there

7    are at least four.  They are related but they all go together.

8    First, the issues --

9    THE COURT:  Just a moment, please.  Regarding the

10   amended deposition notice which was scheduled to be taken on

11   the November 14th, the day after the other 30(b)(6) deposition,

12   are these items, is that Schedule A taken from the

13   June 30(b)(6) notice?

14   MR. SIBLEY:  Yes, Your Honor.  It is the same issues.

15   And I would note several of those issues we already did put a

16   witness up for.  These are the cost related issues.  If you

17   look at issues 17, 18, and 19 of that notice, all relate to the

18   work that's been performed at the site and the associated

19   costs, as well as our expectation as to the future costs.

20   Those issues already have been accomplished by the deposition

21   that took place in July, the two days of deposition, 30(b)(6)

22   depositions that we talked about previously.  The balance of

23   the issues, Your Honor, go to the questions that were, parrot

24   the questions that were asked in the interrogatories that were

25   subject of the motion practice before the Court over the last

1    several months.

2         THE COURT:  The June 30(b)(6) notice, when was that

3    sent or received?

4         MR. SIBLEY:  June?

5         THE COURT:  Yes.

6         MR. SIBLEY:  I forget the precise date, Your Honor.

7    It was at some point in June.  I believe it's in the NCR's

8    papers they provided a precise date when it was first served.

9         THE COURT:  And it set a specific date?

10        MR. SIBLEY:  It set a specific date.  And we quickly,

11   we discussed very, very quickly that with the exception of the

12   cost issues which were, we had no objection to producing a

13   witness on those, with respect to these other issues, we were,

14   we were quickly wrapped up in all of the issues that were

15   associated with the interrogatory responses.  What is a party's

16   obligation to go out and find this information when it's, when

17   it's really information that the lawyers have.  And that's --

18   the Court has hashed through those issues already and worked

19   them out, and ultimately, the answers that Georgia-Pacific

20   provided to those questions were concluded by the Court,

21   concluded were fully complete.  No more was needed from

22   Georgia-Pacific on that score.

23        But once it became apparent, Your Honor, to get back

24   to the process, once it became apparent that we were at

25   loggerheads over what exactly it was the parties needed to do

1    to address those issues, the non-NCR parties, that is, it got

2    wrapped up in the question of really what needed to be done to

3    respond to the interrogatories.  And the Court ruled on, on

4    NCR's motion to compel Georgia-Pacific in early October, and

5    after that ruling, for weeks, for nearly three weeks, no

6    reference at all to NCR wanting to take this deposition.

7    Again, this notice only gets resurrected after we announce our

8    intent to move for a protective order with respect to the

9    October 22nd notice.

10        These issues were not listed among the issues in that

11   October 22nd notice.  They were not part of what NCR proposed

12   to proceed on when they served that notice October 22nd.  And

13   not, quite frankly, not part of the discussion on November 4th

14   when we talked about, when they announced that they intended to

15   proceed.  No reference to this notice whatsoever.  This only

16   comes back and only gets resurrected after we make clear we

17   intend to move for a protective order.

18        Now --

19        THE COURT:  What happened to the date that was

20   originally set for this 30(b)(6) motion back in June or --

21        MR. SIBLEY:  By agreement, by agreement of the

22   parties, we agreed that the only issues that would take place

23   at a date, a negotiated date that was agreeable to the parties,

24   the only issues that the deposition would proceed on at that

25   point were 17, 18 and 19.

1            THE COURT:  I see.

2            MR. SIBLEY:  And that deposition did take place.

3            THE COURT:  All right.

4            MR. SIBLEY:  Now, the October 22nd notice, I think

5       it's, I think it bears emphasis that this notice is defective

6       for at least four reasons:  First, the issues in the notice are

7       not stated with particularity.  And there is several cases that

8       we have cited in our papers that support this proposition quite

9       clearly.  The Society of Professional Engineering Employees

10      case from Kansas deals with a request for a witness to talk

11      about answers to interrogatories, same issue that NCR has

12      listed as issues 1 through 3.  The Court said that a notice of

13      that, an issue stated with that breadth, with that lack of

14      particularity, is "unreasonable."  That the issues were

15      "unreasonable on their face."  You see the Michilin Prosperity

16      case also cited in our papers where a party had asked for a

17      corporate deposition of an opposing party with respect to

18      "documents produced."  Same issue.  Issue number 4 in NCR's

19      notice asking for "documents produced."

20            With respect to timeliness, and really the other

21      issues I would note are no better.  The questionnaire

22      responses, it's just the same.  It's those cover a vast sweep

23      of territory.  What about those responses specifically to

24      prepare a witness to deal with every aspect of those responses

25      as required by the rules would take literally months.

1        And that leads to the second problem.  It's

2   overbreadth.  It's really a species of the first problem, the

3   lack of particularity makes the issues overbroad.  You are

4   asking one witness in one day to talk about every conceivable

5   issue that could be relevant in the case.  That's not fair to

6   the witness because you're not going to cover that much

7   territory in one day, yet you're asking the witness to go

8   educate himself over the full range of issues that could come

9   up in the case.

10       The one Section 104(e) responses, same thing.  What

11  about the responses specifically do you want to ask the witness

12  about?  The notice does not say.

13       The case law talks about 30(b)(6) topics needing to be

14  stated with painstaking particularity.  NCR has not met that in

15  this case.  And as a result it makes the notice overbroad.

16       It's not overbroad I would say because the issues are

17  irrelevant.  All of these issues could conceivably be relevant.

18  It's overbroad because you're putting all of the relevant

19  issues into a single notice.  And that we think is not

20  consistent with the rules and it's an abuse, we submit, of the

21  30(b)(6) process.

22       The notice is also untimely.  Again, as we have

23  articulated the timeline, it was not until October 22nd that

24  the issues in the October 22nd notice were first brought up.

25  Even if NCR had made clear from that date that they did in fact

1   intend to proceed with the deposition as noticed, there still

2   would not have been time.  That is, again, this is all

3   occurring in the context, again, the timeline in the background

4   we provided at the beginning is very important.  This occurs

5   during a time period where at NCR's instigation all of the

6   parties are flying around the country taking, you know, a

7   deposition a day.  24 depositions over 30 calendar days.

8   That's, that's basically at least one deposition every business

9   day.  All of the people, all of the litigation team for my

10  client that would be involved in preparing a corporate designee

11  properly as required by the rules were out defending

12  depositions and participating otherwise.  Doing this at the

13  tail end of discovery with, with so little notice, the number

14  of days themselves, assuming everyone's calendars were clear,

15  would have been sufficient.  The fact that it was also taking

16  place when the parties were conducting discovery at a breakneck

17  pace, the tail end of the period only, only heightens the

18  concern.

19          The case we found is a case from Judge Scoville, the

20  Leys versus Lowe's Home Centers, that case, very similar case

21  where the party waited until four days before the close of

22  discovery to serve a 30(b)(6) notice.  Now, four days is

23  certainly less than the number of days that NCR provided here,

24  but I think it's a difference of degree and not kind.  It's

25  still waiting until the very end to put a corporate opposing

party to the burden of educating a witness on a vast array of 30(b)(6) topics is just not proper.

Finally, the notice is duplicative.  And this really goes more to the issues in the notice that was served on November 6th.  These are the issues originally part of the June notice.  Georgia-Pacific has answered those questions.  The Court, NCR said Georgia-Pacific, you need to tell us more, the Court ruled no, the answers are sufficient.

This strikes us as an end run around the Court's ruling on that regard.  It is certainly true that a 30(b)(6) deposition can cover the same ground as written discovery; that happens.  We recognize that.  But in the peculiar context of this case on these issues, which have been the subject of repeated motion practice in this court, when the Court has reviewed the responses and concluded that they are adequate, we think that putting up a 30(b)(6) deponent to speak to them again is, is unnecessary and it's a waste of everyone's time.

Your Honor, in this regard, and Mr. Parker might disagree with me on this, the, I was not there so I have, I will confess that my, my report is based on hearsay.  NCR took International Paper's deposition.  This is in response to the Court's order from back in September that IP put up a witness given that they had not answered the interrogatories, and it was, by the report I received at least, a not terribly productive exercise.  You have a witness referring to the

1    interrogatory responses and then to expert reports which by the
2    time the deposition took place had been served.  Given the duty
3    that a party undertakes in responding to a 30(b)(6) notice,
4    even when you are simply regurgitating material that is
5    reflected in other written form, it's a big deal.  And in this
6    case we would be taking someone who has sufficient visibility
7    into the case broadly to have at least enough background in the
8    case so that in going out and learning on these, educating him
9    or herself about these topics will have something for that
10   knowledge to latch on to, you're taking a person of that level
11   of seniority and having them sit for a day or even longer to
12   talk about topics that are, where the information has already
13   been disclosed in another form, it is certainly true that you
14   can, that discovery devices can overlap, we don't dispute that.

15         But Rule 26 clearly imposes a rule of proportionality.
16   Is this burden justified given where you are in the case and
17   given what else has gone before.  And we submit in this case
18   that it's not.  And for that reason, Your Honor, we would ask
19   that the Court grant the motion for protective order and
20   preclude NCR from taking the depositions as noticed.

21         THE COURT:  Wasn't one of the reasons the Court
22   thought your answers to the interrogatories were sufficient the
23   first time was that what was being called for was basically
24   speculation?

25         MR. SIBLEY:  That's correct.  The information is, it's

1    a very good point.  NCR is asking -- and now that expert

2    reports are in we have a little better visibility into exactly

3    what NCR wants to do with this.

4         Our position is that you cannot tell on a mill by

5    mill, year by year basis precisely how much carbonless copy

6    paper a mill recycled.  You could if you take a step back and

7    look at it in gross, you can draw some, some conservative

8    estimates about what occurred over the entire time period, but

9    to break it down year by year is simply not possible.  We have

10   been investigating this, and our expert reports bear this out,

11   we have articulated that the, our experts have, were telling us

12   that at the time in the context of work product and it's now

13   reflected in their reports.  No Georgia-Pacific witness is

14   going to be able to tell anyone from NCR precisely how much

15   carbonless copy paper was recycled by the Kalamazoo,

16   Georgia-Pacific Kalamazoo mill in 1963, 1964, 1965.  What we do

17   think is that it was used throughout that period in varying

18   degrees, depending upon market dynamics and availability.  But

19   for a year by year basis we can't provide that.

20        So to answer your question, Your Honor, yes, that was

21   a big part of your ruling was, when my partner, Mr. Shebelskie

22   stood up and said, we don't intend to do that, we say it's

23   impossible.  Once that --  we realized that's where we were --

24   to go back and read the transcript, Mr. Marriott seemed to

25   agree, okay, well, if that's going to be their position, then

1    maybe there is no need for anything more, and the Court agreed

2    with that.

3           The answers on the 30(b)(6), a corporate designee --

4           THE COURT:  I'm sorry, go ahead.

5           MR. SIBLEY:  -- would not say anything different.  It

6    would be the same.

7           THE COURT:  So you would just have somebody basically

8    say the same thing counsel said in court.

9           MR. SIBLEY:  That's exactly right, Your Honor.  We

10   have a little bit more detail now that there's, we have expert

11   reports are out.  But it's at the margins and it doesn't change

12   the core position that we've, we've, we articulated when we

13   were in front of you the last time.  And that position we have

14   taken in our interrogatory responses.

15          THE COURT:  To the extent that you have a little bit

16   more based on the expert reports, is that something that would

17   require you to supplement your answers to the interrogatories?

18          MR. SIBLEY:  We don't think so.  We think the answers

19   to the interrogatories are, were phrased in a way that would --

20   that, that provide the umbrella for what the experts have

21   actually had to say.  We certainly have not changed our core

22   position that you can't tell on a year by year basis.  We talk

23   in the interrogatory answers, Your Honor, about the factors

24   that might lead one mill to use more carbonless copy paper

25   rather than less.  The extent to which they used what's called

1    a ledger grade paper, those types of factors, and our experts

2    who have gone and talked about the various mills from an

3    operational perspective say here's, here's what these mills

4    did, given what they did, it puts them in the, this mill in the

5    more likely to use it category than less likely to use it.  We

6    certainly don't think that that supplementation of the

7    interrogatory answers is necessary in light of what the experts

8    have said.

9              THE COURT:  All right.  Thank you.

10             MR. SIBLEY:  Thank you, Your Honor.

11             MR. MARRIOTT:  Thank you, Your Honor.  David Marriott

12   for NCR.  Your Honor, if I may, I would like to hand up a

13   little binder of materials I would like to refer to.

14             THE COURT:  Give it to the clerk.

15             MR. MARRIOTT:  I will confess, Your Honor, that the

16   binder itself is only partially relevant to this particular

17   motion.  What we have tried to do is put all the documents we

18   thought might be useful during this morning's argument in a

19   single binder.  Of course, we received the Court's order

20   yesterday taking one of the motions off calendar, and we

21   thought it prudent not to recut the binder.  So some of those

22   documents simply don't matter in this motion.  But it may

23   nevertheless be helpful to Your Honor to have it there.

24             THE COURT:  Thank you.

25             MR. MARRIOTT:  Your Honor, what I would propose to do

1    with your permission is to walk you through this little

2    presentation which I hope will be helpful to the Court, and of

3    course I want to answer whatever questions Your Honor has.

4         But let me begin if I may by saying this.

5    Georgia-Pacific seeks a protective order.  And it does so on

6    grounds that NCR is, to quote them, "abusing the discovery

7    process."  And if that, if that were true, Your Honor, then the

8    motion for protective order should be granted.  But it is not

9    true.  And indeed the truth is we submit very different from

10   what you have read in the Georgia-Pacific papers and from what

11   you've heard this morning.

12        To create the impression, Your Honor, of some form of

13   abuse, Georgia-Pacific throws around a bunch of numbers.  And

14   you heard some of those numbers here today.  You heard them in

15   connection with some of the other briefing, and they make some

16   pretty attention grabbing assertions.  But with those numbers,

17   and with those assertions, they seek to suggest that there is

18   an overwhelming number of topics, that it would require

19   countless, indeed innumerable hours to prepare, and the

20   requests imposed some form of unfathomable uncertainty on the

21   process.

22        Not only does that obscure, Your Honor, the numbers

23   that really matter here, and I'm going to come to those

24   specific numbers that we think matter, but it ignores numbers

25   that we believe are important to put in context.

1     Counsel began by saying that context mattered and

2 reviewed with the Court some of what preceded this motion.  Let

3 me with Your Honor's permission do just a brief bit of that as

4 I think it frames nicely the issue that is presented here for

5 the Court.

6     I want to, I want to emphasize really five numbers,

7 Your Honor:  Zero, 100, zero, 100, and zero.  Let me tell Your

8 Honor what I mean by those numbers.

9     NCR, as the Court may recall, had absolutely zero

10 presence at the Kalamazoo River site.  NCR didn't own and

11 operate a facility there, and it didn't discharge a single PCB

12 into the site.  Zero.

13     A hundred percent of the PCBs that are Arcolar 1242

14 that matter to this case were put into the site by the mills,

15 including a particular Georgia-Pacific.

16     Another zero, Georgia-Pacific claims for itself zero

17 percent responsibility for the cleanup of the river.

18     The next hundred it claims NCR alone, though not

19 present, though not discharging anything, simply because it

20 manufactured a paper product, is 100 percent responsible for

21 the discharge of PCBs in the river, even if Georgia-Pacific

22 dumped them in the river in violation of state law ordinances,

23 rules and regulations.  It matters not under their theory of

24 the case.  We made the product, no matter what happened with

25 it, we are responsible for it.  That's the basic theory.

1    The next number, Your Honor, is zero.  The key number

2    here is zero.  Pursuant to an NCR notice Georgia-Pacific has

3    provided zero witnesses, zero 30(b)(6) witnesses.  It is true

4    that early in the case Weyerhaeuser served the 30(b)(6) notice.

5    It is true that that notice overlapped in some respects with an

6    NCR notice.  It is true at that deposition that NCR asked some

7    questions of the witness pursuant to that Weyerhaeuser notice.

8    NCR has served two 30(b)(6) notices in the case and only two 30

9    --

10    THE COURT:  Your point is that the June 30(b)(6)

11    deposition didn't happen to be one that you had noticed but was

12    Weyerhaeuser's notice.

13    MR. MARRIOTT:  That's exactly right.  They noticed the

14    deposition, a 30(b)(6) deposition.  We --

15    THE COURT:  That's the one that went to costs.

16    MR. MARRIOTT:  Well, two or three of the topics

17    concerned costs, yes, Your Honor.  Georgia-Pacific I believe

18    had a number -- or Weyerhaeuser I believe had a number of

19    topics.  The overlap of note here concerned costs.  And there

20    was a deposition that in fact took place on costs.

21    Weyerhaeuser did the principal questioning, we had an

22    opportunity to question, as did the other parties, and we did

23    question.

24    THE COURT:  All right.

25    MR. MARRIOTT:  So --

1       THE COURT:  You got the benefit of it even if you

2  didn't send out the notice.

3       MR. MARRIOTT:  That is fair.  We got the benefit of it

4  on those narrow topics, absolutely correct.

5       But we served, Your Honor, early, relatively speaking,

6  in the case, in the second phase discovery in June, a notice

7  that went to what we thought key issues in the case were.

8  There were 24 topics in that notice.  Now, I'll come to the

9  particular topics here in a minute.  24 topics.  We later

10 served a second notice.  Georgia-Pacific pursuant to our

11 notices has not produced a single witness.  So what you have in

12 effect, Your Honor, is the plaintiff in the case whose been in

13 this litigation, related litigation for years and seeks

14 hundreds of millions if not billion dollars in cleanup costs

15 solely from NCR, which has no facilities, dumped no PCBs, and

16 it declines to produce a single witness pursuant to the NCR

17 notices.  Weyerhaeuser has produced a witness pursuant to our

18 first notice, the June notice.  Following the Court's order,

19 International Paper produced a witness pursuant to that notice.

20 Georgia-Pacific declines.  And I'll come to the particulars of

21 that.  But that's the key number.  Zero witnesses pursuant to

22 NCR's notices in a case --

23      THE COURT:  Counsel, I'm not sure -- I understand your

24 point, but I suppose that if they produce absolutely nothing in

25 discovery, but you didn't ask for it until the last day of

1    discovery, their position would be justified.

2           MR. MARRIOTT:  That would be a problem.  That isn't,

3    of course, we submit, what happened.  But you're right.

4           THE COURT:  No.  So really what we are talking about

5    here is the question of whether or not these 30(b)(6) notices

6    are adequate and ought to be enforced.  So --

7           MR. MARRIOTT:  Absolutely.  So let me turn, Your

8    Honor, to the second slide of this book which is called the

9    notice topics.  And this will be something of a quick, you

10   know, review, Your Honor, based on what you already heard.  But

11   there are two notices here, the first notice and the second

12   notice.  First notice has 24 topics, the second has nine

13   topics.  The full text of the notice, of the topics are in the

14   binders, and we can come to those.  But you can see in essence

15   what these notice topics are about.  Georgia-Pacific --

16          THE COURT:  When you talk about the first notice,

17   what's the date of that one?  Is that the June notice?

18          MR. MARRIOTT:  That's the June notice, Your Honor.

19          THE COURT:  All right.  Thank you.  And the second

20   notice is the one that you issued in October.

21          MR. MARRIOTT:  That's correct.  So four arguments,

22   Your Honor, have been asserted with respect to these two

23   notices.  Turn to page 3 you'll see in essence what these are,

24   and let me take each of them in turn.

25          What they have said is they are insufficiently

1    particular, they are overly broad, they are untimely, and they

2    are duplicative.  What I would like to do is take each of the

3    notices separately because during the prior argument what you

4    had happen, respectfully, is that they were conflated in a way

5    that I think obscures the precision that exists in these

6    notices.

7         So with respect to the first notice.  This is the June

8    notice, Your Honor.  Again, there are 24 topics.  Each of those

9    topics, and I think this point is hard to overstate, each of

10   those topics is undisputedly relevant.  You haven't been told

11   once --

12        THE COURT:  Undisputedly what?

13        MR. MARRIOTT:  Relevant.

14        THE COURT:  Relevant.

15        MR. MARRIOTT:  You have not been told, you cannot be

16   told, you won't be told that we are asking anything that is not

17   relevant to this case.  Second point, Your Honor, is that --

18        THE COURT:  I think opposing counsel made a point that

19   he wasn't claiming that the topics were necessarily irrelevant.

20   I think you may proceed on that.

21        MR. MARRIOTT:  Your Honor, Georgia-Pacific after the

22   issuance of this notice promised, committed, stated, whatever

23   verb you want to use, that it would provide a witness pursuant

24   to this notice.  We served, as Your Honor knows, a motion to

25   compel against International Paper which took a different view.

1    The same notice, Your Honor, was served on International Paper,

2    Weyerhaeuser and Georgia-Pacific.  And Weyerhaeuser said it

3    would provide a witness, Georgia-Pacific said it would provide

4    a witness, International Paper declined.  We moved to compel

5    answers to our interrogatories and in that same motion we asked

6    for a witness as it related to International Paper only with

7    respect to the first notice.  And we dropped a footnote

8    explaining that it was unnecessary because both Weyerhaeuser

9    and Georgia-Pacific had committed to provide the witness.

10          At no point, Your Honor, did, during the course of

11   that hearing, did Georgia-Pacific indicate that it wouldn't

12   provide a witness.  And offline in the meet-and-confer sessions

13   to which counsel reviewed, we had conversations about when that

14   deposition would take place.  And it was our understanding,

15   quite clearly there appears to be some form of

16   misunderstanding, it was our understanding that that witness

17   would be provided by their choice toward the close of the fact

18   discovery period.  And that, of course, Your Honor, presented

19   at the time no particular problem for us because we were

20   interested in answers to our interrogatories to then use in

21   part as a basis for questioning the witness.

22          And as you know, we didn't have answers to the

23   questions to our interrogatories because they were the subject

24   of the motion papers on the motion to compel International

25   Paper and later Georgia-Pacific that were before the Court.

1          So the deposition proceeded on the cost related topics

2     that were noticed by Weyerhaeuser, to which there was some

3     overlap as it related to the NCR notice, and we were content to

4     see that deferred, content may be the wrong word, we were

5     willing to see that deferred without Court intervention because

6     we were waiting for answers to the interrogatories and with

7     that more complete information in hand we believed it would be

8     more efficient and more productive to take the deposition at

9     that point in time.

10         At no point, Your Honor, never did we represent that

11    we were uninterested in that first deposition notice, at no

12    point did we say we abandoned it, and at no point prior to the

13    point immediately preceding this protective order did

14    Georgia-Pacific, counsel for Georgia-Pacific say they were

15    unwilling to provide a witness.  Indeed, simultaneously they

16    had outstanding and were pursuing a deposition notice against

17    us.  Simultaneously we were taking the depositions of

18    Weyerhaeuser.  We were pursuing the deposition of International

19    Paper.  The notion that we would simply abandon the deposition

20    notice as it relates to the plaintiff in the case while

21    pursuing it against the others, we respectfully submit makes no

22    sense.  We never abandoned the notice.  We indeed were waiting

23    for them to provide a witness.  The topic came up several times

24    and we believe we were assured several times we would be given

25    a witness toward the close of the fact discovery period.

1    THE COURT:  If they hadn't told you they were going to

2    file a motion for protective order, were you ever going to

3    renotice this 30(b)(6) deposition?

4    MR. MARRIOTT:  Absolutely.  It was not --

5    THE COURT:  When were you going to do that?

6    MR. MARRIOTT:  Well, it was not until that

7    conversation that it became clear to us they were intending not

8    to provide a witness on that topic at all.  We were waiting

9    toward the end of the discovery period.  Just, Your Honor, as

10   they wait --

11   THE COURT:  Couldn't have waited a whole lot longer

12   because discovery ended on November 14th, I guess.  And when

13   did you send out the notice that you wanted to take this

14   June 30(b)(6) deposition?

15   MR. MARRIOTT:  Well, the moment that it became clear

16   in the conversation, I don't recall the precise date, Your

17   Honor, but the moment they were, it became clear in the

18   conversation that they were taking the position now that we

19   had, that we had abandoned the prior notice, we renoticed it.

20   We were simply waiting for them to give us the date because

21   there was no need to be bothering with the formality of it.

22   When it became clear they weren't giving us a date, we reissued

23   the notice.  But as for timing, Your Honor, the deposition

24   taken by them of the NCR 30(b)(6) witness occurred at the same

25   time.  They asked for a 30(b)(6) witness, we produced the

1    witness and he was deposed on essentially the same schedule

2    that they would have given us the witness.

3          So the idea that they have suggested that somehow NCR

4    was belatedly proceeding while they were diligently pursuing is

5    simply not correct.  They asked us for a witness, we gave it,

6    and that deposition took place basically at the same time when

7    the deposition of their witness would have taken place had they

8    offered the witness.

9          So if I can return, Your Honor, to page 4 --  yes.

10          THE COURT:  I'm not sure I see the connection between

11    the two other than the fact that two parties are both involved.

12    But when was that deposition?  Deposition of your 30(b)(6)

13    witness.

14          MR. MARRIOTT:  November 14th, Your Honor.

15          THE COURT:  And when did they give you notice of that

16    date, when did you --  how did you agree on that date?

17          MR. MARRIOTT:  Well, their notice, Your Honor, goes

18    back a very long time.  I can --  it's like our notice in June.

19    Bear with me just one second.  July 31st.  So they had, you

20    know, a month or so after we served our notice.

21          THE COURT:  And the July 31st notice did they set a

22    date?

23          MR. MARRIOTT:  They did, Your Honor.  And the date by

24    agreement of counsel in the same fashion we expected would

25    happen with our --

1          THE COURT:  What date did they set on the July 31st

2    notice?

3          MR. MARRIOTT:  August 22nd.

4          THE COURT:  And obviously it didn't take place on

5    August 22nd.  What was the understanding about why it didn't

6    take place and how it was going, or when it was going to be

7    rescheduled?

8          MR. MARRIOTT:  Your Honor, I believe the understanding

9    with respect to that one is the same with respect to most of

10   these, which is that we indicated if they wanted a witness we

11   would provide a witness and the parties would agree mutually

12   upon a convenient date.  And it was understood that it wouldn't

13   be the 22nd but it would be some subsequent date.  And it's

14   that same understanding --

15         THE COURT:  How did you end up setting November 14th?

16   When was that date set for this witness?

17         MR. MARRIOTT:  Well, they issued, they reissued the

18   notice very close --  very soon in advance of the actual

19   deposition.  I don't remember the exact date, Your Honor.  But

20   it was done when we agreed roughly on what the date would be,

21   they simply issued the renotice.  It was more a matter of

22   formality than anything else.  There was an understanding among

23   the parties that a witness would be provided, and that we would

24   provide the witness at a date that worked.  And that's the date

25   they asked for, and it's the date the witness was available,

1     and it's the date on which we attended the witness.  I'm sorry,

2     Your Honor, I've been told the notice was November 7th.  So

3     seven days before the deposition.

4          Because as was the case --

5          THE COURT:  So the parties agreed upon that date for

6     that witness, and when did you agree upon that date?

7          MR. MARRIOTT:  Well, I don't have the precise date.

8     It was sort of a fluid conversation, Your Honor, in which what

9     we said was we are going to give you a witness, we will get you

10    a date, tell us what you want, they gave us a date, and we let

11    them have it.  Just as the conversation occurred with respect

12    to the other notice.  The notice --

13         THE COURT:  But I don't see any corresponding

14    conversation regarding the June 30(b)(6) deposition.  The other

15    side certainly doesn't acknowledge any corresponding

16    conversation saying, oh, yes, we had this notice out there in

17    June, and that time came and went, you went through the --  you

18    used the interrogatory approach, those interrogatories were

19    sufficient and so the Court didn't allow you to get further

20    interrogatories.  But we're going to go ahead with the, you

21    still want your 30(b)(6) witness, and let's agree upon a time.

22    They never had that conversation with you.

23         MR. MARRIOTT:  That's actually incorrect, Your Honor.

24    The conversations were all the same conversations.  The one

25    notice came up, the other notice came up.  And to quote

counsel, all right.  Their view was -- all right.  I won't
quote counsel.  Let me paraphrase counsel.  Their view was, I
think quite candidly acknowledged that their notice was simply
an effort at mutually assure or destruction, in his words.
They didn't think we were serious about the June notice; they
thought the best way to deal with the June notice was to give
us a taste of our own medicine, and they served a notice upon
us.  Not only did their notice on us in July, Your Honor, have
all the same topics essentially that we asked, but it went well
beyond that.  And the objective quite clearly was to simply
cause us to go away because they would offer us a witness and
they assumed, they assumed we wouldn't, we wouldn't tender a
witness, and they would make it go away by just simply having
us agree to remove it.

The problem was, Your Honor, we weren't playing games.
We wanted the topics.  We wanted the witness.  We believed they
were important, and we told them that.  And when it became
clear to them that in fact we were going to tender a witness on
the very topics that they were, that they had noticed, that
were essentially the same as ours, they then withdrew several
of their topics and proceeded on a much narrower notice.

In fact, if I can point Your Honor to tab A of the
little handout, so just to explain what this is, we did
electronically a comparison of our June notice and their
comparable notice to us.  This shows only those topics of

their's that relate to ours.  As I say, they propounded 41
topics compared to our 24 topics.  But in the left column you
will see the text of the NCR notice topic from June.  To the
right you will see a black line comparison of their topic to
ours.  And if there is no difference in terms of striked
through language or added language, it is identical.  And if
you look closely you'll see that even where there are
differences, the differences are essentially inconsequential.
What they did for the most part is simply add the word NCR
knowledge to their topic.  And otherwise they repeated the
exact same topics that we asked of them.

          And so counsel had over the course of the summer a
number of conversations about these notices.  At no point did
we say we didn't want ours.  What they said is that they were
going to have to give us a witness, we were going to have to do
the same thing.  We never said we were unwilling to provide a
witness.  We said in fact we were willing to provide them a
witness.  And it's when we said that that suddenly their
position changed, they amended the notice, they dropped a few
of the topics, and they proceeded on a narrower set of topics.

          So despite the allegation that we're abusing the
discovery process, Your Honor, we are, we have consistently
asked for a set of topics that finely track the issues put in
the case by Georgia-Pacific and by the other mill parties.

          THE COURT:  I thought you said their notice tracked

1    yours.

2              MR. MARRIOTT:  That's correct.  And then it went --

3              THE COURT:  Their notice was tracking your notice.

4              MR. MARRIOTT:  That's correct.  If I misspoke, Your

5    Honor.  Their notice tracks ours and then it goes well beyond

6    ours.  And I have not listed all those here.  We had 24 topics,

7    they had 41.  So they track us and they go beyond.

8              But when we moved to compel International Paper, Your

9    Honor, they said at that time, and the way we avoided a motion

10   to compel in the meet-and-confer process was, they said they

11   would provide us with a witness.  They represented that to us.

12   I heard it.  It came to me.  And as a result, we didn't put, we

13   didn't make the motion to compel as to them.  We just did the

14   opposite.  We dropped the footnote and in the footnote we said

15   we are not proceeding against them, they have agreed to provide

16   a witness.  Weyerhaeuser has agreed to provide a witness.

17             Now, in its response to our motion, Your Honor, this

18   is very important to consider the responses, there were

19   essentially two responses to the motion:  One by International

20   Paper, and one by Georgia-Pacific.  In International Paper's

21   response, it recognized that despite the position it had taken

22   in the meet-and-confer it indeed needed to provide a witness.

23   And it said in its papers that it would in fact give NCR a

24   witness pursuant to the 24 topics.  And when we got here to

25   court they acknowledged that.  Your Honor said it was

1    essentially moot.  Your Honor ruled that they provide a

2    witness, in fact, Your Honor ruled they provide a particular

3    type of witness which they ultimately appealed on, but they

4    provided, they were ordered to provide the witness and they

5    did.

6              Georgia-Pacific not only didn't stand up, Your Honor,

7    and say wait a minute, NCR has misrepresented in its brief when

8    it says that we, Georgia-Pacific, have agreed to provide a

9    witness; they didn't say that.  What they instead did, Your

10   Honor, is to submit a brief in which they argued and suggested

11   for the Court the terms under which International Paper's

12   witness should have to provide a witness in response to the

13   notice.  They weighed in suggesting some guidelines as to how

14   the witness should be selected.  This is from our brief, but it

15   quotes their brief.  They said, quote, the Court, they

16   requested that quote, "The Court allow a 30(b)(6) deposition of

17   a party about that party's operations.  In the case of

18   International Paper and Georgia-Pacific, the mills with which

19   each was associated.  And in the case of NCR, its CCP

20   operations.  A party can be examined whether it possesses

21   information about other mills, and companies that are not

22   reflected in produced documents."

23             So we noted the agreement, they not only didn't

24   disagree with it, they weighed in against International Paper

25   and on that limited issue in our favor.

1          So not only did the discussions between counsel make

2     clear that they were giving us a witness, they specifically

3     talked at the time about dates late in the discovery period

4     with me.  Discovery period ultimately then was shifted a

5     little, and in our minds the date for the deposition was simply

6     going to shift.  We were still quarreling with International

7     Paper, and we were taking the deposition of Weyerhaeuser.

8          So that's, Your Honor, if I may, back to page 4, that

9     is a second reason why this notice, this first notice is

10    neither overbroad, nor imparticular.

11         THE COURT:  I'm sorry.

12         MR. MARRIOTT:  Yes, sir.

13         THE COURT:  So far we have been talking about

14    timeliness, that's all.  Is that right?

15         MR. MARRIOTT:  Well, I had begun talking on page 4

16    about imparticularity and overbreadth.  They are all very much

17    related, Your Honor.

18         THE COURT:  Feels like I'm getting two different

19    representations from counsel here.  The other side would

20    suggest that after you issued your 30(b)(6) and had the benefit

21    of a 30(b)(6) deposition as to several issues regarding costs,

22    you essentially let it languish and nothing more was really

23    done about it until they told you they were going to file a

24    motion for protective order on your other 30(b)(6) motion, at

25    which time in just a few days before the close of discovery you

said, well, we are now noticing out the original 30(b)(6)
deposition as well.  Which, again, puzzles me that you didn't
seem to have any concern about what that, what was going to
happen with that deposition until they said that they were
going to fight the other deposition.  Since they had not
mentioned any date, and you weren't asking for any date, and
the time was running, but beyond that, you're now telling me
that there were a number of conversations between you and
opposing counsel, and they made it unequivocal that they were
going to provide a witness, even though nobody ever seemed to
focus on when that was going to happen.

That's a --  either there were a number of
conversations and it was unquestionably that they were going to
continue to provide this 30(b)(6) witness based on the June
deposition, or that was water over the damn back after the
earlier 30(b)(6) deposition on costs, and the Court's motion,
or the motion the Court heard saying the interrogatories were
sufficient, and nothing more was done about it.  That you did
let it languish.  So I don't know.  I'm --  nobody submitted an
affidavit in support of their position.

MR. MARRIOTT:  I'm happy to submit an affidavit, Your
Honor.  I would say to you that there clearly is a difference
of perspective.  But, but what I can tell you unequivocally is
we served the notice, we had multiple conversations about it,
we were assured in those conversations we were going to get a

1    witness, they made effectively a representation to the Court in

2    submitting their brief in connection with IP that they had no

3    problem with providing a witness.  At no point did they say we

4    will not provide a witness, we are unwilling to provide a

5    witness until days before they then ultimately made the

6    protective order.  While we were of course preparing our own

7    motion to compel when we heard that, but it became, you know,

8    it became moot when they filed their motion for protective

9    order first.

10            THE COURT:  You were preparing a motion to compel

11   what?

12            MR. MARRIOTT:  The moment they said --

13            THE COURT:  You were preparing a motion to compel

14   what?

15            MR. MARRIOTT:  The deposition of the 30(b)(6) witness.

16            THE COURT:  Of which 30(b)(6) witness?

17            MR. MARRIOTT:  Well, it would have been both at that

18   time.  But it certainly would have been the first one.  The way

19   it worked out, Your Honor, is we were having a conversation --

20            THE COURT:  Wait a minute, wait a minute, wait a

21   minute.  Why would you have even been thinking about a motion

22   to compel the 30(b)(6), the first 30(b)(6) witness since up

23   until you heard they were going to file a motion for protective

24   order it never occurred to you they weren't going to provide a

25   witness to you?

1    MR. MARRIOTT:  It did not.  And I'm talking about as

2    of the point in time when they told me they were not going to

3    do it.  So in October --

4    THE COURT:  That's when they, when did they say they

5    were not going to do it?

6    MR. MARRIOTT:  They said they were not going to do it

7    in the same conversation in which they were talking about the

8    second notice.  They said, by the way, you're not getting --

9    we sent them a notice.

10    THE COURT:  When was that conversation?  Give me the

11    date.

12    MR. MARRIOTT:  It was in mid-October, Your Honor.  I

13    don't recall precisely the date.  It was mid-October.

14    THE COURT:  So mid-October they tell you that they are

15    not providing you the June 30(b)(6) witness.

16    MR. MARRIOTT:  Your Honor, it was days before they

17    filed, it was a day or two before they filed the motion for

18    protective order.  The moment they said that we began thinking

19    about a motion for protective order, or motion to compel as

20    they had the motion for protective order.

21    THE COURT:  They filed the motion for protective order

22    --  November 7th?

23    MR. MARRIOTT:  It was days --  whatever that was, it

24    was days before that.  It was when they told us we're not

25    giving you a witness, we will file a protective order.  At

1    which point, at which point we had no choice then but to

2    consider a motion to compel as it related to that particular

3    notice, and in the course of those conversations we sent them a

4    note, an e-mail, asking that they clarify that they were in

5    fact still providing one with respect to the first notice, and

6    in the course of those conversations they said, well, we

7    thought you had abandoned the first notice.  We said absolutely

8    not.  We haven't abandoned that.  And then and then only did we

9    begin thinking about making a motion for, a motion to compel,

10   but it became unnecessary because a day or so later they filed

11   a motion.

12          THE COURT:  So what you're telling me then, and I'll

13   understand it, is that you didn't think about a motion to

14   compel until November, say November 5th, that would be two days

15   before they filed their motion for protective order.

16          MR. MARRIOTT:  We may have the exact dates in here,

17   Your Honor.  I can try to find it.  That's essentially right.

18   We didn't think they were not providing a witness.  They had

19   given us no indication that they weren't providing a witness.

20   It's at page 4 of our brief, Your Honor, so we can be more

21   precise about it.  This is of course based on the e-mail

22   traffic which I don't have in front of me.  But we say there,

23   "The parties conferred yet again in an effort to resolve their

24   dispute on November 6th.  NCR --"

25          THE COURT:  I'm sorry.  Point out again where you

1    were.

2             MR. MARRIOTT:  Yeah, I'm sorry.  It's in our brief at

3    page 4.  It's paragraph 13 toward the bottom.  "The parties

4    conferred yet again in an effort to resolve their dispute on

5    November 6th.  NCR inquired whether GP would provide a deponent

6    for at least some of the topics in its Notices.  GP indicated

7    that it would not and took the brand new position that NCR had

8    abandoned its First Notice."  It was then for the first time

9    that we understood there was, there was from their perspective

10   an issue in this.  And we then began thinking about a motion to

11   compel which was overtaken because they filed first.  And ours

12   was converted into an opposition to the motion for a protective

13   order.  That's all that I was saying, Your Honor.

14             To just step back from it for a second.  From a

15   practical perspective, counsel has described this notion that

16   somehow we, we were interested in, no longer interested in a

17   deposition because we got everything we wanted from the

18   interrogatory answers.  And that with all respect is, couldn't

19   be farther from the truth.  To begin with, while we got a very

20   helpful order from Your Honor, International Paper appealed the

21   ruling.  That took sometime in the course of the appeal to

22   resolve.  And we didn't get a witness finally, pursuant to

23   that, we didn't get supplemental interrogatory responses

24   pursuant to that order until much, much later, long after fact

25   discovery had closed.  Indeed, our expert reports I believe

1    were about a week away from being due when we got the order

2    from the Court and that was scheduled.  So we now actually have

3    those supplemental answers, and while we think they have their

4    issues, they are also extraordinarily helpful.  We took a

5    deposition of International Paper with respect to those topics,

6    and we questioned about them.  And I have a very different

7    perspective from counsel for Georgia-Pacific as to the utility

8    of that deposition.  I think it was an extraordinarily useful

9    deposition.  And it was helpful to take the deposition at a

10   time when they had actually taken positions, when they began to

11   take positions so that we actually had a record on which to

12   examine them.

13        So as far as the timeliness goes, Your Honor, I would

14   agree it's far from ideal.  I would like to have had those

15   interrogatory answers much, much, you know, in the past.  I

16   would like to have had those interrogatory answers in July.

17   The requests came out in June.  It didn't work out that way.

18   But it didn't work out that way for any fault of our trying.

19   We made a motion to compel against International Paper, we made

20   a motion to compel against Georgia-Pacific.

21        I want to come back to what Georgia-Pacific said about

22   their interrogatory answers and how they somehow sufficed.  But

23   perhaps it makes the most sense to refer you back to page 4 and

24   let me take you through each of their four points in addition

25   to timeliness.

So they have made the argument, Your Honor, about
overbreadth and particularity.  And I think these arguments
essentially, as a practical matter, though they are different
concepts to be sure, I think our response to them comes closely
together.  Again, no question here about relevance.  They, when
they promised to provide a witness, Your Honor, pursuant to
this first notice when they wrote about it in their brief, when
we had the meet, at no point in time did they say to us, gee,
we don't know what you are talking about.  We have no notion of
what you're talking about as it relates to particularity or
overbreadth.  And indeed I effectively suggest, Your Honor,
they are not even making that argument here today.  Their
particularity and their breadth arguments are really reserved
to the second notice.

They are not making the argument as to the first.

When they weighed in, Your Honor, on the, on the
motion as it related to IP, they didn't make any complaints
about particularity or overbreadth.  They gave Your Honor some
suggestions about how it is they thought IP should have to
produce a witness.  They didn't talk about imparticularity and
overbreadth.  When Your Honor ordered that IP provide a witness
pursuant to that notice, it's the exact same notice that is at
issue as to them.  We sent the same notice to all three of the
mill parties.  So the notice is identical.  When Your Honor
ruled that they were required to provide a witness, when Judge

1    Jonker affirmed the ruling that they provide a witness, there

2    was no indication on anybody's part that there was any

3    uncertainty about what it was NCR was trying to do.

4              And, again, I would return Your Honor to tab A of this

5    little book.  They served themselves, Georgia-Pacific,

6    essentially, and I say essentially, it probably, you know,

7    suggests that there is more difference than there is.  They

8    served nearly verbatim requests on us.  They had no difficulty

9    understanding what they were writing then.  We told them we

10   were prepared to provide a witness.  They elected in the end

11   not to pursue that witness.  They were able to ask us the very

12   questions that they now stand in court and tell you they can't

13   understand, they are unfathomably overbroad, there is no way to

14   imagine how somebody can prepare to do this.  They did the same

15   thing.  The difference is, Your Honor, they did it as a

16   litigation ploy believing it would cause us to drop our

17   requests.  We did it by contrast because we wanted them and

18   because we were prepared to produce a witness doing the same

19   thing.

20             THE COURT:  This little comparison chart that you have

21   prepared, that's as to the June deposition?

22             MR. MARRIOTT:  It is.  I'm taking them one at a time.

23             THE COURT:  You've already told me that they are not

24   really raising a particularity or overbreadth argument.

25             MR. MARRIOTT:  Well, that's why I said earlier I think

these need to be disentangled.  The arguments sometimes

suggests they are but when you look at the particulars they are

not making that argument as to that first notice.  And the

fact, Your Honor --  I think the proof that the argument fails,

if they are or not making it as to the first notice is in the

International Paper deposition.  Finally we got that

deposition.  The witness testified.  The deposition lasted

three, three and a half hours.  I recall not an instance where

the witness was baffled by what it was the topic was asking

about.  The witness said he spent 15 or so, 17 hours preparing

for the deposition.  Not an insignificant commitment but what

happens when you are in litigation of this magnitude and when

you want someone to pay hundreds of millions of dollars in

costs.  The witness testified, I'm sure it wasn't a pleasant

experience, but there was no problem in that deposition --

THE COURT:  We are getting a little attenuated here

because I don't have that deposition notice in front of me and

I'm not really comparing that deposition notice to determine

the sufficiency of yours.

MR. MARRIOTT:  Well, my point is they are identical.

It's the same notice.  We served the same notice on them as we

did on them.  It's the same notice for everybody.  And

interestingly, Your Honor, Georgia-Pacific showed up at that

deposition and it questioned the witness itself.  Now, you

would expect them to do that, but for a deposition notice they

1    are saying is impermissibly overbroad and burdensome.

2          THE COURT:  I thought you said they weren't really

3    raising that argument.  You keep, you keep arguing that you win

4    on that, but at the same time you're telling me they are not

5    really raising that as to the June deposition.  So I don't know

6    if --  you need to spend time on that or not.

7          MR. MARRIOTT:  Your Honor, I think I can move on.  All

8    right.  So that as to the first notice we would submit there is

9    no issue about imparticularity.  That just brings us to the

10   second notice.

11         And counsel pointed you to some of the topics in that

12   notice, Your Honor, and let me see if I can do the same thing.

13         THE COURT:  I think they also raised an argument about

14   the duplicativeness of the June notice.

15         MR. MARRIOTT:  They do.  And I'm happy to do that now.

16   I was going to take, I was going --

17         THE COURT:  I thought you were going to handle the

18   June notice all at one time.

19         MR. MARRIOTT:  I'm happy to do it that way.  I was

20   going to do the thematic points.  Let's just do

21   duplicativeness, Your Honor.

22         There is nothing duplicative about that notice unless

23   you compare it to the second notice.  Their notice, their

24   argument of duplicativeness really says, I believe, as I

25   understand it, that you served a second notice and, hey, it's

just really asking me the same thing as the first notice.
Well, of course it doesn't get you very far here when they are
basically declining to provide a witness with respect to either
notice.

THE COURT:  I thought the duplicative argument from
the June notice went to the fact that you're seeking by a
30(b)(6) deposition the same information you had already
received in the interrogatories which the Court said was
sufficient.

MR. MARRIOTT:  There are two branches of it.  The
first branch I believe relates to the first notice, and
International Paper has essentially the same twist on that in
the motion that will come next.  And then they seem to say that
somehow it's duplicative of interrogatories.

THE COURT:  Talk about the duplicativeness of the
interrogatories.

MR. MARRIOTT:  As I think counsel acknowledged, Your
Honor, there is no prohibition on serving different discovery
vehicles as they relate to the same subject matter.  And so,
yeah, there are some similarities between the topics.  There is
no question about that.  We don't dispute that.  But that is of
course true of every one of the notices by all of the parties
in this case.  Their deposition topics relate to their
interrogatories, which relate to their requests to admit, which
relate to the other devices that have been used.  So, yeah,

1    there is unquestionably some similarity.  But they don't get at

2    the same thing, and the mere fact that somebody provides an

3    answer to an interrogatory doesn't mean that you have achieved

4    by way of discovery what you would get by way of a deposition.

5          And a great example of that occurred in the

6    International Paper deposition where the witness essentially

7    said at one point, I think we have answered that in the

8    interrogatory, to which the answer was, yeah, we have the

9    interrogatories, we are trying to find out if there is anything

10   beyond what's in the interrogatory.  And what we spent time

11   doing at the deposition is understanding what if anything there

12   was that wasn't reflected in the interrogatories.  And we

13   learned some things, Your Honor.

14         So, yes, they are on the same general topics.  But,

15   frankly, Your Honor, the notion that we have asked two

16   different devices I think should be no surprise.  Every party

17   in this case has served RFAs, and interrogatories, and

18   deposition notices on the very same topics.

19         THE COURT:  So you don't want to ask the same

20   questions that Georgia-Pacific has said we don't have answers

21   to.  And that you said, fine, now that I understand your

22   position, I'm not concerned.

23         MR. MARRIOTT:  I want to inquire on the same subjects,

24   Your Honor.  What I would say about that -- so, yes, I want to

25   inquire on the same subjects.  If the answer is what it is,

1    they can simply tell me we have nothing to say beyond what's in

2    our interrogatory responses.  And International Paper witness

3    did exactly that.  I don't want to start us down a road that

4    Your Honor doesn't want to go down.  But to respond to this, to

5    the notion suggested by counsel.  What's been suggested is that

6    we ask interrogatories, they responded to them, they were

7    perfect, and therefore there is nothing else to do is simply

8    not in fact what occurred.  They respond, they responded to

9    interrogatories, we took issue with the interrogatories and

10   moved to compel.  That all got sorted out because counsel came

11   and basically said, look, we have no positions.  We take no, we

12   have no positions on these issues, so don't worry, we are not

13   going to submit any evidence on this at trial, you're not going

14   to hear anything new, you're not going to hear anything that's

15   not in our interrogatory answers.  That's what was said three

16   times on the record.  We said, fine, I think we have what we

17   need.  As it relates to the interrogatories, we need nothing

18   further.  Because if those representations are right, then they

19   are not going to surprise us in any way.  No problem.

20          What you haven't heard is what counsel said is they

21   submitted expert reports and they added a little bit of stuff.

22   Well, this isn't the day to debate and litigate their expert

23   reports, but, Your Honor, they go wildly beyond.  Wildly beyond

24   what they said in their interrogatory responses.  And in our

25   view are utterly inconsistent with the representations that

1    they were taking no positions on the information called for by

2    those interrogatories.  Well beyond that issue.  But that's

3    not, that's not an issue to litigate today.  That's an issue we

4    will litigate presumably when we make the motion to strike

5    those expert reports because they go beyond what was, what was

6    promised in court.  We do not have in those interrogatory

7    answers what they told the Court in our view we were going to

8    get.  Presumably they have a different view.  I don't even

9    think it's a close call.  It goes well beyond.

10          So the idea that we have got it all and there is no

11   need further to inquire is not true as a general matter.  It's

12   certainly not true in a case in which we get six expert reports

13   that go into excruciating detail about what happened at each of

14   those mills, virtually each of those mills.  There are 14

15   mills.

16          So there's a pretty broad disconnect in terms of

17   whether that does it.

18          But, Your Honor, respectfully, there is value that

19   comes from having the corporate representative sworn, being

20   able to ask questions, being able to follow up, being able to

21   understand what it is that they contend, what it is they say,

22   what they know, what they did.  And what I would like to do

23   when it comes to the second notice is walk you through exactly

24   what we have in mind.  There is no mystery.  No --  counsel,

25   despite the assertions of having no, never made any effort to

1    understand from us what it was particularly we had in mind.

2    This imparticularity thing we think --

3           THE COURT:  Are we now arguing the second deposition

4    notice?

5           MR. MARRIOTT:  I did waiver into that, Your Honor.  So

6    let me go back to the first.  So as to duplicativeness, it's

7    very hard to compare the two when it's a comparison; on the one

8    hand, as it relates to the interrogatories, I would say to you

9    they just simply are different.  We acted within the limits set

10   by the Court as it related to interrogatories.  The depositions

11   have value; that's why they served them on us, that's why they

12   insisted on taking our witness's deposition, we gave it.  I

13   think there is value that we get from that exercise.  And there

14   is, while the topics are related, they are not duplicative.

15   And if the rule they are advocating were the case, nobody in

16   this case would have been able to do anything except either

17   serve a set of RFAs or serve a deposition notice or serve

18   interrogatories.  And by contrast, everybody has done all of

19   that.  So that's what I would have to say, Your Honor, on

20   duplicativeness.

21           As it relates to the first notice, I don't think there

22   is any question that it was timely.  The only argument they

23   have made frankly that we abandoned the notice.  And I think,

24   Your Honor, there is absolutely no evidence that we abandoned

25   the notice.  And their own papers indicate that they were

1    providing a witness as well as their statements in court.

2            THE COURT:  All right.  Just so I nail that down.

3    When you say their own papers, specifically what paper are you

4    talking about?

5            MR. MARRIOTT:  Referring to the brief they put in in

6    connection with the IP --

7            THE COURT:  Can you identify that by number somehow?

8    In light of the fact that we have --

9            MR. MARRIOTT:  I believe I can.

10           THE COURT:  -- hundreds and hundreds of docket

11   entries.  You can probably pinpoint it faster than I can.

12           MR. MARRIOTT:  Let me try.  Docket number 555 at page

13   4.  And this is quoted on page 3, paragraph 8 of our, of our

14   opening, of our opposition.

15           THE COURT:  Page --  I'm sorry.

16           MR. MARRIOTT:  This is the text I quoted to Your Honor

17   before.  This is where they talk about the nature of what --

18   it's by implication, Your Honor.  They do not say we have

19   promised to provide a witness.  We said they promised to

20   provide a witness in a footnote.  They made no response to that

21   and instead talked about what the deposition ought to look

22   like.

23           THE COURT:  So what you're pointing out regarding

24   docket entry 555, page 4 is the footnote?

25           MR. MARRIOTT:  No, it is their brief in opposition to

1    IP's motion.

2              THE COURT:  All right.

3              MR. MARRIOTT:  Really our motion to compel IP.  GP

4    submitted a brief, in its brief it took no issue with our

5    saying they promised to provide a witness, and instead

6    suggested guidelines on which the deposition should be taken.

7              THE COURT:  And you made that point in your brief

8    today, and that is where again?

9              MR. MARRIOTT:  At page 3, paragraph 8.  We quote the

10   language of --

11             THE COURT:  Paragraph -- page 3.

12             MR. MARRIOTT:  Paragraph 8.  Is docket 668 if that

13   helps, Your Honor.

14             THE COURT:  Yes.  There is a paragraph 8 on page 4.

15             MR. MARRIOTT:  Well, in my copy page --  I can walk --

16             THE COURT:  Page 3 --  page 3 at the bottom of the

17   brief.

18             MR. MARRIOTT:  Yes, sir.

19             THE COURT:  Page 4 of 13.

20             MR. MARRIOTT:  We are tricked again by the page

21   number.  You're right, bottom of page 3.

22             THE COURT:  All right.  So just a moment.  Your

23   response to their motion regarding the most recent --

24             MR. MARRIOTT:  Yes, Your Honor.  If you --

25             THE COURT:  Which I guess we would call the October

1    deposition -- October notice.

2         MR. MARRIOTT:  October 22nd notice, whichever is

3    easier.  So I think the claim here, Your Honor, is, as to

4    particularity and overbreadth, and what I would do, I suppose,

5    is simply to point the Court to the specific requests

6    themselves which, which appear, if you look in our brief it's

7    tab B, as in boy, and it's on the Schedule A which appears at

8    page 4.

9         THE COURT:  All right.

10        MR. MARRIOTT:  So there are, pursuant to this notice,

11   Your Honor, there are nine topics.

12        THE COURT:  There are nine what?

13        MR. MARRIOTT:  There are nine topics.

14        THE COURT:  Yes.

15        MR. MARRIOTT:  And why don't we take them, just

16   looking at page 4, why don't we take them in reverse order.

17   Look at the bottom, you have the questionnaire responses.  In

18   response to our interrogatories, you will remember, perhaps,

19   although I'm sure you're trying to suppress all memory of it if

20   possible, you may recall that in response to our

21   interrogatories what we got from essentially all of the

22   parties, but Georgia-Pacific perhaps more than most, was a

23   reference to the so-called questionnaires that were submitted

24   by the mills, including Georgia-Pacific mills to the EPA.  And

25   these are questionnaires in which they answered for the EPA

1    questions about the site.

2         These were, these were company documents provided to a

3    government agency with information important to the case.  We

4    would like to question them about that information.  We would

5    like to question them about that information because, Your

6    Honor, they expressly incorporate them in their interrogatory

7    responses.  Whereas typically what a party does, as you know

8    better than I, is if they have got a business record they want

9    to point to, they point you to the business record and they say

10   the information you call for is in the business record, and

11   under 33(d) they can do that.  Because the business record is

12   admissible into evidence and we can actually use it as the

13   party, as the party getting the business record.

14        Here what they did is something a little bit

15   different, a little bit arguably more clever.  What they have

16   all done is they have referred to the, they referred to the

17   questionnaires in their interrogatory responses, but they have

18   not acknowledged the documents are business records; indeed, we

19   have asked them whether they are business records and they

20   decline to answer the question.  We have asked them to admit

21   they are business records so we can use them.  They have

22   declined to answer the question.

23        Because they incorporate them into their interrogatory

24   answers, we think it only fair that we be given an opportunity

25   to question about them.  And what makes it tricky, Your Honor,

1    is they have not said to the Court that the questionnaires are

2    incorporated, they are there, we take no issue with them, they

3    are fine, they were provided to the government, they are

4    honest, they are truthful, we quibble with them not at all, we

5    have nothing to add besides what's in the questionnaire.

6    That's not what they say.  What they have said, and

7    Georgia-Pacific in particular has said, is, well, they are

8    "generally accurate."  And in its discovery responses it says

9    repeatedly, they are "generally accurate."  Without disclosing

10   how exactly they are "generally accurate."  What is it about

11   them that's inaccurate?  If we had a clear answer --

12            THE COURT:  What specifically do they say are

13   "generally accurate?"  Their responses or somebody else's

14   responses?

15            MR. MARRIOTT:  Well, the responses generally, they

16   will refer to theirs in particular, their questionnaire

17   responses; the questionnaire responses go mill by mill.  And

18   they will say -- see if I can give you an example.  They are

19   asked in one, in one request to admit, to admit the information

20   in the mediation questionnaire response for the Kalamazoo mill,

21   which is one of their mills, at Section 1.2 is accurate.

22   Pretty straightforward.  What they say in response is, "They

23   admit that the response presents a generally accurate summary

24   of the mill's ownership history in past operations.  Accept as

25   so admitted, denied."

1    THE COURT:  Is that your request to admit?

2    MR. MARRIOTT:  Well, it's not, Your Honor.  It is

3    Weyerhaeuser's request to admit, but as you will remember in

4    their interrogatory answers, their responses to other party's

5    requests are incorporated by reference.  We had told the Court

6    at a prior hearing that we didn't have a problem with them

7    incorporating by reference so long as it was clear what we were

8    getting.  So, no, we did not propound that request, another

9    party propounded that request.

10   THE COURT:  And nobody moved to challenge the adequacy

11   of that response.

12   MR. MARRIOTT:  Not to my knowledge.  And, and we don't

13   know --

14   THE COURT:  Had it been the procedure?

15   MR. MARRIOTT:  Well, I think, I think that's one

16   approach.  Another approach is to understand what they mean and

17   understand whether there's a basis and whether it's worthwhile.

18   And that's one of the things that we think a deposition has

19   value in doing.  It will give us a chance to understand why it

20   is they deny it.

21       And just by way of comparison, that is exactly what

22   they did to NCR.  We served -- they served RFAs on us, we

23   denied a number of them, or qualified a number of them, they

24   noticed our deposition and they took it, and we had a witness

25   answer their questions about why we denied it.

1    So as to the questionnaire responses, which is the 8th

2 item in their request, they incorporate these things by

3 reference into their interrogatory responses.  There are only

4 eight or so questionnaires.  Asking questions about

5 questionnaires which they studied thoroughly because they have

6 responded to RFAs on, and they provided, they provided, Your

7 Honor, a verification with respect to their discovery requests;

8 the witness who verified it swore that the answers were

9 accurate, they were correct, they had been reviewed, so the

10 idea that it will take an enormous amount of time for a witness

11 to tell us about questionnaires that they prepared, as to which

12 they have answered RFAs, and as to which they have answered

13 interrogatories and had a witness swear to them under oath, is

14 in our view not a sufficient basis for saying we get no witness

15 on this important topic.

16    THE COURT:  The quote, one I always like, that the

17 opposing counsel used in regard to 30(b)(6) depositions was

18 that they require painstaking specificity.  Looking at

19 Section 104(e) responses as the topic, Georgia-Pacific argues

20 that, wow, there were a lot of responses, and you've made no

21 effort to point to those particular ones you want to have them

22 produce a 30(b)(6) witness to.  I think you are kind of

23 agreeing that, yes, we want somebody that can testify to all of

24 these responses, we don't want to identify any particular ones,

25 so they should prepare somebody to respond to, be totally

1    knowledgeable about all the 104(e) response.  Now, is that

2    correct?

3           MR. MARRIOTT:  Well, it's partly right, Your Honor.

4    Let me put it this way.  We have defined the 104(e)s.  This is

5    not a massive universe of documents.  It's probably ten

6    documents.  They submitted one they submitted to the EPA, they

7    ought to be able to have somebody talk about it.  What we want

8    to know is we have follow-up questions about the specifics of

9    what's in the response, and we have questions about whether

10   they have any reason to doubt the accuracy of what other

11   parties provided.  But as it relates to --

12          THE COURT:  Well, that makes somebody become an expert

13   on everybody's response, even parties that are nonparties.

14          MR. MARRIOTT:  Well, I agree we aren't trying to make

15   anyone an expert on that issue.  All --

16          THE COURT:  How would they not be an expert if they

17   could answer that question:  Is there anything that you

18   disagree with or that is inaccurate.  You have to be an expert

19   --

20          MR. MARRIOTT:  We are not asking for that opinion.  We

21   are asking simply whether they have any reason to doubt it.

22   And I think if the answer --  they say in their responses that

23   they have undertaken reasonable investigation as to these

24   issues.  If that's so, they can tell us what the investigation

25   is.  They can say we have no reason to doubt that.  What they

1       have done in fact is submit expert reports that at some length

2       seem to take issue with what's in a number of these

3       questionnaires.  So I think they are capable of doing it.

4               THE COURT:  You want them to tell you what reasonable

5       steps they have taken to respond?

6               MR. MARRIOTT:  Well, I believe, Your Honor, we are

7       entitled --  so if you jump up to the other topics, they are,

8       they are discovery responses, they are document productions.  I

9       believe we are entitled to know what they did to collect

10      documents, where they searched, where they didn't search.  In a

11      number of their interrogatories responses they have a witness

12      whose already sworn to these answers.  And they say in some

13      cases there is nothing more they can do.  They have done a

14      reasonable -- I think we are entitled to know what they did,

15      and be able to evaluate whether or not it was reasonable.

16              THE COURT:  Is that the requirement for a 30(b)(6)

17      witness?  They are supposed to understand the facts of the

18      case, be knowledgeable about the case, but, and they do have to

19      interview witnesses.  They have to collect documents.  But do

20      they, are they responsible for telling you everything that

21      everybody else has done to try to obtain this information?

22              MR. MARRIOTT:  Well, I would say they are not

23      responsible for telling me everything everyone else has done.

24              THE COURT:  Well, then where do you draw the line?

25              MR. MARRIOTT:  I think you draw the line where the

1    rule does.  As I understand the rule, read the rule, it draws

2    it at a reasonable inquiry.  And certainly, Your Honor --

3            THE COURT:  That's a good word.  But give me some

4    definition, parameters.  Reasonable needs, you need some

5    parameters to understand what reasonable means, don't you?

6            MR. MARRIOTT:  Sure, you do.  And let me offer this.

7    So with respect to the mill questionnaires, they are the owners

8    and operators of a number of these mills.  They prepared the

9    questionnaires.  I think the level of what one can reasonably

10   expect them to be able to provide there is different from what

11   you could expect them to do as to some other party.  And what

12   we want to know is their own questionnaires and their own

13   104(e) responses, are they accurate?  Is there anything about

14   them that's inaccurate?  You might say, well, why does that

15   matter?  Well, it matters because of answers like it's, well,

16   it's "generally accurate."  Or unwillingness to respond to RFAs

17   that say, admit that statements are accurate.  Or statements by

18   counsel in court, that, well, they are not entirely accurate

19   because remember they were made in the context of mediation.

20   So there's a little bit of puffery in there.  So we want to

21   understand because they have, they are effectively trying to

22   use these questionnaires and then not use them and attack them

23   at the same time; we want to understand where those lines are.

24   And for the questionnaires that they prepared, and for the

25   104(e) requests, responses that they prepared, I think no one

is in a better position than they to answer those questions.
And I don't view it as being particularly burdensome to say you
prepared this, you gave it to a government agency, you used it
in the litigation, you had an obligation presumably not to
mislead the government, is there anything in this thing that
you think is untrue.  And if so, please tell us what it is.

THE COURT:  That would be the ones they prepared the
answers to.

MR. MARRIOTT:  That's right.  That would --

THE COURT:  All right.

MR. MARRIOTT:  That would --

THE COURT:  But you haven't limited it to that.

MR. MARRIOTT:  We have not, Your Honor.  But mostly
because what we are interested in knowing as to the others is
is whether they have any reason to doubt the accuracy of the
others reports, and that certainly less can be asked of them in
that regard.  We expect they would do less there.  We expect if
they had not abandoned their topic we would be in a position to
do the same thing.  So I understand that less is required
there.  And we would expect less of them in that.

Our principal focus as to them is their own
questionnaires, and their own 104(e) responses, and there
should be no doubt about that.

But insofar as their interrogatories, and maybe part
of this is just the difficulty of draftsmanship, perhaps it

1  could be drafted better, but their challenge, Your Honor, why

2  we have not just listed their discovery responses -- now to

3  jump up to 1 and 2, and 3 and 4 -- the reason we haven't just

4  said your responses and what you guys did to collect documents

5  and what you decided was relevant --  I'm sorry --  the reason

6  we didn't limit it to that is simply because in their own

7  answers, Your Honor, they incorporate the responses of others.

8  And maybe, maybe the prudent thing to do is to just view that

9  as being just about them.  What we want from Georgia-Pacific,

10  what we want from International Paper is testimony as to their

11  own responses.  If they are incorporating others, we would like

12  to know what they are incorporating and how.  And that's why it

13  sweeps more broadly than simply calling for Georgia-Pacific's

14  responses to interrogatories.

15       It's hard to imagine that could impose that much

16  burden.  The witness has already, by way of verifying the

17  interrogatory answer, reviewed it, sworn to it, said that it's

18  accurate.  Where there are uncertainties, where there are

19  ambiguities, where there are generally phrases like "it's

20  generally accurate," we think we ought to be allowed to inquire

21  as to what that means.  And that, Your Honor, basically is

22  topics 1 through 4.

23       And 5 is their denials for requests for admission.

24  Precisely the thing they have asked of us, precisely the thing

25  on which we gave them a witness.

1       6 and 7 are perhaps --

2           THE COURT:  I'm sorry, tell me about 5 again.

3           MR. MARRIOTT:  Sure.  Georgia-Pacific, 5 is

4   Georgia-Pacific's denials of any request for admissions served

5   by any party including the reasons for those denials.  Again,

6   our focus really is on what we served on them, but insofar as

7   their answers incorporate what other people did, they are

8   effectively are the answers that relate to us.  And where they

9   denied or where they equivocated, we would like to understand

10  why that's the case.

11          THE COURT:  Number 4, Georgia-Pacific points out that

12  you want somebody to testify as to the documents produced by

13  Georgia-Pacific in response to any party's request for

14  production of documents.  They point out that there's 400,000

15  documents.

16          MR. MARRIOTT:  Yeah, well, I think --

17          THE COURT:  And that you haven't specified which

18  documents.  So you want somebody to be prepared to speak

19  knowledgeably about any of those 400,000?

20          MR. MARRIOTT:  Absolutely not.  That's not what we

21  intended and, respectfully, I have a hard time believing that

22  that's what they thought we were trying to do.  What we want to

23  understand is they produced documents to us.  Where did they

24  get them, what did they search, what did they not search.  We

25  want to know about their document production.  We do not have

1    any notion whatsoever that a witness could be called upon to

2    opine on behalf of a company or anybody else on any one of

3    400,000 documents.  They have never suggested that was their

4    interpretation until this morning, Your Honor.

5         THE COURT:  Well, I'm reading this without having all

6    the background or baggage, either one, that both of you bring

7    to this.  But I'm looking at this just as an outlander, and it

8    says you want somebody to testify as a 30(b)(6) witness as to,

9    quote, "Documents produced by Georgia-Pacific in response to

10   any Party's request for production of documents."  And I'm told

11   that's 400,000 in number.  To me, that is talking about the

12   entire world, the entire universe as it pertains to these

13   documents.

14        MR. MARRIOTT:  Well, so --

15        THE COURT:  That's the notice that you're giving them.

16   That hardly qualifies as painstaking specificity.

17        MR. MARRIOTT:  Well, if you --  so because the rule

18   requires painstaking specificity, and because it requires

19   particularity, it never occurred to me, Your Honor, that what

20   one would read this to say is that we were asking for them to

21   put up a witness who would be prepared to cover 400,000 pages

22   of paper.  What we, what we understand them to be required to

23   do by that, what we are seeking is a witness who can talk to us

24   about the, their document productions generally.  Where do they

25   get them, when did they get them, whose files were searched.

1   That doesn't require knowledge of the particulars of the

2   documents.  That requires saying, well, pursuant to your first

3   notice, we went to the files of these ten people, and we

4   searched them.  And this is what we came up with.  And it

5   matters, Your Honor, here because, for example --

6        THE COURT:  Well, actually that's the last thing I

7   would think that this statement would talk about.  It talks

8   about the, you want somebody to talk about the documents

9   produced.  That's different.  You're talking about the

10  documents themselves, is different than talking about where the

11  documents came from, or what was done to find the documents.

12  That's goes into document production, something of that nature.

13  It seems to me you're putting them on notice that you want

14  somebody to talk about the documents, the documents produced by

15  Georgia-Pacific.

16        MR. MARRIOTT:  Generally speaking we are.  I guess I

17  just read it in the context of this notice.  I see what Your

18  Honor is saying.  In retrospect it would, it would be drafted

19  differently.  But we have item 8, for example, the

20  questionnaires.  Very specific.  There is eight questionnaires.

21  We have item 9, the 104(e) response.

22        THE COURT:  All right.  Let's talk about 8 since

23  you're talking about 8.

24        MR. MARRIOTT:  I'm really talking about them by way of

25  reference.  When we wanted to refer to specific documents and

expected them to have to come with a witness prepared to talk about the specific documents, we identified them in a much more particular way. I mean -- that I offer as an indication that we didn't -- if we intended 4, Your Honor, to cover any scrap of paper in the case, there would have been no reason for 8, there would have been no reason for 9, or frankly for anything else. Because it would have covered everything.

THE COURT: Well, it seems to cover everything except what you otherwise have specified. This whole, your whole approach to the last minute discovery seems to encompass everything in the case. So the fact that number 4 comes along and says documents produced, and it might be duplicative of 8 as to the questionnaire responses, I assume there are a lot of other documents among the 400,000 that had nothing to do with the questionnaires.

MR. MARRIOTT: There absolutely are. And again, I recognize the interpretation that Your Honor is describing, and I understand it. It was not what was intended. Where we wanted to ask about specific documents, we tried to call those out.

THE COURT: Let's go to number 8 for a moment since you brought it up. I want to talk about it anyway. You said there was I think you said eight responses, something like that. Your opposite number points out that each questionnaire had, it was hundreds of pages, so it's not just eight pages,

obviously, it's eight documents containing hundreds of pages
each.  But each also had appendices.

MR. MARRIOTT:  True.

THE COURT:  And each also had business records
attached to them, I guess.  So each one of these is fairly
comprehensive.

MR. MARRIOTT:  True.  Absolutely true, Your Honor.
But what I would say to that is, they incorporated them into
their interrogatory answers.  I mean they are seeking to use
them.  They gave us those materials and said this is our case.
This is what we want to present.  And I think it only fair that
we be given an opportunity to question them about what they
have incorporated into their own responses.  So they are
voluminous.  But --

THE COURT:  When did you receive their answers that
incorporated these?

MR. MARRIOTT:  Well, we received them sometime, I
guess in the hearing right before the IP motion to compel.  So
I don't have the precise date in mind, but June.  July.

THE COURT:  I'm curious as to why we are getting this
30(b)(6) deposition just a couple weeks before the close of
discovery.  Obviously you want quite a bit of information.
Obviously you received a lot of this back in July, and I assume
it would have been useful to you to have answers to your
questions you are now seeking back in July.  Why wait until now

1    to file this 30(b)(6) deposition?

2         MR. MARRIOTT:  Well, Your Honor, very simply because

3    we didn't get what we asked for.  We had to come here; we had

4    to get an order from Your Honor; we had to go to Judge Jonker;

5    we had to wait weeks after Judge Jonker ruled before they

6    produced a witness.  All of these things are related to one

7    another.  Because the supplements didn't come.  So it's true,

8    it would have been nice to have these things earlier.  But

9    again, it's not for a lack of trying.  I mean --

10        THE COURT:  You could have filed a notice for a

11   30(b)(6) deposition without waiting until October 22nd.

12        MR. MARRIOTT:  Well, fair enough, but we had one in

13   June for which we had been told, in our view, you're going to

14   get it at the end of discovery period.

15        THE COURT:  That was as to your June deposition which

16   pertained to other matters.

17        MR. MARRIOTT:  Yes.  But I guess the point is that

18   there was no great, you know, timely -- there was no great

19   quick response to getting a witness for that notice.  And,

20   again, yes, it came towards the end, but so have all the

21   notices of many of the parties in the case.  What we wanted to

22   do is have answers --

23        THE COURT:  Well, that's not particularly good either.

24   I'm more concerned about the one I've got to deal with today.

25        MR. MARRIOTT:  Well, it may not be particularly good,

1    Your Honor, but the sad reality is we got what we wanted, what

2    we asked for, what we believe we were entitled to much slower

3    than we would have liked it from all of the parties in the

4    case.  And the whole idea here is to get the information that

5    you ask for, then study is, get your experts's comment on it,

6    take, take depositions about it.  We didn't have what we needed

7    in order to be able to in our view to do that.  We wanted to

8    see what they were saying and these things to have back.  I'm

9    not particularly interested in sitting down and taking a

10   deposition from somebody about all the particulars of the

11   questionnaire if I can get them to tell me in some other form

12   of discovery that it's only a particular issue they have a

13   problem with.  If they had said to us, yeah, we submitted those

14   questionnaires to the EPA, we stand by them, they are true, we

15   have no quibbles with them, rely upon them, then we wouldn't be

16   having this issue.  But that's not the case.  We're here

17   because they are using language like, "it's generally

18   accurate."  They are saying it was done in the context of

19   mediation but they won't tell us what it is about it that's

20   incorrect.

21          So if we just had those, that, they are there, we

22   stand by them.  If they admitted they were business records and

23   they were in evidence, perhaps we wouldn't be having an issue

24   with some of these things.  But we are getting, we are getting

25   --

1          THE COURT:  I don't know.  Somehow I feel you would.

2          MR. MARRIOTT:  I would like to think we would.  I have

3     no particular interest, Your Honor, in wasting any time taking

4     discovery.  We fought hard to get the deposition of

5     International Paper.  I suppose I could have sat there for

6     eight hours and questioned the witness and given him a hard

7     time.  I didn't.  We got what we needed in three and a half

8     hours and we were done.  No interest in taking unnecessary

9     discovery.  What I do have an interest in doing is making sure

10    we get what it is they are relying upon, what it is they are

11    incorporating into their case.  And I'm being put in a position

12    where they are basically saying, well, I've got these

13    interrogatory responses crafted by lawyers, you don't, you

14    don't get to examine a witness about them, you don't get to

15    know what we did, we didn't do, you don't get to know what

16    words like "generally accurate" mean.  You just get pointed to

17    the document.  By the way, which documents we don't even agree

18    are admissible into evidence.

19         So I think a deposition is the best tool, frankly,

20    here to be --

21         THE COURT:  Well, I don't disagree with that.  And you

22    certainly have the right to take a 30(b)(6) deposition and

23    various ways of coming at an issue of discovery.  But that's

24    not the immediate issue before the Court.  The immediate issue

25    is whether or not you have specified with any adequacy

1    specifically what it is you want.  You have asked for a,

2    somebody or obviously several people, but I don't know if

3    Georgia-Pacific could find one, one person that could be a

4    30(b)(6) witness as to all of this.  But you've asked for a

5    tremendous amount of information in very broad terms and

6    without any specificity.  They have a right to know

7    particularly what it is you're focusing on, and I'm hearing

8    some of it now.  I don't see it in this notice.

9         MR. MARRIOTT:  Well, Your Honor --

10        THE COURT:  That's why they filed their motion.

11        MR. MARRIOTT:  Well, I have a slightly different view

12   on why they filed their motion.

13        THE COURT:  Well, beyond that.

14        MR. MARRIOTT:  But --

15        THE COURT:  I'm not looking at motive.  I'm looking at

16   what I've got to deal with.

17        MR. MARRIOTT:  The topics.

18        THE COURT:  I take that back.  If I thought there was

19   a bad motive, I would take a look at that.  But go ahead.

20        MR. MARRIOTT:  The topics say of course what they say,

21   Your Honor.  And all I can do is to tell you that as we

22   intended them, and as we, and as we read them, we are not by

23   way of, for example, the one on documents saying, and I don't

24   think any human could reasonably expect that one would show up

25   to testify as to 400,000 different documents.  The idea of

1    having somebody that never occurred --  it never occurred to

2    me, I would submit it never occurred to them, it was never

3    intended --  we would never do it.  Such a deposition would be

4    impossible.

5          THE COURT:  You still haven't given me even now when I

6    have asked you, you haven't given me any specifics about what

7    it is about these documents you want.  You say, well, really

8    what we want is how they were found, how they were produced,

9    where they were obtained.  That's just about as vague as

10   saying, talk about the documents themselves.  Because you've

11   got 400,000 documents that somebody had to find, look for, sort

12   out, and produce.  That's just, that's as broad as the topic

13   here.  So I still don't see any specificity.

14         MR. MARRIOTT:  Well, let me see if I can help on that

15   one.  I think, frankly, on that one, Your Honor, it's hard to

16   be more specific than I have been for anybody.  I mean --

17         THE COURT:  What is it that you want?  You say you

18   can't fathom anybody being able to talk about all 400,000

19   documents.  We agree on that.  What is it that you want to have

20   them have a witness on as far as the documents are concerned?

21         MR. MARRIOTT:  I'm sorry.  I think it's all about

22   levels of specificity.  So, yeah, I think they can talk about

23   the 400,000 in terms of where they got them and whose files

24   they came from.

25         THE COURT:  Why?  There is 400,000 documents.  I

assume there is probably a variety of places they came from.

MR. MARRIOTT:  Your Honor --

THE COURT:  Are you asking as to each document where it came from?

MR. MARRIOTT:  Usually what parties have done, Your Honor, is they have a collection of logs that say here is what we are producing, this is the facility it's from, what was done to collect, what was done not to collect.  It's the mechanics of the collection:  Where they were from, whose files they were from, what period of time they related to that we are interested in.  I think that is, that is commonly provided, and beyond describing it as the mechanics, I'm not sure what else, Your Honor, to say about that.  We want to know whose files did they come from, what did you search for, what did you not search for.  There is, for example, there is a, there is a document request, Your Honor, a response in which they say they are asked to produce reports by us and others relating to discharges into the river.  And what they say in their, in their response, written obviously by counsel, their objections, they say that GP is in -- that the documents we have asked for are, quote, "in repositories with high concentrations of privileged documents," so they won't search it and apparently they won't log it.

So the understanding of what they have done and not done is important to understand whether documents that are

1    important to the case are being withheld.  I understand that

2    statement as I read it to say there are documents out there

3    that speak about discharges by them into the river.  They know

4    they are there.  They know they are in a repository.  They know

5    some of them aren't privileged.  But they are saying that they

6    are among documents for which there are high concentrations of

7    privileged documents.  And yet we are not getting the documents

8    and we are not getting the documents logged.

9         THE COURT:  Sounds like a little bit of something that

10   would have been a subject for a motion to compel.

11        MR. MARRIOTT:  Well, I think it's --

12        THE COURT:  And we would have pinpointed it.  Or you

13   could have put that in here.  We want to know the repository,

14   what's contained in this repository of highly privileged

15   documents, something of that nature.  But that's not what's in

16   here.

17        MR. MARRIOTT:  Well, again, it does, it doesn't say --

18   what it refers to is their answers to our, to our discovery

19   requests.  And what we are trying to get at is when they carve

20   things out, when they say they are not doing things, what

21   exactly is it.  I don't believe that's a particularly

22   burdensome thing to do.  They carved it out.  They wrote an

23   objection about it.  The objection is written in relatively

24   general terms.  We would like to understand exactly what they

25   are talking about.  Perhaps there is no motion to make as to

1    that.  But we will only know that when we understand exactly

2    what's been carved out.

3         So as to documents, that's what we are looking for.

4    What they did in terms of --  for the documents collectively,

5    not for any individual document.  And I believe they can do

6    that, Your Honor.  I believe every party can do that.  They can

7    describe what they got, where they got them, and indeed there

8    have been depositions in this and related cases that have done

9    precisely that.  It has not happened with respect to all the

10   documents that have been produced in Phase II of this case.

11   And because productions are flowing and ongoing, we not that

12   long ago received a new production of documents from

13   Georgia-Pacific.  As to time, I mean typically rather than

14   repeat the depositions three times, we wait until the end of

15   the process so that -- because otherwise you end up saying,

16   well, we are still looking, we are still looking, if we get

17   more we will give you more.  The only way to really do that

18   once and not have to do it three or four times is to do it at

19   the end of the process when you've got presumably what they are

20   going to give you, and you can't be told we will give it to you

21   later because the discovery period is about to close.

22        So I mean, that frankly is the argument for the

23   efficiency of waiting until the end.  Obviously it comes with

24   other consequences, and an argument could be made to the other

25   side.  But if you want to understand why we thought about it

1    that way, it's so we didn't do it multiple times.  We didn't

2    have to end the deposition and say well, we hold this open so

3    that next week when you produce something else we can have more

4    questions about those documents.

5          THE COURT:  Well, they would have a duty to supplement

6    if they couldn't answer.  You could come back on that.

7          Let's go to 1 through 3.  You want to talk about their

8    answers to all the interrogatory --  you want to talk about all

9    the interrogatory answers they have provided, either

10   interrogatories you served, or that International Paper served,

11   or Weyerhaeuser served.  Again, do you feel that meets the test

12   for being specific to focus on particular topics?  I assume

13   those, I don't have them here, I don't think anybody has

14   probably furnished them in regard to this motion, but I suspect

15   those answers cover the waterfront as to a wide variety of

16   subjects that you are asking this 30(b)(6) witness to be

17   familiar with, be able to testify about.

18         MR. MARRIOTT:  Well, I think this one actually, Your

19   Honor, is one of the narrower ones in the sense --

20         THE COURT:  Is it?

21         MR. MARRIOTT:  Well, I do.  Because what they have

22   done is we served a set of interrogatories, they served a

23   document responding to it.  So and then they supplemented it.

24   So you are really talking about asking them questions about the

25   document that they gave us.  That's the spirit in which these

1    were intended.  They served it responsive to our interrogatory,

2    they served responses to RFAs, the responses are incorporated

3    into a document or two.  The documents themselves may

4    incorporate other documents, indeed we know in this case they

5    do, but their responses and objections represent a, two or

6    three documents.  And it's those that we would like to

7    understand.

8         So, for example, one of our questions asked about, one

9    of the questions asked about evidence that they have concerning

10   costs they claim to have incurred.  Georgia-Pacific claims to

11   have incurred about $105 million in costs, all of which it

12   seeks to shift on to NCR.  So we asked them in an interrogatory

13   to disclose to us the evidence of the costs that they have

14   incurred, invoices and the like, because we have experts who

15   want to understand those and who want to try to match up the

16   invoices with the information they are providing about costs.

17   And in one of the answers we are told something like, they will

18   give us only documents sufficient to show, sufficient to show

19   the evidence.  Not just the costs, but the evidence of it, and

20   nothing more.

21        Now, maybe that's okay.  But without really

22   understanding what other kinds of documents are being withheld,

23   it's hard to know whether it is or isn't okay.  The only way I

24   can think to crack that nut is to take the deposition of the

25   witness who swore to the answer.  I think they have had the

1    same witness swear to each of the answers to interrogatories

2    they provided in this case.

3            THE COURT:  Well, they may or may not produce that

4    person as a 30(b)(6) witness.

5            MR. MARRIOTT:  I'm not trying to compel that.  I'm

6    just saying that I suspect when push comes to shove, they would

7    produce that person.  Whoever it is, they have a person who

8    testified, who swore the answers were true who can presumably

9    tell us as to the sufficiency point what's there and what's not

10   there.  And I just --  maybe it's perfectly fine.  I don't want

11   a bunch of useless paper.  But if under the banner of, well, we

12   will give you sufficient but we uniquely in our judgment

13   decide, and you don't get to take a deposition to find out from

14   somebody under oath what's there, it's kind of hard to make

15   that judgment.

16           So that's an illustration of the kind of things we

17   would get from taking out the interrogatory response, going

18   through it, saying you said this, you said that, what does that

19   mean, what does that not mean?  What did you do?  What did you

20   not do?  So I view this as being --

21           THE COURT:  87 of those responses, and is it possible

22   those responses were prepared by the company, by an

23   amalgamation of people that were able to gather together enough

24   information to supply a response, or is it obvious from these

25   responses that they are all the knowledge of one person?

1        MR. MARRIOTT:  Well, I apologize, Your Honor, but I

2   missed the first part of the question.  If the question was

3   they say there is a bunch of answers to these?

4        THE COURT:  Well, I don't know what these

5   interrogatories are.  And I don't know what the answers are.

6   But I assume that the company in preparing the answers must

7   have done something like a 30(b)(6) witness would have to do.

8   They would have had to gather information from various sources

9   in order to provide the answers to the interrogatories.  Unless

10  there is somebody at Georgia-Pacific that is, has enough

11  knowledge to answer each one of these interrogatories by

12  himself or herself.

13       MR. MARRIOTT:  Well, I don't know exactly what they

14  did.  That would be a point of the deposition, Your Honor.  I

15  can't answer that.  I can speculate.  But I really don't know

16  exactly what they did.  That's the reason we would like to take

17  the deposition, to understand that.

18       THE COURT:  So if these are wide ranging, then I

19  assume somebody has to come up to speed on all of these

20  answers.

21       MR. MARRIOTT:  Well, again --

22       THE COURT:  The entire case.  I don't see anything

23  here that's not part of the case.  That sounds like it covered

24  the entire case here.

25       MR. MARRIOTT:  Well, Your Honor, we asked them for

1    interrogatory answers, they in our view declined to provide

2    them.  They have three times supplemented the answers.

3                 THE COURT:  All right.

4                 MR. MARRIOTT:  All right.  So we now have, very late

5    in the day, I don't have the date of the supplement in mind,

6    but it is very late in the period to be sure, perhaps even

7    after the close of fact discovery.  So we, we have, we have

8    supplements to these responses.  I think two or three from

9    Georgia-Pacific.  The only way to kind of, in my view, to

10   efficiently and sensibly, if they are not going to give us

11   answers on a more timely basis, to take a deposition, one

12   deposition, not be told we are abusing the process by taking

13   multiple depositions, is to get the supplemental answers and

14   take the depositions.  We only received International --

15   again, this is a different issue.

16                THE COURT:  Let's don't get into the weeds here of

17   everybody else.

18                MR. MARRIOTT:  But the point is we only got the

19   answers, Your Honor, relatively recently.  And being able to

20   take a deposition by its definition comes later because that's

21   when we got the answers.

22                THE COURT:  I'm going to drop this in a minute.  But

23   don't the interrogatories speak to various aspects of the case,

24   various subject matter?

25                MR. MARRIOTT:  They do but the witness --

1    THE COURT:  And wouldn't you, doesn't a 30(b)(6)

2    witness, aren't they supposed to focus in on a particular

3    subject matter or area that they are supposed to be primed for?

4    Isn't that the way to identify, we want somebody to talk about

5    the costs, we want somebody to talk about what was dumped, we

6    want somebody to talk about which mills you owned and when you

7    owned them.  Something like that.  As opposed to we want to

8    have somebody talk about everything that you have said in

9    answers to all of the interrogatories from everybody that

10   submitted them.

11   MR. MARRIOTT:  Well, again, our real focus is on, Your

12   Honor, their responses to us.  The others are here simply

13   because --

14   THE COURT:  That's not what 2 and number 3 ask for.

15   MR. MARRIOTT:  Well, it's true again.  But it's true

16   that's what it says.  But that's because they incorporate the

17   others in their responses.  So whether or not it says it, they

18   have chosen to incorporate the answers, at least through

19   Weyerhaeuser, their responses to Weyerhaeuser.

20   THE COURT:  Well then that would be part of their

21   answer to your interrogatory as well.

22   MR. MARRIOTT:  At least to us.  You can say in that

23   sense this is belts and suspenders.  We are interested in their

24   answers to us.  Insofar as they incorporate others responses,

25   and you're right, they are part of their's.

1       So, yes, that's one way to do it.  But, Your Honor,

2   the particular document itself, again, we are talking about

3   basically one document, their responses and objections which

4   they have amended two or three times, so that's the document

5   about which we wish to examine the witness.  That document,

6   that document is not floating in sort of the ether generally.

7   It is tied to specific questions on which they --

8       THE COURT:  May be one document but it covers the

9   waterfront, doesn't it?

10      MR. MARRIOTT:  It covers the topics in the notice,

11  which are 24 topics.  They are the topics in the case.

12      THE COURT:  Would a 30(b)(6) notice be adequate if it

13  said please provide somebody to testify as to every aspect,

14  every paragraph of the complaint you have filed?

15      MR. MARRIOTT:  Well, I guess it would depend on the

16  complaint.  That, that wouldn't be the particular, that

17  wouldn't be the ideal way to do it, no.

18      THE COURT:  How is this any different?

19      MR. MARRIOTT:  Well, because there are 24 topics in

20  the notice.  There are 24 topics in the answer to the

21  interrogatory.

22      THE COURT:  24 different topics.

23      MR. MARRIOTT:  We could have served a notice that had

24  24 different topics, and indeed, Your Honor, frankly, we did.

25  And they have declined to give us a witness on that notice.

1     That's the first notice.

2           So the two notices, the two notices are unquestionably

3     related.  One approaches it from the perspective of we are

4     giving you the 24 topics; that's why we have 24 topics in our

5     first notice.

6           THE COURT:  And the 24, tell me again the 24 topics

7     are what?

8           MR. MARRIOTT:  Well, there is --  they are behind tab

9     --  bear with me one second.  They are at tab A, Your Honor, of

10    the little booklet.  If you look at the pages along the top

11    it's page, page 5 of 8 where they start.  These are, this is

12    the notice 1, we are back to the June notice, that's what this

13    is.

14          THE COURT:  Okay.

15          MR. MARRIOTT:  Those are the same topics covered by

16    the interrogatories.  And this is the list of 24 topics on

17    which International Paper gave a witness in three hours.

18          THE COURT:  So you're bringing me back to the June

19    notice then.

20          MR. MARRIOTT:  I am because you asked for the topics.

21    These are the same topics covered in the interrogatories.

22    That's the reason I bring you back.  The interrogatories cover

23    the same topics.

24          THE COURT:  Well, that may suffice for the June notice

25    but it really doesn't answer as to the October notice which

1      doesn't contain this kind of specificity.

2            MR. MARRIOTT:  Well, look, the truth is, Your Honor,

3      if they give us answers to the questions in all of these

4      genuinely, then we probably have answers to the topics.  The

5      topics, I don't disagree that the topics, they are distinct in

6      certain respects to be sure.  This notice doesn't talk about

7      getting information about the way they collected documents.  It

8      doesn't specifically call out the mill questionnaires.  It

9      doesn't specifically call out the 104(e).  Now I think as a

10     practical matter they are there because in their answers on

11     interrogatories, but all of the throwing around of numbers,

12     they all amount to basically the same basic sets of topics.

13     Whether you view it as the first notice --  I mean I think

14     there is not perfect overlap or we wouldn't have served the

15     second notice.  But there is some overlap.  And we don't deny

16     and we have never denied there is some overlap.  But they are

17     distinct topics insofar as --  that's why I view the latter

18     one, Your Honor, in light of this.  We really weren't saying

19     for the latter one give us everything under the sun.  We were

20     trying to focus on those specific documents.  The ones called

21     out in 8 and 9, the 104(e)s, and the mill questionnaires and

22     the responses and objections and, frankly, in retrospect that's

23     the way it should have been framed, responses and objections in

24     documents, whatever.  That would provide the additional

25     specificity.  I'm not sure in the end it would make an enormous

difference, but it certainly would have the greater appearance

of specificity had we done that.

THE COURT:  All right.  Go ahead.

MR. MARRIOTT:  Okay.  So, so that, Your Honor, is the

second notice.  I was addressing by that notice whether or not

the document is overbroad or imparticular, and, again, as I

say, as we intended it, I don't believe it's imparticular or

overbroad.  As read in light of the specific items in the

request, 8 and 9 which call out documents, I think those inform

the meaning of what comes before.  We are not asking for them

to have somebody speak to the particulars of 400,000 or even a

thousand documents.  We are asking for them to describe what it

is they did in response to our, to our discovery requests.

They have given us responses and objections.  The document

presumably written by the lawyers describe the process.  We

would like a witness who can tell us where they searched and

where they didn't search.  Where these documents describe their

own discharges into the river of wastewater, which could not

conceivably be more relevant, and for which they are apparently

sitting on a bunch of documents they are not producing, because

they are, quote, "they are within this high concentration of

other privileged documents," we would like to understand what

that means.  Because if all that means is there is a bunch of

really relevant documents in there but they are surrounded by

privileged documents, and we don't want to sort out the

1   difference, I don't think that's an adequate basis for not

2   giving us the documents.  If they have some other explanation,

3   presumably the witness will tell us that, and perhaps there is

4   no issue.  If there is an issue, we may be back in front of

5   Your Honor.  But we will only know whether there are other

6   discovery issues on their responses as it relates to the

7   documents and to some of the way, some of what these phrases

8   mean if we have a chance to understand from the witness what

9   was intended.

10       And I would just say with respect to the burden

11  question, the witness who signed and verified the

12  interrogatories is the same witness.  So presumably that

13  witness having already verified that they are true, they are

14  accurate, they are complete, Georgia-Pacific has told you

15  repeatedly there is no problem with them, they don't even want

16  to supplement them in response to Your Honor's question

17  earlier, it ought not to be that hard for the witness who

18  already signed off or anybody else they want to put forward to

19  speak to what was done, what was not done, and to some of the

20  vagaries of those documents.

21       I think, Your Honor, I don't want to wear out my

22  welcome, which probably too late, but thank you for your --

23       THE COURT:  You certainly have not worn out your

24  welcome.  Don't worry about that.

25       MR. MARRIOTT:  Thank you.

1      THE COURT:  Okay.  Now, it's 20 past the hour and I

2  know at least my staff is entitled to a lunch break even if you

3  are not.  But you are as well.  So I propose to take a lunch

4  break.  I do have some questions, however, for Georgia-Pacific

5  on rebuttal because I think if there are questions about, or

6  there have been answers, something "generally accurate," or in

7  the context of mediation, the other side ought to be able to

8  follow up on those sorts of things.  That is hardly a

9  definitive answer.  There is also the question, and I want to

10  give Georgia-Pacific the chance to respond to it, about the

11  number of conversations the parties had leading up to the

12  second notice of the June deposition during these

13  meet-and-confer periods, and the representation by NCR that GP

14  said that they would provide a witness.  So I have some

15  questions about, that I wanted to address to Georgia-Pacific.

16  Did you have a dog in this fight?

17      MR. PARKER:  Your Honor, there's the other motion --

18      THE COURT:  Well, I haven't even got to that motion

19  yet.

20      MR. PARKER:  Understood.  In this fight, no.  Except

21  to the -- except it's the same exact notice.  By the way, for

22  the record, John Parker for International Paper.  But I have

23  different arguments than what you've heard.

24      THE COURT:  Right.  I'm not going to decide that one

25  without giving you a chance to argue.  I just want to know if

1    you want to participate in this one.  Because otherwise I just

2    want to know for scheduling purposes who I have to hear from as

3    far as this first motion is concerned.

4         MR. PARKER:  I will do my best to remain silent on

5    this motion, Your Honor.  You know how hard that is for me.

6         THE COURT:  Thank you.  Now, I'm going to take a lunch

7    break.  And then we will come back.  We will finish up with

8    this motion, we will take the next motion, I will not run past

9    3:00 o'clock, however, because I have another meeting out of

10   the building.  So can we be back by 1:30?

11        MR. MARRIOTT:  Yes, Your Honor.

12        MR. SIBLEY:  Thank you, Your Honor.

13        THE CLERK:  All rise, please.  Court is in recess.

14        (Recess taken, 12:21 p.m.; Resume Proceedings, 1:33

15   p.m.)

16        THE COURT:  I'm sorry for the short period of time.  I

17   hope you had a chance to get something to eat.  I should have

18   recommended the superb vending machines that GSA provides for

19   us down in the sub basement.  It slipped my mind.  And I did

20   find out there was a reception for one of our probation

21   officers who is retiring, so some of us had a chance to get a

22   piece of cake, but I would have invited you had I known about

23   it before we broke.

24        Before we proceed I have on the schedule here a motion

25   for an extension of time to complete discovery.  This is docket

1   number 665; this is International Paper Company's motion for

2   leave to receive documents from third parties, et cetera.  And

3   I don't understand there to be any opposition to that motion.

4   None has been filed timely.

5          MR. PARKER:  Your Honor, John Parker on behalf of

6   International Paper.  You're correct.  I have docket, I have it

7   at docket 657 was our motion for leave.

8          THE COURT:  I'm sorry.  You are correct.  I was

9   looking at the docket number for the notice of hearing.  You're

10  docket number 657 is correct.

11         MR. PARKER:  And this is one of the things I was going

12  to actually raise because I thought I could win this one for

13  sure.  No one, no one has filed an opposition to this.  You've

14  set it for hearing on the 30th of this month, and I would

15  actually like you to rule on it and then that way I wouldn't,

16  as much as I enjoy coming here, I wouldn't have to make that

17  extra trip.

18         THE COURT:  All right.  Well, when there's been no

19  opposition to it, I think you are probably on your way to

20  prevailing on that motion.  And December 30th would be awful

21  close to New Years, so I don't want your wife to get after me

22  on that one.

23         MR. PARKER:  I was going to save it for the end, Your

24  Honor, but I actually got specific instructions from Mrs.

25  Parker, who is still thankful for the extension you gave her

1    and me so I could go on vacation with her, to wish you happy

2    holidays and give you her greetings.

3            THE COURT:  Thank you.  I would enjoy meeting her

4    sometime.

5            MR. PARKER:  If I keep coming up here, you may get

6    that opportunity.

7            THE COURT:  When you move up here, I hope you'll bring

8    her along.  As I'm sure you will.

9            MR. PARKER:  Absolutely.  She will give me no other

10   choice.

11           THE COURT:  All right.  I haven't had a chance to

12   peruse the motion but any time motions are unopposed, I think

13   that there is no reason not to grant them.  And the Court will

14   grant this motion.

15           MR. PARKER:  Thank you, Your Honor.

16           THE COURT:  We will enter an order.  All right.  Thank

17   you.  That brings us back to the pending motion we were hearing

18   about.  And, counsel, I appreciate your patience.  Go ahead.

19           MR. SIBLEY:  Certainly, Your Honor.  I should report,

20   Your Honor, that we at your direction we did discuss the issue.

21   I think we have made some progress.  I don't think we are at a

22   point where we can say we have a deal.  We would propose as a

23   path forward that I address the questions you raised before we

24   broke by way of rebuttal.  And then we, we allow a little bit

25   of time, we need to discuss the issue with the right people at

1    the client.  We just haven't been able to raise those people

2    just yet.  But I think this is a question of less than an hour

3    to sort of get approval or not for a concept that we have

4    talked about.

5              THE COURT:  Fine.

6              MR. SIBLEY:  So I'll go ahead and proceed with

7    rebuttal, and then hopefully we can report at some point.  If

8    you indulge me looking at my phone while I wait to see if we

9    have got the thumbs up or thumbs down.

10             Let me talk first about the June notice, Your Honor,

11   and the timeline.  Because that was I know the subject of a lot

12   of discussion and was the topic subject to one of your

13   questions.

14             Georgia-Pacific's consistent position on 30(b)(6)

15   depositions on topics like those that were the subject of the

16   June notice, setting aside the cost related issues that were

17   addressed separately, our consistent position is that 30(b)(6)

18   deposition on those topics is a waste of time.  It doesn't tell

19   really anything beyond what you get from the interrogatory

20   responses, and we have said that.  We said we don't think these

21   depositions should go forward.  They are not, they are not

22   productive.  We don't view this as a good use of anyone's time.

23             Now, with respect to the timeline, here is my

24   recollection as to how that timeline unfolded.  The discovery

25   was served in June, we served responses in July.  We heard soon

1    thereafter that NCR believed our responses to be inadequate.

2    We had a, I can recall two telephone conversations, two

3    specific telephone conversations between myself, Mr. Marriott,

4    on this topic.  One occurred in the latter part of July, and we

5    were talking about the interrogatory responses themselves and

6    it was clear based on that meet-and-confer that we would not

7    reach a resolution as to we will not be able to give NCR what

8    they wanted, nor do we have a real clear sense as to just how

9    far we need to go to get there.  I think ultimately it proved

10   to be the case that we were perhaps talking past one another.

11   We, we can't go year by year, mill by mill and say what each

12   mill recycled by way of carbonless copy paper.  That issue was

13   ultimately resolved in October.

14        The second conversation we had was the first week of

15   August.  I don't remember the precise date, but I remember it

16   was that week because I was on vacation.  I was in Ocean Isle

17   Beach, South Carolina and in the carport of a beach house

18   looking out over the Atlantic Ocean.  And we were talking about

19   the question of the responses, interrogatory responses first,

20   and as a corollary to that, the idea of the deposition.  And

21   Mr. Marriott put the question, do you object categorically to a

22   30(b)(6) deposition.  The answer at that point was, we don't

23   object categorically.  There may be a set of circumstances

24   where a deposition like this would be appropriate, but I can't

25   answer that question once and for all without a ruling on the

1     motion that you're planning to file.  If it's the case, as it

2     turned out to be, that our answers are sufficient, then we

3     refer to our longstanding position, which is that the

4     deposition is a waste of time.  What can a witness tell you

5     that we haven't already provided.  That applies doubly so now

6     that our expert reports are out, and you have that.

7          So that has been Georgia-Pacific's consistent

8     position.  And the way the process works, I think it's useful

9     to note, the deposition, there is no, there is no provision in

10    Rule 30 for objecting to a deposition notice.  That's not the

11    way the process works.  You typically work these things out,

12    you note where you have problems, and you sort these things

13    out.  But the way the process works is, it's on NCR at that

14    point to serve an amended notice and say, here, here is what we

15    want to do, or to at least contact us and say here are the

16    dates, give us one of these dates, and let's go forward now.

17    That's not what happened here.  We got resolution on the

18    interrogatory responses in early October, and from that moment

19    forward, there was silence from NCR.  The topic never came up

20    again.  It was never discussed.

21          And I can say with confidence from early August until

22    the, until frankly November 5th the issue never came up.

23          And we, we believed, and I think we were justified in

24    believing, that given the Court's ruling on our interrogatory

25    responses, that NCR would have no need for a 30(b)(6)

1 deposition.  That they would agree that, yeah, okay, this is

2 not really a productive use of time.  We got the most we're

3 going to get.  Now it's over.  So we at that point the silence

4 to us suggested that the issue had gone away.

5    The burden at this point I would suggest is on NCR to

6 come and say, no, we want to proceed and here is how we want to

7 do it.  And that message did not come until November 5th.  And

8 it was only after, and this is part of the timeline that I find

9 to be a little bit strange, we get a deposition notice on

10 October 22nd, and this is the one that's, that is the subject

11 of the full array of challenges on particularity and

12 overbreadth, we get that notice on October 22nd, and there is

13 no mention of the other notice.  It's not as though they served

14 the amended notice and then tacked on an amended version of the

15 previous notice to identify a date in the future and then added

16 on eight other issues.  It was a completely new notice.  And it

17 was only after we said that this is way, this is way too broad,

18 this is not nearly particular enough, we are not, we are going

19 to move for protective order, it was only at that point that

20 that was the first indication that came back that they wanted

21 to proceed on the June notice.  That is the timeline.  I have

22 been the person whose been running point on that.  That is the

23 timeline to the best of my recollection as to exactly what

24 happened.  I can tell you with a high degree of confidence that

25 from August forward there was no mention of this deposition.

1        Now, during the course of argument on the, on the, on

2    the October issue, we got a lot of specificity or some

3    specificity I should say from Mr. Marriott about the types of

4    questions they were, they were, they would ask.  Statements

5    that were preceded by we are interested in X, our real focus is

6    Y.  We understood this request to ask one thing.  We shouldn't

7    have to file a motion for protective order to get that

8    information.  The duty is on NCR to put that in its notice.

9    And he identified a couple of our answers to other discovery

10   that they thought were deficient.  The one example you

11   mentioned specifically, Your Honor, that I feel obliged to

12   address is the one concerning the request to admit the accuracy

13   of a given section of the questionnaire response.  And we don't

14   have that document in front of us.  That's not been -- the

15   party who actually served that discovery and to whom we

16   responded did not challenge the sufficiency of our answer.  We

17   read in context, we believe, the answer fully satisfies the

18   requirements to respond under the RFA rule.

19        But that wasn't in the notice I think is the key

20   point.  If that's what they want to ask about, we're entitled

21   to know that and to specify that.  Because I can have a, I can

22   prepare a designee to talk about that.  He mentioned some other

23   things about documents and what not.  If it was specified, that

24   would resolve that, that part, that problem with a notice.

25        Now, the timeliness is a whole other issue.  And I

1    would say also, Your Honor, I think you mentioned this during

2    the course of Mr. Marriott's argument.  It's not that the

3    scope, that the notice touches on irrelevant topics.  We don't,

4    we don't dispute that.  It's that it hits on every relevant

5    topic.  And we are really left to guess at precisely what's

6    going to be the focus of the deposition.  That's the key

7    problem with the notice as, as framed by NCR.

8              If you give me one moment, Your Honor, I want to flip

9    through my notes just briefly to make sure I have answered the

10   questions you raised.

11             One other point.  At various points NCR has noted that

12   we took the position in response to NCR's motion to compel

13   International Paper that a 30(b)(6) would be proper limited as

14   we had articulated.  We had identified a middle road, and

15   helpfully or not, had proposed that, stood up and proposed

16   that.  But the Court ruled at that point quite correctly that

17   the issue of the 30(b)(6) notice really wasn't at issue between

18   International Paper and NCR, and that was off the table.  And

19   really that proposed resolution was a way to resolve sort of

20   the broader impasse about what a party's obligation would be

21   with respect to operations that, that were, operations that

22   took place at other party's facilities.  Do we have an

23   obligation to go out and learn about what happened at some

24   other mill and then come and tell you that.  And what we had

25   proposed there was, no, this should be limited to what took

1      place at your facilities, and that's what, that's what we had

2      proposed as sort of a middle, middle position.  Ultimately that

3      was mooted by the Court's ruling that International Paper had

4      not, their objections were not well taken.  And all of this

5      became subsumed by NCR's motion to compel us, and the Court

6      concluded that we had answered the questions adequately, that

7      there was no more we needed to do in responding to that

8      discovery.

9          Mr. Marriott has also said that one of the reasons

10     identified as one of the excuses for providing this so late is

11     that we have never, we have never provided the answers, the

12     answers they need.  The only discovery that we served that they

13     have ever challenged were those interrogatory responses, and

14     the Court concluded that we met the mark.  We did what we were

15     required to do.  So that can't be the answer.

16         Your Honor, I think the --  I want to step back just

17     to make sure I have answered your question.  There was

18     specifically a reference to the statement, the response to RFAs

19     where they asked about specific portions of mediation

20     questionnaire responses where we responded that, to use the

21     words that "this section is generally accurate."  You

22     specifically mentioned that.  And that's not in front of the

23     Court.  I don't have the benefit of having the response

24     directly in front of me.  I do remember it.  I would like to

25     explain briefly so that I can satisfy Your Honor's curiosity on

1    that point.

2         We received from Weyerhaeuser a set of RFAs that asked

3    us to admit the accuracy of every statement, every report of

4    data and every section of every, of certain mediation

5    questionnaire responses.  I can't remember if it was every one.

6    That is a daunting task to do in an RFA.  It is daunting for

7    the following reasons.  The information in a given section

8    covers a wide array of reported stuff, reported data by the

9    mills during the time, during the relevant time period, and

10   then on top of that, literally on top of that, anecdote and

11   conjecture layered on top of that with experts retained at the

12   time of the mediation by some other party talking about, making

13   guesses about what happened during years where you don't have

14   data.

15        Our position was that as an RFA that was ambitious and

16   it came very close to masquerading as an interrogatory because

17   what they are really asking you to do is go through and tell us

18   everything that, everything that's right and everything that's

19   wrong.  That's an interrogatory.  It's not an RFA.  It's not

20   specifically tailored.  But the answer we gave is, where there

21   were specific problems we identified, that we knew about, we

22   identified them, otherwise, we said, "this is generally

23   accurate," but we have not verified every jot and tittle in

24   this answer.  We are looking at this same as you.  But if we

25   know that there are problems, here's what they are.  That was

1    the approach we took.

2         I think that, I think when you look at those

3    responses, that that was -- and Weyerhaeuser did not challenge

4    those, I would say, nor did IP, nor did NCR -- we think those

5    responses met the requirements of the rule.  And to get this,

6    tie this back to the issue that actually brings us here, if NCR

7    had actually put that in their notice, that would be one thing.

8    But they didn't.  They put, they covered the entire waterfront.

9    And that's the problem.  If that was the issue they wanted to

10   talk about, we could have prepped up a witness to talk

11   precisely about that and be prepared to answer those questions.

12   That's productive.

13        I have to say, I don't know that I, had we proceeded

14   with the deposition as noticed, I don't know that I would have

15   had the foresight to penetrate down to that level of detail on

16   that set of discovery responses to get a witness prepared to

17   answer that question.

18        Certainly not in the time that was allotted.

19        And the problem here, Your Honor, is they had a chance

20   to do this right.  They could have, they could have done this

21   with particularity.  They could have done it sooner.  There was

22   no reason -- our interrogatory responses were propounded to

23   them in July.  They could have served this request then.  And

24   we would have, and we could have dealt with it at that time.

25   But they waited until the last minute, and I think we're

1    regrettably at the point where the clock has run out.

2         Your Honor, if there are no further questions.

3         THE COURT:  I know you don't feel that 30(b)(6)

4    depositions accomplish a lot.  I think your words were, "a

5    waste of time."  But under these circumstances -- but the other

6    side has made the assertion that since the expert reports have

7    been received, these go, and I think the word was "wildly

8    beyond" what was said in your interrogatory answers.  So while

9    it looked at one point like you couldn't provide anything

10   further, the suggestion is that the expert reports you have

11   furnished suggest something to the contrary.  And what they

12   want to follow through on is finding out what your position is

13   today based on those reports.  I wanted to give you a chance to

14   respond to that.

15        MR. SIBLEY:  Your Honor, I sharply dispute that

16   assertion.  And I submit to you that if they really thought our

17   expert reports went above and beyond, went far beyond what our

18   interrogatory responses were, they wouldn't be pressing for a

19   30(b)(6) deposition.  They would be perfectly happy to move to

20   strike the reports.  That's not the approach.

21        THE COURT:  Perfectly happy to what?

22        MR. SIBLEY:  To move to strike the reports.

23        THE COURT:  Strike the reports.

24        MR. SIBLEY:  And I submit to you that that is a bit of

25   --

1          THE COURT:  Sounds like they were going to do that

2     anyway.

3          MR. SIBLEY:  Perhaps they might.  That sounds to me

4     like puffery.  The thing we said, the thing they said they

5     wanted most, what they wanted from us, Mr. Marriott stood at

6     the podium and said, we want a table, we want to go year by

7     year, mill by mill, you tell us how much NCR paper was recycled

8     at each mill.  Mr. Shebelskie stood up and said, that's not, we

9     don't think you can do that.  That cannot be done.  What we can

10    tell you is that mills that used more ledger grade paper than

11    other grades of paper were more likely to use carbonless.  You

12    can look in the landfills at what is actually there, and that

13    gives you some indication as to the extent to which they used

14    carbonless copy paper over the entire run of time.  You can

15    look at the types, the finished grades of paper that they made,

16    and that gives you some, can inform somewhat as to the various

17    grades they would have used during the time period.  But we

18    don't have the records to go mill by mill, year by year.  We

19    have not done that.  And Mr. Marriott did not actually point

20    you to anything to the contrary.  That is not what we have

21    done.

22          I think our, our reports fit comfortably within the

23    answers that we provided to discovery.  There are no surprises

24    in there.  I think the only surprise quite --  to put a point

25    on it, Your Honor, I think the only surprise on NCR's part is

1   that we, we have not done that.  That we've not attempted to go

2   year by year.  And the reason why it's important --  I

3   articulated this for you a while back -- the reason why it's

4   important is NCR believes, incorrectly in our view, that if

5   they can limit, if they can show Judge Jonker how much, the

6   massive PCBs that was discharged after March of 1969, that that

7   effectively puts a ceiling on their liability.  We don't think

8   they can make that showing.  We don't think 1969 is the right

9   date.  But that's why they want that.  We don't, we don't have

10  the burden of showing that.  All we needed to show to establish

11  liability and put them in the world of equities where -- and

12  Mr. Marriott said early on that the whole zero, 100 bit about

13  how we want a hundred percent.  That's not an unprecedented

14  ruling.  Judge Griesbach in Wisconsin on summary judgment

15  looked at the facts and said a hundred percent.  Now, he's been

16  sent back.  That's been reversed so they can have a trial on

17  the issue.  Maybe they come to a different conclusion.  But

18  this isn't some wacky, wacky conclusion that we have concocted

19  out of thin air.

20       They want the precision, they want us to take a

21  position on what comes in in each year so that they don't have

22  to.  And that's really what the, that was the real rub, we

23  think, about the whole motion anyway.  We haven't deviated from

24  that.  We are consistent with where we have always been in the

25  case, Your Honor.  Have we studied the issue more, do we have,

1  do we have more detail that was with our experts?  Yes.  But we

2  always said that that was the case.  It's not --  we have not

3  gone away from what Mr. Shebelskie said we were going to do

4  when he stood at the podium here a couple of months ago.

5  THE COURT:  All right.  Thank you.

6  MR. SIBLEY:  Thank you, Your Honor.

7  THE COURT:  Counsel.

8  MR. MARRIOTT:  May I briefly, Your Honor?

9  THE COURT:  Yes, go ahead.

10  MR. MARRIOTT:  So --

11  THE COURT:  I will ask you to keep it brief because we

12  have one more motion.

13  MR. MARRIOTT:  Absolutely.  Look, I -- it doesn't make

14  an enormous amount to sense to debate the question of whether

15  they went beyond with their expert reports.  But I reiterate

16  what I said before.  I don't even think it's a close call.

17  There is detail provided in those expert reports that is a

18  complete stranger to what's in those interrogatory answers.

19  And that will be dealt with by way of a motion to strike.  We

20  intend to make that motion as soon as we can get finished with

21  some of what we are focused on here.  We will endeavor to do

22  that.  That will be presented to the Court and resolved in

23  whatever way the Court thinks appropriate.  But we are not, we

24  are not seeking to litigate that here, Your Honor, except to

25  say this.  The idea that the interrogatory answer gives us

1    everything we want, it isn't true as a general matter, and it

2    certainly isn't true in view of those interrogatory answers.

3    What counsel describes as the additional detail provided by the

4    expert is mill by mill descriptions of what went into those

5    mills and what went out of those mills.

6         We just have obviously a very fundamentally different

7    view about what commitment counsel made at the last hearing.

8    What I heard, what the commitment I understood, Your Honor, was

9    we aren't, don't worry about asking us this stuff because we

10   told you all there is to tell.  There is nothing new you're

11   going to get so don't worry about it.  At which point I stood

12   up and said, fine, we have got everything we could possibly

13   want, you're not going to do anything more later on.  There is

14   no problem.  That's very different from what --  and that's

15   what distinguished International Paper from Georgia-Pacific.

16        The, that aside, Your Honor, the deposition has value.

17   It has value to understand the language of their responses.

18   They have complained, sort of, we can't win either way here.

19   We served the initial request on June 19th, it had I would

20   submit all the detail required by Rule 30(b)(6) and you didn't

21   hear anybody argue in any of the prior motions, including

22   International Paper which were initially opposed to a motion as

23   to that notice that there was any problem with that.  That's

24   the particularity that we believe we are entitled to.  And

25   whatever you want to say about the second notice being

1    overbroad, certainly it includes the topics that were included

2    in the former notice, which we never abandoned.  As counsel

3    reported for you his version of the timeline, at no point did

4    you hear that NCR said never mind that request, we aren't going

5    forward with that.  And you didn't hear that, Your Honor,

6    because we had at least two meet-and-confers, indeed I recall

7    another meet-and-confer at a deposition, in which counsel said

8    that a witness would be provided.  Specific dates in August

9    were discussed.  The notion was the end of the discovery

10   period, when we had the answers or as best --

11           THE COURT:  When did that conversation take place?

12           MR. MARRIOTT:  Well, there were the two conversations

13   that counsel referred to, the two phone conversations, and

14   there was also a conversation, although, in much less detail,

15   and this is not the one at which specific dates were discussed,

16   and that was at a deposition of your, of your witness Brown

17   where I first raised the subject of this deposition, and it was

18   at that deposition that the notion was used of mutually assured

19   destruction.  But the specific conversations about a witness

20   being provided occurred in telephone conversations.  And

21   against this backdrop, and I hesitate --

22           THE COURT:  When was Brown deposed?  When did that

23   conversation take place?

24           MR. MARRIOTT:  July, late July, perhaps.

25           MR. SIBLEY:  Mr. Brown was deposed in July and we --

I don't know that Mr. Marriott is saying that we committed to provide dates in that conversation.  If it was a passing comment in a break, perhaps.  I have no recollection, though, Your Honor, of doing that and we certainly did not commit to provide dates for a deposition.

MR. MARRIOTT:  I'm not saying the dates were provided at the deposition.  I'm saying dates were discussed in the August, in particular, the end of the discovery period was discussed in the telephone conversation, not at the deposition. The deposition was simply a third conversation on the subject.

The only reason, Your Honor, that we did not press for the deposition tomorrow, tomorrow, tomorrow, is because the other depositions on 30(b)(6) were taking place because there was an ongoing fight which has only very recently been resolved about what these interrogatory responses were supposed to be about, and it was fully expected that the witness would in response to the questions at deposition at least in part refer to the interrogatory responses.  That's exactly what the International Paper witness did in response to the questions. And we had no problems with that.  To the extent the witness wanted to refer to the answers, this isn't supposed to be a memory test.  We are not trying to play any tricks.  We simply want to understand the particulars of what they have alleged. IP did it in three hours.  There is no reason that they can't do the same.

1          THE COURT:  I don't know if the two situations are

2    similar or not so that is not really instructive.  The last

3    question, though.  Maybe not the last question.  I want to come

4    back to a point you made earlier about Georgia-Pacific not

5    responding to a footnote that you put into your motion to, I

6    think it was your motion to compel directed to IP, is that

7    correct?  Can you tell me where in the specific footnote you

8    are referring to?  I looked at that portion and I can't find

9    it.

10          MR. MARRIOTT:  I can find it perhaps while the other

11    argument is happening here, Your Honor.  I don't know that I

12    have that brief here.  What I will tell you is just for the

13    chronology sake, and I would be -- delighted is the wrong word.

14          THE COURT:  I've got the brief if you would like to

15    look at it.

16          MR. MARRIOTT:  I would love to look at that.

17          THE COURT:  I printed it out this noon.  Would you ask

18    Faith?  It's on the printer.  I didn't find any motion in

19    regard to that.

20          MR. MARRIOTT:  My point really was, Your Honor, and I

21    don't frankly think this is disputed, and counsel will speak

22    for counsel's self, but we served the notice, there were at

23    least two conversations by telephone on which, on which we

24    agree, I believe that --  may I have just a minute if I can?

25          THE COURT:  You can do that during the break if you

1    want to.  If that's the right brief.  There was no motion

2    attached to that notice, by the way.  There was a notice of a

3    motion.  I never found any motion on the file.  So if there's a

4    motion someplace, it never got docketed, I don't think.  The

5    only thing I had to look at was the brief and that was a

6    corrected brief as it was.  Maybe I'm missing it.  But if could

7    just point out --

8             MR. MARRIOTT:  Just by way of timeline and I will sit

9    down.  I just don't think the fundamentals of this timeline are

10   truly in dispute.  And I'm happy to provide as much more detail

11   as Your Honor would like.  We can go to the e-mails and I can

12   put it in an affidavit.  But what I'm telling the Court is we

13   served the 30(b)(6) notice in June; I raised the subject of we

14   need to find dates at a deposition.  I had two conversations,

15   at least, I can't foreclose that there weren't more, with

16   Mr. Sibley about the deposition.  I understood and I believe

17   that we were told we would be getting a witness pursuant to

18   that notice.  I believe counsel talked about giving us a

19   witness at the end of July.  At no point in time did we say

20   that we did not wish to have that witness.  At several points

21   in time counsel tried to persuade us it was a bad idea because

22   they believe, they believe, and we respectfully disagree, that

23   it's a waste of time.  On several occasions they attempted to

24   persuade us of that.  At no point in time did we say we did not

25   wish to have the deposition.  We were simply waiting to have it

when we had the most complete information we could at the end
of the discovery period.  Which is precisely the time when they
took a portion of their companion notice that they served on
us.  Precisely the same date.

THE COURT:  You said that what is on Schedule A for
the June deposition is also included in the Schedule A of the
October deposition, is that right?

MR. MARRIOTT:  No.

THE COURT:  Is that the inference --  you talking
about the same things?

MR. MARRIOTT:  No, we are not.  The top, the list of
topics is different.  The June notices, there are 24 of them.

THE COURT:  Right.

MR. MARRIOTT:  I think they are quite specific.  The
October notices, there are nine, the topics are nine in number.
And they are the initial ones about the discovery requests, and
then the last two about the 104(e) responses and the
questionnaires.  So they are different sets.  They have had the
24 that are in, in --

THE COURT:  I thought I heard you say that somehow
what had been asked for in June had been subsumed into the
October deposition.

MR. MARRIOTT:  Well, fair.  I don't know that I used
those words, but effectively, Your Honor, what I would say if
one reads it as broadly as they need it, there is no question

1          that it's subsumed.

2                    THE COURT:  Well, the way they read it is it

3          encompasses the entire case; of course it would be subsumed,

4          everything is subsumed.

5                    MR. MARRIOTT:  Exactly.  The notion that they don't,

6          they don't know --

7                    THE COURT:  That doesn't answer the question of

8          specificity.

9                    MR. MARRIOTT:  That by itself doesn't answer the

10         question of specificity.  But what is unquestionably true is

11         they have had the June notice for six months.  They have known

12         we want those topics, they were at and themselves questioning

13         witnesses on the very topics when they were asked of other

14         parties.

15                    There is one other exchange to bear in mind because I

16         think it will help and, again, this is something I'm happy to

17         put in an affidavit because it may be best to provide that

18         context there.  But counsel made reference to, or perhaps I

19         made reference to, a notice that was served by Weyerhaeuser

20         which was the first notice that we got in the case.  That

21         initial Weyerhaeuser notice was on a broad set of topics, very

22         much like the topics on which we served our June notice.  There

23         were communications between and among the parties about the

24         scheduling of that Weyerhaeuser deposition.  It was agreed, I

25         believe, and you have e-mails that I believe bear this out,

1    that Georgia-Pacific would split the topics. That it would

2    take the deposition on the cost related questions first, that's

3    the deposition we in fact did of Mr. Brown in July, and that

4    they would provide a separate witness who would deal with the

5    other topics, and that witness it was agreed would be provided

6    later.

7         Now, NCR served its notice, and as it worked out, for

8    reasons we don't fully understand and don't have visibility

9    into, Weyerhaeuser ultimately dropped the topics on these other

10   topics, and they dropped them, we believe, after they saw our

11   notice.

12        So there was a commitment sort of related but

13   independent on GP's part to provide a witness pursuant to the

14   Weyerhaeuser deposition on these very same topics. That didn't

15   end up happening but they were prepared, we believe, based on

16   the e-mail response, to provide a witness on the very same

17   topics essentially then anyway.

18        So the specific topics are indisputably relevant.

19   They have been in place since June. Everybody has been deposed

20   on them except GP, except the plaintiff in the case. Who now

21   takes the position that because a later notice they believe was

22   too broad shouldn't have to provide a notice at all.

23        We never abandoned that notice, Your Honor. We made

24   clear that we wanted -- and the moment that they suggested to

25   us that we weren't in fact going to get this deposition, we, we

1    were told they would file a motion for a protective order, we

2    were otherwise prepared to make the motion to compel.  But a

3    day's difference resulted in them filing the motion first.

4         THE COURT:  I wonder if what you are trying to pursue

5    in regard to your October deposition might be done by

6    contention interrogatories that would focus on exactly what it

7    is you want.

8         MR. MARRIOTT:  Well, it might well, frankly, Your

9    Honor.  But I have a feeling that I would hear from counsel

10   that I'm no longer permitted to ask contention interrogatories.

11   There are limits the Court put on contention interrogatories.

12   And I'm sure I would hear the argument that I'm no longer able

13   to ask contention interrogatories.  But, frankly, what we

14   really want to be able to do is be able to ask somebody

15   something that tells us what we aren't going to get in lawyer

16   drafted responses.

17        THE COURT:  Okay.

18        MR. MARRIOTT:  Thank you.

19        THE COURT:  Thank you.

20        MR. SIBLEY:  Your Honor, I feel compelled to note one

21   more time at the risk of repeating myself.

22        THE COURT:  It's your motion.

23        MR. SIBLEY:  There was no mention, no attempt, no

24   diligence on NCR's part to schedule that deposition until after

25   they served the October 22nd notice, which suffers from a

number of very quite clear defects.  We had -- the issue in our

minds had been resolved once the Court ruled that we had

satisfactorily answered the interrogatories.  The burden is on

NCR to diligently pursue.  The fact that we, Your Honor, even

after, as of October 22nd -- think about this for a second --

even as of October 22nd, NCR had not indicated that it wanted

to proceed on those issues.  It was only after we said we will

move for a protective order on the October 22nd notice that NCR

said, oh, we want to do this other one also.  And, and you

can't sit back and, and rely on that, Your Honor, and wait

until the last minute and then put us to the burden of having

to go school somebody up and find lawyers to do it who are

staffed covering the numerous other percipient witness

depositions that NCR scheduled.  It's just not, it's just not

right in our judgment.

            THE COURT:  Thank you.  Counsel.

            MR. MARRIOTT:  The only thing to say, Your Honor --

            THE COURT:  I don't want a response to that.  I have

heard --

            MR. MARRIOTT:  I'm not quite done with this.

            THE COURT:  Okay.  I thought that's what you were

talking about when you stood up with that in your hand.

            MR. SIBLEY:  I can report, Your Honor, that we are not

going to be able to resolve this together.  I have gotten

notice that the idea we had floated is not going to be

1    acceptable.

2           THE COURT:  All right.  The other motion is number

3    650.  This is the, a motion to compel brought by NCR.

4           MS. RETTIG:  I have a handout for the Court.

5           THE COURT:  I enjoy those.  I don't know why.  Thank

6    you.

7           MS. RETTIG:  Bear with me a moment, Your Honor.

8    Rebecca Rettig for NCR Corporation.

9           With respect to NCR's motion to compel a 30(b)(6) to a

10   deponent from International Paper, it relates to the second

11   notice only.  The second notice was served on International

12   Paper also on October 22nd and the topics are virtually

13   identical.  They deal with the discovery responses.

14          THE COURT:  Virtually identical to the October 22nd

15   notice you served on GP?

16          MS. RETTIG:  Yes, Your Honor.

17          THE COURT:  Thank you.

18          MS. RETTIG:  But there's a difference, there are a few

19   differences that make International Paper uniquely situated to

20   produce a deponent to the October notice.

21          One of which is that International Paper was prepared

22   to produce a witness in response to the second notice.  And

23   although informal objections had raised a reasonable

24   particularity requirement, at the time when they offered to

25   produce a witness in response to the second notice, they did

1    not say that they would be unable to prepare the witness or

2    could not understand the scope of the topics that would be at

3    issue in a notice relating to, in a deposition relating to the

4    second notice.

5         International Paper is also uniquely situated in that

6    at the deposition relating to the first notice, the topics of

7    which were the same as the June notice you were looking at with

8    respect to GP, it invoked its interrogatory responses in

9    response to questions from Mr. Marriott on the topics because

10   in between the time that we had served the second notice and

11   the time that International Paper 30(b)(6) deposition on the

12   first notice, International Paper said it would no longer

13   produce a witness with respect to the second notice.

14   Mr. Marriott couldn't follow up on any of the questions he had

15   with respect to the processes used to arrive at the

16   interrogatory responses that were invoked in response to his

17   questions.

18        So that's why I would say that International Paper is

19   uniquely situated and should be compelled to provide a witness

20   in response to the second notice.  And because we have limited

21   time, because Mr. Marriott explained in great detail the

22   purpose behind the topics, and what we sought to get from GP, I

23   won't go over that in great detail now with International

24   Paper, but I will say that our intentions are the same.

25        With respect to something, with respect to topic 4,

1    for example, which you focused on, and that's on Schedule A;

2    it's the same as number 4 to GP which is, "The documents

3    produced by International Paper in response to any party's

4    request for production of documents."  We seek the same

5    information from International Paper.  We would like to know

6    the custodians it identified, the repositories it identified

7    and either used or ruled out.  So it's the same type of

8    information we are seeking from International --

9            THE COURT:  Let's find the Schedule A of that --

10            MS. RETTIG:  Schedule A is Exhibit B to our motion.

11            THE COURT:  All right.  Just a moment.  My copy didn't

12    get tabbed so it's going to take me just a moment.

13            MS. RETTIG:  I can give you my copy if that will help

14    of Exhibit B.

15            THE COURT:  And you won't have anything to look at.

16            MS. RETTIG:  I have a separate one.  If you would like

17    a clean copy, I can hand you one.

18            THE COURT:  I've got it.  Thank you, though.  So

19    Schedule A we are talking about the number 4 again.

20            MS. RETTIG:  I was just reiterating in terms of what

21    we seek from International Paper, and the scope of the topics,

22    it's the same narrowing that Mr. Marriott discussed with

23    respect to the topics of Georgia-Pacific.

24            THE COURT:  On its face it's not narrow at all, can we

25    agree on that?

1      MS. RETTIG:  I would agree that there is a reading

2   that you had that was not a narrow reading.

3      THE COURT:  All right.  Do you see any way to look at

4   that language in number 4 and see where it can be read

5   narrowly?  Just from the language itself.

6      MS. RETTIG:  I understand that your reading is

7   broader.  I understand that the language --

8      THE COURT:  It's not my reading.  I'm just saying the

9   way it's stated by you.  Is there any way to read that

10  narrowly?

11     MS. RETTIG:  I certainly understand your point, Your

12  Honor.  I guess what I would say with respect to the time that

13  International Paper had agreed to produce a witness in response

14  to this, they never came back to us with a question to say, we

15  don't understand what this means, can you narrow the scope?

16  And in truth, Mr. Marriott and Mr. Parker had a number of

17  meet-and-confers where they discussed the second notice, and

18  from my understanding from Mr. Marriott, Mr. Parker did not

19  say, we won't be able to prepare a witness, we don't understand

20  what you're asking here.

21     THE COURT:  Okay.

22     MS. RETTIG:  In order to --  Mr. Parker had referenced

23  earlier that he has different objections than Georgia-Pacific,

24  and I want to walk through those a little bit with you.

25     If you turn to page 3 of the handout that I passed out

1    to you, they have a few main objections.  They also have the

2    reasonable particularity requirement, which they pressed hard

3    in their motion, and as I mentioned, they had not pressed hard

4    when they had provided, when they had been willing to provide a

5    witness.

6            They say also that it's duplicative.  That the mode of

7    obtaining the information sought by the second notice would be

8    efficient.

9            THE COURT:  Let me go back to duplicative so that I

10   understand what they are saying.  And perhaps you should have

11   had Mr. Parker put his objections on the record first.  But

12   let's continue this way.  What do you understand they are

13   complaining this to be duplicative of?

14           MS. RETTIG:  I understand their duplicative argument

15   to be two-fold.  One, that it's duplicative of the first

16   notice, and second, that it is duplicative by way of the fact

17   that it is cumulative of other discovery that's previously been

18   served and to which they have responded.

19           Our response to that is that it is certainly not

20   cumulative, and we are not asking them to provide more fulsome

21   answers or provide expansions.  We are simply asking them to

22   explain their responses and the processes by which they arrived

23   at them.

24           THE COURT:  All right.  You are listing the rest of

25   it.  I just wanted to find out what the contention was.  So on

1    to number 3, the Rule 30(b)(6) depositions are an inefficient

2    way to obtain this information.

3         MS. RETTIG:  Yes.  They also had mention --  they also

4    in formal objections that they served on us stated that the

5    deposition notice covers mills that they have no affiliation

6    with or that they are not liable for, and then they have a host

7    of other objections which I'll address briefly.

8         We turn to the next page, to page 4, I'll start with

9    respect to their particularity requirement, which I raised

10   before.  But the purpose of the reasonable particularity

11   requirement is to allow corporations to identify a witness and

12   then to prepare the witness.  As far as we understand, as of

13   November 18th Mr. Parker believed he was able to do exactly

14   that because on November 18th he sent a letter, he sent an

15   e-mail to one of my colleagues, Mr. Marriott, and said we are

16   prepared to provide a witness on both your first notice and

17   your second notice.  As a result of a variety of

18   meet-and-confers, International Paper backed off of that

19   position.

20        But in the e-mail where they offered to provide a

21   witness with respect to the second notice, they didn't say, we

22   won't be able to prepare this witness and we have no idea what

23   you're talking about.  They said we will prepare and produce a

24   witness on both your first and second notices.

25        But now they claim that they don't understand what the

1    notice was about, and that it is overly broad.

2         If we turn to page 5, just to go back to the

3    duplicative argument, if you look at tab A in the handout that

4    I provided to you, you'll see a comparison of side by side of

5    the topics between the first and the second notice.  And you

6    can see that the topics don't overlap.  But I think what

7    illustrates the point a bit more is that when IP produced a

8    witness in response to the first notice, it wouldn't let the

9    deponent answer questions about the second notice.  So to me

10   that shows that there is no overlap.  And I think illustrates

11   the point that they are, that the first and second notices are

12   sufficiently distinct.

13        With respect to the cumulative argument, I think I

14   said before we are not looking to retread old ground but we are

15   testing what they said in their discovery responses.  I think

16   Mr. Marriott spent time talking about that at length.  We are

17   not seeking expansion but only explanation.

18        With respect to their efficiency argument.  In the

19   formal objections they served with respect to the 30(b)(6)

20   notice, IP claimed that it would be more efficient to obtain

21   the answers to the topics in the second notice through written

22   discovery.  As I think we talked about at length with respect

23   to the GP motion, we think a 30(b)(6) deposition is really the

24   best vehicle to test positions.  First of all, discovery

25   responses are packaged lawyer responses.  And to be able to

test a corporate representative about the company's position in those responses is permissible, and NCR submits that it would also be immensely useful to do so.  In addition to the fact that they served their formal objections on November 7th, in which they claimed that it would be much more efficient to get the information through written discovery, on that same day, International Paper on November 7th, joined in the mill party's motion for a protective order on the written discovery, on some of the written discovery that NCR recently served with respect to the RFAs that are the subject of the motion that are pending before Your Honor.

So --

THE COURT:  I'm sorry, run that last part by me again.

MS. RETTIG:  Sure.  So on November 7th in response to our October 22nd notice, International Paper served formal objections, formal written objections and they claim that it would be more efficient to get the information sought in the second notice through written discovery.  One of our --  one of my arguments is that we think a deposition is a better vehicle for us to get it.  But at the same time that they had served their formal objections, they also joined in the motion for protective order by the other mill parties with respect to written discovery that NCR had served on them.  So it seems inconsistent to take the position that we prefer to give you written discovery and then simultaneously object to the written

1        discovery that has been, that has been served on them.

2            THE COURT:  That was the motion that was scheduled to

3        be heard today which is not being heard today.

4            MS. RETTIG:  That's right, Your Honor.  If we proceed

5        on to page 7 to talk about the mills that are, that IP claims

6        are off limits, which are mills, one, that they say they have

7        no affiliation with, or two, they say they were found in Phase

8        I to not be liable for.  I'll step back from that first and

9        say, at the 30(b)(6) deposition with respect to the first

10       notice, IP's representative took the position that NCR is

11       liable for the PCB discharges from all the mills.  They are

12       liable for not only the PCBs discharged from the mills, they

13       are also liable for all of the PCBs at the site, whether they

14       come from recycling of carbonless copy paper or not, and

15       whether they are Arcolar 1242 or not.

16           So I would say that they probably take the 100 percent

17       position that Georgia-Pacific has, but they took a very

18       expansive position and stated it very strongly and clearly when

19       Mr. Marriott inquired about it at the deposition.

20           So to take the position that we can't give you

21       information about other mills when they seek to hold NCR

22       responsible for discharges from those mills seems to put NCR in

23       a bind.

24           In addition --

25           THE COURT:  Well, is IP responsible, does it have a

1    connection with all the other mills?

2         MS. RETTIG:  It doesn't.  IP is primarily responsible

3    in this stage for the Bryant mill, however, they also have

4    connections to two of the Battle Creek mills and the Mac Sim

5    Bar mill.  They had made a motion early on to, a motion in

6    limine to seek to preclude discovery with respect to the two

7    Battle Creek mills, and the Mac Sim Bar mill, and Judge Jonker

8    denied that motion and he stated that it wouldn't be a

9    relitigation of liability to include evidence at this stage

10   regarding the three mills, or anything else that any party

11   thinks is a fair consideration for the Court in allocating

12   responsibility.

13        And in truth, International Paper has been responding

14   to discovery regarding those three mills.  And if you turn to

15   tab B in my handout, and you look at page 6, you can see that

16   International Paper has taken positions on certain of the

17   mills, and all of the mills, in fact, they have stated in

18   response to our interrogatories what their positions are with

19   respect to certain of the mills.  So the fact they are taking

20   positions but do not want to answer questions about those

21   doesn't really, isn't congruent with each other.

22        THE COURT:  Well, what positions are they taking

23   outside of the fact that you're responsible?

24        MS. RETTIG:  They are, they also take positions about

25   the amount of --  they take positions about what types of

1    furnish there was at the mills, their wastewater treatment

2    practices.  And if you're really seeking to hold NCR liable for

3    all the PCBs at the site, in truth the operations of the mills

4    go to how many PCBs those mills discharged, and thus really go

5    to NCR's liability at the end of the day.  And we think that

6    NCR should be able to test International Paper on those

7    contentions since they seek to hold NCR liable.

8         The last set of objections which are outlined on page

9    8 are pretty easily discussed.  With respect to the fact of

10   where the deposition will take place, the first deposition took

11   place in Memphis where International Paper headquarters are,

12   and we are happy to go back there.  So that shouldn't be a

13   reason not to take the deposition.

14        In addition, International Paper claimed that a lot of

15   the information contained in its discovery responses would

16   touch on attorney work product which is privileged and

17   shouldn't be the subject of a deposition.  NCR agrees that

18   attorney work product is not what it is seeking, and if a

19   question that NCR would ask at a 30(b)(6) deposition on the

20   second notice would touch on that, we assume that counsel for

21   International Paper would raise the objection at that time.

22   But what we're looking for is the company's positions with

23   respect to, to a variety of topics and whether and how those

24   were derived is really what we are seeking and not the work

25   product behind it.

1          The last point that International Paper makes --

2          THE COURT:  Run that last sentence by me.  How the

3     position was derived.

4          MS. RETTIG:  It's much, like Mr. Marriott was talking

5     about, the processes by which they arrived at their, at their

6     contentions and the positions that they are really taking.

7          THE COURT:  Wouldn't that perhaps involve work

8     product?

9          MS. RETTIG:  Yes.

10          THE COURT:  Communication.

11          MS. RETTIG:  Yes.  We are certainly not seeking their

12     discussions between International Paper and its lawyers.  But

13     we are seeking to know much -- like we talked about before with

14     the, with respect to the document production, did you look at

15     certain types of documents, did you not look at certain types

16     of documents.  Same with the questionnaire responses which they

17     site in both tab B and other of their interrogatory responses.

18     You know, do you believe that the questionnaires are accurate

19     for the purposes of which you cited them, and the like.

20          With respect to the --

21          THE COURT:  Did they give some sort of "generally

22     accurate" statement response like Pacific allegedly did?

23          MS. RETTIG:  They don't have the same type of

24     "generally accurate" language that Georgia-Pacific does.  But

25     in response to both our interrogatories and some of

Georgia-Pacific's interrogatories about mill operations, their responses look at these documents which both include 104(e) responses and questionnaire responses.  But they don't say at any time, you know, we think these are accurate, we take the position that these are correct, and in fact, in their recent expert reports, in some places they deviate from them and some places not.  And we would like to know their positions on where they think they're incorrect, including for mills that they are not to, some of their experts take positions that deviate from the questionnaires.

THE COURT:  Those were questionnaires or answers to questionnaires filed by other parties.

MS. RETTIG:  Yes.  But if they are using them in some way or dismissing them in some way, we are interested to know why they believe they are inaccurate and the evidence they have that contradicts them.

The last objection that International Paper makes is that NCR doesn't have standing to ask questions about discovery propounded by the other parties.  So, for example, International Paper's discovery responses to Georgia-Pacific.  But I think that goes back to the point that International Paper is seeking to hold NCR liable for a hundred percent of the cleanup at the site, and all of the PCBs there.  So to the extent that --  and in truth, the PCBs at the site, who put them there, when they put them there, the costs for cleaning

1    them up, that's what Phase II discovery has been about.  So

2    regardless of who asked the question, NCR is entitled to test

3    that position because it goes to NCR's liability.

4         One of the last things that Georgia-Pacific said --

5    I'm sorry, is that International Paper says with respect to the

6    second notice is that its burden would outweigh its benefit.

7    They say they would just be looking at documents, that it would

8    be an exercise in page flipping.  But at the end of the day

9    it's NCR who should be determining the utility of the discovery

10   that it seeks.  And NCR believes that a 30(b)(6) deposition on

11   the second notice would be enormously useful and respectfully

12   requests that you grant our motion.

13        THE COURT:  Thank you.  Mr. Parker.

14        MR. PARKER:  Thank you, Your Honor.  John Parker on

15   behalf of International Paper.

16        You just heard a number of, Ms. Rettig just gave you a

17   number of objections that supposedly International Paper is

18   making to this notice.  A couple of those are, I think most of

19   those are not the basis we are opposing this motion.  And in

20   the interest of time, knowing the Court's commitments to be

21   elsewhere, I'm going to just focus on what I think are the four

22   reasons you should deny this motion.

23        First, NCR failed to seek leave of court pursuant to

24   Rule 30(a)(2)(ii) to conduct this deposition, and more

25   importantly, really satisfy the higher burden they have under

1    that rule once they took the deposition of IP once.

2          Secondly, they failed to comply with the reasonable

3    particularity requirement.  You have certainly heard a fair

4    amount about that already today.  But I'll add just a little

5    bit on it.

6          Third, I think topics 1 through 5 of the notice are a

7    veiled attempt by NCR to circumvent the local rules which would

8    have made them sit down with us and discuss any answer they

9    thought to any written discovery that was inappropriate, or not

10   fulsome, or whatever other problem they had with it.

11         And finally, complying with the notice would be unduly

12   burdensome on International Paper compared to any benefit that

13   NCR has, and I would submit to you they don't get to just say

14   that's our choice.  They need to satisfy you as their burden

15   that in fact that deposition, the benefit they would get would

16   exceed the burden on International Paper.

17         The first point.  NCR failed to seek leave of court to

18   take the deposition as required by Rule 30(a)(2)(ii).  Just to

19   give the Court a little timeline context on this notice.  This

20   deposition, the first deposition notice, what is referred to as

21   the June 9th deposition notice, or I like to refer to it as

22   notice 1, was in fact served on International Paper on

23   June 9th, same kind of notice served on Georgia-Pacific, names

24   just changed.

25         They also served on us the written discovery which

1    tracked that notice 1 at that time.  We objected to notice 1.

2    We objected to that discovery, NCR moved to compel, and Your

3    Honor granted their motion to compel.  Most respectfully

4    appealed that decision, and on June 17th, I'm sorry, excuse me,

5    November 17th Judge Jonker affirmed your decision.

6         Now, while that appeal was pending, on October 22nd

7    NCR served what I refer to as notice 2, the second notice that

8    we have been discussing today.

9         THE COURT:  It was served when?

10        MR. PARKER:  It was served on October 22nd.  And Judge

11   Jonker didn't rule on the appeal until November 17th.  We

12   objected to that notice on November 7th, and they filed this

13   motion to compel, NCR did, on the 11th of November, again,

14   before Judge Jonker ruled on the first notice on the 17th of

15   November.

16        THE COURT:  And one more interruption.  What was the

17   date of your objection to the October 22nd notice?

18        MR. PARKER:  The 7th of November.

19        THE COURT:  Okay.

20        MR. PARKER:  So ten days before Judge Jonker ruled.

21   Once he ruled, we did, I did have some discussions with

22   Mr. Marriott that Ms. Rettig has alluded to where I thought we

23   could go forward on both notices.  But that was because of my

24   mistaken belief that notice 2 was identical in all respects to

25   notice 1, that everything that was in notice 1, all 24 topics,

1       would be covered by this notice that tracked the written

2       discovery that had already been served.  And that written

3       discovery dealt with the 104(e) responses.  These were all the

4       contentions my experts were going to give.

5               International Paper has never owned a mill on this

6       river, as I've mentioned before.  In 2000 we bought a company

7       called Champion, International Paper did.  Champion never owned

8       a mill on this river, Your Honor.  In 1986, Champion bought

9       St. Regis.  St. Regis had owned the Bryant mill and sold it in

10      1966.  That's how attenuated International Paper is to this

11      river.  So that everything that we say in these contentions

12      comes from documents somebody else wrote and somebody else

13      controlled.

14              So I assumed that notice 2 was within, within the

15      ambit of notice 1.  They would have been concentric circles, if

16      you will.  When I had the meet-and-confers with Mr. Marriott

17      and he disabused me of that notion and said, no, notice 2 goes

18      farther than notice 1, then I said, well, there is a motion

19      pending about that notice, if that's how you view it, I'll

20      produce, as I've been ordered, a witness on notice 1, which I

21      did on December 10th, and he answered all those questions, but

22      we don't believe that notice 2 is appropriate as you are now

23      interpreting.

24              Now, having taken that first deposition, they cannot,

25      NCR cannot, without leave of court proceed with the second

1    notice.  And that's comes right out of Rule 30(a)(2)(ii), which

2    says in pertinent part, a party must obtain leave of court if

3    the deponent has already been deposed in the case.  And it

4    further says that in order to do that, you have to meet the

5    standards set forth in 26(b)(2)(C).

6            Now, courts have held that Rule 30(a)(2)(ii) applies

7    to a Rule 30(b)(6) deposition.  One case, and by the way these

8    cases are not cited in our brief because at the time I filed

9    the brief I hadn't given the deposition yet.  So it wasn't an

10   issue that I could raise.  But these parties should not be

11   surprised by this because this is exactly what Judge Griesbach

12   raised on an exactly similar issue in the Fox River case where

13   both Georgia-Pacific and NCR are parties.  In that case,

14   Appleton Papers versus George Whiting, Georgia-Pacific filed a

15   motion to compel Appleton Papers to appear at a second Rule

16   30(b)(6) deposition.  Appleton refused claiming it had been

17   deposed once already.  And Georgia-Pacific said, no, no,

18   because the topics are different, I don't have to comply with

19   that rule.  Here's what Judge Griesbach ruled.

20   "Georgia-Pacific is jumping the gun.  Rule 30(a)(2)(ii)

21   requires leave of court if the deponent has already been

22   deposed in the case.  But Appleton Papers has already been

23   deposed in the case and thus leave of court must be obtained

24   prior to the deposition."  Then Judge Griesbach went on to say

25   because there was this motion to compel similar to what we have

today, "If I read the motion to compel generously, I might interpret it as a motion for leave to take a second deposition under 30(a)(2)(ii) rather than a motion to compel.  But Georgia-Pacific -- insert NCR -- has provided little reason to construe the motion in that fashion.  Because its premise is that it has some sort of unqualified right to take a second 30(b)(6) deposition.  That premise is not correct, however." And then he cites a case in Sulfuric Acid litigation where it said the defendants contend they had no obligation to obtain leave of court to conduct a second 30(b)(6) deposition.  And their view Rule 30(a)(2)(B) does not apply to Rule 30(b)(6) depositions especially where the second deposition relates to different topics than the first.  That argument ignores the text, history, and purpose of the 1993 amendments.

Then Judge Griesbach went on to say, "Even if I construed the motion for a protective order as a request for leave, the motion would be denied.  Leave of court is to be granted only when a second deposition would be "consistent with Rule 26(b)(2)," which requires consideration of several pragmatic factors:  Burden and expense, whether the party seeking discovery has been afforded ample opportunity, et cetera.

Although Georgia-Pacific's motion sets forth its position that an additional deposition would not be unduly burdensome, I'm not satisfied they have shown adequate grounds

1    for taking such a deposition."

2              So these parties who are both in Fox River, I'm not,

3    are certainly aware of what Judge Griesbach has done and know

4    that they need to satisfy, or comply with a much higher burden

5    of Rule 26(b)(2)(C).

6              1.  That the deposition is not unreasonably cumulative

7    or duplicative of other discovery.

8              2.  That NCR would not have had an ample opportunity

9    to obtain the information by discovery in this action.

10             3.  The burden or expense of the proposed discovery

11   outweighs its likely benefit considering the needs of the case.

12             That's the point I was making earlier where I would

13   disagree with Ms. Rettig that they, NCR, under Rule 26(b)(2)(C)

14   have the burden of demonstrating that.  I don't think they can.

15             I'm going to touch, Judge --

16             THE COURT:  Just a moment.  First of all, this wasn't

17   the Griesbach, Judge Griesbach's decision that was reversed,

18   was it?

19             MR. PARKER:  No, it was not.  This was not appealed.

20             THE COURT:  Secondly, do you have a citation to that

21   decision?

22             MR. PARKER:  I can do better.  I can give you a copy

23   --  the other parties here if they like a copy of the decision.

24   I brought it.  It's one of those Westlaw cites, Judge, which I

25   will admit to you I'm so old I don't understand all those.

There is the case from Judge Griesbach.  I also have the

Sulfuric Acid decision that he cites if you would like it.

THE COURT:  Yes, thank you.

MR. PARKER:  But this case, by the way, Judge, or this

decision, there's a First Circuit decision actually holding the

same thing saying that the rule that you need leave applies to

the 30(b)(6) deposition as well.  And that's cited in both, by

both Judge Griesbach and by the Sulfuric Acid court.  It's the

Amstar Jack Charter case.

I'm going to jump, Judge, to the point about NCR not

being able to demonstrate that the burden and expense of the

proposed discovery don't outweigh its benefit.  I believe

asking a witness about prior answers it gave to requests for

admission, for example, is a waste of time.  And let me give

you an illustration of that.  From the 30(b)(6) deposition

taken of NCR, in other words, Georgia-Pacific in their attempt

to have assured destruction, sort of a detente argument when

they serve their notice, and as Mr. Marriott said, we went

forward with that deposition, let me quote you some questions

and answers from that deposition.  "Question.  The response to

request 30, that's a request for admission, begins denied.  Can

you tell me the factual basis for NCR's denial of that request?

Answer:  I don't have anything more to add than the response

that's given.  Question:  So if I went through the even

numbered requests, 20 through 38, and I asked you for NCR's

factual basis for the denial of each one of those even numbered
requests, in each instance your response to me would be that
NCR's complete factual basis is set forth in the sentence that
followed the word denied.  Is that correct?  Answer:  Yes.
Question:  I would like to find out the factual basis for NCR's
denial of this request, number 76.  First of all, did NCR deny
this request in whole or in part because NCR believes that
there were no NCR PCBs discharged in the Portage creek?
Answer:  I don't have anything to add other than what's in the
supplemental response.  Question:  Moving to request for
admission number 40.  What's the factual basis for NCR's denial
or request for admission number 40?  Answer:  I don't have
anything to add to what the response says.  I think it speaks
for itself."

          I think it speaks for itself, reading those questions
and answers, that this would be a waste of time.

          Also, and just to touch on what the parties have
already pointed out I think, I won't say ad nauseam, but I just
did, on the particularity requirement, Your Honor.  I want to
focus on the topics that were served on IP, which admittedly
are almost identical to those served on Georgia-Pacific with
the exception of the names being changed.  And again, this is
the Schedule A to their notice.  They say in the first two
topics, 1 and 2, that they would like to inquire into our, IP,
responses that we gave to them and then to the other parties.

1   Today they get up and tell you that this is really an attempt

2   to find out what we did to get the information to answer them.

3   What did we go out and look at and things of that nature.  I

4   submit to you that it's a little bit more than that.  If you

5   look at their brief on page, this would be Document 650 on page

6   3 of 11, they tell you that, IP's responses, this is why it's

7   relevant, "IP's responses to NCR's and GP's Phase II

8   interrogatories refer to documents that address, among other

9   things, CCP recycling, type of furnish used, pulp and paper

10  production, PCB discharges, and wastewater treatment at the

11  Bryant, Mac Sim Bar, Angell Street and Fountain Street mills.

12  IP has or had a relationship with each of these mills and seeks

13  to hold NCR responsible for the consequences of their recycling

14  activities."

15          So in telling the Court that these are relevant, they

16  are not saying we just want to find out what it was you did to

17  answer them, we want to inquire into CCP recycling, type of

18  furnish used, pulp and paper production, PCB discharges.  There

19  is not much left of this case once you start going through all

20  those topics.

21          That's why it's wildly overbroad, and does not have

22  the painstaking specificity that the Lipari court said they

23  need to have.

24          They withdrew topic number 3 for us.  Number 4 asks

25  for the documents we produced.  We didn't produce 400,000, we

only produced 38,000, by their count; we counted it at a little

closer to 40,000, but that's all right. As they say on page 2

of their brief, not only are they interested in those documents

and what we did to gather them, they also want to know, they

want to inquire about authenticity and admissibility. So I

have to prepare a witness to talk about authenticity and

admissibility of 38,000 pages of documents? I don't think

that's reasonable particularity either, Your Honor.

On topic 5, which asks about the denial for the

requests for admission, we denied 92 different requests for

admission. I will say we did receive a lot. And they want to

know the scope of the inquiry that International Paper took,

and, quote, "all of the information concerning or the reasons

why it denied those 92 requests." Again, I would submit

reasonable particularity would demand that they tell me which

of those requests they are actually interested in.

As to topics 6 and 7, which talk about the IP's

acquisition, construction, maintenance and operation of any

mill, then or any lagoon, landfill, et cetera, this, this topic

goes to our -- according to their brief at page 4 of 11, "IP

owns or previously owned one or more of the mills and/or

disposal areas at the site for whose pollution it now seeks to

hold NCR responsible."

So they want to know all about that. I mean I think

on their face topics 6 and 7 are wildly overbroad in that the

1    acquisition, construction, maintenance and operation of a mill,

2    they claim I have some responsibility for four mills, two in

3    Battle Creek, the Mac Sim Bar mill and the Bryant mill, that's

4    a wildly broad topic.  And, by the way, one our experts have

5    addressed to some extent now.

6         The last two topics, first is number 8, the

7    questionnaire responses.  My favorite, Your Honor.  When I saw

8    this topic, I had this great idea.  To give you an idea how

9    voluminous the questionnaire responses are, I was going to

10   stack them up, one on top of each other, and have my paralegal

11   stand.  Unfortunately they kept falling on her.  So I had to

12   put them on a table.  I put a little ruler next to them.  You

13   can see they are over ten feet long.  This is a reasonable

14   particularity?  Ten feet of binders of documents?  There is no

15   way.

16        As to the 104(e) responses, they have defined those as

17   ten specific 104(e) responses, Your Honor.  3M, Gould, Graphic

18   Packaging, IP, Menasha, Michigan Paperboard, Millennium,

19   National Gypsum, Rock-Tenn and Weyerhaeuser.  This morning I

20   tried to find all of those and see how many pages long they

21   were.  I couldn't find Millennium.  Now Millennium is Allied;

22   they are the ones that owned and operated the Bryant mill, King

23   mill, the Monarch Mill.  I can only imagine how long their's

24   was.  I suspect it was longer than all other ones combined.

25   But the other nine that I was able to locate this morning,

1     total of 2724 pages.  That's not reasonable.  2724 pages, about

2     nine of which were responses from other people.  So I'm not

3     quite sure what my witness would say anyway.  As to the one

4     that we did, which related only to the Battle Creek mills, I

5     have a copy I can show it to Your Honor.  We basically said we

6     don't know.  Every single question, because we were so far

7     removed in that chain because, again, that was owned by

8     St. Regis at one time, we are 30 some years and three companies

9     removed from it, our response to the EPA was we don't know.  So

10    I'm not sure what out of any of those we would be able to, we

11    would be able to add.

12          So I think it's pretty clear, Your Honor, that those

13    topics are well beyond any reasonable particularity.

14          Just briefly, I think the topics 1 through 5 that deal

15    with specific written discovery, asking a 30(b) witness to come

16    in and talk about your responses really is a bit of a

17    circumvention of the local rule, 7.1 D which asks a party or

18    requires a party to sit down and have a meet-and-confer about a

19    discovery response they think is not appropriate, or not broad

20    enough.  They want more information.  Instead just asking a

21    witness to come in and talk about them, I think it's really a

22    circumvention of that rule, and I think the motion ought to be

23    denied for that reason.

24          And finally, as I said, the burden with proceeding

25    with this would clearly outweigh any benefit.  I have read you

1    a transcript of what happened at the NCR deposition.  They,

2    NCR, has already deposed my corporate representative as to the

3    first notice.  They got all of that information.  They have

4    given you, Judge, Your Honor, a copy of, as tab B here, my

5    supplemental interrogatory responses that I was ordered to

6    respond to.  Only party that's had to do this.  I have got

7    charts of mill production, I've got all kinds of information

8    here in these discovery responses, and they now have my expert

9    reports.  The notion that somehow they don't have enough

10   information, they don't know what we contend, I think is,

11   frankly, beyond the pale at this juncture.

12        So whatever little benefit they might think they

13   derive by my witness saying, I believe the answer is there, the

14   answer speaks for itself, or any of the other answers that

15   their witness gave, clearly outweighs the cost, the expense,

16   and the time that I'm going to have to commit my witness to,

17   even if I could get specific response or specific requests,

18   topics that my witness could address.

19        So unless you have any other questions, Your Honor,

20   I'll stop there.

21        THE COURT:  You said one of their topics had been

22   withdrawn.

23        MR. PARKER:  Yes.

24        THE COURT:  Which was that?

25        MR. PARKER:  It was topic 3.  Correct, yes.  They have

1    withdrawn topic 3 which asks for responses served by

2    Weyerhaeuser.  Maybe because they didn't serve any

3    interrogatories on us.  It was a good topic to withdraw since I

4    didn't get any interrogatories from Weyerhaeuser.

5            THE COURT:  So in your last argument when you used the

6    example topics 1 through 5.

7            MR. PARKER:  Really 1, 2, 4 and 5.

8            THE COURT:  You're talking about the first five

9    numbered ones and 3 is no longer.

10           MR. PARKER:  Yes, thank you, that's more accurate,

11   Your Honor.

12           THE COURT:  Thank you.

13           MR. PARKER:  Thank you.

14           MS. RETTING:  If I may respond very briefly given the

15   time.

16           THE COURT:  It's your motion.

17           MS. RETTIG:  Thank you.  So I would just like to

18   address Mr. Parker's points very briefly.

19           With respect to his argument on Rule 30(a)(2)(ii),

20   (2)(a)(ii), actually, this is the first time we have ever heard

21   that argument.  They didn't raise it in their motion.  And

22   Mr. Parker says that's because they hadn't given the deposition

23   yet.  But the first 30(b)(6) deposition and the date being

24   scheduled for it was well in the works at the time.

25           And just to back up and talk a little bit about the

1    timeline, as Mr. Parker and I both mentioned, the second notice

2    was served on October 22nd.  At that time IP's appeal of your

3    order requiring them to produce a 30(b)(6) deponent with

4    respect to our first notice was pending.  At that time IP had

5    been refusing to answer any questions with a 30(b)(6) witness

6    on our first notice.  So we served the second notice.

7          Then on November 17th Judge Jonker affirmed your order

8    and the next day Mr. Parker agreed to produce a witness on both

9    the first and the second notice, never raising the fact that he

10   believed that the second notice was improper under

11   30(a)(2)(A)(ii).  He didn't raise it in his brief, and even

12   when the parties met and covered after his brief was filed, he

13   never raised the point then either, that you do not get the

14   second notice because we have provided a witness under the

15   first.

16         So I would submit that he has waived that argument at

17   this point.

18         The other point I want to make with respect to --

19         THE COURT:  He agreed to furnish a witness as to both,

20   and now he is here protesting the fact that he has to furnish a

21   second witness.  What caused him to change his mind and when

22   did that happen?

23         MS. RETTIG:  I don't want to speak for Mr. Parker.

24   During the process of the meet-and-confers, I believe some of

25   the written discovery was at issue too, but he changed his mind

I would say maybe ten days later over the course of the
meet-and-confers.  And I can't speak for why he did so.  But
I'm sure he has a good, a good reason for it.

The other point I wanted to raise for --  I would say
a reason we don't necessarily agree with, but a reason that he
would put forth, with respect to Judge Griesbach's decision
that he quoted to you, what Judge Griesbach said there that I
think is important is he said, "I remain satisfied that there
has been ample opportunity for extensive discovery."  But IP
has been refusing to supplement its answers, it refused to give
a 30(b)(6) witness, and it's the same course of action is
happening here, and I would say this situation --

THE COURT:  That might have been the case earlier, but
they have now given a 30(b)(6) deposition.  They have now
supplemented their answers, perhaps balkingly, but they have
done it.  So those two arguments are kind of past.

MS. RETTIG:  At the same time --

THE COURT:  You haven't had it in, what is it, has
been 11 months since discovery started, you haven't had ample
opportunity to do necessary discovery?

MS. RETTIG:  What I would say is since they have now
supplemented their interrogatory responses, and had at one
point been willing to provide a witness to talk about those
interrogatories, and, you know, they referenced the
interrogatory responses at the 30(b)(6) deposition, and now

they won't let us ask questions about them.  So after a long
period of time trying to get those answers and then relying on
them with respect to the first notice, they have now prohibited
us to ask any questions about them of their witness.

The other thing I would say to go back to their burden
argument, and they quoted much, some passages from NCR's
30(b)(6) deposition.

THE COURT:  You want to ask, you principally want to
ask follow-up questions to the supplemental answers,
interrogatories.

MS. RETTIG:  I would say that's certainly one of our
main focuses.

THE COURT:  But that's certainly a lot narrower area
than this laundry list of things in Schedule A.

MS. RETTIG:  That is true.  It's not the only thing we
want to ask about.  But given how frequently their 30(b)(6)
deponent raised them in response to questions on the first
notice, we certainly have questions about their positions with
respect to those supplemental interrogatory responses.

THE COURT:  I'm sorry.  Say that again.  In light of
the number of times the 30(b)(6) deponent on the first notice
what?

MS. RETTIG:  Raised -- so I'll give you an example,
Your Honor.  Mr. Marriott asked at the December 8th 30(b)(6)
deposition, he said, "Would you please identify the persons who

provided, and from whom each mill acquired PCPs, and PCBs

during the relevant period."  And their deponent responded, "I

believe that information is synthesized in two places, but I

would look to answer your question in more detail.  It's our

response to interrogatory number 3 to defend International

Paper Company's further supplemental and restated responses to

certain of NCR Corporation's interrogatories to the other

parties."  And then they refer to one of their expert reports

as well.  And I think you have a number of other instances --

THE COURT:  He points out three places that would be

responsive to your question.

MS. RETTIG:  No.  He points at two.

THE COURT:  Two places, sorry.

MS. RETTIG:  And one of which is interrogatory number

3 to their supplemental interrogatory responses.

THE COURT:  All right.

MS. RETTIG:  And a number of times when Mr. Marriott

asked a question, International Paper's 30(b)(6) witness

responded by saying, you can find that in our supplemental

interrogatory responses.

THE COURT:  You had the supplemental interrogatory

responses prior to December 8th.

MS. RETTIG:  We did, yes, but they wouldn't let us

question, you know, because they wouldn't allow questions

relating to the second notice; they wouldn't allow us to ask

1      any questions about them at the deposition.

2           To move on to their, to their burden point.

3           THE COURT:  Mr. Parker, doesn't that undercut your

4      argument that you shouldn't have to give a second 30(b)(6)

5      deposition at least as to the supplemental answers to the

6      interrogatories?

7           MR. PARKER:  I make, if I could, Your Honor, a couple

8      of points on that.  First of all, the notice tracked the

9      interrogatories.  That was the whole point about that

10     Georgia-Pacific made this morning about, we felt there was no

11     need for the deposition to go forward once you ruled on the

12     interrogatories.  For us it was the same thing.  We had moved

13     for, or they had moved to compel both and I tried to oppose

14     both because they tracked each other.  Very closely in fact.

15          So to say it -- because they asked, got to ask about

16     the topics, they got the interrogatory answers and my witness

17     was frankly quite candid about saying, well, you can answer

18     that in two places, one in our expert report where he talks

19     about saying no discharges or where the paper came from, or you

20     can look at number 3 of this 60-page interrogatory answer, and

21     you can find it there.  So it's a bit of a misnomer to say I

22     didn't want them to go on topic 2 where it went far afield of

23     the first notice.  But clearly these interrogatory responses

24     are further supplemental answers to their interrogatories track

25     that notice, notice 1, very, very closely.  So I think we did

1    answer it.

2         Secondly, to their timeline.  They claim they want to

3    inquire about our supplemental interrogatory responses.  They

4    served this notice on October 22nd.  I hadn't provided these

5    answers yet.  So that notice could not have been directed to

6    these answers because these didn't come until December 2nd.

7         THE COURT:  But now they want to.

8         MR. PARKER:  Yeah.

9         THE COURT:  And they say because now that you finally

10   produced those --

11        MR. PARKER:  Well --

12        THE COURT:  And they are saying they are precluded

13   from doing that because you won't let your, you didn't let your

14   witness answer as to those supplemental interrogatory answers.

15        MR. PARKER:  Well, I would submit, Judge, first

16   Ms. Rettig read from a quote where my witness actually referred

17   to them.  So to say he wouldn't talk about them.  They came

18   from the experts anyway.  That was my contention all along.

19   That I couldn't give you these answers without getting

20   information from my experts.  They now have my expert reports,

21   which I would argue they are this thick, they are even more

22   fulsome responses than these interrogatory answers are.  But

23   they have both.  They asked about the -- my witness responded

24   from both, and I think they got a full opportunity to do that.

25        THE COURT:  All right.  Thank you.

1    MS. RETTIG:  Just to put a fine point on the timing.

2   We did serve our second notice on October 22nd when we didn't

3   have the supplemental interrogatory responses in the form that

4   they are now precisely so we could ask about the fact of how

5   pared back they were.  We didn't know how Judge Jonker was

6   going to rule at that time.  And we certainly had probably I

7   wouldn't say more questions, but we certainly had a lot of

8   questions about the supplemental interrogatory responses in the

9   form we had received them because International Paper hadn't

10  supplemented them at that time.  So I don't think the timing

11  argument is compelling on that point.

12       If I can move on to the burden point that Mr. Parker

13  made, Your Honor.

14       THE COURT:  When did you receive the supplemental

15  answers?

16       MS. RETTIG:  December, tab B, Your Honor.  I think

17  December 5th.

18       MR. PARKER:  2nd, Your Honor.

19       THE COURT:  December 2nd, thank you.  Go ahead.

20       MS. RETTIG:  With respect to the burden argument,

21  Mr. Parker read a few passages from NCR's 30(b)(6) deposition.

22  But what he didn't read to you, and didn't mention, was that

23  NCR supplemented its RFAs prior to the 30(b)(6) deposition

24  occurring.  So when you actually look at the RFAs that were

25  being inquired about in those passages, request for admission

number 30 says, "Admit that one or more molecules of NCR PCBs are present in operable unit 5."  The response is, "Denied. NCR did not release and is not responsible for releasing directly or indirectly any PCBs into operable unit 5 work area 3."  And it continues on for a few sentences.

So it's not that NCR simply has a response that says denied and there is no additional information.  So when our witness said what we have is contained in those answers, it was contained in those answers.

With respect to Mr. Parker's reasonable particularity requirement on the questionnaires, I think I mentioned this earlier which was they incorporate the questionnaires into their interrogatory responses, they then refer to the interrogatory responses during the 30(b)(6) deposition, and now they won't let us ask questions about the interrogatories or the questionnaires for that matter.

So with respect to the ample opportunity point that Judge Griesbach made, I would say that International Paper is denying us ample opportunity on that front.

THE COURT:  Did you at the 30(b)(6) deposition that you did take from International Paper, and they made reference to these incorporated responses, did you pursue those responses at that time?

MS. RETTIG:  We did not, Your Honor, because Mr. Parker had already made clear that he was not going to

1  provide a witness with respect to that topic.  At the

2  conclusion of the deposition Mr. Marriott reserved his right,

3  particularly with respect to the fact that we had not been

4  allowed to question with respect to the second notice.

5          As for what Mr. Parker calls our veiled attempt to

6  circumvent the local rules, requirements to meet-and-confer, my

7  last point would be that we met and conferred at length about

8  the interrogatory responses that have been the subject of much

9  of today's discussion.  And have, when we need to, have raised

10  it with them and now would like to be able to test them as well

11  as some other responses.

12          Unless you have further questions, Your Honor, I think

13  those are my final points.

14          THE COURT:  Mr. Parker.

15          MR. PARKER:  Can I have 20 seconds, Your Honor, to

16  make one last point?

17          THE COURT:  Um-hum.

18          MR. PARKER:  To the extent that NCR would like an

19  opportunity to ask about our supplemental responses, this

20  information all came from our experts.  Nobody at International

21  Paper knew the answers to any of this.  It all came from our

22  experts.  Expert discovery has not closed in this case.  They

23  are going to get an opportunity to depose our experts and get

24  all that information or ask about all that information then if

25  they would like to.  Thank you.

1      THE COURT:  Counsel, do you want to respond to that?

2  Assuming that to be the case, wouldn't that be a satisfactory

3  resolution of that particular issue?

4      MS. RETTIG:  No.  Because I, I mean we certainly will

5  inquire about their expert's positions during discovery, but we

6  believe that the company has taken positions and they can be

7  tested at this point in time.

8      THE COURT:  What are they going to say?  This is

9  because this is what our experts told us.  What more can they

10  say since they have no personal knowledge?  As has been pointed

11  out several times by Mr. Parker, have a rather attenuated

12  relationship with this physical site.  They know what they are

13  being told.  And as to what's in those supplemental answers,

14  according to Mr. Parker, they are being told the contents of

15  that by their experts.  So they are not going to have any

16  answers independent of what their expert tells them, are they?

17      MS. RETTIG:  I would make two points with respect to

18  that.  First of all, if that was true then every single

19  interrogatory response was based on their experts, then they

20  wouldn't need to invoke both their interrogatory response and

21  separate expert reports in response to certain of our questions

22  during the 30(b)(6) deposition.  They would be able to either

23  just say, see our expert or see this response, which

24  incorporates --

25      THE COURT:  Well, I don't know if those

1    interrogatories encompass everything the expert report

2    contains.  But to the extent it encompasses anything, it sounds

3    like it comes from the experts.

4            MS. RETTIG:  But with respect to the response that I

5    read you, he said there are two different places you can get

6    this information.  One is our interrogatory responses and the

7    other is this page of our expert report.  If it was true that

8    he was just going to answer, well, I got that from my expert,

9    then he wouldn't have to reference both of those.  And in

10   addition, we should be able to ask a witness and have the

11   company take a position on something that the International

12   Paper is contending occurred at the site.

13           MR. MARRIOTT:  Your Honor asked me a question earlier.

14           THE COURT:  Yes, all right.

15           MR. MARRIOTT:  So I am baffled, Your Honor, and I

16   begin I guess sort of an apology.  I could have sworn, would

17   have sworn on the life of my children that this document

18   contained a footnote that said what I said it said.  And I do

19   not see the footnote in the document saying that

20   Georgia-Pacific had said they wouldn't take a witness.  But I

21   never --  so I will continue to look to find out where it is.

22   I still have no doubt that it was said.  What I do have for the

23   Court is this and it's essentially contemporaneous and I think

24   it's effectively the same thing.  I would read from which I

25   thought this footnote existed was filed on August 8th.  On

1    August 11th we were in Judge Jonker's chambers, and we were

2    arguing then about whether or not the period for fact discovery

3    should be extended.  It was our view, and I believe the view of

4    the mill parties except Georgia-Pacific, that this period for

5    fact discovery should be extended in part because we feel on

6    NCR's part that we have gotten what we hoped to get.  So I said

7    the following to the Court with no disagreement or objection by

8    counsel for Georgia-Pacific.  And this is in the context of

9    trying to get the schedule adjusted.  Quote, this is page 29 of

10   the transcript.  "Let me give Your Honor just several examples,

11   as it's been suggested that we simply made a choice here to

12   wait.  The first 30(b)(6) notice was served on Georgia-Pacific

13   in April.  Specifically on April 25th.  About two and a half

14   months later Georgia-Pacific produced its first witness on

15   July 10th.  There's to be a second witness with respect to that

16   same notice.  That witness's deposition has now taken place.

17        NCR served a 30(b)(6) notice on all of the parties on

18   June 19th after reviewing extensively these documents and

19   consulting with our experts.  That 30(b)(6) notice goes to the

20   issues that are, we believe, at the heart of the case.  The

21   amount of carbonless copy paper recycled in each of the mills,

22   the amount of PCBs discharged in the river, the wastewater

23   treatment programs in each of the mills.  Georgia-Pacific has

24   now told us just recently that it will provide a witness for

25   that deposition.  Again, noticed on June 19th.  The deposition

1    probably, according to them, the deponent probably will not be

2    available until sometime in September.  We, to my knowledge, do

3    not have a date for that."

4            That's consistent with what I told the Court before.

5    We had a conversation, they promised to provide a witness.  At

6    that point in time, Your Honor, on August 11th when I made the

7    statement to Judge Jonker, the close of fact discovery was

8    September 15th.  What Georgia-Pacific had told us was they

9    would give us a witness at the end of the period.  And I was

10   telling Judge Jonker that they are going to give a witness in

11   September, that discovery deadline is the 15th.

12           And so here, that is the mind set that we were in.  It

13   is the agreement we believe existed.  It's an agreement we

14   describe orally to the Court then, and it is the agreement with

15   which they expressed no disagreement at the point in time in

16   which we discussed it.  Thank you, Your Honor.

17           THE COURT:  Fine.  Thank you.  I'll allow you to

18   respond to that.

19           MR. SIBLEY:  One minute just very quickly, Your Honor.

20   Mr. Marriott, I have a copy of that transcript.  He quoted it

21   accurately.  And as of early August, as I mentioned, we had

22   stated we did not have a categorical objection but any

23   deposition would have to take place after we had a ruling on

24   sufficiency of our interrogatory answers.  That is entirely

25   consistent with what Mr. Marriott was quoting there.  From that

1    point forward, though, until the time, until November 6th, no

2    indication that they intended to proceed on that notice.  That

3    was it.  And we got a ruling saying that our answers had been

4    sufficient, and as Your Honor said, at that point what the

5    discussions that had taken place previously were water over the

6    damn.  The burden was on NCR to press forward if they still

7    wanted the deposition.  And we did not hear anything about it

8    again until November 6th.

9         MR. MARRIOTT:  Your Honor, they heard nothing about it

10   again, I don't think that's true.  But in any case, they heard

11   about it the moment they suggested they weren't providing a

12   witness pursuant to the notice.  And the idea that --

13        THE COURT:  That fact I understand.

14        MR. MARRIOTT:  -- the idea that just because they are

15   going to provide an interrogatory answer somehow sufficient

16   means there's no depositions makes little sense in view of the

17   scheme of the federal rules and in view of the Court's order as

18   it related to IP, both deposition and interrogatories.  They

19   are different things with different purposes.

20        THE COURT:  All right.  Well, I want to thank you

21   everybody for their very thorough and spirited arguments today.

22   We have taken all the time we have.  It's 10 after 3:00

23   o'clock, and I have another appointment at 3:30 outside the

24   court, as I told you about before.  So we timed this just about

25   right.  Obviously, I'm going to have to take the matter under

1    advisement because there is no time for a ruling now and I do

2    need to follow up on some of the things that you have presented

3    to the Court.  With that I wish you a good day and please have

4    a safe journey.

5              MR. SIBLEY:  Thank you, Your Honor.

6              MR. MARRIOTT:  Thank you, Your Honor.

7              THE CLERK:  All rise, please.  Court is adjourned.

8              (Proceedings concluded, 3:12 p.m.)

1          C E R T I F I C A T E

2

3          I certify that the foregoing is a transcript from the

4    Liberty Court Recording System digital recording of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9

10                          /s/ Kathy J. Anderson

11                          Kathy J. Anderson, RPR, FCRR

12                          U.S. District Court Reporter

13                          402 Federal Building

14                          Grand Rapids, MI  49503

15

16

17

18

19

20

21

22

23

24

25