1

2                    IN THE UNITED STATES DISTRICT COURT

3                   FOR THE WESTERN DISTRICT OF MICHIGAN

4                             SOUTHERN DIVISION

5      GEORGIA-PACIFIC CONSUMER PRODUCTS LP, et al,

6            Plaintiff,                 No.  1:11cv483

7       vs.

8      NCR, INTERNATIONAL PAPER COMPANY,
       WEYERHAEUSER,
9
             Defendants.
10

11     Before:

12                      THE HONORABLE HUGH BRENNEMAN, JR.,
                              U.S. Magistrate Judge
13                           Grand Rapids, Michigan
                               January 9, 2015
14                    Motion to Compel Discovery Proceedings

15     APPEARANCES:

16              MR. PETER A. SMIT
                Varnum Riddering Schmidt & Howlett
17              333 Bridge Street, NW
                PO Box 352
18              Grand Rapids, MI 49501-0352
                616-336-6000
19
                MR. MICHAEL SHEBELSKIE
20              Hunton & Williams LLP
                Riverfront Plaza, East Tower
21              951 E. Byrd Street
                Richmond, VA  23219
22              804-788-8262

23                      On behalf of the Plaintiff;

24

25

```
 1                    MR. GEOFFREY A. FIELDS
 2                    Dickinson Wright PLLC
                      200 Ottawa Avenue NW
 3                    Suite 900
                      Grand Rapids, MI 49503
 4                    616-458-1300

 5                              On behalf of the Defendant NCR,

 6                    MR. JOHN DANIEL PARKER
                      Baker & Hostetler LLP
 7                    PNC Center
                      1900 E. Ninth Street
 8                    Cleveland, OH 44114-3485
                      216-861-7610
 9
                                On behalf of the Defendant IP.
10
                      MR. SCOTT MICHAEL WATSON
11                    Warner Norcross & Judd
                      111 Lyon Street, NW
12                    Suite 900
                      Grand Rapids, MI  49503
13                    616-752-2465

14                              On behalf of the Defendant Weyerhaeuser.

15                    MR. ANDREW C. HANSON
                      Environmental Enforcement Section
16                    U.S. Department of Justice
                      PO Box 7611
17                    Washington, D.C.  20044-7611

18

19

20
            TRANSCRIBED BY:  MS. KATHY J. ANDERSON, RPR, FCRR
21

22

23

24

25
```

January 9, 2015

PROCEEDINGS, 9:37 a.m.

THE COURT:  Good to see all of you.  We have an alarm system in our court that --  well, it's a system that tells us if the court is going to be closed or not.  It doesn't call us every day, obviously, it calls us when the court is going to be closed.  You get a telephone, automatic telephone system.  It wakes you up at some ungodly hour to tell you that the court is going to be closed.  It goes to the telephone, it goes to your cell phone until it finally makes contact with you, and it's an automatic dialing system.  And so, sure enough, it woke us all up this morning, and goes through the normal litany of the information.  At the end it says, and in conclusion, the court will be open.  Well, thank you for that.  You roll over and go back to sleep.

Well, I wouldn't have it any other way.  I read with great interest the briefs in this motion, which is being brought by Georgia-Pacific to compel the Environmental Protection Agency to respond to a subpoena, and the parties have postured this in such a way that, again, by the technicalities of whether or not the subpoena has been properly served and so forth so that we can get to the issue of whether or not the EPA ought to be held to respond on the, more or less on the merits.

I notice we have more people here than I anticipated.

1    Which is fine.  I don't know if all of you have a dog in this

2    fight, and whether you want to participate by way of argument;

3    you're all welcome to.  Or if you simply like blood sport.  Why

4    you want to come up in this weather if you didn't have to, I

5    really have no idea.  Anybody that wants to participate is more

6    than welcome to.  We will start with Georgia-Pacific since that

7    company is the one that brought the motion.  Counsel.

8         MR. SHEBELSKIE:  Thank you, Your Honor.  Good morning.

9         THE COURT:  Good morning.  We do have a couple hours

10   to do this.  Shortly before 12:00 o'clock I do have to recess

11   but we can always pick it up this afternoon of course if we

12   really had to.

13        MR. SHEBELSKIE:  Your Honor, my name is

14   Mike Shebelskie.  I'm with Hunton Williams, along with

15   Peter Smit; we represent Georgia-Pacific in this matter.

16        As Your Honor states, the motion today is a motion to

17   compel the EPA to produce a witness for a 30(b)(6) deposition

18   on various topics.  The EPA has objected and refused to produce

19   a witness in response to any of the topics, thus necessitating

20   our motion here today.

21        As an initial matter, I would like to make a point

22   which I think is not controverted by the EPA, which is that the

23   EPA is in fact subject to the Federal Rules of Civil Procedure,

24   including specifically Rule 30, and Rule 45.

25        Rule 30 of course provides that a party in federal, in

1   a federal lawsuit may take the deposition of any person, and it

2   goes on in particular respect to 30(b)(6) to say that a notice

3   of deposition on a juridical entity can be addressed to any

4   corporation, association, and including governmental body.  And

5   so clearly Rule 30 has no limitation that carves out federal

6   agencies from its scope.

7          And in addition, Rule 30 provides that it can be

8   enforced through a Rule 45 subpoena, and Rule 45, then like

9   Rule 30, is unqualified.  It provides that, "Any person can be

10  compelled to attend the deposition by a subpoena."  Rule 45

11  does not carve out federal agencies, and the case law has been

12  very consistent.  The seminal case on this I believe is the, if

13  I pronounce it correctly, the Yousuf decision from the D.C.

14  Circuit acknowledging that federal agencies are in fact persons

15  within the meaning of Rule 45.

16          So in addition, Your Honor, to the subpoena being

17  properly served or at least -- and there is no controversy on

18  that -- I think there's also no dispute that the EPA is subject

19  to the subpoena.  Rather, the issue goes more to EPA's

20  objection perhaps to relevance, although I'm not so sure their

21  arguments are, that's their primary argument, but more one to

22  whether the EPA gets to override this Court's authority and

23  decide whether or not the subpoena presents an undue burden.

24  And whether it has to comply or not.

25          And obviously it comes as no surprise that our view is

1    that the EPA doesn't have that authority and that the Court

2    gets to decide whether or not in applying the normal rules that

3    apply in federal civil discovery, whether or not discovery is

4    appropriate.

5         THE COURT:  Well, they are looking at the

6    Administrative Procedures Act as the method by which or the

7    Court ought to determine whether they should comply with this

8    subpoena, are they not?

9         MR. SHEBELSKIE:  They are indeed, Your Honor.  And I

10   think really the Court needs to look no further than Judge

11   Scoville's opinion on this topic from just last year, or 2013,

12   just a little over a year ago in the case of Gardner versus

13   Michigan State University.

14        It is cited in our brief.  It's a September 2013

15   opinion, and it's cited at 2013 Westlaw 53202 A 2.

16        Judge Scoville analyzes the case law and his ultimate

17   conclusion is that the Administrative Procedures Act does not

18   govern the standard of review the Court is to apply in deciding

19   the propriety of a Rule 45 deposition subpoena on a federal

20   agency.  There it was the Bureau of Prisons of Indian Affairs,

21   but the issue was the same.

22        What Judge Scoville goes through, his analysis in that

23   opinion notes that in a handful of cases, primarily from the

24   1990s, as he writes, that the agencies, federal agencies had

25   some success, and I'm quoting here from the opinion, "...in

1  persuading federal courts that a proceeding under the APA, and

2  the APA's arbitrary and capricious standard of review was the

3  only avenue of relief, even in federal court with respect to a

4  federal subpoena."

5  Judge Scoville notes that Judge Borman in the Eastern

6  District of Michigan had recently analyzed the case law and

7  concluded that really that was an inappropriate ruling, that

8  really Rule 45 should govern, and more importantly, concluded

9  that the Sixth Circuit would reach that conclusion.

10  The seminal case from the Sixth Circuit is the Bankers

11  Trust opinion, also cited in our brief that appears at 61 F.3d

12  465.  And what Judge Borman in the Eastern District and Judge

13  Scoville here concluded in looking at the Sixth Circuit's

14  opinion in Bankers Trust is that the Court of Appeals in that

15  decision held that an agency --  that the statutory authorities

16  allowing an agency to promulgate its housekeeping regulations,

17  "simply do not give it the power to promulgate regulations in

18  direct contravention of the Federal Rules of Civil Procedure."

19  And then Judge Scoville goes on to say, conclude then

20  that, "The APA standard does not govern the propriety of a Rule

21  45 subpoena."

22  So really, Judge Scoville has I think answered this

23  question because really, Your Honor, the D.C. Circuit, which is

24  no stranger to administrative law proceedings is quite clear on

25  this, that the APA standard does not govern the review of a

1    Rule 45 subpoena.

2             And indeed, and the Ninth Circuit follows suit as

3    well.

4             THE COURT:  The Ninth Circuit and the D.C. Circuit

5    agree?

6             MR. SHEBELSKIE:  Yes, sir.  Believe it or not.  And

7    the Sixth Circuit I think really in Bankers Trust is in

8    agreement as well, and certainly two of your fellow judges here

9    in Michigan so interpret that opinion.

10            And really, Judge, when you look at the case law that

11   the EPA is citing for what they say is the contrary holding,

12   they cite, 1, 2, 3, 4, 5, 6 opinions from different circuits.

13   The context of those are very important.  Some of them involve

14   subpoenas issued by state courts against federal agencies.  And

15   either the agency removed the subpoena, the motion to compel

16   the subpoena to federal court, but on removal the district

17   court's jurisdiction is derivative of the state court's

18   jurisdiction and therefore it does not have authority to issue

19   a subpoena, a state court doesn't have authority to issue the

20   subpoena against the federal agency and therefore the APA could

21   only be the governing standard.  In other cases, two other

22   cases at least the proceedings were not brought up as motions

23   to compel Rule 45 subpoena, but rather were original APA

24   actions.  A person made a voluntary request for information in

25   one case, the agency denied it, the request, and the requester

1     then files an original action in federal court under the APA.

2     Obviously framing the issue under the APA as their complaint,

3     the APA governs their standard.

4          And then yet in one other case the subpoena at issue

5     was one issued by an arbitrator, and the question was whether

6     it's enforceable by the FAA.

7          And so really I think two of their opinions at the end

8     of the day really deal with Rule 45 subpoenas.  That's the one

9     from the Second Circuit that they cite, the General Electric

10    case.

11         THE COURT:  General Electric?

12         MR. SHEBELSKIE:  General Electric, yes, sir.  And the

13    Moore opinion from the Eleventh Circuit.  So really the

14    suggestion that there is this overwhelming body of circuit

15    court case law applying the APA standard to a Rule 45 subpoena

16    I think dramatically overstates the case; and really the

17    lineup, Your Honor, is you have the D.C. Circuit, the Ninth

18    Circuit, and I would say the Sixth Circuit concluding that Rule

19    45 standards apply, and the Second Circuit and the Eleventh

20    Circuit clearly saying to the contrary, and the other circuits

21    making the statements in very different procedural context.

22         And ultimately, Your Honor, I think the reason why the

23    Sixth Circuit ruled the D.C. Circuit rule is correct is because

24    both the statute upon which the agency is relying here, and

25    their regulations don't give them the authority that they are

1       maintaining here with respect to this subpoena.

2               The statutory basis for the regulation that provides

3       the EPA's claim here for an arbitrary and capricious standard

4       is the Housekeeping Statute that appears at 5 U.S. Code

5       Section 301.  Your Honor, I have a copy of that I can hand up

6       to the Court if that would be of assistance.

7               THE COURT:  That would be fine.

8               MR. SHEBELSKIE:  It includes a couple of other

9       attachments.  I have an extra copy for the Court as well.

10              THE COURT:  That would be fine.  Thank you.

11              MR. SHEBELSKIE:  The pages aren't numbered --  there

12      is a transcript that appears and after the transcript the blue

13      page after that is a copy of U.S. Code Section 301, which is

14      the housekeeping, a statute upon which the government bases the

15      regulations in their claim for authority here.

16              And the first part of the statute has two sentences;

17      the first sentence is the sort of substantive provision that is

18      the housekeeping regulation.  Basically it is a grant to the

19      agencies to promulgate regulations to order their internal

20      affairs.  It actually dates back apparently to the George

21      Washington administration when the first cabinets were being

22      set up.

23              But really what is of importance is that second

24      sentence.  This was added in 1958, I believe, it was, after the

25      Supreme Court's decision in Touhy that's discussed in the

1    brief.  Touhy had held that under the housekeeping regulations
2    an EPA employee could not be held in contempt for not appearing
3    at a deposition for a subpoena issued directly on that
4    individual employee.  Wasn't a 30(b)(6) situation.  And the
5    Supreme Court said that the housekeeping regulation certainly
6    was a justification for the employee not to appear and
7    therefore his conduct could not be considered can contumacious.

8         Subsequent to that opinion agencies began to take the
9    view then that these housekeeping regulations allowed them to
10   withhold information going beyond really what Touhy had held.
11   Congress responded to that by passing the amendment 301 and
12   added this sentence which provides specifically, "This section
13   does not authorize withholding information from the public or
14   limiting the availability of records to the public."

15        And the case law in the Ninth Circuit, in the D.C.
16   Circuit, points out that statutory amendment, specifically in
17   the legislative history concerning it, and they explain that
18   the Congress expressly said in adopting this, they wanted to
19   make clear that these housekeeping regulations cannot provide a
20   basis ultimately for an agency to withhold information.  Sure,
21   they can adopt regulations that will say individual employees
22   of an agency don't get to independently decide whether to
23   respond to a subpoena, either to appear at a deposition or to
24   produce documents, but that the agency can centralize the
25   decision making process and make sure that the agency speaks in

1   a considered way with one voice in deciding what the agency's

2   response to the subpoena will be.  But that's all that is.

3   That's an internal housekeeping matter that regulates how the

4   agency will decide how it will respond to a subpoena.  But it

5   cannot, particularly in light of the statutory add-on to the

6   statute, authorize an agency to withhold information and

7   certainly not authorize them to be the arbiter of that decision

8   and to require courts to defer to their decisions under an

9   arbitrary and capricious standard.

10          In addition, Your Honor, even the regulations that the

11  EPA has promulgated under that statute, and that they cite here

12  don't give them that authority with respect to this issue.

13  Your Honor, the regulations that are cited by the agency are

14  also included in this handout I've given you today and they

15  follow the blue page after the statute.

16          And you can see from there the initial regulation

17  section, 2.401 under Scope and Purpose, it provides that this

18  subpart sets forth procedures to be followed when an EPA

19  employee is requested or subpoenaed to provide testimony

20  concerning information acquired in the course of performing his

21  official duties, et cetera.  And then it goes on in the ensuing

22  provisions to say what the employee is supposed to do, namely,

23  give notice to certain officials within the agency, and then

24  rely and take direction from those officials on whether or not

25  to comply with the subpoena or not.

1          These regulations on their face, Your Honor, do not,

2      first of all, concern a Rule 30(b)(6) notice of deposition on

3      the agency as an agency, as a governmental body under Rule

4      30(b)(6).  These concern subpoenas directed individually to

5      agency employees.  So on its face these regulations don't

6      apply, and certainly nothing in these regulations direct that

7      somehow the agency is asserting authority in a 30(b)(6) context

8      on a subpoena, deposition subpoena directed to the agency

9      itself.

10          THE COURT:  You're relying on the --  I don't mean to

11     interrupt you.  For clarification, you're relying upon the

12     first sentence of 2.401 when you say that?

13          MR. SHEBELSKIE:  Yes, sir.

14          THE COURT:  Okay.

15          MR. SHEBELSKIE:  And you'll see throughout the ensuing

16     sections, 2.402 and 2.403, these are the policies and

17     procedures sections but it's all referring to EPA employees.

18     And 2.404 in fact is entitled, Procedures When an Employee is

19     Subpoenaed.  2.405 and 06 concern subpoenas for documents,

20     which aren't at issue here.

21          THE COURT:  Which regulations do you understand the

22     EPA is pointing to as having relied upon to process your

23     request?  Because you are proceeding under a 30(b)(6) request

24     to the agency itself, as I understand it.

25          MR. SHEBELSKIE:  Yes, sir.  Exactly right.  And in

1   their brief, the EPA cites to these regulations here in subpart

2   C starting at 2.401, and continuing to 2.406.  I believe they

3   even cite 2.406 in their brief.  So it's, it's that, those six

4   particular regulations that they are relying on, and really

5   none of them address a 30(b)(6) notice and none of them

6   provide, the agency will not respond and can withhold

7   compliance with a 30(b)(6) notice, nor could it in any event

8   under even the Section 301, the Housekeeping Statute.  And so

9   even if the agency here was trying to assert that in response

10  to a 30(b)(6) notice these regulations or any other regulations

11  that it might now point to authorize it to withhold information

12  under Rule 45 subpoena seeking a 30(b)(6) deposition, the

13  Housekeeping Statute actually prohibits that, and any such

14  regulation and assertion of authority by the agency would,

15  would be unlawful.

16          So really, Your Honor, it's for those reasons that

17  Rule 45, we think the normal standards under Rule 45 apply

18  here, and I don't think there's any question that the EPA

19  possesses relevant and certainly discoverable information

20  relevant to this matter, and I can go into that in just in

21  short order here, Your Honor.

22          The front page of the handout that I gave you includes

23  Schedule A for the 30(b)(6) notice on the amended deposition

24  notice this was included with our brief this copy I have here

25  just for convenience.  And you can see there are 12 topics.

1    It's not a long, not extensive number of topics.  They are very

2    discreet.  They are concise.  And they are certainly all

3    relevant to the issues here.

4         And in particular, Your Honor, I really would like to

5    direct your attention to the topics that start with number 6.

6    And --

7         THE COURT:  I would like to go through these topics

8    with you, and I want to go through them with the EPA as well.

9         MR. SHEBELSKIE:  Well --

10        THE COURT:  Go through them systematically.

11        MR. SHEBELSKIE:  We can go through them

12   systematically, but, Your Honor, as we have been working

13   through this briefing on the issue, and obviously discovery has

14   been going on as well, as you well know, on other topics, I

15   think in fairness, as I read the EPA's brief, they say topics 1

16   through 5 are matters of public record and can be found in the

17   documents, and in large measure, I think that they are right.

18   I would agree with that.  And we also have, around --  was a

19   day or two right before we filed the brief, took the deposition

20   of the Missouri (sic) Department of Environmental Quality, and

21   that deposition concluded I think the day after this brief was

22   filed.  And I think in fairness, topics 1 through 5 have been

23   covered in that deposition for sure, and from Georgia-Pacific's

24   perspective at least, we're satisfied with what we got in that

25   deposition on those topics.  I don't know if the other parties

1     might have a different view on that.  So --

2            THE COURT:  Has NCR also served a notice of a 30(b)(6)

3     deposition on the EPA?

4            MR. SHEBELSKIE:  No, it did not.  NCR served a notice

5     of deposition on an individual EPA employee, Mr. James Saric.

6     We did too.  But we also served a 30(b)(6) notice and have

7     opted just to proceed with respect to the latter notice.

8            THE COURT:  You're not pursuing the individual EPA

9     official.

10           MR. SHEBELSKIE:  That is correct, we are not.  And

11    neither of the other parties has served any notice of

12    deposition on EPA or any employee.

13           THE COURT:  They could appear at this 30(b)(6)

14    deposition of the EPA and ask questions?

15           MR. SHEBELSKIE:  Yes, they could, of course.  We would

16    ask first and they can conduct cross-examination, right.  And

17    obviously the deposition is constrained by the general rule in

18    I think it's in 30 about the seven-hour limit.  So we are not

19    talking about a deposition that's going to go on for days and

20    days and days.  We know we have a discreet period.  And I would

21    add, Your Honor, we did notice a 30(b)(6) deposition of the

22    Missouri (sic) Department of Environmental Quality --

23    Missouri.  I'm thinking of my Super Fund dioxin litigation in

24    Times Beach.  The Michigan Department of Environmental Quality,

25    and Georgia-Pacific's 30(b)(6) deposition of the Michigan

1    agency didn't really go beyond three hours.  So --

2              THE COURT:  I was beginning to wonder how Missouri was

3    involved.

4              MR. SHEBELSKIE:  I wish you had spoken up sooner.

5              THE COURT:  I didn't want to express my ignorance

6    either.

7              MR. SHEBELSKIE:  So that's why I say, Your Honor, from

8    our, from Georgia-Pacific's perspective, we can withdraw topics

9    1 through 5.  The other defendants might have an independent

10   view on that, and so that's why I was starting with number 6.

11   I can talk about 1 through 5 if you still want me to.

12             THE COURT:  Well, procedurally, you filed the 30(b)(6)

13   notice, the other parties would of course like to participate.

14   Do they have any right to rely upon your notice and could they

15   now claim if you withdraw your topics 1 through 5 that they

16   have been somehow blind sided and that they have somehow

17   obtained some right to depose EPA on topics 1 through 5?

18             MR. SHEBELSKIE:  I wouldn't think so, Your Honor.

19             THE COURT:  I'm just curious.  So you're withdrawing 1

20   through 5.

21             MR. SHEBELSKIE:  Yes, from our perspective, and if

22   that is defendant inclusive, that's fine with us.

23             THE COURT:  All right.

24             MR. SHEBELSKIE:  Because I think --  because again,

25   our interest is not to unduly burden the EPA or to take a

1    pointless deposition on topics that we have already established

2    through the Michigan Department of Environmental Quality.  But

3    rather it is to take discovery of matters that we really do

4    need discovery of.  And so we are mindful of that obligation,

5    both to the court and to the agency, and to the other parties

6    too, not to waste people's time and money.

7         Proceeding then to number 6.  This topic as you see is

8    very discreet.  It's very rifle shot.  It's, EPA's reasons for

9    concluding that the removal actions at the Plainwell

10    Impoundment and Plainwell Dam Number 2 Impoundment that were

11    directed by the 2007 Administrative Settlement Agreements and

12    Order between EPA and various parties, including

13    Georgia-Pacific, were time-critical.  That's very discreet.

14    One can argue that's overbroad.  And here's why it's relevant,

15    Your Honor.

16         The Phase II trial that we have upcoming later this

17    year generally concerns allocation responsibility for past and

18    future costs incurred in connection at this Super Fund site.

19    Some of the past costs, a significant amount of the past costs

20    include work that Georgia-Pacific undertook and paid for to do

21    cleanup activities behind two basically dams in the river in

22    the Plainwell area.  And one of the requirements for recovery

23    of those funds from the defendants here is whether or not those

24    expenditures were consistent with the National Contingency

25    Plan, NCP you'll see reference to.  So that's an issue in the

1    case.  And this cleanup work at these two dams were done on

2    what's called a time critical removal basis.  It's done sort of

3    basically on an accelerated basis.  Here the agencies have not

4    finalized their review of the site and made a record of

5    decision of what the ultimate cleanup activity would be.  But

6    in these two particular locations back in the day, a couple

7    years ago, they concluded that these two particular sites

8    presented basically special hazards with the heavy

9    concentrations of PCBs and needed to be cleaned up right away

10   on a time critical basis, basically sort of accelerating the

11   cleanup even though the main decision making process was going

12   on.  That's what time critical here means.

13         And there are separate procedures and processes that

14   agencies and Georgia-Pacific and the other parties engage in

15   under the regulations to decide whether or not to proceed on a

16   time critical basis for certain costs.

17         Well, NCR has challenged the reasonableness of the

18   expenses that Georgia-Pacific incurred to clean up, to do this

19   time critical work behind the Plainwell Impoundments.  And we

20   included with their --  with our brief as an example of this

21   NCR's answers to our interrogatories asking them to explain,

22   identify which of our costs they think are not consistent with

23   the National Contingency Plan, and that's the second attachment

24   in the handout that I gave you.  It was attached to our brief.

25   That is the excerpt from NCR's interrogatory answer concerning

1    our past costs and consistency with the National Contingency

2    Plan.  And on the second page of that interrogatory answer in

3    the handout is page 5 of the excerpt.  In the second, the third

4    bullet point there, NCR says that the, costs Georgia-Pacific

5    has allegedly incurred with respect to three purported time

6    critical removal actions at the Plainwell Dam Number 2, former

7    GP site, "were not incurred consistent with the NCP.  These

8    actions, although described as TCRAs, should have been subject

9    to the NCP requirements for non-time-critical removal actions."

10   Basically they shouldn't have been fast tracked.  They should

11   have been kept on the normal process like the rest of the site

12   or the river portions of the site.  And then NCR goes on to say

13   that, "Georgia-Pacific worked with the EPA and the Michigan

14   Department of Environmental Quality to treat these actions as

15   TCRAs to avoid the procedural requirements of the NCP for

16   non-time-critical removal action or remedial action."

17        In other words, Your Honor, NCR is maintaining that

18   the characterization and treatment of this work as time

19   critical removal actions is basically a sham.  That EPA and

20   Georgia-Pacific and the State Department of Environmental

21   Quality basically colluded together to do this work erroneously

22   and misleadingly characterize it as time critical in order for

23   some purpose, unstated.  But in any event, NCR says that that

24   collusion and improper treatment as a time critical action is

25   something that bars Georgia-Pacific from recovering those

1    costs.  So certainly this is a relevant topic, appropriate for

2    discovery.

3         This is a contention raised by one of the defendants

4    in this action, and Georgia-Pacific under Rule 26 clearly needs

5    to take discovery of this to explore with EPA, which was the

6    lead agency in 2009, as to whether or not there was any

7    improper action, communications, and decision making to treat

8    this as noncritical action.

9         And even though, yes, there's a record of decision,

10   there is agency action, administrative record that says it's a

11   time critical action, the point is NCR is saying behind the

12   scenes EPA didn't think it was time critical and work with

13   Georgia-Pacific.  So this is something that's clearly relevant

14   and is something that cannot be ascertained from the public

15   record because it concerns something that NCR asserts is going

16   behind the public record.

17        THE COURT:  So you have the reasons for that on a

18   record, but you would want to inquire about whether there were

19   any other communications outside of the record and, if so, what

20   they were.

21        MR. SHEBELSKIE:  Exactly, Your Honor.  And more

22   specifically, or as an addition to that specifically, that

23   Georgia-Pacific and EPA did not in some way in dealing with

24   communicating between themselves understand and appreciate

25   these were not time critical reaction, cleanup actions but

 1    nonetheless proceeded to characterize them that way and

 2    proceed.

 3          THE COURT:  Well, we have two entities which are --

 4    well, they are entities that operate through individuals or

 5    through human beings, so the entities themselves don't do

 6    anything.  They only do what the people that act in their name

 7    do.  So that can be found out by looking at the communications

 8    of the people involved in the transactions.  Although I suppose

 9    you could also probe the minds of the people making the

10    decisions and ask them did you label this as A. when it was

11    really B. and thereby cause it to be treated as A. when it was

12    really a B. situation.  That's the only way you can really

13    determine if an organization has characterized something as

14    something it was not.

15          MR. SHEBELSKIE:  Or in addition, Your Honor, whether

16    there were any meetings, or discussions in person that aren't

17    reflected in the administrative record.

18          THE COURT:  Those would be matters of fact.

19          MR. SHEBELSKIE:  Those are matters of fact.  And

20    that's what we would seek to explore.  Certainly the agency has

21    stated its official position in the administrative record as

22    its belief that these were time critical reactions, time

23    critical response actions that needed to be done.  But NCR is

24    suggesting that there was somehow something improper about that

25    process, and some other communications and understandings

between EPA and Georgia-Pacific working together to so
characterize the work as time critical when in fact it wasn't.

And if NCR is entitled to make this argument at trial,
and it may well be that we succeed in having the Court exclude
that contention as an improper collateral attack on the
agency's decision making process, but it's been raised in
discovery now; we need to arm ourselves with rebuttal testimony
in the event that NCR is allowed to make this challenge.

So that's topic 6, Your Honor.

Topic 7, again, is discreet.  It's whether, what are
"EPA's present expectations regarding the need for future
removal or remedial actions at the Site."  And here's why
that's relevant to this proceeding.

International Paper last year filed a motion with the
court arguing that the Phase II proceeding should be bifurcated
and should only cover past costs that Georgia-Pacific has
incurred and not future costs.  And that in fact the court
doesn't have jurisdiction to decide in this proceeding any
issue regarding future costs because, amongst other reasons,
there is no final decision made about future cleanup costs, and
therefore, the Court doesn't have jurisdiction to decide
anything about that.

Judge Jonker denied that motion in part --

THE COURT:  Sorry, who made the motion?

MR. SHEBELSKIE:  International Paper.  He denied that

1  motion to bifurcate but carried over the issue for decision

2  later in connection with Phase II.

3  And so we have an issue Georgia-Pacific has to

4  ultimately still respond to in this lawsuit, is to show that

5  the Court has jurisdiction to decide future costs; and one of

6  the ways of establishing that, as the case law directs, is to

7  show that there is a reasonable likelihood that future costs

8  will be incurred.  Certainly having the view of EPA as to what

9  it's doing now and its expectation as to whether or not some

10  type of future costs will be incurred is something that we need

11  to, and are entitled to, obtain as a fact matter to respond to

12  that jurisdictional challenge that International Paper has

13  raised.  This is, this does not require us to establish that

14  the EPA has made a decision as to what the future costs will be

15  or future remedial actions specifically will be, but rather an

16  understanding of the agency's view that, yes, future costs are

17  reasonable and they are likely to be expected.

18  So that's topic 7.

19  THE COURT:  Isn't EPA going to argue that you're

20  treading on their internal decision making, that they haven't

21  made these decisions yet, and that this is something that is

22  probing beyond what is available to the public?

23  MR. SHEBELSKIE:  No.  Well, no, they shouldn't say

24  that.  And of course the rule provides the approach on, at a

25  deal with that if the questioning bleeds over into that.  Like

1   any privileged matter, what the Federal Rules of Civil

2   Procedure provide, again, I think it's in Rule 30, that if a

3   deponent is asked a question that impinges upon a proper

4   privilege, the witness can be instructed not to answer, and if

5   the examiner believes that the assertion of privilege was ill

6   advised, that that can be the subject of a subsequent motion.

7   Happens all the time when attorneys happen to be deposed.  The

8   fact that questions might be imagined that could impinge upon

9   attorney-client privileges or work product privileges might

10  come up in the deposition; that is not grounds for quashing the

11  deposition in its entirety.  But rather the courts uniformly

12  and consistently say that the deposition goes forward.  And in

13  response to specific questions that fairly impinge upon the

14  privilege, an objection will be made, and that's how the issue

15  is teed up.

16          It's overly broad for EPA to say, well, there is a

17  potential for impingement on the deliberative process privilege

18  and therefore quash the deposition in its entirety.

19          I think it's fair to say, Your Honor, despite the many

20  motions that have been filed in discovery in this case, no one

21  has ever brought a motion against Georgia-Pacific saying that

22  our questions in depositions were abusive, overbearing, went

23  beyond the bounds of proper discovery or impinged upon

24  privilege.  I guess evidenced here by our ability to withdraw

25  topics 1 through 5, we, we try to be very professional about

1    this and not waste people's time and ask things that are just

2    going to be pointless questions because they will be

3    privileged.

4           Your Honor, then turning to questions 8 and 9 I would

5    like to put together because they are related, as it turns out,

6    in the context of this case.  8 concerns "EPA's process for

7    reviewing and approving deliverables submitted by PRPs pursuant

8    to their various administrative orders and consents, and EPA's

9    reasons for assuming responsibility as lead agency at the

10   Site."

11          Now, again, these are very discreet topics.  I don't

12   think anyone can fairly say they are overly broad.  And let me

13   explain the context for them and why they are relevant to this

14   case.

15          A little history here.  EPA designated the Kalamazoo

16   River site as a Super Fund site in 1990.  The Michigan

17   Department of Environmental Quality at that time was named as

18   the lead agency for the site, and EPA still stayed involved.

19   They had to approve all the work product, and that was the way

20   the site was administered for ten years or so.  And then around

21   2000 EPA replaced the state department as the lead agency.

22          Now, NCR has taken the deposition of the project

23   manager for the Missouri --  Michigan Department of

24   Environmental Quality.

25          THE COURT:  Kalamazoo River still remains pretty far

1    north.

2         MR. SHEBELSKIE:  They deposed the project manager for

3    the state department for those ten years and went into great

4    detail with him about the what's called the deliverables that

5    Georgia-Pacific and the other members of its cleanup group

6    performed under the site in those ten years.  Deliverables if

7    you think about it basically are just reports and analyses.

8    You have a whole series of analyses and feasibility studies,

9    investigative studies that have to take place pursuant to these

10   CERCLA regulations and process.  And then that results in a

11   recommendation of feasibility studies, and options and what to

12   do, and then the agencies rely on that information and make a

13   decision on a course of action.

14        And so over that ten-year period Georgia-Pacific

15   worked with the State Department of Environmental Quality and

16   the EPA in conducting investigations at the site, preparing

17   analyses and reports, and feasibility studies, and the like.

18        Now, NCR elicited from the Michigan project manager

19   for that period a searing critique in his opinion of the

20   deliverables that Georgia-Pacific provided during that ten-year

21   period.  And that's --  and I have included the pertinent

22   extracts from his deposition testimony with the package here,

23   and I've highlighted the relevant testimony.  But in sum, Your

24   Honor, what the witness went through and related was he says,

25   the Michigan Department of Environmental Quality and the EPA

1    were very concerned about Georgia-Pacific and were concerned

2    about Georgia-Pacific's bona fides in doing the work.  He goes

3    on to relate how both the state department and EPA supposedly

4    thought that Georgia-Pacific was deliberately foot dragging in

5    preparing all these reports, that Georgia-Pacific allegedly was

6    trying to doctor the reports.  He says, put spin in the reports

7    to favor Georgia-Pacific as opposed to what he viewed as a fair

8    and objective presentation of the science.  That EPA and the

9    state department didn't trust Georgia-Pacific's contractor, it

10   goes by the acronym BB&L, you'll see in here, and that they

11   thought that Georgia-Pacific was ultimately foot dragging on

12   preparing the feasibility studies because it deferred

13   Georgia-Pacific having to incur costs for cleaning up the

14   project.  And, for example --

15           THE COURT:  I apologize.  But who prepared this

16   report?

17           MR. SHEBELSKIE:  Georgia-Pacific through its

18   contractor at the site, BB&L.  And these reports that are at

19   issue here, this ten-year period --

20           THE COURT:  Criticizing the report, not

21   Georgia-Pacific.

22           MR. SHEBELSKIE:  Oh, no.  He is criticizing the

23   process, the entirety of how Georgia-Pacific through --

24   Georgia-Pacific he talks about specifically as well as its

25   contractor; he says Georgia-Pacific is telling the contractor

1    what to put in the reports, Georgia-Pacific is dragging out the

2    preparation of the reports.

3         THE COURT:  Who is he?

4         MR. SHEBELSKIE:  Oh, I'm sorry.  The witness,

5    Mr. Scott Cornelius, the project manager for the State

6    Department of Environmental Quality.  And he's not confining

7    his testimony to just the state department, but also EPA.  He

8    is expressing the views, he says, that EPA shared these views.

9    And he will, for example, and it culminates up at page 180 of

10   his testimony where he's asked, "And did MDEQ and EPA come to

11   believe that the delay was directly associated with the desire

12   of the PRPs to avoid those costs, to avoid the cost of cleaning

13   up the river?"  And his answer is, "Yes, they did."  Again,

14   referring to both the state and the EPA.

15        And then it continues to go on on page 204 with

16   regards to EPA becoming the lead agency and supplanting the

17   state in that, Mr. Cornelius says that EPA was asked, did that

18   happen.  "Did EPA's taking over the site happen because EPA was

19   perceived to have more fire power to compel cooperation?"  And

20   his answer is, "Yes."

21        And so, Your Honor, this whole process about EPA's

22   review of Georgia-Pacific's deliverables and its replacement of

23   the state as the lead agency is relevant to this case because

24   NCR is --

25        THE COURT:  I'm sorry to interrupt you but who is

1    Mr. Roth?

2         MR. SHEBELSKIE:  He is the lawyer for NCR who was

3    taking the deposition.

4         THE COURT:  All right.  Please go ahead.

5         MR. SHEBELSKIE:  Yes.  NCR challenges in part

6    Georgia-Pacific's entitlement to recover its past costs

7    incurred in connection with doing this work.  Because they

8    argue, pointing in part to Mr. Cornelius's testimony, that

9    Georgia-Pacific was dragging its feet, driving up the costs of

10   the work because obviously if you have to go through more and

11   more drafts, if you submit drafts that agencies reject, that

12   adds more costs, and that's all part of the hundred million

13   dollars in past costs for which we are seeking compensation.

14        Also, Your Honor, one of the factors, equitable

15   allocation factors is the cooperation of the parties, have they

16   cooperated with the pertinent agencies here and NCR does and

17   will rely on this type of testimony to say that Georgia-Pacific

18   really wasn't cooperative, that it was basically running a sort

19   of guerilla warfare behind the scenes, and EPA and the state

20   department both viewed Georgia-Pacific as noncooperative, and

21   indeed, the EPA had to step in in order to compel more

22   cooperation from Georgia-Pacific.

23        In addition, Your Honor, Mr. Cornelius goes on

24   starting on page 235 of his deposition and ensuing pages here

25   for something that frankly --  well, certainly something that's

1   not in the administrative record and requires a deposition to
2   explore.  He says before he was replaced as the project manager
3   he and one of his colleagues, a Mr. Al Howard, flew to EPA, and
4   I'm not sure whether that's in Washington or the regional
5   headquarters in Chicago, but in any event, he relayed, starting
6   his testimony that's highlighted here on page 235, that, "He
7   and Mr. Howard on behalf of the State Department of
8   Environmental Quality met with EPA to come up with a cleanup
9   plan for the river."  This is in about the year 2000 when the
10  substitution was made.  And he says in that meeting ultimately
11  that the EPA agreed with Mr. Cornelius that there needed to be
12  dredging of the river, and that would be the plan, that was how
13  they will proceed.  And that really is embodied on page 240 of
14  his deposition testimony where he's asked, "And it was your
15  impression at the end of the meeting that the EPA was on board
16  with your proposal?"  And he responds, "That's what he told
17  us," referring to the EPA official he is meeting with, "That's
18  what they told us.  They said that's the way we'll proceed."

19      And what he recounts in his deposition is that somehow
20  he believes Georgia-Pacific interceded behind the scenes and
21  forced the firing of Mr. Cornelius as the project manager for
22  the state and the project manager at the EPA who he met, and
23  that he is referring to here, and scuttled the supposed
24  agreement between EPA and the state to clean up the river
25  through a dredging operation that they agreed to in this

1    meeting.

2         Now, Georgia-Pacific is not in that meeting.  I'm

3    highly dubious that meeting actually took place, or the content

4    of it was as Mr. Cornelius described it.  But clearly this is

5    something that Georgia-Pacific needs discovery of.  And we can

6    only get that through a deposition of the EPA.  We have

7    Mr. Cornelius's take on it.  We are entitled certainly under

8    the rules to EPA's testimony on this very important topic.

9         THE COURT:  There is the allegations that

10   Georgia-Pacific stepped in at some point to scuttle the plan

11   talked about in this deposition?

12        MR. SHEBELSKIE:  Yes, sir.  Mr. Cornelius in his

13   deposition here talks about Georgia-Pacific he believes went on

14   a witch hunt and had him fired and had the EPA official fired

15   as well.  Removed from the project, not fired from their

16   respective agencies.  Removed from the, removed from the

17   project.

18        THE COURT:  But in fact EPA did step in and take over.

19        MR. SHEBELSKIE:  EPA took over, but did not in fact

20   decide -- the two individuals were replaced as project

21   managers, and EPA did not in fact in 2000 decide that a

22   dredging of the river was an appropriate remedy.

23        THE COURT:  All right.  But they did take over as the

24   lead agency.

25        MR. SHEBELSKIE:  They did take over as the lead

agency.  But, again, Mr. Cornelius's position is that it took over as the lead agency because Georgia-Pacific was not cooperating with the agencies, and EPA needed to be the bigger gun, or bigger club so to speak to beat us over the head.  I don't believe that's an accurate depiction of how those events came to happen, but we are certainly entitled to see if EPA agrees with Mr. Cornelius's characterization of EPA's reasons for doing that.

Now, again, Your Honor, it may well be that at trial Mr. Cornelius's testimony on behalf of EPA, saying what EPA's views were, some of that will not be admissible because he can't speak on behalf of the EPA, and we did object in the deposition to most of those questions, but, again, for discovery purposes we have to be forearmed with testimony to rebut this if it can come in.

And EPA says in its moving papers that it's not appropriate in a CERCLA action to collaterally attack agency decisions, be them the time critical removal decisions, or maybe their decision is not to in 2000 decide a cleanup.  Again, may well be the case ultimately that Judge Jonker rules on that, that NCR can't mount these kinds of collateral attacks to agency decision making and go beyond the administrative record.  But clearly they have conducted discovery to elicit such parol evidence outside the administrative record.

THE COURT:  They being --

1          MR. SHEBELSKIE:  They being NCR.  And intend to

2     introduce it, and we need to be able to respond to that on a

3     factual level through deposition testimony of EPA if it's

4     coming in.

5          So that's topics 8 and 9, Your Honor.  Kind of gives

6     you the context of why that's relevant and why we need a

7     deposition on those topics.

8          And then, Your Honor, 10, 11 and 12 I would lump

9     together because they concern really the amounts and nature of

10    the PCBs that are at the site that are the contamination PCBs.

11    Those topics are of course the sources of the PCBs at the site,

12    the PCBs that predominate and necessitate the cleanup and any

13    estimates of total PCBs.

14         Clearly this is a relevant topic.  The parties have

15    exchanged expert testimony.

16         Well, first of all, you will remember from a couple

17    months ago a motion that NCR brought against Georgia-Pacific to

18    compel, and of course also against International Paper, they

19    wanted, very importantly, say this is critical, we need to know

20    how many PCBs are in the river, who they came from, what the

21    source was and all these sorts of things.  And of course the

22    parties have now exchanged opening expert reports, and NCR has

23    certainly provided their estimations of what they think on a

24    year by year, mill by mill basis each mill contributed to PCBs

25    at the site, and how much are there, and how much were put in

1    the river historically, how much remain, and where the

2    remaining ones came from.  So these are clearly relevant

3    topics.  I don't think EPA would suggest that they're not

4    relevant topics.

5         And to the extent EPA has any fact information on

6    these topics that's not publicly disclosed, and to the extent

7    that they have opinions one way or the other, the fact that

8    they have made a decision one way or the other as you can't

9    make the fine gradations that NCR is trying to advance in here,

10   that is something that is obviously relevant and we need to

11   know.

12        So, Your Honor, those are the --

13        THE COURT:  Has the EPA not provided in some written

14   material somewhere the answer to number 10 as far as they know

15   it?

16        MR. SHEBELSKIE:  I believe there are, Your Honor, yes.

17   Yes.  They are in their certainly, for example, in their

18   five-year review plan they provide an estimate on a gross

19   total.  I don't believe they have any estimates that are

20   publicly disclosed, that I'm aware of, that I can recall, that

21   break it down by mill, by year, and the like.  Again, this can

22   be -- perhaps this will be a very short topic of the

23   deposition, these three, which is to say, yep, there is nothing

24   that the EPA has done, the EPA has not undertaken any

25   calculation or analysis other than the gross amount that's in

1     the river, and EPA has not and cannot do the fine gradation

2     that NCR is advancing and wants the other parties to provide.

3          So, Your Honor, those are the topics.  I should hope

4     that it's fairly clear then that they are relevant and not over

5     reaching, and would not present an undue burden to respond to.

6          And then, Your Honor, really dealing, addressing the

7     topic of undue burden here, obviously in this case this is the

8     only one, one and only deposition of the EPA.  The EPA worried

9     that perhaps this would open them up, a ruling for

10    Georgia-Pacific will open up the door to allow the other

11    parties to serve their own 30(b)(6) notices but that's not

12    going to happen because discovery cutoff has passed.  So that

13    won't occur here.

14         And then they also say more broadly that, well, they

15    don't want to be subjected to deposition notices and sort of

16    every little penny ante incident involving environmental

17    matters that might occur.  Well, with respect, Your Honor, this

18    is not a penny ante incident.  This is a --

19         THE COURT:  I hope not.  Because if it was I would

20    hate to see what the big cases were.

21         MR. SHEBELSKIE:  Exactly, Your Honor.  This is a

22    matter that is a quarter century in the making so far.  Since

23    1990 this has been a Super Fund site, and Georgia-Pacific has

24    been in litigation or under consent orders in that whole time.

25    This is a case where the past costs alone exceed a hundred

million dollars.  And if ultimately the agency, EPA is going to
compel a cleanup of Lake Allegan, dredging of the lake, the
costs could easily exceed a billion dollars.  And all of this
is being done, instigated, necessitated in consequence of the
EPA's designation of this site as a Super Fund site.  So we
wouldn't be here in front of you, Your Honor, if it wasn't for
the EPA.  And as the result of the EPA's designation of this
site they have caused Georgia-Pacific to spend well over a
hundred million dollars over the last quarter century and
potentially have Georgia-Pacific on the hook for a billion
dollars or more in the future.  Certainly this is not an
ordinary case.  This is not a case that is run of the mill, is
going to be repeated, and certainly the needs of this case
justify the discreet deposition on the topics that we have
reviewed here.

        And this will not impose an undue burden on the
agency.  They say, well, their employees are busy, they have
got lots of things to do for the government, and I understand
that.  But really I would have thought since Clinton v. Jones
that really the argument from a government official that they
can't find even one day to appear for a deposition is sort of
behind us.  Even the President could find a day to be deposed.
And here we have an agency that has thousands, maybe tens of
thousands of employees; they can identify who they want their
witness to be.  And we have got plenty of time to work with

1  them, Your Honor.  Our trial is not until September.  And so we

2  have several months to accommodate the EPA's schedule, for them

3  to find one employee to come for a couple of hours to sit down

4  to be deposed on these important topics in this billion dollar

5  case.  And we can go where they are, where the witness is; we

6  can accommodate the witness; if he is in Chicago in the

7  regional office or in Washington in the headquarters, we will

8  go there.  So we can be very flexible on the location, we can

9  be very flexible on the time because we have the luxury of time

10  here.  And, Your Honor, I can assure you, as not only a member

11  of the bar, but based on past experience in this case, that we

12  don't drag out these depositions.  Just like the MDEQ one we

13  were able to conduct our examination in three hours or so.

14  That's what I would anticipate we would have here on these

15  topics.

16          So for all these reasons, Your Honor, I ask that you

17  grant the motion and order the deposition to proceed.  Thank

18  you.

19          THE COURT:  Thank you, counsel.  Before I ask a

20  response from the EPA, are there any other parties that wish to

21  join in on the side of the proponent of this motion so that we

22  have all the arguments on the table so that the EPA can address

23  them?

24          MR. PARKER:  Your Honor, John Parker on behalf of

25  International Paper.  We may have an interest in some very

1   specific topics that are included in the motion, but depending

2   upon what the EPA says in their position, I may actually not

3   have anything to say.  So if I can, I would like to wait and

4   hear.

5            THE COURT:  All right.  That's fine.

6            MR. PARKER:  I suspect I will be more in support of

7   the EPA on that, those topics than against them.  So it may

8   make sense for me to go.

9            THE COURT:  You don't want Georgia-Pacific to get any

10  more ammunition in the opposition to your arguments than they

11  can possibly get.  I understand your position.  Mr. Fields.

12           MR. FIELDS:  Your Honor, Geoff Fields for NCR.  What

13  he said.

14           THE COURT:  You're for NCR, I realize that.  All

15  right.  We are going to take a short break because I have a

16  telephone call to make.  I need to speak to my wife.

17  Mr. Parker will appreciate the importance of that.  And we can

18  all relax for about five or ten minutes.  We will be right back

19  here.

20           MR. PARKER:  Thank you, Your Honor.

21           THE CLERK:  All rise, please.  Court is in recess.

22           (Recess taken, 10:43; Resume Proceedings, 11:04 a.m.)

23           THE COURT:  Counsel, good morning.

24           MR. HANSON:  Good morning, Your Honor.  My name is

25  Andrew Hanson.  I'm a trial attorney with the United States

1    Department of Justice, Environmental Enforcement Section.

2           THE COURT:  All right.

3           MR. HANSON:  The reason I point that out, Your Honor,

4    is because the context of EPA's presence here today, or United

5    States's presence here today is important.  This is a pending

6    enforcement investigation at the Kalamazoo River site.  That

7    investigation has been ongoing for a number of years now.  The

8    case is not closed, unlike some of the, the kind of case cited

9    In re Packaged Ice in the Eastern District of Michigan.  The

10   case is actually ongoing.  Enforcement materials are continuing

11   to be prepared, deliberative internal materials are continuing

12   to be prepared by the agency as it considers what additional

13   response actions might be needed at the Kalamazoo River site.

14          THE COURT:  How long has this investigation been going

15   on?

16          MR. HANSON:  Well, as counsel said, the site was

17   listed on the National Priorities List in 1990.

18          THE COURT:  Certainly no rush to judgment then.

19          MR. HANSON:  Well, it's a, a very extensive site, Your

20   Honor.  The river site alone is 80 miles in length from the

21   Morrow Dam to Lake Michigan, as the Court surely knows.

22          Now, with that in mind, that's the framework by which

23   we analyze --  that informs the framework by which we analyze

24   Georgia-Pacific's request for testimony.

25          THE COURT:  Not an idle question, but when is this

1     investigation ever going to end?  What constitutes a conclusion

2     to the investigation?

3          MR. HANSON:  Well, for the Super Fund investigation,

4     Your Honor, that would end when all of the remedial actions

5     have been selected and to be performed.  Not all the remedial

6     actions have been selected, and even then there is still some

7     implementation oversight of the remedies that are actually

8     performed.  But it is a lengthy process, as I'm sure counsel

9     for Georgia-Pacific can attest.

10          And isn't quite done yet, or it isn't done at all yet,

11    especially with respect to Operable Unit 5, the river site, and

12    also Operable Unit 1, which is partially at issue in the

13    underlying litigation here, Your Honor.  And would also be

14    covered by the topics in Georgia-Pacific's subpoena.

15          THE COURT:  Is it completed as to the remaining ones

16    that are not 1 and 5?

17          MR. HANSON:  For the most part, Your Honor -- I want

18    to be careful here.  For the most part that is correct.  Oh,

19    Operable Units 2 through 4 have remedies selected, the work is

20    either completed or it's ongoing.  And that, again, is

21    information that would be in EPA's second five-year review

22    which contains, frankly, most of the information that's

23    responsive to the subpoena topics.  And I'll address that

24    shortly.

25          But first I want to get to the standard that counsel

1  addressed for reviewing the subpoena that's been issued.

2  I think it's indisputable that there is majority rule

3  out there for agency responses to subpoenas for documents and

4  testimony.  The majority rule is that those requests are

5  analyzed under the Administrative Procedure Act's deferential,

6  arbitrary, capricious and not in accordance of law standard.  I

7  want to be clear that the United States is not taking the

8  position that there is some blanket override of the Federal

9  Rules of Civil Procedure necessarily.  The court reviews the

10  agency's decision on a case-by-case basis as to whether or not

11  it was proper to withhold the testimony or documents.  And the

12  reason I think the reason underlying the Touhy regulations is

13  important, the policy considerations that are in play here, the

14  context here is to agencies, not a party.  Agency is not

15  involved in the underlying litigation.  And as such, the agency

16  should be permitted to look at the limited resources that it

17  has, the cumulative burdens of permitting testimony, and the

18  risk of the appearance of picking sides in the underlying case,

19  all of which are --

20  THE COURT:  Well, speaking of your argument or not, if

21  you were a party, I see the argument that you're making, but on

22  the other hand, the APA would apply, if this were an APA

23  action, but here you are somebody who is being asked to supply

24  information under the Federal Rules of Evidence, or I'm sorry,

25  the Federal Rules of Civil Procedure, and is that really the

1    same situation as when you are rendering a ruling that the APA

2    would apply to.  It seems like you're using the APA proceedings

3    or procedure to apply to a rather collateral or tangential

4    situation where you're not a player to this litigation.  Sounds

5    like this litigation is more suited, or pardon me, the Federal

6    Rules of Civil Procedure are more suited for this type of

7    proceeding.

8            MR. HANSON:  Well, if I may clarify, Your Honor.  If

9    the deposition were ordered here, it would be taken pursuant to

10   the Federal Rules of Civil Procedure.  There is no question

11   about that.  But it's because the agency is not a party,

12   meaning it hasn't done something to be sued and it hasn't sued,

13   so it hasn't subjected itself to the Federal Rules of Civil

14   Procedure.  EPA's --

15           THE COURT:  That would apply to anybody that's not a

16   party to this litigation that receives a subpoena.

17           MR. HANSON:  Right, Your Honor.

18           THE COURT:  Subject themselves either.  But they are

19   still required to come in and be deposed.

20           MR. HANSON:  Right, Your Honor.  But I would say that

21   a federal agency is not just anybody.  It is a taxpayer funded

22   institution with a mission directed by Congress to do certain

23   tasks.

24           THE COURT:  Well, Congress took that into

25   consideration when it drafted or passed on the rules of civil

1     procedure.  These rules are authorized by Congress.  And it

2     provided for these rules to apply it to a congressional, I'm

3     sorry, to a governmental agency.

4            MR. HANSON:  Yes, Your Honor.  And I think I

5     understand what the Court is saying in that regard.  But at the

6     same time, Congress also authorized the agencies to promulgate

7     housekeeping regulations that manage how it uses its resources

8     in response to these sorts of requests.  EPA has promulgated

9     these regulations like many other agencies, and courts by and

10    large have upheld EPA's decision to apply those regulations.

11           There is something I want to point out about In re

12    Packaged Ice that was cited by counsel as well as Michigan

13    State versus Gardner.

14           First, Michigan State versus Gardner mainly relies on

15    the reasoning that In re Package does.  There is some

16    unfortunate facts I think in the Michigan State case where it

17    appears that the agency didn't respond at all to the subpoena

18    and then attempted to rely on the Touhy examples.  That's

19    difficult.  But In re Packaged Ice is important --

20           THE COURT:  That was Judge Scoville's case.

21           MR. HANSON:  I believe Michigan State was Judge

22    Scoville's case.

23           THE COURT:  Yes.  Is that the one you are talking

24    about or not?

25           MR. HANSON:  I'm shifting between Michigan State and

1     In re Packaged Ice.  Michigan State, the Michigan State case

2     mainly relied on the reasoning in In re Packaged Ice.  In re

3     Packaged Ice is important because although it held that the

4     federal agency was subject to Rule 45, there are a couple of

5     distinguishing factors there.  First, as I mentioned when I

6     started, the law enforcement investigation there was closed.

7     It was done.  And the Court was analyzing whether or not the

8     law enforcement privilege would apply to allow the agency to

9     withhold tape recorded interviews in that case.  But even as

10    the Court held that Rule 45 applied to the agency, it actually

11    analyzed the question of whether or not the agency was required

12    to disclose the information pursuant to the agency's own

13    regulations.  It looked at and walked through the agency's own

14    regulations here.  And that's what we are proposing here is the

15    Court apply and review the EPA's regulations to determine

16    whether EPA's decision to withhold the testimony was proper.

17             And I think it's also important to point out that --

18             THE COURT:  Federal Rules of Civil Procedure or under

19    the APA.

20             MR. HANSON:  I'm sorry.  I talked over you, Your

21    Honor.

22             THE COURT:  Did Packaged Ice use the APA analysis?

23             MR. HANSON:  It used the agency's regulations to

24    determine whether or not it was proper for the agency to

25    withhold.  But I don't believe In re Packaged Ice used an

arbitrary and capricious standard to review the decision under those regulations.

THE COURT:  I thought I heard you say that they reviewed the agency's regulations and whether the agency properly applied its regulations.  And that's what you were asking this Court to do.

MR. HANSON:  Yes, Your Honor, we are asking that Court to do that.

THE COURT:  But they didn't use the arbitrary and capricious standard.

MR. HANSON:  Yes, Your Honor.  That's correct.

THE COURT:  So you are asking this Court to follow Packaged Ice and the standard they used in Packaged Ice.

MR. HANSON:  Not necessarily, Your Honor.  What I'm asking the Court to do is to look at the propriety of the agency's decision to withhold the testimony pursuant to the agency's regulations and not necessarily Rule 45.

THE COURT:  What standard should this Court use?

MR. HANSON:  What standard of review --  well, our position is that the standard of review that governs should be the arbitrary and capricious standard should be -- we are not asking the Court to apply In re Packaged Ice in total.  I just wanted to point out some distinguishing features about that case.

I also wanted to point out, Your Honor, that Bankers

1    Trust did not squarely address this issue with respect to

2    whether an agency itself could withhold documents.  That was an

3    instance in which a company had issued a Rule 34 request to

4    another party in the case and then asked, and then that other

5    party declined to produce the material because of some agency

6    regulations that were at issue.  It isn't directly on point.

7    It doesn't directly control this case.  There is some

8    distinguishing facts there.

9            But I think the more important point that I want to

10   make, and that I most like the Court to remember, is that there

11   is a prevailing view out there that, a prevailing rule, I

12   should say, from the courts that the standard of review is

13   arbitrary and capricious when analyzing an agency's decision to

14   withhold documents and testimony.  Many of the cases cited in

15   our brief, Your Honor, relate to depositions.  Some also relate

16   to documents, but they take on those special facts and

17   circumstances associated with compelling an EPA witness, and

18   usually it's EPA -- in several of the cases, for example, Town

19   of Wolfeboro, Boron, the Boron case, and Davis, those are all

20   EPA employees at Super Fund, who are working on Super Fund

21   sites who were asked to be deposed.

22           And those courts found that --

23           THE COURT:  Were those individuals who were

24   subpoenaed?

25           MR. HANSON:  I believe they were individuals who were

1   subpoenaed, Your Honor, but I could check the cases to make

2   sure.  In any event, I'm not sure that it matters here.  And to

3   the extent that Georgia-Pacific is relying on the fact that it

4   has issued a Rule 30(b)(6) notice, I think that helps us, I

5   think that helps our case here.

6          THE COURT:  Why is that?

7          MR. HANSON:  That's because Georgia-Pacific is trying

8   to get the agency's official positions.  They are trying to

9   understand what the company, or what EPA's positions are

10  officially.  Those official positions are found in documents.

11  They wouldn't be found in the kind of, for lack of a better

12  word, intrigue and behind the scenes, and alleged back and

13  forth that appears to be at issue.  The agency's position is

14  found in the administrative record in the underlying actions.

15  It would not be found in the head of an individual employee.

16          The important thing here I think also is that with

17  respect to an individual employee --  well, I have to kind of

18  move on from that.

19          I think the main point is is that --

20          THE COURT:  Well, if somebody has subverted the

21  process, that can only be done by individuals.  Wrongdoing can

22  only be done by individuals.  In fact, any doing by any

23  organization can only be done by individuals.  And how do we

24  find that out if you're not going to let them talk to the

25  people that were involved?

1      MR. HANSON:  Well, I think that they would have to

2  show some compelling need or reason to supplement the

3  administrative record.

4      THE COURT:  The other side wants to attack the

5  decisions represented by that record or wants to go beyond that

6  record.  Now, whether Judge Jonker allows them to do that or

7  not is a question for another day.  But if Judge Jonker should

8  allow the other side to go beyond the record, shouldn't this

9  side be, shouldn't this party, Georgia-Pacific, be allowed to

10  meet those arguments or have discovery and to at least see if

11  they can meet those arguments?

12      MR. HANSON:  Your Honor, I think the answer to that

13  question is probably no.  To supplement the administrative

14  record certain exceptions have to be met.  And there doesn't

15  appear to be any showing by any party in the action so far that

16  those exceptions would be met.  Allowing Georgia-Pacific to

17  probe the --

18      THE COURT:  They're not challenging your decision in

19  the sense that, as I understand, Georgia-Pacific is not

20  challenging your decision and said your decision is wrong, they

21  want you to change your decision.  They want to explore what

22  happened so that if anybody else were to challenge your

23  decision, or challenge what they did based on your decision,

24  they can defend themselves and their actions.

25      MR. HANSON:  Yes, Your Honor.  I think I understand

1     that.

2              THE COURT:  Why is there anything privileged or secret

3     about that?

4              MR. HANSON:  Well, I think I understand, I think I now

5     understand why Georgia-Pacific wants that information, and much

6     of what, much of what I heard today was somewhat new to me.

7     But I think allowing --  our position would be that allowing

8     Georgia-Pacific to ask questions outside the administrative

9     record simply compounds the error of allowing improper judicial

10    review of EPA's decisions.  For example, in Exhibit H to our

11    brief, Your Honor, is the Action Memorandum for the time

12    critical removal action at the Plainwell Dam 2 Impoundment that

13    was undertaken in 2009.  That Action Memorandum explains why

14    EPA determined that the action was in fact time critical.  It

15    was due to the nature and extent of the contamination at issue.

16    That is the administrative record.  That's the agency's

17    decision and that's the agency's position.  Asking questions

18    around that or behind that was typically improper under CERCLA,

19    and that's why we, that's one of the reasons why we said no to

20    the deposition subpoena is because it essentially exposes EPA

21    to being deposed on information that is frankly limited to the

22    administrative record and the basis of its decision.  The

23    Action Memorandum itself attaches the administrative record --

24    not in our brief, Your Honor, we didn't want to flood the

25    Court's docket but the information is there.  It's in the

documents.

And so, again, our position would be that in light of
that, it would be improper to put up an EPA witness to answer
those types of questions when EPA's official position --

THE COURT:  Well, that might be an official position,
and that's perfectly appropriate.  But here one of the parties
directly affected by it in this rather significant litigation
of a rather significant cleanup which is alleging that there
was impropriety.  In fact, they are alleging that you were a
part of that impropriety.  And the other side who is alleged to
have conspired with you in that impropriety wants to defend
itself from allegations of impropriety.  Now, that may not be
of concern to the EPA that it's alleged to have been involved
in some impropriety.  But the other side has a very direct
interest in protecting itself.  Why should it not be able to
obtain testimony or facts or discovery that allows it to do
that?  It doesn't mean your decision is changed, in fact, one
might wonder why you would not want to defend your position.
But that's a question for another day, perhaps.

MR. HANSON:  Well, to be clear, Your Honor, if it came
up in the context of enforcement action, and if that arose, you
know, EPA would again point to the administrative record and
ask if there is something outside of the administrative record,
if there is some reason, for example, NCR, that you think
information is missing from the administrative record that

1  needs to be supplemented then you should, then you should show

2  us what that information is and explain why it should be

3  included.  NCR hasn't done that, to my knowledge.

4  Georgia-Pacific hasn't done that, to my knowledge.  Instead we

5  are kind of wandering beyond the administrative record to probe

6  the mental impressions and alleged back room conversations

7  that, frankly, I'm not aware of, and --

8       THE COURT:  Well, there is sworn testimony that that

9  happened, apparently.  That's what was pointed to this morning.

10  So you can't have a case tried before you open up the door to

11  see if it ought to be tried.  You gather the evidence

12  beforehand, and then you have your trial.  Again, it's not a

13  matter of attacking the decisions of the EPA in an EPA

14  enforcement proceeding, and whether the record should stand or

15  not, it's going to tangential matters, but ones that directly

16  involve how this record was produced.

17       MR. HANSON:  And respectfully, Your Honor, I think we

18  just see it differently.

19       THE COURT:  Obviously.

20       MR. HANSON:  We are concerned that allowing that kind

21  of deposition of an EPA witness effectively does open up the

22  administrative record and change the administrative record in

23  some way, especially where you're asking questions that aren't

24  EPA's official position.  And that is what Georgia-Pacific

25  claims to seek here.  None of that would be considered EPA's

1     official position.  And that's why the topics were so

2     problematic, apart from the difficulty of --

3           THE COURT:  So EPA might not deny that any of this

4     happened.  It might not be in a position to deny any of these

5     allegations.  You have to take a position different from the

6     record.  That's interesting.

7           MR. HANSON:  I'm not sure if that's, that's

8     necessarily true either, Your Honor, without further

9     investigation and talking with EPA.  What I do know at this

10    point is that EPA's decision on the time critical removal

11    action in 2009 is reflected in the administrative record.

12          If I can go on.  That record is either adequate or it

13    isn't.  If one of the parties has a reason to supplement that

14    administrative record, they can ask EPA to do that.  But I'm

15    not sure that this case --

16          THE COURT:  I think that's exactly what they are

17    doing.  They are asking you to supplement it under oath at a

18    deposition.

19          MR. HANSON:  I'm not sure I understood it that way,

20    Your Honor.  That they are asking the EPA to supplement the

21    administrative record.  I think that there's a process and a

22    body of law that applies in that circumstance.  But in --

23          THE COURT:  You thought it was an improper question,

24    somehow intruded upon your decision making, couldn't you raise

25    that objection at the time?

1          MR. HANSON:  Yes, Your Honor, we would.  If we were

2     ordered to produce a witness to be deposed, we will certainly

3     reserve all of our objections to the questions that would be

4     answered during the deposition, that's right.  And to the

5     extent it probed privileged information, we would instruct the

6     witness not to answer.

7          THE COURT:  Sure.  So what's the problem in responding

8     to the 30(b)(6) deposition?

9          MR. HANSON:  Well, maybe the most appropriate thing to

10    do is to go through the topics.  I think we expressed our

11    concerns with respect to topic 6, an improper judicial review

12    outside the administrative record.

13         I think EPA's topic 7 is another topic in which we

14    would be concerned that the topic in total essentially asks for

15    deliberative information.  We would have to object to every

16    question that comes along, that comes out along that topic

17    because, as I said, there are many things that EPA is still

18    considering, and with respect to the site.  So topic 7 would be

19    completely objectionable to us, Your Honor.  It almost

20    certainly would call for privileged information, and I will say

21    that where a topic does seek privileged information,

22    essentially in total, then it's a problem.  I think it would be

23    appropriate for the Court to protect the deponent from having

24    to answer questions along those lines.

25         THE COURT:  These are things that you would never sit

1    down and talk about with any of these parties?

2         MR. HANSON:  Meaning would the EPA sit down in the

3    context of settlement negotiations and discuss potential future

4    response actions?

5         THE COURT:  These parties, with the public, with

6    anybody.  I mean this is all totally private information that

7    even as a public agency you would never express your present

8    expectations regarding what needs to be done in the future?

9         MR. HANSON:  Where those --

10        THE COURT:  Or what you were considering?

11        MR. HANSON:  And where that information is public, it

12   would be found in things like the feasibility study for Area 1

13   of Operable Unit 5, which was I believe just recently completed

14   by Georgia-Pacific.  That is the type of document that does

15   explore, as I understand it, potential future cleanup actions.

16   But, again, that document would speak for itself and the

17   information about what the potential cleanup options would be

18   found there.  Not through --

19        THE COURT:  That was completed by Georgia-Pacific.

20        MR. HANSON:  I believe so, yes.

21        THE COURT:  Does that reflect what the EPA's

22   expectations are?

23        MR. HANSON:  EPA I believe approved the feasibility

24   study pursuant to --

25        THE COURT:  Number one, I haven't read it, and that

would presuppose I even understood or understand it if I did

read it.  But it may put forth alternatives and so forth.  I

don't know what approval of that would mean.  But I think the

question that they want to explore is what are the EPA's

expectations.  Are those set forth in their document?

MR. HANSON:  Well, when EPA, and this goes to the next

topic, topic 8, when EPA approves a document like that, it's

essentially giving the blessing to go forward.  EPA is saying

you're doing it but we approve your work, and go forth,

essentially.  And that's done pursuant to a detailed --

THE COURT:  You're giving your blessing to it.

MR. HANSON:  Exactly, exactly.

THE COURT:  You're giving your blessing to the one

they just finished?

MR. HANSON:  Yes, I believe it's been approved.  I

believe it has been approved.  And if that's not correct, there

has been a public meeting at least issued on it recently, the

feasibility study.  And if that's not correct, I'll let the

Court know.

But the main point is even if EPA hadn't officially

approved it, the work was done pursuant to an Administrative

Order on Consent between Georgia-Pacific and EPA that was

authorized in 2007.  That Administrative Order on Consent has

detailed review and approval procedures, so, for example, EPA's

process for reviewing and approving deliverables, that's the

1    kind of document that lays out that process.  That process is

2    laid out there.  That's EPA's official position through the

3    Administrative Order on Consent of how it will review and

4    approve the work that Georgia-Pacific does.  That's another

5    example of a document that contains the information that would

6    be responsive to the topic.  And it would be somewhat awkward

7    for an EPA witness to answer questions about an Administrative

8    Order on Consent that Georgia-Pacific signed and agreed to at

9    the example.  And so that's one of the concerns with topic 8.

10          Topic 9, there is a memorandum of agreement between

11   EPA and the State of Michigan as to who will be the lead agency

12   at the site, as I understand it, and even a subsequent site

13   specific amendment to that memorandum of agreement.  And,

14   again, information found in a document that explains that, as I

15   understand it, Your Honor, I haven't seen that particular

16   document, but as I understand it, that contains the responsive

17   information.

18          Topic 10, 11 and 12, I think as counsel acknowledged,

19   that information would likely be found in the five-year reviews

20   that EPA has prepared.

21          THE COURT:  Going back to number 9, I think that goes

22   to the deposition that counsel was talking about.  And there is

23   some question about --  some question underlying the

24   proceedings leading up to the EPA assuming responsibility as

25   the lead agency at the site.  And this went beyond simply a

1     decision to take over from the state.

2          MR. HANSON:  Yeah.

3          THE COURT:  This went outside anything in the official

4     record.  I think this is perhaps the allegation, this is the

5     time these allegations were made.  Again, is this something

6     that they are not entitled to inquire about?

7          MR. HANSON:  Your Honor, this might be the one area

8     that could be ripe for deposition if it were limited to that

9     sort of thing.  You know, I would expect that the reasons for

10    EPA taking over would be in the agreement.  For example, the

11    five-year review references the agreement and says that it was

12    simply in the public's interest for EPA to take over, and I

13    would expect that one of those reasons is that EPA has more

14    resources from an enforcement perspective and from I think a

15    technical and analytical perspective; that shouldn't be

16    surprising that the federal government would have resources

17    that perhaps the state wouldn't have.  But, Your Honor, if

18    ordered to produce a witness, this might be one area where the

19    witness could be prepared.

20         THE COURT:  Well, I would assume that you have more

21    resources too, but on the other hand, they are able to produce

22    a witness, they have the resources to do that, and apparently

23    you don't have the resources to produce a witness.  So I

24    question whether or not the federal government does have more

25    resources.

1      Perhaps I'm just --

2          MR. HANSON:  Well, Your Honor, it's not so much that

3      the agency doesn't have the resources; that it's trying to

4      manage its resources and use them as carefully and wisely as

5      possible.

6          THE COURT:  I understand the argument.  I understand

7      you have to make the argument.  If I've heard an argument

8      that's not persuasive in any of these briefs, that's probably

9      it.

10         That brings me to the one question I had about leaving

11     the jurisdiction.  What was that argument about?  You have to

12     travel to a different judicial for the purpose of --

13         MR. HANSON:  The place of compliance is designated to

14     Benton Harbor.  But if --

15         THE COURT:  That's a long ways away from where?

16         MR. HANSON:  Chicago.  It's 99 miles.

17         THE COURT:  How far?

18         MR. HANSON:  99 miles.

19         THE COURT:  99 miles.

20         MR. HANSON:  Yeah, I think, yes.

21         THE COURT:  Do the people that supervise the Kalamazoo

22     River ever go to the Kalamazoo River?

23         MR. HANSON:  Yes, Your Honor, they are at the

24     Kalamazoo River from time to time.

25         THE COURT:  They travel from Chicago to go to the

1  Kalamazoo River?

2  MR. HANSON:  Yes, they do, Your Honor.

3  THE COURT:  They have to go past Benton Harbor to get

4  to the Kalamazoo River?

5  MR. HANSON:  It's along the way, Your Honor.

6  THE COURT:  Yeah.  Okay.  They have to actually

7  probably travel farther to get to the Kalamazoo River.

8  MR. HANSON:  Yeah.  When EPA is engaged in its

9  official duties to clean up and oversee the work on the

10  Kalamazoo River it does have to --  now I think I see where the

11  Court is headed.

12  THE COURT:  The jurisdiction of the court here, and

13  the jurisdiction of the Kalamazoo River is where all this is

14  taking place.  I don't know what Chicago has got to do with

15  anything.  If the guy wants to live in Chicago, work in

16  Chicago, I think he is traveling outside of the jurisdiction of

17  where this is taking place.  Why doesn't he move to here?  Why

18  doesn't EPA office set up here?  This is a billion dollar case.

19  We could use an EPA office here in Western Michigan.  Save a

20  lot of money.  I didn't realize how much he was traveling

21  outside of our jurisdiction to supervise this district.  I

22  think our new congressman ought to look into this.

23  I suspect you're not even from this district.

24  MR. HANSON:  From this district?

25  THE COURT:  Your office isn't even in this district.

1          MR. HANSON:  No, Your Honor, I'm based in Washington

2     D.C.

3          THE COURT:  You have 36 members of the Department of

4     Justice across the street; none of them came over across the

5     street to argue this case, and yet they send you from

6     Washington D.C. to argue this case.  Now, if that isn't an

7     expenditure of funds, that surprises me too.  If we are talking

8     about traveling outside the jurisdiction for the purpose of

9     taking a seven-hour deposition -- we could talk about this all

10    day long, and I could just have fun with it.  But I'm not going

11    to say anything more.

12         MR. HANSON:  Your Honor, I think the case is being

13    managed out of Washington D.C.; I think counsel for

14    Georgia-Pacific mentioned it's very complex, very detailed.

15         THE COURT:  I'll mention that to your 36 colleagues

16    across the street.

17         MR. HANSON:  Not to say that they couldn't handle it,

18    Your Honor.  But I was assigned this matter.

19         THE COURT:  You're doing a fine job.  Actually a lot

20    of those people did transfer from Washington D.C. to come out

21    here to Western Michigan.  Perhaps they like me.  Or maybe that

22    indicates why they maybe assigned this case to somebody in

23    Washington D.C. who presumably doesn't have to deal with the

24    snow as much as they do here.  All right.

25         The cost factor cannot be a serious one.  The time

1    factor cannot be a serious one.  In a normal case, and

2    certainly not in a case with the dollar and the importance of

3    this case.  As far as the public interest is concerned, I

4    presume the EPA works in the public interest, I presume the

5    interests of the EPA are the public interest, and I think

6    that's how any matter ought to be considered.  Would you agree

7    that the interests of the EPA have to be coterminous or could

8    he equal with the public interest?

9            MR. HANSON:  Absolutely, Your Honor.

10           THE COURT:  Wouldn't be any different from the public

11   interest, by definition, I assume.

12           MR. HANSON:  No, Your Honor.

13           THE COURT:  Okay.  So that gets us back to some of the

14   other objections that were raised.  And I only go down that

15   road because these objections were kind of broad brushed.  I

16   think we have to look at them on a one-by-one basis.  And I

17   appreciate you spelling these out, what your objections are.

18           Now, you mention that Judge Scoville in the MSU case

19   tracked the other case that you have discussed, Packaged Ice.

20           MR. HANSON:  Yes, Your Honor.

21           THE COURT:  Most of your discussion was focused on

22   Packaged Ice.  Did you think the analysis by Judge Scoville was

23   appropriate or not?  And of course I'm mentioning that case

24   because Judge Scoville is a member, or was until a few months

25   ago, a member of this court.  So was his analysis correct or

1    not in your mind?

2         MR. HANSON:  In our mind, Your Honor, the analysis was

3    not correct.  The analysis should have been under the

4    Administrative Procedures Act, arbitrary and capricious

5    standard.

6         THE COURT:  Okay.

7         MR. HANSON:  If I may, Your Honor, while I'm thinking

8    of it.  I think I did misspeak earlier with regard to whether

9    EPA had approved the Area 1, Operable Unit 5 feasibility study.

10   I believe it's just out for the public's consumption right now.

11   I just want to correct the record in that regard.

12        THE COURT:  That was the one that was just done.

13        MR. HANSON:  Yes.

14        THE COURT:  How long does it take to review or approve

15   those?

16        MR. HANSON:  It's hard to say, Your Honor.  There's

17   inevitably, from my understanding, going to be some back and

18   forth between EPA and the preparer of the feasibility study

19   where that entity is preparing it pursuant to Administrative

20   Order on Consent.

21        THE COURT:  That's Georgia-Pacific.

22        MR. HANSON:  Yeah, in this case that's

23   Georgia-Pacific.  There are instances in which if there are

24   certain deficiencies the agency can ask Georgia-Pacific to cure

25   those deficiencies.  That inevitably takes time.  It's under

1    the agreement, it's the question is how, how serious are the

2    deficiencies to warrant some subsequent action or EPA action,

3    for example.  But they are very technical documents.  They take

4    a considerable amount of time.  They take a considerable amount

5    of expertise.  And so it's, it is not unsurprising that it

6    would take sometime to complete a feasibility study or remedial

7    investigation.

8            THE COURT:  I suppose I wouldn't be doing justice to

9    Georgia-Pacific if I let you sit down without asking you to

10   respond to the Housekeeping Statute that they raised that added

11   that last sentence that the statute does not give the agencies

12   license to not provide material.

13           MR. HANSON:  Even notwithstanding that last sentence,

14   Your Honor.

15           THE COURT:  Which is passed as a law by Congress and

16   signed by a President of the United States.  I'm particularly

17   interested in that sentence.

18           MR. HANSON:  Well, our position, Your Honor, is the

19   agency is not withholding information.  The information that is

20   responsive to the subpoena topics, the agency's official

21   positions are found in documents.  We have objected to the

22   burden of producing a witness.  That is the crux of that.

23           So as I said, even as the Housekeeping Statute doesn't

24   authorize the agency to categorically withhold documents or

25   information, we're not doing that here, we are just declining

1    to produce a witness due to burden issues, the same

2    consideration that would apply under Rule 26 and 45 as well as

3    I note at the end of our brief.

4          THE COURT:  Well, you are choosing what, what you are

5    producing, rather than giving what the other side, what is

6    being requested.  In other words, you're selecting what you

7    want to produce.  So you really are withholding.  You're

8    withholding what somebody is requesting.  Is that a fair

9    statement?

10         You're limiting the availability of records to the

11   public, are you not?

12         MR. HANSON:  Yes, based on the objections that are

13   stated in the response to the subpoena, the same objections

14   that --

15         THE COURT:  So the statute says this section does not

16   authorize the withholding of information from the public or

17   limiting the availability of records to the public.  So the

18   statute provides no authorization to limit what you provide,

19   you would have to find it someplace else, wouldn't you?

20         MR. HANSON:  Well, for example, there are limitations

21   in the Freedom of Information Act that would authorize the

22   withholding of certain information --

23         THE COURT:  You're relying on the Freedom of

24   Information Act?

25         MR. HANSON:  The agency treats requests for document

1    subpoenas or subpoenas for documents as FOIA requests.  And so

2    it responds to those document subpoena requests as FOIA

3    requests.  So in that instance we would be relying on the

4    Freedom of Information Act.

5         THE COURT:  But they are not requesting a subpoena

6    duces tecum here.

7         MR. HANSON:  They haven't but NCR has in a separate

8    request.  But not in this case, that's right, Your Honor.

9         THE COURT:  All right.  So we are talking about a

10   30(b)(6) deposition here.  So we are not talking about FOIA.

11        MR. HANSON:  In this limited instance, that's right,

12   Your Honor.

13        THE COURT:  So we come back to Section 301.  And 301

14   does not authorize withholding information from the public or

15   limiting the availability of records to the public.  So if that

16   doesn't give you authorization, then you have to look someplace

17   else if you're going to limit the availability of what you

18   provide to the public.  Fair enough?

19        MR. HANSON:  Well, first I would like to -- EPA's

20   regulations, since the Court --

21        THE COURT:  I understand we get past Section 301 as

22   the grounds for limiting what you're providing, is that a fair

23   statement?

24        MR. HANSON:  Right.  And I think the way we get past

25   is still EPA has lawfully enacted Touhy regulations which I

1    understand the Court is having some difficulty with.

2         THE COURT:  I just want to know if we get past 301.

3    Or are you still trying to rely on 301?

4         MR. HANSON:  I'm trying to rely on EPA's Touhy

5    regulations which are promulgated pursuant to 201 (sic), but if

6    I may, the same objections that we would make, that we have

7    made in response to the Touhy requests are the same objections

8    we would make under Rule 45, as I note at the end of our brief

9    on page, I believe it's page 10.  For the same reasons Rule 45

10   would allow the Court to limit the scope of the testimony or

11   quash the subpoena altogether based on the burden concerns, the

12   risk of revealing privileged information, and improper judicial

13   review.

14        THE COURT:  Stop a second.  So you're relying on

15   regulations promulgated pursuant to 301, which allow the head

16   of the agency to promulgate regulations for his or her

17   department for the conduct of its employees for the

18   distribution of performance of its business and for the

19   custody, use and preservation of its records, papers and

20   property.  Which does not authorize it to withhold information

21   from the public or limit the availability of its records to the

22   public.

23        So the head of the EPA promulgates these regulations,

24   but they do in fact withhold information from the public as the

25   EPA construes them.  They issue them and they construe them,

and they say, well, we argue the regulations that we have

issued, we are going to construe them in a way that in fact

withholds information.  Am I understanding that correctly?

MR. HANSON:  I'm not sure I would completely see it

that way, Your Honor.  There isn't a decision by EPA to

categorically withhold information.  It's when doing so --

THE COURT:  To use the old duck analogy - paddles like

a duck and it quacks like a duck, and it looks like a duck,

it's probably a duck.  So you can say we're not doing it, but

that's what you're doing.  That's what you're accomplishing.

You're promulgating the regulations that you're allowed to

promulgate to accomplish something that the regulations are not

supposed to promulgate or not supposed to accomplish.

MR. HANSON:  I think I understand the Court's position

in this regard, Your Honor, but unfortunately --

THE COURT:  I'm in a real quandary.  I had a case the

other day, in fact I still have got it so maybe you can help

me.  Maybe I shouldn't be asking you because the other side

isn't here.  But they called up, they filed a motion, said we

want an FBI investigation, an ongoing FBI investigation for

their private litigation.  I looked at that and I said, wait a

minute, you can't subpoena the FBI investigation for your

private litigation, can you?  I thought it was open and shut.

Obvious, can't do it.  I read the statute.  I get to this last

line.  And I'm sitting here reading this last line and I don't

know how to deny it.  And nobody can tell me how to deny it.
So I have an ulterior motive in asking you to give me some good
reasons.

MR. HANSON:  It may be, Your Honor, that that
particular statute doesn't authorize the withholding of
information, but there may be other statutes that authorize the
withholding of the information.

THE COURT:  I hope so.

MR. HANSON:  That would justify the agency's position.
For example,, as I pointed out today, Rule 45 and Rule 26 would
be other examples that would allow the agency to --  I'm sorry?

THE COURT:  What are we talking about, the FBI or the
EPA?

MR. HANSON:  I'm talking about the EPA, Your Honor.

THE COURT:  Maybe something else that allows the EPA
to do it.  It sounds like 301 isn't the statute that does it.

MR. HANSON:  301 is not the statute that does what,
Your Honor?

THE COURT:  Allows them to withhold information.
You're saying there must be some other statute out there that
allows them to withhold the information.

MR. HANSON:  There could be any number of privileges,
for example, the qualified law enforcement privilege, Your
Honor, or attorney-client privilege.

THE COURT:  Well, I'm asking you what are you relying

1    on in telling this Court that you've got the authority to

2    withhold information from the public and Georgia-Pacific?

3         MR. HANSON:  We are relying on EPA's lawfully

4    promulgated Touhy regulations pursuant to the Housekeeping

5    Statute.  Other courts have reviewed EPA's Touhy regulations

6    and applied them in exactly this kind of setting:  Davis,

7    Boron, Town of Wolfeboro, and have permitted EPA to withhold

8    deposition testimony when it was not in EPA's interests.  In

9    addition, we are relying on Rule 45 and Rule 26 of the rules of

10   civil procedure as noted in our last page of our brief.  I just

11   want to make sure we are being clear about that, Your Honor.

12        THE COURT:  All right.  Those may be appropriate to

13   use anyway.  The Federal Rules of Civil Procedure may be

14   appropriate.

15        MR. HANSON:  Again, Your Honor, that's not our

16   position.  But we would certainly understand the Court, if the

17   Court applied Rule 45 and 26.

18        THE COURT:  Well, the same Congress that drafted 301,

19   which says you can't withhold information, also drafted or

20   approved the drafting of 45 and 26.  The Supreme Court approved

21   45 and 26.  So that's kind of --  I look at that kind of a

22   rock.  I look at the regulations that EPA drafted as kind of a

23   beautiful crystalline glass object of some sort; when a glass

24   object meets a rock or a rock meets a glass object, regardless

25   of how it happens, the glass object usually doesn't fair too

1    well.  Maybe that's a bad analogy.

2         Let's look at the regulations.  The other side has

3    pointed out that the regulations apply to an employee that

4    receives a subpoena.  They say we are not, we are no longer

5    subpoenaing the employee.  30(b)(6) goes to the, 30(b)(6) goes

6    to the agency.  Now, you've said, all right, that makes our

7    position stronger because you're asking for our official

8    position.  Well, regardless of that, the regulations don't

9    appear to apply in that situation.  What's your response to the

10   fact that the regulations don't mention anything about 30(b)(6)

11   depositions directed to your agency?

12        MR. HANSON:  Your Honor.

13        THE COURT:  Speak only to employees.

14        MR. HANSON:  I think I respond that the agency is made

15   of employees.  It would be an employee who would testify on

16   behalf of the agency.  I'm not sure that we would see that as a

17   meaningful, a necessarily meaningful distinction.  Having said

18   that, we do recognize that it does refer to employees in the

19   text of the regulation.

20        THE COURT:  You drafted the regulations.  They are

21   your regulations.  30(b)(6) has been on the books for a long

22   time, and certainly you've had a chance to amend those

23   regulations to address this situation.  There's been litigation

24   about it.  Why wouldn't you address the situation?

25        MR. HANSON:  I'm not sure I have an answer to that,

1    Your Honor, except that, again, I don't think that it's, it

2    would be a meaningful distinction.  The effect would be the

3    same.  An EPA witness would have to make themselves available,

4    prepare for a deposition, and be deposed for a number of days

5    on topics that we have objected to for a number of reasons.

6    Whether that person is an individual, or a representative, at

7    least in the context of the burden, I'm not sure would matter.

8            THE COURT:  Well, it's not really the same thing, is

9    it?

10           MR. HANSON:  No, it's not.

11           THE COURT:  A deposition of an employee only requires

12   the employee to testify what he personally knows.  And actually

13   doesn't have to prepare at all.  He either knows it or he

14   doesn't know it.  He can prepare, I suppose.  It's his personal

15   knowledge.  A 30(b)(6) the witness is testifying on behalf of

16   the organization.  It's the organization testifying, and the

17   30(b)(6) witness does have to prepare himself to speak on

18   behalf of the organization and be able to testify as to

19   everything on the schedule.  It's an entirely different

20   concept.

21           MR. HANSON:  I agree with the Court, Your Honor, there

22   is no dispute there.

23           THE COURT:  Wouldn't the regulations really in this

24   sense they are really addressed to the employee and what

25   happens when an employee is required to testify about some

1    factual situation in his agency, or produce something in

2    something, in some aspect of the agency's work that he's been

3    involved in.  And I can understand why you don't want the

4    employee running off giving a deposition that may be where the

5    answers may be attributable to the organization.  So you have

6    this clearing house or this centralizing is a better word

7    perhaps, you go to somebody and, an agency and you get his

8    clearance or her clearance as to how the employee is supposed

9    to respond.  But that's different than when the 30(b)(6) goes

10   to the agency itself to get the agency's position.  And the

11   regulations do not appear to apply to that situation.  And if

12   they don't apply to that situation, how can the EPA rely upon

13   them today?

14          MR. HANSON:  I think in part, Your Honor, as I

15   explained the agency's position is that the effect is

16   essentially, would essentially be the same.  It's an employee

17   either way.  And, if anything, the burden is greater because,

18   as the Court pointed out, the employee would have to prepare on

19   the enumerated topics for the deposition.  Because, and it's

20   important, it's the agency's position, it's important for the

21   witness to be as prepared as reasonably possible.  I think

22   that's why I think it's still appropriate, we would say it's

23   still appropriate to rely on the Touhy regulations here.

24          THE COURT:  All right.

25          MR. HANSON:  Unless the Court has any other questions,

```
1     I will have a seat.

2            THE COURT:  Thank you.

3            MR. HANSON:  Thank you, Your Honor.

4            MR. PARKER:  Your Honor, may I be very briefly heard?

5            THE COURT:  Well, I'm going to take role here in the

6     sense who wants to say anything further.  We are approaching

7     12:00 o'clock, and I do have another matter previously

8     scheduled.  Mr. Fields, do you have comments as well that you

9     want to offer?

10           MR. FIELDS:  I request two minutes or less.

11           THE COURT:  Mr. Parker.

12           MR. PARKER:  Five minutes or less.

13           THE COURT:  And then the motion is brought by

14    Georgia-Pacific.  So they really get the last word here.

15           MR. SHEBELSKIE:  Your Honor, no more than five

16    minutes.

17           THE COURT:  All right.  I'm afraid because that adds

18    up to half an hour by the time we get done, we will reconvene

19    at a little bit after 2:00 o'clock.  I have a two-hour meeting

20    scheduled at 12:00 o'clock.  I'm sorry, but I don't think we're

21    going to get done in the next three minutes, and my meeting is

22    out of the building at 12:00 o'clock.

23           MR. SHEBELSKIE:  Your Honor, I'm willing to waive my

24    rebuttal argument if the other parties will just so we can, we

25    have taken a sufficient course of time.
```

1    THE COURT:  Well, I hate to do that to you.  You're

2    entitled to make the arguments.  And it's valuable, your

3    comments are valuable.  All right.  In deference to counsel,

4    but I'll hold you to two minutes apiece, two minutes apiece,

5    three minutes.  Is that fair?

6    MR. PARKER:  Thank you, Your Honor.  I will skip then

7    Mrs. Parker's instruction that I wish you a happy new year.

8    The only, we take no position on behalf of

9    International Paper on the propriety of the deposition itself.

10   The only thing that I would focus the Court's attention on in

11   less than two minutes is topic number 7 which goes to EPA's

12   expectations regarding future removal.  As counsel for EPA

13   pointed out, they believe that is privileged and they will have

14   to object to every question.  I think it's appropriate for the

15   Court to enter a protective order as to that topic, and I would

16   note, add that not only does it call for privilege, it calls

17   for speculation.  And while Georgia-Pacific has cleverly tried

18   to word the topic and EPA's present expectations about future

19   actions, I think if a question were asked that way in a trial

20   in front of you, you would sustain a speculation objection as

21   to it.  And I think asking the EPA to talk about what it might

22   or might not do or what it might or might not order at this

23   site in the future is inappropriate, and, therefore, I would

24   suggest that the Court exclude topic 7 if in fact it orders

25   this deposition to go forward.  Thank you, Your Honor.

1       THE COURT:  Thank you, counsel.  Mr. Fields.

2       MR. FIELDS:  Good afternoon, Your Honor.  NCR likewise

3   took no position on the motion.  If the Court determines to

4   authorize the deposition, NCR reserves the right and intends to

5   participate.  Not taking a position doesn't mean we are not

6   interested.  I sat here this morning and heard

7   Georgia-Pacific's counsel say any number of things about either

8   what NCR's theories of the case is, its positions, its actions,

9   what it's said and done.  I'm not going to waste your time here

10  rebutting.  I decline to adopt his summary of any aspect of

11  NCR.  We will have another day in court and NCR can speak for

12  itself at that time.

13      THE COURT:  That's fine.  I assumed you had a

14  responsive position, and I'm not litigating what the

15  allegations are between the two of you quite honestly.

16      MR. FIELDS:  And it's not germane to what your ruling

17  is.  I'll speak my piece in that regard.  Last but not least,

18  there wasn't a handout given to everybody.  There wasn't enough

19  copies for everybody.  I make a request on the record that NCR

20  get a true and complete copy of the handout so that I have it

21  for my file.  And with that I'll sit down.

22      THE COURT:  Can we do that, counsel?

23      MR. SHEBELSKIE:  I think we can do that.  And I

24  apologize.  I thought I had six copies.  I miscounted.

25      MR. PARKER:  We have been sharing nicely, Your Honor.

1          THE COURT:  How many copies are we short?

2          MR. SHEBELSKIE:  Just one.

3          THE COURT:  We have one extra for the clerk.  We don't

4    need that.  We will take care of this right now.

5          MR. FIELDS:  Thank you.

6          THE COURT:  All right.  That matter is taken care of.

7    Thank you.

8          MR. SHEBELSKIE:  Three quick points, Your Honor.

9    There was colloquy about the standard of review that

10   Judge Borman used in Packaged Ice Antitrust litigation case,

11   and he applied the Rule 45 standard.  He went through it, the

12   analysis, and found, and I read here, "The Court finds that the

13   federal discovery rules, including Rule 45 and 26(b), along

14   with the applicable privilege rules, provide sufficient "tools"

15   with which this Court can adequately protect both the

16   litigant's right to receive evidence and the government's

17   interest in protecting both its processes and its resources.

18   Accordingly, the Court will consider whether or not, under Rule

19   45, the subpoena calls for privileged matter or whether

20   production would cause an undue burden."  And that was the In

21   re Packaged Ice litigation case that then Judge Scoville

22   analyzed, found persuasive and consistent with the Sixth

23   Circuit's decree that agencies cannot by regulation override

24   the Federal Rules of Civil Procedure.

25          The second point, Your Honor, I would make is

1    listening to EPA's counsel, if what he says is true about the

2    various topics, then this will be a short deposition.  If, for

3    example, on the time critical removal actions EPA's witnesses

4    are going to say, there was nothing untoward here, our reasons

5    are those stated in the administrative record, we have no

6    further, there was nothing improper or any sort of collusion

7    with Georgia-Pacific, then it's a short, crisp series of

8    questions.  Likewise, for all the topics.

9         And in particular for topic 7 that Mr. Parker also

10   addressed, Your Honor, it wouldn't be appropriate to preclude

11   that because we heard actually from EPA's counsel this morning

12   precisely the type of testimony we need from EPA.  He candidly

13   admitted EPA is still working away.  There's work ongoing right

14   now as we speak.  Back in Chicago or Washington, people at EPA

15   are undertaking analyses and making decisions and assessments;

16   there will be ongoing monitor work.  So in fact even the

17   factual representations that we received here today would be

18   sufficient to establish the minimal jurisdictional threshold we

19   need to establish that there would be future work done that

20   Georgia-Pacific could be responsible for.  So again, these are

21   matters of fact.  Be very quick.  This deposition will not be

22   burdensome.

23        And finally, Your Honor, is that even if the arbitrary

24   and capricious standard were to apply here I think you would

25   have to order the deposition to go forward.  Because quite

1  manifest now that the EPA's decision is arbitrary and
2  capricious, even under the APA.  They are relying, they have
3  made clear today, on a regulation as the basis for their
4  refusal to comply with the subpoena.  Even though that
5  regulation on its face does not apply to 30(b)(6) depositions,
6  even though that regulation on its face doesn't say that the
7  agency will and can withhold deposition testimony in response
8  to a 30(b)(6) notice, and as importantly, that regulation is
9  based on a statute that doesn't allow them to withhold
10 information.  It is clearly arbitrary and capricious to rely on
11 an erroneous legal proposition, namely the Touhy regulations,
12 as something that doesn't give them the authority for the
13 decision.  Conversely, they acted arbitrarily and capriciously
14 by not considering and taking into account the rules, the
15 bedrock principle embodied in the Rules of Civil Procedure that
16 every party is entitled to every man's evidence and testimony.
17 And they haven't weighed that as part of the public interest
18 here for this very important case.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.  Well, I don't have time to
21 rule from the bench, and I'm not 100 percent certain how I'm
22 going to rule.  I think I know how I'm going to rule.  I would
23 prefer to rule from the bench because it's easier than it is to
24 draft an opinion.

25          There are some situations where a party might be well

1    advised not to resist a subpoena.  I know the EPA does not want

2    to open the door to more subpoenas down the road in such cases.

3    On the other hand, what you risk if you lose this motion and

4    you appeal it, and I for some reason should be upheld, which

5    has been known to happen, is that you get some bad law as far

6    as you're concerned.  And is it really worth it.  Or it's going

7    to be a relatively short, and probably not that inconvenient

8    deposition which will be precedent for nothing down the road in

9    other litigation.

10           So is it really a battle that you want to fight.  I

11   haven't studied Scoville's, Judge Scoville's opinion that

12   carefully.  And perhaps he did rule incorrectly.  He was only

13   here as a judge for 28 years before he retired recently.  He

14   had a good reputation.  He was a straight A. student in college

15   and law school.  But then we found out that actually --  he

16   attended the University of Michigan Law School --  he did get

17   one class where he did not get an A.  He got an A. in most of

18   his classes.  So we did have to let him go.  If that undermines

19   his opinion.

20           Judge Borman, well, he is an Article III judge so I

21   won't comment on him.  But certainly seems to be a nice guy

22   every time I have met him, fairly bright.  Their decisions

23   would probably be ones that I would quote if I upheld the, that

24   motion.  And this Court has been known to rule against federal

25   agencies and been upheld at the Sixth Circuit.  That may or may

1    not be something that you want to have happen because the

2    batting average of the Sixth Circuit is --  well, if I want to

3    be upheld at the Sixth Circuit I'm not going to say anything

4    more.

5           But I just wonder if this is a battle you really want

6    to fight, if you want to get another opinion on the record.  On

7    the other hand, you may well prevail.  So you have between now

8    and the time I write the opinion to decide if you want to

9    continue to pursue this.  I assume you're going to continue to

10   pursue it so I'm going to go ahead and write an opinion.

11          MR. HANSON:  Your Honor, may I respond to that?

12          THE COURT:  Of course you can.

13          MR. HANSON:  Thank you.  I candidly, we learned a lot

14   of information today about why these topics are important to

15   Georgia-Pacific that we hadn't heard before.  And candidly,

16   Your Honor, I did my best during the argument but I have

17   learned some new information, and I would be grateful if I

18   could have sometime to talk to counsel for Georgia-Pacific

19   about the deposition and perhaps come to an accommodation and

20   produce a witness.

21          THE COURT:  Well, I leave for London tomorrow morning.

22   And I can assure you that between now and tomorrow morning I'm

23   not going to look at this file.

24          And be there for a week and when I come back there

25   will probably be something else on my desk so it will be just a

1    little while before I get to this.  Will that give you enough

2    time?

3              MR. HANSON:  That is more than enough time.

4              MR. PARKER:  Enjoy your trip, Your Honor.

5              THE CLERK:  All rise, please.  Court is adjourned.

6              (Proceedings concluded, 12:10 p.m.)

1          C E R T I F I C A T E

2

3          I certify that the foregoing is a transcript from the

4    Liberty Court Recording System digital recording of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9

10                              /s/ Kathy J. Anderson

11                              Kathy J. Anderson, RPR, FCRR

12                              U.S. District Court Reporter

13                              402 Federal Building

14                              Grand Rapids, MI  49503

15

16

17

18

19

20

21

22

23

24

25