```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE WESTERN DISTRICT OF MICHIGAN

 3                           SOUTHERN DIVISION

 4     GEORGIA-PACIFIC CONSUMER PRODUCTS LP, et al,

 5           Plaintiff,                No.  1:11cv483

 6       vs.

 7     NCR, INTERNATIONAL PAPER COMPANY,
       WEYERHAEUSER,
 8
             Defendants.
 9

10     Before:

11                       THE HONORABLE HUGH BRENNEMAN, JR.,
                              U.S. Magistrate Judge
12                            Grand Rapids, Michigan
                              January 28, 2015
13                       NCR Motion to Compel Proceedings

14     APPEARANCES
                       MR. PETER A. SMIT
15                     Varnum Riddering Schmidt & Howlett
                       333 Bridge Street, NW
16                     PO Box 352
                       Grand Rapids, MI 49501-0352
17                     616-336-6000

18                             On behalf of the Plaintiff;

19                     MR. JOHN MICHAEL HEYDE
                       Cravath Swaine & Moore LLP
20                     Worldwide Plaza
                       825 Eighth Avenue
21                     New York, NY  10019
                       212-474-1000
22
                               On behalf of the Defendant NCR,
23

24

25
```

```
 1

 2              MR. JOHN DANIEL PARKER
                Baker & Hostetler LLP
 3              PNC Center
                1900 E. Ninth Street
 4              Cleveland, OH 44114-3485
                216-861-7610
 5
                        On behalf of the Defendant IP.
 6
                MR. SCOTT MICHAEL WATSON
 7              Warner Norcross & Judd
                111 Lyon Street, NW
 8              Suite 900
                Grand Rapids, MI  49503
 9              616-752-2465

10                      On behalf of the Defendant Weyerhaeuser.

11

12

13
         TRANSCRIBED BY:  MS. KATHY J. ANDERSON, RPR, FCRR
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                 January 28, 2015

 2                          PROCEEDINGS, 9:50 a.m.

 3              THE COURT:  Good morning.  Starting a few minutes late

 4      and I apologize for that.  I was going to use as my excuse that

 5      my judicial assistant, my secretary, had unexpectedly had a

 6      bout of the flu which caused her to be out, for which reason we

 7      can't function virtually at all in this office.  But as I

 8      walked out of my chambers I noticed she was here, much to my

 9      chagrin; she ought to be home in bed.  But there goes my excuse

10      at least for anything further today.  And she's under strict

11      orders to get the heck out of here and go home, at least after

12      she's gotten done everything I need to have done.

13              So, well, good to see you all.  We are down to four

14      attorneys today.  Despite that, I'm sure this is a significant

15      motion.  I see Mr. Parker here.  How is Mrs. Parker?

16              MR. PARKER:  She sends her regards, Your Honor.

17              THE COURT:  Does she agree with your position on this

18      motion?

19              MR. PARKER:  She rarely agrees with much of anything I

20      say, so I didn't specifically ask her about this one.

21              THE COURT:  Too bad.  Might have been able to resolve

22      this quite promptly.  But I guess we will have to stumble

23      through it on the merits.  Looking forward to taking my

24      direction from however she thought it ought to come.

25              MR. PARKER:  I will ask her about the next motion, I
```

1    promise you.

2          THE COURT:  Certainly save time.  Now, this is the

3    defendant NCR Corporation's motion to compel the production of

4    documents from defendant Weyerhaeuser Corporation, or Company,

5    pardon me.  I think we are talking about three documents here.

6    And I have had a chance to read the briefs, including the one

7    from Georgia-Pacific, and with that, we can begin.  NCR.

8          MR. HEYDE:  Thank you, Your Honor.  John Heyde with

9    Sibley Austin for defendant, NCR Corporation.

10         As Your Honor noted, this motion to compel relates to

11    three documents.  There are two of them that we are seeking in

12    the motion to compel.  One of them has already been disclosed.

13    The three documents that are at issue or that are related to

14    this motion, the one that's already been disclosed is a

15    mediation questionnaire response that Plainwell Inc. had

16    submitted in a mediation that related to allocation of

17    responsibility among those parties for the Kalamazoo River.

18         The two documents that have not been disclosed, or to

19    be more precise, one of them has not been disclosed, the other

20    was disclosed and then was clawed back as inadvertently

21    produced.  The document that was clawed back as inadvertently

22    produced is a mediation brief for an initial statement that

23    draws on some of the facts in the mediation questionnaire

24    response.  And that also cites a third document that we are

25    asking, or the second document we're asking for, and that is a

1     consultant's report called the Arcadis report.  Arcadis is the

2     name of the consulting firm.

3           I thought I would start --

4           THE COURT:  Let me see if I understand this.  The

5     mediation brief that was produced, you had that for several

6     years as I understand it, it was clawed back, and you now want

7     to have that reproduced to you so that you can use it.

8           MR. HEYDE:  Correct, Your Honor.

9           THE COURT:  A copy of it that you have suppressed.

10          MR. HEYDE:  Correct.  We have sequestered our copies.

11          THE COURT:  And that in turn cites this Arcadis report

12     that you have never seen but that you want produced as well, is

13     that correct?

14          MR. HEYDE:  That is correct as well, Your Honor.

15          THE COURT:  Now, as far as the answers to the

16     questionnaire that was, that were given to the EPA, where do

17     you stand on those?  I thought you wanted those produced or you

18     wanted --

19          MR. HEYDE:  Those we have, Your Honor.

20          THE COURT:  You have those.

21          MR. HEYDE:  Yeah.  Those were produced initially, in

22     fact, these were obtained also directly from EPA.  They are

23     very similar to the mediation questionnaire responses that you

24     considered in a previous order when International Paper moved

25     to compel Georgia-Pacific to produce its mediation

1    questionnaire response.  And as Your Honor may recall in that

2    case, the Georgia-Pacific questionnaire response had been

3    produced to EPA but they did not want to produce it in this

4    litigation.  The Plainwell Inc. questionnaire response,

5    however, was produced in this litigation, and was available

6    from EPA.  So that is not -- we don't need that in this motion

7    to compel.

8                THE COURT:  For some reason I thought you had

9    requested that.  So that's not an issue today.

10               MR. HEYDE:  Correct.  It's related to the other two

11   arguments, but it is not a target of our motion to compel.

12               THE COURT:  All right.  Go ahead, please.

13               MR. HEYDE:  All right.  I thought I would start with

14   the sense of why we want the two documents that we want.

15   Because both Weyerhaeuser and Georgia-Pacific have raised in

16   their papers the notion that there's no harm by providing this

17   to NCR because Rule 408 would have prevented NCR's use of these

18   documents anyway.

19               The mediation questionnaire response provides some raw

20   facts that we think, again, having not read the Arcadis report,

21   but that we think the Arcadis report develops with scientific

22   methodologies and provides some context to in that the

23   mediation brief further develops into conclusions about

24   percentages that various mills discharged of the PCBs that went

25   into the Kalamazoo River.

1    Even if the Arcadis report and brief are never

2    admitted in this case, they still are reasonably calculated to

3    lead to the discovery of admissible evidence because they may

4    include scientific data or scientific methodologies that the

5    experts in this case may be able to rely on.  For instance, if

6    there is an estimate of discharges that passed through the

7    wastewater treatment system of either the Plainwell mill or the

8    other mills at issue, there may be publicly available data that

9    is mentioned in the Arcadis report that the other experts may

10   or may not be aware of.

11   And the ability to see how scientists, how engineers

12   put together the facts that are in the mediation questionnaire

13   response is something that's illuminating to the experts even

14   if those reports or those documents never actually get

15   admitted.  I don't want to waive the possibility that we might

16   find a way to use those that does not contravene Rule 408, but

17   the point I want to make is even if they are never admitted,

18   they are still useful, and that is why we are seeking them.

19   NCR is entitled to these documents for four

20   independent reasons, any one of which would require production

21   of the mediation brief, and any one of three of those arguments

22   would require production of the Arcadis report.  Those reasons

23   are:

24   One.  That Weyerhaeuser waived whatever privilege

25   existed as to the mediation brief by producing it in this case

1    over three years ago.

2         Second, as to both the brief and the Arcadis report,

3    whatever privilege accompanied those documents expired when

4    Plainwell, the author of those documents, dissolved and became

5    defunct.

6         Third, the privileges that may have existed with

7    respect to these documents were selectively waived when the

8    mediation questionnaire response was produced to EPA back in

9    2002.

10        And then finally, we would argue that the two

11   documents were never covered by the Goodyear privilege in the

12   first place.

13        So that's the order that I would propose to address

14   those.  If there is another order you would like or if there

15   are particular questions you have, I'm happy to go to those but

16   otherwise I'll tackle them in that order.

17        First of all, Weyerhaeuser waived the privilege with

18   respect to the mediation brief by disclosing the document in

19   its initial disclosures in 2011, and by not seeking to claw

20   those documents back for over three years, and for ten days

21   after we let Weyerhaeuser know that we had the mediation brief

22   and sought the Arcadis report.

23        In order to keep the document privileged despite an

24   inadvertent disclosure, Weyerhaeuser has the burden of proving

25   that the disclosure was inadvertent, that it took reasonable

1  steps to prevent the disclosure, and that it took reasonable

2  steps after the disclosure to rectify its error.  That burden

3  belongs to Weyerhaeuser, and Weyerhaeuser really has not met

4  that burden.

5  As I stand here, I can't tell you facts that relate to

6  whether the document was or was not inadvertently produced, or

7  what steps Weyerhaeuser took before producing the document to

8  prevent its disclosure.  However, Weyerhaeuser has not given

9  you anything to work with on that issue.  As to the first

10  issue, they have essentially implied we waived any discussion

11  of that, and as to the second issue they gave you one sentence

12  in their response that said they represented that they took

13  reasonable steps but they haven't given you any additional

14  detail.  Where I would like to focus is on the third prong fact

15  which is the steps that Weyerhaeuser took after disclosure of

16  the error.

17  And for that, you know, I don't know what they might

18  have done during the three years between the time they

19  disclosed it and October 13th, 2014, but on October 13th I

20  wrote Weyerhaeuser a letter asking for some documents that I

21  thought should have been in their production but were not, and

22  among those documents was the Arcadis report.  And so I wrote

23  to Weyerhaeuser to say, look, we have got your mediation brief

24  or Plainwell's mediation brief, and it references this Arcadis

25  report; we would like to have the Arcadis report too, and we

1   think that was covered in our document production request.

2          A week later I took the deposition of Weyerhaeuser's

3   30(b)(6) designee, and during that deposition I marked the

4   mediation brief as an exhibit.  There was no objection from

5   Weyerhaeuser's counsel.  I asked Weyerhaeuser's 30(b)(6)

6   designee whether he had seen the document, and whether he had,

7   whether Weyerhaeuser had any information that contradicted

8   anything in the mediation brief.  Both of those questions also

9   came in without objection.

10          It wasn't until three days after the deposition, ten

11  days after I sent the letter originally that I asked

12  Weyerhaeuser's counsel whether they were planning on responding

13  to my October 13th letter, and later that day I received a

14  letter back from Weyerhaeuser saying that they would not

15  produce the Arcadis report because they alleged it was subject

16  to the Goodyear privilege.  The next day they told me over the

17  phone that they were considering clawing back the mediation

18  brief as inadvertently produced.  And then of course they did

19  claw it back four days after that.

20          Your Honor, I would argue that that is not reasonable

21  steps to rectify the error.  They had their attention called to

22  the briefs specifically seven days before the deposition.  They

23  had that available to them in prepping their 30(b)(6) designee.

24  They had the document handed to them during the deposition.

25  They mentioned that there were hundreds of pages of documents,

1    and while that may be true over the course of the deposition,

2    still this document was handed to them individually as an

3    exhibit.  It's not the kind of exhibit where you would have had

4    to read through and decipher somebody's handwritten notes to

5    discover whether it's an attorney's notes or whether it's not

6    privileged.  It's clearly privileged on its face, if it is in

7    fact privileged.

8              So they were very clearly on notice at the deposition.

9              We cited case law for the proposition that, you know,

10   if you fail to object to the introduction of an exhibit during

11   the deposition, that you waived the privilege.  The Samaritan

12   Alliance case is particularly on point in that situation.  And

13   partly analogous as well because that also involved a document

14   to which attention had been called in advance.

15             The cases that Weyerhaeuser has cited factually in

16   opposition to our finding of waiver are distinguishable.  The

17   Myers case that they cited mentions a three-week period between

18   the time the party was informed of the disclosure and the time

19   they filed a motion, but doesn't make clear at all when that

20   party actually objected.  They may very well have objected much

21   quicker than three weeks but hadn't filed the formal motion

22   until the three-week period.  In the, in the Alcon

23   Manufacturing case that Weyerhaeuser cites involves attorney

24   notes.  And in particular there was an issue of whether

25   somebody could have told that the handwritten notes they were

1    looking at were in fact the notes of the attorney or the notes

2    of the non-attorney.  And so in that case it may have been

3    reasonable not to notice during the deposition that the

4    document was objectionable.  Here, however, would have been

5    readily apparent on its face.

6            THE COURT:  I'm sorry.  In the Alcon case if the notes

7    were attorney notes, they would have been, that would have been

8    readily evident?

9            MR. HEYDE:  No.  The point is the opposite.  That in

10   the Alcon case, the Court had allowed the party to claw back

11   documents even though they had not objected during a

12   deposition, but the notes in that case required some

13   deciphering in order to figure out that they were in fact

14   privileged.  And that's why the Court excused the fact that

15   they did not object during the deposition.  In contrast in this

16   case --

17           THE COURT:  It was not evident that the notes were

18   privileged.

19           MR. HEYDE:  Exactly.  Whereas in this case, it is

20   evident that at least the Goodyear privilege is an issue.  Now,

21   of course we will argue that the privilege did not apply, but

22   if one thinks that it does, the facts that would lead you to

23   think that would have been readily apparent from the document.

24           THE COURT:  I see.  Thank you.

25           MR. HEYDE:  So for those reasons we contend that

1  Weyerhaeuser waived the privilege as to the mediation brief

2  through its disclosure in 2011.

3         The second reason that NCR is entitled to the

4  mediation brief and the Arcadis report is because whatever

5  privilege attached to it expired when Plainwell Inc. expired a

6  few years ago.  And this reason applies to both the mediation

7  brief and the Arcadis report.  We have not found case law on

8  the question of who holds the Goodyear privilege as opposed to

9  who holds the attorney-client privilege, but in the

10  attorney-client privilege realm, it's clear that when a

11  corporation becomes defunct in the sense that they no longer

12  have an agent who can assert the privilege, the attorney-client

13  privilege expires with the corporation.  Plainwell has

14  undisputedly expired.  It no longer exists, it no longer has

15  any agents.  And we think there is a good analogy to be made to

16  the attorney-client privilege here that documents that may have

17  been subject to the Goodyear privilege lose their privilege

18  when the author of those documents disappears.

19         Now, Weyerhaeuser and Georgia-Pacific have said two

20  things in response to that:  One is they have urged that you

21  should find that the settlement privilege is held by everybody

22  involved in the settlement discussion, and not just by the

23  party that created the documents.  I would urge the Court that

24  at least in the case of documents like this that are prepared

25  clearly by a single party, that don't reflect discussion among

1    the parties an offer and counteroffer and compromise but rather

2    set out the position of a single party or facts related to a

3    single party, that the better analogy is to the attorney-client

4    privilege and to a holding that the privilege is held by the

5    author of those documents, not by everyone in the mediation.

6          If you took the contrary rule, then the approval of

7    every party that participated in that discussion would have

8    been required to release those documents to EPA, would be

9    required in your previous motion to compel that addressed the

10   Georgia-Pacific mediation questionnaire response.  So the

11   better, cleaner rule is to hold that the privilege belongs only

12   to the party that created the documents.

13         The other argument that --

14         THE COURT:  The Arcadis document has not, to your

15   knowledge, been released to any other party outside of the

16   settlement conference.

17         MR. HEYDE:  Not that I'm aware of, Your Honor.  Now,

18   we will argue in a minute as part of my third reason that there

19   is subject matter waiver as a result of the release of the

20   mediation questionnaire response.  But the Arcadis report

21   itself I am not aware that that has been released to anyone.

22         THE COURT:  It did not go to the EPA.

23         MR. HEYDE:  I'm not aware that it did.

24         THE COURT:  Did it go to the other parties?  Was it

25   shown to the other parties as part of the settlement?

1          MR. HEYDE:  My understanding is that it was shown to

2     the other parties, and the reason I believe that is that the

3     mediation brief which we saw before it was clawed back cited

4     the Arcadis report.  And again, the citation would not make

5     sense if the Arcadis report had not also been shared.

6          THE COURT:  You'll have to refresh my recollection.

7     Was NCR part of the settlement?

8          MR. HEYDE:  No, NCR was not part of the settlement,

9     nor was International Paper.  And that, frankly, is one of the

10    reasons why these documents are important to us is that we have

11    facts in the mediation questionnaire response, we have

12    scientific methodology in the Arcadis report, and we have a

13    compilation of all of that into an assertion of what shares

14    parties should bear.  Two of the parties in this litigation

15    have full access, not only to Plainwell's versions of these but

16    to those of any other party that participated in the mediation.

17    Two of the parties to this case, NCR and International Paper,

18    are in the dark as to what those documents say.  And so that's

19    part of the reason why the Arcadis report is important to us.

20         THE COURT:  To your knowledge, do any of the other

21    parties rely upon this report in preparing their expert reports

22    or any other reports that are going to be used in this case?

23         MR. HEYDE:  I have not seen them cited, and to my

24    knowledge, none of the expert reports explicitly reference

25    this.  But the reports would still be useful to us and still

1    reasonably calculated to lead to the discovery of admissible

2    evidence because our experts can use the methodologies to

3    either tell them that there's additional data out there that

4    perhaps they want to acquire, tell them that there's an

5    additional methodology that they would want to consider,

6    perhaps show the limitations of methodologies that they might

7    not otherwise be aware of; to some degree I'm speculating, of

8    course, because I haven't actually seen the document.  But

9    that's the kind of thing I would expect a consultant report on

10   these topics to tell experts in this case who are opining on

11   many of the same issues.

12          THE COURT:  All right.  Thank you.  Please go ahead.

13          MR. HEYDE:  Okay.  As I mentioned, there were two

14   arguments that Weyerhaeuser and Georgia-Pacific had put up in

15   response to our argument that the privilege had expired with

16   Plainwell.  The other argument that they have put forward are

17   or that Weyerhaeuser has put forward is the idea that

18   Weyerhaeuser should be considered a part author of the

19   Plainwell documents, the mediation brief and the Arcadis

20   report.

21          And they have done so, they have made that assertion

22   in a cursory fashion, but they have not backed that up in any

23   way, have not met their burden of showing that the privilege

24   would apply by backing it up.  And for that matter, when I took

25   the deposition of Weyerhaeuser's 30(b)(6) designee, that

1    designee testified that as to the mediation questionnaire

2    response, that Weyerhaeuser perhaps provided a little bit of

3    data but that Weyerhaeuser had not been an author of the report

4    or the author of the questionnaire response, that it had not,

5    you know, he could not testify, for instance, that Weyerhaeuser

6    had seen a draft of the mediation questionnaire response prior

7    to Plainwell putting it in.  The deponent said he knew nothing

8    about the mediation brief but I think it's fair to conclude

9    that if Weyerhaeuser was not a full co-author of the mediation

10   questionnaire response, it was not also a full co-author of the

11   mediation brief or the Arcadis report.  So I think this has to

12   be viewed as the communication of Plainwell Inc., and that the

13   privilege associated with it, if any, went away when Plainwell

14   Inc. went away.  So that's our second reason why NCR is

15   entitled to the document.

16        The third reason NCR is entitled to the two documents

17   is that Plainwell waived whatever privilege attached to those

18   documents when Plainwell disclosed the questionnaire response

19   to EPA.  And as we discussed, that document undisputedly was

20   disclosed to EPA, and that raises the question of subject

21   matter privilege.  And, you know, as you know, there's a waiver

22   as to other documents if it's an intentional waiver of the

23   first document, if the documents concern the same subject

24   matter, and if the documents ought in fairness to be considered

25   together.  Together, excuse me.  We think all three of those

1    are met.  Obviously the waiver to EPA was intentional.  The

2    documents do concern the same subject matter.  They all relate

3    to the subject matter of the amount of PCBs that were

4    discharged from the Plainwell mill as well some of the other

5    mills, and we think they ought in fairness be considered

6    together.

7           Because right now what we have is we have the raw

8    material, if you will, for what ultimately becomes a conclusion

9    as to the amount of PCBs that came out of the Plainwell mill

10   and the efficacy of the Plainwell mill's wastewater treatment

11   system.  But what we don't have is any of the context that goes

12   with that.  So for all I know, the Arcadis report may cast some

13   doubt on certain parts of the mediation questionnaire response.

14          THE COURT:  Where do we draw the line then?  Because I

15   assume there might be a lot of material that Weyerhaeuser, or

16   in this case was it Plainwell, would have had that they used or

17   from which they drew to prepare their responses to the EPA.  Is

18   all of that therefore discoverable because the appearance of

19   answers from which they may have drawn some information --  I

20   assume they have a library of -- perhaps not a good word --

21   volumes of information that and they have used volumes of

22   information from which to take their responses.  Does all of

23   that become available to you because it published some answers

24   to the EPA?

25          MR. HEYDE:  I think these documents are pretty clearly

1    within the core, without necessarily knowing where the, where

2    the fuzzy edges of that circle may be.  But if you look at the

3    Graff case that we cited in our papers, there the Court did go

4    pretty far.  In the Graff case the party had submitted in the

5    response to an information request to EPA under the Clean Air

6    Act, and the Court required that party to provide all of its

7    drafts of that same questionnaire response.  And that to me

8    goes pretty far to not only require the, you know, the final

9    product but also all the draft material as well.

10          I don't think we're urging you to go that far here.

11   We're not urging you to compel drafts of the mediation

12   questionnaire response.  Notes that people compiled while

13   creating the questionnaire response, what we're asking you to

14   compel are two documents that are discreet documents that

15   together make up the initial position of Plainwell Inc.

16          THE COURT:  But aren't those attenuated from the

17   actual responses to the EPA then would be drafts of the same

18   document that went to the EPA?

19          MR. HEYDE:  Well, I guess I would liken them as

20   interrelated documents in the sense that if someone had given

21   me appendix B of a report, and refused to give me the main text

22   of the report, I would want the main text of the report in

23   order to understand what's in appendix B and to understand what

24   the import of what was in appendix B.  I see the mediation

25   questionnaire functioning as that appendix.  You know, it

1    provides very straight answers to straight factual questions.

2    And then Plainwell had its consultants take an engineering and

3    a scientific look at that and turn that into estimates of what

4    people really cared about, which was the amount of PCBs that

5    was discharged from this mill, things like the efficacy of the

6    wastewater treatment system, et cetera.  And then the mediation

7    brief takes that, you know, one step further and says, you know

8    , based on the scientific analysis we think the percentages of

9    PCBs discharged from the various mills were these.

10         So certainly at least with respect to the Arcadis

11   report, I think we're getting the other side of the same coin,

12   that is, the mediation questionnaire response that you really

13   can't fully evaluate what you're seeing in the mediation

14   questionnaire response unless you also see what the consultants

15   have done with that in the Arcadis report.

16         THE COURT:  All right.

17         MR. HEYDE:  So for that reason we would say there's a

18   subject matter waiver, and that's the third independent reason.

19         The fourth reason that we argue that NCR is entitled

20   to receive the two documents is we don't think Your Honor

21   should interpret the Goodyear privilege as broadly as

22   Weyerhaeuser would like to see you interpret it.

23         And there are two reasons for that:  One is that

24   unlike the case in Goodyear, this was a case that was not part

25   of an existing lawsuit.  So Goodyear dealt with an existing

1      lawsuit.  It dealt with a mediation and settlement discussions

2      that were facilitated by the Court; in contrast here, there

3      never was a lawsuit among these parties.  You know, this

4      discussion did not pertain to settling a lawsuit.  And as Your

5      Honor pointed out in the Little River Band case, there are some

6      good reasons for requiring there to be a lawsuit because the

7      complaint and the answer clearly delineate the scope of the

8      discussion.  It provides a nice bright line rule that

9      distinguishes the things that should be subject to the

10     settlement privilege versus the things that are harder to tell

11     whether they are settlement of litigation versus, you know,

12     business efforts to, for instance, in this case, decide which

13     party was going to pay how much for the consultants that they

14     were planning to jointly hire going forward in the future.

15            So I would argue that the Goodyear privilege ought to

16     be limited at the point of whether there is or whether there is

17     not a lawsuit.

18            The other reason that the Goodyear privilege should be

19     held not to encompass these two documents is that they get far

20     afield of the core of what the settlement privilege is designed

21     to protect.

22            These are not the offers and the counteroffers and the

23     compromises and conditional hypothetical concessions that the

24     Goodyear case talks about.  You know, they are more straight

25     factual responses, straight enough in the case of the mediation

1    questionnaire response that the parties were willing to give

2    them to EPA as their response to governmentally required

3    questions.  And in the case of the Arcadis report, and the

4    mediation brief, they represent either scientific methodology

5    applied to those facts, or they represent the initial statement

6    in the mediation and not the give and take.

7           And so I think it makes sense to draw the circle of

8    what's covered by the Goodyear privilege in a way that keeps

9    privileged those documents that really are part of the give and

10   take of settlement, but keeps outside of that privilege these

11   documents.  And so because there was not a lawsuit, because

12   these are not really the types of communication that the

13   privilege was designed to protect, we think that these

14   documents were not subject to the Goodyear privilege to begin

15   with.

16          This is one of the same arguments that NCR made when

17   International Paper filed its motion to compel the

18   Georgia-Pacific mediation questionnaire response.  Ultimately

19   that's not the reason that Your Honor gave for requiring that

20   production, but that was one of the arguments we made there.

21          And I guess the final point related to that is it

22   makes sense to strictly construe the Goodyear privilege,

23   because like any other privilege, the privilege is in

24   dirigation of the search for truth, and you know one should

25   attempt to construe it in such a way that it kind of keeps a

1    bright line, and, you know, stays firmly focused on litigation

2    settlement and documents that truly relate to the give and take

3    of settlement.

4         So for those four reasons --

5    THE COURT:  Let's come back just in passing to the

6    Little River case.  And obviously I'm going to sit up and take

7    notice of any case decided by that particular judge.  Give it

8    great deference of course.

9         But as the other side points out, I believe that that

10   pertained to a document that was published from one side in the

11   litigation to the governor of this state announcing that they

12   were, the tribes in fact were not going to continue to pay the

13   government a certain amount of money, and there was certainly

14   no intention to keep that secret.  So there was no intention to

15   keep anything confidential.  And I think the Court pointed out

16   the obvious there.  So that was really the driving force in

17   that instance, I believe.  Although I haven't read the decision

18   in sometime.

19        So I'm not sure how applicable that case is.

20        As far as the settlement is concerned, we encourage

21   people to be candid at settlement conferences, and say things

22   and put things forward in a spirit of, as I said, of candor

23   because that's what encourages people to settle.  And we don't

24   want them looking over their shoulder thinking, well, if I say

25   this or I put this forward, is it going to come back to haunt

1    me in a trial.  Is somebody going to point out that I made this

2    offer, I made that admission and so forth.  Because if that's

3    going to be the case, I'm not going to say these things.  I'm

4    not going to put this piece of material on the table.

5          I think your suggestion is that we draw the circle in

6    a sufficiently tight fashion that it would not include purely

7    factual evidence, and that would exclude the Arcadis report.

8    But of course we don't know necessarily what's in the Arcadis

9    report.

10          Does it make good policy for the Court now to start

11    trying to second guess each item that is discussed at a

12    settlement conference?  Should we be second is guessing the

13    what the parties talk about at a settlement conference and say,

14    well, that item is something that should be protected but some

15    other item was sufficiently objective, it shouldn't, it should

16    not be within the circle of protected documents and therefore,

17    it can be something that should come back to haunt them, if it

18    does haunt them, and it should be put out on the table for

19    everybody to see.  Or should we allow the, should we defer to

20    the concept that what's said at a settlement conference really

21    ought to be protected to accomplish the purpose of a settlement

22    conference, both now and in future settlement conferences?

23          MR. HEYDE:  I guess two responses to that, Your Honor.

24    One is that the settlement privilege is not the only protection

25    the parties have as they go into settlement.  Rule 408 still

applies.  So to the extent that something sits outside the
circle that we would draw for the Goodyear privilege, it may be
discoverable.  It's still not going to be admitted into court
in order to establish the liability of the party or in order to
establish the dollar amount that that party ought to be paying.
So I don't think there's too much worry that this is going to
be used against them in that kind of way.  You know, as we
pointed out, there were other ancillary reasons why it would be
helpful for our experts to be able to see the Arcadis report,
but those don't relate to violating the purposes of Rule 408
and then still stand.

          The second response I would make, drifting into some
of the other reasons that we were entitled to these documents,
and that is that these documents were sufficiently far from the
core of settlement discussion and the give and take of that
settlement discussion; that as to the questionnaire response,
Plainwell voluntarily sent that into the EPA in order to serve
as a strictly factual response to questions that EPA had asked
it.

          So I think one can feel pretty good that it and its
two immediately related cousins are documents that are outside
the core of the Goodyear privilege.

          So I think for those two reasons, I don't think
there's an adverse policy impact by drawing the circle of the
Goodyear privilege in such a way that it excludes these

1    documents.

2         I guess to also return for a moment to the Little

3    River Band case; of course you're absolutely right, Your Honor,

4    that the particular document in that case is kind of well

5    outside the field of what you might say is the proper

6    application of the settlement privilege.  Nonetheless, while

7    this, these documents are not all that similar to the documents

8    that the tribe wrote to the State of Michigan, nonetheless, the

9    observation that the settlement privilege ought to be

10   restricted to actual filed litigation is I think a good policy

11   way to tightly construe the Goodyear privilege in such a way

12   that there's a bright line rule as to what's in and what's out.

13        THE COURT:  Would that have been dicta in that

14   opinion?

15        MR. HEYDE:  I think it's fair to call it dicta, yes.

16   And so for those four reasons, the production in 2011 in this

17   case, the dissolution of Plainwell and thus the expiration of

18   whatever protection existed, the selective disclosure of one of

19   the documents but not the brief and the Arcadis report to EPA,

20   and then the non-applicability of the Goodyear privilege to

21   begin with, we argue that NCR is entitled to receive both the

22   Arcadis report and the mediation brief.  And we would ask you

23   to compel Weyerhaeuser to make that production.

24        If you have other questions, I would be happy to

25   address them.  Otherwise, I'll sit down and let my learned

1    colleagues have a shot.

2            THE COURT:  Fine.  I'm sure I'll have some more a

3    little bit later.  Thank you.  Just a moment, counsel.

4            MR. WATSON:  Good morning, Your Honor.

5            THE COURT:  Good morning, just a moment.  Go ahead,

6    please.

7            MR. WATSON:  Good morning.  Scott Watson, Your Honor,

8    of Warner Norcross & Judd appearing on behalf of Weyerhaeuser

9    Company.

10           A couple quick things before, before I kind of get

11   started.  Just following up on some of your earlier questions

12   for Mr. Heyde, there's really only two documents at issue here,

13   and I think that became clear.  We are talking about the brief

14   and the report.  And the questionnaire is relevant only kind of

15   because it's already been, it's already been produced to the

16   EPA.  It's also attached as Exhibit A to Weyerhaeuser's brief,

17   Your Honor.  You had asked if it had been produced, and if the

18   parties had it, and it is in fact attached as Exhibit A to our

19   brief.

20           And that questionnaire response presents the facts in

21   great detail.  And all parties have access to those facts.  The

22   brief and the report, the brief was inadvertently disclosed.

23   And that's the subject of the claw back issue.  The report has

24   not been produced to anybody.  Not to the EPA, and not to NCR,

25   and not to International Paper.  And so what you have is a

1   situation where Mr. Heyde says, well, gee, you know,

2   Georgia-Pacific and Weyerhaeuser are really at an advantage

3   here because they have everything and we only have some; in

4   fact, everybody has all of the facts in this case.  Nobody is

5   going to be surprised at trial.  There's no trial by ambush

6   here.  The only thing they are missing is the advocacy

7   statements in the brief and the report.  They are missing the

8   part where Plainwell in the context of mediation to settle what

9   could have been millions of dollars in cleanup costs for, for

10  cleanup along the Kalamazoo River, among themselves while

11  forgoing litigation, and all of the costs that go along with

12  that, including judicial resources, they were hoping to resolve

13  this.  And in that spirit, they prepared a mediation report.

14  They prepared a mediation brief, and they had an expert prepare

15  a report, and then they exchanged those.

16          And I have copies of those if the Court would like to

17  review them in camera.  Obviously, we feel like they are

18  privileged and so haven't disclosed them.

19          THE COURT:  But does the report --  I don't know when

20  you say report exactly what that consists of.  But as opposed

21  to a brief.  I can understand a brief being a marshalling of

22  arguments based on facts and maybe just an advocacy document.

23  A report sounds like it could be more than that.  It might be

24  objective evidence that's been gathered or a scientist or a

25  consultant producing new material or material of a scientific

nature that is more objective in tone.  But what you're telling me as I hear it it's nothing more than an advocacy document itself.

MR. WATSON:  I think that's right, Your Honor.

THE COURT:  Based on everything that they, everybody else already has.  So there is nothing new in it.

MR. WATSON:  Correct.  That's right.  All of the data, all of the facts and all of the data are already in the possession of all of the parties.  So this is just like in any other litigation matter where your expert and, you know, and we have cases that support the proposition that in litigation any expert is presenting one view, one analysis of the facts.  And that's exactly what you have here.  You had Plainwell's expert analyzing the facts in such a way to present an argument in a structured mediation for the purpose of hopefully arriving at a compromise.

So while it may be true to say that the facts underlying that report are objective facts, I think it's not true to say that everything in that report is objective analysis.  I mean it's certainly scientifically defensible analysis but it's geared toward arriving at a compromise, a settlement, a resolution of a dispute outside of litigation, Your Honor.

THE COURT:  Well, does that make NCR feel better, now that you know that you already have all that information, go

1    home?

2            MR. HEYDE:  No.  It does not, Your Honor.

3            THE COURT:  I just thought I would ask.

4            MR. HEYDE:  You know, in particular it's usual in a

5    consulting report or a scientific report or an expert report in

6    litigation to cite not only to the discovery responses, if you

7    will, you know, if you compare the mediation questionnaire

8    response to that, but to also cite to data that's outside the

9    record of what was produced by the parties.  For instance, if

10   you're doing a Fluent transport model of the river, you might

11   need data from the government on the flow of the river.  So the

12   report for all I know may have some of that information in it.

13   Maybe it's data that our experts have already found

14   independently and know about but maybe it's not.

15           THE COURT:  Go ahead, counsel.

16           MR. WATSON:  I think with that kind of general

17   background and summary of the documents, I think I would like

18   to just quickly run through some of the highlights of our

19   argument.  And I'll take these in the opposite order that Mr.

20   Heyde took them in, only because that's the order that they are

21   in the brief, and so I'll stay consistent with the argument

22   presented in the brief.

23           So really this motion boils down to two questions:  Is

24   the report and the brief, are they privileged, and then if they

25   are privileged, was that privilege somehow waived.

1        And the brief and the report are privileged, Your

2   Honor.  They are clearly privileged under Goodyear.  They were

3   prepared as advocacy documents in a multi party mediation to

4   resolve potential liability under CERCLA.  All of the parties

5   in the mediation faced a very real risk of cleanup liability

6   under administrative order, judicial process or both.  They

7   chose to participate in mediation to try to resolve that

8   liability outside of litigation.  That's exactly the situation

9   that you have in Goodyear, it's the situation you have in

10  Graff, and the brief and the report were prepared solely in

11  furtherance of that effort, Your Honor.  They wouldn't have

12  been prepared but for the fact that there was mediation going

13  on and there were attempts to settle this dispute outside of

14  litigation.  This is precisely the type of communication that

15  Goodyear intended to protect.

16        I'll just kind of run through the points that Mr.

17  Heyde made.  He says that there's never been a lawsuit between

18  the parties so Goodyear doesn't apply.  But by its terms

19  Goodyear didn't require a lawsuit to be filed, Your Honor.  The

20  clear policy favors a broad application of the privilege when

21  you read that case.  It applies both, in fact, by its terms,

22  Goodyear applies to both, both settlement under the auspices of

23  the Court but also to informal negotiations between the

24  parties.  And a contrary rule would drastically chill

25  settlement.  It would increase litigation in complex, multi

party cases like CERCLA where it's not always easy to tell when
a party is engaging in negotiations with a regulatory body,
there's administrative order on consent as there was here, and
there's all sorts of voluntary cleanup costs being incurred and
everybody kind of knows, as we see here today, that there may
be some litigation coming for them; it would completely chill
that typical process, Your Honor.  This is just about every
CERCLA case goes this way.  You don't run straight to the
courthouse and file a complaint before you get together as a
group and try to mediate and try to arrive at some informal
allocation.

Graff, the case relied on by NCR, is itself an example
of a case applying the privilege to informal negotiations to
avoid litigation.  Mr. Heyde points to some of the
communications in that case but in fact, there were 1,500
privileged documents being claimed in that case.  The Court
reviewed 99 of those documents in camera.  It found that, yes,
some internal drafts that were never communicated to anyone and
were never prepared to be communicated to anyone, no, those
aren't privileged under the settlement privilege under
Goodyear.  But what about this other set of documents?  This
set of documents that was prepared after receipt of a notice of
violation from the U.S. EPA, not a complaint, not an
administrative complaint, not a judicial complaint, a letter
from the EPA saying, you're in violation of these, of these

1     laws, please do something about it.  What they did about it was

2     prepared some, some communications to send to the EPA to try to

3     settle the matter outside of litigation.  There is no bright

4     line rule when a complaint is filed, Your Honor.  Goodyear

5     doesn't stand for that proposition, and neither does Graff.

6          Graff similarly held that the privilege applies only

7     to communications of documents prepared for settlement, and

8     that's exactly what we have here.  And the Little River Band of

9     Ottawa Indians case doesn't change that analysis either.  There

10    the Court was dealing with statements made in the course of

11    ordinary life.  These were not statements made in the course of

12    ordinary life, Your Honor, for reasons I have already

13    explained.  CERCLA liability at issue here, formal mediation

14    between the parties, I mean it couldn't be more different.

15    Little River was not a settlement communication, it was an

16    official notice, at most it was an invitation to participate in

17    settlement.  Here obviously we were midstream through the

18    process.

19         And in that case there was no indicia of

20    confidentiality.  It was a public statement, Your Honor.  Here

21    the document was stamped as confidential.  There was every

22    expectation of secrecy.

23         And frankly, I don't see the magic of filing a

24    complaint as being a meaningful standard.  The Goodyear case is

25    concerned with settlement communications.  And no, it doesn't

1    define exactly when a communication becomes a settlement

2    communication, but when a complaint is filed, a party has

3    180 days before it's served.  Does it have to be filed and

4    served?  If a 12(b) motion is filed instead of an answer, the

5    complaint can be voluntarily dismissed.  I mean, and under the

6    language of Rule 12, and the language of Rule 42, until the

7    answer has been filed, the issues haven't been joined.  If the

8    issues haven't been joined, then I mean where, where do we draw

9    the line?  I don't think it really makes sense to look at the

10   process to see where that line is drawn.  I think it makes

11   sense to look at the facts and circumstances of the

12   communications.  Is there a real concern about liability?  Is

13   there something motivating the parties to get together and try

14   to settle a dispute between themselves or among themselves

15   without involving the process of the court?  And clearly that's

16   what we have here.  And that's completely consistent with

17   Goodyear.

18          In any event, Your Honor, a final point on this.

19   Goodyear creates a common law privilege.  The Goodyear Court's

20   favorable analysis of the policy for that privilege favoring

21   assessments, efficient use of judicial resources, that policy

22   applies equally to the KRSG CERCLA mediation in 2002 as it does

23   to formal mediation.

24          And so we would suggest, Your Honor, that even if the

25   Court finds that Goodyear doesn't specifically cover this, that

a similar privilege should.  And that the common law would
equally protect these kinds of communications.  The same policy
reasons that the Goodyear Court found those types of settlement
communications to be covered.

Your Honor, the argument that these just aren't the
kinds of reports that Goodyear intended to protect is really
just a red herring.  The Grupo case and the Goodyear case say
that documents prepared in furtherance of settlement inherently
carry the risk of puffery and unreliability.  They are not
privileged only because they are puffery, they are puffery
because they were prepared for settlement negotiations.  They
are inherently unreliable because if I'm insincere, settlement
negotiations and everything that I'm exchanging with the other
side has been carefully reviewed, carefully prepared, either as
puffery to sort of trump up my case and try to get a better
deal, or as possibly a hypothetical, or a concession, or some
attempt to reach a resolution outside of litigation.

So it's not that they are privileged because they are
puffery, it's that because they are settlement negotiations
they are probably puffery.  And we see that with the report,
Your Honor.  That's another example of why this expert report
isn't just an objective recitation of facts, Your Honor.

THE COURT:  What about the argument, however, that the
Court (sic) itself might not be introduced into evidence so you
don't have to worry about the puffery argument there coming

back to haunt you, but it might lead to admissible evidence and
that would, it would seem discount any puffery.  It might put
the other side on a trail to some admissible evidence and that
would be more in the nature of a factual trail or a factual
basis and puffery could be something of no real concern.  If
that's why they want it, to give them clues or insight or maybe
allow them to realize there's some locks they haven't turned
over, that sort of thing, doesn't that really get around any
concern about whether there's hyperbole or puffery or a
particular spin that's been put on the report?

MR. WATSON:  I don't think so, Your Honor, because I
think it sort of just begs the question.  I mean materials are
discoverable if they are not privileged.  So and discoverable
materials are, you know, any materials that are relevant or
likely or calculated to lead to the discovery of relevant
evidence.

But, nonetheless, Rule 26 says that you can't get
ahold of privileged material.  No matter what.  For any reason.
Even if that privileged material cites to other publicly
available facts, you can't have it because it's privileged.
And so to do some sort of after the fact line drawing of
whether the brief or report that I prepared solely because of
settlement negotiations in an attempt to resolve a dispute
outside of litigation, and then say, well, because you did use
some objective facts in there, we're going to allow this

1    document to be produced and reviewed to see which facts you

2    relied on, I don't think that makes sense.  That kind of

3    policy, Your Honor, would completely chill any good faith

4    settlement negotiations between parties.

5         I mean nobody would --

6         THE COURT:  Well, that may be.  But I guess the

7    question goes to whether or not the document is reliable or

8    not.  And I think you were arguing the document was not

9    particularly reliable or it might not be as reliable as other

10   documents because it is prepared for settlement, and settlement

11   documents might be inherently unreliable to the extent that

12   they are puffery.

13        MR. WATSON:  And I think that that's just one factor

14   that Goodyear points out.  It's just sort of an observation

15   that in general, one of the reasons why it makes sense to have

16   this privilege is because even if settlement briefs and

17   underlying expert reports do rely on objective facts, the fact

18   that they were prepared for settlement makes them inherently

19   suspect.  Whether in fact they are or not, that's not what

20   Goodyear is getting at.  Goodyear is simply saying that as a

21   general matter this is one reason why this privilege makes

22   sense.  I don't know if that answers --

23        THE COURT:  Well, then my question was, so if there is

24   a reason for using these documents simply to allow the other

25   side to find, find other admissible evidence, puffery isn't

1    really a concern.  So there are, in other words, legitimate

2    purposes where puffery isn't going to be a problem.

3            MR. WATSON:  That's certainly true, Your Honor.  But

4    that's absolute --  that's true.  But nonetheless, I mean

5    that's only one factor in Goodyear.  There is still the policy

6    and tradition of secrecy that apply to the report.  I mean it's

7    just --

8            THE COURT:  Okay.

9            MR. WATSON:  Which gets to, which was my argument

10   about this would chill, I mean that kind of a rule that says,

11   well, we will ignore the puffery rationale in certain cases

12   where it may not apply, but it would still chill --

13           THE COURT:  There are other arguments, I realize that.

14           MR. WATSON:  Right.  Right.

15           THE COURT:  Okay.  Go ahead.

16           MR. WATSON:  Okay.  So then the next question then --

17   so in our view, for all of those reasons, the brief and the

18   report are privileged.

19           So then the question is, well, did Weyerhaeuser

20   somehow waive that privilege or was privilege somehow waived

21   otherwise?

22           And first of all, by producing the questionnaire to

23   the EPA, Plainwell didn't waive privilege to the brief and the

24   response.  Because the three documents are not wholly

25   interdependent.  The question again, Your Honor, the

1    questionnaire provides facts.  NCR has facts.  There is no

2    surprise here.  There is only advocacy documents that remain.

3    And in any event, Your Honor, 502 just doesn't apply here.  502

4    applies to the attorney-client privilege.  It doesn't apply to

5    the common law privilege in Goodyear.  And in Goodyear actually

6    an example of the situation where -- the facts in Goodyear are

7    complicated -- but in Goodyear one of the parties, Heatway, had

8    settled the dispute, then went to the press and made statements

9    about the content of the settlement negotiations.  And then in

10   another lawsuit, somebody wanted to depose that person to get

11   additional context, additional information for the statement

12   already made.  And it wasn't a waiver case.  The Court said,

13   no, you can't get additional context or additional statements

14   because the settlement privilege applied.  And by the way, the

15   initial statement shouldn't have been made because it was

16   privileged.  But I think the point here, Your Honor, is that

17   making the initial statement even intentionally disclosing

18   content of settlement negotiations doesn't waive the privilege

19   for other settlement negotiations in this same matter.

20          And I think the same is true here.

21          A case relied on by NCR, the New Phoenix case, dealt

22   with subject matter waiver in the context of a case where a

23   party was relying on the advice of counsel defense.  That's why

24   they waived privilege to all of the materials related to the

25   attorney's advice.  Here we are not relying on the advice of

1    counsel defense, Your Honor.  We are not relying on the brief

2    or the report as evidence at all.  And they have all of the

3    facts, the same facts that we're going to rely on.

4              So the concern that we're going to rely on these

5    documents to the disadvantage of NCR just isn't an issue.

6    There is no surprise at trial.  Otherwise it would be a

7    slippery slope, as the Court pointed out.  Do they get

8    everything that we prepared, do they get to depose the

9    mediator, do they get to depose the attorneys?  All of those

10   things could, could conceivably give them more context, the

11   same context that they want from the brief.  And all of those

12   things could have involved discussions of objective fact.  We

13   won't know that because there is no transcript.  But that's the

14   road that we don't want to go down.  And it's a road that

15   Goodyear really doesn't allow for.  Goodyear says, no, this

16   privilege applies, it can't really be waived.  Moving on.

17             But even under 502(a), let's assume that 502(a)

18   applies.  Do they really, in fairness, do they really need to

19   have all these documents?  These are three separate documents.

20   They stand on their own.  The relevant facts are in the

21   questionnaire.  We are not going to be ambushed at trial.  The

22   only thing missing, the only thing they are missing is our

23   legal analysis.  And in the event, again, Your Honor, the

24   bottom line is --

25             THE COURT:  You're saying you're not relying on these

1    documents at trial.

2          MR. WATSON:  That's correct, Your Honor.  You're not

3    going to see us trying to introduce or rely on the brief or the

4    report, the expert report.

5          The other argument that NCR makes for waiver is that

6    somehow the privilege expired when Plainwell went bankrupt.

7    But that's not the case.  Because, first of all, Weyerhaeuser

8    has the privilege as well.  It claims that privilege in its own

9    right.  It participated in conjunction with Plainwell as a

10   party in the mediation; I can represent that as an officer of

11   the court to the Court.  I have also brought with me a copy of

12   the agreement between Plainwell and Weyerhaeuser if the Court

13   would like to review it in camera.  But that agreement

14   obviously would also be privileged and subject to the same

15   confidentiality agreement as these other issues.

16         But I'm not sure it really matters at the end of the

17   day.  Because NCR cites to a whole bunch of cases under the

18   attorney-client privilege, and Mr. Heyde tells you that it's

19   clear that in the attorney-client context, the rule is that the

20   expiration, the expiration of the corporation leads to the fact

21   that the privilege expires as well.  But if you look on pages 7

22   and 8 of NCR's brief, what you'll find is that these cases say

23   things like, "absent some compelling reason to the contrary,"

24   or, "a dissolved corporation has less need for the privilege,

25   and there's a presumption that applies, and ordinarily the

1    privilege terminates."  So in the usual case it may be true but
2    this isn't the usual case.  The facts of Goodyear are on point.
3    Where again, one of the parties, one of the parties in Goodyear
4    dissolved in bankruptcy.  That wasn't an issue for the Court.
5    The privilege still applied to everybody.  It didn't matter.
6    And the rule is just different for common law privilege, Your
7    Honor.  Again, Goodyear itself shows a party dissolving in
8    bankruptcy doesn't impair the privilege and the policy of the
9    rule would be eviscerated otherwise.  Parties would avoid the
10   types of communication fostered by a policy of secrecy and the
11   fear that some day their adversary or one of the other parties
12   to the mediation might some day go bankrupt and then all of
13   them would lose the privilege?  That just doesn't make sense.
14   These briefs were exchanged among all of the parties.  The
15   bankruptcy of one of them shouldn't lead to the waiver of the
16   privilege for everyone else.

17          THE COURT:  The agreement that Weyerhaeuser entered
18   into with Plainwell, do you want to elaborate on that at least
19   in broad terms?  I think you put that in here, but there was a
20   relationship, was there not, between Plainwell and
21   Weyerhaeuser, not between --

22          MR. WATSON:  Yes, Your Honor.  So Weyerhaeuser owned
23   the Plainwell mill in the 1960s, from about 1961 to 1971,
24   thereabouts.  Plainwell owned it after that.  And at the time
25   of the KRSG litigation in the '90s and at the time of the

1    mediation in 2001, 2002, Plainwell was still around and they

2    were the current owner of the mill.  And so they took the lead

3    in the KRSG litigation here in the Western District, and also

4    in the mediation among the KRSG parties, which is the mediation

5    we are talking about here.

6         But Weyerhaeuser had some exposure for that very same

7    mill as a prior owner.  And so Weyerhaeuser and Plainwell

8    talked about, hey, maybe we should participate together on

9    this.  But as -- again as is often the case, these CERCLA

10   cases are sort of like Russian dolls, you take one apart, you

11   start with a group of parties that get together and they sue

12   another group of parties but then, but then you take that layer

13   off and among themselves they try to work something out.  Well,

14   Weyerhaeuser Plainwell is just the next layer, Your Honor.  And

15   so between themselves they said, well, we will participate

16   essentially through Plainwell, but as between ourselves let's

17   have this arrangement where Weyerhaeuser is also participating.

18        THE COURT:  Depending on when the pollution took

19   effect or when Plainwell may have been responsible, they might

20   have gone far enough back that Weyerhaeuser might have been the

21   responsible party or arguably.

22        MR. WATSON:  That's right.  That's right.  That was

23   the concern.  So at least, again, at least at some level they

24   shared some interest, but then at another level between

25   themselves they would want to allocate that separately.

1     THE COURT:  So they enter into an agreement that they

2     will both participate vis-a-vis, together, vis-a-vis the rest

3     of the world, and then hash out the differences between the two

4     of them privately and separately as need be.

5     MR. WATSON:  Correct.

6     THE COURT:  All right.  So even if Plainwell has a

7     demise, which they had, Weyerhaeuser continues to live and

8     continues to have interests that's set out in this agreement

9     between the two.

10     MR. WATSON:  That's right, Your Honor.

11     THE COURT:  That's what I thought.

12     MR. WATSON:  So I think the only other argument then

13     is whether this inadvertent production and whether that somehow

14     waived the privilege.  But it didn't.  Because Weyerhaeuser

15     took reasonable efforts to rectify its error.

16     I'll get to a little more detail, but in general, it

17     took Weyerhaeuser only ten business days; that's a period

18     that's allowed even under the shortest time for any response

19     deadline under the local rules of this court and this district

20     for a party to respond to something.  It took them only ten

21     business days to realize what they had done and issue a formal

22     claw back letter, only 11 days total.

23     THE COURT:  Well, that's if you ignore the fact that

24     they had produced it three years earlier, so it took them ten

25     days and three years.

1      MR. WATSON:  That's fair, Your Honor.  Except that

2  Weyerhaeuser, the context of this case is important.

3  Weyerhaeuser produced the brief inadvertently in 2011 as part

4  of its initial disclosures.  That was Phase I of this trial,

5  liability phase.  Weyerhaeuser stipulated to liability.

6      THE COURT:  How big is this brief?

7      MR. WATSON:  The brief is about 50 pages.

8      THE COURT:  50 pages, okay.  And why do you say it was

9  produced inadvertently?

10      MR. WATSON:  Yes.

11      THE COURT:  It was produced obviously by a law firm

12  representing Weyerhaeuser.

13      MR. WATSON:  Correct, Your Honor.

14      THE COURT:  And every law firm in this litigation that

15  I have seen so far is an extremely competent, highly regarded

16  law firm.  So I assume extremely competent, highly regarded

17  attorneys screen this material.  How did something like this

18  get by?  Why was this an inadvertent production?

19      MR. WATSON:  Well --

20      THE COURT:  I don't want to put you on the spot,

21  necessarily.

22      MR. WATSON:  And I can't, I can't speak --  I can't

23  tell you the specific details because I wasn't personally

24  involved so I couldn't, for example, tell you the name of the

25  individual who had reviewed these documents.  But I can tell --

1      THE COURT:  I wasn't going to ask you that.

2      MR. WATSON:  -- I can tell you, Your Honor, as a

3  matter of course that of course these parties and their lawyers

4  take discovery and their obligations to do discovery, and their

5  obligations to protect attorney-client and other privileges

6  seriously.  And so, you know, in any case, the first step is to

7  kind of gather up your stacks of documents that you think might

8  be responsive, and then somebody reviews those documents to see

9  whether they are relevant, responsive or privileged.  And so

10  how that particular inadvertent disclosure happened is, it's

11  simply a fact of life that no matter how much --  and it's, by

12  the way, the reason we have 26(b)(5)(B) now is because the

13  volume of documents in cases like this one, over three and a

14  half million pages of documents in this case.

15      THE COURT:  All right.  But these documents were used

16  for the settlement purposes, so I assume that they were used

17  for a discreet purpose at a discreet time and place.  And they

18  would have been in a file for that discreet time and place.

19  Which would have been apart from the rest of the files kept by

20  Weyerhaeuser.  In fact, they would have been kept in a lawyer's

21  office, I assume, because a lawyer would have been the one

22  going into the settlement process.

23      So what reasonable steps were taken to shelter these

24  documents because obviously somehow these leaked out of what

25  should have been a separate cache or collection of documents.

1    And they got into the mainstream of Weyerhaeuser's million

2    documents over here.  How does that happen?

3         MR. WATSON:  I think that in general it's fair to say

4    that in a case like this where all documents are reviewed

5    electronically, they probably, they get dumped into an enormous

6    electronic data base.  So the answer to the Court's question I

7    think as an initial matter is that because the documents are in

8    some sense relevant to this litigation and useful by parties

9    even if not produced, then they get, they get dumped into the

10   electronic data base.  And then during review, whether somebody

11   missed the document, or somebody clicked the privilege button

12   but the computer didn't recognize that it was clicked, I

13   couldn't tell you.  But in a case --  it happens.  We try not

14   to let it happen but it does.  And of course care would be

15   taken to try to segregate documents that are known to be

16   privileged.  But I think the answer to the Court's first

17   question is that privileged documents sometimes do get mixed in

18   to the initial bucket of other documents.  Once in there,

19   though, that's why you review them to make sure.

20        And once that mistake happens, Weyerhaeuser doesn't

21   have to review its production.  I mean the fact that it made it

22   through the first time and nobody noticed it, and then

23   Weyerhaeuser stipulated to liability in Phase I, and three

24   years went by, well those were three years when Weyerhaeuser

25   wasn't really looking at these documents.

1    THE COURT:  In your opinion, does the fact that we

2    have these claw back provisions make the law firms and

3    litigators take a more casual attitude toward production?

4    MR. WATSON:  No.  Absolutely not, Your Honor.

5    THE COURT:  That's more of a generic question, I

6    realize.

7    MR. WATSON:  I don't think so.  No.  No.  It's still

8    considered something that you don't want to --  nobody wants to

9    be in the spot that I'm in right now, Your Honor.  This is not

10   the ideal.  And because this is what happens.  I mean the party

11   who gets the document, and of course the way 26(b)(5)(B) is set

12   up is you send the claw back letter and it's a whole bunch of

13   musts, you know, upon receipt of a claw back letter they must

14   segregate, they must do all of these things, and then they may,

15   though, challenge the claim of privilege and that's why we find

16   ourselves here.  And I think that that's fair to say, that's

17   typical case in a claw back situation, Your Honor.

18   THE COURT:  Can Weyerhaeuser show that it did anything

19   to protect the documents that were used in the settlement

20   procedure?  In other words, what it claims are the Goodyear

21   documents, was anything done to set aside the Goodyear

22   documents at the time?

23   MR. WATSON:  Unfortunately, Your Honor, I don't know.

24   I can find out for the Court.  I can tell you that these

25   documents were not treated casually.  I can tell you that they

1    were not sitting on somebody's desk with a stack of other

2    non-privileged documents.  And like the Court says, these are

3    documents prepared by counsel and so you would find them in a

4    lawyer's filing cabinet somewhere, or on their computer.  And

5    they would be treated --  I mean in the course of --

6              THE COURT:  That's what surprises me because it seems

7    like these documents didn't exist because they were in the

8    routine --  prepared routinely during the course of business by

9    Weyerhaeuser, but rather were prepared specifically for

10   settlement purposes by people involved in settlement purposes

11   who thought they would be protected under Goodyear.  So it's

12   something prepared out of the ordinary by people who

13   specifically thought they would be protected and should have

14   been taking steps to protect them.  So it's something out of

15   the ordinary.  So some steps should have been taken to protect

16   them.  And that's what the rule looks to.  So you start off

17   from a basis that is not routine.  And then somehow they end up

18   back in the general data base, as you've referred to it.  And

19   the rule says, well, first of all, a disclosure has to be

20   inadvertent, and you have to have taken reasonable steps to

21   prevent disclosure, and quite frankly, I haven't heard any

22   reasonable steps to protect it.  And you're assuring me that

23   there must have been some taken but I don't know what they are.

24             MR. WATSON:  Well, fair enough.  And I think --  I

25   think the point though is that in the usual course of any

document production, and this I think was the Court's question
about, you know, since the claw back rule do people take their
obligation less seriously, and the answer is no.  So in the
course of any document production, there would have been teams
of lawyers reviewing these documents before they went out the
door.  And whether it was one of those lawyers missing the
document, or whether it was them not properly coding the
document, thinking they had marked it privileged when in fact
they hadn't, or whether the software simply didn't accept,
didn't take the privilege mark and then they moved on to the
next set of documents, I can't tell you.

THE COURT:  The Arcadis report did not get produced.

MR. WATSON:  Correct.  That's right, Your Honor.

THE COURT:  I would assume that would have been right
along with this brief.

MR. WATSON:  That's right.  And so the system in some
sense works.  And we're not here on a stack, we are not here on
the Graff, on the facts of the Graff case were 1,500 documents.
We are here on one, one document that was inadvertently
produced and related document that was caught in the same set
of review that inadvertently missed by a mistake a brief.

And I think along these lines, Your Honor, I think
it's relevant to point out that these things typically are
accidents.

And so even as far back as 1994, I mean you have Judge

1    Quist saying that common sense and sensitivity to the, to

2    ethics and the importance of confidentiality should motivate an

3    attorney who receives a document that might be inadvertently

4    produced to notify the other side.  And so when Mr. Heyde says,

5    well, geez, this thing was privileged on its face, and anybody

6    would have known it was privileged, they didn't give us a phone

7    call and say, hey, did you accidentally produce this.  Did they

8    have a duty?  Did they have an obligation?  No.  But certainly

9    Judge Quist, and the model Rules of Professional Conduct, Rule

10   4.4(b) says that it's always okay to give somebody a call and

11   say, did you mean to do this?  And I think it's a little

12   misleading to say that it was called to our attention.  The

13   document was clearly marked confidential, and they were

14   obviously reviewing it in some detail.  And they could have

15   called to ask if we meant to produce it.  But instead they sent

16   a letter citing to the brief and asking us to produce copies of

17   documents referenced in the brief.  And the same letter asks

18   for multiple other documents.  So we started to do our homework

19   and respond in the ordinary course.  And this is where it took

20   us only ten days to realize what had happened.  And then we

21   called them and said, hey, we think we inadvertently produced

22   this, we're going to issue a claw back letter.  And then four

23   days later we did.

24        THE COURT:  So I guess we're jumping ahead to the

25   letter that they sent to you on October 13th, 2014.

1         MR. WATSON:  Correct.

2         THE COURT:  All right.  And then there was a 30(b)(6)

3    deposition of Weyerhaeuser, and that was about a week later,

4    and the date of that deposition was what?

5         MR. WATSON:  October 20th.

6         THE COURT:  October 20th.

7         MR. WATSON:  It was two days.  So the 20th and 21st.

8         THE COURT:  All right.

9         MR. HEYDE:  Actually if I can correct that.  The 20th

10   and the 27th.

11        MR. WATSON:  Okay.  Sorry about that.

12        THE COURT:  The 20th and what?

13        MR. HEYDE:  27th.

14        MR. WATSON:  That's right.  Because then the letter --

15        MR. HEYDE:  So 27th for the second day of the

16   deposition.  So --

17        THE COURT:  Week apart.

18        MR. HEYDE:  A week apart, yes, Your Honor.

19        MR. WATSON:  Thank you, John.

20        MR. HEYDE:  Sure.

21        THE COURT:  Now, NCR marked this brief as an exhibit

22   at the deposition on the first day of the deposition.  That

23   would be October 20th.

24        MR. WATSON:  Yes.

25        THE COURT:  All right.  According to NCR's brief

1    Weyerhaeuser did not object to the use of the exhibit at that

2    time.

3              MR. WATSON:  That's right, Your Honor.

4              THE COURT:  And then either that day or on the 27th

5    NCR asked the 30(b)(6) witness about the exhibit and the

6    30(b)(6) witness apparently said that he had no knowledge of

7    this brief.  Was that exchange, did that take place on the 20th

8    or the 27th?

9              MR. WATSON:  My understanding, Your Honor, is that all

10   of that occurred on the 20th.  That in the usual fashion, the

11   document was marked, given to the witness on 20th, the witness

12   was asked whether he recognized the document, had seen it

13   before, he said that he hadn't.

14             THE COURT:  Okay.

15             MR. WATSON:  And in 25 lines of transcript, that's the

16   entirety of it.  He never testified about the document or

17   anything in it.  He simply said he didn't know.  He didn't know

18   anything about it.  And the questioning then moved on.

19             THE COURT:  All right.  There were no objections made

20   to either the marking of the exhibit, the introduction of the

21   exhibit, or the questioning regarding the exhibit; the

22   deposition continued a week later, and was completed; nothing

23   more was said about the exhibit, as I understand it, and the

24   day after the deposition was closed, that was October 28th, and

25   was that the day that Weyerhaeuser expressed some question

about the exhibit?

MR. WATSON:  I think --  Your Honor, I think the timeline is that the first day of the deposition was on the 20th, that that's the day that the exhibit, that the brief was marked as an exhibit, the witness was questioned about it. Then on the 23rd, Weyerhaeuser sent to NCR a response to NCR's October 13th letter, and in that, in that October 23rd response Weyerhaeuser said that they would not produce the report because it was privileged.  Yeah, the report.  Then the next day, October 24th, Weyerhaeuser called NCR and told them that they would, they were thinking of issuing a claw back letter. And so then the final day of the deposition was --

THE COURT:  So there's a letter on the 23rd.

MR. WATSON:  That's right.

THE COURT:  Okay.

MR. WATSON:  And in the letter, the letter was responding to the October 13th letter, and then the October 23rd letter Weyerhaeuser was telling, it was responding to the 11 requests in the October 13th letter, but in particular saying that Weyerhaeuser would not produce the report because it was privileged.

THE COURT:  All right.  Then you say that letter is sent on the 23rd.

MR. WATSON:  Yes.

THE COURT:  And that's between the two dates of the

1    deposition.  So the deposition then continues four days later.

2              MR. WATSON:  Right.  Well --

3              THE COURT:  On the 24th something happens.

4              MR. WATSON:  The 24th Weyerhaeuser called NCR to tell

5    them that they were thinking of issuing a claw back letter for

6    the brief.

7              THE COURT:  Thinking about doing it.

8              MR. WATSON:  Well, right.  I mean they had --  the,

9    that they were aware of the issue and would likely issue --  I

10   wasn't on the phone call honestly so I can't tell you what

11   words were used.  But I think that it was, it was a notice

12   phone call, Your Honor.  It wasn't just a --

13             THE COURT:  Who was the call between?

14             MR. WATSON:  I believe that Ms. Margason called or did

15   Chris Baird call?

16             MR. HEYDE:  I had earlier in the day had e-mailed

17   Ms. Margason, Mr. Baird, and I think Mr. Snyder asking for a

18   phone call, and then Ms. Margason called me in the afternoon.

19             THE COURT:  Why did you ask for a phone call?

20             MR. HEYDE:  Because I wanted to discuss the refusal to

21   give us the Arcadis report, and because I wanted to discuss

22   some of the answers that the witness had given on the 20th

23   where he had said he was not aware of things that I thought the

24   witness should be aware of.

25             THE COURT:  Did it pertain to the brief?

1     MR. HEYDE:  No.  It pertained to --

2     THE COURT:  I just want to know if it pertained to the

3 brief.

4     MR. HEYDE:  No.  It did pertain to the mediation

5 questionnaire response and ancillary issue but not to the

6 brief.

7     THE COURT:  So your e-mail went out what day?

8     MR. HEYDE:  My e-mail went out the 24th after

9 receiving the letter on the 23rd.

10    THE COURT:  And so you asked to talk to somebody.

11    MR. HEYDE:  Yes.

12    THE COURT:  And so somebody calls you back, I guess

13 they talk to you about the report some more.

14    MR. HEYDE:  Yes.  There was some rehashing of, you

15 know, what became some of the arguments that we are talking

16 about today with respect to the report.

17    THE COURT:  And they told you what about the brief?

18    MR. HEYDE:  Ms. Margason told me that they were

19 concerned the privilege applied to the brief.  They were

20 curious as to whether I had any copies of the brief that did

21 not come directly from Weyerhaeuser, and I told Ms. Margason

22 that I would look and see whether we perhaps had two in the

23 collection, one of which maybe came from EPA.  Ultimately, we

24 did not find any other copies.  And, you know, they said that

25 they were, you know, that they thought that it was

1    inadvertently produced and were considering doing a claw back

2    letter.  And I can't remember her exact words either.  So I

3    don't want to put words in her mouth.

4            THE COURT:  All right.  And the next thing that

5    happened was three days later you receive such a letter.

6            MR. HEYDE:  The next thing that happened was the

7    second day of the deposition, on October 27th, but there were

8    no questions about either of these documents at that second

9    day.

10            THE COURT:  The next thing that happened as far as the

11    brief was concerned, was what, after the 24th?

12            MR. HEYDE:  Next thing that happened as far as the

13    brief was concerned we received the claw back letter on

14    October 28th.

15            THE COURT:  Well, when you had this telephone

16    conversation on the 24th and you were asked if you had two

17    copies of this brief, perhaps you had received one from the

18    EPA, and you said you would look and see, and you found out

19    that you did not, were you able to answer that instantaneously

20    or did it take you sometime, and if so, did you make another

21    call back to the attorneys for Weyerhaeuser?  How did that

22    work?

23            MR. HEYDE:  I did not know immediately.  And we needed

24    to run some searchs in our electronic data base to see if we

25    had more than one Bates number for the same document.  We were

1    not able to find another copy.  For technical reasons, we were

2    not at the time entirely certain that there was not another

3    copy because you had to run a word search against documents

4    that had been subjected to optical character recognition, and

5    sometimes the OCR is not perfect.

6           I did not call back with the results of that.  It is

7    possible that during a break on the deposition of the 27th I

8    may have mentioned it to Ms. Margason.

9           THE COURT:  She was at the deposition, I take it.

10          MR. HEYDE:  Yes, she was.  But I can't remember

11   whether I did or not, so I don't want to represent that I did.

12          THE COURT:  All right.  Counsel, let me ask you.  This

13   brief was brought up in counsel's letter of October 13th.  Was

14   the witness prepped on this issue at all, the 30(b)(6) witness

15   who was testifying on behalf of Weyerhaeuser?  Was this witness

16   prepped at all on this issue between that time and time he

17   testified?

18          MR. WATSON:  Your Honor, there were a number of

19   topics, as you've seen in the other 30(b)(6) deposition notices

20   that have been at issue before the Court.  And this one was

21   similarly broad, and so I can't say for certain that the

22   witness --  but no.  The short answer is no.  This was not a

23   document presented to the witness and prepared for the 30(b)(6)

24   deposition.

25          THE COURT:  All right.  I don't know if I asked two

1    questions when you were finished with that argument or I

2    interrupted you. So if you have anything further on that, go

3    ahead.

4         MR. WATSON: Only one final point on this notion of

5    what happened at the deposition, Your Honor. It's simply not

6    the case that failure to object to a document at a deposition

7    is alone sufficient to find waiver. It's not a bright line

8    rule. It's still this multi factor balancing approach. And if

9    you look at the cases cited by NCR, you'll kind of see examples

10   of that. So the Samaritan Alliance case, that involves

11   645 pages of production in the entire case. Here we have over

12   three and a half million pages of documents. It was a narrowly

13   focused deposition, solely to probe the issue that was, the

14   same issue that was at issue in e-mails that were at issue in

15   that case. And --

16        THE COURT: This one was --

17        MR. WATSON: The Samaritan Alliance case. So in our

18   case you had a multi day 30(b)(6) deposition covering a huge

19   swath of topics. In that case you had one day, one fact

20   witness and the entire point of that deposition was to get at

21   the same content that was in the contested e-mails. And in

22   fact, in that case, the attorney for the party being deposed

23   objected to the deposition on the grounds of privilege. And

24   yet at the deposition that, the e-mails were marked as

25   exhibits, the witness was asked about the e-mails, the witness

1    answered questions about the e-mails, the attorney was

2    objecting on other grounds but never objected to privilege,

3    even though they had objected to the entire deposition taking

4    place because of privilege.  That's not this case.  This case

5    --

6            THE COURT:  In that case did they think their initial

7    objection on the basis of privilege covered them so they didn't

8    have to keep making that objection?  Did they think they were,

9    had a standing objection?

10           MR. WATSON:  I don't think so, Your Honor.  I think in

11   that case they had actually, it was basically a motion for

12   protective order.  I mean the context of the case was some sort

13   of motion practice or an initial objection that either got

14   resolved against them, or didn't get resolved.  And so, no, I

15   mean they were making, they were objecting to other things at

16   the deposition, including to some of the questions about the

17   e-mails.  They lodged objections but they never said that it

18   was an objection based on privilege, they never instructed the

19   witness not to answer, that sort of thing.

20           But the crucial fact is that the witness was

21   testifying about the documents.  Here, we had a witness who

22   looked at the documents, said they had never seen it before,

23   and then the questioning moved on.  And it's really, it is, as

24   a practical matter, Your Honor, in a multi day deposition

25   involving this huge swath of topics, with hundreds of pages of

1      exhibits, it's really not unreasonable.  And that's the test

2      here, reasonableness.

3              THE COURT:  This brief, is it, how was it captioned?

4              MR. WATSON:  Your Honor, the brief is captioned as an

5      initial brief on allocation, and it's stamped at the top,

6      "Confidential Pursuant to Mediation Agreement."  So Mr. Heyde

7      is right that it's not the kind of thing that requires intense

8      scrutiny to discern its origin or purpose.  As I said earlier,

9      I think that cuts both ways in terms of the October 13th letter

10     and whether that's really calling it to our attention or not.

11             But nonetheless, in this context, it's still a

12     question of unreasonableness.  And even given the arguable

13     obviousness of this document, was it unreasonable --  by the

14     time, as counsel defending a deposition, when you're handed a

15     document as an exhibit and your witness says they don't know

16     anything about it, and the questioning moves on, I don't think

17     it's unreasonable to then not object to the document.  And then

18     two days later when having reviewed the transcript, the

19     exhibits, the other documents as part --  it's not like there's

20     one thing going on here, Your Honor.  There are multiple things

21     going on simultaneously, I mean --

22             THE COURT:  I mean what about the responsibility of

23     the attorney who is sitting there with the witness?  The

24     attorney sees the document, it's marked confidential, it's

25     marked as a mediation brief, when do we hold the, in this case

1    Weyerhaeuser and Weyerhaeuser's attorneys responsible for

2    objecting that they have disclosed this information?  It seems

3    like we have to draw the line somewhere.  And had they been put

4    on notice about this, they see it handed to them, they have

5    disclosed it in the first place under circumstances that are

6    still questionable, but here they had it handed to them after

7    they have been put on notice about it a week earlier by a

8    letter.  It sits right there in front of them saying

9    confidential.  It's a mediation brief.  Which ought to raise

10   red flags.  And they don't do anything about it.  Then there's

11   a week break in the deposition and even during the break they

12   say, well, we're thinking about issuing a claw back letter.

13   That's kind of ambivalent.  It's not exercising their right to

14   issue a claw back letter.  And then when the deposition ends,

15   during which there was no objection, at some point it seems

16   like there's a good argument for waiver there.

17           MR. WATSON:  I think, Your Honor, we do have to be --

18   I think we do have to give some recognition of the fact that at

19   this point with the arguments fully distilled, and presented to

20   the Court, we do have a bit of the benefit of hindsight.  And I

21   would simply say that the Court absolutely right, the line has

22   to be drawn somewhere.  But is it, is it a multi million page

23   document case with lots of topics on a multi day 30(b)(6)

24   deposition where a witness says --

25           THE COURT:  You weren't handed multi million

1      documents.

2           MR. WATSON:  That's true, Your Honor.  But it's not --

3      okay.  I'll put that aside for a moment and just deal with the,

4      the deposition for a second.  I mean is it unreasonable in that

5      circumstance for the person not to object?  And I would say

6      that the test should be when the document is actually used.

7      And that's what you see from the Samaritan Alliance case and

8      the FDIC case, the cases cited and relied on by NCR.  In those

9      cases, the witness started to answer questions about the

10     document in both of those cases.  They were, it's fair to say

11     in those cases, I think, that the document was used.  And in

12     this case I don't think that that's fair to say.  It's fair to

13     say the document was marked as an exhibit, and presented to

14     counsel, but I don't think that in any meaningful sense the

15     document was used.  I don't think that it was --  it was

16     certainly reviewed by counsel, but I don't think it's given the

17     same kind of attention as you sit in a deposition and your

18     witness begins to answer questions about a document, I think

19     that's the moment when most attorneys would say, I need to

20     object to this.  This is a privileged line of inquiry, and the

21     document itself is privileged.  And I'm going to instruct my

22     witness not to answer.  But I think asking if they have ever

23     seen it and not instructing them not to answer the question, no

24     they haven't, I'm not sure that's where the line should be

25     drawn, Your Honor.

1          THE COURT:  All right.

2          MR. WATSON:  So my only final point is that as a

3    practical matter I don't think NCR is really going to suffer

4    any prejudice here.  And I won't belabor the point.  But I've

5    already said that NCR, they already have all of the facts that

6    Weyerhaeuser has.  They have everything we're going to rely on.

7    They are just missing the advocacy here, Your Honor, and that's

8    the Goodyear privilege.  And in addition, and I know Mr. Heyde

9    made the point about, well, there is other discoverable

10   evidence there, but I think that Goodyear covers that argument

11   and tells you that even if there is otherwise discoverable

12   evidence in a privileged document, you don't get the privileged

13   document for that reason.  And the fact is that 408 would be a

14   real barrier to admissibility here.  And so there really isn't

15   very much prejudice that NCR can claim in this case, Your

16   Honor.

17         THE COURT:  All right.  Thank you.

18         MR. PARKER:  Good morning, Your Honor, John Parker on

19   behalf of International Paper.  Before I address the pending

20   motion, I would like to raise with the Court a housekeeping

21   matter.  There is pending before the Court a joint motion, a

22   motion actually on which all these parties agree, to extend

23   expert discovery.  I believe it is 706.  It is near and dear to

24   all of our hearts, and it has been referred to Your Honor.  If

25   you could grant that I think we would all be very, very

1   grateful.  It will --

2       THE COURT:  I did grant it yesterday.  My staff was

3   unable to get that order issued because my secretary suffered

4   the flu, and she's the one that gets those orders out.  I would

5   have no more idea how to get that order out with the present

6   day computerization of the federal court system.  If I would I

7   would be able to understand some of your expert documents.

8       MR. PARKER:  Again thank you very much.

9       THE COURT:  I trust that is not going to screw up

10  Judge Jonker's trial schedule.

11      MR. PARKER:  No.  In fact, we have not moved any of

12  those dates.

13      THE COURT:  You said that in your --

14      MR. PARKER:  Yes.  And in my experience with

15  Judge Jonker, I'm certain he looked at least that portion of

16  the motion before he would have done anything other than deny

17  it, in my experience.

18      And I will say, Your Honor, that it is possible that

19  we may be back on that motion and need even additional time

20  since 20 experts were designated in the first group, and

21  rebuttal experts which are due on Friday, the vaguest line on

22  new experts is 16 and most people are taking over.  So we may

23  find we need even some additional time.

24      THE COURT:  So you are planning to come back for a

25  second bite at the apple.

1      MR. PARKER:  If necessary.  We will do all in our

2   power to avoid that.

3      THE COURT:  Yes, well, good luck with that one.

4      MR. PARKER:  Thank you.  Thank you.  If I can just

5   address briefly the motion before the Court.

6      And I think for context let me try to explain what we

7   understand and know about this mediation which took place back

8   in 2001.  It was between at the time four parties:

9   Georgia-Pacific, Allied, Plainwell, and --

10      THE COURT:  Let me interrupt you for just a moment.

11   Did I get a brief from International Paper?

12      MR. PARKER:  You did not, Your Honor.  Because when I

13   saw that NCR had made a third point, as Mr. Heyde has talked

14   about, which is that the privilege has been waived, I decided

15   not to burden the Court with an additional brief because that

16   is our --

17      THE COURT:  You realize the local rules require a

18   brief if you oppose the motion.

19      MR. PARKER:  We are not opposing the motion.  We are

20   supporting the motion.

21      THE COURT:  Supporting the motion.

22      MR. PARKER:  Yes, Your Honor.

23      THE COURT:  I think you have found a loophole in our

24   local rules when somebody supports the motion.  I'm not sure

25   you've been in that position.  Actually address that issue

1    before.

2         MR. PARKER:  Well, I will be brief, Your Honor.  But

3    just again for context.  That mediation, which took place in

4    2001, was between Georgia-Pacific, Allied, Plainwell, and I

5    guess behind the scenes Weyerhaeuser as their co-partner, and

6    Fort James.  Fort James was later acquired by Georgia-Pacific.

7    So you really have three parties:  Georgia-Pacific, Allied,

8    which has also gone into bankruptcy, and Plainwell.

9         International Paper and NCR were not participants.  We

10   were never invited.  In fact, the theory of liability for

11   International Paper had not yet been dreamed up back in 2001.

12   And the parties, each of the parties, all four of those parties

13   to that mediation prepared three separate documents:  The

14   mediation questionnaire response, which has been before the

15   Court before, the technical reports, whether it was Arcadis,

16   which is a well-known, environmental consulting firm prepared

17   the one for Plainwell, and each of the other parties had these

18   technical reports, we understand, prepared, and then in

19   addition briefs.

20        All of those documents were exchanged between those

21   four parties.  And importantly from International Paper's

22   position, the mediation questionnaire response was then

23   subsequently and unrelated to this mediation produced to the

24   Environmental Protection Agency.  And you've already ruled in

25   connection with a motion I brought seeking production of

1   Georgia-Pacific's mediation questionnaire response that they

2   waive the privilege.  Georgia-Pacific waived the privilege when

3   they gave that document to the Environmental Protection Agency.

4   That's important for two reasons:  One, because for those that

5   forgot that I have actually prevailed on a motion in front of

6   Your Honor, and secondly, because you ruled at that time that

7   the privilege was waived.

8           THE COURT:  As to those answers and that document.

9           MR. PARKER:  Well, that's the question I think that

10  the Court has to confront.  Once the mediation privilege was

11  waived as to those immediate an eggs questionnaire responses,

12  which are enormous documents.  You may remember another motion

13  I brought a picture of the Allied mediation questionnaire

14  response in white binders on the table and it was 12 feet long.

15  They are very, very detailed documents that have information

16  regarding outputs from mills, and production, and all of those

17  sorts of things.

18           While we have not seen the technical reports done by

19  these consulting experts, what we understand is that they took

20  that information and synthesized it and also used additional

21  data regarding the location of PCBs in the river, sampling that

22  had been done in the river as to the existence of PCBs, and

23  tried to integrate all that information.  Then the briefs are

24  the advocacy piece of course written by the lawyers to advance

25  arguments during mediation.

1          Now, as NCR pointed out in what Mr. Heyde termed as

2    argument number 3.  Once the EPA documents were produced, the

3    privilege really has been waived.  There are no selective

4    waivers of privilege that anybody has ever pointed to to me in

5    the Sixth Circuit, which happens to be my home circuit as well.

6    We all know the attorney-client privilege when you waive it,

7    you waive it.  There's not selective waivers of privilege.  And

8    I would submit that once the Court found that the privilege had

9    been waived as to the production of the EPA document, or the

10   production of the mediation questionnaire to the EPA, it's

11   waived it for all.

12          So that I would ask Your Honor that you make your

13   order clear, assuming you rule the way I would like you to,

14   that this is not a limited waiver, since that doesn't exist,

15   but rather that the waiver already occurred.  Because that's

16   the only fair result.  Keep in mind that the parties on this

17   side of the courtroom not only have their own technical

18   reports, they have each other's.  So Georgia-Pacific, for

19   example, or Weyerhaeuser, has the technical report prepared by

20   Allied, now bankrupt, that reports upon the only mill, the

21   Bryant mill, that has any nexus for International Paper in this

22   case, we contend.  It was the subject of Phase I.  So they know

23   what Allied's technical consultants wrote about a mill that

24   they now say I have liability for, and I don't have a copy of

25   that report.

1    Because they claim this mediation privilege over what

2    those technical people say.

3    Mr. Watson points out that while there's a lot of

4    information out there, and there's really not anything that's

5    hidden here, until we see that of course, until we see the

6    technical reports that relate to all of these mills, we don't

7    know that. We don't know how much of a disadvantage we are

8    because consultants who were able to analyze this information

9    14 years ago, and 14 years closer to the events that give rise

10   to this case, what additional advantage they might have.

11   So if in fact the purpose of Rule 502(a) is to prevent

12   a misleading presentation of evidence, you can't use the

13   waiver, the privilege as a sword and a shield. I would suggest

14   that could potentially be happening here. And the only way to

15   ensure that it is not is to reach the logical conclusion,

16   extension of the argument that once the EPA, once giving

17   certain of the documents related to the mediation to the EPA

18   waived the mediation privilege, it waived the mediation

19   privilege.

20   So the addition of this brief, while interesting, is

21   really not in my mind the issue that Your Honor has to decide

22   today. It's rather whether or not the giving of those

23   voluminous documents, which required a great deal of work, and

24   frankly, are not advocacy pieces, didn't waive the privilege,

25   just like those technical consulting reports, which frankly I'm

1    much more interested in than I am a brief that a lawyer wrote;

2    that would give me insight into what happened on the river from

3    a perspective that is 14 years closer in time than we are now.

4    To me that seems to be much more important.

5         I could give you some examples that I am assuming,

6    again, I have never been able to see the technical reports

7    because this privilege has been claimed as to them, but in that

8    mediation questionnaire response, Your Honor, that

9    Georgia-Pacific ultimately had to produce to us, they made a

10   representation in connection with the mediation that they had

11   hooked into the sewer system in 1964 for their large mill, the

12   KPC mill, Kalamazoo Paper Company.  That I'm assuming came out

13   in the mediation from all these technical reports as not being

14   the case.  And in fact they hooked into the sewer system in

15   1967.  When they ultimately turned the report or the mediation

16   questionnaire over to the EPA, they noted that.  That it had

17   come to their attention that in fact they had hooked into this

18   sewer system in 1967.

19        I don't know what other issues, particularly as they

20   relate to this Bryant mill, that I have to defend their

21   practices in this case might lurk in a technical memorandum

22   written by experts retained by the owner and operator of that

23   mill, Allied, which has since gone into bankruptcy, may be

24   there that Georgia-Pacific and Weyerhaeuser have visibility to

25   that I do not.  But it seems to me that under 502, if we are

1    going to get a balanced, fair presentation of the evidence,

2    using this privilege as a shield here is, is unfair.

3         THE COURT:  Help me out here because I wasn't prepared

4    for this particular argument, but you have sought the report

5    that Allied prepared?  Is that the one you're after?

6         MR. PARKER:  Yes.  And Georgia-Pacific has it and they

7    won't give it to us because they claim it's subject to this

8    mediation privilege.  I realize --

9         THE COURT:  Have you filed a motion to obtain that

10   from Georgia-Pacific?

11        MR. PARKER:  We have --  excuse the long answer,

12   Judge.  We actually subpoenaed the Millennium Custodial Trust,

13   the successor to Allied, seeking it.  We thought they would

14   give it to us, and then Georgia-Pacific jumped in and told them

15   no you can't give them to him because it's subject to this

16   mediation privilege.

17        THE COURT:  Why am I hearing, why are you raising this

18   now?  I assume there's a motion out there that you would file

19   against Georgia-Pacific or Millennium Custodial Trust to obtain

20   that.

21        MR. PARKER:  And indeed, Your Honor, we may.

22   Particularly if you rule today as I believe you should.  But I

23   thought that this ruling today, if it addresses this issue,

24   would obviate the need because I think Georgia-Pacific would

25   then give it to us realizing that, all right, you know, the

1    Judge has realized that the privilege was waived.  If I have to

2    file that motion, I certainly will.

3         Unfortunately, Your Honor, in a case like this, we

4    triage.

5         THE COURT:  I hadn't noticed.

6         MR. PARKER:  And therefore only when I have to come to

7    a motion that is of interest to me and try to do things in a

8    more expeditious way, frankly, I try.

9         So I think this issue is squarely before you.  Because

10   I saw it in NCR's brief.  They said that by virtue of producing

11   the mediation questionnaire to the EPA, the privilege has been

12   waived.  And therefore, I think it's squarely before the Court.

13   Now, you may decide this motion on other grounds, which will

14   leave me no choice but to file that motion.  But I'm hoping

15   that you decide it on those grounds and I'll have the guidance

16   I need and maybe don't have to come back.  As much frankly I do

17   enjoy coming before Your Honor.

18        You know, Judge, you raised a very good point on Rule

19   408 that honestly I hadn't focused on.  But it is the ultimate

20   protection here.  If in fact this privilege has been waived,

21   Rule 408 has not been waived.  And there is no reason that if

22   in fact some concession was made during this mediation, which

23   by the way, having read the brief before we had to sequester

24   our copies because I was at the deposition, I read the brief,

25   nobody was making any concessions.  It was a very, and

1    obviously you can look at it in camera, it's a very strong

2    advocacy piece for Weyerhaeuser.  For frankly Plainwell.  And

3    what Plainwell does in that brief is attack Allied and

4    Georgia-Pacific.  I'm sure Georgia-Pacific's brief would attack

5    Plainwell and Allied.  And I'm sure Allied's brief, which I

6    have not seen, would attack Plainwell and Georgia-Pacific.

7    These were advocacy pieces.  Obviously meant for the mediator

8    to read and come to some conclusion.  But Your Honor has served

9    as a mediator more times probably than you care to remember.

10   You know that when you get those briefs only if they are

11   confidential to you, and these were not, do they tend to have

12   concessions from the parties.  Otherwise, they tend to be, when

13   they know the other parties are going to be reading them, they

14   are no different than trial briefs.  They are advocacy.  And

15   that was the case here.

16        But --

17        THE COURT:  They were confidential.

18        MR. PARKER:  They were confidential within the context

19   of the mediation, but they were shared between the parties.  So

20   that it is not that --  I'm not sure how Your Honor conducts

21   mediations, but sometimes when I'm in front of a mediator he

22   will ask that the briefs only be given to him, not shared with

23   the other parties.

24        THE COURT:  Yes, that's the way we do it.

25        MR. PARKER:  I tend to write those a little more

1    candidly than if I know they are going to be distributed to all

2    parties where I don't want to necessarily let my guard down.

3    Here it was the situation where they were shared among the

4    parties, so I don't think anybody was letting their guard down,

5    and if you looked at this brief in camera, I think you would

6    reach that same conclusion.

7         But, again, 408 would protect the introduction at

8    trial of any such concession, puffery, whatever.  But the

9    underlying facts, particularly I think as to the technical

10   reports, and what the consultants have to say about the

11   evidence that was presented, particularly in my case about a

12   mill that I'm required to defend at trial, is very important

13   and would be within this balancing that 502(a) talks about to

14   prevent selective and misleading presentation to the

15   disadvantage of an adversary would be, would be best served.

16   So unless you have any questions that is indeed my short

17   argument.

18        And thank you again for granting the other order.

19        THE COURT:  Yes.  Just a moment, please.  Did you give

20   me your opinion as to whether or not the documents that we're

21   talking about, the brief and particularly the report, were

22   covered by the Goodyear rule in the first place?  I take that

23   you didn't.

24        MR. PARKER:  I didn't.  I have an opinion on that.

25        THE COURT:  Oh, share.

1          MR. PARKER:  Well, I think it's a close call, Your

2     Honor.  I do.  I don't know that --  I certainly do not believe

3     that the mediation questionnaire response or the technical

4     report would be.  The mediation brief itself where you have

5     that advocacy in it and arguably a party could let their guard

6     down, I think that's what the Goodyear privilege was meant to

7     protect.  I don't think you can, Goodyear throws a net so wide

8     that information that's otherwise available, whether it's

9     because it's in the public domain in the sense that you know

10    what a mill output was, or whether it's available because an

11    expert can synthesize that information in a technical report

12    would be covered by the privilege.  Now, when a lawyer gets

13    down to arguing something, I think that might have been

14    covered.  But, again, I think that the bigger issue from our

15    perspective is that it was waived once documents that they

16    claim were privilege within that ambit were given to the EPA.

17         THE COURT:  So the brief and the report would fall

18    within the ambit, but not the responses to the questionnaire?

19         MR. PARKER:  No.  I believe the technical reports and

20    the questionnaire responses are outside of Goodyear.  I think

21    the briefs would be the only thing that would be covered by

22    Goodyear, absent a waiver.  That's a candid answer.  Probably

23    not the best --

24         THE COURT:  The brief comes with the ambit of

25    Goodyear, but the report, which I understood to be more

1    advocacy, but you're saying that would not be, fall within the

2    ambit of Goodyear.

3         MR. PARKER:  That's my understanding.  Now, in

4    fairness, Judge, I have not seen those reports because they

5    have not been produced to us inadvertently or otherwise.  I

6    think Mr. Watson said that he had a copy of that technical

7    report.  You obviously could look at it in camera to make a

8    better decision as to whether it's advocacy or whether it is in

9    fact more akin to the synthesis of information and from a

10   technical consulting standpoint.

11        THE COURT:  The answers to the questionnaires, which

12   were later produced to the EPA, in your opinion clearly do not

13   fall within the ambit of the Goodyear protections.  Is that

14   what you're saying?

15        MR. PARKER:  I took that position with you earlier in

16   connection with my motion to compel those.  It would be hard

17   for me to change my position on that now just because it might

18   serve me better.  Not that you would call me out on that.

19        THE COURT:  Just asking.

20        MR. PARKER:  In fairness, when I made that motion,

21   Your Honor, I did say, one, they weren't covered by Goodyear,

22   and, two, they were waived when they were given to the EPA.  I

23   wouldn't speak for Your Honor as to which of those two grounds

24   you granted my motion on.

25        THE COURT:  Well, I'm wondering if you -- if they are

1    not covered, if the questionnaires responses are not covered by

2    the privilege, and you give those to the EPA, what is it that

3    you're waiving?

4         MR. PARKER:  Well, that's a fair point.  You know,

5    obviously Georgia-Pacific strenuously argued they were, they

6    were privileged, and giving them to the EPA somehow didn't

7    waive that.  Both positions I disagreed with.  So I can't tell

8    you today in good conscience that I thought somehow it is

9    covered.  But there is clearly a continuum and they are

10   related.

11        THE COURT:  Those are documents that are not covered

12   and they are provided, does that necessarily waive documents

13   that would be covered by the privilege or covered by Goodyear?

14        MR. PARKER:  And I don't mean to sidestep your

15   question, but the brief that has now been inadvertently

16   produced, and I think all privilege as to it has been waived,

17   again, because I don't believe there is a selective waiver that

18   can be argued here, clearly has opened the door to at least the

19   technical reports, if not the other briefs being disclosed.

20   Because on my rings of being close to Goodyear, the brief that

21   has been disclosed here, and I think the privilege waived in

22   connection with, is on the innermost ring.  And therefore it

23   would certainly, it would be hard to argue that a brief, a

24   privilege could be waived as to that brief and not somehow

25   waive it as to other documents, unless you believe there is a

1    selective privilege under Goodyear.

2           THE COURT:  So your argument would be as to this

3    particular brief, as to this particular party, it's been waived

4    because it was inadvertently produced and the claw back wasn't

5    effective.

6           MR. PARKER:  For all the reasons that Mr. Heyde has

7    well articulated, that's right.  And I also don't know --

8           THE COURT:  But then --

9           MR. PARKER:  I'm sorry.

10          THE COURT:  Because that's been produced, if there

11   were any privilege as far as the Arcadis report, that's been

12   waived as well at that point.

13          MR. PARKER:  Correct.  And I don't know what Your

14   Honor's basis was for ordering the mediation questionnaire.

15   Whether you found it was not covered by Goodyear or whether you

16   found it was, and the privilege was waived.  If it's the

17   latter, then I think the privilege has been waived period.  If

18   it was the former, then you're right, you need to go to the

19   next step and find whether the brief here was, causes the

20   waiver, in which case then you would again open that door.  If

21   you found the mediation questionnaire responses were not

22   subject to the Goodyear privilege, then you need to look

23   further.  Again, I don't know what the basis was really for

24   your first determination.  I was just so happy I won, maybe I

25   should have listened more closely.

1          But the --  I think the brief here clearly the

2     privilege has been waived as to it.  And therefore, the

3     privilege is waived.

4          THE COURT:  All right.  Thank you.

5          MR. PARKER:  Thank you.

6          THE COURT:  Mr. Smit.

7          MR. SMIT:  Timing is everything.  Your Honor,

8     Peter Smit on behalf of Georgia-Pacific.

9          First of all, I think that's what on Survivor they

10    call a blind side.  Mr. Parker does not have a motion here

11    today.  He does not have a brief here today.  If he is

12    ultimately going to file a motion against Weyerhaeuser or

13    against Georgia-Pacific, or against Millennium Trust, arguing

14    that as the successor to, or as that, arguing as a predecessor

15    to Allied he is entitled to their brief and expert report,

16    that's an item, as the Court says, that is not before it.

17         For another day.

18         So what we are dealing with here is the privilege

19    question relating to Weyerhaeuser's expert report and to its

20    brief.

21         As the Court can quickly tell, privilege and waiver is

22    a very slippery slope.  Just a moment ago Mr. Parker suggested

23    that by the inadvertent disclosure of the mediation brief by

24    Weyerhaeuser, they have as a result waived their privileges to

25    the expert report, and then he said, and also the other briefs.

1    That's the slope.  As soon as you say, okay, that brief is out

2    there, now the expert report is out there, now as a result

3    Georgia-Pacific's brief is out there, Allied's brief is out

4    there, and their expert reports are out there, and the snowball

5    goes down the hill.

6         Let me take the Court back for a minute, if I can.

7    Just picture this.  14 years ago.  The EPA is looking at

8    cleaning up the Kalamazoo River.  Millions of dollars at stake.

9    And we have got a handful of mills that get together and say,

10   let's try to work this out.  They hire a former federal judge

11   and they go into a conference room like this and they sign an

12   agreement that says, the cone of silence is coming down.

13   Everybody has to feel comfortable exchanging information to try

14   to work this out, and none of this information leaves this

15   room.

16        In that context, they all to a certain extent take

17   their best shot at the other mills saying, Plainwell mill,

18   you're bad because you did, A, B, C and D, and Plainwell says,

19   no, no, no, Georgia-Pacific, you're the bad guy here.  Now, why

20   would NCR be interested in getting into that little circle now

21   and poking its head in to find out what went on?  Simply

22   because in the confines of that confidential mediation, the

23   parties did take their best shots at each other, and now NCR

24   looks at it from the standpoint of, I'll bet there's some good

25   stuff in there, some good rationale, some good analysis, some

1    good theories that Georgia-Pacific had against Plainwell, and

2    vice versa.

3         Three documents at issue here.  We have talked about

4    the mediation questionnaires.  That's a set of facts:  Name,

5    rank, serial number.  Things like volumes, and dates, and

6    places, and plants.  The way they started the confidential

7    mediation process was everybody supplied the base facts.  Then

8    to get ready for the mediation, the parties go out and they

9    spend money and they retain a consulting expert who takes those

10   facts and now applies the thought process to them, analyzes

11   those facts, theorizes the facts.  That is then taken and put

12   into an attorney's advocacy brief setting forth theories and

13   things of that nature.

14        The Court ordered that that list of facts, those

15   binders setting forth answers to the various questions, be

16   turned over.  And I also, I don't know if the Court did that on

17   the basis of it had been waived when it went to the EPA, or on

18   the basis of it didn't fall within Goodyear.  But the brief and

19   the report --

20        THE COURT:  I did that as to Georgia-Pacific's.

21        MR. SMIT:  Yes.

22        THE COURT:  Right.

23        MR. SMIT:  The brief and the expert report clearly

24   fall within the Goodyear privilege.  Because --

25        THE COURT:  I again --

1     MR. SMIT:  -- clearly fall within the Goodyear

2  privilege, the brief and the expert report.  The expert report

3  and the brief take the facts and the facts are just that, Your

4  Honor, facts; but the expert report and the brief apply a

5  thought process and that's what Goodyear seeks to protect.  The

6  thought process.  And it makes it clear that it can be any

7  communication.  Doesn't just have to be an attorney

8  communication.  The expert report and the brief contained

9  analysis, interpretation, theories, and argument.  It's the

10  candid thought process that Goodyear intended to protect, and

11  differs from the mediation questionnaires which in fact are a

12  list of facts.

13     There is no requirement in Goodyear that there be an

14  actual suit pending.  Frankly, you can't get much closer to an

15  actual suit than this proceeding, and it simply makes no sense

16  that as everyone sits down and convenes, the arbitrators say,

17  by the way, did anyone file a complaint yet, and then adjourn

18  until somebody does it.

19     Here in the Western District, we do pre-suit

20  facilitations all the time.  And, frankly, they are getting to

21  be a more and more effective process trying to get cases

22  resolved.  And they are protected, as the Court knows.

23     We frequently also in lawsuits have what are

24  consulting, non-testifying experts.  And as the Court knows,

25  that's protected.  Why do we protect a non-testifying

1    consulting expert?  Because it allows an attorney to have a

2    free communication with that expert and to work together to

3    analyze, to theorize, to work up a case, and to basically

4    engage together in the thought process.

5         That's no different than what is going on here in the

6    mediation.

7         I would agree, I understand the differentiation with

8    the drafts of certain reports or the like.  If we had a

9    situation here where half, say every other binder of the

10   mediation questionnaires were turned over to EPA, or excerpts

11   were given to the EPA, or drafts of answers, I think they would

12   be in a good position to come in and say, in fairness, we

13   should have all of that.  But they are not doing that here.

14   What they are saying is that you've turned over the list of

15   facts, now we want your thought process, we want your analysis

16   of your expert, and we want the argument of your attorneys.

17        Finally, as to it expiring, the agreement is that

18   everyone protects everyone else's materials, Your Honor.  In

19   other words, it stays within that room.  I think there's a

20   legitimate question as to even if Weyerhaeuser wanted to waive

21   the privilege, and put their brief out there, or for that

22   matter put our brief out there, they didn't have the right to

23   do that.  That privilege also rests with Georgia-Pacific.  So

24   from the standpoint of what has happened here with

25   Weyerhaeuser's counsel, they are not in a position without our

1    consent to turn over their brief, whether they intended to or

2    not.  Because we also have an interest in that.  We have a

3    privilege in that brief.

4            So the bottom line, Your Honor, is --

5            THE COURT:  Did you raise that argument in your brief?

6            MR. SMIT:  No, we didn't, Your Honor.  I just thought

7    of it as I was sitting here.  Quite candidly.  Legitimately,

8    Your Honor, we have a proceeding that is self-contained.  And

9    today is exactly what everybody was thinking about back in

10   2001, and sure enough here we are today, and what we have is

11   NCR saying, we want to stick our nose in the hen house, we want

12   to find out what went on in that, and to the extent that they

13   dumped on each other, we want to hear what their theories and

14   thoughts and analysis and the like were; there might be some

15   pretty good arguments in that.

16           Now, it comes in under the guise of NCR's experts

17   might have missed things.  There might be facts in there that

18   are really important to NCR's experts that somehow they don't

19   know.

20           Given the number of experts, given the curriculum

21   vitaes and the pedigrees of NCR's experts and what they charge,

22   they have all of the facts, thousands upon thousands upon

23   thousands of documents, pages upon pages of depositions; they

24   have all the facts they need.  There isn't some little nugget

25   of fact in one of these reports that they're going to go,

"Eureka." No. That argument simply gets them in the door of the hen house, and now they look at the theories, and they look at the analysis, and the rationale, and the arguments, and the thought process that Goodyear is intending to keep privileged.

Any questions?

THE COURT: Did Mr. Parker really argue that if Weyerhaeuser has waived its privilege as to the brief they have waived everybody else's privilege as to the brief?

MR. SMIT: I think his exact terminology was, if they waive their privilege to the brief, that waived their privilege to the report, if not the other briefs.

THE COURT: Mr. Parker, are you making that claim? Because I missed it if you did.

MR. PARKER: No. I would think, Your Honor, to Mr. Smit's point, he is saying all the parties, in order for there to be a waiver -- you can't be waived because Georgia-Pacific is a signatory to this agreement. Isn't that bit like saying if an attorney-client privilege exists and my client discloses, waives the privilege and says something, I say no, no, that's not effective, Your Honor, because I didn't agree that he could waive it. Once one party to a privilege waives it, it's waived. And I don't think you get to say, well, no, every party to the privilege has to agree to the waiver before there's an effective waiver. That's where I would disagree with Mr. Smit, respectfully.

1        MR. SMIT:  Your Honor, if I might.  In the

2   attorney-client context, the attorney doesn't hold the

3   privilege, the client does.  In this context, each party holds

4   it.

5        THE COURT:  So I'm not sure I got an answer to my

6   question, MR. HEYDE.  If there's a waiver by Weyerhaeuser as to

7   their brief because they inadvertently waived it, does that

8   waive Georgia-Pacific's privilege as to its brief?  And for

9   that matter, whoever else was in that settlement conference?

10  Is that your argument?

11       MR. PARKER:  That would be my position certainly at

12  least as to everything that Weyerhaeuser holds, which by the

13  way are all these documents, since they were exchanged among

14  the parties, but I would think so.  One party waives it, I mean

15  I'm not certain that to me that's a waiver.  I didn't

16  understand under any --  I don't want to --  I don't want to

17  criticize Goodyear as being ambiguous.  But they didn't parse

18  there whether --  what are we talking about in terms of this

19  privilege.  I don't think it takes everybody.  Once one party

20  waives it, it seems to me that it is waived.  Otherwise there

21  is no privilege.

22       MR. SMIT:  It's a precipitous slope.  The other point,

23  the last point I would make, Your Honor, is assume, and I think

24  it not unlikely, there are banker boxes of materials dealing

25  with the mediation in 2001.  What else do they get?  Do they

1    get the research?  Do they get the notes?  Do they get the

2    interviews?  I mean where do we draw this line?  A set of facts

3    that was sent to the EPA that went out into the public is one

4    thing.  But once again, the Court gave them an inch on that,

5    and sure enough, they are back again saying, now we get it all.

6             THE COURT:  What is your position as to whether or not

7    a waiver of the brief waives the report?

8             MR. SMIT:  To know that I would almost have to look at

9    both of them.  And in honesty, I haven't.  I think it's

10   possible that it could, depending on what's in the brief.  In

11   other words, if the brief is replete with references, quotes,

12   excerpts, things like that from the report, yeah, I see an

13   argument there.  But I just don't know without looking at the

14   two.

15            THE COURT:  Thank you.

16            MR. PARKER:  Your Honor, I have thought of a little

17   additional answer to Mr. Smit and your question, if I can.

18            THE COURT:  I'll take a little additional answer.  I

19   don't want to come --

20            MR. PARKER:  Just so the Court is clear, a mediation

21   questionnaire response was waived by all parties when it was

22   given to the EPA.  Because not -- Georgia-Pacific,

23   Weyerhaeuser, Allied, back in the day, all gave EPA those.  So

24   at least if Your Honor finds that Goodyear covered those, the

25   position that Mr. Smit's client took in the hearing on the

1   motion to compel the production of that, and of course I

2   didn't, but if those were all voluntarily waived and given to

3   the EPA.  Not just by one party, but all parties.  I just

4   wanted to make sure the Court had that context.

5           THE COURT:  I think I thought of that.  All right.

6   Mr. Watson, I wanted to ask you a question to give you a chance

7   to respond to the argument that I don't think was raised prior

8   to your presentation.  And then I want to give Mr. Heyde a

9   chance to respond because this is his motion and he ought to

10  get the last word.  And then perhaps it's time, I think we can

11  wrap this up.

12          The argument has been raised or made that if there has

13  been a waiver as to the mediation brief, and it would probably

14  follow or fall under the inadvertent disclosure and so forth,

15  that that would waive any privilege as to the report as well.

16          What is your response to that?

17          MR. WATSON:  I don't think that's, I don't think

18  that's the right analysis, Your Honor.  And I don't think that

19  that's what Goodyear says.  I mean, first of all, start with

20  the policy of Goodyear.  Would it really make sense to say that

21  you know along the slippery slope that Mr. Smit points out that

22  because we have disclosed the brief, now they get the report,

23  and then where do you draw the line?  Do they get everything we

24  prepared?  Do they get everything that was circulated by every

25  party?  Do they get to depose the mediator?  I'm sure he would

1    be able to add context of his thoughts of what he thought.  Do

2    they get to depose the lawyers who read the briefs and can add

3    additional context?  It's contrary to Goodyear.  And in fact,

4    in Goodyear, and I mentioned this earlier, if you read that

5    case carefully, what you find is that one of the parties to the

6    initial settlement discussions went to the media and disclosed

7    a whole bunch of statements that were made during the

8    mediation.  And then in another lawsuit, another party wanted

9    to get more information.  Hey, can we depose this person?

10             THE COURT:  I'm sorry.  Somebody went to the mediator

11   who was in the mediation?

12             MR. WATSON:  No, went to the media.  So actually went

13   to the news media.

14             THE COURT:  Oh, media, I'm sorry, I didn't hear that.

15             MR. WATSON:  Correct.  And made a statement.  So a

16   public statement telling everybody who would want to read this

17   particular publication about what happened in the settlement

18   negotiations.  And then in a later lawsuit, somebody wanted to

19   depose that person to get additional detail, to get additional

20   context.  And Goodyear said no.  Not only shouldn't you have

21   made the statement to begin with, but because it was settlement

22   privilege, that privilege applies to prevent disclosure ever

23   again.  And so there was never this notion of waiver or maybe

24   it was a little bit related, or, no, we just want a little bit

25   more context, and some of this waiver already happened.  And I

1    think the similar result should obtain here.  The starting

2    point for the analysis is is the document privileged.  Clearly

3    both the report and the brief are privileged.

4        Now, you have to analyze separately whether they were

5    waived.  But waiver of privilege on the brief, which we don't

6    think occurred here, but even if the Court were to say that it

7    did, that certainly mean waiver of the report, and it didn't

8    mean waiver of anybody else's brief or report, or anything else

9    in the matter.

10       THE COURT:  Okay.

11       MR. WATSON:  I did have one other administerial.  I

12   want to correct something on the record, Your Honor.  I had

13   misstated the FDIC case.  So I mistakenly lumped it together

14   with the Samaritan Alliance case, and even though both of those

15   cases are relied on by NCR for the proposition that they are

16   sort of a bright line rule for failure to object to the

17   deposition, and I had told the Court that in both Samaritan

18   Alliance and FDIC that it was clear that the documents were

19   used.  That is clear in the Samaritan Alliance case.  In the

20   FDIC case, though, it's not clear one way or the other.  The

21   Court simply says that the only evidence that was presented to

22   the Court in that case was that the document was produced

23   without objection.  Nobody made any argument about what had

24   actually happened at the deposition.  So we don't know one way

25   or another in that case.

1          THE COURT:  Okay.  Thank you for clarifying that.

2    Mr. Heyde, you get the last word.

3          MR. HEYDE:  Thank you, Your Honor.

4          THE COURT:  I get the last word.

5          MR. HEYDE:  Of course.  As always.

6          MR. SMIT:  All the significant detail.

7          MR. HEYDE:  I'll just briefly cover two points, one

8    relating to the waiver of the mediation brief and its

9    production in this litigation, and then touch on the question

10   that we have been talking about a little bit as to whether the

11   waiver of the brief also affects a waiver of the report.

12          Counsel for Weyerhaeuser raised the question of why

13   NCR didn't come to Weyerhaeuser earlier and say, hey, we have

14   the brief, are you sure you meant to produce this?  It looks

15   like it might be privileged.  Well of course we have argued

16   that it's not subject to the Goodyear privilege to begin with,

17   but a couple other facts are relevant as well.

18          And that is that in addition to receiving the brief as

19   part of initial disclosure, we also served a request for

20   production for all documents that related to the mediation.

21   Weyerhaeuser responded to that request for production, it cited

22   boiler plate language invoking privilege, including

23   attorney-client privilege, et cetera.  But it never raised the

24   Goodyear settlement privilege as one of the reasons to object

25   to that request for production.  And then it ended the request

1   for production by saying it had already produced any relevant,

2   non privileged documents as part of its initial disclosure.

3        So as we saw the brief in light of our request for

4   production, it was not at all obvious to us that Weyerhaeuser

5   had not purposely produced the brief, either agreeing with us

6   that it was not subject to the Goodyear privilege, or having

7   decided to intentionally waive that, just as the mediation

8   questionnaire responses at one point been provided to others.

9   We didn't know.

10        THE COURT:  All right.  In sequence, you served this

11   request for production of documents pertaining to the

12   settlement conference, was that before or after you received

13   the brief?

14        MR. HEYDE:  I don't know exactly, but I believe it

15   should have been slightly afterwards.  Although, it may have

16   been before the initial disclosure was reviewed and we

17   discovered the brief.  That part I'm not sure.  They were both

18   in 2011, and they were both in the fall of 2011, I believe.

19        THE COURT:  So the brief could have been received as

20   part of the 26(a)(1) materials.

21        MR. HEYDE:  It was received as part of the 26(a)(1)

22   material.  What I don't know is whether it had already been

23   reviewed at the time NCR issued its first request for

24   production of documents.

25        THE COURT:  So it would not appear that you received

1    the brief as, pardon me, in response to your request for

2    production of documents.

3         MR. HEYDE:  No.  I don't want to imply that we did.

4    But I think it is relevant to our understanding of it that when

5    we served a request for production of documents and directly

6    said, hey, we want everything that relates to the mediation,

7    that we did not hear in response, no, you can't have that

8    because of the Goodyear privilege.  We got a boiler plate

9    response back that didn't evidence any concern for that

10   privilege.

11        THE COURT:  I see.

12        MR. HEYDE:  The other reason that the brief didn't set

13   off warning alarms on the NCR side as having been potentially

14   and inadvertently produced, that you have to remember the

15   mediation questionnaire responses also said privileged and

16   confidential on them very clearly.  And so that we knew we had

17   a set of documents legitimately that were marked privileged and

18   confidential.  There is no reason to believe that the mediation

19   brief hadn't been purposely produced as well.

20        Mr. Watson also --

21        THE COURT:  And you had those.

22        MR. HEYDE:  And we did have the mediation

23   questionnaire responses throughout this entire litigation.  And

24   those were not inadvertently produced.  Those were purposely

25   produced.

1    Mr. Watson has also tried to make a distinction about

2    the difference between the introducing the exhibit during the

3    deposition, and using it somehow with the idea that because of

4    the content of the witness's answers, the exhibit didn't really

5    get used.  It did get used.  I asked the witness whether he was

6    familiar with it.  It's the question, not the answer that's

7    objectionable.  So if my question was calculated to lead to,

8    you know, to the disclosure of privileged information, counsel

9    could have and should have objected.  I then asked whether

10   Weyerhaeuser had any information that contradicted what was in

11   the mediation brief.  That question too could have been and

12   should have been objected to, regardless of what the answer

13   was.  The witness testified that he, that Weyerhaeuser did not

14   have any such information so far as he knew.

15         THE COURT:  What was the first question?

16         MR. HEYDE:  The first question was whether the witness

17   had seen the document before.  And the second question was

18   whether Weyerhaeuser, and that was appropriate because it was a

19   30(b)(6) deposition, whether Weyerhaeuser had any information

20   contradicting the mediation brief.

21         And then I said the other issue I would address is the

22   question of whether production of the brief affects production

23   of the report as well.

24         And I guess to answer Mr. Smit's or to supplement

25   Mr. Smit's answer to your question about how closely related

1    the two documents are, the brief is replete with references and

2    citations to the Arcadis report.  And to some degree summarizes

3    the analysis of what was conducted in the Arcadis report.  So

4    there is a very close relationship between those two documents.

5            And I think the other thing that's related here is

6    that Weyerhaeuser and Georgia-Pacific are trying to effect the

7    rule that if something is covered by the Goodyear privilege,

8    that every party to the discussion, every party to the

9    mediation has a veto power over every disclosure that relates

10   to the mediation.  And that simply would upend a lot of the

11   procedure and law that exists for how to handle disclosures and

12   how to handle waivers.  So if, for instance, Weyerhaeuser makes

13   either an advertent inadvertent production, how long does

14   Georgia-Pacific have before it has waived the privilege by not

15   objecting?  What about Allied, which no longer exists?  Does it

16   or the Millennium Custodial Trust have veto power over who

17   discloses?  They are not even a party to the litigation.  And

18   do they have to come in or could they come in at trial and say

19   that they had not given consent for something that had been

20   produced?  So I think the better rule and the better way to

21   follow this is to say that the communications that each party

22   gave at least at this initial stage of the settlement where

23   everybody is giving their initial position, their initial

24   facts, that each party holds the privilege alone as to its own

25   contribution.

1          The rule might be different if we were looking at what
2     happened during a mediation session or who made what concession
3     to whom, or who made what offer to whom.  But that's not what
4     we are talking about here.  We are not talking about deposing
5     people, we are not talking about trying to find the mediator's
6     notes or anything.  We are just simply looking for two out of
7     three documents that were the basic building blocks going into
8     the mediation.
9          And with that, if you have additional questions I
10    would be happy to answer them.  Otherwise, that's all I have.
11         THE COURT:  You are taking the position that if the
12    brief has been, any privilege as to the brief has been waived,
13    then the report is sufficiently tied to that brief, that it
14    necessarily, any privilege as to that report necessarily has
15    been waived as well.
16         MR. HEYDE:  I think the two documents are tied closely
17    enough that any kind of subject matter waiver that you would
18    effect would have to draw the report in if the brief came out.
19         THE COURT:  All right.  Thank you.
20         MR. HEYDE:  Thank you, Your Honor.
21         THE COURT:  This is certainly an interesting area.
22    And it certainly would provide grounds for a lengthy, and
23    detailed, and well-reasoned written opinion, like so many other
24    issues that these parties have raised before the Court.
25         And was this case the only case that I had, I would be

1    happy to try to give you that. You may think this is the only
2    case that I have because you may look at my docket and see that
3    Goodyear seems to be there quite a bit, I'm sorry,
4    Georgia-Pacific is the only case on my docket. But believe it
5    or not, I do have other cases. And you would probably rather
6    have an answer than wait; besides you're already waiting for a
7    couple others, opinions. So I'm going to rule from the bench
8    and we will get this matter disposed of.
9           At issue of course is NCR's request to compel the
10   production of the brief that was disclosed and then clawed back
11   by Weyerhaeuser and the Arcadis report that was never produced.
12   Both of which were part of the settlement proceedings early on
13   in this matter.
14          The answers to the EPA, provided to the EPA are not at
15   issue, having already been produced.
16          I think there are good arguments on all sides here,
17   and they have been well made. This Court has this rather
18   extensive experience with settlement conferences, both
19   individually in that I conduct a number of them, and as well
20   with having tried to assist in setting up some of the
21   procedures that our court generally has had with encouraging
22   settlement conferences and other ADR devices in our court
23   generally. Our court is one of the leading courts as far as
24   ADR is concerned in the country, and we have been for sometime.
25          We have a menu of ADR that sometimes lacks only

1    dueling as an alternative.

2         One of the things that makes ADR and settlement

3    conferences in particular successful is the willingness of

4    people to be candid at that stage, and come forward with their

5    best offers and their best positions, and they do that knowing

6    that they aren't going to be haunted by what they say if ADR is

7    not successful or the settlement conference is not successful

8    and if they have to go to trial.

9         And when we have voluntary facilitative mediation,

10   which is a form of settlement conference that does not involve

11   a judge, what goes on there is really hands off as far as the

12   court is concerned.  Our local attorneys are very well aware

13   that the Court will establish the mediations but we do not talk

14   to the mediator, we do not know what goes on in the mediations,

15   we don't know what was said, we simply know if they were

16   conducted or not conducted.  And we find that they are very

17   successful in resolving a number of cases.

18        And then the judges also hold a number of settlement

19   conferences themselves, but even then we use different judges

20   to hold the settlement conferences than we do who try the

21   cases.  So some of us become settlement judges for those

22   particular cases, again, so that we have different judges or

23   different people handling the settlement conference than we do

24   trying the cases.

25        Again, so the parties can feel free to be candid.

1      So what is said at a settlement conference is very
2  important, and we try to make it, protect it as much as
3  possible.
4      That is not to say, however, that everything that is
5  said at a settlement conference is sacrosanct and cannot be
6  waived by one party or another.
7      I don't feel comfortable with the position that
8  somehow what one party does inures to the detriment of
9  everybody else.  So if there is some perception that there is a
10  joint understanding that everything is going to be privileged
11  and one person somehow defaults on that, that everything else
12  suddenly becomes exposed or waived, that doesn't feel right to
13  me.  You may be able to waive your own position of
14  confidentiality, but I don't think you can waive everybody
15  else's.  I don't think you become held hostage to everybody
16  else when you go into a settlement conference and put forth
17  your position.  And suddenly have your position exposed because
18  one other party decides they are going to, that their, let
19  their position become known outside the settlement conference.
20  I don't think you lose your protections.
21      In this instance we have, we have the brief, which is
22  a matter that gives me the most concern, as I suspect
23  Mr. Watson sensed.  Because it was produced as a result of
24  26(a)(1) materials back in 2011, as I understand it.  And I
25  think the argument was that it was disclosed inadvertently.  At

1    least that is the position taken in retrospect.  Whether it was

2    at the time or not, I don't know because apparently there's

3    nobody that can tell us what happened back then.  Mr. Watson is

4    in the unenviable position of saying what must have happened or

5    probably what happened because logically he would like to

6    believe that's what happened, but I think in the absence of any

7    affidavits or firsthand representations by attorneys who were

8    involved, this is somewhat speculative.

9         And what is particularly troublesome is that this

10   document was not a document necessarily from a client produced

11   by the client in the ordinary course of business and held on to

12   by the client, held on to by the client, as one of perhaps

13   thousands or hundreds of thousands of documents that a client

14   would have to produce as part of litigation, but it was a

15   document that was specifically produced for purposes of trying

16   to settle litigation.  And it was produced by attorneys who

17   massaged a lot of information presented for the purpose of

18   responding to these questionnaires.  This is information that

19   was refined and produced and probably had some spin put on it

20   so it was produced in the most effective way on behalf of

21   Weyerhaeuser so that the other, other parties could see it, and

22   see what position Weyerhaeuser had.

23        So it was a document intended to be shared by other

24   parties, at least within the confines of this settlement

25   proceeding.  It wasn't strictly a document between Weyerhaeuser

1    and its attorney, but between Weyerhaeuser and the other

2    parties to the settlement proceeding.

3          But clearly it was produced separate and apart from

4    something Weyerhaeuser produced.  And one would think, and I

5    realize we are looking at this in hindsight but that's the only

6    thing we can do, that it would have been kept in a separate

7    file, indeed in a separate office from Weyerhaeuser, and there

8    would have been reasonable steps to prevent this from being

9    disclosed to parties that were not part of the settlement

10   proceeding.  Indeed it was marked as a confidential document

11   for use in mediation proceedings.  What were the reasonable

12   steps taken to prevent its disclosure to parties outside the

13   settlement proceedings?  We don't know that.  And, again,

14   Mr. Watson, through no fault of his own, is in the unenviable

15   position of speculating that something must have been done, but

16   he can't tell us what those steps were.  So the result is that

17   this document is produced in response to 26(a)(1) materials.

18   Somehow it must have gotten into the data bank of documents

19   that were being produced.  We surmise.  We don't even know

20   that.

21          And then we have to look at whether reasonable steps

22   were taken after disclosure to rectify the error.  And here Mr.

23   Heyde on behalf of NCR puts the Weyerhaeuser attorneys on

24   notice through his letter of October 13th, 2014, some

25   three years later, and a week prior to a 30(b) deposition of

1    Weyerhaeuser, about this brief.  Now, obviously a 30(b)(6)

2    witness has to be prepped as to any number of things.  But the

3    30(b)(6) letter, I'm sorry, the letter pertaining to the

4    30(b)(6) deposition prepared by Mr. Heyde which is an exhibit,

5    which I've read, is fairly short, it does only focus on certain

6    things, and certainly would have called attention to several

7    items that ought to be checked out.

8          So I think that Weyerhaeuser's attorneys are on notice

9    about that.

10          The deposition took place seven days later on

11   October 20th, that's when it started, and at that time NCR

12   marked this brief as an exhibit; there was no objection.

13   Counsel would have seen it when it was marked, and it was not

14   objected to.  We have exceedingly fine counsel in this case on

15   all sides.  And I have never seen instances where counsel are

16   casual at these depositions in big stakes litigation.  They

17   generally review documents quite carefully that the other side

18   is presenting.  And so I presume they saw that this was marked

19   as a confidential document, that had been produced on behalf of

20   their client, and said for mediation.

21          But they did not object to it.  And then their client

22   was asked questions about it.  And as Mr. Heyde points out, the

23   time to object is when the questions are asked, not when the

24   client says I don't have any knowledge about it.  Now, maybe

25   they knew from having prepped their client that they didn't

have any knowledge about it so they didn't think it was
necessary to object.  But that would suggest they knew what the
document was, and what it contained, and would be all the more
reason why they would be on notice that they should take some
action to it, if they wanted to get it back.

The deposition adjourned for an entire week until the
27th when it resumed.  Nothing further was said about this
document at that time.  And the deposition was completed.

There was correspondence between the parties on the
23rd of October; counsel for Weyerhaeuser responded to the
letter of the 13th stating that the report that was also
mentioned would not be furnished.  That was the other item at
issue here.  But apparently did not talk about the brief.

On the 24th NCR, as I understand it, e-mailed counsel
for Weyerhaeuser and asked them to call so they could talk
about the report, and on the same day, counsel for Weyerhaeuser
responded and said they were thinking, in the course of the
conversation, said they were thinking about a claw back letter
as to the brief but didn't say they were actually going to do
it.  And again, that's three days before the deposition
resumed.

Three days ran, the deposition was allowed to be
completed, again, with no further action being taken.  There
was a question at that time as to whether or not NCR may have
obtained the letter, pardon me, the brief from some other

1    source besides Weyerhaeuser, for example from the EPA, and NCR

2    could not answer that at the time.  They did try to check that

3    out and apparently never did get back to the attorneys for

4    Weyerhaeuser.  I don't know if that's why Weyerhaeuser did not

5    do anything further, but they did not until apparently the

6    28th, the day after the deposition.  At which point they issued

7    their claw back request.  And after that the letter, the report

8    which is about 50 pages in length was suppressed and has been

9    ever since.

10         So the question put to the Court is whether or not all

11   of this constitutes reasonable steps taken by Weyerhaeuser

12   after disclosure to rectify the error.  I realize that's a

13   judgment call.  I think that Weyerhaeuser waited too long.  I

14   think at some point they should have acted more promptly on

15   this matter.  Whether it was when they first received the --

16   first of all, assuming you get past the inadvertent disclosure

17   because there has been no showing of a systematic procedure put

18   in to place to guard against these settlement documents

19   produced, assuming you get past that, and for three years this

20   document has been sitting in the hands of NCR, you're notified

21   of that on the 13th of October, it's a matter that goes through

22   an entire deposition after that, it's a deposition that goes

23   over a week's period of time, and nothing is done until the

24   28th when they attempted to claw back.

25         The claw back has been determined to be necessary in

1    litigation nowadays.  It didn't used to be, of course.

2    Mr. Watson assures me that firms take their obligation to try

3    to preclude documents from escaping their grasp seriously, and

4    I have no doubt that's true.  When I asked that question, it

5    was really because I wanted to know what the attitude of firms

6    is.  And I have no doubt they try to protect what they can as a

7    general rule.

8        But I think there has to be an effort to react very

9    promptly, very quickly when the issue comes up.  The claw back

10   is a safety valve, but it's not one that is there for a very

11   long period of time, particularly since the issue is front and

12   center once that first letter is sent out.

13       That in turn brings us to the report.  The report, it

14   has been represented to the Court, and it has not been

15   disputed, appears to be closely tied to this brief.  It has

16   been represented that the brief is replete with references to

17   the report, summarizes portions of it, and I think the waiver

18   of the confidentiality of one waives the other as well based on

19   the subject matter.

20       And for that reason, I find that the report, the

21   Arcadis report is also subject to disclosure, as well as the

22   brief.

23       I do not find that any other brief of any other party

24   or any other report is subject to disclosure as a result of

25   these findings.  And I am not making this finding based on the

1    fact that there have been disclosures by Weyerhaeuser to the

2    EPA and that these documents are, thereby, the confidentiality

3    or any protections afforded these documents is thereby waived.

4    I'm not reaching that question.

5         I believe that the privilege of confidentiality is

6    independent as to each of the participants in the settlement

7    conference, that the brief was waived by the fact that it was

8    inadvertently -- I'm going to strike that word -- that it was

9    disclosed three years ago, and for the reasons I have given in

10   the claw back provision was not successful.  Therefore, the

11   privilege as to that was waived.

12        And as it falls so does the report the Arcadis that is

13   closely tied to it.

14        And it's for those reasons that the motion is granted.

15        Thank you.

16        MR. HEYDE:  Thank you, Your Honor.

17        THE CLERK:  All rise, please.  Court is adjourned.

18        (Proceedings concluded, 12:53 p.m.)

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I certify that the foregoing is a transcript from the

4    Liberty Court Recording System digital recording of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9

10                            /s/ Kathy J. Anderson

11                            Kathy J. Anderson, RPR, FCRR

12                            U.S. District Court Reporter

13                            402 Federal Building

14                            Grand Rapids, MI  49503

15

16

17

18

19

20

21

22

23

24

25