UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC,<br><br>        Plaintiffs,<br><br>   vs.<br><br>NCR CORPORATION, INTERNATIONAL PAPER CO., and WEYERHAEUSER CO.,<br><br>        Defendants. | Case No.  1:11-cv-00483<br><br>Hon. Robert J. Jonker<br><br><br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT INTERNATIONAL PAPER COMPANY'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING "EQUITABLE RESPONSIBILITY" FOR THE BATTLE CREEK MILLS; ORAL ARGUMENT REQUESTED PURSUANT TO W.D. Mich. LCivR 7.2(d)**

# **TABLE OF CONTENTS**

                                                         **Page**

I.      SUMMARY OF ARGUMENT ............................................................................................1

II.     FACTUAL BACKGROUND...............................................................................................3

           A.      GP's "Equitable Responsibility" Claims Related to the Battle Creek Mills ...........3

           B.      GP's Discovery Responses Fail To Establish that PCBs Discharged from the Battle Creek Mills Have Entered the Site Below Morrow Lake Dam.....................4

           C.      GP's Experts Have Not Established that PCBs Discharged from the Battle Creek Mills Have Entered the Site Below Morrow Lake Dam ...............................5

           D.      It is Well Established That No PCBs Were Detected in Large Stretches of the Kalamazoo River Between the Battle Creek Mills and Morrow Lake; No Expert in this Case Has Established that Aroclor 1242 Allegedly Discharged from the Battle Creek Mills Travelled to the Site.....................................................6

III.    SUMMARY JUDGMENT STANDARD..............................................................................8

IV.    NO PARTY HAS ESTABLISHED A *PRIMA FACIE* CASE THAT PCBS DISCHARGED FROM THE BATTLE CREEK MILLS ARE PRESENT IN THE SITE REQUIRING RESPONSE COSTS............................................................................9

V.     CONCLUSION....................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 8

*Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146 (6th Cir. 1995) ..................................................... 8

*Kalamazoo River Study Group v. Eaton Corp.*, 258 F.Supp.2d 736 (W.D. MI. 2002) ......... *passim*

*Kalamazoo River Study Group v. Rockwell International Corporation*, 171 F.3d 1065
    (6th Cir. 1999) ............................................................................................................... *passim*

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................... 9

*Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382 (W.D.Mo 1994) ........................................ 3, 9

**FEDERAL STATUTES**

Federal Rule of Civil Procedure 56(a) ........................................................................................... 8

For the first time during Phase II of this case, Plaintiffs announced that they were seeking to hold International Paper Company ("International Paper") "equitably responsible" for PCBs allegedly contributed to the Site by two mills located in Battle Creek, Michigan, more than 20 miles upstream of the Site.[1] Over International Paper's objection, the Court agreed to give Plaintiffs an opportunity to establish International Paper's responsibility for the alleged discharges of those two mills to the Site. Now that fact discovery has closed, and expert reports have been submitted, it is apparent that neither Plaintiffs nor any of the other parties can make a *prima facie* showing that the Battle Creek mills contributed PCBs to the Site. Instead, they offer evidence merely suggesting that the Battle Creek mills recycled CCP[2], point to the Aroclor 1242 contamination at the Site, and hope that this Court ignores: (a) the 20+ miles of the River separating the Site from these mills; (b) the 13-mile stretch of PCB-free sediment between the Site and the mills; and (c) the impact of Morrow Lake and the Morrow Lake Dam at the end of that 20+ mile stretch of River between the mills and the Site. Consequently, International Paper is entitled to partial summary judgment on liability or "equitable responsibility" for the two mills in Battle Creek.

I.      **SUMMARY OF ARGUMENT**

No party has established a *prima facie* case for any "equitable responsibility" for International Paper of Site costs relating to alleged PCB discharges from two mills located in Battle Creek, more than 20 miles upstream of Morrow Lake Dam, the upper reach of the Site.

GP interjected the issue of a potential "equitable responsibility" for these mills into Phase II, although no determination was made as to International Paper's liability with respect to them

---

[1] As the Court is aware, the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site (the "Site") and OU-5 in particular encompasses the 80-mile stretch of the Kalamazoo River from the Morrow Lake Dam to Lake Michigan. The Battle Creek Mills, as defined below, were located approximately 23 miles upstream of the Morrow Lake Dam.

[2] "CCP" refers to NCR Corporation carbonless copy paper containing Aroclor 1242.

in Phase I.³  Evidence has not been brought forth that is sufficient to make a *prima facie* showing that PCBs allegedly released from these mills can be tied to response costs at the Site.  Even if PCBs were discharged by these mills into the Kalamazoo River (something that International Paper does not concede, but is not contesting for purposes of this Motion), a *prima facie* showing requires demonstrating that those PCBs then traveled the 20+ miles down the River, to and through Morrow Lake and then over Morrow Lake Dam, causing response costs to be incurred.  Any such showing must acknowledge the fact that the PCBs released from the mills would be Aroclor 1242, the PCBs associated with CCP—a high burden given that Morrow Lake has been described by Judge Bell in prior litigation involving the Site as equivalent to an "Aroclor 1254 lake," in which 90% of the PCBs were Aroclor 1254 and 1260.  *See, e.g., Kalamazoo River Study Group v. Eaton Corp.*, 258 F.Supp.2d 736, 741 (W.D. MI. 2002) ("*KRSG v. Eaton*").

In that prior litigation, Judge Bell granted and the Sixth Circuit affirmed a "no-evidence" motion for summary judgment by an Aroclor 1254 defendant located upstream of Morrow Lake because the plaintiffs could not establish that the PCBs from the defendant traveled down a *3,200 foot* ditch (let alone 20+ miles of river) from the defendant's property to the Kalamazoo River just upstream of Morrow Lake.  *See Kalamazoo River Study Group v. Rockwell International Corporation*, 171 F.3d 1065, 1068 (6th Cir. 1999) ("*KRSG v. Rockwell*").  Acknowledging that this presented a "two-site" case, the Sixth Circuit stated that "where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up."  *Id*. (citing to *Thomas*

---

³ In Phase I, Plaintiffs sought to establish International Paper's CERCLA liability *solely* as a result of its predecessor's (St. Regis Paper Company) operation and ownership of the Bryant Mill.  The Court held that International Paper did <u>not</u> have liability as an operator, but found International Paper's predecessor, St. Regis, had "owned" the Bryant Mill for a limited period time for purposes of CERCLA.  Opinion and Order (Dkt # 432).

2

*v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1387 (W.D.Mo 1994)).

No party has met that standard here, *i.e.*, no party has established that PCBs from the two Battle Creek mills traveled down 20+ miles of river to and through Morrow Lake and over Morrow Lake Dam. As such, International Paper is entitled to partial summary judgment on this "equitable responsibility" issue.

## II.   FACTUAL BACKGROUND

### A.   GP's "Equitable Responsibility" Claims Related to the Battle Creek Mills

As part of Phase II, Plaintiffs (collectively, "GP") served discovery on International Paper inquiring into International Paper's corporate predecessors' ownership of three additional mills on the basis that these mills were affiliated with predecessor entities: the MacSimBar Mill ("MacSimBar") in Otsego and the Fountain Street Mill and Angell Street Mill (collectively, the "Battle Creek Mills"), both located in Battle Creek (collectively, the "Three Mills"). Magistrate Judge Brenneman granted a motion to compel brought by GP with respect to the discovery, although he did *not* decide the issue of whether the Court should consider International Paper's alleged "equitable responsibility" for the Three Mills in Phase II.[4]

The Court subsequently denied—without prejudice—a motion *in limine* brought by International Paper seeking to exclude evidence related to the Three Mills. *See* Order Revising Case Schedule and Addressing Motions (Dkt # 541). GP opposed that motion (Dkt # 521), arguing that it should be allowed to argue in Phase II that International Paper may be responsible for other mills that "discharged PCBs into the Kalamazoo River" and argued that the Court should not exclude such matters until "*evidence regarding these mills' discharges* of PCBs into the

---

[4] Rather, the Magistrate Judge granted the motion because he believed it necessary for the Court to decide the larger issue of whether the Three Mills *should be considered* in Phase II and having answers to GP's discovery might assist the Court in that decision. Transcript of 7/14/14 hearing (Dkt # 497) at 76-77.

Kalamazoo River and the uses the parties and their experts make at trial of these mills' PCB discharges" *is known*. GP Opposition, p. 1 (emphasis added).

### B. GP's Discovery Responses Fail To Establish that PCBs Discharged from the Battle Creek Mills Have Entered the Site Below Morrow Lake Dam

International Paper expressly asked GP in discovery for all facts supporting its "contention" that International Paper had "'equitable responsibility' for PCBs [GP] claim[s] were released" from the Battle Creek Mills. GP objected to such requests, claiming, in part, that "[s]ome of this evidence will be the basis for expert testimony and described in expert reports. Expert opinions will be disclosed in accordance with the Court's case management order." *See* GP's Amended Answers and Objections to International Paper's Third Set of Phase II Interrogatories dated September 29, 2014, responses to Interrogatory Nos. 36 and 37, a copy of which is attached as Exhibit A to Declaration of John D. Parker ("Parker Decl."). Substantively, GP responded to these interrogatories by referencing International Paper's alleged successor relationship to Michigan Carton Company (former owner of the mills) as well as circumstantial evidence that the mills processed NCR CCP. *Id.* GP also acknowledged that the Battle Creek Mills were connected to the Battle Creek wastewater treatment plant ("Battle Creek POTW") "from 1959 onwards." *Id.* GP, however, other than pointing to potential evidence that the Battle Creek Mills processed CCP and discharged, mainly through the Battle Creek POTW, to the River, GP cites to no evidence that any Aroclor 1242 allegedly released from the Battle Creek Mills made its way down the 20+ miles of the Kalamazoo River to Morrow Lake. Rather, GP jumps to the conclusion that there were detections of PCBs (not necessarily Aroclor 1242) in Morrow Lake. (As generically stated by GP, there is "[e]vidence establishing the presence of PCBs in Morrow Lake, downstream of Battle Creek."). *Id.*

4

In addition, NCR, while not asserting an "equitable responsibility" claim, has made certain factual assertions relating to alleged discharges of Aroclor 1242 from the Battle Creek Mills.[5] For example, NCR responded to GP's Second Phase II Interrogatories with alleged CCP usage and alleged Aroclor 1242 discharges for each of the 12 mills within the Site as well as the Battle Creek Mills. *See* Defendant NCR Corporation's Responses and Objections to Georgia-Pacific's Second Phase II Interrogatories, dated December 1, 2014 ("NCR's Responses"), response to Interrogatory No. 6, a copy of which is attached as Exhibit B to the Parker Decl.[6]

### C. GP's Experts Have Not Established that PCBs Discharged from the Battle Creek Mills Have Entered the Site Below Morrow Lake Dam

As with GP's discovery responses, GP's experts on the subject, Dr. John R. Wolfe ("Wolfe") and Dr. James C. Farrand ("Farrand"), fail to present evidence sufficient to establish a *prima facie* case showing that Aroclor 1242 PCBs allegedly discharged from the Battle Creek Mills in fact traveled to Morrow Lake and over Morrow Lake Dam and caused response costs to be incurred within the Site. In fact, GP's experts, along with NCR's expert, Dr. D. Grant Allen ("Allen"), simply state that discharges occurred from the Battle Creek Mills, although in doing so, they did not necessarily recognize, at first pass, at least, that the mills were hooked up to the Battle Creek POTW in 1959[7]. *See* Wolfe's December 5, 2014 Expert Report, revised as of

---

[5] Similarly, defendant Weyerhaeuser Co. has not asserted an "equitable allocation" claim against International Paper relating to the Battle Creek Mills. Further, it has not provided any discovery responses in this matter addressing alleged discharges from the Battle Creek Mills, let alone evidence purporting to establish that any such discharges traveled the 20+ miles down the Kalamazoo River, into and through Morrow Lake and Morrow Lake Dam, and into the Site.

[6] It should be noted, NCR's interrogatory responses do not appear to provide for the fact that the Battle Creek Mills discharged to the Battle Creek POTW for nearly the entire period between 1954 and 1981 (NCR's Responses, p. 34-35) and do not set forth any alleged discharge figures for the Battle Creek POTW for the same time period, as they do for the Kalamazoo Wastewater Treatment Plant.

[7] *See* KZ00494835-KZ00494846 (April 3, 1959 Waste Treatment Contract between City of Battle Creek and Michigan Carton regarding the Battle Creek Mills), attached as Exhibit C to the Parker Decl.

February 27, 2015 ("Wolfe 12/5/14 Report"), Section 9.9, p. 57; Farrand's December 5, 2014 Expert Report ("Farrand 12/5/14 Report"), p. 19-20; and Allen December 5, 2014 Expert Report ("Allen 12/5/14 Report"), p. 9.[8] Excerpts of the Wolfe 12/5/14 Report, Farrand 12/5/14 Report, and Allen 12/5/14 Report are attached as Exhibits D, E and F respectively to the Parker Decl. The only estimated discharge figures for the Battle Creek Mills advanced by any party are that the Battle Creek Mills each accounted for ***0.001%*** of the total PCBs allegedly discharged by all mills to the River. *See* Allen 2/27/15 Report, p. 3, attached as Exhibit G to the Parker Decl. (Allen estimates that the Fountain Street Mill discharged only 204 lbs. of Aroclor 1242 and the Angell Street Mill discharged only 197 lbs., out of a total of 186,788 lbs. total for all mills).

> D. **It is Well Established That No PCBs Were Detected in Large Stretches of the Kalamazoo River Between the Battle Creek Mills and Morrow Lake; No Expert in this Case Has Established that Aroclor 1242 Allegedly Discharged from the Battle Creek Mills Travelled to the Site**

The above "evidence" is not sufficient to meet the burden under *KRSG v. Rockwell*. GP must show not only that the Battle Creek Mills discharged PCBs, but also that any such PCBs flowed through the "ditch" to reach the Site—in this case, through the Battle Creek POTW, down

---

[8] GP's experts, Wolfe and Farrand, do not attempt to quantify the amount of PCBs allegedly discharged from the Battle Creek Mills. NCR's expert, Allen, on the other hand, purports to estimate the amount of PCBs released from all mills within the Site, as well as the Battle Creek Mills. While International Paper does not contest, solely for the purposes of this Motion, that some amount of Aroclor 1242 may have been released from the Battle Creek Mills, it should be noted that Allen originally incorrectly stated that "the Battle Creek POTW appears to have received effluent from paper mills—the Fountain Street and Angell Street Mills at some point between 1954 and 2003—but there is no information about when it did so. Accordingly, I have assumed that the Fountain and Angell Street Mills *did not send effluent to the Battle Creek POTW until after the time period covered by my report.* Even if this assumption is incorrect, because of the relatively low discharges from these two mills, it does not materially affect total discharges to the River." Allen 12/4/14 Report, p. 9 (emphasis added). Allen's assumption was incorrect, as noted above and, in fact, Allen was forced to correct this assumption in his Supplemental Report, served on February 27, 2015 ("Allen 2/27/15 Report"), excerpts of which are attached as Exhibit G to the Parker Decl. As Allen conceded in his Supplemental Report, "[b]ased on the documents identified by [International Paper expert] Dr. Woodard, the analysis in this report incorporates secondary treatment of the Fountain Street and Angell Street Mills' effluent by the Battle Creek POTW." Allen 2/27/15 Report, Appendix B, p. 4.

the 20+ miles of the Kalamazoo River below Battle Creek, through Morrow Lake and over the Morrow Lake Dam. It is well-established *no* PCBs were detected *at all* in large stretches of the Kalamazoo River between the Battle Creek Mills and Morrow Lake. In *KRSG v. Eaton*, Judge Bell noted that the "1976 Wuycheck study found *no Aroclor 1254 or any other Aroclor* in sediment between the Eaton Battle Creek facility and the next 13–mile stretch of the River extending to Morrow Lake." 258 F.Supp.2d at 747 (emphasis added; citing to Dr. John P. Connolly's testimony (2/5/02 at 414–16; 5/9/01 Opinion at 20). Further, Judge Bell found that "the non-detects in the stretch of river between Eaton and Morrow Lake are not insignificant." *Id* at 748. Dr. Connolly also testified at the *KRSG v. Eaton* trial that there would be non-detect in "Morrow Lake" if plotting for 1242. *See KRSG v. Eaton* trial testimony, Dr. Connolly, 2/5/02 at 420.

Similarly, no expert in this case has established that Aroclor 1242 allegedly discharged from the Battle Creek Mills made their way to the Site. GP's expert, Wolfe, simply states—without citing to any evidence—that the "Battle Creek mills are not major contributors to PCB contamination downstream of Morrow Lake." Wolfe 12/5/14 Report, p. 57. NCR's expert, Dr. Robert Nairn, "modeled" PCB flows *within* the Site, but *did not model* the portion of the Kalamazoo River from the Battle Creek Mills to Morrow Lake. *See* Nairn December 5, 2014 Report ("Nairn 12/5/14 Report"), excerpts of which are attached as Exhibit H to the Parker Decl. Rather, he simple inputted Allen's original discharge figures (as if the PCBs had been transported the 20+ miles and dropped into the Kalamazoo River just downstream of Morrow Lake Dam) without offering any evidence of how those PCBs may be gotten there.[9] *Id.*

---

[9] Weyerhaeuser's experts do not even consider the Battle Creek Mills in their reports. Further, as noted above, Allen significantly revised his estimated discharge figures for the Battle Creek Mills, stating in the Allen 2/27/15 Report that the Battle Creek Mills each discharged only 0.001% of the total Aroclor 1242 Allen estimates was discharged by all 14 mills. International Paper

In *KRSG v. Eaton,* the Kalamazoo River Study Group (the "KRSG"), of which GP was a member, sought to allocate responsibility to Eaton Corp. for costs incurred at the Site based on Eaton's facilities located above Morrow Lake. *Id*. at 741. After a trial, Judge Bell ruled that 90% of the PCBs in Morrow Lake were Aroclor 1254 and 1260[10] (*i.e*., not from papermaking operations). *Id*. at 741 and 755. Further, GP's expert, Dr. Brown, testified that "[n]inety percent of the PCB mass in sediment in Morrow Lake is comprised of PCB Aroclor 1254. (Brown, 2/5/02, at 282, 288; Exh. 2111–J; Exh. 2111–K)." *Id.* at 755. In addition, Judge Bell noted that:

> Morrow Lake was not and is not a significant contributor of PCBs to the NPL Site. This conclusion is supported by the MDEQ's determination that Morrow Lake is not a significant enough issue to pursue as far as source identification. The MDEQ has expressed no interest in remediating Morrow Lake or the areas upstream of Morrow Lake.

*Id.* at 758 (citations omitted). As such, with respect to Eaton, Judge Bell found that Eaton was not responsible for "any of the remediation costs."[11] *Id*. at 760.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment may show an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). *See also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("To meet [its summary judgment burden], the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the

---

understands that Nairn will be serving a further supplemental report on March 13, 2015 and, to the extent such further report is directed to matters addressed in this motion, International Paper reserves the right to seek leave of the Court to file a supplement to this opening brief.

[10] As this Court recognized in its Opinion and Order in Phase I, the PCBs contained in CCP processed by the mills are Aroclor 1242.

[11] Judge Bell did find Eaton responsible for 10% of the investigation costs for Morrow Lake and the vicinity of the Eaton facility, but zero percent responsible for all investigative work and remediation costs downstream of Morrow Lake. *Id*. at 760-61.

failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury."); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57 (1986) (the existence of any fact issue will not suffice to defeat a no-evidence summary judgment motion; there must be a "genuine issue" regarding a "material fact.").

## IV. NO PARTY HAS ESTABLISHED A *PRIMA FACIE* CASE THAT PCBS DISCHARGED FROM THE BATTLE CREEK MILLS ARE PRESENT IN THE SITE REQUIRING RESPONSE COSTS

The Battle Creek Mills are located 20+ miles upstream of Morrow Lake. As such, any party attempting to establish "equitable responsibility" relating to releases from those mills must establish—in order to make out a *prima facie* case—that discharges from those mills actually reached the Site causing that party to incur response costs. With respect to the Battle Creek Mills, this is a "two-site" case in which it is not enough to merely demonstrate that a discharge occurred at the Battle Creek Mills. As set forth by the Sixth Circuit in prior litigation related to the Site, and as noted above, "[i]n a 'two-site' case such as this, where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a *prima facie* case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." *KRSG v. Rockwell*, 171 F.3d at 1068 (citing to *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1387 (W.D.Mo 1994)). No party has met that standard here.

In *KRSG v. Rockwell*, the Sixth Circuit affirmed Judge Bell's summary judgment in favor of defendant Benteler. Benteler argued, and both Judge Bell and the Sixth Circuit agreed, that the KRSG had failed to establish that Aroclor 1254 from Benteler's facility, *3,200 feet upstream* of

Morrow Lake,[12] reached the Kalamazoo River and flowed through Morrow Lake and into the Site.  In that case,[13] the KRSG failed to prove that "Benteler had contributed PCBs to the Site." *KRSG v. Rockwell,* at 1067.

The Benteler facility at issue was connected to the Kalamazoo River by a 3,200 foot ditch that runs north to south toward Morrow Lake.  *KRSG v. Rockwell,* at 1067.  Along the 3,200 foot ditch from Benteler's property to the River, there were detected levels of PCBs near the Benteler facility, but no PCBs detected beyond the 1,500 foot mark until the ditch reached the River. *KRSG v. Rockwell,* at 1069.  That gap in evidence of PCB contamination was sufficient for this Court to grant and the Sixth Circuit to affirm Benteler's "no evidence" motion for summary judgment.  Here, there is a *20+ mile* stretch of river (not 1,700 feet) with "no detects" for Aroclor 1242 between the Battle Creek Mills and Morrow Lake.  In addition, unlike Benteler's ditch, in which only Benteler's PCBs would be present, in the 20+ miles of the Kalamazoo River from the Battle Creek Mills to Morrow Lake there are multiple potential sources of PCB discharges, only one of which is the Battle Creek Mills.  *See, e.g., KRSG v. Eaton* at 748-750.  Further, given the distance and the nature of the River in the stretch between the Battle Creek Mills and Morrow Lake, even if Aroclor 1242 was released to the River in Battle Creek, there is no evidence that it travelled the 20+ miles downstream to Morrow Lake.[14]

---

[12] The Benteler facility "is located about 3200 feet north of the far southeastern boundary of Morrow Lake, which is an impoundment of the Kalamazoo River located upstream from the Site."  *KRSG v. Rockwell*, at 1067.

[13] In 1995, the KRSG commenced the KRSG action against Benteler and seven other entities with facilities at or near the Kalamazoo River alleging they contributed to the PCB contamination of the Site.  Notably, the KRSG, including its member, GP, did not identify the Battle Creek Mills as potential contributors to the PCB contamination of the Site at that time.

[14] It should be noted, in *KRSG v. Eaton*, Dr. Connolly testified that the river between Battle Creek and Morrow Lake Dam had "extremely high levels" of organic carbon and Dr. Brown testified that the "meanders" of this portion of the River, along with the high organic content, would be "efficient in capturing PCBs":

As set forth above, no party has established that Aroclor 1242 released from the Battle Creek Mills flowed through the Battle Creek POTW, then 20+ miles downstream to Morrow Lake, much less through Morrow Lake and over Morrow Lake Dam to the Site and remain in the Site causing them to incur response costs.  If Judge Bell concluded that a party purportedly releasing Aroclor 1254 (which, along with Aroclor 1260 comprised 90% of the PCBs in Morrow Lake) was not shown to be a contributor of PCBs to the Site, how can any Aroclor 1242 have reached the Site, especially Aroclor 1242 allegedly released more than 20 miles upstream in Battle Creek?

There are multiple "dots" that a party must connect through credible evidence to avoid summary judgment on "equitable responsibility" relating to the Battle Creek Mills, including, without limitation, the following:

- that the Battle Creek Mills discharged Aroclor 1242;

- that the discharge was made to the Kalamazoo River (and not the Battle Creek POTW, to which the mills connected in 1959);

---

"Dr. Connolly testified that *the highest levels of organic material in the River are present in the stretch of River from Battle Creek to Morrow Lake Dam.*  The organic-carbon levels in the sediments upstream of Morrow Lake range from 9 to 20%, which are 'extremely high levels.' (Exh. 6566; Connolly, 2/5/02 at 412).  Dr. Connolly testified that there are two reasons why the organic-carbon levels are so high in this area.  First, this section of the River received fairly high organic loading from such sources as the Battle Creek Waste Water Treatment Plant.  Second, the high number of meanders indicates an increased number of depositional environments and isolated quiescent areas where fine organic particles may settle out. (Connolly, 2/5/02 at 411–12).  Dr. Brown agrees that as a general rule, *meanders will pick up and trap more PCBs than straight stretches of a river*. (Brown, 2/5/02, at 345). *Given its high organic content, this segment of the River from Battle Creek to Morrow Lake Dam would be relatively efficient in capturing PCBs*. (Connolly, 2/5/02 at 416)." 258 F.Supp.2d at 747 (emphasis added).
In addition, Dr. Brown—a GP expert in Phase II—testified that this stretch of the Kalamazoo River is not only high in carbon, but it is slower moving than the river within the Site:  "The Kalamazoo River drops at a rate of two feet per mile in the section from Battle Creek to Morrow Lake, while the stretch within the NPL Site drops at a rate of nine feet per mile. (Brown, 2/5/02, at 290)." *KRSG v. Eaton*, 258 F.Supp.2d at 747.

- that the discharge flowed down the Kalamazoo River, 20+ miles and into Morrow Lake;

- that the discharge was not trapped in Morrow Lake but rather flowed over the Morrow Lake Dam; and

- finally, that the discharged PCBs remain within the Site and have caused or will cause a party to incur any response costs.

GP, the party that raised the theory of "equitable responsibility" for the first time in Phase II, has only presented evidence, in the most general fashion, relating to the first "dot" through its discovery responses and experts Wolfe and Farrand (*i.e.*, that the Battle Creek Mills processed CCP and discharged some, undefined amount of Aroclor 1242). GP then leaps to the fifth "dot" concluding, conditionally—without evidence or facts—that upstream loads of PCBs (not necessarily those released from the Battle Creek Mills), "*may* have contributed to PCB contamination below Morrow Dam," but qualifying that such loads would be "secondary to loads generated by sources downstream of the Dam." Wolfe 12/5/14 Report, p. 57 (emphasis added).

NCR's experts attempt to put a finer point on the issue, but their analysis still suffers from the same gaping holes. Allen provides estimated discharge figures for the Battle Creek Mills, which as noted above, originally ignored the date (1959) in which the mills connected to the Battle Creek POTW or the impact of that connection on any alleged discharges to the River, and, which, once corrected, attribute 0.001% of the total estimated PCBs discharged from all mills to each of the Battle Creek Mills. Taking Allen's estimated figures, NCR's modeling expert, Nairn, inputted Allen's "estimates" of PCBs discharged by the Battle Creek Mills (either at 100% or arbitrarily reduced to 60%) and places them directly below Morrow Lake Dam (without modeling the 20+ miles from Battle Creek) and then includes such loads in his otherwise co-mingled

12

modeling below Morrow Lake Dam. Nairn, however, acknowledges that he did not model the 20+ mile section of the Kalamazoo River from Battle Creek to Morrow Lake Dam.[15] Consequently, he cannot establish that Aroclor 1242 allegedly discharged from the Battle Creek Mills actual made it to the River (rather than being processed at the Battle Creek POTW) or that such a discharge actually flowed 20+ miles downstream to Morrow Lake and over the Morrow Lake Dam. As such, NCR's experts have also failed to connect the dots and to establish facts sufficient to state a *prima facie* case relating to the any "equitable responsibility" of the Battle Creek Mills.

Further, no party has addressed the fact that there are "non-detects" for Aroclor 1242 in more than a 13-mile stretch of the Kalamazoo River between Battle Creek and Morrow Lake—as Judge Bell noted in the *KRSG v. Eaton* decision, or that Dr. Connolly, an expert cited to by NCR's experts, previously testified in the *KRSG v. Eaton* action that Morrow Lake would be a non-detect if plotting for Aroclor 1242.

As the Court in *KRSG v. Rockwell* held, lack of evidence of any one element—such as detectable amounts of PCBs in a 13-mile stretch of the River between the Battle Creek Mills and Morrow Lake—is sufficient for this Court to grant International Paper's motion for partial summary judgment. As no party can "connect the dots" showing PCBs from the Battle Creek Mills entered the Site, no party can establish a *prima facie* claim for "equitable responsibility" relating to the Battle Creek Mills.

---

[15] Nairn attempts to address, in conclusory fashion, his "estimated" trapping efficiency of Morrow Lake in his January 30, 2014 rebuttal report. Nairn, however, does not address the 20+ mile stretch of river between the Battle Creek Mills and Morrow Lake.

**V.     CONCLUSION**

There is no evidence and no expert opinions that establish a *prima facie* claim against International Paper for "equitable responsibility" with respect to alleged discharges of PCBs from the Battle Creek Mills, located 20+ miles upstream of Morrow Lake.  As such, International Paper respectfully requests that the Court grant this motion for partial summary judgment.

Dated:    March 13, 2015	/s/ John D. Parker
	John D. Parker
	Lora M. Reece
	Michael Dominic Meuti
	BAKER & HOSTETLER LLP
	PNC Center
	1900 East 9th Street, Suite 3200
	Cleveland, OH 44114-3482
	Telephone: 216.861.7709
	Facsimile:  216.696.0740
	Email:  jparker@bakerlaw.com
	            mmeuti@bakerlaw.com
	            lreece@bakerlaw.com

	John F. Cermak, Jr.
	Sonja A. Inglin
	Ryan D. Fischbach
	BAKER & HOSTETLER LLP
	11601 Wilshire Boulevard, 14th Floor
	Los Angeles, CA 90025
	Telephone: 310.820.8800
	Facsimile:  310.820.8859
	Email:  jcermak@bakerlaw.com
	            singlin@bakerlaw.com
	            rfischbach@bakerlaw.com

	And by:

	David W. Centner
	CLARK HILL PLC
	200 Ottawa Avenue NW, Suite 500
	Grand Rapids, MI 49503
	Telephone: 616.608.1106
	Email:  dcentner@clarkhill.com

	Attorneys for Defendant
	INTERNATIONAL PAPER COMPANY

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 13, 2015, I electronically filed the foregoing using the ECF system, which will send notification of such filing by operation of the Court's electronic systems. Parties may access this filing via the Court's electronic system.

                                            */s/ John D. Parker*
                                            John D. Parker

605898931.11