```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3   _____

 4   GEORGIA-PACIFIC CONSUMER
     PRODUCTS, LP; FORT JAMES
 5   CORPORATION; and GEORGIA-PACIFIC,
     LLC,
 6
                           Plaintiffs,
 7                                         DOCKET NO. 1:11-cv-483
     vs.
 8

 9   NCR CORPORATION;
     INTERNATIONAL PAPER COMPANY; and
10   WEYERHAEUSER COMPANY,

11                          Defendants.

12   _____/

13

14        TRANSCRIPT OF MOTIONS FOR SUMMARY JUDGMENT

15        BEFORE THE HONORABLE ROBERT J. JONKER

16           UNITED STATES DISTRICT JUDGE

17             GRAND RAPIDS, MICHIGAN

18                 July 15, 2015

19

20   Court Reporter:          Glenda Trexler
                              Official Court Reporter
21                            United States District Court
                              685 Federal Building
22                            110 Michigan Street, N.W.
                              Grand Rapids, Michigan 49503
23

24   Proceedings reported by stenotype, transcript produced by

25   computer-aided transcription.
```

1   A P P E A R A N C E S:

2   FOR THE PLAINTIFF GEORGIA-PACIFIC:

3       MR. GEORGE P. SIBLEY
          HUNTON & WILLIAMS, LLL
4       951 East Byrd Street
          Richmond, Virginia 23219
5       Phone: (804) 788-8262
          Email: gsibley@hunton.com

6

7       MR. MICHAEL RANDOLPH SHEBELSKIE
          HUNTON & WILLIAMS, LLP
          Riverfront Plaza, East Tower
8       951 East Byrd Street
          Richmond, Virginia 23219
9       Phone:  (804) 788-8200
          Email: mshebelskie@hunton.com

10

11      MR. PETER A. SMIT
         VARNUM, RIDDERING, SCHMIDT & HOWLETT, LLP
         Bridgewater Place
12      333 Bridge Street, N.W.
         P.O. Box 352
13      Grand Rapids, Michigan 49501-0352
         Phone: (616) 336-6000
14      Email: pasmit@varnumlaw.com

15      MR. JOHN E. BEERBOWER
         HUNTON & WILLIAMS, LLP
16      Riverfront Plaza, East Tower
         951 East Byrd Street
17      Richmond, Virginia 23219
         Phone:  (804) 788-8200
18      Email:  Jbeerbower@hunton.com

19      MR. JOHN E. BURGESS
         GEORGIA-PACIFIC, LLC
20      P.O. Box 105605
         Atlanta, Georgia 30348-5605
21      Phone:  (404) 652-4000

22

23

24

25

```
1     FOR THE DEFENDANT NCR CORPORATION:

2          MR. DAVID R. MARRIOTT
           CRAVATH, SWAINE & MOORE, LLP
3          Worldwide Plaza
           825 Eighth Avenue
4          New York, New York 10019
           Phone:  (212) 474-1430
5          Email: dmarriott@cravath.com

6          MR. DAVID FRANK LISNER
           CRAVATH, SWAINE & MOORE LLP
7          Worldwide Plaza
           825 Eighth Avenue
8          New York, New York 10019
           Phone:  (212) 474-1000
9          Email: dlisner@cravath.com

10    FOR THE DEFENDANT INTERNATIONAL PAPER COMPANY:

11         MR. JOHN D. PARKER
           BAKER HOSTETLER
12         PNC Center
           1900 East 9th Street, Suite 3200
13         Cleveland, Ohio 44114-3482
           Phone: (216) 861-7610
14         Email: jparker@bakerlaw.com

15         MR. DAVID W. CENTNER
           CLARK HILL, PLC
16         200 Ottawa Avenue, N.W., Suite 500
           Grand Rapids, Michigan 49503
17         Phone:  (616) 608-1100
           Email: dcentner@clarkhill.com
18
      FOR THE DEFENDANT WEYERHAEUSER COMPANY:
19
           MR. MARK W. SCHNEIDER
20         PERKINS COIE, LLP
           1201 Third Avenue, Suite 4900
21         Seattle, Washington 98101
           Phone:  (206) 359-8000
22         Email: Mwschneider@perkinscoie.com

23         MR. DOUGLAS A. DOZEMAN
           WARNER, NORCROSS & JUDD, LLP
24         111 Lyon Street, N.W., Suite 900
           Grand Rapids, Michigan 49503-2487
25         Phone:  (616) 752-2000
           Email:  Ddozeman@wnj.com
```

```
 1
 2                                  Grand Rapids, Michigan
 3                                  July 15, 2015
 4                                  9:57 a.m.
 5                     P R O C E E D I N G S
 6          THE COURT:  Be seated everybody.  We'll get
 7   appearances on the record in a minute.  We have a number of
 8   motions that were on the calendar today in the case of
 9   Georgia-Pacific against NCR, 1:11-cv-483.
10          Why don't we start with appearances and we'll go from
11   there.
12          MR. SMIT:  Peter Smit appearing on behalf of
13   Georgia-Pacific, Your Honor.
14          THE COURT:  All right.  Thank you.
15          MR. SHEBELSKIE:  Michael Shebelskie appearing on
16   behalf of Georgia-Pacific companies, Your Honor.
17          THE COURT:  Thanks.
18          MR. SIBLEY:  Trey Sibley for Georgia-Pacific,
19   Your Honor.
20          THE COURT:  All right.
21          MR. BEERBOWER:  John Beerbower for Georgia-Pacific.
22          MR. BURGESS:  Your Honor, John Burgess also for
23   Georgia-Pacific.
24          THE COURT:  All right.
25          MR. MARRIOTT:  Good morning, Your Honor,
```

1    David Marriott for NCR.

2                 *THE COURT:*  Thanks.

3                 *MR. LISNER:*  Good morning, Your Honor, David Lisner

4    for NCR.

5                 *THE COURT:*  Okay.

6                 *MR. SCHNEIDER:*  Good morning, Your Honor,

7    Mark Schneider for Weyerhaeuser Company.

8                 *THE COURT:*  All right.

9                 *MR. DOZEMAN:*  Good morning, Your Honor, Doug Dozeman

10   on behalf of Weyerhaeuser.

11                *THE COURT:*  All right.

12                *MR. CENTNER:*  Your Honor, David Centner on behalf of

13   International Paper.

14                *MR. PARKER:*  Your Honor, John Parker on behalf of

15   International Paper.

16                *THE COURT:*  Okay.  Anybody else wants to be

17   introduced, or is that enough for today?

18                Okay.  All right.  My computer wasn't working this

19   morning.  It is now.  So I might need a couple of minutes as we

20   go through to open up some of the attachments.  Some of it I've

21   got on the iPad.  But some of you managed to file things in our

22   ECF system that were too big for my iPad to load.  So we'll

23   just get to that when we do.

24                I do want to start just to proceed through a few

25   questions and certainly then give people a chance to make the

1   main presentation you came to make today.  But let me start

2   with whoever is going to speak for Georgia-Pacific.

3           I want to make sure I understand -- I think I do from

4   the papers -- but if Hobart is the law, if that's what I'm

5   bound to follow, do you agree that the 2007, the two

6   administrative settlement orders, I think one for about

7   21 million, one for about 18 million, if Hobart is controlling,

8   do you agree that those are time-barred?

9           *MR. SIBLEY:*  If Hobart is the law, Your Honor, those

10  orders are time-barred.

11          *THE COURT:*  Okay.  And with respect to Hobart, from

12  Georgia-Pacific's point of view, is there any argument that

13  Hobart isn't the law, that it shouldn't apply, apart from the

14  prior decision in ITT, which the position from you is obviously

15  ITT should control and Hobart is at odds with it.  Is there

16  anything else?  In other words, if I reject that, am I done, or

17  do you have another argument that I'm missing on why Hobart

18  shouldn't govern?

19          *MR. SIBLEY:*  Your Honor, I think only arguments that

20  we would preserve for appeal.

21          *THE COURT:*  Okay.  Well, and are those other than the

22  ITT argument?

23          *MR. SIBLEY:*  That's correct.  And we think Hobart

24  inclusively overturned ITT.  The center part of ITT.

25          We would also say that the second aspect of Hobart

1    where they resolve -- the court resolves which statute of

2    limitation will apply to a 113 claim that is not triggered by

3    an event that is delineated in Section 113(g)(3), we think

4    Hobart got that wrong too.  That issue was not reached in ITT,

5    so ITT wouldn't govern that part of the case.  But there is no

6    conflict there.  That's just an argument we would preserve.

7              *THE COURT:*  All right.  I've got you.

8              In terms of the next step along that line, again for

9    Georgia-Pacific, if Hobart controls, if I were to reject the

10   ITT theory, do you agree that by the same force of argument the

11   2006 administrative settlement would be time-barred?

12             *MR. SIBLEY:*  That is correct, Your Honor.

13             *THE COURT:*  Okay.

14             *MR. SIBLEY:*  The 2006 settlement contains the same

15   magic words, if you will, as the 2007 AOCs and then the AO --

16   the AC at issue in Hobart.

17             *THE COURT:*  All right.  And then moving back to the

18   1990 administrative order, my understanding there is you'd say

19   even if Hobart is the law, we'd lose on ITT as controlling

20   authority.  Even under Hobart, the 1990 administrative order

21   isn't time-barred and doesn't trigger or reach the same kind of

22   administrative settlement that would be required?  Am I right

23   about that?

24             *MR. SIBLEY:*  You are correct, Your Honor.

25             *THE COURT:*  Okay.  And so the only thing, in your

1    view, under the 1990 order that would be time-barred, even

2    again if Hobart is the law, would be the OU-3 for about

3    5 million?  And that's because you would concede that's

4    time-barred even under the other statute of limitations?

5            You know what, I should have done that.  I should

6    have asked you all to get to a mic when you're speaking,

7    because you can see Ms. Trexler has got the headsets, and they

8    are tracked to each of the microphones.  Go ahead.

9            *MR. SIBLEY:*  That is correct, Your Honor.  Even under

10   the 107 statute of limitations, costs on OU-3 are time-barred.

11           *THE COURT:*  Okay.  And the other aspects, in your

12   view, of the 1990 order wouldn't be because either they are

13   ongoing or we're still within a few years of initial

14   construction?

15           *MR. SIBLEY:*  That is correct.  No remedial step

16   actions have been implemented, with the exception of OU-2, and

17   that began only recently.

18           *THE COURT:*  All right.  And then before I move to

19   another set of questions.  On what I'm calling the

20   incorporation theory -- that's my word, I don't know if I got

21   it from somebody's brief -- but on the theory that when the

22   1990 order was terminated in 2007, it was basically picked up

23   by the federal 2007 order.  Certainly the defense would take

24   that position.  Your position is not so, it's a separate

25   stand-alone termination so that all those other things, apart

1    from OU-3 that we spent under the 1990 would still be alive and

2    well, not time-barred?

3         *MR. SIBLEY:*  That is correct, Your Honor, under the

4    Sixth Circuit's decision in Kelley from 1994, the removal

5    action at the site is ongoing, it is not completed yet,

6    therefore, our cause of action has not accrued.

7         *THE COURT:*  Okay.  All right.  Thanks.

8         Let me go to NCR, then.  And are you the person,

9    Mr. Marriott, speaking for NCR?

10        *MR. MARRIOTT:*  I am, Your Honor.

11        *THE COURT:*  Okay.  The thing I'm curious about, other

12   than your argument that the Kalamazoo River Study Group

13   litigation ought to serve as essentially a -- you know, to

14   avoid the slice-and-dice as you say.  The one place that

15   everything should and could have been brought.  Other than

16   that, do you have any argument that the 2009 administrative

17   orders or the 2008 administrative orders, money spent under

18   those would be time-barred?

19        *MR. MARRIOTT:*  Not, Your Honor, as to the 2009.

20        *THE COURT:*  Okay.

21        *MR. MARRIOTT:*  The 2008 was not in our view timely or

22   properly disclosed, therefore, it wasn't dealt with in our

23   motion.

24        *THE COURT:*  I see.

25        *MR. MARRIOTT:*  But as to the time bar, the 2009 would

1    not be time-barred.  Other than by our the whole case is

2    time-barred theory.

3              *THE COURT:*  All right.  Okay.  Any other defense want

4    to address that issue?  And I realize it was the NCR and IP

5    brief that raised that.  I don't know that Weyerhaeuser raised

6    that.

7              So, Mr. Parker, anything else?

8              *MR. PARKER:*  No.

9              *THE COURT:*  Okay.  Okay.  Why don't we do this.  Let

10   me give each of you a chance to give me your basic

11   presentation, your basic thumbnail on the limitations issues,

12   and we'll talk later about the International Paper motion on

13   the two Battle Creek mills.

14             And I'll just say a couple preliminary comments.

15   One, it seems to me that however agreeable I might be with the

16   notion that ITT is better than Hobart when it comes to

17   reconciling the language of CERCLA and all the rest, you know,

18   I'm just not sure a district court ought to be in a position of

19   telling the Sixth Circuit, you know, Hobart panel, "Jeez, guys,

20   you got it wrong.  I mean, I know you looked at it and you said

21   ITT was distinguishable and didn't control, but you know what,

22   you're just wrong."  That's usually not a good thing for a

23   district court to do.  And it's usually not very sustainable

24   anyway.

25             So, you know, I hear your argument, you can make it

1    if you want, but I don't think I'm that audacious of a district

2    judge to go that way.  I mean, that's going to be a pretty

3    tough sell, and it seems like that's going to be foreclosed.

4    That's certainly my inclination.

5         At the other end, I think it's a tough sell for NCR

6    and International Paper on the idea that, you know, one case,

7    Kalamazoo River Study Group case here, ought to be the focal

8    point for everything.  I mean, there's lots of CERCLA cases --

9    maybe this one -- where you wouldn't even know within

10   three years of a particular consent decree who all the proper

11   targets would be.  And I don't see anything that's really

12   compelling in the language of the statute or the case law that

13   would drive that.  So I have a hard time seeing a pathway to

14   that argument as well.  The things that -- but again, you can

15   all make it.

16        The things that are more open and questionable are

17   things that I want to talk about or hear you talk about, or

18   would be helpful anyway to talk about, are how I ought to apply

19   Hobart -- or ITT for that matter, but probably Hobart -- to the

20   1990 administrative order and the expenses under that.  And

21   then what do I do with the I think it was the 2000

22   administrative order?  Which, again, is somewhat different than

23   a true Hobart-style administrative settlement.  But that's

24   something that I'd be happy to hear from the parties more on as

25   well.

1          But that's strictly a guide.  Let me just hear in

2     sort of a thumbnail version from the parties what you think I

3     really ought to focus on.  There's lots of exhibits.  If you

4     think there's any particular ones you want me to take a more

5     special look at, you can highlight that.  That's what would be

6     most helpful to me.  And then we still need some time to talk

7     about the motion from International Paper on the Battle Creek

8     mills.

9          And in connection with that, I at least want to

10    preview a little bit things I'm thinking about as we look ahead

11    to trial, even though I don't think we're ready for final

12    pretrial and all of that.  The motion, it seems to me, is a

13    nice segue to some of those questions.

14         So with that as way of introduction, let me go to

15    Weyerhaeuser first.  You presented the most crystalized motion

16    in terms of number of pages and focus of the issues.  Anything

17    you want to present at this point, Weyerhaeuser, I'd be happy

18    to start with you as one of the moving parties on this.

19         MR. SCHNEIDER:  Good morning, Your Honor,

20    Mark Schneider for Weyerhaeuser Company.  If this Court finds,

21    as we believe it should, that Hobart controls, then the Court

22    should grant our motion.

23         Georgia-Pacific has conceded correctly that if Hobart

24    controls, then the 2007 ASAOC, administrative settlement

25    agreements and orders on consent, are time-barred, and so it's

1    up to the Court whether it's going to tell the Sixth Circuit

2    that its 2014 decision in the Hobart case was wrong.

3          The benefits of granting the motion for summary

4    judgment would be that the Court would remove from dispute over

5    $41 million of Georgia-Pacific's past costs.  That's out of the

6    total Georgia-Pacific past costs claim of $105 million.  So it

7    certainly is going to simply trial.

8          As the Court knows, the key issue in Hobart was

9    what -- did the -- did the settlement agreement resolve

10   liability?  Hobart laid out four elements to determine whether

11   a settlement agreement resolves liability.  The Hobart

12   administrative settlement agreement and order on consent, the

13   ASAOC, had four elements.  All of those four elements appear in

14   the Georgia-Pacific 2007 ASAOCs, number 1.  The document is

15   called an administrative settlement agreement and order on

16   consent.  Number 2, the document expressly says that this is an

17   administrative settlement under 113(f)(B)(3)[sic].  Number 3,

18   there's a covenant not to sue.  And number 4, there's

19   contribution protection granted.

20         And so the 2007 ASAOCs are identical, the

21   Georgia-Pacific ASAOCs to that in Hobart.  So if the Court

22   determines that Hobart applies, that's the end of the inquiry.

23         I did want to point out on the 2008 ASAOC, when

24   Weyerhaeuser filed its motion for summary judgment, at that

25   time Georgia-Pacific had not claimed any costs under the 2008

ASAOC.  Three weeks after Weyerhaeuser filed its motion, Georgia-Pacific filed -- served a supplemental expert report in which it claimed to have incurred costs under the 2008 ASAOC. But Georgia-Pacific conceded in its responsive papers that those costs against Weyerhaeuser would be time-barred because more than three years elapsed between the 2008 ASAOC and the 2011 lawsuit against Weyerhaeuser.

On this question of Hobart versus ITT, if one compares the Georgia-Pacific ASAOCs, they are identical in all material respects to that in Hobart and they are completely dissimilar to the ASA -- to the settlement -- to the administrative order on consent in the ITT case.

As the Court knows, there's a big difference between an administrative order on consent, which is the old way that EPA used to address these interim orders, and an administrative settlement agreement and order on consent.  When EPA changed the rules, it then created the document that would trigger the contribution provisions of CERCLA.

The last point I would make, Your Honor, is that there was an unpublished decision by the Sixth Circuit in January of 2015, the LDW -- LWD PRP Group case, and it was confronted with precisely the argument that Georgia-Pacific has made today, that ITT somehow is still good law.  And the Sixth Circuit in that LWD decision said that's not correct.  It said, "We find nothing distinguishes this case from Hobart, and

1    despite plaintiff appellee's invitation do not have power to

2    reverse a precedential opinion of this Court."  Referring, of

3    course, to the Hobart decision.

4         Your Honor, there are many issues of serious dispute

5    in this complex trial that will be coming up, but the issues

6    before the Court on the Weyerhaeuser motion are not among them.

7    We ask the Court to grant our motion.

8         THE COURT:  All right.  Do you want to take a

9    position on how the 1990 administrative order ought to be

10   addressed?

11        MR. SCHNEIDER:  No, Your Honor, we do not have a

12   position on that.

13        THE COURT:  Okay.

14        MR. SCHNEIDER:  Thank you.

15        THE COURT:  Thank you.

16        Let me go to NCR next as one of the other principal

17   moving parties.

18        MR. MARRIOTT:  Thank you, Your Honor, David Marriott

19   for NCR.

20        I'd like, if I may, to just make two points, each of

21   which we believe is dispositive of a different GP claim.  And

22   if I may, Your Honor, we have a set of demonstratives,

23   including a table here that I think may be helpful to the Court

24   if I could pass those out.

25        THE COURT:  Yeah, as long as all counsel have seen

1    it, I'm fine.

2            MR. MARRIOTT:  All right.  Let me, Your Honor, be as

3    mindful as I can of Your Honor's remarks at the outset.  But by

4    way of -- by way of introduction, let me refer you to page 3 of

5    our deck where we've set out a chronology, which I believe

6    at least puts in context the KRSG litigation about which

7    Your Honor asked.  And I'll come in a few moments to why it is

8    we believe that has effectively preclusive effect here.

9            THE COURT:  You weren't part of that case, were you?

10           MR. MARRIOTT:  We were not, Your Honor.

11           THE COURT:  All right.  How -- I mean, just as a

12   practical matter, as a matter of civil procedure, nobody has an

13   obligation to bring somebody in, do they?

14           MR. MARRIOTT:  Well, Your Honor --

15           THE COURT:  Doesn't your theory effectively say, you

16   know, anybody they don't find within three years is out, they

17   are protected, they are time-barred?

18           MR. MARRIOTT:  Really, Your Honor, it's a function of

19   CERCLA and the way CERCLA operates.  And what we believe CERCLA

20   says is that as of the point in time when Section --

21           THE COURT:  The Chief Justice just reminded us that

22   statutes still have to make sense, and how does that possibly

23   make sense?

24           MR. MARRIOTT:  Well, it makes sense, Your Honor, we

25   believe, because what CERCLA effectively says is that once you

1    have a triggering event under 113(f)(1), the right to

2    contribution arises, the statute of limitation begins to run,

3    and in an effort to get people to the bargaining table, to get

4    people to the cleanup table, a person has an obligation to go

5    out and find those who might be potentially responsible.

6          *THE COURT:*  Well, the problem from my perspective,

7    aside from whether it makes sense or not, if you take that to

8    the logical conclusion -- and I know environmental lawyers

9    don't like to close cases anyway -- but they'd never close a

10   case, right?  Because how could you ever do that?  Because

11   you're never sure that next month you might find somebody new,

12   so you would contrive any way you could to keep the case open.

13         I mean, why not limit that to the parties in the case

14   and the issues in the case at the time?  Which would -- or

15   issues that could have been brought against those parties.

16   That would be the normal reach of res judicata.  And why should

17   I read CERCLA to be broader than that?

18         *MR. MARRIOTT:*  Well, Your Honor, I think you should

19   read CERCLA to be broader than that because the purpose of the

20   statute is to promote the prompt, efficient cleanup of the

21   site.  And you do that by giving parties every incentive to go

22   out quickly, to find --

23         *THE COURT:*  Well, I can do that by making everybody

24   jointly and severally liable and cancel the September trial

25   too.  But, I mean, you know, there's still process.

1          *MR. MARRIOTT:*  There is still process, Your Honor.

2     But in this particular case, there's not really any dispute but

3     that in 1995 at the time the KRSG litigation commenced

4     Georgia-Pacific and the other members in the KRSG were fully

5     aware that the alleged source of contamination of the

6     Kalamazoo River was PCBs and that that alleged source came from

7     carbonless copy paper and that NCR was a manufacturer of

8     carbonless copy paper.  So there was no mystery as to the role

9     of carbonless copy and as to the identity of NCR in 1995.  They

10    brought a litigation, the litigation by its own terms was

11    expressly for the recovery of all costs -- past, present,

12    future -- at the site.  That's the way they styled the

13    pleadings.  Those are the issues that were presented.  They

14    sued eight parties.  They didn't sue International Paper.  They

15    didn't sue NCR.  They could have.  And --

16          *THE COURT:*  Can I give this case to Judge Bell?

17          *MR. MARRIOTT:*  Pardon?

18          *THE COURT:*  Can I give this case to Judge Bell?  I

19    don't know if he's in or not right now.  I can't see.

20    But . . .

21          *MR. MARRIOTT:*  I suspect he's had his fill of this

22    litigation, Your Honor.

23          *THE COURT:*  Right.  Okay.

24          *MR. MARRIOTT:*  So that's the chronology.  And the

25    chronology is that they were identified early in '90 as a

1   potentially responsible party.  They engaged in a series of

2   activities and were subject to a number of orders and

3   settlement agreements concerning the cleanup of the site.  They

4   commenced the litigation.  They sought in that litigation the

5   very costs that they now seek in the present litigation against

6   NCR, except now decades after the fact at a time when it is

7   obviously because of the fading of memories, the mortality of

8   us all, more difficult to prosecute.  And we think that's what

9   the statute of limitations is aimed at doing:  Bringing people

10   more quickly to the table so that these disputes can be

11   resolved.

12          But let me -- I'll circle back to that a little bit

13   more, Your Honor, but just by way of background, as the Court

14   says -- and the first point I really want to make -- is that

15   their 107 claim is gone, we believe, as a matter of law

16   following the Sixth Circuit's decision in Hobart.  So if

17   Your Honor were to look at page 5 of our deck --

18          *THE COURT:*  What do you do with the 1990

19   administrative order?

20          *MR. MARRIOTT:*  Well, what we do -- in part the '90

21   order is barred, as counsel has conceded and as they do at

22   page 3 of their opposition brief as it relates to OU-3.  That I

23   believe was conceded this morning.

24          As to the remainder of the 1990, Your Honor, what we

25   say is that it's incorporated by reference.  I don't know if we

```
 1    used that word, but that effectively communicates the concept.

 2    It was incorporated by reference into the two thousand --

 3              THE COURT:  And just to get to that, where in the

 4    2007 order, either the federal one or the state one, where is

 5    the incorporation by reference?

 6              MR. MARRIOTT:  Well, Your Honor, I'm looking at

 7    page 22 of our brief, and what we said there is it was replaced

 8    entirely by the 2007 SRI/FS, which I believe is Exhibit 10.

 9    And we cite here page 624, Exhibit 48.

10              THE COURT:  Right.  But what's the actual language?

11    I know what your brief says.  I just want to make sure I'm

12    relying on the right --

13              MR. MARRIOTT:  Well, I believe what the language of

14    the document is, Your Honor, is that it was terminated and

15    replaced by the later order.  And then we have deposition

16    testimony from a Georgia-Pacific --

17              THE COURT:  Well, okay, just point me to where that

18    language is.

19              MR. MARRIOTT:  Yeah, let me see if I can get that.

20              THE COURT:  All right.  I mean, the termination I

21    definitely see.  The idea that the 2007 order has consistent

22    objectives I definitely see.  That is the federal order.  But

23    I'm looking for that incorporation or replacement language and

24    how to read that with paragraph 9, which is sort of the general

25    this isn't a covenant not to sue or anything else.
```

1          *MR. MARRIOTT:*  Yeah, there's no question that the
2     language of the '90 order isn't as robust as the language of
3     the 2006, 2007, and our argument does depend on that
4     incorporation.
5          *THE COURT:*  Okay.
6          *MR. MARRIOTT:*  And we're looking for that,
7     Your Honor.
8          So the concept of termination, Your Honor, appears at
9     a page which is Bates numbered -- I don't know, frankly, that
10    Your Honor has that, but I'll give you the Bates number for
11    the --
12         *THE COURT:*  Well, the termination is pretty clear.
13    Paragraph 7 of the order, right?  But where is the replacement
14    and incorporation language that you're relying on?
15         *MR. MARRIOTT:*  The replacement language, Your Honor,
16    I think is most directly not from the order but from a
17    deposition of one of Georgia-Pacific's witnesses.
18         *THE COURT:*  Okay.  All right.
19         *MR. MARRIOTT:*  And that's what the cite is at
20    Exhibit 48.
21         *THE COURT:*  All right.  So is there any particular
22    language you'd point me to in the order itself?  Or should I,
23    to accept that argument, have to rely on the deposition?
24         *MR. MARRIOTT:*  Well, it is, frankly, paragraph 7.
25    Paragraph 3 also speaks of termination, Your Honor.

 1              *THE COURT:*  All right.

 2              *MR. MARRIOTT:*  So it's paragraph 3, paragraph 7.  And

 3     it's the deposition.  That's what we have.

 4              *THE COURT:*  All right.  Fair enough.  Go ahead.  You

 5     were talking about barring the 107 claim.

 6              *MR. MARRIOTT:*  Yes, Your Honor.  So following the

 7     Hobart decision, I think the law is clear, if it wasn't before,

 8     that a 107 claim and a 113 claim are mutually exclusive.  And

 9     we've included some of the language from the Court's decision

10     at page 5 of our demonstratives.

11              *THE COURT:*  Would you agree that if I don't think the

12     1990 administrative order falls within Hobart, that there's a

13     107 claim available for anything there?

14              *MR. MARRIOTT:*  Your Honor, I think the 107 claims are

15     now no longer viable.  I believe the only claims are 113

16     claims.

17              *THE COURT:*  Well, why would that be if -- I mean, the

18     premise of the question is I'd look at Hobart and give it its

19     full impact and I'd say, "That doesn't apply to the 1990 order.

20     The 1990 order is more like ITT."  It's the old regime, to use

21     the language that Mr. Schneider alluded to earlier.  If I get

22     to that point -- and apart, again, from your Kalamazoo River

23     Study Group claim -- is there a basis to time-bar those costs?

24              *MR. MARRIOTT:*  Well, so I think the answer depends on

25     which avenue of analysis you pursue.  If you pursue -- if you

1    pursue 113(f)(1) of the statute, which keys off of the prior

2    KRSG litigation, then we think it's barred -- the 107 claim is

3    gone in its entirety and the only thing left is 113.  And we

4    think that's a site-wide bar.

5              *THE COURT:*  And that's the Kalamazoo River Study

6    Group theory?

7              *MR. MARRIOTT:*  That's the Kalamazoo River Study Group

8    theory, that's correct, Your Honor.

9              The other mode of analysis is a different section of

10   section of 113, and that's 113(f)(3)(B), and that's the section

11   that proceeds in some sense on an order-by-order basis.

12             *THE COURT:*  Right.

13             *MR. MARRIOTT:*  But there is case law, including,

14   Your Honor, from Michigan, the Eastern District of Michigan in

15   the MichCon case, and the Whitaker case from the Central

16   District of California, that basically says that once under a

17   single order, all right, you have a 113 claim, that it applies

18   to all costs at the site.  That there's a single --

19             *THE COURT:*  But that still doesn't address the

20   question, because if the 1990 order isn't a Hobart order, isn't

21   an administratively approved settlement, then apart from the

22   Kalamazoo River Study Group theory what's the time-bar theory?

23             *MR. MARRIOTT:*  Well, I guess it's two-fold,

24   Your Honor.  It's by concession in part an order sufficient to

25   resolve government liability.  And you heard counsel say that

1    this morning as to OU-3.  So there's a concession.

2         *THE COURT:*  They don't concede that.  They concede

3    that the OU-3 is time-barred but because it's independently a

4    completed part of the removal action more than three years

5    before, right?

6         *MR. MARRIOTT:*  I think the full explanation of the

7    concession doesn't appear in the brief, but they make the

8    concession.  I understood the concession to be both because it

9    was an order under 113(f)(3)(B) and because it was time-barred.

10   And it may be they are conceding it because of the 107 statute

11   of limitation problem.

12        *THE COURT:*  Okay.  Well, we can get that from them in

13   a minute.

14        Okay.  Go ahead.  Apart from the concession.

15        *MR. MARRIOTT:*  Apart -- if you put aside -- we think

16   the KRSG litigation does it.  If you put that aside,

17   Your Honor, as I read the Sixth Circuit's decision in Hobart,

18   once you have -- as to a site, with the follow-on decisions by

19   Whitaker and by the MichCon -- once you have a 113 claim as to

20   a site, that's what you have as to the entire site and the

21   analysis no longer proceeds on an order-by-order basis.

22        *THE COURT:*  Well, what do you do with Atlantic

23   Richville [sic]?

24        *MR. MARRIOTT:*  Atlantic Research?

25        *THE COURT:*  Or Atlantic Research, yeah.  I mean, I

1    thought any party had a right to bring a cost-recovery claim.

2    At least unless there's a contribution triggering event.

3            MR. MARRIOTT:  Well, I think you do -- you have an

4    opportunity for successive 107 claims, as GP argues, but we

5    think that opportunity ends once you have a 113 trigger.  Once

6    there is a 113 claim as to a site, we believe that's the claim

7    you have as to that site.

8            THE COURT:  All right.  So even if you have a 113

9    claim with respect to 2 percent of the costs in an

10   administrative settlement -- and the 2 percent I'm pulling out

11   of the air, I haven't done math -- that's it, you can never go

12   back to 107?

13           MR. MARRIOTT:  Well, it depends on -- it depends on

14   the contours of the order, Your Honor.  The 1990 order in our

15   view was site-wide, and, therefore, we think it covers costs

16   site-wide.  I suppose if you had an order that was

17   extraordinarily narrow in its reach, that you would then find a

18   different result.  But the 1990 order here is an order that

19   covered the entirety of the site.

20           THE COURT:  But the question is whether it's an

21   administratively approved settlement, right?  I mean, that's

22   the Hobart question.  And I'm saying as to the 2007

23   administrative settlement orders, it sounds like everybody is

24   on the same page.  If Hobart applies, the orders from 2007 are

25   like the Hobart orders and time-barred.  But the 1990 order is

1    different.

2          *MR. MARRIOTT:*  It is different.

3          *THE COURT:*  If I reading Hobart say, "Well, I don't

4    think that's the kind of order Hobart applies to," are you

5    saying there's some other aspect of Hobart that would still

6    mean you'd win?

7          *MR. MARRIOTT:*  Your Honor, I would say that it's not

8    so much Hobart -- well, it is Hobart, because Hobart

9    effectively says, in my view, that you either have a 113 claim

10   or you have a 107 claim.  And I think when you read that with

11   the decisions that approach this on a site-wide theory, once

12   you have a 113 as to a site, that's all you have as to the

13   site.  And you don't have a lingering 107 claim as to a piece

14   and a 113 as to the rest.  And I believe that's what the

15   Whitaker case and the MichCon case effectively say.

16          *THE COURT:*  All right.  Okay.

17          *MR. MARRIOTT:*  All right.  So our view, Your Honor,

18   on point 1 really is that the 113 claim is the only claim that

19   remains.  Because of what the Hobart said and because both of

20   the trigger we think the KRSG litigation represent and because

21   of the language of the orders.  And as it relates to the '90

22   order, we acknowledge that our argument as to the 1990 AOC is

23   about incorporation into the 2007, which we think happens

24   through a combination of the language of the order which

25   terminates it and the concessions of their expert about the

1    effect of the one replacing the other.

2              *THE COURT:*  All right.

3              *MR. MARRIOTT:*  The second point, Your Honor, is that

4    insofar as there's, in our judgment, only a 113 claim, the

5    question becomes whether the 113 claim is time-barred.  And if

6    you turn to page 16 -- page 15 of our slides, you'll basically

7    see that we have two theories.  The one to which the Court has

8    alluded, which is the site-wide theory for the KRSG litigation

9    as a whole, and the other is the order-by-order approach.

10             I think in view what I've heard this morning, it

11   probably doesn't make sense to go through this on an

12   order-by-order basis.  I think there's not much dispute about

13   what those orders mean if the Court accepts Hobart as the

14   controlling authority.  But let me just pause a little longer

15   on the KRSG litigation.

16             *THE COURT:*  What about the 2000 order?

17             *MR. MARRIOTT:*  The 2000 order, Your Honor, is an

18   order as to which, so far as I can tell from GP's brief, it's

19   conceded it's time-barred.  We laid out an argument as to why

20   it was time-barred.  And as I read the opposition, they don't

21   contest the argument that we have made.

22             And we deal with that specifically, Your Honor, at

23   page 26.  The release itself there didn't become effective

24   until two thousand --

25             *THE COURT:*  Let me just, before you pass that, for

1    Georgia-Pacific, I don't know who is going to confirm or deny

2    that.  Is it your position that the 2000 administrative order

3    is time-barred?  Costs.  I think the $6 million in costs on

4    OU-3.

5              MR. SIBLEY:  Your Honor, that is correct.

6              THE COURT:  Okay.  And why do you think it's

7    time barred?

8              MR. SIBLEY:  Under -- the 2006 order called for the

9    remedy in OU-3.

10             THE COURT:  All right.  So it's the same reason

11   underlying why you'd give the 5.9 million time bar under the

12   1990?  Basically that work was done?

13             MR. SIBLEY:  That is correct, Your Honor.

14             THE COURT:  Okay.

15             MR. SIBLEY:  Just to state it completely, the 2000

16   order did not resolve liability.  It is not a Hobart-qualifying

17   order.  We had a 107 claim for the costs incurred under that

18   order.  Under Section 113(g)(2), our statute of limitations on

19   that claim ran from six years from the date of the commencement

20   of physical construction.  We did not bring our claim for the

21   remediation costs incurred under that order within those

22   six years.

23             We also had a Section 107 claim for the recovery of

24   the costs associated with the removal action in OU-3.  But

25   under the weight of authority which we've cited in our brief,

1    the removal action in OU-3 was completed certainly by the time

2    we started physical construction, and for that reason -- we did

3    not bring our suit within three years of that date, and for

4    that reason those costs are time-barred as well.

5            *THE COURT:*  So you don't agree it's a Hobart order,

6    but you agree it's time-barred anyway?

7            *MR. SIBLEY:*  That is correct, Your Honor.

8            *THE COURT:*  Okay.  Thank you.

9            So back to you, Mr. Marriott, for whatever else you

10   want to do.  Either order-by-order or globally on the 113.

11           *MR. MARRIOTT:*  Sure.  Just because it may be helpful

12   in view of the number of questions we've had about it.  If you

13   look at page 27, Your Honor, of our book, you'll see a table

14   that endeavors to summarize the various orders.  The OUs and

15   the amounts in dispute.

16           *THE COURT:*  Is it the same one that was in the brief?

17           *MR. MARRIOTT:*  It is not, I don't believe,

18   Your Honor.

19           *THE COURT:*  Okay.  Go ahead.

20           *MR. MARRIOTT:*  All right.  So what we've

21   effectively -- if you look at what's in blue, that's what's by

22   concession out if Hobart applies.  If you look at what's in

23   green, they have conceded that's out in their brief, 3, and

24   this morning.  The same with the 6, which is in yellow.  So

25   what's left are three sets of costs under the '90, which again

1    we think are out because of the incorporation argument.  The

2    2009 costs are, in our view, out because of the KRSG

3    litigation.  So let me just talk briefly about that since that

4    is effectively what -- in addition to what's already been said.

5            Your Honor, if you take a look at the language of the

6    statute -- and we'll focus specifically on

7    Section 113(g)(3)(A), which is the statute of limitations for

8    contribution claims -- what it says is that no action for

9    contribution for any response costs or damages may be commenced

10   more than three years after the date of judgment in any action

11   under this chapter for recovery of such costs or damages.

12           And our argument is simply that the KRSG litigation

13   and judgment satisfy the language -- that statutory language.

14   They hit those elements.  And because it hits those elements,

15   we contend the KRSG litigation results in a time bar not only

16   as to the 2009 costs, which really are still in dispute plus

17   several from 1990, but also for future costs at the site.

18           The KRSG litigation is triggered, in our view, for

19   several reasons.  This present action is a response cost.  It

20   is an action for response costs and alleged damages and,

21   therefore, satisfies the preamble language in 113(g)(3)(A).

22           GP commenced this action more than three years after

23   it.  There's no dispute about that.  And then the only question

24   becomes is the action then one -- is the KRSG litigation one

25   that was for the recovery of response costs or damages?  And I

1    would point Your Honor to slide 17 where we have a timeline and

2    some of the, we think, key language from the orders in the KRSG

3    litigation.

4         So in '95 the KRSG files a Complaint.  It does so

5    under 107 and 113, and it does so for "all past and future

6    response costs in connection with the site."

7         Rockwell and Eaton, two of the defendants, assert a

8    107 and 113 claim, counterclaims against the KRSG.  And then

9    the court in an order in '98 enters judgment holding the KRSG

10   liable.  And let me just focus the Court on some of the

11   language from that decision which appears at Exhibit 17.

12        The Court said, "The contributions of PCBs to the NPL

13   site by Allied, James River, Georgia-Pacific, and Simpson

14   individually and together are in nature, quantity, and

15   durability sufficient to require imposing the costs of response

16   activities for the NPL site on each of those four parties."

17        Subsequently the Court entered what I think of as an

18   allocation judgment in 2000, and it did that holding KRSG

19   basically responsible for the past and future response costs at

20   the site.  And the order there appears at Exhibit 18.  And the

21   Court said, "Having considered the equities in this case, the

22   court concludes that Rockwell should not be required to

23   contribute to the remediation of the Allied Paper, Inc.,

24   Portage Creek, Kalamazoo Superfund site.  The PCB releases by

25   plaintiff -- plaintiff's members are more than sufficient to

1   justify imposing on plaintiff the entire costs of response

2   activities relating to the NPL site."

3            And if you compared that language to the language of

4   the statute, in our judgment, Your Honor, the test is

5   satisfied, the statute of limitations has, therefore, run.  And

6   that, in essence, is the argument.

7            THE COURT:  And what case or cases would you most

8   heavily rely on for that construction of the statutory

9   limitations period?  Do you have any case?  Or are you asking

10  me to just read the statute?

11           MR. MARRIOTT:  Well, Your Honor, frankly, I think

12  most of the cases -- there's no -- there's no -- I mean, I like

13  the Whitaker case.  I like the MichCon case.  They aren't

14  precisely on this point.  But I think their interpretations --

15  their interpretations of that language is consistent with our

16  theory.  And I think the Supreme Court's decisions in Cooper

17  and Atlantic Research and the Sixth Circuit's decision in

18  Hobart don't say anything that is, in our mind, inconsistent

19  with that.

20           We are asking the Court simply to look at the

21  judgment that was entered in the KRSG litigation, to compare

22  that to the language of the statute.  And the judgment

23  concerned the entire site, costs past, present, and future, and

24  that's the bar that we think as a result applies.

25           I think it's, frankly, as simple as the judgments on

1    the one hand and the statute on the other.  Many cases talk

2    about the statute.  No fact situation I find is precisely this

3    fact situation.

4              *THE COURT:*  All right.

5              *MR. MARRIOTT:*  Thank you.

6              *THE COURT:*  Thank you.

7              Mr. Parker, by the time we get to you, people have

8    covered a lot of ground, but I certainly want to give you a

9    chance to present anything specific from IP on this issue.

10             *MR. PARKER:*  Thank you, Your Honor.  I'll be brief.

11   But I do want to touch on one point that Mr. Marriott alluded

12   to, and that's he mentioned Georgia-Pacific's delay in filing

13   this lawsuit caused the parties prejudice because witnesses

14   have died and documents have been lost.  And, of course, that's

15   what a statute of limitation is designed to prevent.  And I

16   would submit, Your Honor, that the prejudice here is real.

17             I have a little picture here I would like to approach

18   and hand to you if I can.

19             *THE COURT:*  As long as everybody has gotten it.

20             *MR. PARKER:*  Your Honor, this is a picture of

21   Homer Crawford.  It's actually his 1953 Amherst senior yearbook

22   picture.  After he graduated from Amherst in 1938, he went on

23   to the University of Virginia where he got his law degree.  He

24   went to practice in New York and became a partner at LeBouef,

25   MacHold & Lamb, later known as LeBouef Lamb.  And he worked on

1    a client there, St. Regis Paper Company.  In fact, he worked on

2    it so much that in 1956 he became the vice president and

3    general counsel and corporate secretary of LeBouef Lamb.  Or of

4    St. Regis Paper Company.

5              Now, you may remember, Your Honor, from phase I that

6    1956 by coincidence was also the year that St. Regis entered

7    into the transaction with the Allied Paper Company to transfer

8    operation of the Bryant Mill.  Mr. Crawford was intimately

9    involved in that transaction.  I looked at the transaction

10   documents that were marked during phase I.  His signature

11   appears on no less than six of them, including the one that was

12   entitled the lease.

13             You'll recall in phase I that International Paper's

14   position was that that transaction between Allied and St. Regis

15   was covered by the CERCLA secured creditor exemption.  And you

16   ruled on summary judgment that St. Regis's motivation was

17   "fundamentally a question of fact."

18             I failed miserably in phase I persuading you of what

19   St. Regis's motivation was in structuring the transaction the

20   way it did.  You ultimately found I could not meet that burden

21   because I could not produce a witness who could tell you what

22   their motivation was.  But Homer Crawford could have told you.

23   He did the deal.  He was the lawyer on the deal.

24             And as you'll see from the second page of what I've

25   handed to you, Mr. Crawford died in 2004.  So the delay in

1    bringing the suit against International Paper deprived

2    International Paper of the opportunity to have you hear from

3    the very person who was involved in the transaction.

4         THE COURT:  Well, it might make me feel better about

5    enforcing the statute of limitations, but how does it help me

6    understand the scope of the statute of limitations?

7         MR. PARKER:  Well, I think you had mentioned that it

8    doesn't make sense and you need to read a statute in a way that

9    makes sense.  To apply a statute -- or not to deprive parties

10   who may not know of somebody at the time they bring their first

11   action.  Like the KRSG did.  But here not only did the KRSG

12   members know about St. Regis.  I mean, after all Allied was one

13   of the parties in the KRSG.  They had done the transaction.

14   There were lots of documents we saw in phase I that indicated a

15   knowledge of St. Regis.

16        But does it make any more sense for a statute to be

17   read in a way that would allow a party years and years and

18   years after all the witnesses have died, after all the

19   documents have been destroyed to bring another case?  And I

20   won't repeat any of the arguments that I think Mr. Marriott

21   ably made, but we would say, Your Honor, that under

22   113(g)(3)(A), the statute dictates that once a party like

23   Georgia-Pacific decides to bring a contribution action for the

24   costs for all of the site, they need to do it against all of

25   the parties they know about, or otherwise you'll end up having

```
 1    a situation like we have here where a key witness in the case
 2    dies before the suit is even filed.  Thanks.
 3                THE COURT:  Okay.  Thank you.
 4                Let me go to Georgia-Pacific.
 5                MR. SHEBELSKIE:  Thank you, Your Honor.  Again, I'm
 6    Mike Shebelskie for the Georgia-Pacific companies.
 7                And I'd like to start first with the 1990 order and
 8    the 2000 order and the 2007 termination order just to make sure
 9    the record is clear on that and we get those issues off the
10    table.
11                I don't think anyone disputes that the 1990
12    administrative order on consent is not a Hobart-style order and
13    would not, even if Hobart is good law, constitute a 113(f)
14    triggering administrative settlement agreement.  I certainly
15    didn't hear either NCR or International Paper suggest that
16    today.
17                But just so we're clear on the record about why
18    that's the case, as Mr. Schneider pointed out, the Hobart
19    order, the Sixth Circuit noted, had four elements that
20    qualified it as a triggering settlement agreement.  None of
21    those elements are present in the 1990 order.  The 1990 order
22    is not called a settlement agreement.  Unlike the Hobart order,
23    additionally it makes no reference to Section 113(f)(3) and
24    provides further no protection from contribution claims
25    pursuant to Section (f)(2).
```

1          There, unlike the Hobart order, the 1990 order

2    contains no provision stating that its purpose is to resolve

3    liability under CERCLA.  And not least, it does not contain a

4    release from liability, which, of course, is the sine quon non

5    of a qualifying order under 113.

6          Rather than providing a release from liability, the

7    order provides for the potential in the future of a release or

8    a covenant not to sue, but only in the event that the State of

9    Michigan or its Department of Natural Resources certifies that

10   the parties have completed the remedial investigation and

11   feasibility study work in accordance with the order.

12         That condition, of course, does not resolve liability

13   at the time of signing, and it's undisputed that that condition

14   was never satisfied.  The State of Michigan never gave the

15   certification.  And that, of course, brings us to the 2007

16   termination order.  They never gave that certification because

17   in fact the parties to the 1990 order never completed the work

18   called for by the order.  And Michigan very much disavowed that

19   they were giving a release to the parties.  And that, of

20   course, is why there is the subsequent order in 2008, which is

21   a partial settlement with the State of Michigan for disputed

22   invoices that Michigan had incurred prior to that date.  The

23   parties entered into a 2008 agreement with Michigan for that

24   partial settlement precisely because there had been no release

25   of liability, either under the 1990 order or the 2007

1    termination order.  So I think it is about as clear as it can

2    be that the 1990 order is not a Hobart-style order.

3          Turning, then, to the secondary question about the

4    termination order and whether that was somehow incorporated by

5    reference into the 2007 ASAOC that Georgia-Pacific entered into

6    with EPA.  The answer to that is no.  It was not incorporated

7    by reference.  The 2007 termination order only terminates the

8    1990 AOC.  It makes no reference to the EPA's order and

9    certainly contains no clause somehow incorporating that into

10   the 2007 EPA order.

11         Additionally, the EPA order on its face doesn't

12   somehow incorporate the 1990 order.  In fact, you have

13   different parties.  The State of Michigan is the governmental

14   body that is entering into the 1990 order, and it is EPA and

15   only the EPA that enters into the 2007 order.  And while the

16   2007 order contains the type of Hobart-style language that

17   Hobart at least construes as a release from settlement and

18   qualifies it under 113, that language applies only with respect

19   to EPA.  The 2007 administrative agreement and order on consent

20   with EPA does not release any liability Georgia-Pacific has to

21   the State of Michigan.  So neither by their terms nor by their

22   effect do the 2007 termination orders and the EPA orders

23   somehow incorporate by reference the 1990 order.

24         In addition, Your Honor, I think it is irrelevant

25   whether or not it incorporates -- the EPA order somehow

1    incorporates the 1990 order, because the statute of limitation

2    does not run from -- under our 107 claim under the 1990 order

3    from the completion of the work under the 1990 order or the

4    tendering of a draft RI/FS under the 1990 order.  It really is

5    sort of comical to suggest that the submittal of a draft is

6    somehow completion of the RI/FS work.

7          We have until three years following the completion of

8    the removal action, the entire removal action at the relevant

9    operable units to bring our 107 claim under the 1990 order,

10   even if somehow there is an incorporation by reference, which

11   is not the case.  So, Your Honor, I think that sets forth our

12   position on undisputed facts regarding the 1990 order.

13         Mr. Sibley addressed the 2000 AOC with the State of

14   Michigan for the remedy in operable unit 3 and our position on

15   that, so I won't go further into that.

16         And turn, then, to NCR's and International Paper's

17   sweeping contentions that somehow once a potentially

18   responsible party under CERCLA is subjected to any type of

19   triggering event under 113, be it a lawsuit or -- a 107

20   lawsuit -- or be it a qualifying administrative settlement

21   agreement or judicial settlement, the PRP immediately and

22   forever loses all of its rights under 107 to sue anybody else.

23   And indeed only has a one-shot claim under 113 that it has to

24   sue everybody and anybody in the world potentially responsible

25   for contamination under which it could be held liable itself or

1    forever hold its peace.

2             Well, obviously, that sort of sweeping, breathtaking

3    contention is not anything that Congress put into CERCLA.  It

4    is not anything that the Sixth Circuit has held.  It is not

5    anything the Supreme Court has held.  It is not a holding any

6    Court of Appeals has held.  And in fact, it is contrary not

7    only to the statute and purposes of CERCLA, it does violence to

8    them.  And it contradicts the holdings of the Supreme Court in

9    the Atlantic Research case and this -- and the Sixth Circuit's

10   holding in the RSR case, and many other courts of appeals that

11   have addressed the issue.

12            And to start with, Your Honor, I think really is to

13   go back to an observation you made first to think:  Does this

14   rule make sense?  Is that any reasonable way to even interpret

15   this statute?  And the answer has to be no.

16            Take, for example -- well, one of the purposes as

17   we've been told and as we all know of CERCLA is to promote the

18   expeditious cleanup of sites at the expense of polluters and

19   not taxpayers.

20            Well, if NCR's and International Paper's position

21   were adopted, what potentially responsible party would ever

22   want to settle with the EPA or the state for anything at a

23   CERCLA site unless and until the full scope of the remedial

24   investigation and feasibility studies have been completed and

25   the agencies had selected a final record on decision for the

1    remediation.  Otherwise, if you agree --

2            THE COURT:  Some would suggest that's what happens

3    now anyway.

4            MR. SHEBELSKIE:  Well, but not so, Your Honor.  Take

5    a large complicated site --

6            THE COURT:  I guess, you know, the counterpoint would

7    be if Mr. Marriott's position is right, it certainly would

8    accelerate the ending of CERCLA litigation.  And maybe for

9    people today that would be a bit of a surprise and injustice,

10   but going forward you'd certainly have people hustle to get all

11   the parties to the table.

12           MR. SHEBELSKIE:  No, it would clog the courts with an

13   avalanche of litigation.  Let me give you an example grounded

14   in the facts of this case.

15           THE COURT:  Well, it would clear out this one in

16   particular, which is the one I'm particularly focused on at the

17   moment.

18           You know, whatever the merits may be of the general

19   theory that you're articulating, at a minimum here you could

20   say, well, everybody knew what was going on in time to bring

21   the contribution action.  They could have brought the

22   contribution action.  If the statutory language at least

23   arguably fits and there's no case law directly to the contrary

24   or directly in favor, why not?  Then the Sixth Circuit can deal

25   with that issue and all the other ones that are embedded in the

1    case so far.

2           *MR. SHEBELSKIE:* Right.  I'll explain in a moment why

3    the statutory language doesn't fit and that there is in fact

4    case law to the contrary.  But to address sort of the practical

5    policy implications.

6           The remedial -- I want to disagree, Your Honor, with

7    the statement that we all know what's going on at this site.

8           *THE COURT:* Well, why don't you get right to the

9    statute, then, why you don't think it is fairly read the way

10   Mr. Marriott reads it or thinks I should.

11          *MR. SHEBELSKIE:* Yes, Your Honor.  First, there is no

12   provision in CERCLA that says when a party has been sued under

13   Section 107 that the mere filing of the lawsuit precludes the

14   defendant from bringing a 107 claim against other people.  That

15   certainly was a contention in the moving papers.  It hasn't

16   been advanced here today, and certainly they haven't

17   advanced -- identified any litigation -- any statute here today

18   that imposes that result.  They instead are focusing on

19   Section 113(g)(3)(A), and they are taking this statute out of

20   context, not reading it in the entirety of CERCLA as a whole.

21   Because you have to read 113(g)(3)(A) in conjunction with

22   113(f) and -- (f)(1).  And that provides that if a defendant

23   has been sued under Section 107, that defendant may file a

24   contribution action against other persons presumably.  And so

25   this statement in 113(g)(3)(A) is not referring to the

1    plaintiff in the 107 action.  What the argument here today --

2         THE COURT:  Well, wasn't everybody in Kalamazoo River

3    Study Group essentially a plaintiff and a defendant?  I mean,

4    you had affirmative claims and you defended claims.

5         MR. SHEBELSKIE:  Ah, see, that's where NCR's and

6    International Paper's argument collapses.  If they are right

7    that the filing of a 107 claim against a party deprives that

8    defendant of bringing a 107 claim against anybody else, then

9    the counterclaims are invalid.  Because once Georgia-Pacific --

10        THE COURT:  Well, not if they are brought within

11   three years.

12        MR. SHEBELSKIE:  No, no.  Their argument in their

13   brief was --

14        THE COURT:  Well, focus on the argument today.

15   At least what I'm hearing is Mr. Marriott saying, "Look, just

16   read the language of 9613(g)(3), "No action for contribution

17   for any response costs or damages may be commenced more than

18   three years after the date of judgment in any action" -- any

19   action -- "under this chapter for recovery of such costs or

20   damages."

21        At least on the face of things -- and maybe we need

22   to get to context that would seem arguably to cover a judgment

23   in the Kalamazoo River Study Group case.

24        MR. SHEBELSKIE:  Well, here is the implication of

25   their argument.

1          *THE COURT:*  Well, before you get to the

2     implication --

3          *MR. SHEBELSKIE:*  No, why it doesn't work.

4          *THE COURT:*  What's wrong with that language being

5     applied in that way, if anything?

6          *MR. SHEBELSKIE:*  It follows, Your Honor, from the

7     meaning of the word "contribution."  Because that's another

8     point, important, to make clear here.  CERCLA does not define

9     the term "contribution."  And what the --

10         *THE COURT:*  Well, the first premise of his argument

11    is you only have a contribution action.  You lost your 107.  So

12    you may prevail on that.  I might not agree with that.  But if

13    I do, if all you've got is contribution, then why isn't that

14    reading appropriate?

15         *MR. SHEBELSKIE:*  Right.  For two reasons, Your Honor.

16    First, what that is contending is that if a plaintiff files a

17    107 action against a defendant -- and posit there's no

18    counterclaim back against the plaintiff -- so the 107 claim

19    proceeds as simply a 107 claim and it goes to judgment, their

20    argument is that because there's now been a judgment in a 107

21    action, that the plaintiff only can bring contribution claims

22    against the rest of the world.

23         That can't be the case.  Because otherwise it means

24    any time a potential responsible party brings a 107 claim, it

25    has shot itself in the foot when there's a judgment, because

1    once there's been a judgment entered in that case that it has

2    brought, it has now foreclosed itself from suing anybody else

3    under 107.

4            THE COURT:  Right, but so what?  Maybe they want to

5    bring the contribution claim then within three years.  Why

6    isn't that --

7            MR. SHEBELSKIE:  But what is contribution,

8    Your Honor?  As the Supreme Court directs in the

9    Atlantic Research case, Congress intended contribution under

10   CERCLA to be contribution as traditionally understood under the

11   common law.  That follows from, of course, the settled

12   statutory construction principle that when Congress uses in a

13   statute a term that has an accepted meaning and doesn't define

14   it differently in the statute, that is the meaning that will be

15   used in the statute.  In other words, it's assumed Congress

16   intended that.  And, of course, that result is bolstered by the

17   legislative history behind Section 113, as outlined in our

18   briefs.

19           The Section 113 was a result by Congress to address

20   the fact that CERCLA initially didn't allow contribution and

21   courts were implying a traditional right of contribution.

22           THE COURT:  But put 107 to the side for a moment.

23   Let's just focus on the contribution aspect of the case here.

24   So you've got administrative orders from 2009 that would still

25   be within three years.  I guess that wouldn't be within three

1    years of the Kalamazoo River Study Group.  But that's the

2    point.  I mean, if that's a contribution action -- and it

3    certainly is, right?  I mean, those 2009 orders are

4    administrative Hobart orders too.

5            MR. SHEBELSKIE:  Right.

6            THE COURT:  So if Hobart applies, what would be wrong

7    with saying, "Oh, well, I mean, you're too late on that."

8    Whatever may be true for a 107 action, put that to one side.

9    But what's wrong with saying, at least as to the contribution

10   aspects, "It's barred, you're too late," three years after

11   Kalamazoo River Study Group?

12           MR. SHEBELSKIE:  Because ultimately, Your Honor, what

13   contribution is is when a plaintiff sues a defendant and a

14   judgment is entered against that defendant, that defendant can

15   then turn to another party and say, "You have common liability

16   with me," to the plaintiff, "and we now should share this

17   judgment that has been entered against me."

18           So the scope of the contribution claim is governed

19   by -- in the case of an administrative settlement agreement --

20           THE COURT:  So you're saying in essence if you read

21   it the way NCR reads it, the contribution claim would be

22   time-barred before it technically arose?

23           MR. SHEBELSKIE:  Correct.

24           THE COURT:  Okay.  I understand.  Anything else on

25   that?

1      *MR. SHEBELSKIE:*  Well, no, Your Honor.  And -- on

2  that immediate point.  And I think underlying their argument is

3  the contention, made more expressly with respect to the

4  administrative orders, that they say, "Well, look, the remedies

5  are mutually exclusive.  So once you have a 113 claim, you can

6  never have a 107 claim."

7         That's not what Hobart held.  Hobart was looking at

8  the costs under a single administrative order and was holding

9  whether the costs incurred pursuant to that single order, which

10  was a partial settlement, was either -- should be brought under

11  113 or 107.

12         And in fact NCR could be accused of some hypocrisy on

13  this issue, Your Honor, because there was a second

14  administrative order in Hobart to which NCR is a party at that

15  CERCLA site, and NCR has brought a second 113 action to recover

16  administrative costs under that second 113 administrative

17  order.  So NCR certainly does not contend and believe that once

18  you have a 113 claim, you have a one-shot 113 claim for any

19  possible costs at the site.  Rather the 113 claim is limited to

20  the costs that are incurred pursuant either to the settlement

21  agreement or to the judgment in the case.

22         And that is precisely what the Sixth Circuit held in

23  the RSR case at 496 F.3d. 552.  In that case the Sixth Circuit

24  was looking at the statute of limitations under 113 and was

25  initially looking at the effect of the contribution of that as

1  applied to settlement agreements and held that

2  settlement-authorized contribution actions, on those the time

3  bar is limited to "those costs incurred in the settlement."

4        Likewise, with respect to judgment-authorized

5  contribution actions, the Sixth Circuit held that --

6        THE COURT:  Why don't you wrap it up in five minutes

7  unless you've got something new on the limitations issues.

8        MR. SHEBELSKIE:  Right.  On the limitation issue,

9  Your Honor, then as the RSR -- and I would direct you to the

10  American Cyanamid case from the First Circuit that dealt

11  precisely with this issue where there was a two 107 lawsuits,

12  and the issue was whether the filing of the first 107 lawsuit

13  forever barred the defendant --

14        THE COURT:  Go to another topic.  I already told you

15  in my introduction I think NCR has the stretch argument, so

16  stop trying to talk me out of it.

17        MR. SHEBELSKIE:  Okay.

18        THE COURT:  Do you have anything else?

19        MR. SHEBELSKIE:  No, sir.  I'll quit when I'm ahead.

20        THE COURT:  All right.  Let me see if there's any

21  other issue on limitations you want to address.

22        MR. SHEBELSKIE:  Thank you, Your Honor.

23        MR. SIBLEY:  Your Honor, if I may, Trey Sibley for

24  Georgia-Pacific.  Mr. Shebelskie and I flipped a coin to see

25  who would have the privilege of arguing that you should not

1    apply Hobart.  I won't say who lost that coin flip, but I'm

2    here to argue why you should not follow Hobart.

3               *THE COURT:*  Okay.

4               *MR. SIBLEY:*  And our position is laid out in our

5    papers, and I understand where Your Honor is on this.  You

6    noted that you would be audacious indeed to overlook that, and

7    I don't want to -- I recognize that that's where you are on

8    this question.

9               I might observe, however, that there are several

10   benefits to the ITT rule over the Hobart rule, and I would like

11   to persuade Your Honor perhaps if you're not audacious enough

12   to go with us all the way on this, perhaps you might observe

13   that we do have -- that ITT does present the more coherent

14   interpretation of the statute.

15              As Your Honor knows, under the ITT rule, settlement

16   agreements entered into under Section 122(a) of CERCLA, that is

17   agreements that require the performance of future work, do not

18   qualify as administrative settlements under

19   Section 113(f)(3)(B).  There is a good reason why.

20              Orders that require future work, like for example the

21   2007 order that Georgia-Pacific entered into with EPA, might

22   require, as an example, the conduct of a remedial investigation

23   at the site.  Indeed the remedial investigative work at the

24   site here has been ongoing for more than 25 years, and under

25   the current schedule it's likely to go on more than 40 years

1    before it's all said and done.

2            In the course of these types of investigations, the

3    parties learn new things.  For example, there are many sites

4    where parties will discover that the original contaminant of

5    concern is not the only contaminant of concern.  They might

6    discover, for example, that while they were focused on PCBs,

7    there may be something else lurking out there that they didn't

8    fully appreciate until they started poking holes in the ground,

9    taking samples, and doing the investigation.

10           If, for example, in the conduct of an RI/FS a party

11   discovers that there's an additional contaminant and they trace

12   it back to another facility, they would have had -- and all of

13   that occurs more than three years after signing the RI/FS AOC,

14   under the Hobart rule there would be no ability to recover the

15   costs incurred due to that other party's contamination because

16   it occurred more than three years after the party signed the

17   agreement.  For that reason, Your Honor, I think parties will

18   be very reluctant in the future to sign on to these types of

19   ASAOCs to conduct remedial investigations.  If I'm right about

20   that, the cost of conducting these types of investigations will

21   be borne primarily by the taxpayers in the first instance.  And

22   that, we think, is a result that is not terribly satisfying.

23           The textual basis for the ITT approach we think is

24   sound.  I would note further that there's another difference

25   between 122(a) and 122(g) and 122(h).  Under 122(g) and 122(h),

1    Congress specifically said in Section 122 of CERCLA that those

2    agreements confer contribution protection.  There is no

3    analogous provision in Section 122(a).  I think this provides

4    further support for the notion that the specific reference to

5    122(g) and 122(h) administrative settlements as being the types

6    of settlements that trigger 113(f)(3)(B) contribution claims

7    was no accident.  Congress had something specifically in mind.

8    There are good reasons why the statute should not run.  That

9    122(a) settlements should not be treated as

10   contribution-triggering settlements but instead should be

11   governed under the 107 statute of limitations.

12           Setting that question aside, turning to the second

13   part of Hobart, I would say that these same policy rationales

14   apply with equal force to justify applying the Section 107

15   statute of limitations when triggering events specified in

16   Section 113(g)(3) have not occurred.  That argument was

17   presented in Hobart.  Hobart obviously reached a different

18   conclusion.  On that we do not ask Your Honor to follow our

19   view, except perhaps to note its merits on the substance.  We

20   will raise that issue down the line with the Sixth Circuit and

21   maybe the Supreme Court.  Your Honor, that's all I have.  Thank

22   you.

23           *THE COURT:*  All right.  Thank you.

24           Mr. Marriott, do you want some rebuttal time?

25           *MR. MARRIOTT:*  Just briefly, Your Honor.  Thank you.

1    With respect --

2           *THE COURT:*  I should have probably gone in the same

3    order --

4           *MR. MARRIOTT:*  I'm happy --

5           *THE COURT:*  No, go ahead.  You're up there now.

6           *MR. MARRIOTT:*  With respect to the Hobart,

7    Your Honor, we believe that the Court is required to follow the

8    Hobart case.

9           Counsel refers to what they call the nonsensicalness

10   of the notion that the KRSG litigation gave rise to a claim

11   under 113(f)(1) Sufficient to then trigger the statute of

12   limitations here.

13          What I would say, Your Honor, is respectfully we

14   disagree with that for the reasons we previously said, but then

15   I would point the Court to Georgia-Pacific's own Complaint in

16   the present case where at paragraph 41 they allege in this case

17   a 113 claim under (f)(1).  The only lawsuits available to have

18   triggered that (f)(1) claim would have been the KRSG

19   litigation, which we cite to in our papers and which we contend

20   results in a site-wide bar, and the U.S. versus GP litigation.

21   So their own pleading in this case, in our judgment, recognizes

22   that they recognize that the KRSG litigation triggers the

23   requirements of 113(f)(1).

24          Counsel suggested that both the United States

25   Supreme Court's decision in Atlantic Research and the

1    First Circuit's decision in American Cyanamid support their

2    position, and respectfully, I think that's incorrect.  The

3    Atlantic Research case was about who might bring a suit under

4    107.  It was limited to whether 107(a) permits a PRP to recover

5    costs from another PRP.  The Supreme Court said that it does.

6    And yet at the same time it observed that 113(f)(1) permits

7    suit before or after the establishment of common liability.

8    And that observation from the Supreme Court is directly

9    contradictory to what Mr. Shebelskie said about how we couldn't

10   possibly have here by way of the KRSG litigation a suit

11   sufficient to trigger 113(f)(1) because there wasn't a judgment

12   that in his mind qualified.

13          Well, 113(f)(1), Your Honor, is not keyed off of

14   judgments.  As American Cyan -- as Atlantic Research

15   recognized.  The statutory text is clear that it is a result of

16   a suit that is brought "during or following an action" under

17   that chapter a judgment is not required.  The Supreme Court

18   made that clear in Atlantic Research, if it needed to be made

19   clear, because it was clear from the statute itself.  And the

20   GP judgment, simply put, in the KRSG litigation tracked and hit

21   the elements of that statute.  Thank you, Your Honor.

22          *THE COURT:*  All right.  Thank you.

23          Weyerhaeuser, any rebuttal?

24          *MR. SCHNEIDER:*  Very briefly, Your Honor, on the

25   Hobart question.  The Sixth Circuit got it right in the Hobart

1    decision.  The Sixth Circuit got it right in the unpublished

2    LWD PRP case where it looked at Hobart, it looked at ITT, it

3    drew a distinction between those two cases, and it reached the

4    conclusion.  We find nothing distinguishable in this case from

5    the Hobart case.

6              As to the policy arguments advanced by

7    Georgia-Pacific, those arguments are better presented to the

8    Sixth Circuit and not to this Court.

9              *THE COURT:*  Okay.  Thank you.

10             Mr. Parker.

11             *MR. PARKER:*  No, Your Honor, I think everything has

12   already been said.

13             *THE COURT:*  All right.  Thank you.

14             All right.  Let me go to the other motion that we

15   have up today, which is the motion on the two Battle Creek mill

16   sites.  And I'll give Mr. Parker the first opportunity on that

17   since it's his motion.

18             In terms of preliminary comments, so everybody knows

19   what targets they are shooting at, my overall reaction when we

20   get past liability -- which I think we're past for better or

21   for worse -- is that pretty much everything is on the table

22   when it comes to equitable allocation.  Some things are just

23   more persuasive than others.  And it seems to me at least when

24   you have arguable contributions within a common watershed

25   or river, some are going to be more persuasive than others.

1    This one may, for reasons that the International Paper motion

2    points out, be less persuasive as to the upstream mills in

3    Battle Creek.  But you all know I'll give you time limits

4    anyway.  Why not let people decide what they think is most

5    persuasive and proceed accordingly?  I mean, is there really,

6    for summary judgment purposes, when all we're talking about is

7    allocation, a reason to exclude something like this?  So that's

8    where I am.  And we'll want to hear, of course, from you but

9    also the other parties.

10           The other thing, which you can address separately or

11   at the same time, the segue to where are we going with the

12   trial, regardless of what happens on these past costs and

13   limitations, to some extent probably the future and the costs

14   that may be incurred whenever the EPA gets around to deciding

15   the remedy could be a lot more.  And I know the parties -- I

16   don't know if they agree or disagree on how much of an

17   obligation or discretion, requirement, whatever it may be this

18   Court has with respect to future costs, but one thing that

19   strikes me is it's awful hard to allocate future costs in any

20   meaningful way when we don't even know what the remedy is.  And

21   I think the statute will require me to do something in a

22   declaratory judgment about future, but I'm not sure from the

23   cases it's going to require me to give percentage, formula, or

24   anything like that.

25           And the reason I bring it up, the reason I think this

1    is a segue is because at least with respect to allocation

2    generally when we're looking at past costs, it's kind of an

3    all-facts-and-circumstances test it seems to me.  Equitable

4    allocation puts everything in play.

5           I suppose the same thing is true for the future, but

6    it seems a lot harder to even know what the equitable factors

7    are when we don't know what the remedy is.  I mean, to take one

8    extreme, if you're going to dredge up everything in the river

9    for miles and miles, that's one thing.  If you're going to do

10   cap remedies, maybe that's something else.  And contributions

11   and relative culpability might vary depending on that.  So

12   that's why I put it not in the same plane and not identical

13   issues, but they raise the same kind of concerns in my mind.

14          So, Mr. Parker, against those preliminary comments,

15   you certainly can address the motion specifically and anything

16   else you want to on that topic.

17          MR. PARKER:  Well, if I can, Your Honor, I'll address

18   the point you just raised and then move to the motion.

19          As to future costs and your ability now to try to

20   allocate responsibility for those costs, you may recall I

21   actually filed a motion in limine on this very issue which

22   you -- where I had argued that it would be inappropriate for

23   the Court at this juncture to try to allocate future costs.

24   You denied that motion subject to my -- without prejudice --

25   subject to my ability to raise it again.  I think at the time

1    you had indicated it wasn't enough clear to you whether you

2    could decide future costs now.

3            I would only note that I believe you are required

4    under the declaratory judgment provisions of the statute to

5    issue a declaratory judgment as to liability, but you are not

6    obligated and I would argue cannot effectively allocate future

7    costs when you don't know what the remedy is.  And I suspect

8    there will be time for us to make those arguments in a more

9    fulsome way, but I would direct the Court to the prior motion

10   that we had made in that regard.

11           *THE COURT:*  All right.

12           *MR. PARKER:*  So I will move on to our motion

13   regarding the Battle Creek mills.  And I would note in response

14   to your comments that the case that we rely on most here, the

15   case that sets forth the standard that we believe the other

16   parties have not met when it comes to the Battle Creek mills,

17   comes from Judge Bell's courtroom and was affirmed -- which was

18   affirmed by the Sixth Circuit in the KRSG versus Rockwell case.

19   And that case was decided on summary judgment, as we would

20   argue here.  And I think, Judge, it is particularly appropriate

21   because I anticipate -- while I know you're not ready to talk

22   to us about this -- that we will be on some sort of time

23   limitation at trial.  So to the extent I can eliminate issues

24   before trial that I will otherwise have to devote some of my

25   case to, particularly when I believe the law of the

1    Sixth Circuit looking at this very site says the evidence

2    doesn't rise to the level that a reasonable trier of fact could

3    find anything other than summary judgment ought to be granted,

4    it's indeed appropriate.  And I don't believe that the standard

5    that was set forth in that case has been met.

6              Let me just talk briefly about the facts and what we

7    have conceded for purposes of this motion.  What

8    International Paper has conceded for this motion is first that

9    at some point St. Regis had an ownership interest in two mills

10   located in Battle Creek.  Those mills were boxboard mills.

11   Which I think everyone agrees were much less problematic than

12   deinking mills when it came to discharging PCBs.  Those two

13   mills were located more than 20 miles upstream from the

14   Morrow Lake dam.  And, Your Honor, I have some maps here that I

15   would like to give to everybody, including you, if that's all

16   right.

17             THE COURT:  Is it the same map that was in the brief?

18             MR. PARKER:  It's a little different.

19             THE COURT:  All right.  Why is this even an issue at

20   this stage?  You know, I don't think that Judge Bell's case

21   really involved the same kind of issue at the same kind of

22   stage of the case, did it?  I mean, what we're trying to do is

23   figure out with respect to whatever bucket of costs is properly

24   in the case who ought to share and on what basis.  And as I

25   said, I mean, under a general practice of all equitable

1    factors, I mean, whether IP has a bad reputation -- you know,

2    if BP were here, you know, what they did in other parts of the

3    country could conceivably be an equitable factor.  It might not

4    be very persuasive.  But why isn't the fact that you may have

5    these upstream mills at least something the Court can consider?

6    Once you're already liable independently for river

7    contamination.  I mean, now the question is just how much of

8    the share of costs should you pay.

9          *MR. PARKER:*  Well, I think because what the

10   Sixth Circuit said in a two-site case where you're --

11         *THE COURT:*  Right, but this is a river.

12         *MR. PARKER:*  Understood.  And the Sixth Circuit said

13   in the Kalamazoo River when Benteler Industries had -- which

14   was on the river -- they basically said, and I'll quote, "In a

15   two site" --

16         *THE COURT:*  But weren't they talking about whether

17   Benteler could even be liable in that case?  I mean, you're

18   liable.  You're certainly free to disagree and take that to the

19   Court of Appeals.  I get that.  But the only question left is:

20   How much are you liable for?  What should you pay under my

21   liability finding?  And so why isn't everything fairly on the

22   table?  Including your argument that this stuff shouldn't

23   matter at all.

24         *MR. PARKER:*  Well, if it doesn't matter at all,

25   shouldn't it be excluded from the trial if they can --

1          *THE COURT:*  Well, I suspect there's going to be other

2     things that people think matter, and I might disagree.  And

3     that's what the trial is for, everybody trying to marshal what

4     they think the appropriate cost-allocation factors are.

5          *MR. PARKER:*  But when we're talking about

6     contribution to a site, I think there has to be some causal

7     connection under the Sixth Circuit standard in order for you to

8     consider that.  Reputation would be different --

9          *THE COURT:*  Well, they certainly have to prove

10    response costs consistent with the National Contingency Plan,

11    and if they were asking to have you pay for, you know, stuff

12    done over in Jackson, Michigan, probably not.  But if they are

13    asking you to pay for downstream contamination, again, it might

14    be -- for which I've held independently you're liable -- I

15    mean, it might not be the most persuasive factor, but why isn't

16    that at least a factor on the table?

17         *MR. PARKER:*  Well, I think to your Jackson, Michigan,

18    illustration, Your Honor, the Sixth Circuit has said if you're

19    looking at -- I mean, you wouldn't consider that evidence on

20    Jackson, Michigan.  You would find it under 403 so irrelevant

21    it wouldn't come in.  And here the Sixth Circuit has said in

22    order for you to consider this evidence of contribution -- if

23    they want to argue that I'm a BP kind of polluter, you know,

24    fine, but that's not what they are doing here.  They are saying

25    you have contributed PCBs to the site from these mills.

1           *THE COURT:*  Well, if that's an evidentiary issue, why

2      don't we deal with it as a motion in limine as opposed to a

3      summary judgment?

4           *MR. PARKER:*  I could come back in a few weeks, but --

5           *THE COURT:*  I mean, you could, and I would probably

6      say, you know, "Oh, well, it might be liable, or it might be

7      relevant marginally and I can sort it out."  But I guess that's

8      the kind of preliminary question.  I mean, why should I convert

9      this to what amounts to a partial summary judgment almost on

10     liability?

11          *MR. PARKER:*  Well, I think because that's what the

12     Sixth Circuit has said.  In a two-site case when we're talking

13     about a contribution coming from outside the site -- and I'll

14     quote again -- "In a two-site case such as this where hazardous

15     substances are released at one site and allegedly traveled to a

16     second site, in order to make out a prima facie case the

17     plaintiff must establish a causal connection between the

18     defendant's release of hazardous substance and the plaintiff's

19     response costs incurred in cleaning them up."

20          In the Benteler case, which is -- I went on Google

21     and on the third page of the maps I handed out, Judge, there's

22     a little ditch that runs right down to Morrow Lake.  It was

23     3,200 feet long.  PCBs were found along the first 600 feet and

24     the last 15 feet.  And what Judge Bell held was that because

25     you can't show any PCBs in the interim 2,600 feet, that they

1    have not established the causal connection that would cause

2    them to have any responsibility.

3              And here, as Judge Bell also found --

4              *THE COURT:*  Was Benteler liable on other grounds at

5    the site?  Or did that effectively let them walk away from the

6    case?

7              *MR. PARKER:*  That resolved their liability in the

8    case.

9              *THE COURT:*  Yeah.  But, I mean, isn't that the key

10   difference?  You're here on other grounds, and all I have left

11   to do is figure out how much.

12             *MR. PARKER:*  I'd have to look, Judge.  I have to

13   admit I don't know.  I know that there were at least five

14   phases in the KRSG case.  I can't say for certain whether they

15   got out on phase I or whether it was one of the subsequent

16   phases.

17             But if you look at the second map which I took from

18   Google, there's a 13-mile stretch that Judge Bell found in the

19   KRSG versus Eaton case that had no detects whatsoever of PCBs.

20   13 miles between Battle Creek and Morrow Lake.

21             Now, Morrow Lake is still not part of the site.  As

22   the first map shows, the site doesn't start until you get to

23   the other side of Morrow Lake.  And the parties -- what GP and

24   what NCR have done here is tried to demonstrate that there is a

25   possibility that these two mills contributed to the site.  And

1   that's specifically what the Sixth Circuit and Judge Bell said

2   is not enough to keep this in the case.

3        GP points out -- well, while they concede that

4   Judge Bell found that 90 percent of the PCBs in Morrow Lake are

5   1254 or 1260 -- and you'll remember from phase I the PCBs that

6   were in carbonless copy paper were 1242 -- they point out,

7   well, that 10 percent of the PCBs in Morrow Lake -- or

8   Lake Morrow -- were not 1254 or 1260.

9        And they also then concede that -- in fact, Judge,

10  there was one detection of 1242 found in Morrow Lake.  The rest

11  were 1248.  And GP says they can weather, 1248 can weather to

12  look like 1242.  But that's not more than speculative evidence.

13  That's not more than a possibility.  For two reasons.  One,

14  they don't offer any evidence that the 1248 that was found in

15  Morrow Lake was in fact weathered 1242.  And the Court found

16  in -- Judge Bell found in the KRSG versus Eaton case that in

17  fact 1248 was discharged to Morrow Lake from either Eaton or

18  Clark Industries.  So the fact that there is 1248 in there is

19  not evidence of the fact that it came from 30 -- or 28 miles --

20  22 miles upstream from one of these mills and then weathered to

21  look like 1248.

22        NCR's evidence is really no better.  They point out

23  that there's some evidence that these mills recycled CCP.  We

24  don't dispute that.  They initially don't account for the fact

25  that beginning in 1959 the Battle Creek mills discharged to the

1    Battle Creek Wastewater Treatment Plant as opposed to the

2    river.  But even after that they say -- they cite two things.

3    One, they cite a case for the proposition that PCBs tend to

4    flow downstream.  And we'll concede that.  But they do not

5    offer any evidence that for 13 miles between Battle Creek and

6    Lake Morrow there are no findings of PCBs whatsoever.

7            And what they do is they look to their modeling

8    expert, a Dr. Nairn, who has developed a very intricate model

9    of the site itself but did not include in that intricate model

10   Morrow Lake or the upstream area to Battle Creek.  And

11   realizing that he was 20 miles short, he then did a desktop

12   model of the settling capacity of the lake, Morrow Lake.  And

13   the way he does that model is he puts the PCBs at the beginning

14   of the three-mile lake to see what will settle out.  And he

15   concludes that 20 percent of the PCBs would have settled in the

16   lake.

17           But again, Your Honor, as Judge Bell found, as the

18   Sixth Circuit found, when you've got this big gap -- as in

19   Benteler Industries it was 2,600 feet -- here 13 miles, your

20   evidence is only speculative, it is only of a nature that could

21   represent a possibility that the PCBs reached the site.  It

22   does not establish the causal connection.

23           And rarely in my career have I come upon a case that

24   dealt with exactly the same site where these things were found

25   or in this case two sites.  But I think the standard that

1    Judge Bell and the Sixth Circuit have set here -- where I

2    should not have to spend some of my limited and valuable time

3    at trial to try to persuade the Court on something that cannot

4    pass the summary judgment standard that Judge Bell set forth

5    and the Sixth Circuit affirmed and set forth -- there's simply

6    no causal connection between that discharge, alleged discharge

7    up in Battle Creek and the finding of any PCBs in the site

8    itself for which Georgia-Pacific or arguably NCR will incur any

9    costs.  Absent them meeting that burden, I would submit under

10   the KRSG versus Rockwell case there is that gap that Judge Bell

11   and the Sixth Circuit referred to, and, therefore, I should not

12   be obligated at trial to defend that.  Thank you.

13              *THE COURT:*  Okay.  Thank you.

14              Any other defendants want to address the issue?

15              *MR. SCHNEIDER:*  No, Your Honor.

16              *THE COURT:*  Mr. Marriott?

17              *MR. MARRIOTT:*  Mr. Lisner will briefly address it for

18   us.

19              *THE COURT:*  Okay.  Fair enough.

20              *MR. LISNER:*  Good morning, Your Honor.  I'm

21   David Lisner for NCR.

22              NCR opposes IP's motion to dismiss equitable

23   responsibility for the Battle Creek mills.

24              First, responding to Your Honor's comments regarding

25   the Benteler decision from the KRSG litigation.  NCR agrees

1    that that decision is inapplicable here.  (1) as Your Honor

2    observed, it's a decision concerning liability.  Benteler was

3    "Found not liable for response costs at the site."  It's not a

4    decision for equitable responsibility.  And (2), it's not

5    applicable to the facts at issue here.

6            IP in its motion concedes that PCBs were released by

7    the Battle Creek mills into the Kalamazoo River.  The issue in

8    the Benteler decision was whether PCBs from an auto part

9    manufacturing facility located half a mile inland from the

10   Kalamazoo River made it to the river.  That court found it did

11   not, where the KRSG failed to meet its burden.

12           In this case NCR intends to present evidence from its

13   expert witness Dr. Nairn, who has a Ph.D. in numerical sediment

14   transport modeling and over 30 years of engineering experience

15   regarding rivers and coastal engineering.  Dr. Nairn is going

16   to testify at trial that his conclusion that PCBs released by

17   the Battle Creek mills traveled downstream and it's the bounds

18   of the site.  His analysis is based on two principal pieces.

19   (1) he estimated the trapping efficiency of Morrow Lake.

20   Calculating the amount of sediment that was received into the

21   lake and what amount was trapped and what amount flowed over

22   the dam into the site.

23           At Exhibit 2 of the Nairn declaration, which is --

24           THE COURT:  I'm starting to see the 403 prejudice, so

25   don't talk me out of what I already told you was my inclination

1    on the issue.

2           *MR. LISNER:*  Given the distinction in the Benteler

3    decision and the evidence set forth in our brief that we intend

4    to present at trial, we would respectfully ask the Court to

5    deny IP's motion.

6           *THE COURT:*  Okay.  Anything from Georgia-Pacific?

7           *MR. SIBLEY:*  Your Honor, Trey Sibley for

8    Georgia-Pacific.  I will not respond further to the

9    Battle Creek motion.  I think we agree with Your Honor's

10   comments from the bench regarding the appropriate time to

11   address the equitable impact, if any, of the Battle Creek

12   mills.

13          I would like to address briefly the question you

14   posed in prelude to Mr. Parker's argument on this motion

15   regarding future costs at the site.

16          Georgia-Pacific would submit, Your Honor, that you

17   will be in a much better position to decide what, if anything,

18   to do on future costs after you have heard the evidence that

19   will be presented at trial in September.

20          It is certainly the case that the statute is

21   ambiguous regarding just how far you need to go in issuing your

22   declaration at the end of this trial that will govern future

23   actions.  You certainly need to issue some declaration of

24   liability.

25          We think the evidence will show, Your Honor, that you

1    will be in no better position -- no court will be in a better

2    position to equitably allocate costs associated with any remedy

3    down the line than you are right now.

4            It's also -- the situation is also very fluid at the

5    site.  Past work being done or work that is future costs today

6    will be past costs tomorrow.  EPA has issued a record of

7    decision for Area 1 of OU-5.  It has selected a remedy, and the

8    remedial work in Area 1 will begin soon.  We know something

9    right now about what that remedy will look like.  I think it is

10   fair to observe that the remedies going down the river are

11   likely to be very similar.  At least the predicate facts that

12   are relevant amongst the parties here are certainly unlikely to

13   change.

14           In that regard, Your Honor, I think you will find

15   most compelling the facts that it is impossible to know how

16   much any given mill discharged into the river in any given

17   year.

18           It's also relevant that the mills are all located in

19   a -- they are clustered in and around Kalamazoo and Plainwell,

20   a few mills in Otsego.  All of those areas are upstream of most

21   of the portions of the river that have not been addressed yet.

22   Not exclusively, but most of them.  And I think you'll hear --

23   when you hear the evidence at trial, you will conclude that

24   it's impossible to differentiate between the PCBs -- to draw a

25   distinction between PCBs discharged by one mill and PCBs

1    discharged by another that are now resident in these various

2    impounded areas as you go down the river.

3            All of this to say, Your Honor, that I think once you

4    hear this type of evidence -- and some of it is disputed -- but

5    once you hear this type of evidence, I think you'll get greater

6    comfort with the idea of issuing a declaration that relates

7    to -- that will govern in future cases.

8            The absence of a declaration that applies -- that

9    gives the parties some guidance as to the relative shares of

10   responsibility going forward will result in much more

11   litigation.  We will be back in front of the Court every time

12   that the EPA decides to implement a remedy in each area of the

13   river.  We think there are substantial efficiencies to be

14   gained by the Court allocating amongst the parties in some sort

15   of baseline way to keep us from having to come back to court to

16   fight these issues out in complex trials on a going-forward

17   basis.

18           Your Honor, that's what we have to say on future

19   costs.  I recognize it's an issue that's highly relevant, and

20   we look forward to discussing it with you further.  Thank you.

21           *THE COURT:*  All right.  Thanks.

22           Does NCR or Weyerhaeuser want to address that issue

23   at this point?

24           *MR. SCHNEIDER:*  Nothing from Weyerhaeuser,

25   Your Honor.

1          *THE COURT:* Okay.

2          *MR. MARRIOTT:* Your Honor, beyond the elegant

3 solution that I've already suggested of simply dismissing the

4 case.

5          *THE COURT:* Yeah.

6          *MR. MARRIOTT:* I think we've previously spoke on the

7 issue --

8          *THE COURT:* It's starting to look good, right?

9 Anyway, go ahead.

10         *MR. MARRIOTT:* I think, Your Honor, as we said in a

11 previous submission of the same time frame that Mr. Parker

12 alluded to, it is difficult to imagine precisely how the Court

13 can, given the uncertainty as to what the remedy is going to

14 be, go about making judgments about what percentages and what

15 formulas ought to appropriately apply. And for that reason we

16 have, as we said in our prior paper, reservations about

17 proceeding as it relates to any future determination which,

18 again, we think are out under the statute of limitations.

19         *THE COURT:* All right. Thanks.

20         Any rebuttal, Mr. Parker?

21         *MR. PARKER:* Three quick points, if I may,

22 Your Honor.

23         *THE COURT:* Sure.

24         *MR. PARKER:* First in response to Mr. Lisner's

25 comment, I respectfully disagree that the issue in Benteler was

1     whether PCBs reached the river.  The issue was whether they

2     reached the site.  And that's the burden that the parties have

3     that they need to overcome.  They need to show a causal

4     connection, as the Sixth Circuit said, before they can show I'm

5     not entitled to summary judgment.

6              On the future costs, Mr. Sibley alluded to the fact

7     that it may be difficult to determine which mill contributed

8     how much, in which year, and those sorts of things, so,

9     therefore, you might as well just try to decide future remedies

10    now.

11             I would submit, Your Honor, that until you know the

12    remedy, you will be in no position to allocate the

13    responsibility for that among the parties because it will be

14    dictated by the remedy, the location of the remedy.

15             You may recall when we argued this point in

16    connection with a motion in limine some of the parties had

17    suggested that you put into the order an out that would allow

18    the parties to come back and reargue once the remedy came out,

19    and I think you correctly pointed out that becomes an advisory

20    opinion.  And I would just submit that it is -- I would tread

21    with great trepidation towards an area where you are trying to

22    figure out with your crystal ball what the remedies will be and

23    how those ought to be allocated between the parties.

24             And I just have to note as my final point, I find it

25    somewhat ironic that Georgia-Pacific would suggest that there

1    will be substantial efficiencies for you deciding this case all

2    at one time on all of these future costs when to harken back to

3    the motion on the statute of limitations, this all could have

4    been done years ago if they would have named NCR and

5    International Paper at that time and we could have had a final

6    judgment in the most efficient manner.

7              THE COURT:  Okay.  Thanks.

8              MR. PARKER:  Thank you.

9              THE COURT:  Anybody else have closing points on the

10   motions up today?

11             MR. SHEBELSKIE:  Yes, Your Honor, one housekeeping

12   request.  On the statute of limitations issue, the specific

13   dollar amounts that Georgia-Pacific and the other plaintiffs

14   incurred under specific orders are not material -- have not

15   been material to the motion because the motion raises a legal

16   question as opposed to specific dollar amounts.

17             In addition -- and because of that, Your Honor, we

18   would request that if you find that costs under any particular

19   order are time-barred, that the order not specify a specific

20   dollar amount because there may be disagreements between the

21   parties as of right now as to what those dollar amounts are as

22   opposed to saying which orders -- which costs -- by category

23   what are time-barred.

24             And in addition, I did want to make sure the record

25   was clear because we were all focusing on costs under orders,

1    there are two buckets of costs that Georgia-Pacific and the

2    other plaintiffs incurred not pursuant to orders.  The

3    Fort James plaintiff participated in funding part of the RI/FS

4    work.  That was not pursuant to an order.  It was not a party

5    to the 1990 order.  It did that voluntarily.  And then

6    Georgia-Pacific also incurred some removal costs in

7    Operable Unit 2 between 2007 and 2009 after the order with

8    Michigan was terminated and before there was an order for EPA

9    for that area.  So those two housekeeping details, Your Honor,

10   and we'll rest on that.

11            *THE COURT:*  All right.  Well, as to the dollars and

12   cents involved in any particular order, that may or may not be

13   housekeeping.  What I think will ultimately govern the costs is

14   going to be disclosures, things that have already been part of

15   the record.

16            Certainly NCR has submitted the exhibit that it

17   thinks puts the costs into various buckets.  I don't know how

18   much disagreement there is.  It certainly wasn't in the

19   briefing.  And most other disagreements were pointed out in

20   painful detail.  So, you know, we'll see.

21            Obviously, if you're at the defense table and you get

22   a ruling from me that says, well, the 2006 and '7 costs under

23   the administrative settlement orders are out and that appears

24   to be about $43 million and now all the sudden the $43 million

25   gets shifted to the 1990 order because I keep that in, I

1    suspect it's going to be more than housekeeping that we're

2    fighting about at final pretrial.

3            MR. SHEBELSKIE:  Right.  I wasn't suggesting we would

4    do that.

5            THE COURT:  Okay.

6            MR. SHEBELSKIE:  It's just that we haven't vetted

7    that number in the chart because they weren't material to the

8    motion.

9            THE COURT:  All right.

10           MR. MARRIOTT:  All I would say, Your Honor, is I

11   believe the data in the chart comes from an expert report, an

12   expert by the name of Zoch.  And to the extent -- and I think

13   Your Honor alluded to it -- but our only concern, without

14   knowing precisely what the amounts are as to their costs that

15   are being added that weren't disclosed, and obviously if that's

16   the case, we'll deal with that in an evidentiary way prior to

17   trial.  I just don't want my silence to be taken as consent to

18   the addition of costs.

19           THE COURT:  Right.  And I take the other point that

20   Mr. Shebelskie makes in the same vein, that there may be other

21   costs that they don't think are tethered to any particular

22   order but were nonetheless spent and they might seek as a

23   recovery consistent with the NCP.  And, again, that's just

24   going to matter on what was disclosed and what the proofs are.

25   And I don't mean to hold anybody to the notion that this

1    briefing constitutes the sum total of ever penny sought or

2    every penny opposed.

3              Okay.  If there's nothing else on these motions, I

4    have one other thing I want to just lightly address at least.

5    In terms of going forward, we have the September trial.  I

6    think you have an August settlement conference even though

7    you've already had one with a magistrate judge.  And we'll

8    certainly get a written opinion out on this so you know what to

9    expect as you prepare for final pretrial.  We'll go back and

10   look at what has been filed in light of what we've heard today.

11   I think for tentative planning purposes what I would go back to

12   are some of the preliminary comments I made.  And I'm not

13   giving you a ruling, but I want you to be able to think about

14   issues because you're going to start to pull together the

15   proofs, and think about how much time you need and the like.

16             Starting with the last motion first, the IP motion on

17   setting aside the Battle Creek mills, I'm going to go back and

18   read Judge Bell's decision again, but I still think at the end

19   of the day that's likely going to be potentially available in

20   the case.  I don't think I'm going to rule as a matter of

21   summary judgment that a party's operations at those mills or a

22   party's operations elsewhere should be categorically as a

23   matter of law excluded from consideration in equitable factors

24   to allocate costs where somebody has been found liable, rightly

25   or wrongly, for other reasons.  In other words, the liability

1    of IP in my view doesn't depend on what happened or didn't

2    happen in Battle Creek, it depends on other things that we've

3    addressed.  If the only question at trial is what's the

4    appropriate allocation of response costs, then I think it's

5    fair game.  Now, whether it's persuasive or not is another

6    matter.  If we're going to take, you know, days or hours of

7    time to parse through a settlement modeler's model and

8    assumptions on what happened or didn't happen in Morrow Lake

9    and all of that, both sides are going to have to figure out how

10   much they want to put into that, considering the other factors

11   that might be more instrumental in helping the Court decide.

12   But I think that's where it belongs.  And it may be that at

13   final pretrial, you know, there's other evidentiary bases to

14   limit what can or can't be presented on that.  But as a matter

15   of summary judgment, I think it's unlikely that I'll grant that

16   motion from IP, so that is simply advice for planning purposes.

17          On the statute of limitations issues, you've all

18   given me plenty to think about.  And for me anyway, I

19   appreciate the arguments, because it has helped focus me on the

20   decision points.

21          I will say first what may be most clearly in my mind.

22   I think it's very difficult for me, no matter how much I might

23   prefer an ITT regimen or no matter how much I might think that

24   case provides a better pathway for understanding how CERCLA and

25   122 settlements generally work and tie back to 113, and I guess

1    you might even find my name on some of those ITT briefs, so I

2    might have some tendency to like that, I don't think this is

3    the place for me to do it.  I think it's going to be hard for

4    me to find a way to conclude that Hobart isn't the law in this

5    circuit.  I think it is.  So that's where I am now.  I'll go

6    back and look at it.  But if that's the case, then the 2006 and

7    2007 administrative orders, settlement orders by consent would

8    be Hobart orders, and I think they would be time-barred.  And

9    that's a chunk of money.  My rough adding up, subject to

10   everybody's ability to go back and check numbers, was something

11   close to 43 million.

12           I think the parties are in agreement that the

13   Operating Unit 3, the OU-3 portion of the 1990 order and the

14   2000 order are time-barred.  You may disagree as to why at the

15   defense table.  Hobart would be one issue perhaps.  But

16   whatever reasons people may have independently, they get to the

17   same conclusion that those costs would be time-barred.  And I

18   think my notes indicate, again subject to the caveats I said

19   earlier, that's probably about 12 million total, six for each

20   of those.

21           And then the issue that I really need to spend a

22   little bit more time on is how to treat the other expenses that

23   are tied to the 1990 order and how in particular to treat that

24   order under Hobart and how to treat the 2007 termination and

25   related activity.  So that's probably $25 million or so.  And I

1    really don't know what I'm going to do on that.

2          The 2009 orders, I think one is consent and one is

3    administrative, total about 23 million, I think.  And the

4    pathway to exclude those as time-barred I think depends on the

5    Kalamazoo River Study Group theory as I'm calling it.  And as

6    we talked about, I'm going to go back and look.  I understand

7    Mr. Marriott's point and Mr. Parker's point on why I ought to

8    read the statute that way, but at the end of the day that's a

9    hard sell for me.  In part because I do think, arguably anyway,

10   if you read and construe the statute that way, a contribution

11   claim could be foreclosed before it would accrue, at least in

12   common law.  Anyway, that needs to be thought through and

13   articulated, but if I were a betting person, I'd plan that

14   those costs will probably be in the case.

15         And then the 2008 order which has only tangentially

16   been addressed sounds like it's going to come through as final

17   trial on whether it was disclosed in a timely and proper way or

18   not, except as to Weyerhaeuser where I think Georgia-Pacific

19   agrees it was excluded.

20         Those are indications.  It wouldn't be the first time

21   my initial inclination at the end of an argument changed, but I

22   want to give you that as fair notice of what to think about as

23   I sit here today.  And we'll work through the actual decision

24   and hopefully get it to you in short order.

25         One thing I do want to talk about -- and because I am

1    the fact-finder, at least to start I want to talk about

2    settlement discussions on the record, and I'm not going to

3    require anybody to talk with me about it if you don't want to.

4              I know you had a settlement conference with

5    Magistrate Judge Brenneman, and I think I originally scheduled

6    two, one earlier on and one for closer in time to final

7    pretrial, probably in August.

8              As some of you probably know, at least the people in

9    this district, Magistrate Judge Brenneman retires July 31.  And

10   contrary to what you might think, it didn't have anything to do

11   with this case.  You haven't driven him from the practice.

12   He's been a magistrate judge since 1980, I think.  He's worked

13   with 25 percent of the judges who have ever held Article III

14   status in this court.  He is really a walking embodiment of the

15   court in many ways.  And he's -- I'm not sure what his exact

16   age is, but he's around 70.  Maybe a little older.  And as you

17   may or may not know, once a magistrate judge qualifies for the

18   retirement pension, which he did long ago, every year they keep

19   working is just pure gift to the government, both in terms of,

20   number 1, they are getting paid the same amount of money either

21   way, but number 2, they actually pay more while they are

22   working because it's treated as compensation, FICA-taxed, as

23   opposed to pension which wouldn't.  So whether you see him

24   again or not, thank him for his service.  He's been invaluable

25   to the Court all these years, and I'm really going to be sorry

1    to see him go.  But he's not going to be here on whatever date

2    in August you're coming back for a settlement conference, and

3    some poor new magistrate judge will be.  I shouldn't laugh out

4    loud, but what an introduction.

5          What strikes me -- and, you know, it's been a long

6    time since I've been in your shoes -- but what strikes me as I

7    think about the case is that there's almost no way I can

8    imagine a settlement that -- you know, the Iran and the world

9    powers agreement that supposedly walks away from everything, I

10   mean, that would be amazing, and maybe we should call

11   Secretary Kerry now that he's done in Iran and see if he's

12   available, but I don't think that's very likely.

13         On the other hand, what does seem fairly possible to

14   me is a settlement framework that would address more limited

15   scope.  Perhaps some past costs, perhaps -- and we could go a

16   lot of different ways on the future, either putting it to one

17   side altogether with tolling agreements or some kind of a

18   provisional formula that would be allocated in any number of

19   ways.  You've all done settlements of all those varieties and

20   different ones I'm sure.  But what I'm thinking is if there's a

21   pathway to structure it that way that would foreclose your need

22   to come here in September and my need to hear you in September,

23   it would potentially be a pathway for all of you to get to the

24   Court of Appeals on issues you all have.  And right now every

25   one of you has some issues, okay, either from liability or

1    other things.  And probably after I rule on this, there will be

2    issues on limitations that both sides want to bring that really

3    belong in the Court of Appeals.  They are going to have to make

4    the call on some of those things.  Are you all better off

5    getting some closure at that level before you engage in what

6    sounds, even from preliminary discussions on one tiny issue,

7    like it's going to be technical, painful, and expensive?  So

8    that's my only comment.

9          And I should say, you know, I give you a hard time,

10   but I really do like having you come.  It's a good group of

11   lawyers.  It really is.  It's a fun set of issues for me.  And

12   it's a new set of issues that test me, so I like having you

13   here.

14         From the first trial I know you're very efficient, I

15   know you are very able to focus the issues and marshal the

16   proofs.  And I have no doubt that you'd all do a really good

17   job on that.  And I have a new clerk incoming in September, so

18   that person would get a great introduction to fine civil

19   lawyering at a trial.  But I do wonder if it's the best use of

20   everybody's time and money.

21         Against that, how -- and maybe you've already decided

22   none of you want to settle and you just want to litigate and

23   move on.  But is there anything the Court can do that would

24   facilitate at least the parties' exploration to decision point

25   on that between now and September?  Anything that you think we

1   should do?  Certainly you've got the magistrate judge

2   settlement conference.  That may or may not be the most

3   effective route.  But is there anything you think we could do

4   or should do?  I never give you a chance to go first,

5   Mr. Parker, so I'll start with you.

6         *MR. PARKER:*  Thank you.  One of -- short of you

7   granting our motion in its entirety --

8         *THE COURT:*  Well, that's another pathway to the Court

9   of Appeals, I guess, right.

10         *MR. PARKER:*  I'd have to think about it.

11         *THE COURT:*  Okay.

12         *MR. PARKER:*  Nothing strikes me immediately as to the

13   way the Court might be of some assistance.  Like you, I'm going

14   to miss Magistrate Judge Brenneman.  I don't -- he probably

15   would have no interest in this.  Is he available as a private

16   mediator?

17         *THE COURT:*  No.  If he engages in "the practice of

18   law," which the Administrative Office defines very broadly, he

19   forfeits his pension.  And as much as he likes you, he's not

20   willing to forfeit his pension.  Unless you're willing to pay

21   an awful lot of money.

22         *MR. PARKER:*  Bad idea.

23         *THE COURT:*  No, it's a good idea.  It's one of the

24   things we lose as a court.  Because when Magistrate

25   Judge Scoville retired about a year ago, the same kind of

1   thing.  He is a person who did great service to the court over

2   the years, particularly effective in marshaling settlements,

3   and it's just gone.  It's gone to the court and the private

4   bar, and I think that's a loss and too bad.  So I think it's a

5   great idea, but not one that the bureaucracy permits.

6            Anything from Weyerhaeuser?

7            MR. SCHNEIDER:  No, Your Honor, we look forward to

8   the August settlement conference.

9            THE COURT:  Okay.

10           MR. MARRIOTT:  I think you've done it, Your Honor,

11  and I'll continue to think about it.  But by way of ruling on

12  whatever way Your Honor rules on this motion promptly is very

13  helpful.  You've set up the settlement conference for August,

14  and we'll participate in that effort.  And beyond that no great

15  ideas come to mind.

16           THE COURT:  All right.  For GP.

17           MR. SHEBELSKIE:  Your Honor, obviously we acquiesce

18  to Mr. Marriott, and as you know, Judge Brenneman had actually

19  suggested options like that.

20           THE COURT:  Had he?  Okay.

21           MR. SHEBELSKIE:  Could we explore partial

22  settlements, past calls, things like that.  There have been

23  some discussions on that, and I'm sure they will continue.

24           THE COURT:  All right.  I didn't want you to go

25  without at least putting that on the table.  But if you reach a

1    settlement with the new person, whoever that turns out to be, I

2    mean, we know who the people are going to be, I just don't know

3    for sure which one of them is going to get it.  Great.  If not,

4    I'll see you all at final pretrial and trial.  And although

5    it's onerous in some ways, I really am looking forward to it.

6    So, you know, don't give away an important point and settle it

7    for my sake.

8              Anything else today?

9              *MR. PARKER:* No, Your Honor.

10             *MR. MARRIOTT:*  Thank you, Your Honor.

11             *THE COURT:*  Thank you.

12             *THE CLERK:*  Court is in recess.

13         *(Proceeding concluded at 11:58 a.m.)*

14                        *   *   *   *   *

15             I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17             I further certify that the transcript fees and format

18    comply with those prescribed by the court and the Judicial

19    Conference of the United States.

20

21    Date:  July 20, 2015

22

23                        **/s/ Glenda Trexler**
                          _____
24                        Glenda Trexler, CSR-1436, RPR, CRR

25