UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGIA-PACIFIC CONSUMER
PRODUCT LP, et al.,

       Plaintiffs,

                                 CASE NO. 1:11-cv-0483

v.

                                 HON. ROBERT J. JONKER

NCR CORP., et al.,

       Defendants.

_____/

## OPINION AND ORDER

This action arises under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 94 Stat. 2767, as well as the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 100 Stat. 1613, both of which are codified at 42 U.S.C. § 9601, *et seq.* Before the Court are Defendant International Paper's motion for partial summary judgment regarding Equitable Responsibility for the Battle Creek Mills (docket no. 732), Defendant Weyerhaeuser's motion for partial summary judgment on Statute of Limitations (docket no. 735), and Defendants International Paper and NCR Corporation's Joint Motion for Summary Judgment on Statute of Limitations (docket no. 738).

## I. BACKGROUND

This is but one chapter in a protracted litigation battle concerning environmental waste in the waterways of Southwestern Michigan. Between 1972 and 1989, the Michigan Department of Natural Resources—and later the Michigan Department of Environmental Quality and the United

States Environmental Protection Agency ("EPA")—conducted several studies on and around the Kalamazoo River.  These studies revealed that the Kalamazoo River, later designated a Superfund Site, was contaminated with polychlorinated biphenyl ("PCB"), a hazardous material associated with carbonless-copy paper.  For purposes of investigating and remediating the Kalamazoo River Superfund Site, the Michigan Department of Environmental Quality divided the Site into several "operable units."  The governmental entities went after the corporations that they determined were potentially responsible parties to the contamination, and directed them to shoulder responsibility for investigation and cleanup costs.

Plaintiff Georgia Pacific is a liable party under CERCLA that has spent millions of dollars on investigation and cleanup at the Kalamazoo River Superfund Site.  Georgia Pacific incurred many of the costs under various agreements with state and federal environmental agencies relating to the contamination at the Kalamazoo River Superfund Site.  For purposes of the current motions, the following agreements are of interest:

(1)	Two state agreements, one in 1990 and one in 2007: a 1990 Administrative Order by Consent ("AOC") with the Michigan Department of Natural Resources, in which Georgia Pacific agreed to perform various studies on the Kalamazoo River Superfund Site; and a 2007 Administrative Order by Consent ("AOC") with the Michigan Department of Environmental Quality and the Michigan Department of Attorney General, which purported to terminate certain duties and measures associated with the 1990 AOC.

Cleanup work associated with the 1990 AOC involved Operable Unit Two ($4.44 million), Operable Unit Three ($5.96 million), Operable Unit

Five ($19.49 million), and Operable Unit Six ($1.79 million).  Cleanup efforts at Operable Unit Two were completed by or before May 2011, at Operable Unit Six by or before June 2009, and are still ongoing or otherwise incomplete at Operable Unit Five. Notably, cleanup associated with Operable Unit Three ($5.96 million) commenced in 1996 and concluded by or before September of 2003.

Georgia Pacific claims a total sum of *$31.69 million* in costs in connection with cleanup work performed under the 1990 AOC.

(2)     Three federal agreements from 2006 and 2007: a 2006 Administrative Settlement Agreement and Order on Consent ("ASAOC") with the EPA, a 2007 ASAOC for Remedial Investigation/Feasibility Study (RI/FS) with the EPA, and a 2007 ASAOC concerning the Plainwell Impoundment with the EPA.  Together, these agreements  directed Georgia Pacific to perform investigatory and cleanup actions at Operable Units Five and Six, undertake time-sensitive removal actions at the Plainwell Impoundment, and conduct other remedial investigations and feasibility studies relating to the river contamination.

Importantly, the three 2006 and 2007 ASAOC agreements differed from the previous 1990 AOC agreement.  In exchange for undertaking these actions, and as expressly provided in all three of the agreements, the EPA indicated that Georgia Pacific had resolved its liability to the federal government, and that Georgia Pacific was entitled to protection from

contribution actions under CERCLA sections 113(f)(2) and 122(h)(4). Furthermore, all three of the 2006 and 2007 ASAOC agreements unequivocally and expressly indicated that they constituted "administrative settlements" for purposes of CERCLA section 113.

Georgia Pacific claims $3.51 million under the 2006 ASAOC, $21.57 million under the 2007 ASAOC for RI/FS, and $18.05 million under the 2007 ASAOC for Plainwell, for a total sum of approximately *$43.13 million*.

(3)　　　　Two federal agreements from 2009: the 2009 ASAOC concerning the Plainwell Dam with the EPA, and the 2009 federal court Consent Decree. These agreements required Georgia Pacific to undertake time-sensitive removal actions at the Plainwell Dam and to remedy sediment-related costs at Operable Unit Two. These agreements, just like the federal agreements from 2006 and 2007, expressly provided that Georgia Pacific had resolved its liability to the federal government by entering into and performing the agreements.

Georgia Pacific claims $6.83 million under the 2009 ASAOC, and $16.23 million under the 2009 Consent Decree, for a total sum of approximately *$23.06 million*.

Also relevant to the limitations issue is Georgia Pacific's membership in the Kalamazoo River Study Group ("KRSG," an association of paper manufacturers located along the Kalamazoo River that filed suit in 1995 under CERCLA against eight corporate defendants for past and future cleanup costs associated with the Kalamazoo River Superfund Site. The Defendants counterclaimed

against the KRSG and its members.  In 2003, the district court in that case entered judgment holding the Kalamazoo River Study Group liable for all past and future remediation costs associated with the Kalamazoo River Superfund Site.  Neither NCR, IP, nor Weyerhaeuser were defendants in that litigation.

On December 3, 2010, Georgia Pacific filed this CERCLA action against Defendants, who, like Georgia Pacific, also own (or are otherwise associated with) property on or around the Kalamazoo River Site, in an effort to seek contribution from them for costs associated with the cleanup.  After conducting a two-week bench trial in this matter, the Court found that Defendants are liable under CERCLA for PCB disposal at the Kalamazoo River Superfund Site (docket no. 432). Georgia Pacific now seeks the sum of the past costs listed above, for a total recovery of about $100 million in past costs from the Defendants.  The Defendants have moved for summary judgment barring recovery of some or all of the claimed past costs based on the statute of limitations.  In addition, Defendant International Paper has moved for summary judgment precluding Georgia Pacific from relying on International Paper's role at certain upstream mills near Battle Creek for an equitable allocation of response costs at issue in this case.

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Material facts are those necessary to apply the substantive law.  *Id*. at 248.  A dispute is genuine if a reasonable jury could return judgment for the

non-moving party. *Id.* In deciding a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)). Whether a complaint was filed outside of the applicable statute of limitations, however, is solely a question of law, and does not turn on factual disputes. *See Tolbert v. State of Ohio Dep't of Transp*., 172 F.3d 934, 938 (6th Cir. 1999).

## III. DISCUSSION

### A. Defendant International Paper's Equitable Responsibility for the Battle Creek Mills

Defendant International Paper argues that there is no evidence that PCBs allegedly released from two mills located in Battle Creek, Michigan, approximately twenty miles upstream of the Morrow Lake Dam, *reached* the Site. In other words, there is conclusive evidence that PCBs were disposed of at the mills, and conclusive evidence that PCBs were detected downstream, but in International Paper's view, no evidence that PCBs were detected in the distance between these two locations. Therefore, International Paper asserts that all evidence regarding the Battle Creek mills should be barred as a matter of law on the issue of equitable responsibility for past and future cleanup costs. Effectively, International Paper is arguing that nothing concerning the Battle Creek Mills can, as a matter of law, affect the Court's equitable allocation decisions. International Paper cites *Kalamazoo River Study Group v. Rockwell International Corporation*, 171 F.3d 1065, 1068 (6th Cir. 1999), in which the Sixth Circuit affirmed the district court's grant of summary judgment in favor of one of the defendants, relieving that defendant of liability because "where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima

-6-

facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." *Id.* International Paper argues that the same lack of causal connection compels the same conclusion here.

The Court disagrees. That case involved a factually distinct situation. The circumstances in that case involved a "ditch," *see id.* at 1069, which could thwart the river's tendency to carry sediment downstream from one point to another. So merely finding the same contaminant above and below the ditch was insufficient to link the two sites. Some evidence of a contaminant pathway was needed. The facts here are different. The obvious pathway that connects upstream and downstream contamination is the river itself. It cannot be said as a matter of law that the absence of a detection between the upstream and downstream locations conclusively establishes that PCBs "disappeared" or otherwise did not reach the Site. (docket no. 752, Pl. Resp. Br. at 9.) This is evidenced by the testimony and conclusions of various experts hired by the parties, some of which indicate that the PCBs may have traveled downstream. (docket no. 756, Co-Def. Resp. Br. at 9.) In the Court's view, this is an issue for the trier of fact based on all the evidence.

The case International Paper cites is also legally distinguishable. In the *KRSG* decision, the issue was whether the Defendant was liable at all as a potentially responsible party under CERCLA. Here, the issue of liability has already been resolved against it on the basis of its downstream ownership of facilities that contributed PCB's to the river. The only remaining issue is whether International Paper's upstream mills at Battle Creek may be a fair consideration for the Court in equitably allocating costs among liable parties. International Paper's arguments concerning the Battle Creek mills can be fully vetted in the allocation stage of this litigation. But International Paper is not entitled now to a ruling as a matter of law excluding a potentially relevant consideration.

-7-

In a CERCLA equitable allocation decision, a court has broad discretion in making CERCLA contribution allocation decisions, and virtually any factor may be potentially relevant. *See United States v. Consolidation Coal Co.*, 345 F.3d 409, 413 (6th Cir. 2003) (noting ten different equitable factors that may be potentially relevant, and noting that these ten factors are not "exhaustive or exclusive"); *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 572 (6th Cir. 1991)("[B]y using the term 'equitable factors' Congress intended to invoke the tradition of equity under which the court must construct a flexible decree balancing all the equities in the light of the totality of the circumstances . . . . the court may consider any factor it deems in the interest of justice in allocating contribution recovery."); *see also* 42 U.S.C. § 9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.")  Accordingly, the motion is **DENIED.**

### B.  *Defendants' Statute of Limitations Defense*

Defendants advance two arguments as to why the statute of limitations precludes Georgia Pacific from bringing its CERCLA sections 107 and 113 claims and recovering various costs associated with its cleanup efforts.  First, Defendants argue that the litigation pertaining to the Kalamazoo River Study Group—of which Georgia Pacific was a member—constituted a "judgment" that triggered the three-year statute of limitations applicable to such claims.  Second, in the alternative, Defendants argue that the administrative agreements between Georgia Pacific and various governmental agencies constituted "administrative settlements" that triggered the three-year statute of limitations applicable to such CERCLA claims. The Court first discusses in general terms CERCLA claims of this nature, and then the Court considers in turn each argument.

### 1. *CERCLA Primer*

"Congress enacted CERCLA in 1980 to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2180 (2014) (internal quotation marks omitted). CERCLA provides several options by which the government may ensure funding for the cleanup of contaminated areas. The Sixth Circuit has recently explored these options and explained how CERCLA's cost-shifting mechanisms work under each. One option "for the government is to clean up the site itself and enter into a settlement agreement with [potentially responsible parties, or PRPs] to cover the government's response costs." *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 762 (6th Cir. 2014) *cert. denied*, 135 S. Ct. 1161 (2015). Another option is for the government to enter into an agreement with a potentially responsible party that requires the party to incur the costs associated with rehabilitating the site. *See id.* When a party such as Georgia Pacific incurs these cleanup costs upfront, it may partially recover those response costs from other parties who were also liable for the contamination, but that did not initially contribute to the remedial effort. *See id.*

The Sixth Circuit recently noted the following with respect to private actions of this nature:

> While there are multiple avenues for the government and PRPs to apportion the costs of contamination and clean up, CERCLA contains several specific statutes of limitations as to the timing of lawsuits. Cost-recovery actions under § 107(a)(4) must be brought within three years "after completion of the removal action" or "for a remedial action, within [six] years after initiation of physical on-site construction." § 113(g)(2). Actions for contribution under § 113(f), however, must be filed within three years of "(A) the date of judgment in any action under [CERCLA] for recovery of such costs or damages, or (B) the date of an administrative order under [§ 122(g)] (relating to de minimis settlements) or [§ 122(h)] (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages."

*Id.* at 763 (citing *RSR Corp.*, 496 F.3d at 556–58).

The Sixth Circuit has concluded, as have several other circuits, that parties such as Georgia Pacific must seek reimbursement in the form of a contribution action under § 113(f) if they meet one of that section's statutory triggers, rather than in the form of cost-recovery action under § 107(a). *Id.* at 767. In other words, CERCLA sections 113 and 107 provide mutually exclusive remedies, and only one is available to any party seeking recovery of any particular set of costs. *See id.* Moreover, the Sixth Circuit concluded for purposes of section 113 that if a party received a "judgment" in a CERCLA action, or entered into an "administrative settlement," this would serve as a "statutory trigger" that would start the proverbial ticking clock, as far as section 113's three-year statute of limitations is concerned.

Accordingly, parties such as Defendants have an incentive to identify a "statutory trigger," particularly if such trigger occurred more than three years before a private party filed a lawsuit seeking cleanup costs from other parties. This would have the effect of barring recovery under both section 107 (because the statutory trigger permits a contribution claim) and section 113 (because the three-year statute of limitations period for a contribution claim had run). Defendants argue that a statutory trigger applies here so that Georgia Pacific is limited to contribution under section 113. Defendants further argue that at least some of the contribution claims are barred by the running of the three-year limitations period.

### 2. *The* KRSG *Litigation*

Defendants first point to the litigation associated with the Kalamazoo River Study Group ("KRSG"). Defendants note that the common liability at issue in the *KRSG* litigation was "all past

-10-

and future response costs" at the Kalamazoo River Superfund Site.[1]  (docket no. 773, Def. Rep. Br. at 5.)  Defendants argue that as soon as the defendants in the *KRSG* litigation asserted their own section 107 counterclaims against Georgia Pacific, Georgia Pacific was "subject to a civil action" under section 107, which in turn triggered a section 113 claim for costs associated with the Kalamazoo River Superfund Site. Defendants also argue that all of the section 113 costs sought by Georgia Pacific must be barred because the district court entered judgment finding KRSG liable for past and future response costs in June of 2003.  Under this view, Georgia Pacific had the obligation to identify and sue all potentially responsible parties within three years of June 2003, or be forever barred, regardless of what it discovers or spends later.  Because Georgia Pacific waited until December of 2010 to file this suit, Defendants argue that CERCLA's three year statute of limitations bars Georgia Pacific's Recovery for the entire $100 million sum associated with the cleanup efforts.

The Court disagrees that the ostensible section 107 counterclaims asserted by the defendants in the *KRSG* litigation—none of which is a party to the present action—obligated Georgia Pacific to assert section 113 contribution claims against Defendants Weyerhaeuser, NCR Corporation, and International Paper—none of which was a party to the *KRSG* action—for costs that Georgia Pacific incurred separate from those involved in *KRSG*.  It is well established that generally, "a judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings."  *Richards v. Jefferson Cnty., Ala*., 517 U.S. 793, 798 (1996).  Accepting the argument advanced by Defendants would require this Court to read CERCLA to be broader than the typical reach of traditional res judicata principles.  *See id.*  Indeed, it would

---

[1]Defendants also note that Georgia Pacific was subject to section 107 claims in the lawsuit brought against it by the federal government.

effectively bar some contribution claims even before they would normally accrue. The Court declines the opportunity to read CERCLA so broadly, particularly in the absence of precedent, controlling or otherwise, that would lend support to such an expansive interpretation. Accordingly, the Court rejects the defense theory barring all recovery based on the *KRSG* decree.

### 3. The Administrative Agreements

In the alternative, Defendants point to the various agreements between Georgia Pacific and federal and state government agencies as evidence that the statute of limitations under section 113(g)(3)(B) has passed. According to this argument, CERCLA's three year statute of limitations bars Georgia Pacific from recovering the costs associated with the first two categories of agreements listed above, *see supra* Section I, because they are "administrative settlements" that serve as the "statutory trigger" which would foreclose Georgia Pacific's section 107 claims in their entirety, as well as start the ticking of the statute-of-limitations clock on the section 113 claims.

Analyzing this argument depends on applying two decisions of the Sixth Circuit. The most recent decision is *Hobart*, 758 F.3d at 757. *Hobart* provides the Court with a four-part test to determine whether an agreement triggers the statute of limitations on a section 113 claim. *See id.* at 768. First, does the agreement "explicitly state that [the parties] have resolved their liability" with respect to a specific section of CERCLA? *See id.* at 768–69. Second, does the agreement itself indicate that it is an "administrative settlement" providing the party "protection from contribution actions or [CERCLA] claims?" *See id.* at 769. Third, does the title of the document match the statutory language in section 113, and therefore indicate that the parties intended to resolve their liability? *See id.* And fourth, did the governmental agency covenant not to file suit under CERCLA against the party for future response costs? *See id.* Where the answer to those four questions was

-12-

"yes," the Sixth Circuit found that the parties intended for the agreement to resolve liability to the government, and therefore, the agreement was an "administrative settlement" that triggered the ticking of the three-year statute of limitations clock. *See id.* at 768–69. The second decision is *ITT Industries, Inc. v. BorgWarner, Inc.*, 506 F.3d 452 (6th Cir. 2007). In this earlier decision, the Court of Appeals found that a particular agency agreement did *not* trigger a right of contribution under the particular language of the agreement at issue. *Id.* at 459.

Georgia Pacific argues that *Hobart* is in conflict with *ITT Industries*, and that *ITT Industries* must control as the earliest published court authority on the issue. The Court disagrees. The controlling effect of *Hobart* is plainly evident in light of both the lengthy explanation the Sixth Circuit provided as to why *ITT Industries* was distinguishable, and the striking parallels between the agreements at issue in *Hobart* and some of the agreements here. *Hobart*, 758 F.3d at 768–71 (noting "important differences" between *ITT Industries* and *Hobart*). It is therefore unsurprising that the Sixth Circuit has, even more recently, squarely rejected the argument that *Hobart* conflicts with *ITT Industries*, and firmly upheld the validity of *Hobart. See LWD PRP Grp. v. Alcan Corp.*, 600 F. App'x 357, 365 (6th Cir. 2015) (observing that *ITT Industries* does not prevent application of *Hobart*). Of course, this Court is obliged to follow binding precedent. *See id.* ("Because a panel of this Court may not overturn a prior panel's reported decision, we need not, and will not, revisit any of the above arguments, which we have already rejected in *Hobart*. . . . only the full court, sitting en banc, would have power to reverse *Hobart*'s holding.").[2]

---

[2]The Court notes that another panel of the Sixth Circuit heard oral argument on August 4, 2015, in *Florida Power Corp v First Energy Corporation*, Case No. 14-4126, on the same issue.

Under *Hobart* and *ITT*, the decisions about what is time-barred and what is not depends on the particular agreement that triggered the costs. So the Court analyzes the agreements in turn.

**a. The 1990 AOC and the 2007 Order by Consent**

Defendants cursorily argue that the 1990 AOC by itself constitutes an "administrative settlement" as recently described by the Sixth Circuit in *Hobart*. "Under § 113(f)(3)(B) and this circuit's case law, the defining feature of an 'administrative settlement' is that the agreement 'resolve[s] [the PRP's] liability to the United States or a State for some or all of a response action or for some or all of the costs of such action. . . ." *Hobart*, 758 F.3d at 768 (citing CERCLA § 113(f)(3)(B); *ITT Indus.*, 506 F.3d at 459). In so doing, Defendants concede that the liability-focused language of the 1990 AOC is simply not as robust as that found in the later agreements.

The Court finds that the 1990 AOC does not satisfy *Hobart*'s four-part test, and so is not an "administrative settlement" for purposes of triggering the section 113 three-year statute of limitations. Unlike the agreement in *Hobart*, this agreement was titled an Administrative Order on Consent, not an *Administrative Settlement* Agreement and Order on Consent. In this way, the agreement was much more similar to one found by the Sixth Circuit *not* to constitute an administrative settlement—indeed, the "AOC" title of this agreement mirrors the one before the Sixth Circuit in *ITT Industries*. *See ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 460 (6th Cir. 2007) ("Moreover . . . the AOC must constitute an 'administrative or judicially approved settlement' within the meaning of § 113(f)(3)(B). . . . we find that the AOC does not fall within the [CERCLA] settlements as required by the statute of limitations as enumerated under § 113(g).").  The 1990 AOC did not provide Georgia Pacific with broad resolution of their CERCLA liability to the United States, nor did it contain a broad covenant by the EPA not to sue Georgia Pacific under sections 106

-14-

or 107.  *See Hobart*, 758 F.3d at 770 (observing that the government's covenant not to sue in the *Hobart* ASAOC was much broader and expansive than in the *ITT* AOC). The 1990 AOC also did not reference section 113 in the same way as did the agreement in *Hobart*, another distinction that the *Hobart* court found to be critical in distinguishing the facts in *Hobart* from the facts in *ITT Industries.  See id.*

Defendants further argue that even if the 1990 AOC does not itself constitute an "administrative settlement," the 2007 Order by Consent "replaced entirely" the 1990 AOC.  (docket no. 739, Def. Br. at 22.)  If this is so, then it would be appropriate for this Court to examine language in the later 2007 agreements rather than the language in the 1990 AOC in order to determine whether Georgia Pacific entered into an "administrative settlement" relating to these costs.  But the 2007 Order by Consent is simply not as expansive as would be required for Defendants' "replaced entirely" argument to hold true.  Defendants are correct that paragraph three of the 2007 Order by Consent states that "it is appropriate to terminate the State 1990 AOC," and that paragraph seven again states that the 1990 AOC "is terminated."  (docket no. 741-10, 2007 Order by Consent at 3–4, PageID # 22128–29).  But the Defendants fail to reconcile the following paragraph in light of the Sixth Circuit's admonition that an "administrative settlement" must resolve liability for some or all of a response action:

> 9.  <u>Other Claims</u>.  Nothing in this Order shall constitute or be construed as a release or covenant not to sue regarding any claim, cause of action, or demand in law or equity against any person, firm, trust, trustee, joint venture, partnership, corporation, or other entity, for any liability it may have arising out of or relating, in any way, to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to , or taken from the Site.  This Order shall not estop or limit any legal or equitable claims of the State against the Respondents, their agents, contractors, or assigns, including, but not limited to, claims related to the releases of hazardous substances

-15-

or other pollutants or contaminants. Respondents further waive all other statutory and common law claims against the State for costs of conducting the RI/FS, including the OU1 RI Report, and any contribution or counterclaims for such costs. Respondents agree to withhold any judicial challenge relating to or arising out of the performance of this Order until the issuance of the final Record of Decision for Operable Unit 1.

(docket no. 741-10, 2007 Order by Consent at 3–4, PageID # 22131). The Court finds that the language in the 1990 AOC is the relevant language to examine to ascertain whether Georgia Pacific entered into an administrative settlement with respect to these costs. The Court further finds that Defendants have not successfully established that Georgia Pacific entered into an "administrative settlement" with respect to costs associated with the 1990 AOC, and accordingly, finds that the three-year statute of limitations was not triggered on the effective date of the 1990 AOC, nor on the effective date of any 2007 agreement (at least with respect to these costs).

Instead, the Court agrees with Georgia Pacific that its section 107 claim for costs incurred under the 1990 AOC for removal actions in Operating Unit Five, Operating Unit Two, and Operating Unit Six is timely under section 113(g)(2), which indicates that an action to recover costs incurred in a removal action must be commenced "within 3 years after completion of the removal action." Accordingly, the Court **DENIES** the Defendants' motion for summary judgment as to the costs under the 1990 AOC, except with respect to Operable Unit Three. Georgia Pacific concedes that the Operable Unit Three expenses are time barred under section 113(g)(2). (docket no. 761, Pl. Resp. Br. at 23 & n.8.)

### b. The 2006 ASAOC, the 2007 ASAOC for RI/FS, and the 2007 ASAOC for Plainwell

Defendants argue that these agreements are "administrative orders" under which Georgia Pacific "resolved its liability" to the state or federal government for some or all of the response

action or costs of such action.  In so doing, Defendants argue that *Hobart* controls the outcome of this case.  *See Hobart*, 758 F.3d at 770.  Defendants note that each of these agreements contain the *exact same language* as the agreements that the Sixth Circuit examined in *Hobart*: the EPA indicated that Georgia Pacific had resolved its liability to the federal government, that Georgia Pacific was entitled to protection from contribution actions under CERCLA sections 113(f)(2) and 122(h)(4), and that the agreements constituted "administrative settlements" for purposes of CERCLA section 113.  *See id.* at 768–69.  Even the titles of the documents—"Administrative Settlement Agreement and Order on Consent"—are the *exact same language* as the titles of the agreements in *Hobart*.  *See id.*

Georgia Pacific contests whether *Hobart* is controlling, but concedes that if it is, the statute of limitations has run and the costs arising under these agreements are time barred.  A  recent Sixth Circuit panel reached the same conclusion, rejecting the contention that the statute of limitations runs from completion of the removal action rather than from the effective date of a settlement agreement such as this one.  *See LWD PRP Group*, 600 F. App'x at 365–66.

The Court concludes that *Hobart* is controlling and that there is no daylight between the ASAOC agreements in *Hobart* and the ASAOC agreements here.  Deference to the authority of the Sixth Circuit requires that this Court determine that these agreements are "administrative orders" that constitute section 113 statutory triggers, dismiss Georgia Pacific's section 107 claims in their entirety, rule that the three-year statute of limitations has run on these section 113 claims, and **GRANT** summary judgment as to these costs to the Defendants.

exc

!

### c. The 2009 ASAOC and the 2009 Consent Decree

Apart from their argument that all of Georgia Pacific's costs are time-barred due to the *KRSG* litigation, Defendants do not contend that Georgia Pacific's claim for costs relating to any of the post-2007 orders is untimely, as Georgia Pacific's action was filed within three years of the effective date of those agreements.  Therefore, under any theory of the statute of limitations, these costs are not time-barred.  Accordingly, Defendants' motion for summary judgment as to costs associated with these agreements is **DENIED**.

### IV.  CONCLUSION

For the reasons stated above, the Court holds as follows:

1.  Defendant International Paper's motion for partial summary judgment regarding Equitable Responsibility for the Battle Creek Mills (docket no. 732) is **DENIED.**

2.  Defendant Weyerhaeuser's motion for partial summary judgment on Statute of Limitations (docket no. 735), and Defendants International Paper and NCR Corporation's Joint Motion for Summary Judgment on Statute of Limitations (docket no. 738), are **GRANTED IN PART AND DENIED IN PART** as follows:

> (a)     Summary judgment as to costs associated with the 1990 AOC is **DENIED**, except with respect to Operable Unit Three costs that Georgia Pacific concedes are time barred.

> (b)     Summary judgment as to costs associated with the 2006 and 2007 ASAOCs is **GRANTED.**

> (c)     Summary judgment as to costs associated with the 2009 ASAOC and the 2009 Consent Decree is **DENIED.**

**IT IS SO ORDERED**.


Dated: _____August 12, 2015_____          _/s/ Robert J. Jonker_____
                                                ROBERT J. JONKER
                                                CHIEF UNITED STATES DISTRICT JUDGE