# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| GEGRGIA-PACIFIC CONSUMER PRODUCTS LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC<br><br>    Plaintiffs,<br><br>    v.<br><br>NCR CORPORATION, INTERNATIONAL PAPER CO., and WEYERHAEUSER CO.,<br><br>    Defendants. | No: 1:11-cv-00483<br><br>Judge Robert J. Jonker |

**GEORGIA-PACIFIC'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION IN LIMINE TO
EXCLUDE EXPERT TESTIMONY RELITIGATING
PHASE I ISSUES**

I.   **PRELIMINARY STATEMENT**

In Phase I, the Court conducted a two-week bench trial featuring hundreds of exhibits and the testimony of 25 expert and lay witnesses. Opinion and Order ("Order") at 2 (Sept. 26, 2013) (Docket No. 432). Based upon a resulting record that "fill[s] 50 binders and cover[s] thousands of pages," the Court made detailed findings of fact pursuant to Fed. R. Civ. P. 52. *Id.* Of relevance here, the Court made numerous findings regarding (a) the status of NCR broke as a hazardous substance, rather than a "useful product," *id.* at 19-21, and (b) NCR's knowledge, conduct, and intent with respect to contamination of the environment via the recycling of NCR Paper, *id.* at 6-9, 16-21.

In the nearly two years since the Court issued its Order, NCR has never sought reconsideration of those findings. Instead, NCR now intends to include, in the Phase II record, *new* expert testimony that directly contradicts many of the Court's Phase I findings. NCR's goal is either to re-litigate issues it lost in Phase I—or to inject into the trial record new factual grounds for appealing the Phase I findings. In either event, this "do over" tactic is, in the view of a court that addressed this very issue in a phased CERCLA trial, a wasteful and improper exercise. *See Lyondell Chem. Co. v. Albemarle Corp.*, No. CIV. A. 1:01-CV-890, 2007 WL 5517246, at *2-3 (E.D. Tex. Mar. 9, 2007). Georgia-Pacific requests that the Court enter an order *in limine* barring expert testimony that contradicts the Court's Phase I factual findings.[1]

---

[1] Georgia-Pacific is currently reviewing the parties' proposed deposition designations and Phase II trial exhibits, and will request similar relief to the extent any such materials are offered to contradict or relitigate any matters resolved in Phase I.

- 1 -

## II. ARGUMENT

### A. The Parties are Estopped From Any Attempt to Relitigate Phase I Issues

Phased trials are permitted for "convenience, to avoid prejudice, or to expedite and economize…." Fed. R. Civ. P. 42(b). The obvious advantages of phasing are, no doubt, the reason that NCR sought a phased trial in this matter. *See* Joint Status Report at 7 (June 22, 2011) (Dkt. No. 78). It is axiomatic that the convenience and economy offered by phased trials will be lost, however, if the findings at the conclusion of the initial phase are merely temporary waypoints in an argument "to be continued" in a subsequent phase. Instead, in a phased trial, a litigant can and should be "bound by the findings of fact made on the issues already decided and … estopped from any attempt to relitigate those issues which were necessarily raised" previously. *Cont'l Cas. Co. of Ill. v. Westinghouse Elec. Corp.*, 327 F. Supp. 723, 725 (E.D. Mich. 1970) (following a liability finding for plaintiffs in a phased trial, defendants could not, in their subsequent cross-claim proceedings against each other, relitigate issues already decided in the liability phase).

This rule applies with full force to proffered expert testimony that contradicts a court's liability findings in phased CERCLA litigation. In *Lyondell*, for example, various third-party plaintiffs (collectively "El Paso") sought to exclude expert testimony by defendants' expert, Dr. Haddad. El Paso argued that Haddad's testimony, to be offered in the allocation phase of the trial, included opinions that contradicted the court's earlier liability-phase findings regarding the nature of the wastes that had been hauled to the site. 2007 WL 5517246 at *2. In El Paso's view, this rendered Haddad's testimony unreliable under *Daubert*. *Id.*

The court disagreed with El Paso's legal reasoning, noting that a *Daubert* motion "should be focused on the factual basis or methodology of an expert's prospective testimony." *Id.* But

the court *also* disapproved of defendants' attempt to re-litigate the liability phase through Haddad's testimony:

> The court cautions … that during the next phase of trial it will not be receptive to a tedious repetition of matters already adjudicated. The first phase of trial featured many hotly contested issues on which counsel for both sides presented strong arguments. The preponderance of the evidence standard inherently anticipates some uncertainty in such situations. While, as Defendants point out, the court has previously granted a motion to amend the Findings of Fact, the second phase of trial is not the proper forum to relitigate unsuccessful arguments.

*Id.* Accordingly, Haddad was permitted to testify only within those "parameters." *Id.* at *3.

Prohibiting litigants from reopening issues decided in previous phases of litigation is uncontroversial. It is easy to imagine NCR's reaction if Georgia-Pacific had somehow attempted a "do over" after *losing* Phase I. Yet NCR is engaged in just such a gambit.

### B.  Expert Testimony Proffered by NCR Seeks to Relitigate Phase I

NCR intends to offer testimony from three experts—Prof. Bradford Cornell, Marcia Williams, and Dr. Elizabeth Anderson—in an effort to relitigate the Court's Phase I liability finding.

#### 1.  The Court's Phase I Findings Applicable to NCR

In the Phase I trial, questions regarding NCR's status as a CERCLA "arranger" involved disputed facts about NCR's knowledge, conduct, and intent with respect to recycling NCR broke. The Court rejected NCR's claim that during the production period, NCR "saw the CCP broke as a useful product, not as a hazardous substance." *Id.* at 19. The Court concluded that "the record from trial belie[d]" NCR's characterization of broke as useful. *Id.* at 15-21. Based on numerous subsidiary findings—discussed in more detail below—the Court found that NCR was an arranger because it "continued to sell CCP broke to brokers and recyclers after discovering it to be a legal and environmental liability"—and, in particular, that by "at least" March 1969, NCR "knew that CCP broke generated a toxic, hazardous by-product in normal recycling." *Id.* at 17-19.

### 2. The Proffered Testimony of Bradford Cornell

NCR expert Prof. Bradford Cornell testified on direct examination in Phase I that NCR broke was not a waste. Transcript at 998-99 (Docket No. 402). On cross-examination, however, Cornell admitted that broke *was* a waste, at least by September 1970, based on a Monsanto document. Order at 19 (*citing* Transcript at 1022-23, TX 1296). In the wake of that admission by Cornell, NCR chose to conduct no redirect examination. Transcript at 1025. Instead, NCR apparently plans to conduct its redirect using "new" testimony from Cornell—on *precisely* the same topic—in Phase II. The proffered testimony contradicts both the Court's Phase I findings, and Cornell's own Phase I testimony.

Specifically, in his Phase II report, Cornell—after incorporating his Phase I report, and even his Phase I trial testimony, by reference[2]—announces that he has again concluded that CCP broke always was a useful product. *Id.* at 3. Despite the Court's findings to the contrary— findings expressly based, in part, on Cornell's *own testimony*—Cornell now maintains that he has not seen "any evidence that NCR concluded during the Production Period that CCP Broke should be discarded rather than sold for value." As a result, Cornell "continue[s] to hold the same opinion that he reached in [his] June 2012 Report that CCP Broke was a useful product throughout the Production Period." *Id.* at 6-7. Addressing his inconvenient testimony to the contrary in Phase I, Cornell now argues, disagreeing with the Court's finding, that he was actually responding to a "counterfactual hypothetical" that was not consistent with the document being discussed. *Id.* at 7.

Cornell admitted in his Phase II deposition that his opinion testimony regarding broke's status as a useful product isn't "really new," and is instead "a reaffirmation of what [he] said

---

[2] Rebuttal Expert Report of Bradford Cornell ("Cornell Report") at 1 (January 30, 2015) (copy, without attachments, attached as Exhibit A).

- 4 -

earlier."[3]  Cornell also acknowledged that his Phase II "reaffirmation" is based on no new evidence.  *Id.* at 15.  He simply believes the Court was "incorrect to conclude that NCR believed CCP Broke to be a waste as of the time of the Monsanto Memo."  Cornell Report at 7.  Phase II, however, is not an appropriate venue for "reaffirmation" of arguments that were lost (or, in this case, actually conceded) in Phase I.  And in any event, it is difficult to imagine an issue with less relevance to the Phase II allocation process.

### 3. The Proffered Testimony of Marcia Williams

As with Cornell's testimony, the proffered testimony of NCR's expert Marcia Williams reads as if it was inadvertently omitted from Phase I.  Williams has opined that:

- NCR "believed that the recycling of NCR broke was environmentally benign throughout the production period."[4]

- "Aroclor 1242, the type of PCB used in NCR Paper, was not understood to be an environmental contaminant *prior to 1972* since it had not yet been determined to persist and accumulate in the environment."[5]

- "During the time NCR produced NCR Paper containing Aroclor 1242, it would not reasonably have known or expected that its use of PCBs in CCP manufacture or the recycling of CCP broke would result in environmental harm to water bodies.  NCR's actions in this timeframe, particularly the proactive decision in 1970 to discontinue the use of Aroclor 1242, were reasonable and prudent in light of the preliminary and evolving information available at that time about PCBs in general and Aroclor 1242 in particular."  *Id.* at 16.

Thus, Williams disagrees with essentially *all* of the Court's Phase I findings regarding NCR's knowledge, intent, and conduct.  She feels free to do so because she considers the Order to be only a "background document" rather than a "determining document."  Williams Dep. at 103.

---

[3] Deposition of Bradford Cornell ("Cornell Dep.") at 13-15 (March 10, 2015) (excerpts attached as Exhibit B).

[4] Deposition of Marcia Williams ("Williams Dep.") at 46 (April 28, 2015) (excerpts attached as Exhibit C).

[5] Expert Report of Marcia E. Williams ("Williams Report") at 16 (December 3, 2014) (emphasis added) (copy, without attachments, attached as Exhibit D).

For example, Williams disagrees with the Court's summary finding that, by at least March 1969, NCR "knew that CCP broke generated a toxic, hazardous by-product in normal recycling." Williams deems this finding by the Court to be "inconsistent with the way [she has] described the level of knowledge in [her] opinions in [her] report." *Id.* at 83-84. Williams disagrees with numerous other Phase I findings, and even criticizes the rigor of the Court's analysis:

- Williams disagrees with the Court's Phase I finding that "NCR understood, no later than 1969, that CCP broke was a waste, not a useful product, because no rational paper recycler, fully apprised of the facts as NCR was, would use CCP broke in its recycling process." *Id.* at 66-68. In Williams' view, there is "significant information available that wasn't considered" by the Court "as to what was known or not known in 1969." She also observes that the Court lacked sufficient information "to reach the conclusions that are in" that sentence from the Order. *Id.*; s*ee also id.* at 85 (Williams didn't see, in the Court's Order, consideration of information that she believes is available and relevant).

- Williams disagrees with the Court's Phase I finding that "no later than 1969, NCR knew that recycling CCP broke in the paper mills created a hazardous waste stream…" *Id.* at 86-87, 89-90. In fact, according to Williams, assuming the Court "had all the information [she] had and reached that conclusion, then [she] would probably say" that the Court's finding is "unreasonable." *Id.* at 90.

- Williams disagrees with the Court's Phase I finding that "NCR continued to sell CCP broke to brokers and recyclers even though it understood no rational recycler would want the CCP broke anymore if it understood what NCR did…." *Id.* at 92-93.

- Williams disagrees with the Court's Phase I finding on page 16 of its Order that NCR's Dan McIntosh "had conversations [in the late 1960s] with NCR's manager of carbonless paper research, J. E. Gordon Taylor about the need to replace the PCB's in the CCP because of the environmental effect of those PCB's." *Id.* at 95. (When she personally interviewed Mr. McIntosh, however, she did not ask him whether the Court's finding was accurate.) *Id.* at 98.

- When she was asked to comment on the Court's finding that "NCR knew during the production period of the dangers of recycling CCP," Williams observed that this was "not a way [she] would have characterized the situation during the production period." *Id.* at 107.

To Williams's credit, she did apologize in advance for her rejection of the Court's many factual findings in Phase I. Her report notes that "[t]o the extent [her] opinions can be construed as disagreeing with the Court's Phase I decision, no disrespect is intended." Williams Report at 2.

### 4. The Proffered Testimony of Dr. Elizabeth Anderson

No such apology was forthcoming from NCR expert Dr. Elizabeth Anderson because, unlike Ms. Williams, Dr. Anderson did not even review the Court's Phase I Order (whether as "background" or otherwise) before issuing a report that repeatedly rejected it.[6] Like Williams, Anderson flatly contradicts the Court's findings of fact and questions their credibility. In Anderson's opinion:

- "[T]he weight of evidence prior to the time when NCR eliminated the substance from the paper did not indicate potential environmental hazards posed by the Aroclor 1242 in NCR CCP."[7]

- The fact that NCR had phased out Aroclor 1242 from its entire product line well before the 1976 to 1983 timeframe demonstrates "impressive corporate responsibility" on NCR's part. *Id.* at 1, 15; Anderson Dep. at 50-51.

- "*It is not credible to suggest* that a company such as NCR had sufficient knowledge to be concerned about using a substance such as Aroclor 1242, especially in the absence of information about the toxicity of Aroclor 1242 at low environmental levels." Anderson Report at 1 (emphasis added).

- "The weight of evidence attesting to the adverse effects of Aroclor 1242 on the environment did not warrant action until after the decision to replace Aroclor 1242 had already been made and the substitution was completed." *Id.* at 2.

- "NCR should not have been expected to conclude that Aroclor 1242 was in the environment because higher chlorinated compounds had been found in ecological samples [in the "late 1960s and early 1970s"] …." *Id.*

---

[6] Deposition of Elizabeth L. Anderson, Ph.D. ("Anderson Dep.") at 93 (May 8, 2015) (did not review the Order) (excerpts attached as Exhibit E). Anderson subsequently recalled that she had "glanced" at the Order on one occasion, well after preparing her expert report. *Id.* at 139-40, 152.

[7] Expert Report of Elizabeth L. Anderson ("Anderson Report") at 1 (Jan. 30, 2015) (copy, without attachments, attached as Exhibit F).

- "It would have been unreasonable for NCR to make significant changes to its manufacturing process by discontinuing the use of Aroclor 1242 without much more evidence of the presence and toxic effects of PCBs in the environment. … [T]he evidence suggests that NCR's decision to replace Aroclor 1242 was a proactive and responsible step." *Id.* at 3.

- Anderson is unaware of "*anyone, anywhere*" who "actually was concerned *at any point during the production period* about the potential for environmental damage from the use of Aroclor 1242 in NCR Paper." Anderson Dep. at 55 (emphasis added).

There is no way to square any of these opinions with the Court's Phase I findings.

### III.     CONCLUSION

The Court's Rule 52 findings at the conclusion of Phase I were not a "background document," nor were they mere suggestions for further discussion. They were, instead, a "determining document"—they resolved "hotly contested issues on which counsel for both sides" presented arguments. The Phase I findings of fact were the result of considerable time, effort, and resources and the parties. An order *in limine,* barring presentation of expert testimony at odds with Phase I factual findings, will preserve the benefits of the phased trial, and will simultaneously avoid the waste and expense associated with "tedious repetition of matters already adjudicated." Georgia-Pacific respectfully requests that the Court enter such an order.

Dated: August 20, 2015

        GEORGIA-PACIFIC CONSUMER PRODUCTS,
        LP., FORT JAMES CORPORATION, and
        GEORGIA-PACIFIC LLC

        BY:

        _____/s/_____Douglas M. Garrou_____

        Peter A. Smit
        Adam J. Brody
        Varnum LLP
        Bridgewater Place, P.O. Box 352
        Grand Rapids, MI 49501
        (616) 336-6000

        Michael R. Shebelskie
        Douglas M. Garrou
        George P. Sibley, III
        Paul T. Nyffeler
        John E. Beerbower
        Hunton & Williams LLP
        951 East Byrd St.
        Richmond, VA 23219
        (804) 788-8200

        Jan M. Conlin
        Mathew R. Korte
        Ciresi Conlin LLP
        225 S. 6th Street, Suite 4600
        Minneapolis, MN 55402
        (612) 361-8200

- 10 -

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 20, 2015, I electronically filed the foregoing using the CM/ECF system which will send notification of such filing by operation of the Court's electronic systems.  Parties may access this filing via that Court's electronic system.

      By:   /s/    Douglas M. Garrou