## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS, LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC, LLC,<br><br>              Plaintiffs,<br><br>    v.<br><br>NCR CORPORATION, INTERNATIONAL PAPER COMPANY, and WEYERHAEUSER COMPANY,<br><br>              Defendants. | Civil Action No. 1:11-cv-483<br><br>Judge Robert J. Jonker |

## DEFENDANT WEYERHAEUSER COMPANY'S
## PHASE II TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  FACTS ............................................................................................................... 2

  A.  All of the PCBs in the Kalamazoo River and Portage Creek are from NCR ........ 2

  B.  The relative amount of PCBs each mill released to the Site can be inferred from records of mill operations ................................................................. 3

  C.  GP has only paid a fraction of the cost of investigating and remediating sediments in the Kalamazoo River. ........................................................ 7

  D.  GP's costs, recoveries, and remaining work. ...................................... 8

III.  LEGAL FRAMEWORK ................................................................................. 9

  A.  GP's claims and burden of proof against Weyerhaeuser. ................... 9

  B.  Claims by the Defendants. ................................................................. 11

IV.  ARGUMENT ................................................................................................ 12

  A.  Weyerhaeuser has already paid more than its equitable share of response costs for OU5. ................................................................. 12

  B.  Weyerhaeuser should not be held responsible for so-called "orphan" shares ................................................................................................ 17

  C.  Many of GP's claimed costs are unrecoverable. .............................. 18

    1.  All of GP's costs incurred for work upstream of the Plainwell Mill are unrecoverable against Weyerhaeuser. ................................. 19

    2.  Over $10 million of GP's costs are unrecoverable because they are inconsistent with the NCP or were unnecessary. ................. 19

    3.  GP cannot recover costs associated with NRD. ......................... 21

    4.  $7,210,765 of GP's past OU5 costs have been reimbursed by its insurers. ...................................................................................... 21

    5.  Almost $3.4 million of GP's costs are unrecoverable because GP has not properly accounted for them. .......................................... 22

    6.  The Court's ruling on summary judgment. ................................. 23

  D.  GP is not entitled to declaratory judgment on speculative future costs. ............. 23

V.  CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AlliedSignal, Inc. v. Amcast Int'l. Corp.*,
   177 F. Supp. 2d 713 (S.D. Ohio 2001) .......................................................... 13

*Bd. of Cty Comm'rs of Cty. of La Plata, Colo. v. Brown Group Retail, Inc.*,
   768 F. Supp. 2d 1092 (D. Colo. 2011) ........................................................ 18

*Burlington N. & Santa Fe Ry. Co. v. United States*,
   556 U.S. 599 (2009) ............................................................................... 9, 10

*Charter Twp. of Oshtemo v. American Cyanamid Co.*,
   898 F. Supp. 506 (W.D. Mich. 1995) ..................................................... 17, 18

*Chirco v. Crosswinds Communities, Inc.*,
   474 F.3d 227 (6th Cir. 2007) .................................................................... 16

*GenCorp, Inc. v. Olin Corp.*,
   390 F.3d 433 (6th Cir. 2004) ............................................................... 13, 16

*ITT Inds., Inc. v. BorgWarner, Inc.*
   700 F. Supp. 2d 848 (W.D. Mich. 2010) .......................................... passim

*Kalamazoo River Study Grp. v. Menasha Corp.*,
   228 F.3d 648 (6th Cir. 2000) ................................................................. 9, 11

*Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*,
   107 F. Supp. 2d 817 (W.D. Mich. 2000), *aff'd*, 274 F.3d 1043 (6th Cir.
   2001) ......................................................................................................... 15

*Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*,
   355 F.3d 574 (6th Cir. 2004) ............................................................... 10, 15

*KRSG v. Eaton Corp.*,
   258 F. Supp. 2d 736 (W.D. Mich. 2002) ................................................... 15

*Lyondell Chem. Co. v. Occidental Chem. Corp.*,
   608 F.3d 284 (5th Cir. 2010) .................................................................... 18

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
   766 F.3d 212 (2d Cir. 2014) ............................................................... 21, 22

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*,
    714 F.3d 161 (4th Cir. 2013) .................................................................. 10

*Reg'l Airport Auth. of Louisville v. LFG, LLC*
    460 F.3d 697 (6th Cir. 2006) ............................................................. 11, 12

*Southfund Partners III v. Sears, Roebuck & Co.*,
    57 F. Supp. 2d 1369 (N.D. Ga. 1999) ...................................................... 11

*Town of Munster, Ind. v. Sherwin-Williams Co.*,
    Inc., 27 F.3d 1268 (7th Cir. 1994) .......................................................... 16

*U.S. v. Chem-Dyne Corp.*,
    572 F. Supp. 802 (S.D. Ohio 1983) ........................................................ 10

*U.S. v. Hercules, Inc.*,
    247 F.3d 706 (8th Cir. 2001) .................................................................. 10

*U.S. v. Twp. of Brighton*,
    153 F.3d 307 (6th Cir. 1998) .................................................................. 13

*United States v. Atl. Research Corp.*,
    551 U.S. 121, 127 S. Ct. 2331 (2007) ................................................. 9, 12

*United States v. Davis*,
    31 F. Supp. 2d 45 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001) .................................. 17

*United States v. R.W. Meyer, Inc.*,
    932 F.2d 568 (6th Cir. 1991) ............................................................. 10, 13

*Waste Mgmt. of Alameda Cty., Inc. v. East Bay Reg'l Park Dist.*,
    135 F. Supp. 2d 1071 (N.D. Cal. 2001) .................................................. 11

**STATUTES**

42 U.S.C. § 9607(a)(4)(B) ............................................................................. 10

42 U.S.C. § 9607, section 113 ......................................................................... 9

42 U.S.C. § 9613 ............................................................................................. 9

Comprehensive Environmental Response, Comprehensive, and Liability Act,
    42 U.S.C. § 107 ............................................................................. 9, 10, 12

Comprehensive Environmental Response, Comprehensive, and Liability Act,
    42 U.S.C. § 113 ......................................................................... 9, 10, 11, 12

**REGULATIONS**

40 C.F.R. § 300.400(d)(3) ................................................................................. 20

40 C.F.R. § 300.430(2)(b)(5) ............................................................................ 20

40 C.F.R. § 300.430(2)(b)(8) ............................................................................ 20

40 C.F.R. § 300.700(c)(3)(i) ............................................................................. 11

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 886A(2) (1979) ......................................... 10, 14

## I. INTRODUCTION

Weyerhaeuser Company has spent over $21 million cleaning up PCBs, all of which came from NCR, at the Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site (the "Site"). Weyerhaeuser has finished the cleanup of the former 12th Street Landfill, known as operable unit 4 ("OU4"), and is currently cleaning up the former Plainwell Mill (OU7). It has also spent $11,4456,435 of that $21 million cleaning up the Kalamazoo River itself, which (with Portage Creek) is OU5.

Before Georgia-Pacific ("GP") can recover anything from Weyerhaeuser, GP must show that Weyerhaeuser has not yet paid its equitable share of past response costs in OU5. GP's expert, Dr. Wolfe, will testify that the Plainwell Mill, which Weyerhaeuser owned until 1970, discharged only 4% of the PCBs in OU5. Dr. Wolfe will also testify that GP's mills released 24% of the PCBs. Every other party has a similar expert, all of whom will testify that the Plainwell Mill's share is closer to 2%. They also put GP's share much higher, at about 45%. Regardless of whether the Plainwell Mill's share of OU5 costs is 2% or 4%, $11,4456,435 more than covers Weyerhaeuser's equitable share of costs that GP and others, including Weyerhaeuser, have incurred in OU5.

In the unlikely event that the over $11 million Weyerhaeuser has incurred in OU5 response costs does not cover Weyerhaeuser's small share, GP will still not be able to recover from Weyerhaeuser. GP claims that it has spent over $100 million at the site. But it agrees that Weyerhaeuser is only potentially responsible for costs in OU5 downstream of the Plainwell Mill, which GP claims are about $67 million. This Court has already held that over $40 million of that amount is time-barred. Much of GP's work was not consistent with the National Contingency Plan ("NCP") or not necessary; those costs are unrecoverable. GP also seeks to recover in this lawsuit costs associated with natural resource damages ("NRD"), despite this Court's order that GP may not recover them here. GP also failed to properly

account for certain costs, so its claim must be reduced.  The net result, shown in the table below, is that only $4,630,943 of GP's costs are potentially recoverable against Weyerhaeuser.  GP has already recovered more than that from its insurance carriers.

| Type of Cost | Amount |
|---|---|
| Total claimed OU5 Costs | $67,547,751 |
| Time-barred Costs | - $35,625,751 |
| Work upstream of Plainwell Mill | - $7,730,630 |
| Not Consistent with NCP/Not Necessary | - $9,938,987 |
| NRD Costs | - $653,831 |
| Improperly Accounted For | - $3,395,570 |
| **Total Potentially Remaining Against Weyerhaeuser** | $4,630,943 |
| **GP Insurance Recoveries for OU5** | $7,210,765 |

GP is entitled, at most, to recover between 2% and 4% of its recoverable costs from Weyerhaeuser.  That would be between $92,619 and $185,238.  But Weyerhaeuser has already spent over $11 million in OU5, dwarfing what GP claims Weyerhaeuser owes.   And, GP's insurers have already compensated GP for these costs.  To the extent GP is entitled to any recovery at all, it cannot be from Weyerhaeuser.

## II.     FACTS

**A.     All of the PCBs in the Kalamazoo River and Portage Creek are from NCR.**

Paper mills, like other industries in the pre-Clean Water Act era, lawfully discharged untreated wastewater until the mid-1950s, when they installed their first wastewater treatment systems.  These early wastewater treatment systems removed some of the total suspended solids, known as "TSS," from the wastewater.  In an effort to further improve water quality, the mills began installing more robust wastewater treatment systems, or connecting to municipal wastewater treatment systems, in the mid- to late 1960s. Unbeknownst to the paper mills, their wastewater also contained PCBs.  The only documented source of those PCBs is NCR's carbonless copy paper ("CCP").  Although NCR understood, by at least 1969, that recycling CCP would release PCBs, it continued to

manufacture CCP and sell waste CCP to waste paper brokers until 1971. Opinion and Order at 16-17, 19 (Sept. 26, 2103), Dkt. 432. Moreover, NCR actively attempted to conceal the hazards of recycling CCP from paper recyclers, the public, and the government. *Id.* at 20. Without knowing that recycling CCP contained PCBs or that recycling CCP would release PCBs into their finished products or their wastewater, the paper mills that discharged wastewater to the Kalamazoo River inadvertently released almost all of the PCBs now found at the Site.

GP will likely argue that because all of the PCBs at the Site came from NCR, NCR should bear all of the responsibility for cleaning up the Site. Weyerhaeuser agrees, but will focus at trial on how to allocate, among the mill parties (GP, International Paper ("IP"), and Weyerhaeuser), whatever is left after the Court allocates to NCR its fair share.

**B.    The relative amount of PCBs each mill released to the Site can be inferred from records of mill operations.**

Weyerhaeuser is in this case because it owned and operated a small paper mill, known as the Plainwell Mill, in Plainwell, Michigan. The largest of the 12 paper mills at issue in this case, including GP's Kalamazoo Mill and IP's Bryant Mill, are at least 14 miles upstream of the Plainwell Mill.

All 12 paper mills at the Site released some PCBs to the Kalamazoo River. But none of the mills knew, at least until the early 1970s, when NCR could no longer conceal the hazards of its CCP from the government or the public, that recycling CCP could release PCBs. They also did not keep records of the amounts of CCP recycled or PCBs released. Nevertheless, the experts for all the parties agree that the mills did not release PCBs in equal amounts. The experts also agree that some types of mills recycled more CCP, per unit of paper produced, than other mills. For example, they agree that, all other things being equal, fine paper mills that deinked waste paper may have used more CCP than fine paper mills without deinking plants. Boxboard mills typically recycled even less CCP.

The experts agree that some mills released more contaminated wastewater (and therefore more PCBs) than others.  This is partly explained by different production levels at the mills.  All other things being equal, a mill that produces more paper releases more TSS to the river.  GP's Kalamazoo Mill and IP's Bryant Mill, both of which housed one or more large deinking mills, each produced between 200 and 300 tons per day of paper in the late 1950s.  This is more than twice the amount the Plainwell Mill produced.  This partly explains why the Kalamazoo and Bryant Mills released, according to Weyerhaeuser's expert Dr. Neil Ram, 27.4% and 17.7%, respectively, of the TSS discharged to the Site between 1954 and 1980.  In contrast, the Plainwell Mill released less than 6% of the total TSS discharged to the Site.  Because PCBs tend to bind to TSS, the relative amount of TSS released gives an indication of the relative amount of PCBs that each mill released.

Still, TSS release information does not tell the whole story.  The Court has already found that from 1954 to 1970, NCR produced more CCP in the later years than in the early years.  In fact, NCR produced 80% of its CCP after 1963.  Much less CCP was available before January 1963, when the Plainwell Mill stopped deinking waste paper, than after.  Data from disposal areas that the mills used supports that conclusion.  PCB concentrations at the disposal areas that the Kalamazoo Mill and Bryant Mill used (both mills deinked for the entire CCP production period) are much higher, by a factor of 4 to 5 times, than the PCB concentrations measured at the 12th Street Landfill, which the Plainwell Mill used.  Experts for Weyerhaeuser, GP, and NCR all rely on the landfill data to some extent, either to inform semi-quantitative judgments about relative amounts of PCBs each mill discharged or qualitatively to confirm other analyses.  IP's experts, in contrast, will argue that the landfill data should not be used for any purpose.  That is not surprising, because the landfills associated with IP's Bryant Mill have the highest mean and 75th percentile PCB concentrations.

Experts for each party use three general factors—the availability of CCP over time, volume and characteristics of wastewater discharges, and the potential for each mill to have recycled CCP—to draw conclusions about the relative amount of PCBs that one or more of the mills discharged.  For example, Weyerhaeuser's expert, Mr. Steven Werner, considered the ample data regarding the amount of CCP that NCR produced from 1954 to 1971, as well as data regarding the amount PCB concentrations that remained in paper products until 1980, to develop a scaling factor for each year to reflect the volume of CCP potentially available to the mills.  Mr. Werner then used data provided by another Weyerhaeuser expert, Dr. Neil Ram, who conducted a comprehensive review of the available data regarding relative TSS discharges by each of the mills.  Finally, Mr. Werner considered the PCB concentrations at the landfills and disposal areas used by each of the mills to determine the relative potential for a mill to have recycled CCP.  By combining all of these elements, Mr. Werner calculated, to a reasonable degree of scientific certainty, the relative percentage of PCBs that each mill discharged to the Site.

Mr. Werner concluded that the Plainwell Mill released approximately 2.2% of the PCBs to the Site.  The other parties' experts, whose conclusions are summarized in the table below, reached similar conclusions.  GP's expert, Dr. Wolfe, estimated the relative PCB contribution of each mill based on the solids discharged by the mills and PCB data for mill disposal locations.  NCR's expert, Dr. Allen, attempted to quantify, to the pound, PCB discharges from each mill by considering the types of furnish used by each mill, information on mill operations, and TSS discharges.  IP's expert, Dr. Woodard, used similar factors to quantify the amount of PCBs that the Bryant and Monarch Mills discharged.  Dr. Woodard did not quantify discharges from other mills.  Instead, he ranked some of the mills by the amounts discharged and placed others into qualitative categories.  The table below

summarizes the various experts' positions, illustrates the degree of agreement between the experts.

| Mill | Werner (Weyerhaeuser) | Allen (NCR) | Wolfe (GP) | Woodard (IP) |
|---|---|---|---|---|
| **Georgia-Pacific** (Kalamazoo Mill, Board Mill, KVP Mill) | 46.1% | 45% | 24% | Kalamazoo Mill largest contributor, others small to mid-level |
| **International Paper** (Bryant Mill) | 28.7% | 20% | 41% (combined with Monarch) | Third largest contributor |
| **King Mill** | 18.2% | 27% | 23% | Second largest contributor |
| **Monarch Mill** | 4.2% | 1.2% | *See* Bryant Mill | Very small |
| **Weyerhaeuser** (Plainwell Mill) | 2.2% | 1.9% | 4% | Mid-level contributors |
| **Other Mills** | <1% | 4.2% | 7% | Small to mid-level contributors |

With the exception of GP's expert, experts for all of the parties agree that GP's Kalamazoo Mill discharged the most PCBs.  Again with the exception of GP's expert, they all agree that the Bryant Mill was the second or third largest contributor.  For the experts that assigned a percentage rank, they agree that the share of PCBs attributable to the Plainwell Mill is between 1.9% (NCR's expert) and 4% (GP's expert).  The bottom line is that the Plainwell Mill contributed only a very small amount of PCBs to the Site.

Determining the relative amount of PCBs released by each mill is only one step in the analysis, because mill ownership changed over time.  For example, Weyerhaeuser sold the Plainwell Mill to a subsidiary of Philip Morris Inc. in 1970.  The Plainwell Mill then went through several other owners, all of whom were unrelated to Weyerhaeuser.  One of those owners was Simpson Plainwell Paper Company ("Simpson Plainwell").  Regardless of when the Plainwell Mill released PCBs, the experts agree that PCB releases from the Plainwell Mill were very small compared to most of the other mills at the Site.

**C.**     **GP has only paid a fraction of the cost of investigating and remediating sediments in the Kalamazoo River.**

The Environmental Protection Agency ("EPA") listed the 80-mile-long Site on the National Priorities List in 1990.  The Site is divided into OUs, including OU5, which includes 77 miles of the Kalamazoo River and 3 miles of Portage Creek.  The other OUs are associated with specific mills or landfills.  Weyerhaeuser completed, subject to ongoing maintenance obligations, the cleanup of OU4 (the 12th Street Landfill), and is in the process of cleaning up OU7 (the Plainwell Mill).  Weyerhaeuser has spent just over $10 million on those OUs alone.  GP has remediated, or is in the process of remediating, several of the other mill or landfill OUs.  However, because GP has agreed that it is not seeking to recover response costs associated with those mill or landfill OUs from Weyerhaeuser, the remainder of this brief will focus on remediation work in OU5.

GP claims it spent $67,547,751 in OU5, net of settlements it received from Mead, among others.  Weyerhaeuser has also spent millions of dollars in OU5.  Under a 2005 Consent Decree with the United States, Weyerhaeuser paid $6.2 million to EPA's Kalamazoo River Special Account to fund OU5 work.  Weyerhaeuser also performed two emergency cleanup actions in OU5:  one on the banks adjacent to the former Plainwell Mill property and another in the former powerhouse channel adjacent to the 12th Street Landfill.  Weyerhaeuser has also provided ongoing support for the OU5 cleanup, such as conducting sampling in Area 1, conducting sediment coring in Areas 2 and 3, and evaluating potential design options for Area 2.  In total, Weyerhaeuser has spent $11,456,435.68 for these efforts.

In addition to Weyerhaeuser's OU5 costs, two entities that owned the Plainwell Mill after Weyerhaeuser spent millions in OU5.  Weyerhaeuser has no corporate relationship with these subsequent owners, and GP has not provided sufficient information for Weyerhaeuser to determine how much they paid.  However, one of the invoices to the Kalamazoo River Study Group ("KRSG") indicates that as of January 2006, Simpson Plainwell had paid

$7,405,824.80 of the KRSG's OU5 costs. So, entities associated with the Plainwell Mill (including Weyerhaeuser) have collectively paid at least $18,862,259 to remediate OU5.

**D.     GP's costs, recoveries, and remaining work.**

The majority of GP's costs were incurred for work in OU5 upstream of the Plainwell Mill or at GP's former mills and landfills. GP is not seeking those costs from Weyerhaeuser. Nor is it seeking to recover the amounts it received in settlements with some parties (like Mead) or from judgments in the KRSG litigation. However, GP demands that Weyerhaeuser pay a portion of GP's OU5 costs incurred downstream of the Plainwell Mill or that were for OU5 generally. The total cost of that work, net of GP's costs that the Court held on summary judgment were time-barred, is $24,191,370.

GP will assert that it spent the overwhelming majority of the remaining $24,191,370 under the 1990 Administrative Order on Consent ("AOC"). Even if that were accurate, $7,848,100 of these costs were for work that GP performed on its own, outside the 1990 AOC, in an unsuccessful attempt to persuade the Michigan Department of Environmental Quality ("MDEQ") to adopt the remedy that GP preferred. The total cost of this work, which was both unnecessary and inconsistent with the National Contingency Plan ("NCP") (and thus unrecoverable), and other work that was inconsistent with the NCP, was $9,938,987. Also, $3,395,570 should not be recoverable because GP failed to provide sufficient documentation to support the costs or improperly allocated the costs to OU5. Finally, even though the Court ruled that costs associated with NRD should not be included, GP's claim still includes $653,831 of those costs. When all of these costs are deducted from GP's claim against Weyerhaeuser, $4,630,943 remains.

In addition, GP has conceded that it has received $83,683,983 in settlements from its insurance carriers for environmental liabilities to date. Weyerhaeuser's expert, Lynn Mitchell, will testify that $7,210,765 of these recoveries should be allocated to GP's past

OU5 costs; GP's expert, Ross Mishkin, believes that only $6.65 million should be. Regardless, the Court should consider GP's significant insurance recoveries and reduce GP's recovery from the defendants.

### III.    LEGAL FRAMEWORK

**A.    GP's claims and burden of proof against Weyerhaeuser.**

The Court has already held that GP's costs incurred under several orders are time-barred.  Because nothing can cure the statute of limitations problem associated with those orders, any future costs GP incurs under those orders will be time-barred as well.  All that remains in this trial, as to Weyerhaeuser, are GP costs that have been incurred both: (1) downstream of the Plainwell Mill and (2) under the 1990 AOC.

The law is unsettled as to whether a liable party like GP may recover costs incurred under agreements like the 1990 AOC under CERCLA section 107 (cost recovery), 42 U.S.C. § 9607, section 113 (contribution), 42 U.S.C. § 9613, or both.  *United States v. Atl. Research Corp.*, 551 U.S. 121, 139 n.6 127 S. Ct. 2331 (2007) ("We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both").  GP asserted both in its Complaint.  Dkt. 80, ¶ 213.  Liability under section 107 can be, in some cases, joint and several, but liability under section 113 is several only.  *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 613 (2009) (recognizing that liability under section 107 may be joint and several); *see also Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000) (holding that liability under section 113 is several only).

GP's complaint asks for an order directing the defendants "to pay their equitable percentage of the past response costs" and directing the defendants "to pay their equitable percentage of all future response costs."  Dkt. 80, ¶ 213.  It never mentions joint and several

liability. So, regardless of whether GP's claim is under section 107 or section 113, GP has asked for an equitable allocation, which is exactly what the parties have prepared for.

To recover against Weyerhaeuser, GP must prove that it has paid more than its fair share of response costs and that Weyerhaeuser has not. Allocating response costs in CERCLA actions is "'determined from traditional and evolving principles of common law.'" *Burlington N.*, 556 U.S. at 613 (quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 808 (S.D. Ohio 1983)). The Restatement (Second) of Torts is the "'universal starting point'" for applicable common law principles. *Id.* at 614 (quoting *United States v. Hercules, Inc.*, 247 F.3d 706, 717 (8th Cir. 2001)). Under the Restatement:

> The right of contribution exists only in favor of a tortfeasor
> who has discharged the entire claim for the harm by paying
> more than his equitable share of the common liability, and is
> limited to the amount paid by him in excess of his share. No
> tortfeasor can be required to make contribution beyond his own
> equitable share of the liability.

Restatement (Second) of Torts § 886A(2) (1979); *see also United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 577-78 (6th Cir. 1991) (citing Restatement section 886A(2) and holding that parties were entitled only to those costs beyond their equitable shares of liability). As the plaintiff, GP bears the burden of proving each party's equitable share of response costs should be, including its own. *See Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d 574, 590 (6th Cir. 2004) (affirming district court decision that KRSG had burden of proving its equitable right to contribution by a preponderance of the evidence); *see also PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 185 (4th Cir. 2013) (holding that plaintiff "bears the burden of proving each party's equitable share of response costs").

Even if GP proves that Weyerhaeuser has not already paid its fair share of response costs, which GP cannot do, GP must then prove that its costs are recoverable. Private party response costs are recoverable only when they are "necessary costs of response," and if they were incurred "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B);

*Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006).  Whether response costs were both necessary and consistent with the NCP is a prima facie element of GP's claim.  *Reg'l Airport Auth.*, 460 F.3d at 703; *Menasha Corp.*, 228 F.3d at 652-53.  Whether the costs sought by GP were necessary is a threshold issue.  *Reg'l Airport Auth.*, 460 F.3d at 703.

Response costs are necessary only when they are incurred in response to an actual threat to human health or the environment.  *Id*. at 703-04.  Costs that are "scientifically deficient" or "unduly costly" are not necessary, nor are costs incurred "in instituting a needless and expensive monitoring study."  *ITT Inds., Inc. v. BorgWarner, Inc*. 700 F. Supp. 2d 848, 880 (W.D. Mich. 2010) (citations and internal quotation marks omitted).  Costs that are "duplicative of other costs, wasteful, or otherwise unnecessary to address the hazardous substances at issue" are not recoverable.  *Waste Mgmt. of Alameda Cty., Inc. v. East Bay Reg'l Park Dist*., 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001).  Costs incurred in performing activities at a site beyond what was necessary to address the threat are not necessary.  *Southfund Partners III v. Sears, Roebuck & Co*., 57 F. Supp. 2d 1369 (N.D. Ga. 1999).

GP must also prove that its costs were consistent with the NCP.  Actions are considered "consistent" with the NCP "if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup."  40 C.F.R. § 300.700(c)(3)(i); *see also ITT Indus.*, 700 F. Supp. 2d at 880.  GP must demonstrate that the actions for which it incurred costs are in substantial compliance with all of the requirements in paragraphs (c)(5) and (6) of the NCP, and that the actions resulted in a CERCLA-quality cleanup.

**B.    Claims by the Defendants.**

NCR has not asserted any claims here, but Weyerhaeuser and IP have.  Weyerhaeuser asserted a CERCLA section 113 counterclaim against GP and cross-claims against IP and

-11-

NCR. Weyerhaeuser's claims address the unlikely possibility of the Court's granting GP more than it has asked for and holding Weyerhaeuser jointly and severally liable to GP. In that unlikely event, Weyerhaeuser's section 113 claims would provide a procedural mechanism for the Court to conduct an equitable allocation. *See Atl. Research*, 551 U.S. at 140 (stating that a defendant's section 113(f) counterclaim "necessitate[s] the equitable apportionment of costs among the liable parties"); *see also ITT Indus.*, 700 F. Supp. 2d at 888 (citing *Atl. Research* and finding that, because of the section 113(f) counterclaim, the case was "effectively a contribution suit").

IP has also asserted section 113 claims against all of the parties, presumably for the same reason as Weyerhaeuser. In addition, IP has asserted section 107 claims against all of the parties. However, a prerequisite to a successful section 107(a) claim is the incurrence of response costs. *See ITT Indus.*, 700 F. Supp. 2d at 860 (stating that a prima facie case for cost recovery requires the plaintiff to have incurred "necessary costs of response" (quoting *Reg'l Airport Auth.*, 460 F.3d at 703)). Because IP has not incurred any response costs at the Site, its section 107 claims must fail.

## IV. ARGUMENT

GP cannot recover any of its past costs against Weyerhaeuser unless it can meet two prerequisites. First, GP must show that Weyerhaeuser has paid less than its fair share of OU5 response costs. Second, GP must prove that its costs are recoverable. Only if GP meets those prerequisites will the Court need to allocate so-called "orphan" shares or grapple with GP's request for declaratory relief. The sections below explain how these issues should be resolved.

**A.    Weyerhaeuser has already paid more than its equitable share of response costs for OU5.**

The parties will present evidence about what their respective equitable shares of response costs should be. Courts allocate response costs "using such equitable factors as the

Court determines are appropriate." *ITT Indus.*, 700 F. Supp. 2d at 890.  Courts often look to one of the so-called "Gore Factors," the amount of hazardous substances released by each party, as a starting point.  *R.W. Meyer*, 932 F.2d at 576 (recognizing courts' frequent use of "Gore Factors," including consideration of the amount of hazardous waste involved); *AlliedSignal, Inc. v. Amcast Int'l. Corp.*, 177 F. Supp. 2d 713, 751 (S.D. Ohio 2001) (allocating response costs on the basis of the parties' relative contributions of contaminants). The other Gore Factors include: (1) the ability of the parties to demonstrate that their contributions to the contamination can be distinguished; (2) the degree of toxicity of the waste; (3) the degree of involvement by the parties in the contamination of concern; (4) the degree of care exercised by the parties with respect to the hazardous waste; and (5) the degree of cooperation by the parties with the government.  *ITT Indus.*, 700 F. Supp. 2d at 890 (citing *United States v. Twp. of Brighton*, 153 F.3d 307, 318-19 (6th Cir. 1998)).  Of course, courts can consider other equitable factors as well, including traditional equitable doctrines like laches.  *See, e.g., GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 450 (6th Cir. 2004) (upholding district court's use of laches as equitable factor in CERCLA allocation).

Some of the Gore Factors are not relevant to an allocation among the mill parties here.  For example, all of the mills released PCBs, so no one party will be able to argue that its PCB releases were less toxic than other parties' releases.  Also, none of the mill parties knew that CCP contained PCBs, so none of them had any reason or incentive to exercise any particular duty of care with respect to PCBs.

If the parties' witness lists and expert reports are any guide, the bulk of the trial, at least with respect to the mill parties, will concern the estimated amount of PCBs each mill released.  All of the parties' experts agree that the mills did not all discharge the same amount of PCBs.  They also agree that the Plainwell Mill discharged far less, on a relative basis, than mills like GP's Kalamazoo Mill and IP's Bryant Mill.  *See supra* Section II.B.

But even if GP convinces the Court that its expert is right and that the Plainwell Mill's share is 4%, GP still will not be able to recover against Weyerhaeuser.

As noted above, Weyerhaeuser has spent over $11,456,435.68 addressing PCB contamination in OU5.  Other entities that owned or operated the Plainwell Mill (but, like Weyerhaeuser, no other mills) have paid at least another $7,405,824.  A bedrock principal of contribution claims is that a contribution defendant like Weyerhaeuser may not be "required to make contribution beyond his own equitable share of the liability."  Restatement (Second) of Torts § 886A(2) (1979).

Although it is unclear how much has been spent on OU5 in total, it is straightforward to calculate how big that total would have to be for payments from Plainwell Mill entities to be less than 4% of that total.  The total amount spent by all entities in OU5 would have to exceed $286 million (4% of $286 million is $11.44 million) for Weyerhaeuser's expenditures to have been insufficient to cover the 4% share that GP claims Weyerhaeuser should be responsible for.  There is no evidence that the OU5 total has been anywhere near that high.  If the Court determines that Weyerhaeuser's share is approximately 2% (as NCR's and Weyerhaeuser's experts will testify) then the total amount spent on OU5 would have to be over $520 million.  The contributions of Plainwell Mill parties to total OU5 costs are even more outsized, when compared to the Plainwell Mill's estimated share of PCB releases to OU5, when the additional $7,405,824 that Simpson Plainwell spent on KRSG work is considered.

The discussion above assumes that the Court will allocate response costs by the amount of contamination released by each party, but other factors are also relevant to that equitable allocation.  Notably, only two parties in this litigation, Weyerhaeuser and GP, have done any work at the Site.  IP and NCR have done nothing.  Cooperation with the government is one of the Gore Factors and is a well-established equitable factor under

CERCLA.  *See, e.g.*, *Kalamazoo River Study Grp. v. Eaton Corp.*, 258 F. Supp. 2d 736, 753 (W.D. Mich. 2002), *aff'd sub nom*, *Kalamazoo River Study Grp. v. Rockwell Int'l. Corp.* 355 F.3d 574 (6th Cir. 2004).  Once a party has been named a potentially responsible party ("PRP") by EPA, the extent to which that party cooperated with the government in addressing the risks posed by the Site is a factor courts consider during allocation.  *See, e.g., Eaton*, 258 F. Supp. 2d at 754; *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 107 F. Supp. 2d 817, 839 (W.D. Mich. 2000), *aff'd*, 274 F.3d 1043 (6th Cir. 2001).

Since EPA identified Weyerhaeuser as a PRP in 2002, Weyerhaeuser has, among other things:

- implemented the final, EPA-approved remedy at OU4 (the 12th Street Landfill), at a cost of about $6,513,931;

- developed the proposed remedy for OU7 (the former Plainwell Mill) and redeveloped portions of the Plainwell Mill property (the City of Plainwell's City Hall is now in the former mill building), at a cost of $3,550,431; and

- completed, with EPA's direction and oversight, and pursuant to the 2005 Consent Decree, an emergency action to remove PCB-contaminated materials on the river banks adjacent to the former Plainwell Mill site, and an emergency action to remove contaminated materials from the former powerhouse channel in the river near the 12th Street Landfill.

In total, Weyerhaeuser has spent $21,520,797 in OU5 (the river), OU4 (the 12th Street Landfill), and OU7 (the former Plainwell Mill) to address Site-wide hazards.  When the Court adjusts the parties' shares because of cooperation with the government, that adjustment should reflect that Weyerhaeuser, unlike NCR and IP, has cooperated with the government.

The Court should also adjust Weyerhaeuser's share downward because GP has waited so long to bring its claim.  Courts may consider equitable doctrines like laches in performing allocations among PRPs.  *See, e.g.*, *GenCorp*, 390 F.3d at 450 (upholding district court's consideration of laches as equitable factor in CERCLA allocation); *see also Town of Munster, Ind. v. Sherwin-Williams Co*., Inc., 27 F.3d 1268, 1270-71 (7th Cir. 1994).  In the Sixth Circuit, "laches is understood to be 'a negligent and unintentional failure to protect one's rights' and '[a] party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.'"  *Chirco v. Crosswinds Communities, Inc*., 474 F.3d 227, 231 (6th Cir. 2007) (citations omitted).

GP should have known by at least September 2002, when EPA identified Weyerhaeuser as a PRP, that Weyerhaeuser was potentially responsible for releases at the Site.  GP has offered no explanation for why it waited until 2011 to sue Weyerhaeuser, even though GP (via the KRSG) sued other paper mill owners or operators in the mid-1990s.  GP's negligent delay has resulted in prejudice to Weyerhaeuser's ability to defend against GP's claims.  Specifically, in 2011 two key witnesses, both former Plainwell Mill employees, passed away: John Kauffman and Carl Gren.  Mr. Gren was deposed in the KRSG litigation (Weyerhaeuser was not a party in that litigation) and testified that CCP was sorted from the Plainwell Mill's furnish before deinking.  Mr. Kauffman corroborated in an affidavit that the Plainwell Mill sorted CCP from its furnish, and he further stated that "essentially all" of the mill's furnish was magazines, which would not have contained CCP.   Their prior statements are hearsay.  But they show that testimony from Mr. Kauffman and Mr. Gren, if it could have been presented at trial, would have been material to evaluating the amount of PCBs the Plainwell Mill released, a key issue in this case.

To the extent there is any question about the Plainwell Mill's share of PCB releases, it should be resolved in favor of Weyerhaeuser because GP waited so long to file its claim.

**B.**     **Weyerhaeuser should not be held responsible for so-called "orphan" shares.**

Although there are 12 paper mills that discharged to the Site, GP did not sue former owners or operators of all of them.  There are two categories of missing mill parties: (1) true orphan mills, formerly owned or operated by parties that are now defunct or bankrupt; and (2) mills owned or operated by parties that are financially solvent, but that GP simply chose not to sue. GP bears the burden of proving whether there are, in fact, true orphan shares.  *See ITT Indus.*, 700 F. Supp. 2d at 889-90 (placing burden of proving that share was an orphan on plaintiff).

An orphan share "is that portion of response cost liability for which no known and solvent party amenable to suit bears responsibility."  *United States v. Davis*, 31 F. Supp. 2d 45, 68 (D.R.I. 1998) (emphasis omitted), *aff'd*, 261 F.3d 1 (1st Cir. 2001).  Because the Court has already held that NCR arranged for disposal of its CCP at the Site via the mills, NCR is a solvent party amenable to suit to answer for  PCBs from all of the mills.  Therefore, even if one or more of the mills are unrepresented in this litigation by former owners or operators, the shares associated with those mills should go to NCR.

Also, shares belonging to financially solvent entities that are not parties in a case are not true orphan shares subject to allocation.  *See Charter Twp. of Oshtemo v. Am. Cyanamid Co.*, 898 F. Supp. 506, 508 (W.D. Mich. 1995) ("[I]t is clear that shares attributable to solvent PRPs that are not parties in this case cannot be considered 'orphan shares'").  Instead, the plaintiff in a contribution action bears the shares of the parties it chooses not to sue.  *See ITT Indus.*, 700 F. Supp. 2d at 889-90 (finding that plaintiff bore shares of parties with whom it had settled and not sued because plaintiff failed to prove that shares were orphans). Because MeadWestvaco Corporation (now WestRock after MeadWestvaco's recent merger with Rock-Tenn) is solvent, but not a party to this litigation, the Mead Mill falls into this category and cannot be considered an orphan.  Instead, GP must bear the Mead Mill share. The same may be true of other mills.  It is GP's job as plaintiff to identify and pursue all

-17-

solvent parties. To the extent it failed to do so, GP bears the burden of proving that an omitted mill is an orphan.

Even where GP does identify true orphans, the Court has discretion on how to allocate the orphan shares. Courts sometimes allocate true orphan shares among all of the parties. *See ITT Indus.*, 700 F. Supp. 2d at 889 ("[o]rphan shares are 'apportioned among all of the solvent PRPs that are parties in this litigation'" (quoting *Charter Twp.*, 898 F. Supp. at 509)). However, the Court is not confined to allocating orphan shares pro rata. *See, e.g.*, *Bd. of Cty Comm'rs of Cty. of La Plata, Colo. v. Brown Group Retail, Inc.*, 768 F. Supp. 2d 1092, 1119-20 (D. Colo. 2011) (finding that landlord defendant was responsible for 100% of the tenant's orphan share); *see also Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 303 (5th Cir. 2010) (stating that it was within the court's discretion "whether to allocate [the] orphan share to all available responsible parties").

Assuming that there are one or more orphans as to GP's past costs, that orphan share should not go to Weyerhaeuser. GP will present evidence that NCR is responsible for all the response costs at the Site. Barring that, shares from mills connected to one of the parties in this case should go to that party. This would mean that IP would bear the entire Bryant Mill share, and the share of any other mill that IP has owned or operated. It also means that Weyerhaeuser would bear (with due consideration of response costs already paid by other Plainwell Mill owners) the entire Plainwell Mill share. For mills with no connection to GP, IP, or Weyerhaeuser, NCR should bear any orphan share. NCR's connection to those orphan mills (via its PCBs) is closer than connections between the other mill parties and those orphan mills.

## C.      Many of GP's claimed costs are unrecoverable.

In the unlikely event that GP could establish the share of the total OU5 costs that it has paid, that the amount GP paid exceeded its fair share, and that Weyerhaeuser has not yet

paid its fair share, there would still be significant barriers to GP recovering anything from Weyerhaeuser.  Many of GP's claimed costs are unrecoverable.  A significant amount of those costs were incurred for activities upstream of the Plainwell Mill.  Much of the money was spent on activities that were either not consistent with the NCP or not necessary.  Some of the money was spent on activities regarding GP's liability for NRD.  And the Court has already held that a large portion of GP's claim is barred by the statute of limitations.

> **1.  All of GP's costs incurred for work upstream of the Plainwell Mill are unrecoverable against Weyerhaeuser.**

GP has conceded that Weyerhaeuser is not liable to GP for any past or future costs related to portions of OU5 that are upriver of the Plainwell Mill.  This is not surprising, because not one of the experts argues that PCBs from the Plainwell Mill travelled upstream.  Therefore, Weyerhaeuser is not liable for any costs associated with activities upstream of the Plainwell Mill.

> **2.  Over $10 million of GP's costs are unrecoverable because they are inconsistent with the NCP or were unnecessary.**

GP claims that it has spent $21,042,119.71 in OU5 under the 1990 AOC.  Weyerhaeuser's expert, Dr. Michael Johns, has identified $9,938,987 spent by GP on activities that were not consistent with the NCP.  For example, GP spent $7,848,100 performing a "supplemental investigation" that the MDEQ neither authorized nor wanted done under that order.  This work was designed to bolster GP's position regarding the remedy it wanted for OU5, not to comply with the 1990 AOC.  MDEQ did not review the sampling plan for this work, nor did it review the data quality assurance plan for this work, both of which are requirements under the 1990 AOC and the NCP.  In fact, MDEQ did not even consider the data generated during these activities in the remedial investigation/feasibility study ("RI/FS") process.  GP will not be able to meet its burden that this work complied with the NCP for several reasons, including:

- MDEQ, as the lead agency, did not identify the type, quantity, and quality of the independent data to be collected by GP during the RI/FS process, as required by 40 C.F.R. § 300.430(2)(b)(5);

- MDEQ, as the lead agency, did not review and approve the sampling and analysis plans for the data, as required by 40 C.F.R. § 300.430(2)(b)(8); and

- MDEQ was the lead agency for the Baseline Risk Assessment, and did not designate GP or any other KRSG member to be the lead on the risk assessment, as required under 40 C.F.R. § 300.400(d)(3).

GP also spent $1,108,271 on a draft Remedial Investigation/Feasibility that MDEQ rejected, and $982,616 on activities that are not supported by sufficient documentation. Those activities are also not consistent with the NCP.

In addition to being not consistent with the NCP, GP's unilateral work did not comply with elements of the 1990 AOC. For example, Section 30 of the 1990 AOC requires GP to provide MDEQ with the opportunity to review and approve of RI/FS work products and quality assurance project plans, which GP did not do. Appendix 1 of the 1990 AOC requires GP to submit plans for the collection, handling, custody, transport and analysis of samples, and data collected, which GP did not do. Section 16 of the 1990 AOC requires GP to allow MDEQ to observe all work, which GP did not do. These failures were not mere failures to observe procedural niceties. They were a calculated effort by GP to generate data for its own purposes (to support its position in a dispute with MDEQ), not part of GP's compliance with the 1990 AOC.

In addition to being inconsistent with the NCP and not authorized by the 1990 AOC, these costs were also not necessary costs of response. The extra work that GP conducted outside of the 1990 AOC duplicated work that MDEQ had already performed. One of GP's expert witnesses, Dr. Mark Brown, has conceded that GP and the other KRSG members did

-20-

the work to undermine MDEQ's risk assessment. MDEQ did not ask for this work, did not oversee or direct the work, and did not think that the work was necessary. Moreover, the data collected had little or no influence on later remedial decision-making. As Dr. Johns will explain, EPA flagged the data as "category four," which is the least reliable of four categories of data.

GP was of course entitled to do whatever work it thought would help it in its dispute with MDEQ. But because GP collected the data for its own purposes, and because EPA considered it unreliable, GP will not be able to show that the amount paid for the work was a necessary cost of response recoverable against Weyerhaeuser.

### 3. GP cannot recover costs associated with NRD.

This Court has already held that GP may not recover costs associated with NRD in this case. Amended Order Revising Case Schedule and Addressing Motions, Dkt. No. 542. Nevertheless, GP has included $653,831 in NRD costs in its cost claim. NRD issues are not properly before the Court, and GP is not entitled to recover them.

### 4. $7,210,765 of GP's past OU5 costs have been reimbursed by its insurers.

Under CERCLA, the collateral source rule, which generally allows for damages to be recovered by a party even where that party has been wholly or partially indemnified by insurance, does not apply. *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 237-38 (2d Cir. 2014). And, even where there is no risk of double recovery from a cost recovery plaintiff obtaining funds from other responsible parties and its insurance carriers, a court in a CERCLA allocation proceeding may equitably reduce a party's recovery "to account for … insurance proceeds." *Id.* at 238. District courts equitably allocating CERCLA response costs have "broad discretion to balance the equities in the interests of justice," including where "[e]quity and common sense . . . dictate that [p]laintiffs cannot recover the remediation costs paid for by their insurance policies." *Id.* (internal citations and internal

quotation marks omitted).  Where insurance recoveries may be allocated to account for response costs incurred for a particular site, those recoveries reduce the amount of costs a CERCLA plaintiff may otherwise recover, because such a plaintiff "cannot recover the remediation costs paid for by their insurance policies."  *Id*. (internal citations and internal quotation marks omitted).

GP has obtained over $83 million in insurance recoveries from its carriers for environmental claims.  GP's expert, Mr. Mishkin, and Weyerhaeuser's expert, Ms. Mitchell, agree that at least some of this $83 million is allocable to the Site, and specifically to OU5. They disagree, however, on exactly how much.  Ms. Mitchell will testify that $7,210,765 should be allocated to GP's past OU5 costs, and should offset the same amount of past costs claimed by GP for OU5.  Ms. Mitchell will also explain that a total of $1,962,688 of GP's insurance recoveries should be allocated to GP's future costs in OU5.

### 5.    Almost $3.4 million of GP's costs are unrecoverable because GP has not properly accounted for them.

GP has not provided adequate documentation to support its allocation of costs to categories of its claims that are recoverable against Weyerhaeuser.  A paralegal from GP's outside law firm divided GP's 1990 AOC costs into geographic "buckets."  Some of these buckets, including OU5-East, are upstream of Weyerhaeuser, and Weyerhaeuser should bear no liability for them.  Other buckets are downstream of Weyerhaeuser, including OU5-West. There is also an "OU5-General" bucket, which is a catch all for costs that GP claims cannot be divided by geography.  In many instances, GP did not provide sufficient documentation to support its allocation of costs to the distinct cost buckets.  For example, GP placed its entire share of the State of Michigan's oversight costs for 2002-2003 (totaling $641,131.99) in the OU5-General category, without any documentation to show that regulators were overseeing activities solely in OU5 and not also overseeing activities in other areas of the Site (like OU2 or OU3).  In other instances, GP's vendors did not provide sufficient documentation on their

invoices to determine what work was done, let alone to which bucket it should be allocated. As Weyerhaeuser's expert, Mr. Ray Dovell, will testify, there are numerous instances of this, which are summarized in the table below.

| Invoice Source | Amount | Description of Issue |
|---|---|---|
| MDNR/MDEQ | $3,334,436 | Insufficient documentation to support allocation to OU5 General |
| Various vendors | $61,134.37 | Insufficient documentation to support allocation to geographic areas |
| **TOTAL** | **$3,395,570.37** | |

### 6. The Court's ruling on summary judgment.

The Court ruled on summary judgment that all of GP's work under the 2007 ASAOC for the Plainwell Impoundment and GP's past and future work under the 2007 SRI/FS ASAOC are barred by the statute of limitations. Opinion and Order, Dkt. No. 787 at 16-18. GP claims $21.527 million under the SRI/FS ASAOC, and $17.826 million under the 2007 ASAOC for the Plainwell Impoundment, for a total of $39.62 million.[1] In its summary judgment briefing, GP also conceded, presumably also on statute of limitations grounds, that it is not seeking from Weyerhaeuser costs incurred under a 2008 AOC, totaling $1,845,000. So, a total of $41.198 million of GP's claim is time-barred. According to GP's accounting, it allocated $31.928 million of that total to downstream and general cost buckets that it believes Weyerhaeuser should help pay for. It allocated the rest to areas upstream of the Plainwell Mill.

### D. GP is not entitled to declaratory judgment on speculative future costs.

GP alleges that it will incur additional costs in the future, and that it is entitled to declaratory judgment against Weyerhaeuser. GP has performed or is performing response actions under three types of orders: (1) orders for work upstream of Weyerhaeuser; (2)

---

[1] GP updated its cost claim after the Court's ruling on summary judgment; the amounts listed here are the amounts that GP now claims.

orders under which GP or others have already completed all work; and (3) the 2007 SRI/FS ASAOC.  GP concedes that Weyerhaeuser bears no responsibility for the work upstream of Weyerhaeuser.  Orders under which GP has completed work should be addressed by the Court's ruling on GP's past costs.  The Court has already held that the statute of limitations bars GP's claims based on the 2007 SRI/FS ASAOC.

There is currently no order that will require GP to incur any costs that are recoverable against Weyerhaeuser.  Those future orders, if they are executed, may be against any one or any combination of the parties, and they may be for work in any part of the Site.  Without more information about what future orders may come, who they may be against, or what they will require, it would be inappropriate and speculative for the Court to determine how the costs of implementing those orders should be allocated.

## V.     CONCLUSION

Weyerhaeuser has spent approximately $21.5 million at the Site thus far, including $11,456,435.68 just in OU5.  Under any scenario that GP can prove, and even setting aside the millions that other Plainwell Mill entities paid into OU5, Weyerhaeuser has already overpaid for contamination from the Plainwell Mill.  To the extent the Court disagrees, much of GP's claimed past costs are unrecoverable because they were spent on activities that were inconsistent with the NCP or unnecessary, or were not properly accounted for.  Therefore, Weyerhaeuser respectfully requests that the Court find that Weyerhaeuser is not responsible for any of GP's past costs.

DATED: August 31, 2015

**WEYERHAEUSER COMPANY**


By:  /s/ Mark W. Schneider

**PERKINS COIE LLP**
Mark W. Schneider, WA Bar No. 14105
MWSchneider@perkinscoie.com
J. Christopher Baird, WA Bar No. 38944
JCBaird@perkinscoie.com
Michael L. Dunning, WA Bar No. 29452
MDunning@perkinscoie.com
Margaret C. Hupp, WA Bar No. 43295
MHupp@perkinscoie.com
Aubri N. Margason, WA Bar No. 44220
AMargason@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

**Warner Norcross & Judd LLP**
Douglas A. Dozeman, MI Bar No. P35781
ddozeman@wnj.com
Scott M. Watson, MI Bar No. P70185
swatson@wnj.com
900 Fifth Third Center
111 Lyon Street N.W.
Grand Rapids, MI 49503-2487
Telephone:  616.752.2000
Facsimile:  616.752.2500

Attorneys for Defendant
Weyerhaeuser Company

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2015, I electronically filed the foregoing using the ECF system, which will send notification of such filing by operation of the Court's electronic systems. Parties may access this filing via the Court's electronic system.

By: ___/s/ Mark W. Schneider_____