### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS, LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC, LLC, | Civil Action No. 1:11-cv-483 |
| Plaintiffs, | Judge Robert J. Jonker |
| v. | |
| NCR CORPORATION, INTERNATIONAL PAPER COMPANY, and WEYERHAEUSER COMPANY, | |
| Defendants. | |

### DEFENDANT WEYERHAEUSER COMPANY'S
### PROPOSED PHASE II FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.      **BACKGROUND**

   A.      The Kalamazoo River and Portage Creek are contaminated with PCBs.

      1.      The State of Michigan first became aware of the presence of PCBs in the Kalamazoo River in the early 1970s.

      2.      The Environmental Protection Agency ("EPA") listed the Allied Paper Inc./Portage Creek/Kalamazoo River Site (the "Site") on the National Priorities List ("NPL") in 1990.

      3.      Most of the PCBs at the Site came from paper mills that recycled carbonless copy paper ("CCP") made by NCR.

   B.      NCR produced PCB-laden CCP, which was ultimately recycled.

      4.      Available records indicate that, on average, CCP contained approximately 3.4% Aroclor 1242 by weight.

      5.      NCR started producing CCP in 1954.

      6.      Production of CCP increased slowly at first, then more rapidly each year until production stopped in 1971.

    7.       The amount of CCP that NCR produced after 1963 accounts for over 80% of the total amount of CCP produced.

    8.       From 1954 to 1971, the overall availability of CCP for recycling by paper mills would have been proportional to the amount of CCP being produced at any given time.

C.    NCR shipped its PCB-containing CCP emulsion to four different entities: Appleton Coated Paper Company ("ACPC"), Combined Paper Mills ("CPM"), Mead Corporation ("Mead"), and Nekoosa Papers, Inc. ("Nekoosa") (collectively, the "Coating Companies").

    9.       Records document that CCP broke was shipped to "Allied Paper Company, Kalamazoo, Michigan."

    10.     Mead sold CCP broke directly to Georgia-Pacific's Kalamazoo Mill.

    11.     In addition to these direct shipments of CCP, ACPC, CPM, Mead, and Nekoosa all sold CCP to third-party brokers, some of which sold waste paper to recycling mills at the Site.

    12.     Third-party paper brokers also sold waste paper to mills at the Site; that paper was often sorted into grades, including ledger and mixed office waste.

    13.     CCP was sometimes included in the ledger and mixed office waste grades supplied by third-party brokers to recycling mills at the Site.

D.    Converting operations, including NCR's, generated CCP broke and trim that was sold to the Kalamazoo-area recycling mills for use as furnish.

    14.     The process of converting sheets or rolls into forms generated waste CCP, known as "trim."

    15.     Converting plants, whether owned by NCR under its "Systemedia" name or by third-parties, sold trim for recycling; mills at the Site recycled some of that trim.

**II.    Paper mills along the Kalamazoo River and Portage Creek inadvertently released PCBs by recycling CCP.**

A.    The Bryant Mill (International Paper)

16. The Bryant Mill was located along Portage Creek in Kalamazoo, Michigan, three miles upstream of the confluence of Portage Creek and the Kalamazoo River. It opened in 1895.

17. The Bryant Mill recycled waste paper, including CCP, to produce fine paper products.

18. The Bryant Mill released PCBs to the Site.

19. The Bryant Mill deinked waste paper from 1956 to 1971.

20. The Bryant Mill discharged wastewater from its papermaking process directly to Portage Creek until it installed a primary treatment system (a 100-foot diameter clarifier) in 1954.

21. Even after it installed the primary treatment system, the Bryant Mill continued to discharge untreated wastewater to the Bryant Mill Pond and Portage Creek on a regular basis.

22. In 1969, the Bryant Mill connected its clarifier to the City of Kalamazoo Publically Owned Treatment Works ("POTW").

23. From 1954 to 1977, there were at least 88 documented bypasses of the primary treatment system at the Bryant Mill.

24. The Bryant Mill Pond was created in 1895 when a dam was built on Portage Creek at Alcott Street in Kalamazoo, Michigan.

25. From 1895 until it was drained in the early 1970s, the Bryant Mill Pond accumulated material from operations at the Bryant and Monarch Mills, as well as from natural sedimentation in Portage Creek.

26. Sediments contained within the original footprint of the Bryant Mill Pond were contaminated with PCBs.

27. Available sampling data for the Bryant Mill Pond shows that the 75th percentile concentration of PCBs in the Bryant Mill Pond is approximately 41.1 mg/kg PCBs.

28. Available sampling data for the Portage Creek Floodplain shows that the 75th percentile concentration of PCBs in the Portage Creek Floodplain is approximately 110.0 mg/kg PCBs.

29. The Bryant Mill pond trapped only a small fraction of the PCB-contaminated TSS that the Bryant and Monarch Mills released.

30. Wastewater treatment sludge and other waste from the Bryant Mill went to the Bryant Historic Residuals Dewatering Lagoon, the Allied Former Residuals Dewatering Lagoon, the Western Disposal Area, and the Allied Former Type III Landfill.

31. The 75th percentile concentration of PCBs in the Bryant Historic Residuals Dewatering Lagoon is approximately 57.5 mg/kg PCBs.

32. The 75th percentile concentration of PCBs in the Allied Former Residuals Dewatering Lagoon is approximately 1.7 mg/kg PCBs.

33. The 75th percentile concentration of PCBs in the Western Disposal Area is approximately 60.0 mg/kg PCBs.

34. The 75th percentile concentration of PCBs in the Allied Former Type III Landfill is approximately 2.4 mg/kg PCBs.

B. The Monarch Mill (Allied)

35. The Monarch Mill was located on Portage Creek, just upstream of the Bryant Mill. It opened in 1875.

36. The Monarch Mill recycled waste paper, including CCP, to produce fine paper products.

37. The Monarch Mill released PCBs to the Site.

38. The Monarch Mill deinked waste paper from approximately 1946 to 1957.

39. The Monarch Mill discharged wastewater from its papermaking process directly to the Bryant Mill Pond until it installed a primary treatment system (a 90-foot diameter clarifier) in 1953.

40. Even after it installed the primary treatment system, the Monarch Mill continued to discharge untreated wastewater to the Bryant Mill Pond on a regular basis.

41.     The Monarch Mill never installed a secondary treatment system or connected to a POTW.

42.     From 1953 through 1982, there were at least 14 documented bypasses of the primary treatment system at the Monarch Mill.

43.     From 1969 to 1980, the primary treatment system at the Monarch mill also treated whitewater from Mills C and D of the nearby Bryant Mill.

44.     Wastewater treatment sludge and other waste from the Monarch Mill went to the Monarch Historic Residuals Dewatering Lagoon, the Allied Former Residuals Dewatering Lagoon, the Western Disposal Area, and the Allied Former Type III Landfill.

45.     The 75th percentile concentration of PCBs in the Monarch Historic Residuals Dewatering Lagoon is approximately 28.6 mg/kg PCBs.

46.     The 75th percentile concentration of PCBs in the Allied Former Residuals Dewatering Lagoon is approximately 1.7 mg/kg PCBs.

47.     The 75th percentile concentration of PCBs in the Western Disposal Area is approximately 60.0 mg/kg PCBs.

48.     The 75th percentile concentration of PCBs in the Allied Former Type III Landfill is approximately 2.4 mg/kg PCBs.

C.     The King Mill (Allied)

49.     The King Mill was located at 1608 Lake Street in Kalamazoo, Michigan.  The King Mill opened in 1901, and shut down in 1970 or 1971.

50.     The King Mill recycled waste paper, including CCP, to produce fine paper products.

51.     The King Mill released PCBs to the Site.

52.     The King Mill deinked waste paper from at least 1950 until June 4, 1965.

53.     The King Mill discharged the wastewater from its papermaking process directly to the Kalamazoo River via the City of

Kalamazoo King Street Storm Sewer until August 1955, when it installed a primary treatment system (a 110-foot diameter clarifier).

54. Between 1954 and 1970, there were at least 101 documented bypasses of the King Mill's wastewater effluent directly to the Kalamazoo River.

55. The King Mill never had any secondary wastewater treatment on-site, and nor did it send wastewater to a POTW.

56. Sludge from the primary clarifier was disposed of either at the A-Site landfill or at one of the Mill's two onsite sludge lagoons.

57. The 75th percentile concentration of PCBs in the A-Site Landfill is approximately 20.7 mg/kg PCBs.

D.     The Rex Mill (Allied)

58. The Rex Mill was located on King Highway in Kalamazoo, Michigan.  It opened in 1915.

59. The Rex Mill recycled waste paper, including CCP, to produce fine paper products.

60. The Rex Mill released PCBs to the Site.

61. The Rex Mill deinked waste paper until 1968.

62. The Rex Mill discharged wastewater from its papermaking process directly to the Kalamazoo River until it installed a primary treatment system (a 50-foot diameter tank) in 1954.

63. Starting in 1967, the Rex Mill sent the effluent from its primary treatment system to the Kalamazoo POTW.

64. Wastewater treatment sludge and other waste from the Rex Mill went to an on-site sludge disposal area from approximately 1954 to 1968.

65. The 75th percentile concentration of PCBs in the Rex Mill Sludge Disposal Area is approximately 1.2 mg/kg PCBs.

E.     The Hawthorne Mill (Georgia-Pacific)

66. The Hawthorne Mill was located adjacent to the Kalamazoo River, directly east of the Kalamazoo Mill 3.

67. The Hawthorne Mill recycled waste paper, including CCP, to produce fine paper products.

68. The Hawthorne Mill released PCBs to the Site.

69. The Hawthorne Mill may have included a deink plant.

70. The Hawthorne Mill discharged waste from its papermaking process directly to the Kalamazoo River until it installed a primary treatment system (a 50-foot diameter clarifier) in 1954.

71. Even after the Hawthorne Mill installed primary treatment, sludge was discharged to an undiked area and allowed to flow along a natural drainage channel into the Kalamazoo River.

72. Starting in 1967, effluent from the Hawthorne Mill's primary clarifier was sent to the City of Kalamazoo POTW.

73. Wastewater treatment sludge and other waste from the Hawthorne Mill went to on-site sludge beds that were undyked until at least 1955.

74. By 1957, sludge from the Hawthorne Mill was pumped to low-lying ground between a channel that previously ran to the Kalamazoo River.  This area was known as the Oxbow Area.

75. Georgia-Pacific detected PCBs in the Oxbow Area of the Hawthorne Mill property in the 2000s.

F. The Kalamazoo Mill (Georgia-Pacific)

76. The Kalamazoo Mill is located at 2425 King Highway in Kalamazoo, Michigan, and is adjacent to the Kalamazoo River.

77. The Kalamazoo Mill is a complex of five mills that recycled waste paper, including CCP, to produce fine paper products.

78. The papermaking recipe used at the Kalamazoo Mill called for one bale (weighing from 800 to 1,500 pounds) of CCP broke for every batch of deinked pulp; each batch took an hour to deink, and the mill deinked paper 24 hours a day, seven days a week.

79. The Kalamazoo Mill consisted of five mills (Mill 1 through Mill 5) that produced fine paper products by recycling paper, including CCP.

80. The Kalamazoo Mill released PCBs to the Site.

81. The Kalamazoo Mill had deinking operations in Mill 1, Mill 2, and Mill 3.

82. Mill 2 discharged papermaking and deinking wastewater directly to the Kalamazoo River until it installed a primary treatment system (a 40-foot diameter clarifier) in 1954.

83. Even after it installed the primary treatment system, wastewater from Mill 2 was discharged untreated to the Kalamazoo River until 1955, when it was also directed to the primary clarifier.

84. In 1965, a second 50-foot primary diameter clarifier was installed at Mill 2.

85. Mill 1 and 3 discharged papermaking and deinking wastewater directly to the Kalamazoo River until they installed a primary treatment system (a 110-foot diameter clarifier) in 1954. Wastewater from Mill 4 and 5 converting operations was also directed to the 110-foot primary clarifier in 1954.

86. Starting in 1964, the KPC mill started sending effluent from the clarifier to the Kalamazoo POTW.

87. The Kalamazoo POTW had only primary treatment in 1964; it added secondary treatment in 1967.

88. In 1977, a new 135-foot diameter primary clarifier was constructed to treat wastewater from Mills 1 and 3, and the 110-foot primary clarifier was decommissioned.

89. From 1954 to 1980, there were at least 61 documented bypasses of the wastewater treatment systems at the Kalamazoo Mill.

90. Wastewater treatment sludge and other waste from the Kalamazoo Mill went to three landfills over the course of the mill's operations: the King Highway Landfill, the Willow Boulevard Landfill, and the A-Site Landfill. Five on-site dewatering lagoons received wastewater treatment sludge.

91.   The 75th percentile concentration of PCBs in the King Highway Landfill is approximately 6.8 mg/kg PCBs.

92.   The 75th percentile concentration of PCBs in the Willow Boulevard Landfill is approximately 91.0 mg/kg PCBs.

93.   The 75th percentile concentration of PCBs in the A-Site Landfill is approximately 20.7 mg/kg PCBs.

94.   The 75th percentile concentration of PCBs in the Kalamazoo Mill On-Site Dewatering Lagoons is approximately 5.3 mg/kg PCBs.

G.   The Board Mill (Georgia-Pacific)

95.   The Board Mill is located at 243 East Patterson Street in Kalamazoo, Michigan and is adjacent to the Kalamazoo River.

96.   The Board Mill recycled waste paper, including CCP, to produce paperboard.

97.   The Board Mill released PCBs to the Site.

98.   The Board Mill deinked waste paper from 1975 to 1977; the deinked pulp went to the adjacent KVP Mill.

99.   The Board Mill discharged wastewater from its papermaking process directly to the Kalamazoo River until it installed a primary treatment system (a 100-foot diameter clarifier) in 1953.

100.   From 1953 to 1980, there were at least 15 documented bypasses of the Board Mill's primary treatment system.

101.   In 1967, the Board Mill began directing effluent from the primary clarifier to the Kalamazoo POTW.

102.   Wastewater treatment sludge and other waste from the Board Mill went to the James River Type II/Type III Landfill from 1954 to at least 1980.

103.   The 75th percentile concentration of PCBs in the James River Landfill is approximately 4.2 mg/kg PCBs.

H.   The Kalamazoo Vegetable Parchment ("KVP") Mill (Georgia-Pacific)

104. The KVP Mill is located at 100 Island Avenue in Parchment, Michigan, and is adjacent to the Kalamazoo River.

105. The KVP Mill recycled waste paper, including CCP, to produce fine paper for printing, food packaging, and institutional packaging.

106. The KVP Mill released PCBs to the Site.

107. The KVP Mill did not have on-site deinking operations.

108. The KVP Mill discharged wastewater from its papermaking process directly to the Kalamazoo River until it installed a series of eight settling lagoons by 1955 to treat whitewater from Mill 2. In 1972, the lagoons started receiving whitewater from Mill 1.

109. Even after it installed the primary treatment system, the mill continued to discharge some untreated wastewater to the Kalamazoo River on a regular basis.

110. From 1968 to 1980, there were at least 62 documented bypasses of the treatment system at the KVP Mill.

111. In 1970, the KVP Mill added an acid neutralization system to treat whitewater from Mill 1.

112. In 1977, the KVP Mill constructed a 100-foot diameter primary clarifier to treat effluent from both mills.

113. Wastewater treatment sludge and other waste from the KVP Mill went to the James River Type II/Type III Landfill from 1954 to at least 1980.

114. The 75th percentile concentration of PCBs in the James River Landfill is approximately 4.2 mg/kg PCBs.

I. The National Gypsum Mill

115. The National Gypsum Mill was located along the Kalamazoo River at 2305 King Highway in Kalamazoo, Michigan, and adjacent to Mill 4 of the Kalamazoo Mill.

116. From 1947 to 1981, the National Gypsum Mill recycled waste paper, including CCP, to produce gypsum board liner.

117. The National Gypsum Mill released PCBs to the Site.

118. The National Gypsum Mill did not deink waste paper.

119. The National Gypsum Mill discharged wastewater from its papermaking process directly to the Kalamazoo River until it installed a primary treatment system (a clarifier) by 1961.

120. By 1967, the National Gypsum Mill sent its wastewater to the Kalamazoo POTW.

J.      The Plainwell Mill (Weyerhaeuser)

121. The Plainwell Mill is located at 200 Allegan Street in Plainwell, Michigan, and is adjacent to the Kalamazoo River. It is also known as the Hamilton Mill.

122. The Plainwell Mill recycled waste paper, including a small amount of CCP, to produce fine paper products.

123. The Plainwell Mill released PCBs to the Site.

124. The Plainwell Mill deinked waste paper, primarily magazine and book paper, until January 1963.

125. In 1947, the Plainwell Mill installed, in conjunction with the Kalamazoo River Improvement Company, a pilot wastewater treatment to research the treatment of deinking wastewater. That system operated through 1952.

126. Apart from effluent that was directed to the pilot treatment plant, the Plainwell Mill discharged wastewater to the Kalamazoo River until it installed a primary treatment system (a 55-foot diameter clarifier) in 1954.

127. Some of the mill's wastewater continued to discharge to the Kalamazoo River through the No. 2 Sewer until 1966.

128. In 1967, the Plainwell Mill installed a secondary treatment system (a 55-foot diameter clarifier and a 1.85 Mgal aerated lagoon that was equipped with two aerators).

129. From 1954 to 1982, there were 37 documented bypasses of the wastewater treatment system.

130.   From 1955 to 1983, sludge from the Plainwell Mill wastewater treatment system was disposed of at the 12th Street Landfill.

131.   The 75th percentile concentration of PCBs in the 12th Street Landfill is approximately 12.0 mg/kg PCBs.

K.   The MacSimBar Mill (Mead)

132.   MacSimBar Mill is located at 431 Helen Street, in Otsego, Michigan.

133.   The MacSimBar Mill recycled waste paper, including CCP, to produce  paperboard (until 1968) and board for book covers and multi-ply paperboard (after 1968).

134.   The MacSimBar Mill released PCBs to the Site.

135.   The MacSimBar Mill did not deink waste paper.

136.   The MacSimBar Mill discharged wastewater to the Kalamazoo River until approximately 1953, when the mill installed a primary wastewater treatment plant (a grit chamber and two 50-foot diameter parallel clarifiers).

137.   In 1960, the MacSimBar Mill began sending effluent from its primary clarifiers to an aerated oxidation-stabilization lagoon.

138.   The MacSimBar Mill had at least 22 documented bypasses of its wastewater treatment systems.

139.   Wastewater treatment sludge and other waste from the MacSimBar Mill went to a Former Type III Landfill adjacent to the mill from 1955 to 1985.

140.   The 75th percentile concentration of PCBs in the Mead Former Landfill is approximately 2.7 mg/kg PCBs.

L.   The Menasha Mill

141.   The Menasha Mill is located at 350 North Farmer Street in Otsego, Michigan, and is adjacent to the Kalamazoo River.  It is also known as the Otsego Falls Mill.

142.   The Menasha Mill recycled waste paper, including CCP, to produce paperboard products.

143.   The Menasha Mill did not deink waste paper.

144. The Menasha Mill discharged wastewater from its papermaking process directly to the Kalamazoo River until it installed a primary treatment system (accumulation tanks) in 1953.

145. Even after it installed the primary treatment system, the Menasha Mill continued to discharge some untreated wastewater to the Kalamazoo River on a regular basis.

146. The Menasha Mill did not construct a primary clarifier until spring of 1972.

147. There were at least five documented bypasses of the Menasha Mill wastewater treatment system from 1953 to 1980.

148. A 78-acre parcel of property on the north side of Farmer Street was used for on-site waste disposal.  A number of sludge decanting ponds were constructed at the site.

### III.  The Plainwell Mill only released 2.2% of the PCBs to the Site.

A. It is possible to calculate the relative amount of total suspended solids ("TSS") each of the mills released.

149. TSS is a measurement of the solid particles suspended in water that will not pass through a filter.

150. The amount of TSS discharged by a facility is commonly referred to as a "loading" and is measured in pounds per day.

151. PCBs in mill wastewater adsorb to solid particles (measured as TSS) also contained in mill wastewater.

152. When the mills discharged TSS in wastewater effluent to Portage Creek or the Kalamazoo River, the PCBs attached to the solid particles were also discharged.

B. All other things being equal, the more of a mill's TSS that reached the Kalamazoo River, the more PCBs that mill would have released to the Site.

153. With rare exceptions, there are no data regarding the PCB concentrations in mill effluent prior to the mid-1970s.

154. Dr. Neil Ram reviewed historical sampling data for the twelve Kalamazoo-area mills and compiled available data regarding

TSS loadings from all twelve mills to Portage Creek and the Kalamazoo River from 1954 to 1980.

155. Dr. Ram calculated, to a reasonable degree of scientific certainty, the following relative TSS loadings from each of the Kalamazoo-area mills for 1954-1980:

155.1. Bryant Mill:  17.7%.

155.2. Monarch Mill:  4.7%.

155.3. King Mill: 24.1%.

155.4. Rex Mill: 8.6%.

155.5. Hawthorne Mill: 0.7%.

155.6. Kalamazoo Mill: 27.6%.

155.7. Board Mill: 3.2%.

155.8. KVP Mill: 1.6%.

155.9. National Gypsum Mill: 1.7%.

155.10. Plainwell Mill: 5.7%.

155.11. MacSimBar Mill:  1.5%.

155.12. Menasha Mill: 3.1%.

C. The likelihood that a mill released PCBs depended on the amount of CCP available in that year.

156. Available records of CCP production provide quantitative information about the amount of CCP produced per year from 1954 to 1971.

157. The overall availability of CCP in the recycled paper stream would have been proportional to the amount of CCP produced.

158. The recycling of CCP also released PCBs into finished paper products; therefore, mills were still recycling paper contaminated with PCBs even after CCP ceased being produced in 1971.

D.    Although there are no records of the amount of CCP used by each mill, PCB concentrations in the mill disposal areas indicate the amount of CCP recycled by each mill relative to the others.

159.    The amount of CCP each mill used in its furnish depended on the mills' size and operations.  Data are not available regarding the amount of CCP used by any of the mills.

160.    The 75th percentile PCB concentration data from each of the mills' landfills provides an indication of the relative amount of CCP each mill recycled.

E.    It is possible to calculate the relative percentage of PCBs that each of the mills discharged using the data regarding TSS releases from the mills, the amount of CCP available for recycling, and the PCB concentrations in the disposal areas that the mills used.

161.    Using TSS data, CCP availability data, and the PCB concentrations in the disposal areas, Mr. Steven Werner calculated,  to a reasonable degree of scientific certainty, the relative percentage of PCBs discharged from each of the Kalamazoo Mills to be:

161.1.  Bryant Mill:  28.7%

161.2.  Monarch Mill:  4.2%

161.3.  King Mill: 18.2%

161.4.  Rex Mill: 0.5%

161.5.  Hawthorne Mill: <0.1%

161.6.  Kalamazoo Mill: 45.2%

161.7.  Board Mill: 0.8%

161.8.  KVP Mill: 0.1%

161.9.  National Gypsum Mill: <0.1%

161.10.Plainwell Mill: 2.2%

161.11.MacSimBar Mill:  0.2%

161.12.Menasha Mill: 0.1%

162. Mr. Werner's opinion regarding the relative amount of PCBs each mill discharged is similar to the estimates that Dr. Wolfe (Georgia-Pacific's expert) and Dr. Allen (NCR's expert) generated.

## IV. REMEDIATION AND COST HISTORY OF THE SITE

A. Georgia-Pacific's work at the Site.

163. The State of Michigan, Georgia-Pacific, H.M. Holdings and Simpson Plainwell Paper Company (collectively the Kalamazoo River Study Group, or "KRSG") entered into an Agreement on Consent to conduct a Remedial Investigation/Feasibility Study and other work at the Site in 1990 (the "1990 AOC").

164. James River Corporation (now known as Fort James Corp., which is one of the Georgia-Pacific Plaintiffs in this action) joined the KRSG in 1993.

165. The KRSG parties split the cost of work done under the 1990 AOC.

166. Simpson Plainwell Paper Company was a former owner or operator of the Plainwell Mill; it never owned or operated any other mill at the Site.

167. As of as of January 2006, Simpson Plainwell had paid $7,405,824.80 of the KRSG's OU5 costs; some of the work Simpson Plainwell paid for was upstream of the Plainwell Mill.

168. Georgia-Pacific is not seeking any costs from Weyerhaeuser for work Georgia-Pacific performed upstream of the Plainwell Mill or in any OU other than OU5.

169. The portion of Georgia-Pacific's claim against Weyerhaeuser, net of the cost of Georgia-Pacific's work upstream of Weyerhaeuser and net of Georgia-Pacific's costs that this Court held were barred by the applicable statute of limitations, is $24,191,370.

170. Of the amount Georgia-Pacific claims it spent under the 1990 AOC, it spent $7,848,100 on studies that the State of Michigan did not want Georgia-Pacific to conduct. The work was not necessary or not consistent with the NCP because:

170.1.  the State of Michigan did not identify the type, quantity, and quality of the independent data to be collected by Georgia-Pacific;

170.2.  the State of Michigan did not review and approve the sampling and analysis plans for the data;

170.3.  the state of Michigan did not designate Georgia-Pacific to be the lead; and

170.4.  the State of Michigan did not use the data generated.

171.  Georgia-Pacific spent approximately $1.1 million more on drafting a Remedial Investigation/Feasibility Study that was not consistent with the National Contingency Plan ("NCP").

172.  The total amount that Georgia-Pacific spent on work in OU5 downstream of the Plainwell Mill that was not consistent with the NCP or unnecessary was $9,938,987.

173.  Georgia-Pacific has recovered $83,683,983 from its insurance carriers.

173.1.  $7.210 million of this should be allocated to Georgia-Pacific's recoverable past OU5 costs; and

173.2.  $1.962 million of this should be allocated to Georgia-Pacific's recoverable future OU5 costs (if any).

174.  Georgia-Pacific has included $653,831 in costs associated with Natural Resource Damages claims.

175.  Georgia-Pacific is improperly accounted for $3,395,570 of its costs.

176.  The total of Georgia-Pacific's costs that are potentially recoverable against Weyerhaeuser, net of costs for upstream work, time-barred costs, the cost of work not consistent with the NCP or not necessary, NRD costs, and costs that were not properly accounted for is $4,630,943.

177.  Georgia-Pacific is not now incurring, and will not in the future incur, additional costs under the 1990 AOC.

178.  Georgia-Pacific is not now incurring, and will not in the future incur, additional recoverable costs under any existing order.

B.      Weyerhaeuser's work at the Site.

179.    Weyerhaeuser entered into a Consent Decree with the United States in 2005.

180.    The Consent Decree required Weyerhaeuser to pay $6,338,851.53 to EPA, $6.2 Million of which EPA was required to place in EPA's Kalamazoo River Special Account to fund OU5 work.

181.    Weyerhaeuser paid the $6,338,851.53 to EPA.

182.    The Consent Decree also required Weyerhaeuser to address OU4 (the 12th Street Landfill) and OU7 (the Plainwell Mill property).

183.    Weyerhaeuser has completed the cleanup of OU4, subject to ongoing operation and maintenance obligations.

184.    Through July 31, 2014, Weyerhaeuser incurred approximately $6,513,931 in response costs in OU4.

185.    The cleanup of OU7 continues under EPA supervision, but Weyerhaeuser has redeveloped OU7 to a sufficient extent to allow the City of Plainwell to relocate its City Hall to the former Plainwell Mill building.

186.    Weyerhaeuser completed a Remedial Investigation and Feasibility Study for OU7, and in June 2015, EPA issued the Proposed Plan for OU7.

187.    Through July 31, 2014, Weyerhaeuser incurred approximately $3,550,431 in response costs in OU7.

188.    Under the 2005 Consent Decree, Weyerhaeuser has also performed response actions in OU5.

189.    With EPA approval and direction, Weyerhaeuser conducted an Emergency Action to remove or contain paper residuals and PCB-impacted soils and sediments located on the banks of the former Plainwell Mill, which are included within OU5; Weyerhaeuser completed that Emergency Action in 2008.

190.    With EPA approval and direction, Weyerhaeuser conducted an Emergency Action at the former Powerhouse Channel at the

12th Street Landfill, which was located within OU5; Weyerhaeuser completed that Emergency Action in 2008.

191.    Weyerhaeuser has also participated in an EPA pilot study in OU5, conducted an ongoing review of OU5 RI/FS reports, conducted sampling of OU5 Area 1 surface waters for PCBs, conducted sediment coring in Areas 2 and 3, and evaluated potential design options for Area 2.

192.    Through July 31, 2014, Weyerhaeuser incurred $11,456,435.68 in OU5 costs.

C.    NCR's and IP's work at the Site.

193.    Neither IP nor NCR have done any work at the Site nor incurred any recoverable costs.

V.    **PROPOSED CONCLUSIONS OF LAW**

A.    Weyerhaeuser has already paid more than its equitable share of response costs in OU5.  Therefore, Georgia-Pacific is not entitled to any recovery from Weyerhaeuser.

194.    Liability under CERCLA section 113 is several only.  *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 613 (2009)

195.    To the extent that Georgia-Pacific's costs are recoverable under CERCLA section 107, Georgia-Pacific has asked for an equitable allocation of those costs.

196.    Georgia-Pacific bears the burden of proving what each party's equitable share of those costs should be, including its own.  *See Kalamazoo River Study Grp. v. Rockwell Intern. Corp.*, 355 F.3d 574, 590 (6th Cir. 2004).

197.    The $11,456,435.68 that Weyerhaeuser has spent addressing contamination in OU5 is more than Weyerhaeuser's equitable share of response costs.

198.    The combined $18,862,260.48 paid by Weyerhaeuser and other entities associated with the Plainwell Mill is more than sufficient to cover the Plainwell Mill's equitable share of PCB contamination at the Site.

199. Because Weyerhaeuser specifically, and the other Plainwell entities generally, have paid far more than the share of response costs attributable to PCB discharges from the Plainwell Mill, Georgia-Pacific is not entitled to any recovery from Weyerhaeuser.

B. To the extent that the Plainwell Mill's equitable share of response costs has not been satisfied, Georgia-Pacific's past response costs are not recoverable against Weyerhaeuser.

200. $9,938,987 of Georgia-Pacific's past response costs are unrecoverable because they were not consistent with the NCP or were unnecessary.

201. $3,395,570 of Georgia-Pacific's past response costs are unrecoverable because Georgia-Pacific improperly accounted for them.

202. $653,831 of Georgia-Pacific's past response costs were spent on Natural Resource Damage issues, and thus unrecoverable in this action.

203. $7,210,765 of Georgia-Pacific's past response costs are unrecoverable because Georgia-Pacific has already recovered that amount from its insurers.

C. There are no "orphan" mills at the Site, but to the extent that there are, they should not be allocated to Weyerhaeuser.

204. NCR arranged for disposal of all of the PCBs at the Site; therefore, it is equitably allocated all of the response costs.

205. Because NCR arranged for disposal of its waste CCP at all of the Kalamazoo Mills, and because NCR is a solvent party and amenable to suit, there are no orphan shares to allocate.

206. To the extent shares of response costs belong to solvent entities that are not parties to this action, those shares are assigned to Georgia-Pacific.

207. To the extent there are any orphan shares, they are assigned to NCR.

D. Georgia-Pacific is not entitled to a declaratory judgment against Weyerhaeuser for future response costs.

208.    A declaratory judgment for future costs must satisfy Article III case and controversy requirements.

209.    The only costs that Georgia-Pacific may seek against Weyerhaeuser that are not barred by the applicable statute of limitations or associated with work upstream of the Plainwell Mill are those pursuant to Georgia-Pacific's 1990 AOC.  Georgia-Pacific has not incurred any costs under its 1990 AOC since 2007, and has not alleged that will incur any future costs under the 1990 AOC.

210.    Georgia-Pacific has not satisfied its burden of proving that it will enter into future orders for work at the Site and what work any future orders would entail.  Therefore, Georgia-Pacific is not entitled to declaratory judgment against Weyerhaeuser on future costs.

DATED: August 31, 2015         **WEYERHAEUSER COMPANY**


By:  /s/ Mark W. Schneider

**PERKINS COIE** LLP
Mark W. Schneider, WA Bar No. 14105
MWSchneider@perkinscoie.com
J. Christopher Baird, WA Bar No. 38944
JCBaird@perkinscoie.com
Michael L. Dunning, WA Bar No. 29452
MDunning@perkinscoie.com
Margaret C. Hupp, WA Bar No. 43295
MHupp@perkinscoie.com
Aubri N. Margason, WA Bar No. 44220
AMargason@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

**Warner Norcross & Judd, LLP**
Douglas A. Dozeman, MI Bar No. P35781
ddozeman@wnj.com
Scott M. Watson, MI Bar No. P70185
swatson@wnj.com
900 Fifth Third Center
111 Lyon St. N.W.
Grand Rapids, MI 49503-2487
Telephone:  616.752.2000
Facsimile:  616.752.2500

Attorneys for Defendant and Crossdefendant
Weyerhaeuser Company

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 31, 2015, I electronically filed the foregoing using the

ECF system, which will send notification of such filing by operation of the Court's electronic

systems.  Parties may access this filing via the Court's electronic system.


By:  <u>    /s/ Mark W. Schneider               </u>