**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GEORGIA-PACIFIC CONSUMER** | ) | |
| **PRODUCTS LP,** | ) | |
| **FORT JAMES CORPORATION, and** | ) | |
| **GEORGIA-PACIFIC LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No**: **1:11-cv-00483** |
| **v.** | ) | |
| | ) | **Judge Robert J. Jonker** |
| **NCR CORPORATION,** | ) | |
| **INTERNATIONAL PAPER CO.,** | ) | ***ORAL ARGUMENT REQUESTED*** |
| **and WEYERHAEUSER CO.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## GEORGIA-PACIFIC'S PHASE II TRIAL BRIEF

## Table of Contents

Table of Contents ................................................................................................ i

Table of Authorities ......................................................................................... iii

Preliminary Statement ........................................................................................ 1

I.    Relevant Legal Standards ........................................................................ 4

    A.    CERCLA Generally ................................................................... 4

    B.    Standard for Recoverability of Costs ...................................... 5

    C.    Cost-Recovery Under CERCLA § 107(a) ............................... 6

    D.    Contribution Under CERCLA § 113(f) .................................... 7

    E.    The Statutory Requirement to Enter a Declaratory Judgment Establishing Liability for Future Costs ................................................................... 9

II.    Issues to Be Resolved at Trial ............................................................. 11

    A.    Burdens of Proof ...................................................................... 11

    B.    The Recoverability of Georgia-Pacific's Past Costs ............... 13

        1.    Necessity and NCP-Consistency ............................... 13

        2.    Whether Awarding Georgia-Pacific Its Claimed Costs Will Result in an Impermissible Double Recovery ........................................................... 15

            a.    Settlements, Judgments, EPA/Michigan Payments and Vendor Credits .......................................................... 15

            b.    Insurance Recoveries ...................................... 16

    C.    Whether the Harm at the Site is Capable of Apportionment ................. 17

    D.    The Allocation of Equitable Responsibility for Past and Future Costs ............. 18

        1.    Equitable Factors That Dominate The Analysis ..................... 18

            a.    NCR Is Uniquely Blameworthy .................... 18

            b.    Georgia-Pacific Is the Only Party to Fully Investigate PCB Contamination at the Site and Track Down the Party Chiefly Responsible ......................................................... 21

c.    It Is Impossible to Attribute PCBs in Specific Areas of the River to Discharges from Individual Mills..................................................22

d.    Geography Matters. ........................................................................23

2.    Proposed Allocation Methodologies.......................................................25

a.    NCR Pays 100% of, at a Minimum, Any Share Attributable to Georgia-Pacific's Mills...........................................................25

b.    Evaluating Each Party's Contribution to the Discharges From Each Mill ........................................................................................26

E.    The Court's Mandatory Declaration Governing Liability for Future Costs .........28

III.    Other Issues Related to the Presentation of Proof at Trial..............................................29

A.    NCR's Strategic Decision to Not Plead a Divisibility or Apportionment of Harm as an Affirmative Defense ..............................................................29

B.    NCR's Objection to Georgia-Pacific's Summary of Voluminous Records..........31

C.    Georgia-Pacific's Position on Trial Time and the Order of Presentation.............32

Conclusion    .................................................................................................................34

## Table of Authorities

### CASES

*Adobe Lumber, Inc. v. Hellman,*
    No. Civ. 05-1510, 2009 WL 256553 (E.D. Cal. Feb. 3, 2009).........................................16

*Akzo Nobel Coatings, Inc. v. Aigner Corp.,*
    197 F.3d 302 (7th Cir. 1999) ..........................................................................................7

*AlliedSignal, Inc. v. Amcast Intern. Corp.,*
    177 F. Supp. 2d 713 (S.D. Ohio 2001) ........................................................................4, 9

*America Cyanamid Co. v. Capuano,*
    381 F.3d 6 (1st Cir. 2004)...........................................................................................7, 28

*Anspec Co. v. Johnson Controls,*
    922 F.2d 1240 (6th Cir. 1991) .....................................................................................4, 5

*Appleton Papers Inc. v. George A. Whiting Paper Co.,*
    No. 08-C-16, 2009 WL 5064049 (E.D. Wis. Dec. 16, 2009) ...........................................8

*Artesian Water Co. v. New Castle County,*
    659 F. Supp. 1269 (D. Del. 1987)............................................................................... 14-15

*Boeing Co. v. Cascade Corp.,*
    920 F. Supp. 1121 (D. Or. 1996),
    *aff'd in relevant part*, 207 F.3d 1177 (9th Cir. 2000)...................................................9, 10

*Burlington N. & Santa Fe Railway Co. v. United States,*
    556 U.S. 599 (2009).....................................................................................................4, 6

*Carson Harbor Village, Ltd. v. Unocal Corp.,*
    990 F. Supp. 1188 (C.D. Cal. 1997),
    *aff'd en banc by,* 270 F.3d 863 (9th Cir. 2001)................................................................5

*Centerior Serv. Co. v. Acme Scrap Iron & Metal,*
    153 F.3d 344 (6th Cir. 1998), *abrogated on other grounds by*
    *United States v. Atl. Research Corp.,* 551 U.S. 128 (2007) ...............................................8

*City of Bangor v. Citizens Communs. Co.,*
    437 F. Supp. 2d 180 (D. Me. 2006) .............................................................................10

*City of Wichita v. APCO Oil Corp. Liquidating Trust,*
    306 F. Supp. 2d 1040 (D. Kan. 2003)........................................................................6, 10

*County of La Plata v. Brown Group Retail, Inc.,*
    768 F. Supp. 2d 1092 (D. Colo. 2011).........................................................................10

*Dent v. Beazer Materials & Services, Inc.*,
    156 F.3d 523 (4th Cir. 1998) ................................................................9

*Ellman v. Woo*,
    No. 90-0718, 1991 WL 274838 (E.D. Pa. Dec. 16, 1991)................................10

*Idaho v. Hanna Mining Co.*,
    882 F.2d 392 (9th Cir. 1989) ................................................................4

*Kalamazoo River Study Group v. Eaton Corp.*,
    258 F. Supp. 2d 736 (W.D. Mich. 2003) ............................................5, 15

*Kalamazoo River Study Group v. Menasha Corp.*,
    228 F.3d 648 (6th Cir. 2000) ................................................................4

*Kelley v. I.E. DuPont de Nemours and Co.*,
    17 F.3d 836, 844 (6th Cir. 1994) ..........................................................9

*Kelley v. Thomas Solvent Co.*,
    727 F. Supp. 1532 (W.D. Mich. 1989) ..................................................4

*Lockheed Martin Corp. v. United States*,
    35 F. Supp. 3d 92, 162 (D.D.C. 2014) ..................................................10

*Morrison Enterprises v. McShares, Inc.*,
    302 F.3d 1127 (10th Cir. 2002) ............................................................6

*NCR Corp. v. George A. Whiting Paper Co.*,
    768 F.3d 682 (7th Cir. 2014) ..............................................................17

*New York v. Solvent Chemical Co., Inc.*,
    871 F. Supp. 2d 209 (W.D.N.Y. 2012)..................................................10

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010)............................................................4, 5

*NutraSweet Co. v. X-L Engineering Co.*,
    227 F.3d 776 (7th Cir. 2000) ..............................................................6

*Regional Airport Authority v. LFG, LLC*,
    460 F.3d 697 (6th Cir. 2006) ..............................................................5

*Richland-Lexington Airport District v. Atlas Properties, Inc.*,
    901 F.2d 1206 (4th Cir. 1990) ............................................................5

*Roberts v. Heating Specialist Inc.*,
No. 3:12-cv-1820, 2014 WL 3845877 (D. Or. Aug. 5, 2014) ..........................................10

*Rochester Gas & Electric Corp. v. GPU, Inc.*,
No. 00-cv-6369, 2008 WL 8912083 (W.D.N.Y. Aug. 8, 2008).......................................10

*Tanglewood East Homeowners v. Charles-Thomas, Inc.*,
849 F.2d 1568 (5th Cir. 1988) ........................................................................................5

*United Alloys, Inc. v. Baker*,
797 F. Supp. 2d 974 (C.D. Cal. 2011) ...........................................................................10

*United States v. Cello-Foil Products, Inc.*,
100 F.3d 1227 (6th Cir. 1996) ..........................................................................................4

*United States v. Consolidated Coal Co.*,
345 F.3d 409 (6th Cir. 2003) ............................................................................................8

*United States v. Davis*,
31 F. Supp. 2d 45 (D.R.I. 1998)...................................................................................8, 10

*United States v. Kramer*,
757 F. Supp. 397 (D.N.J. 1991) ........................................................................................9

*United States v. Newmont USA Ltd.*,
No. CV-05-020, 2008 WL 4621566 (E.D. Wash. Oct. 17, 2008) ....................................10

*United States v. R.W. Meyer, Inc., (R.W. Meyer I)*
889 F.2d 1497 (6th Cir. 1989) ......................................................................................4, 6

*United States v. R.W. Meyer, Inc. (R.W. Meyer II)*,
932 F.2d 568 (6th Cir. 1991) ............................................................................................7

*United States v. Shell Oil Co.*,
605 F. Supp. 1064 (D. Colo. 1985)..................................................................................14

*United States v. Township of Brighton*,
153 F.3d 307 (6th Cir. 1998) ............................................................................6-7, 25, 31

*Vine Street, LLC v. Keeling*,
460 F. Supp. 2d 728 (E.D. Tex. 2006),
*Rev'd on other grounds by* 776 F.3d 312 (5th Cir. 2015)....................................................9

*Wickland Oil Terminals v. Asarco, Inc.*,
792 F.2d 887 (9th Cir. 1986) ............................................................................................5

## FEDERAL STATUTES AND REGULATIONS

40 C.F.R. § 300.700(c)(3)(i) ...........................................................................................5

40 C.F.R. § 300.700(c)(3)(ii) ..........................................................................................6

40 C.F.R. § 300.700(c)(4) ...............................................................................................5

42 U.S.C. § 9607(a) .................................................................................................*passim*

42 U.S.C. § 9607(b) .........................................................................................................4

42 U.S.C. § 9613(f) ..................................................................................................*passim*

42 U.S.C. § 9613(g)(2) ....................................................................................................9

**Preliminary Statement**

The Kalamazoo River is heavily contaminated with poly-chlorinated biphenyls (PCBs). Those PCBs came from NCR's carbonless copy paper (CCP). NCR made CCP with Aroclor 1242, a toxic mixture of PCBs, starting in the early 1950s and continuing into the 1970s. When mills recycled CCP, some of the PCBs in the CCP were discharged into the environment along with other recycling waste. Other PCBs from the CCP went into paper products made from the recycled fiber—including paper used to make food packaging.

Plaintiffs Georgia-Pacific Consumer Products, LP, Fort James Corporation, and Georgia Pacific LLC (collectively, Georgia-Pacific) have paid more than $105 million to investigate and clean-up the PCBs. That work has taken 25 years, and more is necessary. Tens or hundreds of millions more will be spent to complete the clean-up. Georgia-Pacific has borne the clean-up costs alone since 2009 and has brought this CERCLA cost recovery action to make the other parties—NCR, International Paper Company (IP), and Weyerhaeuser Company (Weyerhaeuser)—pay their fair share of the costs.

Weyerhaeuser has stipulated to liability, and in Phase I, the Court found that NCR and IP are also liable. In Phase II, the Court must determine the shares each of these companies should bear, not only for Georgia-Pacific's past costs, but also for future costs the parties are certain to incur. The issues to be tried in Phase II fall into two broad categories: (1) the amount of Georgia-Pacific's non-time-barred past costs that were "necessary" and consistent with the National Contingency Plan (NCP); and (2) the portion of past costs and expected future costs that each party should bear.

With respect to past costs, Georgia-Pacific will prove in Phase II that it has incurred $105,461,168.72 in necessary and NCP-consistent costs from 1990 through September of 2014, net of credits from vendors, agreed payments by EPA and MDEQ, and third-party settlements

and judgments. Following the Court's ruling on Defendants' statute of limitations motions, $52,313,329.67 of Georgia-Pacific's past costs remain recoverable. Applying the framework of the Court's decision, $28,010,726.99 is recoverable under CERCLA § 107(a), and the balance is recoverable under CERCLA § 113(f).

Georgia-Pacific also will demonstrate that the Court should allocate future costs in the same manner as those past costs. The circumstances of the Site, and the nature of the future clean-up costs that will be incurred, permit the Court to enter a declaratory judgment that resolves future cost recovery actions, save only the question of the necessity and NCP-consistency of newly incurred costs.

With respect to the equitable allocation of costs, the Kalamazoo Site presents a particularly unusual scenario. In many CERCLA cases, the PRPs' moral blameworthiness is largely equal, so the parties seek to allocate responsibility based on objective factors such as their years of operation at the Site, and/or the volume of pollutants each released. The equitable scenario is starkly different here, as evidenced by NCR's acknowledgement long ago that recycling mills such as Georgia-Pacific are the "innocent victims" of NCR's conduct.

NCR was right. As the Court has found, NCR not only "continued to sell CCP broke to brokers and recyclers after discovering it to be a legal and environmental liability," NCR did so while it "actively attempted to conceal the hazards associated with CCP broke—from recyclers, the public, and even governmental entities." Order and Opinion ("Opinion") at 19-20 (Docket No. 432). NCR's wrongdoing meant that Georgia-Pacific—which, along with other recyclers, considered CCP broke to be a "safe, viable source of pulp," *id.* at 20—was left holding the bag.

With Phase I completed, however, the prediction made by NCR's Gordon Taylor in April 1969 has finally come to pass: the "second shoe" has dropped. Equitably, the Court's Phase I

findings alone are more than sufficient to assign 100 percent responsibility for past and future costs at the Site to NCR, the only intentional wrongdoer with respect to PCB contamination at the Site.  At the very least, the equities on Georgia-Pacific's side of the ledger—including extensive cooperation with government authorities—strongly compel making NCR stand entirely in Georgia-Pacific's shoes for those costs.

Indeed, although NCR's arranger liability has been established, the story of NCR's inequitable conduct has not yet been fully told.  The Court's Phase I liability determination was based on a finding that by "at least" March 1969, broke itself had become a waste—i.e., by at least that time, "NCR knew CCP broke generated a toxic, hazardous by-product in normal recycling."  Opinion at 17.  That is certainly true.  In Phase II, however, Georgia-Pacific will shine a spotlight on the time period *before* March 1969 and will show that from the *beginning* of the production period NCR showed reckless disregard for the consequences of its disposal plan for PCBs—and that NCR's inequitable conduct only worsened from there.

The evidence of NCR's inequitable conduct will show that NCR's stewardship of the PCBs in its product was plainly wrongful *even by the standards of the day*—standards that NCR itself expressly recognized.   The sorry tale of NCR's handling of PCBs even includes a lengthy time period during which NCR—despite *actual knowledge* that broke recycling was contaminating food with Aroclor 1242—kept silent and kept selling PCB-contaminated broke anyway, with enormous impacts on the environment.  Georgia-Pacific will also describe NCR's strategy to cover up its wrongful conduct, a strategy that continues to the present day in this Court.

## I.     Relevant Legal Standards

### A.     CERCLA Generally

CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). Liability under CERCLA for the statute's four categories of PRPs is strict. *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996). Where a plaintiff makes its prima facie case, the defendant is liable, regardless of actual fault or knowledge, unless it can prove one of the very limited defenses recognized under 42 U.S.C. § 9607(b). *See United States v. R.W. Meyer, Inc.* (*R.W. Meyer I*), 889 F.2d 1497, 1508 (6th Cir. 1989). A CERCLA plaintiff need not satisfy common law rules of causation, such as proximate cause, to meet its burden. *See, e.g., AlliedSignal, Inc. v. Amcast Intern. Corp.*, 177 F. Supp. 2d 713, 749 (S.D. Ohio 2001). There is no minimum amount of pollution that CERCLA will tolerate. *See Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 660 & n.7 (6th Cir. 2000). "[E]ven a minimal amount of hazardous waste brings a party under the purview of the statute as a PRP." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010).

Exceptions to CERCLA's broad sweep must be narrowly construed so as not to frustrate CERCLA's remedial purpose. *Idaho v. Hanna Mining Co.*, 882 F.2d 392, 396 (9th Cir. 1989). "[T]he remedial nature of CERCLA's scheme requires the courts to interpret its provisions broadly to avoid frustrating the legislative purposes." *Anspec Co. v. Johnson Controls*, 922 F.2d 1240, 1247 (6th Cir. 1991). Courts therefore "construe CERCLA's limited defenses narrowly to effectuate the Act's broad policies." *Kelley v. Thomas Solvent Co.*, 727 F. Supp. 1532, 1540 n.2 (W.D. Mich. 1989). The Court should remain mindful that "Congress intended that those

responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created." *Anspec Co.*, 922 F.2d at 1247.

### B.    Standard for Recoverability of Costs

To be recoverable under CERCLA, costs must be "necessary" and "consistent with the NCP." There is no bright line rule for showing necessity, and the bar is not particularly high. As a general matter, "[c]osts are 'necessary' if incurred in response to a threat to human health or the environment." *Regional Airport Authority v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006); *see also Carson Harbor Village, Ltd. v. Unocal Corp.*, 990 F. Supp. 1188, 1193 (C.D. Cal. 1997*), aff'd en banc*, 270 F.3d 863 (9th Cir. 2001) (Responses costs "are 'necessary' and thus recoverable under CERCLA when undertaken in response to an actual and real threat to human health or the environment."). CERCLA does not require costs to be incurred in response to an express command from State or federal authorities. *See, e.g., Richland-Lexington Airport Dist. v. Atlas Properties, Inc.*, 901 F.2d 1206, 1208-09 (4th Cir. 1990); *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1575 (5th Cir. 1988); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 890 (9th Cir. 1986); *Kalamazoo River Study Group v. Eaton Corp.*, 258 F. Supp. 2d 736, 758 (W.D. Mich. 2003).

The NCP-consistency of actions taken by a private party is governed by a flexible standard. In general, work will be considered "'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of [40 C.F.R. § 300.700(c)], and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). "[I]mmaterial or insubstantial deviations" from the NCP requirements will not render a response action "inconsistent." 40 C.F.R. § 300.700(c)(4). Moreover, actions that are taken pursuant to a government order are afforded a presumption of consistency. *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 137 (2d Cir. 2010) ("NiMo's

adherence to the DEC Consent Decree established its compliance with the [NCP].”); *Morrison Enterprises v. McShares, Inc.*, 302 F.3d 1127, 1136 (10th Cir. 2002); *see also* 40 C.F.R. § 300.700(c)(3)(ii) (“Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered ‘consistent with the NCP.’”); *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (holding that a response action “satisfied the NCP” *because* “[t]he Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation.”); *City of Wichita v. APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1083 (D. Kan. 2003) (holding that “for purposes of the … rebuttable presumption, … there is no difference” between a consent decree and a consent order).

### C.     Cost-Recovery Under CERCLA § 107(a)

CERCLA § 107(a) provides the statutory mechanism for private parties, including PRPs, to recover response costs from other PRPs where those costs have not been triggered by one of the events that give rise to a contribution claim under § 113(f).  Joint and several liability is the default rule for cost recovery under § 107(a).  *See, e.g., R.W. Meyer I*, 889 F.2d at 1507 (“CERCLA has been interpreted to impose joint and several liability when the environmental harm is indivisible, and to allow for apportionment when two or more persons independently are responsible for a single harm that is divisible.”) (internal citations omitted).  A defendant liable under § 107(a) can escape joint and several liability for all of the harm at a CERCLA site only if it can show that the harm at the site is “theoretically capable of apportionment” and that there exists a reasonable basis for apportionment.  *Burlington Northern*, 556 U.S. at 614-15; *see also United States v. Twp. of Brighton*, 153 F.3d 307, 317-18 (6th Cir. 1998).  A defendant bears the burden of pleading and proof on the question of divisibility and apportionment.  *Twp. of*

*Brighton*, 153 F.3d at 319 ("[A] defendant can avoid joint and several liability if it can prove divisibility . . . .").

> ### D.      Contribution Under CERCLA § 113(f)

CERCLA § 113(f) is the other statutory mechanism for a PRP to recover response costs. The principle difference from § 107(a) is that liability under § 113(f) is several—each party's several share is based on the consideration of equitable factors that are not considered in resolving § 107(a) claims. *See United States v. R.W. Meyer, Inc.* (*R.W. Meyer II*), 932 F.2d 568, 572 (6th Cir. 1991).  In general, a contribution plaintiff must show the equitable shares of each party and that it has paid in excess of its own share.  It then can recover from a defendant up to that defendant's equitable share.

The Court has broad discretion to allocate equitable responsibility among the parties.  In general, the Court "must construct a flexible decree balancing all the equities in the light of the totality of the circumstances."  *R.W. Meyer II*, 932 F.2d at 572.  In doing so, the Court is free to consider whatever factors it deems appropriate and has the discretion to weigh those factors however it chooses.  42 U.S.C. § 9613(f)(1); *R.W. Meyer II*, 932 F.3d at 572; Opinion and Order of August 12, 2015 (Dkt. No. 787) ("MSJ Decision") at 8 ("In a CERCLA equitable allocation decision, a court has broad discretion in making CERCLA contribution allocation decisions, and virtually any factor may be potentially relevant.").

The Court need not allocate shares to PRPs that are not parties to the case, especially where that would unfairly saddle one of the parties with excess costs.  *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 19 (1st Cir. 2004).  "[I]n some cases apportioning responsibility among all PRPs is not an attractive option as it could 'complicate an already difficult allocation process or saddle firms . . . with excess costs and 'might take years of trial time.'"  *Id.* (quoting *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 306 (7th Cir. 1999)).

-7-

Although there is no single exhaustive list of factors, Courts frequently will consider the so-called "Gore" factors:

- The ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

- The amount of the hazardous waste involved;

- The degree of toxicity of the hazardous waste involved;

- The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

- The degree of care exercised by the parties with respect to the hazardous waste, taking into account the characteristics of such hazardous waste; and

- The degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or environment.

*Centerior Serv. Co. v. Acme Scrap Iron & Metal*, 153 F.3d 344, 354 (6th Cir. 1998), *abrogated on other grounds by United States v. Atl. Research Corp.*, 551 U.S. 128 (2007). Courts have also applied the so-called "Torres" factors:

- The extent that clean-up costs are attributable to a specific party.

- The party's level of culpability.

- The degree to which the party benefitted from disposal of the waste.

- The party's ability to pay its share of the cost.

*United States v. Consol. Coal Co.*, 345 F.3d 409, 413 (6th Cir. 2003) (citing *United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998) (Torres, J.)). But "[n]either of these lists is . . . exhaustive or exclusive," and "in any given case, a court may consider several factors, a few factors, or only one determining factor, depending on the totality of the circumstances presented to the court." *Consol. Coal Co.*, 345 F.3d at 413-14 (internal citations and quotations omitted). That includes factors unrelated to the basis for a party's liability. *See Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 5064049, at *12 (E.D. Wis. Dec. 16,

2009) ("[S]everal of the oft-cited equitable factors in § 113 actions have nothing to do with the reasons the parties are considered PRPs."); MSJ Decision at 8.

     **E.**    **The Statutory Requirement to Enter a Declaratory Judgment Establishing Liability for Future Costs**

CERCLA states that the Court "*shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (emphasis added). The duty to enter this declaration is mandatory. *Kelley v. I.E. DuPont de Nemours and Co.*, 17 F.3d 836, 844 (6th Cir. 1994); *Dent v. Beazer Materials & Servs., Inc.*, 156 F.3d 523, 531–32 (4th Cir. 1998) (a court must enter declaratory relief as to future response costs where liability for existing costs is established); *AlliedSignal v. Amcast Int'l Corp.*, 177 F. Supp. 2d 713, 757 (S.D. Ohio 2001); *United States v. Kramer*, 757 F. Supp. 397, 412 (D.N.J. 1991).

The statute does not make exceptions where records of decisions governing future remedies have not yet issued. *See, e.g.*, *Vine Street, LLC v. Keeling*, 460 F. Supp. 2d 728, 767 (E.D. Tex. 2006), *rev'd on other grounds by* 776 F.3d 312 (5th Cir. 2015) (rejecting the claim that "assigning future liability is simply too speculative since there is no remediation plan in place"); *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1140–42 (D. Or. 1996), *aff'd in relevant part*, 207 F.3d 1177 (9th Cir. 2000) (rejecting the claim that declaratory relief is inappropriate where "the remedy . . . has not yet been determined" and awarding declaratory relief for future costs on a proportional share basis).

Pursuant to this statutory mandate, courts routinely issue a declaration of liability that binds the parties in future action by assigning parties a percentage of the equitable responsibility

for future costs.  That way, all that is left to do in future cases is establish the amount of

necessary and NCP-consistent costs.[1]

---

[1] *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 162 (D.D.C. 2014) (awarding future costs on a percentage basis); *Roberts v. Heating Specialist Inc.*, No. 3:12-cv-1820, 2014 WL 3845877, at *19 (D. Or. Aug. 5, 2014) ("Further, the Court finds that THS is responsible for 60 percent of past and future response costs incurred at the Property, and Plaintiffs are responsible for 40 percent of such costs"); *New York v. Solvent Chem. Co., Inc.*, 871 F. Supp. 2d 209, 216 (W.D.N.Y. 2012) ("[T]he court finds that the declaratory judgment should include a method for allocating future costs on the same basis as the allocation of past costs, and can be entered on the basis of the current record."); *County of La Plata v. Brown Group Retail, Inc.*, 768 F. Supp. 2d 1092, 1122-23 (D. Colo. 2011) ("Brown Group is entitled to a declaratory judgment that it shall be liable for 75% of the recoverable future response costs set forth above."); *United Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974, 1004 (C.D. Cal. 2011) ("The Court likewise finds that declaratory relief is appropriate as to the allocation of future NCP-compliant response costs. Thus, United Alloys is responsible for one-third of such response costs and Flask is responsible for two-thirds of such response costs."); *United States v. Newmont USA Ltd.*, No. CV-05-020, 2008 WL 4621566, at *62 (E.D. Wash. Oct. 17, 2008) ("The court's equitable allocation will not only apply to already incurred qualifying response costs, but also to qualifying response costs incurred after December 31, 2004 and future response costs that the parties are likely to incur."); *Rochester Gas & Elec. Corp. v. GPU, Inc.*, No. 00-cv-6369, 2008 WL 8912083, at *41 (W.D.N.Y. Aug. 8, 2008) ("Accordingly, the Court determines that FirstEnergy is liable for eight percent of all future East and West Station MGP related response costs performed . . . that are not inconsistent with the NCP."); *City of Bangor v. Citizens Communs. Co.*, 437 F. Supp. 2d 180, 226 (D. Me. 2006) ("The Court's equitable allocation applies not only to the response costs already incurred by the parties, but also serves as the allocation that will be applied to qualifying response costs likely to be incurred by either side in the future."); *City of Wichita v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1117 (D. Kan. 2003) ("Future costs for such remediation should be allocated on the same basis as past costs: the relative size of each defendant's contaminant plume. Thus, ALT and Reid are liable for 1.72% and 0.15% respectively of the City's future groundwater remediation costs for the Site."); *United States v. Davis*, 31 F. Supp. 2d 45, 69 (D.R.I. 1998) (allocating future costs among ten parties on a percentage basis); *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1142 (D. Or. 1996) ("Further, Boeing and Cascade are responsible, on a 30/70 percent allocation, for future response costs incurred to remediate the TSA which are necessary and incurred in compliance with the NCP."); *Ellman v. Woo*, No. 90-0718, 1991 WL 274838, *7 (E.D. Pa. Dec. 16, 1991) ("The court further declares that defendants shall be responsible for fifty percent (50%) of all response costs incurred by plaintiff in the future, to the extent that such costs are necessary and consistent with the National Contingency Plan.").

## II.     Issues to Be Resolved at Trial

### A.     Burdens of Proof

At the outset, it is necessary to identify the costs that Georgia-Pacific may recover under § 107(a) versus § 113(f).  That distinction dictates who bears the burden of proof on various important issues regarding those costs.

Applying the Court's summary judgment ruling, Georgia-Pacific's costs under the 2009 Plainwell Dam No. 2 ASAOC ($6,828,627.04), the 2009 OU2 Consent Decree ($15,628,975.64) and the 2008 AOC with the State of Michigan ($1,845,000.00) must be recovered under CERCLA § 113(f).  The balance of Georgia-Pacific's non-time-barred costs ($28,010,726.99)— nearly all of which were incurred in carrying out the removal actions called for by the 1990 AOC—can be recovered under CERCLA § 107(a).

For costs recoverable under § 107(a), Georgia-Pacific's only remaining evidentiary burden is to establish that the costs were necessary and NCP-consistent.  Once it meets that burden, Georgia-Pacific can recover the full amount of its § 107(a)-recoverable costs from any of the Defendants under the default rule of joint and several liability. The burden then shifts to each Defendant to show that it should not have to pay some portion of those costs.  CERCLA gives Defendants two ways to do that.

First, a Defendant can contend that one of CERCLA's defenses should limit Georgia-Pacific's recovery.  For example, a Defendant may contend that the harm at the Site is capable of apportionment based on geography and that it should not have to pay for actions in areas to which it has no connection—such as landfills in which it did not discharge wastes or portions of the river upstream from its mill.  As yet another example, a Defendant might argue that Georgia-Pacific's costs should be offset by prior settlements or insurance recoveries.  But on each of these defenses, Defendants bear the burden of pleading and proof.

Second, a Defendant can seek contribution through a counterclaim or cross-claims and seek to shift a portion of the Georgia-Pacific's § 107(a)-recoverable costs to other Defendants or back to Georgia-Pacific.  IP and Weyerhaeuser have asserted such claims.  NCR has not.  IP and Weyerhaeuser bear the same burden of proof on their § 113(f) claims that Georgia-Pacific bears on its § 113(f) claims—each must prove its equitable share of the costs in question, that it has (or will) pay in excess of that share, and the shares that should be borne by each other party.

Applying these principles, the following table summarizes the costs at issue on each claim asserted by Georgia-Pacific, IP and Weyerhaeuser:

| Party Asserting | Claim | Description of Costs | Amount Sought |
|---|---|---|---|
| Georgia-Pacific | §107(a) | Non-time-barred Costs associated with the 1990 AOC (including costs agreed to in 2007 Termination AOC) | $27,411,869.31 |
| | | OU2 Costs incurred between February 2007 and September 2009 | $598,857.68 |
| Georgia-Pacific | §113(f) | 2008 Michigan Response Cost AOC | From NCR and IP, the portion of $1,845,000.00 exceeding Georgia-Pacific's equitable share |
| | | 2009 Plainwell No. 2 TCRA ASAOC | From NCR and IP, the portion of $6,828,627.04 exceeding Georgia-Pacific's equitable share |
| | | 2009 OU2 Consent Decree | From NCR, the portion of $15,628,975.64 exceeding Georgia-Pacific's equitable share. |
| Weyerhaeuser | §113(f) | Georgia-Pacific's §107(a)-recoverable costs. | From GP, IP and NCR, the portion of GP's §107(a) costs recoverable against Weyerhaeuser exceeding Weyerhaeuser's equitable share. |
| International Paper | §113(f) | Georgia-Pacific's §107(a)-recoverable costs. | From GP, Weyerhaeuser and NCR, the portion of GP's §107(a) costs recoverable against IP exceeding IP's equitable share. |

**B.      The Recoverability of Georgia-Pacific's Past Costs**

**1.      Necessity and NCP-Consistency**

The hurdles for showing necessity and NCP-consistency are low.  Georgia-Pacific will clear them easily.  Georgia-Pacific has funded the comprehensive study of PCBs in the Kalamazoo River, the evaluation of the risks posed by those PCBs, and multiple removal and remedial actions.  No party meaningfully disputes that this work was taken in response to actual PCB contamination at the Site or that it has laid the foundation for a cost-effective set of remedies.

Defendants nonetheless object to some of those costs, and those objections fall mainly into four categories.  First, NCR takes the remarkable position that none of Georgia-Pacific's costs incurred to perform a time-critical removal action (TCRA) at the former Plainwell Dam No. 2 impoundment are NCP-consistent, because that work was not, in fact, time critical.  NCR does not challenge the efficacy of that work.  Nor could it.  The work successfully removed an ongoing source of PCB contamination in the river.  Nor does NCR contend the work would have cost less if done on a non-time critical basis.  Rather, NCR maintains that the costs are not recoverable solely because the work could have been performed as non-time critical work or as part of the final remedy.  EPA disagreed and ordered that the work be done on a time critical basis.  NCR cannot collaterally attack the EPA's determination in this proceeding, and its contention should be rejected.

Second, NCR and Weyerhaeuser challenge Georgia-Pacific's costs associated with a supplement to a draft RI/FS that Georgia-Pacific submitted to MDEQ in 2000.  The evidence will show that the supplement presented additional risk assessment and modeling work that the KRSG performed to refine the understanding of the risk of PCBs to human and ecological receptors and the potential efficacy of certain remedial approaches.  MDEQ did not want the

KRSG to perform this work, and NCR and Weyerhaeuser thus contend that the work was "unnecessary" or inconsistent with the NCP.  But whether MDEQ wanted the work or not is of no moment.  The standard is whether the costs were incurred in response to contamination or the threat of contamination, and no one disputes that the work reflected in the supplement was prepared for that reason.  Furthermore, the evidence will show that this work refined the understanding of the risk associated with PCBs and has resulted in a vastly more cost-effective remedy for Work Area 1 of OU5.  It is no understatement to say that this work will save the parties to this case tens (if not hundreds) of millions of dollars over the life of the clean-up at the Site.  That NCR and Weyerhaeuser challenge the critical decision to do this work is, in a word, bold.

Third, NCR and Weyerhaeuser challenge Georgia-Pacific's costs associated with the preparation of the draft RI/FS that MDEQ disapproved in 2002.  Under their view, any costs associated with the preparation of deliverables that are "disapproved" are not recoverable.  This is not the law.  Reports submitted to agency are "disapproved" all the time as part of the ordinary process of developing and refining clean-up studies and work plans.

Finally, Defendants challenge whether Georgia-Pacific may recover costs associated with work to analyze the damage to natural resources at the Site and the efficacy of steps to mitigate those damages and thus reduce the amount of NRDs that might ultimately be awarded.  Defendants contend that these costs are off the table, because the Court concluded that any allocation of actual NRDs would be addressed in a later case, after NRDs have been assessed.  But these costs are not NRDs.  They are reasonable and necessary costs incurred in response to the contamination at the site and are thus necessary costs of response.  *See Artesian Water Co. v.*

*New Castle County*, 659 F. Supp. 1269, 1288 (D. Del. 1987) (citing *United States v. Shell Oil Co.*, 605 F. Supp. 1064, 1084 n.10 (D. Colo. 1985)).

>     **2.     Whether Awarding Georgia-Pacific Its Claimed Costs Will Result in an Impermissible Double Recovery.**

Defendants also contend that Georgia-Pacific's costs should be reduced to prevent a double-recovery due to money received through credits from EPA or contractors, through settlements and judgments with other PRPs, and through insurance settlements.

>     **a.     Settlements, Judgments, EPA/Michigan Payments and Vendor Credits.**

With respect to money received from EPA and through credits from contractors, there does not appear to be any dispute.  Those credits are readily attributable to specific categories of work, and Georgia-Pacific has deducted each credit from the amount that Georgia-Pacific seeks for that category of work.  Defendants have not challenged that accounting.

With respect to settlements and judgments, some can be allocated to specific categories of work while others cannot.  Georgia-Pacific's $100,000 settlement with Gould Paper Corporation (the successor to the owner and operator of the Hawthorne Mill at the time that mill was in operation) relates specifically to clean-up work called for under the 2006 ASAOC for a TCRA at the former KPC and Hawthorne Mill properties.  Georgia-Pacific submits that this amount should be deducted from the costs associated with the TCRA.  Similarly, Georgia-Pacific's share of the judgment from Eaton Corporation in the KRSG litigation related specifically to investigative work performed in OU5 in the period before 2007.  *See KRSG v. Eaton Corp.*, 258 F. Supp. 2d at 760-61.  That work falls logically within the broader category of work conducted in OU5 under the 1990 AOC.  Defendants appear to have no quarrel with this approach to these two settlements.

Two other settlements—with Rock Tenn and Mead (former owners of the Mac Sim Bar mill)—present a different issue. In those settlements, Georgia-Pacific accepted cash ($1,662,500.00) from those parties in exchange for a full release for past and future costs associated with the Mac Sim Bar's contribution to the PCB contamination in OU5. There seems no dispute that this money should count against costs incurred in OU5, but because the releases protect Rock Tenn and Mead for all costs at the Site, it may not be appropriate to deduct the full amount of those settlements against Georgia-Pacific's OU5 costs under the 1990 AOC. CERCLA provides multiple ways to account for settlements like this. *See generally Adobe Lumber, Inc. v. Hellman*, No. Civ. 05-1510, 2009 WL 256553, at *3 (E.D. Cal. Feb. 3, 2009) ("The proportionate share approach, embodied in the Uniform Comparative Fault Act (UCFA), calls for the reduction of the nonsettling defendants' liability by the equitable share of the settling party's obligation. In contrast, under the pro tanto approach contained in the Uniform Contribution Among Tortfeasors Act (UCATA), the liability of the nonsettling defendants is reduced by the dollar amount of the settlement.") (internal citations omitted). Georgia-Pacific is mostly indifferent as to how those settlements are credited going forward, so long as they only count against Georgia-Pacific once.

### b. Insurance Recoveries

Defendants contend that Georgia-Pacific's recoveries in insurance settlements that relate to the Kalamazoo Site should count against Georgia-Pacific. In the mid-1990s and again in the early 2000s, Georgia-Pacific negotiated settlements that covered multiple environmental sites and, in some cases, asbestos liabilities. NCR's expert attributes, at most, $21,301,516 of those settlements to Georgia-Pacific's losses at the entire Kalamazoo site; Weyerhaeuser's expert attributes $7,210,765 to Georgia-Pacific's losses in OU5; and Georgia-Pacific's expert assigns

-16-

$13,053,239 (site-wide), which includes $6,649,837 for OU5, of those settlements to Georgia-Pacific's losses at the Site.

The Court, however, does not need to decide which of these experts is correct, because even using NCR's inflated estimate, there is no chance that Georgia-Pacific will get a double recovery.  That amount ($21,301,516) is less than half of the more than $50 million in costs the Court already has concluded are time-barred, and that is before accounting for the tens of millions in future costs Georgia-Pacific will incur under the 2007 SRI/FS ASAOC that will also be time-barred.  Georgia-Pacific's Kalamazoo-related insurance recoveries should count first against the costs that are unrecoverable in this action, and only if the insurance recoveries exceed that amount is there even the possibility of a double-recovery.  *See NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 708 (7th Cir. 2014).  In light of the Court's summary judgment ruling, that is now mathematically impossible.

### C. Whether the Harm at the Site is Capable of Apportionment

IP and Weyerhaeuser have asserted as defenses to Georgia-Pacific's § 107 claim that the harm at the Site is capable of apportionment.  As explained below, NCR has not asserted divisibility or apportionment of harm as a defense to Georgia-Pacific's § 107(a) claim, but apparently will attempt to argue that the harm can be apportioned on a temporal basis.

Georgia-Pacific submits that the only basis to apportion harm at the Site is based on geography.  As discussed more fully below, mill owners and operators should not be made to pay for areas of the site that were not impacted by mills they owned or operated.  Each of the mill owners agrees on this fundamental point.

There is no other reasonable basis to apportion liability based on the record developed in this case.  It is impossible to determine the dates and amounts of PCBs discharged by any one

mill, much less where those PCBs reside today. Any theory of apportionment grounded on those determinations is simply untenable.

### D. The Allocation of Equitable Responsibility for Past and Future Costs

To resolve the § 113(f) claims in the case—i.e., Georgia-Pacific's claim for costs under the 2009 Plainwell Dam No. 2 TCRA ASAOC and the 2009 OU2 Consent Decree, and IP's and Weyerhaeuser's respective counterclaims and cross-claims—the Court will need to determine the parties' respective equitable shares. As explained above, the Court enjoys considerable discretion in deciding how to do that allocation and can consider factors even beyond those that would make a party liable under CERCLA. There is no one-size-fits-all formula.

#### 1. Equitable Factors That Dominate The Analysis

While the Court has the discretion to focus on any set of factors it thinks important, the evidence will show that four equitable factors predominate: (1) NCR's unique culpability; (2) Georgia-Pacific's unique cooperation; (3) the absence of data that would allow anything beyond rough approximation of the amount of PCBs discharged by each mill; and (4) geography.

##### a. NCR Is Uniquely Blameworthy

First and foremost, NCR is uniquely culpable for the PCB contamination at the Site. Its culpability is evident not only from the facts that led the Court to find NCR liable as an arranger in Phase I, but also from facts Georgia-Pacific will present in Phase II that extend beyond the liability inquiry. This factor is so compelling it justifies making NCR solely responsible for cleaning up the Site.

As a preliminary matter, the Court *already* has made factual findings that are more than sufficient to establish NCR as the sole intentional wrongdoer with respect to PCB contamination of the Kalamazoo River. The Phase I findings establish that NCR engaged in what can only be described as a campaign of purposeful environmental fraud:

-18-

- The coating on NCR broke, including PCBs, was a waste.  Opinion at 7-8.

- This waste component of NCR Paper presented a "unique problem" during recycling—a chemical reaction between the dyes and clays in the paper would cause a blue tint.  *Id.* at 8.

- NCR therefore developed a recycling process by which the waste coating, including PCBs, would be discharged into the environment.  *Id.* at 8-9.

- NCR, despite its protestations to the contrary at trial, never believed that waste treatment would prevent the discharge of PCBs to the environment.  *Id.* at 17-18.

- "Even after NCR knew hazardous waste disposal necessarily resulted from the process of recycling CCP broke, NCR continued to manufacture CCP and encourage recyclers—like those in the Kalamazoo River Valley—to use CCP broke in their recycling operations to avoid other, higher cost means of disposing of the CCP broke."  *Id.* at 3.

- NCR's fear of losing business was behind its decision to "take no action" regarding PCB pollution, even as internal documents show that NCR secretly feared the "second shoe would drop."  *Id.* at 16-17.

- To the recyclers and brokers, on the other hand, CCP broke remained a safe, viable "source of pulp."  *Id.* at 20.  If the recycling mills had known about the PCBs in CCP broke, they would not have bought the material.  *Id.* at 3.

- "NCR actively attempted to conceal the hazards associated with CCP broke—from recyclers, the public, and even governmental entities."  *Id.* at 20.

NCR actually agreed with the Court's assessment years ago.  In an internal NCR memo, a place where he thought he could be candid, Lowell Schleicher—NCR's Director of Basic Research, and one of the scientists who had, in 1967, received news of Soren Jensen's discovery of PCBs in the environment—declared the recycling mills to be "innocent victims of circumstance created by" the manufacturers of NCR Paper.

That is not all.  Additional discovery conducted since Phase I has revealed that NCR's misconduct is even greater.  In Phase II, Georgia-Pacific will show that:

- From the very *beginning* of the production period, NCR likely was aware that its plan for the disposal of the PCBs in NCR Paper presented substantial environmental risks, particularly given NCR's deep knowledge of the chemical characteristics of PCBs. Indeed, NCR itself was actively involved in an organization, the Ohio River Valley

-19-

Water Sanitation Commission (ORSANCO), that recognized that indiscriminately discharging large quantities of PCBs into rivers and streams—as NCR's production plan required—was highly inappropriate.

- NCR did not merely know of, and ignore, a *risk* that food contamination would result from recycling of CCP broke. NCR actually continued selling PCB-contaminated broke for more than a year *after it confirmed that such food contamination was indeed taking place*. Anyone in the United States over 44 years of age may well have consumed NCR PCBs that NCR knew were contaminating the food supply.

There is no need to judge NCR's culpability through hindsight, applying the standards of today. The Court can instead look to the standards NCR recognized at the time (such as the views of ORSANCO), and to the benchmarks provided during the same time period by the actions of Monsanto and Wiggins Teape. Though by no means blameless, those entities at least took concrete action, in the wake of the Jensen Report, to reduce environmental and health risks from PCBs. Monsanto, for example, launched an investigation into the ways that NCR Paper and other PCB-containing products might be causing contamination, unaware (thanks to NCR) of the fact that CCP broke was being recycled in enormous quantities. For its part, Wiggins Teape disclosed its discovery of food contamination to NCR and to the UK government. Even more importantly, Wiggins Teape *stopped selling CCP broke*, choosing to stockpile the material rather than add to the known problem of environmental and food contamination.

In marked contrast, NCR, in its own words, chose to "take no action"—other than to ramp up production and continue facilitating the recycling of CCP. Even assessed under the standards in place during the production period, this choice by NCR was demonstrably improper, reckless, and even dangerous. NCR's continued, calculated inaction and concealment is directly responsible for enormous amounts of preventable environmental contamination, including contamination of the Kalamazoo River.

And there is an equally important equitable postscript to this sorry tale. In Phase II, Georgia-Pacific will detail NCR's actions *after* the production period, as NCR worked to avoid

the dropping of the "second shoe." Echoes of NCR's traditional strategy will even be heard at trial, as NCR voices defenses that are identical to—and just as plainly false as—NCR's protestations of innocence from decades ago.

> **b.** **Georgia-Pacific Is the Only Party to Fully Investigate PCB Contamination at the Site and Track Down the Party Chiefly Responsible.**

The second overriding equitable consideration is Georgia-Pacific's cooperation. Georgia-Pacific is the only party that has cooperated fully with the State and EPA to clean up the Site. Unlike any of the Defendants, Georgia-Pacific assumed the significant burden of investigating the Site and working with state and federal authorities to identify the most cost-effective way to remediate the harm caused by NCR's PCBs. Thanks to Georgia-Pacific's hard work and willingness to push back against the State's faulty initial risk assessments and the State's pre-existing bias to dredge the whole river, Georgia-Pacific has saved all PRPs at the site (including the Defendants) tens of millions of dollars in clean-up costs. Because Georgia-Pacific took on this task voluntarily, it assumed the risk that some of its costs might not ultimately be recoverable from other parties. Georgia-Pacific thus should be rewarded for its efforts that have provided this great benefit to the Defendants.

Georgia-Pacific should benefit as well vis-à-vis Weyerhaeuser and IP because Georgia-Pacific alone developed the evidence establishing NCR's liability as an arranger, even going so far as to travel to England to preserve critical, decades-old Wiggins Teape documents that were about to be destroyed. In uncovering NCR's decades-old strategy to conceal its responsibility and avoid liability, Georgia-Pacific has materially reduced the liability exposure of both IP and Weyerhaeuser. It is through Georgia-Pacific's hard work that those two parties can shift to NCR some or all of their responsibility for cleaning up the Site.

In Phase I, Georgia-Pacific was the only party to have developed and presented evidence of NCR's liability at the Site.  This is largely true for Phase II as well.  IP does plan to present evidence that NCR-sourced CCP broke was recycled at the Bryant Mill, but as the Court will see, that evidence is almost entirely derivative of Georgia-Pacific's Phase I presentation, even using graphics that were developed by Georgia-Pacific's witness.

### c.    It Is Impossible to Attribute PCBs in Specific Areas of the River to Discharges from Individual Mills.

The significant dearth of records defy any attempt to determine the precise amount of CCP recycled by any one mill in any given year, or to determine the amount of PCBs that any mill discharged in any given year.  The data necessary to make those determinations do not exist. Mills did not test their wastewater effluent for PCBs before the early 1970s. Comprehensive records that would identify how much CCP a mill used at any point in time are unavailable. Mills throughout the Kalamazoo Valley used CCP—as the Court found in Phase I, "a considerable amount of CCP broke from NCR sources in Wisconsin and Ohio" likely would have ended up in the Kalamazoo River Valley—but records that would show just how much CCP a mill used or from whom that paper was purchased at any point in time are no longer available.  Anecdotal evidence, such as Don Lacey's testimony about the recipe for deinking at the Georgia-Pacific mill that included CCP, cannot fairly be extrapolated to draw conclusions about the amount of CCP used over time, because mills would alter their mix of wastepaper based on any number of factors—*e.g.*, the price of virgin pulp, the price of various grades of wastepaper, backhauling relationships.

The best anyone can do with the data available is to draw coarse conclusions about the mills' relative discharges across the entire relevant period.  For example, there appears to be no dispute that the major deinking mills that produced "fine" papers—the KPC Mill, the King Mill,

the Bryant Mill, and (to a lesser extent) the Plainwell Mill—were the largest users of wastepaper grades that would have included CCP.  The mills that produced paperboard—the Sutherland Mill, the Battle Creek mills, and the Mac Sim Bar Mill—would have used substantially less (if any) and discharged significantly fewer PCBs.  The other mills likely used even less.

Additionally, the presence of PCBs in the landfills used by certain mills certainly shows they recycled CCP, and sheds *some* light on the amount those mills recycled in total.

But the data do not allow the parties to go further.  It is impossible, for example, to determine *when* a given mill recycled CCP or how much it recycled in any given year.  Nor is it possible to attribute specific PCBs in the river to specific mills.  Due to other factors relevant to the fate and transport of PCBs that changed over time, such as the lowering of dams in the river and the use of secondary treatment by all of the significant deinking mills (other than Bryant) by 1967, it is now impossible to draw any conclusions regarding the quantity of PCBs located in specific areas of the river that can be attributed to specific mills.  In sum, the PCBs downstream of the Plainwell Mill are a mix of the PCBs discharged by all of the major contributors that cannot be unscrambled.  NCR is the only party that does not accept this fundamental truth, and Georgia-Pacific predicts the Court will agree that the conclusions provided by NCR's experts are unreliable.

### d.    Geography Matters.[2]

Finally, the geographic distribution of the mills and undisputed facts regarding their historic operations also impact the equitable analysis.  No mill's owner or operator should be made to pay for actions taken in areas that could not have been impacted by that mill.

---

[2] To aid the Court's understanding of the discussion of the geography, attached as Exhibits A, B, and C are maps of the River and the mill sites, identifying the Operable Units (OUs) into which the Site has been divided.

Weyerhaeuser and IP should not pay the clean-up costs incurred in OU2, where Georgia-Pacific has incurred costs, because none of their PCB-contaminated residuals went there. Likewise, Weyerhaeuser should not have to pay for costs incurred above the Plainwell Mill.  It could not have caused the PCB contamination that caused those costs.  Nor should GP pay for costs incurred in Portage Creek, which could only be the result of PCBs discharged by facilities owned by others (like the Bryant and Monarch Mills) on Portage Creek.  The Court can, and should, allocate the equities in a way that does not make the owner of one mill responsible for another mill's contribution.

Accordingly, Georgia-Pacific will not seek to recover from IP and Weyerhaeuser costs attributable solely to actions taken in areas of the Site that were not impacted by those companies' mills.  Thus, Georgia-Pacific does not seek its OU2 costs from IP or Weyerhaeuser. Nor does Georgia-Pacific seek from Weyerhaeuser costs associated exclusively with response actions performed entirely upstream of Plainwell.  Respecting this principle requires Georgia-Pacific to seek to recover a different total amount from each Defendant.  Applied solely to non-time-barred costs, and relying on Georgia-Pacific's categorization of costs by OU and geographic area, Georgia-Pacific seeks to recover the following amounts from each other party:

| Geographic Area | Triggering Order (107/113) | Total Amount Sought from: | | |
|---|---|---|---|---|
| | | NCR | IP | Weyerhaeuser |
| OU2 | 1990 AOC (107) | $4,434,433.48 | $0.00 | $0.00 |
| | 2007 Term. AOC (107) | $953.93 | $0.00 | $0.00 |
| | 2007-09 Actions (107) | $598,857.68 | $0.00 | $0.00 |
| | 2009 CD (113) | $15,628,975.64 | $0.00 | $0.00 |
| GP/FJ Mill Sites | 1990 AOC (107) | $1,789,648.59 | $0.00 | $0.00 |
| | 2007 Term. AOC (107) | $3,017.18 | $0.00 | $0.00 |

| | | | | |
|---|---|---|---|---|
| **OU5**[3] | 1990 AOC (107) | $21,110,000.39 | $21,110,000.39[4] | $20,207,997.92 |
| | 2007 Term. AOC (107) | $73,815.74 | $73,815.74 | $73,815.74 |
| | 2008 AOC (113) | $1,845,000.00 | $1,845,000.00 | [time-barred] |
| | 2009 P2 ASAOC (113) | $6,828,627.04 | $6,828,627.04 | $0.00 |
| | **TOTAL** | **$52,313,629.67** | **$29,857,443.17** | **$20,281,813.66** |

IP and Weyerhaeuser may dispute the manner in which Georgia-Pacific has categorized costs by OU or by geographic region of the Site. To the extent that dispute relates to costs incurred under the 1990 AOC, which Georgia-Pacific can recover under § 107(a), the burden falls to IP and Weyerhaeuser to prove that costs were incurred in areas for which their mills have no causal connection. *Twp. of Brighton*, 153 F.3d at 319.

### 2. Proposed Allocation Methodologies

Any method of allocating fault for the PCB contamination at the Site should account fairly for the factors listed above. Georgia-Pacific submits that either of two approaches to allocation would allow the Court to do so.

#### a. NCR Pays 100% of, at a Minimum, Any Share Attributable to Georgia-Pacific's Mills.

First, the Court can allocate 100% of the responsibility to NCR. This approach is consistent with the equitable principles identified above, because it:

- takes into account NCR's unique responsibility for all PCB contamination at the site due to paper recycling, its continuing obfuscation of its responsibility, and its failure to cooperate with the government to prevent contamination in the first place or to clean up the site;

---

[3] OU5 costs on this chart are not offset by the amounts recovered in settlement from Mead or Rock Tenn described above.

[4] This includes costs incurred by Georgia-Pacific upstream of the confluence of Portage Creek and the Kalamazoo River. Should the Court conclude that the Battle Creek mills did not contribute PCBs to the Site, this amount should exclude costs Georgia-Pacific has incurred in OU5 above Portage Creek and thus should be reduced to $20,604,946.46.

- credits Georgia-Pacific for its substantial cooperation, which is especially appropriate given that Georgia-Pacific cannot recover a substantial portion of its past costs;

- does not rely on any inherently unreliable volumetric estimates of individual mill discharges;

- does not offend geographic limits on any party's liability, because NCR's nexus to the Site was as an arranger rather than an owner/operator—and essentially all of the PCBs that any mill discharged originated with NCR in the first place.

This is, by far, the easiest and most fair way to allocate equitable responsibility at the Site.

For these same reasons, should the Court decide to investigate the relative contributions of the various recycling mills to Site contamination (as discussed below), it would be appropriate for NCR to shoulder any calculated share of past and future costs that would otherwise go to Georgia-Pacific.  Georgia-Pacific is unlike the other recyclers both in terms of its cooperation and, as noted above, because Georgia-Pacific "brought NCR to the table."

### b. Evaluating Each Party's Contribution to the Discharges From Each Mill

Should the Court decide to evaluate the contribution of specific mills, Georgia-Pacific proposes a simple two-step methodology that respects the powerful equitable considerations described above.

First, for each relevant mill—and as the evidence will show, there are only four (KPC, King, Bryant and Plainwell)—the Court should identify the parties connected to that mill.  NCR, of course, is connected to every mill that recycled or deinked CCP.  The Court already has found that NCR arranged for the disposal of a "considerable amount" of its own broke at mills in the Kalamazoo valley.  Opinion at 22.  But the analysis required by § 113(f) need not be limited to evidence that would make NCR (or any other party) liable under CERCLA.  MSJ Decision at 8.  Thus, it is entirely appropriate for the Court to account for the undisputed fact that every PCB on every sheet of NCR paper—whether it came from NCR or another pre-consumer source, from

post-consumer sources, or from paper manufactured using NCR paper—originally came from

NCR's proprietary emulsion.  But whereas NCR is connected to every PCB now present at the

Site due to paper recycling, the mill parties are only connected to the PCBs discharged into the

river or landfills due to recycling and deinking at the mills they owned or operated.  If, as

explained above, no mill party should be made to pay to clean up PCBs in landfills that did not

receive residuals from a mill it did not own or operate, it likewise should not have to pay for

PCBs discharged into the river or landfills from facilities it neither owned nor operated.[5]

Second, after identifying the parties connected to each mill, the Court would weigh the

equities among the connected parties.  For example, with respect to the KPC Mill, Georgia-

Pacific owned the mill and NCR arranged for the disposal of CCP and its coating there—but

Weyerhaeuser and IP have no connection at all.  So the Court would allocate responsibility for

the KPC mill's contribution between NCR and Georgia-Pacific.  And as noted above, the Court

would be well justified to allocate 100% of that share to NCR.

This approach is also consonant with the most important equitable principles described

above.  It allows the Court to account for NCR's unique culpability vis-à-vis *each* other party in

the case.  It likewise allows the Court to account for Georgia-Pacific's substantial cooperation

without unfairly adjusting—one way or the other—the shares assigned to IP or Weyerhaeuser as

a result.  It does not require the Court to go beyond where reliable data will allow with respect to

volumetric contributions or PCB fate and transport.  The Court can instead make a rough

(perhaps quite rough indeed) estimate regarding the total PCBs discharged by each mill over the

---

[5] To remain faithful to this principle, the Court would need to conduct multiple allocations based on the geographic area where costs have been incurred.  At a minimum: (1) OU2 and GP/Ft. James mill properties (between GP and NCR); (2) OU5-Portage Creek (NCR and IP); (3) OU5-East and Central (GP, NCR and IP); (4) OU5-West (NCR, GP, IP and Weyerhaeuser); and (5) Site-Wide Costs (all parties).

entire period and then move on.  And finally, this regime recognizes that, unlike NCR, the mill

parties have no connection to PCBs discharged by mills they did not own or operate, and

therefore should not, in fairness, be made to pay for cleaning them up.

IP and NCR may argue that the Court should assign shares to non-parties, such as

bankrupt parties (like Allied's successor, Millennium Holdings, LLC) or companies in the chain

of title for one or more of the mills.  The apparent motive is to limit what a § 113(f) plaintiff

could recover from the parties in this case.  As explained above, the Court is not required to

allocate shares to non-parties.  *See Am. Cyanamid*, 381 F.3d at 19.  And doing so here would

complicate the case unnecessarily and could work substantial injustice on any party asserting a

§ 113(f) contribution claim.

### E.  The Court's Mandatory Declaration Governing Liability for Future Costs

Future costs are certain to occur.  Within a matter of weeks (if not days), EPA will issue

an Action Memorandum finding that a time-critical removal action is necessary at the Otsego

Township Dam and will begin negotiations with parties to perform that work voluntarily.  And if

the parties do not agree to do the work voluntarily, EPA will issue a unilateral order under

CERCLA § 106 directing the parties to do so.  Similarly, EPA is weeks away from publishing

the final record of decision for the remedy in Work Area 1 of OU5.

If the Court's declaration in this case does not assign responsibility among the parties in

this case for that work, the parties will be back in front of the Court almost immediately with a

new case addressing the same issues.

Fortunately, the status and salient characteristics of the Site permit the Court to enter a

detailed declaratory judgment that will resolve future disputes (other than the amount, necessity,

and NCP-consistency of future costs incurred).  This is so because the allocation methodology

the Court will apply with respect to past costs will be fully applicable to future costs, regardless

of the remedies ultimately selected or the cost of those remedies.  The majority of the future

costs will be incurred in the river downstream of Plainwell, where the PCBs from the all of the

mills are intermingled.  The allocation methodology the Court uses to allocate past costs for

areas downstream of Plainwell will thus be fully applicable to this category of future costs.  The

parties' respective culpability and the physical impossibility of attributing PCBs to mills will

remain the same.  So the relative percentages the Court assigns for past costs will apply with

equal force to future costs.  With respect to future costs that might be incurred upstream of

Plainwell, the Court's task is almost as simple.  The Court need only remove Weyerhaeuser's

share from the equation and redistribute shares proportionately.

III.    **Other Issues Related to the Presentation of Proof at Trial**

      A.    **NCR's Strategic Decision to Not Plead a Divisibility or Apportionment of Harm as an Affirmative Defense**

An unresolved issue is whether NCR has preserved the right to avoid joint and several

liability on Georgia-Pacific's § 107(a) claim through the affirmative defense of divisibility or

apportionment of harm.  NCR identifies apportionment of harm in the Pretrial Order as an issue

for trial, but it did not plead that affirmative defense, and despite undisputed notice of its absence

for almost a year, it has not sought leave to amend.

As a preliminary matter, NCR's pleadings do not assert, and have never asserted,

divisibility or apportionment of harm as an affirmative defense of divisibility.  NCR did

generally plead "all other defenses under CERCLA" as its 13th Affirmative Defense.  Def. NCR

Corp.'s Answer & Affirmative Defenses to the 1st Am. Compl. of Plaintiffs' Georgia-Pacific

Consumer Prods. LP, Ft. James Corp. & Georgia-Pacific LLC (Dkt. No. 90) at 54.  But in

response to a Georgia-Pacific interrogatory seeking specification of those defenses, NCR stated a

year ago that it was "not currently aware of any additional defenses that it intends to assert other

than to those specifically enumerated in its Answer dated July 25, 2011." NCR Corp.'s Resps. & Objs. to Georgia-Pacific's First Phase II Interrogatories at 8-9 (served Aug. 14, 2014) (attached as Ex. D).

Notwithstanding its failure to plead divisibility, NCR proposes to present through a series of experts (numbering a half dozen or more) that the harm at the Site is capable of apportionment on a temporal basis. More specifically, NCR appears set to argue that there is a date before which it did not have the intent to arrange for the disposal of hazardous substance and that, as a matter of law, it should not be made to pay for PCBs discharged from mills before that date.

That contention is based on a misreading of the Court's Phase I opinion. The Court's Phase I opinion does not set a bright line date as to when NCR became an arranger. It finds that NCR was an arranger "no later than" 1969. So if the Court allows NCR to make this affirmative defense despite failing to plead it, NCR would have the heavy burden of proving when, before 1969, it lacked the requisite intent. It then would have to quantify the amount of PCBs discharged before and after that date. The evidence—or more accurately, the lack thereof—will defy any attempt to prove either of those matters.

But the Court should disallow NCR from pursuing a divisibility defense at trial. Georgia-Pacific noted NCR's failure to plead this defense a year ago, in a brief filed October 6, 2014. *See* Plfs.' Opp'n to Def. NCR Corp.'s Mot. to Compel (Dkt. No. 586) at 7-8. A day later, NCR responded by supplementing its interrogatory response to say that its Answer "expressly asserts defenses that include the divisibility/apportionment defense, including defense Nos. 3, 4, 5, 13, and 14." NCR Corp.'s 2nd Supp. Resps. & Objs. to Georgia-Pacific's First Phase II Interrogatories at 10-13 (served Oct. 7, 2014) (attached as Ex. E). But those defenses cannot be fairly read to assert divisibility or apportionment as a defense, a point Georgia-Pacific reiterated

to NCR a few weeks later.  Letter from G. Sibley to D. Lisner ("Sibley Letter") (Oct. 20, 2014) (attached as Ex. F).

NCR never sought leave to amend in the intervening year. That it has not taken that step suggests that the failure to amend was no oversight.  We do not know NCR's motive, but one possibility is that NCR wants to avoid characterizing its apportionment/divisibility argument as an affirmative defense to avoid conceding that it must bear the burden of proof. *See Twp. of Brighton*, 153 F.3d at 319 ("[A] defendant can avoid joint and several liability if it can prove divisibility. . . .").   But regardless of NCR's motive, the fact remains it did not plead this defense.

### B.      NCR's Objection to Georgia-Pacific's Summary of Voluminous Records

Georgia-Pacific asks that the Court rule in advance of trial, ideally at the pretrial conference, on NCR's objections to Georgia-Pacific's summaries of the invoices and related records concerning its response costs.  Georgia-Pacific has been cleaning up the Site for 25 years.  The costs for that work are memorialized in hundreds of invoices.  To streamline presentation of those costs at trial, Georgia-Pacific has prepared summaries of this cost information pursuant to Rule 1006.  The summaries at issue are Trial Exhibits 2598 thru 2617. Georgia-Pacific produced copies of these summaries on July 30, 2015, long before the agreed date on which the parties would exchange exhibits.  The underlying invoices were produced in discovery.  Most, in fact, were produced during discovery in Phase I.

IP and Weyerhaeuser initially objected to the summaries as hearsay, but they have withdrawn those objections, provided that Georgia-Pacific acknowledges each Defendant's ability to challenge the portion of the Site to which Georgia-Pacific contends the costs relate and the order under which Georgia-Pacific contends the costs are recoverable.  Georgia-Pacific has agreed to that term.

NCR, however, maintains its objections.  Based on the meet-and-confer process, Georgia-Pacific understands that NCR objects that the underlying records (invoices and information extracted from Georgia-Pacific's accounting databases that were disclosed to Defendants in discovery) are hearsay.  The charges on the invoices, however, are not hearsay. They are the charges Georgia-Pacific incurred.  Moreover, each of the underlying records qualifies for the business records exception to the hearsay rule and has been certified as allowed by Rule 902(11).  NCR has also suggested that the summaries are inaccurate, but it has never specified how.  The only explanation provided has been that NCR's experts challenge whether certain of the costs were necessary and consistent with the NCP.  That is not an objection to the accuracy of the summary—even if NCR were correct about the recoverability of certain costs, that has no bearing on the admissibility of the summaries, only the portion of those costs the Court might award.

Georgia-Pacific understands that the Court prefers to resolve evidentiary objections at trial.  NCR's objections to the summaries, however, present a special circumstance.  These summaries will be among the first exhibits that Georgia-Pacific presents.  If they are not admissible, Georgia-Pacific may be required to present voluminous evidence—hundreds of invoices—and additional live witnesses to authenticate the records.  Because this could impact the time required to try the case, Georgia-Pacific requests the Court's consideration of this evidentiary issue at the earliest opportunity.

### C.    Georgia-Pacific's Position on Trial Time and the Order of Presentation

As noted in the Final Pretrial Order, Georgia-Pacific submits that the case can be tried in 75 hours, with Georgia-Pacific allocated 30 hours, NCR allocated 22 hours, IP allocated  11 hours, and Weyerhaeuser allocated 11 hours.

This allocation fairly reflects the evidentiary burdens that each party will bear.  Georgia-Pacific, as a cost-recovery plaintiff and the only party seeking to recover its costs, bears the burden of proving those costs were necessary and NCP-consistent.  And unlike IP and Weyerhaeuser, Georgia-Pacific will present the bulk of the evidence of NCR's distinct culpability.  Georgia-Pacific, therefore, should be given the largest share of trial time.

NCR should, in fairness, have the second largest share.  In addition to rebutting Georgia-Pacific's evidence of NCR's blameworthiness, NCR will present its own evidence regarding the conduct of the mill parties.   NCR also will present a staggering array of expert testimony to support its theory of apportionment and allocation.  While Georgia-Pacific considers this evidence fundamentally flawed, it will take time to present and rebut.  IP and Weyerhaeuser have lesser evidentiary burdens.  Each will rebut testimony offered by Georgia-Pacific and NCR.  Neither will offer evidence on genuinely new topics, so their time allocations should be less than those for Georgia-Pacific and NCR.

For these same reasons, Georgia-Pacific submits that the order of presentation at trial should be as follows:

1.  Georgia-Pacific (case-in-chief)

2.  NCR (response to GP's case-in-chief; presentation of its case-in-chief)

3.   IP (response to GP and NCR cases)

4.  Weyerhaeuser (response to GP, NCR and IP cases)

5.  IP (rebuttal to Weyerhaeuser case)

6.  NCR (rebuttal to IP and Weyerhaeuser cases)

7.  GP (rebuttal to all Defendants' cases)

This order of presentation has several tangible benefits.  It recognizes that NCR will present evidence that differs from the evidence Georgia-Pacific will present, and that IP and

Weyerhaeuser will need to rebut that evidence.  Requiring NCR to precede these parties in presentation allows IP and Weyerhaeuser to efficiently present responsive evidence in one segment of the case.  In contrast, neither IP nor Weyerhaeuser is likely to present evidence against NCR that differs meaningfully from what Georgia-Pacific presents in its case in chief.  So NCR is not prejudiced by having to present its case before those parties.  Finally, this order of presentation allows the plaintiff (Georgia-Pacific) to have the first and last words as is customary.

<u>**Conclusion**</u>

Georgia-Pacific appreciates the time and attention the Court already has devoted to this matter and looks forward to a smooth trial.

Dated:  August 31, 2015

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

By:  ___/s/ Michael R. Shebelskie_____

Peter A. Smit
Adam J. Brody
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501
(616) 336-6000

Michael R. Shebelskie
Douglas M. Garrou
George P. Sibley, III
Paul T. Nyffeler
John E. Beerbower
Hunton & Williams LLP
951 East Byrd St.
Richmond, VA 23219
(804) 788-8200

-34-

Jan M. Conlin
Mathew R. Korte
Ciresi Conlin LLP
225 S. 6th Street, Suite 4600
Minneapolis, MN 55402
(612) 361-8200

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 31, 2015, I electronically filed the foregoing using the

ECF system, which will send notification of such filing by operation of the Court's electronic

systems. Parties may access this filing via the Court's electronic system.

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

By:_____/s/ Michael R. Shebelskie_____