**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GEORGIA-PACIFIC CONSUMER PRODUCTS LP,** | ) | |
| **FORT JAMES CORPORATION, and** | ) | |
| **GEORGIA-PACIFIC LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No: 1:11-cv-00483** |
| **v.** | ) | |
| | ) | **Judge Robert J. Jonker** |
| **NCR CORPORATION,** | ) | |
| **INTERNATIONAL PAPER CO.,** | ) | |
| **and WEYERHAEUSER CO.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**GEORGIA-PACIFIC'S PHASE II PRETRIAL**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.      FINDINGS OF FACT

### A.      SITE BACKGROUND

1.      EPA added the Allied Paper/Portage Creek/Kalamazoo River Site ("Site") to the National Priorities List in 1990.

2.      The Site currently includes an 80-mile stretch of the Kalamazoo River from Morrow Dam to Lake Michigan.  The Site also includes an approximately three-mile portion of Portage Creek, a tributary stream that flows into the Kalamazoo River at the City of Kalamazoo. The portion of Portage Creek included in the Site extends from its confluence with the Kalamazoo River upstream to the Bryant Mill Pond.

3.      The Site currently consists of the following Operable Units: OU1 (Allied Paper Property/Bryant Mill Pond); OU2 (Willow Boulevard and A-Site Landfills); OU3 (King Highway Landfill); OU4 (12th Street Landfill); OU5 (Portage Creek and Kalamazoo River); and OU7 (Plainwell Mill).  The *situs* of the former Kalamazoo Paper Company ("KPC") Mill was once OU6, but was delisted from the Site following completion of a Time Critical Removal Action (TCRA) there.

4.      OU5 (Portage Creek and Kalamazoo River) is divided into seven work areas: Area 1 (Morrow Dam to Plainwell Dam, including Portage Creek); Area 2 (Plainwell Dam to Otsego City Dam); Area 3 (Otsego City Dam to Otsego Dam); Area 4 (Otsego Dam to Trowbridge Dam); Area 5 (Trowbridge Dam to Allegan City Dam); Area 6 (Lake Allegan); Area 7 (Allegan Dam to Lake Michigan).

5.      Removal actions are complete in all Operable Units except OU5.  Any required remedial action also has been implemented in those Operable Units, although some future remedial work, such as monitoring activities, will continue.

1

6.     The remedial investigation and feasibility study for Work Area 1 of OU5 is complete.  EPA has issued a proposed remedy for Work Area 1.  The proposed remedy calls for the removal of contaminated river sediment and floodplain soils at various locations in the Work Area, engineering and institutional controls, and monitored natural recovery.  EPA is expected to issue soon a record of decision approving the remedy.

7.     Four TCRAs have been performed in Work Area 1 of OU5.  Two of the TCRAs were performed in the Bryant Mill Pond and Portage Creek.  The other two were performed at the former Plainwell Impoundment and Plainwell No. 2 Dam.  The TCRAs removed contaminated sediments and soils at those locations.

8.     EPA has proposed an additional TCRA at the Otsego Township Dam in Work Area 3.

9.     The remedial investigations and feasibility studies for Work Areas 2 thru 7 are in various stages of completion.

10.    Although the remedial investigations and feasibility studies for Work Areas 2 thru 7 are not finalized, EPA expects to require remedial actions in some or all of those areas.  The remedial actions are likely to include some combination of removal or capping of contaminated sediments and floodplain soils, engineering and institutional controls, and monitored natural recovery.

**B.     PCB CONTAMINATION AT THE SITE**

11.    Polychlorinated biphenyls (PCBs) are the contaminant of concern at the Site.

12.    EPA designated the Site as a Superfund site because of PCB contamination.

13.    PCBs are the pollutant that necessitated the past remedial actions at the Site.

14.    PCBs are the pollutant that will necessitate the future remedial actions at the Site.

15.      PCBs were produced from 1930 to 1977 by Monsanto Corporation and marketed as mixtures under the trade name Aroclor. Aroclors generally were identified by a four-digit numbering code in which the first two digits indicate the type of mixture and the last two digits indicate the approximate chlorine content by weight percent.  For example, Aroclor 1242 is a chlorinated biphenyl mixture having an average chlorine content of 42% by weight and comprising a distribution of varying amounts of mono- (1), di- (2), tri- (3), tetra- (4), penta- (5), hexa- (6), and hepta- (7) chlorinated derivatives (known as "congeners") of the molecule biphenyl.

### C.      SOURCE OF PCB CONTAMINATION AT THE SITE

16.      The PCBs that necessitated the response actions at the Site came from NCR's carbonless copy paper ("CCP," which was known commercially as "NCR Paper") that paper mills in the Kalamazoo River valley recycled.  There was no other source of PCBs in those mills' papermaking operations.

17.      It is not possible to reliably estimate the amount or the timing of PCB discharges into the Kalamazoo River during the production period of NCR's PCB-containing carbonless copy paper.  There is insufficient information to estimate *either* the inputs (the amounts of CCP recycled) *or* the outputs (the amount of PCBs discharged in effluent) – whether for one mill, for all mills in total, for any given year, or for the entire production period.  No mill maintained information sufficient to show the amount of CCP it recycled, when it recycled that CCP, or the amount of PCBs discharged in effluent as a result.

18.      Although it is impossible to quantify the PCBs that mills discharged at the Site, the mills unquestionably discharged a massive amount of PCBs as a result of recycling NCR's carbonless copy paper.  The large amount of PCBs in the Kalamazoo River—which has been

estimated to be as much as 350,000 pounds of PCBs prior to remediation efforts—confirms that the mills discharged massive amounts of PCBs.

19.     The large amount of PCBs in the mills' landfills provides additional confirmation that the mills discharged substantial amounts of PCBs.

20.     It also is impossible to attribute particular PCBs now found in the Kalamazoo River to particular mills or to specific years of discharge.  The PCBs discharged into the Kalamazoo River were intermingled by the river's hydrodynamics, making it impossible to attribute specific amounts of PCBs at any given location to a particular upstream mill.  Various disturbances in the river system in the decades after the discharge period—such as bank erosion, the lowering or removal of dams, and floods—further intermingled the PCBs and further confound any ability to trace specific amounts of PCBs in the Kalamazoo River to specific mills or specific years of discharge.

### D.     PAPER MILLS AT THE SITE

21.     The following paper mills operated in the Kalamazoo River valley.

| Fine Paper Mills (Deinking Mills) |
|---|
| Bryant Mill |
| King Mill |
| Kalamazoo Paper Company (KPC) Mill |
| Weyerhaeuser/Plainwell Mill |
| Monarch Mill |
| Rex Mill |
| **Paper Board Mills** |
| Sutherland/Brown/Fort James Mill |
| Mac Sim Bar/Hoerner-Waldorf/Otsego Mill |
| Michigan Carton Battle Creek Mills – Fountain Street and Angell Street |
| **Other Mills** |
| National Gypsum Mill |

| |
|---|
| Otsego Falls/Menasha Mill |
| Kalamazoo Vegetable Parchment Mill |
| Hawthorne Mill |

22.     The locations of these mills are depicted in TX 2619.

23.     The deinking mills made various kinds of writing and other specialty papers. These mills used a combination of virgin pulp, secondary fiber, and deinked pulp as furnish to make paper.  The types of waste paper they typically used to make deinked pulp were ledger and books and magazines.  Ledger is a category of pre-consumer waste paper that included carbonless copy paper.

24.     The paperboard mills made cardboard and packaging materials, including food containers.  They used almost exclusively waste paper to make their products.  The waste paper they used was mostly mixed waste of various grades and other types of post-consumer paper (*e.g.,* magazines, newspapers).  Only a small percentage of the waste paper they used (approximately 5%) was likely ledger, which would have been used only as furnish for the outer layers of their products.  These mills did not deink waste paper and instead used waste paper directly as furnish.

25.     The mills in the "Other" category recycled no, or at most a *de minimis*, amount of carbonless copy paper.  They also did not deink waste paper.

26.     Although it is impossible (for the reasons noted above) to quantify each mill's usage of carbonless copy paper, the major deinking mills—the Bryant Mill, the King Mill, the KPC Mill and (and to a lesser extent) the Plainwell Mill—indisputably recycled substantial amounts of carbonless copy paper and consequently discharged substantial amounts of PCBs in their wastewater.  This conclusion is based on the type and amount of paper they produced at any given time, the years they operated, and the size and duration of their deinking operations.  The

significant amounts of PCBs in disposal areas associated with these mills further confirm they recycled large amounts of carbonless copy paper.

27.    The King and Plainwell Mills were next to the Kalamazoo River and discharged PCB-containing wastewater into the river from their onsite wastewater treatment systems.  Those mills never connected to any municipal wastewater treatment plant.

28.    The KPC Mill discharged PCB-containing wastewater into the Kalamazoo River from its onsite wastewater treatment systems until 1967, when it connected to the Kalamazoo wastewater treatment system.  The Kalamazoo wastewater treatment system would not have removed all, or even most, of the PCBs from the KPC Mill's wastewater before discharging that wastewater into the Kalamazoo River.

29.    The Bryant Mill discharged PCB-containing wastewater into Bryant Pond and Portage Creek from its onsite wastewater treatment system.  A significant percentage of the PCBs it discharged migrated down Portage Creek and into the Kalamazoo River.  Conversely, PCB discharges from the KPC, King and Plainwell Mills did not contaminate Portage Creek and Bryant Pond.

30.    The other mills at the Site individually and collectively discharged an amount of PCBs that is inconsequential compared to the major deinking mills.

**E.    THE PARTIES' CONNECTION TO THE MAJOR DEINKING MILLS**

31.    Georgia-Pacific has a connection with only one of the major deinking mills—the KPC Mill.  Georgia-Pacific, LLC is the successor to the company that owned and operated that mill.

32.    International Paper has a connection with only one of the major deinking mills—the Bryant Mill.  As the Court found in Phase I, International Paper is the successor to the

company that owned and operated the Bryant Mill before 1956 and that leased it to Allied Paper between 1956 and 1966.

33.     Weyerhaeuser has a connection with only one of the major deinking mills—the Plainwell Mill.  The Plainwell Mill was owned and operated between 1954 and 1963 by companies to which Weyerhaeuser is the successor and by Weyerhaeuser directly between 1963 and 1970.

34.     NCR has a connection to each mill.  As the Court has already found, a considerable amount of CCP from NCR Sources was recycled by mills on the Kalamazoo River.  Further, *all* PCBs discharged to the Kalamazoo River environment through the recycling of NCR CCP were contained in an emulsion invented by and originally manufactured by NCR, whether or not the wastepaper itself came directly from an NCR Source.

### F.     GEORGIA-PACIFIC LACKED KNOWLEDGE OF PCB CONTAMINATION

35.     The KPC Mill did not know before 1971 that NCR's carbonless copy paper contained PCBs, or that its waste water contained PCBs as a result of recycling carbonless copy paper.

36.     There was nothing from the appearance of carbonless copy paper that indicated it contained PCBs.

37.     There was nothing in the recycling process that revealed that PCBs were in carbonless copy paper.

38.     Like other mills at the Site, the KPC Mill did not test its wastewater effluent for PCBs before 1971.

39.     Corroborating the KPC Mill's lack of knowledge, regulatory officials did not know before 1971 that NCR's carbonless copy paper contained PCBs.  EPA and the State did not

determine that the recycling of carbonless copy paper was the source of PCB contamination at the Site until after 1971.

### G.    NCR'S KNOWLEDGE OF PCB CONTAMINATION

40.    In contrast to the KPC Mill, NCR knew at all times that its carbonless copy paper contained PCBs and that recycling it caused PCBs to be discharged into the environment.

41.    Also in contrast to the KPC Mill, NCR intended the PCB contamination to occur. NCR developed procedures for the recycling of carbonless copy paper in order to make its product viable.  The recycling process NCR developed and promoted entailed the discharge of PCBs and other unwanted constituents in the carbonless copy paper through the recycling mills' wastewater.

42.    NCR acted with reckless disregard of that PCB contamination.  NCR did not investigate the environmental consequences of discharging PCBs into the environment.

43.    Instead of warning recycling mills about the PCB discharges caused by recycling, NCR engaged in a campaign of misinformation, cover-up and deceit to hide the use of PCBs from recyclers, government regulators, and the world.

44.    Unlike Wiggins Teape, NCR's licensee in England, NCR even continued to sell PCB-contaminated broke and trim from carbonless copy paper after NCR learned that the recycling process was contaminating paper food packaging, and thus food, with PCBs.  By the time food contamination was confirmed, NCR had long been aware of a risk of that contamination.

45.    At all times, NCR could have taken numerous steps to stop the contamination of the environment and food, but NCR elected not to act, and instead continued to facilitate recycling of CCP.

### H.     GEORGIA-PACIFIC'S COOPERATION IN THE CLEAN-UP

46.     Georgia-Pacific has voluntarily participated in the clean-up of the Site.  It started working with the State of Michigan in 1987 to develop containment plans for the disposal areas the KPC Mill used.  When the Site was added to the National Priorities List in 1990, Georgia-Pacific entered into an AOC with the State of Michigan that year to conduct a remedial investigation and feasibility study at the Site.  That order was terminated in 2007.  Georgia-Pacific then entered into an ASAOC with EPA to complete the remedial investigation and feasibility study in OU5.  Work under that latter order is ongoing.

47.     Georgia-Pacific also entered into the following orders and agreements with the State of Michigan and EPA with regard to the Site:

> 47.1.   An AOC with the State in 2000 to implement the remedy in OU3.
>
> 47.2.   An ASAOC with EPA in 2006 to perform a TCRA at the former OU6 (the KPC and Hawthorne Mill sites).
>
> 47.3.   An ASAOC with EPA in 2007 to perform the TCRA at the former Plainwell impoundment.
>
> 47.4.   An AOC with the State in 2008 to reimburse the State for certain costs it incurred in connection with remedial investigations at the Site.
>
> 47.5.   An ASAOC with EPA in 2009 to perform the TCRA at the former Plainwell Dam #2.
>
> 47.6.   A consent decree with EPA in 2009 to perform the remedial  action at OU2.

48.     Georgia-Pacific initially worked under the 1990 AOC through the Kalamazoo River Study Group ("KRSG").  The other members of the KRSG were Millennium Holdings, LLC (the successor to Allied Paper), James River (which later merged with Georgia-Pacific) and

Simpson-Plainwell (later Plainwell, Inc.), the owner and operator of the Plainwell Mill after Weyerhaeuser.  Plainwell, Inc., filed for bankruptcy in 2000.  Millennium Holdings, LLC (through its affiliate Lyondell Chemical Company) filed for bankruptcy in 2009.

### I.     OTHER PARTIES' LACK OF COOPERATION

49.     NCR has not participated in any cleanup activities at the Site.  NCR has refused to participate in any cleanup activities even after receiving a general notice letter from EPA in 2010 that identified NCR as a potentially responsible party.

50.     International Paper has not participated in any cleanup activities at the Site. International Paper has refused to participate in any cleanup activities even after receiving a general notice letter from EPA in 2010 that identified International Paper as a potentially responsible party.

51.     Weyerhaeuser did not participate in any cleanup activities at the Site before 2005. Weyerhaeuser entered into ASAOCs with EPA in that year to perform remediation at OU4 (12th Street Landfill) and OU7 (Plainwell Mill).  Weyerhaeuser has not entered any orders to perform work in OU5 (Kalamazoo River/Portage Creek).

### J.     GEORGIA-PACIFIC'S COSTS

52.     The response costs, net of credits, settlements and judgments which Georgia-Pacific has incurred and for which it seeks reimbursement are set forth in TX 2617, which is attached as Exhibit A.

53.     Those costs were necessary and consistent with the National Contingency Plan.

54.     Georgia-Pacific expects to spend at least another $50 million to complete the remedial investigations and feasibility studies under the 2007 SRI/FS AOC.

### K. DEFENDANTS' ABILITY TO PAY

55. Each of the Defendants has the ability to pay the past costs Georgia-Pacific seeks from them.

56. Each Defendant also has the equal ability to pay future remedial costs at the Site.

## II. CONCLUSIONS OF LAW

### A. GEORGIA-PACIFIC'S CLAIMS

57. Georgia-Pacific has asserted claims against each Defendant under §§ 107(a)(4) and 113(f)(3) of CERCLA, 42 U.S.C. § 9601 *et seq.*  Georgia-Pacific seeks to recover various past response costs under both provisions.  It also seeks a declaration of liability to govern future response costs incurred at the Site.

### 2. Section 107(a)(4) claim

58. Section 107(a)(4), 42 U.S.C. § 9607(a), allows recovery of response costs that a person incurs as a consequence of the release, or threatened release, of pollutants.  The costs must be necessary and consistent with the National Contingency Plan.

59. There is no bright line rule for showing necessity, and the bar is not particularly high.  As a general matter, "[c]osts are 'necessary' if incurred in response to a threat to human health or the environment."  *Regional Airport Authority v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006); *see also Carson Harbor Village, Ltd. v. Unocal Corp.*, 990 F. Supp. 1188, 1193 (C.D. Cal. 1997), *aff'd en banc*, 270 F.3d 863 (9th Cir. 2001) (Responses "costs are 'necessary' and thus recoverable under CERCLA when undertaken in response to an actual and real threat to human health or the environment.").  CERCLA does not require costs to be incurred in response to an express command from State or federal authorities.  *See, e.g., Richland-Lexington Airport Dist. v. Atlas Properties, Inc.*, 901 F.2d 1206, 1208-09 (4th Cir. 1990); *Tanglewood East*

*Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1575 (5th Cir. 1988); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 890 (9th Cir. 1986).

60.     The NCP-consistency of actions taken by a private party is governed by a flexible standard.  In general, work will be considered "'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of [40 C.F.R. § 300.700(c)], and results in a CERCLA-quality cleanup."  40 C.F.R. § 300.700(c)(3)(i).  "[I]mmaterial or insubstantial deviations" from the NCP requirements will not render a response action "inconsistent."  40 C.F.R. § 300.700(c)(4).  Moreover, actions that are taken pursuant to a government order are afforded a presumption of consistency.  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 137 (2d Cir. 2010) ("NiMo's adherence to the DEC Consent Decree established its compliance with the [NCP].");  *Morrison Enterprises v. McShares, Inc.*, 302 F.3d 1127, 1136 (10th Cir. 2002);  *see also* 40 C.F.R. § 300.700(c)(3)(ii) ("Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'");  *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (holding that a response action "satisfied the NCP" *because* "the Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation.");  *City of Wichita v. APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1083 (D. Kan. 2003) (holding that "for purposes of the ... rebuttable presumption, that there is no difference" between a consent decree and a consent order).

61.     Liability under § 107(a)(4) is joint and several.  *See, e.g., United States v. R.W. Meyer* (*R.W. Meyer I*), 889 F.2d, 1497, 1507 (6th Cir. 1989) ("CERCLA has been interpreted to

impose joint and several liability when the environmental harm is indivisible, and to allow for apportionment when two or more persons independently are responsible for a single harm that is divisible.") (internal citations omitted). A defendant liable under § 107(a) can escape joint and several liability for all of the harm at a CERCLA site only if it can show that the harm at the site is "theoretically capable of apportionment" and that there exists a reasonable basis for apportionment. *Burlington Northern and Santa Fe Ry. v. United States*, 556 U.S. 599, 614 (2009); *see also United States v. Twp. of Brighton*, 153 F.3d 307, 317-18 (6th Cir. 1998). A defendant bears the burden of pleading and proof on the question of divisibility and apportionment. *Twp. of Brighton*, 153 F.3d at 319 ("[A] defendant can avoid joint and several liability if it can prove divisibility . . . .").

62.    After removing costs that the Court has determined are barred by the statute of limitations, Georgia-Pacific may recover under § 107(a)(4) the total amount of $28,010,726.99.

63.    NCR, International Paper, and Weyerhaeuser are jointly and severally liable to Georgia-Pacific under § 107(a)(4). NCR is liable for the entire $28,010,726.99, since it has no divisibility defense. International Paper's joint and several liability is limited to $21,183,816.13, given the geographic divisibility of the total amount. Weyerhaeuser's joint and several liability is limited to $20,281,813.66, given the geographic divisibility of the total costs.

64.    The geographic divisibility described above proceeds from the conclusion that a paper mill owner/operator should not pay for the clean-up of PCBs in areas that were not impacted by mills owned or operated by that party. Georgia-Pacific's accounting records, which tracked where actions were performed and their associated costs, provides a reasonable basis for apportioning harm based on geography. The amounts above are drawn from Georgia-Pacific's accounting records.

13

65.    International Paper has asserted a counterclaim against Georgia-Pacific and cross-claims against the other Defendants under § 113(f).  International Paper seeks equitable apportionment of any response costs that are imposed on it as a consequence of Georgia-Pacific's § 107(a)(4) claim.

66.    Weyerhaeuser has filed a comparable counterclaim against Georgia-Pacific and cross-claims against the other Defendants.

67.    An award on Georgia-Pacific's § 107(a)(4) claim against International Paper and Weyerhaeuser thus must consider whether those Defendants have proven the award would exceed their fair share of response costs.

68.    NCR did not assert any counterclaims or cross-claims.  No such consideration is thus to be made in awarding relief against NCR on Georgia-Pacific's § 107(a)(4) claim.

### 3.    Section 113(f)(3) claim for past costs

69.    Section 113(f)(3), 42 U.S.C. § 9613(f)(3), allows a responsible party to obtain contribution from other responsible parties for response costs incurred pursuant to certain administrative agreements with the United States and judicially approved settlements.

70.    As with § 107(a)(4), the response costs must be necessary and consistent with the National Contingency Plan to be recoverable under § 113(f).  But unlike § 107(a), the parties' liability under § 113(f) is several—each party's several share is based on the consideration of equitable factors that are not considered in resolving § 107(a) claims.  In general, a contribution plaintiff must show the equitable shares of each of the parties and that it has paid in excess of its own share.  It then can recover from each defendant up to that defendant's equitable share. *United States v. R.W. Meyer, Inc. (R.W. Meyer II)*, 932 F.2d 568, 572 (6th Cir. 1991).

71.    The Court has broad discretion to allocate equitable responsibility among the parties.  The Court "must construct a flexible decree balancing all the equities in the light of the

14

totality of the circumstances." *R.W. Meyer II*, 932 F.2d at 572.  In doing so, the Court is free to consider whatever factors it deems appropriate and has the discretion to weigh those factors however it chooses.  42 U.S.C. § 9613(f)(1); *R.W. Meyer II*, 932 F.2d at 572; Opinion and Order of August 12, 2015 (Dkt. No. 787) ("MSJ Decision") at 8 ("In a CERCLA equitable allocation decision, a court has broad discretion in making CERCLA contribution allocation decisions, and virtually any factor may be potentially relevant.").

72.     The Court need not allocate shares to PRPs that are not parties to the case, especially where that would unfairly saddle one of the parties with excess costs.  *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 19 (1st Cir. 2004).  "[I]n some cases, apportioning responsibility among all PRPs is not an attractive option as it could 'complicate an already difficult allocation process or saddle firms . . . with excess costs and 'might take years of trial time.'"  *Id.* (quoting *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 306 (7th Cir. 1999)).

73.     Although there is no single exhaustive list of factors, courts frequently will consider the so-called "Gore" factors:

- The ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

- The amount of the hazardous waste involved;

- The degree of toxicity of the hazardous waste involved;

- The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

- The degree of care exercised by the parties with respect to the hazardous waste, taking into account the characteristics of such hazardous waste; and

- The degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or environment.

*See Centerior Serv. Co. v. Acme Scrap Iron & Metal*, 153 F.3d 344, 354 (6th Cir. 1998),

*abrogated on other grounds by United States v. Atl. Research Corp.*, 551 U.S. 128 (2007).

Courts have also applied the so-called "Torres" factors:

- The extent that cleanup costs are attributable to a specific party.

- The party's level of culpability.

- The degree to which the party benefitted from disposal of the waste.

- The party's ability to pay its share of the cost.

*United States v. Consol. Coal Co.*, 345 F.3d 409, 413 (6th Cir. 2003) (citing *United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998) (Torres, J.)).  But "neither of these lists is . . . exhaustive or exclusive," and "in any given case, a court may consider several factors, a few factors, or only one determining factor, depending on the totality of the circumstances presented to the court." *Consol. Coal Co.*, 345 F.3d at 413-14 (internal citations and quotations omitted). That includes factors unrelated to the basis for a party's liability. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 5064049, at *12 (E.D. Wis. Dec. 16, 2009) ("[S]everal of the oft-cited equitable factors in § 113 actions have nothing to do with the reasons the parties are considered PRPs."); MSJ Decision at 8.

74.    In the wake of the Court's ruling on the statute of limitations, Georgia-Pacific seeks a total of $24,302,602.68 under § 113(f)(3) against NCR and International Paper only.  The maximum share of this amount that can be assigned to International Paper, in light of geographic divisibility, is $8,673,627.04.

75.    As with Georgia-Pacific's § 107(a)(4) costs, the different amounts Georgia-Pacific seeks reflects that Georgia-Pacific does not seek contribution from International Paper and Weyerhaeuser for response costs that were incurred in the Kalamazoo River upstream from those parties' respective mills or in the disposal areas that their mills did not use.  Also, a portion

of Georgia-Pacific's § 113(f)(3) costs is time-barred as to Weyerhaeuser and not the other Defendants.

### 4. Claim for Future Costs

76.     Georgia-Pacific also seeks a declaration under § 113(g)(2) of the parties' future liability for response costs at the Site.

77.     CERCLA states that the Court "*shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (emphasis added). The duty to enter this declaration is mandatory. *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 844 (6th Cir. 1994); *Dent v. Beazer Materials & Servs., Inc.*, 156 F.3d 523, 531–32 (4th Cir. 1998) (holding that a court must enter declaratory relief as to future response costs where liability for existing costs is established); *AlliedSignal v. Amcast Int'l Corp.*, 177 F. Supp. 2d 713, 757 (S.D. Ohio 2001); *United States v. Kramer*, 757 F. Supp. 397, 412 (D.N.J. 1991).

78.     The statute does not make exceptions where records of decisions governing future remedies have not yet issued. *See, e.g.*, *Vine Street, LLC v. Keeling*, 460 F. Supp. 2d 728, 767 (E.D. Tex. 2006), *rev'd on other grounds by* 776 F.3d 312 (5th Cir. 2015) (rejecting the claim that "assigning future liability is simply too speculative since there is no remediation plan in place"); *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1140–42 (D. Or. 1996), *aff'd in relevant part*, 207 F.3d 1177 (9th Cir. 2000) (rejecting the claim that declaratory relief is inappropriate where "the remedy . . .has not yet been determined" and awarding declaratory relief for future costs on a proportional share basis).

79.     Pursuant to this statutory mandate, courts routinely issue a declaration of liability that binds the parties in future action by assigning parties a percentage of the equitable responsibility for future costs.

### B.     LIABILITY ON GEORGIA-PACIFIC'S CLAIMS

80.     The Court has previously found that NCR and International Paper are liable to Georgia-Pacific.   Weyerhaeuser admitted liability.   The Court now concludes that Georgia-Pacific is entitled to recover the following amounts from Defendants.

#### 1.     Past Costs Under Section 107(a)(4)

81.     The Court finds that the response costs Georgia-Pacific seeks under § 107(a)(4) were necessary and consistent with the National Contingency Plan.

82.     NCR is jointly and severally liable to Georgia-Pacific for the full amount of those costs, $28,010,726.99.   NCR has not pleaded the affirmative defense of divisibility.   Even if NCR had, the Court finds that NCR has not proven a reasonable basis for apportioning the harm at the Site as between Georgia-Pacific and NCR.

83.     International Paper and Weyerhaeuser are with NCR jointly and severally liable to Georgia-Pacific to the extent, respectively, of $21,183,816.13 (International Paper) and $20,281,813.66 (Weyerhaeuser).   As noted above, these amounts exclude costs associated with response actions performed exclusively in portions of the Kalamazoo River upstream of these Defendants' mills or in disposal areas that their mills did not use.

84.     Judgment will be entered against each of the Defendants in the foregoing amounts, plus prejudgment interest from the date of Georgia-Pacific's Complaint (December 3, 2010), on Georgia-Pacific's § 107(a)(4) claim.

#### 2.     Past Costs Under Section 113(f)(3)

85.     The Court finds that the response costs Georgia-Pacific seeks under § 113(f)(3) were necessary and consistent with the National Contingency Plan.

86.     The Court finds that, as a matter of equity based on all the evidence, NCR is 100% responsible for those response costs.

87. The Court's finding that NCR should bear the cost of any share otherwise attributable to Georgia-Pacific takes into account these parties' relative degree of involvement in generating the contamination, their relative culpability, and their relative degree of care, especially NCR's knowing role in creating the PCB contamination and its reckless disregard of the risks posed by that contamination, versus Georgia-Pacific's lack of knowledge until it was too late.

88. It takes into account Georgia-Pacific's 25-year history of cooperation at the Site versus NCR's stubborn refusal to assist in the cleanup and to deny liability for the contamination, which continued even after Phase I of this lawsuit notwithstanding the mountain of evidence establishing NCR's arranger liability.

89. It reflects that NCR benefitted greatly from the disposal of the PCBs.  As the Court found in Phase I, recycling of broke and trim from the production of carbonless copy paper was crucial to the economic viability of the product.

90. It reflects that Georgia-Pacific has incurred approximately $55 million in past response costs that the Court has declared time-barred and is expected to incur another $50 million under the 2007 SRI/FS ASAOC that Georgia-Pacific will not be able to recover.

91. The Court also notes and relies on NCR's ability to pay the allocated liability.

92. Judgment will be entered against NCR in the amount of $24,302,602.68, plus prejudgment interest from the date of Georgia-Pacific's Complaint (December 3, 2010) on Georgia-Pacific's § 113(f)(3) claim.

### 3. Future Costs

93. The Court finds and declares that Georgia-Pacific has no liability for future response costs in OU1.  Nor is Georgia-Pacific liable for future response costs in the Portage

Creek portion of OU5.  As among the parties to this lawsuit, those costs are to be borne solely by International Paper and/or NCR.

94.     The Court finds and declares that NCR is 100% responsible for any future response costs that Georgia-Pacific incurs elsewhere at the Site.   This finding is based on consideration of the same equities that provide the basis for allocating to NCR 100% of Georgia-Pacific's past costs under § 113(f)(3).

Dated:  August 31, 2015

> **GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**
>
> By:    /s/ Michael R. Shebelskie
>
> Peter A. Smit
> Adam J. Brody
> Varnum LLP
> Bridgewater Place, P.O. Box 352
> Grand Rapids, MI 49501
> (616) 336-6000
>
> Michael R. Shebelskie
> Douglas M. Garrou
> George P. Sibley, III
> Paul T. Nyffeler
> John E. Beerbower
> Hunton & Williams LLP
> 951 East Byrd St.
> Richmond, VA 23219
> (804) 788-8200
>
> Jan M. Conlin
> Mathew R. Korte
> Ciresi Conlin LLP
> 225 S. 6th Street, Suite 4600
> Minneapolis, MN 55402
> (612) 361-8200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2015, I electronically filed the foregoing using the

ECF system, which will send notification of such filing by operation of the Court's electronic

systems. Parties may access this filing via the Court's electronic system.

**GEORGIA-PACIFIC CONSUMER PRODUCTS,
LP., FORT JAMES CORPORATION, and
GEORGIA-PACIFIC LLC**

By:____/s/ Michael R. Shebelskie_____

21