UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, et al., | |
| Plaintiff, | Case No.  1:11-cv-00483 |
| vs. | |
| NCR CORPORATION, et al., | Hon. Robert J. Jonker |
| Defendants. | |

**INTERNATIONAL PAPER COMPANY'S PHASE II TRIAL BRIEF**

## I.  INTRODUCTION

The ultimate purpose of the upcoming trial is to help the Court arrive at an appropriate allocation of those response costs incurred at the Allied Paper/Portage Creek/Kalamazoo River Superfund Site ("Site").  From International Paper's perspective, that division of responsibility should first focus on the nature of NCR's liability flowing from its role as a party that arranged for the disposal of carbonless copy paper ("CCP"), and its equitable responsibility for injecting CCP into the stream of commerce.  The division should then turn to parties that were actively involved and owned and operated mills at the time those mills recycled CCP and discharged PCBs to the Site, Plaintiffs ("GP") and Weyerhaeuser (collectively, the "Mill Parties").  Only then should the Court consider International Paper, which itself never discharged polychlorinated biphenyls ("PCBs") to the Site and instead whose primary tie to the Site is as the successor to a discharger's landlord.  Compared to the other parties, International Paper thus has a fundamentally different relationship to the PCB discharges that caused the response costs at issue.  Allocating costs according to the various parties' relationship to those PCB discharges, along with other factors, supports an assignment of no more than a minimal share of any recoverable response costs to International Paper.

One of those factors—the source of the PCBs detected in Kalamazoo River sediments— will be the focus of much of the evidence, primarily from expert testimony, presented during the trial.  International Paper expects that evidence to demonstrate that the Bryant Mill (the basis for its owner liability determined in Phase I) contributed relatively minimal amounts of the PCBs detected in Kalamazoo River sediments for two primary reasons.  First, the Bryant Mill was located on Portage Creek, not on the Kalamazoo River itself.  Second, the Bryant Mill had a 29-acre pond, where PCBs discharged from the Bryant Mill settled, were trapped and were then later removed.  In contrast, other mills along the Kalamazoo River lacked a settling basin like the

Bryant Mill Pond.  Also, those mills—and in particular, GP's Kalamazoo Paper Company ("KPC") Mill—discharged their effluent directly into the main stem of the much larger and faster-moving Kalamazoo River, and the PCBs in that effluent then settled in sediments throughout the length of the River.

Other factors are important to determine International Paper's relative share of responsibility, although they may not be a focus of testimony at trial.  Those factors include:

- the limited and passive nature of International Paper's tie to the Site as an "owner" of the Bryant Mill and without any involvement in the activities that resulted in PCB discharges at the Site;

- GP's lengthy delay in pursuing claims against St. Regis as a potentially responsible party ("PRP") and the resulting prejudice to International Paper's ability to defend itself against GP's claims because records have been lost or destroyed and key witnesses have died; and

- Allied's[1] payments attributable to the response costs caused by the Bryant Mill's discharges.

Much of the most-important evidence regarding these issues and other issues addressed below will be found in the records from the Site investigation and the prior CERCLA cost-recovery litigation that GP prosecuted from 1995 to 2004, not from the mouth of any witness at trial. Those other issues are the primary focus of this trial brief.

## II.  EVIDENCE THAT WILL NOT BE A FOCUS OF TRIAL SUPPORTS A MINIMAL ALLOCATION TO INTERNATIONAL PAPER.

Much of the evidence that the Court should weigh most heavily in considering International Paper's equitable responsibility will not be a focus at trial.  The parties' discovery has centered, and their expert witnesses' testimony will focus, largely on two equitable factors: (1) NCR's concealing its knowledge that PCBs were hazardous and that recycling CCP would

---

[1]     For clarity, International Paper refers to Allied and its successors HM Holdings, Inc., Millennium Holdings, Inc. and Millennium Holdings LLC collectively as "Allied."

release PCBs into the environment; and (2) the various mills' operations and the extent to which modeling PCB discharges from the mills (and the fate of those PCBs) over time is possible. Because this case is being litigated so long after the relevant discharges took place, evidence regarding other issues, with rare exceptions, is not available. Other relevant evidence—for example, evidence concerning the interactions of Kalamazoo River Study Group ("KRSG") members—is not available because the only two KRSG members that are not plaintiffs in this litigation have gone bankrupt and because GP has invoked the "mediation privilege" to shield other relevant information from discovery.

As a consequence, evidence addressing equitable factors such as laches and Allied's prior payments on behalf of the Bryant Mill will not be major subjects of trial evidence. Instead, that evidence will be highlighted primarily in post-trial briefing. Regardless, keeping these issues in mind will help to place in proper context the trial evidence that the Court receives.

### A. **International Paper is economically remote from the Site and lacks a direct connection to any PCB discharges.**

GP's primary basis for suing International Paper is its connection to the Bryant Mill. Indeed, that is the only basis that GP's Amended Complaint identifies for pursuing claims against International Paper. [Dkt. #80 (Am. Compl.) ¶¶ 95–112.] But International Paper has only an indirect connection to the Bryant Mill—and thus to the Site: during a ten-year period, International Paper held title to real property where Allied de-inked wastepaper containing CCP.

Unlike the Mill Parties (GP and Weyerhaeuser), International Paper itself never operated the mill at the center of its putative liability during the relevant period (1954–1971). GP purchased the Kalamazoo Paper Company ("KPC") Mill (and its liabilities) in 1967 and operated that mill itself from 1967 through 1971 and beyond. GP also owned and operated other mills: the Sutherland "Board" Mill and Sutherland's Plant 11 and the Kalamazoo Vegetable Parchment

Mill.  Similarly, Weyerhaeuser bought the Plainwell Mill (and its liabilities) in 1963, and operated the mill itself until 1970.  By contrast, International Paper acquired Champion, which had never operated the Bryant Mill.  Champion, in turn, had acquired St. Regis, which had operated the Bryant Mill only until June 30, 1956, and held title to the mill and its associated real property only until 1966.

Nor did International Paper's predecessor St. Regis discharge any PCBs during the short time it operated the Bryant Mill during the relevant period.  The Court has already determined that there is no evidence that the Bryant Mill recycled CCP or otherwise discharged PCBs before June 30, 1956.

So the two Mill Parties are former owner/operators of their relevant mills, and both discharged PCBs while they operated those mills.  By contrast, International Paper is three degrees removed from mill operations:  It is merely the successor to the successor of a company that was a landlord during a portion of the relevant period.  International Paper is thus the only party that is a PRP as a successor to a non-operating (former) owner.

The terms of the lease between St. Regis and Allied bolster the conclusion that International Paper is economically remote from the Site.  Under those terms, St. Regis relinquished most indicia of ownership, aside from holding title, collecting rent, and retaining the right to enter the property.  Indeed, just 3½ years after the transaction and after pouring millions of dollars into mill improvements, Allied began accounting for the transaction as a purchase, rather than as a lease, reflecting Allied's understanding that *it*, not St. Regis, possessed most indicia of ownership from that point forward.

Nor do the two mills located in Battle Creek, the Fountain Street Mill or the Angell Street Mill (the "Battle Creek Mills") or the MacSimBar Mill materially increase International Paper's

connection to the Site. After Phase I, GP suggested that International Paper may have additional "equitable liability" for those three mills. The Battle Creek Mills are outside of the Site. The third is the MacSimBar Mill, which is located downstream of the Mill Parties' mills. In fact, it is the farthest downstream of any mill alleged to have recycled CCP. Like the Bryant Mill, International Paper itself never operated those mills. Instead, *after* the relevant period, St. Regis and Champion bought companies that had operated these mills during the relevant period:

- **Fountain Street Mill:** In 1974, St. Regis acquired and merged with Michigan Carton Company, which operated the Fountain Street Mill and then operated the mill until 1984, when the mill was sold to the Michigan Holding Company.

- **Angell Street Mill:** Michigan Carton Company also operated a second mill in Battle Creek, the Angell Street Mill, which St. Regis acquired through its 1974 merger with Michigan Carton Company. After Champion acquired St. Regis, Champion sold the mill to Waldorf Corporation in 1985. The mill was thus not an asset of Champion when International Paper acquired Champion in 2000.

- **MacSimBar Mill:** St. Regis never owned the MacSimBar Mill. Instead, Hoerner-Waldorf Corporation and its predecessor Waldorf Paper Products Company owned and operated the mill from July 1, 1960 until January 1, 1968, when assets associated with the mill were sold to Mead. Hoerner-Waldorf merged into Champion in 1977, and International Paper acquired Champion in 2000.

These histories show that International Paper is economically remote from those mills, and especially remote from their operations during the relevant period.

Under the circumstances here, allocating more than a minimal share to a party as economically remote from the Site as International Paper would not advance CERCLA's purpose. Congress passed CERCLA primarily to facilitate the cleanup of hazardous waste by forcing those *responsible* for the contamination to pay for its remediation. *E.g.*, *Wiegmann & Rose Int'l Corp. v. NL Indus.*, 735 F. Supp. 957, 962 (N.D. Cal. 1990) ("Courts have repeatedly noted that one of the primary objectives of CERCLA is to require responsible parties to bear the

costs of remedying the conditions they created."); *United States v. CDMG Realty Co.*, 96 F.3d 706, 712 (3d Cir. 1996) (noting that one of Congress's goals was "to force polluters to pay the costs associated with their pollution"). And International Paper's connection to the Site's PCB problem is attenuated relative to that of the other parties. That supports allocating no more than a minimal share of the responsibility for—and thus the costs arising from—that problem.

### B. GP's delay in pursuing its claims against St. Regis's successors justifies substantially reducing any allocation to International Paper.

GP's delay in pursuing International Paper—or Champion, for that matter—is another equitable factor militating in favor of reducing any allocation to International Paper.

GP dragged its feet for nearly two decades. The Site was listed on the National Priorities List in 1990. In December 1990, GP, Allied, and Simpson Plainwell Paper Company entered into the 1990 AOC, agreeing to perform a Site-wide remedial investigation and feasibility study ("RI/FS") under the Michigan Department of Natural Resources' supervision. In early 1991, those three companies formed the KRSG, an unincorporated association whose purpose was to locate, and procure contribution from, other PRPs. The KRSG pursued dozens of companies and invited them to join the cause. Only one did—James River Corporation, which later became Fort James Corporation, which in turn GP acquired and is now a plaintiff in this case. The KRSG's dragnet also led to nearly a decade of litigation. In 1995, the KRSG sued eight other companies in this Court, and that CERCLA litigation continued until 2004. Not once did GP approach St. Regis's successors (Champion or International Paper), even though GP knew about St. Regis's connections to the Site. The first notice of GP's claims came when GP filed this lawsuit, which was days after the EPA informed International Paper that it had been named as a PRP at the Site.

Allowing GP to recover from International Paper now—decades after beginning its investigation of the Site and pursuit of multiple other PRPs —would be inequitable.

*First*, GP had an opportunity to attempt to hold St. Regis's successors liable in the KRSG litigation but elected not to do so. The KRSG litigation represented GP's first attempt to pursue § 107 claims for Site-related costs, and was thus the proper time to pursue those claims—the same claims at issue in this case—against St. Regis's successors. GP can identify no facts related to St. Regis's limited role at the Site that GP did not know by 1995, when the KRSG litigation began, but did know in November 2010, when it initiated this case. Giving GP that second bite at the apple would contravene the policies underlying statutes of repose and limitations, and the principles of equity. *See GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 450 (6th Cir. 2004) (affirming the district court's consideration of laches as an equitable factor when allocating response costs); *Town of Munster, Ind. v. Sherwin-Williams Co.*, 27 F.3d 1268, 1270 (7th Cir. 1994) (holding that, although the equitable doctrine of laches does not bar a § 107 claim, the court may consider such equitable factors when allocating contribution shares); *W. Props. Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 693 (9th Cir. 2004) ("[E]ven though the oil companies' laches argument fails as a matter of law, delay may be relevant to the extent that the district court considers it to be an appropriate equitable factor."), *abrogation on other grounds recognized by Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 931, 932 & n. 8 (9th Cir. 2008).

*Second*, GP's delay prejudiced International Paper. Since 1995, key witnesses have died, including the architects of the 1956 transaction that transferred the Bryant Mill's business from St. Regis to Allied. Other witnesses knowledgeable about the various mills' CCP purchases and recycling have also passed away. GP's delay has thus hampered the factual record available to present to the Court. Further, GP's delay deprived International Paper of the opportunity to assess whether to proceed with the Champion acquisition in light of St. Regis' potential liability

for the Site. Had GP pursued Champion in 1995, the terms of International Paper's 2000 acquisition of Champion might have been different. And GP's decision not to pursue its claims earlier, when it clearly could have, strongly influences the equities.

In sum, International Paper has been prejudiced by GP's decision to delay in pursuing it, and that should weigh heavily in the Court's allocation.

### C.   Allied already paid the Bryant Mill's fair share of costs under the 1990 Administrative Order on Consent.

Allied's prior payments present an additional equitable factor important to International Paper, but unlikely to receive much attention at trial. Through its claims, GP seeks to allocate the costs that it incurred under the 1990 Administrative Order on Consent ("AOC"). But GP is not the only party that incurred and paid costs under that agreement; Allied (through its successor Millennium) did, too.

The 1990 AOC remained in effect until September 2007, when GP, Allied, and the State of Michigan entered into an agreement terminating the 1990 AOC. (Plainwell, Inc., a party to the 1990 AOC, filed for bankruptcy in 2000.) Allied remained in business and continued funding work at the Site until its January 2009 bankruptcy. Thus, the entire time that the 1990 AOC was in effect, Allied was solvent, and it paid its share of costs incurred under that agreement. GP has not suggested that Allied's payments did not cover costs incurred because of the Bryant Mill's alleged PCB discharges. Moreover, Allied's bankruptcy proceedings led to a settlement that provided an additional $50 million to the U.S. Environmental Protection Agency ("EPA") to address any further liability of Allied for OU5 costs.[2]

GP cannot equitably collect additional money for the Bryant Mill's contribution to costs incurred under the 1990 AOC. As the Court knows, CERCLA is equitable in nature. And a

---

[2]   This payment will be relevant to International Paper's share at the point at which the Court addresses future costs.

cornerstone principle of equity is the prohibition against double-recovery.  *United Alloys, Inc. v. Baker* at 797 F. Supp. 2d 974, 1002 (C.D. Cal. 2011); *Basic Mgmt., Inc. v. United States*,  569 F. Supp. 2d 1106, 1125 (D. Nev. 2008); *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 154 (D.D.C. 2014).  Here, GP paid less under the 1990 AOC because Allied paid its share; Allied's payments thus offset GP's Site-related costs.  And those payments covered the Bryant Mill's share.  Allowing GP to further offset those costs by collecting additional amounts related to the Bryant Mill would flout the double-recovery prohibition.

### D.    Viable parties that contributed to the Site's PCB problem are absent because GP chose not to sue them.

GP remains responsible for the liability of viable parties it elected not to sue.  There are parties associated with several of the mills—among them, the Hawthorne Mill and the MacSimBar Mill—that GP could have, but did not sue.  Further, GP is also responsible for costs attributable to non-Aroclor 1242 PCBs, as those discharges came from entities other than the defendants in this case.

GP's claims in this case center only on recycling NCR's CCP and the resulting PCB discharges.  CCP contained Aroclor 1242—a solution of PCBs manufactured and sold by Monsanto—until 1971.  When paper mills recycled CCP, some of the Aroclor 1242 entered the mills' wastewater and accordingly, the Site.  GP thus seeks to hold NCR, Weyerhaeuser, and International Paper liable for their roles in recycling CCP:

- NCR as a company that arranged for the disposal of CCP,

- Weyerhaeuser as a former owner and operator of a mill that recycled CCP, and

- International Paper as the successor to a non-operating owner of a mill that recycled CCP.

GP, of course, owned and operated several mills that recycled CCP and discharged large volumes of PCBs to the Kalamazoo River.

As a KRSG member, GP pursued Site-related CERCLA claims 20 years ago against a different group of defendants.  During that case, GP asked the Court to find that 25% of the PCBs in river sediments between Morrow Lake Dam and Lake Allegan Dam (including those sediments in the former impoundments) originated from discharges of Aroclor 1254.  CCP, however, did not contain Aroclor 1254.  Ultimately, the Court accepted the KRSG's—and thus GP's—representations about the amount of non-1242 Aroclors present in river sediments.  *Kalamazoo River Study Group v. Eaton Corp.*, 258 F. Supp. 2d 736, 740–41 (W.D. Mich. 2002).

Throughout this case, GP has neither pursued nor adduced evidence that International Paper's predecessors have any responsibility for PCBs resulting from non-1242 Aroclors.  This is not surprising since in the KRSG litigation, GP took the position that the paper mills on the Kalamazoo River were not responsible for the non-1242 Aroclors at the Site.  *Id.*  Consequently, through this litigation, GP's has tightly tethered its claims to CCP recycling.  Because GP lacks evidence that the Bryant, MacSimBar, or Battle Creek Mills are responsible for the non-1242 Aroclors present in Kalamazoo River sediments, International Paper cannot be held responsible for the cleanup costs associated with those PCBs, which make up approximately 25% of the PCB mass in the 80-mile stretch of the Kalamazoo River included in OU5.

Indeed, costs associated with non-1242 Aroclors are divisible.  A two-prong test governs divisibility.  First, the Court determines whether the harm at issue is theoretically capable of apportionment—a question of law.  *United States v. NCR Corp.*, 688 F. 3d 833, 838 (7th Cir. 2012).  Second, if the answer is yes, the court considers "how actually to apportion the damages, which is 'a question of fact.'"  *Id.* (citation omitted).  Applying that test is straightforward.  As a

matter of law, International Paper is not responsible for contaminants that its predecessors—and those operating on their property—did not release.  And GP has already quantified those releases, which provides a factual basis for apportioning costs and holding that the costs attributable to investigating and remediating non-Aroclor 1242 PCBs are "off the table."

Nor can GP contend that the non-1242 Aroclor discharges represent an orphan share, as no evidence identifies the responsible dischargers, let alone establishes that they are defunct or insolvent.  *E.g.*, *ITT Indus. v. BorgWarner, Inc.*, 700 F. Supp. 2d 848, 889 (W.D. Mich. 2010) (defining orphan shares as response costs that are attributable to bankrupt or financially insolvent PRPs); *Charter Twp. of Oshtemo v. Am. Cyanamid Co.*, 898 F. Supp. 506, 508 (W.D. Mich. 1995) (same) (citation and quotation marks omitted); *see also United States v. Grand Rapids*, 166 F. Supp. 2d 1213, 1224 (W.D. Mich. 2000) ("share attributable to the insolvent and defunct parties").

But the Court should not expect much evidence on this topic at trial.  While attempting to quantify the paper mills' Aroclor 1242 releases may suit GP's litigation interests, quantifying the non-1242 Aroclors in OU5 does not.  Regardless, during the KRSG litigation, GP showed—and the Court found—that non-1242 Aroclors comprise approximately 25% of the PCB mass in OU5.  So further evidence on this topic is unnecessary.

### III.    THE TRIAL EVIDENCE WILL ALSO SUPPORT AT MOST A MINIMAL ALLOCATION TO INTERNATIONAL PAPER.

As noted above, International Paper expects the presentation of evidence at trial to focus on two issues:  (1) NCR's knowledge that PCBs were potentially hazardous and its concealing that fact from the paper mill operators; and (2) the timing, amount, and fate of the various mills' PCB discharges (although the limited historical records will be an obstacle to any conclusions on these matters). International Paper expects that GP will spend some of its time at trial on the first

issue.  And well it should.  NCR is the only party to this lawsuit that acted with the knowledge that PCBs were harmful and were contained in CCP.  While International Paper supports GP's position, International Paper will not offer witnesses addressing the NCR-knowledge issue.  As to the second issue, as explained above, mill-discharge evidence tells only a small portion of the story relevant to International Paper—even though there will be a great deal of testimony offered at trial on this subject, including by International Paper's witnesses.

Below, International Paper first discusses issues relevant to the proper scope of trial and then explains one aspect of what it expects the mill-discharge evidence to show.

**A.**     **From International Paper's perspective, this trial is about allocating only past costs incurred at OU5, arising under either the 1990 AOC or the 2009 ASAOC.**

1.     GP's past-cost claims against International Paper are limited to those incurred under either the 1990 AOC or the 2009 Plainwell Dam No. 2 ASAOC.

Many of the costs that GP seeks to recover are irrelevant to International Paper.  GP seeks to recover costs incurred at various OUs and under various orders.  As to International Paper, however, GP's only potentially recoverable costs are those incurred at OU5 (i.e., Portage Creek and the Kalamazoo River) under either the 1990 AOC or the 2009 Plainwell Dam No. 2 Administrative Settlement Agreement and Order on Consent ("ASAOC").[3]

Costs incurred at OUs other than OU5 do not concern International Paper.  GP does not seek to recover any costs related to OU1 (Allied Landfill and the Bryant Mill Pond), OU4 (the 12th Street Landfill), or OU7 (the Plainwell Mill property).  And GP seeks to recover costs incurred at OUs 2 and 3 (the Willow Blvd./A-Site and King Highway Landfills, respectively) from NCR only.

---

[3]     GP may also seek recovery of $1,845,000 in costs it paid under a 2008 Termination AOC (Allied also paid $1,845,000 under that AOC).  Since GP only recently raised this claim after discovery closed, International Paper believes it was raised too late, and, if not, Allied already paid International Paper's potential share.

Similarly, GP cannot recover from International Paper any costs incurred under agreements other than the 1990 AOC and the 2009 Plainwell Dam No. 2 ASAOC.  Costs from some other agreements (the 2000 AOC, the 2006 ASAOC, and the 2009 Consent Decree) were not incurred at OU5.  The Court has already held that costs from yet other agreements—specifically, the 2007 SRI/FS ASAOC and the 2007 Plainwell Impoundment ASAOC—are time-barred.  [Dkt. #787 (Aug. 12, 2015 Op. & Order).]  And GP failed to timely disclose the costs that it now seeks under the 2007 Termination AOC and the 2008 AOC.  So the only past costs that GP can seek to allocate to International Paper are those incurred at OU5 under the 1990 AOC or the 2009 Plainwell Dam No. 2 ASAOC.

> 2.      Awarding future costs at this juncture would not be appropriate.

The Court should not expand the scope of this trial to encompass claims for future costs. Simply put, the record on which this case is being litigated is too underdeveloped for the Court to determine responsibility for any future costs.

It goes without saying that the ultimate remedy or remedies selected will drive the response actions, which in turn will drive the Site-related costs.  This is true not just of the *amount* of costs, but also the *location* of those costs, i.e., where response actions causing those costs will take place.  And because the EPA has not yet selected any remedies in OU5, both the amount of future costs and the types of activities that will cause their incurrence are unknown.

The size and complexity of conditions at the Site further complicates the picture.  OU5 spans 80 miles of the Kalamazoo River and three miles of Portage Creek, and EPA contemplates separate remedies in each of the seven areas of OU5.  Indeed, EPA is considering cleanup alternatives—and will presumably soon issue a record of decision—for Work Area 1 of OU5. The SRI/FS reports for other work areas remain in progress.  Different cleanup alternatives and

conditions at different areas of the river would likely support different allocations among different collections of parties.  So allocating future costs now would be premature.

**B.**     **Likely trial evidence concerning PCB discharges from the various mills is not relevant to the Bryant Mill, and will demonstrate that there is no basis for any allocation to International Paper associated with the MacSimBar and Battle Creek Mills.**

Aside from the NCR-knowledge evidence issue, International Paper expects that the focus of the parties' trial evidence will be on the mills' Aroclor 1242 discharges.  Since St. Regis did not operate the Bryant Mill when the mill recycled CCP, evidence about relative discharge must also be viewed in light of International Paper's attenuated relationship to and responsibility for such discharges.

St. Regis relinquished title to the Bryant Mill in 1966, five years before NCR stopped putting Aroclor 1242 into its CCP.  Thus, no discharges that occurred during the subsequent years can be tied to St. Regis, much less to International Paper.  The Court should not conflate the large amount of mill-discharge evidence that will be presented at trial with its relevance to International Paper any more than the Court should conflate St. Regis with Allied.

Regardless, the mill-discharge evidence that the Court will hear actually bolsters the conclusion that International Paper deserves no more than a minimal share—if any share at all— of the response costs.

1.     "PCB discharge" evidence alone greatly overstates the Bryant Mill's contribution to the PCB problem.

International Paper expects GP and NCR, through their expert witnesses, to argue that the Bryant Mill recycled significant amounts of CCP and thus discharged a high volume of Aroclor 1242.  For now, International Paper notes only that Allied, not St. Regis, operated the Bryant Mill when those discharges occurred, and will save further rebuttals for trial.  Regardless,

information concerning the amount of Aroclor 1242 that the Bryant Mill discharged is no proxy for information concerning the Bryant Mill's contribution to the Site's PCB problem.

*First*, unlike the other mills, the Bryant Mill had a mill pond that functioned like a second, substantial clarifier.  So it is misleading to focus on production capacity and to compare the Bryant Mill's Aroclor 1242 discharges to estimated discharges from other mills.  The reality is that the Bryant Mill discharged to the Bryant Mill Pond, not the Kalamazoo River.  The Bryant Mill Pond acted like a 29-acre clarifier, trapping nearly all the PCBs in the mill's effluent and preventing those PCBs from reaching Portage Creek or the Kalamazoo River.  With the exception of the Monarch Mill, which also discharged to the Bryant Mill Pond, the other mills at the Site discharged directly to the Kalamazoo River.

*Second,* the PCBs that the Bryant Mill Pond trapped have, for the most part, already been removed at Allied's and the EPA's expense, so GP cannot seek costs associated with those PCBs.  Allied conducted and financed a Time Critical Removal Action ("TCRA") at the Bryant Mill Pond in 1998–99, removing 21,000 pounds of PCBs.  In addition to that removal action, EPA conducted a TCRA of Portage Creek that was completed in 2013, removing an estimated 2000+ pounds of PCBs.  Thus, the PCBs trapped in the Bryant Mill Pond—as well as those that flowed into lower Portage Creek—have all been removed from the Site, not on GP's dime.

*Third*, as noted above, the trial evidence will focus on the various mills' discharges of Aroclor 1242.  But during the KRSG litigation, GP established that approximately 25% of PCBs in Kalamazoo River sediments between Morrow Lake Dam and Lake Allegan Dam derive from non-1242 Aroclors.  So evidence concerning the Bryant Mill's Aroclor 1242 discharges cannot speak to a quarter of the Kalamazoo River's PCB problem.

**Fourth**, the Bryant Mill's discharges are not International Paper's discharges. The period relevant to GP's claims spans approximately 18 years—1954 through 1971. For 2½ of those years (1954 through June 30, 1956), the Court has already ruled that there is no evidence that the Bryant Mill discharged PCBs. For another six years (1966 through 1971—the period when CCP production peaked), St. Regis neither owned nor operated the Bryant Mill. And during the intervening decade, Allied operated the Bryant Mill while St. Regis was merely its landlord. St. Regis neither recycled wastepaper nor played any role in selecting the wastepaper that Allied recycled. Thus, the Bryant Mill's discharges were not St. Regis's discharges, and are not now International Paper's.

2. <u>The Battle Creek Mills' PCB discharges were at most de minimis, and there is no evidence that they caused GP to incur response costs at the Site.</u>

Although GP belatedly placed the Battle Creek Mills at issue in this case, there is likely to be little evidence regarding them at trial. These mills discharged few PCBs, and no evidence suggests that those PCBs traveled to the Site.

Neither of the Battle Creek Mills discharged many PCBs. Both were boxboard mills and thus recycled very little ledger-grade wastepaper. Neither mill deinked. Both were connected to the Battle Creek Publicly Owned Treatment Works by 1960. Each of these facts illustrates that the Battle Creek Mills' PCB-discharge quantities were low.

Further, the few PCBs that the Battle Creek Mills may have discharged did not cause GP to incur any response costs. The Battle Creek Mills are approximately 22 miles upstream of the Site. No PCBs from those mills could have reached the Site without first:

- traversing more than 20 miles of the Kalamazoo River;

- traveling through Morrow Lake; and

- clearing Morrow Lake Dam.

As International Paper previously noted, GP lacks evidence showing that any PCBs discharged from the Battle Creek Mills have actually reached the Site.  [*See* Dkt. #733, 771.]

### 3.  The MacSimBar Mill's PCB discharges were at most minor.

Similar to the Battle Creek Mills, International Paper does not expect GP to offer much testimony regarding the MacSimBar Mill, either.  Like the Battle Creek Mills, the MacSimBar Mill was at best a minor contributor to the Site's PCB problem.  It was a boxboard mill, and like the Battle Creek Mills, never deinked.  Also like the Battle Creek Mills, the MacSimBar Mill's geography shows that at best, it was a minor contributor.  While the Battle Creek Mills sit 22 miles upstream of the Site, the MacSimBar Mill is the Site's most-downstream mill, located in Otsego, approximately eight miles downstream of the Plainwell Mill and only about 14 miles upstream of the Lake Allegan Dam.

There may be little attention paid to the MacSimBar Mill for another reason—GP has already assumed responsibility for at least some of that mill's liability.  Waldorf Paper Products Company and Hoerner-Waldorf Corporation—both predecessors of Champion—owned and operated the MacSimBar Mill between 1960 and 1968.  The Mead Corporation bought the mill in 1968 and operated it through and after the relevant period.  In 2003, GP reached a settlement with Mead, under which GP agreed to indemnify Mead for any liability at the Site.  GP also settled with a second operator, Rock-Tenn Company, which GP sued in the KRSG litigation.  So not only do the facts show that the MacSimBar Mill was a minor contributor to the Site's PCB problem, GP seemingly has little incentive to try to show otherwise.

## IV.  ADDITIONAL MATTERS TO CONSIDER

In addition to the issues described above, the Court should be aware of some of the complex evidentiary issues that this case presents.

17

### A.    Most of the documentary evidence is ancient.

Much of the documentary evidence relevant to this case will be admissible under the ancient-document exception to the hearsay rule.  *See* Fed. R. Evid. 803(16).  This should come as little surprise, as (a) the relevant period for mill discharges runs from approximately 1954 until 1971, and (b) the first AOC for work at the Site became effective almost 25 years ago.  For this reason, International Paper has withheld hearsay objections to documents that predate September 1995 and that do not bear facial indicia of unreliability.

### B.    Some evidence is admissible against one party, but not others.

Additionally, many of the relevant documents are—and some of the relevant prior testimony is—admissible against one of the other parties, but not against International Paper.  As to the party who created the document or whose agent testified at the deposition, the relevant evidence qualifies as a statement of a party opponent under Federal Rule of Evidence 801(d)(2).  But if offered against International Paper, the same evidence is hearsay barred by Rule 802 and subject to no exception under Rules 803 or 804.  International Paper identifies some examples of such evidence below.

#### 1.    KRSG documents are admissible against GP, but not against International Paper.

The KRSG had no separate legal existence.  Instead, it was merely an unincorporated association—a name by which its members referred to themselves collectively.  Put differently, KRSG was GP by a different name.

Federal Rule of Evidence 801(d)(2) excludes from the definition of hearsay out-of-court statements made by a party opponent.  That rule's exclusion extends to statements made by people whom the party opponent authorized to speak and by people who served as the party opponent's agents:

**Statements That Are Not Hearsay.**  A statement that meets the following conditions is not hearsay:

> (2) **An Opposing Party's Statement.**  The statement is offered against an opposing party and:
>
> > [. . .]
> >
> > (C) was made by a person whom the party authorized to make a statement on the subject;
> >
> > (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.
>
> [Fed. R. Evid. 801(d)(2).]

The KRSG's statements are thus admissible against GP.  During the KRSG litigation, the KRSG's counsel informed this Court that he spoke for the KRSG, which in turn spoke for the individual members:

```
12        THE COURT:  It's my understanding that this is an
13  unincorporated -- Kalamazoo River Study Group is an
14  unincorporated group of individual companies that are involved
15  in the cleanup of the Bryant Mill Pond and the other areas, is
16  that right?
17        MR. MOELLER:  That is correct, Your Honor.

      […]

21        THE COURT:  Okay.  You are speaking for all of the
22  companies that have gotten together for purposes of proceeding
23  as an unincorporated group against the defendants, right?
24        MR. MOELLER:  That's correct, Your Honor.  The
25  association speaks on their behalf and we represent the

1  association.
```

Thus, GP spoke through the KRSG.  Put differently, GP selected KRSG as its agent and

authorized the KRSG to speak on matters regarding the Site, so any statements concerning the

Site made through the KRSG are GP's statements and thus admissible against GP under Rule 801(d)(2)(C) and (D).

The KRSG's statements, however, are not admissible against International Paper. If GP were to offer any KRSG documents against International Paper, those statements would be hearsay (insofar as they were offered for the truth of the matter asserted) because they are statements of GP (the offering party), not of International Paper (the offering party's opponent). Thus, while Rule 801(d)(2) permits International Paper to offer KRSG documents against GP, it does not permit GP to offer them against International Paper. *See, e.g.*, *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000).

This analysis also applies to documents created by GP's and/or the KRSG's agents. Contractors such as BBL and ARCADIS performed much of the work done at the Site and drafted many of the reports concerning the Site. Those reports are hearsay, if offered against International Paper. But since GP hired those contractors as its agent and authorized them to speak about issues related to the Site, those documents are admissible against GP under Rule 801(d)(2)(C) and (D).

    2.    <u>GP's Mediation Questionnaire Responses are admissible against GP as a statement of a party opponent, but are inadmissible hearsay for any other purpose.</u>

This one-way admissibility rule also applies to the mediation questionnaire responses that GP and Fort James submitted in connection with the KRSG members' mediation. That mediation took place between 2000 and 2002 and was intended to allocate responsibility for Site-related costs among the KRSG's four members. (It failed.) As part of the mediation proceedings, each party completed a lengthy questionnaire, submitting information about the various mills' operations. The statements that GP and Fort James made in those documents are admissible against GP and Fort James under Rule 801(d)(2)(A).

Those exhibits are not admissible, however, against other parties.  Instead, those documents are hearsay, subject to no exception.  And because those documents constitute advocacy pieces designed by each declarant to minimize its share of Site-related costs, the mediation questionnaire responses lack the circumstantial guarantees of trustworthiness necessary to qualify for Rule 807's residual exception.

### 3. Plainwell documents related to the KRSG members' mediation are admissible against Weyerhaeuser, but not against International Paper.

Along similar lines, statements that Plainwell Incorporated ("Plainwell") made in connection with the KRSG members' mediation are admissible against Weyerhaeuser as party admissions.  True enough, Weyerhaeuser and Plainwell are different companies.  But Weyerhaeuser has represented that it "participated with . . . Plainwell, Inc., in [the] mediation" and as a result of that participation, Weyerhaeuser asserted it could claim privilege regarding mediation-related documents created by Plainwell.  [Dkt. #694 (WH's Opp. to NCR's Mot. to Compel) at 1.]  By Weyerhaeuser's own accord, then, Weyerhaeuser authorized Plainwell to speak on Weyerhaeuser's behalf for purposes of the mediation, so those documents constitute Weyerhaeuser's statements under Rule 801(d)(2)(C).  If offered against International Paper, however, those Plainwell-created documents would remain inadmissible hearsay.

### 4. Certain deposition transcripts are also admissible against one party, but not others.

As International Paper explained more fully in its memorandum supporting its motion *in limine* regarding prior deposition testimony [Dkt. #791], Rule 32(a)(1)(A) bars testimony offered against International Paper from depositions of which International Paper had no notice. Because International Paper was not a party to *HM Holdings, Inc. v. Lumbermens Mutual Casualty Co.*, deposition testimony from that case is not admissible against International Paper. The same is true of deposition testimony from the KRSG litigation.  But because GP was

represented at depositions in the KRSG litigation, Rule 32(a)(1)(A) does not bar International Paper from offering testimony from those depositions against GP.  The same one-way admissibility applies to depositions from *Georgia-Pacific v. Aetna Casualty Co.*—i.e., Rule 32(a)(1)(A) permits International Paper to offer deposition testimony from that case for use against GP, but does not permit GP to offer it against International Paper.

A similar analysis applies to certain depositions taken in this case—30(b)(6) depositions in particular.  For instance, GP cannot offer deposition testimony from its own 30(b)(6) witnesses.  Statements in those transcripts are hearsay—out-of-court statements offered (presumably) for the truth of the matter asserted—if GP offers them, so Rule 32(a)(1)(B) bars GP from offering them.  If International Paper offers those statements against GP, however, they are statements of a party opponent, and thus not hearsay under Rule 801(d)(2).  *Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 718 (6th Cir. 1999); *see also* Fed. R. Civ. P. 32(a)(3) (permitting a party to use an *adverse party*'s 30(b)(6) deposition for any purpose).

## V.      LENGTH OF TRIAL AND ORDER OF PRESENTATION

### A.      International Paper recommends 18 days of trial, and requests one quarter of the trial time.

The parties have been unable to reach consensus on the length of trial and the order of presentation.  International Paper conservatively estimates that it will require a minimum of 22.5 hours to put on its case, cross-examine other witnesses, and present rebuttal evidence.  Provided that the other parties receive equal time, International Paper estimates that trial can be completed in 90 hours, or 18 five-hour days.  As in Phase I, the parties should present their respective cases in the order in which they appear on the pleadings.

GP has taken the position that GP should be allowed 30 hours to present its case, while the defendant/counter/crossclaimants should be forced to share a total of 45 hours between them.

This suggestion—which has GP allocated 40% of all trial time—is simply unfair.  More importantly, even assuming an equal distribution of 15 hours per defendant, this allocation would not permit International Paper to adequately present its defenses, counterclaims and crossclaims.

Neither of GP's proffered reasons for allocating itself the plurality of trial time justifies GP's inequitable proposal.  First, GP claims that it needs more time because it bears the burden of proving that its costs were necessary and NCP-consistent.  GP does bear that burden.  But that evidence will not go unrebutted.  If GP presents witnesses to testify that its costs were NCP-consistent, the other parties will need to cross those witnesses and/or put on witnesses of their own.  Quite simply, *all* parties need trial time to address the NCP-consistency issue.  Second, GP says that it needs more time because GP will present the bulk of the evidence of NCR's distinct culpability.  But that assertion overlooks the fact that this case is much akin to a "circular firing squad," in which all parties (except NCR) have lodged counter and/or cross claims against one another, and the division of liability will be a zero-sum game.

GP's attempt to short-change International Paper's trial time is especially curious after GP injected into this case issues related to the Battle Creek Mills' and the MacSimBar Mill's liability.  Because GP did so, International Paper now does not have just one mill's evidence to address; it has four.  While altogether without merit, adequately defending against these allegations—and the allegations concerning the Bryant Mill—will require International Paper to present its own experts, and to effectively cross-examine the army of experts amassed by the other parties.  For example, because International Paper had only an attenuated, third-degree relationship to the Bryant Mill, the other parties have spared little time or expense in conflating St. Regis with Allied and suggesting that International Paper's equitable responsibility is commensurate with Allied's.  International Paper needs trial time to rebut those attempts.

Similarly, other parties have hired a plethora of experts to try to divine opinions about the various mills' annual discharges from the limited available records.  Demonstrating that doing so is a fool's errand, as International Paper will at trial, will require trial time.

Likewise, IP will need to establish the merits of its counter and cross-claims, which will require substantial testimony of witnesses.  Thus, despite International Paper's faint connection to the Site's PCB contamination, adequately presenting its defenses and affirmative claims will necessarily take International Paper more time than GP would allot it.

**B.**     **The parties should present their cases in the order that they appear on the pleadings.**

Both GP's and NCR's proposals unnecessarily complicate the order-of-presentation issue.  GP's proposal calls for it to lead off and for the defendants to then "rotate" their affirmative, response and rebuttal cases, with GP presenting last.  NCR's proposal is for GP to begin, International Paper and Weyerhaeuser to follow, and NCR to finish.  The Court should ignore both proposals.  The parties should present in the order they appear on the pleadings.

Only two parties bear a true burden of proof on any issues.  GP bears the burden of showing that it incurred costs and that those costs were necessary and NCP-consistent.  NCR bears the burden of proving divisibility—that costs are theoretical capable of apportionment and that a reasonable basis exists to apportion costs.  (International Paper bears that burden as well, but will establish in its post-trial briefing that costs arising from non-1242 Aroclors are divisible.  So International Paper will not bear a burden at trial.)  After that, no clear burdens of proof exist.  Instead, each party will present evidence regarding the equitable factors that it believes should drive the Court's allocation.  Consequently, parties "bear a burden" only insofar as they want to convince the Court of particular facts relevant to those factors.  There is no ultimate question, other than those outlined above, upon which *any* party bears a burden of proof.

In that scenario, the most fair and most straightforward solution is for GP (as the plaintiff) to present its case first, for NCR (as a burden-bearing defendant) to present its case next, and for International Paper and Weyerhaeuser to follow.

## VI.   CONCLUSION

The bulk of the evidence presented during trial by the other parties will likely focus on two equitable factors—knowledge and discharge volume.  As to International Paper, those factors paint only part of the picture.  GP's delay in suing International Paper, International Paper's unique position with respect to the Site, and Allied's prior payments on the Bryant Mill's behalf, while not  emphasized at trial, deserve the Court's consideration in fashioning  an ultimate allocation as to International Paper.


Dated:  August 31, 2015

<div style="margin-left:40%">

*/s/John D. Parker*

John D. Parker
Lora M. Reece
Michael Dominic Meuti
BAKER & HOSTETLER LLP
PNC Center
1900 E. 9th Street, Suite 3200
Cleveland, OH 44114
(216) 621-0200
Attorneys for International Paper Co.
jparker@bakerlaw.com
lreece@bakerlaw.com
mmeuti@bakerlaw.com

</div>

John F. Cermak
Sonja A. Inglin
Ryan D. Fischbach
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard Suite 1400
Los Angeles, CA 90025
(310) 820-8800
Attorneys for International Paper Co.
jcermak@bakerlaw.com
singlin@bakerlaw.com
rfischbach@bakerlaw.com


And by:

David W. Centner
CLARK HILL PLC
200 Ottawa Ave. NW, Ste. 500
Grand Rapids, MI 49503
(616) 608-1106
Attorneys for International Paper Co.
dcentner@clarkhill.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2015, I electronically filed the foregoing using the

ECF system, which will send notification of such filing by operation of the Court's electronic

systems.  Parties may access this filing via the Court's electronic system.


*/s/John D. Parker*

607328554.1