UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, et al.,<br><br>       Plaintiffs,<br><br>  vs.<br><br>NCR CORPORATION, et al.,<br><br>      Defendants. | CASE NO.  1:11-cv-00483<br><br><br>HON. ROBERT J. JONKER |

**INTERNATIONAL PAPER COMPANY'S
PROPOSED PHASE II FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

International Paper Company ("International Paper") respectfully submits the following Proposed Phase II Findings of Fact and Conclusions of Law.

The Proposed Phase II Findings of Fact and Conclusions of Law are based on International Paper's current understanding of the anticipated testimony and other evidence to be presented at the Phase II trial.  International Paper reserves its right to conform its proposed post-trial findings of fact and conclusions of law to the evidence actually admitted during the Phase II trial.  Except as noted, any capitalized terms used but not specifically defined are intended to have the same meaning as in the Proposed Phase II Pretrial Order and the Phase I Final Pretrial Order and in International Paper's Phase I stipulations of fact (Dkt. Nos. 360, 377 and 390).

These Phase II Proposed Findings of Fact and Conclusions of Law do not include proposed findings or proposed conclusions of law as to any matter addressed in the Court's September 26, 2013 Opinion and Order, or include uncontroverted facts set forth in the Phase II Proposed Pretrial Order.

I.      **PROPOSED FINDINGS OF FACT**

A.      **Relationship of the Parties to the Site**

1.      Each of the parties, other than International Paper, directly engaged in activities that contaminated the Site with polychlorinated biphenyls ("PCBs").  Those parties did so both before and after it became known that (a) NCR carbonless copy paper ("CCP") contained PCBs, and (b) recycling CCP broke and trim in the wastepaper stream entailed environmental risks.

Role of NCR Corporation ("NCR")

2.      NCR developed CCP, controlled its production, profited from its production and no later than March 1969, knew that CCP was not a "useful product."

    2.1    NCR had knowledge that was not available to others that recycling CCP could be potentially hazardous to the environment.

    2.2    NCR could have timely disclosed that recycling CCP would release Aroclor 1242 PCBs into the environment, but elected not to do so.

    2.3    While it possessed knowledge that recycling CCP was potentially harmful to the environment, NCR did not stop or reduce CCP production.  In fact, NCR accelerated CCP production.  NCR also failed to try to remove CCP from the wastepaper stream or to stop paper mills from recycling CCP or wastepaper containing CCP.

    2.4    NCR directly profited and benefitted from continuing to sell CCP and the continued recycling of CCP broke and trim.

Role of Plaintiffs Georgia-Pacific LLC, Georgia-Pacific Consumer Products LP and Fort James Corporation (collectively, "GP")

3.      GP owned and operated numerous paper mills within the Site.

4.      While GP operated these mills, they processed wastepaper containing CCP and discharged PCBs to OU5, including after it was known that recycling wastepaper discharged PCBs.

5.      Plaintiff Georgia-Pacific LLC is the successor to Georgia-Pacific Corporation, which at all relevant times owned and operated the KPC Mill.

   5.1    The KPC Mill was located on the banks of the Kalamazoo River, upstream of the River's confluence with Portage Creek.  The KPC Mill was in operation until 2000.

   5.2    The KPC Mill de-inked wastepaper at three separate mills within its plant.  At least one of those mills de-inked wastepaper through 1980.

   5.3    Because few operational records from the 1950s and 1960s are available, it is difficult to accurately estimate the KPC Mill's production levels, furnish sources, and waste discharges, among other things.

   5.4    There are records from sources other than the KPC Mill's own records that show that the KPC Mill received and processed large amounts of CCP in 1955 and 1966.  The existence of records for these two years does not mean that the KPC Mill did not receive similar amounts of CCP in other years.

   5.5    The KPC Mill wastewater system utilized two separate clarifiers.  Both clarifiers discharged effluent directly into the Kalamazoo River for many years.  A 110-foot clarifier serviced Mill No. 1 and Mill No. 3.  A 40-foot clarifier serviced Mill No. 2.  The 110-foot clarifier was connected to the Kalamazoo POTW in May 1967.  The 40-foot clarifier was not connected before Mill No. 2 closed in 1969.

5.6     Before and after the KPC Mill connected to the Kalamazoo POTW, frequent and substantial bypasses occurred at the KPC Mill.  During those events, the KPC Mill discharged substantial amounts of effluent or untreated wastewater directly to the Kalamazoo River.

5.7     The KPC Mill also had on-site lagoons that it used, particularly in the 1950s, to dispose of paper-mill waste, and decanted water from these lagoons entered the River.

5.8     In the late 1950s, the KPC Mill created an off-site disposal location across the river from the KPC Mill, known as the King Highway Landfill.  The KPC Mill ran a pipe under the Kalamazoo River connecting the KPC Mill and the King Highway Landfill.

5.9     Later, the KPC Mill constructed a second landfill known as the Willow Blvd. Landfill, also immediately adjacent to the Kalamazoo River, by placing paper-mill waste into the River.

5.10    The KPC Mill took underflow from its clarifiers for dewatering in a series of unlined lagoons at these landfills.  The underflow is frequently referred to as "residuals."  As residuals sat in the lagoons, decanted water would separate from the residuals and rise to the top of the lagoons.  From there, the decanted water would be discharged into the Kalamazoo River.

5.11    Discharges of decanted water and later erosion of berms and migration of paper residuals containing PCBs from these landfills contributed to additional discharges of PCBs into OU5.

6.      In 1978, GP acquired real property adjoining the KPC Mill on which the Hawthorne Mill was located.

   6.1     GP did not operate the Hawthorne Mill, but soils on that property contained some of the higher concentrations of PCBs detected within the Site.

   6.2     Gould Paper Company is the successor-in-interest to OU5 liabilities associated with the Hawthorne Mill. GP did not name Gould Paper Company as a defendant in this action.

7.      Plaintiffs Georgia-Pacific Consumer Products LP and Fort James Corporation are the successors to owners and operators of two additional mills, the Sutherland Mill and the KVP Mill.

   7.1     The Sutherland Mill was also known as the Kalamazoo Board Mill and the Brown Mill. It was located along the Kalamazoo River in Kalamazoo, Michigan.

   7.2     The Sutherland Mill had two separate paper-making operations, the Board Mill and Plant 11. The Sutherland Mill Board Mill was in operation by 1954 and is still in operation. Plant 11 manufactured paperboard between 1954 and 1969; after 1969, it converted finished paper products.

   7.3     The Sutherland Mill operated a de-inking plant from May 1975 until May 1977.

   7.4     The Sutherland Mill Board Mill had a wastewater system in which its clarifier discharged effluent directly into the Kalamazoo River until it connected to the Kalamazoo POTW in 1967.

   7.5     During the time it manufactured paperboard, Plant 11 was not connected to a wastewater treatment system or the Kalamazoo POTW. Untreated wastewater

from paper making in Plant 11 was discharged directly into Schipper's
Creek/Kalamazoo River.

Role of Weyerhaeuser Company ("Weyerhaeuser")

8.    Weyerhaeuser and its predecessors owned and operated the Plainwell Mill.

    8.1    The Plainwell Mill de-inked wastepaper until 1963.  Weyerhaeuser and its
    predecessors owned the Plainwell Mill during the time that the mill de-inked
    wastepaper.

    8.2    During that time period, the Plainwell Mill developed a landfill, known as the 12th
    Street Landfill, to dispose of paper mill residuals.  The 12th Street Landfill did not
    initially have any berms.  After de-inking at the Plainwell Mill ceased,
    Weyerhaeuser learned that PCB-impacted paper-mill residuals were eroding from
    the 12th Street Landfill into the Kalamazoo River.

Role of International Paper Company

9.    During Phase I, the Court found that International Paper is a liable party because
International Paper is the successor to St. Regis Paper Company ("St. Regis").  St. Regis
held title to real property on which the Bryant Mill was located from July 1, 1956 until
June 30, 1966, but during that time period, did not operate the Bryant Mill.  Instead,
Allied Paper Company ("Allied") operated the Bryant Mill during and after that period.

    9.1    The Bryant Mill was a paper mill located on Portage Creek in Kalamazoo,
    Michigan.  It de-inked wastepaper during the time that Allied operated the mill.
    The Bryant Mill closed its de-inking operations and began using virgin pulp
    exclusively in 1971.

    9.2    After June 30, 1956, St. Regis did not operate, control, or have any involvement
    in the Bryant Mill's paper-making operations.  Instead, Allied—the company that

acquired the mill operations in 1956—controlled the Bryant Mill's paper-making and related operations.

9.3     Allied, a public company, began to report the Bryant Mill as an asset on its financial statements, at least as early as 1960.

9.4     Throughout the relevant period, Allied also operated the King Mill and the Monarch Mill. St. Regis never owned, operated, or had any other relationship with those mills.

9.5     St. Regis held title to real property on which the Bryant Mill was located until July 1, 1966, which was the effective date of the deed transferring title to Allied.

9.6     As a non-operating owner, St. Regis was not directly involved in any PCB discharges from the Bryant Mill. St. Regis was thus economically remote from the operations that caused PCB discharges at the Site.

9.7     Champion International Corporation ("Champion") acquired and merged with St. Regis in 1985. International Paper in turn, acquired and merged with Champion in 2000.

10.     In this phase, GP has asserted that International Paper is "equitably responsible" for three other Michigan paper mills. Two of these mills—the Angell Street Mill and the Fountain Street Mill (collectively, the "Battle Creek Mills")—are located in Battle Creek, Michigan, more than 20 miles above the Site's upper boundary. The other mill, the MacSimBar Mill, is located the farthest downriver of all the paper mills at the Site.

10.1    These mills were paperboard mills that used but did not de-ink wastepaper.

10.2     International Paper never operated any of these mills.  Instead, International

Paper's predecessor, Champion, acquired and merged with a company that had

some prior involvement with the mills.

    10.2.1     Michigan Carton Company operated the Battle Creek Mills until 1974,

         when it merged with St. Regis.

    10.2.2     St. Regis sold assets associated with the Fountain Street Mill to

         Michigan Holding Corporation in 1984, before St. Regis merged with

         Champion.

    10.2.3     After Champion acquired St. Regis, Champion in 1985 sold assets

         associated with the Angell Street Mill to the Waldorf Corporation.

         The Angell Street Mill was thus not an asset of Champion when

         International Paper acquired Champion in 2000.

    10.2.4     Hoerner-Waldorf Corporation ("Hoerner-Waldorf") operated the

         MacSimBar Mill between July 1, 1960 and January 11, 1968.  In 1977,

         Hoerner-Waldorf merged with Champion.

10.3     The Battle Creek Mills were located more than 20 miles above the upper

boundary of the Site and no PCB discharges from them reached or caused

response costs to be incurred in OU5.

10.4     There is no direct evidence that the MacSimBar Mill discharged Aroclor 1242

PCBs to OU5 between July 1, 1960 and January 11, 1968 (when Hoerner-Waldorf

and its predecessor operated the mill).

10.5     The evidence does not show that any response costs associated with discharges

from the MacSimBar Mill are Hoerner-Waldorf's responsibility, rather than the

responsibility of those that owned and operated the Mill prior to Hoerner-Waldorf (United Biscuit Company, now known as Keebler Company) or subsequently (such as Mead Corporation and Rock-Tenn Company).

**B.      Sources of PCB Discharges to the Site**

11.      PCBs are present in OU5 sediments.  The amount of PCBs in OU5 is disputed.  As of 2002, EPA and MDEQ estimated that OU5 sediments contained approximately 113,000 pounds of PCBs.  That estimate has not changed.  Another credible estimate places the amount at 76,600 pounds.  The difference reflects the uncertainty in a mass calculation of this type, given that it covers such a large area with variable bulk density and PCB sample concentrations.

12.      Recycling wastepaper containing CCP resulted in discharges of Aroclor 1242 PCBs to OU5.

13.      Substantially all of the Aroclor 1242 PCBs present in OU5 sediments are attributable to discharges from paper mills  recycling CCP wastepaper.  Those discharges occurred in several ways.

13.1    Paper mills discharged Aroclor 1242 PCBs to OU5 in effluent from mill wastewater systems.

13.2    Paper mills discharged Aroclor 1242 PCBs to OU5 when the mills bypassed their wastewater systems.

13.3    Aroclor 1242 PCBs entered OU5 through discharges of decant water or other liquid from settling ponds and dewatering lagoons.

13.4    Aroclor 1242 PCBs entered OU5 through erosion of landfills adjoining the Kalamazoo River containing PCB-containing paper-mill waste.

14. The paper mills within the Site, including the Bryant Mill after July 1, 1956, received non-trivial amounts of pre-consumer NCR CCP broke and trim.

    14.1 For example, documents exist showing that the KPC Mill received 611,440 pounds of CCP broke directly from Mead Corporation in 1965. Mead was one of the companies that manufactured CCP under a contract with NCR,

    14.2 Existing documents also show that in 1955, Mead sold and shipped an additional 403,705 pounds of CCP to a Kalamazoo-based wastepaper broker that, at the time, sold wastepaper to the KPC Mill.

    14.3 Based on assessments of the KPC Mill's wastewater-treatment system's operations during 1955 and 1965, these shipments resulted in wastewater effluent containing 3,390 pounds (for the 1955 shipments) and 4,147 pounds (for the 1965 shipments) of PCBs being discharged into the Kalamazoo River.

    14.4 Testing conducted by the Sutherland Mill showed that its furnish contained Aroclor 1242 PCBs at levels indicating that the Mill may have received CCP broke and trim in its wastepaper supply, including in the early 1970s.

15. Paper mills recycling wastepaper containing CCP is one source, but not the only source, of PCBs present within the Site.

16. Approximately 25% of the PCB mass in the sediments in OU5 is from non-1242 Aroclors, which are not associated with recycling of wastepaper by paper mills.

**C.**    **Status of Investigation and Remediation of the Site**

17. GP is not seeking to recover from International Paper costs that GP incurred at any OU at the Site except OU5.

18. GP is currently performing a remedial investigation and feasibility study ("RI/FS") for all areas within OU5 under the 2007 SRI/FS ASAOC. GP is barred from recovering any

past or future costs incurred under the 2007 SRI/FS ASAOC because of the statute of limitations.  [Dkt. #787 (Aug. 12, 2015 Op. & Order).]

19.  EPA has divided OU5 into seven work areas.  No remedies have been selected for any of those work areas.

    19.1  In Work Area 1, a feasibility study has been completed, and EPA has selected a proposed remedial action plan as a preliminary step to issuing a record of decision selecting a remedy.

    19.2  At all other work areas, no remedial investigations have been completed and no feasibility studies have been approved.

20.  Until a remedy is selected and the remedial design/remedial construction is underway or completed for a given work area, the nature and responsibility for PCBs present in that work area and the factors relevant to assigning responsibility for the investigating and remediating of those PCBs cannot reasonably be determined.

**D.    Relative Discharges of Aroclor 1242 PCBs by Mills Within the Site**

21.  Determining the specific amount of PCBs that each mill released into the Kalamazoo River system over the relevant time period would require contemporaneous PCB-monitoring data for each mill's wastewater discharges.  The mills did not gather that information, so it is not available.

22.  Accurately interpolating each mill's PCB discharges during the relevant period would require thorough and detailed information about each mill's furnish content, production levels, and other aspects of each mill's historical operations.  The operational records that have survived and are available are too incomplete to permit such interpolation.

23.  The mills' records regarding production volume, furnish sources, waste-treatment processes, bypass history, and other factors are limited and incomplete.  These surviving

records do not provide a basis for any reliable conclusions regarding the individual mills' annual PCB-discharge volumes.

24. GP has not sued or has settled with viable parties associated with certain mills. In those cases, any liability associated with those parties is attributed to GP.

25. Available information permits additional conclusions regarding the Bryant Mill's and the Monarch Mill's contributions to PCBs in OU5 sediments.

25.1 While the other mills at the Site were located directly on or adjacent to the Kalamazoo River, the Bryant Mill and the Monarch Mill were located on Portage Creek, about three miles upstream of Portage Creek's confluence with the Kalamazoo River's main stem. The Bryant and Monarch Mills were therefore geographically isolated from the other mills.

25.2 The Bryant and Monarch Mills existed in an essentially isolated, "closed" system regarding the fate and transport of waste materials, including PCBs.

25.2.1 From July 1, 1956 through July 1, 1966 (when St. Regis relinquished title to the Bryant Mill), both mills discharged effluent from their wastewater treatment systems into Portage Creek and into the 29-acre Bryant Mill Pond.

25.2.2 Later, in September 1969, effluent from the Bryant Mill clarifier was sent to the Kalamazoo POTW. De-inking ended in 1971.

25.2.3 Substantially all of the PCBs in these mills' wastewater effluent settled and was trapped in the Bryant Mill Pond or in downstream portions of Portage Creek.

25.3     Removal actions were conducted at the Bryant Mill Pond in 1999 in which 146,000 cubic yards of PCB-impacted material was removed. That action removed approximately 21,000 pounds of PCBs from the former Bryant Mill Pond. An additional estimated 100 pounds of PCBs was removed in a 2002 removal action.

25.4     An additional time-critical removal action was performed in 2013 on Portage Creek. That action removed approximately 23,700 cubic yards of sediment containing over 2,000 pounds of PCBs.

25.5     GP did not incur the costs for the removal activities conducted at the Bryant Mill Pond and Portage Creek, so those costs are not among GP's claimed response costs in this case.

25.6     After St. Regis' ownership period ended, the Bryant Mill Pond was lowered on several occasions (including in 1972 and 1976).

    25.6.1     The 1972 dam lowering was done as a coordinated effort between Allied and the City of Kalamazoo. Both parties were aware that Aroclor 1242 PCBs were present in Pond sediments and that the lowering would cause some Aroclor 1242 PCBs then trapped in Pond sediments to be transported downstream.

    25.6.2     The 1976 dam lowering occurred at the direction, and with the approval, of the State of Michigan. The State and Allied both knew that lowering the dam would cause some Aroclor 1242 PCBs then trapped in Pond sediments to be transported downstream.

25.6.3      If not for the 1972 and 1976 dam lowerings, additional Aroclor 1242 PCBs would have remained in the Bryant Mill Pond sediments and would have been removed during the time-critical removal action at the Bryant Mill Pond.

26.     The mills located on the Kalamazoo River within the Site, including the KPC Mill, are the source of substantially all of the Aroclor 1242 PCBs in OU5.

27.     Discharges from the mills located on the Kalamazoo River caused PCB hot spots.  Those hot spots occur near discharge points, where faster-settling material deposited, and in downstream reservoirs where slower-settling releases deposited.

28.     Further, erosion from residual-dewatering lagoons and disposal areas located along the Kalamazoo River resulted in releases of PCBs to the River that continued for decades. These releases did not stop until the lagoons and disposal areas were remediated.

29.     The Battle Creek Mills are located more than 20 miles upstream of Morrow Lake and the Site in Battle Creek, Michigan.  The Battle Creek Mills did not discharge any Aroclor 1242 PCBs that either (a) are now present in OU5 sediments or (b) have caused GP to have incurred response costs.

30.     GP has not established that it incurred any response costs caused by discharges of Aroclor 1242 PCBs from the MacSimBar Mill during the Hoerner-Waldorf operating period.

31.     The MacSimBar Mill is located the farthest downstream of any of the mills and therefore could not have contributed to PCBs contained in upstream sediments, including in any sediments related to costs incurred by GP in connection with the 2009 Plainwell ASAOC between GP and the EPA.

**E.      GP's Unreasonable Delay in Pursuing this Action**

32.     GP was identified as a potentially responsible party ("PRP") with respect to the Site on June 13, 1990.  By then, GP had been aware for a number of years that Kalamazoo River sediments were contaminated with Aroclor 1242 PCBs resulting from paper mill recycling of CCP.

33.     In December 1990, GP and two other parties entered into an Administrative Order on Consent ("1990 AOC") with the Michigan Department of Natural Resources ("MDNR"). The other parties were HM Holdings, Inc. and Simpson Plainwell Paper Company.

33.1    HM Holdings, Inc. was successor to Allied's liabilities.  It later became known as Millennium Holdings LLC.  (Collectively, Allied, HM Holdings, and Millennium Holdings, Inc. and Millennium Holdings, LLC are hereafter referred to as "Allied.")  Allied later filed for bankruptcy protection in January 2009.

33.2    Simpson Plainwell Paper Company operated the Plainwell Mill after Weyerhaeuser's operating period.  Simpson Plainwell later became known as Plainwell, Inc., until it filed for bankruptcy in November 2000.  (Collectively, Simpson Plainwell and Plainwell, Inc. are referred to as "Simpson-Plainwell.")

34.     Among other things, the 1990 AOC called for GP, Allied, and Simpson-Plainwell to conduct a RI/FS for the entire Site.

35.     In January 1991, GP, Allied, and Simpson-Plainwell formed an unincorporated association called the Kalamazoo River Study Group ("KRSG").

36.     After signing the 1990 AOC, GP began a search to identify additional PRPs with respect to the Site.  That search identified multiple PRPs and ultimately resulted in GP, as a member of the KRSG, filing a CERCLA cost-recovery and contribution suit against eight

defendants identified during the PRP search, *Kalamazoo River Study Group v. Rockwell, et al.*, W.D. Mich. Case No. 1:95-CV-838 (the "KRSG Litigation").

37. The KRSG Litigation remained pending until 2004. Neither Champion, before its 2000 merger with International Paper, nor International Paper was named as a defendant in the KRSG Litigation.

38. As a member of the KRSG, from the PRP search and otherwise, GP knew that St. Regis had owned and operated the Bryant Mill before July 1, 1956, and held title to real property associated with the Bryant Mill after that date.

39. International Paper first learned of its potential liability associated with the Bryant Mill in late 2010, when it received notice that had been named as a PRP and sued in this action.

40. GP's delay in pursuing its claims related to St. Regis and International Paper is not justified.

41. Witnesses with information relevant to International Paper's defense have died or otherwise become unavailable as a result of GP's delay in asserting its claims against International Paper, including with respect to the security-interest defense to International Paper's CERCLA liability addressed during Phase I. Similarly, documents relevant to International Paper's defense have been lost, destroyed or are no longer available.

42. The delay also deprived International Paper of the opportunity to be involved in dealings with regulatory agencies during earlier stages of the investigation and therefore to potentially minimize the costs that are the subject of GP's claims for work performed under the 1990 AOC.

43. As to the Battle Creek Mills, GP commissioned a report in 1990 regarding paper mill contributions of PCBs that evaluated the Battle Creek Mills. Afterward, GP did not

pursue claims related to the Battle Creek Mills either as part of its PRP search or in the KRSG Litigation.  Due to GP's delay, information and witnesses that might have been available to defend against such claims are not available, to International Paper's prejudice.

44.     As to the MacSimBar Mill, the PRP search included the MacSimBar Mill.  The PRP search thus should have disclosed—and likely did disclose—Hoerner-Waldorf's role at the Mill.

    44.1     Rock-Tenn, the company that operated the MacSimBar Mill during the 1990s, was named as a defendant in the KRSG Litigation (Rock-Tenn).

    44.2     GP later entered into a settlement with Rock-Tenn.

    44.3      In 2003, GP entered into a settlement agreement with Mead Corporation, which operated the MacSimBar Mill in 1968 and afterward.

    44.4     GP never pursued claims related to the MacSimBar Mill against Hoerner-Waldorf or International Paper until GP belatedly raised them in this litigation.

    44.5     Due to GP's delay, information and witnesses that might have been available earlier to defend against such claims are now not available, to International Paper's prejudice.

**F.     Allied's Funding of Site Work**

45.     During the relevant period, Allied owned and operated the Bryant Mill and two other mills at the Site, the King Mill and the Monarch Mill.

46.     As a member of the KRSG, Allied funded a share of the Site-investigation costs that KRSG members incurred beginning around 1990.  Allied continued to fund the KRSG's Site investigation until Allied filed for bankruptcy in January 2009.

46.1    Allied's payments included funding a share (at times as much as 55%) of the overall cost of work that is the basis for costs included in GP's claim for costs incurred under the 1990 AOC and the 2008 Administrative Order by Consent for Payment of Past Response Activity Costs (the "2008 AOC").

46.2    Further, Allied's successor paid EPA approximately $50 million in a 2010 bankruptcy settlement for future costs associated with OU5 of the Site.

47.    Allied itself also funded other work related to the Site, including the Bryant Mill Pond removal action referred to in Paragraph 25.3 and another removal action in the Bryant Mill Pond floodplain.

48.    As a KRSG member, Allied was also a party (along with GP) to the 2003 settlement with Mead referred to in Paragraph 44.3, under which Mead paid GP and Allied $1.5 million each in exchange for a release and indemnity relating to the Site, and a 1998 settlement in the KRSG Litigation with Rock-Tenn referred to in Paragraph 44.2, under which GP and Allied each received a share of a $325,000 settlement payment.

**G.    GP's Claimed Costs Against International Paper**

49.    GP's past-cost claims against International Paper that are not barred by the statute of limitations (*see* Dkt. No. 787) relate to costs that GP claims were incurred in OU5.

50.    GP has not established a basis for recovery, nor does it seek, from International Paper any of its past costs classified as OU2, OU3, OU4, OU6 or OU7 costs.

51.    GP's past OU5 cost claims include:

51.1    $6,828,627 it claims to have incurred under the 2009 Plainwell ASAOC ("Plainwell Dam No. 2 Costs");

51.2    $1,845,000 it claims to have incurred under the 2008 AOC ("2008 AOC Costs");

51.3    $21,042,119.71 (net of credits) it claims to have incurred under the 1990 AOC, including $15,515,629.36 on behalf of Georgia-Pacific LLC and $5,526,490.35 on behalf of Georgia-Pacific Consumer Products LP and Fort James Corporation "1990 AOC Costs"); and

51.4    $24,297 (net of credits) it claims to have incurred under the 2007 Administrative Order on Consent that terminated the 1990 AOC ("2007 Termination AOC Costs").

52.    The 2009 Plainwell ASAOC states that: (1) it "constitutes an administrative settlement for purposes of Section 113(f)(3)(B);" (2) it "constitutes an administrative settlement for the purposes of section 113(f)(2)" and provides "protection from contribution actions or claims as provided by Section 113(f)(2);" (3) the document is titled an "Administrative Settlement Agreement and Order on Consent"; and (4) contains a provision stating that "EPA covenants not sue or to take further administrative action against [GP] pursuant to Sections 106 and 107(a) of CERCLA" for the work and future response costs that are the subject of the 2009 Plainwell ASAOC.

53.    The 2008 AOC states that: (1) it "constitutes an administratively approved settlement for purposes of Section 113(f)(3)(B);" (2) it constitutes an administrative settlement for the purposes of section 113(f)(2) and provides protection from contribution actions or claims as provided in section 113(f)(2); (3) the parties state in the document that it is an "administratively approved settlement"; and (4) contains a provision stating that the State of Michigan "covenants not sue or take further administrative action" against GP for the costs that are the subject of the 2008 AOC.

54. The Plainwell Dam No. 2 Costs are not reasonable, necessary and/or were not incurred in compliance with the National Contingency Plan ("NCP") in an amount according to proof. They are also subject to offsets for settlements and insurance recoveries in an amount according to proof.

55. The 2008 AOC Costs are not reasonable, necessary and/or were not incurred in compliance with the NCP in an amount according to proof, and are also subject to offsets for settlements and insurance recoveries in an amount according to proof.

56. GP did not include or timely include in its cost claims the 2008 AOC Claims or the 2007 Termination AOC Costs.

57. The 1990 AOC Costs and the 2007 Termination AOC Costs are not reasonable, necessary and/or were not incurred in compliance with the NCP in an amount according to proof, and are also subject to offsets for settlements and insurance recoveries in an amount according to proof.

58. The harm associated with non-1242 Aroclor PCBs in the sediment of OU5 is theoretically capable of apportionment.

## II.  PROPOSED CONCLUSIONS OF LAW

1. No responsibility can be imposed on International Paper, equitably or otherwise, for past or future costs incurred on account of the presence of non-Aroclor 1242 PCBs at the Site.

2. NCR is equitably responsible for 100% of all response costs being addressed because of (a) NCR's superior knowledge regarding effects of recycling CCP; (b) NCR's failure to warn the mill operators of such harm or to take steps to prevent/minimize that harm; (c) NCR's increasing CCP production after it knew that recycling CCP was potentially harmful to the environment; (d) NCR's profiting from manufacturing and selling CCP and the sale of CCP broke and trim.

3.     Any costs not allocated to NCR should be allocated to GP and Weyerhaeuser because of their direct involvement in the activities that resulted in OU5's PCB contamination.

4.     Any Aroclor 1242 PCB discharges from the Bryant Mill (in particular, those that occurred during the St. Regis ownership period) that did not settle in and were not trapped by the Bryant Mill Pond and/or Lower Portage Creek and reached OU5 sediments are *de minimis*.

5.     Nearly all, if not all, Aroclor 1242 PCBs discharged from the Bryant Mill during St. Regis's ownership period have already been removed from the Bryant Mill Pond and Portage Creek.  The response costs that GP seeks in this litigation do not include response costs associated with removing PCBs from the Bryant Mill Pond and Portage Creek.

6.     Third parties (Allied and others), and not St. Regis, are responsible for any PCBs in Bryant Mill Pond sediments that traveled further downstream as a result of lowering the Bryant Mill Pond Dam after St. Regis relinquished title to the Bryant Mill.

7.     Some paper mills that discharged Aroclor 1242 PCBs from CCP were owned and/or operated by companies that are now bankrupt or insolvent.  NCR is equitably responsible for these companies' shares because of its (a) superior knowledge regarding effects of recycling CCP; (b) failure to warn the mill operators of such harm or to take steps to prevent/minimize that harm; (c) increasing CCP production after it knew that recycling CCP was potentially harmful to the environment; and (d) profiting from manufacturing and selling CCP and the sale of CCP broke and trim.

8.     GP's delay in bringing suit against International Paper was not justified and unduly prejudiced International Paper.

9.     While the extent of the prejudice to International Paper as a result of GP's delay cannot be known with certitude, a larger share of liability is appropriately allocated to GP as a result of its laches.

10.    Because GP's delay denied International Paper the opportunity to participate in the Site investigation, GP's participating in that investigation deserves no weight in an equitable allocation between GP and International Paper.

11.    As to International Paper, cooperation is of limited importance as an equitable factor, since International Paper had no notice of its potential liability—and thus no opportunity to cooperate with the government—until 2010.

12.    GP's delay in asserting "equitable responsibility" arguments with respect to the Battle Creek Mills and MacSimBar Mill is itself a basis for concluding that International Paper has no "equitable responsibility" related to those mills.

13.    GP is not entitled to recover any of its past or future response costs related to any landfill, mill property or upland area of the Site from International Paper, including any past response costs related to OU2, OU3, OU4, OU6, and/or OU7.

14.    The 2009 Plainwell ASAOC and the 2008 AOC each is an "administrative settlement" under Section 113 and *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757 (6th Cir. 2014).  GP therefore is limited to a claim under Section 113 with respect to the 2009 Plainwell Dam No. 2 Costs and the 2008 AOC Costs.

15.    As to the 2009 Plainwell Dam No. 2 Costs:

15.1   Any Plainwell Dam No. 2 Costs that are recoverable (that is, that (i) are reasonable, are necessary, and were incurred in compliance with the NCP, and (ii) are not subject to offsets because of settlements or insurance recoveries or

because they relate to costs resulting from non-1242 Aroclors) should be equitably allocated to NCR.

15.2 Even if less than all of the 1990 AOC Costs are equitably allocated to NCR, none of the recoverable 1990 AOC Costs can be recovered from International Paper in light of equitable factors that include: (i) GP's laches; (ii) the payments previously made by Allied (including those with respect to the same underlying costs), (iii) the *de minimis* presence and impact of Aroclor 1242 PCBs associated with Bryant Mill operations during the St. Regis ownership period, and (iv) the passive nature of International Paper's connection to the Site and its PCB contamination, compared to the other parties' connections.

16. As to the 2008 AOC Costs:

16.1 GP is barred from recovery of the 2008 AOC Costs because of its delay in including such costs as part of its cost claims.

16.2 Even if GP is not barred from recovering 2008 AOC Costs, any 2008 AOC Costs that are recoverable (that is, that (i) are reasonable, are necessary, and were incurred in compliance with the NCP, and (ii) are not subject to offsets because of settlements or insurance recoveries or because they relate to costs resulting from non-1242 Aroclors) should be equitably allocated to NCR.

16.3 Even if less than all of the 2008 AOC Costs are equitably allocated to NCR, none of those costs are recoverable from International Paper.

16.3.1 The total payments made under the 2008 AOC were $4,100,000.

Allied paid 55% of those costs.

16.3.2    That payment, in and of itself, offsets any allocation to International Paper for GP's portion.

16.3.3    In addition, none of the recoverable 2008 AOC Costs can be recovered from International Paper, in light of equitable factors that include: (i) GP's laches; (ii) the other payments previously made by Allied, (iii) the *de minimis* impact of PCBs associated with Bryant Mill operations during the St. Regis ownership period on OU5 sediments; and (iv) the passive nature of International Paper's connection to the Site and its PCB contamination, compared to the other parties' connections.

17.    As to the 2007 Termination AOC Costs:

17.1    GP is barred from recovery of the 2007 Termination AOC Costs because of its delay in including those costs as part of its cost claims.

17.2    Even if GP is not barred from recovering 2007 Termination AOC Costs, any 2007 Termination AOC Costs that are recoverable (that is, that (i) are reasonable, are necessary, and were incurred in compliance with the NCP, and (ii) are not subject to offsets because of settlements or insurance recoveries or because they relate to costs resulting from non-1242 Aroclors) should be equitably allocated to NCR.

17.3    Even if less than all of the 2007 Termination AOC Costs are equitably allocated to NCR, none of those costs are recoverable from International Paper.

17.3.1    The 2007 Termination AOC required Allied and GP collectively to pay $287,714.90.  Allied paid a portion of those costs.

17.3.2    That payment, in and of itself, offsets any allocation to International Paper for GP's portion.

17.3.3    In addition, none of the recoverable 2007 Termination AOC Costs can be recovered from International Paper, in light of equitable factors that include: (i) GP's laches; (ii) the other payments previously made by Allied, (iii) the *de minimis* impact of PCBs associated with Bryant Mill operations during the St. Regis ownership period on OU5 sediments; and (iv) the passive nature of International Paper's connection to the Site and its PCB contamination, compared to the other parties' connections.

18.    As to the 1990 AOC Costs:

18.1    Any of the 1990 Costs that relate to non-Aroclor 1242 PCBs should be apportioned and deducted from the amount of costs that GP can recover from International Paper.

18.2    Any liability that International Paper may have under Section 107 for the 1990 AOC Costs that exceeds GP's fair share of those costs should in turn be equitably allocated among the defendants pursuant to Section 113.

18.2.1    Responsibility for the 1990 AOC Costs (to the extent that GP has established by admissible evidence that it incurred such costs and that such costs are (i) reasonable, necessary and in compliance with the NCP, and (ii) are not subject to offsets on account of settlements or insurance recoveries) should be equitably allocated to NCR;

18.2.2　Even if less than all of the 1990 AOC Costs are equitably allocated to NCR, GP can recover none of the recoverable 1990 AOC Costs from International Paper, in light of equitable factors that include: (i) GP's laches; (ii) the payments previously made by Allied (including those with respect to the same underlying costs), (iii) the *de minimis* impact of PCBs associated with Bryant Mill operations during the St. Regis ownership period on OU5, and (iv) the passive nature of International Paper's connection to the Site and its PCB contamination, compared to the other parties' connections.

19.　The MacSimBar Mill, which was not the subject of any liability determination in Phase I, offers no basis for allocating to International Paper any of the costs addressed above.

20.　The Battle Creek Mills, which were not the subject of any liability determination in Phase I, offers no basis for allocating to International Paper any of the costs addressed above.

21.　If no past costs are awarded to GP from International Paper, GP has no right to declaratory relief against International Paper

22.　Without a current order under which GP will incur costs that it can seek to recover from International Paper, GP has no right to declaratory relief against International Paper.

23.　Declaratory relief for future response costs is not appropriate at this time because (a) EPA has not determined the nature and scope of the remedies for each work area within OU5, and (b) those determinations will dictate which factors are relevant to the allocation of responsibility.

Dated:  August 31, 2015

/s/John D. Parker
John D. Parker
Lora M. Reece
Michael Dominic Meuti
BAKER & HOSTETLER LLP
PNC Center
1900 E. 19th Street, Suite 3200
Cleveland, OH 44114
(216) 621-0200
Attorneys for International Paper Company
jparker@bakerlaw.com
lreece@bakerlaw.com
mmeuti@bakerlaw.com

John F. Cermak
Sonja A. Inglin
Ryan D. Fischbach
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard Suite 1400
Los Angeles, CA 90025
(310) 820-8800
Attorneys for International Paper Company
jcermak@bakerlaw.com
singlin@bakerlaw.com
rfischbach@bakerlaw.com

And by:

David W. Centner
CLARK HILL PLC
200 Ottawa Ave. NW, Ste. 500
Grand Rapids, MI 49503
(616) 608-1106
Attorneys for International Paper Company
dcentner@clarkhill.com

607321740.2