**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | | |
|---|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No: 1:11-cv-00483 |
| v. | ) ) | Judge Robert J. Jonker |
| NCR CORPORATION, INTERNATIONAL PAPER CO., and WEYERHAEUSER CO., | ) ) ) ) | |
| Defendants. | ) | |

---

## DEFENDANT NCR CORPORATION'S PHASE II PRE-TRIAL BRIEF

---

# TABLE OF CONTENTS

**Page(s)**

Preliminary Statement.......................................................................................................1

Statement of Facts...........................................................................................................5

Argument ........................................................................................................................6

I.      The Trial In This Matter Should Be Limited To Past Costs. ...............................6

II.     Whatever The Scope Of The Upcoming Trial, No More Than A Small Fraction
        Of The Cleanup Costs Can Be Attributed To NCR.............................................8

        A.      NCR's Divisible Share Is No More Than 2%........................................8

        B.      No More Than A Very Small Share of Response Costs Should Be
                Allocated To NCR. ...........................................................................14

III.    The Court Should Conduct The Trial In A Way That Allows For The Most Fair
        And Efficient Presentation Of Evidence...........................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington N. & Santa Fe Ry. v. United States*,
 556 U.S. 599 (2009) ................................................................................................8

*Centerior Serv. Co. v. Acme Scrap Iron & Metal*,
 153 F.3d 344 (6th Cir. 1998) ................................................................................14

*City of Detroit v. A.W. Miller, Inc.*,
 842 F. Supp. 957 (E.D. Mich. 1994) .....................................................................27

*Comerica Bank-Detroit v. Allen Indus., Inc.*,
 769 F. Supp. 1408 (E.D. Mich. 1991) ...................................................................28

*CSX Corp. v. The Children's Inv. Fund Mgmt. (UK) LLP*,
 No. 08 Civ 2764 (S.D.N.Y. 2008) .........................................................................33

*Friedland v. TIC-The Indus. Co.*,
 566 F.3d 1203 (10th Cir. 2009) .............................................................................29

*GenCorp, Inc. v. Olin Corp.*,
 390 F.3d 433 (6th Cir. 2004) ................................................................................10

*Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*,
 758 F.3d 757 (6th Cir. 2014) ................................................................................27

*KRSG v. Eaton Corp.*,
 258 F. Supp. 2d 736 (W.D. Mich. 2002) ................................................................9

*NCR Corp. v. George A. Whiting Paper Co.*,
 768 F.3d 682 (7th Cir. 2014) ..................................................................................4

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*,
 714 F.3d 161 (4th Cir. 2013) ..................................................................................8

*United States v. Davis*,
 31 F. Supp. 2d 45 (D.R.I. 1998)............................................................................14

*United States v. NCR Corp.*,
 — F. Supp. 3d —, 2015 WL 2350063 (E.D. Wis. 2015) ......................................11

*United States v. P.H. Glatfelter Co.*,
 768 F.3d 662 (7th Cir. 2014) ...........................................................................8, 11

*United States Virgin Islands Dep't of Planning and Natural Res. v. St. Croix Renaissance Group, LLLP*,
   No. 07-114, 2013 WL 5640720 (D.V.I. Oct. 16, 2013)...........................................................8

*United Steelworkers of Am., Local 2116 v. Cyclops Corp.*,
   860 F.2d 189 (6th Cir. 1988) ......................................................................................6

**Statutes & Rules**

42 U.S.C. § 9607(a)(4)(b) .............................................................................................2

42 U.S.C. § 9613(g)(3) ...............................................................................................27

Defendant NCR Corporation ("NCR") respectfully submits this Pre-trial Brief in connection with the claims to be tried in the upcoming trial involving Georgia-Pacific Consumer Products LP, Fort James Corporation and Georgia-Pacific LLC (collectively, "GP"), International Paper Co. ("IP"), and Weyerhaeuser Co. ("Weyerhaeuser") (collectively, the "Mill Parties").

### Preliminary Statement

This phase of the case concerns the apportionment and allocation of environmental cleanup costs claimed by GP at the Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site (the "Site").  At issue in the upcoming trial is each party's respective responsibility for the costs of cleaning up PCBs discharged into the Kalamazoo River during the recycling of carbonless copy paper ("CCP") by the Kalamazoo-area mills ("Kalamazoo Mills") and other non-NCR entities;[1] whether the harm is divisible and those costs can be apportioned; and the equitable allocation of costs that all of the potentially responsible parties at the Site are potentially responsible for, regardless of whether the Court determines that a reasonable basis for apportionment exists.  NCR will demonstrate that the costs can be apportioned, no more than 2% of the past costs claimed by GP should be apportioned to NCR, and application of equitable factors to the percentage of harm that NCR is potentially legally responsible for brings NCR's share of costs to an even smaller amount.  But even under equitable factors alone, NCR should not be allocated more than 2%.

---

[1] While NCR contends that it has no liability for past or future cleanup costs incurred at the Site, the Court held in its Opinion and Order, dated Sept. 26, 2013, (Dkt. No. 432) ("Phase I Opinion") at 2–3, that NCR is liable as an arranger for the costs of cleanup of at least some of the PCBs discharged at the Site.  NCR respectfully reserves the right to appeal that ruling.

As a preliminary matter, trial should be limited to assignment of responsibility for past costs only.  GP seeks to hold NCR not only responsible for past costs, but for unspecified future response costs that may or may not be incurred in different areas of the Site.  This Site presents particular obstacles as to future costs, since the EPA has not even finished studying which areas of the 80-mile river portion of the Site will need to be cleaned, or selected a final remedy for the river areas that have been characterized.  Thus, the nature and scope of future costs are highly uncertain, as are the parties' defenses and the equitable factors that might apply to such future costs, including whether GP paid more than its "fair share".  Apportioning and/or allocating future costs at this time would be premature.

By contrast, GP's alleged past costs[2] are known, as are the parties' defenses with respect to such costs.  Following the Court's summary judgment ruling and further GP concessions, GP's claim for past costs is limited to approximately $50 million.  GP's claim for past costs is subject to defenses that can readily be adjudicated at this time and that further limit GP's potential recovery to no more than approximately $20.3 million, before any apportionment or allocation offsets are applied.  As examples, certain of GP's claimed costs are unrecoverable because they are not necessary costs of response consistent with the National Contingency Plan ("NCP"), a statutory precondition for recovery.  *See* 42 U.S.C. § 9607(a)(4)(b).  And any GP recovery must be offset by, among other things, insurance proceeds that GP has received pursuant to numerous insurance settlements that covered liabilities related to the Site.

In any event, no more than 2% of recoverable response costs at the Site can be attributed to NCR because:  (i) there is a reasonable basis for apportionment at the Site, and NCR should be assigned no more than a small share of Site response costs because it is only

---

[2] Only GP seeks past costs.

potentially responsible for a fraction of the PCBs at the Site that arise from recycled CCP; (ii) when equitable factors are applied to the PCBs at the Site that NCR could be liable for, its equitable share is smaller still; and (iii) even if the Court evaluates NCR's share on the basis of equitable factors alone, its share is minimal.

To begin, 25% of the PCBs at the Site are entirely unrelated to NCR and indeed even to CCP, and therefore NCR cannot be liable for the costs of remediating them. The Court held NCR liable only for arranging for the time-limited disposal of certain CCP broke and trim actively recycled by others at the Site. As previously admitted by GP, approximately 25% of the PCBs at the Site are from sources other than CCP recycling, such as transformers and the like, and thus could not have been arranged by NCR. (This is all the more true in light of the fact NCR had no facility on the river.) No more than 75% of PCBs at the Site are from Aroclor 1242, the only PCB type used in CCP. It is possible to distinguish between different PCBs, and the harm from them is divisible.

Of the remaining PCBs at the Site that could have come from recycled CCP, no more than a small share can be attributed to NCR. Unlike the Mill Parties, NCR neither owned nor operated any facilities on the Kalamazoo River and never discharged any PCBs or other pollutants at the Site. The Court found that NCR's liability is limited to that of an arranger and, moreover, that it acted as an arranger only from March 1969 forward. (Phase I Opinion at 16-19.) A share of less than 2% is merited based on the combination of the following factors:

(1)     No more than a small amount (4.2%) of all CCP recycled by paper mills located nationwide was made up of CCP broke or trim generated by facilities owned by NCR during the time NCR owned them, such that NCR could be said to have arranged for the disposal of CCP through their actions.

3

(2)     The vast majority of the recycled CCP broke and trim generated by NCR's affiliates was recycled by paper mills outside of the Kalamazoo area, and predominantly by mills located along the Fox River in Wisconsin, where virtually all of the CCP broke originated.[3]  The alleged evidence cited by the Mill Parties to show that CCP broke and trim generated by NCR's affiliates was recycled at the Site corresponds to no more than several truckloads of CCP broke and trim—by any measure a tiny amount in comparison to the amount of CCP recycled at the Site that was generated by sources never affiliated with NCR.

(3)     The Court has found that NCR had the intent necessary to be liable as an arranger only beginning in March 1969.  By multiple measures that NCR will demonstrate at trial, no more than a very small percentage of total contamination at the Site was caused by PCBs released after 1969.

Moreover, standard allocation analyses and other equitable factors further reduce the share of costs for which NCR could be held legally responsible in light of the Site's divisibility.  *First*, while it is true that NCR manufactured CCP using PCBs sold by Monsanto from 1954-1971 (the "Production Period"), NCR did not intend to harm the environment. During the Production Period, no scientific literature identified the PCBs used in CCP (Aroclor 1242) as an environmental hazard.  When concerns about PCBs as a class of substances grew, NCR ceased using Aroclor 1242 long before other manufacturers of PCB-containing products ceased their use of it and well before Aroclor 1242 was found to be an environmental hazard.  *Second*, the Kalamazoo Mills, most of which were owned and operated by the Mill

---

[3] The Seventh Circuit has affirmed the district court's decision in Fox River litigation that Appleton Coated Paper Company's ("ACPC") sales of CCP broke did not constitute an arrangement for the disposal of a hazardous substance.  *See NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 703-07 (7th Cir. 2014).

Parties and none of which was owned or operated by NCR, knowingly polluted the Site for decades, and would have done so regardless of whether they knew that CCP contained PCBs. They discharged most of the PCBs present at the Site and knowingly and persistently violated government orders restricting paper mill pollution.  *Third*, for decades the Mill Parties benefited disproportionately from recycling CCP and their continued failure to implement adequate wastewater treatment practices.  And *fourth*, GP and other owners and operators of the Kalamazoo Mills, unlike NCR, have long been identified by the government as potentially responsible parties at the Site, and in view of their long history of flouting government regulations and orders, overstate their cooperation with the government.

Finally, NCR respectfully requests that the Court require the parties to present their cases at trial in accord with their respective burdens of proof and to present affirmative testimony before rebuttal testimony.  NCR believes that it will need 22 hours of trial time to present its case in chief and a comparable amount of time to cross-examine the other parties' witnesses.

## Statement of Facts

The facts supporting NCR's defenses to the claims against it are summarized in detail in NCR's Preliminary Proposed Findings of Fact and Conclusions of Law for Phase II, submitted herewith.[4]  Rather than repeat those facts here, they are incorporated by reference and will be further elaborated in NCR's post-trial submissions.

---

[4] References to NCR's Preliminary Proposed Findings of Fact and Conclusions of Law for Phase II are noted as "PFOF ¶__".

## Argument

**I.      THE TRIAL IN THIS MATTER SHOULD BE LIMITED TO PAST COSTS.**

As a preliminary matter, the upcoming trial should be limited to past costs. Deciding future costs at this time would be premature.  So far as we know, GP is not incurring, and won't incur, any recoverable costs under any existing order.  Costs GP is incurring under any of its existing settlement orders are time-barred.  There is no way fairly to determine each party's respective responsibility for future costs without knowing the full nature and extent of releases of hazardous substances in all areas of the Site and the complete remedy for the river.  Requiring NCR to try future costs at this time would deny NCR a full and fair opportunity to present its defenses to the other parties' claims for future costs.

Courts in the Sixth Circuit weigh several factors in deciding whether a matter is ripe for judicial review:  (i) "the likelihood that the harm alleged by plaintiffs will ever come to pass", (ii) "whether the factual record of this case is sufficiently developed to produce a fair and complete hearing as to the prospective claims", and (iii) "the hardship that refusing to consider plaintiff's prospective claims would impose upon the parties".  *United Steelworkers of Am., Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194-95 (6th Cir. 1988).  These factors weigh in favor of limiting the scope of trial to costs that have been incurred.

Because remedy selection is ongoing (and for many portions of the Kalamazoo River has not yet begun), there is no way to determine what cleanup the EPA may ultimately require.  Investigative work is expected to continue at the Site for several years.  Accordingly, the harm to be apportioned and/or allocated is not yet known.  The Court cannot fairly apportion

harm without knowing what that harm is and how it came about.  The record is not developed enough to allow for a fair hearing as to unknown future costs.[5]

In contrast to future costs, the Court should be able to fully and fairly determine the parties' relative responsibility, if any, for GP's remaining past costs.  GP's claim is now approximately $50 million.[6]  GP's claim for these past costs is subject to a number of defenses and offsets.  As a preliminary matter, not all of GP's claimed costs qualify as necessary costs of response consistent with the NCP, which will reduce the claim substantially.

If the upcoming trial is limited to past costs, then upon entry of a judgment as to past costs the parties can appeal issues that will either foreclose the need for a trial as to future costs (*e.g.*, whether GP's claim is time-barred in its entirety, whether NCR was correctly held liable as an arranger, and whether IP qualifies for CERCLA's secured creditor exemption), or permit any trial as to future costs to occur when information is available concerning the remedy that will be implemented.

While GP insists on resolving responsibility for future costs now, that position is inconsistent with its repeated assertion during discovery that the current record makes it impossible to know the quantity of PCBs discharged annually by each of the Kalamazoo Mills. The contributions of PCBs by the Kalamazoo Mills to the Site are a critical factor in determining the parties' responsibility, if any, for future costs.  There can be no question that delaying a trial on future costs until after final remedies have been selected, when the parties will have had

---

[5] For example, Lake Allegan may require an enormous amount of remediation, or may require none.  The remedy to be adopted by the EPA, however, will not be known for years.

[6] GP originally claimed $105 million in past costs, but the Court's summary judgment order reduced the claim by $49 million, and GP has conceded that another $6 million is time-barred.  (*See infra* at 27.)

additional opportunity to ascertain the Mills' annual discharges and their relation to the final remedy, will permit a more reliable decision regarding apportionment and allocation.[7]

## II.   WHATEVER THE SCOPE OF THE UPCOMING TRIAL, NO MORE THAN A SMALL FRACTION OF THE CLEANUP COSTS CAN BE ATTRIBUTED TO NCR.

While the Court has ruled, subject to appeal, that NCR is liable as an arranger for at least some of the PCBs discharged at the Site, NCR should be held responsible for no more than 2% of cleanup costs.  Both NCR's divisible share of any cleanup costs and the share of cleanup costs that equitably may be allocated to NCR are either smaller or equivalent to that amount.[8]

### A.   NCR's Divisible Share Is No More Than 2%.

An alleged harm is divisible or subject to apportionment where (i) it is theoretically capable of apportionment and (ii) there is a reasonable basis for apportionment.  *See Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 614 (2009).

Environmental harm is theoretically capable of apportionment where a party can show the extent to which it contributed to the alleged harm.  *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 678 (7th Cir. 2014).  "[A] 'reasonable basis for apportionment' need not be mathematically precise, and may be based on the simplest of considerations,' *e.g.*, time and land areas."  *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 183 (4th Cir. 2013)

---

[7] While NCR believes it makes sense to defer any trial of past costs, it has made a reasonable effort to estimate the Mills' annual discharges of PCBs.  Tellingly, GP, which seeks a trial on all issues now, has not.  As we expect will become obvious at trial, GP seeks to use the uncertainty created by its request for future costs before the remedy has been selected as a basis for bolstering its argument that NCR should be held liable for all PCB discharges at the Site.  For the reasons set forth below, that position cannot be sustained, and ignores GP's culpable conduct.

[8] Based on the Court's summary judgment ruling, NCR understands that GP has a § 107 claim pending with respect to at least some of its claimed costs.  *See* Opinion and Order, dated Aug. 12, 2015 (Dkt. No. 787).  Accordingly, NCR presents a divisibility defense in response to those costs but contends that the facts supporting its divisibility defense are applicable equally to the contribution claims asserted by GP and the other Mill Parties.

(quoting *Burlington*, 556 U.S. at 617-18).  "Defendants' burden may be met by showing that harm can be divided among them based on volumetric, chronological, or geographic considerations."  *United States Virgin Islands Dep't of Planning and Natural Res. v. St. Croix Renaissance Group, LLLP*, No. 07-114, 2013 WL 5640720, at *3 (D.V.I. Oct. 16, 2013) (quoting *Burlington*, 556 U.S. at 617-18).

Here, the alleged harm is theoretically capable of apportionment, and there is a reasonable basis for apportioning NCR's divisible share.[9]  NCR's divisible share is minimal—no more than 2% based on the combination of the following factors:

NCR had nothing to do with 25% of the PCB contamination at the Site.  At least 25% of the PCBs at the Site derive from sources other than CCP, such as transformers.  The only PCB ever used in CCP was Aroclor 1242.  (PFOF ¶ 202; *see* Phase I [Proposed] Final Pretrial Order, dated Jan. 30, 2013 (Dkt. No. 360) at 4, ¶ 9.)  In prior litigation concerning the Site, GP argued (and the Court accepted) that 25% of the PCB content in the Kalamazoo River is made up of Aroclor 1254 and Aroclor 1260, PCBs that were used in various oils in heavy manufacturing and as dielectric fluids in electrical equipment as well as in adhesives, coatings, and plasticizers, but never in CCP.  *See KRSG v. Eaton Corp.*, 258 F. Supp. 2d 736, 741 (W.D. Mich. 2002).  NCR did not contribute any of those PCBs to the Site.  GP is estopped from arguing differently in this proceeding.

NCR could have arranged for no more than a fraction of the CCP recycled at the Site.  While NCR was found liable as arranger for a short period of time, it could not have arranged for the disposal of most of the CCP that was recycled by the Kalamazoo Mills.  During

---

[9] Notwithstanding the foregoing discussion that trial should be limited to GP's past costs, NCR has retained experts who have considered the current record, who have submitted reports, and who will present credible testimony at trial that both NCR's divisible and allocable shares should be assessed at less than 2%.

the Production Period when CCP was manufactured using PCBs, recycled CCP came from three different sources:  (i) CCP broke from one of four CCP coating mills, ACPC, Combined Paper Mills ("CPM"), Mead Corporation ("Mead"), and Nekoosa Papers, Inc. ("Nekoosa") (collectively, the "Coating Companies"); (ii) CCP trim from the converting operations of Systemedia and Independent Converters unrelated to NCR (collectively, "Converting Companies"); and (iii) CCP from post-consumer sources.  (PFOF ¶ 203.)  NCR never owned or operated Mead or Nekoosa, never owned or operated any Independent Converters, and never transacted in post-consumer CCP.  (PFOF ¶¶ 203.4-203.7.)  Thus, NCR could not have arranged for the disposal of CCP from these sources.[10]

While under the Court's Phase I Decision NCR could have arranged for the disposal of CCP by ACPC, CPM and Systemedia at the Site (collectively, "NCR affiliates"), any NCR responsibility derived from these entities is minimal.  NCR owned Systemedia throughout the Production Period, but only acquired CPM in July 1969 and ACPC in September 1970. (PFOF ¶¶ 203.1-203.3.)  During the period that NCR owned the entities—the only time NCR could be said to have arranged for the disposal of the CCP broke and trim generated by them— NCR's affiliates generated only 4.2% of all CCP recycled at any recycling mill nationwide. (PFOF ¶ 214.)  Much less than that amount reached the Kalamazoo River.

<u>Very little of the recycled CCP broke and trim generated by ACPC, CPM and Systemedia reached the Site</u>.  NCR could only be liable in this case for PCBs released as a result of recycled CCP that NCR's affiliates sent *to the Site* for recycling.  While the Court found that at least some CCP broke from NCR's affiliates reached the Site (Phase I Opinion at 21), the vast

---

[10] The Sixth Circuit requires a party liable as an arranger to have "owned or possessed" the allegedly disposed material.  *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 449 (6th Cir. 2004).

majority of CCP broke and trim generated by NCR's affiliates never reached the Site and was recycled by mills outside of the Kalamazoo area.

The vast majority of CCP broke and trim generated by ACPC and CPM was recycled by mills along the Fox River in Wisconsin due to the simple fact that local demand was strong and transportation costs to ship it elsewhere were significant. (*See* PFOF ¶ 216.1 (Wisconsin government concluded that "most, if not all, NCR Paper broke produced by [ACPC] was likely deinked and used in the Fox Valley" because "the total amount of NCR paper produced would have required only about 1% of the deinking capacity in the [Fox] Valley", "strong local [Wisconsin] demand", and "shipping costs [that] would have made it less economically attractive to ship material to distant mills").) NCR is paying by far the largest portion of the cleanup costs at the Fox River, where NCR formerly maintained CCP operations, and unlike other PRPs there, has consistently performed remediation work in accordance with the governments' unilateral administrative order at the Fox River.[11]

In any case, very little of the CCP that NCR is alleged to have handled as an "arranger" reached the Kalamazoo Site. Of the many facilities that NCR's Systemedia division operated throughout the country during the Production Period, there is no evidence or allegation that any CCP trim reached the Site from any of its facilities other than Systemedia's (i) Washington Courthouse, Ohio facility; (ii) Viroqua, Wisconsin facility; and (iii) Dayton, Ohio facility.[12] (PFOF ¶ 216.2.) The recycled CCP trim generated by those three facilities made up

---

[11] GP is also a recipient of the unilateral administrative order, and although it made limited contributions to the costs of remediation there initially, from late 2009 until mid-2015 it did not contribute a single cent. It changed its position only after the Seventh Circuit ruling of late 2014, and the federal court's divisibility decision of May 2015 concerning the Fox River. *See, e.g., United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 678 (7th Cir. 2014); *United States v. NCR Corp.*, — F. Supp. 3d —, 2015 WL 2350063 (E.D. Wis. 2015).

[12] Both GP's expert, Dr. Dolan, and IP's expert, Dr. Frazier, concede that there is no direct evidence linking the Viroqua facility to the Kalamazoo Mills. (PFOF ¶ 278.3.)

no more than 1.4% of all the CCP recycled by recycling mills nationwide. (*Id.*) Only a fraction of which could have arrived at the Site.

The extremely limited direct evidence cited by the Mill Parties to show that NCR-arranged CCP reached the Site corresponds to only a tiny share of the CCP recycled by the Kalamazoo Mills. Specifically, the Mill Parties pointed to (i) a 1965 letter purportedly written by Mr. Heinritz stating that "limited quantities" of CCP were sent from ACPC to Allied prior to 1965; (ii) three 1968 entries in a 16,000 line-item list of waste paper shipments received by GP's Kalamazoo Paper Company Mill (the "KPC Mill"); and (iii) testimony in which a former driver for GP recalled transporting two truckloads of CCP from NCR's affiliates to the KPC Mill. (*See* PFOF ¶¶ 217.2-217.5.) While the Court found that NCR had the requisite intent to be liable at the Site as an arranger at least as of March 1969, evidence prior to that time perforce cannot form the basis of a transaction for which NCR can be liable as an arranger. On this basis, the 1965 letter, which relates to the shipment of "limited quantities" of CCP prior to May 1965 (four years before the Court found NCR had the necessary intent to be liable as an arranger and five years before NCR acquired ACPC), is not evidence of CCP the disposal of which was arranged by NCR.

For the same reason, the three entries in the KPC Mill's ledger relating to shipments of CCP in 1968 are not evidence of NCR-arranged CCP.[13] As a result, the only remaining direct evidence is the somewhat qualified testimony that two truckloads of CCP were transported by one of GP's drivers from an NCR affiliate to GP's KPC Mill. Two truckloads amount to no more than a fraction of the hundreds of tons of CCP recycled by the Kalamazoo

---

[13] The car records indicate that the entries cited by GP in its Phase I Post-trial Proposed Findings of Fact were received by the Kalamazoo Paper Company Mill from a paper broker, and do not indicate whether the subject paper was CCP broke or trim generated by one of NCR's affiliates. (PFOF ¶ 217.3.)

Mills.  (PFOF ¶ 217.2.)  In Phase II, the Mill Parties have not adduced any additional evidence of NCR-arranged transactions, despite incentive for them to do so.  (PFOF ¶ 217.5.)

<u>The majority of PCBs at the Site were discharged before March 1969</u>.  The vast majority of PCB contamination at the Site was caused by PCBs released prior to 1969, a period in which the Court has not found that NCR was an arranger.

By 1969 a significant amount of the Kalamazoo Mills had closed their deinking operations, which were responsible for recycling the vast majority of the CCP recycled at the Site.  (PFOF ¶ 219.)  By the same time, many of the Kalamazoo Mills had begun using secondary wastewater treatment, resulting in a substantial decrease of PCBs released into the Kalamazoo River and Portage Creek.  (PFOF ¶ 220.)  Specifically:

- Only 16.44% of all the CCP recycled by the Kalamazoo Mills was recycled after January 1, 1969 (and no more than 4.6% of all CCP recycled nationwide after January 1, 1969, was made up of CCP broke or trim generated by ACPC, CPM, or Systemedia (regardless of when NCR owned them)).  (PFOF ¶ 221, 221.1.)

- Only 4.49% of the Aroclor 1242 released by the Kalamazoo Mills into the Kalamazoo River and Portage Creek was discharged after January 1, 1969.  (PFOF ¶ 223.)

- Geochronological dating of the Kalamazoo River demonstrates that no more than 13% (and likely less) of all PCBs (not only Aroclor 1242) presently in the Kalamazoo River were deposited in the river after January 1, 1969.  (PFOF ¶ 224.)

- On a work-area-by-work-area basis, no more than the following percentages of soil and sediment likely to be dredged or capped (based on *assumed* EPA remedies) are contaminated with Aroclor 1242 that was discharged after January 1, 1969 (PFOF ¶ 225):

13

| OU5 Work Area | % of Contamination Volume after Jan. 1, 1969 (Assumed Dredging Remedy) | % of Contamination Area after Jan. 1, 1969 (Assumed Capping Remedy) |
|---|---|---|
| Work Area 1A | 2.52% | 2.52% |
| Work Area 1B | 2.71% | 3.55% |
| Work Area 2 | 3.46% | 3.62% |
| Work Area 3 | 3.29% | 3.02% |
| Work Area 4 | 3.43% | 3.72% |
| Work Area 5 | 3.48% | 3.33% |
| Work Area 6 | 5.79% | 7.49% |
| Work Area 7 | 3.28% | 3.44% |

B.     No More Than A Very Small Share of Response Costs Should Be Allocated To NCR.

Entirely apart from whether the alleged harm should be apportioned (and NCR's share should be divided), no more than a very small share of response costs should be allocated to NCR.  Under either analysis, NCR's share is minimal.

In allocating response costs, courts consider a variety of equitable factors including:  "(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or environment".  *Centerior Serv. Co. v. Acme Scrap Iron & Metal*, 153 F.3d 344, 354 (6th Cir. 1998), *abrogated on other grounds*; *see also United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998) (noting "critical" equitable factors include "(1) [t]he extent to which cleanup costs are attributable to wastes for which a party is responsible, (2) [t]he party's

14

level of culpability, (3) [t]he degree to which the party benefitted from disposal of the waste, and (4) [t]he party's ability to pay its share of the cost").

Consideration of these factors (some but not all of which also bear on apportionment/divisibility, as discussed above) demonstrates that no more than a small share of any response costs at the Site should be allocated to NCR.  Indeed, for the same reasons that NCR's divisible share is small, NCR should be allocated no more than a minimal share (and no more than 2%) of the PCB-cleanup costs at the Site.

As stated, (i) NCR had nothing to do with 25% of the PCBs found at the Site because they were not from CCP; (ii) only a small fraction of the PCBs at the Site could have been arranged by NCR because the vast majority came from sources other than entities owned or operated by NCR; (iii) direct evidence that NCR arranged for the disposal of CCP at the Site corresponds to a very small fraction of CCP recycled at the Site; and (iv) the vast majority of the PCBs from recycled CCP were discharged before March 1969, the date after which the Court found NCR to be an arranger.  While these factors alone merit a small share for NCR, standard allocation analyses and other factors demonstrate that NCR's equitable responsibility for any apportionable amount is smaller still, and that, separate from NCR's divisible share, NCR's allocable share should also be no more than 2%.  Specifically:

While NCR manufactured CCP, NCR acted in good faith and without culpable intent.

1. When NCR used Aroclor 1242 in CCP, the use of PCBs in industry was ubiquitous and PCBs were considered safe.  PCBs were widely used in hundreds of applications from the 1930s to the 1970s, including as a dielectric in electrical equipment; as plasticizers and modifiers in paints, waxes, lacquers, adhesives and coatings; in

construction materials; and in hydraulic fluids, heat transfer fluids, compressor fluids, vacuum pump oils, cutting fluids and lubricants. (PFOF ¶ 123.) PCBs were also widely used in the paper industry as inks, coatings and adhesives, as well as in paper-mill heat-transfer and hydraulic fluids. (PFOF ¶ 123.)

2.  <u>When NCR selected Aroclor 1242 for use in its emulsion, NCR reasonably believed that it was safe</u>. In 1953, Monsanto, at all relevant times the manufacturer of Aroclor 1242, informed NCR that Aroclor 1242 was not an acutely toxic chemical. (PFOF ¶ 320.1.) At the time, Monsanto informed customers that, even in work settings, it did "not believe that there is an industrial hazard caused by [NCR's] use of Aroclor . . . under normal conditions". (PFOF ¶ 320.2.) NCR commissioned its own toxicology studies to confirm this. These studies concluded that, even at the point of manufacture, "the toxic and irritative potential [of NCR's CCP emulsion] were sufficiently low that the material would not be required to bear precautionary labeling under the Federal Hazardous Substances Labeling Act". (PFOF ¶ 321.2.) And available scientific studies at the time concluded that PCBs "are very little toxic and operations employing them can easily be safeguarded". (PFOF ¶ 316.1.) NCR also commissioned toxicity studies to confirm that its final product was safe for consumers. (PFOF ¶ 321.) At no point during the Production Period was there any indication that CCP might not be safe.

3.  <u>The specific PCB used in CCP (Aroclor 1242) was never identified in the environment during the Production Period</u>. There was no evidence of potential harm to the environment from any PCBs until the Swedish scientist Soren Jensen discovered them in environmental samples. In December 1966, a journal announced that Jensen had

detected PCBs in environmental samples.  (PFOF ¶ 325.)  Jensen later concluded that what he found resembled Aroclor 1254.  (PFOF ¶ 326.1.)  Neither Dr. Jensen's 1966 research nor any published research or government agency during the Production Period identified Aroclor 1242 in the environment.  (PFOF ¶¶ 330-331.3.)  Only Aroclor products with higher chlorine contents—that were never used in CCP—were identified. (PFOF ¶ 330.2.)

      4.      <u>During and after the Production Period, Monsanto assured its customers, including NCR, as well as the government and the public that Aroclor 1242 was not an environmental contaminant</u>.  NCR reasonably relied on Monsanto's assurances that Aroclor 1242 did not pose a hazard to the environment.  Monsanto repeatedly assured NCR that Aroclor 1242 had not been found in the environment and that it degraded. (PFOF ¶ 338.)  Monsanto assured its customers, the public, and Michigan's environmental regulator that PCBs with a chlorine content of less than 54% (Aroclor 1242 had a chlorine content of 42%) were "not considered a general environmental contaminant", (PFOF ¶ 339 (Dec. 1969 statement)), and that "PCBs with a chlorine content of less than 54% have not been found . . . and appear to present no potential problem to the environment", (PFOF ¶ 341 (Feb. 1970 statement)).  Even four years after NCR ceased using Aroclor 1242, Monsanto told government agencies that "if we could just turn the clock back and only use let's say [Aroclor] 1221, a 1232 and even a 1242 and no others, we probably wouldn't be sitting in this room today.  I just don't think a problem would have developed".  (PFOF ¶ 350.)  The paper industry agreed and argued against limiting discharges of 1242 on the grounds that 1242 did not

bioaccumulate in fish or wildlife, was not being found in the environment, and was believed to degrade.  (PFOF ¶ 350, ¶ 434.2.)

5.      During the Production Period, no data suggested that the levels of PCBs detected in the environment were hazardous.  Not only was there no evidence during the Production Period that Aroclor 1242 persisted in the environment, there was also no evidence that Aroclor 1242 was toxic at low, environmental levels of exposure.  (PFOF ¶ 332.)  A Federal Task Force concerning PCBs concluded in May 1972, a year after NCR discontinued use of Aroclor 1242 in its CCP emulsion, that "[t]here currently are no toxicological or ecological data available to indicate that the levels of PCBs currently known to be in the environment constitute a threat to human health".  (PFOF ¶ 333.7.)  Time Magazine published in its December 1971 issue that "[f]or all the grim warning signs, there is as yet no proof that PCBs at present low levels found are harmful to humans".  (PFOF ¶ 333.6.)  And a FDA scientist was quoted in October 1971 as stating "PCB is everywhere.  And we really don't know if we should—or should not—be alarmed".  (PFOF ¶ 333.5.)  Indeed, the EPA didn't ban the manufacture or importation of PCBs until 1979—eight years after NCR ceased using Aroclor 1242 in CCP.  (PFOF ¶ 367.)

6.      NCR ceased using Aroclor 1242 in April 1971, before it was identified as a potential environmental hazard.  NCR acted responsibly in ceasing its use of Aroclor 1242 in April 1971.  (PFOF ¶ 358.)  In October or November of 1970, NCR met with Monsanto and communicated that it would withdraw from the CCP business unless Monsanto came up with an alternative to Aroclor 1242 on a "timely basis".  (PFOF ¶ 357.)  At the time, the overall visibility of the PCB issue and the identification of

higher-chlorinated Aroclors in fish and wildlife prompted NCR to want to remove substances such as Aroclor 1242 from its manufacturing processes.  (PFOF ¶ 354.)  Once a replacement (mono isopropyl biphenyl or "MIPB") was identified, NCR quickly replaced Aroclor 1242 by April 1971, despite MIPB's higher cost and lesser performance (PFOF ¶ 359), and despite the fact that Aroclor 1242 was not identified in scientific literature as a potential source of PCBs in the environment until after the Production Period.  (PFOF ¶¶ 330-331.3).  According to former Monsanto employee Thomas Gossage, NCR was the *only* purchaser of its PCBs "taking a strong leadership position in getting [PCBs] out of their downstream products".  (PFOF ¶ 357.1.)

7.    NCR stopped using Aroclor 1242 before Monsanto stopped selling it, before other users stopped buying it, at a time that paper companies first started using it in their products, and eight years before it was banned.  Monsanto continued to manufacture and sell PCBs (including Aroclor 1242) to other customers through 1971 and 1972 for a variety of applications.  (PFOF ¶ 361.2.)  In fact, 1970 was a record year for Aroclor sales—and was thus likewise a record year for Aroclor use across industries.  (PFOF ¶ 361.1)  When NCR decided to stop using Aroclor in its manufacture of CCP in 1970, other paper companies like Champion, Allied and Mead were first developing their own CCP with Aroclor.  (PFOF ¶ 373.)  NCR ceased using Aroclor 1242 eight years before the U.S. banned the manufacture or importation of PCBs.  EPA first banned PCBs in 1979.  (PFOF ¶ 367.)  Even then, EPA's 1979 ban specifically exempted the continued use of CCP products previously sold, concluding that the continued use of CCP did "not present an unreasonable risk" because the "potential PCB exposure and risks to human health or the environment are negligible".  (PFOF ¶ 367.)  Companies are entitled to rely

on government pronouncements and to act in accordance with them, but in any event should not be punished for actions consistent with those pronouncements.

8. <u>NCR did not conceal the fact that CCP contained PCBs</u>.  The fact that CCP contained a PCB compound was well known throughout the paper industry.  NCR disclosed its use of PCBs in numerous patents filed and published before and during the Production Period.  (PFOF ¶ 372 *citing* patents from 1951 and 1955.)  NCR widely marketed and licensed these patents.  (PFOF ¶¶ 373.9, 376.)  NCR's patents were themselves well known in the paper industry.  (PFOF ¶¶ 373-373.9.)  Indeed, Allied Paper Company, former owner and operator of the Bryant, Monarch, Rex and King Mills, experimented with developing its own carbonless copy paper *using* PCBs.  (PFOF ¶¶ 378.1-378.2 (evidence indicating that trial coating runs occurred at Allied as early as 1968-1971).)  That NCR's CCP contained PCBs was also discussed since the 1950s in publications and by organizations related to or read by the paper industry.  (PFOF ¶ 376.4 (Institute of Paper Chemistry discussing NCR's CCP patents and the fact that CCP contained PCBs in 1955).)  Many companies outside of the paper industry similarly corresponded with NCR about the fact that PCBs were in CCP, further demonstrating that it was no secret that PCBs were in CCP.  (PFOF ¶ 376.2.)

9. <u>The hazards associated with DDT did not indicate that PCBs were harmful to the environment</u>.  While it was known during the Production Period that DDT was a potent insecticide that caused eggshell thinning and was lethal to fish, the properties and effects of DDT did not demonstrate that PCBs were environmentally harmful.  (PFOF ¶¶ 369-369.6.)  At that time, neither PCBs generally nor specific Aroclor mixtures, such as Aroclor 1242, were known to have those effects.  (PFOF ¶ 369.2.)  Obvious

differences between the properties, uses, releases, and effects of the two substances demonstrate that no inference of environmental harm should have been drawn against PCBs based on then-current DDT research.  (PFOF ¶ 368.)

The Kalamazoo Mills, not NCR, discharged most of the PCBs at the Site.  All of the Aroclor 1242 at the Site was discharged from one of the 14 Kalamazoo Mills, none of which was owned by NCR.  (PFOF ¶ 382.)  While the Mill Parties have estimated varying contributions of each mill, they all agree that the KPC Mill, the King Mill, and the Bryant Mill were the principal dischargers of Aroclor 1242 at the Site.  (PFOF ¶ 385.)  In addition to Aroclor 1242, the Kalamazoo Mills released PCBs from sources other than CCP, including PCBs from the hydraulic and electrical equipment that make up 25% of the PCBs found at the Site today.  (PFOF ¶¶ 393-393.17.)  NCR had no ability to control the practices of the Mill Parties.

The Kalamazoo Mills knowingly polluted the Kalamazoo River, and would have done so regardless of whether they knew that CCP contained PCBs.  For decades, the Kalamazoo Mills knowingly polluted the Kalamazoo River (i) in violation of government orders that restricted paper mill discharges beginning in the early 1950s; (ii) while resisting implementation of available wastewater treatment until the late 1960s; (iii) while routinely bypassing implemented wastewater-treatment systems; and (iv) despite being told by Michigan's environmental regulator in the early 1970s that their effluent was still releasing PCBs into the Kalamazoo River.  (PFOF ¶ 394.)  Had the Mills complied with their regulatory obligations and taken steps to ameliorate the well-known pollution of the Kalamazoo River, a problem with which NCR had no involvement, the PCB contamination in the Kalamazoo River would be a fraction of what it is today.

Paper mill waste caused the Kalamazoo River to be one of the most polluted rivers in Michigan in the 1950s through the 1970s.  (PFOF ¶ 395.14.)  As late as the early 1950s, the Kalamazoo Mills discharged wastes directly into the river, without any treatment.  (PFOF ¶ 395.1.)  Former mill employees described the Kalamazoo River in the 1950s and 1960s as "an open sewer", that flowed "with a brown consistency, like a diluted chocolate milk", whose color "would depend what day you'd go by there.  It would be red, some days green, some days kind of a nothing, some days kind of whitish".  (PFOF ¶ 395.4, 395.10, 395.11.)  A former professor of hydrobiology described it as the "most grossly polluted [river], with organic pollutants that [he had] ever seen in [his] career".  (PFOF ¶ 395.9.)  Michigan's Toxic Substances Unit Supervisor described the Kalamazoo River as "by far the most contaminated river [he] had ever seen in [his] life up to then" and Portage Creek as "sort of like a blue—a blueberry milkshake but not quite as thick as—as a milkshake but that color, and it was—had a plume that went a considerable distance downstream where it discharged into the Kalamazoo River".  (PFOF ¶ 395.8.)  Photographs from the pre-1969 period reflect these observations.

In response to the paper mill pollution problem, the Michigan Water Resources Commission ("MWRC") issued administrative orders in 1951 prohibiting paper-mill-deinking operations from discharging *any* suspended solids into the river and prohibited paper-mill-recycling operations from discharging more than 10 pounds of suspended solids into the river per ton of product produced.  (PFOF ¶ 398.)  The Kalamazoo Mills repeatedly and openly violated those orders.  (PFOF ¶ 399.)  Internal mill memoranda from the time period admit, for example, that the King Mill was "in flagrant violation of [its] Michigan Water Resources Commission orders on the amount of waste that [it] may discharge" (PFOF ¶ 399.1), and that "[t]here are undoubtedly times when [the Bryant Mill is] not in conformation with our orders from the

WRC" (PFOF ¶ 399.3).  A former mill employee explained that the numerous Kalamazoo Mills did not comply with MWRC's regulations because of compliance costs.  (PFOF ¶ 399.7.)  Far fewer PCBs would have been released into the river had the Mills complied with their regulatory obligations designed to prevent environmental contamination.  Deliberate disregard of legitimate administrative orders should not effectively be rewarded today by shifting the consequences of that knowing and intentional non-compliance to others.

Notwithstanding the Commission's orders, the Kalamazoo Mills resisted timely implementation of available secondary wastewater treatment.  (PFOF ¶ 400.)  Secondary treatment for paper-mill effluent was available to the Kalamazoo Mills via technology by the mid-1950s and was economically feasible no later than 1960.  (PFOF ¶¶ 404-404.4.)  But secondary treatment was not implemented by most Kalamazoo Mills until 1967, when the City of Kalamazoo's Wastewater Treatment Plant began operating secondary treatment.  (PFOF ¶ 407.)  The Kalamazoo Mills would have released many fewer PCBs into the Site had they addressed the Kalamazoo River's well-known pollution problem simply by adopting secondary treatment sooner.  (PFOF ¶ 410.)

Despite belatedly adopting secondary wastewater treatment, the Kalamazoo Mills repeatedly and with full intent bypassed installed treatment processes and discharged large amounts of untreated wastes directly into the Kalamazoo River.  The Kalamazoo Mills were documented as frequently bypassing wastewater treatment processes (primary and secondary treatment) hundreds of times throughout the 1950s, 1960s and 1970s.  (PFOF ¶¶ 411-423.4.)  This was not accidental or unintentional.  They also bypassed wastewater processes in many undocumented instances as bypass events were "a highly kept secret" by the mills.  (PFOF ¶ 412.)  NCR had no involvement in the Mills' decisions to bypass treatment processes and

discharge waste directly into the Kalamazoo River, and should not be made to suffer the consequences of that behavior today.

Any contention that the Kalamazoo Mills would have improved their wastewater or recycling practices had they appreciated during the Production Period that PCBs were contained in recycled CCP is belied by the record.  After being told by MDNR that PCBs were found in their wastewater discharges, the Kalamazoo Mills took no responsive or investigatory actions at all.  (PFOF ¶ 435.4.)  MDNR issued a report in April 1972 concluding that "major sources" of PCBs in the Kalamazoo River appear to be, among others, "reclamation of waste paper on which specialty inks have been used".  (PFOF ¶ 435.1.)  In response, none of the Kalamazoo Mills contacted MDNR about its conclusion, or took any actions to investigate potential sources of PCBs in their effluent or to remediate observed PCB contamination.  (PFOF ¶ 435.4.)

Other factors demonstrate that the Mill Parties bear primary responsibility for the harm.  Other factors demonstrate that the Mill Parties, and not NCR, should bear primary responsibility for cleanup costs at the Site, including that:

1.  The Kalamazoo Mills benefitted disproportionately from paper recycling. The Kalamazoo Mills received substantial economic benefits from their decisions leading to the release of Aroclor 1242 at the Site.  (PFOF ¶ 438.)  The Kalamazoo Mills benefitted from using recovered paper (including CCP) during and after the Production Period as an input in papermaking instead of more expensive virgin wood.  (PFOF ¶¶ 439-440.7.)  The Mills also benefitted economically by delaying the installation of available wastewater-treatment systems and avoiding compliance with regulatory requirements, and thus postponing or indeed permanently forgoing some costs.  (PFOF

¶¶ 441-441.4.) In doing so, the Mills effectively transformed their private costs of waste treatment and compliance with government orders into public pollution costs—costs that the Mill Parties now seek to transfer to NCR even though NCR had no involvement in their knowing decisions to pollute the Kalamazoo River for decades on end, nor any ability to control those practices. The Mill Parties' position to the contrary is cynical at best.

2.      The Mill Parties can better afford cleanup of the Site. Each of the three Mill Parties has greater financial resources than NCR to fund remediation of the Site. Financial filings show that NCR has the smallest revenue and earnings among the parties. (PFOF ¶¶ 442-446.) Moreover, NCR is the sole party taking the lead in the concurrent remediation of the Fox River in Wisconsin, where GP refused to expend a penny for more than half a decade.

3.      GP overstates its alleged cooperated with the government. In the 1950s, 1960s, and 1970s, the Kalamazoo Mills ignored the government's repeated requests and orders to limit their pollution discharges. (PFOF ¶ 449.) While GP has now incurred cleanup costs, GP's actions at the Site cannot in any respect be characterized as cooperative, either in years past or more recently. Indeed, the acts detailed above in derogation of government orders were plainly contrary to law and driven by financial expediency, not cooperation. In addition, numerous submissions by GP's former remediation contractor, Blasland, Bouck & Lee, were rejected by MDEQ as deficient and inconsistent with operative government orders, and, in some cases, rejected as inappropriate advocacy pieces instead of scientific or engineering analysis. (PFOF

¶¶ 450-451.3.) MDEQ's former project manager described an "astonishing lack of cooperation" from GP's contractor at the Site. (PFOF ¶ 450.1.)

    4.    <u>The construction and operation of the landfill operable units by the Kalamazoo Mills fell below all reasonable standards of care</u>. The Mill Parties improperly operated and maintained the landfill operating units and, as a result, caused further PCB contamination in the Kalamazoo River. Photographic evidence demonstrates, for example, that GP created the Willow Boulevard portion of OU2 *in* the Kalamazoo River by continually dumping paper mill waste directly into the River. (PFOF ¶ 457.) The landfill operating units frankly functioned as dumps, and bore none of the hallmarks of carefully engineered landfills.

    <u>Standard allocation analyses support a small share for NCR</u>. Responsibility for NCR's share of GP's past costs can reasonably be determined based on: (i) the amount of expected remediation (dredging or capping) that is attributable to releases of Aroclor 1242 released after January 1, 1969, *i.e.*, just before the period of NCR's arranger liability and (ii) the share of the market for recycled CCP made up of CCP broke or trim generated by NCR's affiliates during the post-1969 period to estimate the *maximum* amount of PCB releases that could potentially be attributed to NCR.[14] Even on this basis, NCR's equitable share of river cleanup costs is for each Work Area:

---

[14] Responsibility for cleanup of the upland portions of the Site (*i.e.*, landfills and former mill properties) can be determined based on Aroclor 1242 discharged through the solid waste of the relevant mills and NCR's market share of recycled CCP during the corresponding period. For the period after January 1, 1969, NCR's share of responsibility for the upland areas is no more than the following: OU1: 2.5%; OU2 (Willow Blvd. portion): 1.8%; OU2 (A-Site portion): 0%; OU3: 1.8%; OU4: .02%. (PFOF ¶¶ 295-299.)

| OU5 Work Area | % of Contamination Volume after Jan. 1, 1969 (Assumed Dredging Remedy) | % of Contamination Area after Jan. 1, 1969 (Assumed Capping Remedy) |
|---|---|---|
| Work Area 1A | .14% | .14% |
| Work Area 1B | .15% | .2% |
| Work Area 2 | .19% | .2% |
| Work Area 3 | .18% | .17% |
| Work Area 4 | .19% | .21% |
| Work Area 5 | .19% | .19% |
| Work Area 6 | .32% | .42% |
| Work Area 7 | .18% | .19% |

NCR's equitable share of cleanup costs for the Site as a whole can also reasonably be determined based on estimates for (i) the amount of Aroclor 1242 discharged by the Kalamazoo Mills after January 1, 1969, estimated by various experts in this litigation, and (ii) NCR's market share of recycled CCP during that time.  Based on these alternative data sets, NCR's equitable share of responsibility ranges between 0.22% and 2% of remediation costs, depending on which expert's estimates are used.[15]  (PFOF ¶¶ 293-310.)

No more than approximately $21.34 million of GP's initially claimed costs are recoverable.  GP seeks past and future costs incurred at the Site in the total amount of $105,532,901.  (PFOF ¶ 460.)  Most of GP's claimed costs, however, are:  (i) barred by the statute of limitations; (ii) barred because they were disclosed too late; (iii) unrecoverable as inconsistent with the NCP; and (iv) subject to offsets based on GP's receipt of settlement proceeds from other parties and settlements with its insurers.

NCR contends that all of GP's claims for past and future costs are time-barred for the reasons set forth in NCR's and IP's Joint Motion for Summary Judgment.  (NCR's and IP's Mem. of Law in Support of Joint Mot. for Summ. J., dated, March 15, 2015 (Dkt. No. 739).)

---

[15] Alternative allocation methodologies that will be presented by Dr. Gordon Rausser demonstrate that NCR's share of costs at the Site and various geographic divisions of the Kalamazoo River are each less than 1%.  (PFOF ¶ 303.)

The Court held that $49.09 million of GP's claimed costs are time-barred  (Opinion and Order,

dated August 12, 2015 (Dkt. No. 787) at 18), and GP has also expressly conceded that an

additional approximately $6 million in costs are time-barred, (GP Mem. of Law in Opp'n to

NCR's and IP's Joint Mot. for Summ. J., dated Apr. 16, 2015, at 23 n.8 (Dkt. No. 761)

("Georgia-Pacific concedes that it is time-barred from recovering costs associated with OU3")).

Of GP's costs remaining following the Court's Order,  NCR believes that $25,699,023 of

claimed past costs under the 1990 AOC are time-barred because the AOC was superseded and

"replaced entirely" by the 2007 SRI/FS ASAOC, which qualifies as an administrative settlement

under *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 775 (6th Cir. 2014), and which

became "effective" on February 21, 2007—outside the three-year statute of limitations,

42 U.S.C. § 9613(g)(3).

GP should not be permitted to recover $1.69 million in claimed costs that were

not timely disclosed in this litigation.  Specifically, GP cannot recover approximately $1.62

million in costs that it claims were incurred pursuant to the 2008 AOC and approximately

$74,000 in costs claimed under the 2007 AOC Termination Order, because these costs were not

disclosed to defendants until after the close of fact discovery.  (PFOF ¶¶ 466-466.2.)  There was

no excusable neglect, particularly in a case with such extensive discovery.

GP should also not be permitted to recover claimed costs that are not necessary

response costs consistent with the NCP.  GP bears the burden of showing that all of the costs it is

seeking in this litigation were necessary and incurred consistent with the NCP.  *City of Detroit v.*

*A.W. Miller, Inc.*, 842 F. Supp. 957, 962 (E.D. Mich. 1994).  Specifically, GP is unable to prove

that $11.6 million of claimed costs relating to the KRSG's 2000 Supplement were necessary,

because the bulk of those costs relate to the KRSG's 2000 Supplement and GP cannot determine

the small fraction that related to other tasks.  (PFOF ¶¶468-468.6)  The evidence instead shows that the Supplement (i) was created outside the scope of the 1990 AOC and was not subject to regulatory oversight, and (ii) was not necessary to either MDEQ's or the EPA's decision-making.  (PFOF ¶¶ 469-470.5.)  GP is also unable to prove that approximately $6.8 million of claimed past costs relating to the Plainwell No. 2 Dam removal action were incurred in substantial compliance with the NCP.  The removal action was improperly conducted as a "time-critical removal action", which is reserved for actions that must be done with less than six months of planning time.  (PFOF ¶ 471.)  The Plainwell No. 2 dam action, however, was contemplated well more than six months before it was executed, and should have been conducted as a "non-time-critical removal action", which would have required GP to prepare an Engineering Evaluation/Cost Analysis and to obtain public comment on the response, both of which GP failed to do.  (PFOF ¶ 471.3.)  Finally, GP is unable to provide sufficient documentation regarding, or has inaccurately accounted for, approximately $2.03 million in claimed costs.[16]  (PFOF ¶ 475.)

   <u>In addition, any costs recoverable by GP in this action must be offset by (i) settlements with various parties and (ii) insurance proceeds concerning the Site, which eliminate altogether GP's claim for past costs</u>.  Specifically, GP's recoverable costs must be offset by at least $1.7 million in settlement proceeds received from other parties in connection with environmental liabilities at the Site.[17]  (PFOF ¶¶ 478-482.)  To avoid a windfall double

---

[16] In addition, approximately $9.8 million of GP's claimed costs are unrecoverable because GP did not provide sufficient proof of payment of those costs.  (PFOF ¶ 477.)

[17] NCR additionally contends that GP's claim must be offset by the equitable value of the claims it settled with other parties concerning liabilities at the Site, and not only the dollar value of the corresponding settlement proceeds. *See Comerica Bank-Detroit v. Allen Indus., Inc.*, 769 F. Supp. 1408, 1415 (E.D. Mich. 1991) (holding that a contribution claimant's settlement with another party reduces the claimant's claim by the settling party's equitable liability—not by the dollar value of the settlement).

recovery, GP's recoverable costs must also be offset by up to $70.82 million of proceeds that GP received from its insurers pursuant to settlement agreements that failed to expressly allocate proceeds to liabilities unrelated to the Site. (PFOF ¶¶ 483-487); *see, e.g.*, *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1206-07 (10th Cir. 2009).

## III.   THE COURT SHOULD CONDUCT THE TRIAL IN A WAY THAT ALLOWS FOR THE MOST FAIR AND EFFICIENT PRESENTATION OF EVIDENCE.

In conducting the trial of this matter, NCR respectfully requests that the Court follow a protocol that will facilitate the fair and effective resolution of the case, by (i) requiring the parties to present their cases based on their procedural posture; (ii) requiring that affirmative testimony be presented before rebuttal testimony; and (iii) allocating time among the parties in a manner that allows them to present their evidence and cross-examine the witnesses against them.

Order of Party Presentations. All parties agree that GP should proceed first with its case in chief. But the Mill Parties appear to contend that NCR should go next, followed by IP and Weyerhaeuser, and despite the fact that all of the Mill Parties have asserted claims or cross-claims against NCR and NCR is purely a defendant vis-à-vis every other party. NCR respectfully requests that the parties should be permitted/required to present their cases based on their procedural posture, *i.e.*, whether they are asserting claims in this action. As the plaintiff, GP should proceed first with its case, followed by IP and Weyerhaeuser, who have asserted counterclaims and cross-claims, and NCR, which is stricly and only a defendant with no affirmative claims, should go last.

NCR should be permitted to proceed last because: (i) all of the other parties have asserted claims against NCR and NCR has no claims pending against the other parties; (ii) the Mill Parties bear the burden of proof as to NCR, whereas NCR has no burden except as to its defenses; (iii) NCR should not be required to put on proof of its defenses before the other parties

have put on proof of the claims to which the defenses relate; (iv) NCR's defenses are common to all the other parties; and (v) permitting NCR to proceed last will promote efficiency in the presentation of evidence.

While the Mill Parties' coordinated effort to pin full responsibility for the clean-up of the Site on NCR would be benefitted by requiring NCR to present its case before all the Mill Parties present their cases against NCR and in the middle of the Mill Parties' collective attacks on NCR, such an approach would turn the regular and fair course of proceeding on its head.

Sequence of Proof. Just as the parties should be permitted/required to present their cases based on respective procedural postures, they should be required to present affirmative testimony before rebuttal testimony, *i.e.*, they should not be permitted to present rebuttal testimony before the testimony allegedly being rebutted.

Pursuant to the Court's Order of November 21, 2013 (Dkt. No. 437), the parties disclosed expert testimony in two steps: they first submitted expert reports on issues as to which they bear the burden of proof; next they submitted rebuttal reports. Some of the parties' experts submitted both opening and rebuttal reports (as well as supplemental reports). While requiring the parties to defer rebuttal testimony until after the testimony of the witness being rebutted will require some witnesses to testify more than once, it makes no sense to require rebuttal testimony before the testimony of the witness whose testimony is being addressed.

Allocation of Trial Time. Based on the approach taken by the Court in Phase I, we expect that the Court intends to allocate the available trial time among the parties for their trial presentations. Insofar as all of the Mill Parties seek to shift all of the cleanup costs to NCR, and the potential cleanup costs could exceed $1 billion (based on an EPA estimate), NCR intends

31

to call a large number of witnesses and present an even larger number of exhibits and deposition testimony excerpts in support of its defenses.  NCR estimates that it will need nine trial days (assuming five hours per trial day) or 45 hours to put on its case in chief, cross-examine the Mill Parties' witnesses, and present rebuttal evidence.  More specifically, NCR estimates that it will need 22 hours to put on its live witnesses, three hours to play/read depositions, and 20 hours to cross-examine the Mill Party witnesses lined up against NCR.

While we recognize that NCR has requested a significant amount of time, NCR cannot fairly defend itself with less time.[18]  This is especially so given the stakes and that each of the Mill Parties intends to offer multiple witnesses criticizing NCR's experts.  Following is a table of only NCR's expected, most-likely live witnesses and the amount of time we believe will be required to present their direct testimony:

---

[18] The Mill Parties have collectively designated 26 expert witnesses for the upcoming trial.

|   | Witness | Subject/Role | Time Required for Direct (mins.) |
|---|---------|--------------|----------------------------------|
| Expert Witnesses |||| 

| | **Witness** | **Subject/Role** | **Time Required for Direct (mins.)** |
|---|---|---|---|
|  | **Expert Witnesses** | | |
| 1 | Kenneth Abraham | Analysis of GP's insurance proceeds | 45 |
| 2 | Grant Allen | Estimates of PCB releases by Kalamazoo Mills | 60 |
| 3 | Elizabeth Anderson | Degree of care | 60 |
| 4 | Robert Barrick | Paper mill wastewater treatment | 60 |
| 5 | John C. Butler, III | Apportionment and cost allocation | 90 |
| 6 | Brad Cornell | Useful product analysis | 30 |
| 7 | Peter Guengerich | Degree of care | 60 |
| 8 | David Hagen | Landfill operations | 60 |
| 9 | Robert Nairn | River modeler | 90 |
| 10 | Gordon Rausser | Cost allocation | 60 |
| 11 | Danny Reible | Geochronological dating of river sediment | 60 |
| 12 | Robert Rock | Accounting analysis of GP's claimed costs | 45 |
| 13 | Gary Scott | Estimates of CCP recycled by Kalamazoo Mills | 60 |
| 14 | Marcia Williams | Degree of care | 150 |
| 15 | Christopher Wittenbrink | Analysis of CCP from NCR affiliates | 60 |
| 16 | Jeff Zelikson | NCP compliance analysis of GP's claimed costs | 45 |
|  | **Fact Witnesses** | | |
| 1 | Mark Brown | Former Sr. Environmental Consultant, GP; Former Sr. VP, Blasland, Bouck & Lee | 30 |
| 2 | Scott Cornelius | Former Kalamazoo River Superfund Site Project Manager, MDEQ | 60 |
| 3 | Frederick Harrison | Former Laboratory Technician, Allied Paper Corp. | 30 |
| 4 | John Hesse | Former Toxic Substances Unit Supervisor, MDNR | 30 |
| 5 | Daniel McIntosh | Former Manager of Technical Services, NCR Corporation | 45 |
| 6 | Edward Gallagher | NCR Corporate Representative | 60 |
| 7 | James Pope | Former Pollution Investigator, Michigan Water Resources Commission | 30 |
| | | **Total Hours** | **22** |

Omitted are witnesses from whom NCR expects to present testimony by deposition video.  Also omitted from this computation of time are deposition excerpts NCR expects to submit by transcript only.[19]

In the event the Court is concerned about the amount of time NCR believes is required for a fair trial of this matter, NCR urges the Court to consider adopting, for at least some witnesses, a trial protocol under which experts would (i) be allowed to adopt their expert reports as their direct testimony; (ii) offer a brief summary of their written opinions; and (iii) submit to cross-examination.  This approach, which has been successfully used in other bench trials (*e.g.*, *CSX Corp. v. The Children's Inv. Fund Mgmt. (UK) LLP*, No. 08 Civ 2764 (S.D.N.Y. 2008) (Kaplan, J.)), allows for an efficient presentation of expert testimony while still permitting the Court to assess in person the witness's credibility.

In any case, we respectfully submit that NCR be permitted to put on the case it has spent years preparing and to cross-examine the witnesses against it.  While NCR is not the only defendant, it is a defendant vis-à-vis every other party.  Despite their acknowledged pollution over decades, and despite the evidence showing their disregard of administrative orders, the Mill Parties seek to hold NCR 100% responsible for the cleanup of the Site, and they are collaborating in this effort to shift blame to NCR.  In a case of this magnitude, considerable trial time is required.[20]

---

[19] NCR expects to introduce considerable deposition testimony into the record.  We propose to present very little of that testimony in court by way of video deposition or reading deposition transcripts in open court.  We expect that the vast majority will be introduced into evidence and be available for citation in post-trial submissions. If the parties are required to read/play deposition testimony in open court, NCR would need considerably more time to present its case.

[20] For the Phase I Trial, the Court allowed 6-7 days to GP; 4 days to NCR; and 4 days to IP.  However, for that Phase of the case, GP was required to prove liability solely for NCR and IP.  Weyerhaeuser stipulated to liability.

Dated:  August 31, 2015

Respectfully submitted,

NCR CORPORATION

/s/ David R. Marriott
David R. Marriott
*Counsel for NCR Corporation*

SIDLEY AUSTIN LLP
John M. Heyde
One South Dearborn Street
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 853-7036
jheyde@sidley.com

MARTEN LAW PLLC
Linda R. Larson
Bradley M. Marten
1191 Second Avenue, Suite 2200
Seattle, Washington 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
llarson@martenlaw.com
bmarten@martenlaw.com

DICKINSON WRIGHT PLLC
Geoffrey A. Fields
200 Ottawa Avenue, N.W., Suite 1000
Grand Rapids, Michigan 49503
Phone: (616) 336-1017
Fax: (616) 458-6753
gfields@dickinsonwright.com

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott
Darin P. McAtee
Yonatan Even
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
dmarriott@cravath.com
dmcatee@cravath.com
yeven@cravath.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 31, 2015, I electronically filed Defendant

NCR Corporation's Phase II Pre-trial Brief using the ECF system, which will send notification of

such filing by operation of the Court's electronic systems.  Parties may access this filing via the

Court's electronic system.


<u>/s/ David R. Marriott</u>
*Counsel for NCR Corporation*