**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**GEORGIA-PACIFIC CONSUMER**          )
**PRODUCTS LP,**                      )
**FORT JAMES CORPORATION, and**       )
**GEORGIA-PACIFIC LLC**               )
                                      )
    **Plaintiffs,**                )
                                      )      **No: 1:11-cv-00483**
    **v.**                        )
                                      )      **Judge Robert J. Jonker**
**NCR CORPORATION,**                  )
**INTERNATIONAL PAPER CO.,**          )
**and WEYERHAEUSER CO.,**             )
                                      )
    **Defendants.**                )

## [PROPOSED] FINAL PRETRIAL ORDER

A final pretrial conference was held on September 3, 2015. Appearing for the parties as counsel were:

**For Plaintiffs Georgia-Pacific Consumer Products, LP, Fort James Corporation and Georgia-Pacific LLC (collectively, "Georgia-Pacific"):**

    Michael R. Shebelskie
    Douglas M. Garrou
    George P. Sibley, III
    Jan M. Conlin
    Peter A. Smit

**For Defendant NCR Corporation ("NCR"):**

    Evan R. Chesler
    David R. Marriott
    John M. Heyde
    Geoff A. Fields

**For Defendant International Paper Co. ("International Paper"):**

    John D. Parker
    Michael D. Meuti
    David W. Centner

**For Defendant Weyerhaeuser Co. :**

> Mark W. Schneider
> J. Christopher Baird
> Scott M. Watson

**1.      Exhibits**

Attached as Exhibit A to this order is a list of the parties' intended trial exhibits.  Any objections to these exhibits are noted.

Pursuant to the Court's order dated August 13, 2014, and in light of the Court's ruling that the "trial record developed during Phase I of trial will be considered a part of the Phase II trial record", the parties have maintained a "continuous exhibit marking system consistent with the Phase I trial system".  (*See* Dkt. No. 541 ¶ 7; *see also* Dkt. No. 530 at 6.)  Exhibit A therefore lists:  (i) all exhibits on the Phase I exhibit list (Dkt. No. 415-1), along with their admitted status, any associated objections from Phase I, and any objections made during the Phase II pretrial process; and (ii) additional exhibits that the parties have listed as trial exhibits for purposes of the Phase II trial and any associated objections.  Georgia-Pacific objects to the use of any exhibit listed in Exhibit A that was not previously offered in Phase I and is now offered for the purpose of contradicting any Phase I finding, including for establishing (a) that NCR is not liable as an arranger under CERCLA, or (b) that International Paper is entitled to assert the "secured creditor" exemption under CERCLA, on grounds including relevance.  NCR objects to the admissibility of any Monsanto Company documents on grounds of relevance to the extent that they are offered to prove NCR knowledge or intent.

Excluded from Exhibit A are:  (i) exhibits expected be used solely for impeachment purposes (*see* Dkt. No. 437 ¶ 9); and (ii) the majority of the parties' intended demonstrative exhibits, which will be provided as separately agreed to by the parties.

The parties note that some exhibits they have identified are lengthy documents, only portions of which will be offered at trial.

## 2. Uncontroverted Facts

The parties stipulate to the following facts for the purpose of Phase II:[1]

### A. The Parties

#### (1) NCR Corporation

1. NCR is a Maryland corporation with its principal place of business in Duluth, Georgia.

2. NCR is currently a global provider of self-service and assisted-service solutions, including automated teller machines (ATMs) and ATM and financial services software, point of sale devices and software, and self-service kiosks and software applications that permit consumers to interact with businesses from their computers or mobile devices in the financial services, retail, hospitality, travel and telecommunications and technology industries.

#### (2) Georgia-Pacific

3. Georgia-Pacific LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. It is the successor to Georgia-Pacific Corporation.

4. Georgia-Pacific LLC is currently one of the world's leading makers of tissue, pulp, paper, packaging, building products and related chemicals.

5. Georgia-Pacific Consumer Products LP and Fort James Corporation are subsidiaries of Georgia-Pacific LLC.

6. Georgia-Pacific, Consumer Products LP and Fort James Corporation are successors to the companies that owned and operated the Sutherland Mill and the Kalamazoo Vegetable Parchment Mill (the "KVP Mill") between 1954 and 1980.

7. Georgia-Pacific Corporation purchased the Hawthorne Mill property in 1978.

#### (3) International Paper Company

8. International Paper is a New York corporation with its principal place of business in Memphis, Tennessee.

---

[1] Where a capitalized term is used in a stipulated fact (such as "Kalamazoo Paper Company Mill"), that term may be defined in a subsequent fact and that definition is intended to apply.

9.     International Paper is currently a paper and packaging company with markets and manufacturing operations in North America, Europe, Latin America, Russia, Asia, Africa and the Middle East.

10.     International Paper is the successor to the St. Regis Paper Company ("St. Regis").

11.     St. Regis is the successor to the Michigan Carton Company, which operated the Fountain Street Mill and the Angell Street Mill between 1954 and 1974. Following its 1974 merger with Michigan Carton Company, St. Regis operated the Fountain Street Mill and the Angell Street Mill through 1980.

### (4)     Weyerhaeuser Company

12.     Weyerhaeuser is a Washington corporation with its principal place of business in Washington State.

13.     Weyerhaeuser is a large manufacturer of wood and specialty cellulose fibers products and an owner of private timberlands.

14.     The Plainwell Mill was owned and operated between 1954 and 1970 by Weyerhaeuser or companies for which Weyerhaeuser assumed liabilities.

### B.     Mills

15.     The following paper mills operated in the Kalamazoo River Valley during some or all of the relevant time period:  (i) the Kalamazoo Paper Company Mill; (ii) the Sutherland Mill (comprised of the "Board Mill" and a second mill known as "Plant 11"); (iii) the Kalamazoo Vegetable Parchment Mill; (iv) the Hawthorne Mill; (v) the Bryant Mill; (vi) the Fountain Street Mill; (vii) the Angell Street Mill; (viii) the MacSimBar Mill; (ix) the Hamilton Mill; (x) the Monarch Mill; (xi) the King Mill; (xii) the Rex Mill; (xiii) the Otsego-Menasha Mill; and (xiv) the National Gypsum Mill (all mills collectively, "Kalamazoo Mills"). Two of the mills, the Fountain Street Mill and the Angell Street Mill, were located outside the boundaries of the Site.

### (1)     Kalamazoo Paper Company

16.     The Kalamazoo Paper Company Mill (the "KPC Mill" or "KPC") was located at or near 2425 King Highway along the Kalamazoo River in Kalamazoo, Michigan, and in Work Area 1B of OU5, between Morrow Dam and the confluence of Portage Creek with the Kalamazoo River.

17.     The KPC Mill was in operation by 1954.  It closed in 2000.

18.     The KPC Mill made fine printing papers between 1954 and 1980.

19.     The KPC Mill recycled waste paper.

20.     The KPC Mill deinked waste paper.

21.     Save-alls were installed on the KPC Mill's paper machines starting in 1950.

22.     Wastewater from the KPC Mill was discharged directly into the Kalamazoo River before 1954.

23.     The KPC Mill installed a primary clarifier for Mill 2 in 1954.

24.     The KPC Mill installed a primary clarifier for Mills 1 and 3 in 1955.

25.     The KPC Mill connected to the Kalamazoo POTW in 1967.  The primary clarifier for Mill 2 was never connected to the Kalamazoo POTW.

26.     The King Highway Landfill is located on the south bank of the Kalamazoo River across from the KPC Mill property.  It is approximately 15 acres in size.

27.     The Willow Boulevard Landfill is located on the south bank of the Kalamazoo River, across from the KPC Mill property, on property owned by Kalamazoo Paper Company and later Georgia-Pacific Corporation.  It is approximately 11 acres in size, and is next to the A-Site Landfill.

### (2)     Sutherland Mill and Plant 11

28.     The Sutherland Mill, also known as the Kalamazoo Board Mill and the Brown Mill, was located at 243 East Paterson Street along the Kalamazoo River in Kalamazoo, Michigan, and in Work Area 1C of OU5, between the confluence of Portage Creek with the Kalamazoo River and the Plainwell Dam.

29.     The Sutherland Mill was in operation by 1954.  It is still in operation.

30.     The Sutherland Mill made paperboard between 1954 and 1980.

31.     The Sutherland Mill recycled waste paper.

32.     From 1975 until 1977, the Sutherland Mill operated a deinking plant that supplied some pulp to the KVP Mill.

33.     The Sutherland Mill was owned by:

•     Sutherland Paper Co. (as of 1954 – 1960)
•     KVP Sutherland Company (1960 – 1966)
•     Brown Company (1966 – 1976)
•     Gulf & Western Corporation, through a controlling interest in Brown Company (1976-1980)
•     James River Paper Company, Inc. (1980 – 1997)
•     Fort James Corporation (1997 – 1999)

34.     The Sutherland Mill installed save-alls on its papermaking machines by 1954.

35.     Wastewater from the Sutherland Mill was discharged directly into the Kalamazoo River before 1954.

36.     The Sutherland Mill installed a primary clarifier in 1954.

37.     The Sutherland Mill connected to the Kalamazoo POTW in 1967.

38.     Papermaking and recycling waste from the Sutherland Mill was deposited at a landfill formerly operated by the KVP Mill.

39.     The companies that owned and operated the Sutherland Mill during the relevant period also owned and operated Plant 11.

40.     Plant 11 was located at 2050 East Michigan Avenue in Kalamazoo, Michigan, and in Work Area 1B of OU5, between Morrow Dam and the confluence of Portage Creek with the Kalamazoo River.

41.     Plant 11 was owned by:

- Sutherland Paper Company (as of 1954 –1960)
- KVP-Sutherland (1960 – 1966)
- Brown Company (1966 – 1976)
- Gulf & Western Corporation, through a controlling interest in Brown Company (1976 – 1980)
- James River Corporation (1980 – 1994)
- L.C. Howard (1994 – and after)

42.     Plant 11 manufactured paperboard between 1954 and 1969.  It thereafter only converted finished paper products.

43.     Plant 11 did not deink waste paper.

44.     Wastewater from Plant 11 was discharged directly into a tributary of the Kalamazoo River until at least 1967.

45.     Plant 11 did not operate any lagoons, landfills or impoundments on-site for papermaking waste.

### (3)     Kalamazoo Vegetable Parchment Mill

46.     The Kalamazoo Vegetable Parchment Mill (the "KVP Mill" or "KVP") was located along the Kalamazoo River in Parchment, Michigan, in Work Area 1C of OU5, between the confluence of Portage Creek with the Kalamazoo River and the Plainwell Dam.

47.     The KVP Mill was in operation by 1954.  It closed in 2000.

48.     The KVP Mill made parchment, waxed papers, and other specialty papers between 1954 and 1980.

49.     The KVP Mill did not recycle waste paper.

50.     The KVP Mill did not deink waste paper.

51.     The KVP Mill was owned by:

- Kalamazoo Vegetable Parchment (KVP) (as of 1954 – 1960)
- KVP-Sutherland Company (1960 – 1966)
- Brown Company (1966 – 1976)
- Gulf & Western Corporation, through a controlling interest in Brown Company (1976 – 1980)
- James River Paper Company, Inc. (1980 – 1995)
- Crown Paper Company, Inc. (1995 – at least 2000)

52.     The KVP Mill had two mills, referred to as Mill 1 and Mill 2.

53.     KVP's Mill 2 had a series of on-site settling lagoons between 1946 and July 1977.

54.     The KVP Mill installed a primary clarifier and a secondary treatment aeration lagoon system in 1977.

55.     Wastewater from KVP's Mill 1 was discharged directly into the Kalamazoo River until 1972.

56.     The KVP Mill never connected to a POTW.

57.     Beginning in the 1950s, the KVP Mill deposited papermaking waste in an on-site landfill known as the Parchment Landfill.  Waste from the Sutherland Mill also was deposited in the Parchment Landfill.

### (4)    Hawthorne Mill

58.     The Hawthorne Mill was located along the Kalamazoo River in Kalamazoo, Michigan, and in Work Area 1B of OU5, between Morrow Dam and the confluence of Portage Creek with the Kalamazoo River.

59.     The Hawthorne Mill was in operation as of 1954.  It closed in or about 1974.

60.     The Hawthorne Mill made fine paper as of 1954 until it closed.

61.     Wastewater from the Hawthorne Mill was directly discharged into the Kalamazoo River before 1954.

62.     The Hawthorne Mill installed a primary clarifier in 1954.

63.     The Hawthorne Mill connected to the Kalamazoo POTW in 1967.

64.     The Hawthorne Mill deposited papermaking waste off-site.

### (5)    Bryant Mill

65.    The Bryant Mill was located along Portage Creek in Kalamazoo, Michigan three miles upstream from Portage Creek's confluence with the Kalamazoo River.

66.    The Bryant Mill recycled waste paper.

67.    The Bryant Mill deinked waste paper.  It stopped deinking in 1971. Its deinking operation was in Mill A.

68.    Wastewater from the Bryant Mill was discharged directly into Portage Creek and the Bryant Mill Pond before 1954.

69.    The Bryant Mill installed a clarifier in 1954.

70.    The Bryant Mill connected to the Kalamazoo POTW in September, 1969.

### (6)    Fountain Street Mill

71.    The Fountain Street Mill is located at 79 East Fountain Street along the Kalamazoo in Battle Creek, Michigan, upstream of Morrow Dam and the Site.

72.    The Fountain Street Mill was in operation as of 1954.  It is still in operation.

73.    The Fountain Street Mill made paperboard between 1954 and 1980.

74.    The Fountain Mill recycled waste paper.

75.    The Fountain Street Mill did not deink wastepaper.

76.    The Fountain Street Mill did not have on-site clarifiers or settling lagoons.

77.    The Fountain Street Mill connected to the Battle Creek POTW by 1960.

### (7)    Angell Street Mill

78.    The Angell Street Mill is located at 177 Angell Street along the Kalamazoo River in Battle Creek, Michigan, upstream of Morrow Dam and the Site.

79.    The Angell Street Mill was in operation as of 1954.  It is still in operation.

80.    The Angell Street Mill made paperboard between 1954 and 1980.

81.    The Angell Street Mill recycled waste paper.

82.    The Angell Street Mill did not deink wastepaper.

83.    The paper machine at the Angell Street Mill had save-alls by 1950.

84.    Wastewater from the Angell Street Mill was discharged directly into the Kalamazoo River before 1959.

85.    The Angell Street Mill never installed clarifiers or settling lagoons.

86.    The Angell Street Mill connected to the Battle Creek POTW no earlier than 1959.

### (8)    MacSimBar Mill

87.    The MacSimBar Mill, also known as the Otsego Mill, was located at 431 Helen Avenue along the Kalamazoo River in Otsego, Michigan, and in Work Area 3 of OU5, between the Otsego Dam and the Otsego City Dam.

88.    The MacSimBar Mill was in operation by 1954.  It closed in or about 2004.

89.    The MacSimBar Mill made paperboard between 1954 and 1980.

90.    The MacSimBar Mill recycled waste paper.

91.    The MacSimBar did not deink wastepaper.

92.    The Waldorf Paper Company merged with Hoerner Boxes, Inc., in 1966 and became the Hoerner-Waldorf Corporation.  International Paper is a successor to Hoerner-Waldorf Corporation.

93.    Wastewater from the MacSimBar Mill was discharged directly into the Kalamazoo River before 1954.

94.    The MacSimBar Mill installed primary clarification in 1954.

95.    The MacSimBar Mill installed a secondary treatment lagoon sometime between 1960 and 1967.

96.    The MacSimBar Mill never connected to a POTW.

### (9)    Plainwell Mill

97.    The Plainwell Mill, also known as the Hamilton Mill, was located at 200 Allegan Street along the Kalamazoo River in Plainwell, Michigan, and in Work Area 1C of OU5, between the confluence of Portage Creek with the Kalamazoo River and the Plainwell Dam.

98.    The Plainwell Mill was in operation by 1954.  It closed in 2000.

99.    The Plainwell Mill made fine paper between 1954 and 1980.

100.    The Plainwell Mill recycled waste paper.

101.    The Plainwell Mill deinked waste paper.  It stopped deinking in January 1963.

102.    Save-alls were installed on all of the Plainwell Mill's papermaking machines by 1966.

103.    Except effluent discharged at certain times from 1947-1952, through a pilot secondary treatment plant on-site, wastewater from the Plainwell Mill was discharged directly into the Kalamazoo River before 1954.

104.    The Plainwell Mill installed a primary clarifier in 1954 and secondary treatment in 1967.

105.    The Plainwell Mill never connected to a POTW.

### (10)    Monarch Mill

106.    The Monarch Mill was located along Portage Creek in Kalamazoo, Michigan.

107.    The Monarch Mill was in operation as of 1954.  It partially shut down from February to November 1957 and entirely shut down from January 1958 through September 1959. It permanently closed in 1980.

108.    The Monarch Mill produced a variety of coated and uncoated papers before 1958. After it reopened in 1959, the Monarch Mill primarily produced carbonizing tissue and book printing paper.

109.    The Monarch Mill deinked waste paper.  It stopped deinking in 1957.

110.    Save-alls were installed on the paper machines at the Monarch Mill by 1957.

111.    Wastewater from the Monarch Mill was discharged directly into Portage Creek above the Bryant Mill Pond before 1953.

112.    The Monarch Mill installed a primary clarifier in 1953.

113.    The Monarch Mill never connected to a POTW.

114.    Effluent from the Monarch Mill clarifier was discharged into Portage Creek above Bryant Mill Pond.

### (11)    King Mill

115.    The King Mill was located at 1608 Lake Street along the Kalamazoo River in Kalamazoo, Michigan, and in Work Area 1B of OU5, between Morrow Dam and the confluence of Portage Creek with the Kalamazoo River.

116.    The King Mill was in operation as of 1954.  It closed in 1971.

117.    The King Mill made fine paper between 1954 and 1971.

118.    The King Mill recycled waste paper.

119.    The King Mill deinked wastepaper.  It stopped deinking in 1965.

120.    Save-alls were installed on the King Mill's paper machines beginning in 1957.

121.    Wastewater from the King Mill was discharged into the Kalamazoo River via the King Street sewer before 1955.

122.    The King Mill installed a primary clarifier in 1955.

123.    The King Mill never connected to a POTW.

124.    A-Site Landfill was located on approximately 22 acres of land on the south bank of the Kalamazoo River, to the east of the Willow Boulevard Landfill.

**(12)    Rex Mill**

125.    The Rex Mill was located along the Kalamazoo River on King Highway next to Comstock Township, Michigan, and in Work Area 1B of OU5, between Morrow Dam and the confluence of Portage Creek with the Kalamazoo River.

126.    The Rex Mill was in operation by 1954.  It closed in 1968.

127.    The Rex Mill made fine papers between 1954 and 1968.

128.    The Rex Mill recycled waste paper.

129.    The Rex Mill deinked wastepaper.

130.    Wastewater from the Rex Mill was discharged directly into the Kalamazoo River before 1954.

131.    The Rex Mill constructed a primary clarifier in 1954.

132.    The Rex Mill connected to the Kalamazoo POTW in 1967.

**(13)    Otsego Falls Mill**

133.    The Otsego Falls Mill was located at 350 North Farmer Street along the Kalamazoo River in Otsego, Michigan, and in Work Area 3 of OU5, between the Otsego Dam and the Otsego City Dam.

134.    The Otsego Falls Mill was in operation by 1954.  It is still in operation.

135.    The Otsego Falls Mill made corrugated paper.

136.    The Otsego Falls Mill recycled waste paper.

137.    Wastewater from the Otsego Falls Mills was discharged directly into the Kalamazoo River before 1953.

138.    Accumulation tanks were installed at the Otsego Falls Mill in 1953.

**(14)    National Gypsum**

139.    The National Gypsum Mill was located at 2305 King Highway along the Kalamazoo River in Kalamazoo Township, Michigan and in Work Area 1B of OU5 between Morrow Dam and the confluence of Portage Creek with the Kalamazoo River.

140.    The National Gypsum Mill was in operation by 1954.  It closed in 1981.

141.    The National Gypsum Mill made liner for gypsum wallboard.

142.    The National Gypsum Mill recycled waste paper.

143.    The National Gypsum Mill did not deink waste paper.

144.    The National Gypsum Mill was owned by the National Gypsum Company as of 1954 to 1981.

145.    Wastewater from the National Gypsum Mill was discharged directly into the Kalamazoo River before installation of a primary clarifier sometime between 1960 and 1967.

146.    The National Gypsum Mill connected to the Kalamazoo POTW in 1967.

**D.    Publicly Owned Treatment Works**

147.    The City of Kalamazoo Publicly Owned Treatment Works (the "POTW") is located along the western bank of the Kalamazoo River downstream from the confluence of Portage Creek with the Kalamazoo River in Kalamazoo, Michigan.

148.    In May 1967, the Kalamazoo POTW began providing secondary treatment.

149.    The Battle Creek POTW is located at 2000 West River Road, Battle Creek, Michigan.

150.    The Battle Creek POTW was in operation by 1954.

151.    The Battle Creek POTW began providing secondary treatment by 1962.

**C.    Carbonless Copy Paper**

**(1)    CCP Manufacturing**

152.    NCR purchased Aroclor 1242 from Monsanto.  NCR used the Aroclor 1242 that it purchased to manufacture emulsion for use in CCP.

153.    NCR shipped the CCP emulsion that it manufactured to three different entities: Appleton Coated Paper Company ("ACPC"), Combined Paper Mills ("CPM"), and Mead Corporation ("Mead") (collectively, the "Coating Companies").

154.    ACPC operated in Appleton, Wisconsin and coated CCP with CCP emulsion from 1953-1971.  ACPC was a separate company from NCR until NCR acquired it on September 30, 1970.

155.    CPM coated CCP with CCP emulsion from December 1969 to 1971 in Combined Locks, Wisconsin.  CPM was a separate company from NCR until NCR acquired it on July 28, 1969.

156.    Mead coated CCP with CCP emulsion at its Chillicothe, Ohio facility from 1955 to 1971.  NCR and Mead have always been independent companies.  NCR is not a corporate successor to Mead.

157.    The Coating Companies used the CCP emulsion that they obtained from NCR to coat paper and to create rolls or sheets of CCP.

158.    Other than the operations known at one time as NCR's Systemedia division, NCR owned or operated no entities that converted CCP.

159.    The Converting Companies processed rolls and sheets of CCP into finished CCP products, such as business forms.

### (2)    Recycling of CCP

160.    Recovered paper is a significant source of fiber in the paper industry.  Some mills use recovered fiber to make paper because it is typically less expensive than virgin fiber and is often readily available.

161.    The following categories of CCP were recycled:  (i) CCP broke, (ii) CCP trim (together with the first category, "pre-consumer CCP"), and (iii) CCP after consumer use ("post-consumer CCP").

162.    The Coating Companies generally generated CCP broke, and the Converting Companies generated CCP trim, although those terms were occasionally used interchangeably to describe pre-consumer CCP.

163.    Both the Coating Companies and Systemedia facilities sold CCP broke and trim to scrap-paper brokers, who, in turn, resold it.

### E.    The Site

164.    EPA proposed to include the Allied Paper, Inc./Portage Creek/Kalamazoo River Site (the "Site") on the National Priorities List (the "NPL") on May 5, 1989, and listed the Site on August 30, 1990.

165.    Polychlorinated biphenyls ("PCBs") are the contaminant of concern at the Site.

166.    The Site is located in Allegan and Kalamazoo Counties, Michigan.  It includes disposal areas, paper mill properties, approximately 80 miles of the Kalamazoo River (from

Morrow Dam to Lake Michigan), adjacent river banks and contiguous floodplains, as well as a three-mile stretch of Portage Creek.

167.    When the Site was originally added to the NPL in 1990, the Michigan Department of Natural Resources, later the Michigan Department of Environmental Quality ("MDEQ") was the lead agency for the remedial investigation at the Site.

168.    The Site has been divided into seven current or former Operable Units (OUs): OU1 (Allied Landfill/Bryant Mill Pond); OU2 (Willow Boulevard/A-Site Landfill); OU3 (King Highway Landfill); OU4 (12th Street Landfill); OU5 (Kalamazoo River and Portage Creek); OU6 (the former KPC and Hawthorne Mill Properties); and OU7 (Plainwell Mill).

169.    EPA has subdivided OU5 into the following seven work areas.

169.1    Area 1:  Kalamazoo River from Morrow Dam downstream to Plainwell Dam as well as the lower portion of Portage Creek;

169.2    Area 2:  Kalamazoo River from Plainwell Dam downstream to the Otsego City Dam;

169.3    Area 3:  Kalamazoo River from Otsego City Dam downstream to Otsego Dam;

169.4    Area 4:  Kalamazoo River from Otsego Dam downstream to Trowbridge Dam;

169.5    Area 5:  Kalamazoo River from Trowbridge Dam downstream to Allegan City Dam;

169.6    Area 6:  Lake Allegan; and

169.7    Area 7:  Kalamazoo River from Allegan Dam downstream to Lake Michigan.

170.    For the purposes of analysis in this litigation, Work Area 1 is subdivided into Area 1A for the stretch of Portage Creek from below the Bryant Mill Dam to Portage Creek's confluence with the Kalamazoo River; Area 1B for the stretch of Kalamazoo River between Morrow Dam and the confluence of Portage Creek with the Kalamazoo River; and Area 1C for the stretch of the Kalamazoo River between the confluence of Portage Creek with the Kalamazoo River and the Plainwell Dam.

**(1)    Allied Landfill/Bryant Mill Pond – OU1**

171.    EPA released a feasibility study for OU1 in January 2015.  EPA has not yet issued a proposed remedial action plan for OU1 or a record of decision selecting a remedy for OU1.

14

### (2)    Willow Boulevard/A-Site Landfill – OU2

172.    OU2 encompasses the Willow Boulevard and A-Site Landfills.

173.    Operation and Maintenance and ongoing monitoring will continue into the future.

### (3)    King Highway Landfill – OU3

174.    OU3 comprises the King Highway Landfill, approximately 7 acres of former dewatering lagoons on former KPC mill site, and the King Street Storm Sewer.

175.    The final remedy for OU3 has been completed.

### (4)    12th Street Landfill – OU4

176.    OU4 comprises the 12th Street Landfill.

### (5)    Kalamazoo River and Portage Creek – OU5

177.    OU5 is made up of approximately 80 miles of the Kalamazoo River (from Morrow Dam to Lake Michigan), adjacent river banks and contiguous floodplains, as well as a three-mile stretch of Portage Creek.

178.    Georgia-Pacific and MHLLC funded removal of PCB-impacted sediments and floodplain soils in the former Plainwell Dam area (the "Plainwell No. 1 TCRA").  The work commenced in 2007 and was completed in 2009.

179.    Georgia-Pacific funded removal of PCB-impacted sediments and floodplain soils in the former Plainwell Dam No. 2 area (the "Plainwell No. 2 TCRA").  The work commenced in 2009 and was completed in 2010.

180.    In 2013, EPA completed a time-critical removal action to remove PCB-impacted sediments in Portage Creek between its confluence with the Kalamazoo River and the Bryant Mill Dam.

181.    EPA has approved the remedial investigation report and feasibility study for Work Area 1 of OU5.

### (6)    Former Plainwell Mill Property – OU7

182.    The Former Plainwell Mill Property (OU7) is a 34-acre mill property located on the west side of the Kalamazoo River upstream from the Plainwell Dam.

### G.    Response Activity

183.    In December 1990, HM Holdings, Inc./Allied Paper Inc., Georgia-Pacific Corporation, and Simpson Plainwell Paper Company formed the Kalamazoo River Study Group (the "KRSG").  Fort James Corporation, another PRP, later joined the KRSG.

15

184.    Simpson Plainwell Paper Company ("Plainwell") is a former PRP at the Site.

### (1)    The 1990 AOC

185.    Effective December 28, 1990, MDNR and the three original members of the KRSG entered into an Administrative Order by Consent (the "1990 AOC").

186.    In October 2000, the KRSG submitted a draft RI/FS for OU5.  In 2002, MDEQ rejected the draft RI/FS.

187.    Effective on September 28, 2007, the 1990 AOC was terminated by an Administrative Order by Consent for Termination (the "2007 Termination AOC") between the State of Michigan (through MDEQ and the Michigan Department of Attorney General ("MDAG")), Georgia-Pacific Corporation, and Millennium Holdings, Inc., as the successor to KRSG member HM Holdings, Inc./Allied Paper, Inc. ("Millennium").

### (2)    The 2000 OU3 AOC

188.    EPA issued a Record of Decision ("ROD") selecting a remedy for OU3 in 1998.

189.    Effective February 8, 2000, Georgia-Pacific Corporation entered into an Administrative Order by Consent for Response Activity (the "2000 OU3 AOC") with MDEQ.

190.    The remedy required by the 2000 OU3 AOC was completed in 2003.  MDEQ issued a Certificate of Completion of Construction on June 26, 2013.

### (3)    The 2005 Consent Decree

191.    Effective February 15, 2005, Weyerhaeuser entered into a Consent Decree with the United States (the "2005 Consent Decree").

192.    In March 2010, EPA approved the final Remedial Design Report for OU4.  The remedial action field work was completed in November 2010, and EPA granted the Certification of Completion of the remedial action on October 1, 2012.  Subject to on-going operations and maintenance, the remedy in OU4 has implemented.

193.    On June 8, 2015, EPA issued its Proposed Plan for the OU7 remedial action.

194.    Under the Consent Decree, in 2007-08, twe Emergency Responses were completed in anticipation of the Plainwell Dam removal.

### (4)    The 2006 OU6 ASAOC

195.    Effective November 20, 2006, Georgia-Pacific LLC entered into an Administrative Settlement Agreement and Order on Consent for a Removal Action (the "2006 OU6 ASAOC") with EPA.

196.    On April 29, 2008, Georgia-Pacific LLC submitted a final completion report, which had been pre-approved by EPA on April 16, 2008.

### (5) The 2007 SRI/FS ASAOC

197.  Effective February 21, 2007, Georgia-Pacific LLC and MHLLC entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study (the "2007 SRI/FS ASAOC") with EPA.

198.  Work under the 2007 SRI/FS ASAOC is ongoing.

### (6) The 2007 Plainwell ASAOC

199.  Also effective February 21, 2007, Georgia-Pacific LLC and MHLLC entered into an Administrative Settlement Agreement and Order on Consent for Removal Action concerning the Plainwell Impoundment (the "2007 Plainwell ASAOC") with EPA.

200.  Georgia-Pacific LLC submitted a final completion report regarding the 2007 Plainwell ASAOC on March 5, 2010, which EPA approved on March 30, 2010.

### (7) The 2009 Plainwell ASAOC

201.  Effective June 8, 2009, Georgia-Pacific LLC  entered into an Administrative Settlement Agreement and Order On Consent for Removal Action concerning the Plainwell No. 2 Dam (the "2009 Plainwell ASAOC") with EPA.

202.  Georgia-Pacific LLC submitted a final completion report on February 25, 2011, which EPA approved on March 1, 2011.

### (8) The 2009 OU2 Consent Decree

203.  MDEQ issued the final OU2 RI/FFS in November 2004.  EPA issued a ROD for OU2 in September 2006.

204.  On September 30, 2009, Georgia-Pacific LLC entered into a Consent Decree for the Design and Implementation of Certain Response Actions at Operable Unit 2 (the "OU2 Consent Decree") with EPA.

### H. Georgia-Pacific Corp.'s Claimed Costs

205.  The summary reflected in TX2617 identifies the costs that Georgia-Pacific seeks to recover from defendants as well as some (but not necessarily all) settlements, judgments and other credits or offsets (other than insurance recoveries) that may offset those costs.

206.  On March 17, 2015, EPA convened a meeting to discuss a proposed time-critical removal action in the Otsego Township portion of OU5.

### 3. Controverted Facts and Unresolved Issues

The factual issues remaining to be determined and issues of law for the Court's

determination are set forth below.

The parties disagree on the appropriate description of the issues to be tried. Alternative descriptions are thus set forth here.

(i)   <u>Georgia-Pacific's Description of the Issues</u>

1.   Whether Georgia-Pacific's past response costs were necessary and consistent with the NCP.

2.   For Georgia-Pacific's response costs that are recoverable under CERCLA § 107, the amount of those costs to be assessed against the Defendants.

3.   For Georgia-Pacific's costs that are recoverable under CERCLA § 113(f):

a.   Whether Georgia-Pacific paid in excess of its fair share of those costs; and

b.   The amount of those costs that should be equitably allocated to the Defendants.

4.   The equitable allocation of responsibility among the parties to this case of response costs incurred in the future.

5.   With respect to affirmative defenses asserted by Defendants:

a.   Whether the amount of past costs that Georgia-Pacific seeks to recover from Defendants in this case should be reduced at all based on Georgia-Pacific's insurance recoveries, and if so, by how much.

b.   Whether the harm at the site is theoretically capable of apportionment on any basis other than geography, and if so, whether there is a reasonable basis to do so.

(ii)   <u>NCR's Description of the Issues</u>

1.   NCR believes the Phase II trial should address only past costs.

2.   The scope of NCR's arranger liability under CERCLA § 107, and NCR's several share of liability, if any, for costs incurred at the Site.

3.   Whether the alleged harm at the Site for which Georgia-Pacific, International Paper and Weyerhaeuser seek to hold NCR responsible under CERCLA § 107 is theoretically capable of apportionment, and whether there is a reasonable basis for apportioning NCR's divisible share.

4.   The equitable allocation of any past or future response costs at the Site for which NCR may be liable, including whether GP has paid costs in excess of its fair share.

5.      Whether the claims asserted against NCR:  are barred by the statute of limitations; seek costs that were necessary and consistent with the National Contingency Plan; are subject to offsets for settlement or insurance; or are barred under the doctrines of estoppel, laches or unclean hands, including Georgia-Pacific's delay in pursuing NCR and prejudice to NCR's defense as a result.

6.      The scope of any declaratory relief under either §§ 107 or 113 of CERCLA, in particular with respect to future costs as to yet to be selected and implemented remedial measures.

(iii)      International Paper's Description of the Issues

1.      As to any past costs that Georgia-Pacific seeks to recover from International Paper, whether those costs are "necessary costs of response incurred consistent with the NCP" within the meaning of Section 107(a) of CERCLA and are subject to offsets and credits or are otherwise not recoverable against International Paper.

2.      As to Georgia-Pacific's claim for past response costs under CERCLA §107:

a.      (i) Whether any alleged harm for which International Paper is liable for the period of St. Regis' ownership of the Bryant Mill is theoretically capable of apportionment, and if so, (ii) whether there is a reasonable basis for apportionment of the harm.

b.      International Paper's several share of any past response costs that Georgia-Pacific is entitled to recover from International Paper; and

c.      The amount of such costs, if any, that International Paper should bear.

3.      As to Georgia-Pacific's claim for past response costs under CERCLA § 113(f):

a.      (i) Whether Georgia-Pacific has paid a share of such costs in excess of its "fair share," and (ii) if so, the amount of such costs, if any, that should be equitably allocated among International Paper and the other defendants;

b.      The equitable allocation of those costs, based on such factors as the Court deems appropriate, which International Paper contends should include, without limitation:

(i)      Georgia-Pacific's delay in pursuing International Paper and prejudice to International Paper's defense as a result;

(ii)      The extent of equitable responsibility, if any, that should be imposed on International Paper, as a successor to St. Regis,

as a CERCLA "owner" for PCBs discharged by Allied in its operation of the Bryant Mill, given St. Regis' lack of control over that Allied's discharges and the limited nature of St. Regis' ownership interest in the Bryant Mill property (both temporally and otherwise);

(iii)    The circumstances that resulted in substantially all of the Aroclor 1242 PCBs discharged as a result of the Bryant Mill's operations being retained in the Bryant Mill pond (and remediated by the 1999 Bryant Mill Pond TCRA); and

(iv)    Payments made by Allied/Millennium to fund Site work until Millennium's 2009 bankruptcy and the additional payment made as part of the bankruptcy in effect represented the "fair share" of any recoverable costs attributable to PCB discharges from the Bryant Mill.

4.    The scope of any declaratory relief under either §§ 107 or 113 of CERCLA, in particular with respect to future costs as to yet to be selected and implemented remedial measures.

(iv)    <u>Weyerhaeuser's Description of the Issues</u>

7.    Whether Georgia-Pacific's past response costs were necessary, consistent with the NCP, barred by the applicable statute of limitations, or otherwise unrecoverable against Weyerhaeuser.

8.    For Georgia-Pacific's past response costs that are recoverable under CERCLA § 107:

a.    Weyerhaeuser's several share of liability, if any, for response costs incurred at the Site; and

b.    The amount of Georgia-Pacific's past response costs that Weyerhaeuser should bear, if any.

9.    For Georgia-Pacific's past response costs that are recoverable under CERCLA § 113(f):

a.    Whether Georgia-Pacific has paid in excess of its fair share of those costs; and, if so,

b.    The amount of Georgia-Pacific's past response costs, if any, that should be equitably allocated to the parties.

20

10.    Whether Georgia-Pacific is entitled to declaratory relief and, if so, what form that relief should take.

**4.    Witnesses**

Attached as Exhibit B are tables listing the non-expert and expert witnesses for each party, the method by which the party expects to offer that testimony, the likelihood that the witness will be called, and any objections to a particular witness being called or designated (other than those raised by motion in limine or other pretrial motions).

**5.    Depositions and Other Discovery Documents**

Attached as Exhibit C are tables that set forth designated prior testimony, counter-designations, counter-counter-designations, and any objections to designated testimony.  By agreement of the parties, any party may offer into evidence testimony that has been designated by any other party to which no objection has been made and sustained.  Georgia-Pacific objects to the use of any deposition designation listed in Exhibit C that was not previously offered in Phase I and is now offered for the purpose of contradicting any Phase I finding, including for establishing (a) that NCR is not liable as an arranger under CERCLA, or (b) that International Paper is entitled to assert the "secured creditor" exemption under CERCLA, on grounds including relevance.

Attached as Exhibit D are tables of designated answers to written discovery, or portions thereof, that are expected to be offered in evidence by the parties.

**6.    Length of Trial**

Georgia-Pacific believes that the trial should take 15 days, assuming 5 hours per day.  Georgia-Pacific believes that to put on its case, cross-examine other witnesses, and present rebuttal evidence, it needs 6 days or 40% of whatever time the Court makes available for trial in

this case.  Georgia-Pacific will state its justification for the time required and its beliefs on the order of defendants in its Trial Brief.

Weyerhaeuser believes that the trial can be completed in 18 days (90 hours). Weyerhaeuser anticipates that it will need 20 hours to put on its case, cross-examine other witnesses, and present rebuttal evidence.  Weyerhaeuser will explain its position in more detail at the final pretrial conference.

International Paper believes that the trial can be completed in 18 days (90 hours). International Paper anticipates that it will need one-quarter of that time, or 22.5 hours, to put on its case, cross-examine other witnesses, and present rebuttal evidence.  International Paper will explain its position in more detail in its Phase II Trial Brief.

Based on the trial time that each party has stated that it needs to put on its case in chief, cross-examine adverse witnesses and present rebuttal evidence, NCR estimates that trial will last approximately five weeks (or 25 trial days (assuming five hours per day) or 125 hours).  NCR estimates it will need nine trial days or 45 hours, for the reasons explained in its trial brief.

### 7. <u>Prospects of Settlement</u>

The parties have engaged in court-ordered settlement negotiations on two separate occasions.  The parties believe that settlement is unlikely.

Dated:  August 31, 2015

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

By:   /s/ Michael R. Shebelskie

Peter A. Smit, Bar No. P 27886
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501
(616) 336-6000

Michael R. Shebelskie
Douglas M. Garrou
George P. Sibley, III
Paul T. Nyffeler
John E. Beerbower
Hunton & Williams LLP
951 East Byrd St.
Richmond, VA 23219
(804) 788-8200

Jan M. Conlin
Mathew R. Korte
Ciresi Conlin LLP
225 S. 6th St.
Suite 4600
Minneapolis, MN  55402
(612) 361-8100

**NCR CORPORATION**

By:_____/s/ David R. Marriott_____


Geoffrey A. Fields
Dickinson Wright PLLC
200 Ottawa Avenue, N.W., Suite 1000
Grand Rapids, Michigan 49503
Phone: (616) 336-1017
Fax: (616) 458-6753
gfields@dickinsonwright.com

Evan R. Chesler
David R. Marriott
Darin P. McAtee
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
dmarriott@cravath.com

John M. Heyde
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 853-7036
jheyde@sidley.com

Linda R. Larson
Bradley M. Marten
Marten Law PLLC
1191 Second Avenue, Suite 2200
Seattle, Washington 98101
Phone: (206) 292-2600
Fax: (206) 292-2601
llarson@martenlaw.com

**INTERNATIONAL PAPER COMPANY**

By:_____/s/ John D. Parker_____

    John D. Parker
    Lora M. Reece
    Michael Dominic Meuti
    BAKER & HOSTETLER LLP
    PNC Center
    1900 E. 19th Street, Suite 3200
    Cleveland, OH 44114
    (216) 621-0200
    Attorneys for International Paper Company
    jparker@bakerlaw.com
    lreece@bakerlaw.com
    mmeuti@bakerlaw.com

    John F. Cermak
    Sonja A. Inglin
    Ryan D. Fischbach
    BAKER & HOSTETLER LLP
    11601 Wilshire Boulevard Suite 1400
    Los Angeles, CA 90025
    (310) 820-8800
    Attorneys for International Paper Company
    jcermak@bakerlaw.com
    singlin@bakerlaw.com
    rfischbach@bakerlaw.com

    And by:

    David W. Centner
    CLARK HILL PLC
    200 Ottawa Ave. NW, Ste. 500
    Grand Rapids, MI 49503
    (616) 608-1106
    Attorneys for International Paper Company
    dcentner@clarkhill.com

**WEYERHAEUSER COMPANY**

By:_____/s/ Mark W. Schneider_____

Mark W. Schneider, WA Bar No. 14105
MWSchneider@perkinscoie.com
J. Christopher Baird, WA Bar No. 38944
JCBaird@perkinscoie.com
Michael L. Dunning, WA Bar No. 29452
MDunning@perkinscoie.com
Margaret C. Hupp, WA Bar No. 43295
MHupp@perkinscoie.com
Aubri N. Margason, WA Bar No. 44220
AMargason@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Douglas A. Dozeman, MI Bar No. P35781
ddozeman@wnj.com
Scott M. Watson, MI Bar No. P70185
swatson@wnj.com
Warner Norcross & Judd, LLP

900 Fifth Third Center
111 Lyon St. N.W.
Grand Rapids, MI 49503-2487
Telephone:  616.752.2000
Facsimile:  616.752.2500

The foregoing Final Pretrial Order is hereby approved and SO ORDERED.


Dated: _____          _____
                                          Robert J. Jonker
                                          United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2015, I electronically filed the foregoing using the ECF system, which will send notification of such filing by operation of the Court's electronic systems. Parties may access this filing via the Court's electronic system.

**GEORGIA-PACIFIC CONSUMER PRODUCTS, LP., FORT JAMES CORPORATION, and GEORGIA-PACIFIC LLC**

By: \_\_\_/s/ Michael R. Shebelskie_____