**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  April 25, 2022

Mr. David William Centner
Clark Hill
200 Ottawa Avenue, N.W., Suite 500
Grand Rapids, MI 49503

Mr. John F. Cermak Jr.
Ms. Sonja Ann Inglin
Cermak & Inglin
12121 Wilshire Boulevard
Room 322
Los Angeles, CA 90025

Mr. Ryan David Fischbach
BakerHostetler
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025

Mr. Douglas M. Garrou
Mr. Jeffrey Pierce Lamberson
Mr. Michael R. Shebelskie
Mr. George Peter Sibley III
Hunton Andrews Kurth
951 E. Byrd Street
Richmond, VA 23219

Ms. Margaret C Hupp
Ms. Kathleen M. O'Sullivan
Mr. Mark William Schneider
Perkins Coie
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099

Mr. John Daniel Parker Jr.
BakerHostetler
1900 E. Ninth Street, Suite 3200
Cleveland, OH 44114-3485

Mr. Peter A. Smit
Varnum
P.O. Box 352
Grand Rapids, MI 49501-0352

Mr. Thomas D. Warren
Warren Terzian
30799 Pinetree Road
Suite 345
Pepper Pike, OH 44124

Mr. Scott M. Watson
Warner Norcross & Judd
150 Ottawa Avenue, N.W.
Suite 1500
Grand Rapids, MI 49503

   Re: Case No. 18-1806, *Georgia-Pacific Consumer Prods., et al v. NCR Corp., et al*
     Originating Case No. : 1:11-cv-00483

Dear Counsel,

 The court today announced its decision in the above-styled case.

 Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

      Yours very truly,

      Deborah S. Hunt, Clerk


      Cathryn Lovely
      Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

GEORGIA-PACIFIC CONSUMER PRODUCTS LP; FORT JAMES CORPORATION; GEORGIA-PACIFIC LLC,

*Plaintiffs-Appellees,*

*v.*

NCR CORPORATION,

*Defendant,*

WEYERHAEUSER COMPANY,

*Defendant-Appellee,*

INTERNATIONAL PAPER COMPANY,

*Defendant-Appellant.*

No. 18-1806

———————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cv-00483—Robert J. Jonker, District Judge.

Argued:  October 28, 2021

Decided and Filed:  April 25, 2022

Before:  MOORE, KETHLEDGE, and DONALD, Circuit Judges.

———————

## COUNSEL

**ARGUED:**  John D. Parker, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellant. Mark W. Schneider, PERKINS COIE LLP, Seattle, Washington, for Appellee Weyerhaeuser Company.  Michael R. Shebelskie, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Georgia-Pacific Appellees.  **ON BRIEF:**  John D. Parker, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellant.  Mark W. Schneider, Kathleen M. O'Sullivan, Margaret Hupp, PERKINS COIE LLP, Seattle, Washington, Scott M. Watson, WARNER NORCROSS & JUDD

LLP, Grand Rapids, Michigan, for Appellee Weyerhaeuser Company.  Michael R. Shebelskie, Douglas M. Garrou, George P. Sibley, III, J. Pierce Lamberson, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, Peter A. Smit, VARNUM LLP, Grand Rapids, Michigan, for Georgia-Pacific Appellees.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge.  Decades of pollution in western Michigan led the EPA to designate the Kalamazoo River and Portage Creek as a high priority for cleanup.  Decades of litigation followed, including many actions filed under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").  In this dispute, two parties found liable on a CERCLA contribution claim raise a statute of limitations defense.  Holding that defense to be meritorious, we **REVERSE** the judgment of the district court.

## I.  BACKGROUND

### A.  The Kalamazoo River

Since the late 1860s, paper mills have dotted the banks of the Kalamazoo River, and its tributary, Portage Creek, in southwestern Michigan.  Elmer B. Hess, *The Kalamazoo Valley Paper Industry*, 69 PROC. OF THE IND. ACAD. OF SCI. 224, 226 (1959).  Kalamazoo presented the ideal location for paper manufacturing, offering ample water and a prime location for nationwide distribution.  *Id.* at 229–34.  Paper played a major role in the region's development:  by 1954, paper mills in Kalamazoo County registered sales of almost $175 million annually and accounted for 17% of the county's total household incomes.  HAROLD T. SMITH, THE POSITION OF THE PAPER INDUSTRY IN THE ECONOMY OF KALAMAZOO COUNTY, MICHIGAN, IN 1954 1 (1958).

This major industry was not to last.  At the end of the twentieth and into the twenty-first century, mills were closing at a rapid pace.  *See, e.g.*, *G-P Set to Dismantle Kalamazoo Mill*, RECYCLING TODAY (Feb. 20, 2001), https://www.recyclingtoday.com/article/-b-g-p-set-to-dismantle-kalamazoo-mill--b-/ ("The area has seen the closing or planned closing of five paper mills since last fall.").

The mills left, but their environmental legacy remained.  In the 1950s, researchers had already started raising concerns over the paper industry's environmental impact on the Kalamazoo River.  SMITH, THE POSITION OF THE PAPER INDUSTRY IN THE ECONOMY OF KALAMAZOO COUNTY 7–8.  That same decade, the river's environmental problems worsened substantially when paper mills undertaking carbonless copy-paper recycling began releasing polychlorinated biphenyls ("PCBs") into the river and surrounding land.  *Damage Assessment, Remediation, and Restoration Program:  Kalamazoo River*, NAT'L OCEANIC & ATMOSPHERIC ADMIN. (last updated Oct. 21, 2021), https://darrp.noaa.gov/hazardous-waste/kalamazoo-river.  PCBs produce a host of negative health effects, including possibly increasing exposed individuals' risk of cancer.  *Polychlorinated Biphenyls (PCBs)*, ILL. DEP'T OF PUB. HEALTH (Feb. 2009), http://www.idph.state.il.us/envhealth/factsheets/polychlorinatedbiphenyls.htm.

The environmental devastation caused by the proliferation of PCBs led the EPA in 1990 to add the Kalamazoo River to the National Priorities List ("NPL"), which identifies the most important Superfund sites.  ENV'T PROT. AGENCY, HISTORIC PRESERVATION AND MIXED-USE SUPERFUND REDEVELOPMENT:  THE PLAINWELL PAPER MILL IN PLAINWELL, MICHIGAN 2 (2014).  Litigation surrounding the contamination of the Kalamazoo River has since spanned decades, *see, e.g.*, *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648 (6th Cir. 2000), and spawned hundreds of millions of dollars in cleanup costs, *see, e.g.*, DEP'T OF JUST., EPA AND JUSTICE DEPARTMENT ANNOUNCE $245 MILLION AGREEMENT FOR CLEANUP AT THE ALLIED PAPER INC./PORTAGE CREEK/KALAMAZOO RIVER SUPERFUND SITE (Dec. 11, 2019).

**B.  Environmental Litigation Regarding the Kalamazoo River**

Today's litigation involves several firms and successors to firms that played a role in the manufacture of paper along the Kalamazoo River and Portage Creek in the mid-twentieth century.  There are four relevant firms in this matter:  International Paper ("IP"), Weyerhaeuser, Georgia-Pacific ("GP"), and NCR Corporation ("NCR").  R. 432 (Phase I Op. at 1) (Page ID #12726).

In 1990, the same year that the EPA added this portion of the Kalamazoo River to the NPL, GP and two other paper companies—HM Holdings, Inc./Allied Paper Inc. and Simpson

Plainwell Paper Company—formed the Kalamazoo River Study Group ("KRSG"),[1] which entered an Administrative Order on Consent ("AOC") with Michigan requiring KRSG to perform a site-wide remedial investigation and feasibility study.  R. 737-1 (1990 AOC) (Page ID #21681–715); *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d 574, 578 (6th Cir. 2004).

In 1995, KRSG initiated a cost-recovery action under CERCLA § 107,[2] amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), seeking response costs from several firms that it alleged had released PCBs into the Kalamazoo River.  R. 741-12 (KRSG Complaint) (Page ID #22142–209).  IP was not one of the named firms.[3]  KRSG sought a declaratory judgment that the defendants were liable for "any response costs that may be incurred by Plaintiff in the future in connection with the Site."  *Id.* at 2 (Page ID #22143).  Two defendants counterclaimed, asserting that the KRSG members were responsible for the PCB contamination at the site.  R. 741-17 (KRSG 1998 Order at 6) (Page ID #22287).  The district court held a trial concerning both sides' claims.  *Id.*  Its opinion, issued in 1998, found the KRSG members—including GP—liable "for the PCB contamination of the [relevant site]."  *Id.* at 10, 12 (Page ID #22291, 22293).  The same opinion also found one defendant—Rockwell—"liab[le] for the release of PCBs to the Site."  *Id.* at 42 (Page ID #22323); *see also Kalamazoo River Study Grp. v. Rockwell Int'l*, 107 F. Supp. 2d 817, 819 (W.D. Mich. 2000).

In its 1998 opinion, the district court found another defendant—Eaton—not liable for any PCB discharges from its Battle Creek facility.  R. 741-17 (KRSG Order at 31) (Page ID #22312).  We reversed the district court's decision as to Eaton's liability, holding that the district court applied the incorrect legal standard.  *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d at 650.  On remand, the district court found that Eaton was liable for the PCB releases at some facilities along the Kalamazoo River, but not others.  *Kalamazoo River Study Grp. v. Eaton*

---

[1] Fort James Corporation, another paper company, later joined the KRSG.

[2] All section references in this opinion are to CERCLA as amended, which appears at 42 U.S.C. § 9601 *et seq.*

[3] The complaint named many entities as defendants:  Eaton Corp.; Rockwell International, Inc.; Benteler Industries, Inc.; Upjohn Co.; Menasha Corp.; Wells Aluminum Corp.; Hercules, Inc.; and Rock-Tenn Co. *Kalamazoo River Study Grp. v. Rockwell Int'l*, 107 F. Supp. 2d 817, 818–19 & n.1 (W.D. Mich. 2000).

*Corp.*, 142 F. Supp. 2d 831, 859 (W.D. Mich. 2001) (finding Eaton liable for PCB releases at Battle Creek and Kalamazoo facilities but not liable at its Marshall facility).

The 1998 KRSG judgment came at the end of the liability phase of the trial between KRSG and the defendants it sued. *Kalamazoo River Study Grp. v. Rockwell Int'l*, 107 F. Supp. 2d at 819. After the 1998 judgment and the Sixth Circuit's partial reversal, the district court proceeded to allocate response costs among the three groups that had been held liable: KRSG, Rockwell, and Eaton. In 2000, the district court declined to allocate any response costs to Rockwell, reaffirming the KRSG members' responsibility for "*the entire cost of response activities relating to* the NPL site" on this stretch of the Kalamazoo River. *Id.* at 840 (emphasis added). We affirmed this decision. *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 274 F.3d 1043 (6th Cir. 2001). In a subsequent decision, the district court held Eaton liable for a small portion of the costs of investigating parts of the NPL site but wrote "that it would not be equitable to require Eaton to share in the remediation of the NPL Site." *Kalamazoo River Study Grp. v. Eaton Corp.*, 258 F. Supp. 2d 736, 760 (W.D. Mich. 2003). We again affirmed. *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d at 578.

To sum up, the federal district court confirmed the KRSG members' liability for remediation costs three times: in 1998, 2000, and 2003.

**C.  Today's Dispute**

Now, we turn to this case. In 2010, GP filed an action under §§ 107(a) and 113(f) against NCR and IP to recover its response costs involving the affected area. R. 1 (Compl.) (Page ID #1–33). GP later amended its complaint to add Weyerhaeuser as a defendant. R. 80 (First Am. Compl.) (Page ID #1202–40). GP argued that IP and Weyerhaeuser were liable under § 107(a)(1) and (2) as successors to companies that owned and operated mills that discharged PCBs, and brought § 113(f) contribution claims against both firms. *Id.* at 28–38 (Page ID #1229–39); R. 1 (Compl. at 26–31) (Page ID #26–31). (Weyerhaeuser itself also owned a mill during the relevant time period.) (R. 80 (First Am. Compl. at 21) (Page ID #1222). GP alleged that NCR faced liability under §§ 107 and 113 because it arranged the disposal of PCB-containing substances at the affected area. R. 1 (Compl. at 20–25) (Page ID #20–25).

Weyerhaeuser, in its answer, did not contest that it owned a PCB-discharging facility at the NPL Site, while reserving the right to contest claims in the litigation and asserting twenty affirmative defenses.  R. 105 (Weyer. Answer at 32, 55–57) (Page ID #1537, 1560–62).  NCR denied liability.  R. 29 (NCR Answer at 2) (Page ID #231).  IP argued that even if its predecessor owned the Bryant Mill ("Mill") while it discharged PCBs, it was nonetheless not liable because it owned the property only as a secured creditor, which would shield it from CERCLA liability if true.  R. 432 (Phase I Op. at 2) (Page ID #12727); § 101(20)(A).

After the first phase of a bifurcated trial, the district court found NCR liable as an "arranger" under CERCLA, and found IP liable as an owner, rejecting IP's claim that it fell within the secured-creditor exception.  R. 432 (Phase I Op. at 3) (Page ID #12728).

After the phase I decision, the defendants (including IP and Weyerhaeuser) moved for summary judgment, arguing inter alia that GP's claims were time-barred under CERCLA.  R. 787 (SJ Op.) (Page ID #24179–97); R. 736 (Weyer. MSJ) (Page ID #21665–78); R. 739 (IP & NCR MSJ) (Page ID #21831–61).  The district court observed that CERCLA imposes a three-year statute of limitations for § 113(f) contribution claims, and that the limitations period begins to run when a party receives a "judgment" in a CERCLA action or enters an "administrative settlement" concerning such an action.  R. 787 (SJ Op. at 10) (Page ID #24188).  The defendants identified four events that may have caused the statute of limitations to begin running:  the 2003 declaratory judgment from the KRSG litigation, described above; the 1990 AOC and a 2007 Order by Consent that modified some of the 1990 AOC's terms; three Administrative Settlement Agreements and Orders on Consent ("ASAOCs") entered into between 2006 and 2007; and a 2009 ASAOC and consent decree.  *Id.* at 10–18 (Page ID #24188–96).

The district court found that the claims concerning the 2006–07 ASAOCs and one sub-claim from the 1990 AOC were time-barred, but that the remaining claims were not.  *Id.* at 18 (Page ID #24196).  The district court's analysis concerning the ASAOCs and the AOC involved determining whether the agreements qualified as "administrative settlements" for CERCLA's purposes, an issue that the parties have not appealed.  *Id.* at 12–18 (Page ID #24190–96).  By contrast, the district court's analysis of the KRSG judgment, at issue in this appeal, concerned "traditional res judicata principles."  *Id.* at 11 (Page ID #24189).

After the lengthy phase II trial, the district court apportioned forty percent of liability to GP, forty percent to NCR, fifteen percent to IP, and five percent to Weyerhaeuser. R. 921 (Phase II Op. at 64) (Page ID #34699). All four parties appealed, but GP, NCR, and Weyerhaeuser dismissed their appeals, leaving IP as the sole appellant. R. 969 (Dismissal of NCR App. at 3) (Page ID #35328) (App. No. 18–1805); R. 971 (Dismissal of Weyer. App. at 3) (Page ID #35333) (App. No. 18–1858); R. 972 (Dismissal of GP App. at 4) (Page ID #35337) (App. No. 18–1818). Weyerhaeuser, however, remained as an appellee in IP's appeal, which is now before us.

Only two issues remain on appeal: whether the 1998, 2000, or 2003 judgments of liability in the KRSG litigation started CERCLA's statute of limitations to run for contribution claims; and whether IP owned the Mill from 1956–66 only as a "secured creditor." The district court answered both in the negative. We reach the first question alone and reverse the district court.

## II. ANALYSIS

CERCLA "promote[s] 'the timely cleanup of hazardous waste sites' and [] ensure[s] that the costs of such cleanup efforts [a]re borne by those responsible for the contamination." *CTS Corp. v. Waldburger*, 573 U.S. 1, 3 (2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)).

CERCLA imposes liability on four types of Potentially Responsible Parties ("PRPs"):

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances . . . at any facility . . ., and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

*§ 107(a)(1)–(4)*.

CERCLA contains several provisions that distribute cleanup costs among the relevant parties. *See Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 762 (6th Cir. 2014). Section 107(a)(4)(B) permits a private party to recover from another the "necessary costs of response incurred by any other person consistent with the national contingency plan."

Section 113(f)(1) creates a contribution right for any party sued under §§ 106 and 107. § 113(f)(1); *Hobart*, 758 F.3d at 762. That section provides:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title [§ 107(a)], during or following any civil action under section 9606 of this title [§ 106] or under section 9607(a) of this title.

§ 113(f)(1). The Supreme Court has held that "contribution" here means the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 138 (2007) (quoting BLACK'S LAW DICTIONARY 353 (8th ed. 2004)). The Court also held that § 113(f) authorizes contribution suits before or after "the establishment of common liability." *Id.* at 138–39. Section 113(f) contribution claims are available only to parties that have first been sued under §§ 106 or 107(a). *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 160–61 (2004).

These two statutory rights under §§ 107 and 113(f) are mutually exclusive, providing causes of action "to persons in different procedural circumstances." *Atl. Rsch. Corp.*, 551 U.S. at 139 (quoting *Consol. Edison of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 99 (2d Cir. 2005)). The Supreme Court explained the difference: "costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f)." *Id.* at 139–40 n.6.

In *Hobart*, we held that "PRPs must proceed under § 113(f) if they meet one of that section's statutory triggers." 758 F.3d at 767. This is because of CERCLA's structure. For one thing, because § 107(a)(4)(B) "likely provides a broader avenue for recovery, and has a longer limitations period than § 113(f)," it provides a more attractive option for PRPs. *Id.* (internal citations omitted). For another, the Supreme Court has held that PRPs may bring actions under

§ 113(f) only when they "demonstrate that certain preconditions [a]re met." *Id.* (citing *Cooper Indus.*, 543 U.S. at 165–66). Putting those two pieces together, we concluded that if a party *may* bring a suit under § 113(f), it *must* do so. *Id.* Otherwise, "[t]here would be no reason to limit § 113(f)'s availability" to parties who have faced §§ 106 or 107 actions as the Court did in *Cooper Industries*, because § 107(a)(4)(B) would always offer a (more attractive) fallback option. *Id.*

Not only do §§ 107 and 113(f) provide different avenues of recovery, but also they provide different statutes of limitations for their different types of actions:

> Cost-recovery actions under § 107(a)(4) must be brought within three years "after completion of the removal action" or "for a remedial action, within [six] years after initiation of physical on-site construction." § 113(g)(2). Actions for contribution under § 113(f), however, must be filed within three years of "(A) the date of judgment in any action under [CERCLA] for recovery of such costs or damages, or (B) the date of an administrative order under [§ 122(g)] (relating to de minimis settlements) or [§ 122(h)] (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages." § 113(g)(3).

*Id.* at 763; *see also RSR Corp. v. Com. Metals Co.*, 496 F.3d 552, 556–58 (6th Cir. 2007).

SARA, which amended CERCLA, contains "legislative history [that] indicates that . . . '[t]he [§ 113(f)] statute of limitations begins to run at the date of judgment for recovery of response costs . . . .'" *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 15 (1st Cir. 2004) (quoting H.R. Rep. No. 99-253, pt. 1, at 79 (1985)). "The statute of limitations, however, is not triggered for costs not contained within the judgment." *Id.*

## A. Statute of Limitations

This appeal requires us to determine whether the declaratory judgment on liability issued in the KRSG litigation commenced the running of CERCLA's statute of limitations. "The principal purpose of [CERCLA's] limitations periods in this setting is to ensure that the responsible parties get to the bargaining—and clean-up—table sooner rather than later." *RSR Corp.*, 496 F.3d at 559 (citing H.R. Rep. No. 99-253, pt. 1, at 80). "[W]e review de novo a district court's grant of summary judgment." *Hobart*, 758 F.3d at 765. Questions of law

regarding whether a complaint was filed outside of the statute of limitations similarly receive de novo review.  *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001).

### 1.  CERCLA's Statute of Limitations

IP argues that GP is time-barred from bringing its contribution claim against IP because of a declaratory judgment issued against GP in 1998.  We agree.

### a.  The Parties' Positions

As noted above, in 1995, KRSG sued several parties under § 107 for recovery of costs related to PCB contamination of the affected area.  R. 741-12 (KRSG Compl.) (Page ID #22142–72).  As a member of KRSG, GP sought a declaratory judgment for "any response costs that may be incurred by Plaintiff in the future in connection with the Site."  *Id.* at 2 (Page ID #22143).  Some defendants counterclaimed, resulting in three separate judgments finding the KRSG members, including GP, liable and responsible parties under § 107 for the PCB contamination at the affected site.  R. 741-17 (KRSG 1998 Order & Partial J. at 12) (Page ID #22293); *Kalamazoo River Study Grp. v. Rockwell Int'l*, 107 F. Supp. 2d at 840 (2000); *Kalamazoo River Study Grp. v. Eaton Corp.*, 258 F. Supp. 2d at 760 (2003).  IP argues that GP's current action filed in 2010 is untimely because these judgments marked the commencement of the three-year statute of limitations period for all contribution actions for the entire cost of cleaning up the site.  IP Br. at 32–33; *see* R. 787 (SJ Op. at 5) (Page ID #24183).

GP argues that these declaratory judgments do not impose recoverable costs or damages, but instead fix only liability; as a result, GP argues, declaratory judgments do not cause the statute of limitations period to begin to run for contribution claims.  GP Br. at 19; *cf. Continental Cas. Co. v. Indian Head Indus., Inc.*, 941 F.3d 828, 835 (6th Cir. 2019) (stating, in the context of claim preclusion, "declaratory judgments are often prefaces to later actions for damages or an injunction.").  But IP argues that the KRSG declaratory judgment in 1998 compelled GP to pay for "the entire cost of response activities relating to the NPL site" on this stretch of the Kalamazoo River.  IP Br. at 32–33 (quoting *Kalamazoo River Study Grp. v. Rockwell Int'l*, 107 F. Supp. 2d at 840).  According to IP, although those costs were not yet fixed, GP's liability

was fixed no later than June 2003, the date of the third district court judgment in the KRSG litigation.  IP Reply Br. at 4.

### b.  The District Court's Reasoning

The district court briefly discussed these arguments in its 2015 opinion, referencing general res judicata principles and citing no CERCLA cases.  R. 787 (SJ Order at 11–12) (Page ID #24189–90).  The district court declined to apply § 113's statute of limitations because doing so would "effectively bar some contribution claims even before they would normally accrue," which it was unwilling to do "in the absence of precedent . . . that would lend support to such an expansive interpretation."  *Id.* at 12 (Page ID #24190).

### c.  Our Analysis

The limitations issue has two complicating factors.  First, IP and Weyerhaeuser were not parties to the KRSG litigation.  GP therefore argues that even if the KRSG litigation did start the statute of limitations to run with regards to some PRP's, it did not do so with regards to IP and Weyerhaeuser.  GP Br. at 17–19.  Second, the 1998 KRSG judgment awarded no specific amount of damages or costs, instead resulting in simply a determination of liability.  *Id.* at 20.  GP argues that this means that the judgment is not an action "for *recovery* of such costs or damages," because the judgment awarded no response costs or damages.  *Id.* at 19 (quoting § 113(g)(3)(A)).

It does not matter for § 113(g)'s purposes whether the particular contribution action is pursued against a party to the liability-assigning judgment, or against a non-party to that judgment.  As we explained in *RSR*, "Rather than focus on *who* settled the cost-recovery action, in short, the statute asks us to focus on *what* was settled."  496 F.3d at 557.  Although we have not directly addressed this issue beyond *RSR*, we believe that § 113(g)'s statute of limitations should bar an action against a nonparty beyond the statutory period.  In *ASARCO LLC v. Shore Terminals LLC*, the Northern District of California noted that CERCLA, by referencing "*any* response costs or damages," "speak[s] of the response costs and damages that were part of the settlement, not whether the settlement involved a specific party."  No. C 11-01384, 2012 WL 2050253, at *5–6 (N.D. Cal. June 6, 2012).  We agree with this reasoning, which matches our

earlier recognition that "[t]he principal purpose of limitations periods in th[e CERCLA] setting is to ensure that the responsible parties get to the bargaining—and clean up—table sooner rather than later." *RSR Corp.*, 496 F.3d at 559.

We next consider whether the 1998 declaratory judgment's bare-bones nature prevented it from beginning the running of § 113(g)(3)(A)'s statute of limitations.

First, the statute's text suggests that a declaratory judgment determining liability starts § 113(g)(3)(A)'s statute of limitations running. Section 113(g)(2) explains that, in any § 107 action (like the one between KRSG and their multiple defendants that produced the initial judgment of liability), "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." § 113(g)(2). Immediately after § 113(g)(2) discusses this "declaratory judgment on liability for *response costs*," § 113(g)(3) provides that "[n]o action for contribution for *any response costs* or damages may be commenced more than 3 years after . . . the date of judgment in any action under this chapter for recovery of *such costs* or damages." § 113(g)(3)(A) (emphasis added). These three italicized references to a judgment for "response costs" strongly suggest that the "declaratory judgment on liability for response costs" mentioned in § 113(g)(2) can also serve as a "judgment in any action under this chapter for recovery of such costs or damages" causing the statute of limitations to begin to run, as described in § 113(g)(3)(A). Because the district court in 1998 issued such a judgment, the statute of limitations started to run on that date.

To bolster this reading, we next look to our precedents. Our caselaw does not indicate whether a bare declaratory judgment begins the running of CERCLA's statute of limitations for contribution claims. We have, however, answered a similar question arising in the context of a nearby CERCLA provision: the statute of limitations that begins to run by entry of a judicially approved settlement. § 113(g)(3)(B). In *RSR Corp. v. Commercial Metals Co.*, RSR had entered a settlement agreement with the government that required RSR to "undertake . . . further response actions to the extent necessary" to clean up a contaminated site. 496 F.3d at 554 (quotation marks omitted). Over three years later, RSR filed a CERCLA contribution action against Commercial Metals, which the district court dismissed on statute-of-limitations grounds.

*Id.* Despite RSR arguing, like GP, that this consent decree did not cover future costs, we affirmed this dismissal, stating that "Because the consent decree established RSR's liability, its contribution action regarding those 'costs' accrued on the date of the consent decree . . . and expired three years later." *Id.* at 558. *RSR* thus established a clear rule for CERCLA's statute of limitations in the settlement context: when a party assumes an obligation to pay response costs, including future costs, the statute of limitations for contribution actions regarding those response costs begins to run. And that is the case even when the specific amount owed in response costs is not yet known, or when all parties who could face contributory liability are not yet identified.

Many of the same factors that *RSR* evaluated in the settlement context also apply in the context of a judgment. For instance, with both settlements and judgments, "The principal purpose of limitations periods in this setting [of CERCLA contribution actions] is to ensure that the responsible parties get to the bargaining—and clean-up—table sooner rather than later." *RSR Corp.*, 496 F.3d at 559 (citing H.R. Rep. No. 99-253, pt. 1, at 80). *RSR* also highlighted a concern that applies here: if the statute of limitations does not begin running at the entry of the settlement/judgment, it is not clear when the limitations period *would* begin running. *See id.* at 557.

Of course, there are important contextual differences between judicially approved settlements and declaratory judgments. The primary one is that of consideration. When a party settles a CERCLA claim with the government, it gains a bargained-for reprieve from future government enforcement actions. This was central to *RSR*'s resolution. RSR had argued that it "could not have resolved its liability to the United States before the completion of the remedial action." *RSR Corp.*, 496 F.3d at 558. We rejected that claim because RSR had promised to assume "*all* liability (vis-à-vis the United States) for future remedial actions" "in exchange for the United States' covenant not to seek further damages." *Id.* RSR opted into a settlement to secure peace for itself; here, GP could not engage in the same economic calculation prior to receiving the declaratory judgment. As a result, we cannot reflexively apply *RSR*'s holding to § 113(g)(3)(A)'s statute of limitations.

We next turn to other circuits' efforts to solve this problem. No circuit has confronted a case concerning the commencement date for the running of the statute of limitations when a

party faces a bare declaratory judgment of liability.  GP points us to several allegedly analogous cases, especially *American Cyanamid Co. v. Capuano*.  In *American Cyanamid*, the First Circuit held that the phrase "such costs or damages" in § 113(g)(3)(A) referred only to "the costs or damages contained in the 'judgment' mentioned" in that subparagraph, not to "any response costs or damages that could arise in the future."  381 F.3d at 13.  *American Cyanamid* concerned a declaratory judgment that had held a party "jointly and severally liable for all future costs of removal or remedial action incurred" by the government at a particular site.  *Id.* at 12.  The First Circuit held that a "declaratory judgment is binding on any subsequent actions to recover response costs or damages, but it is not itself a judgment for the recovery of such costs or damages." *Id.* at 13.

This language, which seems favorable to GP, weakens substantially when placed in context.  *American Cyanamid* involved judgments for two separate types of environmental remediation:  one litigation concerning soil remediation, and a separate investigation concerning groundwater remediation.  381 F.3d at 10–11.  The court had to consider whether a declaratory judgment entered as to soil remediation caused the statute of limitations to begin running as to contribution regarding groundwater remediation.  *Id.* at 12–13; *see also ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1214 (9th Cir. 2015) (distinguishing *American Cyanamid* on these grounds, and rejecting the broad proposition that CERCLA's limitations period does not begin running after a consent decree until costs under that decree "bec[o]me fixed").  Although *American Cyanamid* occasionally uses broader language, this distinction remains crucial: *American Cyanamid* did not deal with a case in which one declaratory judgment purported to assign sitewide liability.[4]

And in *Arconic, Inc. v. APC Investment Co.*, the Ninth Circuit held that a settlement that did not impose "any response costs or remedial obligations" did not cause the limitations period to begin running "merely because it foresaw the remediation of the" affected area.  969 F.3d 945, 952 (9th Cir. 2020).  For two reasons, this case does not cleanly apply:  first, it concerns a

---

[4]To be sure, *American Cyanamid* did endorse the position that, when "there has been no expenditure or fixing of costs for which a PRP may seek contribution," CERCLA's statute of limitations does not begin to run.  381 F.3d at 12 (quotation omitted).  This position, rejected in *ASARCO LLC*, does not bind us, and we think that *RSR*'s language outweighs any persuasive value it may have.

settlement, not a judgment. *Id.* at 951. Second, like *American Cyanamid*, the earlier settlement in *Arconic* did not cover the claims at issue in the later case. *Id.* at 952.

We believe that the soundest course is to apply the rule from *RSR Corp.* and hold that the 1998 bare declaratory judgment caused the limitations period to begin to run. CERCLA aims to bring parties to the clean-up table as soon as possible. *See RSR*, 496 F.3d at 559. CERCLA provides that the limitations period begins to run on "the date of judgment in any action under [CERCLA] for recovery of such [response] costs or damages." § 113(g)(3)(A). Here, the KRSG decision issued in 1998 imposed such response costs or damages, compelling GP as a member of KRSG to pay for "the entire cost of response activities relating to the NPL site," i.e., PCB cleanups on this stretch of the Kalamazoo River. *Kalamazoo River Study Grp. v. Rockwell Int'l*, 107 F. Supp. 2d at 840 (2000). True, GP did not yet have a bill in hand for response costs or damages. But as we held in *RSR*, GP had received the responsibility to pay for "as-yet-unfinished" remedial work. 496 F.3d at 557. The 1998 declaratory judgment on liability therefore started the contribution clock ticking.

As described above, the district court in the KRSG litigation issued three separate declaratory judgments discussing the KRSG members' liability for response costs at the affected site. R. 741-17 (KRSG 1998 Order & Partial J. at 12) (Page ID #22293); *Kalamazoo River Study Grp. v. Rockwell Int'l*, 107 F. Supp. 2d at 840 (2000); *Kalamazoo River Study Grp. v. Eaton Corp.*, 258 F. Supp. 2d at 760 (2003). The district court here understood IP to argue that the third judgment, issued in 2002 and amended in 2003, caused the statute of limitations to begin to run. R. 787 (SJ Op. at 11) (Page ID #24189). At one point, the district court seemingly endorsed this position itself. *Id.* at 5 (Page ID #24183) ("In 2003, the district court in that case entered judgment holding the [KRSG] liable for all past and future remediation costs associated with the [site].").

We read IP as arguing that the 1998 judgment started the statute of limitations. In IP's motion for summary judgment, it argued that the 1998 judgment "h[eld] GP liable for past and future response costs pursuant to the defendants' §§ 107 and 113 counterclaims." R. 739 (IP MSJ at 18) (Page ID #21853). IP also wrote that by 2010, "more than 12 years" had passed since the first § 107 judgment against GP. *Id.* at 18–19 (Page ID #21853–54). IP seems to

maintain this position on appeal, arguing that "the court in the KRSG Litigation found GP *liable* on Eaton's and Rockwell's §§ 107 and 113 counterclaims for *all past and future* response costs" in 1998.  IP Br. at 32.  *But see* IP Br. at 33 (calling its statute-of-limitations argument "consistent with what the district court found in this case—namely, that in 2003, the court in the KRSG litigation" found GP, as a member of KRSG, liable for all past and future remediation costs at the site).

We agree with IP's conclusion, and conclude that the 1998 judgment caused the statute of limitations to begin to run.  First, and most importantly, the 1998 order provides that "judgment as to liability is entered . . . against Plaintiff KRSG on Defendants' counterclaims."  R. 741-17 (1998 Order at 1) (Page ID #22281).  The 2000 and 2003 judgments simply allocated liability owed by various defendants and did not affect the KRSG members' already-fixed liability.  Additionally, we have previously suggested, albeit obliquely, that the 1998 judgment assigned liability.  *Kalamazoo River Study Grp. v. Rockwell Int'l*, 274 F.3d at 1046 ("At the liability stage [in 1998] . . . [t]he district court determined that the KRSG and Rockwell had both released a sufficient amount of PCBs to face liability . . . .").

We note, however, that in this case it does not matter which judgment caused the statute of limitations to begin to run, because each of the judgments identified by IP and the district court issued more than three years before GP brought this action in 2010.

Because the 1998 KRSG judgment caused the statute of limitations to begin to run, the three-year statute-of-limitations period concluded before GP filed its 2010 action, and we must dismiss GP's action on limitations grounds.

## 2.  The Statute of Limitations' Application to Weyerhaeuser

We next address whether the dismissal of GP's contribution action against IP also requires dismissal of the action against Weyerhaeuser, even though Weyerhaeuser dismissed its own appeal from the judgment in this matter.  We conclude that § 113(g)(3) also bars the contribution claim against Weyerhaeuser.

Weyerhaeuser makes two arguments.  First, it argues that time bars apply to all similarly situated defendants when the plaintiff had notice of the issue.  Second, it argues that it raised the statute of limitations defense early in the litigation.  We find both arguments compelling.

We apply time bars to all similarly situated defendants so long as the plaintiff was "on notice that, to survive summary judgment, it had to come forward with evidence showing that the statute of limitations did not bar its [] claims." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 407 (6th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)) (dismissing claim on statute-of-limitations ground even with respect to defendant who did not raise statute-of-limitations defense); *see also Thomas v. Mahoning Cnty. Jail*, No. 16-3495, 2017 WL 3597428, at *2 (6th Cir. Mar. 21, 2017) (order) (dismissing claim on statute-of-limitations ground when other movants advanced the defense).  Here, IP and NCR moved for summary judgment on statute-of-limitations grounds, citing inter alia the 1998 KRSG judgment.  R. 739 (Mem. of Law of NCR & IP re: MSJ) (Page ID #21831–61).[5]  This put GP on notice that it needed to refute the statute-of-limitations argument to survive summary judgment.  *See* R. 761 (GP Resp. re: Statute-of-Limitations MSJ at 11–18) (Page ID #23857–64).  Because Weyerhaeuser is in the same factual position as IP for purposes of the statute-of-limitations issue, and because IP raised the issue and gave GP an opportunity to respond before the district court, the time bar applies to GP's claims against Weyerhaeuser as well.

Additionally, Weyerhaeuser may benefit from today's statute-of-limitations ruling because Weyerhaeuser raised a statute-of-limitations defense, albeit briefly.  Weyerhaeuser's answer included 20 affirmative defenses, one of which read, "GP's claims are barred in whole or in part by the applicable statutes of limitations or waiver."  R. 105 (Weyer. Answer, Affirmative Defenses, Countercl., and Cross-Cls. in Resp. to GP's First Am. Compl. at 56) (Page ID #1561).  And later in the 2010 litigation, in 2013, GP and Weyerhaeuser entered a stipulation that did "not limit the rights of each party to litigate any other issues."  R. 369 (Order Granting Revised Stip. on Phase I CERCLA Liab. at 3) (Page ID #9012).  Weyerhaeuser argues that its brief invocation

---

[5]Weyerhaeuser's Motion for Summary Judgment on statute-of-limitations grounds concerned two ASAOCs that GP and another KRSG member entered with the EPA in 2007.  R. 736 (Weyer. MSJ) (Page ID #21665–78).

of the statute of limitations sufficed to put GP on notice of the issue.  Weyer. Br. at 40.  We agree.  *See Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 546–47 (6th Cir. 2012).

For those two reasons, CERCLA's statute of limitations applies to GP's claim against Weyerhaeuser.

### 3.  GP's § 107 Claim

GP separately argues that, even if IP is correct and GP's § 113 contribution claims are barred by the 1998 KRSG judgment, it can still prevail on some of its other claims, which it has brought under § 107.  Our decision today does not affect GP's § 107(a) claims that fall outside of the 1998 KRSG judgment's broad scope.

As discussed above, *Hobart* analyzed the interplay between §§ 107 and 113, concluding that "if a party is able to bring a contribution action, it must do so under § 113(f), rather than § 107(a)."  748 F.3d at 767.  Section 107(a) provides the avenue for parties who incur costs on their own, and § 113(f) is the statutory tool to recover contribution for costs imposed via settlement or judgment.  *Id.* at 762.  And, as we concluded above, the 1998 KRSG judgment started § 113(g)(3)(A)'s statute of limitations running and established GP's right to seek contribution "for the PCB contamination of the NPL site."  R. 741-17 (1998 Order at 12) (Page ID #22293).

GP notes, correctly, that a party with a contribution claim under § 113(f) for costs from one judgment may later bring a § 107(a) claim for costs not contained within the judgment that led to the § 113(f) claim.  GP Br. at 24.  But as IP notes, and as we have already discussed, the 1998 KRSG judgment had a broad scope, covering "the costs of response activities for the NPL Site."  R. 741-17 (1998 Order at 12) (Page ID #22293); IP Reply at 12–13.  GP may bring § 107(a) claims for costs that fall outside of that judgment, but the judgment's breadth suggests that identifying such costs will prove difficult in practice.

GP therefore cannot pursue its § 107(a) claims for any costs that fall within the scope of the 1998 KRSG judgment.

**B.  Secured-Creditor Exception**

Because we conclude that the statute of limitations on GP's contribution claim has run, we need not address IP's arguments concerning whether CERCLA's secured-creditor exception applies.

### III.  CONCLUSION

When the district court entered the 1998 declaratory judgment, CERCLA's statute of limitations for contribution claims began running.  Because the district court here did not enforce that statute of limitations, we **REVERSE** its judgment and **REMAND** for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 18-1806

GEORGIA-PACIFIC CONSUMER PRODUCTS LP; FORT
JAMES CORPORATION; GEORGIA-PACIFIC LLC,

     Plaintiffs - Appellees,

    v.

NCR CORPORATION,

    Defendant,

WEYERHAEUSER COMPANY,

    Defendant - Appellee,

INTERNATIONAL PAPER COMPANY,

    Defendant - Appellant.

> **FILED**
> Apr 25, 2022
> DEBORAH S. HUNT, Clerk

Before:  MOORE, KETHLEDGE, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk